**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| COAKLEY PENDERGRASS; TRIANA ARNOLD JAMES; ELLIOTT HENNINGTON; ROBERT RICHARDS; JENS RUECKERT; and OJUAN GLAZE, | CIVIL ACTION FILE NO. 1:21-CV-05339-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; ANH LE, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board, | |
| Defendants.[*] | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

_____

[*] Pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs have automatically substituted Edward Lindsey, in his official capacity, for Rebecca N. Sullivan, in her official capacity, based on Defendants' representation in their recently filed status report. *See* Defs.' Status Report 2 n.1, ECF No. 31.

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

BACKGROUND .................................................................2

LEGAL STANDARD..........................................................4

ARGUMENT ....................................................................5

    I.    Plaintiffs are substantially likely to prove that SB 2EX violates Section 2 of the Voting Rights Act. ...................................................5

        A.    *Gingles* One: An additional, compact majority-Black district can be drawn in the western Atlanta metropolitan area. ..................6

        B.    *Gingles* Two: Black Georgians are politically cohesive............7

        C.    *Gingles* Three: White Georgians engage in bloc voting to defeat Black-preferred candidates. ........................................................9

        D.    Under the totality of circumstances, SB 2EX denies Black voters equal opportunity to elect their preferred candidates to Congress. ..............................................................................................11

            1.    Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination. ...........................12

            2.    Senate Factor Two: Georgia voters are racially polarized. ......................................................................15

            3.    Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.................................16

            4.    Senate Factor Four: Georgia has no history of candidate slating for congressional elections.................................17

5.    Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process..17

6.    Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns. ...................20

7.    Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts. ..............................................21

8.    Senate Factor Eight: Georgia is not responsive to its Black residents. .........................................................................22

9.    Senate Factor Nine: The justification for the new congressional map is tenuous. .......................................23

II.    Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction. ....................................................................24

III.    The balance of equities and the public interest favor injunctive relief. .............................................................................................24

CONCLUSION .....................................................................................25

## INTRODUCTION

This case calls for a straightforward application of Section 2 of the Voting Rights Act—no more, no less. Georgia has a Black population sufficiently large and geographically compact to create an additional majority-Black congressional district in the western Atlanta metropolitan area, which can be drawn without reducing the total number of congressional districts in the newly enacted map in which Black voters have the opportunity to elect their candidates of choice. Rather than draw this district as required by federal law, the Georgia General Assembly instead chose to dilute the votes of Black Georgians by engaging in textbook examples of "packing" and "cracking." The new congressional map packs Black voters into the Thirteenth Congressional District and cracks others among the rural-reaching, predominantly white Third, Eleventh, and Fourteenth Congressional Districts. Consequently, Georgia's new congressional districts—combined with the state's extreme racially polarized voting, severe socioeconomic disparities between Black and white Georgians, and the ongoing effects of a tragic history of discrimination and racial appeals in campaigns—deny Black Georgians equal access to the political process in violation of Section 2.

Without this Court's intervention prior to the 2022 elections, Georgia will subject its Black citizens, including Plaintiffs, to an unlawful congressional

districting plan and irreparably violate their fundamental right to vote. Because Plaintiffs are highly likely to succeed on the merits of their Section 2 claim, they respectfully request that the Court preliminarily enjoin implementation of Georgia's enacted congressional map and ensure the creation of an additional majority-Black district in the western Atlanta metropolitan area.

## BACKGROUND

Over the past decade, Georgia's population increased by more than 1 million people—growth that was entirely attributable to an increase in the state's minority population. *See* Ex. 1 ¶¶ 13–14 & Fig. 1.[1] While Georgia's white population has decreased since 2010, its Black population grew by over 15 percent and now comprises 33 percent of the state's total population. *Id.* ¶¶ 15–17, 21–22 & Fig. 3. The growth of Georgia's Black population has been particularly pronounced in the Atlanta metropolitan area, where more than 60 percent of the state's Black community now resides. *Id.* ¶¶ 24–32 & Figs. 4–5.

Notwithstanding the significant increases in Georgia's minority communities, the General Assembly enacted a new congressional districting plan that limits the ability of Georgians of color—Black Georgians in particular—to participate equally

---

[1] The exhibits are attached to the Declaration of Kevin J. Hamilton, filed concurrently with this motion.

in the political process. The Georgia Assembly passed the Georgia Congressional Redistricting Act of 2021 ("SB 2EX") with a party-line vote in the Georgia State Senate and a near-party-line vote in the Georgia House of Representatives. *See* Exs. 11–12. SB 2EX proceeded through the legislative process in only six days; the speed with which the General Assembly enacted the maps was criticized by legislators and Georgia voters alike, who objected to the limited time for consideration and the lack of transparency. *See* Exs. 11–14. Governor Brian Kemp signed SB 2EX into law at approximately 5:00 p.m. on December 30, 2021; as *The Atlanta Journal-Constitution* noted, "[w]hile there was never a doubt that Kemp would sign the redistricting bills, he waited over a month since they passed the General Assembly. The delay stalled legal action until the new maps were written into state law." Ex. 15.

SB 2EX subverts fair representation for Black Georgians by packing and cracking Black voters in the western Atlanta metropolitan area. The new congressional map packs the region's Black voters into the Thirteenth Congressional District, which includes significant Black populations in south Fulton, north Fayette, Douglas, and Cobb Counties. The remaining Black communities in Douglas and Cobb Counties are cracked among the Third, Eleventh, and Fourteenth Congressional Districts—predominantly white districts that stretch into the rural

reaches of western and northern Georgia. As a result, while the Thirteenth Congressional District has a Black voting-age population greater than 66 percent, the Third, Eleventh, and Fourteenth Congressional Districts have Black voting-age populations between 14 and 24 percent, *see* Ex. 1 ¶ 51 & Fig. 9—meaning that Black voters in these latter districts have no opportunity to elect their candidates of choice to the U.S. House of Representatives.

Plaintiffs are Black citizens of Georgia and registered voters who face personal harm to their voting rights because of SB 2EX, which dilutes their votes by packing and cracking members of their community among multiple congressional districts and thus prevents them from electing their representatives of choice. *See* Exs. 5–10. Plaintiffs filed their complaint only hours after Governor Kemp signed SB 2EX into law. *See* Compl., ECF No. 1. The need for expedition is significant in this case: under Georgia law, the candidate qualification period for the 2022 congressional elections begins on March 7, 2022. *See* O.C.G.A. § 21-2-132(d)(2); *see also* Ex. 16. Absent relief from this Court, the 2022 congressional elections will be held under an unlawful map.

**LEGAL STANDARD**

"A preliminary injunction may be entered when a plaintiff establishes four elements: '(1) a substantial likelihood of success on the merits; (2) a substantial

threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Friedenberg v. Sch. Bd.*, 911 F.3d 1084, 1090 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)).

## ARGUMENT

### I.    Plaintiffs are substantially likely to prove that SB 2EX violates Section 2 of the Voting Rights Act.

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

To prevail on their Section 2 claim, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51

(1986). Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the nine factors identified in the Senate report that accompanied the 1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44.

### A.  *Gingles* One: An additional, compact majority-Black district can be drawn in the western Atlanta metropolitan area.

Plaintiffs readily satisfy the first *Gingles* precondition because it is possible to "creat[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) (plurality op.) ("*LULAC*") (quoting *De Grandy*, 512 U.S. at 1008). The numerosity requirement of this precondition involves a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.).

Expert demographer William Cooper has offered an illustrative plan that unequivocally satisfies the first *Gingles* precondition, demonstrating that the Black community in the western Atlanta metropolitan area is sufficiently large and geographically compact to comprise more than 50 percent of the voting-age

population in an additional congressional district. *See* Ex. 1 ¶¶ 10, 42, 47 & Fig. 8, 51 & Fig. 9. Notably, compared to the enacted plan and congressional plans nationwide, Mr. Cooper's plan scores in the same range of average compactness. *Id.* ¶¶ 53–54 & Fig.10. It also complies with other traditional redistricting principles, including population equality, contiguity, maintaining political boundaries and communities of interest, and avoiding pairing of incumbents, *see id.* ¶¶ 47–49 & Fig. 8, 55–58 & Fig. 11—all of which were guidelines adopted by the General Assembly during this redistricting cycle. *See* Ex. 17.

Moreover, Dr. Maxwell Palmer confirmed that Black voters would be able to elect their preferred candidates in Mr. Cooper's illustrative majority-Black district. In the proposed district, Black-preferred candidates would have won all 31 statewide races from 2012 through 2021, with an average of 66.7 percent of the vote. *See* Ex. 2 ¶¶ 22–23. Plaintiffs therefore satisfy the first *Gingles* precondition. *See Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (first *Gingles* factor requires "an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate").

## B.     *Gingles* Two: Black Georgians are politically cohesive.

Plaintiffs also satisfy the second *Gingles* precondition because Black voters in Georgia are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends

to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68.

Dr. Palmer analyzed political cohesion and racially polarized voting in a focus area composed of the four congressional districts from which Mr. Cooper's illustrative majority-Black district was drawn—the Third, Eleventh, Thirteenth, and Fourteenth Congressional Districts. *See* Ex. 2 ¶ 9. To perform his analysis, Dr. Palmer used precinct-level election results and voter turnout by race as compiled by the State of Georgia and a widely accepted methodology called ecological inference analysis. *See id.* ¶¶ 10, 12–13; *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018) (recognizing ecological inference as "the 'gold standard' for use in racial bloc voting analyses"), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *accord Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *29 n.27 (M.D. Ala. Feb. 5, 2020).

Dr. Palmer found "strong evidence of racially polarized voting across the focus area" and "in each of the four individual congressional districts" that comprise it, concluding that "Black voters are extremely cohesive." Ex. 2 ¶¶ 6, 15. In the 31 electoral contests between 2012 and 2021 that he analyzed, Dr. Palmer reported that Black Georgians in the focus area voted as a bloc for the same candidates with an

average of *98.5 percent* of the vote. *Id.* ¶¶ 14–15. The same holds true for the elections in each of the four individual congressional districts: "[o]n average, Black voters supported their candidates of choice with 97.2% of the vote in CD 3, 96.0% in CD 11, 99.0% in CD 13, and 95.5% in CD 14." *Id.* ¶ 18. Plaintiffs therefore satisfy the second *Gingles* precondition. *See* 478 U.S. at 56 (noting that "[a] showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim").[2]

### C.   *Gingles* **Three: White Georgians engage in bloc voting to defeat Black-preferred candidates.**

Finally, Plaintiffs satisfy the third *Gingles* precondition because, in the area where Mr. Cooper proposes a new majority-Black district, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51.

Dr. Palmer found high levels of white bloc voting in opposition to the candidates whom Black voters cohesively supported. In the same 31 elections

---

[2] Dr. Palmer's results confirm federal caselaw recognizing that Black voters in various parts of Georgia vote cohesively. *See, e.g.*, *Wright*, 301 F. Supp. 3d at 1313 (noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same candidate"); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1329 (N.D. Ga. 2012) ("Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting black candidates.").

between 2012 and 2021 discussed above, white voters in the focus area overwhelmingly opposed Black voters' candidates of choice: an average of only 11.5 percent of white voters supported Black-preferred candidates, and in no election did white support exceed 16 percent. Ex. 2 ¶¶ 6, 16. Accordingly, "Black-preferred candidates are largely unable to win elections in the focus area. Across an analysis of 31 statewide elections from 2012 to 2021, the Black-preferred candidate lost every election in the focus area." *Id.* ¶ 7. The same is true when analyzing the elections on a district-by-district basis: Black-preferred candidates were defeated in every election in the Third, Eleventh, and Fourteenth Congressional Districts, with Black-preferred candidates prevailing only in the Thirteenth Congressional District, where Black voters comprise a majority. *Id.* ¶¶ 7, 21. In short, Black voters' candidates of choice are consistently defeated in the focus area by white bloc voting, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition. *See* 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.").[3]

_____

[3] Once again, these results are consistent with previous cases from across the state. *See, e.g.*, *Whitest v. Crisp Cnty. Bd. of Educ.*, No. 1:17-CV-109 (LAG), 2021 WL 4483802, at *3 (M.D. Ga. Aug. 20, 2021) ("African Americans in Crisp County are politically cohesive in elections for members of the Board of Education, but the

**D.**     **Under the totality of circumstances, SB 2EX denies Black voters equal opportunity to elect their preferred candidates to Congress.**

Considering the "totality of circumstances," SB 2EX denies Black Georgians an equal opportunity to elect their preferred congressional representatives. 52 U.S.C. § 10301(b). Notably, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of the circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This is not an unusual case.

The factors outlined in the Senate Judiciary Committee report accompanying the 1982 Voting Rights Act amendments—the "Senate Factors"—are "typically relevant to a § 2 claim" and guide this analysis. *LULAC*, 548 U.S. at 426; *see also Gingles*, 478 U.S. at 36–37 (listing Senate Factors). They are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a

---

white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education."), *appeal docketed sub nom. Postell v. Crisp Cnty. Sch. Dist.*, No. 21-13268 (11th Cir. Sept. 21, 2021); *Wright*, 301 F. Supp. 3d at 1317 (finding that "[t]he third *Gingles* factor is satisfied" after concluding that "there can be no doubt black and white voters consistently prefer different candidates" and that "white voters are usually able to the defeat the candidate preferred by African Americans").

majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29 (1982)).

Here, each of the relevant Senate Factors confirms that the congressional map enacted by SB 2EX denies Black voters equal electoral opportunities.

### 1. Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination.

"Georgia electoral history is marked by too many occasions where the State, through its elected officials, enacted discriminatory measures designed to minimize black voting strength." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1572 (S.D. Ga. 1994); *see also, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021), ECF No. 636 (taking judicial notice of fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting"). As the Eleventh Circuit has similarly acknowledged, "[t]he voting strength of blacks has historically been diminished in Georgia in numerous ways, including property ownership requirements, literacy tests, and the use of the county unit system which undermined the voting power of counties with large black populations." *Brooks v. Miller*, 158 F.3d 1230, 1233 (11th Cir. 1998). These discriminatory actions have evolved over the years, but they have persisted. As a result of the centuries-long effort to marginalize and disenfranchise Black Georgians, they still lack equal access to the state's political processes today.

As described in detail in the attached expert report of Dr. Orville Vernon Burton, Georgia's history features a sordid and recurring pattern: after periods of increased nonwhite voter registration and turnout, the State finds methods to disfranchise and reduce the influence of minority voters. Ex. 3 at 2, 8–9. Since Reconstruction, these tactics have included poll taxes, a white-only primary system, majority-vote requirements, and at-large districts. *See id.* at 2–3, 9–32.

While the passage of the Voting Rights Act changed Georgia's trajectory, it did not stop the State from attempting to prevent the exercise of Black political power. *See id.* at 32–40. Between 1965 and 1980, nearly *30 percent* of the Department of Justice's objections to voting-related changes under Section 5 were attributable to Georgia alone. *Id.* at 2–3, 36–37. When Congress reauthorized the Voting Rights Act in 1982, it specifically cited systemic abuses by Georgia officials intended to obstruct Black voting rights. *Id.* at 39–40.

Georgia's discrimination has also extended to its redistricting efforts. Even after the county-unit system was invalidated, the state's districting maps have been plagued by vote dilution and racial discrimination. Federal courts invalidated Georgia's redistricting plans for voting rights violations several times. *See Georgia v. United States*, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 of Voting Rights Act in part because it

diluted Black vote in Atlanta-based congressional district to ensure election of white candidate); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (per curiam) (three-judge panel) (invalidating state legislative plans that reduced number of majority-minority districts). And for four decades in a row, the Department of Justice objected to reapportionment plans submitted by Georgia because the maps diluted Black voting strength. *See* Ex. 3 at 37–38, 40–41; *see also, e.g.*, Ex. 18 (1992 objection letter from Department of Justice asserting that "the submitted [congressional] plan minimizes the electoral potential of large concentrations of black population in several areas of the state"); Ex. 19 (1982 objection letter from Department of Justice asserting that "the proposed [congressional] plan divides an apparently cohesive black community of Fulton and DeKalb Counties").

Ultimately, as this Court has noted, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,

950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) (quoting *Brooks*, 848 F. Supp. at 1560),

*aff'd in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015). But

racial discrimination in voting is not consigned to history books; efforts to dilute the

political power of Black Georgians persist today. During the past decade—and after

the U.S. Supreme Court effectively barred enforcement of the Section 5 preclearance

requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013)—Georgia has slashed

polling places by the hundreds, primarily in Black communities; increased voter

purges and challenges against minority voters; and launched state-sponsored

investigations of minority voting groups. *See* Ex. 3 at 40–53. Georgia's efforts to

discriminate against Black voters has simply not stopped.

### 2.    Senate Factor Two: Georgia voters are racially polarized.

Courts have repeatedly found that voting in Georgia is racially polarized. *See,*

*e.g.*, *Fayette Cnty.*, 775 F.3d at 1340 (noting that Fayette County "[v]oters' candidate

preferences in general elections were racially polarized"); *Ga. State Conf. of NAACP*

*v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (three-judge panel)

(concluding that "voting in Georgia is highly racially polarized"); *Wright*, 301 F.

Supp. 3d at 1319 (finding "Sumter County's voters to be highly polarized"). These

findings were confirmed in the focus area by Dr. Palmer's analysis discussed above,

*see supra* Sections I.B–C, which concluded that there is "strong evidence of racially

polarized voting across the focus area" and "in each of the four individual congressional districts" that comprise it. Ex. 2 ¶ 6.

### 3. Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.

As discussed above, Georgia has employed a variety of voting practices that have discriminated against Black voters. *See supra* Section I.D.1; Ex. 3 (describing Georgia's use of majority-vote requirements, at-large districts, numbered posts, and other discriminatory tactics). In particular, even though the U.S. Supreme Court has specifically explained that the use of majority-vote requirements is meaningful evidence of ongoing efforts to discriminate against minority voters, *see Gingles*, 478 U.S. at 45, Georgia continues to impose a majority-vote requirement in general elections, including for elections to the U.S. House of Representatives. *See* Ex. 3 at 31, 35; O.C.G.A. § 21-2-501. The combination of a majority-vote requirement and racially polarized voting ensures that Black voters cannot elect candidates of their choice when they are a minority of a jurisdiction's population, even when the white vote is split. *See* Ex. 3 at 31, 35; *see also City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (describing how such circumstances "permanently foreclose a black candidate from being elected").

### 4. Senate Factor Four: Georgia has no history of candidate slating for congressional elections.

Because Georgia's congressional elections do not use a slating process, this factor has no relevance to Plaintiffs' claim.

### 5. Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process.

Georgia's Black community continues to suffer as a result of the state's history of discrimination. The findings of previous courts, *see, e.g.*, *Wright*, 301 F. Supp. 3d at 1320–21, have been confirmed by Dr. Loren Collingwood. He concluded that, "[o]n every metric, Black Georgians are disadvantaged socioeconomically relative to non-Hispanic White Georgians," disparities that "have an adverse effect on the ability of Black Georgians to participate in the political process, as measured by voter turnout and other forms of political participation." Ex. 4 at 3. While "the burden is not on the plaintiffs to prove" that these disparities are "causing reduced political participation," *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984), Dr. Collingwood has concluded that this is in fact the case, explaining that "[t]he data show a significant relationship between turnout and disparities in health, employment, and education; as health, education, and employment outcomes increase, so does voter turnout in a material way." Ex. 4 at 3.

The disparities and disadvantages experienced by Black Georgians impact nearly every aspect of daily life:

- "The unemployment rate among Black Georgians (8.7%) is nearly double that of White Georgians (4.4%)." *Id.* at 4.

- "White households are twice as likely as Black households to report an annual income above $100,000." *Id.*

- Black Georgians are more than twice as likely as white Georgians to live below the poverty line—and Black children more than *three times* as likely. *Id.*

- Black Georgians are nearly three times more likely than White Georgians to receive SNAP benefits. *Id.*

- Black adults are more likely than white adults to lack a high school diploma—13.3 percent as compared to 9.4 percent. *Id.*

- Thirty-five percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24 percent of Black Georgians over the age of 25. *Id.*

Ultimately, Dr. Collingwood concluded that "the numbers convey consistent racial disparities across economics, health, employment, and education"—disparities that "hold across nearly every county in the state." *Id.* at 4–5.

The evidence strongly suggests that the socioeconomic disparities imposed on Black Georgians impacts their levels of political participation. As Dr. Collingwood explained, "[t]here is vast literature in political science that demonstrates a strong and consistent link between socio-economic status [] and voter turnout. In general, voters with higher income and education are disproportionately likely to vote and participate in American politics." *Id.* at 6. This pattern can certainly be seen in Georgia. Dr. Collingwood found that, in elections between 2010 and 2020, Black Georgians consistently turned out to vote at lower rates than white Georgians—a gap of at least 3.1 percent (during the 2012 general election) that reached its peak of 12.6 percent during the 2020 general election. *Id.* at 6–7. This trend can be seen at the local level as well: during each general election, white voters exceeded the turnout rates of Black voters in all but a handful of Georgia's 159 counties, and of 1,957 precincts analyzed, white voters had higher rates of turnout in 79.2 percent of precincts. *See id.* 7–12. Voter turnout in the Atlanta metropolitan area "is very similar to the overall Georgia trend." *Id.* at 12–14.

Comparing rates of Black voter turnout with educational attainment, Dr. Collingwood found that "each 10 percentage-point increase in the size of the Black population without a high school degree decreases Black turnout by 3.5 percentage points" and that "Black turnout rises 2.3 percentage points for each 10 percentage-

point increase in percent Black 4-year degree." *Id.* at 14–15. The pattern holds between voter turnout and poverty: "Black turnout falls 4.9 percentage points for each 10 percentage-point increase in percent Black below the poverty line," *id.* at 16, confirming the link between socioeconomic disadvantage and depressed political participation.[4]

### 6.     Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns.

Federal courts have found evidence of racial appeals being deployed in Georgia political campaigns, *see, e.g.*, *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997), and evidence of such appeals abounds even today.

As recounted in Plaintiffs' complaint, *see* Compl. ¶¶ 56–67, and reported by local, state, and national news outlets, *see* Exs. 20–31, the past five years have seen frequent racial appeals in campaigns, targeting minority candidates with derogatory language, racist tropes, and dog-whistle insinuations. The examples described in these articles are just the most recent types of racially charged political campaigns

---

[4] This effect extends beyond voter turnout: Dr. Collingwood further found that white Georgians are more likely than Black Georgians to participate in a range of political activities, including attending local meetings, demonstrating political participation through lawn signs and bumper stickers, working on campaigns, attending protests and demonstrations, contacting public officials, and donating money to campaigns and political causes. Ex. 4 at 17–21.

that have tainted elections in Georgia throughout the state's history—and, indeed, continue to taint the state's political process today.

> **7.  Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.**

As a consequence of Georgia's history of voter suppression and racial discrimination, Black Georgians have struggled to win election to public office.

At the time of the Voting Rights Act's passage, Black Georgians constituted 34 percent of the voting-age population, and yet the state had only *three* elected Black officials. Ex. 3 at 32. By 1980, Black Georgians comprised only 3 percent of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. *Id.* at 38–39. That particular trend has not changed: while more Black Georgians have been elected in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. In the most recent General Assembly elections, for example, none of the House's Black members was elected from a district where white voters exceeded 55 percent of the voting-age population, and none of the State Senate's Black members was elected from a district where white voters exceeded 47 percent of the voting-age population. *See id.* at 53–54. Overall, although Black Georgians comprise 33 percent of the state's population, the Georgia Legislative Black Caucus has only 14 members in the State Senate—25

percent of that chamber—and 41 members in the House—less than 23 percent of that chamber. *See* Ex. 32. In early 2021, one news outlet reported that Georgia had a total of only 66 Black legislators—less than 28 percent of the General Assembly. *See* Ex. 33; *see also* Ex. 34.

Black officials have been underrepresented across Georgia's statewide offices as well. Including the incumbent, the state has had 77 governors, none of whom has been Black. *See* Exs. 35–36. Most recently, former House Minority Leader Abrams lost to Governor Kemp in the 2018 gubernatorial election. And although Georgia recently elected a Black U.S. senator, Senator Warnock is the *first* Black Georgian to hold that office—after more than 230 years of white senators. *See* Ex. 37.

In many areas of Georgia—including the focus area at issue in this case—racially polarized voting continues to obstruct Black candidates' election to office. Indeed, in the past ten years, *no* Black-preferred candidate in a statewide election garnered a majority of votes in the focus area at issue in this case. *See* Ex. 2 ¶ 21.

### 8.    Senate Factor Eight: Georgia is not responsive to its Black residents.

Although the Eleventh Circuit has noted that "[u]nresponsiveness is considerably less important under" a Section 2 results claim, *see Marengo Cnty. Comm'n*, 731 F.2d at 1572, it is nonetheless true that Georgia has long neglected the needs of its Black residents. On numerous issues, the State has refused to take actions

that would have demonstrably bettered the lives—and thus increased the political power—of its Black community. To give some examples of these ongoing disparities, Black Georgians are more than twice as likely as white Georgians to be denied unemployment benefits. *See* Ex. 38. The pregnancy-related mortality rate for Black women in Georgia is more than three times the rate for white women. *See* Ex. 39. And despite this and the other disparities in health care and outcomes between Black and white Georgians, *see supra* Section I.D.5, Georgia's decision to forego Medicaid expansion has left hundreds of thousands of Georgians without health insurance because they earn too much to qualify for Medicaid but too little to qualify for health insurance subsidies—an estimated 60 percent of whom are Black or Hispanic. *See* Ex. 40. On these issues, as with those discussed above, the State has refused to take responsive steps to meet the needs of—and remedy the ills borne by—Georgia's Black community.

### 9. Senate Factor Nine: The justification for the new congressional map is tenuous.

Finally, no legitimate governmental interest justifies denying Black Georgians the ability to elect candidates of their choice. SB 2EX was met with resounding opposition from Black voters and legislators across the state, resulting in this suit and others. *See* Exs. 41–42. The map-drawers and advocates of SB 2EX did not and cannot justify the refusal to draw an additional majority-Black congressional district

in the western Atlanta metropolitan area. Nor could they: drawing districts to account for the numerosity and compactness of Georgia's Black community, including in this case's focus area, is required by the Voting Rights Act.

## II.   Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction.

Plaintiffs are likely to suffer irreparable harm absent preliminary injunctive relief. The candidate qualification period for the 2022 congressional elections is scheduled to begin on March 7, 2022, with the primary election following on May 24. *See* O.C.G.A. § 21-2-132(d)(2); Exs. 16, 43. If this deadline and the elections that follow occur under SB 2EX's unlawful congressional map, then Black Georgians' voting rights will be unlawfully diluted—a violation of their fundamental rights for which there is no adequate remedy. "[O]nce the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Accordingly, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *Id.* (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)).

## III.   The balance of equities and the public interest favor injunctive relief.

The balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), also

strongly favor injunctive relief. As the Eleventh Circuit and this Court have recognized, the "cautious protection of . . . franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348–49 (N.D. Ga. 2015) ("[T]he public interest is best served by ensuring not simply that more voters have a chance to vote but ensuring that all citizens . . . have an equal opportunity to elect the representatives of their choice."). And the public interest would most certainly be disserved by an election conducted under an unlawful districting scheme. *See Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004) (per curiam) (three-judge panel).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court preliminarily enjoin implementation of SB 2EX and ensure the creation of an additional majority-Black congressional district in the western Atlanta metropolitan area. Plaintiffs further request that the Court expedite its consideration of this motion, including the scheduling of any hearings, to ensure that necessary remedies are timely adopted and a lawful congressional map is in place before the deadlines for this year's midterm elections.

Dated: January 12, 2022

Respectfully submitted,

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com


Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law


Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law


*Counsel for Plaintiffs*

*Admitted *pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: January 12, 2022

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: January 12, 2022

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*