# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| COAKLEY PENDERGRASS; TRIANA ARNOLD JAMES; ELLIOTT HENNINGTON; ROBERT RICHARDS; JENS RUECKERT; and OJUAN GLAZE, | CIVIL ACTION FILE NO. 1:21-CV-05339-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; ANH LE, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board, | |
| Defendants.* | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

* Pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs have automatically substituted Edward Lindsey, in his official capacity, for Rebecca N. Sullivan, in her official capacity, based on Defendants' representation in their status report of January 11, 2022. *See* Defs.' Status Report 2 n.1, ECF No. 31.

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................2

    I.      Plaintiffs are substantially likely to succeed in showing that Georgia's new congressional map violates Section 2............................................2

          A.     Plaintiffs have shown that a compact majority-Black congressional district can be drawn in the western Atlanta metropolitan area........................................................................2

          B.     Plaintiffs have shown that voting in Georgia is racially polarized. ....................................................................................8

          C.     Plaintiffs have shown that the Senate Factors weigh in their favor. .........................................................................11

          D.     Defendants misapply the test for proportionality. ....................15

    II.     The remaining preliminary injunction factors weigh in favor of relief. ....................................................................................17

CONCLUSION ......................................................................................20

## INTRODUCTION

After final enactment of Georgia's new congressional map was delayed to stymie any legal challenges ahead of the 2022 midterm elections, Defendants now assert that there is no time to remedy a violation of federal law—even though election day is more than *nine months* away. Defendants cannot manufacture arbitrary deadlines to forestall relief for Georgia's Black voters. And hollow appeals to administrative convenience cannot trump "[t]he law that confronted one of this country's most enduring wrongs; pledged to give every American, of every race, an equal chance to participate in our democracy; and now stands as the crucial tool to achieve that goal." *Brnovich v. DNC*, 141 S. Ct. 2321, 2373 (2021) (Kagan, J., dissenting).

Rather than seriously contest Plaintiffs' case, Defendants mischaracterize applicable legal standards and quibble with (but neither refute nor even undermine) the evidence Plaintiffs have submitted in support of their claim. Once Defendants' distortions are corrected, the Court is left with one conclusion: Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim. And because the equities favor a lawful congressional map—which the Georgia General Assembly or this Court can readily adopt well in advance of election day—a preliminary injunction should be issued.

## ARGUMENT

**I.    Plaintiffs are substantially likely to succeed in showing that Georgia's new congressional map violates Section 2.**

Contrary to Defendants' assertions, *see* Defs.' Resp. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n"), ECF No. 40, Plaintiffs are likely to prove—and, indeed, have already proven—that the Georgia Congressional Redistricting Act of 2021 ("SB 2EX") violates Section 2 of the Voting Rights Act of 1965.[1]

### A.    Plaintiffs have shown that a compact majority-Black congressional district can be drawn in the western Atlanta metropolitan area.

To satisfy the first *Gingles* precondition, Plaintiffs must show that the Black population in the western Atlanta metropolitan area is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). William S. Cooper's illustrative plan demonstrates that this requirement is easily satisfied here. *See* Ex. 1 ¶¶ 42–51.[2]

In response, Defendants first suggest that Plaintiffs have failed to demonstrate compactness because "they must demonstrate connections between the disparate

---

[1] Defendants maintain that this Court lacks jurisdiction to grant relief. *See* Opp'n 25. Plaintiffs incorporate by reference their arguments that only a single-judge district court can hear their purely statutory claim and that Section 2 confers a private right of action. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss, ECF No. 39.

[2] Unless otherwise noted, exhibits are attached to the Declaration of Kevin J. Hamilton, filed concurrently with Plaintiffs' motion. *See* ECF No. 34.

geographic communities they unite that go beyond race." Opp'n 10–11. But Plaintiffs have done precisely what is required of them: "show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998); *see also LULAC v. Perry*, 548 U.S. 399, 433 (2006) ("While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." (cleaned up) (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997))).

Mr. Cooper's illustrative majority-Black district has been drawn consistent with traditional redistricting principles such as "compactness, contiguity, and respect for political subdivisions," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), which were also criteria adopted by the General Assembly to guide its own redistricting efforts. *See* Ex. 17. Defendants try to dispute whether Mr. Cooper's illustrative map satisfies these criteria, *see* Opp'n 7, but "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles," *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000), and an illustrative plan can be accepted even if it is "far from perfect." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018) ("*Wright I*"),

*aff'd*, 979 F.3d 1282 (11th Cir. 2020) ("*Wright II*"). Mr. Cooper's illustrative plan, which only marginally deviates from SB 2EX in terms of the relevant criteria, more than adequately satisfies traditional redistricting principles and is therefore sufficiently compact for purposes of the first *Gingles* precondition. *See* Ex. 1 ¶¶ 43–46, 53–58; Second Declaration of Kevin J. Hamilton ("Second Hamilton Decl."), Ex. 1 ¶ 3.[3]

Defendants further claim that "Plaintiffs cannot succeed because their illustrative plan is not a proper remedy." Opp'n 11–14. Their arguments do not hold up under scrutiny. Though Defendants fault Plaintiffs' illustrative plan for "not defer[ring] to the legislature's policy choices for the majority of districts in Georgia," noting in particular that Mr. Cooper's illustrative plan "maintains far fewer district cores from the existing 2012 congressional plan, including placing less than 5% of the prior District 6 into the new District 6," *id.* at 7, 12, they cite no authority holding that an existing map must be scrupulously preserved when remedying a Section 2 violation. Nor would such a requirement make sense; under Section 2, Plaintiffs are *required* to demonstrate that the State could have created a new majority-Black district that does not currently exist, so they can hardly be

---

[3] The Second Declaration of Kevin J. Hamilton and accompanying exhibits will be filed concurrently with this reply.

faulted for failing to maintain the same district configurations that they claim are unlawful. Moreover, preservation of previous districts was not a criterion adopted by the General Assembly, *see* Ex. 17, and even if it were, "an interest in core retention cannot trump compliance with the [Voting Rights Act]." *Chestnut v. Merrill*, 446 F. Supp. 3d 908, 919 (N.D. Ala. 2020).[4]

Plaintiffs' proposed map *does*, incidentally, respect a critical policy choice made by the General Assembly: it ensures that Georgia's congressional map "compl[ies] with Section 2 of the Voting Rights Act of 1965," just as the legislature intended. Ex. 17. And Mr. Cooper's illustrative map accomplishes this goal while limiting the number of enacted districts that must be redrawn. *See* Ex. 1 ¶ 11; Second Hamilton Decl., Ex. 1 ¶ 4.

Finally, Defendants suggest that "the boundaries of the districts [in] the illustrative plan are 'unexplainable other than on the basis of race,' which is

---

[4] Defendants cite *Wise v. Lipscomb*, 437 U.S. 535 (1978) (plurality op.), to suggest that federal courts cannot redraw congressional maps when remedying Section 2 violations. *See* Opp'n 12. But *Wise* counseled legislative deference when drawing remedial maps, not when scrutinizing enacted maps. *See* 437 U.S. at 540 ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure . . . ."). And even then, the *Wise* Court acknowledged that "when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so," judicial redistricting is appropriate. *Id.*

unconstitutional." Opp'n 13 (quoting *Miller v. Johnson*, 515 U.S. 900, 910 (1995)). Defendants are wrong as a matter of fact and as a matter of law. Factually, Mr. Cooper's illustrative map is not "based predominantly on race"; his proposed districts "are compact; they are contiguous; and they respect precinct borders," *Davis*, 139 F.3d at 1425, which "serve[s] to defeat a claim that a district has been gerrymandered on racial lines." *Shaw*, 509 U.S. at 647. That race was a factor in Mr. Cooper's map-drawing is not impermissible, but inevitable: as the Eleventh Circuit has explained, "we *require* plaintiffs to show that it is possible to draw majority-minority voting districts." *Davis*, 139 F.3d at 1426. Indeed, "[t]o penalize [Plaintiffs] . . . for attempting to make the very showing that *Gingles*, *Nipper* [*v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc)], and *SCLC* [*of Ala. v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc),] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id.* at 1425; *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1344–45 (N.D. Ga. 2015) (rejecting same argument Defendants offer here).

As a legal matter, Defendants misapply the racial gerrymandering standard to this Section 2 case. The Eleventh Circuit has expressly rejected Defendants' "attempt to apply authorities such as *Miller* to [a] Section Two case, . . . because the

*Miller* and *Gingles/Nipper/SCLC* lines address very different contexts." *Davis*, 139 F.3d at 1425.

Even if the racial gerrymandering doctrine could be applied to Plaintiffs' Section 2 claim—it cannot—and even if race predominated over other factors in the illustrative plan—it does not—"a district created to comply with § 2 that uses race as the predominant factor in drawing district lines may survive strict scrutiny." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1305 (N.D. Ga. 2013), *aff'd in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Miller*, 515 U.S. at 916, 920 (applying strict scrutiny to racial gerrymandering claims and requiring that such maps be "narrowly tailored to achieve a compelling interest"); *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) ("As in previous cases . . . the Court assumes, without deciding, that the State's interest in complying with the Voting Rights Act was compelling."); Ex. 17 ("All plans adopted by the [House Legislative and Congressional Reapportionment] Committee will comply with Section 2 of the Voting Rights Act of 1965, as amended."). In this context, narrow tailoring does not "require an exact connection between the means and ends of redistricting," but rather just "'*good reasons*' to draft a district in which race predominated over traditional districting criteria." *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1064 (M.D.

7

Ala. 2017) (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). Compliance with the Voting Rights Act is an indisputably "good reason" to draw a district that considers race, and therefore Plaintiffs' illustrative plan—which remedies vote dilution under Section 2—would satisfy the requirements of strict scrutiny against a hypothetical racial gerrymandering claim.

**B.     Plaintiffs have shown that voting in Georgia is racially polarized.**

Defendants question the findings of Dr. Maxwell Palmer—who clearly demonstrated that Black Georgians are politically cohesive, that white Georgians engage in bloc voting to defeat Black-preferred candidates, and that voting in Georgia is racially polarized, *see* Pls' Mem. of Law in Supp. of Mot. for Prelim. Inj. 7–10, 15–16, ECF No. 32-1; Ex. 2—by suggesting that "partisanship explains the polarization better than race." Opp'n 14–16.

Defendants once again try to move the goalposts. The Eleventh Circuit has never held that Section 2 requires a determination that voters are motivated by race when evaluating the existence of racially polarized voting. In fact, it has indicated the *opposite*, reversing a district court's insistence that a Section 2 plaintiff "indicate that race was an overriding or primary consideration in the election of a candidate." *City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1556 (11th Cir. 1987). In so doing, the court reiterated the *Gingles* plurality position on this issue:

"racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." *Id.* at 1557 (quoting *Gingles*, 478 U.S. at 74); *see also Gingles*, 478 U.S. at 73 ("All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations."). Thus, "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *Carrollton Branch of NAACP*, 829 F.2d at 1557–58 (quoting *Gingles*, 478 U.S. at 74).[5]

At any rate, even under Defendants' theory of Section 2, it would be *their* burden to "affirmatively prove . . . that racial bias does *not* play a major role in the political community." *Nipper*, 39 F.3d at 1524–26 & nn.60, 64 (op. of Tjoflat, C.J.) (emphasis added) (quoting *Solomon v. Liberty County*, 899 F.2d 1012, 1034 (11th

---

[5] Defendants cite *Solomon v. Liberty County Commissioners*, 221 F.3d 1218 (11th Cir. 2000) (en banc), to support their argument that proof of causation is needed as part of the racially polarized voting inquiry. But the district court decision that the en banc Eleventh Circuit affirmed concluded that Section 2 liability is *not* dependent upon the subjective thoughts of voters. *See Solomon v. Liberty County*, 957 F. Supp. 1522, 1543 (N.D. Fla. 1997) ("[T]he presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under Section 2."). Moreover, aside from the single-sentence dictum Defendants cite, the Eleventh Circuit's decision did not discuss any causation requirement for the racially polarized voting analysis; rather, it focused on Senate Factors Seven (minority candidate success) and Nine (tenuousness of the policy at issue).

Cir. 1990) (en banc) (Tjoflat, C.J., specially concurring)).[6] Defendants have fallen woefully short of meeting that burden. Their only evidence is the simple observation that "[t]he support of Black voters for candidates in every race [Dr. Palmer] analyzes are virtually identical," which "holds true for every general election Republican versus Democratic matchup Dr. Palmer analyzed, regardless of the race of the candidate." Opp'n 14. But this phenomenon is just as consistent with *racially* polarized voting as *politically* polarized voting. The mere existence of a partisan divide would reveal nothing about *why* Black and white voters support candidates from different parties. At most, "Defendants have raised an interesting possibility that partisanship, not race," is causing Georgia's racially polarized voting; but that is not enough to meet their burden. *Ga. State Conf. of NAACP*, 118 F. Supp. 3d at 1347. And in any event, as Dr. Orville Vernon Burton's supplemental report explains, race—and issues inextricably linked with race—unquestionably contribute to the partisan divide among Black and white voters in Georgia. *See* Second Hamilton Decl., Ex. 2. That fact is underscored by the opposing positions the two

---

[6] While his opinion is often referred to as the "plurality opinion" in *Nipper*, then-Chief Judge Tjoflat's discussion of this issue was joined by only one other judge. The remainder of the en banc court refused to join it, either because it was unnecessary to reach the outcome of the case, *see id.* at 1547 (Edmondson, J., concurring in the opinion in part and concurring in the result), or out of explicit disagreement, *see id.* (Hatchett, J., dissenting).

major parties have taken on issues related to race, as well as the differing views on those issues held by the members of the two parties. *See id.* In short, Defendants have failed to satisfy their own artificially heightened burden.

### C. Plaintiffs have shown that the Senate Factors weigh in their favor.

Rather than seriously engage with Plaintiffs' evidence—or, for that matter, Georgia's undeniable history of racial discrimination, the consequences of which persist today—Defendants mischaracterize cherry-picked pieces of evidence and try to poke holes in Plaintiffs' case. In so doing, they leave the vast majority of Plaintiffs' evidence unrebutted, evidence that proves that, under the totality of circumstances, Georgia's political processes "are not equally open to participation" by members of the state's Black community. 52 U.S.C. § 10301(b).

At the outset, Defendants suggest that "[t]his type of analysis is particularly ill-suited to emergency relief because the totality is generally weighed after significant discovery and a bench trial." Opp'n 17. But while analyzing the totality of circumstances in a Section 2 case is undoubtedly a fact-intensive process, it is certainly compatible with expedited consideration. Contrary to Defendants' intimations, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-

417, pt. 1, at 29 (1982)). What's more, certain of the Senate Factors—in particular the history of discrimination—are not subject to good-faith dispute. *See, e.g.*, *Wright I*, 301 F. Supp. 3d at 1310 ("Georgia's history of discrimination 'has been rehashed so many times that the Court can all but take judicial notice thereof.'" (quoting *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994)). And the Eleventh Circuit has made clear that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of the circumstances." *Ga. State Conf. of NAACP*, 775 F.3d at 1342 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Accordingly, any suggestion that either Plaintiffs or the Court must engage in the protracted exercise of proving or disproving every Senate Factor misunderstands the legal standard.

The individual pieces of evidence that Defendants flag for scrutiny do not undermine Plaintiffs' case. Both Dr. Burton and the U.S. Supreme Court have noted that the use of majority-vote requirements is meaningful evidence of ongoing efforts to discriminate against minority voters. *See* Ex. 3 at 31, 35; *Gingles*, 478 U.S. at 45. While it is true that Senators Raphael Warnock and Jon Ossoff recently won run-off elections, *see* Opp'n 18, the very recent success of just two candidates cannot refute decades of officially sanctioned discrimination and the tools with which it was

effectuated—nor, for that matter, remedy more than a century of underrepresentation by Black officeholders. *Cf. Gingles*, 478 U.S. at 75 ("[P]roof that some minority candidates have been elected does not foreclose a § 2 claim.").

Similarly, to rebut Plaintiffs' vast evidence of the long history of discrimination in voting, Defendants note "the DOJ approval of the 2011 Republican-drawn plans on which the 2021 congressional plan was based." Opp'n 18–19. But the Department of Justice's previous determination under a different legal framework—Section 5's retrogression standard—does not insulate SB 2EX from scrutiny under Section 2's vote-dilution standard. *See, e.g.*, *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003). That is especially true in this case, where Mr. Cooper demonstrated that the new map dilutes Black voting strength "in an area that has experienced significant growth in the Black population since the 2010 Census." Ex. 1 ¶¶ 38–41.

Defendants further fault Plaintiffs for "cit[ing] practices over which Defendants have no control or that have been found constitutional, including polling place closures and voter-list maintenance," Opp'n 19, but they cite no authority suggesting that either of these facts constitutes a safe harbor or otherwise reduces the probity of Plaintiffs' evidence.

13

Finally, Defendants boldly suggest that Plaintiffs' voluminous evidence of racial appeals in political campaigns from the past five years "hardly indicates racism permeates Georgia political campaigns," and that "Herschel Walker's widely reported frontrunner status as the Republican nominee for U.S. Senate *would tend to indicate a lack of racism in Georgia politics*." Opp'n 19 (emphasis added) (footnote omitted). As Defendants themselves note, consideration of the Senate Factors requires "an 'intensely local appraisal' of the facts in the local jurisdiction." *Id.* at 18 (quoting *White v. Regester*, 412 U.S. 755, 769 (1973)). A fair, thorough appraisal of Georgia's political and demographic history—informed by both local experience and Plaintiffs' unrebutted evidence of historic and recent racial discrimination, markedly polarized voting, glaring socioeconomic disparities between Black and white Georgians, and sustained official indifference to the same—will certainly belie Defendants' risibly rose-colored assessment.

Ultimately, it is simply disingenuous to suggest that "Plaintiffs [] offer scant evidence for many of the factors." *Id.* Four experts and dozens of accompanying exhibits prove that SB 2EX has the effect of diluting the votes of Black Georgians. Defendants have shown nothing to the contrary.

14

### D.     Defendants misapply the test for proportionality.

Defendants also contend that, "[w]ith five districts that are majority non-white on the adopted 2021 congressional plan, if Black voters are able to elect their candidates of choice in all five districts, their candidates of choice will hold 35.7% of the districts in the state (5 districts divided by 14 total districts)"—a result, they claim, "[t]hat provides at least a significant basis 'rough proportionality' that would indicate no violation of Section 2." Opp'n 19–21 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1023 (1994)). Setting aside the fact that proportionality is not a "safe harbor" in vote-dilution cases, *De Grandy*, 512 U.S. at 1017–21, Defendants' analysis conflates *majority-Black* districts with *majority-minority* districts—an inappropriate approach under *De Grandy*. As one court has explained,

> [t]he *De Grandy* Court provided an explicit definition of proportionality: "'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population." The Court's subsequent application of this definition eliminates any conceivable ambiguity in the term "majority-minority." In conducting its proportionality analysis, the Court counted *only* those districts with "a clear majority of black voters," and did not count a district in which black voters, although not a majority, had been "able to elect representatives of their choice with the aid of cross-over votes." Consequently, *De Grandy* provides inadequate support for including "opportunity districts" in a proportionality calculation.

*Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 312 (D. Mass. 2004) (three-judge court) (citations omitted) (quoting *De Grandy*, 512 U.S. at 1014 n.11, 1023);

15

*see also Wright II*, 979 F.3d at 1289 (proportionality inquiry "asks whether 'minority voters form effective voting *majorities* in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population'" (emphasis added) (quoting *De Grandy*, 512 U.S. at 1000)).[7]

While "five districts [] are majority non-white [in] the adopted 2021 congressional plan," Opp'n 21, at most only *four* of those districts have Black voting-age populations that exceed 50 percent. *See* Second Hamilton Decl., Ex. 1 ¶ 5 & Fig. 1. Under *De Grandy*, the Black share of the state's new congressional map (four of 14 seats) is therefore less than 29 percent—below the statewide 33.8 percent Black citizen voting-age population (and, for that manner, every other statewide measurement of the Black population). *See* Ex. 1 ¶¶ 18 & Fig. 2, 21 & Fig. 3, 24 & Fig. 4. Proportionality therefore does not weigh against Plaintiffs' claim.

---

[7] While the *LULAC* Court referred to minority "opportunity districts" in its analysis of proportionality, 548 U.S. at 436, its opinion did not displace *De Grandy*'s method for determining how many such districts exist in a given map—which is to say, counting the number of districts in which the relevant minority group constitutes an effective voting majority of the population. *See, e.g.*, *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 940 n.12 (8th Cir. 2018) ("[I]n most cases, the proportionality inquiry is focused on the number of minority-majority districts being created . . . ."); *Fairley v. Hattiesburg*, 584 F.3d 660, 673 (5th Cir. 2009) (citing *LULAC* and describing inquiry as "whether the number of districts in which the minority group forms an effective *majority* is roughly proportional to its share of the population in the relevant area" (emphasis added)).

## II.     The remaining preliminary injunction factors weigh in favor of relief.

Defendants apparently do not dispute that Plaintiffs and other Black Georgians will suffer irreparable harm if the new congressional map violates Section 2. *See* Opp'n 22. This is a sensible concession. Because vote dilution is clearly a harm for which no court can provide retrospective relief, "plaintiffs seeking preliminary injunctive relief under section 2 'should not be and are not required to make the usual showing of irreparable injury as a prerequisite to relief; rather, such injury is presumed by law.'" *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (quoting *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984)). Defendants' suggestion that vindicating Plaintiffs' and other Black voters' fundamental rights is not in the public interest, *see* Opp'n 22, cannot be squared with controlling law instructing that "cautious protection of . . . franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).

Whatever inefficiencies a preliminary injunction might cause to Georgia's election administration, *see* Opp'n 23–25, do not remotely outweigh the irreparable vote-dilution harm that Plaintiffs and other Black Georgians will face if SB 2EX is used in the 2022 elections. As an initial matter, Defendants' timing-related concerns ring hollow in light of the State's unclean hands. As Defendants note, the General

Assembly passed SB 2EX on November 22, 2021. Opp'n 3. And yet even though time was of the essence, Governor Brian Kemp waited *more than a month* to finally sign SB 2EX into law, significantly delaying Plaintiffs' ability to file this suit. *See* Ex. 15.[8] Countenancing these acts of gamesmanship and Defendants' related arguments would create a perverse incentive for states around the country: evade timely judicial review of new redistricting plans simply by delaying enactment until it is too late for courts to intervene.

Even if the State's hands were clean, Defendants offer no convincing reason why this Court should not vindicate Plaintiffs' and other Black Georgians' fundamental right to vote ahead of the 2022 elections. The candidate qualification period does not even begin until March, and the primary election is not scheduled until the end of May. *See* Ex. 43. The Secretary of State's suggestion that counties complete their voter-to-district allocations by February 18, Opp'n 23, is tied to the candidate qualification period. *See id.*, Ex. B at Ex. 2 (letter to counties suggesting changes by February 18 "for qualifying to occur the week of March 7"). Thus, if this Court finds it necessary to give counties more time to complete that process, it could delay the candidate qualification period *without* needing to adjust the primary

---

[8] Plaintiffs, by contrast, wasted no time in bringing suit, filing this action just hours after Governor Kemp signed SB 2EX into law.

election date. *See Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) (per curiam) (federal courts "ha[ve] the power appropriately to extend the time limitations [set by election calendars] imposed by state law"); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (per curiam) (three-judge court) (ordering that new statewide maps be drawn in time for upcoming primary election).

Nothing proposed or requested by Plaintiffs would prevent the Court from giving the General Assembly (now in session) the opportunity to draw a new plan in the first instance. *Cf.* Opp'n 24. If the Court invalidated SB 2EX under Section 2, then the General Assembly would have clear direction as to what must be done to remedy the congressional map's flaws. Consistent with the practice of other courts in recent cases, this Court would need to give the General Assembly mere weeks to craft a remedial plan. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022) (providing ten days for redistricting body to adopt new legislative plans); *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (providing 14 days for legislature to adopt new congressional plan, starting on February 5 of election year); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1357 (N.D. Ga. 2004) (per curiam) (three-judge court) (providing two-and-a-half weeks for General Assembly to adopt new legislative plans, starting on February 10 of election year).

Neither case on which Defendants rely counsels otherwise. *See* Opp'n 22–23. In *Favors v. Cuomo*, plaintiffs sought a preliminary injunction in *April* of an election year, *see* 881 F. Supp. 2d 356, 362 (E.D.N.Y. 2012) (three-judge court)—more than three months later than Plaintiffs' motion here. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), is even less applicable. There, the Supreme Court worried that a *last-minute* injunction against a voter-identification law would "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5. But this litigation does not impact whether a given voter can *cast* a ballot; it impacts only the candidates listed on their ballot. Defendants' hyperbolic claim that relief would somehow result in "outright disenfranchisement," Opp'n 25, is entirely baseless.

The equitable considerations in this case are clear. Plaintiffs and other Black Georgians will suffer irreparable harm if required to vote under SB 2EX's new congressional map. The Court has ample time to remedy the Section 2 violation without interrupting this year's midterms. And Defendants' concerns about timing ultimately stem from the State's own actions to evade timely judicial review.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court preliminarily enjoin implementation of SB 2EX and ensure the creation of an additional majority-Black congressional district in the western Atlanta metropolitan area.

Dated: January 20, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs' Reply in Support of Motion for Preliminary Injunction has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: January 20, 2022

**Adam M. Sparks**
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing Plaintiffs' Reply in Support of Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated:  January 20, 2022                    **<u>Adam M. Sparks</u>**
                                            *Counsel for Plaintiffs*