# EXHIBIT A

No. 21A375 & 21A376

In the Supreme Court of the United States

JOHN H. MERRILL,
IN HIS OFFICIAL CAPACITY AS THE ALABAMA SECRETARY OF STATE, et al.
*Applicants*,
v.
EVAN MILLIGAN, et al.
*Respondents.*

**AND**

JOHN H. MERRILL,
IN HIS OFFICIAL CAPACITY AS THE ALABAMA SECRETARY OF STATE, *et al.*,
*Applicants*,
v.
MARCUS CASTER, *et al.*,
*Respondents.*

**BRIEF OF THE STATES OF LOUISIANA,  ARKANSAS, ARIZONA, GEORGIA, INDIANA, KENTUCKY, MISSOURI, MISSISSIPPI, MONTANA, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH AND WEST VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF APPLICANTS**

JEFF LANDRY
  *Attorney General*
ELIZABETH MURRILL*
  *Solicitor General*
 *Counsel of Record
Louisiana Dept. of Justice
1885 N. Third Street.
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov

*Counsel for Louisiana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

INTERESTS OF AMICI CURIAE ............................................................. 1

SUMMARY OF THE ARGUMENT ........................................................... 2

   I.  ORDERING STATES TO REDRAW ELECTORAL MAPS AT THIS LATE DATE VIOLATES THE *PURCELL* PRINCIPLE ..................................................................... 3

  II.  BECAUSE OF THE SPECIAL CIRCUMSTANCES SURROUNDING THE 2020 CENSUS DELAYS, FEDERAL COURTS SHOULD BE ESPECIALLY CAUTIOUS IN ISSUING PRELIMINARY INJUNCTIONS IN REDISTRICTING CASES IN 2022. ........................... 7

 III.  *GINGLES* FACTORS MUST BE GIVEN MEANING AND CLARIFICATION .................. 13

      A.  The Court Should Clarify that *Gingles* Factors Cannot be Satisfied Without also Complying with Traditional Districting Criteria ................. 14

      B.  Plaintiffs' Proposed Districts in Alabama Do Not Satisfy Traditional Districting Criteria ...................................................................... 20

CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 931 (2015) ............................................................. 15, 16

*Alabama Legislative Black Caucus v. Alabama,*
  231 F. Supp. 3d 1026 (M.D. Ala. 2017)..................................... 16, 17, 21

*Alabama v. U.S. Dep't of Com.,*
  2021 U.S. Dist. LEXIS 120917 (M.D. Ala. June 29, 2021) ............................... 10, 11

*Andino v. Middleton,*
  141 S. Ct. 9 (2020) ..................................................................... 7

*Bethune-Hill v. Va. State Bd. of Elections,*
  137 S. Ct. 788, 799 (2017) ............................................................ 16

*Bethune-Hill v. Virginia State Bd. of Elections,*
  368 F. Supp. 3d 872 (E.D. Va. 2019) ...................................................... 16

*Bethune-Hill v. Virginia State Board of Elections,*
  326 F. Supp. 3d 128 (E.D. Va. 2018) .................................................. 15, 16

*Caster v. Merrill,*
  No. 2:21-cv-1536-AMM (N.D. Ala. Jan. 24, 2022)................................................. 12

*Cooper v. Harris,*
  137 S. Ct. 1455 (2017) ......................................................... 14, 17, 23, 24, 25

*Democratic Nat'l Comm. v. Wis. State Legislature,*
  141 S. Ct. 28 (2020) ....................................................................... 1, 4, 6, 7

*Easley v. Cromartie,*
  532 U.S. 234 (2001) ...................................................................... 18

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) ...................................................................... 17

*LULAC v. Perry,*
  548 U.S. 399 (2006) .......................................................... 14, 19, 21, 25

*Milligan v. Merrill,*
  2:21-cv-1530-AMM (N.D. Ala. Dec. 22, 2021) ......................................... 5

*Nat'l Urban League v. Ross,*
  508 F. Supp. 3d 663 (N.D. Cal. 2020) ................................................. 8, 9

*Ohio v. Raimondo,*
848 F. App'x 187 (6th Cir. 2021) ....................................................... 11

*Page v. Virginia State Board of Elections,*
58 F. Supp. 3d 533 (E.D. Va. 2014) ................................................... 14

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) ................................................................................ 4

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
140 S. Ct. 1205 (2020) .................................................................... 4, 7

*Ross v. Nat'l Urban League,*
141 S. Ct. 18 (Oct. 13, 2020) ............................................................. 9

*Rucho v. Common Cause,*
139 S. Ct. 2484 (2019) ..................................................................... 16

*Va. House of Delegates v. Bethune-Hill,*
139 S. Ct. 1945 (2019) ..................................................................... 16

*Veasey v. Perry,*
574 U.S. 951 (2014) ............................................................................ 7

*Wittman v. Personhuballah,*
578 U.S. 539 (2016) .......................................................................... 15

**Statutes**

13 U.S.C. § 141(b) ................................................................................. 9

52 U.S.C. § 20302(a)(8)(A) ................................................................... 5

**Other Authorities**

Ala. Code §§ 17-11-5(b); 17-11-12.................................................... 5, 6

Code of Ala. §§ 17-13-3(a); 17-13-5(a) ................................................ 12

Nat'l Conf. of State Legislatures, *Table 7: When States Mail Out Absentee / Mail Ballots* (Dec. 28, 2021), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-7-when-states-mail-out-absentee-ballots.aspx.................. 13

U.S. Census Bureau, *Census Bureau Sets Key Parameters to Protect Privacy in 2020 Census Results,* (June 9, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-key-parameters.html.................................... 10

## INTERESTS OF AMICI CURIAE

States have deep and long-standing interests in redistricting.[1] When courts issue injunctions that bar States from implementing maps that result from the legislative process, citizen involvement is stymied, confusion and chaos are injected into elections, and ultimately trust in the entire process erodes. "[R]unning a statewide election is a complicated endeavor" that requires "thousands of state and local officials and volunteers [to] participate in a massive coordinated effort" to implement the requirements of state election law. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Moreover, when the rules that apply to redistricting change after the legislative process has concluded, it further erodes confidence by rendering the completed political process contemplated by Congress and the Constitution irrelevant.

In this case, States have an additional interest related to the federal government's delay in producing Census data. This delay resulted in every state having to compress its redistricting process, even though several amici states litigated cases with the federal government to avoid this very result – litigation ensuing after the maps were drawn, injunctions being issued delaying qualifying or otherwise causing downstream difficulties in carrying out their elections.

---

[1] Amici provided notice to the parties who consented to the filing of this amicus brief.

## SUMMARY OF THE ARGUMENT

In a 234-page decision, just *four days* before Alabama's candidate-filing deadline and mere months before absentee ballots will be sent to voters, a federal district court has enjoined Alabama from using its newly drawn congressional districts—districts Alabama created on a remarkably truncated schedule, through no fault of its own. In doing so, the district court injected confusion in the election cycle, penalized Alabama for diligently drawing new congressional districts on a tight timeline, and improperly held Alabama violated § 2 of the Voting Rights Act by not using race as a predominate feature of its maps. This Court should grant the stay and end this Court-created injury.

*First*, the district court has violated the *Purcell* principle. This Court has cautioned lower courts from altering election laws before elections. Doing so creates confusion for elections officials, candidates, and voters. Here, the district court has left Alabama wondering how they will administer the upcoming primary election without finalized congressional districts, left Alabama candidates wondering who their constituents will be and where they will run, and left Alabama voters wondering what congressional districts they will end up in. To create certainty once again and prevent this confusion from continuing, the *Purcell* principle militates in favor of granting the stay.

*Second*, the U.S. Census Bureau harmed Alabama; then the district court made it worse. The Bureau flouted federal law when it delayed the release of the 2020 census data—a situation not seen since 1840. Alabama challenged the Bureau's delay in federal court but was denied relief. Despite diligently drawing and enacting new

congressional districts in a truncated timeline, the district court has now forced Alabama to draw new maps on an even shorter schedule. The condensed schedule with which Alabama must comply—through no fault of its own—further militates in favor of granting the stay.

*Third*, the district court faulted Alabama for not letting race predominate when it redrew its districts. Yet this Court and other federal courts have consistently *required* States not to let race predominate when drawing legislative districts. Nevertheless, the district court held Alabama violated § 2 of the Voting Rights Act because it did not use race as a predominant feature of its districts.

Federal courts have been less than clear when providing States with an evidentiary standard to satisfy § 2 of the Voting Rights Act and the Equal Protection Clause. This Court now has the opportunity to clarify this standard. Specifically, this Court should clarify that *Gingles* factors cannot be satisfied without also complying with traditional districting criteria. The absence of clarity no doubt means litigation will ensue across the country over new maps and further militates in favor of granting the stay

For these reasons, this Court should grant the stay.

## I.   ORDERING STATES TO REDRAW ELECTORAL MAPS AT THIS LATE DATE VIOLATES THE *PURCELL* PRINCIPLE

By enjoining Alabama's congressional map only four days before its candidate filing deadline, the district court injected confusion into Alabama's 2022 election process and thus created a *Purcell* problem. The *Purcell* principle emphasizes that lower courts should avoid altering election rules before an election. *See Purcell v.*

*Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). When lower courts change "the rules of the road" before elections—at a time when such rules should be "clear and settled"—they inject confusion into the election cycle and create a cascade of problems for election administrators, candidates, and voters. *Democratic Nat'l Comm.*, 141 S. Ct. at 31. (Kavanaugh, J., concurring in denial of application to vacate stay).

If the *Purcell* principle serves one end, it exists to prevent "judicially created confusion" in the elections cycle. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). "[R]unning a statewide election is a complicated endeavor" that requires "thousands of state and local officials and volunteers [to] participate in a massive coordinated effort" to implement the requirements of state election law. *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). Deadlines for candidate filing and absentee ballot applications might seem arbitrary to a reviewing federal judge, but they are the result of carefully reasoned policy choices by state officials that should only be enjoined in cases featuring the most egregious constitutional violations.

Here, by enjoining Alabama's newly drawn congressional districts and extending the candidate filing deadline by fourteen days, the district court has left Alabama elections officials wondering how they will administer the upcoming primary election without a finalized district map, left Alabama candidates wondering who their constituents will be, and left Alabama voters wondering which district they will end up in. In short, the district court has fostered enormous confusion where there was certainty, and done so only days before qualifying.

4

Local elections officials now have a much more difficult job ahead thanks to the district court. As Alabama Director of Elections Clay Helms attested below, local officials are already racing against the clock. *See Milligan v. Merrill*, 2:21-cv-1530-AMM, ECF No. 79-7 ¶ 2 (N.D. Ala. Dec. 22, 2021) ("Helms Decl."). Due to the U.S. Census Bureau's delayed release of 2020 census data, addressed further in Section II *infra*, Alabama's new congressional districts were drawn and approved much later than is typical. *Id.* ¶ 15. After the new districts were in place, county boards of registrar began reassigning 3.6 million Alabama voters to the new districts. *Id.* ¶ 6. Forty-five out of sixty-seven counties reassign voters "manually," a "laborious" process that requires "officials to pore over maps and lengthy lists of voters to ensure that each voter is correctly assigned to his or her precinct"—a process that usually takes three to four months to complete. *Id.* ¶ 9. The deadline to reassign voters is March 30, 2022, the date when absentee voting begins for the May 24, 2022 primary election.[2] Ala. Code §§ 17-11-5(b); 17-11-12.

Thanks to the district court, this timeline is now much tighter—instead of five months to properly reassign all of Alabama's voters to their new districts, registrars will now have only *two*. As Director Helms warned, this "rushed" process has the potential of "increasing the likelihood of mistaken reassignments" and affords "less time to notify voters about changes"—thus "increasing the likelihood of voter, political party, and candidate confusion." Helms Decl. ¶ 18. *See Democratic Nat'l*

---

[2] Alabama also must send absentee ballots to overseas voters by April 9, 2022. 52 U.S.C. § 20302(a)(8)(A).

*Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring) (emphasizing that "judicial restraint" "prevents election administration confusion—and thereby protects the State's interest in running an orderly, efficient election").

The district court has caused confusion for candidates as well. Before the district court's decision, January 28th was the deadline for candidates to qualify for the primary election. Ala. Code § 17-13-5(a). Candidates had identified the districts in which they intended to run, knew their constituencies, and were familiar with district-specific issues. Now, candidates have no certainty with regard to any of these considerations—many cannot even be sure they live in their sought-after district. As Director Helms pointed out, this "[u]ncertainty about which district a potential candidate resides in and the characteristics of that district could impact fundraising, campaigning, and even the decision whether to run at all." Helms Decl. ¶ 20. This confusion is worse for independent candidates and committees. To achieve ballot access, independent candidates and committees must submit a petition that is signed by registered voters who are eligible to vote in the election at issue. *Id.* ¶ 21. Because of the district court's order, these candidates and committees do not know whether the signatures they have gathered will help them achieve ballot access, or if all of their efforts to date have been useless. *Id.*

Changes to election laws at the state level will have cascading downstream effects for voters who, through no fault of their own, must figure out how to accommodate their new reality. And the confusion of elections officials and candidates is compounded for Alabama voters. *Id.* ¶¶ 11, 18. Election officials have less time to

notify voters of their district reassignments, which also increases the likelihood of voter confusion and decreased voter turnout. *Id.* Voters cannot even be certain whether they can vote for their incumbent representatives.

There was no uncertainty in this election cycle until the district court created it. This Court has blocked election rule changes close to an election and has recognized that "[e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *See Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring); *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Andino v. Middleton*, 141 S. Ct. 9 (2020); *Veasey v. Perry*, 574 U.S. 951 (2014). For the reasons explained above, the Court should do so here as well. As this Court has stated, "when a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error." *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (2020). Due to the confusion that the district court has created and will continue to create, this Court should stay the district court's decision.

## II.   BECAUSE OF THE SPECIAL CIRCUMSTANCES SURROUNDING THE 2020 CENSUS DELAYS, FEDERAL COURTS SHOULD BE ESPECIALLY CAUTIOUS IN ISSUING PRELIMINARY INJUNCTIONS IN REDISTRICTING CASES IN 2022.

In addition to the background *Purcell* principle, there are special concerns that counsel against judicial interference with state election calendars in 2022. Last year, for the first time since 1840, the Census Bureau delayed release of population data from the 2020 census until months into the next calendar year. *Nat'l Urban League*

*v. Ross*, 508 F. Supp. 3d 663, 674 (N.D. Cal. 2020) (noting that the Bureau last missed its reporting deadline in 1840 and last missed its collection deadline in 1950).

Nearly every State relies on federal census data to make its own redistricting decisions, so the delay prevented States from starting their redistricting processes in earnest until the autumn of 2021. This extensive delay has already made it more difficult for States to hold their spring 2022 primary elections on-time. And any further delay predicated upon the novel Section 2 theory advanced by Respondents would upend the 2022 election calendar nationwide. Countless States would be forced to start from scratch, redrawing their district maps to incorporate the new Supreme Court guidance thereby preventing candidates from filing to run for office and elections from being held on their currently scheduled dates. New rules not only upend congressional elections, but also have downstream effects on other office-holders whose districts are based on congressional districts. And the rules for drawing districts matter no matter what level the office. The potential for creating chaos in federal, state, and local elections is enormous.

The deadline for the release of census data is not subject to reasonable dispute, because it is specifically enshrined in federal law. The tabulation of total population by State (*i.e.*, the top-line population numbers for each State that determine how many seats the State receives in congressional apportionment) must be completed "within 9 months after the census date[,]" meaning they are reported to the President by the Secretary of Commerce no later than December 31st of the census year. 13 U.S.C. § 141(b). The same section also sets a deadline for the delivery of state-specific

population data to the Nation's Governors, which must be "be transmitted to each respective State within one year after the decennial census date[,]" or by March 31st of the calendar year immediately following the census. *Id.* § 141(c). The deadlines were clear, and yet in the most recent census cycle they were ignored for the first time in decades – indeed in over a century.

One might assume that the COVID-19 pandemic was the primary factor affecting the Bureau's extended delay, and it certainly contributed. The Census Bureau has explained in other fora the myriad difficulties of collecting reliable data in the midst of a pandemic, natural disasters, and civil unrest. *See, e.g.*, *Nat'l Urban League*, 508 F. Supp. 3d at 671-75. But the Bureau's data collection operations ceased in mid-October 2020, and yet the release of the final data to the States did not occur until almost a full *year* later. *Ross v. Nat'l Urban League*, 141 S. Ct. 18 (Oct. 13, 2020) (granting stay of district court preliminary injunction and thereby allowing Bureau to conclude field operations).

The pandemic was not, therefore, the *sole* reason for the Bureau's lengthy delay: In 2020, the Bureau was also involved in implementing a new algorithm that was, they assert, designed to protect the privacy of Census respondents. Indeed, the Bureau did not finalize this algorithm until June 2021—more than two months after its statutory deadline for reporting population data to each State.[3] In other words, long after its data collection efforts ended in mid-October 2020 and months after its

---

[3] U.S. Census Bureau, *Census Bureau Sets Key Parameters to Protect Privacy in 2020 Census Results*, (June 9, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-key-parameters.html.

statutory deadline, the Bureau was still tinkering with the data rather than releasing it to the States that desperately needed it to initiate their redistricting processes. Even worse, the Bureau persisted in applying its algorithm to the data despite legitimate concerns raised in litigation concerning the effect its new "differential privacy" method would have on the usability of the underlying population data for redistricting purposes. *See, e.g.*, *Alabama v. U.S. Dep't of Com.*, 2021 U.S. Dist. LEXIS 120917 (M.D. Ala. June 29, 2021) (plaintiffs alleging that the application of differential privacy would "generate intentionally skewed and untrustworthy data" that would be insufficient for compliance with the Voting Rights Act, among other uses, but dismissed on standing).

Two States—including Petitioner in the present application for stay—took the initiative last spring to attempt to enforce the Census Bureau's statutory deadlines for the release of state population data. *See generally Alabama*, 2021 U.S. Dist. LEXIS 120917; *Ohio v. Raimondo*, 528 F. Supp. 3d 783 (S.D. Ohio 2021). A three-judge panel in the Middle District of Alabama denied the State's requested injunctive relief after concluding that the Bureau had presented sufficient evidence that it could not meet its deadlines. *Alabama*, 2021 U.S. Dist. LEXIS 120917, at *37-38. Similarly, although a three-judge panel of the Sixth Circuit concluded that Ohio had been injured by the delay in the release of data, the Bureau was never ordered to comply with a deadline earlier than the one it voluntarily imposed on itself. *Ohio v. Raimondo*, 848 F. App'x 187, 188 (6th Cir. 2021).

10

Although legislation was introduced that would have extended the relevant deadlines, *see* H.R. 2699, 117th Cong. (2021), it never passed. Hence, the Census Bureau, without any legislative changes to its statutory deadlines for the release of data to the States, unilaterally breezed past those deadlines without any lawful authority. Individual States diligently attempted to obtain judicial relief in early 2021 so they could begin redistricting as scheduled and avoid precisely the problems created here, but their efforts were rejected. *Alabama*, 2021 U.S. Dist. LEXIS 120917; *Ohio*, 528 F. Supp. 3d 783. The apportionment data was finally reported to the President on April 26, 2021. *Alabama*, 2021 U.S. Dist. LEXIS 120917, at *11. The state-specific data was released in "legacy format" on August 12, 2021, and the final release of user-friendly P.L. 94-171 data did not occur until September 16, 2021, nearly *six months* after the statutory deadline.[4]

The delayed start of redistricting in 2021 was not the fault of any State, but States and their citizens are most injured if the Court fails to grant Petitioner's requested emergency stay. Despite the interminable delay, States leapt into action as soon as they could and commenced redistricting so new districts would be finalized before any candidate filing deadlines. Alabama, exhibiting impressive speed, enacted its new congressional map November 4, 2021. Order, *Caster v. Merrill*, No. 2:21-cv-1536-AMM, at *3 (N.D. Ala. Jan. 24, 2022). The recent decision by the three-judge

---

[4] U.S. Census Bureau, *Census Bureau Delivers 2020 Census Redistricting Data in Easier-to-Use Format*, (Sept. 16, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-redistricting-data-easier-to-use-format.html; U.S. Census Bureau, *2020 Census Statistics Highlight Local Population Changes and Nation's Racial and Ethnic Diversity*, (Aug. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html#:~:text=AUG.,identify%20their%20race%20and%20ethnicity.

panel in the instant case threw a giant wrench into those plans at the last minute of the eleventh hour.

The initial Complaint in this case was filed on November 4, 2021, the same day the new Alabama congressional map was enacted. Less than three months later— and only four days before Alabama's candidate filing deadline for its May 24, 2022 primary elections—the three-judge panel issued its 234-page order preliminarily enjoining the Secretary of State from conducting congressional elections using Alabama's adopted map. Code of Ala. §§ 17-13-3(a); 17-13-5(a); Order, *Caster v. Merrill*, No. 2:21-cv-1536-AMM, at *5 (N.D. Ala. Jan. 24, 2022). Simultaneously, the panel stayed Alabama's candidate filing deadline for 14 days. *Id.* at 6-7. Of course, if the state legislature is unable to produce a map in this limited period of time that the panel finds satisfactory, that filing deadline could be extended even further. The time crunch, created by the federal government as a result of the delay in the Census, is now – based on the rulings from the panel –penalizing Alabama. What is happening here does not bode well for other States who have not yet completed their work. In the unique context of the 2022 redistricting cycle, this Court should instruct federal courts that the Census delays are an additional factor to weigh against preliminary injunctions challenging adopted maps in the 2022 election cycle.

Alabama begins mailing absentee ballots to voters 45 days before an election, or April 9, 2022 for the May 24th primary.[5] The court's current timetable leaves only

---

[5] Nat'l Conf. of State Legislatures, *Table 7: When States Mail Out Absentee/Mail Ballots* (Dec. 28, 2021), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-7-when-states-mail-out-absentee-ballots.aspx.

sixty days for the State to print ballots and make other election administration decisions between the extended candidate filing deadline on February 8th and the mailing of the first absentee ballots on April 9th. Any further constriction of that timeframe creates an untenable situation in States across the country, as important deadlines get extended and candidates campaign in ever-changing districts without any certainty as to the identity of their ultimate constituents. In other states, with candidate filing and absentee ballot mailing deadlines that are weeks earlier than Alabama's, confusion worsens and distrust in the process increases.

This Court should re-enforce – that in addition to *Purcell* – the unique circumstances of the timing of the Census data should weigh against the issuance of preliminary injunctions except in extreme and patently unlawful circumstances.

## III.   *GINGLES* FACTORS MUST BE GIVEN MEANING AND CLARIFICATION

Legislatures, commissions, and others responsible for drawing maps are looking to this Court for clarity as to how to comply with Section 2 and limit consideration of race in a manner that satisfies strict scrutiny. Over the last decade, federal courts have struck down congressional and state legislative maps in North Carolina and Virginia that were drawn with race as a predominant factor. Legislators across the country look to these cases to guide their actions. Because the decision below would require map-drawers to violate traditional districting principles and consider race as a predominant factor to comply with Section 2, it cannot stand.

There is a significant lack of clarity on what constitutes evidence necessary to satisfy Section 2 and therefore require the creation of majority-minority districts,

while at the same time remaining faithful to the Fourteenth Amendment. This Court should use this opportunity to clarify that Section 2 cannot require districts that require the subversion of traditional districting principles to racial considerations. To do otherwise would undermine this Court's substantive decisions in *LULAC v. Perry*, 548 U.S. 399 (2006) and *Cooper v. Harris*, 137 S. Ct. 1455 (2017).

## A. The Court Should Clarify that *Gingles* Factors Cannot be Satisfied Without also Complying with Traditional Districting Criteria

States need clarity on jurisprudential standards governing compliance with Section 2 or they will increasingly be mired in lengthy, costly litigation over their maps. This ultimately erodes confidence in the integrity of our elections as a whole. A brief review of the current state of the jurisprudence illustrates just how hopelessly opaque the standards are.

In *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014), the court struck down a congressional district that was initially created in 1991 as a majority-minority district. That district was maintained as a majority-minority district in the 2000 redistricting cycle and initially in the 2010 cycle when the Virginia legislature adopted a new map. In *Page*, the court found that the congressional district violated the Fourteenth Amendment's equal protection clause as constituted because the district was drawn with race as the "predominant consideration." *Id.* at 540. The court highlighted the lack of empirical evidence before the legislature about racial block voting, the irregular shape and compactness of the district, the number of splits of political subdivisions, and the predominance of race as a factor in drawing the maps based upon the testimony of the drafter, and determined that all of this

14

evidence caused the district to violate the Equal Protection Clause. *Id.* at 545-50. *Page* was vacated in light of this Court's decision in *Alabama Legislative Black Caucus v. Alabama*, and remanded. 575 U.S. 931 (2015). The three-judge court subsequently issued later opinions reaching similar conclusions, 2015 U.S. Dist. LEXIS 73514 (E.D. Va. 2015), and this Court ultimately dismissed the appeal from that decision in *Wittman v. Personhuballah*, 578 U.S. 539 (2016). The appeal was not denied on the merits, but rather for lack of standing by the intervenor Defendants after Virginia's Attorney General declined to defend the otherwise duly enacted state law. *Id.* at 544-46.

Similarly, in another Virginia case focusing on state legislative maps, the three-judge Court in *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128, 136 (E.D. Va. 2018), found that "race predominated over traditional districting factors" in 11 state house districts and struck those down in violation of the Fourteenth Amendment. This Court held that no "actual conflict" need be found between race and traditional districting principles to find racial predominance, but that "there may be cases where challengers will be able to establish racial predominance in the absence of an actual conflict by presenting direct evidence of the legislative purpose and intent or other compelling circumstantial evidence." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). This language is so vague that no reasonable legislator reading the opinion would know what it means. The district court found that "harm from such racial sorting is apparent" and conducted a "holistic analysis" of the evidence. *Bethune-Hill*, 326 F. Supp. 3d at 140,

142. Once again, this language is vague, yet suggests considerations of race are dangerous to the long-term survivability of the maps. Ultimately, the three-judge court there struck down the 11 districts it was charged with reviewing on remand. Once again, Virginia's then-Attorney General declined to defend the map, and this Court dismissed the appeal by the intervenors for lack of standing. *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1955-56 (2019).[6]

In *Alabama Legislative Black Caucus*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), the three-judge court – in accordance with this Court's instructions in *Alabama Legislative Black Caucus*, 575 U.S. 254 (2015) – went through Alabama's legislative maps literally district-by-district and line-by-line (including several hundred maps of small areas), and ultimately struck down 12 districts where it found that "race predominated" in the drawing of the district's lines. In contrast to the three-judge court in *Page*, in this case anecdotal testimony from incumbent members of the legislature was deemed a sufficiently "strong basis in evidence" to justify a 55% "floor" in the black voting age population of many of the districts. *Alabama Legislative Black*

---

[6] Of note here, after the Virginia legislature declined to adopt a remedial map, the three-judge court imposed a map that made significant reductions in the black voting age population of many of the challenged districts. *Bethune-Hill v. Virginia State Bd. of Elections*, 368 F. Supp. 3d 872 (E.D. Va. 2019). District 63 was reduced from 59.53% percent black voting age population to 47.47% black voting age population. District 75 was reduced from 55.42% black voting age population to 52.45%. Two political scientists (including one serving as the court's special master) calculated that these districts would allow black voters to continue to elect their preferred candidates. *Id.* at 882-883. Once again, as Chief Justice Roberts wrote in *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019), "Experience proves that accurately predicting electoral outcomes is not so simple, either because the plans are based on flawed assumptions about voter preferences and behavior or because demographics and priorities change over time." In the next election held under this plan, the incumbent black Delegates in districts 75 and 63 were defeated by white candidates. *See* Virginia 2021 election results at https://results.elections.virginia.gov/vaelections/2021%20November%20General/Site/GeneralAssembly.html (visited Jan. 27, 2022). These two districts are the seats that currently give Republicans a majority in the Virginia House of Delegates and contributed to the reduction of the size of the Legislative Black Caucus in the Virginia House.

*Caucus*, 231 F. Supp. 3d at 1033. In fact, that court said, "the Supreme Court does not require that the legislature conduct studies." *Id.* There was evidence in the record based on testimony from incumbent black legislators that their districts needed to be 62% black voting age population or even 65% black voting age population. *Id.* at 1040. That Court correctly found that "we must determine whether the legislature subordinated *traditional race-neutral districting principles* . . . to racial considerations." *Id.* at 1049 (internal quotations omitted). Ultimately, the court found 12 of the districts violated the Fourteenth Amendment while upholding a majority of the districts it reviewed.

Similarly, in *Cooper v. Harris*, 137 S. Ct. 1455 (2017), this Court struck down two Congressional Districts after finding race was the predominant factor in their creation. In that case, this Court directly addressed the applicability of both Section 2 and the Equal Protection Clause and found neither justified those Congressional districts. *Id.* at 1481-82. This followed a long line of cases about race and redistricting in North Carolina including *Shaw*, *Cromartie I*, and *Cromartie II*.  To summarize *Cooper*, the map adopted by the North Carolina legislature in 1997, was twice approved by this Court in *Hunt v. Cromartie*, 526 U.S. 541 (1999) and *Easley v. Cromartie*, 532 U.S. 234 (2001).  That map is reproduced for the Court's convenience here                                  (available                                  at https://en.wikipedia.org/wiki/North_Carolina%27s_congressional_districts#/media/F ile:United_States_Congressional_Districts_in_North_Carolina,_2003_–_2013.tif (Visited Jan. 27, 2022):



Just over a decade later, this Court struck down North Carolina's 2011 congressional map, reproduced below, as unconstitutional (available at https://en.wikipedia.org/wiki/North_Carolina's_congressional_districts#/media/File: United_States_Congressional_Districts_in_North_Carolina,_since_2013.tif (visited Jan. 27, 2022):



To the ordinary observer, District 12 (the pink district) and District 1 (the brown district) in these two maps look substantially similar, but the 1997 version was deemed constitutional while the 2011 version was not. No ordinary legislator could possibly understand why the 1997 districts were permissible but the 2011 districts were not.

In *LULAC v. Perry*, this Court struck down a district that Texas argued it was compelled to draw by Section 2. That district – District 25 – stretched from Austin to the Rio Grande Valley. It is reproduced here: https://en.wikipedia.org/wiki/United_States_congressional_delegations_from_Texas #/media/File:United_States_Congressional_Districts_in_Texas,_2005–2006.tif (Visited January 27, 2022).



The lesson legislatures took from this Court is that districts combining disparate minority populations hundreds of miles apart for the purpose of creating majority-minority districts did not in fact satisfy the requirements of Section 2.

It is against this backdrop – with a murky evidentiary standard and with the legislature seeing four maps struck down by courts this past decade and Texas' map the prior decade that considered race "too much" – that the three-judge court decision now pending review before this Court is ***requiring*** the State of Alabama to consider race predominately and draw two exceedingly slim, geographically distant, majority black Congressional districts. This Court now has the opportunity to provide much-needed clarity to state legislatures.

### B. Plaintiffs' Proposed Districts in Alabama Do Not Satisfy Traditional Districting Criteria

In *Alabama Legislative Black Caucus*, the three-judge court summarized the distribution of the black population in Alabama as follows, "[T]he black population in Alabama is not evenly dispersed throughout the state. It is concentrated in counties along the Black Belt in the south-central part of the state, as well as the counties that contain major metropolitan areas: Madison County in the north (Huntsville), Jefferson County in the north-central (Birmingham), Montgomery County in the south-central (Montgomery), and Mobile County in the southwest (Mobile)." 231 F. Supp. 3d at 1055. That court well-established that the black population in Alabama is geographically concentrated and not entirely in the same region of the state.

As this Court explained in *LULAC v. Perry*, the only way to satisfy the compactness requirement of Section 2 is the "compactness of the minority population, not [] the compactness of the contested district." 548 U.S. at 433 (internal citation omitted).

A map showing the concentrations of black populations in Alabama is included in the three-judge court's opinion below:



This population distribution lines up well with the description provided by Judge Pryor in *Alabama Legislative Black Caucus*. The black lines in the map above (left) present the new Congressional Districts recently adopted by Alabama. The map to the right shows the districts in various colors overlayed over Alabama's county lines, demonstrating that only three counties are split to create the enacted districts and that the enacted map unites three of the five concentrations of black population described by Judge Pryor (namely Birmingham, and Montgomery) in a geographically compact fashion.

The four exemplar maps presented by Dr. Duchin to the court, which the court below credited, requires bisecting the otherwise concentrated minority population in every iteration, and requires combining population in the southwestern portion of the state (black population in Mobile) with black population more than 200 miles away on the Alabama / Georgia border. There appears to be no reason to combine the

populations in Eufala in a single district with Mobile other than the fact that many

of the people who live in those two far-flung communities are black.  For the Court's

convenience, Dr. Duchin's maps are below:



Dr. Duchin's "black voting age population" using the "any part" black numbers are

51.37% for Plan A, 50.24% for Plan B, 50.06% for Plan C, and 50.05% for Plan D.[7]

Mr. Cooper, demographer for another group of Plaintiffs, also submitted

exemplar maps that similarly divide otherwise concentrated population in Alabama's

"Black Belt" and presented districts that similarly bisect it in every iteration (from

2:21-cv-01536-AMM, Document 48):

---

[7] Dr. Duchin's other black voting age population count is 51.5%, 51.06%, 53.5% and 51.73%
respectively for her plans A, B, C and D.



For Mr. Cooper's districts, the black voting age population using the "any part black" measure of his "second" district ranges from 50.09% in Illustrative Plan 1,[8] to 50.88% in Illustrative Plan 2[9], to 50.09%[10] in Illustrative Plan 3, to 50.07% in Illustrative Plan 4.[11]   There is simply no plausible way to draw these proposed districts unless black population numbers were the "predominant factor" in the map drawer's methodology.   And, once again, Mr. Cooper combines Mobile with Eufala in three of his four maps.

Despite the precise focus on race of all of these plans to obtain population numbers that are barely majority-minority,[12] the need to bisect the "Black Belt" in

---

[8] The "18+ any part black" number of Mr. Cooper's other majority-minority district is 53.28%.

[9] The "18+ any part black" number of Mr. Cooper's other majority-minority district is 53.79%.

[10] The "18+ any part black" number of Mr. Cooper's other majority-minority district is 50.27%.

[11] The "18+ any part black" number of Mr. Cooper's other majority-minority district is 50.09%.

[12] In addition, in *Alabama v. Department of Commerce*, *supra*, Alabama raised substantial questions with respect to the accuracy of these population numbers with the implementation of the Census Bureau's "differential privacy" methods. "Differential privacy" methodology results in the Census redistricting data not being the actual enumerated population in each Census block, but rather

every plan, and the combination of geographically disparate minority communities on opposite sides of the state, the court below found that Section 2 of the Voting Rights Act *requires* Alabama to adopt a configuration like this.

The decision below conflicts with this Court's decision in *LULAC v. Perry*, where the state was not justified in drawing a district that stretched 300 miles from Austin to the Rio Grande Valley connecting two different Hispanic communities. 548 U.S. at 429-30. Yet – if this ruling is permitted to stand – Alabama has violated the law by not drawing the slimmest of majority-minority districts and connecting Mobile with Eufala – more than 200 miles apart.

## CONCLUSION

States need clarity. Over the last decade, this Court and the lower courts have consistently told legislatures that race cannot predominate when they draw representative districts. The court below concluded that Alabama violated the Voting Rights Act by not using race as a predominant feature of its maps in violation of this Court's rulings in *LULAC* and *Cooper*. This Court should stay the decision below and make clear why it is correcting this error.

---

"adjusted" by adding and subtracting from population numbers and then running a series of algorithms on the data to correct for fractions and negative numbers. The Census Bureau's use of differential privacy for the first time ever in the 2020 Census raises real questions about whether a district that is 50.05% black voting age population according to Census data adjusted by differential privacy is in actuality a majority black voting age population district.

Respectfully submitted,

JEFF LANDRY
  *Louisiana Attorney General*
ELIZABETH B. MURRILL*
  *Solicitor General*
  *\*Counsel of Record*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 205-8009
murrille@ag.louisiana.gov
*Counsel for Louisiana*

ADDITIONAL COUNSEL

MARK BRNOVICH
ARIZONA ATTORNEY GENERAL

LESLIE RUTLEDGE
ARKANSAS ATTORNEY GENERAL

CHRIS CARR
GEORGIA ATTORNEY GENERAL

TODD ROKITA
INDIANA ATTORNEY GENERAL

DANIEL CAMERON
KENTUCKY ATTORNEY GENERAL

LYNN FITCH
MISSISSIPPI ATTORNEY GENERAL

ERIC SCHMITT
MISSOURI ATTORNEY GENERAL

AUSTIN KNUDSEN
MONTANA ATTORNEY GENERAL

JOHN O'CONNOR
OKLAHOMA ATTORNEY GENERAL

ALAN WILSON
SOUTH CAROLINA ATTORNEY GENERAL

KEN PAXTON
TEXAS ATTORNEY GENERAL

SEAN REYES
UTAH ATTORNEY GENERAL

PATRICK MORRISEY
WEST VIRIGINIA ATTORNEY GENERAL