# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, <br><br> *Defendant*. | CIVIL ACTION <br><br> FILE NO. 1:21-CV-05337-SCJ |
| COAKLEY PENDERGRASS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.*, <br><br> *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.*, <br><br> *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:22-CV-00122-SCJ |

**DECLARATION OF GINA WRIGHT**

Pursuant to 28 U.S.C. § 1746 and F.R.E. 702 and 703, I, GINA WRIGHT, make the following declaration:

1.

My name is Gina Wright. I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

2.

I am the Executive Director of the Legislative and Congressional Reapportionment Office (LCRO), a joint office of the Georgia General Assembly. The LCRO is responsible for providing redistricting services to legislators using data obtained from the United States Census Bureau. The LCRO assists the General Assembly in drawing the districts of the State Senate and State House of Representatives, the Public Service Commission, as well as the fourteen (14) United States Congressional districts. Through sponsorship from a legislator, the LCRO also assists local County Commissions, Boards of Education, and City Councils in adjusting their districts. Finally, the LCRO also provides an array of maps and data reports to both legislators and the public at large.

3.

As Executive Director, I oversee and direct a staff of six (6) in providing redistricting and other mapping services to the Georgia General Assembly. These services may include drawing maps for statewide legislative districts, local redistricting plans, city creation boundaries, annexations and de-annexations, as well as precinct boundary changes. All local redistricting bills through the House Committee on Intragovernmental Coordination require my signature following a technical review of the bill. I am the official state liaison for Georgia for the 2020 Census Redistricting Data Program. I oversee the creation of our statewide voting precinct mapping layer through my work with all county election officials throughout the state. I assist the Office of the Attorney General in candidate qualification challenges related to issues regarding a candidate's residency.

4.

I regularly assist federal courts as an expert or technical advisor in redistricting matters. I participate in the Redistricting and Elections Standing Committee of the National Conference of State Legislatures and contribute to their databases and publications. Finally, I participate as a presenter in statewide forums such as the The Georgia Association of Voter Registrars and Elections Officials Association, the

Georgia Municipal Association (the "GMA"), the Association of County Commissioners in Georgia (the "ACCG") and the Georgia Legislative CLE class.

5.

I began work with the LCRO in December of 2000 as a Redistricting Services Specialist. I became Executive Director of the LCRO in June 2012. I am a 2000 summa cum laude graduate from Georgia State University. I have a Bachelor of Arts degree in Political Science and a minor in Spanish.

6.

I have been appointed as an expert or technical advisor for redistricting by federal courts in the following cases:

- *Ga. State Conf of the NAACP v. Fayette County Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1359 (N.D. Ga. 2014) (appointed as the Court's "independent technical advisor."); *see also Ga. State Conf of the NAACP v. Fayette County Bd of Comm'rs*, 118 F. Supp. 3d 1338, 1340 (N.D. Ga. 2015) ("Court-appointed expert or technical advisor.")

- *Crumly v. Cobb County Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1344 (N.D. Ga 2012) (appointed as the "Court's technical advisor and consultant.")

- *Martin v. Augusta-Richmond County*, 2012 U.S. Dist. LEXIS 85113, *2-3 (S.D. Ga 2012) (appointed by Court as "advisor and consultant.")

- *Walker v. Cunningham*, 2012 U.S. Dist. LEXIS 178337, *5 (S.D. Ga. 2012) (appointed by Court "as its independent technical advisor.") (3 judge panel).

- *Bird v. Sumter County Board of Educ.*, CA No. 1:12cv76-WLS (M.D. Ga. 2013) ECF 70 p. 5 (appointing Gina Wright as the Court's "independent technical advisor.")

- *Adamson v. Clayton County Elections and Reg. Bd.*, CA No. 1:12cv1665-CAP (N.D. Ga. 2012), ECF 23 p. 2 (appointing Gina Wright as the Court's "independent technical advisor.")

In the past several years I have testified, either at trial or by deposition, in:

- *NAACP v. Kemp*, CA No. 1:17cv1427 (N.D. Ga.) (3 judge court) (consolidated with *Thompson v. Kemp*).

- *Ga. State Conf. of the NAACP v. Fayette County Bd. Of Comm'rs*.

7.

I am not being compensated separately for my work in this matter.

8.

In preparing my analysis, I considered the following facts and data: block equivalency files of five redistricting plans: one state Senate plan by William Cooper

4

in Alpha Phi Alpha called ILLUSTRATIVE_PLAN_2_BEF_Senate; one state House plan by William Cooper called ILLUSTRATIVE_PLAN_2_BEF_HOUSE; one Congressional plan by William Cooper called Pendergrass v. Raffensperger Illustrative_Plan Modified_Districts Block Equivalency; one state Senate plan by Blakeman Esselstyn called Grant v. Raffensperger Illustrative Plans Shapefile; and one state House plan by Blakeman Esselstyn called Grant v. Raffensperger Illustrative Plans Shapefile. I also relied on the 2020 PL-94-171 Census Data and Geography files for the state of Georgia; past state House, state Senate, and congressional district maps for the state of Georgia maintained by my office; the 2020 enacted plans for state House, state Senate, and Congress; precinct data from our office on voter registration; and my personal knowledge of the facts regarding redistricting in Georgia. In preparation for rendering my opinions, I reviewed the entire plans.

9.

Based on my analysis, the districts discussed below in the remedial plans do not comply with traditional redistricting principles, in some districts unite disparate communities in Georgia solely on the basis of race, and would cause significant changes from the 2020 enacted plans if used as remedial plans by a court. My

analysis is explained below and I reserve the right to add to this analysis if called on to testify further.

## Cooper State Senate Plan

10.

The Cooper State Senate plan adds majority-Black districts using the any-part Black voting age population Census metric when compared to the adopted House plan. Six of the new districts created in the Cooper State Senate have Black voter registration of less than 50%.

11.

The proposed District 23 unites disparate communities apparently based on race. The district barely crosses 50% any-part Black voting age population and only achieves that number by connecting Black voters in Augusta with Black voters in Milledgeville and Warner Robins. District 23 as drawn is below 50% on Black voter registration. There is no basis to connect Augusta with Warner Robins in a Senate district if not for the race of the individuals in the districts. The proposed District also adds minority population to District 22 and takes it far outside its traditional boundaries in Richmond County.

12.

The proposed District 28 splits multiple counties with the goals of achieving majority black status. It unites areas of Jonesboro with areas south of Griffin, apparently for the purpose of including the Black population in Griffin. This splist Spalding County into two districts, where it is currently not split. Further, creating District 28 results in connecting Jonesboro to the eastern side of Spalding in District 44. This also bears no connection to any type of a community. Coweta County was previously, the new district configuration will results in the division of Coweta County into three districts (16, 35 and 29) which are apparently based on race. I cannot identify a reason for drawing District 28 aside from a purely racial goal. District 28 also has a Black voter registration of less than 50%.

13.

The proposed District 17 connects the black population in Stonecrest to the Ola and Lake Dow communities in Henry County. Stonecrest shares few if any characteristics with the Ola and Lake Dow communities in Henry County and I cannot identify any community of interest that supports the creation of this district. It also splits a large neighborhood in Lake Haven with no apparent reason for doing so.

7

14.

In short, the additional districts this plan proposes appear to be drawn based on race.

**Cooper State House Plan**

15.

The Cooper state House plan adds a number of majority-Black districts, including Districts 73, 110 and 144, using the any-part Black voting age population Census metric when compared to the adopted House plan.

16.

The proposed District 73 uses Black population in south Clayton and combines those with Black population in Griffin to create a district. It creates significant changes to surrounding Districts like 78 and 109 by connecting communities that share little to no common interests. Clayton County's boundary was respected in both the adopted House plan and the Democratic House proposal. This new District 73 and its surrounding districts break county boundaries in apparent service of a racial goal.

17.

Nearby District 110 barely goes over a majority district by combining Black population in Griffin with parts of Locust Grove in Henry County. Spalding County

has traditionally only had two House districts but this configuration would result in four districts within the county boundaries (73, 110, 129 and 130). As a result of creating District 110, the Cooper Plan revises District 111 in a way that that splits a number voting precints with no apparent goal other than to create a majority black district. Similarly, the configuration of District 129 is spread among five counties. I have not separately analyzed incumbents, but am aware of a number of incumbents in this area who could be affected.

18.

District 144 unites disparate communities in a single district. It uses Black population in the cities of Eatonton and Milledgeville and the counties of Hancock and Wilkinson to achieve a district that is barely over 50% any part Black voting age population. District 144 further divides Twiggs and Wilkinson counties into different districts; they have historically been in the same district as they constitute a single community of interest. The districts drawn in the adopted House plan in the same area respect county boundaries and communities of interest and avoid the unnecessary division of counties for racial purposes as Cooper's District 144 does.

19.

Southwest Georgia was a significant challenge because it was the area of the state with the most underpopulated districts. The Cooper plan's reconfiguration of

the area, specifically District 138, results in multiple split counties and connecting areas that have nothing in common, like Columbus, Americus and Junction City or Thomasville and Albany. I cannot identify a community of interest or purpose for configuring southwest Georgia as this plan does; it also appears to pair additional incumbents. Further, the plan does not address some public comments like reducing the number of splits in Tift County.

**Esselstyn State Senate Plan**

20.

The Esselstyn Senate plan also adds majority-Black districts above the adopted Senate plan when using the any-part Black voting age population Census metric.

21.

District 23 divides Baldwin County, Greene County, and Wilkes County, and still only achieves 50.43% AP Black VAP. It is below 50% Black voter registration. It shifts the district significantly west instead of keeping it an east Georgia District. Given the low Black VAP, the specificity of the splits, and the shape of the district, it appears to be drawn with a racial goal in mind.

22.

District 28 is made up of parts of four counties, Fulton, Coweta, Fayette and Clayton and includes parts of Riverdale in Clayton County and Newnan in Coweta County. Riverdale and Newnan have little in common and do constitute a community of interest.. This configuration splits Clayton County into four districts in a manner that make no geographic sense apart from a racial goal. Clayton County has traditionally been split into two districts; this plan would split the County into four districts.

23.

District 25 is at least more compact, but strategically connects pieces of south Clayton with Henry apparently in service of a racial goal. The side effect of making a compact District 25 impacts nearby Districts, including District 10 not being a community of interest, reaching all the way up to Stonecrest in the north and down to the Butts-Monroe County line in the south. I cannot imagine a non-racial purpose in creating this district.

**Esselstyn State House Plan**

24.

The Esselstyn House plan adds majority-Black districts above the adopted House plan when using the any-part Black voting age population Census metric.

25.

District 149 splits Baldwin County three ways, and barely reaches 50%--crossing that threshold by two-hundredths of a point. The three-way division of Baldwin makes no sense and is not at all compact. Further, connecting a small portion of Milledgeville with Macon in a single House district lacks any coherent community.

26.

District 145 is relatively compact, but a side effect of this configuration requires significant changes to the configuration of north Macon, placing parts of Macon together that encompass separate communities. This configuration of Bibb County significantly divides the minority population in the central part of the county and goes directly against the public testimony that was provided during the Macon Town Hall meeting conducted to receive public comment regarding the General Assembly's redistricting efforts.

27.

Districts 74 and 117 suffer from the same problems I outlined above regarding Cooper House District 73 and 110. Districts 74 and 117 are both below 50% Black on voter registration. It is also unusual that District 116 follows the interstate except

to take a single precinct across the interstate that likely has racial implications for District 117.

28.

District 64 only achieves minority status by connecting communities in Fulton County with communities in Paulding County. It is below 50% Black on voter registration and pulls District 66 below 50% Black on voter registration. The configuration of District 61 also runs an extremely long distance connecting East Point and parts west of Douglasville, which would not be a community of interest.

**Cooper Congressional Plan**

29.

I cannot explain the decision to take District 6 into Fayette County. The district is below 50% Black on voter registration and only barely over the 50% threshold on any part Black. District 6 specifically grabs Black voters near Acworth and Kennesaw State University to connect them with other Black voters in South Cobb, Douglas, and Fulton Counties. Likewise, District 13 reaches into Newton County in an unusual way that cannot be explained by normal redistricting principles. The divisions of Cobb, Fayette, and Newton Counties do not make sense as part of normal redistricting principles and I can only conclude that the drawing of this district in service of some kind of specific goal.

30.

I reserve the right to continue to supplement this report in consideration of additional facts, testimony, or materials that may be produced.

[Signature on next page]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of February, 2022.

                                                                                                        _____
                                                                                                         GINA WRIGHT