```
 1                      UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
 2                           ATLANTA DIVISION

 3

 4   ALPHA PHI ALPHA FRATERNITY,    )
     INC., ET AL.,                  )
 5                  PLAINTIFFS,     )
                                    )  DOCKET NO. 1:21-CV-05337-SCJ
 6        -VS-                      )  VOLUME 1 - A.M.
                                    )
 7   BRAD RAFFENSPERGER,            )
                                    )
 8                  DEFENDANT.      )
     _____
 9   COAKLEY PENDERGRASS,           )
     ET AL.,                        )
10                  PLAINTIFFS,     )
                                    )  DOCKET NO. 1:21-CV-5339-SCJ
11        -VS-                      )
                                    )
12   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
13                  DEFENDANTS.     )
     _____
14   ANNIE LOIS GRANT, ET AL.,      )
                                    )
15                  PLAINTIFFS,     )
                                    )  DOCKET NO. 1:22-CV-00122-SCJ
16        -VS-                      )
                                    )
17   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
18                  DEFENDANTS.     )
     _____
19
             TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20             BEFORE THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT JUDGE
21                 MONDAY, FEBRUARY 7, 2022

22

             VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23       OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT COURT
24                      ATLANTA, GEORGIA
                        404-215-1479
25             VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1  APPEARANCES:

 2  ON BEHALF OF THE PLAINTIFF:

 3   KEVIN J. HAMILTON, ESQ.
     ABHA KHANNA, ESQ.
 4   SOPHIA LIN LAKIN, ESQ.

 5
    ON BEHALF OF THE DEFENDANT:
 6
     BRYAN P. TYSON, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2     WITNESS                  DIRECT    CROSS   REDIRECT   RECROSS
         WILLIAM SEXTON COOPER    33       71       94
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  First of all, I'll say good morning to

2    everyone.  Let me also say, first, I want to apologize to

3    everyone.  I understand most of you all would have preferred to

4    have done this by Zoom, and I would have preferred to have done

5    this by Zoom as well.  However, in my opinion, this is a case, a

6    hearing of such importance, I need to make sure that I understood

7    what everybody was trying to tell me, that it was coming across

8    clearly.  I have used Zoom a lot in the last two years.  It is

9    nice.  But in a hearing of this nature, I don't quite have the

10   patience maybe to deal with some of the things that Zoom has to

11   deal with.

12           So I need to have everyone here so I can see everything,

13   make sure I'm understanding everything because I might have to

14   make a very quick decision in this case because we're all watching

15   what is going to happen in the Supreme Court regarding the Alabama

16   case.  But, basically, what I'm saying to y'all, I just thought

17   this case was too important.  I need to make sure things are

18   coming across, that I have them correct to do this case by Zoom.

19           Also, I will make sure you all are protected.  Now, I

20   will have my mask off most of the time, because I'm constantly

21   talking and constantly making decisions.  Each one of y'all have

22   to keep your mask on unless you are talking at some point.  When

23   you do your opening, I prefer if you come up to the podium, to the

24   Plexiglass, you can remove your mask.

25           When you're questioning witnesses, you can remove your

1   mask.  Any time you're talking, you can remove your mask.

2          I'm going to do everything possible to keep y'all safe.

3   I need you here for the full six days.  So I don't want anyone

4   getting sick or going home making family members sick.  As my wife

5   tells me every day, the way I'm sending you to the office, I want

6   you to come back that way.  So wherever you come from in Atlanta

7   or wherever, I want to send you back as healthy as you did when

8   you arrived here.  I need your help to do that.

9          Now, there are a number of attorneys involved in this

10  case, I will say.  And for the record, what I like to do is ask

11  the lead attorney for each party to stand up and introduce

12  yourself and introduce everyone that is working with you in this

13  case.  We want to make sure the record reflects that.  Once that

14  is done, we'll proceed with the opening statements; 15 minutes

15  each.

16         There are a couple of rulings we're going to admit

17  before we begin the evidence.

18         Again, the whole point in this case, I need to make sure

19  I hear everything y'all want to tell me and get across your

20  points, because once we stop, then I have to go and make

21  decisions.  With that stated, we'll start with the Alpha

22  attorneys.

23         MR. HAMILTON:  Good morning, Your Honor.  It's Kevin

24  Hamilton on behalf of the Pendergrass and Grant plaintiffs.  With

25  me today to my left is Abha Khanna, my partner.  Next to her Joyce

1  Gist Lewis, local counsel.  I think you know her.

2         THE COURT:  I've seen her around from time to time.

3         MR. HAMILTON:  Jonathan Hawley is here as well.  Graham

4  White, like Jones.

5         THE COURT:  Good last name.

6         THE WITNESS:  And then our paralegal who is probably the

7  most important member of the team, Trisha Marino is here as well.

8         MS. LAKIN:  Good morning, your Honor.  Sophia Lin

9  Lakin --

10         THE COURT:  You can remove your mask.

11         MS. LAKIN:  As long as you can hear me.

12         THE COURT:  I can hear you.

13         MS. LAKIN:  With me at counsel table is Ari Savitzki and

14  Anuradha Sivaram.  Also in the courtroom we have Jenessa

15  Calvo-Friedman, Sean Young, Rahul Garabadu, George Varghese,

16  Robert Boone, and Edward Williams.  I believe that's it for today.

17         THE COURT:  All right.  And for the Grant, Pendergrass

18  are the same people.  Now, there are attorneys here also -- go

19  ahead, Mr. Tyson.  Mr. Tyson, I know you have quite a few cases in

20  front of me.

21         MR TYSON:  I know, Your Honor.  We were supposed to be

22  here trying one case, and now we're here trying a different case.

23         Brian Tyson for the defendants in all three cases.  I'm

24  joined today by my colleagues Frank Strickland, Bryan Jacoutot,

25  Loree Anne Paradise, and Taylor English.  And then we also have

1   Charlene McGowan from the Georgia Attorney General's Office as

2   well.

3              THE COURT:  Any attorneys I haven't heard from?

4              Now, there are also attorneys I understand from the

5   Georgia NAACP.  They're supposed to be on my first bench to my

6   right.  The NAACP, are the attorneys there for that?  Y'all have a

7   reserved seat.  Here's what we're going to do.  The individuals on

8   the first bench behind the bar, I'm going to ask y'all to trade

9   seats with -- so the NAAPC, y'all have your seats.  You all have

10  your seats?  So make sure you all have your seats set.  All right.

11  Then you're fine.

12             All right.  Okay.  I think I've done all of the

13  preliminary.  So with that stated, we will begin opening

14  statements, and Mr. Hamilton, you can go first.

15             MR. HAMILTON:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MR. HAMILTON:  Kevin Hamilton again on behalf of the

18  Pendergrass and Grant plaintiffs.

19             As you know, the plaintiffs in both cases, as well as in

20  the Alpha case, have moved for a preliminary injunction barring

21  the use of the newly-redrawn congressional and legislative maps

22  adopted by the Georgia Legislature.

23             There is already a voluminous body of evidence in the

24  record before the Court.  Over the course of this hearing, we'll

25  highlight the key evidence supporting the pending motion that's in

1    evidence.  At its conclusion, we will ask this Court to enter the

2    requested injunction.  I'd like to just take a couple of minutes

3    at the outset to provide a brief overview of the case, the

4    evidence we intend to present, and a quick sketch of the order of

5    the witnesses.

6            Over the past decade, Georgia's black population has

7    increased by over 15 percent.  Its minority population as a whole

8    has increased more than 25 percent.  At the same time, the white

9    population has deceased by nearly a full percentage point.  And

10   yet despite these significant changes in Georgia's demographic

11   makeup, the number of majority black districts in the state's

12   congressional and legislative maps has hardly moved.  Effectively

13   diluting tens of thousands of black Georgians voting power.

14           The general assembly's method for this dissolution of

15   black votes is as old as the Civil Rights Act, the Voting Rights

16   Act itself.  And precisely what that landmark legislation was

17   meant to prevent.

18           Some black voters have been packed into the majority and

19   super-majority black districts in the Atlanta Metro area in Bibb

20   County, while others have been packed into rural regions and

21   predominantly white suburban districts.  The combined effect of

22   these line-drawing decisions is that black voters throughout the

23   state are being denied the opportunity to elect the candidates of

24   their choice, and denied equal participation in the political

25   process.  These are ultimately textbook violations of Section 2 of

1  the Voting Rights Act.  And Georgia's unlawful new maps can and

2  must be enjoined, which is precisely what we seek with the pending

3  motions for preliminary injunctions in these two cases.

4       The evidence already in the record and that we will

5  highlight over the next six days demonstrates both the elements of

6  the Section 2 claims and that have been proven in both Pendergrass

7  and in the Grant case.

8       First in Pendergrass, the expert testimony of mapper

9  demographer Bill Cooper, our first witness, will show that the

10  black population in the Western Mid-Atlanta metro area is

11  sufficiently large and compact enough to form the new

12  congressional district where black voters can elect candidates of

13  their choice to Congress.

14       On the legislative side in the Grant case, our second

15  witness, Blake Esselstyn, will show that the black populations in

16  both the Atlanta area and the black belt similarly allow for the

17  creation of three new majority black Senate -- state Senate

18  Districts, and five new State House Districts.

19       Mack Palmer, our third witness, will show that voting in

20  these areas is significantly and racially polarized.  Black voters

21  overwhelmingly will vote together.  And where there is more black

22  voters that are in the minority, white voters consistently vote as

23  a block to defeat black preferred candidates.

24       These are the three Gingles preconditions, and they are

25  readily satisfied in both Pendergrass and Grant on the record

1  before the Court.

2          As the Eleventh Circuit has reminded us, it would be an

3  unusual case where these three conditions are met and a finding of

4  dilution does not follow.

5          Your Honor, these are not unusual cases.  The Senate

6  factors that guide the totality of circumstances analysis

7  uniformly weigh in plaintiff's favor and confirm what even a

8  casual observer of Georgia's history and politics already well

9  knows.  Dr. Vernon Burton will demonstrate that for more than 150

10 years, the state has undertaken discriminatory actions to deny its

11 black citizens the right to vote, from poll taxes to literacy

12 tests and worse.  And similarly, those efforts persist -- similar

13 efforts persist to today, and are stoked by continued racial

14 appeals in political campaigns.

15         Black Georgians have historically been underrepresented

16 in elected office.  And the end result is more than a century of

17 discrimination and disenfranchisement is clear, and stark

18 discrepancies between black and white Georgians across all areas,

19 employment, education, economics, Welfare, and reduced political

20 participation by black voters.  Dr. Loren Collingwood's report

21 addresses those disparities; it's in the record before Your Honor.

22         In response to this overwhelming evidence, the state has

23 worked hard to distort the controlling legal standards and

24 distracted the Court.  They repeatedly question this Court's

25 jurisdiction and the ability of defendants to even seek relief

1  under Section 2.  This Court has already rejected those arguments

2  as outside the mainstream and unsupported by any authority.

3        Defendants have demanded that plaintiffs make novel

4  choices; for example, that their illustrative maps are perfect

5  across all redistricting criteria or that polarization and voting

6  is caused by race, not partisanship, even though the Eleventh

7  Circuit has expressly disclaimed such requirements.

8        Defendants have even suggested that establishing a

9  Section 2 violation somehow constitutes impermissible racial

10  gerrymandering, even though the Eleventh Circuit has squarely

11  rejected that argument.  Make no mistake; this is a frontal

12  assault on the Voting Rights Act.

13        Defendants have misapplied proportionality analysis in

14  the Congressional case, manipulated the numbers to hide the fact

15  that Georgia's new Congressional map falls well short of providing

16  representation equal to their numbers.  And above all, defendants

17  have sounded the same disingenuous beep loudly and repeatedly that

18  it is just too late to remedy these violations of federal law.

19        This last argument is not only incorrect; it's

20  fundamentally inequitable.  The State of Georgia through its

21  governor delayed the final enactment of these maps by more than a

22  month.  The purpose of that delay was clear, to deny judicial

23  review ahead of this year's mid-term elections.  Defendants should

24  not be allowed to use that argument to evade their obligations

25  under the Voting Rights Act and further delay the voting power of

1    black Georgians.  And even setting that aside, we are still more

2    than three months from the primary election, and more than nine

3    months from the general election.

4              Your Honor, it is hardly too late to right these wrongs.

5    Whatever administrative inconveniences are placed on the State

6    pale in comparison to the irreparable harm that would come from

7    denying black voters their fundamental rights to equal

8    participation in the political process.  This Court has the power

9    and, indeed, the responsibility to provide a swift and effective

10   remedy.

11             A generation ago, after decades of marches, protests,

12   and struggles, Congress adopted the Voting Rights Act to ensure

13   that federal courts like this one would have the power to act when

14   a state, like Georgia here today, acts to dilute the votes of

15   black Americans.

16             At the conclusion of these proceedings, Your Honor,

17   we'll ask for an order granting the motion for a preliminary

18   injunction enjoining the use of the adopted Congressional and

19   Legislative maps in setting a prompt schedule for the remedial

20   phase of this litigation.

21             THE COURT:  Thank you, sir.

22             MR. HAMILTON:  Thank you, Your Honor.

23             THE COURT:  Counsel.

24             MS. LAKIN:  Good morning, Your Honor.

25             THE COURT:  Good morning.

1          MS. LAKIN:  Sophia Lin Lakin for the Alpha Phi
2   plaintiffs.
3          Over the last decade, Georgia's black population grew by
4   nearly half a million people while the white population declined.
5   So when drawing new electoral maps, you would expect that growth
6   to matter.  Yet Georgia's new legislative maps ensure that despite
7   this tremendous growth in the black population, black voters will
8   have few, if any, new political opportunities in their State House
9   and Senate elections.  This is voter dilution, and the evidence in
10  the record and that we will hear this week will demonstrate that
11  the dilution of black voting strength violates Section 2 of the
12  Voting Rights Act.
13         To establish a vote dilution violation, we need to show,
14  first, that it is possible to draw new black majority districts or
15  districts based on the size and concentration of the black
16  population.  The evidence will show that.
17         Second, we need to show that voting in these areas is
18  racially polarized such that black voters, even if they vote
19  together, will typically be unable to elect their preferred
20  candidates in the districts as the state drew them.  The evidence
21  will show that, too.
22         Last, we need to show that looking about the broader
23  context, including historical and present-day conditions, the
24  state's districts resulted in inequality in the opportunities
25  employed by black and white voters to elect their preferred

1  candidates.  The evidence will show that, too.

2          Demographics and mapping expert William Cooper, who has

3  served as an expert in over 40 redistricting cases, will testify

4  that he identified particular areas in the state where the black

5  population has become more numerous or more concentrated,

6  including in a set of counties in metro Atlanta and also in

7  counties around Augusta and Albany, part of the basis for the

8  Black Belt.

9          Mr. Cooper will explain that despite the increased

10  growth and concentration, the number of majority black Senate and

11  House Districts has been, basically, static from 2006.  And he

12  will demonstrate how he was able to draw at least three additional

13  black majority Senate Districts, and at least four new majority

14  black House Districts using additional redistricting principles

15  and guidelines.  As Mr. Cooper will tell us, his maps are just

16  illustrative.  They simply show one way to draw additional

17  majority black districts that reflect the growth and concentration

18  of Georgia's black population.

19          We will also hear from Lisa Handley, who has 40 years of

20  experience analyzing minority vote dilution.  She will testify

21  that in the areas of focus, voting is polarized by race, and that

22  because of this racial polarization, black voters in this area do

23  not have the ability to reflect their preferred candidates unless

24  the district boundaries are drawn to provide these voters with an

25  opportunity to elect; opportunities the state could have drawn but

1   did not.

2          The evidence will also show when considering the broader

3   social and historical context, and in these areas of Georgia in

4   particular, the state's districts result in an unequal opportunity

5   for black voters to participate in the political process.

6          Dr. Adrienne Jones, an assistant professor of political

7   science at Morehouse, will testify that Georgia's political

8   campaigns have been long characterized by racial appeals.  She

9   will also testify that black Georgians have been and continue to

10  be underrepresented in elected office, particularly in the precise

11  areas of focus here.  She will testify that these areas have

12  largely failed to elect black general assembly members in at least

13  the last 15 years.

14         Dr. Jones and Professor Jason Ward, a historian at Emory

15  University, also explain in their written declarations that

16  Georgia has a long and largely undisputed history of

17  state-sanctioned discrimination against black voters,

18  discrimination that extends beyond the law to harassment,

19  intimidation, and violence.  And as Dr. Traci Burch, a political

20  scientist at Northwestern University, explains in her written

21  declarations, the persistent effects of discrimination in Georgia

22  are reflected in racial disparities across a litany of

23  socioeconomic categories, each of which correlated the hierarchy

24  of political participation.

25         The Court will also hear from Bishop Reginald Jackson of

1   the 6th District of the AME Church, which has long worked to

2   increase voter participation and equal opportunities for black

3   Americans.

4          Sherman Lofton, the State Director of Alpha Phi Alpha,

5   the nation's oldest black fraternity, will also testify.  Both

6   will explain that fair electoral maps are critical to their

7   organizations, to their members and brothers, and to the health of

8   Georgia's democracy.  Director Lofton, along with state

9   representative Derrick Jackson, will also testify as to how some

10  of the new majority black districts drawn by Mr. Cooper better

11  reflects their communities than the state's maps.

12         Plaintiffs are likely to succeed on this evidence, but

13  the State will argue that it's already too late.  As Mr. Hamilton

14  explained, it is not.  And for the black voters who reside in the

15  challenged districts, once an election is held under an unlawful

16  map, there is no do-over.  These voters will have forever lost

17  their ability to participate in the more core expression of

18  citizenship on equal terms.

19         The Court can, and as the evidence will show, must grant

20  plaintiff's requested relief.  Thank you.

21         THE COURT:  Thank you, ma'am.  Mr. Tyson.

22         MR. TYSON:  Thank you, Your Honor.  Let me get my slides

23  up here real quick.  Your Honor, these are just our

24  demonstratives.  So everyone has a copy of the slides.  We're not

25  asking for these to be admitted.

1          THE COURT:  You may proceed, Mr. Tyson.

2          MR. TYSON:  Thank you, Your Honor.  Good morning.  Glad

3    to be here with you.  We're here to talk about districts and maps.

4    I thought we might start a brief journey down memory lane in terms

5    of Georgia redistricting.

6          This is an actual district drawn by the Georgia

7    Legislature that was actually used in elections in Georgia.  This

8    is District 13 from the 2001 Congressional map.  And when the

9    author of the plan was asked what the community of interest was in

10   particular this district, he said, well, it is really a tourism

11   district.  Because if you start up here out I-85 in Gwinnett,

12   travel down through Conyers, around McDonough, visit Griffin and

13   come back and stop in Fulton County, you pretty much took a pretty

14   good tour of Atlanta.  This was a district that was part of the

15   2001 Congressional plan in Georgia that was drawn with a lot of

16   very particular partisan goals at the time.  One of them was Major

17   Steve Murphy was elected or was represented by a Republican in his

18   area.  But this is a map that was precleared by the Department of

19   Justice as complying with the Voting Rights Act.  Georgia

20   certainly has a colorful history in the context of redistricting.

21         This is just a way to contrast the plan that the

22   plaintiffs now challenge here as violating the Voting Rights Act

23   and the congressional side of things.  We, obviously, have a lot

24   to say about it.  I know we can all agree that this one is at

25   least cleaner than the 2001 plan in terms of geography.

1          So you're going to hear a lot of testimony.

2          THE COURT:  Mr. Strickland was involved a little bit in

3     contesting the 2001 map.

4          MR. TYSON:  Excuse me, Your Honor?

5          THE COURT:  Mr. Strickland, I think, was involved in

6     contesting the 2001 map.

7          MR. TYSON:  He was.  Yes, Your Honor.

8          We're going to hear testimony about maps and districts

9     that the plaintiffs have laid out.  The first general

10    preconditions.  And I think it's important for us to remember that

11    when we're talking about these districts and these particular

12    plans, the issue before the Court is about black voters.  You're

13    going to hear discussions, the decrease of non-Hispanic white

14    voters in Georgia.  That's true.  That happens.  But the

15    particular claims here don't involve all minority voters; they

16    involve black voters specifically.

17         And the other cases that you have with the other judges

18    will deal with some of those additional classes, but these claims

19    are about black voters specifically.

20         So what did the plaintiffs do in terms of proposing a

21    remedy for you?  I want to walk through a couple of districts and

22    look at how they look different than the adopted plan.

23         You'll hear testimony about this from both Gina Wright

24    as an expert and then John Morgan, our map drawer.

25         So the left here, you'll see the adopted District 18.

1    This is the map that is the Chairman of the Senate's redistricting

2    committee's district, so it got a lot of attention.  You can see

3    that it starts right here in Macon with population in Houston

4    County.  And then has four whole counties right around the area

5    there.  By Mr. Cooper's plan, he treats Senate District 18 a

6    little different.  He is first of all starting in Macon, but then

7    he comes all the way over to the Alabama border to here, down by

8    Fort Benning, then travels down through Americus on down to Albany

9    and Leesburg, and ends up right around Albany and Worth County

10   there at the bottom of the district.

11          Now, this may seem a little bit unusual, and the

12   plaintiffs have said on the original illustrative, but what you'll

13   hear in terms of testimony is the reason why this district looks

14   the way it does is because of what happens on the other side of

15   the state.  And so this other district here is the district for --

16   let's see if it's going to work for me.

17          THE COURT:  Mine is not showing anything.

18          MR. TYSON:  Let me try to reset this.  I apologize.  We

19   have the printed copy in front of you.  Let's proceed with that.

20   So if you look at the printed copy that is there, you see District

21   26 is the pink.  That is the adopted district, starts in Macon and

22   goes east.  That is a majority black district and the way the

23   legislature drew it.

24          District 23, the blue district there, is not a majority

25   black district, but is one the plaintiffs say should be made

1  majority black.  And so to do that, Mr. Cooper has taken and

2  turned District 26 to run west, and has brought District 23, as

3  you'll hear testimony, to bring in Augusta, Milledgeville and

4  Baldwin County, and included a piece of Warner Robins in Houston

5  County.

6          Now, in view of all of that work, though, along the way,

7  this district is barely over 50 percent.  So it's 50.5 percent on

8  the "any part black" category, and takes all the effort to reach

9  that point along the way.  It's also an important distinction,

10  "any part black" refers to individuals who responded to the census

11  that they identify as any part black.  So for example, Vice

12  President Harris is both black and Asian.  She would be any part

13  black, but would not be included in the single-race black that we

14  refer to on the census numbers there.

15          So you'll hear testimony about how putting Augusta,

16  Milledgeville, and Warner Robins together is uniting disparate

17  communities based solely on the race of the individuals involved.

18          The next on -- the next plan is an example from

19  Mr. Esselstyn's plans for the Grant plaintiffs, and that is

20  District 149 in the House.  And you can see that that is four

21  whole counties going down to a small piece of Telfair County.

22  That is not a majority black district on the configuration the

23  Legislature adopted.

24          The plaintiffs have instead drawn District 149.

25  Proposed it includes both Macon, and it has that finger up into

1   Milledgeville to capture black voters that are there.  This is a
2   different configuration.  It's a should-have-been adopted by the
3   Legislature as a majority black district, but it requires all of
4   those different components to put those together.

5          As you'll hear testimony from Mr. Morgan and Ms. White,
6   while these are illustrative plans, the way they are configured
7   are so tight in terms of the population, there's not really a
8   whole lot of different ways to configure, for example, District
9   149 and have it still be a majority black district.  But then this
10  gets even more complicated as you look at what both Mr. Cooper and
11  Mr. Esselstyn has said.  The next slide there shows you --
12  Mr. Esselstyn has said there should have been an additional
13  minority black district.  So one is laid up in Metro Atlanta to
14  the west there, Douglas.  There's two in South Metro and two in
15  middle Georgia.  When you compare that to what Mr. Cooper found,
16  though, he says there needs to be a new district in Southeast
17  Georgia in the house.  Mr. Esselstyn didn't identify that.  He has
18  one in middle Georgia instead of two.  He has one in South Metro.

19         So even among the experts, there is a disagreement --
20  and you'll hear testimony as we work through that with them about
21  where these new majority black districts should have been drawn.

22         And the last one I'll make about these districts,
23  they're very, very close in population.  The next slide shows you
24  the population report.  Even with all of the effort that went into
25  District 149 for Mr. Esselstyn's plan, you're still only 200ths of

1  a point above majority status.  50.02 percent even with all of the

2  efforts with Milledgeville and separating Baldwin County and the

3  way that was done.

4         So we're going to talk through all of these details, and

5  at the end of the day, Section 2 cannot and does not require you

6  to racially gerrymander.  It doesn't require that you draw the

7  maximum number of majority black districts on a particular plan.

8  That's why the Supreme Court has talked about the importance in

9  looking at the communities that are involved.  That's why in Lou

10 Lack (phonetic) you couldn't unite disparate communities based

11 solely on the race of those involved.

12        But even if you agree with the plaintiffs on the merits

13 of that piece, the next slide gives you a little overview of some

14 of the timing problem.  We've had references here, although the

15 elections are nine months away, we have three months until the

16 primary.  We began the process of districting in Georgia in the

17 summer, holding hearings.  There was a committee education day

18 that dealt with hearing from groups like the NAACP, the ACLU and

19 others to talk with the Legislature about the process.  They held

20 a special session in November.  The Governor signed the maps in

21 December.  But while all of that is going on, county election

22 officials are looking at early voting sites and Election Day

23 precinct locations.  They are getting contracts with those venues

24 wherever they may be and getting those set.  They are bringing in

25 poll workers for particular days.

1          So, yes, the election is still a little ways out, but

2     these process are already underway and have been underway for

3     awhile.  Not only that, we have the process starting in -- January

4     13 of nominating petitions for candidates.  Obviously, voters who

5     are eligible to vote in aaparticular election can vote and can

6     sign a nominating petition, and that process has been underway for

7     candidates trying to get on that petition since January.

8          We are now in a season where election officials have

9     started reassigning voters based on the new districts.  And on

10    that you will hear testimony from Ms. Bailey on Richmond County

11    elections.  That is a manual process.  You have to touch each

12    component of the streets in your county to update those district

13    numbers.

14         So election officials have to undertake that process so

15    we know which House, Senate, Congressional, local districts, all

16    those different -- are set for each combination of ballots in that

17    particular jurisdiction.  And when that's finished, then the

18    Secretary's Office begins working through ballot styles and

19    building the actual database for those ballots.

20         You'll hear testimony from Mr. Barnes about how the

21    Secretary has set the deadline of February 18 for County officials

22    to finish updating all the districts so that we can still have

23    time to build those ballots in combinations before qualifying

24    starts on March the 7th.

25         And one distinction you'll hear testimony about from

1  Ms. Bailey and others, is that Georgia is in a different position

2  than, say, Alabama where the three-judge court delayed qualifying

3  for a couple of weeks.  In Georgia, once you hit the end of

4  qualifying on March 11, you're on a mad dash to -- the voter

5  deadline for mailing out absentee ballots on April the 5th.  So in

6  that time period, you'll have elections officials getting proofs

7  of ballots, working through those proofs, making the edits.  You

8  have to proof the Republican ballot, the Democratic ballot, the

9  non-partisan ballot, get those back to the secretary, work through

10 that process with them, get those all set so you have time to

11 print them and get them sent to voters.  So even if there was a

12 delay in the qualifying process, you'll hear Ms. Bailey testify to

13 this, you're placing the timely holding of the May election at a

14 great risk.  And if you delay qualifying, you might have to also

15 delay the primary.  And delaying the primary would work a massive

16 disruption in terms of early voting sites, election date sites,

17 voter confusion, candidates who have relied on that for strategy,

18 all of those different components.  Those are the timing issues

19 that you will hear about as we move through this.

20          So we began on January 13 in terms of the election.  We

21 are now well into the process of updating voter registration

22 databases, and this is -- this election is so far out of the train

23 station at this point, it would be dangerous to try to pull that

24 back and change things now.

25          As I wrap up, I want to remind you, there's kind of a

1   slide here that has different complicated legal issues we have to

2   decide, we have to look at.  Denial or abridgement of voting on

3   account of race or color, that's what we're trying to get at that

4   question.

5          We talked about the Gingle's preconditions that have to

6   be worked through with drawing the district, the political

7   cohesion, and the plaintiffs don't believe that the cause of that

8   is relevant.  It's part of at least the totality and the

9   circumstances of what is happening in Georgia and trying to answer

10  the question:  Is voting equally open to black Georgians on these

11  redistricting plans, in particular.  That's where all these

12  totality factors come into play at the end.  And so those are all

13  of the things that have to happen in the next six days

14  essentially, how to work through all these different legal issues

15  along the way.

16         So we believe plaintiffs will not be able to show that

17  they are clearly entitled to relief.  We have to go through this

18  long discovery process.  We can get to the question by 2024, but

19  let's not try to do this on a rushed PI basis right now.

20         So in conclusion, the evidence will show you that the

21  plaintiffs cannot prevail on their motion.  They have not

22  presented with proper remedies that can be used there, the

23  improper focus on race when drawing districts makes these

24  unconstitutional racial gerrymandering.  And we'll talk through

25  that.

1          The voting patterns in Georgia, you'll hear testimony is

2     polarized by party, not by race.  That's the key question.  The

3     totality of the circumstances show that black Georgians are able

4     to participate fully in the election processes in Georgia.  But

5     even if the plaintiffs show they're likely to succeed on those

6     issues, they can't show the other factors necessary to get the

7     preliminary injunction.  The equities and the public interest

8     massively favor avoiding the confusion and chaos that will result

9     by changing the district maps at this late date.

10          So, Your Honor, the way to sum this up is, Section 2

11    require this intensely local appraisal of the facts on the ground.

12    That is the point of a Section 2 case, why we do it through a

13    bench trial with significant discovery.  It's almost like it

14    requires hours of time watching gaming film.  It requires weeks

15    and weeks and weeks of practice reps getting ready for the game.

16    What the plaintiffs are essentially asking you to do is join them

17    in the arm chair, yelling at coaches, pull out Stetson and put in

18    JT and not recognizing that these are questions that the

19    Legislature studied.  They looked at the game.  They studied the

20    issues.  They took the time to hear from Georgians and draw these

21    maps.

22          We would urge the Court not to second-guess the

23    Legislature's decision especially on this timeline and especially

24    on the evidence that you'll hear.  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Tyson.

1          A couple of matters.  There was a motion filed to

2  exclude or strike the testimony of the three state's experts.  The

3  Court is going to deny that motion.  The three experts will be

4  allowed to testify.  I note your exception to my ruling.

5          Last night I received Document 95, plaintiff's unopposed

6  motion to take judicial notice.  I would have taken that judicial

7  notice at the proper time in this case.  I received the

8  stipulations.  Thank y'all, and I also saw the declarations.

9          As indicated, this hearing will deal with whether or not

10 the Court is going to grant the injunction.  As y'all three have

11 already indicated, the Court will also have to make what I call a

12 precis decision as well.  And so keep that in mind as you address

13 the Court.

14         And with that stated, are both sides invoking the rule

15 of sequestration?  I understand y'all want to keep your experts in

16 at certain times.  All other witnesses, are you invoking the rule

17 or are they allowed to start courtroom?  I'll start with Mr.

18 Hamilton first.  What is your position?

19         MR. HAMILTON:  Our position is the sequestration rule

20 should be waived.

21         THE COURT:  Okay.  Ms. Lakin?

22         MS. LAKIN:  With respect to the experts, we gave one

23 expert in the room.  We join in the request that any experts can

24 be in the room.

25         THE COURT:  Mr. Tyson?

1          MR. TYSON:  We would invoke the rule as to non-expert

2     witness, but we are fine with the experts staying in the room.

3          THE COURT:  Experts can remain in the courtroom, but all

4     other witnesses are to make sure they are in the witness room to

5     my right across the hall.  There is an overflow courtroom for

6     individuals to hear, not see, on the 21st floor.  It's Room 2105.

7     With that stated, you can call your first witness.

8          MR. HAMILTON:  A couple of housekeeping things.  I

9     wanted to note that in the interest of efficiency, the state has

10     and Alpha plaintiffs have agreed with the plaintiffs to introduce

11     Dr. Collingwood's report without requiring him to testify.  So I

12     just wanted to note that for the record.

13          THE COURT:  Is that correct, Mr. Tyson?

14          MR. TYSON:  Yes, Your Honor.  It is.

15          THE COURT:  Alpha?

16          MS. LAKIN:  No objection.

17          THE COURT:  All right.  That will happen.

18          MR. HAMILTON:  Thank you, Your Honor.  Because of health

19     conditions, Dr. Burton would like to be able to testify remotely,

20     which we've already discussed with the courtroom deputy

21     Ms. Wright.  That won't happen today.  That will be later this

22     week.

23          THE DEPUTY CLERK:  I need to know at least a day in

24     advance.

25          MR. HAMILTON:  At least a day in advance?

1          THE COURT:  We have to let our IT people know.  First of

2     all, is there any objection coming from Alpha?

3          MS. LAKIN:  No, Your Honor.

4          THE COURT:  From the State?

5          MR. TYSON:  None here, Your Honor.

6          THE COURT:  If he's going to testify tomorrow, we need

7     to know today.  One day in advance.

8          MR. HAMILTON:  Thank you.  And then our first witness is

9     going to be Dr. Cooper.  My colleague, Ms. Khanna, will be

10    examining Dr. Cooper.  And as you know, we've proposed and the

11    Court has directed that we present the evidence organized by topic

12    with mapping experts going first and then the experts addressing

13    racially polarized voting, and then, finally, a number of

14    witnesses to address the Senate factors.

15         Our first witness, Dr. Cooper, has been retained as an

16    expert by both sets of plaintiffs to address the Congressional map

17    on behalf of the Pendergrass plaintiffs, and separately to address

18    the Legislative maps on behalf of the Alpha plaintiffs.  So for

19    the sake of clarity, we intend to elicit Dr. Cooper's testimony

20    this morning with respect to the Congressional map in our case and

21    the Pendergrass case, allow the State to cross-examine him on that

22    topic.  Then the Alpha plaintiffs would call Dr. Cooper in their

23    case, elicit Dr. Cooper's testimony on the Legislative map, allow

24    the State to cross-examine.  For the remaining witnesses that the

25    Pendergrass and Grant plaintiffs will call, we'll address the

1  Congressional and Legislative issues in one examination, given the

2  overlap.  But I just wanted to flag how we intended to proceed

3  with Dr. Cooper and make sure there is no objection.

4        THE COURT:  I appreciate that.  Thanks a lot.  It

5  clarifies for me, everything I need.  So thank you.

6        MR. HAMILTON:  And then the last thing, Your Honor, in

7  the interest of efficiency to try to move it along.  There are a

8  number of Plaintiff's exhibits as to which there have been no

9  objections by any party.  And so at the outset, we would like to

10  move all of them into evidence.  And I've circulated a list to the

11  State and to other counsel, and I will hand one to Court Clerk.

12        THE COURT:  Mr. Tyson, do you agree there is no

13  objection to that list?

14        MR. TYSON:  Yes, Your Honor.  These are the ones we have

15  not made any objection to.

16        THE COURT:  Mr. Hamilton, I hate to ask you to do this,

17  but for the record very quickly, if you could just say -- not a

18  whole lot about it, but what they are --

19        MR. HAMILTON:  By number?

20        THE COURT:  Yes.

21        MR. HAMILTON:  So at this time, plaintiffs move Exhibit

22  Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,

23  18, 19 and 20, 21, 22, 23, 24, 25, 26, 38, 39, 40, 53, 55, 56, 57,

24  58, 60, 62, and 66.

25        THE COURT:  All right.  They're admitted into evidence

1  without objection.

2           (Government's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

3  11, 12, 13, 14, 15, 16, 17, 18, 19 and 20, 21, 22, 23, 24, 25, 26,

4  38, 39, 40, 53, 55, 56, 57, 58, 60, 62, 66 were received and

5  marked into evidence.)

6           MS. LAKIN:  Your Honor, before we call the first

7  witness, we would also like to move in the Alpha Plaintiff's

8  exhibits that also have no objection, just for purposes of

9  housekeeping.

10          THE COURT:  That's fine.  No problem with that, Mr.

11 Tyson?

12          MR. TYSON:  We exchanged the list last night.  It

13 contains the list.  We have no objection.

14          THE COURT:  Mr. Hamilton, no objection?

15          MR. HAMILTON:  No objection.

16          THE COURT:  Counsel?  I'm allowing this counsel to state

17 which ones are.  If you could move over for a second.  I'm trying

18 to keep all of these protocols up and keep you safe.

19          MS. LAKIN:  Just for purposes of reading this into the

20 record, for the Alpha exhibits, I will refer to them as "A"

21 exhibit number.  So exhibit numbers A1, A2, A3, A4, A5, A6, A7,

22 A8, A9, A10, A11, A12, A13, A14, A15, A16, A17, A18, A22, A37,

23 A46, A47, A48, and A49.

24          THE COURT:  All those exhibits are admitted into

25 evidence without objection.

1              (Alpha Exhibits Nos. A1, A2, A3, A4, A5, A6, A7, A8, A9,

2   A10, A11, A12, A13, A14, A15, A16, A17, A18, A22, A37, A46, A47,

3   A48, A49 were received and marked into evidence.)

4              MS. LAKIN:  Thank you, Your Honor.

5              THE COURT:  Mr. Hamilton, you can come back and call

6   Dr. John Cooper, I think, to the stand.

7              MR. HAMILTON:  Yes, my colleague Ms. Khanna is going to

8   call Dr. Cooper.

9              THE COURT:  I wanted to make sure I get it right.  I

10  would rather be called Jones instead of Smith.

11             MS. KHANNA:  I will call Dr. Cooper at this time.

12             THE COURT:  Dr. Cooper, if you will come up.  You can

13  remain standing.

14             THE DEPUTY CLERK:  Do you solemnly swear that the

15  evidence you shall give in the matter now before this Court, shall

16  be the truth, the whole truth and nothing but the truth, so help

17  you God?

18             THE WITNESS:  I do.

19             THE DEPUTY CLERK:  Could you please state and spell your

20  name for the record?

21             THE COURT:  One second.  Would you grab those baggies.

22             What we're doing, sir, I'm going to ask you to put one

23  of the baggies on the mic.

24             THE WITNESS:  Okay.

25             THE COURT:  Ms. Wright, will you tell him again what you

1  want him to do?

2           State your name.

3           THE WITNESS:  William Sexton Cooper.

4  WILLIAM SEXTON COOPER, having been sworn,

5  testifies as follows:

6  DIRECT EXAMINATION

7  BY MS. KHANNA:

8  **Q.**  Good morning, Mr. Cooper.

9  **A.**  Good morning.

10  **Q.**  You've been retained as an expert on behalf of the Pendergrass

11  plaintiffs in this case; is that right?

12  **A.**  Yes.

13  **Q.**  And you prepared two expert records in the Pendergrass case;

14  correct?

15  **A.**  Yes.

16  **Q.**  An initial report and a supplemental report?

17  **A.**  That is correct.

18  **Q.**  I want to pull up on to the screen Plaintiff's Exhibit 1.  Can

19  you please identify this exhibit on the screen?

20  **A.**  This is the initial declaration I prepared.

21  **Q.**  And if I can now pull up Plaintiff's Exhibit 2.

22  **A.**  And this is the second declaration.

23  **Q.**  And you have both of those exhibits in front of you in a

24  binder with all of the Plaintiff's Exhibits; correct?

25  **A.**  I do.

**Q.**  If we can pull up page 29 of Plaintiff's Exhibit 1.  And you can just look at it on the screen for now.  Is this a copy of your CV?

**A.**  Yes, it is.

**Q.**  Is it a complete and accurate summary of your background and professional experience at least with a date at the very top of it?

**A.**  Yes, as of October 31, 2021.

**Q.**  Wonderful.

Mr. Cooper, I'm just going to ask you a few questions about your background and expertise without combing through your resume. What is your profession?

**A.**  I provide consulting services using geographic information system software to analyze demographic data and prepare election plans.  I do it for various entities, governments, civil rights groups, non-profits.  Self-employed.  And I live in Bristol, Virginia, which is just due north of here by about 300 miles.

**Q.**  Mr. Cooper, is it fair to say that you draw maps for a living?

**A.**  Yes.  Lots of them.

**Q.**  Have you been accepted as an expert witness in cases involving redistricting before?

**A.**  Yes.

**Q.**  Approximately how many cases have you testified in?

**A.**  I've -- I've either testified in trial or by declaration in something approaching a hundred.  I started doing this in 1986.

1  So over the years numerous cases have accumulated.

2  **Q.**  So over 30 years of experience in testifying in court?

3  **A.**  Right.

4  **Q.**  Have you served as an expert in any other Georgia

5  redistricting cases?

6  **A.**  I have.  At least ten, I think, are listed on my CV that was

7  just submitted.

8  **Q.**  Do you have any examples --

9  **A.**  Way back to the 1990s.

10  **Q.**  Do you have any examples of the areas and the kind of cases

11  you've litigated in Georgia, or, I'm sorry, you've served as an

12  expert for in Georgia?

13  **A.**  Yes, I think my first case involved a little town in Telfair

14  County called Lumber City, and I testified at trial in Augusta in

15  that case.  That was in 1989, I think.  It might have been '90,

16  but I think it was '89.  Throughout the '90s I testified in

17  several cases in Georgia.  One in Rome.  Another one in Cook

18  County, another one in Bulloch County.  Also filed a brief

19  declaration in Miller v. Johnson, but I was not very active in

20  that case until the very end, and probably leaving an important

21  one out here.  I did lot of voting plans in Georgia during the

22  '90s, not necessarily litigation-related, for counties and towns

23  for civil rights organizations during that time period.

24  **Q.**  And over the last decade did you also testify as an expert

25  witness in the Fayette County case?

**A.**   Oh, yes, moving forward this decade I testified in the Section

2 case involving Fayette County, Georgia.  I also provided test --

declarations in a case that did not finally go to trial in

Gwinnett County, Georgia.  I testified via declarations for two

state level cases, one involving State House Districts, NAACP, I

believe, and another one involving a Georgia congressional plan.

Both of those cases were in 2017/2018 time period.  I provided

declarations in a lawsuit involving the school board in Emanuel

County, Georgia, and I developed a consent decree plan for that

particular locale.  I also developed along with input from the

defendants for century plan for Fayette County in 2015, I believe

was the date that it finalized.  So I have been active in Georgia.

**Q.**   Have any of the Section 2 lawsuits in which you served as an

expert resulted in statewide redistricting plans?

**A.**   Yes, approximately four.  In the 1990s, a new House district

in west Tennessee was created in a Section 2 lawsuit I was

involved in.  In the 2000s -- and really my work started in the

1990s, I was involved in statewide legislative Section 2 lawsuits

in Montana and South Dakota and the upshot of those two cases

were -- was that in Montana two additional House districts were

drawn as a remedy for a Section 2 violation and another Senate

seat.

     And the same is true in South Dakota later that decade where

the Court simply ordered my illustrative plan into effect because

the defendants failed to produce a remedial plan.

1  **Q.**  And you also served as an expert in a Mississippi case Section
2  2 case as well?
3  **A.**  That's true.  In 2019 I testified in federal court in
4  Mississippi, and that was a Section 2 case involving a state
5  Senate case in the Delta part of the state, and the Court ruled in
6  our favor, and the state redrew the boundary for that state Senate
7  District.
8  **Q.**  Mr. Cooper, when was the last time you testified as an expert
9  map drawer in a Section 2 case?
10  **A.**  That would have been early January.  I testified in the
11  Alabama congressional case that is now with the Supreme Court.
12  **Q.**  Just a few weeks ago?
13  **A.**  Yeah.
14  **Q.**  Did the court credit your testimony in that case?
15  **A.**  Yes, it found me to be credible.
16  **Q.**  Did you recall the outcome of the district court opinion in
17  that case?
18  **A.**  Favorable to the plaintiffs.
19  **Q.**  Have you only done work on behalf of plaintiffs in litigation?
20  **A.**  No, I've worked on behalf of local governments and state
21  governments.
22  **Q.**  Do you have any examples of cases where you've worked on
23  behalf of the defendant jurisdictions?
24  **A.**  Well, the most recent example would be in the Northern
25  District of Florida in the summer of 2020 where I was the expert

1    for the city of Quincy, Florida in a Section 2 lawsuit that was

2    filed against that particular locality.  Earlier in the decade I

3    worked for the state of Maryland and the state of Pennsylvania

4    regarding parts of gerrymanders or parts of redistricting trials.

5    And I have done other work for local governments even since the

6    2020 census was released.  I developed the election plan that is

7    now in place in San Juan, Utah, San Juan County, Utah which is a

8    rural county in the southwest part of the state.  I drew a three

9    district commission plan for that entity.  And also provided an

10   analysis of the election plan for the City of Wenatchee,

11   Washington.  I drawn a plan for Wenatchee, Washington, in 2018

12   that was adopted, and they have wanted me to take a second look

13   with the release of the 2020 data to determine whether or not it

14   was mal-apportioned.  I discovered it was not mal-apportioned.  So

15   that was a short project.

16           MS. KHANNA:  Your Honor, I would like to now proffer

17   Mr. Cooper as an expert in redistricting and with reference to

18   census data to the Court.

19           THE COURT:  Voir dire?

20           MS. LAKIN:  None.

21           THE COURT:  I know you probably wouldn't, but I still

22   have to ask.

23           From the State?

24           MR. TYSON:  No objection, your Honor.  We'll ask some

25   questions of Mr. Cooper in cross.  No objections to his

1  qualifications.

2          THE COURT:  He's allowed to testify as an expert.  For

3  the record, I'm kind of guessing that Pendergrass and Grant does

4  not.  If Alpha is not going to object, I could do one of two

5  things; I can go ahead and make an assumption and not ask you, or

6  I can do the procedure that I have to ask you on the record.

7  Which one would you prefer?

8          MS. LAKIN:  Your Honor, for purposes of the record,

9  please go ahead and continue asking.

10          THE COURT:  Okay.  Thank you.

11  BY MS. KHANNA:

12  **Q.**  Mr. Cooper, can you please tell the Court what you were asked

13  to do in this case, in the Pendergrass case?

14  **A.**  Well, I was asked to examine the demographics of the state of

15  Georgia based on the 2020 census and also looking back in time.

16  And to determine whether today in 2022, it would be possible to

17  draw an additional Congressional district in Georgia that would be

18  majority black voting edge.  So I proceeded to analyze the

19  demographics and developed an illustrative plan for the plaintiffs

20  that shows it's extraordinarily easy to make a new majority black

21  district in Georgia.

22  **Q.**  And is there any -- what region in particular did you examine

23  when you were determining the question of whether it is possible

24  to draw an additional majority black district consistent with

25  traditional principles?

**A.**   Well, I focused on metro Atlanta, where all the population growth of the African-American population over the past decade has occurred.  And specifically the western part of metro Atlanta and the Counties of Fayette, Cobb, Douglas, and Fulton.

**Q.**   Let's talk a little bit about those demographics that you just mentioned over the last decade.  Can you please describe at a high level the population growth patterns among the different racial groups in Georgia since 2010?

**A.**   Well, yes.  The average American population has increased by about a half-million, 500,000 persons.  So that's more -- well over what would be half of a congressional district.  The minority population on the whole has grown by over a million.  I think it's 1.76 million.  And the non-Hispanic white population during that same time frame has actually declined by about one percent or 52,000 people.

**Q.**   Actually let's pull up Plaintiff's Exhibit 1, page 7, which is figure one of your report, your initial report in this case.  And I believe this reflects some of the numbers that you just mentioned.

**A.**   Yes.

**Q.**   What does this figure tell us about the demographics of the population growth of all of the population that was gained in Georgia over the last decade?

**A.**   It's been exclusively the population that is non-white or minority.

1  **Q.**  And you mentioned earlier that approximately 55 -- 500,000 of

2  that growth of over a million was attributable to the black

3  population?

4  **A.**  Yes.

5  **Q.**  Is that accurate?

6  **A.**  Yes.

7  **Q.**  The non-Hispanic white population, I think you testified it

8  dropped by almost a percentage point.  How does that -- how did

9  that account for in absolute terms?

10 **A.**  Almost 52,000 persons.

11 **Q.**  And I see on this chart you have at the bottom two categories,

12 SR blacks, single-race black, and AP black, which I believe is any

13 part black.  Can you explain the difference between those two

14 metrics?

15 **A.**  Yes.  A person who is considered to be single-race black would

16 have checked the census form on April 20 -- on April 1, 2020 or

17 thereabouts to indicate that they were of one race, black.  If you

18 are part of the -- any part black category, then those are persons

19 who are either one race, single-race black, or persons who checked

20 black and some other race, like black and white or black and

21 indigenous.

22 **Q.**  What metric do you use in your analysis when determining

23 whether the black population is sufficiently large to create an

24 additional large majority district?

25 **A.**  In this case, I used the any part black population and any

1  part black voting age population metrics.

2  **Q.**  And why do you use that metric instead of the single black?

3  **A.**  Well, there is case law now that I think requires one use any

4  part black in most instances.  There is a Supreme Court ruling

5  Ashcroft v. Georgia from 2003 where the Supreme Court specifically

6  relied on the any part black definition and the three-judge panel

7  in Alabama three weeks ago also agreed that the any part black

8  category was the appropriate metric to use in a Section 2 case.

9  **Q.**  You mention the Alabama case as a court that also used the any

10  part black metric in determining whether the first Gingle's

11  precondition has been satisfied.  Have there been any other

12  Section 2 cases where you recently testified where the Court

13  determined that the any part black metric was the appropriate

14  metric to use?

15  **A.**  Yes.  The Fayette County Georgia case specifically also relied

16  on the any part black definition.

17  **Q.**  And what about in the Ferguson School district cases?

18  **A.**  In the Ferguson school district case in Missouri that I was

19  involved in around 2014 or 2015 also relied on the any part black

20  definition.

21  **Q.**  Looking back at figure one, what is each racial group's share

22  of the population in 2020 under the census data?

23  **A.**  We're focusing in figure one in part because I have a typo in

24  this.

25  **Q.**  I don't believe it's in this one actually.

1    **A.** I'm sorry, you're right.  It's 33.03 percent for the state.

2    **Q.** The black population is about a third of the entire population

3    of Georgia, correct?

4    **A.** Yes.

5    **Q.** What about the white population?

6    **A.** It is 49 -- I'm sorry, 50.06 percent, so it's just about 50

7    percent.  Razor-thin majority.

8    **Q.** Georgia is almost a majority/minority state; is that right?

9    **A.** Almost.

10   **Q.** Is there any particular region of the state that seems to

11   hydrate Georgia's population growth?

12   **A.** Yes, clearly metro Atlanta.

13   **Q.** If we can turn to page 14 of Plaintiff's Exhibit 1 and figure

14   five.  So we can focus a little bit more on the demographic trends

15   in metro Atlanta.  Can you explain what this figure shows?

16   **A.** Yes.  This figure shows the change in the ethnicity of the

17   population in metro Atlanta.  In other words, as I defined metro

18   Atlanta, I'm using the term to apply to what is known as the

19   Atlanta MSA, a 29-County region as defined by the census bureau

20   and the Office of Budget Management, the U.S. government.  So it's

21   a well-known, well-established --

22          THE COURT:  At the appropriate time I would like you to

23   put the names of those 29 Counties in the record.  We don't need

24   to do it right now, but it needs to be a part of the record, but

25   we'll do that a little bit later.  Okay.

1          MS. KHANNA:  Thank you, Your Honor.  We will.

2    BY MS. KHANNA:

3    **Q.**  You mentioned -- you referred to the 29-County MSA.  What does

4    the MSA stand for?

5    **A.**  Metropolitan statistical area.

6    **Q.**  That area you said is defined by the U.S. census bureau?

7    **A.**  Yes.

8    **Q.**  As well as the Office of Management and Budget?

9    **A.**  Yes.

10   **Q.**  I looked at the last line of figure five here.  It looks like

11   the 2020 percent of the population that is black is actually a

12   little lower than the 2010 percent of the population that was

13   black.  Is that accurate?

14   **A.**  Yes, that was unfortunate a copy and paste error.  The number

15   is higher.  It should be almost 36 percent, 35.9 1 percent for

16   metro Atlanta.

17   **Q.**  Okay.  Thank you, Mr. Cooper.  Let's turn to page 55 of your

18   report, let's take a look at the enacted congressional plan.  This

19   is the plan as a whole, and I think maybe we should zoom in also

20   closer on metro Atlanta.  This is on page 56 of Plaintiff's

21   Exhibit 1.  Mr. Cooper, what is notable about the enacted maps

22   treatment of the Atlanta metro area?  You can look at the figure

23   on your screen if that's easier for you.

24   **A.**  I've got it in my exhibit book, too.  Well, it's notable that

25   many -- that the proposed plan creates a District 13 that extends

1  from around Fayette County and beyond east, and also north into

2  Cobb County.  So Fayette is kind of the center of the district,

3  although not the whole County, just the northeast part.  The key

4  point is this District 13 is packed with African-American voters.

5  Under the 2021 plan it's almost 65 percent, a little bit over 65

6  percent black voting age.

7      And so it's clear to me based on my demographic analysis that

8  it would be very easy to unpack that population so that there are

9  fewer African Americans living in the district but still a clear

10  majority black voting age population district.  And in so doing

11  create an additional majority black district in western metro

12  Atlanta that would include a little part of Fayette County and

13  south Fulton County, west -- eastern Douglas County and central

14  Southern Cobb County.

15  **Q.**  I believe I think you might have misspoken when you said the

16  proposed plan.  This is the enacted plan we're talking about,

17  correct?

18  **A.**  The exhibit said proposed.  But it is clear by the state we

19  got it, it was the enacted plan.

20  **Q.**  Understood.

21          THE COURT:  Hold on.  Go back over the Counties you're

22  talking about in the proposed plan.

23          THE WITNESS:  The Counties I'm talking about for the

24  proposed plan include Henry County, Clayton County, part of

25  Fayette County, south Fulton, eastern Douglas County, and part of

1  south Cobb.  I think I've included all those Counties.

2  BY THE ATTORNEY:

3  **Q.**  I'm sorry.  Just to clarify what Counties were you listing

4  there?

5  **A.**  District 13.

6  **Q.**  Oh, the current District 13, under the enacted plan?

7  **A.**  Yes.

8        THE WITNESS:  That was your question, Your Honor?

9        THE COURT:  Yes.

10  BY MS. KHANNA:

11  **Q.**  You mentioned the packing that you observed in the enacted

12  plan District 13.  Did you also observe any cracking in the

13  enacted plans treatment of the metro Atlanta area?

14  **A.**  Yes, to the extent that the areas in the south Fulton and

15  eastern Douglas County and southern and central Cobb County have

16  significant black populations, and some of those areas

17  have -- well, they've been placed in Fulton County in District 13

18  and that is, in fact, packing to a large degree.  So that the real

19  cracking, which is the fragmentation of the black population,

20  is -- is most evident in Cobb County.  Cobb County has been split

21  four ways under the enacted plan when, in fact, it is almost

22  impossible to create an entire congressional district within Cobb

23  County.  And the illustrative plan we'll see a little bit later,

24  I've drawn a district that creates an additional black district

25  that would include part of Cobb County and just split Cobb County

1  two ways.  As it now stands, the enacted plan takes population

2  that is just a few minutes away from downtown Atlanta in western

3  Cobb County and puts it in District 14, which goes all the way to

4  the suburbs of Chattanooga.

5       THE COURT:  What does the southwest Cobb County have in

6  dealing with the people of the western part Congressional District

7  14?  Let me change it.  What other similarities did you find that

8  the people of southwest Cobb County have with the people in

9  western District 14, if any?

10      THE WITNESS:  I think you would be hard-pressed to find

11 anything with relation to south Cobb County that would connect

12 that part of District 14 to the remainder, particularly since

13 District 14 extends way to the north.  So it's really -- it's

14 really getting into an Appalachian Regional commission territory.

15 It's just not the same.

16      THE COURT:  How would you describe southwest Cobb

17 County?

18      THE WITNESS:  Suburban.

19 BY MS. KHANNA:

20 Q.  Mr. Cooper, you mentioned you also drew an illustrative plan

21 in this case; is that right?

22 A.  That's right.

23 Q.  Could you describe to the Court what is an illustrative plan?

24 A.  It's simply a demonstration plan showing how one could produce

25 a plan with an additional minority/majority district to take the

1  Gingle's precondition, in other words, the population is

2  significantly numerous and sufficiently compact to allow for a new

3  district.

4  **Q.**  So when you are drawing an illustrative plan to determine

5  whether the black population is sufficiently numerous and

6  geographically compact to form an additional majority black

7  district, do you consider race?

8  **A.**  Yes.  That is something that one does consider as part of

9  traditional redistricting principles.

10  **Q.**  So why do you consider race in drawing an illustrative plan?

11  **A.**  Well, you have to be cognizant of race in order to develop a

12  plan that respects communities of interest, as well as complying

13  with the Voting Rights Act because one of the key tenets of

14  traditional redistricting principles is the importance of not

15  diluting the minority vote.

16  **Q.**  Are there other considerations that you take into account in

17  addition to race when drawing an illustrative map?

18  **A.**  Oh, yes.

19  **Q.**  And are those the traditional redistricting principles?

20  **A.**  Yes.

21  **Q.**  Can you generally define what that term means and refers to?

22  **A.**  Well, it's just a set of guidelines, general guidelines,

23  general principles for developing a redistricting plan.  And

24  normally those are listed out as part of a statement by the

25  Legislature or some other government body to advise plan drawers

1  how to draw a plan.

2  **Q.**   What specific traditional redistricting principles did you

3  consider in drawing your illustrative plan in this cases?  Can you

4  list them out?

5  **A.**   Yes.  I, of course, had to be aware of the population of the

6  districts with -- with congressional redistricting plans,

7  population equality is almost an ironclad rule in a sense that you

8  have to draw districts that are within plus or minus one person of

9  the ideal district size.  You can't deviate from that number, or

10  if you do so, it has to be very small.  So that's -- that's the

11  probably the most absolute of all the principles.  So that's

12  number one.

13  **Q.**   What other traditional redistricting principles did you

14  consider in drawing your illustrative plan in this case?

15  **A.**   Other traditional redistricting principles include congruent,

16  the districts have to connect to one another.  You can't have a

17  piece in Cobb County and another one in Raymond County.  Also, you

18  need to draw districts that are reasonably compact.

19          THE COURT:  What?

20          THE WITNESS:  Reasonably compact, reasonably shaped.

21  That is another important factor.  And another factor of

22  traditional redistricting principles one should consider, must

23  consider, on par with population equality is the non-dilution of

24  the minority vote because you have to abide by the Voting Rights

25  Act.  So that's another traditional redistricting principle that

1  is always uppermost in one's mind.

2          I also am aware of, to the extent possible, where

3  incumbents leave.  It's not exactly a redistricting principle but

4  one that should be at least taken into consideration, one should

5  also avoid splitting cities and towns where possible or other

6  political subdivisions, counties, too, and to the extent possible

7  follow precinct lines which are constantly changing oftentimes,

8  but to the extent you can use present-day precinct boundaries,

9  that is better in drawing a plan.

10 BY MS. KHANNA:

11 **Q.**   What about communities of interest?

12 **A.**   That is another -- that is another, more subjective principle.

13 One needs to at least be aware of historical components that might

14 go into how one would draw a plan, regional interests,

15 transportation corridors that may connect one part of a district

16 to another.  The economic base of the region you're looking at,

17 the kinds of employment, so there are a lot of different factors

18 that go into the mix with community of interest, and it is

19 possible for two different people to have or two different plan

20 drawers to have a different perspective of what amounts to a

21 community of interest for a given place.

22 **Q.**   Was any one of these factors the predominant factor when you

23 were drawing your illustrative plan in this case?

24 **A.**   No.  I tried to balance them all, as I always do.  And so I

25 did not -- I did not prioritize anything other than specifically

1  meeting the one-person, one-vote zero population ideal district

2  size.

3  **Q.**  Did race predominate in your drawing of the illustrative plan?

4  **A.**  No, I was aware of the racial demographics for most parts of

5  the state, but certainly did not predominate.

6  **Q.**  Let's take a look at your illustrative plan.  Can we pull up

7  Plaintiff's Exhibit 1, page 65.  This is a map of all of Georgia.

8  I see there is a black outline toward the northwest portion of the

9  state.  Can you explain what that is?  And again it's up on the

10 screen if it's easier for you.

11 **A.**  Well, that's the -- the black outline shows the 29-County

12 metro Atlanta MSA area that we've discussed previously.  And this

13 is a map of my illustrative plan that I developed that did not

14 change the 2021 plan adopted by the state in toto.  It actually

15 leaves Districts 2, 8, 1, 12, and District 5 intact without any

16 changes at all, as well as District 7, which is mostly within

17 Gwinnett County.  So we changed six districts.  I'm sorry, I

18 changed eight districts.

19 **Q.**  So you did not redraw the whole map of Georgia?

20 **A.**  No, I did not.

21 **Q.**  If you could turn to page 63 of Plaintiff's Exhibit 1 --

22          THE COURT:  Go back one second.  No, this map I can ask

23 my question off, and then you can proceed.

24          MS. KHANNA:  Going back to page 63?

25          THE COURT:  Yes, I want to make sure inside of the black

1   is your proposed additional district.

2          THE WITNESS:  All of the districts that I have proposed

3   that are majority black are in the -- inside that black perimeter

4   which represents the 29-County Atlanta metropolitan area.

5          THE COURT:  So that would be the new majority/minority

6   district?

7          THE WITNESS:  The new majority black district is

8   actually District 6, that is kind of a beige color.  That is

9   Fulton, part of south Fulton, a bit of north Fayette County,

10  eastern Douglas County and southern and central Cobb County.

11  BY MS. KHANNA:

12  **Q.**  So Mr. Cooper, you just mentioned illustrative district --

13         THE COURT:  Hold on.  Hold on.  Wait a second.  Go

14  ahead.

15  BY MS. KHANNA:

16  **Q.**  You mentioned illustrative District 6 is the new majority

17  black district that you drew in your illustrative plan; is that

18  right?

19  **A.**  That is correct.

20  **Q.**  How does the illustrative plan address the cracking and

21  packing of black voters that you identified in the enacted plan?

22  **A.**  Well, the illustrative plan reconfigures Districts 4, 13, and

23  6.  District 5, as I mentioned, stays exactly the same as it is in

24  the adopted 2021 plan.  So in order to undo the packing in

25  District 13, I did modify District 14, also, and that district is

1    actually in Newton and DeKalb, and a little bit in Fulton, also.

2    And then progressing south, I reconfigured District 13, so it's

3    only about 51 percent any part black, AP, instead of 56.  From

4    there it is just a matter of looking at south Fulton, Douglas and

5    Cobb and working at the precinct level basically developing the

6    new majority black district.  It was extremely easy to do this.

7    It is not a complicated plan drawing project.  I did it probably

8    in an afternoon.

9    **Q.**  You mentioned I believe that the illustrative plan addresses

10   what you identified as the packing of black voters in District 13.

11   How does it address the cracking of black voters that you also

12   mentioned in Cobb County and surrounding areas?

13   **A.**  Well, it undoes the cracking because instead of splitting Cobb

14   County four ways, I split it just two ways.  So I included all of

15   southern and central Cobb County in District 6.  Also I put the

16   eastern population of Douglas County, which is predominantly

17   African American in District 6, and, of course, south Fulton,

18   which was partly in District 13, has now shifted entirely to

19   District 6, although there was a tiny piece of south Fulton

20   County, the extreme southwest corner that was actually in District

21   3.  You have to look at the map.  There was some cracking in the

22   very extreme southeast part, southwest part of Fulton County.

23   **Q.**  Let's take a look at the data underlying your illustrative

24   plan.  If we can pull up Plaintiff's Exhibit 1, page 22, and take

25   a closer look at figure nine.  Again, we see here a few acronyms.

1   Can you describe what -- explain what the acronym BVAP stands for?

2   **A.**   Yes.  It just means any part black voting age population.

3   **Q.**   What is the BVAP or the black voting age population of your

4   new illustrative of District 6?

5   **A.**   52.3 percent.

6   **Q.**   You also include an acronym here for NHBC VAP.  What does that

7   refer to?

8   **A.**   This is non-Hispanic citizen voting age population.  This is

9   not -- that particular percentage does not come directly from the

10  2020 census.  It is from a census bureau sample that is known as

11  the American Community Survey.  And it's a five-year sample.  So

12  it represents the 2015-2019 citizen voting age population as

13  reported in the American Community Survey.  That's the most recent

14  survey available.  We're still waiting on 2016-2020.  So it's not

15  exactly correct.  Its survey midpoint would be July of 2017.

16  **Q.**   Why did you include -- why did you report the non-Hispanic

17  black citizen voting age population in describing your

18  illustrative plan?

19  **A.**   Well, I think that's a metric that is often reported in

20  districts that have a fairly diverse population, and so that is

21  why I used that metric to demonstrate that not only are all of

22  these districts over 50 percent black voting age population, or at

23  least the ones -- the District 6 and 13 and 4 that I reconfigured,

24  but it was also over 50 percent black citizen voting age

25  population.

1  **Q.**  Is it fair to say that the non-Hispanic black citizen voting

2  age population is a more restrictive definition of which -- who

3  counts as a black voter and who is actually eligible to vote?

4  **A.**  Yes, I think it's the most -- really the most restricted

5  conservative measure you could derive using census-based data.

6  **Q.**  What is the non-Hispanic black voting age population of your

7  new illustrative District 6?

8  **A.**  It is 50.69 percent.

9  **Q.**  You mentioned that the -- what is the black voting age

10  population again for illustrative District 6?

11  **A.**  50.2 3 percent.

12  **Q.**  Let's talk about each of the districting principles that you

13  considered in creating the illustrative plan.  You mentioned

14  population equality, Mr. Cooper.  How is the principle of

15  population equality reflected in your illustrative plan in the

16  Pendergrass case?

17  **A.**  Well, it's reflected with perfection because the districts are

18  plus or minus one person.  So that's indisputable, I think.

19  **Q.**  You also said you consider political subdivision boundaries;

20  is that right?

21  **A.**  I did.  I attempted to avoid splitting counties where

22  unnecessary and avoid splitting towns and municipalities in

23  Georgia because precinct boundaries sometimes cross into and split

24  cities and towns.  Sometimes it's necessary to make sort of a

25  Hobson's choice to take the -- to keep the precinct whole or keep

1  the city whole.  So in some places I chose the city over the

2  precinct and vice versa.

3  **Q.**  Did you have to split counties also in your illustrative plan?

4  **A.**  Yes, to meet one-person, one-vote in the congressional plan,

5  it is absolutely necessary to split some counties.

6  **Q.**  When you did have to split a county, what was your approach in

7  drawing those lines?

8  **A.**  I would try to split the county by precinct.  But again

9  because of the one-person one-vote requirement in some instances,

10 I split precincts.

11 **Q.**  When you had to split a precinct to satisfy one-person

12 one-vote, what was your approach in drawing the lines then?

13 **A.**  I would follow, if possible, a municipal boundary or an

14 observable boundary like a road or waterway.  And in some cases,

15 generally following observable boundaries, but also relying on a

16 census bureau boundary that is established, known as a block

17 group.  And block groups are just components of census tracts and

18 are part of census tracts that are often recognized as a community

19 of some sort.

20 **Q.**  Let's take a look at the number of splits that we're talking

21 about in the illustrative plan.  If we could turn to Plaintiff's

22 Exhibit 1, page 25, and take a closer look at figure 11.  How does

23 the number of County splits in the illustrative plan compare to

24 the number of County splits in the 2021 enacted plan?

25 **A.**  Well, I split one more County in the illustrative plan.  In

1  that eight-district area where I modified the districts, there is

2  one additional county split.

3  **Q.**  And thank you for clarifying.  This figure only addresses the

4  eight districts that you modified in the enacted plan, it doesn't

5  talk about the numbers that exist in the rest of the state?

6  **A.**  Right.

7  **Q.**  And I see the second column there is called unique County

8  district combinations.  What does that refer to?

9  **A.**  That refers to any sort of a split.  For example, in a large

10 County you may have several different pieces of districts, and so

11 that's -- that's the reflection of those pieces of districts.  And

12 so you can see on that metric, the illustrative plan is superior

13 to the 2021 plan.  The illustrative plan splits 14 places on the

14 map versus 19 in the '21 plan.

15 **Q.**  Is it fair to say that the first column refers to the number

16 of actual Counties that are split, while the second column refers

17 to the number of splits total?

18 **A.**  Right.

19 **Q.**  And there you mention that the illustrative plan fares better

20 than the enacted plan?

21 **A.**  Yes.

22 **Q.**  And what about municipality splits, how does the illustrative

23 plan compare to the enacted plan on that metric?

24 **A.**  That metric, again there are fewer splits of municipalities in

25 the illustrative plan in that eight-district area than in the same

1  area under the 2021 plan which splits nine municipalities.

2  **Q.**  And did you endeavor to keep municipalities whole where

3  possible?

4  **A.**  I did.

5  **Q.**  And then I see the last column is called 2020 VTD splits.  Can

6  you explain what a VTD is?

7  **A.**  A VTD is just a census bureau term for precinct.  In Georgia I

8  think the number of precincts statewide in my mind, it's somewhere

9  in the neighborhood of 2800.  And for the eight districts that

10 we're examining here, there are only 44 precincts split or VTD

11 splits.  In the 2021 plan I split three more.  So again, that's a

12 situation probably where I decided to split a precinct to protect

13 the municipality boundary and avoid the split.

14 **Q.**  Does the difference between 44 and 47 VTD splits strike you as

15 a meaningful difference?

16 **A.**  No, it is not.

17 **Q.**  Why is that?

18 **A.**  It's just three precincts.  Precincts are constantly changing

19 in Georgia.  Splitting a VTD should not be a problem at this stage

20 of the decade.

21 **Q.**  So unlike County lines, municipality lines, VTD boundaries

22 shift over the course of a decade?

23 **A.**  Yes, as Counties and cities redistrict, there will be new

24 precincts established.  And if the practice is the same in Georgia

25 as it was in the decade of the 2010s, the state office that

1  handles redistricting in Georgia would produce a new statewide

2  precinct file.  It might not increase the number of precincts but

3  it would merge some and split some.

4  **Q.**  Thank, you, we can take this exhibit down.

5      Mr. Cooper, you also considered geographic compactness; is

6  that correct?

7  **A.**  I did.

8  **Q.**  What are the most common compactness metrics?

9  **A.**  Well, I think the most common is just the eyeball test, but

10 beyond that, the software I use is called Maptitude for

11 redistricting, and it allows you to get an instant readout of a

12 series of compactness measures.  You can actually see, okay, if I

13 move this County, and put it in that district, move this County

14 and put in the other district, how does that affect the scores?

15 There is no bright line rule as to what is necessarily a compact

16 district based on these various measures of compactness.  At some

17 point visually you can see there might be problems, but there

18 are -- it is a way to look at a plan overall and develop a mean

19 score for each plan, and that's what I've done in one of the

20 tables in my declaration.

21 **Q.**  You referred to some various measures of compactness.  What

22 are the most common measures that demographers use or experts

23 map --

24 **A.**  Well, the most common measures probably most frequently

25 referenced are REOC score, which is to -- the REOC score is,

1 basically, in simple terms, just creating a number between zero

2 and one to compare the area of a district with a circle drawn

3 around the district, and so the higher you are towards one, the

4 more compact the district would be under that measure.

5    The Polsby-Popper measure doesn't look at area, but it looks

6 at the perimeter of the district.  If you have a lot of lines

7 going all over the place, that's not a compact district

8 necessarily.  That's a way to take a look at that angle of

9 compactness.  And again, the score goes from zero to one.  And the

10 higher, of course, you are with the score, the more compact

11 district you would have you under Polsby-Popper.  Sometimes those

12 two measures are in conflict; you can have a high REOC score but a

13 lower Polsby-Popper score, and vice versa.

14 **Q.**  Just to clarify, in your experience is there any bright line

15 rule that determines on these metrics or any other when a district

16 is sufficiently compact or not compact?

17 **A.**  No, because so many factors also enter into the equation.  In

18 Georgia, the municipal boundaries in many Counties also are not

19 exactly compact.  So that begins to affect the compactness of a

20 district you might be drawing.  So there is no bright line rule,

21 nor should there be.  You have to at some point it gets quite

22 subjective.  But you know, there are some municipalities in

23 Georgia that have a Polsby-Popper score of point zero one.  That

24 is as uncompact as you possibly can get.  I think that one is in

25 Gordon County.  So it will vary from County to County.  There's

1   some Counties like Social Circle, which is almost a circle, so

2   that's nearly perfectly compact.  There are lots of -- a few

3   circular towns in Georgia that I have seen.

4   **Q.**  Let's take a look at the compactness data of your plan versus

5   the enacted plan.  Pull up Plaintiff's Exhibit 1, page 24, and

6   zoom in on figure ten.  What does this table show about

7   compactness of your plan versus in the enacted plan?

8   **A.**  In short, that it shows almost no difference at all.  2021

9   plan scores 3-100ths of a point higher, point 43 versus point 40,

10  on the REOC score, and on the Polsby-Popper score the 2021 plan is

11  point 25 and the illustrative plan is point 23.

12      So practically speaking, there is no difference.  The low

13  scores are also within the range of what one would expect in the

14  legislative or congressional plan.  In fact, in the Polsby-Popper

15  score, the lists for the two scores are identical, 2.6.

16  **Q.**  You've drawn a number of illustrative plans over the course of

17  30-plus years.  Do any of these numbers strike you beyond the norm

18  or the usual range?

19  **A.**  In the usual range.  There is no problem with the compactness

20  per se in either plan.

21  **Q.**  You also mentioned you considered contiguity; is that right?

22  **A.**  Yes.

23  **Q.**  What is contiguity?

24  **A.**  All pieces of the County must fit -- of the district must fit

25  together.  I think Georgia does allow for water, for places around

1  Jekyll Island, places like that.  You have to connect the island

2  to the shore with the district.  It's just the district has to be

3  in one area and connect in some fashion.

4  **Q.**  Is your illustrative plan contiguous?

5  **A.**  Yes.

6  **Q.**  How do you know looking at the Maptitude software that the map

7  is contiguous?

8  **A.**  You run a little module that will give you an instantaneous

9  analysis of whether or not the districts are contiguous.  I run it

10  frequently.  Sometimes -- and, in fact, you do have situations in

11  Georgia, there is something called point time contiguity involving

12  County lines.  In Newton County, there is a little box that is

13  from Rockdale County, it almost looks like it should belong in

14  Newton County, but it doesn't.  It belongs in Rockdale.

15  **Q.**  You also mentioned communities of interest while listing the

16  various traditional principles that you considered.  How did you

17  take into consideration communities of interest in drawing your

18  illustrative map?

19  **A.**  Well, I looked at a couple of maps of the state that I thought

20  would be very informative.  One was a map prepared by the

21  Department of Community Affairs in Georgia that shows all of the

22  regional commissions in Georgia.  And that map is attached to my

23  exhibit.  I also looked at the census bureau's map of metropolitan

24  statistical areas which are larger population areas in the state

25  that have a community of interest in terms of economic ties and

1  transportation ties, as well as micropolitan areas also defined by

2  the census bureau, and those are part of the state that are

3  urbanized but not large population centers, and there are a number

4  of those.  I think all told there are something on the order of 36

5  metropolitan statistical areas in the state or micropolitan

6  statistical areas, actually more micropolitan than metropolitan

7  areas.

8  **Q.**  You also mentioned just now the regional commission.  What

9  regional commission did you consider as a community of interest in

10  drawing your illustrative plan?

11  **A.**  Of course, focused on metro Atlanta, 29-County area, also

12  there is a more narrow focus on traditional Atlanta to an extent

13  that is the 11-County area that is defined by the Atlanta regional

14  commission.  It used to be ten, but just residential.  I think

15  last summer Forsyth County was added, so it's now an 11-County

16  area that is the core of Atlanta as many people would think of

17  Atlanta.

18  **Q.**  Mr. Cooper, did you read a report submitted in this case by

19  Mr. Morgan on behalf of the defendants in this case?

20  **A.**  I did review that.

21  **Q.**  And he suggested that your illustrative District 6 is not

22  compact.  Do you recall that?

23  **A.**  I do.

24  **Q.**  Did you respond to the criticism in your supplemental report?

25  **A.**  I responded to some of his criticisms.  I don't know if I

1  directly responded on compactness, but I will respond now and say

2  that I do not believe that District 6 is not compact.  It is

3  clearly within the norm.

4  **Q.**  Do you also -- sorry.  Did anything in Mr. Morgan's report

5  submitted on behalf of defendants change your conclusions about

6  the compactness of your illustrative plan?

7  **A.**  No.

8  **Q.**  About three days ago, defendants also submitted the expert

9  report of Gina Wright.  Have you seen that as well?

10  **A.**  I have.

11  **Q.**  I don't actually believe that that report has been submitted

12  into evidence.

13          THE COURT:  It hasn't been submitted into evidence, but

14  I did read it last night.

15          MS. KHANNA:  I think if we can pull that up to make sure

16  we're all reading from the same document.

17  BY MS. KHANNA:

18  **Q.**  Yes.  If we look at page 1 of Ms. Wright's report, paragraph

19  29.  Do you see that Ms. Wright includes a single paragraph of

20  analysis on your illustrative congressional plan; is that right?

21  **A.**  Yes.

22  **Q.**  Let's walk through some of the things that she notes about

23  your plan.  She first writes that she, quote, cannot explain the

24  decision to take District 6 into Fayette County in your

25  illustrative map.  Do you see that?

1  **A.**   Yes.

2  **Q.**   Can you explain that decision?

3  **A.**   Yes.  It's real simple.  To meet one-person one-vote

4  requirements, one has to split Fayette County between District 13

5  and District 6 because if you put all of Fayette County in

6  District 13, it would be overpopulated by -- I don't have the

7  number in front of me, but several thousand people.  So I had to

8  split Fayette County.

9  **Q.**   She also mentions here the black voter registration of the

10  area.  Did you look at voter registrations statistics at all in

11  drawing your illustrative plan?

12  **A.**   No, I did not look at voter registration situations

13  statistics.

14  **Q.**   She next notes that your illustrative District 6, quote, grabs

15  black voters near Acworth, Kennesaw State University to connect

16  them with other black voters in south Cobb, Douglas and Fulton

17  Counties.  Do you see that?

18  **A.**   Yes.

19  **Q.**   What is your response to that observation?

20  **A.**   Well, again, to ensure that District 6 met population equality

21  it is extended further north into Cobb County.  But I don't think

22  there is anything unusual about doing that.  It's not an area that

23  is predominately black.  It is a racially diverse area that in the

24  Senate plan, that part of Cobb County is 48 percent black plus

25  Latino plus Asian CVAP; that is their District 33.  I did go into

1  that area to balance the population out in terms of population

2  equality.

3  **Q.**  Were there densely populated black areas in those Counties

4  that you didn't include in your illustrative map?

5  **A.**  Yes, there would have been in places.

6  **Q.**  So if you were seeking to grab black voters in these areas,

7  could you have done that better if you had wanted to?

8  **A.**  Sure, there would be ways to enhance the black voting age

9  population, not just in District 6 but elsewhere, by changing

10  lines and perhaps splitting some additional Counties.

11  **Q.**  Ms. Wright next notes that illustrative District 13, quote,

12  reaches into Newton County in an unusual way that cannot be

13  explained by normal redistricting principles.  Do you see that?

14  **A.**  Yes.

15  **Q.**  Can you explain that configuration?

16  **A.**  Well, yes.  I did extend part of District 13 into Newton

17  County.  The reason again was because you have to balance

18  populations out, and District 4, which is mostly in Newton County,

19  would have been overpopulated.  So I had to take some population

20  from Newton County and put that into District 13.  And when I did

21  that shift of population, I used whole precincts, except I think I

22  split two precincts, and again that was the issue of trying to get

23  the population down to zero because you're dealing with census

24  blocks.  Some of which have 25 people, others had 34, 72, 10, and

25  so the idea is you have got to keep shifting those blocks around

1  until you get to zero.

2          THE COURT:  In other words, the largest district is

3  765,189 people.

4          THE WITNESS:  Right.

5          THE COURT:  All of them.  You're just trying to keep it

6  within that one-person of 765,000 people.

7          THE WITNESS:  One single person.  There are situations

8  where the state has gone beyond that, not Georgia, but recently

9  Arkansas went above zero to 3 or 400, and there was a case --

10          THE COURT:  Let's stick to Georgia.

11          THE WITNESS:  Okay.

12          THE COURT:  So in Georgia you were keeping with that

13  one-person.

14          THE WITNESS:  Right.

15          THE COURT:  That's why you did what you did going into

16  Newton County?

17          THE WITNESS:  Right.

18          THE COURT:  How did DeKalb County, the fourth district

19  look if you hadn't gone into Newton County, if you left Newton

20  County in the fourth district?

21          THE WITNESS:  Well, it would have changed -- I would

22  have had to make some additional changes elsewhere, I suppose, to

23  get DeKalb County back down to zero.

24          THE COURT:  Right.

25          THE WITNESS:  I didn't really run that experiment, but

1   that's another option, one could change one other County perhaps

2   other than Newton.

3          THE COURT:  Okay.

4   BY MS. KHANNA:

5   **Q.**  And finally Ms. Wright concludes in this paragraph that,

6   quote, that the divisions of Cobb, Fayette and Newton Counties do

7   not make sense as part of normal redistricting principles, and I

8   can only conclude that the drawing of this district is in service

9   of some kind of specific goal.  Did you see that?

10  **A.**  I did.  And I don't understand what she meant really.

11  **Q.**  Did you have one specific goal in drawing your illustrative

12  map?

13  **A.**  No, I did not.

14  **Q.**  You had several goals; is that right?

15  **A.**  Well, yes.  I mean, you asked me to determine whether or not

16  an additional majority black district could be created, but that

17  was not the goal per se.  I had to also follow traditional

18  redistricting principles and then make an assessment as to whether

19  that one additional black district could be determined.  I

20  determined that it could be, but that was not my goal per se.

21  **Q.**  We can take down the exhibit.  Thank you.  Mr. Cooper, in your

22  opinion, as someone who draws electoral districts for a living,

23  does the illustrative map that you drew in the congressional case

24  here comply with traditional redistricting principles?

25  **A.**  Yes.

**Q.**   We discussed earlier you served as an expert in multiple
Section 2 cases over the last 30-plus years; is that right?

**A.**   Yes.

**Q.**   How does this illustrative plan compare to other maps that you
have drawn over the last 30 years?

**A.**   Well, I think I suggested it was extraordinarily easy to draw
this additional majority black district in the western part of
metro Atlanta.  It basically just draws it.  It is just that easy.
I did it in a couple of hours in late November.

          MS. KHANNA:  Thank you, Mr. Cooper.  I have no further
questions at this time.

          THE COURT:  I have one question.  One of the things that
the State argues is that by doing this, you pointed out that eight
other congressional districts -- well, that's a problem.  What do
you have to say about that?

          THE WITNESS:  I don't think it's a problem.  It modifies
the other eight districts, of course.  The State could choose to
draw those districts differently.  I tried to put incumbents in
those respective districts.  I tried to avoid comparing incumbents
except for Gwinnett County, where the Representative Bourdeaux
lives outside of that district but she can run in it because there
is no state requirement that you live in the district.  And the
same with Representative McBath, who lives in Cobb County, I
think, but slightly out of the lines that I drew, and she's
planning on running in Gwinnett County right now as I understand,

1   which is about 15 miles away from where her home is as drawn.

2   Cobb County is about three miles within of where she lives.  She

3   lives close to District 6, but can obviously run in District 7 or

4   elsewhere, for that matter as I understand the law in Georgia.

5           MS. KHANNA:  If I may ask one follow-up question, Your

6   Honor.

7   BY MS. KHANNA:

8   **Q.**  Before drawing an illustrative plan with a new majority black

9   district that didn't exist before, is it possible not to alter any

10  surrounding districts?

11  **A.**  No, you would have to alter surrounding districts.  It may be

12  possible to reduce it to just changing seven.  That's conceivable.

13      But obviously the area west and north of Cobb County is going

14  to have to change.

15          THE COURT:  It goes without saying if you change,

16  something else has to change.

17          THE WITNESS:  That's right.  It is a ripple effect, and

18  that exists in the congressional plans and also the State House

19  and Senate plans in Georgia.

20          MS. KHANNA:  Thank you, Mr. Cooper.  Thank you, your

21  Honor.

22          THE COURT:  Any questions from the Alpha attorney?  I'm

23  giving you an opportunity if you want to ask him any questions

24  regarding the congressional map he's testified to.

25          THE WITNESS:  No, Your Honor.

1              THE COURT:  Before we start the cross-examination.

2    Let's take a break.  It's five after 11; we'll start back at 20

3    minutes after 11.  A 15-minute break.

4              (Whereupon a break was taken.)

5              THE COURT:  I'm ready.

6              MR. TYSON:  Thank you, Your Honor.

7    CROSS-EXAMINATION

8    BY MR. TYSON:

9    Q.  My name is Brian Tyson.  It's good to see you.  I think I last

10   saw you in your deposition in the Dwight case, if I recall

11   correctly?

12   A.  I believe that would be correct.

13   Q.  Glad to have you back.  I have a couple of background

14   questions and then I want to work our way into your declarations

15   and some of the issues you talked through with Ms. Khanna.

16       Have you ever served as an expert witness on the side of the

17   government in Georgia involving the Voting Rights Act?

18   A.  No.

19   Q.  And I believe I last saw you in the Dwight case in 2018.  Do

20   you recall what that case was about?

21   A.  Are you referring to the congressional case?

22   Q.  Yes.

23   A.  Yes, it was about creating an additional majority black

24   district in the Georgia congressional plan that was initially

25   adopted, I think, in 2012.

**Q.**   So that case, as you recall, was based on adding an additional

minority black congressional district to the prior plan, not the

current congressional district?

**A.**   Right, based on the 2010 census.

**Q.**   Do you know what the disposition of that case was?

**A.**   It's my understanding that plaintiffs voluntarily dismissed it

at some point in advance of the 2020 elections.

**Q.**   And you mention in your report that Georgia NAACP and Thompson

cases you were involved in in Georgia.  Do you recall those?

**A.**   I do.  That would have been the state House litigation that

was about the same time, in 2017.

**Q.**   And those cases were also seeking to add majority black

districts to the state House districts, correct?

**A.**   I believe in one instance in Henry County and also in Gwinnett

County.

**Q.**   And do you recall the disposition of those cases?

**A.**   Also voluntarily dismissed.

**Q.**   And that was after Democrats won the seats that were being

challenged?

**A.**   I'm not sure who won the seats.

**Q.**   So let's talk about your declaration.  First I want to get

some definitions.  You used the term "packed" in terms of certain

districts on the Georgia congressional plan.  What's the threshold

you used to determine when a district is packed?

**A.**   I'm not a political scientist, so I'm looking at it somewhat

1    subjectively.  But when I see there are districts in Georgia like

2    District 2 in south Georgia, and District 5 in Atlanta that are

3    both under 50 percent black voting age population and electing

4    African Americans to Congress, it seems to me like it's completely

5    unnecessary then to create a District 13 in metro Atlanta that is

6    over 65 percent black voting age population.

7    **Q.**   So your definition of a packed district is based on other

8    majority or close to majority districts in a jurisdiction?

9    **A.**   It would vary from state to state and case to case.  But there

10   is evidence that there is no need to have -- I think you'll hear

11   that from the Gingle's 2 and Gingle's 3 analysis that plaintiffs

12   are presenting that there are no reasons to have a district that

13   is high as 56 percent black in metro Atlanta.

14   **Q.**   And so there is not a threshold then; you are just comparing

15   it and it's higher than all the others, is that fair to say?

16   **A.**   From my perspective, I would have gotten feedback, I suppose,

17   from the attorneys if there was something special about those

18   Counties that required the black population to be over 65 percent

19   in order to elect a candidate of choice.

20   **Q.**   And you also used the term "cracked" in Cobb County, black

21   voters who votes were being cracked in multiple districts.  Again

22   what is your definition, how did you determine that those voters

23   were cracked?

24   **A.**   Well, Cobb County is split four ways in the congressional

25   plan, and there is part of a congressional district in Cobb County

1  that is majority black, not all of it.  And that factor, plus just

2  looking at the demographics of Cobb County, convinced me that the

3  black population was being cracked, and that one could draw a

4  reasonably compact district that was partly in Cobb, partly in

5  Fulton, partly in Douglas and partly in Fayette.

6  **Q.**  I want to turn to your declaration.  I put on the screen

7  paragraph 8 of your declaration, this is when you indicated in

8  your conversation with Ms. Khanna about what you sought to do.

9  And there you indicated the attorneys for the plaintiffs in this

10  case asked me to determine whether the African-American population

11  in Georgia is sufficiently large and geographically compact to

12  allow for the creation of an additional majority-black

13  congressional district in the Atlanta metropolitan area.  Is that

14  a correct statement of the instructions you were given?

15  **A.**  Yes.

16  **Q.**  And did you start with the adopted congressional plan as your

17  baseline in drawing?

18  **A.**  No.  When I -- we again work -- well, yes, the 2021 plan it

19  was my baseline.

20  **Q.**  When did you first begin exploring drawing congressional

21  districts in Georgia after the 2020 census?

22  **A.**  I believe sometime in the later part of November.  After the

23  2021 plan had been adopted.

24  **Q.**  And so you started with the 2021 plan and you said you began

25  to look at metro Atlanta specifically for whether an additional

1  district could be drawn; correct?

2  **A.**   Correct.  I knew that over 400,000 additional African

3  Americans now reside in metro Atlanta than in 2010, so that was a

4  signal most likely a majority black district could be created.

5  **Q.**  And your goal in drawing was to add an additional black

6  district, correct?

7  **A.**  I was given the request to assess whether it would be possible

8  while simultaneously complying with a traditional redistricting

9  principles.  It was not exactly a goal.  They asked me whether it

10  could be done and I determined very quickly that it could be done.

11  It was very easy.  There are no complexities here like there might

12  be in other states.  This is just drop-dead obvious.

13  **Q.**  And you chose to adjust the area on the west side of Atlanta.

14  Could you have taken District 7 and made it a majority black

15  district if you had adjusted the population differently?

16  **A.**  Perhaps.  I did not try to do that.

17  **Q.**  Did you only draw one plan?  Did you draw several versions of

18  this plan?

19  **A.**  Well, as I told the Judge, it took me a couple of hours to

20  make the assessment that the district could be drawn.  But then to

21  get the population down to zero, I did make modifications that

22  took longer because you can waste an hour or two just trying to

23  get from plus ten to minus ten down to zero, shifting census

24  blocks around.  It took me longer to produce the plan in two

25  hours, but it only took me a couple of hours to know automatically

1    that that district was there.  It was just a matter of refining it

2    getting into one-person one-vote compliance.

3    **Q.**   You chose not to adjust District 5; correct?

4    **A.**   That's correct.

5    **Q.**   District 7?

6    **A.**   That's correct.  I tried to keep districts intact that I

7    could.

8    **Q.**   And so is it your testimony that it is required to modify

9    eight districts to add a single majority black district in

10   Georgia?

11   **A.**   No, it may well be you could reduce it to seven, perhaps six.

12   With further experimentation, it may be possible to just change

13   six or seven.

14   **Q.**   That is not an experiment you've undertaken at this point,

15   correct?

16   **A.**   No, no.  I wanted to make sure that I put the present

17   incumbents in their own district, even though I understand it's

18   not necessary, and that may have impacted my ability to avoid

19   modifying the districts.  It may be that I could have done another

20   configuration that might have impaired incumbents but allow, say,

21   District 10 or one of the most eastern districts to stay as it is.

22   **Q.**   Let me direct you to figure one on page 7 of your report on

23   the screen.  You and Ms. Khanna talked about the increase in black

24   population in different parts of Georgia.  In looking there,

25   obviously there's been a dramatic growth, you indicated 400,000

1  new people joining our state.  But on the next-to-last line for

2  single-race black, is that what SR stands for?

3  **A.**   Yes.

4  **Q.**   For single-race black you indicate that in 2010 the percentage

5  of the Georgia population was 30.46 percent, and in 2020 it was

6  31.0 percent, correct?

7  **A.**   That is correct.

8  **Q.**   That is zero point 54 point increase; right?

9  **A.**   Yeah.  That would be correct.

10 **Q.**   So half a percentage point.  And then on the eight key black

11 number, you have that going from 31.5 percent to 33.0 percent.

12 You agree that's one and a half percent increase?

13 **A.**   One and a half percentage increase, which translates into

14 434,000 people.

15 **Q.**   So when you talk about the dramatic growth, as a percentage

16 there is not a huge change in the number of black individuals in

17 Georgia that as a raw number there was a significant change?

18 **A.**   It is -- it is a change, an upward change in the black

19 population in percentage terms, but the raw number, the absolute

20 number is what really jumps out.

21 **Q.**   And in the far lower right of that chart, you say a

22 15.85 percent increase.  Is that simply this one and a half point

23 increase in AP black being represented as a percentage change?

24 **A.**   No, it's the -- the 484,048-person increase compared to 2010

25 population.

1  **Q.**  So I'm going to move down to paragraph 40 and figure seven.

2  This is the chart in your report that shows the change in metro

3  Atlanta; is that right?

4  **A.**  This chart shows the population change in Cobb, Douglas,

5  Fayette and Fulton Counties, four of the metro Atlanta Counties.

6  There are actually 11.  There are 11, core 11, the 11-county

7  region.

8  **Q.**  Did you look at any other metro Atlanta Counties to conduct

9  this kind of analysis, or were you always zeroed in on Cobb,

10  Douglas, Fayette and Fulton?

11  **A.**  Well, I did look at the metro Atlanta area, as I mentioned in

12  the direct testimony in terms of the 29 Counties.  And I did not

13  produce a table that would look at another set of Counties,

14  although in the legislative plans I draw in the next -- my next

15  piece of testimony, I did look at a five-county area that included

16  South Metro Atlanta, and that would have included in addition to

17  Fayette, Spalding and Newton and Rockdale, and Henry County.

18  **Q.**  And you're reporting the total change of 53.27 percent of

19  black population as a percentage of the total change; right?

20  **A.**  Right.

21  **Q.**  So I want to look at something a little bit more specifically

22  with you.  If you could grab the paper copy of the exhibits that

23  are there in front of you, the notebook, and if you could go to

24  Plaintiff's Exhibit 1, page 45.  Some of the backup documentation

25  you have.

**A.**   Plaintiff's Exhibit 1, page 45?

**Q.**   It looks like this.  Aaspreadsheet with various County populations on it.

**A.**   Yes.

**Q.**   Are you with me there?

**A.**   Yes.

**Q.**   So I just want to dig in a little bit.  I went to law school so I would not have to do math, but at the risk of doing some math, I want to make sure I understand this.  I have an Excel sheet here.  I want to do this calculation with you.  The way I read this Fulton County line here, the 18-plus pop column has 847,182.  Do you see that?

**A.**   For the 18-plus pop in Fulton County, yes.

**Q.**   And that's the number of people of voting age in Fulton County on the census, correct?

**A.**   On the 2020 census, right.

**Q.**   The column next to that is the 18plus AP black column, that is the number of any part black people of voting age in Fulton County in the 2020 census, correct?

**A.**   Correct.

**Q.**   I entered those two numbers into my spreadsheet.  If I wanted to know what the percentage of people in Fulton County who are AP black VAP, I would divide the 368,635 by 847,182; is that correct?

**A.**   That is correct.

**Q.**   So when I do that, I get a 43.51 percent number.  Now you have

1  represented in the far column there that there is a 20 percent

2  change in the black voting age population; is that right?

3  **A.**   In the -- in the total black voting age population African

4  -- any part black compared to 2010.

5  **Q.**   So if I wanted to know the 2010 numbers, I would have to take

6  847,182 and subtract the 18-plus pop change number 146,287 number,

7  right?

8  **A.**   Yes, I think you could derive it from this table.

9  **Q.**   If I wanted to know the AP black VAP raw number, I would take

10  368,635 and subtract 62,029; is that correct?

11  **A.**   I think so.  I didn't catch everything, yeah.

12  **Q.**   Okay.  So then this would give me -- basically I'm taking the

13  2020 number minus the change from 2010, so we're getting the 2010

14  VAP number and then the 2010 voting age AP black VAP number,

15  correct?

16  **A.**   Yeah, I'm not prepared to do calculations in my head on the

17  stand.  So I'm not sure where you're leading with this.

18  **Q.**   What I want to do --

19  **A.**   -- the calculation error or something.

20  **Q.**   It's not an error.  I just wanted to understand when I do this

21  calculation here, it shows that the black VAP percentage in Fulton

22  County in 2010 was 43.74 percent, and in 2020 it's 43.51 percent.

23  So it's actually gone down by two-tenths.

24  **A.**   That's possible.  I can't say for sure because I'm not -- you

25  know, I don't have a calculator.  I don't have the data in front

1  of me either, so...

2  **Q.**  You're representing this as a 20 percent change in Fulton

3  County on the far right number, what are you showing with that 20

4  percent on your spreadsheet here?

5  **A.**  Well, the -- I'm showing for Fulton County that the black

6  voting age population increased by 20.2 percent compared to 2010.

7  **Q.**  And you're calculating that as a percentage of raw votes, not

8  as a percentage of the population of Fulton County by each

9  demographic group, correct?

10  **A.**  Right.  It's a 20 percent increase in the black voting age

11  population for 2020 compared to 2010.

12  **Q.**  And it's possible other demographic groups changed in the --

13  **A.**  Well, you mean other demographic groups have been part of the

14  increase in the overall non-white population in Fulton County;

15  that's true.

16  **Q.**  It's possible for the black voters to go up by 20 percent but

17  actually be less of a share of population in Fulton County,

18  correct?

19  **A.**  Yes, that's possible.

20  **Q.**  Let's go back to your declaration and start talking about your

21  illustrative plan.  I'm going to bring up paragraph 45.  Actually

22  we've already covered that.

23      Let me go to a higher resolution of your plan.  I want to talk

24  about here -- this is page 72 of your report.  I want to ask some

25  questions about the design of District 6 as you've configured it

1  on your illustrative plan.  First of all, you would agree with me

2  District 6 is just barely a majority black voting age on its AP

3  voting age population, correct?

4  **A.**  Yes, it's a little over 50 percent black voting age

5  population.

6  **Q.**  And so what I first wanted to ask about, you indicated that

7  this little tail running down into Fayette County -- I'm pointing

8  to it on the screen so you can see it here -- was done for

9  one-person one-vote purposes, correct?

10  **A.**  Well, yes, because I had -- I had to reduce the population a

11  little bit in District 4 to bring it into compliance because it

12  was overpopulated under the 2020 census.  That in turn meant I was

13  putting even more people into District 13 because that too was

14  overpopulated.  So after bringing Fayette County into District 13,

15  it too did include not all of Fayette County.  So I included the

16  northern part of Fayette County, a racially diverse area.  That is

17  not overwhelmingly black.  It's balanced to some part of Cobb

18  County where there is no racial majority.

19  **Q.**  So it's your testimony the portion of Fayette you included is

20  not a heavily black area?

21  **A.**  I don't have the percentages, but it does not include any of

22  Fayetteville, except maybe a little tiny part that may be related

23  to one of those precincts that turn into the town of Fayetteville

24  that I wasn't able to split, and zero population area of Tyrone,

25  and the rest of it is just suburban and probably quite similar to

1  parts of Cobb County.

2  **Q.**   Do you know if the District 6 would still be a majority black

3  if this portion of Fayette was removed?

4  **A.**   Well, perhaps it wouldn't be, but that doesn't mean the

5  district couldn't have been drawn.  It just meant that qualitative

6  population growth rules -- and that's the cleanest and the easiest

7  way to balance the district to plus or minus one.

8  **Q.**   You already had split Douglas County and Cobb County in

9  District 6; correct?

10  **A.**   Yes.

11  **Q.**   And so is there a reason why you went down to grab racially

12  diverse areas of Fayette County and didn't just adjust your split

13  in Douglas County?

14  **A.**   Yes.

15  **Q.**   Why is that?

16  **A.**   Because I had to reduce the overpopulation in District 13.

17  **Q.**   And District 13 likewise has splits with others -- splits with

18  other Counties in other places, doesn't it?

19  **A.**   There is a split in Newton County because I had to reduce the

20  overpopulation relating to District 4.

21  **Q.**   Let me ask about the portion that goes up into Cobb County.

22  Is there a reason why you took this kind of up 75 in Acworth and

23  Kennesaw as opposed to making the district more compact by taking

24  in west Cobb?

25  **A.**   One could have made that decision, and I don't know how that

1  would have affected the underlying black voting age population,

2  but I really don't feel I did anything improper in going up 75 a

3  ways to pick up population in and around Kennesaw and Acworth.   It

4  is not a majority black.  It is a racially balanced area.  And so

5  I was not trying to maximize the black voting age population of

6  District 6 by going into Kensington -- again into Kennesaw and

7  Acworth.

8  **Q.**  Would it surprise you if trading the Acworth Kennesaw area to

9  west Cobb brought the district below 50 percent black?

10 **A.**  It may or may not.  I mean it's possible.  Certainly there are

11 other possible ways to draw a majority black District 6 rather

12 than the way I've drawn this plan.  This is just an illustrative

13 plan and probably represents just one of several different ways

14 that one could draw a district, that would be predominantly in

15 Cobb and Fulton Counties in term of population.  Clearly you could

16 cross the line into Fulton County where District 5 is and start

17 making adjustments there.  I tried to be conservative and take

18 what was given in the 2021 plan and just show with just modest

19 changes, relatively modest changes in and around metro Atlanta,

20 you could create the majority black district, and as part of the

21 illustrative plan I went out and filled out the rest of the state,

22 but the Legislature in some sort of a remedial plan can certainly

23 determine that it needs to be drawn another way.

24 **Q.**  So is it your testimony that the shape of District 6 in Cobb

25 County is driven solely by population, one-person one-vote, or was

1    it driven by other considerations?

2    **A.**   Well, the point also is to demonstrate that the black

3    population is sufficiently large and numerous to allow for the

4    creation of ann additional majority black district.

5           THE COURT:  But that's not the question he asked you,

6    though.  That's not the question he asked you.  Repeat your

7    question again.

8    BY MR. TYSON:

9    **Q.**   My question was, what was the basis for the shape of the

10   district in Cobb County?  Is it your testimony that that is only

11   for one-person, one-vote purposes?

12   **A.**   Well, I had to -- I had to add population to the district, and

13   so it might have been possible to draw a more compact-looking

14   district that would have taken in areas south of Acworth and

15   Kennesaw.  I was working mainly with whole precincts.  And so it's

16   conceivable that one could have done another iteration and come up

17   with a more compact-looking district.

18          THE COURT:  Let me actually understand what you're

19   saying.  You went to Kennesaw to obtain population?

20          THE WITNESS:  Yes.  If I cut this off right at

21   the -- around Marietta, there would have been insufficient

22   population in District 6 in terms of meeting the zero deviation

23   requirement, and it's actually -- you know, a fairly significant

24   population that would have been short.  So I had to go in some

25   direction and pick up fairly heavily populated areas, and I knew

1  Kennesaw and Acworth were racially diverse so from a community of

2  interest standpoint it made sense to include that with central

3  Cobb County, which is also racially diverse, and southern Cobb

4  County, which is more predominantly black.

5  BY MR. TYSON:

6  **Q.** And so, Mr. Cooper, in that explanation then, you said you

7  knew that there was racially diverse population in Acworth and

8  Kennesaw, you just said earlier you were trying to take into

9  account compactness. You would agree with me not having a finger

10 up in Acworth and Kennesaw would make for a more compact district,

11 right?

12 **A.** Perhaps.

13 **Q.** It wouldn't be a district that was majority black, would it?

14 **A.** I don't know. And I would also point out that municipalities

15 in Georgia have odd shapes, and so to a certain extent some of the

16 lines you see around Kennesaw and Acworth are related to

17 odd-shaped precincts or odd shaped municipality boundaries.

18 **Q.** Are the precinct boundaries in west Cobb more regularly shaped

19 than the precinct boundaries in Kennesaw and Acworth?

20 **A.** Don't know.

21 **Q.** Does Georgia in its guidelines consider municipality splits as

22 part of their drawing process?

23 **A.** I believe so.

24 **Q.** You testified earlier that south Cobb County was suburban in

25 nature; is that correct?

**A.**   I believe so.

**Q.**   Do you also know if Paulding County is suburban in nature?

**A.**   I believe that it would be at least in part be suburban in nature.

**Q.**   And you've put Paulding County, which is suburban in nature, in with a district that runs down into Columbus, I put the page 6 of your report, page 70 of your report on there, on the screen; is that right?

**A.**   I did.

**Q.**   And what about western Douglas County, is that also a suburban area?

**A.**   It is suburban, right.

**Q.**   So you criticize the general assembly for putting south Cobb County in a district that goes up to Chattanooga, but you likewise put a district in an area that runs down to Columbus; correct?

**A.**   That is true.  But Columbus is a Georgia city.

**Q.**   And so it's your testimony that since Chattanooga is not a Georgia city, it's inappropriate to put it in south Cobb County?

**A.**   It just seems like an odd decision to take part of Cobb County and put it in a district that goes all the way up to Chattanooga and deep into Appalachian, Georgia.

**Q.**   I move to your supplemental report.  And on page 4 of that, you had a figure one that has your BVAP and BCVAP comparison of your illustrative plan.  I put it on the screen for you if it's easier to look at it there.

1    **A.**   Yeah.

2    **Q.**   So I want to direct you first to District 13.  You indicated

3    that 66 percent you viewed as too high for the black VAP number.

4    You brought District 13 down to where it's barely over 50 percent

5    on the black citizen voting age population number, correct?

6    **A.**   Correct.

7    **Q.**   It's just 5/100th of a point over majority on that number?

8    **A.**   Correct.  Again, that is a historical number.  It's

9    conceivable it's up a little bit since 2017.

10   **Q.**   And is this non-Hispanic black citizen voting age population

11   metric any part non-Hispanic voting age population, or is it

12   non-Hispanic single-race citizen voting age?

13   **A.**   It is non-Hispanic single race, and it would be possible to

14   derive with another calculation the black and white -- you take it

15   up two races but you cannot calculate the any part definition

16   using the five-year survey, which is only taken down to the census

17   block vote and it gets desegregated into blocks.  You take into

18   consideration persons that are black and one other race using that

19   dataset black and one other race and non-Hispanic that is possible

20   and then that number would go up a little bit more than you would

21   see in that chart.  So instead of 51.5, it would be higher, but

22   not a lot higher.

23   **Q.**   So making the changes to make District 6 majority, District 3

24   is getting very, very close to that number, the status as a

25   majority district, correct?

1    **A.**   District 3?

2    **Q.**   I'm sorry, District 13.

3    **A.**   Well, yes, it is 50.05 percent non-Hispanic black single race.

4    But as I've indicated if you really carried it out to the extreme

5    and added in the two race factor, it would be higher.

6    **Q.**   Let's do a quick count there using that number on the 2021

7    plan.  You would agree that District 2, District 4, District 5,

8    and District 13 are all minority non-Hispanic black voting

9    population correct?

10   **A.**   Yes.  Although it's razor-thin in District 2.  It is four

11   people over.  Otherwise, it would be a 50/50 district.

12   **Q.**   You didn't alter District 2 in your illustrative plan;

13   correct?

14   **A.**   I did not.

15   **Q.**   On your illustrative plan essentially you're adding District 6

16   as a 50.69 percent as a non-Hispanic black voting age population

17   in a majority district, correct?

18   **A.**   Yes.

19   **Q.**   Instead of four out of 14 districts that would be a majority

20   black in that category, your map has five, correct?

21   **A.**   Based on black -- non-Hispanic citizen voting age population,

22   yes.

23   **Q.**   And again, you didn't impact District 5, which is below

24   majority on black voting age population, correct?

25   **A.**   Correct.

**Q.**  You didn't impact District 2, which is below majority on black voting age population; correct?

**A.**  Correct.

**Q.**  Let's go back to your main report.  I want to go through some of the numbers that you discussed with Ms. Khanna on compactness. Beer's now on paragraph 54, figure ten, you report those numbers.

**A.**  Yes.

**Q.**  And although I know you testified earlier that you view those differences as very slight.  It is correct to say that on the REOC and Polsby-Popper scores, the average compactness of the illustrative plan and the 2021 plan in comparing those, the 2021 plan is more compact, correct?

**A.**  Apple to apples for the eight changed districts, right.  That is not to say that I could not draw an illustrative plan using the whole state, but changing other districts to draw a more compact overall plan that's certainly possible if not probable.

**Q.**  So we're all clear on this, the plan that is before the Court today is still less compact than the 2021 plan as to these eight districts; correct?

**A.**  Right, it's a matter of balancing things; because I was able to avoid changing six of the districts, I might have sacrificed compactness overall.  The figures you see here are only for the eight modified districts.

**Q.**  And isn't that the two in this compactness report, a maximum number, a low number and a mean number?

1   **A.**   Yes, it does report a maximum number.

2   **Q.**   Is there a reason why you didn't report the maximum number in

3   figure ten?

4   **A.**   No, I think the lower probably is more meaningful for

5   assessing the compactness of a plan.

6   **Q.**   Let me direct you to paragraph 55 and figure 11 on your

7   report.  You discussed with Ms. Khanna, you agree that your

8   illustrative plan splits one more County than the illustrative

9   plan on those eight districts; correct?

10  **A.**   Yes.

11  **Q.**   And at least one of the reasons why there is an additional

12  County split is because of your goal of drawing an additional

13  black district; correct?

14  **A.**   No, I disagree.  I'm fairly certain that I can reduce the

15  County splits perhaps to 12.  I don't know for sure, but I was

16  very cognizant and attempted to avoid pairing and compassing for

17  the remainder of the plan.

18  **Q.**   But you have not tried that exercise; correct?

19  **A.**   I did not try that exercise, no.  This is an illustrative

20  plan.  So, you know, I don't -- I don't think it's necessary to

21  game out every possible scenario to prove Gingle's one.

22  **Q.**   Mr. Cooper, is this the maximum number of majority black

23  districts that can be drawn on a congressional plan in Georgia on

24  your illustrative plan?

25  **A.**   I don't think you could draw an additional majority black

1  district and also adhere to existing redistricting principles.

2  There are sufficient population perhaps, but it would not be a

3  compact district.

4  Q.  You're not opining in your report or your testimony that the

5  district you've drawn would definitely elect the candidate of

6  choice in the black community, are you?

7  A.  No.

8  Q.  And for purposes of this case and this declaration, the

9  Pendergrass issue specifically, your compactness relates to the

10  districts, not to the underlying black population; is that

11  correct?

12  A.  I'm not sure if I've ever seen a Section 2 lawsuit where

13  there's ever been a calculation of the underlying minority

14  population.  I think that's an unusual way to examine things, and

15  I don't think there's a way to meaningful produce a metric other

16  than to demonstrate that you can draw a majority black district.

17  Q.  Did you undertake any analysis of connections between Acworth

18  and Kennesaw and north Fayette County, for example?

19  A.  No.

20  Q.  So you strictly were focused on drawing the districts you

21  drew, you didn't consider connections and communities in

22  underlying population?

23  A.  I looked at some -- some information, but these -- these

24  Counties are all part of core Atlanta, and they're not -- the

25  distances are fairly small.  This is an illustrative plan, and if

1    certain communities like Acworth should not be included in the

2    majority black district based on a community of interest, probably

3    an alternative configuration could be developed.  This is not

4    something that has to be ordered into place.  It's simply an

5    illustration.

6    **Q.**  So along that line, Mr. Cooper, back to your supplemental

7    report, District 6 is 50.23 percent on its black voting age

8    population; correct?

9    **A.**  Correct.

10   **Q.**  And so is it your testimony there are other ways to configure

11   District 6 that would maintain its majority character apart from

12   the way you configured it?

13   **A.**  I think there would be.

14   **Q.**  But you haven't done that analysis yet, have you?

15   **A.**  I have not, no.

16   **Q.**  If we're moving Kennesaw and Acworth below 56 percent and an

17   alternative configuration was not possible, would that impact your

18   decision about the ability to redraw that district?

19   **A.**  If it were not possible.  But I have no reason to think it's

20   not possible.

21   **Q.**  But again, you haven't done that analysis yet?

22   **A.**  I have not -- I have not produced a plan that is any different

23   than an illustrative plan that we see here today, but that doesn't

24   mean that I couldn't if given the challenge, but I presented one

25   illustrative District 6.  Simple.

1          MR. TYSON:  Let me check with my co-counsel briefly, but

2     I think I may be finished, Your Honor.

3          THE COURT:  Okay.

4          MR. TYSON:  Thank you, Mr. Cooper.  I don't have any

5     other questions at this time.

6          THE COURT:  Ms. Khanna, any redirect?

7          MS. KHANNA:  Thank you, your Honor.

8     REDIRECT EXAMINATION

9     BY MS. KHANNA:

10    **Q.**  Mr. Cooper, if we could turn to page 5, Plaintiff's Exhibit 1

11    of your report and look at footnote 3.

12       And Your Honor, I was reminded that I requested that we read

13    into record the 29 Counties that comprise the Atlanta MSA, so I'm

14    just directing Mr. Cooper to that portion of his report.

15          THE COURT:  Thank you.

16    BY MS. KHANNA:

17    **Q.**  And Mr. Cooper when you have it in front of you we can pull it

18    up on the screen as well, whatever is easier for you to read.

19    Would you mind reading into the record the 29 Counties that make

20    up the Atlanta MSA?

21    **A.**  Allow me to get a drink of water.

22    **Q.**  It could take awhile.

23    **A.**  They are in alphabetical order, Barrow, Bartow, Butts,

24    Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas,

25    Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry,

1  Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens,

2  Pike, Rockdale, Spalding and Walton.

3  **Q.**  Thank you.  You also mentioned that in drawing your

4  illustrative District 6, you considered the 11-county Atlanta

5  regional commission boundaries as well; is that right?

6  **A.**  That's true.

7  **Q.**  On page 13 of your report, Plaintiff's Exhibit 1 you have a

8  footnote there listing the website for the regional commission.

9  Do you see that there?

10  **A.**  Yes.

11  **Q.**  And I don't think in your report you actually list out those

12  Counties.

13  **A.**  No, I should have, but I didn't.

14  **Q.**  But going to that website would produce such a list; is that

15  right?

16  **A.**  I think you will immediately see a map, and actually if you

17  look at Plaintiff's Exhibit showing the regional commissions in

18  Georgia, I think that's Exhibit -- I'm not sure what the Exhibit

19  number is here, maybe D, maybe F, something like that.  Early on

20  there is a statewide map showing the regional commissions, and

21  that map does show the Atlanta regional commission and the 11

22  underlying counties.

23  **Q.**  So if I use this website and pull that up, would it -- would

24  it surprise you if the following 11 Counties were included in the

25  ARC?  And I would list them for you here.  I don't think you're

1  going to find them looking at the report.  Is there a specific

2  exhibit that you're referring to?

3          THE COURT:  Let's do it this way.  Mr. Tyson, would you

4  stipulate to the 11 counties that Ms. Khanna is going to read?

5          MR. TYSON:  Yes, Your Honor, the ARC is made up of 11

6  counties.  I'm happy to stipulate to those 11.

7          MS. KHANNA:  Thank you.  Your Honor, if I may list off

8  those counties, Mr. Cooper.  Cherokee, Clayton, Cobb, DeKalb,

9  Douglas, Fayette, Forsyth, Fulton, Gwinnett, Henry and Rockdale.

10          THE WITNESS:  That sounds correct to me.

11 BY MS. KHANNA:

12 **Q.** Four of those counties, Cobb, Douglas, Fulton and Fayette,

13 make up your new congressional District 6 in the illustrative

14 plan, correct?

15 **A.** Yes.

16 **Q.** Is that right?

17 **A.** Yes.

18 **Q.** Paulding is not included in that 11-county ARC; is that

19 correct?

20 **A.** It is not included in the core Atlanta district in the core

21 Atlantic counties.

22 **Q.** As you just mentioned you would characterize that 11 County

23 Atlanta regional commission area as the core Atlanta area; is that

24 correct?

25 **A.** Correct.

1  **Q.**  You spoke with Mr. Tyson on cross about the configuration of

2  congressional District 6 and it's approach to Kenworth and

3  Acworth -- I'm sorry, Kennesaw and Acworth?

4  **A.**  Yes.

5  **Q.**  Did you -- when you were drawing that district, were you

6  seeking to grab black population also wherever you could?

7  **A.**  No.  I was not.  That was an area with relative racial

8  diversity.  I thought it would fit into a majority black district.

9  But I was not trying to identify majority black blocks to put into

10  District 6 from that area.

11  **Q.**  If you wanted to grab black population in those areas or

12  northward in Cobb County, could you have done it differently?

13  **A.**  Perhaps.  So I could have changed District 5 in Fulton County

14  and done further -- done further changes to the plan that was

15  adopted, perhaps, splitting an additional County or something to

16  find other areas to draw a majority black district, an additional

17  majority black district.  It would still be Cobb and Fulton based,

18  or to include more Fulton County, a portion of Fulton County that

19  is now in District 5.

20  **Q.**  Thank you.  I want to take another look at your illustrative

21  District 6 if we could turn to page 63 of Plaintiff's Exhibit 1.

22  So I believe you spoke with counsel on cross about the treatment

23  of the western part of Douglas County here and how it was

24  connected to the westward district of District 3 here; is that

25  right?

1    **A.**   Yes.

2    **Q.**   If we could now turn to page 55 of your report of Plaintiff's

3    Exhibit 1 which is the enacted map.  And do you see here how the

4    western -- in the enacted map, the State of Georgia also split

5    Douglas County and included its western portion in that westward

6    district; is that right?

7    **A.**   That's true.

8    **Q.**   If we turn back to page 3 of your initial report, Plaintiff's

9    Exhibit 1.  Let's look at paragraph 8 here.  I believe you read

10   this on cross as well.  Where it says that "the attorneys for the

11   plaintiffs in this case asked me to determine whether the

12   African-American population in Georgia is sufficiently large and

13   geographically compact to allow for the creation of an additional

14   majority black congressional district in the Atlanta metropolitan

15   area."  Did I read that correctly?

16   **A.**   Yes.

17   **Q.**   Were you asked to draw as many majority black districts as

18   possible --

19   **A.**   No.

20   **Q.**   In the congressional map?

21   **A.**   No.

22   **Q.**   Were you asked to draw every conceivable way of drawing an

23   additional majority black district?

24   **A.**   No.

25   **Q.**   The word "whether" is used in your paragraph 8.  If the answer

1   to the question was no, would you have reported that to counsel in

2   this case?

3   **A.**   Yes.  I've done that in other cases.

4   **Q.**   And you anticipated my question.  Have you in other cases when

5   asked to do a Gingle's one analysis, come back and said no, it

6   does not appear to satisfy the Gingle's one criteria?

7   **A.**   Right, this is prelitigation.  I have a clear memory of

8   someone asking me in the early '90s to draw a majority black

9   commission district in Henry County when Henry County was nine

10   percent black, and so -- well, I did it for them, then told them

11   it was just too crazy-looking, couldn't consider it.

12   **Q.**   The question you were asked was not please draw an additional

13   majority black district, correct?

14   **A.**   No, no, this person insisted that I show him what the district

15   looked like.

16   **Q.**   The question in this case was not --

17   **A.**   Whether.

18   **Q.**   -- can you draw a majority black district, correct?

19   **A.**   Right.

20   **Q.**   It was whether you could draw a majority black district, this

21   is -- sorry.  As you wrote here, whether the black population is

22   both sufficiently large and geographically compact to draw an

23   additional majority black district?

24   **A.**   Right.

25   **Q.**   And how did you determine the answer to that question?

1   **A.**   Well, I looked at all of the factors that are part of the

2   traditional redistricting principles and tried to balance them.

3   So I tried to draw a compact district, a district that didn't

4   split very many political subdivisions, and we already seen that

5   the plan that I've drawn splits fewer municipalities than the

6   adopted 21 plan.  And I looked at other factors, like congruity,

7   the various traditional redistricting factors.  The idea was to

8   balance those factors and show that a district could be created if

9   it could be created.

10          MS. KHANNA:  Thank you, Mr. Cooper.  I have no further

11  questions.

12          THE COURT:  Recross.

13          MR TYSON:  Very briefly, yes.  Very briefly, Your Honor.

14  RECROSS-EXAMINATION

15  BY MR. TYSON:

16  **Q.**  Mr. Cooper, you said you knew in response to a question of

17  Ms. Khanna, that areas of racial diversity, does Maptitude display

18  census information or racial data if you command it to do that?

19  **A.**   It does show -- you can color-code maps to show racial

20  diversity, sure.

21  **Q.**  Did you have a color coded map with demographic information on

22  it when you were drawing or conducting your analysis in this case?

23  **A.**   No, I did not have a color-coded map on screen.

24  **Q.**  How did you determine what areas had racial diversity then?

25  **A.**   Sometimes I used little dots that show where the diverse

1  population lives.

2  **Q.**  So in draw your District 6, you would have had dots showing

3  where, for example, a black population was?

4  **A.**  Occasionally.  However, I knew that anyway from just looking

5  at your Senate plan.  Senate District 33, which runs from central

6  and south Cobb County up into Acworth and Kennesaw, is -- is

7  roughly 48 percent non-Hispanic Asian, Latino, and black CVAP.

8  It's almost majority non-white.  The white CVAP in that area is 33

9  or 34 percent.  And that's for your district that you drew,

10  District 33, I believe in Cobb County for the state Senate.

11  **Q.**  So in conducting your analysis you looked at demographic

12  information of state legislative districts as part of your process

13  in drawing congressional?

14  **A.**  I was aware and knowledgeable of that information in part

15  because I was also working on the other side of this case looking

16  at legislative districts.

17  **Q.**  And at various points you had dots showing you where black

18  population was around metro Atlanta; correct?

19  **A.**  Occasionally, yes.  I mean, I have a map in the next -- the

20  next section of my testimony that shows percent black by County.

21  **Q.**  Ms. Khanna asked you about your analysis, whether the

22  population was geographically compact.  Do you recall that line of

23  questioning?

24  **A.**  Yes.

25  **Q.**  And your way to answer whether the black population was

1  geographically compact was by drawing a majority black district,

2  correct?

3  **A.**   Drawing a majority black district that adhered to

4  redistricting principles.  I think if you look at the compactness

5  scores, if you look at the number of political subdivisions that

6  are split in order to draw that plan, it's possible, and I have

7  come to the conclusion that one can draw an additional majority

8  black district in that area.

9  **Q.**  And so again, your methodology for answering the question

10  posed in the declaration was creating a majority black district

11  that you believe is consistent with traditional redistricting

12  principles, correct?

13  **A.**   Yes.

14          MR. TYSON:  I don't have anything further, Your Honor.

15          THE COURT:  Thank you.  What I'm going to ask you to do

16  is take that baggie and put it in the trash can.  It's 12:15.  I

17  was going to stop for lunch at 12:30, but I think it would be a

18  good idea to stop now instead of starting another witness which

19  will be the same witness.  Before we move on from this

20  congressional part, is there anything else anybody wants to ask?

21  Because when we come back, we'll move to the Senate and House

22  District portions, I think.

23          MS. KHANNA:  Your Honor, may I ask one follow-up

24  question?

25          THE COURT:  Mr. Tyson, you can also ask a follow-up.

1          MR. TYSON:   Thank you.

2   REDIRECT EXAMINATION

3   BY MS. KHANNA:

4   **Q.**  Mr. Cooper, in response to the question from Mr. Tyson just

5   now, you mentioned that you were aware of the Senate map that was

6   enacted by the Legislature in 2021 as well; is that right?

7   **A.**   Yes.

8   **Q.**  And you were aware that in the Senate map there were at least

9   four Senate districts in western metro Atlanta that were majority

10   black; is that right?

11   **A.**   Right.

12   **Q.**  You also talked about an additional district, Senate District

13   33, that was 40 percent black voting age population?

14   **A.**   Right.

15   **Q.**  You were aware when you were drawing your illustrative map in

16   the congressional case that the State of Georgia had drawn

17   majority black districts in western Atlanta in the Senate,

18   correct?

19   **A.**   Yes, because four Senate districts is one congressional, 14

20   times four is 56.  So that's why I was so confident at the outset

21   that it was going to be likely that I could draw the additional

22   majority black district in that part of the state.

23   **Q.**  But it did not draw an additional black majority in western

24   metro Atlanta on the congressional map; correct?

25   **A.**   Correct.

1          MS. KHANNA:  Thank you, Your Honor.

2          THE COURT:  Mr. Tyson.

3          MR. TYSON:  Nothing further, Your Honor.

4          THE COURT:  We'll stop right here for the lunch break.

5     We'll start back at 1:30.  Thank you all.  Have a good lunch.

6          (Whereupon, the hearing concluded at 12:15 a.m.

```
 1                    C E R T I F I C A T E

 2

 3  UNITED STATES DISTRICT COURT

 4  NORTHERN DISTRICT OF GEORGIA

 5

 6     I do hereby certify that the foregoing pages are a true and

 7  correct transcript of the proceedings taken down by me in the case

 8  aforesaid.

 9     This the 8th day of February, 2021.

10

11

12

13

14                     /s/Viola S. Zborowski_____
                        VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                      OFFICIAL COURT REPORTER.

16

17

18

19

20

21

22

23

24

25
```