```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3

 4   ALPHA PHI ALPHA FRATERNITY,    )
     INC., ET AL.,                  )
 5                  PLAINTIFFS,     )
                                    ) DOCKET NO. 1:21-CV-05337-SCJ
 6        -VS-                       ) VOLUME 2 - A.M.
                                    )
 7   BRAD RAFFENSPERGER,            )
                                    )
 8                  DEFENDANT.      )
     _____
 9   COAKLEY PENDERGRASS,           )
     ET AL.,                        )
10                  PLAINTIFFS,     )
                                    ) DOCKET NO. 1:21-CV-5339-SCJ
11        -VS-                       )
                                    )
12   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
13                  DEFENDANTS.     )
     _____
14   ANNIE LOIS GRANT, ET AL.,      )
                                    )
15                  PLAINTIFFS,     )
                                    ) DOCKET NO. 1:22-CV-00122-SCJ
16        -VS-                       )
                                    )
17   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
18                  DEFENDANTS.     )
     _____
19
             TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20              BEFORE THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT JUDGE
21                TUESDAY, FEBRUARY 8, 2022

22

             VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23      OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT COURT
24                     ATLANTA, GEORGIA
                        404-215-1479
25             VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3    KEVIN J. HAMILTON, ESQ.
      ABHA KHANNA, ESQ.
 4    SOPHIA LIN LAKIN, ESQ.
      ARI J. SAVITZKY, ESQ.
 5    SEAN J.YOUNG
      RAHUL GARABADU
 6    ROBERT BOONE
      ABIGAIL SHAW
 7    ALEX W. MILLER
      MAURA DOUGLAS
 8    ANURADHA SIVARAM
      EDWARD WILLIAMS
 9    JENNESA CALVO-FRIEDMAN
      GEORGE P. VARGHESE
10

11

12   ON BEHALF OF THE DEFENDANT:

13    BRYAN P. TYSON, ESQ.
      LOREE ANNE PARADISE, ESQ.
14    BRYAN JACOUTOT, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE COURT:  One of the issues the case has to decide in
 2   this case, along with the preliminary injunction, is whether or
 3   not it would be a burden on the State or to go forward in this
 4   case based on the elections coming forward.  In the State of
 5   Alabama, there was a case that started in November of 2021 on
 6   their redistricting maps.  That's before a three-judge panel.
 7   That case -- was three cases, I believe.  One case was a
 8   constitutional challenge, along with the Voters Right Act
 9   challenge, and then there was one single Voters Right Act
10   challenge that Judge Manasco held.
11          I think it was January 27, Alabama, a three-judge panel
12   issued a ruling, and the ruling they issued was not based on the
13   constitutional challenge, but it was on voters' section to the
14   Voters Right Act challenge.  And also the same judge ultimately
15   made a ruling, a 225-page order they found that under Gingle's
16   that the district could be compact in a geographic area.  I think
17   there was a political wish list in voting and polarization.  That
18   case was entered.  There was an appeal, and petition by the
19   Attorney General, Secretary of State of Alabama to the Supreme
20   Court.
21          Yesterday the Supreme Court issued a ruling staying the
22   Alabama case and granting a writ of petition.  Three other
23   justices did not give an opinion why they issued the stay.  Two of
24   the justices -- well, one justice, Justice Kavanaugh, wrote a
25   concurrent opinion with Justice Alito.  And it in they -- let me
```

```
 1   also back up.  The State of Georgia and 13 other states issued an
 2   amicus brief saying it was too close to election; this should not
 3   go forward.  And Justice Kavanaugh and Justice Alito agreed with
 4   those 14 states; it was too close.
 5           Justice Kavanaugh pointed out that the lower courts,
 6   when it's close to election, should not do anything that could
 7   cause that election to be put into chaos or disorganization.  And
 8   he pointed out, he had a test that he put forward to indicate that
 9   underlying merits are clear-cut.  He says, I think that the
10   Purcell principle just might be overcome even with respect to the
11   injunction issued to an election, if the plaintiff established at
12   least the following:  The underlying merits are entirely clear-cut
13   in favor of the plaintiff.  The plaintiff will suffer irreparable
14   harm after the injunction.  The plaintiff has not unduly delayed
15   in bringing the complaint to the Court, and the changes in the
16   questions are at least feasible before the election without
17   significant cost, confusion, and hardship.
18           He also pointed out two of them probably could be met.
19   But he pointed out two of them, and one particular he didn't think
20   could be met.  And that's having such a relaxed version of Purcell
21   would not permit the District Court's late-breaking injunction.
22   That is because the plaintiffs could not satisfy at least two of
23   those four prerequisites; namely, that the merits be clear-cut in
24   favor of the plaintiff, and that the changes be feasible without
25   significant cost, confusion or hardship.
```

1        He goes on to point out that this Court and the lower

2   federal courts have been less than clear about the rules that

3   govern the majority/minority districts, and bluntly adds that the

4   states need clarity.

5        The issue in this case is exactly the issue in the

6   Alabama case.  It's a Section 2 Voting Right Act case.  It's no

7   different.  It's the exact same thing.  I know as I sit here this

8   morning that two of the justices are saying it's too close to the

9   Alabama primary election.  The Alabama primary election is May 24.

10  The Georgia primary election is May 24.  Again, I don't know what

11  the other three justices' reasons were, but I do know the issues

12  of this case are the exact same issues that is in front of them in

13  the Alabama case.

14        As a United States District Court judge, I am required

15  to follow the precedents and the decisions of the Supreme Court

16  and the Eleventh Circuit.

17        In looking at this last night and looking at it this

18  morning, I asked:  How does this case differ in any way from the

19  case in front of the Supreme Court?  And there's only two things

20  that are different:  The one in front of the Supreme Court of

21  Alabama was a three-judge court, and this is a single-judge court.

22  And the other issue is that I have not issued a ruling in this

23  case; they have a ruling there in that case.

24        But hypothetically, if I said to the plaintiffs -- the

25  Court will hear everything that y'all want to say, congressional

1  maps, on the Section 2 maps, I agree with you.  I agree you have

2  substantial reason to think you're going to succeed.  It's

3  irreparable harm.  I don't think it is in the public's interest.

4  I think you're going to suffer more than the defendant.  If I said

5  every one of those things, and it's no question in my mind,

6  Mr. Tyson is going to appeal it.  No question in my mind those

7  same 13 states that sent those amicus briefs are going to send the

8  same ones.  I don't see how the Supreme Court is going to rule any

9  different in a stay in my case than in any other case.

10         The key thing, I'm required -- and I'm going to tell

11 you, y'all are veteran, excellent lawyers, but I have to say what

12 I'm saying.  I'm required to follow what the Supreme Court says.

13 I understand, Mr. Hamilton, that this case probably will first go

14 to the Eleventh Circuit.  But I would be totally surprised if not

15 today or later this week, the one case in Alabama's -- in the

16 Eleventh Circuit, the Eleventh Circuit is going to issue a ruling

17 today or later this week saying we stay.

18         Even if the Eleventh Circuit didn't stay my case, let's

19 say I rule your way entirely, and Mr. Tyson appeals it, and the

20 Eleventh Circuit says, no, we're not going to grant the stay; what

21 is Mr. Tyson going to do next?  He's going to appeal it to the

22 Supreme Court.

23         This is not a decision that I make lightly.  I

24 understand and I'm not going to make a decision until I hear from

25 y'all, but this is not something I'm facing lightly, because I

1  understand your positions strongly.  I understand the State's

2  position.  I understand that I have to make the decision that is

3  going to affect a lot of different people in a lot of different

4  ways.  Okay?

5          One more time, I am required to follow the decisions and

6  the precedents by the United States Supreme Court.  It's not

7  negotiable.  And as I read this ruling, and I read -- I read it

8  all.  As I read this ruling, what I'm basically hearing them say

9  is:  Lower court in the Northern District of Georgia, you are not

10 to go forward.

11         Now, before I make a decision and tell you what I'm all

12 going to do, I wanted to tell you how I was thinking and I want to

13 hear from y'all.  That's only fair.  Everybody in this case has

14 worked very, very hard to get to where we're at now, and I

15 appreciate that.  My wife asked me last night, how did they all

16 do.  I said the lawyers came here really prepared.  They really

17 knew what they were doing -- all the lawyers.  I said that

18 was -- that's a judge's pleasure to have lawyers that come

19 prepared and are passionate about what they argue.  So that's why

20 I'm going to give y'all a chance to tell me what's on your mind,

21 and then we'll go from there.  Ms. Khanna, I will start with the

22 Pendergrass lawyers.

23         MS. KHANNA:  Thank you, Your Honor.  Abha Khanna for the

24 Pendergrass and Grant plaintiffs.

25         The Supreme Court's order and the stay order in Merrill

1  is not binding on this Court, and changes absolutely nothing about

2  the course of these proceedings, and that is for at least three

3  reasons.

4          Your Honor just mentioned that this Court is bound to

5  follow the precedent of the Supreme Court.  That is true.  But the

6  Supreme Court yesterday issued no precedent and no binding opinion

7  and no majority opinion that would bind this Court to rule one way

8  or another on the issue in front of it.  Because that is there is

9  simply no majority opinion for this Court to follow.  Only two

10 Justices indicated that the timing-related equities of that case

11 was the reason for the stay in that case.  Four Justices concluded

12 that the timing-related equities were not an obstacle to relief in

13 that case.  No other Justice included -- indicated their views one

14 way or another.  It would be entirely unwarranted for this Court

15 to halt all proceedings in this case based on the assumption and

16 speculations of what was in the hearts and minds of the majority.

17         THE COURT:  What is it that you would see that would

18 make you think, make me think that if I issue a stay -- again, if

19 I rule your way completely, that those five Justices would rule

20 differently?

21         MS. KHANNA:  I actually think there is multiple

22 differences, Your Honor.  I think the fundamental question --

23         THE COURT:  Give me some.

24         MS. KHANNA:  I'll go through the factual differences as

25 well.  But I think the fundamental question that Your Honor raises

1  is really -- I can't think of another instance where a District

2  Court would be forced to throw up his hands because the likelihood

3  of a different ruling on a potential hypothetical appeal is slim.

4  Right?  I think the question before this Court is whether the

5  evidence before this Court allows this Court to rule on the motion

6  for preliminary injunction, which it absolutely will, however it

7  rules one way or the other.  What the Eleventh Circuit or the

8  Supreme Court might do in this case, for the Court to just say,

9  well, it's probably going to turn out this way, so we can just

10 stop.  I've never heard of that, Your Honor.  I don't think that

11 that's something we want to suggest, that a two-Justice

12 concurrence in a stay order has the power to do here.

13         THE COURT:  I guess my question, though, is that you

14 have to show the public interest aspect, and in reading -- I can't

15 see -- it's going to be very difficult for you with this ruling to

16 overcome the public interest part of the requirement on the

17 preliminary injunction.  I think it just wouldn't be wise for me

18 to say I'm completely disregarding what the Supreme Court just

19 said.

20         MS. KHANNA:  I don't think the Court has to disregard

21 anything.  But -- and you're right, maybe it might be hard for us,

22 but we deserve the chance to be able to make our case.  And the

23 State does not just get to -- we don't get to presume that the

24 State will be able to make their case on the interests here.  You

25 mentioned, Your Honor, that the differences between Alabama and

1  Georgia are on the merits and on the feasibility.  That's exactly
2  what we're here to decide in this hearing.  What are the merits of
3  this case?  How clear-cut are they?  And what is the feasibility
4  in Georgia?
5          THE COURT:  I guess, though as I indicated before -- I'm
6  thinking out loud -- if I rule entirely your way, every issue, I
7  can't see how a stay is not going to be granted.  It's the same
8  issues.
9          MS. KHANNA:  I can see that actually, Your Honor.  Well,
10 two things:  One is you mention that Mr. Tyson might go jump to
11 the Supreme Court.  And difference in the posture here is actually
12 very relevant.  Because the Supreme Court in the Alabama case had
13 mandatory direct review.  It had no choice.  It has no choice but
14 to hear that case.  The Supreme Court does not have to hear this
15 case or really any case.
16         THE COURT:  I understand that.  What would make you
17 think that the Supreme Court with the exact same issue -- it's no
18 different in this case than the Alabama case -- is not going to
19 say -- I agree they might not have to hear this case, but why
20 would they say, Georgia, you go forward with your injunction, draw
21 up new maps.  Alabama, we're not going to go that?
22         MS. KHANNA:  Two responses to that, Your Honor.  One is
23 I litigated the Alabama case, and I can attest this is not the
24 exact same issue as the Alabama case.  That is because as the
25 defendant's counsel reminded us in his opening statement, Section

1  2 requires an intensely local appraisal of the various factors.

2  So to suggest that we can just paint all Section 2 cases with a

3  broad-brush, frankly, if that were it true, we could have

4  dispensed with this entire hearing once the Alabama ruling was

5  decided because 235 pages were already found in our favor.  But

6  that's not something -- I don't believe the State is going to

7  agree to that.  They are not identical by any means, just given

8  the very nature of Section 2.

9           And the second point, Your Honor, you began this -- this

10 hearing this morning correctly indicating that this Court is bound

11 by binding precedent of the Supreme Court.  This Court, however,

12 is not bound to predict what the -- what a Supreme Court -- what

13 any Appellate Court might do if it lands on their desk at the end

14 of a hypothetical ruling in this case.  That is not

15 being -- that's not dictated by precedent.  That is this Court

16 reading the tea leaves, figuring out what might happen on appeal,

17 and that's not how courts --

18           THE COURT:  That's what the District Courts do every

19 day.  There's not an exact ruling on all fours on every case that

20 comes in front of the District Court.  I have to look at what the

21 Eleventh Circuit does in the case, what the Supreme Court does in

22 a case, and make a ruling based on what I think they are going to

23 do.  I do that every day.  It's not a case on point every day that

24 says two plus two is four.  It's not like that.  I'm looking at

25 cases every day; not just me, other District judges.  Okay.  In

1  this case the Supreme Court did this; here are some similarities.

2  The Eleventh Circuit did this, here's some similarities.  Based on

3  what the Supreme Court did here and the Eleventh District did

4  here, here's how I'm going to ruling.

5          MS. KHANNA:  Based on binding precedent, this Court is

6  required to interpret that precedent and apply that precedent.

7  There is no binding precedent.  There can be no dispute about

8  that.  The stay order issued yesterday is not binding precedent on

9  anyone or anything, and certainly provides no majority that can

10  name those reasons.  So what exactly is it that this Court is

11  bound by?  Is it the silence of three Supreme Court Justices?

12  That can't be right.  By the concurrences of two Supreme Court

13  Justices?  That can't be right.

14          THE COURT:  Well, let me ask you this question.  You're

15  saying that you don't think if this same case went in front of

16  those same nine Justices, you would get a different ruling?

17          MS. KHANNA:  I don't think it is this Court's task at

18  this moment to try to predict what an Appellate Court might do in

19  the future and predict a likelihood of success on appeal in a

20  different circumstance.  The task before this Court is to

21  determine the likelihood of success on the merits before this

22  Court.  Absolutely, this Court is bound -- for instance, Your

23  Honor, this Court is bound by binding Eleventh Circuit and Supreme

24  Court precedent, and the last time the Supreme Court actually

25  provided binding precedent on it, most recently in the Shelby

1  County case, the Supreme Court was very clear that Section 2 is

2  permanent.  Section 2 applies nationwide, and, quote, injunctive

3  relief is available in appropriate cases under Section 2 to block

4  voting laws from going into effect.  That is an actual binding

5  opinion that is binding on this Court.

6           THE COURT:  You're overlooking one of the things I said,

7  though, is that the public interest part of a preliminary

8  injunction is that if I don't say, okay, you might -- you have to

9  have four as against the public interest to go forward on this

10  matter, does that not stop your case right there?

11           MS. KHANNA:  Not at all, Your Honor.

12           THE COURT:  You lose one -- you have to win all four,

13  don't you?

14           MS. KHANNA:  Absolutely, and I believe we can.

15           THE COURT:  If you lose one, you don't go forward.

16           MS. KHANNA:  I don't there is any precedent or reason

17  for this Court to presuppose that we're going to lose.

18           THE COURT:  I have to look at all of the aspects that's

19  there.  You're not saying I should totally disregard what the

20  plaintiff is saying, are you?

21           MS. KHANNA:  I'm not saying for you to disregard

22  anything, Your Honor.  I am saying that you can look at the

23  guidance provided by two Supreme Court Justices in a concurring

24  opinion, if the Court would choose to do so, it's not binding

25  precedent, and then apply it to the facts of this case, and the

1    facts of this case are what we're here to develop over the course

2    of these proceedings.

3         The State is going to offer testimony, witness testimony

4    about the feasibility of holding this election in Georgia,

5    changing district lines in Georgia.  It is certainly our ability,

6    our right and, frankly, it is in the Court's interest to hear that

7    evidence, determine whether we can meet an admittedly high bar in

8    a preliminary injunction to satisfy those elements.  I don't think

9    that the Supreme Court's stay order yesterday changed the standard

10   by any means.  But even if it did, it did not -- we're still -- I

11   think this Court would still benefit from allowing plaintiffs the

12   opportunity to meet that standard.  And it might find, and I

13   actually believe it will, that we do meet that standard here.

14   Just even if -- even setting aside the fact that there is no

15   binding majority opinion in this case, even setting aside the fact

16   that the procedural posture is entirely different, even if we take

17   Justice Kavanaugh's concurrence as pretending it's binding,

18   continuing with this hearing is still appropriate to determine

19   whether the preliminary injunction factors in this case, including

20   the equities under Purcell, permit injunction here.

21        I will be very clear in how we can do that, spelling out

22   those four factors that Justice Kavanaugh did.

23        Justice Kavanaugh is very clear that Purcell is not an

24   absolute rule.  And it does not prohibit injunctions against state

25   election laws in the period close to an election.  If Justice

 1  Kavanaugh wanted to suggest an absolute rule in his concurring

 2  opinion, he could have, but he expressly disclaimed that.  So

 3  point one is that I don't believe it makes sense for this Court to

 4  treat Alabama as an absolute rule when it specifically said it is

 5  not.  Instead, Justice Kavanaugh said that the Purcell principle

 6  allows the District Court to enjoin an election law close to an

 7  election if, number one, the underlying merits are entirely

 8  clear-cut in favor of the plaintiff; number two, the plaintiff

 9  would suffer irreparable harm if you issue the injunction; number

10  three, the plaintiff has not unduly delayed bringing the

11  complaint; and number four, the changes in question are at least

12  feasible before the election without significant cost, confusion

13  or hardship.  Let me briefly march through those factors here.

14          Number one on the merits.  The only way for this Court

15  to determine, quote, the underlying merits, whether the underlying

16  merits are entirely clear-cut in favor of the plaintiffs, is to

17  hold the hearing and to hear the evidence.

18          THE COURT:  Let's stop right there.  What does Kavanaugh

19  say further?  What does he say about clear-cut further in his

20  concurrence?  What does he say?

21          MS. KHANNA:  What does he say about what counts as

22  clear-cut evidence?

23          THE COURT:  What does he say about clear-cut in his

24  ruling?  What does he say?

25          MS. KHANNA:  Is there a specific passage that Your

1  Honor --

2          THE COURT:  I'm asking you.

3          MS. KHANNA:  I'm sorry?

4          THE COURT:  He is saying -- maybe I'm interpreting this

5  wrong, but the Court case law in this area is notoriously unclear

6  and confusing.

7          MS. KHANNA:  But I don't believe that Justice Kavanaugh

8  suggests that there is no such thing as a clear-cut case under

9  Section 2.  I certainly -- without a record in that case before

10 the Court, let alone a hypothetical record in this case, I don't

11 think that we can determine or certainly not predetermine what

12 Justice Kavanaugh may or may not find to be clear-cut.  That is

13 this Court's prerogative to determine right now; it is not the

14 Eleventh Circuit's right now, and it is certainly not Justice

15 Kavanaugh's prerogative right now.  And as I mentioned earlier,

16 Section 2 requires an intensely local appraisal.  That is

17 precisely why the case is before this Court who is best positioned

18 to provide that meritorious determination based on an intensely

19 local appraisal.

20          Irreparable harm.  I believe there is no dispute that

21 plaintiffs would suffer irreparable harm if the Court were to find

22 there is a likely Section 2 violation.

23          Undue delay, the Pendergrass plaintiffs filed their case

24 just hours after Governor Kemp signed these maps into law.  And

25 the Grant plaintiffs followed less than two weeks later.  Notably,

1  Your Honor, the only party to these proceedings that engaged in

2  undue delay is the State itself, when Governor Kemp delayed more

3  than a month after the Legislature passed these statewide

4  redistricting plans to sign them into law in an apparent effort to

5  foreclose timely judicial relief.

6          On the feasibility of the injunction, again, the only

7  way to determine for this Court whether implementing new plans in

8  this case, in Georgia, is feasible, is to hold this hearing.  We

9  need to hear from the witnesses about what is and is not feasible

10 in Georgia.  And we, the plaintiffs, believe that the evidence

11 will establish that altering the map at this point is entirely

12 feasible.

13         Your Honor is correct that Georgia and Alabama share a

14 primary date of May 24.  But Georgia has a significantly later

15 qualifying deadline than Alabama does.  Alabama's qualifying

16 deadline was January 28, a full month-and-a-half before Georgia's

17 March 11 qualifying.

18         THE COURT:  March 7.

19         MS. KHANNA:  March 7 is the opening of the period,

20 correct, Your Honor, and March 11 is the deadline.  Still a month

21 away.  Unlike in Alabama where the Court's opinion was just, I

22 think, one or two business days before the qualifying deadline and

23 it had to be stayed.  This Court is entirely -- we believe that

24 the evidence will show that it is entirely feasible to find in our

25 favor and to remedy on preliminary basis without altering the

1  election schedule at all.  That was not possible in Alabama.

2        THE COURT:  Do you believe that?

3        MS. KHANNA:  I do believe that, Your Honor.  I can say

4  that with experience in multiple courts where legislators are

5  given opportunities to remedy violations and are able to meet that

6  task.  And where they are not, courts are.

7        THE COURT:  The case will probably be over at the

8  earliest on Friday, maybe Monday.  This is one judge as opposed to

9  three judges.  Let's say a decision is made on February the 18th,

10  the Friday, next Friday.  As the law indicates, I have to give the

11  general assembly the opportunity to make the corrections first.

12  Probably you're talking about two weeks.  That puts you at around

13  March 1st, 3rd, something like that.  And qualifying starts on

14  March the 7th.  So you're saying there wouldn't be any problem

15  whatsoever?

16        MS. KHANNA:  I honestly don't believe that that -- I

17  think that that's entirely feasible.  Does it require some people

18  to be inconvenienced?  Absolutely.  Does it require throwing out

19  the voting rights of hundreds of thousands of black voters?  I

20  don't think so.

21        THE COURT:  It's a tough call.

22        MS. KHANNA:  It's a tough call, and it is the tough call

23  that this Court is empowered to make.  It's not whether this was

24  decided for this Court yesterday or the day before or today.

25        THE COURT:  What if I just stopped this hearing and

1  certify a question up to the Eleventh Circuit that says, maybe I

2  should say, hey, look, I'm not going to go forward because I think

3  it's going to be stayed.  Y'all have a right to go to the Eleventh

4  Circuit and say we think Judge Jones stopped too quickly.

5       MS. KHANNA:  Certainly that is this Court's prerogative

6  as well.  I believe this Court has no reason to abdicate its

7  fact-finding duties here and assume the facts will turn out one

8  way or the other.

9       THE COURT:  At least we'd have some kind of answer from

10 Eleventh Circuit if I certify an appeal up to them, and said Judge

11 Jones stopped too quick.  He shouldn't have stopped.  He should

12 have proceeded with the hearing.  I thought about what if I was to

13 wait and see what the outcome was from the Alabama case.  I want

14 to hear from y'all this morning.  Go ahead.

15      MS. KHANNA:  Well, then that would, basically, be this

16 Court inviting a pronouncement that as a legal matter, cases

17 brought at a certain time are too late.  But that's a

18 law -- that's precedent that nobody has suggested.  Justice

19 Kavanaugh did not suggest that.  Purcell is not a matter of law;

20 Purcell is a factual inquiry.  And I think that would be an error.

21 I don't know what the Eleventh Circuit would say, but I certainly

22 don't believe that this Court --

23      THE COURT:  Why do you think it's error?  They'd

24 probably agree with you -- maybe.

25      MS. KHANNA:  Perhaps, but I don't believe that this

1   Court needs to take on that guesswork at this stage.  You need to

2   file -- follow binding precedent.  But you don't need to guess at

3   what the precedent could be down the road.

4            THE COURT:  I guess one of the things I'm concerned

5   about is that we go through the rest of this hearing, the rest of

6   this week and -- no, go ahead.  I need to quit talking and let you

7   talk.

8            MS. KHANNA:  No, no.

9            THE COURT:  Go ahead.

10           MS. KHANNA:  I'm happy to answer any questions that the

11  Court has.

12           THE COURT:  I interrupted too many times.  I apologize.

13  Go ahead.

14           MS. KHANNA:  Not at all.  I appreciate the opportunity

15  to be able to answer the Court questions; these are very big

16  issues.  As Your Honor mentioned first thing yesterday, why are we

17  all here?  Why are we not doing this over Zoom because these are

18  really, really important issues that warrant bringing people from

19  across the country even in the midst of a pandemic to hammer them

20  out and to see what are the facts here.  Who is going to be

21  harmed?  How clear-cut are the merits?  And what is the Court's

22  responsibility and possibilities to remedy if there is a

23  violation?  We have come here to -- to make that showing, to

24  hammer out those issues.  And I believe that this Court is best

25  positioned to do that.  I would encourage this Court to welcome

1  the opportunity to do that.  That doesn't mean this Court is bound

2  to decide one way or the other.  At the end of the day, the

3  decision is yours, Your Honor, of course.  But I would -- I would

4  really strongly encourage the Court to just hear the evidence and

5  see if this case warrants the injunction that we believe it does.

6          THE COURT:  I know I said I wouldn't interrupt, but I

7  apologize.  I almost feel like issuing an advisory opinion.

8          MS. KHANNA:  That this Court would be issuing?

9          THE COURT:  Let's say we go all the way through and at

10  the end of the next week I issued an opinion; it's on your behalf.

11  Going forward -- again, the enormity of what has to be done here

12  can't really be expressed in words.  And --

13          MS. KHANNA:  I understand entirely why it might feel

14  that way.  I imagine district court judges feel that way often,

15  that their rulings might not stand up on appeal.

16          THE COURT:  I'm not worried about that.  I've been a

17  judge since 1995.  I rule.  If they agree with me, I'm happy.  If

18  they disagree with me, I say, they're right, I'm wrong, and I go

19  onto the next case.  I'm kind of a relief pitcher.  I don't know

20  that for the last case.  And after 30-some years being a judge --

21  don't get me wrong, every judge wants to be affirmed.  I want to

22  be affirmed all the time.  And they'll tell you.  But I don't make

23  a decision based on -- I try to make a decision based on what I

24  think the law is and what the facts are.  That's what I'm saying.

25          MS. KHANNA:  Absolutely, Your Honor, and I couldn't

1    agree more.  This Court needs to make a decision based on what the
2    law is, which is exactly what it was yesterday morning because
3    there is no binding precedent, and based on what the facts are
4    which are exactly what we're here to do over the course of the
5    next five days, and I believe that this Court -- I believe that
6    this Court, the State of Georgia, the parties would benefit from
7    actually deciding Georgia's fate in Georgia's courts based on
8    Georgia's facts, and not reading the tea leaves from a
9    non-majority opinion to say what may or may not happen if this
10   case goes on appeal, if the Supreme Court takes it.  I think that
11   this Court would -- I think there would be certain -- I don't
12   think there is any need to abdicate the very real authority this
13   Court has and there is nothing advisory about any opinion this
14   Court issues when this Court issues an injunction.  That is the
15   law of the land unless and until an Appellate Court says
16   otherwise.  And I don't -- I don't believe that the District Court
17   should short-circuit that process and throw up its hands.
18          I do also want to emphasize one other difference just on
19   the facts.  Here the primary election or the primary election does
20   not begin next month.  Justice Kavanaugh noted in the Alabama
21   opinion that the primary election in the state, quote, begins next
22   month.  I have to say and again I litigated that case, it is
23   unclear to me why -- why he believes that the primary election in
24   Alabama begins next month.  But putting that record aside, on this
25   record, the primary election does not begin next month, it begins

1  at the very earliest on April 5, which is two months from now.

2       THE COURT:  I think what he meant is that the process

3  begins next month.  You have to send out the absentee ballots, and

4  then you have to mail the calling requirements for the 45-day

5  period.  So the State of Georgia, I'm not clearly up-to-date on

6  the requirements in Alabama.  But the State of Georgia, they have

7  to start doing that in March.

8       MS. KHANNA:  I'm sorry.

9       THE COURT:  They've already started a lot of the

10  process.  Now some of the other processes -- I could be wrong; he

11  could mean something else.  That's how I took it.  Not that he was

12  saying the actual election would be in March, that the process of

13  getting ballots and things done begins in March.

14       MS. KHANNA:  Certainly states may choose and may usually

15  prepare for elections.  That does not mean the elections begin.

16  The Court is right; you have deadlines to require 45 days before

17  the election to send out absentee ballots, but that 45-day period

18  here is April 9.

19       THE COURT:  Well, but the ballots have to be -- the

20  local ballots in the counties have to be put together and the

21  Secretary of State has to sign off on them.  The process has

22  already begun on that.  But go ahead.  I understand your point.

23  As you interpret it, he got the date wrong in the primary.

24       MS. KHANNA:  I'm not suggesting that he got the date

25  wrong.  I understand.  I understand that certain preparations have

```
 1   to be made, but we just can't be backtracking about and repeat
 2   backtracking about -- when you look at Purcell, Purcell talked
 3   about Election Day.  How close are we to Election Day.  That was
 4   an October case about a November Election Day.  Well, you kind of
 5   start preparing, and the primary and it's July, but you really
 6   start printing in June, that's a certainly slippery slope, and I
 7   don't know what the kind of -- rule on when an election begins
 8   that way.  Because really then the State can say that, your know,
 9   I started sitting down -- our employees started sitting down with
10   ballots; they started doing that months ago.  So really this case
11   is over.
12        THE COURT:  I think your argument is similar to Justice
13   Kagan's argument, is that, you know, you're almost kind of boxed
14   in when you can actually bring a Voters Right Act.  It's almost
15   like you can only bring it -- not in the year of an election.  But
16   that is not me saying it.  I understand what you're arguing.
17        MS. KHANNA:  I think that is a very good point, Your
18   Honor.
19        THE COURT:  It's not my point.
20        MS. KHANNA:  It's not your point, I understood.  But as
21   a legal matter, as a factual matter, and, again, I can speak with
22   some experience having litigated these cases before, it's almost
23   always too late unless it's too soon.  And that can't be how we
24   judge the voting rights of minority voters in the State of
25   Georgia, and we certainly can't make that decision without the
```

 1  record to decide that very, very crucial question.

 2          I do want to make a final note on this question of

 3  confusion that Justice Kavanaugh discusses and the State mentioned

 4  in his opening statement and I imagine Mr. Tyson will argue as

 5  well.  The candidates in Georgia did not even know what districts

 6  they were going to be in until a few weeks ago when these plans

 7  were enacted into law on December 30.  It cannot be that the

 8  passage of a month has now cemented in place those lines and those

 9  expectations indefinitely such that they can never be altered or

10  cannot be altered over the course of the next eight months.  That

11  seems -- there is something in Congress about that.

12          THE COURT:  Let me ask you this question.  Let's say we

13  go forward and I issue a ruling, and I issue a ruling in your

14  behalf, but then I turn around and say, I'm going to stay my

15  ruling?

16          MS. KHANNA:  If the Court were to issue a preliminary

17  injunction and stay its own injunction?

18          THE COURT:  I can actually -- I may be wrong.  I could

19  have this hearing, I could rule and maybe rule in your favor, but

20  is there anything to say I cannot stay -- I'm staying my ruling;

21  I'm not going to let it go into effect at this time?

22          MS. KHANNA:  Certainly, there is nothing restricting

23  this Court from doing that.  Actually, Your Honor, if the question

24  is in that instance is it even worth it in the first place, I

25  would say the answer even there, if the Court were to take that

1    drastic step --

2            THE COURT:  I tell you if I ever get in trouble, I'm

3    going to call you up.  You're fiery.

4            MS. KHANNA:  I would say in that instance, it is

5    absolutely worth it.  For this Court to weigh in on the merits

6    before it and decide the question actually presented to it for the

7    voters of Georgia, for the parties in this case, as I think as

8    a -- as a -- I think it matters for a whole host of reasons, for

9    citizens, for voters.  But as a practical matter, I also think it

10   matters because what if the Supreme Court appeal happened -- we

11   have no idea the scheduling of appeal will --

12           THE COURT:  October.

13           MS. KHANNA:  What if it happens next month, what if it

14   happens in six months.  The point is if this Court has already

15   hammered out a preliminary ruling on the likelihood of success on

16   the merits, that is absolutely something that could expedite

17   relief when and if this Court decides to lift that stay.

18           THE COURT:  We have one other issue.  The Supreme Court

19   is going to look at this issue of the Voters Right Act, Section 2,

20   next fall, October.  The lower courts, all of us need guidance.  I

21   don't know what they're going to say on that ruling.  I could rule

22   one way and they can come back and say, Jones, once again, you

23   messed up.  It's not -- this is not the way it's going to be.

24   It's just throwing things out.  They can -- I don't know where

25   they're going to go.  They can do a number of things on this

1   Voters Right Act.  And it's almost to the point where I'm trying

2   to decide what do I do not only with this case, but I'm involved

3   in a three-judge panel case with the NAACP in Cobb County.  What

4   do we do as far as Voters Right Act, Section 2, up until -- almost

5   maybe they tell us what they're going to do in the fall?

6          MS. KHANNA:  Your Honor, I also don't know what the

7   Court is going to say or do in the fall, next summer, whenever

8   they issue an opinion in that case.  But I do know what the Court

9   has done.  I do know the law as it stands right now, and that is

10  Gingle's and that is Bartlett and that is the well-established

11  precedent of the Supreme Court.

12         THE COURT:  Let me give you an example of what I'm

13  talking about.  Mr. Young brought a case in front of me, an

14  abortion case, about 18 months ago?  Okay.  I looked at the law

15  and I said, this is the law, and I issued an injunction based on

16  the law, the law as I saw it.  And I know -- but to me the law is

17  clear-cut.  This is the law.  It was appealed to the Eleventh

18  Circuit, and at the same time a Mississippi case was in front of

19  the Supreme Court.  The Eleventh Circuit said, we're not going to

20  rule yet.  We're going to wait and see what the Supreme Court says

21  with the Mississippi case.  I admit this is not exactly the same,

22  but it almost -- because I know right know they're going to take

23  up this issue of the Section 2 of the Voters Right Act in the fall

24  of 2022.

25         MS. KHANNA:  Your Honor, the Eleventh Circuit, again,

1   had the prerogative to decide it wanted to wait, as does this

2   Court, if it wants to stay its own ruling.  I don't think it means

3   you have to stop the proceedings altogether.

4         THE COURT:  If I stay my ruling, why go through the

5   whole process?  You know, we're all lawyers here and I understand

6   we -- and that's why we're having this discussion now, but from a

7   practical point of view, if I practically know I'm going to stay

8   my ruling, why go through this whole process?

9         MS. KHANNA:  I guess, Your Honor, I think you should go

10  through this whole process because I believe I can convince you

11  that this injunction needs to go forward.  I really think I can

12  convince you not to stay the ruling.  I think that even if this

13  Court did decide that it wanted to stay its ruling, there is still

14  merit in actually adjudicating these motions because the minute

15  that the stay lifts, we should be able to proceed as quickly as

16  possible.  The last place we want to find ourselves is to say, oh,

17  actually, now it's too late again for Georgia voters.

18        THE COURT:  If I were to stay it, it wouldn't lift until

19  after the Supreme Court.  Why would I lift a stay on my ruling?

20  First of all, if I don't lift a stay on my ruling for the Georgia

21  Election on May 24, it's moot anyway, isn't it?

22        MS. KHANNA:  This Court might lift a stay on its ruling

23  if the Supreme Court indicates that it should.

24        THE COURT:  What?

25        MS. KHANNA:  If the Supreme Court, when it does rule on

1 Section 2, whatever it says is about the Alabama case, I'm not

2 willing to say today what that ruling is going to be.

3          THE COURT:  I don't know either.

4          MS. KHANNA:  And it could well mean this Court -- any

5 stay imposed by this Court should be lifted, and then at that

6 point we might be in, when, 2023.

7          THE COURT:  If I don't lift the stay before May 24, it

8 is a moot point, because the next election is 2024.  By that time,

9 the common cause -- NAACP parties already know their schedule,

10 that we're looking at a trial on the matter before the 2024

11 elections, even before we get into 2024.  So what I'm saying is

12 that it's your situation, based on how I rule here, would be

13 basically the same way, you're looking at a trial of -- an

14 injunction hearing.  Again, if I issue a stay and I don't lift

15 that stay before May 24, it's a moot point.

16          MS. KHANNA:  I have two responses to that, Your Honor.

17 I had one.  I had two responses; now I have one because one left

18 my mind.

19          THE COURT:  Well, I'm going to give you a chance to say

20 something else after Mr. Tyson is finished.  So if you forget, you

21 can come back.

22          MS. KHANNA:  Okay, I do have two responses.  One comes

23 from, as I mentioned before, Your Honor, experience in litigating

24 voting right cases.  There is an election every two years.  I can

25 guarantee you the day after the November 2022 election, there will

 1  be states that say, likely the State of Georgia who say, you know

 2  what, it's too late for us to do anything in 2024.  I can

 3  guarantee you even more that next spring they will definitely be

 4  saying that, next summer even more so, and next fall, we'll be in

 5  the place we are right now.

 6          THE COURT:  I don't doubt you.  Mr. Tyson is shaking his

 7  head.  I don't doubt what you're saying.  They might say it.  They

 8  probably will say it.  And they said it here.

 9          MS. KHANNA:  They say it everywhere, Your Honor.  It's

10  always too late.  I mean, look, and sometimes --

11          THE COURT:  That doesn't mean I'm going to agree with

12  you, though.  Let's give --

13          MS. KHANNA:  Sorry.  If I may, just one last point.

14          My second point on the primary, Your Honor.  Justice

15  Kavanaugh's opinion seems to presuppose that the primary is

16  something fixed, and the Alabama District Court also seemed to

17  presuppose that the primary was something fixed.  Let's be very

18  clear about this:  This is a question in Georgia, and who has

19  authority to do what here?  Many of the very candidates who the

20  State says need to be protected from this confusion borne of this

21  upcoming election, this primary, are current members of the

22  legislature.  And if they are so worried about confusion, about

23  where they could run, about when they need to file, or about the

24  March 11 deadline, or even about the May 24 primary, they have the

25  power to fix that by enacting new deadlines.  And if Governor Kemp

1  were so concerned about the settled expectations of candidates,

2  Georgia candidates, he would not have intentionally delayed

3  signing the bill for a month.

4  And if at the end of this hearing, this Court is

5  convinced, as I think it will be, that the irreparable harm to

6  hundreds of thousands of black voters, whose votes will be diluted

7  under these maps, outweighs any confusion borne by a handful of

8  candidates, then this Court has the power to move the filing

9  deadline or even the primary.  At one stroke, Your Honor, this

10  Court could move remedy plaintiffs' vote dilution and prevent any

11  confusion caused by the election calendar.  This Court has the

12  power to do both.  To be clear, there is absolutely nothing

13  sacrosanct about the primary date.  In 2020 just two years ago at

14  the start of the pandemic, 16 states chose to delay their

15  primaries without disrupting the November election, without

16  descending into the chaos that the State seems to pretend is going

17  to happen here.

18  THE COURT:  What did Kavanaugh say about that when he

19  said -- I can't remember his exact sentence.  More or less what he

20  says, the words, if the State wanted to interrupt the Purcell

21  matter, they can do it.  In other words, I find -- I'm going to

22  give you a written order.  He said if the states want to do this,

23  they can; but plaintiff, you can't.

24  MS. KHANNA:  I don't believe that's what he said.  I

25  certainly agree that if the state is worried about candidate

1   confusion, the very candidates who will be confused can solve that

2   problem today.  I do not believe he said that this Court is

3   powerless to issue injunctions, and even if he had, that would not

4   overturn the binding precedent in Shelby County that says that

5   federal courts have the authority and the obligation to issue

6   injunctions under Section 2.

7          THE COURT:  Can I interrupt one second?

8          MS. KHANNA:  Yes, of course.

9          THE COURT:  It is one thing for a state on its own to

10  toy with its election laws close to the state's election, but it's

11  quite another thing for a Federal Court to swoop in and redo a

12  state's election laws that appear close to an election.

13         MS. KHANNA:  And that's a true statement.  The State can

14  decide to change its election calendar for any reason or no reason

15  whatsoever.  This Court cannot do that.  This Court, however, can

16  change the election calendar not for no reason whatsoever, but if

17  it finds that this case warrants it.

18         THE COURT:  I'm familiar with that.  That's the reason

19  why we have May 24 primary in Georgia now instead of July.  Some

20  judge changed that.

21         MS. KHANNA:  That is correct, Your Honor.  And in 2020

22  the State changed the primary twice.  We would be in a different

23  conversation.  Purcell was a fall case about a November election.

24  Moving the November general election, now that, I will admit, is a

25  high bar.

1          THE COURT:  I don't get to do that.

2          MS. KHANNA:  Exactly.  And we are not asking the Court

3  to do that.  And we're not even asking the Court to change the

4  primary.  My point is that there is nothing set in stone about

5  that date as Georgia itself has proved as recently in the last two

6  years.  In short, Your Honor -- and I will sit down.

7          THE COURT:  Listen, I appreciate a lawyer that has

8  passion.

9          MS. KHANNA:  I'm not laughing at that, Your Honor.

10          THE COURT:  You also understand the law quite well.

11          MS. KHANNA:  The State has unclean hands.  The State of

12  Georgia -- I'm not speaking about the State of Alabama, the State

13  of Georgia has unclean hands when it comes to the timing-related

14  concerns of this case.  Any purported concern about timing is a

15  problem of the State's own making, and the State is the one with

16  power to remedy any injury it thinks it has.  Ultimately, Your

17  Honor, the only blameless parties in this case are Georgia's black

18  voters.  Who unlike the State and unlike this Court are also

19  powerless to rectify any actual or perceived harms in this case.

20  Purcell does not give states an automatic free pass to violate

21  minority voting rights once a decade.  I don't believe that's what

22  Justice Kavanaugh even suggested.  And it does not allow federal

23  courts like this one to abdicate the responsibility to recognize

24  and to remedy violations of federal law.

25          THE COURT:  Thank you.  Let me make one correction

1  regarding the abortion case with Mr. Young.  Even though the

2  Eleventh Circuit stayed and put it on hold, they did not change

3  the laws on abortions or policies being held in Georgia.  That's a

4  significant difference between this case and that case.

5          MS. KHANNA:  Thank you, Your Honor.

6          MR. SAVITZKY:  Good morning, Your Honor.  Ari Savitzky

7  on behalf of the Alpha plaintiffs.  I know we've been over many of

8  the issues.  I'll keep it, perhaps -- perhaps a little shorter in

9  trying to cover the same ground.  But as we see it, the hearing

10 should proceed.  The Supreme Courts non-precedential stay order in

11 Milligan doesn't change anything.  The Voting Rights Act is the

12 same today as it was yesterday.  The irreparable harm to Georgia

13 voters, loss of political rights, is the same today as it was

14 yesterday.  And this Court's task, hearing the evidence before it

15 and applying the law as it is, as it was, as it remains, is the

16 same today as it was yesterday.

17          So I'd like to first make a sort of global point and

18 then similarly talk about the factors in the -- in the -- in

19 Justice Kavanaugh concurrence and some potential distinctions with

20 the Alabama case.  The global point is that there's no opinion

21 from five Justices here; there is no presidential opinion.  We

22 have a one-paragraph order.  But what Justice Kavanaugh's

23 concurrence does say very clearly is that the stay order here,

24 quote, does not make or signal any change in Voting Rights Law.

25 Make no mistake, it would be a substantial change in Voting Rights

 1  Law to hold that a plaintiff who comes into court on a VRA

 2  redistricting claim, minutes, hours after the challenge maps goes

 3  into effect, who files a comprehensive preliminary injunction

 4  motion within a week of maps going into effect, should not even be

 5  heard in seeking relief.

 6         THE COURT:  Let me ask you this question.  Same question

 7  I asked Ms. Khanna, let's say I have a hearing, continue the

 8  hearing and I rule completely in your way, and then I issue a

 9  stay, what will I have accomplished?  I understand -- at least we

10  have a ruling that what the State of Georgia did was wrong.

11         MR. SAVITSKI:  That's right, and we would have the

12  ability to argue that the stay should not be issued and to ask the

13  Eleventh Circuit on a emergency basis to consider the grounds on

14  which you decide to stay your decision.  But let me just back up

15  because the idea that you would find for the plaintiffs --

16         THE COURT:  What if I issue the stay now and allow you

17  to take it to up to the Eleventh Circuit now without going through

18  the rest of the five days?

19         MR. SAVITZKY:  Well, that's the fundamental point, Your

20  Honor.  We don't have a record to go up on.  We don't have a

21  record to decide whether it stays --

22         THE COURT:  Your argument said I really should not be

23  stopping the hearing.

24         MR. SAVITZKY:  Correct.

25         THE COURT:  And I should not issue a stay.

1          MR. SAVITZKY:  Correct.  But whether or not you issued a

2    stay at the end of the day, I strongly would oppose the issuance

3    of a stay at the end of these proceedings.  But for Your Honor,

4    the question of whether or not a stay would be proper would be

5    based on the evidence that's adduced at the hearing.  How strong

6    is the merits showing?  We think, we can move right into the

7    factors of Justice Kavanaugh's concurrence.  How strong is the

8    showing?  We think it would be strong.  Whatever is in the record

9    and papers and testimony you heard is clear-cut.  We will hear

10   plenty more evidence on the merits.  That is how the Court rules,

11   how the Court considers any potential stay, how the Court crafts

12   the scope of the relief that it orders, and I'd like to get back

13   to that point.

14          Just going to the second factor, irreparable harm.  We

15   know the loss of political rights is irreparable harm.  We know

16   once we run elections on an illegal map, we have incumbents, who

17   have the power of incumbency, who are elected on a map that

18   violates the Voting Rights Act.  The scope of the irreparable harm

19   to voters, to the system, to the process is substantial.

20          THE COURT:  Is that not the same -- I'm -- was that

21   argument not that same argument before the Supreme Court that the

22   map in Alabama is unconstitutional and voters have to vote on an

23   unconstitutional map?  Is that not the argument?

24          MR. Savitzky:  I think Justice Kavanaugh in his

25   concurrence --

1          THE COURT:  I think Justice Kavanaugh, the other four

2     also -- the argument you're making now is that why should voters

3     have to vote on an unconstitutional map.

4          MR. SAVITZKY:  Correct.  And we think it would be

5     irreparable harm in the extreme.  There is no way to remedy that

6     that harm.  You cannot get that election back.

7          THE COURT:  Is that not the argument that was made to

8     the Supreme Court when they came up with this ruling yesterday?

9          MR. SAVITZKY:  Yes, and just to back up.  It's one of

10    the factors to be considered in this sort of Purcell-type analysis

11    and any stay analysis.  You could consider the strength of the

12    merit case; you can consider the irreparable harm.  On that front

13    you're balancing all of these factors.  This isn't is a case where

14    there is any doubt, there is any question about irreparable harm.

15    This is a case where irreparable harm is at its highest possible

16    level.  That's another thing to consider in this case

17    specific -- as you look at all of the evidence that's come in, the

18    evidence on the merits, on irreparable harm, -- let me get to that

19    third factor, undue delay.  We've talked about already.  Obviously

20    the plaintiffs came in within moments of the maps being enacted.

21    Obviously --

22          THE COURT:  I agree.  I have no problem with it.  I

23    think the plaintiffs -- I think one of them got filed hours after

24    the Governor signed the -- I have no problem.  I think the

25    plaintiffs did everything they're supposed to have done.  They

1  waited, they couldn't file it if they had to.  That's not an issue

2  for me.

3        MR. SAVITZKY:  Then, Your Honor, to the last points

4  which is really what we've been focused on.  I would emphasize

5  we're balancing all of these and looking at the evidence that's

6  come in on them.  That's precisely our point, are changes to the

7  map feasible before the election without significant cost

8  hardship.  We think those changes are feasible.  We think those

9  changes are feasible without changing the dates, but we think you

10  also could change the dates if you think there are some hardships.

11  The point is we need to hear evidence on that.

12        There is going to be testimony on those issues.  The

13  Court has yet to hear any testimony about the nature of the

14  relevant deadline.  We have a piece of paper with some dates, but

15  we haven't heard testimony about it.  We haven't heard testimony

16  about the kinds of hardships.  We will have questions on

17  cross-examination on those issues.  The Court also --

18        THE COURT:  The point I think -- excuse me for

19  interrupting -- is that again, even if I agree with you on

20  everything, maybe I don't agree with you on District 18, but let's

21  say I agree with you on everything, and then I said, well, I agree

22  but I don't agree that this is not going to cause the State undue

23  burden on trying to have an election, and I grant the stay.

24        MR. SAVITZKY:  I think at the end of the day if you

25  decided that there would be a substantial significant hardship --

1  and here's an important point -- that couldn't be remedied with

2  additional ancillary or other relief, then you might decide an

3  injunction was inappropriate.  But the point is you would have to

4  make that determination based on hearing the evidence in the

5  record.  Based on hearing the testimony that we are here to put on

6  and to elicit and to all hear.

7          I just want to be very clear about that last point, and

8  Ms. Khanna raised it as well.  The Court hasn't heard any

9  testimony about whether, if there are hardships.  We don't know

10  what the hardships are, what the nature of them are, we don't know

11  how they balance out, and it is the extreme irreparable harm here

12  against the clear-cut nature of the merits here.  But if there are

13  hardships and if they have some significance to them, we also

14  haven't heard evidence on whether there is additional relief that

15  the Court could order.

16          We're here talking about how to craft an equitable

17  remedy, a remedy that addresses voting rights act violations, and

18  that could include changing some deadlines, and maybe the evidence

19  will indicate which deadlines might not be changed and how.

20          THE COURT:  Why could they have not allowed the Alabama

21  court to change the deadlines in Alabama?

22          MR. SAVITZKY:  Well, that's an important distinction,

23  Your Honor, because if you look at the Alabama decision what the

24  Court said is, well, we read Purcell to say if the deadline is

25  very imminent, that's a problem.  Yes, the candidate filing

1  deadline is tomorrow, you know, is imminent, we're going to stay

2  that for two weeks, but otherwise there's two months; there's

3  enough time.

4          THE COURT:  Why did they not say that?  Why could they

5  have not said District Court, you have the authority to change --

6  as they'd already done -- the qualifying deadline in Alabama to

7  change the primary date, the absentee ballot date, why did they

8  not give that option?

9          MR. SAVITZKY:  Your Honor, I don't know why the Alabama

10  court didn't do that.

11          THE COURT:  Not the Alabama court, the Supreme Court.

12          MR. SAVITZKY:  Your Honor, what we're looking at with

13  the Supreme Court -- it's important to understand the reason we

14  don't have that from the Supreme Court, but what we do have from

15  the Court is a one-paragraph order --

16          THE COURT:  But you are going to say that I could go

17  through and work around Purcell by changing all these dates.

18          MR. SAVITZKY:  To the extent that Purcell is about

19  whether or not a ruling extremely close in time to an election

20  would, in particular, cause hardship, ancillary or supporting

21  relief to move back the dates of the election, especially now --

22  as Ms. Khanna pointed out, we're early in the calendar.  It is

23  February of 2022.  That relief will alleviate those Purcell

24  problems.  And that is relief that is within the Court's power to

25  grant, and that is part of what the Court does in providing

1    remedies.  The remedy, the violation of rights, and provide a

2    whole remedy that addresses all of the issues in the public

3    interest.

4              And so we need to hear testimony about exactly what the

5    facts are and the best way for the Court to craft a remedy for a

6    serious -- what we think is a clear-cut and serious voting rights

7    violation.  If the Court agrees, the Court could also hear those

8    facts and determine how to put a remedy into place.  And that is

9    going to be fact-specific.  Of course, it is.  Whatever that

10   remedy is will then be entirely different from what the Alabama

11   court did for sure, and it will be based on different facts.

12             We think that is a significant distinction between the

13   Alabama case because we don't have a record yet, because a remedy

14   hasn't been crafted yet because the facts supporting the potential

15   remedy and possible remedial actions the Court could take to

16   obviate some of those concerns are still open because we're on day

17   two of the hearing.  We think the hearing should proceed.  The

18   Court should hear all the evidence.  And then the Court will

19   determine what relief is appropriate based upon the ERA violation.

20             THE COURT:  Thank you.

21             MR. SAVITZKY:  Thank you, Your Honor.

22             THE COURT:  Anyone else?  Mr. Tyson?  Mr. Tyson, the

23   argument is made that there is no evidence in the record yet that

24   it's going to be difficult for Georgia to conduct these elections

25   if I proceed and rule against Georgia.

1            MR. TYSON:  I'm sorry, Your Honor?

2            THE COURT:  The argument is being made there is no

3    evidence in the record.  I understand it's in the briefs, there is

4    no evidence in the record that it's going to be difficult for

5    Georgia to proceed if I rule against Georgia.

6            MR. TYSON:  Your Honor, I think there is evidence in the

7    record on that point from Mr. Barnes and Ms. Bailey in their

8    declarations.  They laid out for the Court the timelines and the

9    difficulties that are there.  And I think the key point when we're

10   looking at all this, looking back at 2020 and all those different

11   election cases that were rolling through, and the Eleventh Circuit

12   was consistently staying those based on Purcell, the Georgia

13   project was to set forth ballots after the election was over.  In

14   terms of procedurally where we see this, I think you issuing an

15   opinion and staying an opinion is much more like an advisory

16   opinion in that scenario.  For our position, given the evidence in

17   the record from Mr. Barnes and Ms. Bailey, the plaintiffs don't

18   have any sort of specific evidence that I'm -- they can point me

19   to something if I missed it, but I don't believe there is

20   something in the record on timing of the election from the

21   plaintiffs, that you can deny the preliminary injunction motions

22   based purely on the public interest in Purcell issues that are

23   involved.  We think that is the proper procedural posture then to

24   either stay the case and give us some direction on Section 2 or we

25   proceed on the same calendar along the three-judge panel cases, we

1   can work through towards a trial.

2          THE COURT:  Let me ask you this, Mr. Tyson.  The

3   plaintiffs very strongly -- since this is denying black voters the

4   right to vote for the person they want.  I don't know how I'm

5   going to rule yet.  But if I did rule against the State, they also

6   argue, Judge, it's not right that they don't get a chance to be

7   heard in this important matter.  Something I thought about a lot

8   last night.  What's the State's position?  These are the state's

9   citizens.  These are black voters.  These black voters are

10  citizens of State of Georgia.  You represent them as well.

11         MR. TYSON:  Yes, Your Honor.  And I think it is -- it is

12  a very serious charge to say any voters in Georgia are going to be

13  affected adversely by this process.  Number one, we recognize that

14  is a very serious charge the plaintiffs make.  Based on the

15  testimony yesterday you heard from Mr. Cooper, there is a lot of

16  uncertainty, a lot of things that go into drawing district maps.

17  It's a complicated process.  There are a lot of pieces to it.  And

18  as we were going to explore with other experts, there's even

19  disagreement among the experts about where Georgia should have

20  drawn additional districts they didn't draw.  So we think that,

21  number one, it is a very difficult factual scenario to work

22  through.

23         Number two, these districts are largely similar to what

24  you saw in the Georgia Democratic Party plans that were submitted,

25  those were the only ones before the Legislature.  We've stipulated

1  with the plaintiffs that the only plans the legislature had to

2  look at were the ones the chairs drew and the ones the Democratic

3  caucus drew.  These plans don't go viciously after incumbents.

4  They don't make these major changes that will adversely affect

5  voters.

6         They're largely similar to the plans that were in place

7  for the last decade.  And so from the State's perspective, the

8  State did the very hard job of working through the public comment,

9  getting the input there, getting input from Legislatures who know

10 their constituents, and putting all those factors together into

11 redistricting plans.  And the showing that these plans violate the

12 Voting Rights Act, it's not as if we're in the scenario -- I think

13 back to the cases in the early '80s and '90s, where you had an

14 at-large system of election for a county.  They were clearly

15 subverting the rights to vote, of black voters in an urban core of

16 a county having at-large elections.  You could have very simply

17 and easily crafted an additional district with all redistricting

18 principles and address the right to vote like that.

19        This case is far more complex than that because we're

20 talking about what is the impact of drawing predominantly based on

21 race, which we know we can't do under Shaw.  How do we square that

22 with the requirements of the Voting Rights Act?  And the State has

23 engaged in all those processes in the time that it took to draw

24 the district.

25        THE COURT:  Isn't that something we should talk about in

the hearing, hear evidence on it, help me make a determination whether or not, you know, the state law -- there's a lot of assumptions that I'm going to rule, I may at the end of the day say I'm ruling for the State of Georgia.  Should I not hear that and at least make that determination?

In other words, the question also said -- I think they raised, well, Judge, do you have the authority to stop it in the middle?  Right now I think I do.  But that's really a valid question.

MR. TYSON:  It certainly is, Your Honor.  And I think this comes back to what we've been saying from the beginning, which is, Section 2 cases require, as Ms. Khanna said, an intensely local appraisal of the facts.  We're essentially trying to take a year-long process of discovery and digging into what is happening here and cram it into an emergency timeline when, from our position, it is already too late to alter the election machinery.  And so we think Your Honor, the Court, the people of Georgia will be better served by let's dig in and really unearth these facts and explore these questions we talked about with Mr. Cooper, explore the partisan race issues we have with the political scientists -- not on an emergency track, but explore that on a normal discovery track.  Because at the end of the day, the four prongs that you have to get to get an injunction, the plaintiffs are not going to be able to clear the equities and public interest because of the place we are in the election

1  calendar.

2        We talked about kind of this, you know, when does

3  Purcell apply.  It's always too late, Ms. Khanna said.  As someone

4  who elects -- represents local election officials, put it that

5  way, county boards of election, you can't just snap your fingers

6  and hold an election.  There is a whole process you have to go

7  through to work that.  The Supreme Court precedent recognizes

8  there's this concept of election machinery.  You kind of get the

9  election machine rumbling down the tracks, and it gets to be too

10  late to put a stop to it.

11        THE COURT:  Ms. Khanna said, Judge, you did that back in

12  January when you started this.  Let's face it, I'm having this

13  discussion with y'all now based on what the Supreme Court did

14  yesterday.  Okay?  And the argument is being made, Mr. Tyson, that

15  says, Judge, you really don't know what the other three are

16  thinking.

17        MR. TYSON:  Certainly, yes.  And maybe, if I could, Your

18  Honor, maybe on that point.  I think it's helpful to look at what

19  other Justices said, because I think that might help clarify on

20  some of these things.  So, obviously, we have Justice Kavanaugh

21  and we talked a lot about his situation there, the massive

22  hardship that is involved.  But I think if you look at Justice

23  Kagan's dissent, it helps reinforce the reason why.  The Alabama

24  case in many ways was a simpler decision-making process than the

25  facts that you've got here.  Justice Kagan notes in her dissent

1    there are several things Alabama didn't argue.  She said Alabama

2    had been on notice since 2018 that they could draw this additional

3    majority black district.  There was actually a map introduced in

4    the special session that drew the district the Legislature

5    rejected.  In the stipulated facts in the case here, nobody had

6    drawn a majority black 6th Congressional District before

7    Mr. Cooper proposed that.  No one had drawn any of these other

8    districts on the legislative maps until they were proposed here.

9    This is a different scenario we're facing versus than Alabama.

10          Justice Kagan noted that Alabama didn't argue that its

11   enacted plans were better on compactness than traditional

12   redistricting principles.  That's exactly what we're arguing here.

13   That the enacted plans are more compacted.  That they do fit

14   traditional principles better.

15          Justice Kagan said Alabama didn't contend it was

16   impossible to redraw the map on their election timeline because

17   although it's the same election, they had the earlier qualifying

18   period and all that.  We are contending it's impossible to do that

19   on this timeline.  That's what Ms. Bailey talked about, Mr. Barnes

20   talked about.  Those are the points we're making there.

21          So ultimately when you look at the Chief Justice's

22   dissent, I think he frames the whole issue that we're struggling

23   with, which is Gingle's and its progeny have engendered

24   considerable disagreement and uncertainty regarding the nature and

25   contours of a vote dilution claim.  Justice Kavanaugh said

1  something similar, and to show clear-cut entitlement to relief,

2  we're going to have show many more different facts here than they

3  had in the Alabama case.  Even if they couldn't show it there,

4  there's no basis for us to find that here.

5          THE COURT:  In other words, I raised the question that

6  we really won't know about Section 2, the Voters Right Act, until

7  after the Supreme Court issues a ruling in the fall.  I'm not sure

8  they're going to hear it in the fall.  They might not issue a

9  ruling until June of the next year '23.  So where does that put

10  me?  In other words, that's the concern I had last night is that I

11  don't know what they're going to say about Section 2, the Voters

12  Right Act, until they say it.

13          MR. TYSON:  Certainly.  I've given that a lot of thought

14  since last night, too.  What do we do from here?  I think we kind

15  of have two options essentially.  One option is we move forward

16  with discovery and kind of get all of the facts into the record so

17  we at least know some of them, hoping the Supreme Court doesn't

18  add some more factors that we have to consider later.  I think

19  largely the factors will be the same.  It is going to be political

20  science research, it's going to be district maps, a lot of those

21  same principles.

22          THE COURT:  But right now, I do know what the law is

23  right now.  The law of the land right now is the Gingle's factors,

24  the Gingle's factors and the totality of the circumstances.  So

25  why should I not say -- mainly kind of like I did in the abortion

1  case.  Here's what I'm ruling now.  If it changed, it changed, but

2  here is the law now.

3          MR. TYSON:  Your Honor, I think the reason is because

4  that's only one factor of the preliminary injunction issue.  Even

5  if you were to find the plaintiffs' likelihood of success on all

6  of the existing law pieces, we still don't cross public interest.

7  We don't cross equities, and so for that reason the injunction is

8  going to need to be denied, no matter what.  We can work through

9  the likelihood of success and all the other pieces of the puzzle

10 and the existing law in the normal discovery track on the schedule

11 that's been set in the three-judge panel cases and then see when

12 we get direction from the Supreme Court.

13          But as a practitioner, I'm in the same mode as Chief

14 Justice Roberts is, it is hard to give good legal advice around

15 compliance of Section 2 because the law is very difficult to

16 interpret what is the role of racial predominance when you're

17 drawing this unconstitutional with Section 2 requirement that you

18 must draw these districts.  These are questions that we need to

19 know the answer to before all these cases go forward.

20          THE COURT:  One last question for you.  I have a general

21 idea if I don't go forward, I should say.  There is another

22 question that said, well, if you stop it, are you denying the

23 injunction, are you suspending the hearing or are you issuing a

24 stay?  What are you saying, Judge Jones, right now?  The hearing

25 is -- only had one witness.

1          MR. TYSON:  And, Your Honor, I think the proper

2    procedural posture would be, you have not concluded this, and your

3    review of the evidence, it's in the record, and based on the input

4    of the Supreme Court in the Alabama case, that the public interest

5    and the equities cannot be met no matter what the evidence or the

6    likelihood of success would be.  So at this point we would deny

7    the motions for preliminary injunction based on public interest

8    and equities based on the evidence in the record before you, which

9    is Ms. Bailey's declaration, Mr. Barnes' declaration, and then we

10   can set a schedule and proceed after we go from there.  We think

11   procedurally that makes the most sense at this point.

12          THE COURT:  Thank you, Mr. Tyson.

13          MR. TYSON:  Thank you, Your Honor.

14          THE COURT:  Any last words from Ms. Khanna?

15          MS. KHANNA:  Thank you, Your Honor, a few brief points

16   in response.  Mr. Tyson began his argument and ended the argument

17   with a discussion of the evidence on the record.  And the evidence

18   on the record that he pointed to is a declaration by Mr. Barnes, I

19   believe paragraph declaration by Mr. Barnes, that actually gets

20   the deadline wrong for you to call the ballots.  It says that the

21   deadline is April 5th; it's not.  That is the first day under

22   Georgia law that ballots may be sent to overseas, not the

23   deadline.

24          It also assumes the credibility of Ms. Bailey's expert

25   report.  They're submitting her as an expert.  They could not

1  manage to get expert analysis from her by the Court-ordered
2  deadline originally when plaintiffs objected, and they put in an
3  expert analysis two days later to assume that this evidence in the
4  record is unassailable.  Without any cross-examination, without
5  any determination of the witness' credibility, without any probing
6  into the facts is quite a dangerous precedent indeed.  I think the
7  Court has talked about what precedent this Court should follow,
8  but I think it's also important to think about what precedent
9  would this Court be setting if it were to stop the hearing at this
10  point?  And I think that precedent would be one of two things,
11  both of which would be very dangerous.  One is it would be
12  undermining what Justice Kavanaugh said by turning Purcell into an
13  absolute bar.  Saying, oops, there is nothing as a matter of law
14  essentially, nothing I can really do here, nothing the courts can
15  really do here.  Or if it were to determine it based on the,
16  quote, unquote, evidence in the record, it would basically say all
17  the State has to do is throw together a declaration in 12 hours;
18  we don't get to test the relevance, the probative.  We don't get
19  to decide whether or not it's credible or not, but we just presume
20  that the State can kind of wave a magic wand and hands off,
21  Court's done.  And what message would every other court in the
22  land take from that?  That really at the end of the day the Court
23  is powerless, and that the Court -- and that somehow a non-binding
24  stay order from the Supreme Court in a different case has now shut
25  down voting rights litigation for the rest of the year.  That

1    can't be true.

2          THE COURT:  Well, I'm not the only judge in America.  I

3    think there are at least three other judges in three other states

4    are having to deal with this today.

5          MS. KHANNA:  And it would be a dangerous position,

6    indeed, for the Courts to decide -- for the District Courts to

7    decide that they are entirely powerless.  The Supreme Court never

8    said it, and I don't think this Court needs to presume that at

9    this point.

10          Mr. Tyson's comments about why this hearing should not

11    go forward, why the preliminary injunction should be denied, were

12    entirely based on the merits -- I'm sorry, the bulk of that

13    discussion was on the state-specific issues and the plan-specific

14    issues.  He said that the Legislature did everything right here.

15    He said the maps in front of him were doing this and not that.  He

16    said that they followed previous lines.  I understand that's

17    Mr. Tyson's position; certainly plaintiffs have a different

18    position, but that is the nub of the issue.  What are the planned

19    specific merits of each of the plans at issue here, and maybe

20    they're not all created equal.  Maybe some are simpler than

21    others; maybe some are more clear-cut than others.  There is a

22    Congressional case, there is a House case and there is a Senate

23    case.  And we can't just wave with a broadbrush saying they are

24    probably more or less the same because the state's attorney has

25    decided that the process here was good.

1            And then at the end of that discussion, Mr. Tyson says

2    well, after disclaiming that the merits here matter -- even the

3    State seems to believe that the merits here matter, says well, we

4    can really just wash away the merits entirely in this preliminary

5    injunction hearing, turns out that this first merit issue just

6    gets thrown out the window because this Court can't issue a

7    injunction no matter what.  And again, that is a complete reversal

8    of what the preliminary injunction standard is.  There is not one

9    wholly dispositive factor.  It is always a balance.

10           And when Mr. Tyson says it is already too late, when the

11   State says it is already too late, think about what that means,

12   Your Honor.  The minute that we filed our lawsuit, which was the

13   first minute we could file our lawsuit, it was already too late.

14           THE COURT:  I didn't agree with that.  If I agreed with

15   that, I would have stopped it on January 4.  So I don't agree with

16   that.

17           MS. KHANNA:  But that argument that it is already too

18   late suggests or I think necessitates the State's position that in

19   an election year, in the redistricting cycle where we draw a new

20   map, we kind of get a freebie.  We can pack all black voters in

21   one district, and turns out there's nothing we can do about it

22   because it's too late.  We can malapportion the districts, but

23   there is nothing anybody can do about it because it's too late.

24   We can concede a voting rights action, but there's really nothing

25   the State can do about it because it is too late.  That can't be

1  true.

2           THE COURT:  I'm not saying it's true.  I'm not making a

3  determination on anything.  All I'm saying is that -- you know,

4  sometimes it's best to listen than talk.  So I'll listen.

5           MS. KHANNA:  I understand, Your Honor, and I will take

6  the same advice.  I appreciate the opportunity to address the

7  Court today.

8           THE COURT:  I need about 15 minutes to -- well, go

9  ahead.

10          MR. SAVITZKY:  Thank you, Your Honor.  Very briefly.  To

11 stop this hearing now would be to say that a state can sort of

12 slow walk its redistricting process until the beginning of the

13 state's election calendar as the state describes it, and then be

14 immune from a suit under the ERA for at least one election.  They

15 can use the process entirely within their own control to escape

16 any judicial review.  That cannot be right.  And, in fact, I would

17 suggest that the State create a delay -- would support altering,

18 if the facts support it, after we hear the evidence, the State's

19 schedule in order to insure that the Court can impose effective

20 relief to remedy any violations of law that it finds are likely.

21          I would add to that only, we think that at a minimum,

22 you should hear the witnesses the state has talked about who are

23 going to testify to purported difficulties.  Mr. Tyson said it

24 would be impossible -- impossible under the current schedule.  We

25 don't think that's right, impossible under a schedule the Court

 1  alters slightly.  We think that could make it even less difficult.

 2  But the point is we need to develop at least those facts, even if

 3  the Court wants to consider sort of hardship issue first.  There

 4  are no facts in the record on that beyond a declaration on a piece

 5  of paper that doesn't get to the actual nature of the hardships.

 6  It doesn't get to, well, how difficult is it really.  And that

 7  includes, by the way, the fact that plaintiffs have reserved the

 8  right to put on a rebuttal case in response to those witnesses.

 9  So there is -- there's evidence to be heard on the issues that the

10  Court is concerned about.  There's, of course, evidence to be

11  heard on the merits, on the significant ERA violations that we

12  think are clear on this record and that we think we can show

13  further through testimony.

14          And so we think before there is any decision, you need

15  to hear the evidence.  You need to hear the evidence that goes

16  both to the merits, but especially if the Court is concerned about

17  these questions of -- of whether a remedy is possible, let's hear

18  the evidence on that, too.

19          THE COURT:  Thank you.  Mr. Tyson, any last words?

20          MR. TYSON:  Yes, Your Honor.  Just very briefly, Your

21  Honor.  I think it's also important to remember we're on a very

22  unusual timeline this year and last year.  We had COVID delays in

23  the census.  The census numbers would normally come out in March

24  and April.  Special session is usually August.  This year we had

25  August since its release, November special session.  There are a

1  lot of unique things that happened this year on the timeline.  And

2  so again I think it's important to remember this is not -- the

3  machinery of the election is the key point at this point.

4       In a -- in a different year with a different timeline in

5  the Legislature, there may be more time to review these kinds of

6  issues ahead of time.  The Governor is not a party here.  The

7  Secretary can't tell the Governor what to do; I'm sure he could

8  try.  The Governor chose to sign the maps when he signed them.

9  All those pieces, though, don't impact the local election

10  officials' work to get the election run, and that is essentially

11  where we are at the end of the day.  I want to make sure from the

12  timeline perspective this was part of it.

13       THE COURT:  I want to ask this question, I think I know

14  the answer, but I want to make sure.  In the 2001 redistricting,

15  the maps that they ran on was the maps that the general

16  assembly -- I think Governor Miller was the governor at the time

17  and that the DOJ precleared.  They did not change those maps until

18  later; is that correct?

19       MR. TYSON:  That's correct, Your Honor.  DOJ initially

20  objected to the state plan in 2001.  There were slight

21  modifications made in the regular session in early January, but

22  they were -- those maps were run on 2002, and there was litigation

23  after that to throw them out.

24       THE COURT:  Those maps were later declared

25  unconstitutional, but they did run on those maps.  My point is,

1  that it is not something completely new that elections proceed on

2  maps that are later found to be unconstitutional.  I think it's

3  happened twice in Georgia.  I know it happened in 2001.  I think

4  it happened again -- the maps were not declared unconstitutional

5  in 2012, but I was trying to last night to find other states where

6  they have proceeded on maps that were later found

7  unconstitutional.  So it's -- go on.

8          MR. TYSON:  You're correct, Your Honor.  Also too the

9  challenge was that the 2001 Congressional map was

10 unconstitutional.  The three judge court rejected that claim of

11 the plaintiffs.  There was a second election on that 2001

12 Congressional plan as well and the Legislature redrew it later.

13         THE COURT:  Thank you all.  Give me a few minutes.  I'm

14 going to go back to my office and think about this, and I'll come

15 back and tell you what I'm going to go.

16         (Whereupon, a break was taken. )

17         THE COURT:  Here's what I would like to do.  I want to

18 sort of shift how we're going to do this.  I want the State to put

19 up evidence regarding why this would be difficult for the State to

20 go forward.  I'll allow the plaintiff to present rebuttal evidence

21 to that.  We were talking more or less about equity and public

22 interest.

23         Now the question is, is the State prepared to do that

24 after lunch today, or will you need to wait until tomorrow?

25         MR. TYSON:  Your Honor, I can check on Mr. Barnes.  He's

1  in Atlanta.  Ms. Bailey is in Augusta, I'm not sure I can get her

2  this afternoon.  I can check on Mr. Barnes' availability this

3  afternoon.

4          THE COURT:  We might do Mr. Barnes this afternoon and

5  Ms. Bailey tomorrow.  She's in Augusta.  I don't know how soon you

6  can have your rebuttal witnesses ready.

7          MR. TYSON:  We can do our best, as fast as possible,

8  Your Honor.

9          THE COURT:  That's what we'll probably do.  Here's what

10  we will do.  We will adjourn until 2 o'clock this afternoon, and

11  then we'll start -- we only have Mr. Barnes.  We only have

12  Mr. Barnes.  If Ms. Bailey can be here -- Augusta is, what, a

13  two-hour drive from Atlanta on I-20.  If she can get here to

14  help -- if she can't, then we'll deal with her tomorrow.  That's

15  what we're going to do.  Thank y'all.

16          (Whereupon, the hearing concluded at 10:48 a.m.)

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9      This the 8th day of February, 2022.

10

11

12

13

14                    /s/Viola S. Zborowski_____
                      VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25
```