```
1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4   ALPHA PHI ALPHA FRATERNITY,    )
    INC., ET AL.,                  )
5                 PLAINTIFFS,      )
                                   ) DOCKET NO. 1:21-CV-05337-SCJ
6        -VS-                      ) VOLUME 3 - A.M.
                                   )
7   BRAD RAFFENSPERGER,            )
                                   )
8                 DEFENDANT.       )
    _____
9   COAKLEY PENDERGRASS,           )
    ET AL.,                        )
10                PLAINTIFFS,      )
                                   ) DOCKET NO. 1:21-CV-5339-SCJ
11       -VS-                      )
                                   )
12  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
13                DEFENDANTS.      )
    _____
14  ANNIE LOIS GRANT, ET AL.,      )
                                   )
15                PLAINTIFFS,      )
                                   ) DOCKET NO. 1:22-CV-00122-SCJ
16       -VS-                      )
                                   )
17  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
18                DEFENDANTS.      )
    _____
19
          TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20            BEFORE THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT JUDGE
21              WEDNESDAY, FEBRUARY 9, 2022

22
            VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23     OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT COURT
24                   ATLANTA, GEORGIA
                      404-215-1479
25              VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFFS:

 3    KEVIN J. HAMILTON, ESQ.
      GEORGE P. VARGHESE, ESQ.
 4    GRAHAM W. WHITE, ESQ.
      MICHAEL BRANDON JONES, ESQ.
 5    ABHA KHANNA, ESQ.
      SOPHIA LIN LAKIN, ESQ.
 6    ROBERT BOONE
      ABIGAIL SHAW
 7    ALEX W. MILLER
      CASSANDRA MITCHELL
 8    MAURA DOUGLAS
      SAMUEL WEITZMAN
 9    EDWARD WILLIAMS
      ANURADHA SIVARAM
10    CHARLOTTE GEAGHAN-BREINER

11


12   ON BEHALF OF THE DEFENDANTS:

13    BRYAN P. TYSON, ESQ.
      LOREE ANNE PARADISE, ESQ.
14    BRYAN JACOUTOT, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2  WITNESS                 DIRECT   VOIR   CROSS   REDIRECT   RECROSS
                                     DIRE
 3
       LYNN BAILEY          6, 14,    15   23,59        69    74,76
 4                          16
       RICHARD BARRON          79          91           99
 5  NANCY BOREN              102          117          122

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          THE COURT:  We have Ms. Bailey this morning at nine, and

 2   how many rebuttal witnesses?  Do you have another other witnesses

 3   than Ms. Bailey?

 4          MR. HAMILTON:  Ms. Bailey is the last witness.

 5          THE COURT:  How many rebuttal witnesses do we have?

 6          MR. HAMILTON:  Your Honor, the plaintiffs anticipate

 7   calling three or maybe four witnesses.

 8          THE COURT:  Okay.  And then after that, when we go back

 9   to the merits part?

10          MR. HAMILTON:  If we go back to the merits part, then we

11   would have Blake Esselstyn and then Max Palmer.

12          THE COURT:  They're here and ready to go forward?

13          MR. HAMILTON:  They're here and ready to go forward.

14          THE COURT:  Here's what the Court is going to do.  The

15   Purcell issue was issued in the case before the Supreme Court.  I

16   said that on Monday.  And I don't think it would be fair to make a

17   decision on Purcell until I hear all of the evidence.  I recognize

18   that the Supreme Court decision -- that Justice Kavanaugh's

19   concurrence is a concurrence.  Okay?  I recognize that.  I

20   recognize the fact that I don't have an opinion in the case

21   because the three other judges didn't say one way or the other.

22   But I don't want anybody to take the position that I've wiped away

23   the Purcell issue.  I'm going to decide that issue.  That is an

24   issue that is still going to be decided, and it's going to be

25   decided taking into consideration what the Supreme Court did.

1          I recognize that you all filed a brief this morning.  I
2    didn't have a chance to read it, but I kind of can guess what it's
3    going to say.  But I'm going to read it.  But I'm going to read
4    it.
5          And I recognize again, three other justices didn't say
6    one way or the other why they're ruling.  And one more time,
7    Justice Kavanaugh joined by Justice Alito, it's a concurrence.
8    But I would be dishonest to look at you and say I'm not going to
9    consider it.  Okay?  On the other hand, Mr. Tyson, I need to hear
10   all of the evidence before I make a decision.  I want to hear
11   this -- I heard yesterday Mr. Barnes' reason why it's going to
12   cause a disruption.  I'll hear Ms. Bailey give a reason.  I also
13   need a reason why -- you asked a very good question yesterday of
14   Mr. Barnes.  You said:  Will voters lose confidence in voting if
15   there is chaos and confusion?  I thought it was a good question.
16   But another question jumped in my mind immediately:  Will they
17   lose confidence if they think they're voting with unconstitutional
18   maps?  I have to allow this side to have people get up and tell me
19   that, too, before I make the decision.
20          But one more time, no one should take this to mean that
21   I have disregarded Purcell.  That is an issue that is still at the
22   height of what's got to be decided in this case, and I'm going to
23   consider what the Supreme Court did.  But I'm going to hear all of
24   the evidence, and then I'll make a decision.
25          Now, we're a little bit off schedule.  I still think we

```
 1  can get it done by 5 o'clock on Monday, but if not, we'll go into
 2  Tuesday.  But we may have to start Tuesday afternoon because I
 3  have to go to Rome -- the sentencing is here?  Good, I don't have
 4  to go to Rome.  I have to do a sentencing here Tuesday morning.  I
 5  was going to get a Batmobile or something.  The sentence will be
 6  here Tuesday morning.  If we're not done by 5, 5:30 on Monday,
 7  then y'all come back 1:30 Tuesday and we'll finish up.  So don't
 8  stress.  You're going to get whatever you plan on presenting,
 9  you're going to present.  Okay?
10          Let's go, Mr. Tyson.  Let's roll.
11          MR. TYSON:  Mr. Jacoutot will be handling Ms. Bailey,
12  Your Honor.
13          THE DEPUTY CLERK:  Would you raise your right hand.  Do
14  you solemnly swear that the evidence you shall give in the matter
15  now before this Court, shall be the truth, the whole truth and
16  nothing but the truth, so help you God?
17          THE WITNESS:  I do.
18          THE DEPUTY CLERK:  Thank you.  Have a seat, and please
19  state and spell your name for the record.
20          THE WITNESS:  Thank you.  Are you okay without a mask?
21          THE COURT:  Yes, you can.
22          THE WITNESS:  My name is Lynn Bailey.  It's L-Y-N-N, B
23  as in boy, A-I-L-E-Y.
24  LYNN BAILEY, having been duly sworn, takes the stand and testifies
25  as follows:
```

1              THE COURT:  Can I ask some additional courtesy here?  I
2  would like to ask the first question.
3              MR. JACOUTOT:  Certainly.
4              THE COURT:  Is it okay?  Good morning, Ms. Bailey.
5              THE WITNESS:  Good morning.
6              THE COURT:  Let me say first off, Ms. Bailey, I
7  appreciate what you do at the Board of Elections in Richmond
8  County.  Augusta, Richmond.
9              THE WITNESS:  Yes, sir.
10             THE COURT:  I think poll workers and what you do are not
11 appreciated enough, and I appreciate and I thank you what y'all
12 do.  Y'all are like schoolteachers; you don't get enough credit
13 and you don't get enough pay, probably.  So I always say up front
14 what you do.  Believe it or not, about 100 years ago I worked at
15 the polls.
16             THE WITNESS:  Excellent.
17             THE COURT:  I have a general idea what you have to go
18 through.
19             I'm trying to make a decision regarding what you have to
20 do.  Three things right off the bat:  One, I fully recognize that
21 I have the authority to change the primary, which I've done
22 before.  I realize I have the authority to change qualifying.
23 There's an election calendar.  I can change that whole calendar in
24 this week or the next week.  But the question is not what
25 authority I have to do that.  My first question is what affect

 1  would it have on you and other Board of Election supervisors in

 2  the State of Georgia, poll workers, if I said that's not

 3  constitutional and we're changing all this.  I'm changing all of

 4  this as early as, let's say, February the 15th or as late as

 5  February 23.  And I said, I'm changing it all.  Qualifying is not

 6  going to be March 7, qualifying is going to be March 28.  Election

 7  is not going to be May 24, but it's going to be June 24.  Send out

 8  the 45-day notices to the people, the soldiers and people

 9  overseas, it's going to change from May the 5th to May the 1st.  I

10  changed the whole election calendar.  Tell me the effect.

11          THE WITNESS:  Well, thank you for the question, Your

12  Honor, and for your kind words.

13          I think the biggest impact that we'll see -- and I think

14  it's important, too, to note from the onset, that if we're going

15  to change the qualifying period, then it would be helpful to,

16  likewise, change the election date.  Now, each one of those

17  changes provides its own set of challenges.  Changing the

18  qualifying period, assuming it would be moved to a later date, I

19  worry that it would cut into the time if the Election Day holds.

20  I worry that it would cut into the time that local officials have

21  to do the redistricting.  As Your Honor knows, the general tasks

22  that are associated with putting on an election are vast.  Laying

23  aside the various timelines that Your Honor mentioned, the smaller

24  tasks, like gathering supplies and training poll workers and

25  whatnot, there are -- there is much to be done.  In a year like

1  this year where we have the bonus of redistricting, it is an added

2  thing.

3          I do worry that what will suffer as a result of that, if

4  we move the qualifying date and hold the election where it is, is

5  that the back-end process for election officials will be affected.

6  And by that what I mean is the process of validating the work, the

7  changes that have been made to voters' records, quality assurance

8  to make sure that voters are properly apportioned.  You can only

9  imagine in today's environment how little you know -- well, how

10  little tolerance there is for anything less than perfection.

11          THE COURT:  That's true.

12          THE WITNESS:  And under normal circumstance, local

13  election officials would be checking, double-checking,

14  triple-checking that kind of work to make sure it's accurate.  So

15  I do worry that is the one thing that will suffer.

16          Now, on the other end of the calendar if you alter the

17  election date, I worry that the primary, the main challenge will

18  be coordinating that with all of our polling locations.  As it is

19  now, that date of May the 24th has been set, and is on church

20  calendars and community center calendars around the state.  And so

21  to change that and to interrupt vacation bible school calendars

22  and such, as an example, it's -- it's a fairly impactful thing for

23  election officials to have to make those types of changes and to

24  keep all their polling places on board with those changes.

25          So those would be my greatest concerns.

1        THE COURT:  What kind of costs would you incur if you

2   have to go and make these changes?

3        THE WITNESS:  I think that the cost on the front end

4   would likely come in the form of hiring additional personnel to

5   help perform these tasks in a condensed time frame.  I think on

6   the back end, the cost could be monetary.  But I think -- I fear

7   that it could, also, be -- just the impact of polling places not

8   being able to accommodate the change and having to move voters

9   around at the last minute and the general confusion that that

10  causes.  Now, with those types of moves, our local election

11  officials would be notifying voters by mail.  So there would be

12  that cost as well.

13       THE COURT:  As my understanding, you all send out this

14  week or next week to voters telling them where they're going to be

15  voting.

16       THE WITNESS:  Well, we hope.  February 18 is the

17  deadline by which the Secretary of State's office would like for

18  the local officials to have their information into the statewide

19  system.  Some will make that deadline; some will not.  But

20  as -- as that deadline is achieved, the counties will then order

21  precinct cards advising voters what changes, not only in their

22  polling place may have occurred, but also in their district

23  assignment numbers.

24       THE COURT:  If polling places are changed in -- and

25  you're no longer voting in House District 2, you're now in House

 1  District 3, and you're no longer voting in House District 1,

 2  you're voting in House District 5, does that mean you have to

 3  assign a new polling --

 4          THE WITNESS:  Well, I think -- I know that any change

 5  you make to a voter, if it's just a simple change, I think the

 6  polling place stays the same.  If you're changing the district

 7  assignment number, that voter gets a card to advise them that your

 8  district number has changed.  There will be circumstances under

 9  which, though, that voters will also be affected by a polling

10  place change.  That's the one that I think is more of concern to

11  me is the polling place change.

12          THE COURT:  I realize if I issue this order, unless the

13  Eleventh Circuit changes it, y'all are going to do your best to

14  follow it and get it done.  But what effect will this have on poll

15  workers and people in your office?

16          THE WITNESS:  Well, again, Your Honor, if the time

17  schedule is condensed, it takes away valuable time out of our

18  calendar to perform our everyday tasks.  It's important to

19  recognize that the election calendar -- and laying redistricting

20  aside, the election calendar is set, basically, on a 90-day

21  calendar moving back from Election Day.  That's when important

22  deadlines start happening, like calling for special elections,

23  like changing polling places that are outside of the voters'

24  precinct, which can be done under certain circumstances, but it

25  has to be done at least 90 days ahead.  Those things are going to

 1  go on irregardless.  But the special circumstances that we have

 2  this year of the compressed calendar due to the fact, as Your

 3  Honor knows, the census data arriving late.  Also, we had an

 4  earlier election calendar this year than we have ever had in any

 5  year following redistricting.  I think back to 2012, for example,

 6  qualifying in 2012 was in May, and the election was in July.  And

 7  that's not the calendar that we're currently on.  So we've taken

 8  this particular -- due to no one's fault, it's just the way it's

 9  going to happen.

10          THE COURT:  I plead guilty to that.  I changed that, so

11  that's my fault.

12          THE WITNESS:  All right, fair enough.

13          So we've taken time -- in this particular circumstance

14  between the census being late, we have taken time off the

15  customary calendar -- off both the back end and the front end,

16  which makes the whole thing a challenge.  But to take additional

17  time away from that calendar, I think only contributes to that;

18  compounds the challenge.

19          THE COURT:  One more question; then she's your witness.

20  Okay?

21          MR. JACOUTOT:  Please.

22          THE COURT:  I indicated at the beginning I have the

23  authority to make these changes.  But as you know, I'm a District

24  Court judge, and there's two levels above me.  Let's say I make

25  the change, but then on March the 4th the Eleventh Circuit, the

1  Supreme Court says Judge Jones is wrong; we're going to leave it

2  like it is.  What happens then?

3          THE WITNESS:  Well, there would be chaos, of course.

4  There would be a scramble, of course.  There would be a

5  reassessing of the calendar.

6          THE COURT:  They don't say I'm wrong; they stay it.

7          THE WITNESS:  Pardon me?

8          THE COURT:  They don't say I'm wrong.  They just said

9  they'd stay it.  They stay it.

10          THE WITNESS:  So if it's stayed and the qualifying

11  period is the same, then we would certainly already be on track to

12  complete our tasks.

13          Now, again, we have to be mindful that this whole

14  exercise of redistricting is an extra bonus, if you will, for

15  election officials this year, and it's not a small thing.

16          THE COURT:  Excuse me.  I guess part of my question is

17  that if I change it and it gets changed back, what would it

18  affect?  What impact?

19          THE WITNESS:  Confusion.  Confusion with the local

20  election officials.  Certainly confusion with the voters.  What we

21  want to have happen is prior to qualifying voters and candidates

22  alike, to know in which district they're going to be qualifying

23  and to have that information readily available.  And the only way

24  to do that, to have it readily available, electronically available

25  is to have all of the work done associated with it and get the

1  changes made into our state-wide system so that voters can look at

2  that and know what their standing is.  So it would be very, very

3  helpful to have that done.

4          THE COURT:  I thank you for answering my questions,

5  ma'am.  And, again, I want to say again, thank you.  I appreciate

6  what you do.  It's not an easy job, but y'all get it done.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Your witness.

9          MR. JACOUTOT:  Thank you, Your Honor, for that

10  assistance.  I appreciate it.

11  DIRECT EXAMINATION

12  BY MR. JACOUTOT:

13  **Q.**  My name is Brian Jacoutot.  I represent the Secretary of

14  State's office.

15    Ms. Bailey, I just want to get some background information on

16  you.  Can you briefly summarize for the Court your background and

17  experience with Georgia elections?

18  **A.**  Sure.  For the last 28 years, I have been Elections Director

19  for Richmond County, Georgia.  I recently retired December 21st of

20  2021.  I'm currently working part-time as a consultant to the

21  Richmond County Board of Elections, and also to the Georgia's

22  Secretary of State's office.

23          MR. JACOUTOT:  Great.  Based on that and Your Honor's

24  questioning of Ms. Bailey, I'd move to admit her as an expert

25  pursuant to 702.

1          THE COURT:  Y'all wish to voir dire, the plaintiffs?

2          MR. HAMILTON:  I would, Your Honor.

3          THE COURT:  Okay.

4   VOIR DIRE

5   BY MR. HAMILTON:

6   **Q.**  Good morning.

7   **A.**  Good morning.

8   **Q.**  Have you ever appeared as an expert witness --

9   **A.**  I have not.

10  **Q.**  -- in litigation?

11  **A.**  No.

12  **Q.**  Have you ever been qualified by any judge or court to appear

13  as an expert witness?

14  **A.**  No, sir.

15  **Q.**  Do you have any formal training with respect to -- I recognize

16  that you have substantial and impressive election experience, but

17  do you have any training with respect to or degrees with respect

18  to academic study of election or election processes?

19  **A.**  I do not.

20  **Q.**  Are you familiar with the Secretary of State's website that

21  provides voters with information concerning elections and voting

22  locations?

23  **A.**  Yes.

24          MR. HAMILTON:  Thank you.  We have no objection, your

25  Honor.

```
1              THE COURT:  Mr. Lakin?

2              MR. VARGHESE:  Your Honor, we have no objection.

3              THE COURT:  She's qualified to testify as an expert in

4  this area.  Mr. Jacoutot.

5              MR. JACOUTOT:  Thank you, Your Honor.

6  DIRECT EXAMINATION

7  BY MR. JACOUTOT (continued):

8  Q.  Ms. Bailey, in front of you is what's been marked Defendant's

9  Exhibit 38.  Is this the declaration that you submitted in this

10 case?  Feel free to review it, if you would like.

11 A.  Yes.

12 Q.  And so now we've all read the declaration, we don't want to

13 repeat what's in it, but I want you to briefly give us an overview

14 of what an election official has to do in a redistricting year

15 that is different from an normal election year?

16             MR. JACOUTOT:  And I'd also move to have the declaration

17 admitted as Defendant's Exhibit 38 into the record.

18             THE COURT:  Any objection to 38 being admitted?

19             MR. VORGHESE:  No, Your Honor.

20             MR. HAMILTON:  No objection.

21             THE COURT:  It's admitted without objection.

22             (Defendant's Exhibit 38 was received and marked into

23 evidence.)

24 BY MR. JACOUTOT:

25 Q.  You covered most of this with the judge, but we're going to
```

1  shorten it down a little bit.  But I do want to talk about, you

2  know, street segments and specifics of that.  Your outline -- you

3  outline in your declaration the process of updating street

4  segments.  Could you briefly walk us through that process?

5  **A.**  Sure.  First off, I'll take a moment to define a street

6  segment.

7  **Q.**  Certainly.

8  **A.**  So as we go through the process of redistricting, as everyone

9  know, the districting lines are laid down, sometimes streets are

10  separated by certain blocks or even at odd sides of the roads.

11  Each one of those separations is a street segment.

12      So as we go through the very first step a local official would

13  take, is to take the physical map that comes to us through the

14  Legislative Reapportionment and Redistricting Office, and doing a

15  deep dive on that map, we call it, to ascertain where changes have

16  been made, where have precincts been split, how are voters going

17  to be affected by these changes.  As we go through that process,

18  we make notations of where these various splits occur and whatnot.

19  Using that information, we then go to our state-wide system and

20  enter that information into our system.

21      Now, it's important to recognize the fact that with the

22  current software that we use, even in circumstances where we have

23  entire precincts that are moved -- so they're not split.  An

24  entire precinct is moved from one district to the other.  Still

25  every street segment that belongs to that precinct has to be

1  manually touched within that system.  And I'll give you Richmond

2  County as an example, because that's the county with which I'm the

3  most familiar with.

4      We have around 130,000 registered voters in Richmond County,

5  and our database consists of just over 5,000 street segments.  So

6  within every one of those 5,000 street segments is a separate

7  transaction within that system.

8  **Q.**  Okay.  You said there was no way to automatically do that?

9  **A.**  There is not.

10 **Q.**  Is there a training document that explains the process that a

11 register has to utilize?

12 **A.**  There is.

13 **Q.**  Okay.  Will you look in that binder right there in front of

14 you.  Turn to Tab 7.  If you could just have a look at that for

15 me.

16 **A.**  Okay.

17 **Q.**  That's what's been marked as Defendant's Exhibit 7.  Can you

18 identify that document?

19 **A.**  Yes.  This looks to be the publication by the Georgia

20 Secretary of State's office that takes local election officials

21 through the process of doing the manual work in our state-wide

22 system.

23 **Q.**  Okay.  And you have personal familiarity with this document

24 due to your time as an elections director?

25 **A.**  I do.

```
 1           MR. JACOUTOT:  I move to admit this Exhibit 7 into the
 2  record.
 3           THE COURT:  Any objection?
 4           MR. HAMILTON:  Well, Your Honor, no objection to this
 5  particular document, but we do have objection to this witness
 6  testifying about this particular document, because as you recall,
 7  the Court ordered a disclosure as an expert witness pursuant to
 8  Rule 26.  There's nothing about this document in that declaration
 9  and that disclosure from last Friday.
10           So asking questions within the scope of the declaration,
11  no objection.  The document itself, no objection.  Questions about
12  this witness, we strenuously object under Rule 26.
13           MR. VARGHESE:  Your Honor, we have no other comments.
14  This wasn't in the expert's report.
15           THE COURT:  The objection is it wasn't disclosed.  I did
16  order all expert disclosures to be give by noon last Friday.  So
17  unless you can tell me something that I should let it in, I have
18  to sustain the objection.
19           MR. JACOUTOT:  Do you mind if I briefly confer with my
20  co-counsel?
21           THE COURT:  Yes, yes.
22           MR. JACOUTOT:  Okay.  So we've produced the document,
23  but we're not going to ask her questions about it.  So it's fine.
24           THE COURT:  All right.  Sustained.
25  BY MR. JACOUTOT:
```

1  **Q.**  Can you generally walk us through the process a registrar uses

2  to update the database?

3  **A.**  Would you repeat the question, please?

4  **Q.**  Sure.  Can you walk us generally through the process that a

5  registrar uses to update the segment database?

6  **A.**  Sure.  The process begins with notifying the Secretary of

7  State's office that we are ready to enter the redistricting

8  module.  And when a local elections office does that, they are

9  removed from normal activity within the system.  In other words,

10  you're prevented from adding new voters, making changes to voters

11  and whatnot.  We're over in the redistricting model.

12      Once we're set up, we go through the process of accessing, as

13  I said earlier, the street segments and updating them as need be.

14      In the case of precincts that are split, we take the

15  information that we've identified through our research and manual

16  and looking at maps, also using technology as a guide, too,

17  because we are able at least to get shapefiles that our

18  information technology department can use to help us parse out

19  where the changes are occurring, and then go into the system and

20  make those changes.  Now, once the changes are made, the next

21  step, and arguably one of the most important steps, is then the

22  quality assurance on that very 5,000 transactions that we have

23  done.  So we would go back through using reports to help us

24  identify any things that we have missed or addresses that are

25  improperly districted so we can go in and make that change.  And

1    there would be another review following that.  All of that would

2    happen prior to the voters being notified of their district

3    changes.

4    **Q.**  Okay.  To clarify, all of this is done manually; correct?

5    **A.**  That's correct.  The only electronic component at all would be

6    using the shapefiles that's provided by the Legislative

7    Reapportionment and Redistricting Office to help import those

8    electronic files.  For those of us with GIS departments, that's a

9    very good tool to have.

10   **Q.**  In past redistricting, how many staff would you have working

11   on the reallocation process in your district?

12   **A.**  It's varied.  Typically, redistricting is not happening in the

13   throes of an election prep.  It's kind of a separate event that

14   goes on its own.  So in the past, and I have had direct

15   administration over -- to complete redistricting cycles.  And my

16   recollection of those is that it's pretty much all people on deck

17   doing this work.

18       Now, in the environment that we're in now, we would -- it

19   would be my best estimate -- again, I'm not the director of

20   elections there.  But based on my experience, I would think that

21   we would dedicate three or four employees in a county of

22   Richmond's size, and that it would take us anywhere from three to

23   four weeks to actually do the work.  Frankly -- frankly, the time

24   limit that it takes to do the work is going to be dependent upon

25   how many actual precincts are split.  So how many of those deep

1  dives we need to do to separate voters to the even and the odd

2  side of the road and then on certain blocks of the street.

3  **Q.**   Okay.  And does every county in Georgia have the resources

4  that Richmond County has?

5  **A.**   No.  I wouldn't think so.  Richmond County has a robust

6  Information Technology Department, and I would think that in that

7  regard, the medium and larger-sized counties in most instances are

8  likely to have a bit of a leg up on that.

9  **Q.**   Does every county in Georgia have a Board of Elections?

10 **A.**   Every county in Georgia does not have a Board of Elections.

11 Most do.

12      The last time I checked, I think there were 30 or so counties

13 where the probate court judge was the Elections Superintendent.

14 But in other counties in Georgia, there are boards of elections.

15 Some are combined offices, like the Richmond County Board of

16 Elections.  By combined, I mean we do voter registration and

17 election activities.  And some are just separate boards focusing

18 only on elections.  And in some of those instances, those are more

19 part-time boards.

20 **Q.**   Do you know if the Secretary was given a deadline for counties

21 to complete the process of reallocating voters?

22 **A.**   Yes.  It's my understanding that they have requested that all

23 the processing that we are to do within the state system be

24 completed by February the 18th.

25           MR. JACOUTOT:  And Your Honor covered a lot of this for

1  me already coming up.

2          THE COURT:  I apologize.

3          MR. JACOUTOT:  It's okay.  I always take the help.  Your

4  Honor, I may have more on redirect, but for now I will pass the

5  witness.  Ms. Bailey, thank you for your service to Georgia.

6          THE WITNESS:  You're welcome.  Thank you.

7          MR. HAMILTON:  Pursuant to an agreement with the

8  Alpha Phi plaintiffs, they are going to cross-examine Ms. Bailey

9  first and then I'll follow.

10          THE COURT:  All right.  That's fine.

11  CROSS-EXAMINATION

12  BY MR. VARGHESE:

13  **Q.**  Good morning.

14  **A.**  Good morning.

15  **Q.**  Ms. Bailey, my name is George Varghese, and I represent the

16  Alpha plaintiffs.  I have a few questions for you, if you don't

17  mind.

18      Now, Ms. Bailey, you're testifying here this morning as an

19  expert witness on county election processes and the timing of the

20  calendar; is that correct?

21  **A.**  Yes.

22  **Q.**  And to be clear, your experience administering elections is

23  limited to Richmond County; correct?

24  **A.**  Primarily.  Primarily.  I have, however, served on many state

25  committees with the basic oversight of elections, and also on the

1  federal level with self-working groups and communities as well.

2  **Q.**  You've never actually administered elections in Fulton County?

3  **A.**  No, I have not.  That is correct.

4  **Q.**  And is it fair to say that you're not really in a position to

5  testify about how those counties would react to any changes in

6  deadlines; is that right?

7  **A.**  I think that is fair to say.  I can only speculate based on

8  the experience that I have had.

9  **Q.**  Of course.  Of course.  And I know you have been doing this a

10  while.  I think you did 18 years; is that right?

11  **A.**  28.

12  **Q.**  28?  Sorry.  I was off by ten.

13     I want to ask you a little bit about the work that you did at

14  the county level, and, in particular, about the adoption of new

15  districting maps.  And you testified on direct and in response to

16  Judge Jones' questions that the critical work involved when a new

17  redistricting map comes out is the street segment.  Do I have that

18  right?

19  **A.**  That is correct.  It's the bones of the work that needs to be

20  done, first, to identify the street segments that have changed,

21  and then to enter those street segments into our system

22  accurately.

23  **Q.**  And that's the election access?

24  **A.**  That is correct.

25  **Q.**  And from there it goes on to the Secretary of State to do

1  everything that the Secretary of State needs to do with that?

2  **A.**   The election in that system is actually the Secretary of

3  State's software.   So it goes -- once we enter it in there, it is

4  a direct line to the Secretary of State's office.

5  **Q.**   Great.   And the way you described it both in your declaration

6  and then again this morning, is that this is pretty complicated,

7  hard manual work; correct?

8  **A.**   Yes.

9  **Q.**   You have to go in and look at each segment?

10  **A.**   It's a very deliberate process.

11  **Q.**   And the Board of Elections wants to get it right; correct?

12  **A.**   Absolutely.

13  **Q.**   Because, in fact, sort of the aiming of the Board of

14  Elections, the goal, is the way I see it, threefold:   You want to

15  make sure that you're following the law; correct?

16  **A.**   Correct.

17  **Q.**   You want to make sure you're protecting Georgia voters;

18  correct?

19  **A.**   Correct.

20  **Q.**   And you want to make sure that the election is accurate, as

21  accurate as can be; right?

22  **A.**   Absolutely.   Yes.

23  **Q.**   Anything that I missed?   Those are really the three goals of

24  the Board of Elections?

25  **A.**   Sure.   I think at the end of the day, we want to provide any

1    eligible voter who's registered to vote with a ballot and have

2    them vote on their proper candidates and to count that ballot in

3    the way that it was cast.  That's the goal.

4    **Q.**  And the hard part with this goal is that the rules sometimes

5    change; correct?

6    **A.**  They do.

7    **Q.**  And, for example, county elections officials don't get to

8    establish deadlines; correct?

9    **A.**  That is correct.

10   **Q.**  And the Legislature is the one who really defines the rules,

11   too; correct?

12   **A.**  The Legislature and courts, of course.

13   **Q.**  Of course.  I was getting there.  Judge Jones.

14            THE COURT:  Hey, I'm guilty.

15   BY MR. JACOUTOT:

16   **Q.**  And sometimes that leaves situations where there are tight

17   deadlines for folks in your position, in the Board of Elections'

18   positions, the county officials to implement those rules; correct?

19   **A.**  Sometimes, yes.

20   **Q.**  And it's onerous work, and you do the best you can to make

21   sure you get it correct?

22   **A.**  Of course, yes.

23   **Q.**  Because Georgia voters are relying on you?

24   **A.**  They are, indeed.

25   **Q.**  To follow the laws and make sure the election is as accurate

1   as possible, to make sure the people have competence in their

2   elections; correct?

3   **A.**   Correct.

4   **Q.**   And over your tenure as an election official of 28 years,

5   those deadlines have changed quite a bit; correct?

6   **A.**   They do sometimes change.

7   **Q.**   And, in fact, just a few years ago in the 2020 election, the

8   deadlines for the primary changed twice; correct?

9   **A.**   They did.

10  **Q.**   And that caused a lot of work on your part and the elections

11  officials who were administering those elections; correct?

12  **A.**   Yes.

13  **Q.**   And that couldn't have been easy?

14  **A.**   No.

15  **Q.**   But you guys got the work done, because it was important?

16  **A.**   We did get the work done.  I'm going to add, though,

17  circumstances were a little bit different in 2020.  In 2020 when

18  we changed the election dates, most places -- we were closed down.

19  Everything was shut down.  So the rescheduling that I talked about

20  with Your Honor at the beginning of our discussions, it just

21  wasn't an issue in 2020.  We pretty much had carte blanche to do

22  what we wanted to with those polling locations, which is a huge

23  thing to be considered.

24  **Q.**   And after the election there was a massive recount; correct?

25  **A.**   Yes.  Multiple.

1  **Q.**  I'm sorry.  And that was a lot of work as well; correct?

2  **A.**  Of course, yes.

3  **Q.**  And you hired a lot more staff?

4  **A.**  We did.

5  **Q.**  And you got the job done?

6  **A.**  We did.

7  **Q.**  Because that's the work of the Board of Elections?

8  **A.**  Correct.

9  **Q.**  There was something interesting.  As I was preparing here

10  today to talk to you, I found an article in the Augusta Chronicle

11  about your retirement in -- June 15th of 2021.  Are you familiar

12  with that article?

13  **A.**  Maybe.

14  **Q.**  It talked about your career as the head of the Richmond County

15  Board of Elections.

16  **A.**  Okay, sure.

17  **Q.**  Do you recall that?

18  **A.**  I do.

19  **Q.**  And in that article you said something about election laws

20  changing.  You said, "Election laws are perpetually changing.  As

21  election administrators, our job is to implement and adhere to

22  whatever set of laws we have before us, and to do so fairly."  Do

23  you recall saying that?

24  **A.**  I don't recall saying it, but it sounds accurate.

25  **Q.**  And if you turn, it should be on your credit screen behind

1   you, if you could see that okay.

2   **A.**   Okay.

3   **Q.**   I wanted to ask you about this quote.  You said it's accurate.

4   So do you still believe that today?

5   **A.**   I do.

6   **Q.**   And that your job is to do the best you can with the laws as

7   they come in; correct?

8   **A.**   Always, yes.

9   **Q.**   With those three goals in mind:  Follow the law, protect

10  Georgia voters, and ensure the accuracy of the election; correct?

11  **A.**   Correct.

12  **Q.**   And so if the laws change, y'all adapt and you change with it;

13  correct?

14  **A.**   Well, of course, yes.  We're going to follow whatever

15  directives, whatever the law says and whatever court orders that

16  we might have in play.

17  **Q.**   That might mean working longer hours?

18  **A.**   Oh, sure.

19  **Q.**   And it might mean hiring temporary workers to help out, like

20  you did with the recount?

21  **A.**   I agree.

22  **Q.**   And it might mean you educate voters about these changes to

23  make sure they know what they're supposed to go?

24  **A.**   I agree with all of those statements.

25  **Q.**   At the end of the day, you do all these things because you

1  want to make sure this election is fair and people have faith in

2  the election; correct?

3  **A.**   We do those things to make things operate and continue as

4  smoothly as they can for our voters with, you know -- always with

5  as little disruption as possible, with the least amount of

6  confusion.  But, yes, sir, at the end of the day, we are going to

7  implement those changes to the best of our ability.

8  **Q.**   And this is not an uncommon thing?  As you mentioned in your

9  quote, they're perpetually changing.  This happens all the time;

10  right?

11  **A.**   In the last couple of years for sure.

12  **Q.**   And so if this Court were to order changes in the deadlines,

13  there is no reason to expect that county election officials

14  wouldn't do what they always do in these situations, and adhere to

15  these changes as best as they can; correct?

16  **A.**   Well, I have to agree with that statement.  Whatever His Honor

17  would direct us to do, we certainly would do.  But we wouldn't

18  want to do it at the sacrifice of the accuracy of the process, and

19  that would be my foremost concern.

20  **Q.**   Of course, because at the end of the day you want to make sure

21  people have faith in this election; correct?

22  **A.**   Yes.  And that they can vote without any problems.

23  **Q.**   And that you're following the law, that voters are protected,

24  and the Elections Act?

25  **A.**   Yes.

1  **Q.**  So let me talk to you now a little bit about the calendar,

2  which is why you're here today.

3  **A.**  Okay.

4  **Q.**  Now, you mentioned that the new redistricting maps come out,

5  and the major task for the county, the Board of Elections, is to

6  go through this street segmentation and upload the information to

7  the election map; correct?

8  **A.**  Is it an upload if it's just a data entry?  I guess, whatever.

9  It is a manual process of putting that information into our

10  system, yes.  First identify and then putting it into our system.

11  **Q.**  And it's a time-consuming process that y'all take the time to

12  make sure it's accurate?

13  **A.**  Of course.

14  **Q.**  And I think you said on direct that one of the most important

15  parts is checking, double-checking, triple-checking, I think those

16  were your words?

17  **A.**  Arguably the most important part.

18  **Q.**  And so you want to make sure you build in enough time to make

19  sure that happens; correct?

20  **A.**  Correct.

21  **Q.**  And I just want to make sure I understand the technical

22  aspects of it.  Because there is the federal election lines, the

23  congressional lines, there is the state legislative lines, and

24  then there is also the local lines; correct?

25  **A.**  That is correct.

1  **Q.**  And so for each of the street segments you need to figure out

2  the congressional lines, the state legislative lines, and the

3  local lines?

4  **A.**  Sure.  Think of it almost like a plate of spaghetti, one set

5  of lines go in, the next ones come over, the next ones come over,

6  the next ones come over, and all of the little pockets that are

7  left behind then become your precincts.  And you use those

8  boundaries then to separate your voters, one from the other, by

9  their combination of candidates.

10  **Q.**  And is that -- is that the combo -- is that what a combo is?

11  **A.**  It is.

12  **Q.**  Okay.  I just want to make sure I've got that right.

13  **A.**  District combo is the lingo.

14  **Q.**  I'm sorry, I didn't mean to talk over you.

15  **A.**  It's okay.

16  **Q.**  So please explain, how do you define district combo?

17  **A.**  District combo is the sequence of numbers that denote the

18  Congressional District, the State Senate District, the State House

19  District, the Commission District, the School Board District and

20  any municipal districts that are involved or any other elective

21  districts that are set forth in the various jurisdictions around

22  the state.  So it is a string of numbers.

23  **Q.**  Okay.  And that captures a voter's voting precinct all the way

24  through, from the federal all the way down to the local; correct?

25  **A.**  It does.

1  **Q.**  Okay, okay.  And so I think you testified on direct that in

2  this process, it takes, roughly, three to four weeks in Richmond

3  County to be able to do all of that for your -- you said 150,000

4  voters?

5  **A.**  130,000, and the three to four weeks is an estimate.  And it

6  would really depend upon how many split precincts there are

7  involved.  It's a simpler, less complicated matter to move an

8  entire precinct than it is to split a precinct and parse the

9  voters out.  Now, that does not mean -- don't be confused and

10  think that just because a precinct is moved in whole, that there

11  is nothing that needs to be done to that, other than just entering

12  a couple of numbers and take this whole batch and change them all,

13  because that's not how it works.  You would still have to go in

14  and identify every single street segment that's in there, and

15  update it to at least new district numbers and indicate changes

16  like that that have occurred, street segment by street segment.

17  **Q.**  Okay.  That's very helpful.  And if we're looking at this

18  specific year, we know that Governor Kemp signed the new maps on

19  December 30th of 2021; is that correct?

20  **A.**  Okay.

21  **Q.**  I'm going to put that up on the screen there, and so you'll

22  see December 30th the maps were signed.

23      The next thing that happened is that the Secretary of State

24  gave County Boards of Elections until February 18 to include their

25  data in ElectioNet; is that correct?

1  **A.**   February 18, yes.

2  **Q.**   That's the deadline that all of the counties across the state

3  need to have their information into the system for the Secretary

4  of State; correct?

5  **A.**   Yes.

6  **Q.**   And if we look at that, that's a period of 50 days; correct?

7  **A.**   Okay.

8  **Q.**   And so is that 50 days that all of the counties across the

9  state have to get all of their combos in, into the Secretary of

10  State's system; correct?

11  **A.**   That's the period of time that election officials will be

12  scrutinizing the maps and the files, identifying where changes

13  have been made, doing the research that allows us to develop and

14  change street segments.  Also, during that same period of

15  time -- I mean, this does not contemplate local redistricting.

16          THE COURT:  Say that again?

17          THE WITNESS:  This does not contemplate local

18  redistricting.  This calendar contemplates the things that happen

19  on the state level.  The Congressional Senate and House Districts,

20  taking Richmond County as an example, the district lines for

21  commission and school board were just dropped as general

22  legislation last week.  So, frankly, the likelihood of Richmond

23  County meeting that February 18 deadline, it may or may not

24  happen.

25  BY MR. JACOUTOT:

1   **Q.**  Again, that is another example of the rules changing or things
2   being dropped on election officials, and they have to scramble to
3   try to meet the deadline of February 18?
4   **A.**  Correct.  I suppose.  I think that we were pretty much -- I
5   don't think this was a shocker, the February 18 date.  I think
6   knowing that qualifying was on March the 7th, that most elections
7   officials are cognizant of the fact that you want your computer
8   work done, as I mentioned to His Honor, prior to qualifying, just
9   to give the public notice what their district assignments are.
10  And so this was not a big stretch to have this date.
11  **Q.**  And once the Secretary of State gets the information by the
12  February 18 deadline, the Secretary of State's office has a lot of
13  things to do to get ready for the primary; correct?
14  **A.**  There are many things to be done by the Secretary of State's
15  office -- the least of which is doing the ballot layout.  So
16  once -- once the locals get the information into the system, the
17  center for election services will at least begin to build the
18  bones of the database to take those district combos and at least
19  associate the offices with each district combo that is going to
20  appear on the ballot.  Then as we move along in the process -- if
21  I'm jumping ahead, please stop me.
22  **Q.**  You're doing great.
23  **A.**  We'll move on through the process, and March 7th through the
24  11th is the qualifying period.  At the conclusion of that period,
25  we'll take the names of the candidates that are associated with

1   the structure that's already been built into the database by the

2   center, hopefully, and send that up to them for inclusion in our

3   ballots.

4   **Q.**   And all of this is leading up to the May 24 primary, which we

5   now put up on the screen there.  So the things that you were

6   talking about the Secretary of State's office doing, is getting

7   the ballot layout done; correct?

8   **A.**   Yes.

9   **Q.**   And then the candidate's filing deadline has to come within

10  that period; correct?

11  **A.**   Correct.

12  **Q.**   And then getting the absentee ballots out to the overseas

13  voters have to be done 45 days prior to the primary; correct?

14  **A.**   Also correct.

15  **Q.**   And if we look at our table for a second, that period that the

16  Secretary of State has built in is 95 days from February 18th

17  until May 24th.  Do you see that?

18  **A.**   I see it, yes.

19  **Q.**   And, presumably, that's to allow the Secretary of State to

20  have enough time to do all of these things to get ready for the

21  primary; correct?

22  **A.**   Right.  Yes.  As I mentioned earlier to His Honor, the

23  election calendar, for the most part, begins on Election Day and

24  works backwards.  And, typically, the deadlines that we're trying

25  to hit are going to be the qualifying deadline.  So that we can

1  get our information to the Center for Elections in a timely manner

2  for them to develop our ballot, send a file to us for us to proof,

3  which adds in some more days in there.  Following the proof of the

4  ballot, we'll send it back to the Center for Elections.  They'll

5  make the updates.  Again, they need time to do those things.  And

6  finally, it will go from the Center for Elections to whatever

7  printer it is that we use for our ballots to be printed and

8  delivered -- all in time for that April 9 distribution date for

9  the military and overseas citizens.

10 **Q.**  And so at least the way that it is set up now, the calendar is

11 set, so there should be 95 days between when the county submits

12 everything through ElectioNet until the primary on May 24;

13 correct?

14 **A.**  You know, I would have to get my calculator out to add that

15 stuff up.  I'm seeing the numbers on your screen here.

16 **Q.**  Okay.

17         THE COURT:  We're just going to take him at his word

18 that he counted right.

19         MR. TYSON:  Your Honor, I had credibility --

20         THE COURT:  Fortunately, I am a judge that is not so

21 good with math.

22         MR. JACOUTOT:  And I apologize about that.  But, yes, 95

23 days -- I actually put this in an Excel spreadsheet.  So I do

24 actually feel confident in the number.

25 BY MR. JACOUTOT:

1  **Q.**  And you said everything else flows from that.  And I want to
2  pull that out.  So then 28 days later is the primary runoff?
3  **A.**  Correct.
4  **Q.**  And that's a new -- a new thing here in Georgia that followed
5  S.B. 202; is that correct?
6  **A.**  That's correct.
7  **Q.**  Because it used to be -- following Judge Jones' order, it used
8  to be you had to build in 45 days for the overseas ballots;
9  correct?
10 **A.**  There were nine weeks between the election and the runoff,
11 yes.
12 **Q.**  But now because of that, because it's it's -- right choice
13 voting, it only has to be 28 days; is that right?
14 **A.**  Yes.  Under the current law, that is true.
15 **Q.**  So there is the runoff, then November 8 is the general
16 election and that's unmovable; correct?
17 **A.**  Correct.
18 **Q.**  That's 140 days later, and then finally the general runoff
19 which is, again, 28 days, and that reflects the new -- the new
20 time lag; correct?
21 **A.**  Correct.
22 **Q.**  Okay.  So this is the calendar as it is in place today with
23 respect to the new maps; correct?
24 **A.**  Yes.
25 **Q.**  And one of the things that you said on direct is you're

1 concerned -- actually, it wasn't on direct.  When Judge Jones was

2 asking you questions, you said that you wanted to make sure that

3 if deadlines moved, county officials had enough time to do

4 everything they needed to do to make sure that the election could

5 be pulled off accurately; correct?

6 **A.**   Correct.

7 **Q.**   And I think you said it was the back end processes would be

8 affected, that was your biggest concern.  You wanted to make sure

9 that the back end processes would not be affected?

10 **A.**   Correct.  And I said that because a lot of conversation around

11 this matter has centered upon possibly changing the qualifying

12 period.  And in my mind that translates to shaving off time on the

13 front end of the process if we move the qualifying period.  So

14 that, I don't think, would be a good solution for Georgia at all,

15 and would, quite frankly, wreak havoc with the election

16 scheduling.

17 **Q.**   Let me make sure I understand what you're saying.  When you

18 say changing the qualifying period, what do you mean?

19 **A.**   So if the qualifying period is changed from March 7 until --

20           THE COURT:  March 11.

21           THE WITNESS:  Yes, sir.  If it changed to a date further

22 in the future without consideration given for the election date,

23 so if you keep May the 24th where it is and change the qualifying

24 period, then that, I think, would be costing -- it would cost the

25 locals a lot of time.

1          And as I mentioned earlier to His Honor, my biggest

2  concern, again, about changing -- and sincerely, a concern about

3  changing the election date, is the upheaval that would be caused

4  by changing the calendars and the schedules for all these polling

5  places that we have out there, who sometimes barely tolerate us

6  anyway.

7  **Q.**  And I'm going to get back to that.  I do have some questions

8  about that.  But I just want to make sure that we just look at

9  this calendar for a second.

10     Are you comfortable with this calendar in terms of the time

11  lapses between the various deadlines?  Is this something that you

12  feel is a workable solution in the State of Georgia?

13  **A.**  Well, quite frankly, it is a solution that we have, is it not?

14  This calendar has been of concern for a good while for election

15  officials.  We know that we're operating under a very condensed

16  schedule.  As I mentioned before to His Honor, the fact that the

17  census data was late getting here and the fact that qualifying is

18  earlier in the year, both of those things have converged to

19  severely shorten the time that we would have to do these combined

20  processes.  So to answer your question, yes, this is the calendar

21  that we have.  It is a calendar with which I have never been

22  completely comfortable in light of the fact that we have

23  redistricting going on at the same time as these major elections.

24  **Q.**  I'm going to come back to that in one second.  I do appreciate

25  you bringing that up.  I do have some questions about that.

1   **A.**   Sure.

2   **Q.**   But let's take Judge Jones's questions at the very beginning.

3   He said if he changed the deadlines, how would that affect you.

4   And so I want to start with that.

5       If Judge Jones changed the deadline so that the new

6   redistricting maps came out -- and I'm going to point you to the

7   screen there -- the new redistricting maps came out, say, March 4.

8   Do you see that?

9   **A.**   I do.

10  **Q.**   And if the same 50 days were given to the county election

11  boards, that would mean the new Secretary of State deadline would

12  be April 23.   Do you see that?

13  **A.**   The secretary's deadline for the -- UOCAVA, for the military

14  and overseas folks?

15  **Q.**   No, no, no.   Sorry.   The Secretary of State's deadline for the

16  county to include data into election.

17  **A.**   And tell me how you came up with that?

18  **Q.**   So currently, in the current schedule, there is 50 days

19  between December 30 and February 18; correct?

20  **A.**   Tracking, okay.

21  **Q.**   So if I kept that same 50 days, the March 4 new maps, the new

22  Secretary of State deadline would be April 23.   Do you see that?

23  **A.**   I do.

24  **Q.**   And you don't have any reason to believe that the County

25  Boards of Election wouldn't be able to do the exact same thing

1    they've just done, do you?

2    **A.**   I think my biggest concern would be the fact that for many

3    counties in Georgia, they are currently hip-deep in this exercise

4    right now.  They're looking at maps.  They're entering information

5    into elections that they're striving to meet that February 18

6    deadline.  And they're doing that without any -- building in as

7    much time as they can to move forward to the election preparation

8    things they need to do, recruiting poll workers, packing supplies,

9    notifying voters, and other important -- very important work that

10   needs to be done.  Did that answer your question?

11   **Q.**   Kind of.  But that answer assumes the same election deadlines?

12   **A.**   Okay.

13   **Q.**   And so if the election deadlines also move, then we would be

14   in the same exact position as we are today; isn't that right?

15   **A.**   And according to this calendar -- if I may ask a question of

16   you, according to this calendar, it proposes July the 27 as the

17   date?

18   **Q.**   Well --

19   **A.**   According to --

20   **Q.**   According to the calendar, yeah.

21   **A.**   Okay.  My biggest concern with that, I would think that the

22   August 24th runoff is getting pretty close to the November

23   calendar at that point.

24   **Q.**   Okay.  Well, let's take it a step at a time for a second.

25   **A.**   Okay, sure.

**Q.** So the first gap of time, from March 4 to April 23, that would be 50 days that the County Boards of Elections would have to enter their data into ElectioNet.  That is the same as what the County Board of Elections has right now; correct??

**A.** Correct.  And if I could just clarify that, too.  Just because the governor signed -- just for clarification, because the governor signed those bills on December the 30th, does not mean that we had maps in our hands the very next day.  So there was a lag before the information came down to us.  Now, this happened after my retirement.  So I'm not exactly sure the point in time that the maps arrived.  But I can tell you with great certainty, it did not happen before I left there on December 31.

**Q.** Thank you.  That's a good clarification.

     So, in fact, it was less than 50 days that the County Boards of Elections had?

**A.** I think it likely could have been.

**Q.** And if we bake in the same amount of time for the Secretary of State, 95 days, that would put the primary on July 27?  Do you see that?

**A.** I do.

**Q.** And, in fact, that would also -- from the July 27 primary, you could back your way into when the absentee ballot deadline time would be, 45 days earlier, and that is June 24.  Do you see that?

**A.** I do.

**Q.** And that would also make the candidate qualifying May 10.  Do

1  you see that as well?

2  **A.**   I do.

3  **Q.**   And there is no reason to think that this schedule would

4  impose a greater burden on the State than was already there with

5  the existing calendar; correct?

6  **A.**   Arguably, I think that -- I think that this proposed calendar,

7  again, having the primary runoff on August 24, it seems to be

8  nudging in just a bit on the ballot preparation time for the

9  November election.

10  **Q.**   Okay.  I'll come back to that in one second.  Let me just

11  finish up on a couple of other things.

12      In terms of the work that the county has to do within the

13  50-day period, if the new redistricting map doesn't change a

14  district at all, any of the combos, would there be any work for

15  the county to do?

16  **A.**   No.  But can we guarantee that?

17  **Q.**   If the new redistricting map -- well, I'm just asking

18  questions.  If the new redistricting map changes only some of the

19  data, so, for example, it changes the state legislative lines but

20  the local lines don't change, there is some work for the County

21  Board to do, but less than what they had to do originally; isn't

22  that correct?

23  **A.**   Sure.

24  **Q.**   They could rely on the work they've already done?

25  **A.**   To some extent hopefully, yes.

1 **Q.**  And so if the municipal lines aren't changing and it's just

2 the state legislative lines that are changing, there is, in fact,

3 less work for the County to do during the segments in process;

4 isn't that right?

5 **A.**  It -- well, it would, obviously, depend on the volume of

6 change from the new plans that were drawn, and yet still the new

7 plans would have to be looked at in great detail to identify where

8 voters might be affected.  And, again, you know, I think -- I'm

9 not so sure that every single street segment may not have to be

10 touched again depending on -- depending on the magnitude of the

11 change.

12 **Q.**  But the County Boards wouldn't be any different position than

13 if they were to try to hit the February 18 deadline?

14 **A.**  No, which is also not a good position.

15 **Q.**  In fact, it might even be in a better position if some of

16 these other lines aren't moving at all and they've already entered

17 the data; isn't that right?

18 **A.**  I don't see it as being any better.

19 **Q.**  Okay.  But at least the same.

20       And let me ask you this.  In terms of the work that the

21 Secretary of State has had preparing the ballots, handling the

22 candidate qualifying, sending out the absentee ballots, the

23 original calendar had built in 95 days for that.  Do you see that?

24 **A.**  I do.

25 **Q.**  And there is no reason to think that the Secretary couldn't do

1  the same thing if the 95 days were from April to July; correct?

2  **A.**   I would hope so, but I can't speak on -- I'm not going to

3  speak on their behalf.

4  **Q.**   95 days in April, May, June and July are the same as 95 days

5  in February, March, April and May?

6  **A.**   Yes, you would think.  Yes, you would think.

7  **Q.**   Okay.  And then we get to the -- then everything else rolls

8  off of that primary date.  So the July 27 primary, 28 days later

9  is the August 24 primary, the November 8 general election does not

10  move, the December 6 general runoff does not move.  Do you see

11  that?

12  **A.**   I do.

13  **Q.**   And the one issue that you raised is this issue about whether

14  or not August 24 may be too close to the November 8 general

15  election; is that correct?

16  **A.**   Yes.

17  **Q.**   Now, Georgia has a history of primaries in the month of July;

18  correct?

19  **A.**   We did for a number of years.

20  **Q.**   And June?

21  **A.**   Yes.

22  **Q.**   And even --

23  **A.**   But we had a different runoff schedule, you know, during that

24  time.

25  **Q.**   It was a longer runoff schedule; correct?

1   **A.**  Well, the elections were back in July.  We had a three-week

2   runoff for the primaries and four weeks for the general.  It was

3   because of that change that built in His Honor's change, that

4   built in the nine-week schedule to accommodate the military and

5   overseas citizens ballots, that the election calendar was spread

6   out and backed up.  And that's the point in time that we moved

7   from a primary in July to a primary in May, and then the

8   qualifying, likewise, moved back 11 weeks with a normal flow of

9   the election calendar.

10  **Q.**  But you have no reason to believe that holding a primary

11  runoff in August would not be feasible, that wouldn't work?

12  **A.**  I think that from the election official's perspective, that we

13  could likely make -- that we could make that work, of course.  But

14  I think that that question is best directed to the Secretary of

15  State's office.

16  **Q.**  Because you're not an expert on that; correct?

17  **A.**  I am not.  And I'm not the one out there building the ballots,

18  and that would be my biggest concern.

19  **Q.**  Right.  But you're here testifying in terms of the counties

20  and the election process?

21  **A.**  Yes.

22  **Q.**  Is it fair to say that in this calendar on the right side,

23  they're not in any worse position at all than they are today?

24  **A.**  The same number of days are built in, that is correct.  Again,

25  my biggest concern would be developing the ballot layouts in a

1  timely manner to get them to us after the runoff when we have the

2  proper candidates on August the 24th, for us to certify our

3  election, which is a week after the date of the election, which

4  then bumps us nearly to Labor Day.

5     After the election is certified, then we're going to give that

6  information to the Center for Elections for them to put into our

7  ballot, and then to get back to us in time for us to proof that

8  ballot and send the military ballots and overseas citizen ballots

9  out, meeting that 45-day deadline.

10 **Q.**  And I appreciate that.  Again, just to be clear, though,

11 you're not here testifying as to the capabilities of the Secretary

12 of State?

13 **A.**  Fair.  I am not.

14 **Q.**  And so you're just concerned that they may not be able to do

15 it as well?  Is that your concern?

16 **A.**  I am.  It's based on past experience.  I think it is a valid

17 concern.

18 **Q.**  Okay.  But you don't know, in terms of your job and the

19 County's job in terms of protecting Georgia voters, following the

20 law, and ensuring the integrity of the election, you would agree

21 with me that there is no reason to think that the calendar on the

22 right isn't workable?

23 **A.**  It appears to have -- the same date in timeline built in

24 there, unless I'm missing something.

25 **Q.**  And you would agree with me that if it's workable, it's

1  something that election officials can do because they, as you

2  said, right to the Augusta Chronicle, election rules change and

3  you guys do your best to make it work; correct?

4  **A.**  Well, election officials do have as much grit and

5  determination as any group I know.  We would work as hard as we

6  could to make whatever timeline is in effect work.  But, again, I

7  have to go back and say that any time you start making these type

8  of changes, it does come with its own set of confusion.  And, you

9  know, I am equally as concerned with not having adequate time for

10 quality assurance when it comes to parsing out the voters and

11 creating the street segments, as I would be for getting our ballot

12 proofs on time.  And particularly building in the certification

13 process that takes a week, the -- getting the proofs back,

14 proofing them, getting them back -- getting those ballots to the

15 printer and then back to us all in time to meet that UOCAVA

16 deadline, the military deadline.

17 **Q.**  Yeah.  No, I understand that.  But, again, you're going

18 beyond, you're talking about work such as the Secretary of

19 State --

20 **A.**  I apologize, yes.

21 **Q.**  And to be fair, that's not your expert opinion; right?  I

22 mean, you didn't work in ballot proofing at the Secretary of

23 State's office?

24 **A.**  No, I did not.

25 **Q.**  You don't really know the effort it would take or how much

1  time they need to do that; correct?

2  **A.**   I don't know firsthand.

3  **Q.**   And you're used to changes that happen pretty close to an

4  election; correct?

5  **A.**   Yes.

6  **Q.**   Polling locations sometimes have problems?

7  **A.**   Yes.

8  **Q.**   And you have to work to educate voters about new polling

9  locations; right?

10  **A.**   Yes.

11  **Q.**   There was an example just -- just last year, I believe, isn't

12  that right, with Minnick Park (phonetic)?

13  **A.**   Yes.

14  **Q.**   And that was a polling location whose foundation was, I

15  believe, crumbling because of heavy rain.  Do I have that correct?

16  **A.**   It was.  The building foundation was sinking.  Yes.  The walls

17  were cracked.

18  **Q.**   Not a good polling location.

19  **A.**   No, not a good polling location.

20  **Q.**   And so you all moved that polling location within four days of

21  the election; isn't that right?

22  **A.**   We did.  We did.  Because it was an emergency situation.  You

23  know, there was no choice.  The building was deemed uninhabitable

24  by humans, and so we changed it to a place that could accommodate

25  voters.  We moved them actually in a neighboring polling place.

1  So it worked out fine.  But it was not without its confusion, of

2  course.  And we went through putting signage out to help direct

3  voters.  And, in fact, there was a voluntary group that stayed at

4  Minnick Park all day providing a shuttle from there to the new

5  polling place as well.  So we were fortunate to have a lot of help

6  in making that change.

7  **Q.**  And that was the Henry Briggin Center; right?

8  **A.**  Yes.

9  **Q.**  The new location that you sent folks to?

10  **A.**  Yes.

11  **Q.**  Then to educate all of those voters who for months had thought

12  that their location was going to be the Minnick Park polling

13  center; right?

14  **A.**  It's been for decades.  It had been there for a long time,

15  yes.

16  **Q.**  But since the day you did it -- you changed it because you

17  said it was uninhabitable, you didn't have a choice?

18  **A.**  Correct.

19  **Q.**  You had to protect Georgia voters?

20  **A.**  Yeah, absolutely.

21  **Q.**  And so the way you did it, you staffed up, you educated

22  voters, and you told people where to go and you got it done;

23  right?

24  **A.**  Yes.

25  **Q.**  Ms. Bailey, you're a member of the Georgia Association of

1  Voter Registrars and Election Officials?  Do I have that right?

2  **A.**  Technically, I'm no longer a member since I'm not Elections

3  director any longer, but I had been for some 35 years.

4  **Q.**  And does that go by GAVREO?  Do I have it right?

5  **A.**  It's an acronym, GAVREO, G-A-V-R-E-O, Georgia Voter

6  Registration Election Officials Association, I think.

7  **Q.**  Can you explain to this Court what is GAVREO?

8  **A.**  I can.  GAVREO is a group of local election and voter

9  registration officials.  It is -- it was formed for the primary

10  purpose of providing training to election and registration

11  officials across the state.  The group has been in existence for

12  around 40 years, I think.  Although they have residential -- let

13  me back up.

14     For the last 40 years or so, there were two associations;

15  there was one for voter registrars and one for election officials,

16  and then two years ago that was combined into one association,

17  which is what we call GAVREO.

18  **Q.**  And what's the -- do you know what the purpose is or how would

19  you define, like, the purpose?

20  **A.**  Sure.  The primary purpose is to coordinate with the Secretary

21  of State's office and the University of Georgia to develop

22  continuum for annual required training for local elected official

23  and registrars across the state.

24  **Q.**  Approximately, how many members are there in GAVREO?

25  **A.**  The last time I checked, there were over 500.

1  **Q.**  How often do you meet?

2  **A.**  We meet once a year.  It is for the purpose of annual

3  training.

4  **Q.**  And what kinds of things do you discuss?

5  **A.**  Well, it's a series of hot topics.  But there are things that

6  are constants.  This year, I'm sure there will be a lot of

7  talk -- I haven't seen the agenda.  But I'm sure there will be a

8  lot of discussion about redistricting, which will lead into

9  ElectioNet.  There will be talk about -- I'm speculating here, it

10  could be anything.  It would be polling training, it could be poll

11  watchers, it could be any number of elections or voter

12  registration-related topics.

13  **Q.**  And is it fair to say that the purpose of the association is

14  to exchange ideas and to think about ways to make the election in

15  Georgia better, protecting voters, following the law, ensuring

16  accuracy?

17  **A.**  It is, in fact, the exchange of ideas.  The networking there

18  is invaluable, the sharing of information.  But the organization

19  takes great care to vet and bring in experts to train and provide

20  the proper training on whatever particular subject matter they

21  deemed relevant for that training year.

22  **Q.**  You mentioned earlier in your testimony that you had concerns

23  about the calendar as it was laid out for this year.  Do you

24  remember testifying about that?

25  **A.**  I do.

1 **Q.**  Can you explain a little bit.  What were your concerns about

2 the existing calendar?

3 **A.**  My biggest concern about the existing calendar, again, was the

4 fact that it typically during a redistricting time, counties are

5 getting their maps and beginning the process that the special

6 session of the General Assembly, as an example, would go into

7 session in August.  This year it was in November.  That took time

8 on the front end of the process.  In fact, you mentioned GAVREO.

9 The organization sent a resolution -- and perhaps I'm getting

10 ahead of myself -- but they sent a resolution to the governor

11 prior to the special session to ask him to contemplate a change in

12 the election calendar.  I believe the dates that were on that

13 moved the qualifying period to April the 11th, with the primary --

14 going from memory here, perhaps on June the 21st, May the 26th,

15 with the runoff in July.  I believe that was the calendar that was

16 proposed.

17     Now, it's important to know with that, the point in time that

18 that calendar and the resolution was about to reach -- by the way

19 was signed by over 400 members of the GAVREO organization -- it

20 was hoped that it would be taken up during the special session so

21 that we could implement it in November and immediately build that

22 into our plan.  But that is not the situation.  It didn't happen.

23 And so that's not where we are now.

24 **Q.**  And you're right, that's exactly where I was going.

25     So GAVREO passed a resolution in August of 2021; correct?

1  **A.**   Yes.

2  **Q.**   And it was signed -- my count was 390.  You said it was over

3  400.

4  **A.**   Okay.

5  **Q.**   So Georgia election officials asking that the calendar be

6  moved back; correct?

7  **A.**   Yes.

8  **Q.**   And you were one of the people that signed that?

9  **A.**   Absolutely.

10  **Q.**   If you could see it, I had it in the screen in front of you

11  here, and this is the GAVREO resolution.  We pulled out your name

12  from the 390 other folks who signed it.  But this is the

13  resolution calling for a primary on June 28, a primary election on

14  July 26 in order to allow the counties enough time to make sure

15  they had everything in place for the election; is that right?

16  **A.**   Yes.

17  **Q.**   And if we would just look at these dates, June 28 and July 26,

18  it's certainly the opinion of GAVREO that you can hold a primary

19  in the summertime and be ready for an election in November;

20  correct?

21  **A.**   We can hold an election with a runoff, we believe, on July the

22  26th.  But we talked about running that runoff to August.  It's a

23  different set of circumstances.

24  **Q.**   Sure.  But the point being that you were asking for more time

25  in order to do this work?

**A.**   Oh, yes, absolutely.

**Q.**   And if you look at the revised schedule, the revised schedule has a primary on July 27.  So well after the June 28 primary that you all were advocating for; correct?

**A.**   Correct.

**Q.**   And the revised schedule has the August 24 runoff, which is after the July 26 runoff that you were advocating for; right?

**A.**   Yes.

**Q.**   Either way, it would build in more time for county officials to do their job of getting ready for the election; isn't that right?

**A.**   That is correct.  But I must say again, just to clarify --

**Q.**   Yes.

**A.**   -- this change was contemplated and supported when it was hoped to go into effect during the special session back in November.

**Q.**   Yup.

**A.**   It's a completely different set of circumstances to have these volume of changes go into effect this close to the qualifying period and the election date, in my opinion.

**Q.**   Right.  Unless you move the Election Day and the qualifying period; correct?

          THE COURT:  Why is it different now?  Can you explain a little bit more why it's different now?

          THE WITNESS:  Yes, sir.  Thank you for that question.

1    It's different because if we had made these changes back in

2    November, election officials would have known before they

3    contacted all of their polling places, to reserve them for May the

4    24th.  This is now.  This is the election date.  And our polling

5    places would have known no different.  They would have marked it

6    on their calendar, and that would have been it.  That is not the

7    situation we have now.  At this point, we have been working for

8    months with a well-established election calendar.  And so to now

9    move the dates contained within that calendar, I truly believe

10   would cause confusion and upheaval to the process.  Not

11   necessarily -- you know, can people qualify?  Sure.  People are

12   going to be able to qualify.  We'll do that, even if we have to

13   get a paper map out to look and have them point where they live

14   and place them in their district.  I mean, if the information is

15   not in ElectioNet in a timely matter, then that is precisely what

16   we would have to do.  But it is not desirous to do it that way.

17   It's desirable for voters to have that information ahead of time

18   so that they can know what their situation is before they come to

19   qualify.  So they can plan.  And I do worry as we start adjusting

20   this calendar that we may sacrifice some of that type of time off

21   the schedule.

22          I think it's a completely different situation to change

23   the calendar in November before an election, and to change it just

24   a few months before the election.  I think it's a completely

25   different set of circumstances.

**Q.** Well, one of the things that GAVREO resolution talks about,
though, that it's actually -- it's actually a challenge to get
polling locations during the school year.  And one of the reasons
why you all were were advocating for a primary in the summertime,
because it was easier to get polling locations?

**A.** Right, and I don't disagree with that at all.  But, again,
it's a different set of circumstances from when that resolution
was signed, and it was hoped to be taken up in November.  I think
that GAVREO will continue to push this calendar.  It will continue
to, hopefully, have it taken up as regular legislation during a
regular cycle.  Hopefully, effective the '24 elections.  But it
looks like it's not going to be the case for this election, is the
way it seems.

**Q.** But regardless of what happens in this litigation, whatever
the deadlines that you ultimately get set, you still have
confidence that election officials will be able to do their job to
the best of their ability; correct?

**A.** I do.  I do.  But at some point you do have to stop and think
at what sacrifice.  And to me the sacrifice is primarily I -- is
the quality assurance. And I hate to keep harping on that, but I
think that is what will suffer.  Will we get the data entry done?
Sure.  We'll beat that keyboard.  We'll get that data in there
however long it takes.  We will review our work for accuracy, we
will.  But we need more time -- not necessarily more time, but we
need as least as much as we have now and not less time to do that.

**Q.**  And so the calendar on the right gave you that same amount of time, those same 50 days to do that, and if the Secretary of State had the same 90 days, you would be in the same position that you are in today; correct?

**A.**  Not exactly, because we're talking about having different election dates in this calendar.  You're talking about --

**Q.**  Again, just talking about the work that you were talking about in terms of street segment, loading the data in, you would have the exact same amount of time?

**A.**  Same work, different circumstances.

**Q.**  Fair enough.  But no doubt that those three -- those three goals of every election official in the preliminary would still be met, in terms of following the law, protecting Georgia voters, and insuring the accuracy of the election; correct?

**A.**  To the best of our ability, yes.

          MR. VARGHESE:  Thank you, Ms. Bailey, I have nothing further for you.

          THE COURT:  Your witness.

CROSS-EXAMINATION

BY MR. HAMILTON:

**Q.**  Good morning, again.

**A.**  Good morning.

**Q.**  I'll try to be shorter.

     We want to talk first about the street segment work that you discussed with Judge Jones a moment ago.  That street segment work

1  needs to be updated for street segments that would be changed in a

2  remedial map.  In other words, the street segment work that you're

3  doing in a district that wouldn't be touched by a remedial map

4  that the Court might order.  So, for example, Senate District 36

5  right here where this Courthouse sits, the illustrative map

6  proposed by the plaintiff doesn't change anything about this

7  district.  So if Judge Jones entered a remedial order for the rest

8  of the state, it's not going to affect the work right here in

9  Senate District 36 at all, that work is continued; is that right?

10 **A.**  I think that's an accurate statement.

11 **Q.**  So --

12           THE COURT:  Let her finish her answer.

13           MR. HAMILTON:  I'm sorry.

14           THE WITNESS:  I think I was just going to say, how do we

15 know for sure what's going to be changed and whether

16 things -- whether district lines within our local jurisdictions

17 will be changed or not?  So absent that knowledge -- and I'm not

18 familiar with the plan of which you speak.  So without that

19 knowledge, I really wouldn't be able to say.

20 **Q.**  Okay.  Fair enough.  It's fair to say that right now election

21 officials across the state are proceeding with the street

22 segmentation work today based on the --

23 **A.**  Well, I'm not sure that we are yet.  I think that many are,

24 but, again, I'll use Richmond County as an example.  I mentioned

25 earlier that our local lines were just dropped this week or the

1  end of last week.  So for Richmond County and I suspect other

2  counties in the state, there is still that work yet to be done.

3  **Q.**  Okay.  And that doesn't have anything to do with this

4  litigation?

5  **A.**  Okay.

6  **Q.**  Right?  I mean, if there's changes to the count in the school

7  commission, the school district boundaries or the county

8  commission lines, those changes exist whether Judge Jones enters a

9  remedial order or not?

10 **A.**  That is correct.  But you had asked the question of whether or

11 not most counties were actively engaged on doing the work on the

12 street segments, and I would say not yet.

13 **Q.**  Okay.  And whenever they start, they'll start.  But that work

14 will proceed without disturbance from Judge Jones in every part of

15 the state that is unaffected by whatever remedial order the judge

16 might enter?  It's just not going to change anything; right?

17 Right?

18 **A.**  Yes.

19 **Q.**  Okay.  And I noted that you said you didn't look at the

20 illustrative plans that have been offered in this litigation, and

21 that's fair enough.  I don't expect you to if you're retired.  I

22 hope you have better things to do than to look at that.  But just

23 to drive that point home, I'll represent to you out of the 56

24 Senate Districts in the state, only 34 -- actually, a full 34 of

25 them are untouched by the illustrative map.  So if the Court

1   entered that order changing the Senate District lines, in 34 of

2   the 56 counties there wouldn't be any change?

3   **A.**   But on the other side of that, in nearly half the counties in

4   this state there would be change.

5   **Q.**   And the remaining 22 Senate Districts there would, that's

6   right.

7        I'll represent to you on the House side, the 154 of 180 House

8   Districts are unchanged in the illustrative map.  So there, too,

9   if Judge Jones entered a remedial order in 154 of those House

10   Districts, there's not going to be a change from the work that the

11   local county election officials will have to do, at least not as a

12   result of Judge Jones' order; right?

13   **A.**   The one thing that jumps out to me is that I have no idea

14   whether these changes in the Senate lines and the House lines

15   affect the same counties or are if those are all different

16   counties.  So you could be talking about a vast number of

17   jurisdictions.

18   **Q.**   Okay.  Well, let's talk about counties.  In 90 of the 159

19   Georgia counties, there are no changes in the plaintiff's

20   illustrative map.  So if Judge Jones entered that as a remedial

21   order, in most of the counties in the state, there would be no

22   change, at least as a result of the remedial order; right?

23   **A.**   Correct.

24   **Q.**   And -- and that's with the State Senate plan, and I'll just

25   finish this line.  In the House side, there's 119 counties of 159

1   where the illustrative maps don't touch that county at all.  So in

2   those counties, 119 of the 159 Judge Jones entered as -- that

3   illustrative plan on the State House side as a remedial map, there

4   would be no change?

5   **A.**  Do we know when you -- I'm just curious, when you talk about

6   the changes in the Senate and the House, you've mentioned how

7   many -- how many counties are affected by the particular set of

8   plans.  But, again, between those two plans, how many counties

9   overall (sic).

10  **Q.**  Overlap?  And I don't have that number for you.  I'm only

11  taking part of the plans individually.  But it's a fair point.

12  There could be -- it could be a slightly lower number on either

13  side.

14      If a precinct itself isn't actually split in the new plan or

15  reassigned to a different Legislative District or Congressional

16  District, then the street level segment work doesn't need to

17  change, you just reassign the entire precinct; is that right?

18  **A.**  You're talking about under the current plan as we're doing our

19  work right now?

20  **Q.**  Right.

21  **A.**  Actually, you do, and here's why.  We talked about district

22  combos earlier.  I mentioned that that was a string of numbers

23  that denote Congressional, Senate, House and the local lines.  The

24  district combo numbers will all change in every county in Georgia.

25  And with that change, whether or not a precinct is affected

1  individually with that one change in the district combo, every

2  single street segment within that precinct has to be touched at

3  least to update the district combo, which will be a change certain

4  for every precinct in the state.

5  **Q.**  Okay.  Fair to say that -- at least for the areas in

6  which -- which would remain untouched in a remedial map, that work

7  would be the same whether Judge Jones enters that order or not

8  then?

9  **A.**  I would think so.  But I might encourage you to speak with the

10 Secretary of State's office about that, too, to ensure that's how

11 their system works.  It would seem logical that it would work that

12 way, but I'm not 100 percent positive.

13 **Q.**  Now, we talked about the February 18 deadline for this segment

14 work to be completed.  That's not a deadline established by state

15 law; correct?

16 **A.**  It is not set by law.

17 **Q.**  That was communication established or sent on December 29 by

18 Blake Evans, the Elections Director from the Secretary of State?

19 **A.**  I recall the communication.  I don't recall the date.

20 **Q.**  It probably hit your desk before you cleaned it out.

21 **A.**  Probably.

22 **Q.**  And, of course, if the primary date is moved, then this

23 administrative deadline established by Mr. Evans, that could be

24 more easily accommodated as well?

25 **A.**  Yes.  Well, it depends.  I mean, if that -- if the election

1  date is changed but yet we have a new set of lines coming in, then

2  there's still going to be an awful lot of rework that will need to

3  be done, and understandably so.

4  **Q.**   Sure.  But it doesn't have to be done by February 18?

5  **A.**   That is correct.

6  **Q.**   And you mentioned in your declaration that the deadline for

7  election officials to set polling places located outside of a

8  precinct is February 23.  Do you recall that?

9  **A.**   90 days before the election, yes.

10  **Q.**   And you would have to notify voters of any changes in

11  precincts or polling locations well in advance of an election?

12  **A.**   30 days by law.

13  **Q.**   But if this Court were to order a remedial map and push the

14  primary election date back, then there would be plenty of time to

15  notify the voters that that date would change as well?

16  **A.**   Well, if the qualifying period likewise changes and we have

17  more work to do on the district lines, I don't know that we've

18  gained a whole lot.

19  **Q.**   We may not have gained a whole lot, but we haven't lost

20  anything either?

21  **A.**   That's correct.

22  **Q.**   And when I asked you some questions a little earlier this

23  morning, you said you were familiar with the Secretary of State's

24  website?

25  **A.**   Yes.

1  **Q.**  That website has updated individualized voter-specific

2  information on polling locations, doesn't it?

3  **A.**  It does.

4  **Q.**  So if a voter wants to know "where do I go to vote," they can

5  go to that website and it will tell them?

6  **A.**  It will.

7  **Q.**  And you said one of the concerns you had with moving the

8  primary election date was polling locations.  Did I hear you

9  right?

10  **A.**  You did.

11  **Q.**  But polling locations have to change for a number of reasons.

12  For example, a Court order in Larios v. Cox in 2004, when the date

13  of the elections were changed, you had to find new polling

14  locations then; right?

15  **A.**  I'm not familiar with that case.

16  **Q.**  It was 2004.  You don't recall the election being changed by

17  court order at that point?

18  **A.**  I can't say that I do.

19  **Q.**  Do you recall Johnson v. Miller, 1996, when Georgia's election

20  date was changed by court order then?

21  **A.**  Did you say 1996?

22  **Q.**  '96, yes.

23  **A.**  No.

24  **Q.**  Well, certainly when there are special elections, you have

25  to -- you have to arrange for polling locations; right?

1  **A.**  We do.

2  **Q.**  And runoffs?

3  **A.**  Runoffs as well, yes.

4  **Q.**  And when there are recounts, you have to find recount

5  locations?

6  **A.**  Of course.

7  **Q.**  Like in 2020?

8  **A.**  Absolutely.

9  **Q.**  And you had to actually do that twice in 2020, because there

10  were two different --

11  **A.**  We did have two different runoffs -- recounts.  Only one

12  caused us to have to seek an alternate place to do it.  The second

13  recount was a machine recount.  We did it on site at our

14  tabulation center.

15  **Q.**  And it's easier, isn't it, at least with respect to school

16  locations for polling places, to schedule those when schools are

17  out in the summer rather than when they are in session during the

18  school year; isn't that true?

19  **A.**  Yes, it is true.  That takes me back to the resolution that

20  the association was in support of, for that very reason to make

21  more polling locations accessible.  These days parents are

22  skeptical about strangers, multitudes of strangers walking into

23  their children's school.

24  **Q.**  Correct.

25  **A.**  It's just for that reason that Richmond County only uses one

1 school as a polling place.  We use these huge buildings and

2 churches instead.

3 **Q.**   And, typically, the elections are held on Tuesdays?

4 **A.**   Yes.

5 **Q.**   And so for church locations, there's no reason to think that a

6 church would be less available on a given Tuesday if this Court

7 were to reschedule the primary election?

8 **A.**   There is not, per se.  But it has been my experience that

9 there are conflicts that arise with last-minute changes,

10 particularly around vacation bible school.  You know,

11 they -- churches, at least the ones that we deal with, they are

12 kind enough to give us first dibs, if you will, on their facility,

13 and then they plan around elections -- and especially in places

14 where we're doing early voting where we need the three-week period

15 of time.  That's a pretty big ask in the first place.  So those

16 plans, at this point, facilities at least in Richmond County have

17 been notified of date certain for the elections, and the time

18 period has been blocked off for us.  And so I do -- I am concerned

19 that that could be an issue.

20 **Q.**   And you said toward the end of your examination at what

21 sacrifice if we move this election, at what sacrifice does the

22 State have.  And I guess I would ask you -- of course there is a

23 sacrifice being made if we don't change the election date, if this

24 Court were to conclude that the election -- the districts as drawn

25 are unconstitutional because they dilute the black vote, there is

1  a sacrifice there being made, but it's being made by hundreds of

2  thousands of African-American voters in the state; isn't that

3  right?

4  **A.**  You know, I appreciate that.  That is not what I'm here to

5  testify about, though.

6  **Q.**  All right.  Thank you.

7  **A.**  You're welcome.

8            THE COURT:  Redirect?

9            MR. JACOUTOT:  Thank you, Your Honor, just briefly.

10 REDIRECT EXAMINATION

11 BY MR. JACOUTOT:

12 **Q.**  Ms. Bailey, you testified about the process of allocating

13 voters being easier when precincts were whole; do you recall that?

14 **A.**  I do.

15 **Q.**  And what part of the process is easier; is it the initial

16 manual identification part or the data entry part?

17 **A.**  You know, I think both can be very complicated.  The initial

18 analysis is where we're looking at electronic files and hard

19 copies of maps to identify where voters have been impacted by the

20 changes.  And then we'll take an even deeper dive into that to

21 figure out which side of the road voters live on and parse that

22 information out.  So that part is very important to the basic

23 identification of those streets segments, if you will.

24     Equally important, though, is the accuracy of the data entry

25 because you can make a spreadsheet all day long, but if all of the

1  changes that you want to have made, if you don't enter it

2  accurately into the system, then it's a problem.

3  **Q.**  On the dates you were asked about, and during cross, do you

4  start entering data in ElectioNet before you receive all

5  districts, including local districts, or do you start before you

6  receive your local districts?

7  **A.**  I can only testify to what Richmond County is doing.  And we

8  will be waiting until we get our local districts, because I

9  mentioned earlier the development of these district combos.  We

10  won't know what our district combos are and how they'll be

11  impacted until we get those local lines.  So they need to be taken

12  all as a whole.  That does not mean that the staff isn't already

13  well engaged and, in fact, I would say probably finished with

14  parsing out voters that have been split by the House and Senate

15  and the Congressional lines.  Those changes have already been

16  evaluated and identified and are ready to go once we get the local

17  lines in.

18  **Q.**  Okay.  And you tried to avoid touching each street segment

19  more than once?

20  **A.**  Pardon me?

21  **Q.**  Do you try to avoid touching each segment more than once?

22  **A.**  Sure, yes.  Absolutely.

23  **Q.**  Okay.  And I heard about the governor signing maps.  If the

24  governor signed the maps earlier, could you have started entering

25  data earlier?

**A.**  If the governor had signed the maps?

**Q.**  He had signed the maps earlier?

**A.**  Earlier than December 30.

**Q.**  Would you have started -- would you have started entering data earlier?

**A.**  We will -- they will begin entering data just as soon as all of the information gets to them to do so.  And so the sooner the information comes, the sooner we can get started.  Does that answer your question?

**Q.**  Yes, information is correct.  When the information comes in?

**A.**  That's correct.

**Q.**  Okay.  So if the governor signed the map on December 30, does it affect the individuals' ability to start the process?

**A.**  Actually, local election officials, to some extent -- because we had the lines.  The lines were posted before the governor enacted them into law.  So there was some preliminary work, minimal preliminary work on them before they were signed.  But you didn't want to go too far with them, because the last thing you want to do is have to go back and redo that and confuse the matter.

**Q.**  Sure.  Moving to a different topic.

     COVID-related closures in Georgia is far more muted today than they were 2020; would you say so?

**A.**  I would.

**Q.**  Okay.  Doesn't this make moving the election date now more

1  workable in 2021 than in 2020, because most venues have sort of

2  the normal business traffic and simply can't accommodate the huge

3  Georgia election --

4  **A.**  I think that is a hundred percent --

5          MR. HAMILTON:  Objection, leading.  Your Honor, I

6  recognize it is an expert witness and it's a bench trial --

7          THE COURT:  It was leading.

8          MR. JACOUTOT:  Sure.

9  BY MR. JACOUTOT:

10  **Q.**  How is implementing a change out of Election Day in 2021

11  different than it was in 2020 during all of COVID?

12  **A.**  The difference is that in 2020 the state, in most places in

13  the county, were on total lockdown.  So the facilities simply

14  weren't being used.  So it made the calendar and the polling place

15  availability much more flexible than it is under our current

16  situation.  At this point, you know, we're far from being back to

17  normal, but certainly things are opening back up and have resumed

18  somewhat of a familiar role.

19  **Q.**  Are you aware that Georgia is using relatively new voting

20  machines?

21  **A.**  Very well aware.

22  **Q.**  Do you know if those machines require any special places due

23  to how they're constructed?

24  **A.**  Well, they -- they do.  It makes -- they do.  They draw more

25  electricity than the former system.  And I think the main reason

1  is because each one of the ballot marking devices that you touch

2  to cast -- to mark your ballot is connected to a desktop printer.

3  And because of that, you are limited -- how much equipment you can

4  connect to each circuit within your facility.  So it is no longer

5  important to know, necessarily, how many outlets you have in a

6  facility, but it's more how many machines are you attaching to a

7  particular circuit within that building.  I am no election, but we

8  have at least learned that much.

9  **Q.**  And on cross you were asked about the Minnick Park closing.

10  Do you recall that?

11  **A.**  Yes.

12  **Q.**  Do you recall if that was only polling location change you had

13  to make in that short time frame?

14  **A.**  That was a first for me, to be notified four days before an

15  election that you simply can't use a facility.  It very rarely,

16  rarely happens.

17  **Q.**  Would you say it would be more difficult -- or how would

18  having more polling locations change -- affect the difficulty of

19  doing so?

20  **A.**  Well, the biggest challenge is, first of all, finding the new

21  location.  If the current location is not able to accommodate you,

22  finding one that accommodates the new voting system.  It's a very

23  good point you brought up about the electrical configuration.  We

24  have several polling places just in Richmond County that we are in

25  the process of splitting right now because we need to put more

1  equipment in them to accommodate growth in pollution.  The

2  facility can physically hold the equipment, but the electrical

3  layout isn't compatible.  Does that answer your question?

4  **Q.**  So more complicated, the more units you have to change?

5  **A.**  Yes.

6  **Q.**  And you spoke also about the -- let me make sure I'm getting

7  this right, the GAVREO --

8  **A.**  Yes.

9  **Q.**  -- resolution --

10  **A.**  Yes.

11  **Q.**  -- that you signed?

12  **A.**  Yes.

13  **Q.**  Now, did that resolution ask the State to take action to

14  change deadlines or did it ask the federal court to take action?

15  **A.**  The State.

16       MR. JACOUTOT:  No further questions.

17       THE COURT:  Recross?

18  RECROSS-EXAMINATION

19  BY MR. VARGHESE:

20  **A.**  Hello.

21  **Q.**  Hello.  Ms. Bailey, I just wanted to ask you a couple of

22  questions about -- that you were just asked about on -- on

23  redirect.

24     To be clear, you talked about electricity and these new

25  machines and the problems because they require more power.  Do I

1    have that right?

2    **A.**   You do.

3    **Q.**   But to be clear, for the May 24 primary, Richmond County is

4    using churches still; correct?

5    **A.**   Absolutely.

6    **Q.**   You're using schools still; correct?

7    **A.**   One, yes.

8    **Q.**   One school?

9    **A.**   Yes.

10   **Q.**   You're using community centers; yes?

11   **A.**   Yes.

12   **Q.**   And those are traditionally the places you use for polling

13   locations; correct?

14   **A.**   Yes.

15   **Q.**   So there is nothing about this newfangled technology and new

16   power generation that is excluding your traditional polling

17   locations; isn't that correct?

18   **A.**   It is correct.  But it does, however, place limitations on the

19   facilities from which we have to choose.  I think that was the

20   point.

21   **Q.**   And to be clear, you have polling locations arranged for

22   May 24; correct?

23   **A.**   Correct.

24   **Q.**   And as you've answered on cross, there is a belief that

25   schools will be more available come summertime; correct?

**A.**   Yes.

**Q.**   And sitting here today, you don't know one way or another whether or not there are going to be any problems finding polling locations if, hypothetically, a primary is set in July; correct?

**A.**   No, we don't know for certain.

          MR. VARGHESE:  Thank you, Ms. Bailey.  Thank you.

          THE WITNESS:  You're welcome.

          MR. HAMILTON:  All right.  Last time.

          THE WITNESS:  That's okay.

RECROSS-EXAMINATION

BY MR. HAMILTON:

**Q.**   I believe you testified the sooner we have the information, the sooner we can get started; is that right?

**A.**   Yes.

**Q.**   And the State here, acting through the governor, waited until December 30 to adopt these district lines; correct?

**A.**   They were adopted on December 30, yes.

**Q.**   And the State refused a specific request to allow more time for this election acting through the Legislature; correct?

**A.**   You're speaking of the resolution for the association?

**Q.**   Yes.

**A.**   It was not taken up during the special session.

**Q.**   It was refused?

**A.**   (The witness nods head.)

**Q.**   Even though that request came from over 400 Georgia election

1    officials?

2    **A.**   Again, I can only tell you that when we sent it up there.  I

3    don't know the reasons why, the logic behind it.  I have no idea.

4    But it was not taken up during the special session.

5    **Q.**   Even though it was signed by 400 Georgia election officials?

6    **A.**   It was, in fact, signed by 400 election officials.

7    **Q.**   Whose job it is to run fair and accurate elections to protect

8    Georgia voters?

9    **A.**   Absolutely.

10            MR. HAMILTON:  Thank you.

11            THE COURT:  Thank you, Ms. Bailey.  I appreciate it.

12   Have a safe trip back to Augusta.  We're going to take a 20-minute

13   break right now.  We'll start back at 20 after 11.

14            (Whereupon, a break was taken at 11 a.m.)

15            THE COURT:  I think the State has rested this part of

16   this case.  Is that correct, Mr. Tyson?

17            MR. TYSON:  Yes.  These are all of the witnesses we

18   have.

19            THE COURT:  Go ahead.

20            MR. TYSON:  A housekeeping issue I wanted to raise

21   briefly with you.  I apologize.  Our answers are currently due on

22   Friday of this week, the day after tomorrow, and it would be

23   helpful if we could get an extension of time under the

24   circumstances since we are actively engaged in the hearing.  But I

25   can do that and let you know afterwards, if you would prefer that.

```
 1            THE COURT:  I don't have a problem with it.  I have to
 2   hear from the other side.
 3            MR. HAMILTON:  What I would suggest is that Mr. Tyson
 4   and I talk -- discuss it over lunch and come back with an
 5   agreement.
 6            THE COURT:  All right.
 7            MR. TYSON:  I apologize.  We'll figure it out.
 8            The other thing, Your Honor, this is the first time with
 9   Ms. Bailey we've seen kind of an alternate election calendar.  I
10   just didn't want to spring this on anybody later, just to flag for
11   everybody that the four-week runoff timeline is one of the issues
12   being contested in the Senate Bill 202 case before Judge Boulee.
13   So I just wanted to make sure that everybody was aware, there's at
14   least another judge looking at whether or not we need a nine-week
15   runoff or a four-week runoff.
16            THE COURT:  I thought about that, Mr. Tyson.  I'm glad
17   you brought it up.  Obviously, Judge Boulee is going to rule when
18   he needs to enter a ruling, but the ruling can have an effect on a
19   number of things.
20            Mr. Tyson, you have a right to a closing argument on
21   this part of it at the end of the trial.  So I didn't want you to
22   think you were losing that, as well as the plaintiffs as well.
23   We're going back to the plaintiffs in the next part of the case.
24            Is there anything else the plaintiff is going to put up
25   for rebuttal right now?
```

1          MR. HAMILTON:  Your Honor, the plaintiffs call Richard

2     Barron as our next witness.

3          (A discussion is held off the record.)

4          THE DEPUTY CLERK:  Sir, could you stand and raise your

5     right hand, please.

6          Do you solemnly swear that the evidence you shall give

7     in the matter now before this Court, shall be the truth, the whole

8     truth and nothing but the truth, so help you God?

9          THE WITNESS:  I do.

10         THE DEPUTY CLERK:  If you could have a seat.  If you

11    could state and spell your name for the record.

12         THE WITNESS:  It's Richard Barron, R-I-C-H-A-R-D,

13    B-A-R-R-O-N.

14    RICHARD BARRON, having been duly sworn, takes the stand and

15    testifies as follows:

16    DIRECT EXAMINATION

17    BY MR. WHITE:

18    **Q.**  Good morning, Mr. Barron.  How are you?

19    **A.**  Good morning.

20    **Q.**  Would you describe your professional background for the Court?

21    **A.**  Yes.  I'm the current -- currently, I'm the elections

22    director for -- the director of elections -- director of

23    registration elections for Fulton County, Georgia.  I've been in

24    that capacity for about eight-and-a-half years.  I was also

25    elections administrator in Williams County, Texas, and I worked

1  for the Travis County, Texas, as well.  I have about 22 years of

2  elections experience.

3  **Q.**  And what are your responsibilities as the Director of

4  Registration and Elections in Fulton County?

5  **A.**  I oversee the voter list, voter list maintenance for Fulton

6  County, along with recruiting poll workers, training poll workers,

7  getting all of the election polling places set up, early voting,

8  and I have a staff of 45.  We also tabulate all of the ballots,

9  test the equipment, get it delivered.

10  **Q.**  And how many elections have you administered in your current

11  role?

12  **A.**  Probably more than 30.

13  **Q.**  And how many elections have you administered in the prior

14  role?

15  **A.**  It was at least 30 there as well.

16  **Q.**  Okay.  Are you familiar with Georgia's election system?

17  **A.**  Yes.

18  **Q.**  Are you familiar with Georgia's election calendar?

19  **A.**  Yes.

20  **Q.**  Now, how many employees work for the Department of

21  Registration and Elections?

22  **A.**  We have 45 full-time staff, and then depending on the

23  election, we'll have anywhere between 200 to 500 supplemental or

24  seasonal staff that come on board and work full-time.

25  **Q.**  And what is the role of the seasonal staff?

1    **A.**  They are in all sorts of support positions; absentee by mail,

2    early voting, warehouse support.  They prepare voting machines.

3    They do everything, data entry.

4    **Q.**  So is it fair to say you can call them when you have to

5    administer an election under an expedited timeline?

6    **A.**  Yes.

7    **Q.**  Now, do you and your team have additional election

8    responsibilities in the State of Georgia in enacting new

9    districting plans?

10   **A.**  Yes.

11   **Q.**  What are they?

12   **A.**  Well, we get maps from the reapportionment office.  We have to

13   make sure that those lines match up with our precinct lines.  We

14   have to move street segments, move voters according to the

15   districts that they're now in, and notify the voters.  We have to

16   document all those on proposals to make sure that everyone knows

17   what -- what we've done throughout the process.

18   **Q.**  And how soon after receiving new maps can you start those

19   steps?

20   **A.**  Right away.

21   **Q.**  And did the Secretary of State direct you to complete these

22   steps of reallocating voters and updating street segments by a

23   particular date?

24   **A.**  February 18.

25   **Q.**  What was the reason for that deadline?

1  **A.**  It's hard to speak to what they have to do afterwards, but I'm

2  sure it has something to do with getting prepared ahead for ballot

3  building, ahead of the qualifying period of March 7th to the 11th.

4  **Q.**  And do you and your team need to review the documentation

5  before they are sent out?

6  **A.**  Yes, we proof the ballots when we get them, and we get reports

7  that we have to proof the ballots against reports.  Ballot

8  combinations are part of that, district combinations.

9  **Q.**  About how long does it usually take for your team to do that?

10  **A.**  Three to four days.  And then we'll send them back to the

11  State with corrections, and then we usually have two to three days

12  afterwards.

13  **Q.**  So about six or seven days total, you think?

14  **A.**  Yes.

15  **Q.**  Can you complete that process faster, if you had to?

16  **A.**  Probably.  We probably could get it done in maybe five days if

17  we -- that's, I guess, a crucial process where you have to make

18  sure that everything is accurately proofed.

19  **Q.**  Now, you have experience building ballots in prior roles or

20  this current role?

21  **A.**  Yes.  Williamson County I primarily built the ballots for that

22  county as part of my election administrator duties.

23  **Q.**  And what does that process entail?

24  **A.**  It is -- it would be similar to what Senate for election

25  systems does here, in that -- take all of the -- all of the races,

1  all the district combos, you basically -- you get a report or an

2  export out of the voter registration system, put in all of the

3  districts and create the combos and then enter in all of the

4  races, all of the candidates, and then you -- you prepare the

5  ballot for testing.

6  **Q.**   Would you say it's a difficult process?

7  **A.**   It can be, yes, a complicated process to do that.  But after

8  you do it so many times, it does get easier.

9  **Q.**   Now, the State of Georgia enacted Congressional and

10  Legislative redistricting plans on December 30, 2021; correct?

11  **A.**   Yes.

12  **Q.**   Have you already completed the process of reallocating voters

13  and updating street segments in response to the State Legislature

14  and Congressional plans?

15  **A.**   We've completed all of our work except for -- we're waiting

16  for a response from Atlanta public schools and for one

17  neighborhood to change in the County Commission District.

18  **Q.**   How long did it take for your team to complete those steps?

19  **A.**   About four weeks.

20  **Q.**   Does it take every county four weeks?

21  **A.**   No.  It depends on the size of the county and how many

22  districts you have to move voters between.  Fulton County is the

23  largest county.  We have the most streets, and we have the highest

24  population.  So it's going to take us longer than it would other

25  counties.

**Q.** Got it.  Now, are you aware that this Court can order the State of Georgia to draw remedial Congressional and Legislative maps in this case?

**A.** Yes.

**Q.** How would the passage of a remedial map affect you and your team in preparing for the May 2022 election?

**A.** If we had to start over with a new map, again, our staff, having been through redistricting now, if we had to redo that, it would take us somewhere in the two- to three-week range, depending on how much overtime and weekend time we put in.

**Q.** By the two- to three-week range, you're referring to the process of updating the street segments and reallocating?

**A.** Correct, and depending on how many changes were made since we've already put changes in with the current map.

**Q.** Right.  And so would you need to reallocate voters in districts that remained unchanged in the remedial map?

**A.** If they were unaffected, we wouldn't have to make changes, no.

**Q.** Would that be true for other counties as well?

**A.** Yes.

**Q.** Now, if the State of Georgia enacted new maps in the next week or so, say by February 18 or February 23, would it be feasible for you and your team to administer a May 22 primary?

**A.** Yeah, as long as we -- I mean, the deadline that we'd be looking at would be April -- you know, April 9 is when we have to get the UOCAVA ballots out, and we really need to start logic and

1  accuracy testing.  I mean, the preference for us would be April 1.

2  But as long as we could get it started sometime between April 8

3  and April 12, we could conduct logic and accuracy testing.

4      So if we had a ballot to start proofing by April 1st or 2nd,

5  we could get it done.

6  **Q.**  So do you think it would be catastrophic if the Court ordered

7  new maps by February 18 or February 23?

8  **A.**  I can't imagine using that word, no.

9  **Q.**  Now, as a general matter, is your office capable of

10  administering --

11          THE COURT:  Let me ask this question.  But what if you

12  don't get the maps until March 3th or 4th?

13          THE WITNESS:  Well, I think, according to my staff, we

14  would need another -- we would need probably two weeks to complete

15  that process, to redo the maps now.  So qualifying is the 7th to

16  the 11th.  I don't know exactly what the State has to do, but as

17  long as we --

18          THE COURT:  The State has to -- if I find there is a

19  violation, the State gets first chance at redrawing the maps.

20          THE WITNESS:  I don't know what the State has to do to

21  build the ballots once we do the data entry to move voters.  But

22  as long as we would be able to -- if we had enough time to get all

23  of the data entry done and move the voters and then -- and we can

24  start proofing a ballot probably by April 1st or 2nd, we -- we

25  should be -- I mean, that would compress the timeline and make

1  it -- we'd have to work longer hours, but I think we'd be okay.

2          THE COURT:  If you got a map on March 4 -- 3 or 4.

3          THE WITNESS:  As long as we can have a ballot to proof

4  by April 1st, we should be all right.

5  BY MR. WHITE:

6  Q.  Mr. Barron, as a general matter, is your office capable of

7  administering an election on an expedited time frame?

8  A.  Yes.

9  Q.  Can you give an example of that?

10  A.  Well, in June 20 -- well, in 2020 we had six elections in

11  eight months, from June of 2020 to January of 2021.  And there

12  were two elections dropped -- dropped on us that we were not

13  expecting, which was the Congressional District 5 election when

14  Congressman Lewis after -- after he died, and so we had to run an

15  election on September 29, and then the runoff on December 1.  That

16  September 29 election was in half of our county, and the election

17  date was two weeks from start of early voting for the November

18  2020 election.  And then we had to start early voting for the

19  December 1 election, six days after the presidential.

20      So having that dropped in there, we were at one point

21  preparing or administering three elections at once.  So it's --

22  we're capable of doing that.

23  Q.  I ask the follow-up about the special election after

24  Congressman Lewis passed.

25      You mentioned there was a primary election date on September

1  29?

2  **A.**  Yes.

3  **Q.**  How much advance notice did you get for that election date?

4  **A.**  I believe the governor called that election at the beginning

5  of August.  I don't remember exactly when, but -- so we had

6  probably eight, I don't know weeks, seven weeks' notice.

7  **Q.**  And the May 22 primary date -- and the May 2022 primary date

8  is further than eight weeks away from today, isn't it?

9  **A.**  Yes.

10  **Q.**  Now, if the Court --

11       THE COURT:  Can I ask this question?  If you had a map

12  on March 3rd or 4th, how would that impact qualifying on March

13  7th?

14       THE WITNESS:  Well, that could -- it depends -- I guess

15  if the districts were going to be the same -- that could impact

16  qualifying.

17       THE COURT:  So if it impacts qualifying, you can still

18  get it by April 1st?

19       THE WITNESS:  The candidates that are going to qualify,

20  they're going to qualify according to the addresses.  So we would

21  have to determine where -- whether they still lived in the

22  district with the redrawn map.

23       THE COURT:  So you would not need the qualifying date to

24  change if you got a map on March 3rd or 4th --

25       THE WITNESS:  No.  We would be able to pin -- if we have

1    the map through GIS, we would be able to pinpoint where that

2    candidate actually lived, what district in which the candidate

3    lived.

4            THE COURT:  So it's your testimony if there's a

5    qualifying date of March 7th, that would not have to change?

6            THE WITNESS:  I haven't -- that question I haven't

7    thought completely through.

8            THE COURT:  It's an important question.

9            THE WITNESS:  Sitting here now -- yeah.  I think as

10   long -- as the candidate needs qualifying in most cases, I think

11   for Congressional offices, it's different; they just have to live

12   in Georgia.

13           THE COURT:  We have -- qualifying right now is March 7th

14   through 11th.  If you had a map on March 3th or 4th, how would it

15   impact qualifying?

16           THE WITNESS:  I think certain offices require residency.

17   SO we would have to pinpoint where they are at in order to qualify

18   them.

19           THE COURT:  Thank you.

20   BY MR. WHITE:

21   Q.  Just a quick follow-up on that.  You had testified as long as

22   you receive the ballot combinations from the State by April 1, you

23   could --

24   A.  For the ballot.  We would need the ballot project by April

25   1st, yes.

1  **Q.**  Now, if the Court moved the primary date to later in the

2  summer, how would that affect your ability to administer the

3  election?

4  **A.**  Essentially, it would just give us more time to prepare for

5  the election.  We would have to do certain things, such as, you

6  know, we'd have to let all of our polling places know that the

7  election was -- date would be moved.  You know, for schools that's

8  going to be easier because it's easier for them, too, if we vote

9  when there is no school in session.  The government buildings,

10  it's easy to move the dates for those.  And most of the churches

11  that we use, those are available on Tuesdays.  We usually try to

12  get polling places reserved at the beginning of a calendar year

13  and let them know what the dates are.  But in 2020 we did have to

14  change dates two different times on polling places.

15  **Q.**  Right.  That September 29 primary we were talking about

16  before, that was an example where you had to secure polling places

17  on short notices; correct?

18  **A.**  Yes.

19  **Q.**  So you think if the Court is moving the primary date to later

20  in the summer, it would be easier to secure the polling sites?

21  **A.**  Yes.

22  **Q.**  Now, have you ever administered an election where the election

23  date was changed?

24  **A.**  Yes.  In 2020, in March, the presidential preference primary

25  was moved to -- it was combined with the May general primary, and

1  then that election was moved from May to June.

2  **Q.**  Did that cause any administrative difficulties that made it

3  unfeasible to administer the election?

4  **A.**  No, no.  I mean, the pandemic had the most effect on that.

5  But...

6  **Q.**  Let me shift gears for a second.

7     Does voter confidence in elections affect how you do your job?

8  **A.**  It can, yes.

9  **Q.**  How?

10  **A.**  Well, I mean, voters are -- are affected by, I guess,

11  political environment.  They're affected by legislation, and if

12  you have -- for example, I think in S.B. 202 there have been some

13  roadblocks put up with voters, and that can affect participation

14  if voters feel that the process isn't -- isn't fair.

15  **Q.**  For practical purposes, how does that have an impact on your

16  day-to-day job?

17  **A.**  Well, it can be -- we can get more complaints.  I mean, the

18  counties are usually going to be the ones that bear the brunt of

19  blame for the legislative changes if it affects them.  For

20  example, the provisional -- the new provisional law that we used

21  to be able to allow -- voters used to be able to vote at a

22  precinct and have at least a portion of their ballot count.  Now

23  if they vote out of precinct before five, their ballot won't

24  count.  So there are these things that happen in legislation, and

25  then the counties usually are the ones that hear the complaints.

1    **Q.**  Do you think that voter confidence could be affected if the

2    elections proceeded under maps that were perceived to be

3    discriminatory against African-Americans?

4    **A.**  It could have an effect, a negative effect, especially I think

5    if you couple it with some of the effects of S.B. 202.

6    **Q.**  Let me ask you one more thing.  In your experience as an

7    elections administrator, is it important that elections officials

8    be able to adopt unforeseen circumstances?

9    **A.**  Yeah, in our job we have a lot of -- really, when you

10   administer elections, you have to be able to adapt to all sorts of

11   different timelines that may occur or, you know, various things.

12   For example, we had 26 COVID infections leading up to the November

13   elections, and it wiped out half my warehouse staff, and you have

14   to be able to -- to manage different scenarios that arise and make

15   due with what is done.  If you get legislation that -- that tells

16   you you have to administer an election a different way, you have

17   to go ahead and administer it that way.

18   **Q.**  Do you think your team is capable of adopting to the

19   unforeseen circumstances at the moment?

20   **A.**  Yes.

21            MR. WHITE:  No further questions, Your Honor.

22            MS. LAKIN:  No questions, Your Honor.

23            THE COURT:  Mr. Tyson?

24   CROSS-EXAMINATION

25   BY MR. TYSON:

1  Q.  Good morning, Mr. Barron.  How are you?

2  A.  Good, thank you.

3  Q.  Good to see you again.

4      I just have a few questions for you.

5      I thought I had read in some media reports that you are

6  resigning effective December 31?

7  A.  Yes.

8  Q.  But you're still the director?

9  A.  Until April 1.

10  Q.  April 1.  That is to allow time to find a successor?

11  A.  Yes.

12  Q.  So in thinking about the kind of timeline we have that you

13  were speaking to Mr. White about -- so first of all, you talked

14  about building ballots.  Do you recall that testimony?

15  A.  Yes.

16  Q.  And it's correct, isn't it, that the voter registration

17  database has to be fully updated in order to build ballots for all

18  voters; right?

19  A.  Yes.

20  Q.  And you indicated that as long as you had a ballot to proof by

21  April the 1st, you would be able to administer the May elections

22  timely; is that right?

23  A.  Yes, we should.  I checked with my staff and that -- I mean,

24  it does crunch the timeline, but yeah.

25  Q.  And if qualifying was held May 7 through 11, as the judge

1  asked you about, and during that same period of time your staff
2  has spent two weeks entering information into the voter database,
3  you don't know how long it takes the Secretary to then generate
4  ballots after that; right?
5  **A.**   No.   The only familiarity I have would be from building
6  ballots in Williamson County.   You, basically, get an export out
7  of the system, and if the data entry is done, it should be a
8  simple export to populate the district combos that kind of drive
9  that.
10  **Q.**   So if your process took two weeks with your staff, and the
11  Secretary's process took three weeks, you wouldn't have a ballot
12  by April 1st; right?
13  **A.**   If they had a three-week timeline, then that would be -- it
14  would be hard to get it -- to meet that April 1 deadline, yeah.
15  **Q.**   And if you didn't have a ballot by April 1, you would have
16  doubts about being able to hold a primary on the 24th of May;
17  right?
18  **A.**   It would make it almost -- that April 9th UOCAVA deadline is
19  the one -- is that federal deadline we have to -- to abide by.
20  **Q.**   And so April 9 is the day by which it's too late to hold a May
21  24 primary?
22  **A.**   Well, it would -- it would mean that we would be out of
23  compliance with federal law and getting overseas ballots to voters
24  that live outside of the country.
25  **Q.**   And you mentioned logic and accuracy testing as well?

1  **A.**   Yes.

2  **Q.**   When does that process generally begin, before the UOCAVA

3  deadline or after?

4  **A.**   It could begin before.  But it also -- I mean, it could begin

5  afterwards as well.  We have -- it just depends on how -- if we

6  want to work people long hours and on the weekends day after day

7  after day.

8     I mean, April 1st is ideal for us, but my staff could verify

9  that they could start somewhere between April 8th and 12th as

10  well.

11  **Q.**   And logic and accuracy testing involves programming the voting

12  machines and making sure they're ready for deployment for early

13  voting and Election Day voting; right?

14  **A.**   Yes, yes.

15  **Q.**   Do you know if Fulton County has already secured its early

16  voting sites and Election Day voting sites for the May primary?

17  **A.**   Yes.  Yes.

18  **Q.**   You know, and yes, you have?

19  **A.**   Yes.  To both, yeah.

20  **Q.**   And so if the elections were moved, I believe you testified,

21  that it would not be difficult to use the same facilities on a

22  different day?  Am I characterizing that correctly?

23  **A.**   I mean, we would have to make arrangements.  Almost all of our

24  early voting sites are in county buildings.  So for early voting

25  it's -- you know, we have ways of moving the dates.  For the

1  election date polling sites, we would have to make arrangements

2  with all of them.  But for some polling sites, it's probably

3  easier.  The schools would probably welcome us being there outside

4  of a school day.  So there are certain sites where the issue of

5  moving the date is -- is really not going to be a problem for

6  some.

7  **Q.**  And I believe you testified you were the Director of Elections

8  during the 2020 election; right?

9  **A.**  Yes.

10  **Q.**  And when the primary elections were delayed in 2020, did you

11  lose access to some polling locations?

12  **A.**  Well, we lost 44 -- 44 of the 45 of the polling places that we

13  lost were due to COVID, for COVID reasons.

14  **Q.**  And when those sites were unavailable, you had to combine

15  those polling locations with other polling locations; right?

16  **A.**  Yes.

17  **Q.**  And one of those was -- does the Lutheran Church of the

18  Redeemer, does that ring a bell?

19  **A.**  I've heard of that polling site.  I don't remember if it was

20  combined.

21  **Q.**  Do you remember if Grady High School had to be combined with

22  Park Tavern?

23  **A.**  Yes.  APS came us to ten days before the election and said it

24  was unavailable due to construction.

25  **Q.**  And so on June 9, 2020, there were almost 16,000 voters who

1  were assigned to vote at Park Tavern; correct?

2  **A.**   Yes.

3  **Q.**   And you wouldn't have had to combine those precincts if you

4  had been able to use the other polling sites for that delayed

5  primary; right?

6  **A.**   I think the delayed primary -- Grady High School was

7  definitely affected by the delayed primary, because something had

8  been scheduled for construction and APS did not make us aware of

9  that.  With regard to the other polling site you mentioned, I'm

10 unsure why.

11 **Q.**   And so I guess my question was specifically, if Grady High

12 School, for example, had remained available, you wouldn't have had

13 to add those voters to Park Tavern; right?

14 **A.**   Right.

15 **Q.**   Are you aware of the lines that appeared at Park Tavern on

16 June 9, 2020?

17 **A.**   Yes.

18 **Q.**   I'm going to mark an impeachment exhibit here.  Have you seen

19 these pictures of individuals waiting in line at Fulton County

20 polling sites before?

21 **A.**   I've seen pictures.  I don't know if I've seen these exact

22 ones, but...

23 **Q.**   And the waits at various places, Christian City on the second

24 page indicated was a five-hour wait for polling?

25 **A.**   Yes.

1   **Q.**   Was Christian City a site where multi-polling locations had

2   been combined?

3   **A.**   Yes.

4   **Q.**   And the wait to Park Tavern was hours long as well; right?

5   **A.**   Yes.  They have, I think, 450 people lined up before 7, so...

6   But it ended up being -- it was the third most efficient site in

7   the state that day, but even at the rate that they were processing

8   voters, they were behind the eight-ball before the poll even

9   opened.

10   **Q.**   And on the second page there, the top, it indicates that at

11   Christian City and Union City, a lot of the people there were

12   almost all people of color.  Do you see that line?

13   **A.**   Yes.

14   **Q.**   Do you know if voters of color were more affected by wait

15   times in the June 2020 primary than other voters?

16   **A.**   Yeah, they were.

17   **Q.**   And so the necessity of combining precincts due to the loss of

18   access to polling locations negatively impacted the voters of

19   color; right?

20   **A.**   Yes.  The turnout was definitely higher in areas where there

21   were higher percentages of Democratic voters because of -- it was

22   a more competitive primary as well.

23   **Q.**   And if you had been able to use the voting sites you had

24   access to before the delay in the election, then not nearly as

25   many voters would have had to be scheduled to vote at the same

1  place; right?

2  **A.**   Yes.  But most of those combinations, they didn't have

3  anything to do with the delay.  They had to do with the pandemic.

4  44 of the 45 were pandemic-related.  They were polling places that

5  cancelled because they just did not want to be a part of the

6  election.

7  **Q.**   Is Grady High School the one out of 45 you referenced?

8  **A.**   I believe so, yes.  Because that came at the last minute.

9  **Q.**   In your experience, can voters' confidence in elections be

10  affected by long lines?

11  **A.**   Yes.

12  **Q.**   In your experience, does moving polling locations affect voter

13  confidence?

14  **A.**   Yeah.  Well, you want to try to avoid changing polling

15  locations, if at all possible.  Consistency is -- is the

16  best -- the best way to make sure that voters continue to want to

17  go and vote on Election Day.

18  **Q.**   And that consistency is why you schedule at the beginning of a

19  calendar year with polling locations for the whole year; right?

20  **A.**   Yes.

21  **Q.**   In your experience, does moving polling locations cause

22  confusion for voters?

23  **A.**   Yes, it can.

24  **Q.**   Has Fulton County ever made errors in allocating voters to

25  districts in ENet?

1  **A.**   Probably, yes.

2  **Q.**   Do you recall if Fulton County had been fined by the State

3  Election Board for making errors in allocating voters in every

4  districting line?

5  **A.**   I don't know.  I don't remember specifics.

6          MR. TYSON:  Mr. Barron, thanks.  That's all the

7  questions I have for you.  We appreciate your service.  I know

8  2020 was a very difficult year for you, but we appreciate your

9  service.

10          THE COURT:  Any redirect?

11          MR. WHITE:  Yes, Your Honor.

12  REDIRECT EXAMINATION

13  BY MR. WHITE:

14  **Q.**   Mr. Barron, Mr. Tyson brought up the fact that you had

15  announced your resignation this upcoming year.  Do you recall

16  that?

17  **A.**   Yes.

18  **Q.**   What is the reason for your resignation?

19  **A.**   Various reasons.  I mean, some of it just has to do with the

20  political environment.  The -- I think a lot of the threats.

21  Personal reasons.  Just cowardice of elected officials that won't

22  stand up to constituents regarding all the lies about the

23  elections.

24  **Q.**   Now, you were asked a moment ago about the potential for voter

25  confusion if the primary date moved.  What steps did your office

1    take to mitigate that confusion?

2    **A.**   To mitigate the confusion, primary confusion?

3    **Q.**   Yes.

4    **A.**   Well, one thing that we do -- in addition, we have to mail out

5    precinct cards to voters as polling places changed.  We also do

6    head of household mailings that list all the early voting sites,

7    the Election Day site for that precinct, as well as how to vote

8    absentee by mail.  So that goes out to all of the households in

9    Fulton County.  Candidates do a pretty good job of publicizing

10   things.  Secretary of State's office also publicizes.  They

11   publicized a lot of the changes in 2020 to the election dates as

12   well.  Social media.

13   **Q.**   You were asked before about the need to secure additional

14   polling sites on short notice.  Now, you've done this before

15   recently; correct?

16   **A.**   Right.  Yes, in 2020 we had to -- we had to secure polling

17   sites.  We lost a lot of polling sites before the June election,

18   and then just -- we ended up -- I think we went from about 200 --

19   a little over 200 down to I think 164.  And then before the time

20   of the November election came about, we had 264 locations that we

21   added -- or we added a hundred locations.

22   **Q.**   And you testified a moment ago that voters of color could be

23   negatively impacted by long lines at that precinct places.  Do you

24   recall that?

25   **A.**   Yes.

1  **Q.**  Do you think that voters of color are also negatively impacted

2  by voting under maps that dilute their voting power?

3  **A.**  Yes.  They would be affected by that as well.

4          MR. WHITE:  I have no further questions, Your Honor.

5          THE COURT:  Recross --

6          MR. TYSON:  No, Your Honor.

7          THE COURT:  Mr. Barron, I will tell you the same thing I

8  told Ms. Bailey.  I thank you for what you do as Polling Director,

9  and everyone that works for polling.  You're not appreciated

10 enough.  Thank you for what you do, and you're free to go.

11         THE WITNESS:  Thank you.

12         THE COURT:  Call your next witness.  Call your next

13 witness.

14         MR. JONES:  Your Honor, the Pendergrass plaintiffs call

15 Nancy to the stand.

16         THE COURT:  Is she here?

17         MR. JONES:  She is here.

18         THE COURT:  You need to have the witnesses close by so

19 when one finishes, the other one comes in.

20         MR. JONES:  Yes, sir.

21         If Your Honor will allow me a brief recess, I'll go find

22 her.

23         MR. HAMILTON:  Our paralegal is grabbing her from the

24 witness room right now.

25         THE COURT:  All right.  We'll sit tight right here.

1          THE DEPUTY CLERK:  Could you raise your right hand.  Do

2    you solemnly swear that the evidence you shall give in the matter

3    now before this Court shall be the truth, the whole truth and

4    nothing but the truth, so help you God?

5          THE WITNESS:  I do.

6          THE COURT:  Have a seat.  If you could please state and

7    spell your name for the record.

8          THE WITNESS:  My name is Nancy Boren, N-A-N-C-Y, last

9    name Boren, B-O-R-E-N.

10         THE COURT:  Ms. Boren, you can testify with your mask on

11   or off.  It's up to you.

12         THE WITNESS:  Thank you.

13   NANCY BOREN, having been duly sworn, took the stand and testified

14   as follows:

15   DIRECT EXAMINATION

16   BY MR. JONES:

17   **Q.**  Good morning, Ms. Boren.  How are you?

18   **A.**  Good morning.  Thank you, I'm fine.

19   **Q.**  Could you please state your occupation for the record?

20   **A.**  Yes.  I'm the Director of Elections and Voter Registration in

21   Muscogee County, Georgia.

22   **Q.**  How long have you held that position?

23   **A.**  26 years.

24   **Q.**  Can you describe your job responsibilities?

25   **A.**  We administer the elections in Muscogee County and maintain

1  the voter registration list for Muscogee County.

2  **Q.**   And do you oversee the reallocation of voters to districts

3  after new redistricting plans are in place?

4  **A.**   We implement the redistricting plan by inputting that

5  information into our statewide voter registration system.

6  **Q.**   And have you served as the Elections Director during previous

7  redistricting cycles?

8  **A.**   Yes, I have.

9  **Q.**   Are you knowledgeable about Georgia's election calendar?

10  **A.**   Yes, I am.

11  **Q.**   So are there set movable deadlines that you are required to

12  adhere to as the Director of Elections?

13  **A.**   Yes, there are.

14  **Q.**   And what are those?

15  **A.**   Qualifying dates, the date that we mail military and overseas

16  ballots, the date of the general primary, the runoff, if

17  necessary, and the general election.

18  **Q.**   Now, as a general matter, can you explain the process that you

19  follow to reallocate voters to new districts once you have those

20  new maps in hand?

21  **A.**   Yes.  So we, for our state and federal redistricting, get maps

22  from the Legislative Reapportionment Office.  We apply those

23  through Shapefiles in our GIS and our ESRI redistricting system,

24  and then we do our school board and our local city counsel inhouse

25  with our GIS Department.

1  **Q.**  All right.  Now, if precincts are whole during the process

2  of -- let me rephrase it.

3     If precincts are whole, do you have to touch every street to

4  reassign voters?

5  **A.**  We do.  We have to go into every street to reassign those

6  districts.

7  **Q.**  Okay.  And that is process more complicated if those precincts

8  are split?

9  **A.**  It is more complicated, because we have to identify street

10  segments.

11  **Q.**  Now, if you received new Legislative and Congressional maps

12  this week, could Muscogee County hold a primary election as

13  scheduled on May 24?

14  **A.**  Yes.

15          THE COURT:  Did you say this week?

16          MR. JONES:  Yes.

17          THE COURT:  You have more faith in me than I have.

18          MR. JONES:  I'm a praying lawyer, Your Honor.

19          THE COURT:  You must have some real connections.

20  BY MR. JONES:

21  **Q.**  To be a little more fair, what if you received new Legislative

22  and Congressional maps next week?

23  **A.**  Yes, it would.

24  **Q.**  Let me complete the question.  If you received new Legislative

25  and Congressional maps next week, could Muscogee County hold a

1  primary election on May 24?

2  **A.**   Yes.

3  **Q.**   And if you --

4            THE COURT:  Let's be practical here.  You're not going

5  to get a map next week.  All right.  If you got a map at the

6  earliest May 3rd or 4th -- I mean, March 3rd or 4th, could you be

7  ready for election on May 24?

8            THE WITNESS:  So there are a lot of processes that have

9  to fall into place --

10            THE COURT:  Tell me about them.

11            THE WITNESS:  -- when we get those maps.  Qualifying

12  will have to take place beginning March 7, and that ends March the

13  11th.  Before you can qualify a candidate, you need to know where

14  they live.  You need to know their residence and if they meet the

15  qualifications for the office.  We could do that with maps for our

16  local redistricting without having to have it in a statewide voter

17  registration system, but once we do that, that information then

18  goes to the Center for Elections systems who builds our database,

19  our ballot database for us.  Before we can even do that, though,

20  we have to have ballot combos that show those Congressional, State

21  Senate, State House, local school board, and local counsel seats.

22  So it would be difficult, but as elections officials, we are

23  accustomed to accomplishing a lot of things in a short period of

24  time.

25            THE COURT:  Could you have qualifying on March the 7th?

1          THE WITNESS:  Well, since we only qualify school board

2    and our local council, yes.

3          THE COURT:  I'm talking about could the State have

4    qualifying on March the 7th if a ballot was given on -- a map on

5    March 3rd or 4th?

6          THE WITNESS:  I can't answer that question for the

7    state.

8          THE COURT:  Thank you.

9    BY MR. JONES:

10   Q.  And just one more question, Ms. Boren.  If you received new

11   maps before the end of this month, so before March 1, could

12   Muscogee County hold a primary election as scheduled on May 24?

13   A.  Yes, if we receive our database and the necessary items that

14   we need to conduct an election, yes.

15   Q.  Thank you.

16         THE COURT:  Any questions from the plaintiffs?  I'm

17   sorry.  I thought you said thank you because you were done.

18   You're not done.  Sorry.

19         MR. JONES:  No.

20   BY MR. JONES:

21   Q.  Ms. Boren, will Muscogee County hold election for offices

22   other than U.S. Congressmen and State Legislature in 2022?

23   A.  Yes, we will.

24   Q.  What other offices will hold elections this year?

25   A.  We have our local school board, our local city council, and a

1  state court judge seat that is county.

2  **Q.**  Has the school board passed new maps this year?

3  **A.**  They did.

4  **Q.**  When did you receive the final maps for the 2022 school board

5  elections?

6  **A.**  Monday.

7  **Q.**  Now, even though you received the final school board maps just

8  this week, are you confident that Muscogee County can hold a

9  primary election as scheduled in May?

10  **A.**  Yes.

11  **Q.**  Do you know if the maps that you just received this week were

12  the first set of maps that the Muscogee County school board passed

13  this cycle?

14  **A.**  They were not the first set of maps.

15  **Q.**  What happened to the initial set of maps?

16  **A.**  Our city council and our school board made an agreement to

17  mirror each other districts, but we abut a military reservation

18  and the school board was required to bring in the population from

19  the school board which changed the district lines.  Legislative

20  Reapportionment redrew those school board lines for the school

21  district.

22  **Q.**  And when you said Legislative Reapportionment, are you

23  referring to an office that's part of the General Assembly?

24  **A.**  Yes, I am.

25  **Q.**  And so to make sure I have your testimony clear, you're saying

1  that the General Assembly rejected the initial maps that Muscogee

2  County school board submitted?

3  **A.**   Reapportionment Office rejected the lines for not meeting

4  technical certification.

5  **Q.**   Now, when the Reapportionment Office rejected those initial

6  school board maps, did it express any concerns about the ability

7  for Muscogee County election officials to administer the 2022

8  school board elections on the current calendar?

9  **A.**   No.

10  **Q.**   Did the governor express any concerns about your ability to

11  administer this election on the current calendar?

12  **A.**   Not on local lines, no.

13  **Q.**   Did the Secretary of State express any concerns about your

14  ability to conduct the 2022 school board elections on the current

15  calendar?

16  **A.**   No.

17  **Q.**   Now, are you familiar with the -- one more question before I

18  proceed to that.

19      Did the new school board maps split more precincts than your

20  Congressional and Legislative districts?

21  **A.**   Yes.

22  **Q.**   Okay.  Are you familiar with the Georgia Association of Voter

23  Registrars and Election Officials?

24  **A.**   Yes, I am.

25  **Q.**   Do you belong to that organization?

1  **A.**   Yes, I do.

2  **Q.**   That organization passed a resolution last summer regarding

3  Georgia's election calendar; is that right?

4  **A.**   That is correct.

5  **Q.**   Are you familiar with that resolution?

6  **A.**   I am.

7  **Q.**   Let's pull that up, if we can.

8      Now, at the top here it says by majority vote.  Did the

9  association vote to approve this resolution?

10  **A.**   We did.

11  **Q.**   Did you participate in that vote?

12  **A.**   Yes, I did.

13  **Q.**   How did you vote?

14  **A.**   I voted in favor of the resolution.

15  **Q.**   Now, I want to focus on the third "whereas" paragraph.  Okay?

16  **A.**   Okay.

17  **Q.**   Now, what concern was this paragraph addressing?

18  **A.**   At the time that we passed the resolution, the special session

19  had not been scheduled yet, and we were concerned that the special

20  session -- well, may I read it?

21  **Q.**   Sure.

22  **A.**   Give me a moment.  So we were concerned that the special

23  session would only address federal and state reapportionment and

24  not local reapportionment.

25  **Q.**   Perfect.  And let's see.  Proceeding -- proceeding to the next

1  paragraph, the fourth "whereas" paragraph in the resolution.
2  Could you please read that aloud?
3  **A.**   "Whereas, these delays will give the counties inadequate time
4  to make complicated redistricting changes before the commencement
5  of candidate qualifying on March 7, 2022; and that after the 2010
6  census, the qualifying period in 2012 commenced on May 23, 2012,
7  providing more than two additional months for redistricting
8  efforts."
9  **Q.**   And so how much more time did counties have in 2012 to prepare
10 for the first primary election after the census as compared to
11 this year?
12 **A.**   Two months.
13 **Q.**   And what accounts for that difference?  Do you know why there
14 was more time?
15 **A.**   Legislation was passed in 2014 that removed the provision
16 delaying the summer primary in the even-numbered year after
17 reapportionment.  Typically, it was later in the summer, and that
18 2014 legislation removed that requirement.
19 **Q.**   And do you know why that legislation was passed?
20 **A.**   I don't know specifically.  I have an understanding, but I
21 don't know specifically.
22 **Q.**   Okay.  What's your understanding of why it was passed?
23 **A.**   Well, my understanding is that the military needed 45 days to
24 complete their runoff ballot, and backing up the November election
25 calendar, that time was needed so that the military would have

1  their 45 days for voting.

2  **Q.**  Now, has Georgia changed the way that it conducts runoff

3  elections and primaries for the UOCAVA voters?

4  **A.**  Yes.

5  **Q.**  So is that same length of time still needed today?

6  **A.**  No.

7  MR. JONES:  Your Honor, at this time I would like to

8  offer this document into evidence as Plaintiff's Exhibit 68.

9  THE COURT:  Any objection?

10  MS. PARADISE:  No objection.

11  THE COURT:  Admitted without objection.

12  (Plaintiff's Exhibit 68 was received and marked into

13  evidence.)

14  BY MR. JONES:

15  **Q.**  Ms. Boren, would it make your job easier if the 2022 election

16  was passed back?

17  **A.**  Pushed forward?

18  **Q.**  Well, later, not sooner?  Definitely, later.

19  **A.**  Yes.

20  **Q.**  Okay.  And if the primary election was pushed to the current

21  runoff date, the date when runoffs are currently scheduled, would

22  you need to hire new poll workers or secure new polling places?

23  **A.**  We have already secured polling places and early voting

24  locations, as well as poll workers in anticipation of the runoff

25  date.

1  **Q.**  So would it harm your office in any way to give you additional

2  time to prepare for the election?

3  **A.**  Additional time is always a good thing to have.  So I would

4  say no.

5  **Q.**  So based on your experience and your testimony today, is it

6  fair to say that it would be feasible for you to administer the

7  upcoming primary on time even if district lines were changed, so

8  long as you receive new maps by the end of the month?

9  **A.**  Yes.

10  **Q.**  Without any undue hardship on your office?

11  **A.**  Is overtime hardship?  I mean, obviously we may have to work a

12  little bit longer, but not undue hardship.

13  **Q.**  And if the election were pushed back, do you think you could

14  take it -- not incur those overtime costs?

15  **A.**  That additional time would give us time to cross our T's and

16  dot our I's.

17            THE COURT:  Let me make sure I understand what you're

18  testifying about.  You're testifying about county school board

19  races.  You're not talking about Congressional races or State

20  Senate or State House races, are you?

21            THE WITNESS:  Well, we have to do all reapportionment at

22  the county level, and so that requires us touching every street

23  that's in our county to add that to Congressional, State Senate,

24  State House and local seats.

25            THE COURT:  The maps you're talking about, I want to

 1  make sure we're talking about the same maps; it's two different

 2  maps.  The map for the school district and the County Commission

 3  are different.

 4          THE WITNESS:  There are actually five different maps.

 5          THE COURT:  Exactly.

 6          THE WITNESS:  So we have Congressional map, State Senate

 7  map, school board.

 8          THE COURT:  Excuse me.  You are talking about getting a

 9  map at the end of this month.  My understanding is that the

10  Georgia Senate has changed the way they do it.  It used to be that

11  the local delegation voted on the map and that was it.  But now

12  the whole House, the whole Senate voted on the map.  So you're

13  actually getting the map from the Senate and the House, which is

14  impossible to get next week; right?

15          THE WITNESS:  I would hope that that's why our school

16  board passed their lines Monday so that local legislation could be

17  introduced and that it could be passed.  So they received the

18  technical certification for school board.

19          THE COURT:  But you understand, I'm not dealing with

20  that.

21          THE WITNESS:  I do.  I understand that.

22          THE COURT:  They can pass one today if they wanted to

23  for those races.

24          THE WITNESS:  That's correct.

25          THE COURT:  So it is still your testimony that it is

1   possible -- if you got a map, a Congressional map or a House or

2   Senate map on March the 4th, no impact on you?

3           THE WITNESS:  Well, March 4 would be difficult, but he

4   said the end of February was his question.

5           THE COURT:  Well, he has a great connection from above,

6   but, you know --

7           THE WITNESS:  I think.

8           THE COURT:  I might need a little more time.  I'm not

9   saying, Mr. Tyson, there's going to be a map, you know, but there

10  is a process.  Even if I ordered it next week, the law says, as

11  you know, that the General Assembly gets first shot at drawing the

12  map.  Okay?  So more than likely you're not talking about a map

13  next week or at the end of February, even under the best of

14  situations, you're talking about a map around March 3rd or 4th.

15  My question is, what, if any, impact would that have?

16          THE WITNESS:  So, obviously, a week later, looking at

17  March 4, you're a week later into the process, and the process

18  for -- we don't qualify for Congressional, State Senate or State

19  Representative; the State does that.  We only do the local

20  qualifying.  But what I would have to do is have that information

21  put into Muscogee County's database, not statewide, Muscogee

22  County database so I can then submit my information to the Center

23  For Election Systems and have the ballots built for Muscogee

24  County, not statewide.

25          THE COURT:  How long would that take?

1          THE WITNESS:  Typically, the -- once the information is
2  entered and we have the district combos, we submit that
3  information to the Center for Election Systems and
4  qualify -- qualifying ends, we usually have our database within a
5  week to ten days.  I do understand there are going to be some
6  challenges this time with the rank choice voting database that is
7  going to be required for the military and overseas.  Those are
8  going to pose challenges for the Center of Elections Systems, not
9  Muscogee County again, at a statewide level.  I can only speak to
10 Muscogee County.  So getting the map March 4th for qualifying for
11 state or federal offices is not going to impact me, but it's going
12 to impact me for my school board and my city council.
13          THE COURT:  So could you do qualifying on March 7?
14          THE WITNESS:  With a map.  If I had a map in front of
15 me.  Our city council districts will not be changed because we --
16 we have a charter provision that requires six months before new
17 lines can be implemented for a local election on a city council.
18 So our lines will not be changed for the May 24 election.  So
19 school board -- I mean, council is out.
20          THE COURT:  So whatever lines are for that council,
21 that's how people are going to vote.
22          THE WITNESS:  That is how they're going to vote.
23          THE COURT:  And that does not change if you get a map.
24          THE WITNESS:  That is true.  And we will update the
25 school board lines.

1          THE COURT:  And could you enter a ballot -- people are

2   going to vote.  They have not just school board and County

3   Commission on that ballot.  They've got House District, Senate

4   District, Congressional District, Governor.

5          THE WITNESS:  Right, and those are the district combos

6   that I was speaking about that are assigned to precincts.  In the

7   2020 primary, we had about 200 ballot styles; all of those

8   different district combinations.

9          THE COURT:  So Muscogee County, it makes no difference.

10  You're going to run on a city council on whatever that map is

11  right now.

12         THE WITNESS:  We are.

13         THE COURT:  Okay.

14  BY MR. JONES:

15  Q.  Just a couple of follow-up questions, Ms. Boren.  So if you

16  received remedial maps or new maps for this election cycle that --

17  let's take the Congressional map, for example, that made no

18  changes to Muscogee County, would it require you -- and you

19  received those new maps on March 3rd or 4th, could you

20  still -- would you still be prepared for qualifying on March 7?

21  A.  Yes.

22  Q.  And if you received legislative maps that made minimal changes

23  and had few -- a small number of split precincts, could you

24  receive new maps on March 3rd or 4th and be prepared for

25  qualifying on March 7?

1    **A.**   Yes.

2          MR. JONES:   Thank you.   We no further questions at this

3    time.

4          MS. LAKIN:   No questions, Your Honor.

5          THE COURT:   Your witness.

6    CROSS-EXAMINATION

7    BY MS. PARADISE:

8    **Q.**   Good afternoon, Loree Anne Paradise representing the State.

9    Ms. Boren, how are you?

10   **A.**   Hi.

11   **Q.**   I have a couple of brief questions for you based on your

12   conversation with Mr. Jones.

13      Now, you handle voter registration in your county; correct?

14   **A.**   Yes.

15   **Q.**   And based on your knowledge of the voter registration database

16   here in Georgia, you'd agree with me that there is no way to

17   update all of the street segments in one precinct at the same

18   time?

19   **A.**   That is correct.

20   **Q.**   That is a manual process that has to be done?

21   **A.**   Yes.

22   **Q.**   In past redistricting cycles, approximately, how many staff

23   would you have working on the reallocation process of new

24   districts?

25   **A.**   Two.

1  **Q.**  And what error checking processes would your office utilize

2  after that data entry is completed?

3  **A.**  We have GIS and ESRI, and we would do a match/mismatch list of

4  districts with a Shapefiles lead on that ESRI software to show us

5  each address point.

6  **Q.**  Okay.  And you would agree that the deadline for calling

7  special elections that coincide with the May primary is February

8  23 because that is 90 days out from the primary; correct?

9  **A.**  Yes.

10  **Q.**  And you'd agree that the date for moving polling locations

11  outside the boundaries of a precinct is also February 23?

12  **A.**  Unless there is an emergency that makes the precinct unusable.

13  **Q.**  Okay.  And as you testified on direct, you proof the ballots

14  that you receive from the Center of Election Services?

15  **A.**  Yes.

16  **Q.**  And you proof these ballots during the time frame between the

17  close of qualifying and the time of mailing the UOCAVA ballots;

18  yes?

19  **A.**  No.  It's done before that.

20  **Q.**  Okay.

21  **A.**  We proof them, we receive our database back, we send it to the

22  printer who prints our ballots, and then we begin the logic and

23  accuracy testing of the equipment that is used to tabulate the

24  votes.

25  **Q.**  Do you send out your UOCAVA ballots on the 49th day or the

1    45th day before an election?

2    **A.**   We begin on the 49th day.  We end on the 45th day.

3    **Q.**   Have you secured early voting sites and Election Day voting

4    precincts for voters in Muscogee County?

5    **A.**   Yes.

6    **Q.**   If the election was moved, what would happen to those sites

7    and precincts?

8    **A.**   I could not say what would happen, because I don't know what

9    date.  We've already scheduled it, though, for the general primary

10   for runoff and for the November election.

11   **Q.**   But you would agree that it would be incredibly disruptive for

12   your office; yes?

13   **A.**   We would -- it would necessitate us contacting each facility

14   and seeing if they had availability.

15   **Q.**   And you'd agree that you would likely have to obtain new

16   voting locations, new polling sites?

17   **A.**   Again, I wouldn't know that without knowing the date that it's

18   moved.

19   **Q.**   And you would have to notify voters if you hypothetically

20   changed the polling locations?

21   **A.**   Yes.

22   **Q.**   That is something you would have to do?

23   **A.**   Yes.  Send precinct cards, yes.

24   **Q.**   And going back to 2020, the election there, you'd agree that

25   that process when you had to shift locations was easier because of

1  the circumstances you were dealing with surrounded -- surrounding

2  the COVID-19 pandemic, there were no other events being held at

3  the Civic Center and where your polling locations may be?

4        MR. JONES:  Objection, your Honor.  Beyond the scope of

5  the direct.

6        THE COURT:  I think he's right on that.  I think

7  Mr. Jones is right on that.

8        MS. PARADISE:  Okay.  Withdrawn.

9  BY MS. PARADISE:

10 **Q.**  Hypothetically, if the Court created a new map that changed

11 districts in your county on March 5, would you be able to complete

12 the tasks needed for the May primary?

13 **A.**  I would on the local scene.  I don't know how that would

14 impact the State's preparation of the database.

15 **Q.**  Right.  Understood.  But you would agree if that hypothetical

16 deadline changed and March 5 you received a new map, you would

17 have less time for error checking and ensuring the accuracy of

18 information --

19 **A.**  Yes.

20 **Q.**  -- you provided voters?

21 **A.**  Because you now moved it from the 4th on a Friday, to the 5th

22 on a Saturday.  We keep moving it further from the last week of

23 February --

24        THE COURT:  It wouldn't be on the 5th; that's for sure.

25        THE WITNESS:  Y'all keep all backing me up on time here.

1          THE COURT:  Sorry about that.

2    BY MS. PARADISE:

3    **Q.**  And you would agree that the new voting machines need more

4    power than the old machines which limits potential voting sites as

5    possible voting locations?

6    **A.**  Additional power, yes.

7    **Q.**  And you'd degree if your poll workers and poll -- you would

8    agree that your poll workers and poll worker training would be

9    impacted if this hypothetical took place?

10   **A.**  The dates would be changed, yes.

11   **Q.**  Just a few more questions here.  Going to this resolution from

12   the Georgia Association of Voter Registrars and Election Official

13   dated August 30.  You would agree that August 30 is before

14   Governor Kemp announced when the special session for redistricting

15   would be called?

16   **A.**  Yes.

17   **Q.**  And you would also agree that if the Legislature had made the

18   changes requested in this resolution during the special session in

19   November, it would have been easier to have implemented those

20   changes then than if the Legislature had made -- were to make

21   changes now in February of 2022?

22   **A.**  Yes.

23   **Q.**  Can the May 24 primary be moved without massive disruptions

24   for voters and election officials?

25   **A.**  I can only speak for Muscogee County.  And I would say

1  massive, no.  No massive disruptions.

2  **Q.**  But would it is fair to say there would be disruptions to you

3  and your staff and the process you're going through right now?

4  **A.**  There would be changes, yes.

5          MS. PARADISE:  All right.  I don't have any further

6  questions.  Thank you so much and thank you for the work you're

7  doing.

8          THE COURT:  Any redirect?

9          MR. JONES:  Very briefly.

10  REDIRECT EXAMINATION

11  BY MR. JONES:

12  **Q.**  Ms. Boren, if you did receive -- I'll illustrate this

13  hypothetical for one last time -- maps in the first week of March,

14  you've already testified that if there are few changes to the

15  Congressional and Legislative maps if you can get it done on time,

16  are you confident that your work would be accurate?

17  **A.**  That's like asking me if I'm still beating my husband.  I

18  mean -- am I confident?  You know --

19          THE COURT:  I hope not.

20          THE WITNESS:  Right.

21          I would love to say yes, but, obviously, providing more

22  time to cross your T's and dot your I's and check your work is

23  something that election officials need and want, especially with

24  the highlight that we have on our career after 2020.

25  BY MR. JONES:

1  **Q.**  And so as an example, if the primary election were pushed back

2  to the date when the runoff election is currently scheduled, would

3  you feel confident in your ability to prepare?

4  **A.**  Yes, I would feel more confident.

5            MR. JONES:  Thank you very much.

6            THE COURT:  Recross?

7            MS. PARADISE:  No, Your Honor.  Thank you.

8            THE COURT:  Ma'am, I want to thank you as I thanked all

9  the election people and poll workers.  What y'all do is valuable,

10  and I appreciate you.  And you don't get paid enough or thanked

11  you enough.

12            THE WITNESS:  Thank you.

13            THE COURT:  We're are going to stop right here for a

14  lunch break.  We will start back here at 1:30.

15            (Whereupon, the hearing concluded at 12:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by me in the case

8  aforesaid.

9      This the 9th day of February, 2022.

10

11

12

13

14                    /s/Viola S. Zborowski_____
                      VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25