```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   ALPHA PHI ALPHA FRATERNITY,    )
     INC., ET AL.,                  )
 5                   PLAINTIFFS,    )
                                    )  DOCKET NO. 1:21-CV-05337-SCJ
 6        -VS-                      )  VOLUME 4 - A.M.
                                    )
 7   BRAD RAFFENSPERGER,            )
                                    )
 8                   DEFENDANT.     )
     _____
 9   COAKLEY PENDERGRASS,          )
     ET AL.,                        )
10                   PLAINTIFFS,    )
                                    )  DOCKET NO. 1:21-CV-5339-SCJ
11        -VS-                      )
                                    )
12   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
13                   DEFENDANTS.    )
     _____
14   ANNIE LOIS GRANT, ET AL.,      )
                                    )
15                   PLAINTIFFS,    )
                                    )  DOCKET NO. 1:22-CV-00122-SCJ
16        -VS-                      )
                                    )
17   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
18                   DEFENDANTS.    )
     _____

19
           TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20              BEFORE THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT JUDGE
21               THURSDAY, FEBRUARY 10, 2022

22

           VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23     OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT COURT
24                     ATLANTA, GEORGIA
                        404-215-1479
25             VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1  APPEARANCES:

 2  ON BEHALF OF THE PLAINTIFF:

 3   GRAHAM W. WHITE, ESQ.
     JENNESA CALVO-FRIEDMAN, ESQ.
 4   ABHA KHANNA, ESQ.
     SOPHIA LIN LAKIN, ESQ.
 5   ARI J. SAVITZKY, ESQ.
     SEAN J.YOUNG
 6   ROBERT BOONE
     ABIGAIL SHAW
 7   ALEX W. MILLER
     MAURA DOUGLAS
 8

 9


10
    ON BEHALF OF THE DEFENDANT:
11
     BRYAN P. TYSON, ESQ.
12   LOREE ANNE PARADISE, ESQ.
     BRYAN JACOUTOT, ESQ.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3   WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

4      ORVILLE VERNON BURTON      4      23        38         41
       MAXWELL PALMER            44      65        74         75
5      LISA HANDLEY             70     101       114

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Held in open court at 9 a.m.)

 2              THE COURT:  Sir, would you raise your right hand, and I

 3  guess we have to give him the oath.

 4              THE DEPUTY CLERK:  Do you solemnly swear that the

 5  evidence you shall give in the matter now before this Court, shall

 6  be the truth, the whole truth and nothing but the truth, so help

 7  you God?

 8              THE WITNESS:  I do.

 9              THE DEPUTY CLERK:  Thank you.  Could you state and spell

10  your name for the record.

11              THE WITNESS:  Yes.  Orville, O-R-V-I-L-L-E, Vernon,

12  V-E-R-N-O-N, Burton, B-U-R-T-O-N.

13              THE DEPUTY CLERK:  Thank you.

14              THE WITNESS:  I'm getting an echo.  I hope you're not.

15              THE COURT:  We're fine.  You're coming through fine.

16              THE WITNESS:  Thank you.  I'm going to turn my phone off

17  now.

18              MR. WHITE:  Good morning, Your Honor.  This is Graham

19  White, on behalf of the Pendergrass plaintiffs.

20  ORVILLE VERNON BURTON, having been duly sworn and appearing via

21  Zoom, takes the stand and testified as follows:

22  DIRECT EXAMINATION

23  BY MR. WHITE:

24  Q.  Good morning, Dr. Burton.  Can you hear me?

25  A.  Good morning.  I can.
```

**Q.** Now, you have been retained on an expert on the Senate factor
pertaining to the history of voting-related discrimination; is
that right?

**A.** Yes.

**Q.** Can you briefly describe your educational background?

**A.** Well, I was born in Royston, Georgia, and grew up in Ninety
Six, South Carolina, or in the county right outside of there.
Went to public schools in Ninety Six.  I went to Furman University
for my BA, and while there I also participated in the Harvard
Columbia Yale intensive summer studies program.  And from there,
after the Army, I went to Princeton University where I got my MA
and Ph.D.  Back in the Army briefly, and then out.  For 34 years
at the University of Illinois.  From there I went to Coastal
Carolina University for an endowed chair, and am now at Clemson
University as the Judge Matthew J. Perry, Jr., Distinguished
Professor of History.

**Q.** Can you briefly describe your professional background?

**A.** I did a little of it there, but I am a specialist in United
States history.  I specialize particularly in the American South
and race relations.  I have been elected by my peers to be
president of the Southern History Association, Agricultural
History Association, a member of the Society of American
Historians.

    I have received a number of awards.  I've written more than 20
books, the latest is <u>Justice Deferred</u>, co-authored with Armand

1   Derfner, Race and the Supreme Court.  The Age of Lincoln received

2   a number of awards and acclaims.  And I received from the American

3   History Association their award for the best teacher; and the

4   Carnegie Foundation for the research -- won teacher of the year

5   and a number of others.  All in my vitae which is attached in a

6   free file.

7   **Q.**  Thank you, Dr. Burton.  And have you served as an expert

8   witness before?

9   **A.**  Yes.

10  **Q.**  On what subjects?

11  **A.**  Well, on redistricting.  Certainly on intent and purpose of

12  voting laws, racial block voting analysis, very recently in North

13  Carolina on felony disenfranchisement.  But a lot of issues

14  dealing with discrimination, and particularly on voting, voting

15  laws, those sorts of things.

16  **Q.**  And have you offered expert testimony on the history of racial

17  discrimination in any of these cases?

18  **A.**  Yes, many of them.

19  **Q.**  Do you know about how many?

20  **A.**  No.  I started with -- got involved as an expert witness right

21  after Mobile v. Bolden in 1980.  The first time I testified was

22  about 1985 or '86 in Jacksonville, and that was clearly on intent.

23  The huge county -- the Charleston County Council case about 2003

24  or '4.  And then most recently, the South Carolina voter ID law

25  where I was an expert for the League of Women Voters.  It is in

1  Arlington Heights.  The intent and purpose of election laws.  The

2  voter ID law in Texas, and the felony disenfranchisement case I

3  just spoke about, was all about voting laws and intent,

4  discrimination.

5  **Q.**  Thank you, Dr. Burton.

6          MR. WHITE:  Your Honor, I tender Dr. Burton as an expert

7  on the history of race discrimination and voting.

8          THE COURT:  Does anyone wish to voir dire for the

9  plaintiffs?  For the State, does anyone want to voir dire?

10          MS. PARADISE:  Your Honor, no.  No objection.

11          THE COURT:  I'll allow him to testify as an expert.

12          MR. WHITE:  Thank you, Your Honor.

13  BY MR. WHITE:

14  **Q.**  Dr. Burton, let me direct your attention to Plaintiffs'

15  Exhibit 7.  Do you have that in front of you?

16  **A.**  I do.

17  **Q.**  Briefly, what is it?

18  **A.**  It is my report that I did for this case on redistricting.

19  **Q.**  And let me direct your attention to Exhibit 7, page 2 to the

20  section titled, "Statement of inquiry."  Is this an accurate

21  summary of what you were asked to do in this report?

22  **A.**  Yes.

23  **Q.**  And what was it that you were asked to do here?

24  **A.**  To look at and analyze the history of discrimination as it

25  related to the State of Georgia in voting, and to put that into a

1   locality of the circumstances or into the historical context.

2   **Q.**   And I'm going to direct your attention to pages 6 and 7.  Is

3   this an accurate summary of the sources you reviewed to form your

4   expert opinions in this report?

5   **A.**   Yes.

6   **Q.**   Now, at a high level, Dr. Burton, what did you conclude about

7   the history of voting-related discrimination in Georgia?

8   **A.**   That since the end of the enslavement of human beings, that

9   Georgia as a state, both parties over time have worked to both

10  disenfranchise, that is, to keep the franchise from particularly

11  African-Americans and other minorities later or to dilute the

12  impact of their vote in ways that they could not easily elect

13  candidates of their choice.  That is continued to the present day

14  in different voting discriminatory techniques that are used.

15  **Q.**   I believe you analyzed this pattern in your report

16  chronologically; is that right?

17  **A.**   Yes.

18  **Q.**   Now, because your report is in the record, let's just identify

19  some of your key findings and conclusions starting with page 9

20  where you analyze the reconstruction period after the Civil War.

21       And just briefly, could you explain for the Court, how did the

22  State of Georgia treat black voters during this period?

23  **A.**   Well, the first constitution of 1865 was very explicit, only

24  white men were enfranchised, and the constitution even went

25  further and put into the constitution that African-Americans could

1   not hold office in the State of Georgia.  With the Military

2   Reconstruction Acts, because of the intimidation and violence, as

3   well as the election of former Confederates, including vice

4   president Adlai Stevenson to the Congress, they refused to seat

5   those, and military reconstructionists gave African-Americans the

6   vote for the first time.  They voted in 1867 for the 1868

7   constitution.  About 25 black people were elected.  Immediately --

8   a huge amount of violence was going on even at this time.

9   Immediately Democrats and Republicans got together and expelled

10  all of the black state legislators except for four who did not

11  look black.  Those were reinstituted in 1870 by Congress, but then

12  immediately Reconstruction ends in 1871.

13      Georgia Legislature quickly changes the local election and

14  puts accounting systems in charge, and, in particular, with that

15  overthrow, they controlled the local elections.

16      Then with the -- immediately the first state at all institutes

17  a poll tax as a way to particularly disfranchise

18  African-Americans.  In 1877 they rewrite a new constitution, and

19  they made that poll tax cumulative, which is very hard.  It means

20  that in order to vote you have to pay an accumulative poll tax

21  from the time -- every -- every year back to vote.  For landless

22  people, Georgia had the least number, that is, the smallest

23  percentage of land -- black landowners of any state.

24  Q.  Thank you, Dr. Burton.  Section C of your report starting on

25  page 15 discusses the populous and early progressive movement.

1    Dr. Burton, again, just briefly can you explain for the Court
2  how the State of Georgia treated black voters during this period?
3  **A.**  Because the Populous Coalition was a coalition that grew out
4  of the Granger movement and particularly black and white farmers
5  came together, there was a black franchise, and in reaction, in
6  fact, immediately the Democratic Party ceded the primary elections
7  to the party itself which was started.  Then in 1898 it went to a
8  state-wide primary.  And then in 1900 it made it a white primary;
9  the second state after South Carolina, in fact, to make it a white
10 primary.  And, of course, why that matters in a one-party state,
11 it's that vote and the only vote that really counts, and blacks
12 are excluded from it.
13    And then in 1908 you have what is called the Felder-Williams
14 Bill, often known as the "Disenfranchising Act," and in that one
15 it makes exceptions so whites will be able to vote, because the
16 1870 15th Amendment says you cannot say that blacks cannot vote,
17 black people, but you can use neutral language, which is what's
18 been done pretty much ever since.  By using neutral language by
19 saying only landowners.
20    As I mentioned, Georgia has a -- if you had fought in the
21 Confederate Army, if you understand the Constitution -- in other
22 words, there is a literacy test that goes with that.  And then you
23 had a new registration.  And extraordinarily important in Georgia,
24 continuing today, is what is called by some people the pure
25 election law, the Georgia Challenge Law of 1910, which changes the

1    way it was done.  The registration books were open to any citizen

2    to challenge for any reason anyone who tried to register to vote.

3    And it was stated at the time that was to keep black people from

4    voting.

5        You have to remember, this tradition of violence,

6    intimidation, terror was rampant, particularly at this time that

7    went in with that law as a result of all of this.  Again, with the

8    poll tax still there, was that -- it really was Jim Crow, and

9    African-Americans were pretty much disfranchised except for a few

10   in sort of the metro -- what we think of the Atlanta area today,

11   in the urban areas where people are a little safer today than they

12   were out in rural, more white areas.

13   **Q.**  Thank you, Dr. Burton.  And let's jump ahead to the Voting

14   Rights Act era.  And your report on page 29 discusses how Georgia

15   apportioned its Congressional and Legislative Districts in the

16   decades leading up to that passage of that statute in the 1950's

17   and '60's.

18       Can you describe to the Court how Georgia treated black voters

19   during its apportionment of its Congressional and Legislative

20   districts?

21   **A.**  Well, because of the particular county unit system, it really

22   was malapportioned with rural and urban, and African-Americans, it

23   was to a great extent where it worked to -- if they could vote at

24   all or have representation, that it was extremely malapportioned

25   in the state because -- because the apportionment favored the

1  white rurals in the state.  One example I give is -- if I
2  remember -- seven counties, most of them have become in the
3  rural -- what becomes part of the metro Atlanta later, but in
4  those seven counties you had 41 percent of the population, and yet
5  in the Georgia House, they represented only 12 percent of the
6  elected legislators from those counties.
7      And in 1960, Fulton County was the most underrepresented
8  county in all of the United States, in the State Legislatures.
9  DeKalb County was the third of all counties in the United States
10  underrepresented in their state.
11     The same thing about the Congressional Legislative.  And the
12  example I gave in my report was the 5th, which is again the 5th
13  District, Fulton, DeKalb -- about three counties.  It was the
14  second most populous Congressional District in the United States.
15  It had close to 800,000 inhabitants, whereas a very rural 9th
16  District in Georgia had about a third of that or about 238 or
17  239,000.  So you can see just how malapportioned it was before the
18  Voting Rights Act and before Baker v. Carr.
19  **Q.**  And, Dr. Burton, the Voting Rights Act was passed in 1965;
20  correct?
21  **A.**  Yes.
22  **Q.**  And just briefly, what was it designed to address?
23  **A.**  It was designed to address the kind of technique that I talked
24  about that were established after Reconstruction and after the
25  populous conservancy of the interracial coalition that was growing

1  in Georgia.  Things like the primary, particularly, literacy laws

2  that disfranchise people, all of these kinds of franchise devices

3  are devices that diluted the vote of minorities.

4  **Q.**  And Section G of your report focuses on the Voting Rights Act,

5  the preclearance requirement; right?

6  **A.**  What page is that?

7  **Q.**  This is starting on page 32 of your report.

8  **A.**  Yes.

9  **Q.**  Was Georgia subject to preclearance?

10 **A.**  Yes.

11 **Q.**  Why was that?

12 **A.**  Well, it -- there is a -- Section 4 of the Voting Rights Act

13 had a formula that was put together, for instance, literacy, and

14 Georgia had a literacy test that automatically made

15 coverage -- every county in Georgia, because one of the states --

16 the entire state was covered because it used diluted and different

17 techniques and devices to disfranchise and to limit the impact and

18 influence of particularly black voting at that time.

19 **Q.**  Now, let's take a look at table 1 on page 34, if you could

20 pull that up.

21     Dr. Burton, can you describe for the Court what this table

22 shows?

23 **A.**  Yes.  Those are the states that are completely covered by

24 Section 5, and this is in 1976.  It is the -- 11 years after the

25 passage of the Voting Rights Act, and it shows the percentage of

1    registered voters, black and white for all of those states, and

2    then it shows the percentage difference between black and white

3    registration.  And you will note that Georgia has the second, only

4    after Alabama, disparity between black and white voting, that

5    white voters are much more -- still registered -- able to register

6    to vote, are registered to vote than are black voters, and that

7    actually Georgia's percentage of black voters is the lowest

8    registration of any of those covered states.

9    **Q.**  And, Dr. Burton, why did this underrepresentation persist

10   after the Voting Rights Act was passed?

11   **A.**  Well, there are a number of reasons, but you still have and

12   have today this challenge law, which if you put it into the

13   context of the violence, the intimidation and the threats of

14   violence that existed and continues to exist, is one of those

15   reasons.  But another is that so many jurisdictions just ignored

16   preclearance.

17       In the Congressional testimony, for example, Union Bond, for

18   the 1982 renewal of the voting -- there were at least 400 that had

19   been documented that just never put in for preclearance in

20   Georgia.  Plus there were also using different techniques about

21   polling places, and a number of things like that, as I said, did

22   not go through preclearance registration, as well as with the

23   Voting Rights Act, they went to at-large elections.

24   **Q.**  And, Dr. Burton, I want to jump ahead to page 36 of your

25   report where you discuss statistics on the preclearance

1    requirement from 1965 to 1981.  Can you pull that up?

2    **A.**   Page 36?

3    **Q.**   Page 36, yeah, the last paragraph of the page.

4    **A.**   Yes.

5    **Q.**   Dr. Burton, can you describe for the Court what you discussed

6    here?

7    **A.**   The number of objections, how many objections came -- rather,

8    the number of preclearance and then the number of objections of

9    all of the objections in this period, let's see, 1965 to 1981, 30

10   percent for all preclearance objections were to the State of

11   Georgia, which is an extraordinarily high number.  Louisiana is

12   second, and it is about half, a little bit more than half.  So it

13   gives you an idea of how many objections there were by the

14   Department of Justice during that time period right before the

15   renewal of the Voting Rights Acts in 1982.

16   **Q.**   And, Dr. Burton, were Georgia's Legislative and Congressional

17   redistricting plans among the voting changes that were subject to

18   preclearance?

19   **A.**   Yes.

20   **Q.**   Were they ever brought before the Preclearance Department?

21   **A.**   Yes, from the first time in 1970 it was objected to for

22   forward recycling terms up through 2000.

23   **Q.**   Your report discusses the use of redistricting cycles in

24   detail from pages 37 to 41; correct?

25   **A.**   That looks correct.

**Q.**  Let's turn to page 44 where you talk about the Supreme Court's decision in <u>Shelby County v. Holder</u>.  Why is that case significant for your analysis?

**A.**  Well, in <u>Shelby v. Holder</u>, Judge Roberts basically said things are not as they used to be.  And it is not that preclearance was ended, but the formula he thought was out of date, despite huge testimony, amount of testimony brought forward to show in the renewal in 2006 just how states such as Georgia has continued to use different devices and ways to diminish the vote.  And the almost unanimous passage in renewal in 2006 and 2013, the Supreme Court in an vote of five/four --

THE COURT:  The last part he went out.

BY MR. WHITE:

**Q.**  Dr. Burton, could you just repeat the last thing you said.  I think the Court Reporter was having trouble hearing.

**A.**  I'm sorry.  I'm rushing speaking.  I apologize for that.  One of the few Southerners that speaks too fast, I think.

I think what I said, if I remember, is that the formula in Section 4 was ruled unconstitutional, which then means that there was no formative term in which jurisdictions would be covered that could be objected to; so therefore, Section 5 is basically the heart of the voting right that's been gutted.

**Q.**  Thank you, Dr. Burton.  I want to turn your attention to page 46 where you talk about a 2018 assessment for the U.S. Commission on Civil Rights.  And we can pull that up here.

1    Dr. Burton, can you describe for the Court what your report
2  says about that assessment?
3  **A.**  Yes.  And I will look at the report, if that's okay.  But it
4  says that Georgia is the only state that used the five most common
5  restrictions that impose difficulty for minority voters, and those
6  were voter ID law, proof of citizenship requirement, voter purges,
7  cutting the opportunity for early voting, and widespread polling
8  place closures.
9  **Q.**  And one example of these Shelby County restrictions in Georgia
10 that your report discusses are polling place closures in 2015;
11 correct?
12 **A.**  That's right.
13 **Q.**  You have an entire section of your report dedicated to those
14 closures on page 46; correct?
15 **A.**  Beginning on page 46, it runs on for quite a bit.  It was
16 huge.
17 **Q.**  Can you just describe very briefly what your section discusses
18 about those polling place closures?
19 **A.**  Yes.  They're mainly in areas where black voters are, and
20 wide -- really wide effect on -- on black opportunity to
21 vote -- vote.  And it's not just the closing of polls, but social
22 science literature has shown that even moving a polling place, not
23 just closing it, but moving the location of it disadvantages.
24 There is a disparity between how it affects minority voters and
25 white voters to the disadvantage of minority voters.  So it has

1  had a huge impact.  And it continues -- and it continues to today

2  the polling -- closing the polling places.

3  **Q.**  Dr. Burton, you also have a section in your report, starting

4  on page 48, focusing on voting purges and challenges; is that

5  right?

6  **A.**  Yes.

7  **Q.**  And when did these voting purges occur?

8  **A.**  Well, I documented between 2012 and 2018.  I noticed that one

9  person said that on one day it was the largest mass

10  disfranchisement in U.S. history.  At that time, the State

11  Secretary Kemp really removed 1.4 million voters from the -- from

12  the rolls.  That is, they were purged.  And when you put that

13  together with voter challenges and intimidation that any citizen

14  can use that voter challenge law, which again was established

15  clearly with the intent right after the populous insurrection to

16  keep African-Americans from voting, is pretty disturbing.

17  **Q.**  Dr. Burton, you also have a section in your report discussing

18  Senate Bill 202, and that's starting on page 50; correct?

19  **A.**  Page 50, yes.  Yes.  Yes.

20  **Q.**  And just briefly, why do you -- why -- can you describe to the

21  Court why you have a section on S.B. 202 in your report?

22  **A.**  Yes.  Because it is the latest example -- it was clearly in

23  reaction to the former president, what has become commonly called

24  the Big Lie, that he fraudulently lost this election.  That he had

25  really won it because of -- of voter fraud, which is an old trope

1   that goes back to Reconstruction, continually pointing out to

2   metro Atlanta counties and areas as to where they argue that voter

3   fraud was.

4       It's become what is often called a -- a dog whistle in terms

5   of -- instead of using racist terms, as it had been common, before

6   the Voting Rights Act.  Voting fraud has been become one of those

7   dog whistles or code words.  And what S.B. 202 has done, it

8   targets particularly areas of black voters, things that black

9   voters do, just as the old Disfranchisement Act after the populous

10  party that would disadvantage minority voters.

11      Particularly another one is drop boxes in the areas.  There's

12  just a huge number of areas where absentee votes and ballots could

13  have been done compared to what it was in the 2020 election.

14  **Q.**  Thank you, Dr. Burton.  Let's turn now to Exhibit 8.  Do you

15  have Exhibit 8 in front of you?

16  **A.**  I will in just a moment.  Okay.

17  **Q.**  And can you identify Exhibit 8 for the Court?

18  **A.**  Yes, that's my supplemental report that I was asked to do in

19  response to the objections that the State put into the preliminary

20  injunction.

21  **Q.**  And what issues were you asked to discuss in this supplemental

22  report?

23  **A.**  The State had argued that it was partisanship, not race, that

24  caused minority voters to not to be able to elect candidates of

25  choice, and I was asked to address the social science and

1 historical literature, and look at specifics in Georgia of the

2 relationship of partisanship and race.

3 **Q.**  At a high level, Dr. Burton, what did you conclude on that?

4 **A.**  You cannot separate partisanship and race.  That still

5 continues.  It really matters.  And also I think it needs to be

6 said, when you look at this, it's not about the race of the

7 candidates; it's about the race of the voter.  And in statistical

8 terms, statisticians have said there is a multipolarity between --

9 when you look at voting in Georgia, or most states, in fact,

10 between race and party.  And you cannot separate them at all.  And

11 there is a historical development that I tried to lay out that

12 scholars have talked about of how this all came about.

13 **Q.**  And, Dr. Burton, on page 3 of your supplemental report there

14 is a section entitled, "Historical Foundation of the Partisan

15 Divide Among Black and White Georgians."  And in this section you

16 talk about the Great White Switch.  What was the Great White

17 Switch?

18 **A.**  Well, it was coined by two scholars, one who was at Emory, two

19 brothers, Earl and Merle Black, and it talks about what really

20 begins with the Civil Rights Act of 1964 and the 1965 Voting

21 Rights Act, which were both bipartisanship in support.  But with

22 that, it begins -- what they called the Great White Switch in

23 which, particularly African American voters, coming from the party

24 of Lincoln, start moving to the Democratic Party and, in

25 particular, why conservative Democrats in the South begin to move

1  toward the Republican Party.  That, again, develops over time,

2  becomes more and more so.  You have a Southern strategy that is

3  best associated with Kevin Phillips' book, as I stated earlier,

4  but it was implemented by Richard Nixon, Strom Thurman's Dixiecrat

5  run and changed to the Republican Party, and his strategies all

6  the way down through Lee Atwater developed this Southern strategy

7  that particularly was clear in trying to identify the Democratic

8  Party as the party, as they said at the time, of the Negro, or

9  African-Americans, we would say today, that that party is clearly

10 to be identified as the party of black people in the South.

11 **Q.**  And, Dr. Burton, on page 4 of your supplemental report, you

12 say that Georgia is a focal point of the Southern strategy.  What

13 do you mean by that?

14 **A.**  Well, in particular, you can see in the 1980 election, when

15 Georgia -- former governor Jimmy Carter runs against President

16 Reagan.  President Reagan begins to use the -- what we call code

17 words or dog whistles now at this time, and he attracted a lot of

18 conservative white Democrats into the Republican Party, that is,

19 to vote for him, and that really is a major shift point.  And so

20 he goes to Neshoba County, where three civil rights workers had

21 been murdered, and he talks about states rights there.  And he

22 uses -- he uses terms like the "Welfare queen" and the "strapping

23 young buck," that sort of goes into these coded words; it begins

24 this big shift.

25     And it really, really becomes, as I said, a focal point in

1    Georgia today with the huge increase in minorities.  And not just

2    African-Americans, although they have certainly increased, too,

3    but other minority voters who are often identified with Democrats.

4    So you have all of these code words that have -- we talk about

5    now.  And you can go back still to Carter, to blessing law and

6    order, all of that are ways that have suddenly shifted what people

7    talk about, the poverty, fraud, lazy, criminal corruption --

8    immigration has become a big one in the last few years.

9  **Q.**  Now, let's turn to the end of your supplemental report on page

10   7 to the section titled, "Divergent Race-Related Views of Members

11   of the Democratic and Republican Parties in Georgia."

12       Dr. Burton, you start this section by discussing the voting

13   record of Georgia Republican and Democratic election officials,

14   elected officials on civil rights issues; is that correct?

15  **A.**  Yes.

16  **Q.**  Why do you discuss these issues?

17  **A.**  Well, it's about policy.  The policies that are supported by

18   Republicans are antithetical to the policies that most minority

19   and black voters want; that is, those around race and civil rights

20   are what's driving the shift as it continues to the actual

21   policymaking.  And so this is a grading by the NAACP, which is an

22   advocacy group for civil rights and for legislation and issues

23   that would benefit minorities, and every year they grade

24   legislatures.  So I thought this was a useful way to look at a

25   quantitative analysis.  And you can see that in this table, if I

remember correct, that the highest voting record, that is, the

highest reporting of those issues that minorities care about,

those that involve race in some way, are those that are proxy

for -- it's 13 percent, whereas among the Democrats it was 100

percent, where one of the very lowest is 81 percent, showing these

sort of antithetical partisan race positions of the voting members

of Congress.

**Q.** And what do these numbers tell us about race and politics in

Georgia today?

**A.** That they are so intertwined that it really matters.  That

they play a part in separating and continue to play a part with

black and white voters and the partisanship groups.

MR. WHITE:  No further questions, Your Honor.

THE COURT:  Your witness.

CROSS-EXAMINATION

BY MS. PARADISE:

**Q.** Good morning, Dr. Burton.

**A.** Good morning.

**Q.** My name is Loree Ann Paradise, and I represent the Secretary

of State.  Before we get started, I want to let you know I grew up

in Northeast Georgia near Royston as well.  I spent a lot of time

over in Hart, Madison, and Franklin County.  So it's unbiased, but

it's a good place to be from.

**A.** It is.  We went there almost every week to see my grandmother.

We'd drive 80 miles every Sunday after church.  We were regularly

1  in Royston.  I own a farm there that I was born on.

2  **Q.**  A beautiful part of the state.

3     So to get us started, I just have a couple of introductory

4  questions and then we'll get into your report, if that's okay with

5  you.

6     First, can you tell me when you were asked to prepare your

7  report for this case?

8  **A.**  I do not remember precisely.  I would have to go back -- I can

9  find that information for you.  It may be in the report, but I

10  think -- I am thinking it was December.

11  **Q.**  Okay.  So that would be after the special legislative session

12  that was held here in Georgia, if you remember?

13  **A.**  I don't remember precisely.  It may have been November.  I

14  was -- I was working on another report on Georgia at the time, so

15  a little confused as to when I shifted from one to the other.

16  **Q.**  Okay.  Who asked you to prepare your report?

17  **A.**  It was Kristina Ford, attorney Kristina Ford.

18  **Q.**  And did Ms. Ford provide you with any assumptions as to what

19  the report should entail?

20  **A.**  No.  She just told me that they wanted, as I remember, Senate

21  factor one, which is the history of voter discrimination or how

22  discrimination in its context might have affect voting results.

23  **Q.**  And what data were you specifically asked to review?

24  **A.**  The history of discrimination in Georgia, and I determined as

25  a historian and reports I've done before, what I would look at.

**Q.**   Okay.  Now, looking at your CV there on page 19, Appendix B of your report, you state that you've written a number of reports as expert witness for minority plaintiffs and voting rights and discrimination cases; is that correct?

**A.**   Yes.

**Q.**   Have you ever testified on behalf of a government defendant?

**A.**   I don't believe I have.  Not to the best of my recollection at this moment.

**Q.**   In cases involving partisan plaintiffs or defendants, have you ever testified on behalf of any Republican?

**A.**   I have not testified, but I was -- I was hired by Republicans in Illinois to do a report.

**Q.**   Now, let's move to your report which is very linear, which I appreciate it.  It made my job a little easier.  And we'll start -- we'll move date by date and section by section.

So, first, you would agree with me that the first 37 pages of your 58-page report deal with the time period beginning at Reconstruction up until the 1980s; correct?

**A.**   Can I have a moment?  You said from pages one through what?

**Q.**   The first 37 pages of your report deal with the time period from Reconstruction up until the 1990s?

**A.**   That looks correct without, you know, reading back through it.

**Q.**   And so that section ends around 40 years ago; yes? Approximately, 40 years ago?

**A.**   Yes.

**Q.**  And then jumping to page 38 of your report, we get to a
section that you titled, "End of the 20th Century."  Do you mind
going there for me?  And then we'll go through the recent
redistricting cycles that you have listed.

So you mentioned both the 1980 and 1990 redistricting cycles.
Do you agree that both of these redistricting maps or the
redistricting maps from both of these cycles were initially
rejected by the Department of Justice under Section Five Three
clearance?

**A.**  Yes.

**Q.**  Are you aware that the Democratic Party was in control of
Georgia government during both of those redistricting cycles?

**A.**  Yes.  I just dropped my report.  So if you go back, I'm going
to have to pick it up.

**Q.**  That's fine.  You can take time if you need it.

That brings us to a final section of your report titled, "The
Modern Era."  Can we go there?

**A.**  Okay.

**Q.**  And you start by highlighting the 2000 redistricting maps
passed by the Georgia General Assembly.  Do you see that?

**A.**  Yes.

**Q.**  And your comment there reads that, "For the fourth decade in a
row, the Georgia General Assembly passed redistricting plans that
would not survive preclearance."  Is that accurate?

**A.**  That's right.  They finally did of course, but...

1   **Q.**   And are you aware that during that redistricting cycle, the

2   Democratic Party held majorities in both the Georgia House and

3   Senate as well as the Georgia Governor's Office?

4   **A.**   Yes.

5   **Q.**   Okay.   We're going to take a little history lesson down

6   Georgia elections here.

7       So then in 2002 former Governor Sunny Purdue, a Republican,

8   beat Democratic incumbent Roy Barnes; do you agree?

9   **A.**   Yes.

10  **Q.**   And then the Democrat plans for both the House and the Senate

11  were thrown out as unconstitutional by a three-judge panel; yes?

12  **A.**   Yes.

13  **Q.**   And then beginning 2004, the 2004 elections, Republicans in

14  Georgia won a majority in the Georgia House; correct?

15  **A.**   That is correct, I believe.

16  **Q.**   And then in 2005 the Republican minority redrew the

17  Congressional map?   Do you recall?

18  **A.**   Yes.

19  **Q.**   And that map as drawn by the Republican majority was

20  precleared by the Department of Justice; yes?

21  **A.**   Yes.

22  **Q.**   And then moving to the 2010 redistricting cycles, the

23  Republicans again had the majority in state government here in

24  Georgia; yes?

25  **A.**   Yes.

1  **Q.**  And you are aware that all three of the statewide maps passed

2  by the Georgia General Assembly and then signed by then Governor

3  Nathan Deal in 2011 were precleared by the Department of Justice

4  at their initial submission?

5  **A.**  Yes.

6  **Q.**  Okay.  Let's jump to page 48, the section you labelled, "Voter

7  Purges and Challenges."  And here you specifically reference two

8  election policies utilized here in Georgia, exact match and what

9  you call voter purchase.

10    As it relates to the exact match policy, we'll start there.

11  Are you aware that a challenge to Georgia's database matching

12  process is currently an open matter before this Court set for

13  trial in April?

14  **A.**  I am -- I don't know if I'm aware or not.  I looked at

15  testimony in, I think, but I'm not sure -- in expert witness

16  reports, but I'm not sure I was aware when it was said or anything

17  like that.

18  **Q.**  Okay.  And then moving on to what you call "voter purges," are

19  you aware that the Secretary of State's office calls this practice

20  "voter list maintenance"?

21  **A.**  Probably, but I don't remember at this time.  But I will grant

22  you that, if that's what it was called, and you tell me.  I

23  believe you.

24  **Q.**  And are you aware that in a separate case, Fair Fight Action

25  and other plaintiff groups have challenged the Secretary of

1   State's voter list maintenance practices here in Georgia?

2   **A.**   I believe -- I believe I looked at that.

3   **Q.**   So are you also aware that those claims were dismissed two

4   years ago in December 2019?

5   **A.**   I don't believe that I was aware.

6   **Q.**   Okay.

7   **A.**   I may have been but, you know, I didn't have focus on it.

8   **Q.**   And then the next section you have is labeled, or subsection,

9   I should say, on page 50 is labeled, "Senate Bill 202."  Are you

10   aware that piece of legislation is involved in ongoing litigation?

11   **A.**   Yes.

12   **Q.**   And are the plaintiffs in this case challenging any of the

13   other provisions of S.B. 202, in this case?

14   **A.**   I'm sorry, repeat your question.  I'm a little lost.

15   **Q.**   I should have phrased it better.  I apologize.

16     Are you aware, are the plaintiffs in this case challenging

17   provisions of S.B. 202?

18   **A.**   The same plaintiffs?

19   **Q.**   Yes, sir, in this case.

20   **A.**   I don't know if they're the same plaintiffs or not.  I guess

21   that's what's throwing me off.  I do know that S.B. 202 is being

22   challenged.

23   **Q.**   Is it being challenged in this case is my question?

24   **A.**   Oh, oh, no.  It's just being used as evidence of -- of

25   examples of the history of how voting discrimination is employed

1  and used and continue to show the patterns of it, and, hopefully,

2  helping people to understand the historical context of the

3  repeated patterns and what the formerly -- kind of things done,

4  such as the Franchising Act of 1998, the similarities and things

5  and what the effects would be.

6  **Q.**  And I want to jump briefly to your supplemental report and

7  then I just have a couple of -- I'll finish up with one or two

8  questions of Appendix A of your initial report.

9      So going to your supplemental report, you are not a political

10  scientist, are you?

11  **A.**  I do political history.  And I would like -- can I explain?

12  **Q.**  Of course.

13  **A.**  No, I'm not a political scientist, but I have sat on many

14  political science Ph.Ds at the University of Illinois committees.

15  I have been asked to teach in the political science department at

16  the University of Illinois and come in and do lectures on the

17  Voting Rights Act and racial discrimination.

18      So I'm very familiar with the literature.  But, no, my Ph.D.

19  isn't.

20  **Q.**  And going to page 4 of your supplemental report, can you

21  define for me what a subtle racial appeal is, the technical

22  definition for that?

23  **A.**  Can you point me to where the -- to where the statement you

24  said --

25  **Q.**  Of course.  It's page 4, your third paragraph -- third

1  paragraph, excuse me, that starts with, "The Southern strategy

2  continued after Nixon."  Do you see that paragraph where you talk

3  about Ronald Reagan, President Reagan and his campaign in the 1980

4  presidential race?

5  **A.**   Yes.

6  **Q.**   Okay.  Can you just provide a definition for me?

7  **A.**   Yes.  And I thought that I had in the report, but maybe I

8  didn't.  It was done so quickly.  But it's using term -- Lee

9  Atwater explained it better than anyone in what is now a famous

10 interview that has been published.  And that is, when you learn

11 that you can't use the old racial appeals that have been used

12 before, so you use words that become associated and carry the same

13 meaning.  And I tried to give those examples in my direct

14 testimony, such as, Reagan used "Welfare queen," and "strapping

15 young buck" and "busing" became one of those, the opposition to

16 busing.  Law and order.  In the latest book I did, there is a good

17 explanation of this, in fact the co-author of the book, Justice

18 Deferred:  Race and the Supreme Court on how busing became -- with

19 law and order, and, particularly, President Nixon decided to use

20 "law and order" as a terminology in a way that pointed to

21 minorities.  And the old tropes that came out of Reconstruction of

22 the dangerous black man, of the dangers of black people, of

23 criminality being associated with black people and old trope in

24 language built upon it.  So it's these coding words.  And I can

25 send you the page numbers to my book where I have a whole section

1  on this.  And it's not unique to me.  It's been done by a number

2  of scholars that I believe are cited in the footnotes here.

3  **Q.**  And I apologize if I just missed it, but what did you say the

4  source of that was?  And would you able to provide the source for

5  that definition?  Not right now.

6  **A.**  Sure.  Absolutely.  And I can also -- these footnotes discuss

7  it really in detail.  One of the most famous is Ian Haney Lopez,

8  Dog Whistle Politics, have coded racial appeals, have reinvented

9  racism, and wrecked the middle class.  It's a 2013 book, and there

10  has been a discussion of it.  But it's common among political

11  scientists, law professors and others is the way -- there is a

12  good bit on the Lee Atwater interview where he actually talks

13  about all of this, more or less is apologizing for it.

14  **Q.**  Skipping to -- thank you for that.

15      Skipping to page 7 where you have the chart that you provided

16  some direct testimony on, the chart titled "Pro-Civil Rights Votes

17  Among Georgia's Congressional Delegation, 2017 to 2019."

18      Do you see that?

19  **A.**  I do.

20  **Q.**  And you divide this chart into two columns, Republican members

21  and Democratic members.  And would you say that effectively this

22  chart, this chart is you taking the data that the NAACP compiled

23  in its scorecard and putting it into a form in your report?  Yes?

24  **A.**  Yes.

25  **Q.**  You have no idea what votes the NAACP looked at to determine

1  these findings; correct?

2  **A.**   No.   I did have some ideas.   I mean, I didn't do them all, but

3  I looked at the reports and they -- they have over the years, they

4  have done this.   And they looked at legislation that they consider

5  civil rights legislation or rights that would benefit the social,

6  economic and political advancement of minority groups.   So it's

7  those sorts of -- of -- they don't necessarily become legislation,

8  but focus on those issues that are policy issues.

9  **Q.**   Right.   But you don't know specifically -- what votes that

10 these members of Congress took on proposed pieces of legislation

11 in their chambers for the NAACP to determine these findings;

12 correct?   You don't know the specific votes that were taken?

13 **A.**   I couldn't list them, but I'm sure we could -- we could find

14 them in the record if we went back, spent the time to do it.   The

15 NAACP has already done that, so...

16 **Q.**   And you have the dates here 2017 to 2019, but during that

17 range, you aren't even aware of what year these specific votes

18 were taken in that date range; correct?

19 **A.**   No, that's a cumulative voting period.

20 **Q.**   Okay.   So you don't really know the process that the NAACP

21 used to compile and create this scorecard; yes?

22 **A.**   No, I would not agree to that.   I have looked at this

23 scorecard for years, over the years, different dates and, you

24 know, over time have seen it.   I did not go in and look at each

25 and every one or anything like that.   I just took it as it was

1  done.  But I would not agree that I don't understand what they

2  were doing or, you know...

3  Q.  Right.  And I apologize if I misphrased my question.

4       You've looked at these, and I know you have extensive

5  knowledge of these score cards, but you don't know what votes or

6  what years these votes were taken that the NAACP used?

7  A.  I know they were taken in 2017 to 2019.  I don't know which

8  vote was taken when.  This is -- this is a -- this is a way social

9  scientists would put together a table or the other things, all the

10  data, every single one listed with every person.  It would be hard

11  to interpret.  You want to put it together in an average form, if

12  I'm understanding your question like this.

13  Q.  Yes, sir.  Yes, sir.  Okay.

14       My final couple questions, we'll scoot back over to your

15  report, specifically Appendix A, and there you have -- you have

16  replicated a chart titled "Representative Discriminatory Voting

17  Tactics in Georgia."  I will give you a few minutes to get there,

18  and I will do the same.

19       And this chart you have three columns, which are labeled

20  "Voting Mechanism Adoption."  Then you have "Name of Georgia

21  Jurisdiction," is the second column, and then the third and final

22  column says, "Details;" is that correct?

23  A.  Yes.

24  Q.  And in the "detail columns" you list discriminatory practices

25  that were enacted in Georgia cities and counties; yes?

1  **A.**   Just Georgia cities and counties, yes, I think that is

2  correct.  You have things like Board of Education, but I assume

3  that would still be city and county.  Sometimes school districts

4  can be a little different.

5  **Q.**   And I will be more specific and use your phrasing.

6      You have the "details column" and then with dates that reflect

7  two discriminatory practices that were enacted in Georgia

8  jurisdictions -- to stay on your wording that you have in your

9  report -- is that correct?

10  **A.**   Correct.  Yes.

11  **Q.**   So in that details column, you provide dates of implementation

12  for each of these practices listed; yes?

13  **A.**   I tried to, to the best of my ability working, you know, with

14  the data.  And much of this is taken from two sources, which were

15  done by Laughlin McDonald.

16  **Q.**   Can you repeat that, Dr. Burton?  I apologize.

17  **A.**   No.  The source is listed at the bottom of the table at page

18  58.  They come from Laughlin McDonald, "Voting Rights in the

19  South," "Ten Years of Challenging Continuing Discrimination

20  Against Minorities," was put out by ACLU Southern regional office

21  in 1982.  And then Laughlin McDonald's book, A Voting Rights

22  Odyssey, which was Cambridge University Press in 2003, which

23  actually was the reason for the press, the publication of that

24  book.  So I studied that.

25  **Q.**   You would agree that the most recent date located in the

1   details column of your chart for Appendix A is 1981; correct?

2   **A.**   I have not looked -- if you say so, you know, I would -- I

3   will accept what you say.  I haven't looked back to make sure the

4   latest one is 1981.  But if you say so, I agree.  Certainly, the

5   majority of the table came from McDonalds' book which was put

6   together for the renewal of Voting Rights Act -- the ACLU book

7   which was put together for the renewal of the voting rights in

8   1982.  So that would make some sense.  I would think that there

9   would be some others from the later publication, but I haven't

10  read this.

11  **Q.**   If you want to take a minute or two to comb through that

12  details column and look at those dates, that's fine.

13  **A.**   No, I will accept what you say if you looked through it.

14  **Q.**   And you would agree that 1981 was 41 years ago?

15  **A.**   Yes.

16          MS. PARADISE:  Your Honor, I just want one second to

17  confer.

18          Those are all the questions I have, Dr. Burton.  Thank

19  you very much for your time.  I appreciate it.

20          THE COURT:  Any redirect?

21          MR. WHITE:  Yes, Your Honor, very briefly.

22  REDIRECT EXAMINATION

23  BY MR. WHITE:

24  **Q.**  Dr. Burton, you were asked about some of the methods and

25  sources that you considered in writing this report, do you recall

1   that?

2   **A.**   Yes.

3   **Q.**   Can I direct your attention to pages 6 and 7 of your expert

4   report.   That's Exhibit 7.

5   **A.**   This is embarrassing, but can you give me a moment.   I dropped

6   the report and it's sort of a --   I apologize.

7   **Q.**   No problems.   Do you have it in front of you?

8   **A.**   Yeah.   I've never testified remotely, so it's a little

9   different not having a binder.   Okay, I'm ready.

10  **Q.**   So do you have the section, Section C on page 6 is titled,

11  "Methodology of Sources."   Do you have that page in front of you?

12  **A.**   I do.

13  **Q.**   And just briefly could you describe for the Court the kind of

14  sources you considered in putting this report together?

15  **A.**   Yes.   As I explained it there, this is just an overview.   But

16  I do what I do if I was writing "Justice Deferred:   Race in the

17  Supreme Court," that page --

18      (Reporter asks for a clarification.)

19  **A.**   I'm sorry, I'll slow down.   This Boston accent throws most

20  folks in the north.

21      What I have done is used the standard methodology that I think

22  any expert, political science historian, political sociologist

23  would use to do the kind of report or investigate the questions

24  that I was asked to investigate.   It is, in fact, what I would do

25  as if I were writing the book I just co-authored, <u>Justice</u>

1   Deferred:  Race in the Supreme Court, or with The Age of Lincoln

2   or the book I did on Penn Center or any other.

3        And so I looked at all of the secondary, that is, the work by

4   scholars that have been done before and used those by other social

5   scientists, the literature that they had worked on, I looked at,

6   as primary sources as well.  Particularly using newspapers, trying

7   to look at multiple sources.

8        As a historian I think we are the best trained to get at the

9   truth through newspapers, to evaluate them.  I looked at the

10   Constitutions of Georgia, the Legislative debates.  I looked at

11   laws that were passed.  I looked at court cases, some of which I

12   was just asked about, including, you know, expert witness reports

13   on different cases and times.  Looking at the actual bills

14   themselves, trying to put these things in chronological order.

15   And through this sort of totality of the circumstances, one way to

16   look at it as a historian, we come at this to put together the

17   narrative and the story to help the Court.

18   Q.  And, Dr. Burton, do you believe that you had a sufficient

19   opportunity to study all of the materials you've listed on pages 6

20   and 7 in preparing your report?

21   A.  Yes.

22   Q.  And Dr. Burton, you were asked about the voter registration

23   purges that occurred around 2015.  Do you recall that?

24   A.  I do.

25   Q.  And you were asked if you recalled whether the Secretary of

1    State's office called those purges "voter list maintenance"?  Do

2    you recall that?

3    **A.**  I do.

4    **Q.**  And isn't it true that the State of Georgia used neutral terms

5    to describe its discriminatory voter purge laws in the 20th

6    century, the registration purge laws?

7    **A.**  Yes.

8    **Q.**  And, Dr. Burton, you also testified that about -- testifying

9    about Georgia's history of voting discrimination, is it your

10   testimony that voting-related discrimination has been limited just

11   to one party?

12   **A.**  No.  It doesn't matter.  One of the -- one of the sad things

13   in our history is like the populous party, the Reconstructionist

14   civil rights movement, and now the -- what's happened with Georgia

15   and other states moving toward a majority/minority, whichever

16   party has been in power has sadly used these neutral-sounding --

17   that is, the word does not say we're disenfranchising black voters

18   or minorities, but it has that effect.  It doesn't matter.  It

19   could be Martians, as far as I am concerned.  I don't want to find

20   that, but we do.  You asked about recent laws.  I mean, just last

21   month, I believe, maybe two months ago in Lincoln County, Georgia,

22   they closed -- I think it's 13 polling places and -- and left one.

23   And that one is removed or further away from where most

24   African-Americans live in that county, making it more difficult.

25   So this is -- even though this table is around 1982, I tried to

1   point out that these processes have continued.  This is where the

2   work had been documented at that time.

3   **Q.**  Is it fair to say that because you just testified that the

4   discrimination you discuss in your report was perpetrated by both

5   Democrats and Republicans, is it fair to say that that is because

6   the discrimination you discuss in your report is on the basis of

7   race, not party?

8   **A.**  Yes.

9   **Q.**  Dr. Burton, you were also asked about Appendix A in your

10  report and various -- various discriminatory practices that

11  occurred around the 1970s and '80s.  Do you recall that?

12  **A.**  Yes.

13  **Q.**  Is it fair to say your report discusses significantly

14  discriminatory practices in the State of Georgia that occurred

15  after 1981?

16  **A.**  Yes, and that was what I was trying to say in the previous

17  answer, that was as far as it is had been documented by someone at

18  the time.  And I built upon that to show the parallels and the

19  continued discrimination with the voter challenge law, with the

20  purges, with the reregistration, and particularly the polling

21  places which continue -- as I said, the last one I saw was this

22  Lincoln County.  I believe it's -- I think it was last month.  But

23  it's very recently where you closed 13 polling places, leaving

24  only one.  And you can see in the report that at the time

25  Secretary Kemp said to people, to the registrars and others, now

1   that you no longer have Shelby County, I would recommend you close

2   polling places.  I mean, that's on the record.  It's stated.  It's

3   huge.  As I said, it was a huge purge in Georgia.  It really

4   affected the 2018 election in terms of the number of voters who

5   were removed from the rolls.  And when you think about the voter

6   challenge law still in effect and still with groups using that as

7   a way to try to challenge and discourage voters in an era that has

8   grown in terms of the context -- from the Georgia's enslavement,

9   the violence and intimidation and threat, it's really sad.

10  **Q.**  Thank you, Dr. Burton.

11          MR. WHITE:  No further questions, Your Honor.

12          THE COURT:  Any Recross?

13          MS. PARADISE:  Just one.

14  RECROSS-EXAMINATION

15  BY MS. PARADISE:

16  **Q.**  Dr. Burton, I just have one final question for you.  You just

17  said that the then Secretary of State Kemp recommended closing

18  polling locations to counties.  What is your authority?  What is

19  your source for that comment?  Can you provide that?

20  **A.**  Yeah, it's in my report.  Can you guide me -- because I

21  dropped the report -- what page this article starts on?

22  **Q.**  I can find that.

23  **A.**  Yeah, I've just got to sort this out.

24  **Q.**  Your subsection -- polling place closures, Subsection A, is on

25  page 46 of your report.

**A.**   Okay.  It goes to Footnote 165.  The leadership offers
educational -- I'm reading Footnote 165, and this is a quote from
Secretary of State Kemp.  "As a result of the Shelby v. Holder
Supreme Court decision," and then this is -- to make sense, my
words in brackets -- "counties are," end of bracket, "no longer
required to submit polling place changes through the Department of
Justice for preclearance," and the footnote is the Leadership
Conference Education Fund, Democracy Diverted.  Polling Place
Closures and the Right to Vote, September 2019, page 32.

**Q.**   Thank you, Dr. Burton, for highlighting that footnote.  And I
see your comment -- your comments in the report here on page 46.
But your comments just now were that then Secretary of State Kemp
recommended two counties to close polling places.  Do you agree
that's different than his quote saying, "as a result of the Shelby
decision, counties are no longer required."  Do you agree, that's
not recommending closing polling locations?

**A.**   The word I used in the quote was to focus to encourage
counties to reduce voting locations, and my memory that is
accurate from what was the source I used.  I don't have that
source with me at the moment, but the other way you can look at
it, it's certainly encouraging if you are told you no longer have
to submit polling places changes.  But I have to go back to find
the words.  But I will change that word to saying that this is the
statement that he made that I quoted, if that makes you feel more
comfortable.

1  **Q.**   That's fine, Dr. Burton.   I just want to go on the record that

2  you agree that where you say then Secretary of State Kemp

3  encouraged counties, that's your word, and his quote was, from

4  your footnote provided here, "As a result of the Shelby v. Holder

5  Supreme Court decision, counties are no longer required to submit

6  polling place changes to the Department of Justice for

7  preclearance."   So "encouraged" is your phrasing, not the then

8  Secretary of State Kemp's; correct?

9  **A.**   That -- that is correct, but I also believe that I use that

10  word having read the context of what was said in that report's

11  footnote.

12  **Q.**   Understood.   But you would agree that "encouraged" as it is

13  written on page 46 of your report, is your phrasing, not then

14  Secretary of State Kemp's?

15  **A.**   That is correct.   That is how I wrote it.

16  **Q.**   Thank you, again.   I appreciate your time.

17         MS. PARADISE:   Nothing further, Your Honor.

18         THE COURT:   Is this all for this witness?

19         MR. WHITE:   Yes.

20         THE COURT:   Thank you, Doctor.   Have a great day.   We

21  will stop right here and take a 15-minute break and start back

22  here at 10:35.

23         (A discussion is held off the record.)

24         THE COURT:   Do you want to call your next witness?

25         MR. HAWLEY:   Good morning, Your Honor.   Jonathan Hawley

1    on behalf of the Pendergrass and Grant plaintiffs.  We would like

2    to call Dr. Max Palmer.

3              THE COURT:  All right.

4              THE DEPUTY CLERK:  Sir, could you remain standing and

5    raise your right hand, please.  Do you swear that the evidence you

6    shall give in the matter now before the Court shall be the truth,

7    the whole truth and nothing but the truth, so help you God?

8              THE WITNESS:  I do.

9              THE DEPUTY CLERK:  If you could have a seat, and please

10   state and spell your name for the record.

11             THE WITNESS:  Maxwell Palmer, M-A-X-W-E-L-L,

12   P-A-L-M-E-R.

13   MAXWELL PALMER, having been duly sworn, takes the stand and

14   testified as follows:

15   DIRECT EXAMINATION

16   BY MR. HAWLEY:

17   **Q.**  Good morning, Dr. Palmer.  You've been retained as an expert

18   in both the Pendergrass Congressional case and the Grant

19   Legislative case; is that correct?

20   **A.**  Yes.

21   **Q.**  And you prepared two expert reports, one in the Pendergrass

22   case and one in the Grant case; is that right?

23   **A.**  Yes.

24   **Q.**  Could we please pull up Plaintiffs' Exhibit 5.  Dr. Palmer,

25   can you identify this?

**A.**   That is my expert report in the Pendergrass case.

**Q.**   Thank you.  And let's now please pull up Plaintiffs' Exhibit 6.  Can you do the same?

**A.**   That is my expert report in the Grant case.

**Q.**   And do you have copies of these reports in the binder there in front of you?  I think it might be in the white binder there.

**A.**   I do.

**Q.**   Tabs 5 and 6.  Okay.  Is your CV included in these reports?

**A.**   It is.

**Q.**   And is that CV a complete and accurate summary of your background and professional experience?

**A.**   Yes.

**Q.**   I am going to ask you a couple of questions about those topics.  Can you first summarize your educational background, please?

**A.**   I received my undergraduate degree in mathematics and government and legal study from Bowdoin College in Maine, and my Ph.D in political science from Harvard University.

**Q.**   And, Dr. Palmer, feel free to leave your mask on, or you can take it off if it makes things easier for you.

     And where are you currently employed?

**A.**   I'm currently an associate professor of political science at Boston University.

**Q.**   Are you tenured?

**A.**   Yes.

1  **Q.**  What classes do you teach at Boston University?

2  **A.**  I teach classes on American politics and political

3  methodology, including introduction to American politics,

4  Congress, American political institutions, data science, and

5  formal theory.

6  **Q.**  What are your principal areas of research?

7  **A.**  American political institutions, Congress and voting rights,

8  and local and urban politics.

9  **Q.**  Have you been accepted as an expert witness in cases involving

10  redistricting previously?

11  **A.**  Yes.

12  **Q.**  Have you ever been rejected as an expert by any court?

13  **A.**  No.

14  **Q.**  I believe -- sorry.  On the first two pages of your report,

15  does that list the cases in which you previously served as an

16  expert?

17  **A.**  Yes.

18  **Q.**  And in approximately how many of those cases did you conduct a

19  racially polarized voting analysis?

20  **A.**  I think all of them, including Bethune-Hill v. Virginia,

21  Thomas v. Bryant in Mississippi, Chestnut v. Merrill in Alabama,

22  Dwight v. Raffensperger in Georgia, Bruni v. Hughes and Texas

23  Alliance for Retired Americans v Hughes, both in Texas, and Caster

24  v. Merrill in Alabama.

25  **Q.**  And in those cases did the courts previously credit and rely

1  on your analysis?

2  **A.**  Yes.

3  **Q.**  Have you ever served as an expert for a jurisdiction?

4  **A.**  Yes.  I worked as the independent racially polarized voting

5  analyst for the Virginia Independent Redistricting Commission.

6  **Q.**  And was that commission bipartisan?

7  **A.**  Yes.

8          MR. HAWLEY:  Your Honor, pursuant to Federal Rule of

9  Evidence 702, the Pendergrass and Grant plaintiffs would like to

10  proffer Dr. Palmer as an expert in redistricting and data

11  analysis.

12         THE COURT:  Do any of the Alpha Phi attorneys wish to

13  voir dire?

14         MS. LAKIN:  No, Your Honor.

15         THE COURT:  Does the State wish to voir dire?

16         MR. JACOUTOT:  No, Your Honor, we might have some

17  questions about his methodology on cross.

18         THE COURT:  He'll be allowed to testify as an expert in

19  that area.

20  BY MR. HAWLEY:

21  **Q.**  Dr. Palmer, let's talk specifically about the work you

22  performed in these cases.  What were you asked to do in

23  Pendergrass and Grant?

24  **A.**  I was asked to offer an expert opinion on the extent to which

25  voting is racially polarized in different parts of Georgia, and I

1  was also asked to evaluate the performance of the new black

2  majority district in the plaintiffs' illustrative maps.

3  **Q.**  At a high level, what did you conclude about

4  racially-polarized voting in the areas of Georgia you examined?

5  **A.**  I find strong evidence of racially-polarized voting in all of

6  the different counties areas that I examined in both cases, and I

7  find that all the new black majority districts in all the new

8  illustrative maps would perform for black-preferred candidates.

9  **Q.**  And did you reach any conclusion about the success of

10 black-preferred candidates in the areas that you examined?

11 **A.**  I do.  I find that black-preferred candidates are generally

12 unable to win elections in these areas, except in the black

13 majority districts.

14 **Q.**  And you mentioned that you concluded that in the

15 illustrative -- the additional districts in the illustrative

16 plans, that black-preferred candidates would be able to win

17 election in those new districts; is that correct?

18 **A.**  Yes.

19 **Q.**  And is that true in both the Congressional map and the

20 Legislative map that has been introduced in these cases?

21 **A.**  Yes.

22 **Q.**  Before getting into the specifics of the cases, let's discuss

23 racially-polarized voting analysis more generally.

24     What is racially-polarized voting as you understand it?

25 **A.**  I think of racially-polarized voting as when majorities of

1 voters of different racial or ethnic groups vote cohesively, that

2 is, majorities of each group vote for the same candidates.  And

3 then polarization is when they're supporting -- voters of

4 different groups are supporting different candidates.

5 **Q.**  Now, is it always the case that each racial group you examine

6 has a preferred candidate?

7 **A.**  No.

8 **Q.**  Is that the purpose of this analysis in part to find that out?

9 **A.**  Yes.  First to find out if there are preferred candidates for

10 each group, and then if those candidates are the same or different

11 across groups.

12 **Q.**  In the past cases that you testified in, have you ever

13 conducted a racially-polarized voting analysis and found that

14 there was no racially-polarized voting?

15 **A.**  Yes.  For example, in Bethune-Hill v. Virginia, I was looking

16 at several different districts for the House of Delegates, and in

17 some of those districts there was evidence of racially-polarized

18 voting and in others there was not.

19 **Q.**  And how do you go about examining racially-polarized voting?

20 **A.**  I use a statistical technique called Ecological Inference,

21 often referenced to as EI, which seeks to estimate group level

22 behaviors, that is, what percentage of black voters are supporting

23 each candidate, what percentage of white voters are supporting

24 each candidate based on aggregate data, the precinct level

25 elections returns and data on voter turnout by race that we have

1  available.

2  **Q.**   And can you explain the ecological inference or EI at a high

3  level?

4  **A.**   So EI is a statistical technique, and it's used -- I analyze

5  many, many different elections for many different geographies in

6  my reports, and for every different election and geography, I run

7  this model called EI.   And it takes aggregate data.   And the

8  challenge we have in our elections is that we have the secret

9  ballot.   We don't get to see how any one person votes, but we have

10  aggregate-level data.   We get to see at the precinct level the

11  votes cast for each candidate, and we also get to see the voters

12  who turned out.   And in Georgia because of the way that voters

13  report their race on the voter registration form and the State

14  makes that data available, we can see voter turnout by race as

15  well as those precinct levels.

16      So what EI does, it takes all those levels, precinct level

17  election results, precinct level voter turnout by race, and use

18  that to estimate what percentages of voters of a racial group are

19  supporting each candidate.

20  **Q.**   Do scholars and experts regularly use EI to examine

21  racially-polarized voting?

22  **A.**   They do.

23  **Q.**   In your opinion, what is the best available method for

24  assessing racially-polarized voting?

25  **A.**   Ecological inference.

1  **Q.**  Is it your understanding that Courts regularly rely on EI

2  analysis to determine whether there is racially-polarized voting

3  in a particular area?

4  **A.**  Yes.

5  **Q.**  Now, what kind of results does an EI analysis produce?

6  **A.**  So the results of the EI analysis, and this is done for each

7  separate election and geography, is for each group -- I get a mean

8  estimate or an estimate of the level of support for that group for

9  each candidate, and then I also get a confidence interval, a

10  measure of uncertainty in the estimate.

11  **Q.**  And which racial groups did you examine in the cases here?

12  **A.**  I looked at African-American voters, white voters, and then

13  all other groups combined into the other category, which includes

14  Native Americans, Asian Americans, Hispanic voters, and any other

15  ethnic group.

16  **Q.**  And which elections do you examine in the course of your

17  analysis?

18  **A.**  I looked at 31 general elections from 2012 through the 2021

19  runoff elections.

20  **Q.**  What kinds of data did you use?

21  **A.**  I used two kinds of data.  First, I have these precinct level

22  election returns.  Every precinct and every separate contest, the

23  number of votes cast for each candidate.  And then second, for

24  every precinct in every election year, the number of voters by

25  race who turned out to vote, and I merge those two data sources

1  together so that my data is ultimately for every election precinct

2  and contest.  The votes cast for each candidate, and the number of

3  voters by race who participated in that election.

4  **Q.**  Thank you, Dr. Palmer.

5     Now, let's talk about your analysis of the Congressional map

6  in the Pendergrass case.  Which geographic regions of Georgia did

7  you examine in Pendergrass?

8  **A.**  I looked at a focus area defined as the 3rd, 11th, 13th, and

9  14th Congressional Districts under the newly-enacted maps.

10 **Q.**  And what was the reason behind this focus area?

11 **A.**  My understanding was that this was the area from which the new

12 black majority district would be drawn.

13 **Q.**  That would be the new black -- majority black district that is

14 drawn by Mr. Cooper in his illustrative plan for the Pendergrass

15 case; correct?

16 **A.**  That's right.

17 **Q.**  Overall, what did you find in your analysis of those 31

18 elections in this Congressional focus area?

19 **A.**  I find strong evidence of racial polarized voting in this

20 focused area as a whole.  I estimate more than 98 percent of black

21 voters support the same candidate in each contest, and only 11 or

22 11 and a half percent of white voters support those candidates.

23 **Q.**  Let's please pull up figure 2 on plaintiffs 6.  Dr. Palmer, is

24 this a figure from the Pendergrass report?

25 **A.**  Yes.

**Q.** What does it show?

**A.** So this figure illustrates the ecological inference results in a relatively compact way. I present the estimates for each group separately, and I don't include the election labels here just to get into a smaller figure, but there are 31 points for each racial group.

The dark blue dots represent the ecological inference estimates for black voters. And they show that in every election, 95 percent or more of black voters are supporting the same candidates. They're all up at the top of the "Y" axis, which is the percentage of voters voting for the black preferred candidate. So that is evidence that black voters are highly cohesive in these elections and have a clearly defined preferred candidate.

And then the white circles show the level of support from the white voters for these same candidates, and they're all down at the bottom of the "Y" axis around the 10, 15 percentage range. And so we see high cohesion among white voters against or in favor of the opponent of the black preferred candidate. And the difference between them in the fact that these are on the opposite ends of these axis shows this is a very, very high level of polarization in every election that I looked at.

**Q.** Let's please pull figure three on page 7 on Plaintiff's Exhibit 5.

Dr. Palmer, is this also a figure from your Pendergrass report?

**A.**   Yes.

**Q.**   Can you tell us what it shows?

**A.**   So this figure shows the exact same results as in figure two, just in a larger format.  And here I'm breaking out each electoral contest separately with a label which election corresponds to what result.  But the evidence here is the exact same.  We see high levels of cohesion among black voters in all 31 contests.  There is a clear black preferred candidate in every election, and we see very low levels of support from white voters for those same candidates.

**Q.**   So ultimately what do figures two and three tell us about racially polarized voting in this area of Georgia in these elections?

**A.**   That there is a high level of polarized voting in all these elections.

**Q.**   Does your report contain the precise numbers for the elections depicted in these two pictures we just looked at?

**A.**   Yes.  Table one on page 13 has the numbers used to make these figures.

**Q.**   I believe we just pulled that up on the screen.  Can you explain the chart in a little more detail?

**A.**   So each row of this table is a separate election and represents a separate run of the ecological inference model.  And then there's three sets of numbers, one for black voters, and then for white voters, and then for the other group.  And with each set

1  of numbers is first the estimate.  That's the number followed by

2  the percentage sign.  So, for example, on the top row for the 2012

3  presidential election, I'm estimating that 97.9 percent of black

4  voters supported their candidate of choice.  And then in

5  parentheses after that estimate is the 95 percent confidence

6  interval, and these are measures of uncertainty in the estimates

7  that come out of the EI model.

8  **Q.**  You mentioned earlier that your focus area consisted of four

9  Congressional Districts in the enacted map.  Did you also conduct

10  racially polarized voting analysis for each of those districts

11  individually?

12  **A.**  I did.

13  **Q.**  And what were your results?

14  **A.**  I find the same pattern across all four Congressional

15  Districts.  I think I have this in figure four.

16  **Q.**  Yes, please.  Let's pull up figure four, which is on page 8 of

17  Plaintiffs' Exhibit 5.

18      And, Dr. Palmer, can you describe this -- this figure?

19  **A.**  So this figure is designed in the same way as figure two.  We

20  have the blue circles represent the level of support for black

21  preferred candidates from black voters, and the white circles, the

22  level of support for black preferred candidates from white voters.

23  Behind some of the dots you'll see a vertical black line, and

24  those represent the bounds of the confidence interval of that

25  range of uncertainty.  Those are actually in figures -- figure two

1  as well, but they're so small when we have the whole focus area,

2  that they're usually covered up with the dots.  Here with each

3  Congressional District, we have a little bit less data for each

4  district; then we combine them altogether, so we have a level of

5  uncertainty in those estimates.

6  **Q.**  Does your report contain the precise figure that correspond

7  with the dots depicted in figure four?

8  **A.**  Yes.  Tables 2, 3, 4, and 5 are the same format as table 1,

9  and present the results for each district separately.

10  **Q.**  After looking at racially polarized voting in each of these

11  four Congressional Districts, what was the conclusion that you

12  drew?

13  **A.**  There is a high level of racially polarized voting in all four

14  districts.

15  **Q.**  And after you made the conclusion about the focus areas and

16  the individual districts, what did you do next in your analysis?

17  **A.**  I then looked at the ability of black preferred candidates to

18  win elections in the focus area as a whole and in each of the four

19  districts.

20  **Q.**  And -- thank you.  And what was your conclusion there?

21  **A.**  I find that the black preferred candidate lost all 31

22  elections in the focus areas as a whole, and in the 3rd, 11th and

23  14th Congressional Districts, the black preferred candidate was

24  only able to win in the 13th Congressional District, which is the

25  only black majority district in the focus area.

1  Q.  Could we please pull up table 6 on page 18 of Plaintiff's

2  Exhibit 5.

3      Dr. Palmer, could you please describe this table?

4  A.  This lists the election results for the 31 elections I

5  examined in the focus area as a whole and in each of these four

6  Congressional Districts.  In the focus area, we see all of the

7  numbers are in the 40 percent range, showing that the black

8  preferred candidate lost all of these elections.  Only in the

9  column for the 13th Congressional District are these numbers above

10  50 percent.

11  Q.  And again across the focus area, the black preferred

12  candidates were defeated in all 31 elections that you looked at;

13  correct?

14  A.  Yes.

15  Q.  And in each individual district, the black preferred candidate

16  was only able to win in the 13th Congressional District, which is

17  the only majority black district in your focus area; correct?

18  A.  Yes.

19  Q.  Okay.  We can take down Plaintiffs' Exhibit 5.

20      So now let's turn to the third part that you mention in your

21  analysis, your analysis of the functionality of the new majority

22  black district in the Pendergrass plaintiffs' illustrative map.

23  What is functionality analysis?

24  A.  The functionality analysis is looking at whether the black

25  preferred candidates, who I identified for these elections using

1  the racially polarized voting analysis, if they are able to win in

2  the boundaries of the new district as drawn or the new

3  illustrative district as drawn by Mr. Cooper.

4  **Q.**  And that is illustrative Congressional District 6 in

5  Mr. Cooper's map; correct?

6  **A.**  Yes.

7  **Q.**  How did you perform this analysis?

8  **A.**  So for each of these elections I analyzed, the other source of

9  data I have are precinct shapefiles, which are the geographic

10  boundaries of the precincts.  And this is a little bit different

11  from the way that the mapping experts were talking about VTDs,

12  because precincts can change over time, and I have separate

13  precinct shapefiles for each separate election year.  But I can

14  take those boundaries and overlap them with the boundaries of the

15  new 6th Congressional District from the illustrative map to say

16  which precincts would have been in this district under these

17  boundaries.  And then I add up the election results across all

18  those precincts.  So it's really figuring out which precincts fall

19  into this district each year and then adding up those votes to

20  figure out the vote shares of each tab.

21  **Q.**  And what did you conclude about whether a black preferred

22  candidate would be able to win in the illustrative Congressional

23  District 6?

24  **A.**  I found that the black preferred candidate would be able to

25  win in all 31 elections that I analyzed with an average of over 66

1  percent of the vote.

2  **Q.**  Could we please pull up figure 5 on page 11 of Plaintiff's

3  Exhibit 5.

4      Dr. Palmer, what does this figure show?

5  **A.**  This figure shows the results of the functionality analysis.

6  Each row is a separate election, and the blue dot represents the

7  vote share for the black preferred candidate.  And that's the vote

8  share from all voters, not of any one particular racial group.

9  And we see that in every election, those blue dots are well to the

10  right of that solid black line marking the 50 percent mark, that

11  is, the point at which it takes to win the election.

12  **Q.**  We can go ahead and take down Plaintiff's Exhibit 5.

13      Let's shift gears now and talk about the Grant case, which is

14  the challenge to the new Legislative maps.  Can you describe the

15  analysis you undertook in that case compared to what you just

16  talked about in Pendergrass?

17  **A.**  The analysis is extremely similar.  I'm using the exact same

18  data sources, the exact same methodology, the same ecological

19  inference algorithm.  The only difference in these cases is I'm

20  looking at multiple focus areas and many more districts.

21  **Q.**  And in so those focus areas and districts you looked at

22  racially polarized voting, the ability of the black preferred

23  candidates to win, and the functionality of the illustrative new

24  majority black districts; correct?

25  **A.**  Yes.

**Q.**  Let's talk about those analysis of those legislative focus areas.  Can we pull up figure one on page 4 of Plaintiff's Exhibit 6.

Dr. Palmer, what does this figure show?

**A.**  This figure shows the focus areas that I examined for the House map and for the Senate map, and there are three different focus areas for the House and two for the Senate, though the Senate ones partially overlap.  Each one is defined as a set of districts under the newly-enacted map.  And so for the House, I have -- the area I refer to as western Atlanta, southern Atlanta and then the black belt.  And then for the Senate area, I refer to it as a the black belt, and the second area that I refer to as Southern Atlanta.

**Q.**  And what was the reason behind the districts that constitutes these legislative focus areas?

**A.**  These were the areas from which I understood the new black majority districts would be drawn.

**Q.**  And when you looked at racially polarized voting for these new focus areas, did you look at the same 31 statewide elections that you examined in the Congressional case?

**A.**  Yes.

**Q.**  Overall, what did you find in your analysis of those 31 elections in these five legislative focus areas?

**A.**  I find strong evidence of racially polarized voting across all five focus areas.

1  **Q.**  Let's please pull up figure two on page 6 of Plaintiffs'

2  Exhibit 6.

3      Dr. Palmer, is that a figure from your Grant report?

4  **A.**  Yes.

5  **Q.**  And what does it show?

6  **A.**  This figure is the same format or a similar format to the ones

7  we've looked at before except broken out by focus area instead of

8  by district.  So the blue dots are, again, the level of support

9  for the black preferred candidate by black voters, the white

10 circles for the support by white voters, and we see across all

11 five focus areas and all 31 elections really high levels of

12 racially polarized voting.

13 **Q.**  And I believe the precise numbers for the elections reflected

14 in these figures are reflected in tables 2 through 6 of the Grant

15 report; is that correct?

16 **A.**  Yes.

17 **Q.**  Did you run racially polarized voting analysis on a

18 district-by-district level within these focus areas?

19 **A.**  I did for most of the districts.  I did this for all of the

20 State Senate Districts.  There are a few State House Districts

21 that didn't have enough precincts to run the ecological inference

22 models.  We didn't have enough data at the district level to run

23 an accurate model.

24 **Q.**  And what were the results of that district-by-district

25 analysis?

1  **A.**   They're all in figure three of my Grant report.

2  **Q.**   Please pull up figure three on page 7 of Plaintiffs' Exhibit

3  6.

4      And what does this figure show, Dr. Palmer?

5  **A.**   In the 6th House on districts where I was able to run

6  ecological inference, I find strong evidence of racially polarized

7  voting in all of the districts.  And then in the State Senate

8  Districts, I find very strong evidence of racially polarized

9  voting in almost all of the districts, except in Senate District

10 39, I find that voting is generally not polarized.  And in

11 District 44 I find mixed results.  In 18 of the 31 elections, I

12 find that white voters don't have a clear candidate of choice.

13 They're, roughly, split between the two candidates.  And then in

14 the 13th, I do find evidence of polarization, but a little bit

15 weaker.

16 **Q.**   Do those two individual results change your overall

17 conclusions about racially polarized voting in these legislative

18 focus areas?

19 **A.**   No.

20 **Q.**   And what is that overall conclusion?

21 **A.**   That there are strong levels or high levels of racially

22 polarized voting in the focus areas.

23 **Q.**   Thank you.

24     Now, again, after you determined that there was racially

25 polarized voting in these areas, what did you do next?

**A.**   I then looked to see if the black preferred candidates were able to win elections in these districts.

**Q.**   And how did you conduct this part of your analysis?

**A.**   In the same way as I did before.  I matched up the new district lines to the old precinct shapefiles to figure out what precincts fall into which districts, and aggregated up the election results.

**Q.**   It looks like we are now pulling up figure 4 on page 8 of Plaintiffs' Exhibit 6.  Dr. Palmer, could you describe this figure?

**A.**   This figure shows us the percentage of the vote for the black preferred candidate.  And it's not from any one particular racial group but just from all of the voters in these elections on average.  So I'm not plotting results for 31 separate elections in each district.  It would just be a little bit too hard to read, but showing the average levels here.

The dark blue circles indicate that this district is a black majority district, and the white circles indicate that it's not a black majority district.  And what we see is that black preferred candidates are able to win.  They're above the 50-percent line in the black majority districts, but not in the non-black majority districts.

**Q.**   Let's turn to your analysis of the functionality.  What did your functionality analysis examine in the Grant legislative case?

**A.**   In the same way as with the Congressional map, I looked at

1  the -- if black preferred candidates would be able to win under

2  the new black majority districts in the illustrative maps for this

3  case.

4  **Q.**   And how did you perform that analysis?

5  **A.**   In the exact same way as I did in the previous report.  I

6  overlaid the boundaries of the new districts on top of shapefiles

7  of the old precincts to figure out which precincts would fall into

8  which districts.

9  **Q.**   Can we pull up figure 5 on page 9 of Plaintiffs' Exhibit 6.

10      Dr. Palmer, what does this figure show?

11  **A.**   This figure shows the election results across all 31 elections

12  in each of the new black majority districts under the illustrative

13  maps.  And so each dot corresponds to one separate -- one of the

14  31 election results.  In House Districts 64, 74, and 149, and

15  Senate Districts 23, 25, and 28, I find that black preferred

16  candidates won a larger share of the vote in every election that I

17  looked at.  In House District 117, I find the black preferred

18  candidate has won the majority of the vote in all 19 elections

19  since 2018.  And in House District 145, I find that the black

20  preferred candidate has won all 19 elections since 2018, and 27 of

21  the 31 that I looked at overall.

22  **Q.**   And just to confirm, these are the three new majority black

23  Senate Districts and five new majority House Districts that

24  Mr. Esselstyn drew in his illustrative plans; correct?

25  **A.**   That's right.

**Q.**  Did the changes that Mr. Esselstyn made to the enacted

districts, change the ability of the black preferred candidates to

win in the majority black districts already in the enacted map?

**A.**  No.

**Q.**  Dr. Palmer, did you review the reports submitted by Dr. John

Alford in this case?

**A.**  I did.

**Q.**  Did anything in his report change your conclusions about

racially polarized voting in the areas of Georgia you looked at?

**A.**  No.

**Q.**  Why not?

**A.**  Dr. Alford is focused on the role of party in predicting how

people might vote, but that's not the purpose of this analysis.

The purpose of the racially polarized voting analysis is to figure

out how people vote.  We don't know how they vote until we do this

analysis, until we try to find the levels of support among each

group for each candidate.  It doesn't try to understand why people

vote the way they do and understands it isn't necessary to

identify if racially polarized voting exists.

**Q.**  Dr. Palmer, did anything in Dr. Alford's report change your

conclusions about either racially polarized voting or any of the

other issues that you examined in your reports?

**A.**  No.

**Q.**  Thank you, Dr. Palmer?

        MR. HAWLEY:  No further questions at this time.

```
 1              THE COURT:  For the Alpha Phi plaintiffs, do you all
 2   wish to examine?
 3              MS. KHANNA:  No, Your Honor.
 4              THE COURT:  For the Pendergrass, Grant plaintiffs, do
 5   y'all all wish to examine?
 6              MR. JACOUTOT:  Brian Jacoutot, Secretary of State.  Good
 7   morning, Your Honor.
 8   CROSS-EXAMINATION
 9   BY MR. JACOUTOT:
10   Q.  Good morning, Dr. Palmer.  How are you?
11   A.  Good.  Thank you.
12   Q.  So I'll start with sort of some background information before
13   you get into your reports and the methodology that you spoke about
14   earlier.
15      When you're providing expert testimony to litigants just
16   historically for you, has it typically been on behalf of
17   plaintiffs?
18   A.  Yes.
19   Q.  Okay.  You never testified on behalf of a jurisdiction that
20   was defending a Section 2 case?
21   A.  No.
22   Q.  And just in your involvement in this particular case, who
23   first contacted you to be involved in the case?
24   A.  Umm, I believe it was Abha Khanna.
25   Q.  And about when was that?
```

1   **A.**   I'm not sure.  Sometime this fall.

2   **Q.**   Sometime this fall?  Would it have been November, October?

3   **A.**   I don't remember when I was first contacted about it.

4   **Q.**   Okay.  So sometime in fall, early fall, late fall?

5   **A.**   Umm, probably October-ish, roughly.

6   **Q.**   And were you told what you were being hired for?

7   **A.**   I don't remember when we first discussed the exact scope.

8   **Q.**   Okay.  Whenever you were first, you know, given the scope,

9   what were the plaintiffs' -- what did the plaintiffs tell you that

10  they wanted to prove?

11  **A.**   I was -- I don't think they told me what they wanted to prove.

12  I was asked to analyze racially polarized voting and the

13  performance of illustrative maps once they were drawn.

14  **Q.**   Okay.  And were you told of their position on the issues in

15  this case?

16  **A.**   Umm, I was told they were challenging these maps.

17  **Q.**   Okay.  Anything else?

18  **A.**   I don't believe so.

19  **Q.**   So let's spend a little time on the data you used.  You listed

20  the facts you relied on in your reports; is that correct?

21  **A.**   Yes.

22  **Q.**   Did plaintiffs' counsel provide you with any facts or data

23  that is not listed in your reports and that you considered in

24  forming your opinions in this case?

25  **A.**   I don't believe so.  I think there was data that was provided

1 in a previous case in Dwight v. Raffensperger in 2018 or 2019.

2 That was provided to me from -- I believe originally from the

3 Secretary of State's office that I used, and I mentioned that in

4 my report.

5 **Q.** Okay.  Did plaintiffs' counsel tell you to assume anything

6 that you relied on when forming your opinions in this case?

7 **A.** I don't believe so.

8 **Q.** Are there any other facts or data that you wish you would have

9 had in creating your report, but that you didn't have access to?

10 **A.** No.

11 **Q.** All right.  In your reports, you discuss with counsel for

12 plaintiffs, that you analyzed the issue of racial polarization in

13 selected elections; correct?

14 **A.** Yes.

15 **Q.** And with respect to that issue, is it correct to say that you

16 only considered a limited set of geographic locations in Georgia?

17 **A.** Yes, only the focus areas that I discuss in the report.

18 **Q.** Now, throughout your report, you only consider general

19 election contests; correct?

20 **A.** And runoff elections.

21 **Q.** And runoffs.  So no primaries, though; right?

22 **A.** That's right.

23 **Q.** Is that because you don't find them useful in analyzing in

24 terms of demonstrating racial polarization?

25 **A.** I find primaries to be the most useful election trend.

1  **Q.** You do find them useful?

2  **A.** I find general elections to be most useful.

3  **Q.** Okay.  And primaries?

4  **A.** Less so.

5  **Q.** Okay.  But it is somewhat useful for you?

6  **A.** No.  I prefer using general elections, because that's the

7  final choice that voters make, and the place where we have by far

8  the largest number of voters participating in the election.

9  **Q.** Okay.  Just to be clear for the record because I sort of heard

10  somewhat useful, or you said the general elections were more

11  useful.  So we can say clearly that the primaries, in your

12  opinion, are not useful for determining racial polarization?

13  **A.** They're certainly not necessary for what I need to do here.

14  **Q.** Have you read the other reports filed by plaintiffs' experts

15  in this action?

16  **A.** No.

17  **Q.** Have you read Dr. Handley's report?

18  **A.** No.

19  **Q.** So you're not aware that Dr. Handley is -- are you aware that

20  Dr. Handley is also being proffered as an expert by the plaintiffs

21  in this action on the issue of racial polarization?

22  **A.** Yes.

23  **Q.** And since you didn't read her report, I assume you're not

24  aware that she considered them, correct, the primaries, and she

25  said in her report, specifically in her rebuttal expert report,

1  that these primaries help show racial polarization in Georgia

2  elections?

3  **A.**  I'm only aware of it from the degree that Dr. Alford mentioned

4  it in his report.

5  **Q.**  So is it fair to say that Dr. Handley is mistaken about the

6  value of determining the primaries in her analysis in terms of

7  determining if there is racial polarization?

8  **A.**  I don't know.

9  **Q.**  Let's turn briefly to your reports and they are in -- we'll

10  look at -- since you -- as we have all seen, they're very similar

11  in terms of what they tease out.  So let's do Grant/Pendergrass

12  Plaintiffs' Exhibit 5.  And let's go -- I have it as page 16 on

13  mine, but mine is a docket entry.  I believe it is Plaintiffs'

14  Exhibit 17, which is table 5.  Make sure that that is table 5 that

15  you see in there.

16  **A.**  Yes.

17  **Q.**  Okay.  And you guys, you talked with counsel for plaintiffs on

18  the ecological inference results, correct, or excuse me, sort of

19  how ecological inference analysis work; is that correct?

20  **A.**  Yes.

21  **Q.**  And the table here is like others in your report, and it

22  contains a number of election contests with projected vote by race

23  using EI; correct?

24  **A.**  Yes.

25  **Q.**  You previously testified that EI was the best form of

1 analysis; correct?

2 **A.**   Yes.

3 **Q.**   And can you clarify the numbers and the brackets?  Those are

4 the confidence intervals; right?

5 **A.**   Yes.

6 **Q.**   And you would agree with me that inclusion of the confidence

7 interval makes your EI analysis more precise; correct?

8 **A.**   It doesn't make the analysis more precise; it's a measure of

9 uncertainty in the analysis.

10 **Q.**   So it gives you a better idea of the data, though, when you're

11 looking at it, how the data -- sort of the upper and lower bounds

12 of what the data is going to be; is that correct?

13 **A.**   Not of what the data show; it gives you balance on your

14 estimate.

15 **Q.**   Does it give you -- if you're looking to utilize the

16 information in this table, would you say that using confidence

17 intervals gives the user of the data a better idea of what the

18 limits of those - the data likely is?

19 **A.**   Umm, I'm not sure I'd say what the limits are.  It's about how

20 we interpret the results.

21 **Q.**   Okay.  Well, do you typically use confidence intervals in your

22 ecological inference?

23 **A.**   I do.

24 **Q.**   And why do you do that?

25 **A.**   It's important to me to show a level of uncertainty in the

1  estimates.  In this case, because we have really good data -- one

2  really nice thing about Georgia is it's excellent election data.

3  Most states don't have voter turnout by race available at all, let

4  alone at the precinct level.  And so since we have such good data,

5  we get really high levels of precision in the estimates.  But it's

6  useful to have the confidence interval, because a wide confidence

7  interval shows that we have less certainty or less precision in

8  the results.

9  Q.  So confidence intervals can help with precision, because as

10  you just stated, a wide interval will show you have less precise

11  results; correct?

12  A.  Precision of the results, not precision of the data.

13  Q.  Okay.  So precision of the results.  And as you've just

14  related, the confidence interval certainly can vary, correct,

15  sometimes widely?

16  A.  Yes.

17  Q.  Can you look at the 2012 presidential election on table 5.

18  Let me pull it up here.

19     So the confidence interval there for the presidential election

20  for black voters is 9 points?

21  A.  I'm sorry.  Just to be clear, we're looking at table 5, which

22  is the results for just the 14th District?

23  Q.  Just the 14th, yeah.

24  A.  Yes.

25  Q.  And if you look over at the other category, there's about a 25

1  point span for that analysis; correct?

2  **A.**   Yes.   The other group is much, much smaller.   It's a much

3  smaller percentage of the electorate.   And for really small

4  groups, depending on the distribution of that group in the area,

5  we tend to get higher levels of uncertainty in some cases.

6  **Q.**   Okay.   But you would agree with me that these numbers are

7  important in establishing the preciseness -- how did you put it,

8  the results, not the data?

9  **A.**   They're important for understanding the precision of the

10  results, though I think I tend to pay less attention to the other

11  category in these cases because we're really focused on

12  polarization between black and white voters.

13  **Q.**   Certainly.   Certainly.   And so you report -- and the other

14  ones you provided are very similar to this one.   As we saw earlier

15  in direct, they have the black voters voting cohesively and the

16  white voters voting cohesively as well?

17  **A.**   Both of my reports show that, yes.

18  **Q.**   And they both sort of tell -- you have numerous tables and

19  charts that tell a very similar story -- each of those tables and

20  stories, would you say?

21  **A.**   Yes.

22  **Q.**   Black voters are incredibly cohesive in supporting Democratic

23  candidates in a general election; is that right?

24  **A.**   Yes.

25  **Q.**   And white voters are incredibly cohesive in supporting a

1    Republican candidate; is that right, also?

2    **A.**   Yes.

3    **Q.**   That's regardless of general election?

4    **A.**   That's the general pattern I find.

5    **Q.**   That's regardless of geographical area; is that correct?

6    **A.**   Yes.

7    **Q.**   The race of the party behind, the party identifier; is that

8    correct?

9    **A.**   Generally, yes.

10   **Q.**   Isn't it true that political affiliation and not race could be

11   a driving factor behind black voting behavior?

12   **A.**   As we're -- as I said before, we're not trying to understand

13   what makes people vote the way they do.  The whole purpose is to

14   figure out how people vote, not why people vote.  That's a

15   different question that would take a different analysis.  We're

16   trying to understand how people vote, and what I find is there's

17   high cohesion among black voters and high cohesion among white

18   voters, and they're supporting opposing candidates.  It doesn't

19   matter what the parties of the candidates are or what the racial

20   backgrounds of those candidates.  It's about the choices that

21   voters are making.

22   **Q.**   And so I understand that's why you're conducting the analysis

23   but -- did you consider or analyze partisanship at all as part of

24   your analysis?

25   **A.**   No.  The entire purpose of this analysis is about how people

1    vote and not why.  And partisanship could be an explanation of why

2    people choose the candidates they do, but it's not part of how

3    they're voting.

4    **Q.**  In your opinion, that's not part of how they're voting?

5    **A.**  Yes.

6    **Q.**  But you couldn't -- as you just mentioned, you can't rule out

7    that partisanship is a possible cause for the polarization that

8    you found in your analysis; isn't that correct?

9    **A.**  I'm not saying anything about cause whatsoever.

10            MR. JACOUTOT:  Okay.  That's all I have, Your Honor.

11            THE COURT:  Thank you.  Direct?

12            MR. HAWLEY:  One moment, please, Your Honor.

13   REDIRECT EXAMINATION

14   BY MR. HAWLEY:

15   **Q.**  Dr. Palmer, just to tease out what that last exchange with

16   Mr. Jacoutot was talking about.

17       As part of your analysis, do you know why any given voter

18   votes for the candidate that they vote for?

19   **A.**  No.

20   **Q.**  Whether it's based on partisanship, race of the candidate,

21   height of the candidate, any other endogenous, exogenous factors,

22   that's not part of your analysis; correct?

23   **A.**  No.

24   **Q.**  What is your analysis?

25   **A.**  My analysis is just how people vote.

1 **Q.**  How people vote is determined by looking at the choices they

2 make as voters and comparing those among different racial groups;

3 is that correct?

4 **A.**  That's right.  When a voter goes to vote, they have the

5 choices before them, and every contest is a separate choice to

6 make, and I'm trying to identify patterns across those very

7 choices.

8          MR. HAWLEY:  Thank you, Dr. Palmer.  Your Honor, that's

9 all.

10         THE COURT:  Recross?

11         MR. JACOUTOT:  No, Your Honor.

12         THE COURT:  Call your next witness.

13         MS. LAKIN:  The Alpha plaintiffs call Dr. Lisa Handley.

14         THE DEPUTY CLERK:  Would you raise your right hand,

15 please.  Do you solemnly swear the evidence you shall give in the

16 matter now before this Court shall be the truth, the whole truth

17 and nothing but the truth, so help you God?

18         THE WITNESS:  I do.

19         THE DEPUTY CLERK:  Thank you.  You can have a seat.  If

20 you could please state and spell your name for the record.

21         THE WITNESS:  Lisa Handley.  L-I-S-A, H-A-N-D-L-E-Y.  I

22 wonder if you can hear me all right, if I should take my mask off.

23         THE COURT:  Yes, you can take it off.

24         MS. LAKIN:  Your Honor, may I approach the witness to

25 hand the witness these binders?

1           THE COURT:  Yes.

2    LISA HANDLEY, having been duly sworn, takes the stand and

3    testified as follows:

4    DIRECT EXAMINATION

5    BY MS. LAKIN:

6    **Q.**  Good afternoon, Dr. Handley.

7    **A.**  Good afternoon.

8    **Q.**  It's still morning.  Good morning, Dr. Handley.  Sophia Lin

9    Lakin for the Alpha plaintiffs.

10       Have you been retained by the Alpha plaintiffs as an expert in

11   this litigation?

12   **A.**  I have.

13   **Q.**  Dr. Handley, can you turn to tab one in the binder in front of

14   you.  Dr. Handley, what is this document?

15   **A.**  This is the report I filed, the preliminary report I filed in

16   this case.

17   **Q.**  And for the record, this has previously been admitted Alpha

18   Plaintiffs' Exhibit A3.  Dr. Handley, can you please turn to tab 6

19   in your binder.

20   **A.**  Yes.

21   **Q.**  And what is this document?

22   **A.**  This is the rebuttal declaration I submitted in this case.

23   **Q.**  For the record, this is previously admitted Alpha Plaintiffs'

24   Exhibit 4.

25       Dr. Handley, did you review your initial report and appendices

1  in preparing for today's testimony?

2  **A.**  I did.

3  **Q.**  And in going over your initial report and appendices, did you

4  notice any corrections that you would like to make?

5  **A.**  There were typos in Appendix A.

6  **Q.**  Can you turn to tab 8 in your binder.  Is this the corrected

7  Appendix A that corrects those typos?

8  **A.**  Yes.

9  **Q.**  And did any of those typos affect any of the substance of your

10  report?

11  **A.**  No.

12          MS. LAKIN:  Your Honor, we would like to move the

13  corrected Appendix A into evidence as Alpha Exhibit A52.

14          THE COURT:  Any objection from the Pendergrass?

15          MR. HAWLEY:  No, Your Honor.

16          THE COURT:  The State?

17          MR. TYSON:  No objection.

18          THE COURT:  It's admitted.

19          (Plaintiff's Exhibit A52 was received and marked into

20  evidence.)

21  BY MS. LAKIN:

22  **Q.**  Dr. Handley, please turn to Tab 5 of your binder, which is

23  page 46 of Alpha Exhibit A3.  What is this document?

24  **A.**  This is a copy of my CV.

25  **Q.**  Is this CV up to date?

1  **A.**   It is.

2  **Q.**   Is it a complete and accurate summary of your background and

3  professional experience?

4  **A.**   Yes.

5  **Q.**   Dr. Handley, what do you do for a living?

6  **A.**   I am a consultant.  I started a company back about 20 years

7  ago called Frontier International Electoral Consulting, which

8  provides election assistance in mostly post-conflict countries.  I

9  primarily work for the U.N. in that context.  I also do consulting

10 here in the United States, and I teach at Oxford Brooks in Oxford,

11 England.

12 **Q.**   And what topics do you provide consulting services on in the

13 United States?

14 **A.**   Primarily redistricting and particularly minority vote

15 dilution.

16 **Q.**   How long have you been providing consulting services on these

17 topics?

18 **A.**   40 years.

19 **Q.**   Can you describe your educational background?

20 **A.**   I have a Ph.D in political science from George Washington

21 University.

22 **Q.**   Can you turn to pages four and five of your CV, Dr. Handley.

23 Can you describe some of the academic work you've done on the

24 topic of redistricting and minority vote dilution?

25 **A.**   The last book listed is actually my dissertation, minority

1    dissertation, my request for voting equality.  There are over a

2    dozen articles and peer review journals that are listed.  There is

3    another dozen chapters in edited volumes, all having to do with

4    minority vote dilution.

5    **Q.**   Have you been accepted as an expert witness in litigation

6    before?

7    **A.**   Many times.

8    **Q.**   Approximately how many times?

9    **A.**   Scores.

10   **Q.**   How many cases in which you've served as an expert witness

11   involved voting rights and redistricting, if any?

12   **A.**   All but one that I can think of.

13   **Q.**   What are you typically asked to do as an expert in these

14   cases?

15   **A.**   I'm almost always asked to do an analysis of voting patterns

16   by race and ethnicity.  I have also frequently been asked to

17   evaluate plans for the opportunity they provide for minority

18   voters to elect their candidates of choice.  And sometimes I draw

19   illustrative districts related to the first prong of Gingle's.

20   **Q.**   Approximately how many times have you performed a racial block

21   voting analysis?

22   **A.**   Well, I would say hundreds because I not only do it within the

23   context of court cases, but a lot of jurisdictions will approach

24   me and ask me to do an analysis of voting patterns prior to

25   drawing districts.

1   **Q.**   How many -- how about evaluating districts for whether they

2   provide opportunities to elect; approximately, how many times have

3   you conducted that kind of analysis?

4   **A.**   Less than hundreds, but probably scores of times.  Again, both

5   in the context of a court case and, also, for clients'

6   jurisdictions who wish to evaluate the plans, the proposed plans

7   that they are considering.

8           MS. LAKIN:  Your Honor, the Alpha plaintiffs offer

9   Dr. Lisa Handley as an expert in racial polarization analysis and

10  analysis of minority vote dilution and redistricting.

11          THE COURT:  Does the Pendergrass attorney wish to voir

12  dire?

13          MR. HAWLEY:  No, Your Honor, no objection.

14          THE COURT:  Does the State wish to voir dire?

15          MR. TYSON:  No, Your Honor.

16          THE COURT:  She's allowed to testify as an expert in

17  that area.

18          MS. LAKIN:  Thank you so much.

19  BY MS. LAKIN:

20  **Q.**   Dr. Handley, what were you asked to do in this case?

21  **A.**   I was asked to do an analysis of voting patterns by race and

22  to evaluate the various plans to explore the opportunities they

23  provided for black voters to elect their candidates of choice.

24  **Q.**   And did you do this analysis for all of Georgia?

25  **A.**   No.  I did it for six specific areas in Georgia.

1  **Q.**  Did you form any opinions from your analysis?

2  **A.**  I did.

3  **Q.**  Are those opinions accurately summarized in the reports that

4  you submitted in this case?

5  **A.**  Yes.

6  **Q.**  At a high level, what opinions did you reach with respect to

7  whether there is racially polarized voting in the areas of Georgia

8  that you examined?

9  **A.**  Voting was quite starkly polarized in the general elections

10  that I looked at, both for the statewide contests that I looked at

11  and in terms of the state legislative elections that I looked at.

12  It was also polarized in the Democratic primaries that I reviewed.

13  **Q.**  And at a high level, how, if at all, did that polarization

14  affect the ability of black voters to elect candidates of their

15  choice in the areas that you analyzed?

16  **A.**  If voting is starkly polarized as it is in the areas that I

17  looked at, districts have to be drawn to provide black voters with

18  an opportunity to elect their candidates of choice in order to

19  ensure that such candidates do serve in the Legislature.

20  **Q.**  And that's the case in all six areas of Georgia that you

21  analyzed?

22  **A.**  In all six areas that I analyzed, voting was very starkly

23  polarized, yes.

24  **Q.**  Did you draw any conclusions about the ability of black voters

25  to elect candidates of their choice under the illustrative plans

1  as compared to the enacted plans?

2  **A.**   Yes.   The illustrative plans in each of the areas that I

3  looked at, there was at least one additional black opportunity

4  district compared to the enacted plan.

5  **Q.**   You mentioned you evaluated six -- areas, six specific areas

6  in Georgia.   Why did you focus on these areas?

7  **A.**   It's my understanding that these are the areas that are the

8  focus of this litigation.

9  **Q.**   Turning to your analysis, let's focus on your opinion that

10 voting in Georgia is racially polarized in the areas you analyzed.

11 How do you define racially polarized voting?

12 **A.**   Borrowing from Gingle's, I declare an election to be polarized

13 if the outcome would be different if the election were held only

14 among black voters compared to only among white voters.

15 **Q.**   And how do you evaluate whether voting in an area is racially

16 polarized?

17 **A.**   Well, we don't have the race of the voter on the ballot.   So

18 we have to use statistical techniques to do this.

19 **Q.**   What statistical techniques for doing this did you use in

20 doing this in this case?

21 **A.**   I employed three statistical techniques, these are the

22 standard techniques.   They are called homogeneous precinct

23 analysis, ecological impression and ecological inference.

24 **Q.**   Do you describe necessary statistical methods in your expert

25 report?

1  **A.**   Yes, they're described.

2  **Q.**   Why do you use all three methods?

3  **A.**   The courts have used all three methods.  It's a matter of

4  time.  The early cases, in fact, only had homogeneous precinct and

5  ecological regression, and EI, ecological inference was developed

6  later.  I include all three of those for two reasons.  The courts

7  have accepted all three of them, and two, even though EI is more

8  recent and more statistically sophisticated, I think that

9  homogeneous precinct analysis and ecological regression serve as

10 good checks on the estimates produced using EI.

11 **Q.**   And when you refer to EI, you mean --

12 **A.**   Ecological inference.

13 **Q.**   Are these three statistical methods, homogeneous analysis,

14 ecological regression and ecological inference, widely used in

15 voting rights cases?

16 **A.**   Yes.

17 **Q.**   And have they been accepted by courts in voting rights cases?

18 **A.**   Yes, as I mentioned, the reason I use all three is because all

19 three have been accepted.

20 **Q.**   Have you used the method of ecological inference analysis you

21 used in this case before?

22 **A.**   Yes.  Yes.  Since it was developed by Gary King in the

23 late -- in the mid-1990s.  I've probably been using it from the

24 2000 around redistricting.

25 **Q.**   Have courts accepted the kind of ecological inference analysis

1    that you have used in this case before?

2    **A.**   Yes.

3    **Q.**   How many times, approximately?

4    **A.**   How many times have the courts accepted my analysis?  Scores.

5    **Q.**   Do you typically report confidence intervals for your

6    ecological inference analysis in your written expert reports?

7    **A.**   I calculate them.  I have them available.  I do not include

8    them in my reports, but, of course, I supply them if requested.

9    **Q.**   And did you calculate the confidence intervals in this case?

10   **A.**   Yes, I did.

11   **Q.**   Can you briefly explain what a -- strike that.

12        Dr. Handley, what data goes into your racial block voting

13   analysis in this case?

14   **A.**   The point of the analysis is to look at patterns across the

15   demographic composition of the precincts.  The election precincts

16   are usually the units of analysis.  You're going to look at

17   patterns across these precincts in terms of the demographic

18   composition of the precincts and the voting behavior.  This means

19   you need two pieces of information.  You need to know the

20   demographic composition, and in Georgia we have what we call the

21   best data because we have turnout by race.  So turnout by race is

22   included in the database, and then we're going to look at patterns

23   of voting, so we want the election returns associated with

24   these -- the turnout race all at the precinct level.  So this is

25   how I conducted the database.

1  **Q.**  Dr. Handley, what election cycles did you analyze in this

2  case?

3  **A.**  The Demographic primary and general elections in 2016, 2018,

4  2020, and the runoff in 2021.

5  **Q.**  Did you analyze any other kinds of elections?

6  **A.**  I looked at statewide elections and I looked at state

7  legislative elections in the area as of interest.

8  **Q.**  Can you turn to page 8 of your binder, which is your corrected

9  Appendix A, and turn to the second and third pages.

10  Are the statewide elections you evaluated listed on these two

11  pages?

12  **A.**  Yes.

13  **Q.**  And are those same elections listed on your screen?

14  **A.**  Yes.

15  **Q.**  Why did you look at these statewide elections, in particular?

16  **A.**  Each of these elections included black candidates.  And I was

17  particularly interested in voters' responses to black candidates

18  because the courts have determined these as the most probative.

19  You don't want a situation where black voters can only elect their

20  candidates of choice if those candidates are white.

21  **Q.**  And Dr. Handley, you mentioned that each of these elections

22  had -- included a black candidate.  Is that correct?

23  **A.**  So there is an exception to that, and that is that I looked at

24  the Democratic primary with Ossoff where he did have black

25  candidates competing against him.  But he was clearly the black

1  candidate of choice.  So I followed him up through the general

2  election, and through the runoff.  And also because it was a very

3  visible election that the entire country was paying attention to.

4  **Q.**  Dr. Handley, do you ever look at elections -- obviously you

5  did in this instance.  Do you otherwise look at elections that

6  don't include black candidates in other circumstances?

7  **A.**  I do.  For example, I was just working in Arkansas where they

8  only had one black candidate running statewide in the last ten

9  years.  So in that instance, white versus white contests had to be

10  reviewed.

11  **Q.**  Why do you look at primary elections?

12  **A.**  So we have a two-stage election process here, and black

13  preferred candidates have to get through both of them.  Now in

14  some cases, where I worked in northeastern Ohio, for example,

15  where lots of white voters vote Democratic, it's actually the

16  primary that is difficult for the candidates of choice to get

17  through.  But here in Georgia, where a lot of white voters

18  actually vote in the Republican primary, it's easier for black

19  voters to get through the Democratic primary than it is through

20  the general election.

21  **Q.**  Dr. Handley, I'd like to ask you a few questions about the

22  geographical areas that you focused on.  Let's turn to table 1 on

23  pages 6 and 7 of your initial report.

24      What does table 1 show?

25  **A.**  This is a more detailed explanation of the areas that I

 1  focused on.  So the first column provides the name that I gave

 2  that particular area.  The second column is the illustrative

 3  districts in that area.  The third column is the enacted districts

 4  in that area, and the final column indicates the counties that

 5  encompass those districts.

 6  **Q.**  And why are some of the districts numbers bolded in the

 7  illustrative district column?

 8  **A.**  These are the districts that are the additional minority

 9  opportunity districts offered by the illustrative plan compared to

10  the enacted plan.

11  **Q.**  Would you walk us quickly through each of the areas of

12  interests.

13  **A.**  So the first area is the eastern Atlanta metro region.  The

14  second area is the Southern Atlanta metro area.

15  **Q.**  And if you could pause for a moment.  Why is there an area

16  here with striped lines in the corresponding map?

17  **A.**  The striped lines are Fulton County.  A small portion of, at

18  least one illustrative or enacted district falls within that

19  county.  However, that county is very large, and only a small

20  portion of the residents of that county were in one of these

21  districts.  So rather than to include them in the analysis and

22  have them sort of overwhelm the analysis when only a few residents

23  of that county were in it, I left that county out of the analysis.

24  **Q.**  Can you walk through the rest of the areas?

25  **A.**  The third area is east central Georgia.  Now we're going to

1   turn to the State House plan, and the fourth area is the

2   southeastern Atlanta metro region.  The fifth area is central

3   Georgia, and the sixth area is southwest Georgia.

4   **Q.**  And so just to be clear, the top three areas are in

5   relationship to the State Senate Districts?

6   **A.**  That's correct.

7   **Q.**  And the last three areas are for the State House plans?

8   **A.**  That's correct.

9   **Q.**  Let's walk through your racial polarization analysis of

10  statewide elections in one of these areas.  Can you turn to page 4

11  of tab 8, which is your corrected Appendix A.

12  **A.**  Okay.

13  **Q.**  What does this table show?

14  **A.**  So this table indicates, first, you can see up in the

15  left-hand corner, the region that we're talking about, along the

16  first column you'll see the year and the election contest and the

17  candidates listed for each of those election contests.  Then you

18  see the race and the party of those candidates.  And then the next

19  six rows report my estimates of voting patterns.  The first three

20  for black voters, the final three for white voters, HP stands for

21  homogeneous precinct analysis, ER for ecological regression, and

22  EI for ecological inference.

23  **Q.**  Okay.  What is the first election on this table?

24  **A.**  This is the 2021 runoff for U.S. Senate with Warnock and

25  Loeffler.

1  **Q.**  Can you walk us through what this table shows for this

2  election?

3  **A.**  So the ER estimate is 114.3 percent.  I should mention EI and

4  ER have advantages and disadvantages.  One of the disadvantages of

5  ER it can produce estimates outside of the possible.  We don't

6  believe that more than 114.3 percent voted for Warnock.  So those

7  are the ER estimates.

8     The next is the EI in which we estimate 99.2 percent of the

9  black voters supported Warnock.  And then if you go over to the

10  white voters, the ER estimate for white voter support for Warnock

11  is 6.8 percent and for EI it's 8.1 percent.

12  **Q.**  Can you explain why there is no estimates in the HP column?

13  **A.**  Because there were no homogeneous precincts, no overwhelmingly

14  white or overwhelmingly black precincts in this area for this

15  election.

16  **Q.**  So for this first election, would you characterize this as a

17  polarized contest?

18  **A.**  I would characterize this as a starkly polarized contest with

19  the vast majority of black voters supporting one candidate and the

20  vast majority of white voters supporting the other candidate.

21  **Q.**  What is contained in the remaining portion of this table?

22  **A.**  The rest of the statewide elections, general elections and

23  primaries that I looked at for each area.

24  **Q.**  Did you analyze voting patterns in the five other areas of

25  interest that you identified earlier?

1  **A.**   Yes.   The estimates would show up in identical tables.

2  **Q.**   And are those identical tables contained in your report?

3  **A.**   In Appendix A, yes.

4  **Q.**   What if any did you conclude about racially polarized voting

5  in these six areas based on your analysis of statewide elections?

6  **A.**   All of the statewide general elections that I looked at in all

7  six areas were starkly polarized.

8  **Q.**   You mentioned earlier that you also analyzed state legislative

9  contests for your racial polarization analysis?

10 **A.**   That's correct.

11 **Q.**   What state legislative contests did you analyze?

12 **A.**   If a state legislative district from the old plan, 2021, was

13 included -- wholly contained within the area, I analyzed that

14 state legislative contest.   I also if it overlapped with the

15 illustrative plan, the additional illustrative district, I also

16 analyzed those state legislative elections for a total of 26 state

17 legislative elections.

18 **Q.**   Did you look at all of these state legislative contests or a

19 subset, depending on the race?

20 **A.**   Yes.   So these 26 contests, were contests that included black

21 and white candidates.

22 **Q.**   What opinions if any did you form about racial polarization in

23 the state legislative general election races you analyzed?

24 **A.**   These contests were just as starkly polarized as the statewide

25 elections that I looked at.

**Q.** Let's turn now to your analysis of black voters opportunity to
elect candidates of their choice in the illustrative and enacted
plans.  How do you evaluate opportunities to elect given to black
voters in a plan?

**A.** There are two overriding things that you're looking at,
overarching.  You're going to look at the black voting age
population or minority age population, if you're not in a
jurisdiction that you're interested in black voters specifically.
And the other thing you're going to do as part of the district
specific functional analysis, you're going to look at the voting
patterns in that district.  So I have a couple of methods of
looking at the voting patterns in the districts, and it depends on
whether I have proposed district boundaries or not.  In both
cases, I want to look at participation rates and voting patterns
for black preferred candidates.  But if I don't have proposed
boundaries, I'm simply going to use algebra to calculate the black
voting age population needed to elect candidates of choice.

   If I do have proposed boundaries, then I can look at
historical elections and do something I call recompile election
results to see how these black preferred black candidates would do
in these newly-proposed districts from either the illustrative
plan, enacted plan, any plan that hasn't had elections already in
them.

**Q.** And just to be clear, what approach did you use here?

**A.** Here we had proposed boundaries.  So I used recompiled

1  election results to make a determination whether the districts,

2  the proposed districts would provide black voters with an

3  opportunity to elect their candidates of choice.

4  **Q.**  And just to be clear, with respect to the enacted plan, you

5  mention that we had proposed districts, and that's because no

6  elections has ever been run on those yet?

7  **A.**  I'm using "proposed" to encompass both the illustrative and

8  the enacted.  I'm using it to describe any districts that we have

9  not had elections in.

10  **Q.**  Have you used recompiled election analysis before?

11  **A.**  I have.

12  **Q.**  And has recompiled election analysis been accepted by courts?

13  **A.**  Not only has it been accepted by courts, but it's been used by

14  special masters for the courts specifically for this purpose.

15  **Q.**  Do other experts use this analysis to examine opportunity to

16  elect?

17  **A.**  Yes.

18  **Q.**  Let's walk through your analysis in one of the areas of

19  interest.  Can we turn to page 14 of your initial report, which is

20  under tab 1 of your binder.

21     Which area of interest is represented by the maps here?

22  **A.**  So this is the eastern Atlanta metro region.

23  **Q.**  And can we pull up Plaintiffs' demonstrative Exhibit PDX2.17.

24  Dr. Handley, what does the demonstrative on the screen show?

25  **A.**  Here we've overlaid the two maps you've seen on the previous

1  page overlaid here so you see the illustrative, enacted plan and

2  the general area that they encompass.  And the dotted lines are

3  the old district that most overlaps with the new minority

4  opportunity district offered in the illustrative plan.

5  Q.  What district number in the previous plan is that most

6  overlapping district in this area?

7  A.  Repeat the question.

8  Q.  What district number in the previous plan is that most

9  overlapping district in this area?

10  A.  It's the State Senate District 17.

11  Q.  What can you tell us about the historical voting patterns in

12  the state legislative general elections in this area?

13  A.  All of the state legislative elections that I looked at in

14  this area were starkly polarized.

15  Q.  What, if anything, can you tell us about the success of the

16  lack of preferred candidates in the state legislative general

17  election contests in this area?

18  A.  If the district was not a minority black district, the black

19  preferred candidate did not win in this area.

20  Q.  I'd like to take a quick look at the historical state

21  legislative general election contests in the prior District 17 we

22  were just talking about before which overlapped most with the new

23  black opportunity district in the area.  Can you turn to tab 7 in

24  your binder.  And Dr. Handley, what is this document?

25  A.  This is Appendix B, which reports the results of the state

1  legislative elections that I analyzed.

2  **Q.**  Can you turn to page 2 of this document?

3  **A.**  Yes.

4  **Q.**  And what is this table?

5  **A.**  This is the results of the State Senate elections that I

6  analyzed.

7  **Q.**  In looking at this table, what can you tell us about the

8  historical general election contests in prior Senate District 17?

9  **A.**  The two that are included in this table are starkly polarized.

10  There's one that is not.  The most recent one that had only white

11  candidates, that was also starkly polarized.  These two candidates

12  are starkly polarized with the vast majority of black voters

13  supporting the black candidate, and the vast majority of white

14  voters in both instances supporting the white candidate.

15  **Q.**  Were black voters successful in electing their candidates of

16  choice?

17  **A.**  So the column that is labeled "vote" provides the actual

18  results of the election.  And you can see that in both instances,

19  the black -- preferred black candidate lost the election to the

20  white preferred white candidate.

21  **Q.**  Did you look at these historical state legislative general

22  election contests in all six areas of interest?

23  **A.**  Yes.

24  **Q.**  And what, if anything, can you tell us about the success of

25  black candidates in these historical state legislative contests in

1  all six areas?

2  **A.**   In these six areas, if the district was not majority black in

3  composition, the black preferred candidates did not win.

4  **Q.**   Let's turn back to the maps of area one again.  Can you

5  explain what the color shading in the two maps represents?

6  **A.**   If a district is shaded pink, it means it's a majority black

7  voting age population district.  If it is shaded gray, it means it

8  is not.

9  **Q.**   So you mentioned earlier that you used recompiled election

10  analysis to evaluate the opportunity to elect for black voters in

11  the districts under the illustrative and enacted plans.  How did

12  you go about conducting that analysis?

13  **A.**   I identified based on my racial black voting analysis, the

14  black preferred black candidates that were in racially polarized

15  contests, and then this is reported at the precinct level.  When

16  you draw new districts, they don't necessarily follow the precinct

17  boundaries.  So you have to disaggregate the election results from

18  the precinct down to the block level and then reaggregate them up

19  to reflect the proposed district boundaries in order to determine

20  if the black preferred black candidate would win.

21     Now, in this particular instance, this is the average of the

22  five black preferred black candidates that ran in the general

23  election, and for the -- for the primary, it was the six black

24  preferred black candidates that ran in the Democratic primary.

25  **Q.**   How do you go about determining based on these -- these scores

1  that you calculated, how did you go about determining opportunity

2  to elect once you've done that calculation?

3  **A.**  So looking, for example, at a GP --

4  **Q.**  Sure, we can go ahead and look at an example.  Can you look at

5  the comparison table for the illustrative plan in this area.  And

6  can you walk us through District 17 in this table?

7  **A.**  Looking at District 17 you can see that the black voting age

8  population of this district is 62.5.  The GE score is .635 and the

9  DPr score is .631.  What that can be read as is my estimate of how

10  the percentage of votes a hypothetical black candidate would get

11  in that district would be 63 percent in the primary and 63 or 64

12  percent in the GE, in the general election.  I'm just rounding up

13  because that .635 can be read as a percentage.

14  **Q.**  What do these scores mean for the black preferred candidates

15  and their ability to be successful?

16  **A.**  So in this district, the black preferred candidate would win

17  both the primary and the general election and represent this

18  district.

19  **Q.**  What about the two other districts in this illustrative plan

20  table?

21  **A.**  They also have -- there are at least majority black in voting

22  age population and they also have GE and DPr scores of above .5.

23  It would of course take at least 50 percent of the vote to carry

24  the district.  So you're interested in making sure that these

25  scores are above .5.

1  **Q.**  Would you characterize these other illustrative districts as

2  opportunity districts?

3  **A.**  Yes, they are.

4  **Q.**  Can we now take a look at the comparison table for the enacted

5  plan in this area.

6      Can we start with District 17 again and walk us through what

7  this table shows for District 17 in the enacted plan?

8  **A.**  The enacted plan 17 is 32 percent black in voting age

9  population, while the primary score is above .5.  It is .575.  The

10 GE score is point 352.  And obviously with only 35 percent of the

11 vote, the black preferred candidate would lose in this district.

12 **Q.**  What about the other districts in this enacted plan comparison

13 table?

14 **A.**  Districts 10 and 43 would both provide black voters with an

15 opportunity to elect their candidates of choice.

16 **Q.**  Based on these analyses summarized in comparison table one,

17 did you draw any conclusions about black voters' opportunity to

18 elect in this area under the two different plans?

19 **A.**  In this particular area, the illustrative plan offers one

20 additional minority black opportunity district than the enacted

21 plan.

22 **Q.**  Could you tell us which district is the additional black

23 opportunity district?

24 **A.**  District 17.

25 **Q.**  Did you do this analysis in the five other areas of interest?

**A.**   I did.

**Q.**   How does your analysis in these other areas compare to your analysis of the eastern Atlanta metro region?

**A.**   In each of the other areas, there was also at least one additional black opportunity district offered by the illustrative plan compared to enacted plan.

**Q.**   In these six areas, what can you say about the black voting age population in the districts that you have found to provide black voters with an opportunity to elect?

**A.**   In these six areas, the black opportunity districts were all at least 50 percent black in voting age population.

**Q.**   Bringing your racial polarization analysis and this opportunity to elect analysis together, how does racial block voting in these areas affect black voters' opportunity to elect?

**A.**   Because voting is so starkly polarized, this impedes the ability of black voters to elect their candidates of choice unless districts are drawn specifically to provide black voters with an opportunity to elect their candidates of choice in these areas.

**Q.**   Thank you, Dr. Handley.  You identified a rebuttal report that you provided in this litigation.  What was the subject of that report?

**A.**   This was a response at that time to a comment in the defendants' brief that party rather than race explained the voting patterns.

**Q.**   Can you summarize the opinions in your rebuttal case for the

1  Court?

2  **A.**  Yes, I can.

3  **Q.**  What were those -- please provide that summary, thank you.

4  **A.**  First, I think that saying something like it is either party

5  or race is incorrect.  It's simplistic.  The two variables are not

6  competing.  They are highly correlated.

7      Second, to suggest that without any analysis is to do so

8  without any evidence, but it is also ignoring the fact that race

9  impacts political attitudes and partisan voting choices.  So race

10 has a direct impact on the vote choice, but it also has an

11 indirect impact that's being ignored by saying it's either race or

12 party, but an indirect impact through party to vote choice.

13     And finally, I offered some evidence of what happens when a

14 party is removed because I had analyzed Democratic primaries.  I

15 found that even when party is not an issue, voting is still

16 polarized between black and white voters.

17 **Q.**  And just to be clear, when you -- were you asked to look at

18 causation of voting patterns in this case?

19 **A.**  I have never been asked to look at that, and I was not asked

20 to look at that in this case.

21 **Q.**  Dr. Handley, are you aware that the defendant in this case has

22 submitted a declaration by Dr. John Alford that responds in part

23 to some of the opinions and analysis that you have offered in this

24 case?

25 **A.**  Yes.

**Q.**   Have you reviewed Dr. Alford's declaration?

**A.**   Yes.

**Q.**   Dr. Alford suggests that uncertainty about the width of confidence intervals in your analysis means, quote, that we are not able to say with any assurance which candidate a group of voters preferred.  What, if any, response do you have to that statement?

**A.**   As I mentioned earlier, I did calculate confidence intervals. I did look at them.  They were very tight.  They were very small around the estimate.  And there were only a handful of instances in which you could say that confidence intervals overlapped.  So that's one thing.

Second of all, of course, the best estimate you have is the point estimate.  And third of all, of course I think that caution is irrelevant in this case.  And I'm only offering the Democratic primary in rebuttal to the argument that it is party, not race.

**Q.**   How if at all does Dr. Alford's argument about racially polarized voting change the opinions you've reached about racially polarized voting in this case?

**A.**   Racially polarized voting is very stark in the general elections.  It's somewhat less stark in the primaries, but it is very stark in the general elections, both statewide and state legislative.

**Q.**   And how, if at all, does any of the questions that Dr. Alford raises about your Democratic primary elections analyses change

1  your opinion that there is some evidence of racial polarization in

2  the Democratic primaries in the areas you looked at?

3  **A.**  It doesn't change it at all.

4          MS. LAKIN:  Thank you, Dr. Handley.  No further

5  questions at this time.

6          THE COURT:  Anything from the Pendergrass?

7          MR. HAWLEY:  No, Your Honor.

8          THE COURT:  Your witness.

9  CROSS-EXAMINATION

10 BY MR. JACOUTOT:

11 **Q.**  Good afternoon, Dr. Handley.  We've passed the noon mark.

12 **A.**  Good afternoon.  I'm going to take a sip of water here.

13 **Q.**  Certainly.  Are you ready to proceed?

14 **A.**  I am.

15 **Q.**  So I've got a few opening questions for you and then we can

16 get into the reports and your testimony earlier.  My name is Brian

17 Jacoutot.  I represent the Secretary of State.

18     Is it correct to say that you've never testified for

19 jurisdiction that was defending a Section 2 case?

20 **A.**  I don't think that's correct, no.

21 **Q.**  You don't think that's correct?

22 **A.**  Repeat the question.

23 **Q.**  I'll phrase it differently.  Have you ever testified for a

24 jurisdiction or on behalf of a jurisdiction that was defending a

25 Section 2 case?

**A.**   I have.

**Q.**   Okay.  And which case was that?

**A.**   Several cases.  A case -- Holyoke case.  Several cases in Florida.  I don't -- I couldn't tell you off the top of my head.

**Q.**   Multiple cases, though, you would say?

**A.**   Yes.

**Q.**   Who first contacted you to be involved in this case?

**A.**   The person?

**Q.**   Yes.

**A.**   Well, it's somebody at the ACLU, probably Dale Ho.  I don't remember.

**Q.**   Okay.  Do you recall when that was?

**A.**   I do not.

**Q.**   Okay.  Do you recall when you drafted your expert report or when you began drafting your expert report?

**A.**   It depends on how exact you want me to be.  I could probably identify -- I would say January, but that's a guess.

**Q.**   Okay.  January of 2022?

**A.**   Yes.

**Q.**   And when did you begin drafting your rebuttal declaration?

**A.**   You could probably guess that better than me.  It would have been after the State's brief.

**Q.**   Okay.  And you've covered some of this in your direct so we can skip.

So you listed the facts you relied on in your reports;

1  correct?

2  **A.**  I'm sorry?

3  **Q.**  You listed the facts that you relied on in making your

4  reports, you listed those in the reports; correct?

5  **A.**  Yes.

6  **Q.**  Okay.  Did Plaintiffs' counsel provide you with any facts or

7  data that is not listed in your reports and you considered in

8  forming your opinions?

9  **A.**  No.

10 **Q.**  Okay.  Did Plaintiffs' counsel tell you to assume anything

11 that you relied on when forming your opinions in this case?

12 **A.**  No.

13 **Q.**  Okay.  Before we get into your findings, I want to talk a

14 little bit about your methods.  In your initial report you sort of

15 break down the three basic statistical analyses used in voting

16 rights cases, and just to clarify, homogeneous analysis,

17 ecological regression and ecological inference; is that correct?

18 **A.**  Yes.

19 **Q.**  And you used some version of each of these in your report

20 where they were available?

21 **A.**  I used -- I'm sorry?

22 **Q.**  You used some version of each of these methods in your report

23 where it was available, so for instance, as you said homogeneous

24 analysis is not always available?

25 **A.**  I see.  Yes.  So if there were not any overwhelmingly

1  homogeneous precincts, I couldn't report those.  Occasionally EI

2  estimates are not produced using the default settings in the

3  program that I use.  So those would have been represented with an

4  NA.  So now I've forgotten the question, but I think that's

5  responsive.

6  **Q.**  Yeah, yeah, that is.  Thank you.

7     So you mentioned with counsel on direct that you did not

8  include confidence intervals in your ecological inference, but you

9  do have them?

10 **A.**  They are not included in my report because, of course, the

11 program does produce them.  But I did review them.

12 **Q.**  You said that's because only a handful of instances in which

13 they overlapped with, I guess 50 percent; was that right?  Is that

14 a correct characterization?

15 **A.**  There were a few instances in which the confidence intervals

16 for the two candidates for a particular race overlapped.  By race

17 I mean black or white.  In fact, it was only four black voters.

18 **Q.**  So to be clear, the confidence intervals overlapped in a way

19 that it changed who sort of had the majority vote, share of the

20 vote; is that right?

21 **A.**  No.

22 **Q.**  Can you explain --

23 **A.**  No.  What it means is that you have point estimates, and what

24 I gave you in the report are the point estimates.  Confidence

25 intervals are intervals around these point estimates in which you

1  are 95 percent sure that the true value might lie.

2  **Q.**  And so when you say overlap, what do you mean by that?

3  **A.**  So if you had, say, an estimate of 50.1 and an estimate of

4  49.9, it would almost have to be the base of the confidence

5  intervals would overlap such that the true estimate is somewhere

6  between, say, 49.9 and 51.1 for both, both estimates.

7  **Q.**  Okay.  And in your recollection, were they that close, the

8  51.1 and 49.9 and they had an overlap, or they were a little

9  further apart and still had an overlap, if you recall?

10 **A.**  I think I understand your question.  If the estimates were

11 very close, it is possible, in fact it's likely that the

12 confidence intervals overlapped but only if they were very close.

13 **Q.**  Okay.  Would you agree with me that confidence intervals are

14 generally wider for primaries -- for primary elections than they

15 are in the general elections?

16 **A.**  Yes, though I'm going to add the caveat that that was true of

17 white voters in the Democratic primaries and not so much for black

18 voters.

19 **Q.**  And if the confidence intervals overlapped in your data that

20 you didn't present in the report, would you have considered that

21 at any point -- would you consider that particular race where they

22 overlap polarized, or would you say that's not polarized?

23 **A.**  If the outcome would have been different among black and white

24 voters, I would have called that polarized.

25 **Q.**  Okay.

**A.**   Using the point estimates, the EI point estimates.

**Q.**   Isn't it fair to say those are pretty important to include where that occurs where it would change the outcome?

**A.**   It would -- I still have the point estimates and it doesn't change the outcome.  I'm not sure what your question is.

**Q.**   Let me make sure I understand your response.  You said the confidence interval could -- the overlapping of the confidence interval could change the polarization of the race whether you consider it polarized or not.  Did I mishear that?

**A.**   Yeah.

**Q.**   Okay.  Go ahead and let me know then did -- at any point did any of the confidence intervals in the data that you have, overlap in a way that caused you to change whether you consider that race polarized or not?

**A.**   I made the decision as to whether it was polarized on the point estimates, on the EI point estimates.

**Q.**   Okay.  Okay.  I think I have you.

   Can we turn to the tables on page 26 of your initial report. This is the eastern Atlanta metro area one table; is that right?

**A.**   Well, it depends on your numbering.  If you tell me where you want me to look at the eastern Atlanta metro area.

**Q.**   Yeah, this is page 25 as the Plaintiffs have labeled it.

**A.**   So the first page of the eastern Atlanta; right?

**Q.**   Yes.

**A.**   Yes.

1  **Q.**   Okay.   So can we just look at the Warnock general election.

2  **A.**   The Warnock what?

3  **Q.**   The Warnock general election.   It's labeled as special Senate,

4  but it was the first version, and then they had the runoff.

5  **A.**   Okay.

6  **Q.**   Look at U.S. special Senate.   Here is the black candidate, but

7  it's somewhat unique.   There was an election with many different

8  candidates with multiple parties on the ballot; correct?

9  **A.**   Yes.

10 **Q.**   Where we have multiple parties represented by black and white

11 candidates, the white vote doesn't coalesce very well, does it?

12       MS. LAKIN:   Objection, your Honor.   The question is a

13 little vague.   What do you mean by "coalesce"?

14       MR. JACOUTOT:   I'll rephrase it.

15 BY MR. JACOUTOT:

16 **Q.**   In this race in this contest where we have multiple parties

17 represented by both white and black candidates, it doesn't appear

18 that the white vote is polarized.

19       Would you say so?

20 **A.**   If the election were held only among white voters, Loeffler

21 would have won, so that is a polarized contest.

22 **Q.**   That's polarized because you were combining candidates?

23 **A.**   Well, because you have a runoff in this particular instance

24 but if you didn't have a runoff, Loeffler would have won.   In this

25 particular instance it's polarized, because I talked about who

1  would have won and who would have lost.

2  Q.   Okay.  So -- I'm sorry.

3       Looking at this -- let's just look at the EI numbers, too.  We

4  have Loeffler at 40, Doug Collins at 23.5 and Raphael Warnock at

5  27.2?

6  A.   Correct.

7  Q.   You characterize that particular contest there as white voters

8  being polarized?

9  A.   As black and white voters being polarized, yes.

10 Q.   I'm not asking specifically just about the white.  My initial

11 question was it doesn't coalesce very well.  I'm trying to say are

12 white voters voting as a block in this election?

13 A.   Define what you mean by "block."

14 Q.   Are you familiar with the term "racial block voting"?

15 A.   Yes, I am.

16 Q.   So would you say that the white voters are cohesively voting?

17 A.   White voters are not.  A vast majority of white voters are not

18 supporting a single candidate.

19 Q.   Okay.

20 A.   Does that answer your question?

21 Q.   It does.  Thank you.

22      If we move up to the 2021 runoff for Senator Warnock, the

23 Democrat in this race was clearly the black preferred candidate;

24 isn't that right?

25 A.   Yes.

1  **Q.**  And it's to a far higher degree in the general where we had

2  many candidates from both parties; right?

3  **A.**  Repeat the question.

4  **Q.**  The cohesiveness of the black vote in the general is far more

5  apparent than it was in the special Senate race; isn't that

6  correct?

7  **A.**  There is a higher percentage of black voters supporting

8  Warnock in the runoff than in the special Senate contest, if that

9  is responsive to your question.

10  **Q.**  Okay.  And even in the statewide election here in the general,

11  whether the white voters were polarized or not in their vote, they

12  didn't vote as efficiently as the black to defeat the black

13  candidate; right?

14  **A.**  That's correct.  I'm nervous about you talking about white

15  voters being polarized, since it's a -- it's a matter of comparing

16  white and black voters.

17  **Q.**  But either --

18  **A.**  But Warnock won the contest.

19  **Q.**  Okay.  Now, you mentioned in your initial report that the

20  Democratic -- the recent Democratic primaries were consistently

21  racially polarized in all six areas; is that correct?

22  **A.**  Yes.

23  **Q.**  That's page 2 of 8 of Plaintiffs' Exhibit A-4.  And in that

24  report, you have -- you have a graph.  I'm just looking for it.

25  One second.

**A.**  Are we talking about my rebuttal declaration?

**Q.**  Your rebuttal declaration, yes.  Okay.  So we're kind of going back and forth here.  In your initial report, you state that Ossoff and Parksdale were sort of the exception of the role -- let me rephrase.

In your initial report, you state that the recent Democratic primaries were consistently racially polarized in all six areas; is that correct?

**A.**  Yes.

**Q.**  And then you list the exception of Ossoff and Parksdale; correct?

**A.**  Yes.

**Q.**  Which were the only contests that you considered that had only white candidates running; is that correct?

**A.**  In the primaries there were black candidates running in those contests.

**Q.**  In the general, were they?

**A.**  No.  I thought you were talking about the primaries.  Are we talking about the primaries or the generals?  I'm sorry, you're going back and forth.

**Q.**  We are.  We're going to go back to the rebuttal real quick. So the rebuttal election you have the chart where it shows -- this is back to the primaries, by the way -- this chart says 62.5 percent of racially polarized primaries for eastern metro one, eastern Atlanta metro you have 75 percent, 75 percent, 75 percent,

1    62.5 percent and 62.5 percent?

2    **A.**   Yes.

3    **Q.**   Is that what you deem consistent racial polarization?

4    **A.**   Consistent... is that what I deemed consistent polarization?

5    Yes.

6    **Q.**   So those are referring to that like --

7            MS. LAKIN:  Your Honor, I'm not sure if he asked the

8    question if that is what it was.  Just for clarification of

9    Dr. Handley's answer, I want to make clear what it is that she's

10   referring to.

11   BY MR. JACOUTOT:

12   **Q.**   Certainly.  The chart here refers to the same races that you

13   were referring to in your initial report where you said Democratic

14   primaries are consistently racially polarized in all six areas; is

15   that correct?

16   **A.**   Democratic primaries are consistently polarized.  I don't know

17   where that sentence probably appeared in my initial report.  It

18   might have appeared in the rebuttal report as well.

19   **Q.**   And so you are -- it's your testimony then that eastern

20   Atlanta region has 62.5 percent racially polarized primaries by

21   your count.  That's consistent racial polarization?

22   **A.**   Yes.

23   **Q.**   Okay.

24   **A.**   Let me rephrase that.  It's consistent polarization across all

25   of the areas.

1  **Q.**  Okay.

2  **A.**  So we're talking about what is it, 33 contests out of 48

3  contests across the whole area.

4  **Q.**  Okay.  So you -- would you not make the claim then that within

5  the eastern Atlanta metro area that those Democratic primaries are

6  racially polarized consistently?  And I can rephrase that if you

7  would like.

8  **A.**  I guess it would depend on your definition of "consistently."

9  I would say that five out of eight were polarized.

10  **Q.**  Yes, and I'm using the word "consistent" very deliberately

11  because you use it in your report.  So I'm asking you if your

12  definition of "consistent" is such that 62.5 percent racial

13  polarization rate within the eastern Atlanta metro region is

14  consistent?

15  **A.**  I'm saying to you, I used the word "consistent" to describe

16  the patterns described across all areas, not in a single area.

17  **Q.**  So you are saying that the eastern Atlanta metro region is not

18  consistently racially polarized; is that correct?

19  **A.**  I'm saying that five out of the eight contests were polarized

20  but I'm not -- I think that I would want more contests to talk

21  about consistency.

22  **Q.**  Okay.  I understand you.  Thank you.

23      Now you noted you were not asked to consider causation in your

24  reports about causation of voting habits, I believe it was?

25  **A.**  I was not asked to look at causation, no.

**Q.**  Okay.  So then you didn't look up -- you didn't look at
partisan as possible rationale for racial polarization?  Excuse
me.  You didn't look at partisan polarization as a possible
rationale for the behavior of black and white voters in Georgia?

**A.**  I did what you do in a minority vote dilution case, and that
is I looked at whether blacks and whites were voting differently.

**Q.**  And you mentioned at the end of your testimony -- I want to
make sure I have this right -- that you only offered primaries as
a rebuttal, primary results as a rebuttal to John Alfred's
testimony; is that correct?

**A.**  Well, again, I do look at primaries in general -- in general
in a broad sense as opposed to in general elections.  I look at
primaries because this is a two-stage election process, and you
want to see what happens in the primaries.  But it is, in fact,
not a particularly arduous process to get through a primary in
this area.  But it is certainly the case in other cases that I
have been involved in that the primary is the election in which it
is difficult for black preferred candidates to be elected.  So
that's the only reason for looking at primaries.

**Q.**  Is a reason that you looked at the primaries to help establish
your conclusion that there's racial polarization in these contests
that you analyzed?

**A.**  There is racial polarization in the primaries, but no, it is
the stark polarization in the general elections that I would say
is the stumbling block to black voters being elected -- to black

1  voters being able to elect their candidates of choice.

2  **Q.**  I'm not sure that answered my question.  So is one of the

3  reasons or is the reason that you included primary contests in

4  your rebuttal declaration to demonstrate racial polarization in

5  Georgia?

6  **A.**  And I think I did answer it.  I said the reason that I did

7  that was I typically do that to see if primaries are polarized to

8  the degree that it makes it difficult for black voters to elect

9  their candidates of choice.  That is not the case in many

10  instances, in the instances that I looked at here in Georgia.

11  **Q.**  Is it fair to say that the answer to my question is yes?

12  **A.**  Repeat the question.

13  **Q.**  Is the reason you utilized primary data, primary races in your

14  rebuttal declaration in order to prove your conclusion that

15  there's racial polarization in Georgia, yes or no?

16  **A.**  No.

17  **Q.**  No?  Okay.  Thank you.

18       MR. JACOUTOT:  No further questions.

19       THE COURT:  Any direct?

20       MS. LAKIN:  Just very briefly.

21  REDIRECT EXAMINATION

22  BY MS. LAKIN:

23  **Q.**  Dr. Handley, do you typically look at primary elections when

24  you conduct racial block voting analyses generally?

25  **A.**  I do generally.

1      As I said, it's a matter of determining where the problem

2  areas might be for minorities in term of electing their candidates

3  of choice.

4  **Q.**   So looking at Democratic primaries is a typical aspect of your

5  racial block analysis?

6  **A.**   Yes.  Because minorities typically vote in the Democratic

7  primaries.

8              MS. LAKIN:  No further questions.

9              THE COURT:  Recross?

10             MR. JACOUTOT:  No Recross.

11             THE COURT:  Thank you.  We'll stop right here for lunch,

12  and we will start back here at 1:30.  Thank you.

13             (Whereupon, the hearing broke for lunch at 12:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 10th day of February, 2021.

10

11

12

13

14                      /s/Viola S. Zborowski_____
                        VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                      OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25