```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4  ALPHA PHI ALPHA FRATERNITY,    )
    INC., ET AL.,                  )
 5                  PLAINTIFFS,    )
                                   )  DOCKET NO. 1:21-CV-05337-SCJ
 6       -VS-                      )  VOLUME 5 - A.M.
                                   )
 7  BRAD RAFFENSPERGER,            )
                                   )
 8                  DEFENDANT.     )
    _____)
 9  COAKLEY PENDERGRASS,           )
    ET AL.,                        )
10                  PLAINTIFFS,    )
                                   )  DOCKET NO. 1:21-CV-5339-SCJ
11       -VS-                      )
                                   )
12  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
13                  DEFENDANTS.    )
    _____)
14  ANNIE LOIS GRANT, ET AL.,      )
                                   )
15                  PLAINTIFFS,    )
                                   )  DOCKET NO. 1:22-CV-00122-SCJ
16       -VS-                      )
                                   )
17  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
18                  DEFENDANTS.    )
    _____)
19
            TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20             BEFORE THE HONORABLE STEVE C. JONES
                  UNITED STATES DISTRICT JUDGE
21                FRIDAY, FEBRUARY 11, 2022

22

23          VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
        OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
24                UNITED STATES DISTRICT COURT
                       ATLANTA, GEORGIA
25                      404-215-1479
                VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1  APPEARANCES:

 2  ON BEHALF OF THE PLAINTIFF:

 3   KEVIN J. HAMILTON, ESQ.
     ABHA KHANNA, ESQ.
 4   SOPHIA LIN LAKIN, ESQ.
     ARI J. SAVITZKY, ESQ.
 5   RAHUL GARABADU
     ROBERT BOONE
 6   ALEX W. MILLER
     MAURA DOUGLAS
 7   ANURADHA SIVARAM
     EDWARD WILLIAMS
 8   JENNESA CALVO-FRIEDMAN
     ABIGAIL SHAW
 9

10

11  ON BEHALF OF THE DEFENDANT:

12   BRYAN P. TYSON, ESQ.
     LOREE ANNE PARADISE, ESQ.
13   BRYAN JACOUTOT, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2   WITNESS                    VOIR
                        DIRECT  DIRE    CROSS    REDIRECT   RECROSS
3
      RICHARD BARRON          6    10    55, 86      114       116
4     JOHN MORGAN           118

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Held in open court at 9 a.m.)

2          THE COURT:  Mr. Tyson, the State will present their

3     case.

4          MR. TYSON:  Thank you, Your Honor.  We're going to call

5     Gina Wright to the stand first.  While Ms. Wright is coming to the

6     stand, I wanted to raise a couple of issues for the Court.

7          We filed yesterday our consent motion for extension of

8     time for additional time to answer to February 25.  In all three

9     cases, February 25 is when it is agreed -- they accommodated us

10    and we appreciate that.

11         THE COURT:  It will so be ordered.  It will be February

12    25.  Let me also say, I can't remember the exact date that y'all

13    have to provide your findings of fact and conclusions of law.  I

14    think it was five days after the hearing ends.  I'm confident by

15    next Friday the 18th to have the findings of facts and conclusions

16    of law by 5:15.

17         MR. TYSON:  That will work.  And then, Your Honor, along

18    the lines of the Plaintiffs in terms of the exhibits that were not

19    objected to, I believe Exhibits 1 through 37, there wasn't any

20    objection to those, we move those to be admitted.

21         THE COURT:  Admitted into evidence without objection.

22    Well, first of all, any objections of 1 through 37 from

23    Pendergrass and Grant?

24         MR. HAMILTON:  No, Your Honor.  I don't believe so, with

25    the exception of Ms. Wright's declaration, Judge.

```
1              MR. TYSON:  We didn't mark that one yet.

2              MR. HAMILTON:  So no objection to that range.

3              THE COURT:  Okay.  From the Alpha attorneys, any

4    objections?

5              MR. SAVITSKY:  No, Your Honor.

6              THE COURT:  State's 1 through 37 is admitted without

7    objection.

8              (State Exhibits 1 through 37 were received and marked

9    into evidence.)

10             MR. TYSON:  And then, Your Honor, Exhibit 38 is the

11   report of Lynn Bailey; we move to admit that as well.

12             MR. HAMILTON:  And, Your Honor, I do have an objection

13   to that.  During the voir dire examination of Ms. Bailey, I would

14   like to explore that report and the reasons why we think that she

15   should not be qualified as an expert, nor the report admitted.

16             So I would like to object at this point without any

17   foundation being laid for the report.

18             MR. TYSON:  And to be clear, I'm not bringing

19   Mr. Riley.  I'm bringing Ms. Bailey to testify here this week, the

20   Richmond County Elections Director.

21             THE COURT:  Any objection?

22             MR. SAVITZKY:  No, Your Honor.

23             THE COURT:  38 is admitted without objection.

24             MR. TYSON:  Thank you, Your Honor.

25             (State's Exhibit 38 was received and marked into
```

1  evidence.)

2        THE DEPUTY CLERK:  Do you solemnly that the evidence you

3  shall give in the matter now before this Court, shall be the

4  truth, the whole truth and nothing but the truth, so help you God?

5        THE WITNESS:  I do.

6        THE DEPUTY CLERK:  If you would please state and spell

7  your name for the record.

8        THE COURT:  Yes, you can take that off.

9        THE WITNESS:  My name is Gina Wright, G-I-N-A,

10 W-R-I-G-H-T.

11       THE DEPUTY CLERK:  Thank you.

12 DIRECT EXAMINATION

13 BY MR. TYSON:

14 **Q.**  Good morning, Ms. Wright.  Good to see you.

15 **A.**  Good morning.

16 **Q.**  So we know each other, obviously.  I'm Brian Tyson.  I

17 represent the Secretary of State.

18    I want to begin today if you could just briefly summarize for

19 the Court your background and experience with redistricting.

20 **A.**  Sure.  I have worked for the Legislative and Congressional

21 Reappointment Office of the Georgia General Assembly for 21 years,

22 just over 21 years.  I've been the director for almost ten.  And

23 I've worked with multiple jurisdictions on redrawing district maps

24 over that time period.

25 **Q.**  And how many redistricting cycles have you drawn redistricting

1  plans?

2  **A.**   This is my third redistricting cycle.

3  **Q.**   And for what jurisdictions does your office draw redistricting

4  plans?

5  **A.**   We work with all levels of government, from small city council

6  boards, county commissions, county school boards, the occasional

7  water authority, up through the state level maps with the State

8  House, State Senate and the U.S. Congressional District map for

9  Georgia.

10  **Q.**   Approximately, and I know this will be a guess, how many maps

11  do you think you've drawn that have actually been used in Georgia

12  elections?

13  **A.**   Oh, probably hundreds.

14  **Q.**   And did you draft the statewide redistricting plans for State

15  House, State Senate, and Congressional Districts in 2021?

16  **A.**   Yes, I did.

17  **Q.**   Does your office reevaluate redistricting plans drawn by

18  others?

19  **A.**   Yes, we do.

20  **Q.**   And what does that involve?

21  **A.**   What that would include is a technical review of the maps.

22      So we look for things such as unassigned geography,

23  inconsistent geographic features, voting amenity issues where a

24  precinct is split, population.  We also look at things that might

25  involve the Voting Rights Act, and if there is anything there that

1 we see, we would encourage them to discuss that with counsel.

2 **Q.** And do you personally undertake those reviews as part of your

3 role as the director?

4 **A.** Yes, I do.

5 **Q.** And do you know approximately how many maps not drawn in your

6 office you conducted a technical review of?

7 **A.** I have no idea. Probably more than dozens.

8 **Q.** And did your office, I think you mentioned, issue a

9 certification for maps after a technical review?

10 **A.** Yes. This process was set up in 2019 as a way of -- because

11 these bills, they have to come through legislation to adopt these

12 maps. This process was set up so that we would be sure that what

13 we're putting into legislation for the members of the Georgia

14 General Assembly is technically sound and a good map for them to

15 push through, good in terms of technical qualifications before

16 they put it into legislation. So we began doing that this cycle.

17 **Q.** And have you ever served as an expert witness before on

18 redistricting?

19 **A.** I've served as the technical expert to the Court, yes.

20 **Q.** And what are some cases where you've served as a technical

21 expert to the Court?

22 **A.** I don't know the specific names. I think they're listed in my

23 report. I know I've worked with cases with Cobb County, and I've

24 worked on cases in Fayette County, Richmond County, Clayton

25 County. I was named in the -- one of the Sumter County cases, I

1 believe.  So several.  I think they're listed.

2          THE COURT:  Mr. Tyson, and to the Pendergrass, Grant and

3 Alpha attorneys, about seven years ago, she worked with me in

4 drawing the maps for Cobb County.

5 BY MR. TYSON:

6 **Q.**  And, Ms. Wright, you've also been an expert witness in the

7 Dwight case for one of the Congressional Districts in Georgia;

8 right?

9 **A.**  That's correct.

10 **Q.**  And is your work in redistricting, in analyzing demographic

11 data based on particular types of data in your office?

12 **A.**  Can you clarify what you mean?

13 **Q.**  So what types of data do you use in your work in your office?

14 **A.**  The primary source is census data from the most recent census.

15 We might also review previous census data, if necessary.  We also

16 do bring in data from the Secretary of State's office specific to

17 Georgia election return data.

18 **Q.**  And does that include voter registration data?

19 **A.**  Yes.

20 **Q.**  It includes election returns?

21 **A.**  Yes.

22 **Q.**  Is the process of your work in redistricting and analyzing

23 demographic data something that requires technical and specialized

24 knowledge?

25 **A.**  I would think so, yes.

1          MR. TYSON:  So, Your Honor, pursuant to Federal Rule 702

2     we move that Ms. Wright be qualified as an expert on redistricting

3     in Georgia and the analysis of demographic data in Georgia.

4          THE COURT:  Do you wish to voir dire?

5          MR. HAMILTON:  Please.

6     VOIR DIRE EXAMINATION

7     BY MR. HAMILTON:

8     **Q.**  Good morning, Ms. Wright.

9     **A.**  Good morning.

10    **Q.**  Kevin Hamilton on behalf of the Pendergrass and Grant

11    plaintiffs.

12         You mention that you served as a technical advisor to

13    different Courts on various occasions; is that right?

14    **A.**  That's correct.

15    **Q.**  Including this Court?

16    **A.**  Yes.

17    **Q.**  And you mentioned a number of them in your declaration?

18    **A.**  I'm sorry, I didn't hear what you said.

19    **Q.**  You mentioned a number of them in your expert report?

20    **A.**  Yes.

21    **Q.**  But not all of them; right?

22    **A.**  I didn't hear what you said.  Sorry.

23    **Q.**  Not all of them?

24    **A.**  I'd have to go back and look.  I can't remember what's all on

25    it.  I'd have to check.

1    **Q.**  One of the ones you didn't include was the Georgia State

2    Conference of the NAACP v. The State of Georgia; is that right?

3    **A.**  I'm not sure.

4    **Q.**  I'd like to ask you a couple of questions about that case.

5             MR. HAMILTON:  Your Honor, I've got highlighted copies

6    of the case that I would like to distribute, if I could.

7             THE COURT:  Okay.

8             MR. HAMILTON:  I failed to provide one to the witness.

9    May I approach?

10            THE WITNESS:  Thank you.

11            THE COURT:  I'm familiar with the case.

12            MR. HAMILTON:  Okay.

13   BY MR. HAMILTON:

14   **Q.**  Do you recall this case, Ms. Wright?  It involved

15   gerrymandering, racial gerrymandering challenge to House Districts

16   that were redrawn in 2015?

17   **A.**  Yes, I do.

18   **Q.**  Those were HD 105 and House District 111?

19   **A.**  Yes.

20   **Q.**  You were a witness?

21   **A.**  Yes.

22   **Q.**  In fact, you drew those two House Districts, didn't you?

23   **A.**  Yes.

24   **Q.**  The case involved two white Republican incumbents, Joyce

25   Chandler in District 105 and Brian Strickland in House District

1  111?

2  **A.**  Yes.

3  **Q.**  They went to you to enlist your help in redrawing their

4  districts; is that right?

5  **A.**  Yes.

6  **Q.**  You testified in that case that in redrawing those two

7  districts, you worked to adhere to traditional redistricting

8  principles in redrawing those two districts; right?

9  **A.**  That's correct.

10  **Q.**  And if we could just call up the opinion at page 3.  The

11  second highlighted passage, the Court found that more often the

12  new maps had a negative impact on those principles.  For example,

13  the new maps created districts that were less compact, deviated

14  more from the ideal district size, split more municipalities

15  across district lines, and split more districts across county

16  lines.  Did I read that correctly?

17  **A.**  You did read that correctly.

18  **Q.**  And the map you drew, if we can turn to the next highlighted

19  section, gave Districts 105 and 111 more white voters and fewer

20  black voters; is that right?

21  **A.**  That is what this says.

22  **Q.**  It also said more white -- it says, "No party to this lawsuit

23  disputes that redrawing Districts 105 and 111 made them more white

24  and less black"?

25  **A.**  What was the question?  I'm sorry.

1 **Q.** That's what the Court found; right?

2 **A.** That is what this says.

3 **Q.** And in the next section in assessing the credibility of the

4 witnesses, the Court specifically held that the statements of

5 Ms. Wright and Mr. O'Connor are sometimes at odds with other

6 evidence in the record. Do you recall that?

7 **A.** Not specifically, but I'm sure if you say it's in there.

8 **Q.** We just pulled it up on the screen. Does that refresh your

9 recollection?

10 **A.** That's what that says, yes.

11 **Q.** And then in the conclusion of the Court's opinion, the last

12 passage I'll highlight, the Court said -- if we could call

13 that up -- Ms. Wright and her colleagues openly undertook to help

14 Republican incumbents. In doing so, the 2015 redistricting moved

15 many black voters from districts where their votes would have made

16 an impact into districts where they did not. And it ended with

17 this statement, "But fair and effective representation is

18 decidedly not what the voters removed from House District 105 and

19 111 got." Do you see that?

20 **A.** I do see that.

21 **Q.** Now, let me put that aside and let me ask you about your

22 declaration. You filed a declaration in this case; is that right?

23 **A.** Yes.

24 **Q.** And I believe it's been marked as an exhibit. I have hard

25 copies here I'd like to hand out for ease of reference.

1           MR. HAMILTON:  May I approach, Your Honor?

2           THE COURT:  Yes.

3   BY MR. HAMILTON:

4   **Q.**  If I could direct your attention -- well, first of all, I've

5   called up a copy of the report.  You recall filling out or

6   preparing this declaration as an expert in this case; correct?

7   **A.**  Yes.

8   **Q.**  You wrote it?

9   **A.**  Yes.

10  **Q.**  So let's turn to paragraph ten of your report.  In paragraph

11  ten in the last sentence you say, "Six of the new districts

12  created in the Cooper State Senate plan have black voter

13  registration of less than 50 percent."  Do you see that?

14  **A.**  I see that.

15  **Q.**  You don't anywhere in this report identify which six

16  districts, do you?

17  **A.**  I don't believe so.

18  **Q.**  And you don't identify the source of the black voter

19  registration figure?

20  **A.**  As I mentioned, we have data from the Secretary of State's

21  office.

22  **Q.**  But you don't mention that as the source here, do you?

23  **A.**  Oh.  I don't see that in there, no.

24  **Q.**  You don't offer the Court a specific percentage?

25  **A.**  A specific percentage of what?

**Q.**   It says "less than 50 percent."  Every number between zero and 50 is less than 50 percent; isn't that right?

**A.**   Yes.

**Q.**   You don't provide the Court with the numbers from which that percentage was calculated in your report?

**A.**   Is that a question?

**Q.**   Yes.

**A.**   No, I did not.

**Q.**   And there's no tables or backup data in your report, there's no missing appendices, this is it; is that right?

**A.**   Correct.

**Q.**   And the same thing happens in paragraph 11.  If we look at paragraph 11, it says in the second sentence, "The district barely crosses 50 percent any part black voting age population and only achieves that number by connecting black voters in Augusta with black voters in Milledgeville and Warner Robins."  You don't provide a specific number here, do you?

**A.**   No, I do not.

**Q.**   Or the backup data from which that percentage, whatever it might be, was actually derived?

**A.**   No, I do not.

**Q.**   Paragraph 12 on the next page has the same issue.  You discuss District 28 has a voter registration of less than 50 percent, but don't provide the Court with any actual percentage?

**A.**   Yes, that's what it says.

1  **Q.**  And there is no backup data?

2  **A.**  Are you asking is there any?  Well, I have the data; it's not

3  included here yet.

4  **Q.**  And there is no way for this Court to assess or weigh that

5  calculation, because you didn't provide that calculation for the

6  Court?

7  **A.**  I was under the impression this was an initial report and

8  there would be more information forthcoming.

9  **Q.**  I could keep going, but the fact is, you'll agree with me,

10  that throughout the report almost without exception,

11  there's -- you don't provide the Court with specific percentages

12  anywhere in this report, do you?

13  **A.**  That's correct.

14  **Q.**  You mention that District 22 and its, quote, traditional

15  boundaries in Richmond County, but there's no place in your report

16  where you describe what those traditional boundaries in Richmond

17  County are; is that correct?

18  **A.**  That's correct.  It's just that it's within Richmond County,

19  is the traditional location of that district.

20  **Q.**  You don't identify the boundaries of -- what you call the

21  traditional boundaries of that district?

22  **A.**  No, I don't know them specifically.

23  **Q.**  You comment on compactness in various districts.  I'll direct

24  your attention to paragraph 25 of your report.  Tell me when

25  you're there.

**A.**   Okay.

**Q.**   Second sentence says, "The three-way division of Baldwin makes no sense and is not at all compact."  Do you see that?

**A.**   Yes.

**Q.**   The very next paragraph you say, paragraph 15 -- sorry, "District 145 is relatively compact."  That's the way the sentence starts; correct?

**A.**   Correct.

**Q.**   But there's no compactness measures of either district here; correct?

**A.**   Correct.

**Q.**   Nowhere is there a REOC score or a Polsby-Popper score reported or afforded for each of these districts?

**A.**   Correct.

**Q.**   No comparison to the enacted plan?

**A.**   Right.

**Q.**   In fact, if we compare House District 149, the one that you say is not at all compact, it's, in fact, more compact than the enacted plan, isn't it?

**A.**   I can't answer that question.

**Q.**   Well, let's take a look.

     Let me direct your attention to Exhibit 3.  It's been admitted into evidence at page 132.  This is Dr. Esselstyn's report where he reports the compactness score, and I would like Trisha to highlight HD 149 so we can see what the compactness of that

1  district is as reported by Dr. Esselstyn.

2      For the REOC score it's .32; is that right?

3  **A.**  That's what this shows.

4  **Q.**  You're familiar with the REOC scores; correct?

5  **A.**  I'm familiar with them, but I don't utilize those reports, so

6  I don't know them in detail.

7  **Q.**  Zero is the least compact?

8  **A.**  Right.

9  **Q.**  One is the most compact; you know that?

10  **A.**  Yes.

11  **Q.**  And while we here, we'll look at the Polsby-Popper measure for

12  this House District, again, it's House District 149 is .22;

13  correct?

14  **A.**  That's what this says.

15  **Q.**  And again, zero is the least compact, and 1.0 is the most

16  compact?

17  **A.**  Are you asking me?

18  **Q.**  Yes.

19  **A.**  I believe that to be true.

20  **Q.**  So let's compare Dr. Esselstyn's plan to the enacted plan that

21  we just looked at.

22          MR. HAMILTON:  And, Trisha, same exhibit, Exhibit 3,

23  page 148.  And if we could highlight District 149, House District

24  149.

25  BY MR. HAMILTON:

1  **Q.**   We see it has a REOC score of .42; is that right?

2  **A.**   That's what this says.

3  **Q.**   And a Polsby-Popper score of .23?

4  **A.**   That's also what it says.

5  **Q.**   So if we put those numbers together -- Trisha, I think we've

6  done that in an illustrative exhibit here.

7  BY MR. HAMILTON:

8  **Q.**   So as measured by the REOC and Polsby-Popper measure in both

9  cases, the Esselstyn plan, House District 149, is more compact

10  than the enacted plan; is that right?

11  **A.**   I would need to double-check that the numbering of the

12  districts is the same and the same location, because a district

13  drawn in one place might have a different district number.  So

14  without knowing the maps I'm looking at with the numbers, I can't

15  really say that that's completely true and in the same location.

16  **Q.**   All right.  Fair enough.  The point is you didn't provide any

17  statistical measures of the compactness other than your opinion

18  unsupported by specific data; correct?

19  **A.**   That's correct.

20  **Q.**   No calculation of data to reach a result or conclusion?

21  **A.**   Correct.

22  **Q.**   And then finally in your declaration on paragraph 12, in

23  paragraph 12, if I could direct your attention to that, do you see

24  the sentence that begins "Coweta County" on page 7?

25  **A.**   Oh, Coweta County?

1  **Q.** Yeah, if you look --

2  **A.** Yes.

3  **Q.** Coweta County -- I'm just going to read it into the record.

4  Quote, Coweta County was previously, the new district

5  configuration will result in the division of Coweta County into

6  three districts, 16, 35, 29, which are apparently based on race,

7  period, close quote.

8      That's what you wrote in your report; is that right?

9  **A.** That does appear to have a typographical error in it.

10          MR. HAMILTON:  Your Honor, we would object to Ms. Wright

11  as an expert.  Her credibility has been specifically questioned by

12  the Court in connection with the 2015 redistricting where she

13  moved many black voters from districts where their votes would

14  have made an impact to districts where they would not.  And a

15  report is little more than a running commentary untethered to

16  data, much less any sort of scientific or technical analysis that

17  would lend to credibility before this Court.  I'm sure you know

18  under Evidence Rule 702, expert witnesses who are qualified by

19  knowledge, skill, experience, training or education may testify in

20  the form of an opinion or otherwise, subject to four requirements:

21          Number one, the expert's scientific, technical or other

22  specialized knowledge will help the trier of fact understand the

23  evidence or to determine a fact in issue.  That's A.

24          Number two, the testimony is based on sufficient facts

25  or data.

1        Number three, the testimony is the product of reliable

2   principles and methods.

3        And number four, the expert has reliably applied the

4   principles and methods to the facts of the case.

5        I'm sure Your Honor recalls 702 was specifically amended

6   to ensure the reliability of expert and scientific evidence

7   produced in federal courts.  Ms. Wright fails on at least three of

8   the four grounds; although she has practical experience relating

9   generally to redistricting, she doesn't apply that technical or

10  specialized knowledge here in any way which might be helpful to

11  this Court.  And her credibility has been specifically questioned.

12  But more importantly, her testimony is not based on sufficient

13  facts or data which are notably absent from the report.  Instead,

14  the report is full of conclusory statements, but bereft of facts

15  or data upon which an expert might reasonably rely.  That's the

16  settling of the two-prong rule, and it's absent from her report;

17  no facts or data.

18        Number two, she has not and cannot show that her

19  analysis or conclusions to the product are reliable principles or

20  methods at 702(C), and it, too, is wholly absent from her report.

21  She doesn't mention, much less discuss, whatever the principles or

22  methods she utilizes to reach her conclusions.  A good example is

23  the compactness.  She says this is not at all compact without

24  providing any kind of compactness score or even a comparison --

25        THE COURT:  I think your argument is going to what

 1  weight I should give her testimony, not so much if she is

 2  qualified to testify as an expert.  I will let you finish, and

 3  I'll hear from Mr. Tyson.

 4          MR. HAMILTON:  I'm sorry?

 5          THE COURT:  Finish your argument and I'll hear from

 6  Mr. Tyson.

 7          MR. HAMILTON:  Thank you.  And the last part is she

 8  fails to explain how she's reliably applied the unidentified

 9  principles or methods to the facts of the case.  That's 702(D).

10  The report is nothing more than a collection of running commentary

11  and unsupported conclusions without a foundation in facts or

12  scientific or technical methodology.  There is no showing that

13  she's applied in a reliable manner, scientific or technical

14  principles or methods to the facts of the case.  That is the third

15  problem.  There is no reliable application of recognized

16  principles or methods to the facts in violation of 702(D).

17          Each of those flaws is an independent basis for

18  excluding her as an expert and sustaining an objection to her

19  report, and I would submit that all three of those flaws, coupled

20  with the credibility findings in the NAACP decision, point to the

21  same conclusion, that she should be excluded as an expert.

22          So, Your Honor, the State carries the burden of

23  establishing her credentials as an expert witness.  We would

24  submit they have failed to carry that burden, and we would urge

25  the Court to -- to decline to certify her as an expert.

1           THE COURT:  Thank you.  Alpha attorneys.

2           MR. SAVITZKY:  No position at this time, Your Honor.

3  We're happy to cross on this as well.

4           THE COURT:  Ms. Tyson, any response to the objection of

5  Ms. Wright testifying as an expert?

6           MR. TYSON:  Thank you, Your Honor.  Just a couple of

7  points in response.

8           First, I think it's important to note that in the

9  Georgia and State Conference of the NAACP case, this was an order

10 on a preliminary injunction.  Ms. Wright didn't testify in court.

11 In fact, Judge Duffy specifically criticized the majority for

12 making a credibility determination without hearing from

13 Ms. Wright, and when he watched her video testimony, as he said

14 later in that opinion, he declined to join the majority in their

15 opinions about Ms. Wright's credibility.

16          Further, as this Court will recall, the time period for

17 Ms. Wright to draft this report was about 18 hours.  And there,

18 obviously, will be further developments as we go along here.

19          But all the issues that Mr. Hamilton has identified,

20 Ms. Wright has testified she uses a consistent method in reviewing

21 plans.  She has census data.  She has the types of data.  She

22 discusses her analysis of these plans.  None of that goes to her

23 qualifications as an expert.  You may choose to discount some of

24 her testimony about that, but we believe that goes to the weight,

25 not to her qualifications as an expert.

1          THE COURT:  All right.  Based on what I've heard, I'm

2    going to overrule the objection.  Ms. Wright will be allowed to

3    testify as an expert.  The things that you pointed out goes to how

4    much weight should I give to the testimony, not to her

5    qualifications to testify.  She may testify as an expert.

6          So I note your exception and Alpha's exception to my

7    ruling her to testify as an expert, but I'm going to allow her to

8    testify as an expert.

9          MR. TYSON:  Thank you, Your Honor.

10   DIRECT EXAMINATION

11   BY MR. TYSON (continues):

12   **Q.**  Ms. Wright, in front of you -- we have marked in front of you

13   your report.  Can you take a look at that, please.

14       So do you recall what you were asked to do in this case?

15   **A.**  Yes.

16   **Q.**  And what were you asked to do?

17   **A.**  To review the submitted plans that were presented as

18   alternatives to the maps that were enacted by the General

19   Assembly.

20   **Q.**  And let's begin first with Mr. Cooper's maps of the House and

21   the Senate.  Do you recall reviewing those plans?

22   **A.**  Yes.

23   **Q.**  And did you notice anything in particular about Mr. Cooper's

24   maps based on your initial review?

25   **A.**  They were significantly different from what we have drawn.

**Q.**  Were the deviations higher than the deviations on the adopted plans?

**A.**  I believe so, yes.

**Q.**  And can you remind us briefly what a deviation is?

**A.**  A deviation is the measure of population above or below the ideal district size, whatever that ideal size is; it's either a whole number figure, a population above or below, or it can be calculated as a percentage.

MR. HAMILTON:  Objection, Your Honor.  None of this is included in the report by Ms. Wright.  There's nothing about deviation, population deviation in the Cooper plan.

MR. SAVITZKY:  And that objection we join in, Your Honor.

THE COURT:  Mr. Tyson, how can Ms. Wright testify about that if it hasn't been disclosed to the other parties?

MR. HAMILTON:  Your Honor, I'll take that point and I'll move on at this point.

THE COURT:  Sustained.

MR. TYSON:  Because of the record, I'll get to the point with other witnesses and not belabor the point here.

BY MR. TYSON:

**Q.**  Ms. Wright, what I would like to do then is walk through your report in terms of what you looked at for specific districts that were drawn.  If you could turn to paragraph 11 of your report.

In paragraph 11 you looked at proposed Senate District 23; is

1  that correct?

2  **A.**   Yes.

3  **Q.**   And I'm putting on the screen here Plaintiffs' Exhibit --

4  figure 14 in Mr. Cooper's report that shows a representation of

5  Senate District 23.  Do you see that?

6  **A.**   Yes.

7  **Q.**   You say in your report there's not a basis to connect Augusta

8  with Warner Robins in a Senate District if not for the race of the

9  individuals in the districts.  Can you explain that statement to

10  the Court, please?

11  **A.**   There -- between Richmond and Augusta -- Richmond County, the

12  area that surrounds District 23, it's traditionally been in the

13  east Georgia district, and the counties that surround the Augusta

14  area, including part of Augusta, Richmond, Warner Robins is in

15  Macon, which is in central Georgia.  So you're connecting two

16  different areas of the state through one district that's stretched

17  all the way halfway across the state to do that.

18  **Q.**   You discussed with Mr. Hamilton a minute ago the boundaries of

19  District 22.  What are you referring to in your report about

20  taking District 22 outside of its boundaries, traditional

21  boundaries?

22  **A.**   Historically, District 22 in the State Senate map has been

23  within Richmond County, and it's not gone outside of Richmond

24  County.  It is an Augusta district.  That has always been there

25  for a very long time.

1  **Q.**  And does Mr. Cooper's plan take District 22 outside of

2  Richmond County?

3  **A.**  Yes, it does.

4  **Q.**  You also say in your report that District 23 only achieves the

5  50 percent -- over 50 percent any-part black voting age population

6  by connecting black voters in Augusta with black voters in

7  Milledgeville and Warner Robins.  Do you recall that?

8  **A.**  Yes.

9  **Q.**  And what is the basis for that statement?

10  **A.**  There are significant minority populations in Milledgeville,

11  and also -- there's significant minority populations in

12  Milledgille, as well as in Twiggs and Wilkinson Counties.  So

13  reaching from the area where the district was previously located

14  over that way to get through over to Warner Robins where there is

15  also some growing minority population there.  I have no other

16  reason why you would go and draw a district from Augusta to Warner

17  Robins unless that was the purpose.

18  **Q.**  Ms. Wright, I'm assuming as a matter of fact you know who

19  various incumbents are in district -- State Senate Districts?

20  **A.**  I didn't hear the last point.

21  **Q.**  Do you know who the incumbent is in Senate District 23?

22  **A.**  Yes, I do.

23  **Q.**  Who is that?

24       MR. HAMILTON:  Same objection, Your Honor.  We're

25  deviating from the report.  There's nothing about incumbents, who

1  they are and where they live in the report.

2          MR. TYSON:  And, Your Honor, we specifically noticed

3  Ms. Wright as an expert and a fact witness.  She know facts about

4  the incumbents, as she testified based on her work.  I think she

5  can share the facts of the Court about that.  That doesn't require

6  expert opinion.

7          THE COURT:  Anybody can look at the map, Mr. Hamilton,

8  and see those counties.

9          MR. HAMILTON:  As long as we're clear when he's asking

10  her as an expert and as opposed to a fact witness.

11          THE COURT:  This is fact.  There is not the expert.

12  BY MR. TYSON:

13  **Q.**  Mw. Wright, I'm asking you a question -- a factual question

14  for you based on your knowledge of the Legislature.  Who is the

15  incumbent in Senate District 3?

16  **A.**  Senator Max Burns.

17  **Q.**  Is he a Republican or a Democrat?

18  **A.**  He's a Republican.

19  **Q.**  Let's move next to proposed district -- Senate District 28.

20  I'm putting figure 15 from Mr. Cooper's report on there.

21      You indicate that District 28 splits multiple counties with

22  the goal of achieving majority black status.  What do you mean by

23  that?

24  **A.**  So the northern Fayette County area, Clayton County has a

25  significant minority population, and there's also a significant

1  minority population in and around the City of Griffin.  So it

2  connects those three areas to create that district.

3  **Q.**  And you reference an adjoining District 44.  What are the

4  communities that you're referring to in District 28 and 44 in your

5  report?

6  **A.**  So the creation of 20 -- let's see, 28 is taking Fayetteville.

7  It reaches over into Tyrone, and North Peachtree City area, goes

8  across Clayton County, all the way over towards by Schley, and

9  then down towards Griffin, all the way through the city limits, to

10 the far side of Griffin to connect that area.

11 **Q.**  You point out the division of Coweta County on this plan.  Why

12 do you conclude that this division of Coweta County, in your

13 expert report, is based on -- apparently based on race?

14 **A.**  The effect of District 35 wrapping around the City of Newnan

15 and working on the local maps for Newnan, Coweta County, that area

16 on the south side of Newnan has some minority population there.

17 So with District 35 being a majority/minority district, they came

18 across and wrapped around Newnan to go below to the southern part

19 of the city to gather that minority population to include it in

20 District 35.  That's what it would look like to me.  I don't know

21 why you would wrap around the city otherwise.

22 **Q.**  And you reference there is no connection to a type of

23 community out in district -- I'm sorry -- sorry.  Let me go back

24 to the first part of paragraph 12 of your report.

25     You say District 28 unites with areas of Jonesboro and areas

1  south of Griffin apparently for the purpose of including that

2  black population in Griffin.  Can you explain that statement to

3  the Court?

4  **A.**  Yes.  I think I sort of did a little bit already.  But the

5  area around Jonesboro and Clayton County, this is a large minority

6  population there.  So connecting that with the area north Fayette

7  and then reaching down into Griffin where there is -- in Griffin

8  there is also a minority population; that's what I mean by that

9  statement.

10  **Q.**  And you indicate that District 28 has a black voter

11  registration of less than 50 percent.  Where did that information

12  come from?

13  **A.**  Can you repeat that one more time?

14  **Q.**  The last sentence of paragraph 12 indicates that District 28

15  has black voter registration of less than 50 percent.  What is

16  your basis for that statement?

17  **A.**  We have voter registration data from the Secretary of State's

18  office that's by precinct.  So we're able to look at what that

19  percentage would be by district.  It estimates where some

20  precincts are split.  It gives us a pretty good idea of what the

21  percent voting registration is with any district that we draw.

22  And in this particular case in applying that data here, it was

23  less than 50 percent.

24              THE COURT:  What was it?

25              THE WITNESS:  I don't know.  It was in the 40s, but I'm

1  not sure exactly.

2            THE COURT:  48 or 49?

3            THE WITNESS:  I'd have to review the data again and see.

4  BY MR. TYSON:

5  **Q.**  Let's go to District 17.  District 17 is an area you have some

6  familiarity with?

7  **A.**  Yes.

8  **Q.**  You indicate in paragraph 13 of your report that District 17

9  connects black population in Stonecrest to the Ola and Lake Dow

10  communities in Henry County.  What are those communities?

11  **A.**  In reference to the map or what are they describing, the

12  communities?

13  **Q.**  Can you describe those communities?  You're talking about them

14  being connected, but what are you referring to there?

15  **A.**  So Ola and Lake Dow are very rural communities in Henry

16  County.  They're in the area of the bottom portion of this

17  district, in the 17th District in the orange.  It's a very rural

18  area.  There is no municipality out in that area.  That's very

19  different from what Stonecrest and South DeKalb is, which is

20  definitely much more of a municipalized area, much more urban,

21  connecting two very different communities in one district.

22  **Q.**  You also mention it splits a large neighborhood in Lake Haven

23  with no apparent reason for doing so.  What are you referring to

24  there?

25  **A.**  In Central Henry County there is a large neighborhood there

1  that is very influential in that area that was divided literally

2  through the neighborhood.  Part of the neighborhood in one

3  district, part in another.  There's also a precinct there that's

4  identified that way.  But beyond just splitting the precinct, they

5  literally split through the neighborhood.

6  **Q.**  And why would splitting a neighborhood be of note for you?

7  **A.**  Well, if you maintain communities, that's definitely a

8  community.  When you look at that small level of a neighborhood in

9  and of itself, you're putting people in the same neighborhood in

10 different districts, having to vote in different combos for

11 different candidates that live in the same neighborhood and share

12 the same interests with each other.

13 **Q.**  Now, as a matter of just factual basis for the Court, who is

14 the incumbent in Senate District 28?

15 **A.**  Matt Brass, Senator Matt Brass.

16 **Q.**  He's a Republican?

17 **A.**  Yes, he is.

18 **Q.**  And who is the incumbent as just a factual matter in District

19 17?

20 **A.**  Senator Brian Strickland.

21 **Q.**  And what is his political party?

22 **A.**  He's also a Republican.

23 **Q.**  Going back to your expert report in paragraph 14, you conclude

24 that the additional districts -- and does that refer to the three

25 districts you just analyzed in the preceding paragraphs?

1   **A.**   I'm sorry, can you repeat that?

2   **Q.**   So in paragraph 14 when you say, "The additional districts

3   this plan proposes."  Are you referring to Districts 23, 28, and

4   17?

5   **A.**   Yes.

6   **Q.**   And you conclude that they appear to be drawn based on race?

7   **A.**   It appears to be that way.

8   **Q.**   And, again, what is -- you made this conclusion.  Is that

9   based on all of the analysis that you described in the paragraphs

10  that went before paragraph 14?

11  **A.**   Yes.

12          THE COURT:  Ms. Wright, in the adopted plan, are there

13  any counties or areas that's urban in one spot and then another

14  spot is rural?

15          THE WITNESS:  We try not to do that, if we can.  I'd

16  have to go back and review all of the districts to verify that.

17  But it's very different communities.  So if we're trying to

18  maintain communities, we try to avoid doing that.

19          THE COURT:  Southwest Cobb County, how would you

20  describe it?

21          THE WITNESS:  Southwest Cobb County?  I think that is

22  near Powder Springs and that vicinity?

23          THE COURT:  Yes.

24          THE WITNESS:  I haven't had a lot of experience in that

25  area, but it is municipalized.  It is developed.  It's an

1   established older area.  It's been there for awhile.  I don't know

2   if I would define it as rural, per se.  But I don't know if I

3   would define it as urban either.  It's not really an urban area.

4           THE COURT:  Is it part of metro Atlanta?

5           THE WITNESS:  Yes, it's part of metro Atlanta.

6           THE COURT:  How would you describe North Polk County or

7   Bartow County in Northwest Georgia?

8           THE WITNESS:  Those are more rural counties.

9           THE COURT:  But yet in the adopted plan it's in the same

10  Congressional District?

11          THE WITNESS:  That's correct.

12          THE COURT:  Explain to me how is it that -- when you

13  connect a Senate district, urban and rural, and that's wrong, and

14  you connect a Congressional District that's urban and rural and

15  that's right.

16          THE WITNESS:  Sometimes the decisions to combine

17  communities are not ones that I have to make.

18          THE COURT:  That's what keeps happening to me.

19  BY MR. TYSON:

20  **Q.**  Following up on Judge Jones' questions, is there a size

21  differential in the State Senate and Congressional Districts?

22  **A.**  Yes, there is.

23  **Q.**  And do Congressional Districts -- I guess they have to contain

24  a lot more people than a State Senate district does?

25  **A.**  Yes, a lot more people.

1  **Q.**  Let's move on to Mr. Cooper's House plan.  And you also

2  analyzed his House districts; is that correct?

3  **A.**  Yes.

4  **Q.**  I should write down my page numbers to get there a little

5  quicker.  Sorry.

6     So I put figure 27 on the screen that shows Mr. Cooper's State

7  House plan.  And I recognize you have not looked at these

8  particular reports, but these are the districts that you reviewed?

9  Is that correct?

10  **A.**  Yes.

11  **Q.**  So let's talk first about District 73.  And this is a district

12  here, the purple or the kind of pink on the map.  Do you see that?

13  **A.**  Yes.

14  **Q.**  And you say that this proposed district uses black population

15  in South Clayton and combines it with black population in Griffin

16  to create a district.  What do you mean, "uses and combines the

17  population"?

18  **A.**  Puts them together.  So you're combining those two areas into

19  one district.

20  **Q.**  You also reference significant changes around those districts.

21  You referenced District 78 and District 109.  What are the changes

22  made that you are referring to there?

23  **A.**  So a lot of times in the creation of a new district that was

24  proposed, the impact of the districts that are around it is more

25  significant than the creation of the district that was put there.

1  And that seems to be the case in this area where District 109 is

2  running, again, across Jonesboro, Clayton County, almost all the

3  way over to the Fayette County line through Henry County and

4  further across, straight through the middle of Henry County there.

5      In District 78, which I can't see fully on the map, that seems

6  to be the similar-type thing.  It went all the way into the City

7  of Jonesboro.  It points directly into the downtown area of

8  Jonesboro and then stretches across Henry County, and I can't

9  fully see it on the map to further give you any analysis of that.

10  But that's what it appears to be.

11  **Q.**  At the end of paragraph 16, you say that District 73 and its

12  surrounding districts break county boundaries in an apparent

13  service of a racial goal.  Can you explain further what you mean

14  by that?

15  **A.**  Sure.  You're dividing counties crossing districts across

16  counties, and we try to avoid doing that in the plans we're doing.

17  We try to eliminate crossing county boundaries more than we have

18  to for population purposes.  We know in the Clayton County area,

19  the majority of the districts that we created were all within

20  Clayton County, because that is a very densely populated

21  community.  The incumbents, four out of five of them live in that

22  community.  So we make sure we try to accommodate those

23  communities by keeping them wholly within those county boundaries,

24  which was one of the guidelines the committee set forth, which was

25  to maintain those political boundaries where we could, which in

1  this case would be the county line.

2  **Q.**  And there are obviously times when you have to cross county

3  boundaries?

4  **A.**  That's correct.

5  **Q.**  And when you have to cross a county boundary, what things do

6  you take into account before you make that break?

7  **A.**  So when you're crossing a county line, I'm going to try to

8  follow things like voting precincts boundaries.  If that's

9  something that I can follow, I'm going to look for major roadways,

10 major geographic features, areas that may share something in

11 common with the district that is coming across to reach into that

12 district for whatever purpose, whether they share a major roadway

13 that they travel or, you know, another resource.  We have places

14 in South Georgia where they share -- local counties can share a

15 similar source.  So connecting those counties or connecting across

16 them makes more sense then to go into another county where they

17 might share anything in common.

18 **Q.**  Are regional commissions something you looked at in trying to

19 decide which counties to connect with --

20 **A.**  I'm sorry, can you repeat that?

21 **Q.**  Are regional commissions something you looked at when trying

22 to decide which counties to --

23        MR. HAMILTON:  Your Honor, again I object.  There is

24 nothing about regional commissions or considering regional

25 commissions and splitting counties in the expert report.

1          THE COURT:  That probably falls on an expert, Mr. Tyson.
2     So I'll sustain that objection.
3          MR. HAMILTON:  Thank you, Your Honor.
4     BY MR. TYSON:
5     Q.  Ms. Wright, let's next -- I'm sorry, one more question here on
6     the factual basis.  Do you know --
7          THE COURT:  Ms. Wright, I apologize.  You're like me.  A
8     lot of times I talk fast.  But Ms. Viola is trying to get it all
9     down.  So just relax.  A lot of times when I start talking and the
10    lawyers tell me a lot of times, Judge, we don't understand what
11    you're saying.  Just slow it down a hair.
12         THE WITNESS:  Yes, sir.
13         THE COURT:  Thank you.
14         MR. TYSON:  All right.  I had the same problem.  I was
15    admonished earlier this week, but trying to slow down a little
16    bit.
17    BY MR. TYSON:
18    Q.  So, Ms. Wright, as a matter of your factual knowledge, do you
19    know who the incumbent in District 73 is?
20    A.  Yes, I do.
21    Q.  And who is that?
22    A.  Representative Karen Mathiak.
23    Q.  And what party is Representative Mathiak?
24    A.  She's a Republican.
25    Q.  Let's move next to District 110, paragraph 17 of your report.

1    You say that it combines pockets of Locust Grove and Henry

2  County, Spalding -- I'm sorry.

3    You say first that Spalding County has traditionally only had

4  two House districts, but this configuration results in four

5  districts.  Can you explain that to the Court?

6  **A.**  Yes, in the past, other cycles of maps in the past, there have

7  been two representatives who represented Spalding County.  This

8  proposal would have four representatives in Spalding County.  I

9  think our proposal may have had three.

10  **Q.**  And you reference, again, an adjoining district, District 111.

11  What are you referring to when you say -- or how did you conclude

12  there was no apparent racial goal, no apparent goal other than to

13  create a majority black district?

14  **A.**  Are you referring to 110 or 111?

15  **Q.**  In your report in paragraph 17 you say it revises District 111

16  in the way that it splits a number of voting precincts with no

17  apparent goal other than to create a majority black district.

18  **A.**  Correct.  So District 111, the way it's configured, wraps

19  around 110.  Again, reaching over through this area of McDonough

20  and the southern part of McDonough and where there's a minority

21  population to go across and gain in that whole area.  I think

22  they're in -- but not quite in Clayton County.  There's another

23  area of minority population combined together in that structure to

24  create that district.

25  **Q.**  And you indicate that you hadn't looked at incumbents, but you

1  are aware of incumbents.  Can you explain that statement to the

2  Court?

3  **A.**  As far as -- I'm not sure I know what you mean.

4  **Q.**  In your report and this paragraph you say you hadn't

5  separately analyzed which incumbents, I'm assuming, were in which

6  districts?

7  **A.**  Correct.

8  **Q.**  What do you mean by you're aware of a number of incumbents in

9  this area that could be affected?

10  **A.**  Specifically in Henry County there are several incumbents who

11  live close to each other, and I did not review their addresses in

12  relation to this map.  But I know that there are several that live

13  close to each other.  So I cannot say whether they would be

14  combined in the same district or not, just due to the fact that

15  they live very near each other.

16  **Q.**  Do you know the -- back to factual questions.  Do you know the

17  incumbent in District 110?

18  **A.**  On this proposed map or...

19  **Q.**  The current District 110.

20  **A.**  Yes.

21  **Q.**  Who is that?

22  **A.**  That's Representative Clint Crowe.

23  **Q.**  Is Representative Crowe a Republican?

24  **A.**  Yes, he is.

25  **Q.**  Let's go next to House District 144.  Figure 32, Mr. Cooper's

1  report.

2      You first say that District 144 in your report it says, "It

3  unites disparate communities in a single district."  Can you

4  explain that?

5  **A.**  Yes, so Taliaferro, Warren Counties are very rural counties.

6  I mean, they are where they are.  But it reaches over in an

7  unusual way to go into Eatonton, to go into Milledgeville and then

8  to sink down even further and pick up Wilkinson County, which in a

9  House district seems like an unusual combination of these areas

10  from a traditional standpoint of what district -- what counties

11  these areas have been combined before.

12  **Q.**  Let me flesh that out a little bit.  So you say it reaches

13  into Clayton and Baldwin Counties.  Did you use the word

14  "unusual"?

15  **A.**  Yes.

16  **Q.**  What do you mean by unusual ways?

17  **A.**  Well, if you look at the shape of how it's drawn, it looks a

18  little unusual to me.

19          MR. SAVITZKY:   Your Honor.

20          THE COURT:  Hold on.

21          MR. SAVITZKY:  The witness doesn't discuss the shape of

22  the districts, the shape of the lines here at all.  I mean, it's

23  not one of the topics discussed in her discussion of District 144

24  in her report.

25          THE COURT:  I'm looking at the report right now,

1  Mr. Tyson, and I don't see it either.

2          MR. TYSON:  Your Honor, it's referring specifically to

3  black population of Eatonton and Milledgeville, I believe that's

4  what Ms. Wright is referring to, of Putman and Baldwin Counties.

5          THE COURT:  It says uses the black population.

6          MR. SAVITZKY:  There is no basis, I think, that the

7  shape has anything to do with that.

8          THE COURT:  Mr. Tyson, she can testify about her reason

9  maybe about the shape.  She can give the reason why she thinks it

10  is the way it is, other than going into the geographical shape.

11          MR. TYSON:  Certainly, we can do that.

12          MR. SAVITZKY:  And, Your Honor, I move to strike the

13  last answer of the witness.

14          THE COURT:  Disregard it.  It's struck.

15  BY MR. TYSON:

16  Q.  Ms. Wright, your report indicates that the District 144 uses

17  black population in the cities of Eatonton and Milledgeville and

18  Hancock and Wilkinson Counties to achieve a district that is

19  barely over 50 percent any-part black voting age population.  Do

20  you see that statement?

21  A.  Yes, I do.

22  Q.  And so when you say "uses black population in Eatonton and

23  Milledgeville," what are you referring to?

24  A.  That the district goes into the cities and bypasses other

25  population that would have been more contiguous, would have been

1  more compact to reach into this area to specifically select that

2  population to add it to that district in order to achieve a

3  particular goal.

4  **Q.**  And you say that "Twiggs and Wilkinson Counties have

5  historically been in the same district"?

6  **A.**  That's correct.

7  **Q.**  And they're divided on this District 144; correct?

8  **A.**  Yes.

9  **Q.**  And when you say in the first paragraph of paragraph 18 that

10 District 144 unites disparate communities in a single district,

11 which disparate communities are you referring to?

12 **A.**  I would say that's Eatonton and Milledgeville, and further out

13 into Wilkinson and into Taliaferro.

14 **Q.**  And Eatonton and Milledgeville are in adjoining counties.  Why

15 would you say they're disparate?

16 **A.**  Communities there are more common.  It's the connection of

17 those two communities with the rest of the district that is much

18 more rural and smaller population areas.

19 **Q.**  Thank you.   Taking you to District 138.  I'm sorry, move on

20 from this.  Let's go to southwest Georgia.

21    Now, Ms. Wright, I'm looking to see -- you reference Tift

22 County.  I don't see a District 138 that touches Tift County.  Do

23 you know what you might be referring to there?

24 **A.**  So 138 is not really shown on this particular map.  The very

25 bottom of it is where it comes into Sumpter County there and goes

1  upward and wraps around in Columbus, picks part of Americus and

2  reaches all the way up into the bottom of Talbot County.  That's

3  what I'm talking about with 138.  I think Tift County just in this

4  southwest Georgia region, I'm including Tift as part of that

5  southwest portion of that region there, that was specifically

6  asked not to be divided into multiple districts through our public

7  hearings.  And we tried to reduce the number of splits there.  It

8  is a larger -- slightly larger county than some of the areas

9  nearby.  We did try to honor the request of people nearby by

10 reducing the split from three to two in the map that the General

11 Assembly adopted.

12 **Q.**  You also said you can't identify a community of interest or a

13 purpose for configuring Southwest Georgia as this plan does.  Can

14 you explain that statement?

15 **A.**  Yes.  I believe that relates to the way that District 138 is

16 connected.  The district that is -- I think it's 151 that's not

17 fully shown on this map either and how they dip down and divide --

18 specifically Sumpter County being split three ways on this map.

19 Those are the districts I think I was referring to.

20    I would also point out in 153 in the same Southwest Georgia

21 region, the same portions where Albany is located to run from

22 Albany down to Thomasville, I do mention that in that paragraph,

23 that that is also communities that would not typically be combined

24 together.  So I'm not sure what the reason would be unless there

25 was another particular goal in mind to draw that.  Albany is

1  very -- is a very unique, defined identity in that region, as is

2  Thomasville further south, but they don't share a common interest.

3  Q.  So let's move next to Mr. Esselstyn's State Senate plan.  I

4  want to begin with the first district.  You begin with District 23

5  in Paragraph 21.  You reference that this district achieves 50.43

6  percent AP black VAP.  Do you see that?

7  A.  Yes.

8  Q.  And you say it's below 50 percent black voter registration.

9  Do you recall what that number was?

10  A.  I don't recall the specific number, but it was below 50.

11        THE COURT:  Mr. Tyson, at some point in time I have to

12  get those numbers.

13        MR. TYSON:  Yes, Your Honor.  Certainly, we can have

14  Ms. Wright as soon as she finishes here, run those for us.

15  BY MR. TYSON:

16  Q.  You reference that this proposed district shifts the district

17  significantly west instead of keeping it an East Georgian

18  district.  Can you explain that?

19  A.  Yes, in the similar fashion to the previous version of this

20  district that we looked at, 23 has -- Senate District 23 has

21  traditionally been surrounding Augusta.  It's an Eastern Georgia

22  district that kind of runs parallel in that area to the state

23  line.  This pushes it further into Central Georgia, into

24  Milledgeville, much further to the west than it traditionally has

25  been.

1  **Q.**  You reference the low black VAP, the specificity of the

2  splits, and the shape of the district as leading to your

3  conclusion that it appears to be drawn with a racial goal in mind.

4  Can you explain that to the Court?

5  **A.**  Sure.  Your Honor, so when we were looking at where they split

6  the counties that they included on this map, they split McDuffy

7  County, which is not a large county as it is, but they split it

8  into  City of Thompson, which has a black population area in the

9  city.

10         THE COURT:  What kind of population?

11         THE WITNESS:  A black population in Thompson.  There is

12  also -- similarly, we looked at Milledgeville has a minority

13  population as well.  It runs through the city, to pick up those

14  areas in the City of Milledgeville.  It also goes up into Greene

15  County.  It's also splitting in Greene County where there is some

16  minority population on that portion of the county as well.  So

17  those areas were specifically divided within those counties.  It

18  also splits Wilkes County for a small area as well.  So those

19  particular splits, to be included with other counties that they

20  added into this district, seem to me to have had a purpose for

21  doing that rather than taking the areas also that are close by in

22  counties such as Jenkins, or just making it more compact in the

23  region that it is currently in.

24  **Q.**  Let's go back to Senate District 28.  That's the next one in

25  your report.  District 28 is generally the same area that I think

1  we've already discussed in Mr. Cooper's plan.

2     You say that Riverdale and Newnan have little in common and do

3  constitute a community of interest.  Can you explain that?

4  **A.**  I think that's a typographical error where the word "not" was

5  not included, but they do not constitute a community of interest.

6  I apologize for the typos.

7  **Q.**  And, again, I know you had a very short time to get this put

8  together.  You say that Clayton County has traditionally been

9  split into two districts, and this would split the county into

10  four districts.  Can you explain that?

11  **A.**  Yes.  Clayton County has typically been represented by Senate

12  Districts 34 and 44 for as long as I've been paying attention to

13  the maps.  This would increase that to four districts within

14  Clayton County within the Senate.

15  **Q.**  So let's go back to the illustrative District 25.  You

16  reference that it is at least more compact in the first part of

17  your sentence there.  Do you see that?

18  **A.**  Yes.

19  **Q.**  And Mr. Hamilton and you had a discussion earlier about

20  compactness.  How do you quantify when you say a district is more

21  or less compact?

22  **A.**  I really look at it and measure it about how I can view these

23  areas in relation to the county lines, in relation to the shape of

24  the district.  I know some of the scores that you run are

25  mathematical, but they vary.

1          MR. HAMILTON:  Objection, your Honor.  None of these

2   methodologies are discussed in this report.

3          MR. TYSON:  I was trying to flush out what she means in

4   the statement in the report, Your Honor.

5          THE COURT:  She's going into areas they have not

6   prepared for.  So I'm going to sustain that.

7   BY MR. TYSON:

8   **Q.**  Ms. Wright, you say that District 25 was apparently connecting

9   pieces of geography apparently in service of a racial goal.  Can

10  you explain that, please?

11  **A.**  In District 25, is that what you said?

12  **Q.**  Yes.

13  **A.**  Yes.  So, again, this is an area that's taking in that side of

14  Henry County.  That's the southwestern side of Henry County

15  combining it with Clayton County to create that -- that particular

16  district.

17  **Q.**  You also reference adjoining District 10.  Can you explain why

18  you have raised or why you say you cannot imagine a non-racial

19  purpose in creating District 10?

20  **A.**  Right.  So in District 10 as it is proposed on this map, you

21  have Butts County in its entirety, which is a rural county.  It's

22  outside -- I mean, I don't know that everyone would consider that

23  even suburban.  It's just a pretty rural county outside of

24  Atlanta, stretching all the way up and following the river, which

25  is the county line, picking up portions of the Ellenwood area of

1  North Henry, Rockdale County, and then reaching up again into the

2  Stonecrest area and DeKalb County.  As far as Senate districts go

3  which are smaller in population than we talked about with others,

4  and those communities are extremely different communities.

5  **Q.**  So let's go next to Mr. Esselstyn's House plan.  And first

6  let's talk about a district we spent a lot of time talking about,

7  District 149.  So you reference that Baldwin County is split three

8  ways, and that District 149 is over 50 percent by 200ths of a

9  point.  Do you see that?

10  **A.**  Yes.

11  **Q.**  When you say the three-way division of Baldwin makes no sense,

12  what are you referring to?

13  **A.**  I'm referring to the way that District 149 runs vertically

14  through the -- the City of Milledgeville all the way up to the

15  northern county boundary there.  If I was going to divide a

16  county, I would try to do it with the compact area or the regional

17  area that borders that, not vertical stripes that run through the

18  county like that -- especially in rural Georgia.

19  **Q.**  And you reference connecting a small portion of Milledgeville

20  with Macon lacks any coherent community.  What are you referring

21  to there?

22  **A.**  Just the two cities are different communities.  They are

23  uniquely their own.  They have their own colleges.  They have

24  their own identities.  They're connecting them in a way that they

25  have not traditionally been connected through this district.

1  **Q.**  And then you see District 145 is right next to it there?

2  **A.**  Yes.

3  **Q.**  So first of all, you reference significant changes in the

4  configuration of North Macon.  Can you explain what those changes

5  are?

6  **A.**  So I'm referring in that to District 143 in that area of Bibb

7  County that is in the northern area.  That district has

8  significantly changed from what it looks like now and divides that

9  area of Macon into different districts.  We had testimony in Macon

10  at that hearing specifically asking to keep their districts with

11  an eastern district and a western district, which is how those two

12  districts where those incumbents that live there are currently

13  drawn.  And they asked we maintain it the same way.  This would

14  take and divide the whole county differently and divide that

15  community which specifically asked -- which is the minority

16  community in Macon that asked for that.  This divides them up into

17  four districts, which would be completely the opposite of what

18  they asked for.

19           THE COURT:  Ms. Wright, Miss Viola --

20           THE WITNESS:  Oh, I'm sorry, I forgot.  My apologies.

21  BY MR. TYSON:

22  **Q.**  Do you want to finish that thought?

23  **A.**  Okay.  The public hearing, we had testimony from the

24  community, the minority community directly in Macon and Bibb

25  County who asked to maintain two districts for the current

1  incumbents that are there, who live in that community, one being

2  on the eastern side, one being on the more central western side,

3  and this would be completely the opposite of what they were asking

4  us to do and would divide their community up into four different

5  districts.

6  Q.   Thank you.  Let's go look next at south metro -- Districts 74

7  and 117.  So I want to ask you about one particular comment you

8  made about 116 following the interstate -- except for a single

9  precinct that likely has racial implications.  What do you mean by

10  that?

11  A.   So the way 116 is drawn, this map is using I-75 as a boundary

12  line from the top to the bottom.  Except for the area where it

13  reaches across into a particular precinct, which is -- I've

14  already mentioned is the Lake Haven precinct, takes portions of

15  Lake Haven and puts it into 116, divides through the neighborhood

16  again, and puts the rest of it into 117.  The Lake Haven precinct

17  is a majority white precinct in that area.

18  Q.   And Ms. Wright, while we're in this part of the state, I want

19  to ask you a fact question, not an expert question.  Are you

20  familiar with Irondale?

21  A.   Am I familiar with --

22  Q.   Irondale?

23  A.   I've heard the name before, but no, I'm not familiar with it

24  as a -- I'm not sure what you want me to say.

25  Q.   I'm just asking -- let me ask it this way.  Is Irondale an

1   incorporated city in Georgia?

2   **A.**   No, it's not.

3   **Q.**   So last let's go look at district -- illustrative District 64.

4   And you say District 64 only achieves minority status by

5   connecting communities in Fulton County with communities in

6   Paulding County.  Do you see that?

7   **A.**   Yes, I do.

8   **Q.**   And can you explain what you mean by that statement to the

9   Court?

10  **A.**   I think it's pretty self-explanatory.  It's the area of Fulton

11  County crossing the river, which is the county line there,

12  stretching through Douglas County and then reaching over into

13  Paulding County in a relatively small area point, crossing into

14  the county line there to take in that area of Southeastern

15  Paulding.

16  **Q.**   Do you recall as a factual question who the incumbent in the

17  current District 64 is?

18  **A.**   I'm not certain of who the incumbent in 64 is.

19  **Q.**   Is District 64 on the adopted plan located just as a factual

20  matter in this vicinity of the state or is it somewhere else?

21  **A.**   I'm not a hundred percent sure.  I believe that it is.  It was

22  previously in that region.

23  **Q.**   Thank you.  Last, let me get to our Congressional Districts

24  here.  You have also reviewed Mr. Cooper's Congressional plan;

25  correct?

**A.**   Yes.

**Q.**   You indicate in your report that you can't explain the decision to take District 6 in Fayette County.  Can you explain what you mean?

**A.**   Yes, the manner in which District 6 goes into Fayette County does not follow any voting precinct boundaries.  It splits three or four different voting precincts.  It doesn't follow reasonable geography.  It jumps all over the place in terms of what the line is, trying to determine what they used to draw that line.  It's not fully contiguous to the line, the county line.  If you were going to take a population area into that district just to add population, I would have thought you would take a whole precinct or follow a major geographic feature, and it doesn't do either.

**Q.**   And you state that the divisions of Cobb, Fayette, and Newton Counties do not make sense as part of normal redistricting principles.  Can you explain that?  Let's start with Cobb.

**A.**   Sure.  District 6 in Cobb seems to follow a relatively straight line across the center, just above the center of Cobb County, and then except for one area in the middle that pushes upward towards Kennesaw, and where I know where Kennesaw State University is located, but follows a mostly straight line except where it juts upward, which seems to be unusual-looking to do that.  Did you want me to go into the --

**Q.**   Well, next what do you mean by the division -- well, you explained the division of Fayette County, why that didn't make

1  sense.  Is that your prior answer?

2  **A.**   With Fayette County?  Yes.

3  **Q.**   And then what about the division of Newton County not making

4  sense in terms of normal redistricting principles?

5  **A.**   Similarly, if you look at the shape of District 13 that was

6  created, rather than -- you can see that Newton County is shaped

7  like a V at the bottom.  It would make more geographic sense to

8  include areas that border both those portions of the county near

9  the bottom where the point of the district is, where the county

10  line is, to include precincts in that area that would be more

11  compact and contiguous to the district that was drawn to give it a

12  more compact shape.  It doesn't do that.  It goes up the county

13  line on the northwestern side and again splits precincts to go up

14  that county line sticking into the area  where Rockdale and Newton

15  Counties border each other, and I don't understand the reason

16  behind that.

17  **Q.**   Ms. Wright, I want to ask you to wrap up -- here's a couple of

18  questions as your capacity as a fact witness, not as expert

19  testimony.  Are you familiar with the term the "black belt" in

20  Georgia?

21  **A.**   Yes.

22  **Q.**   And again, as a matter of factual testimony, can you generally

23  describe your understanding of the black belt for the Court?

24  **A.**   Sure, that's an area of the state and counties that stretch,

25  roughly, from the Augusta area towards the Macon area that have

1  had a longstanding history and tradition of significant black

2  populations in those counties.  Some of those counties still today

3  have majority African-American population in them.  They're

4  typically small in size, but those counties have historically had

5  that population there.

6  **Q.**  Again, as a factual matter of your personal understanding, is

7  the black belt a single community or does it include many

8  communities?

9  **A.**  It includes many communities.

10         MR. TYSON:  Ms. Wright, that's all the questions I have

11  for you.  Thank you very much.

12         THE WITNESS:  Thank you.

13         THE COURT:  Mr. Hamilton.

14  CROSS-EXAMINATION

15  BY MR. HAMILTON:

16  **Q.**  Good morning again.

17  **A.**  Good morning.

18  **Q.**  Let's start with the time you had to prepare your report.

19  When were you retained by the State?

20  **A.**  I'm sorry, I didn't understand the question.

21  **Q.**  When were you asked by the State to be an expert witness in

22  this matter?

23  **A.**  I don't know the date.

24  **Q.**  Are you aware that the Court-imposed the deadline for

25  disclosure of expert witnesses was January 31 at 5 p.m.?

**A.**   No, I was not aware of that.

**Q.**   Were you retained before or after?  Were you first asked to be an expert witness before or after that date?

**A.**   I honestly don't remember the date.

**Q.**   And then your actual report was filed around noon or just before noon on February 4; is that right?

**A.**   Yes.

**Q.**   Were you retained more than 18 hours before February 4?

**A.**   I'm not sure what the definition of "retained" was.

**Q.**   When you were first asked to be an expert witness?

**A.**   Yes, I think it was more than 18 hours.

**Q.**   Was it more than three days?

**A.**   I honestly don't know what day it happened.

**Q.**   All right.  So in any event, you actually had more time since you didn't realize or maybe the State didn't realize that a report was required under Rule 26 for expert witnesses?

**A.**   Correct.

**Q.**   Now, I want to talk about over the course of the next period of time, two words that show up a lot in your report, one of them is "apparently," and the other one is "significant change."  So we'll start with "apparently."  And if I could direct your attention to your report on page 7.  This is paragraph 12.  We can start with paragraph 11.  Paragraph 11 in the very first sentence says, "Apparently based on race, the proposed District 23 unites disparate communities apparently based on race."  Do you see that?

1  **A.**   Yes.

2  **Q.**   If we look at paragraph 12, you use "apparently" twice.

3  "Apparently for the purpose of including black population in

4  Griffin," and then down at the third line from the bottom, "which

5  were apparently based on race."  And paragraph 13 in the fifth

6  line you say, "With no apparent reason for doing this."  Paragraph

7  14 appears to be drawn based on race.  Paragraph 16, last

8  sentence, "An apparent service of racial goals."  I can keep

9  going, but the word "apparent" appears throughout your report;

10 isn't that true?

11 **A.**   Yes.

12 **Q.**   The reason you put that in there is because you, in fact,

13 didn't draw these maps, did you?

14 **A.**   I did not.

15 **Q.**   You weren't there?

16 **A.**   Correct.

17 **Q.**   You have never spoken with either Dr. Cooper or Dr. Esselstyn?

18 **A.**   Correct.

19 **Q.**   You don't know what the purpose was for any of these drawings?

20 **A.**   Correct.

21 **Q.**   This is just -- just your best guess?

22 **A.**   This is my analysis.

23 **Q.**   It's a guess?

24 **A.**   It's what I can look at.  That's why I said "apparently."  I

25 don't know what their motivation was.

1    **Q.**   You're just speculating on what the reason was?

2    **A.**   I'm evaluating what I see.

3    **Q.**   And speculating as to the the purpose of what you see?

4    **A.**   If I had known for certain, I would have said that that's

5    certainly what he did, which is why I said "apparently."

6    **Q.**   Fair enough.

7         As the executive director -- well, let me -- yes.  As the

8    executive director of the Legislative and Congressional

9    Reapportionment Office, fair to say you were heavily involved in

10   assisting the Legislature -- Legislators who drew the

11   redistricting maps that are being challenged in this lawsuit?

12   **A.**   That's correct.

13   **Q.**   Your office did a technical review?

14   **A.**   We don't perform technical reviews on maps that we draw in our

15   office.  We review them as we draw them.

16   **Q.**   Okay.  In your declaration you say all local redistricting

17   bills through the House Committee on Intergovernmental

18   Coordination require my signature following a technical review of

19   the bill.

20   **A.**   That's specific to local redistricting bills on the process

21   build-out.

22   **Q.**   Right.  You're familiar with the Legislative consideration of

23   the redistricting bill here?

24   **A.**   Can you say that again?

25   **Q.**   You're familiar with the process by which that bill, the

1  redistricting bill here, moved through the Legislature?

2  **A.**   Yes.

3  **Q.**   Fair to say it went pretty quickly, didn't it?

4  **A.**   The passage of the bill --

5  **Q.**   Yes.

6  **A.**   -- or the creation of the map?  The passage of the bill moved

7  through the process in the standard time frame, yes.

8  **Q.**   It was introduced, considered, and then passed by both houses

9  of the Georgia Legislature in six days?

10  **A.**   That is the amount of time that bills can be passed through

11  the Legislature.

12  **Q.**   Oh, I know that.  I'm just asking you, this one moved -- was

13  introduced, considered, passed by both houses of the Legislature

14  in six days?

15  **A.**   I can't say for sure that's the amount of days, but I believe

16  that you know what you're speaking about.  But it was through the

17  process of both chambers passing through as legislation does.

18  **Q.**   And then it was signed by the governor?

19  **A.**   Yes, it was signed by the governor.

20  **Q.**   The governor took a little bit longer than six days to sign

21  it?

22  **A.**   Yes, he did.

23  **Q.**   30 days, in fact; right?

24  **A.**   I do not know exactly how many days.

25  **Q.**   I want to talk a little bit about the other word, "significant

1  change."  You mention that throughout your report; fair to say?

2  **A.**   Yes.

3  **Q.**   You said that the illustrative plans prepared by Dr. Cooper

4  and Dr. Esselstyn would cause significant changes from the 2020

5  enacted plan if used as remedial plans by a Court.  Do you recall

6  that?

7  **A.**   Can you tell me where that was?

8  **Q.**   Yeah, it's in your declaration, paragraph 9.

9  **A.**   Yes, I see that.

10 **Q.**   Let's start with that last bit.  You know that these plans

11 that have been submitted so far in this litigation are

12 illustrative plans designed to show that an additional

13 majority/minority district or districts could have been drawn;

14 right?

15 **A.**   Yes.

16 **Q.**   That's part of what we call the Gingle's analysis?  You know

17 that?

18 **A.**   I do know what that is.

19 **Q.**   And they're offered to prove liability; right?

20 **A.**   I don't know why they're offered.

21 **Q.**   Well, you know they're not offered as remedial maps?

22 **A.**   I have not been here for all of the proceedings.  So I don't

23 know what the previous discussions or what they've been offered as

24 specifically.

25 **Q.**   Okay, that's fair enough.  I'm not asking you to guess about

1  that.  But you, yourself, have served as a technical advisor to

2  federal courts in preparing remedial maps?

3  **A.**  Yes.

4  **Q.**  So you know that that's a separate step of the process?

5  **A.**  Correct.

6  **Q.**  First, there is a liability finding, then we decide what to do

7  about it; right?

8  **A.**  Okay.

9  **Q.**  And in your report you made the point about how the

10 illustrative map would cause significant changes from the adopted

11 plan; right?

12 **A.**  Yes.

13 **Q.**  And one of those significant changes would be the creation of

14 additional majority/minority districts in the State House plan.

15 That would be a significant change, wouldn't it?

16 **A.**  That's not what I was referring to.

17 **Q.**  I'm not asking you what you were referring to.  I'm saying,

18 the creation of additional majority/minority districts in the

19 State House plan would be a significant change to the State House

20 plan, wouldn't it?

21 **A.**  It would be a change, yes.

22 **Q.**  And that change would be significant?

23 **A.**  If you want to say that change would be significant, then you

24 can say that change would be significant.

25 **Q.**  You would agree with that, don't you?

1  **A.**  It would change the map. Yes, it would change the map.

2  **Q.**  In a significant way?

3  **A.**  It would change the map.

4  **Q.**  All right.

5     Another one of those significant changes would be the creation

6  of additional majority/minority districts in the State Senate

7  plan; is that right?

8  **A.**  Can you restate that?

9  **Q.**  Sure.  Another one of those significant changes would be the

10  creation of additional majority/minority districts in the State

11  Senate map; correct?

12  **A.**  That would change the Senate map as well, yes.

13  **Q.**  It would change it significantly, wouldn't it?

14  **A.**  It depends on whether you refer to that as a significant

15  change.  That's not what I was referring to as a significant

16  change.

17  **Q.**  Okay.  Another significant change would be the creation of

18  additional majority/minority Congressional District; isn't that

19  true?

20  **A.**  That would also change the Congressional map.

21  **Q.**  In a way that could be considered significant?

22  **A.**  The impact of changing of the map would be the significant

23  part.

24  **Q.**  Of course in any Section 2 case, the creation of a new

25  majority/minority district will by definition result in a change

1    to the map?

2    **A.**   Can you restate that again?

3    **Q.**   In any Voting Rights Act case under Section 2, the creation of

4    a new majority/minority district will, by definition, result in

5    change to the existing map?

6    **A.**   If that's how the Court determines that it needs to happen,

7    then, yes, it would change the map.

8    **Q.**   And that would be a significant change for the voters who are

9    affected by that map, new map; isn't it?

10   **A.**   Any change to a map can be a significant change to the voters.

11   **Q.**   Well, but for the minority voters who might be, for once,

12   given an actual opportunity to elect candidates of their choice,

13   that would be a significant change, wouldn't it?

14   **A.**   I think that depends on how you draw the district.  As I

15   mentioned in the Bibb County area, that would significantly change

16   those districts, but that's not the way the people there asked for

17   that to be drawn.

18   **Q.**   And I appreciate the testimony, but that's not what I'm

19   asking.  For the minority voters in a new majority/minority

20   district who were given an actual opportunity to elect the

21   candidates of their choice, that's a significant change?  You'll

22   agree with me with that, won't you?

23   **A.**   Sure.

24           THE COURT:  What kind of change would it have on the

25   people -- you testified Bibb County is represented by, I think,

 1 African-American, two African-American males, I think.

 2          THE WITNESS:  Actually, the House, it's a male and a

 3 female.

 4          THE COURT:  If they split it up, would there be a

 5 significant change for them to have that representation there?

 6 You testified they didn't want that change?

 7          THE WITNESS:  They preferred to keep the districts there

 8 as they were drawn.  That's what the people there actually spoke

 9 about to maintain those incumbents that are there.  They didn't

10 want to lose those incumbents.  Now, I don't know beyond that

11 testimony.  That's just what they were stating at the time.  I

12 don't know if they were worried that there would be significant

13 change to those districts or what, but that was their testimony.

14 So we tried to make sure we complied with that.

15          THE COURT:  If the Court said to the General Assembly

16 you have to redraw these maps -- Mr. Hamilton pointed out based on

17 the finding of liability, at the end of the day the Court approves

18 a remedial map that changes Bibb County, whereas I think if I were

19 to accept something close to what we have now, one of them or both

20 of them may be running against each other?

21          THE WITNESS:  That could happen.  I don't know.  I would

22 have to verify their locations.

23          THE COURT:  And it is your testimony the people said

24 they don't want that?

25          THE WITNESS:  They wanted to maintain the two incumbents

1  that they had in the districts and the shape that they're

2  currently in because they felt that that represented their

3  communities there.

4          THE COURT:  Go ahead, Mr. Hamilton.

5  BY MR. HAMILTON:

6  **Q.**  So far I've been talking about significant change in a way

7  that's good, a significant change wherein creating a

8  majority/minority district to give voters a voice, but there is a

9  different kind of significant change where voters are stripped of

10 their voice, and if we go back to this Court's decision in

11 Georgia -- State Conference of the NAACP v. Georgia -- sorry,

12 Georgia State Conference of the NAACP v. Georgia, the Court made

13 an observation about the map that you drew in 2015.  The Court

14 said, "Ms. Wright and her colleagues openly undertook to help

15 Republican incumbents.  In doing so, the 2015 redistricting moved

16 many black voters from districts where their voices would have

17 made an impact into districts where they did not."

18     Do you recall that line from the Court's opinion?

19 **A.**  Not specifically.

20 **Q.**  Shall I call it back up on the screen?

21 **A.**  It's, I'm assuming, in this packet?

22 **Q.**  Yes.

23 **A.**  I believe you when you read it.

24 **Q.**  That was a significant change for those voters; right?  Those

25 voters were removed from -- black voters were removed from a

1  district where their voices would have made an impact to a

2  district where they did not.  That's significant to them; correct?

3  **A.**   I'm sure that would be significant to them.

4  **Q.**   Okay.  Let's look for a minute at the criteria the Legislature

5  adopted in connecting the redistricting in 2020.  You're familiar

6  with that; correct?

7  **A.**   Yes.

8  **Q.**   And so if I might direct your attention to Exhibit 39.

9      Your Honor, I believe this has already been admitted into

10  evidence.  We'll put it on the screen.

11      My question for you, Ms. Wright, is:  This is the 2021

12  committee guidelines for the redistricting process; is that right?

13  You can look at it on the screen, you can look at it in the

14  binder, whichever is more convenient for you.

15  **A.**   It does appear to be so, yes.

16  **Q.**   And if we look at page 2 of Exhibit 39, this is the principles

17  that the committee adopted with respect to redistricting criteria

18  to be employed by the Legislature; correct?

19  **A.**   Yes.

20  **Q.**   There's nothing in here about core retentioning?

21  **A.**   I don't remember that terminology being in there.

22  **Q.**   Nothing here about avoiding significant change to preexisting

23  districts?

24  **A.**   I don't remember that being mentioned either.

25  **Q.**   In fact, the enacted redistricting map made significant

1  changes to preexisting districts in some cases, didn't it?

2  **A.**  Sometimes that's necessary, yes.

3  **Q.**  Right.  And I think you said, quote -- from my notes, I think

4  you said "Sometimes the decisions to connect communities, I don't

5  have to make."

6  **A.**  Correct.  I work for the General Assembly; I don't make every

7  decision.

8  **Q.**  Fair enough.  Let's take a look at some of the decisions the

9  General Assembly made in this map.  Let's start with House

10 District 117.  And --

11          MR. HAMILTON:  Your Honor, I have prepared an exhibit of

12 the benchmark map for use, if I might approach.

13          THE COURT:  Yes.

14          MR. HAMILTON:  And if I might approach the witness to

15 provide a copy?

16          THE COURT:  Yes.  Did you get a copy?

17          THE WITNESS:  No, Your Honor.

18          THE COURT:  Thank you.

19          MR. HAMILTON:  All right.  If I might -- oh, I think the

20 next exhibit number is 69.  So I would like to mark this as

21 Exhibit 69, and I would like to move the admission of the

22 document.  The document is drawn from the State's own website, as

23 you can see from the footer.  It is an admission of a party

24 opponent.  Mr. Tyson has indicated he has no objection.

25          MR. TYSON:  No objection.

1    THE COURT:  Any objections from Alpha?

2    MR. SAVITZKY:  No, Your Honor.

3    THE COURT:  Admitted without objection.

4    (Plaintiff's Exhibit 69 was received and marked into

5    evidence.)

6    BY MR. HAMILTON:

7    Q.  We have it up on the screen there.  It's easier to look at

8    there.  And so this is the benchmark plan.  This is prior to the

9    redistricting map; right?

10   A.  Correct.

11   Q.  This is the way it looked.  In the benchmark plan -- let's

12   take a look at House District 117 and 141 and where they were

13   located.  Do you see that?

14   A.  Yes.

15   Q.  Now, let's look at the benchmark -- I'm sorry, the adopted

16   plan and where they were moved.  Do you see that?

17   A.  Yes.

18   Q.  So in the adopted plan, House District 117 was moved from

19   northeast of Atlanta to just south of Atlanta.  Do you see that?

20   We'll toggle between these two.

21   A.  Those are where the districts are located.  That's not the

22   process -- they are not relocated.  They're renumbered.  The

23   entire map was renumbered.

24   Q.  117 was located in one place?

25   A.  Correct.

1  **Q.**  And then it was relocated to another?

2  **A.**  In sequence with the other district numbers, yes.

3  **Q.**  All right.  And 141 was moved as well?

4  **A.**  Yes.  Many districts numbers were moved across the state.

5  **Q.**  So we can put these two maps side by side.  There was no part

6  of the core of that district that remained the same?

7  **A.**  It's not the numbering of the districts; it's the location of

8  the districts and what makes up the districts in the house map.

9  It is traditional that we renumber it from top to bottom starting

10  in Dade County going across the state as best we can to try to

11  flow the sequence of the district numbers.

12          THE COURT:  So the numbers changed, not necessarily the

13  district?  And then Clay County was District 46, and then in 2006,

14  it was changed and became 47; right?   It's the numbers changed

15  because you have to redo all of the numbering when you do the

16  redistricting?

17          THE WITNESS:  That's correct, Your Honor.  Especially in

18  the House, we make significant renumbering there to try to assist

19  the County Elections Office so they somewhat have a flow of

20  district numbers.  Sometimes it doesn't exactly work out, but we

21  try to have a sequence of numbers in their counties.  So you just

22  don't pick one.

23          In the Senate it's a little different.  You do kind of

24  move them around.  The House specifically tries to renumber it

25  every time.

```
 1              THE COURT:  All right.  Thank you.
 2  BY MR. HAMILTON:
 3  Q.  Let's change gears for a little bit.
 4      You talked about the importance of preserving neighborhoods
 5  and communities?
 6  A.  Yes.
 7  Q.  You're familiar with the City of Athens?
 8  A.  Yes.
 9  Q.  Is there an educational institution somewhere in that city?
10  A.  That's correct.
11  Q.  What is it?
12  A.  You're asking me what it is?  The University of Georgia.
13  Q.  And the enacted map --
14              THE COURT:  Let me add, the home of the Bulldogs.
15              THE WITNESS:  That's correct.
16              THE COURT:  Go ahead, Mr. Hamilton.
17              MR. HAMILTON:  Shall we talk more?
18  BY MR. HAMILTON:
19  Q.  In the enacted map, Athens is divided among two Senate
20  districts, that's Senate District 46 and 47, and four House
21  Districts, 120, 121, 122, and 124; is that right?
22  A.  Are you asking on the map that was just adopted or the
23  previous?
24  Q.  Yes, the enacted map.
25  A.  I think that's correct.  I'm not looking at the map in front
```

1  of me, but that does sound correct.

2  **Q.**   Those divisions were not consistent with public comment, were

3  they?

4  **A.**   The county is divided between multiple districts, so yes.

5  **Q.**   In fact, the Athens voters , the public comments, urged the

6  unification of Athens, didn't they?

7  **A.**   They did, I believe.

8  **Q.**   Do you know the political makeup of Athens voters?

9  **A.**   Not specifically.

10  **Q.**   And we've touched on this a little earlier.  In your comments

11  about District 23 in the Esselstyn State Senate plan, you said in

12  paragraph ten in your report that it's below 50 percent black

13  voter registration.  Do you recall that?

14  **A.**   Paragraph ten?

15  **Q.**   Um-hum.  Yes.

16  **A.**   Can you restate that question again?

17  **Q.**   Sure.  So, sorry, paragraph 11 actually.

18       You say in the fourth line, District 23 as drawn is below 50

19  percent on black voter registration.  Do you see that?

20  **A.**   Yes, I see it.

21  **Q.**   You don't provide the actual data from which you calculate

22  that percentage; right?

23  **A.**   Correct.

24  **Q.**   You don't actually even give us an actual specific percentage

25  number?

1  **A.**   That's correct.

2  **Q.**   And we don't -- so we don't know the specific number of white

3  registered voters or black registered voters?

4  **A.**   In this report you do not.  But I do have the data available.

5  **Q.**   All you say is below 50 percent, which could be 49.9, 39, 29,

6  19, all of those are numbers are below 50 percent; correct?

7  **A.**   It would be below 50 percent, yes.

8  **Q.**   Now, the truth is we simply don't know the race of

9  approximately 8.8 percent of Georgia registered voters; isn't that

10  true?

11  **A.**   I don't know that specific number, but I'm sure there is some

12  percentage that we don't know.

13          MR. HAMILTON:  Your Honor, I have another document drawn

14  from the Secretary's website.  If I might mark this as Exhibit 70.

15          THE COURT:  Okay.

16          MR. HAMILTON:  And may I approach?

17          THE COURT:  Yes.

18          MR. HAMILTON:  And may I provide a copy to the witness?

19          THE COURT:  Yes.

20          MR. HAMILTON:  Your Honor, again, this is drawn from the

21  Secretary of State's database.  I believe this is the information

22  you asked for just a moment ago during the direct examination.

23  It's the voter registration statistics drawn from the Secretary of

24  State, and I move the admission of Exhibit 70 as the admission of

25  a party opponent.

 1          MR. TYSON:  We have no objection, Your Honor.  It's

 2  publicly available.

 3          MR. SAVITZKY:  No objection.

 4          THE COURT:  70 is admitted with objection.

 5          (Plaintiff's Exhibit 70 was received and marked into

 6  evidence.)

 7          MR. TYSON:  Your Honor, I'm sorry.  One thing just to

 8  clarify.  I believe this report happens at a particular --

 9  whatever day it's polled.  So I'm not sure -- this is a snapshot

10  in time, but I do believe this is continuously updated.  I

11  realized there isn't a particular date on this --

12          THE COURT:  What date, Mr. Hamilton?  Is this

13  representing -- this says 9/27/2021.  On the front page it says

14  updated 9/27/2021.

15          MR. HAMILTON:  That's right.

16          THE COURT:  That's what I'm accepting for 70, 9/27/2021.

17          MR. HAMILTON:  For that point -- the variation isn't

18  going to matter.  This is the data that was available, I believe,

19  on the publicly-available website at the time the map was drawn.

20          THE COURT:  All right.

21  BY MR. HAMILTON:

22  Q.  So this document, you're familiar with these voter

23  registration statistics?

24  A.  Yes.

25  Q.  They report active registered voters by race and gender on a

1  county-by-county basis?

2  **A.**   Yes.

3  **Q.**   And then there's county totals on the far right of these

4  columns?

5  **A.**   Yes.

6  **Q.**   And if we go all the way down to the bottom of the table,

7  there are statewide totals?

8  **A.**   Yes.

9  **Q.**   And there are some abbreviations here.  Just to orient us, the

10  abbreviations are up at the top.  They're called race codes.  Do

11  you see that?

12  **A.**   Yes.

13  **Q.**   So let's look at Cobb County, and I know that these are small

14  numbers here.  So, hopefully, your sight is better than mine, but

15  it's on line 33.  And the fourth column from the right side is "UK

16  male voters."  Do you see that?

17  **A.**   Yes.

18  **Q.**   Those are male voters of unknown race; correct?

19  **A.**   Correct.

20  **Q.**   All the other columns to the left of that break out the race

21  by male and female; correct?

22  **A.**   Actually, the OT is considered "other."  So I don't believe

23  you would know the race of that category either.

24  **Q.**   Just so that we're oriented, starting from the right-hand side

25  of this table counting four over, first, it's -- that column

1  reports the unknown male voters, unknown race male voters?

2  **A.**   Correct.

3  **Q.**   Next column to the right is unknown female voters?

4  **A.**   Yes.

5  **Q.**   Those are female voters for whom we do not know the race?

6  **A.**   Correct.

7  **Q.**   And the next column to the right is unknown voters, that is,

8  voters for whom we know neither gender nor race?

9  **A.**   Correct.

10 **Q.**   And then the far-right column is the total voters for that

11 particular --

12 **A.**   Correct.

13 **Q.**   Now that we're oriented, let's look at the data for Cobb

14 County as an example.

15    For Cobb County, the number for unknown male voters is 20,695;

16 is that right?

17 **A.**   That is what this report says, yes.

18 **Q.**   So there are 20,695 male voters in Cobb County for whom we

19 don't know if they are black or white or anything else about their

20 racial makeup; correct?

21 **A.**   Correct.

22 **Q.**   And then if we look at female voters, the next column over

23 there's 21,978 female voters for whom race data is not available;

24 correct?

25 **A.**   Yes.

1  **Q.**  And then the next column to the right is unknown gender voters

2  for whom race data is not available.  And that number is 356; is

3  that right?

4  **A.**  Yes.

5  **Q.**  And the sum of those three numbers is 43,029.  And I provided

6  a calculator up there, if you don't trust my math, to allow you to

7  sum those three columns, which is the sum of 26,095, 21,978, and

8  43,079 -- I'm sorry, 26,095, 21,978, and 356 totals to 43,029

9  voters.

10  **A.**  I'll take your word for it.

11  **Q.**  So there's 43,029 voters in Cobb County for whom we don't

12  have -- who are registered voters for whom we don't know the race?

13  **A.**  Correct.

14  **Q.**  And the total number of registered voters in Cobb County is

15  listed in the far-right column; correct?

16  **A.**  Yes.

17  **Q.**  And in this case that's 532,814?

18  **A.**  Yes.

19  **Q.**  So we don't know the race of 43,029 registered voters out of a

20  total of 532,814 voters in Cobb County alone?

21  **A.**  That's correct.

22  **Q.**  So we can do the same thing if we go all the way down to the

23  bottom of the statistics here at the bottom of the chart, there

24  are 319,167 male voters for whom the State does not have race

25  data; correct?

1  **A.**  Correct.

2  **Q.**  317,496 female voters for whom the State goes not have race

3  data?

4  **A.**  Yes, that's what this says.

5  **Q.**  5,629 registered voters whom the State knows neither gender

6  nor race data; correct?

7  **A.**  Correct.

8  **Q.**  So the grand total -- again, the calculator is in front of you

9  if you don't trust my math -- there are 642,292 voters in the

10  State of Georgia for which Georgia does not have race data;

11  correct?

12  **A.**  Correct.

13  **Q.**  There's a total of 7,234,431 registered voters in the State of

14  Georgia; correct?

15  **A.**  Correct.

16  **Q.**  Again, if you want to check my math here, expressing 642,292

17  voters as a percentage of 7,234,431 is about 8.8 percent; correct?

18  **A.**  I'll take your word for the math.

19  **Q.**  Okay.  It's awfully difficult to report the precise racial

20  makeup of registered voters in any particular district or county

21  because there is at least an 8.8 percent margin of error on

22  account of this missing data; isn't that true?

23  **A.**  I would disagree with that.

24  **Q.**  You don't mention the missing race data anywhere in your

25  report, do you?

1  **A.**  Correct.  As I said before, I expected there would be time for

2  more detailed analysis and data later.

3  **Q.**  You don't describe how you reached the conclusions that you

4  report in your expert report?

5  **A.**  I'm sorry, I don't understand the question.

6  **Q.**  Well, you -- you articulate a conclusion about voter

7  registration numbers in your report but without explaining how it

8  is that you reach that conclusion?

9  **A.**  Well, I'm doing the analysis looking at the data.  That's how

10  I reach the conclusion.  Again, I thought there would be

11  additional information provided later on beyond this report.  That

12  was my understanding.

13  **Q.**  So you'll agree with me, won't you, that at least as to

14  vote -- black voting age population, black VAP, the Senate

15  District 23 in the Esselstyn illustrative plan is over 50 percent?

16  **A.**  Can you repeat?  Which -- Senate 23?

17  **Q.**  23.

18  **A.**  It's -- and my report says district barely crosses 50 percent

19  AP Black voting age population.  So I assume that means it is over

20  50 percent.

21  **Q.**  It's a majority/minority district?

22  **A.**  According to the VAP, yes, black voting age population, yes.

23  **Q.**  In fact, according to your report, it's 50.43 any part black

24  voting age population?

25  **A.**  I'm looking at the Cooper one.  I apologize.  What number of

1   the report are you looking at?

2   **Q.**   Page 10, paragraph 21.

3   **A.**   I was on the wrong one.  Yes, I see that.

4           THE COURT:  Let me ask a question right here.  Does the

5   Secretary of State's office take into consideration AP black,

6   which is any black or single-race black?

7           THE WITNESS:  No, Your Honor, they do not.

8           THE COURT:  They do not?

9           THE WITNESS:  Uh-huh.

10          THE COURT:  So would that affect the statistics then if

11  the person that was drawing these maps was looking at any part

12  black as opposed to -- since the Secretary of State does not take

13  into considering any part black, it's just straight black, would

14  that affect whether it would be below 50 percent or higher than 50

15  percent?

16          THE WITNESS:  It could affect it either way, Your Honor.

17  It just depends on what fields you're looking at in the census

18  data.  There are multiple different categories for the race

19  fields, and the reports we standardly produce on our print maps,

20  we're using non-Hispanic race categories, which are the single

21  race alone.  So they are not in combination with any other race

22  category; whereas AP can overlap with other categories as people

23  are in multi-racial categories, and also, the numbers won't add up

24  to a perfect amount, which is another reason we use the

25  single-race categories on our report so people can take a map and

1    add that up to 100 percent.

2            THE COURT:  That could explain the difference of where

3    some -- what you all show below 50 percent and whereas Dr. Cooper

4    has 50 percent; right?

5            THE WITNESS:  Correct.  And the data we show is pulled

6    from the Secretary of State's office at the voting precinct level.

7    So it's more specific than the county level.  And that would be --

8    we have all of those categories that's presented here in our

9    system combined into single-race categories, not by gender.  We

10   don't usually need gender data for what we do.  But the categories

11   are broken up by each of the race categories so we can see the

12   percent by precincts per each of the precincts.  As they whole,

13   then we know that data is completely accurate for those race

14   categories as reported by the Secretary of State's office.

15           THE COURT:  All right, Mr. Tyson, when you send me this

16   information later, make sure you put at the top "single-race

17   black" and add the information that Ms. Wright just pointed out,

18   because that is important.

19           MR. TYSON:  Yes, Your Honor, we will.

20           THE COURT:  Thank you.

21           THE WITNESS:  You're welcome.

22   BY MR. HAMILTON:

23   Q.  All right.  I just want to continue with where we're going and

24   then I'll circle back to that.

25       We just talked about District 23 in the Esselstyn illustrative

1  plan.  I think you testified that the black voting age, any part

2  black voting age population is 50.43 in that district; correct?

3  **A.**   Yes.

4  **Q.**   So if the Court is asking whether this illustrative district

5  is a majority/minority black voting age population district, the

6  answer is yes?

7  **A.**   Can you say that one more time?  I missed part of it.

8  **Q.**   If the Court wants to know if this illustrative District No.

9  23 is a majority/minority district, the answer is yes?

10  **A.**   If your metric is the AP race category, then yes.

11  **Q.**   The same is true of District 28 in the Esselstyn plan?

12  **A.**   I don't see the number on here for 28.

13  **Q.**   Let's go to Exhibit 3, page 54.  And I'll just put it on the

14  screen to make it easy for you.  We go to the far-right column for

15  District 28.

16  **A.**   Yes, this is --

17  **Q.**   57.28 percent?

18  **A.**   Yes.

19  **Q.**   Okay.  The same is true for District 25 in the Esselstyn

20  report, it's page 9, table 1?

21  **A.**   If my eyes are looking correctly, I think that's correct.

22  Yes.

23  **Q.**   And District 23 is a majority/minority as well; correct?

24  **A.**   I think that's the one I mentioned at 50.43.

25  **Q.**   Okay.  And then if we go to the Esselstyn reported attachment,

1  page 108, District 64 is?

2  **A.**   Which, the House?  On which plan are we looking at?

3  **Q.**   The Esselstyn report for House District 64.  It's

4  page -- Exhibit 3, page 108 to 113 is the range of pages for the

5  districts I'm about to read.

6      64 is a majority/minority district; correct?

7  **A.**   According to AP age populus, it's 50.24 percent.

8  **Q.**   And the illustrative Exhibit 74 is also 53.94 percent any part

9  black voting age population?

10  **A.**   Yes, that's what this shows.

11  **Q.**   District 117 is also a majority/minority district at 51.56?

12  **A.**   Yes, that is what's shown.

13  **Q.**   District 145 is a majority/minority district at 50.38?

14  **A.**   Yes, 50.38 AP VAP.

15  **Q.**   149 is majority/minority district at 50.02?

16  **A.**   Yes, the AP VAP appears to 50.02.

17  **Q.**   All of these were majority/minority districts that could have

18  been drawn by the Legislature but were not?

19  **A.**   They're districts that were drawn on this plan.  I don't know.

20  Comparing the two is kind of --

21  **Q.**   All right.  The same is true with respect to the plan that the

22  Pendergrass plaintiffs prepared for the Congressional map, the

23  proposed Congressional District 6, is about 50 percent black

24  voting age population; correct?

25  **A.**   I don't see that in front of me.

1   **Q.**   That's Exhibit 1, the Cooper report at page 21.

2   **A.**   I think they have to pull it up.

3   **Q.**   It should be on the screen now.  It reports the black voting

4   age population of 50.23 percent; correct?

5   **A.**   Yes, that's what that says.

6   **Q.**   That's a majority/minority district?

7   **A.**   Yes, according to that.

8   **Q.**   That could have been drawn by the Legislature?

9   **A.**   Various ways you can draw them, but yes.

10   **Q.**   Let me close with a couple of questions about Bibb County.

11       You testified that minority voters in Bibb County wanted to

12   keep House District 142 and 143 in Bibb County?  Is that your

13   testimony?

14   **A.**   Yes, the two districts that were currently there with the

15   incumbents that currently represent them.

16   **Q.**   And then you suggested that the Esselstyn plan does the

17   opposite of that?

18   **A.**   What I suggested is that the community there, part of that

19   community that makes up one of those districts or both of those

20   districts there, would be divided between different districts on

21   that proposal.

22   **Q.**   But Districts 142 and 143 are still wholly within Bibb County;

23   isn't that right?

24   **A.**   But wholly within the county doesn't mean they're still made

25   up of the same community and same makeup of the districts that

1  they current are.

2  **Q.**  All right.  And in Mr. Esselstyn's illustrative map, the

3  remainder of Bibb County is included in two additional majority

4  black districts; isn't that true?

5  **A.**  I don't have that in front of me.

6  **Q.**  You don't know?

7  **A.**  Well, I don't have it to review right now.

8  **Q.**  Let's take a look at Exhibit 3.

9      MR. HAMILTON:  Page 22, Trish, will you pull that up.

10  BY MR. HAMILTON:

11  **Q.**  Does that allow you to answer the question?

12  **A.**  Yes.  So the area in downtown Macon that you see divided

13  between 142, 143, 145 and 149 are all dividing the downtown Macon

14  area into multiple districts which would divide up that community.

15  **Q.**  Now that you have the map in front of you, you can confirm

16  Districts 142 and 143 are still wholly within Bibb County in

17  Mr. Esselstyn's map?  That is a true statement; right?

18  **A.**  Yes, that is a true statement.

19  **Q.**  And the rest of Bibb County is included in two additional

20  majority black districts; isn't that true?

21  **A.**  According to the map on the screen, yes.  That's what they're

22  shaded as.

23      MR. HAMILTON:  Thank you.  No further questions.

24      THE COURT:  Let me make sure I understand correctly.

25  You were saying that Districts 145 and 149 divide downtown Macon.

1  You want to put that map back up.

2         THE WITNESS:  Right in -- the fingers right in the

3  middle where they all intersect.

4         THE COURT:  So they would have three different

5  representatives in downtown Macon?

6         THE WITNESS:  Potentially four, depending upon which

7  precinct you decide as the core city part of Macon is.  They

8  cooperated in and consolidated their government, but when you

9  think of the downtown Macon area, what was the downtown core of

10 the city before they consolidated their government, it's right in

11 that center area where they meet.

12        THE COURT:  Before we do redirect, let's take a break

13 right here.

14        MR. TYSON:  Your Honor, to pose a timing issue.

15 Mr. Morgan is our next witness.  He has a meeting with the New

16 Jersey Redistricting Division virtually starting at 1:00.  Is that

17 correct?

18        MR. MORGAN:  Yes.

19        MR. TYSON:  So just thinking of timing here, I don't

20 know how long --

21        THE COURT:  Go ahead.  Are we going to have redirect on

22 Ms. Wright?

23        MR. SAVITZKY:  Yes, we would like to cross-examination

24 Ms. Wright as well.

25        MR. TYSON:  I'll keep my direct on Mr. Morgan really

1  short.  I just want to make everyone aware about a timing issue.

2  We may lose him for a window of time in the early afternoon.

3  Dr. Alford is available in that window, though.

4          THE COURT:  What we might want to do is call

5  Dr. Alford -- well, you call your case as you see fit.  We'll work

6  it out where he'll get to testify from Jersey (multiple

7  crosstalk).  We'll work it out where he can testify here.  I have

8  to tell you, I have to take a 20-minute break.  I've scheduled a

9  conference call, and I need to go in and tell them I can't do it

10  and then come back.  I'll be right back.  We'll say 11:15 we'll

11  start right back.

12          (Whereupon, a break was taken.)

13          THE COURT:  You may begin.

14          MR. SAVITZKY:  Good morning, Your Honor.

15          THE COURT:  Good morning, sir.

16  CROSS-EXAMINATION

17  BY MR. SAVITZKY:

18  **Q.**  Good morning, Ms. Wright.

19  **A.**  Good morning.

20  **Q.**  My name is Ari Savitzky, the attorney for the Alpha Phi

21  plaintiffs.  I'm going to ask you some questions this morning.

22     Ms. Wright, I know we are catching you during a very busy time

23  right now.

24  **A.**  That's correct.

25  **Q.**  Your office is overseeing the redistricting process not just

1  for Congress and for the State Legislature, but it also does

2  technical reviews for the local governments and county

3  governments; that's correct?

4  **A.**   Yes, that's correct.

5  **Q.**   We've been post perennial census redistricting season?

6  **A.**   Yes.

7  **Q.**   And so that technical review has sort of been -- was peaking

8  over the last month or so?

9  **A.**   It is actually a small part of what I do.  We actually work

10 with the local governments.  We actually create their maps as

11 well.  So it's a combination of all those things.

12 **Q.**   Okay, okay.  I know your time is valuable.  So thank you for

13 being here.

14 **A.**   Thank you.

15 **Q.**   Ms. Wright, it's fair to say you have some experience when it

16 comes to redistricting?

17 **A.**   Yes.

18 **Q.**   And you know that there are certain principles that a map

19 drawer follows when they're drawing district lines?

20 **A.**   Yes.

21 **Q.**   And if we could pull up Alpha Phi Plaintiffs 15.  We talked

22 about these already, but they're the -- I think it's the Senate

23 version, but the guidelines that you followed; is that right?

24 **A.**   Yes, this is the committee guidelines.

25 **Q.**   And let's just briefly -- I know we talked about these

1  already.  So I don't want to get too deep into it, just sort of

2  rehash.  One of those guidelines is equal population, right,

3  drawing districts that are substantially equal as practicable in

4  terms of population size.  Do I have that right?

5  **A.**  Yes, that's correct.

6  **Q.**  And for the General Assembly you're trying to hit a deviation

7  of, I think, one percent for Senate District, and is it two

8  percent?

9  **A.**  We didn't establish a firm set range.  We drew districts as

10  close to zero as possible and then see where the range fell as a

11  result of that.  And if we could tighten this to a smaller

12  deviation, then we did.

13  **Q.**  As close as possible?

14  **A.**  Yes.

15  **Q.**  One percent is probably the lowest, most stringent standard,

16  you know, you could apply at the State Legislative level; would

17  you agree with that?

18  **A.**  I'm sorry?

19  **Q.**  At the State Legislature redistricting level, that one percent

20  deviation is probably the most stringent standard you could apply?

21  **A.**  And I guess you could try to do it tighter if you wanted to,

22  but I think it would be really difficult to draw it tighter.

23  **Q.**  The next set of principles on here and -- let's go to the next

24  page of this.  There we go.  Here are the actual -- sorry.  We

25  have compliance with the -- with Section 2 of the Voting Rights

1   Act, U.S. Constitution and the Georgia Constitution.  Do you see

2   that here, Nos. 3 and 4, I believe; is that right?

3   **A.**  Yes, I do.

4   **Q.**  Okay.  We don't have to blow it up.  That's fine.

5      And then you have to be contiguous, no multi-member districts.

6   And then there is a set of things to consider.  You should

7   consider boundaries of counties and precincts.  Do I have that

8   right?

9   **A.**  Yes.

10   **Q.**  Compactness and communities of interest?

11   **A.**  Yes.

12   **Q.**  And those are "should" considers?

13   **A.**  Yes.

14   **Q.**  Should considers.  I imagine there are some tradeoffs, though,

15   when you start thinking about these different factors; is that

16   right?

17   **A.**  You could say that.

18   **Q.**  Would you say it is a balancing act?

19   **A.**  Yes.

20   **Q.**  To balance the different factors, especially the sort of

21   "should consider" factors?

22   **A.**  Yes.  You try to consider all of them, but sometimes you do

23   have to make those determinations.

24   **Q.**  And just I think the last one is, effort should be made to

25   avoid unnecessary pairing of incumbents; right?

1  **A.**  Actually, the last one is the one that says it's not intended
2  to limit consideration of other principles, but next to last.
3  **Q.**  Okay.  I want to ask you a little more about communities of
4  interest.
5      Would you agree with me, community of interest is anything
6  that unites people in an area and brings them together?
7  **A.**  Yes.
8  **Q.**  Would you say that a community of interest is sort of in the
9  eye of the beholder?
10  **A.**  It can be.
11  **Q.**  Would you say a community of interest could be a municipality
12  or like a county or a city or town?
13  **A.**  It could be.
14  **Q.**  Would you say it could be a region or a broader area of the
15  state?
16  **A.**  I mean, a region sounds like a large area.  So when you start
17  talking about large areas, it's not as much as a community of
18  interest, I would think, but --
19  **Q.**  I think you testified earlier this morning it could be an area
20  of the state?
21  **A.**  It could -- it could be a section, a portion of a certain
22  area.
23  **Q.**  It could be something sort of economic, commercial in nature?
24  **A.**  I think there is a variety of things it could be.
25  **Q.**  But it could be something economic or commercial in nature?

**A.**   It could be.

**Q.**   It could be a roadway as you discussed with Mr. Tyson earlier, I think?

**A.**   It could be that it shares things of a certain -- yeah, a major road.

**Q.**   It could be demographic similarities?

**A.**   I suppose it could be if you defined a certain racial group that defines themselves as a community of interest, yes.

**Q.**   Racial, socioeconomic?

**A.**   Age, sure.

**Q.**   Those could all be a community of interest?

**A.**   As you said, it's kind of in the eye of the beholder.

**Q.**   There is one more factor I want to get to, Ms. Wright, before we finish the preliminaries and look at a couple of maps.

Looking back at the guidelines, it says "All plans adopted by the committee, by Section 2 of the Voting Rights Act as amended." Did I get that right?  That's No. 3.

**A.**   Yes.

**Q.**   And that means ensuring that Legislative maps don't dilute the minority vote?

**A.**   Yes.

**Q.**   To comply with the Voting Rights Act and avoid diluting, for example, black voting strings, it might be necessary to draw the new black majority district in the area where the black population is large and concentrated enough?

**A.**   It could be met.

**Q.**   And that's federal law.  So that's not a "should consider," that's a must -- "must consider," must do, if you have to do it?

**A.**   Right.  Complying with the Voting Rights Act is federal law, yes.

**Q.**   Okay.  No matter who -- let's say they vote unanimously to pass a map, but if it doesn't comply with the Voting Rights Act, that's -- it's outside the guidelines?

**A.**   Can you state that again?

**Q.**   Yeah.  It doesn't matter, you know, which party, which politicians, you know, support a map; if the map violates the Voting Rights Act, it's outside the guidelines and --

**A.**   Yes, these are the guidelines that the committee voted to work within.

**Q.**   So I think it's time to look at a couple of maps.  Let's turn -- first, let's go to paragraph 13 of your declaration. Could we bring up the right declaration.  Paragraph 13.  We'll start with -- this is about Senate District 17 in the illustrative maps drawn by Mr. Cooper.

You say District 17 connects the black population in Stonecrest to Ola and to the Ola and Lake Dow communities in Henry County.  Stonecrest shares few, if any, characteristics with the Ola and Lake Dow communities in Henry County.  Do I have that right so far?

**A.**   Yes.

1  **Q.**  And you say, I cannot identify any community of interest that

2  supports the creation of this district?

3  **A.**  Yes.

4  **Q.**  Now, Ola and Lake Dow are sort of small, unincorporated

5  communities; is that right?

6  **A.**  Yes.

7  **Q.**  And actually, they're not separate municipalities?

8  **A.**  No, they're not a municipality.

9  **Q.**  If I sent someone a letter in Ola, I could put McDonough on

10  the envelope and it would get to them?

11  **A.**  If that's their address, yes.

12  **Q.**  Because they live in McDonough for all intents and purposes?

13  **A.**  I'm not sure.  It's something like that.

14  **Q.**  Are you aware that Ola and Lake Dow are in the municipality of

15  McDonough?

16  **A.**  No, I don't believe that they are.

17  **Q.**  Stonecrest is a municipality?

18  **A.**  Yes.

19  **Q.**  McDonough is a municipality?

20  **A.**  Yes.

21  **Q.**  McDonough is in District 17, in the illustrative District 17?

22  **A.**  I would have to look at the map.  I'm not a hundred percent

23  sure.

24  **Q.**  All right, let's pull it up.  Alpha Plaintiffs 1, page 180, I

25  think it's exhibit -- anyway, in the record it's Alpha Phi 1, page

108.   Okay.

Do you see that, District 17 over here?

**A.**   Yes.

**Q.**   It's McDonough.  Do you see that?

**A.**   Yes, I do.

**Q.**   Okay.   Stonecrest is -- I guess it's up here in DeKalb right along that line there.

**A.**   Yes, it's in southeast DeKalb.

**Q.**   All right.   So looking at two incorporated municipalities of some size, apples to apples, we should talk about McDonough and Stonecrest.

**A.**   I would also say that those two municipalities are quite different.

**Q.**   Okay.   Were you aware that those are both cities of populations of over 25,000?

**A.**   Yes, but Stonecrest is significantly larger than McDonough.

**Q.**   You're aware that they are both located in the suburbs?

**A.**   Yes, I'm aware of that.

**Q.**   Are you aware that they both have similar rates of educational attainment; particularly high rates of bachelor degrees or higher education?

**A.**   I have not done that type of analysis of both cities.

**Q.**   You didn't do that type of analysis?

**A.**   No.

**Q.**   Are you aware that, in particular, they have black populations

1    of particularly high -- bachelor's or higher educational

2    attainment?

3    **A.**   I have not studied the educational levels of those cities.

4    **Q.**   You didn't study any of the socioeconomic attributes of those

5    communities?

6    **A.**   No, I have not.  Not of those two cities.

7    **Q.**   You said in your report you cannot identify any community of

8    interest in this area?

9    **A.**   Well, you're talking Ola and Lake Dow.  So then I mentioned --

10   I'm talking about actual city.  When it's McDonough -- it's two

11   different areas.

12   **Q.**   McDonough is within District 17?

13   **A.**   McDonough is, yes.

14   **Q.**   And Stonecrest is within District 17?

15   **A.**   Yes, but I didn't discuss McDonough.  And so I'm talking about

16   Ola and Lake Dow.

17   **Q.**   Okay.

18   **A.**   I did not consider McDonough in comparing Stonecrest.  I was

19   looking at the region of Ola and Lake Dow, which is not the City

20   of McDonough.

21   **Q.**   And you're aware McDonough is significantly larger than Ola

22   and Lake Dow?

23   **A.**   I'm sorry, say that again?

24   **Q.**   You're aware that McDonough is significantly larger than Ola

25   and Lake Dow?

1  **A.**  I don't know what the population size of that area is.  I just

2  know where the region is.  So...  since it's not a municipality,

3  to measure the population size of it.

4  **Q.**  You're aware that McDonough is the county seat of Henry

5  County?

6  **A.**  Yes, I am.

7  **Q.**  So let's look at enacted 20, 21, enacted 2020 map, District

8  17.  PDX 1, page 42.  Okay.

9      So on the right here that's the 2021 map; is that right?

10  **A.**  Yes, it appears to be.

11  **Q.**  And in the 2021 map, District 17 still is McDonough; right?

12  McDonough, and goes out to Newton County here; right?  About half

13  of Newton County, and then it goes out to Walton County and then

14  goes all the way up to Morgan County.  Do I have that right?

15  **A.**  Yes.

16  **Q.**  Morgan County is a more rural area; is that right?

17  **A.**  More than what?

18  **Q.**  More than McDonough?

19  **A.**  Not the Ola and Lake Dow area, no.  I wouldn't think that it

20  is.

21  **Q.**  The Ola and Lake Dow area is a mix; right?

22  **A.**  Ola and Lake Dow areas of Henry County are similar in rural

23  nature to Morgan County and Walton County.

24  **Q.**  And they're different than McDonough?

25  **A.**  Yes, but McDonough is, what I said before, is different than

1   Stonecrest in terms of the type of city that it is.  It is a

2   definitely a small-town feel, more of the type of city feel you

3   would find in the City of Madison.

4   **Q.**  And they also shared some similarities?

5   **A.**  Which?  Who?

6   **Q.**  McDonough and Stonecrest also shared some similarities?

7   **A.**  I don't think that they do --

8   **Q.**  Okay.

9   **A.**  -- which is what I said in my report.

10  **Q.**  But you didn't study the various --

11  **A.**  I didn't break down the educational levels, no.

12  **Q.**  Or any socioeconomic?

13  **A.**  I'm familiar with both areas, and so that's what I'm basing

14  that on.

15  **Q.**  So keeping county whole is one of the principles in the

16  guidelines; right?

17  **A.**  Yes.

18  **Q.**  Just looking at Newton County, the 2021 plan splits Newton

19  County between District 17 and District 43; is that right?

20  **A.**  That's correct.

21  **Q.**  Now, let's just pull up quickly PDX 009, and we'll look at

22  these same lines and the way that it shows on the black voting age

23  percentage and the different precincts.  Actually, unfortunately,

24  they're switched around.  Let's zoom in on the left side here.

25  Okay?

1    All right.  See that -- that line is splitting the county; am
2  I right?  It shows the most heavily black precincts are on one
3  side of the line, split off into 43?
4  **A.**  That's what that appears to show, yes.
5  **Q.**  Okay.  And the black voting age population of District 43 is
6  65 percent black?
7  **A.**  I don't have that information in front of me.
8  **Q.**  We can go back to the other image.  It's Plaintiffs 142.
9  Good.  All right.
10    You see over here on the right side, it's 64.3 percent black
11  voting age population?
12  **A.**  Okay.
13  **Q.**  All right.  And the rest of Newton County is here in that
14  District 17 that we're talking about?
15  **A.**  Yes.
16  **Q.**  Let's talk about the next district, District 23, and let's go
17  back to your report for just one second.
18  **A.**  Sure.
19  **Q.**  Paragraph 11, please.
20    You say there's no basis to connect Augusta with Warner Robins
21  or Milledgeville and Warner Robins other than race.  That's what
22  you say in the report?
23  **A.**  Yes.
24  **Q.**  Now, let's look at District 23, it's Alpha Plaintiffs
25  184 -- one, and then page 184.

1      Ms. Wright, are you aware that there is an important freeway

2   that connects specifically Warner Robins, Milledgeville and

3   Augusta?

4   **A.**   No, I'm not.  You said from Milledgeville to Augusta?

5   **Q.**   The Fall Line Freeway?

6   **A.**   No.

7   **Q.**   You're not aware of the Fall Line Freeway?

8   **A.**   Are you talking about I-20?

9   **Q.**   No.  I'm talking about -- you can see -- it's actually on

10   here.  Let's pull it up.  PDX 21, page 12.  Can we do that?  Do

11   you see this is from the Georgia Department of Transportation

12   study?  You can see it here.

13   **A.**   I'm not sure which one you're talking about.

14   **Q.**   Just zoom in here right here on Baldwin County.  Right in the

15   center.

16            THE COURT:  Are you talking about 441 South?

17            MR. SAVITZKY:  Well, right here in Baldwin County it's

18   24.

19            THE WITNESS:  I've actually driven from Augusta to

20   Warner Robins, and it's very difficult to do because there is not

21   a single transportation route to travel to make that trip.

22   BY MR. SAVITZKY:

23   **Q.**   This is what the Georgia Department of Transportation was

24   discussing in this report.

25      Can we go to page 6 of the report, please.  Same document,

1  page 6.

2          THE COURT:  What are we looking at?

3          MR. SAVITZKY:  Let's see the title.  Sorry.  This is a

4  study from the Georgia Department of Transportation.

5          THE COURT:  I guess I'm trying to figure out what you're

6  talking about that connects Baldwin and Augusta and Milledgeville.

7  BY MR. SAVITZKY:

8  Q.  Can we just see the title page, page 1 of this exhibit,

9  please.

10     All right.  This is the "Connect Central Georgia Study" from

11  the Georgia Department of Transportation.  Do you see that?

12  A.  Yes, I see that.  From July of 2013.

13  Q.  Okay.  Let's go to page 6 now.  All right.  And looking at

14  that first paragraph -- this area has been a strategic target for

15  economic development -- this area has been a strategic target --

16  the third line -- for economic initiatives.  And we don't have to

17  highlight it, just if I read that part right.  "Strategic target

18  for economic development initiatives."  Do I have that right?

19  A.  That's what that paragraph says.

20  Q.  And going down here, it's a business case for transportation

21  in Georgia.  Completion of the Fall Line Freeway.

22  A.  It looks like it is a study they were doing about the fact

23  that transportation in this area was difficult.

24  Q.  Were you aware that the Fall Line Freeway just received

25  federal funding in the bipartisan infrastructure?

1  **A.**   No, I was not.

2  **Q.**   All right.   In your direct testimony you talked about the

3  Black Belt; is that right?

4  **A.**   Yes.

5  **Q.**   Pull up Alpha 1, page 82.   I'm showing you the appendix to a

6  report, the Georgia Budget and Policy Institute, identifying

7  certain counties in Georgia for study and education.   Just sort of

8  looking at the metric they use.   The third line.   School districts

9  are considered if they have one of the following criteria:   The

10  majority of black student population, majority of students living

11  in poverty and a history of enslaved labor.   Did I read that

12  correct?

13  **A.**   Yes, I think so.

14  **Q.**   Okay.   And then let's go down where it says -- the last

15  paragraph, school systems that met two of the criteria were

16  included in the selection.

17      Would you agree that counties that ended up being included in

18  this study share certain demographic socioeconomic similarities?

19  **A.**   That's possible that they do.   It depends on other factors as

20  well.

21  **Q.**   In your report -- let's go back to the report, paragraph 11.

22  You say, "The proposed district adds minority population to

23  District 22.   It takes it far outside of traditional boundaries in

24  Richmond County."   Do I have that right?

25  **A.**   Yes.

**Q.** Are you familiar with the districting principle as maintaining existing district course?

**A.** Yes.

**Q.** Those aren't in the guidelines for the State of Georgia?

**A.** I think that would fall under No. 9 on the guidelines, other things that we could consider.

**Q.** Okay. Anything else you can consider, but not specifically in the guidelines?

**A.** Right.

**Q.** All right. Just one other second. I'm going to show you a map, PDX 23.5. Two maps. Nope. Nope. Nope. There we go.

So we can see the freeway I was talking about before, you can see the map from that study. Both of them tend to show a sort of east/west sort of like central Georgia across the state; right?

**A.** Yes.

**Q.** Very quickly let's go to plaintiff's one, page 48. Nope. Nope. We're looking for P DX1, page 48. I apologize.

There we go.

Now, the shape on the right here, this is existing district 236789, right?

**A.** Yes.

**Q.** Sort of oriented more north to south; is that right?

**A.** Yes.

**Q.** And District 23 on the left is oriented more east to west?

**A.** Yes.

1  **Q.** Let's look at another district.  And turn to paragraph 12 here

2  and bring your report back up, please.  Paragraph 12 you say, "I

3  cannot identify a reason for drawing District 28 aside from a

4  purely racial goal."  Do I have that right?

5  **A.** Yes, that's what that says.

6  **Q.** You say the district here bears no connection to any type of

7  community.  Do I have that right?

8  **A.** Which line is it?

9  **Q.** Right here, right in the middle it's highlighted "bears no

10  connection to any type of community"?

11  **A.** Yes.

12  **Q.** Now, I think the specific communities that you talk about are

13  Jonesboro and Griffin.  Are those the ones you discuss in this

14  paragraph?

15  **A.** Yes, I think so.  Yes.

16  **Q.** When you said those areas had no connection, did you consider

17  whether they had commonalities with respect to --

18  **A.** I didn't do an analysis of each city with education levels and

19  socioeconomic --

20  **Q.** Poverty levels?

21  **A.** No, I did not.

22  **Q.** Labor force population?

23  **A.** No.

24  **Q.** No?  Are you aware that Jonesboro and Griffin are literally

25  connected by US 41, the old Dixie Highway?

1  **A.**  Yes, I do know that.

2  **Q.**  Are you aware that the Jonesboro and Griffin High school

3  football teams play against each other?

4  **A.**  No, I don't keep up with the fall high school football

5  schedule.

6  **Q.**  Would it surprise you that they play with each other?

7  **A.**  No.  They're both south metro schools.

8  **Q.**  You concluded those areas have no connection to each other?

9  **A.**  I think that in a district map that that's a little bit

10  different than two schools that play each other in football.

11  **Q.**  Let's look at District 73.  Turning to 16 of your report,

12  paragraph 16.  You say the illustrative District 73 connects

13  communities that "share little to no common interests."  Am I

14  reading that correctly?

15  **A.**  Which line?

16  **Q.**  It's highlighted.  "Share little to no common interests."

17  **A.**  Yes, that's in reference to Districts like 78 and 109.

18  **Q.**  Is it?

19  **A.**  Yes.  "It creates significant changes to surrounding districts

20  like 78 and 109 by connecting communities that share little to no

21  common interests."

22  **Q.**  It -- the sentence -- the subject of the sentence "it" being

23  the proposed District 73?

24  **A.**  It creates change to the surrounding districts by connecting

25  those communities.

1  **Q.**  You don't mention any of those particular communities in your

2  report, do you?

3  **A.**  No.

4  **Q.**  Let's look at paragraph 17 in your report.  And this is about

5  District 110.  You state that the new black majority district in

6  the illustrative plan would result in Spalding County being

7  included in more than its traditional two House districts; is that

8  right?

9  **A.**  Yes.

10  **Q.**  And you also say illustrative House District 129, you

11  mentioned touches five different counties?

12  **A.**  Yes.

13  **Q.**  You didn't do any analysis of county splits, unique county

14  district splits, anything like that in assessing these plans?

15  **A.**  I have not done that level of analysis of report yet.

16  **Q.**  You don't know which plan has more county splits, more unique

17  county district splits?

18  **A.**  That was not an instruction I was given.

19  **Q.**  Let's just pull up Alpha 1, page 356.  And this is the 2021

20  plan; right?

21  **A.**  Yes.

22  **Q.**  And just looking at Spalding County, does the enacted plan

23  split Spalding County into its traditional two State House

24  Districts?

25  **A.**  I have already testified it would now be in three on the

1    adopted plan.

2    **Q.**   And does it split the City of Griffin?

3    **A.**   I believe it follows voting precinct boundaries lines there.

4    So it's possible that it does.  I cannot tell that on this map.

5    **Q.**   And the black voting age population of all three of those

6    districts in Spalding County in Griffin is under 50 percent?

7    **A.**   Yes.

8    **Q.**   Let's talk about District 144.  Go to paragraph 18 of your

9    declaration.

10       You say District 144 unites disparate communities in a single

11   district; is that right?

12   **A.**   Yes.

13   **Q.**   You testified already that sometimes communities that are

14   different go in the same district; correct?

15   **A.**   Sometimes.

16   **Q.**   It's not a problem, necessarily, to unite disparate

17   communities in a single district, is it?

18   **A.**   But the guidelines say that we were going to consider

19   communities of interest, so we do try to consider that where we

20   can.

21   **Q.**   Of course.  And the enacted map does contain districts where

22   disparate communities are united in a single district?

23   **A.**   It can happen.  We also try to comply with the previous

24   boundary lines in order to reduce the drastic impact on the

25   voters.  So sometimes these communities are already having

1  multiple representatives or senators in those areas.  So if that's

2  the case, sometimes we maintain that.

3  **Q.**  You said Milledgeville and Eatonton share some things in

4  common?

5  **A.**  They are similar in size cities.

6  **Q.**  Similar-sized cities, both county seats and neighboring

7  counties?

8  **A.**  Yes.

9  **Q.**  District 144, and let's pull up Alpha 1, page 186.  Excuse me,

10  no.  Alpha 1, 360.  The illustrative 144 -- let's go back two

11  pages -- there we go -- includes Eatonton and Milledgeville, which

12  are, as you just said, similar cities?

13  **A.**  Yes, it does.

14  **Q.**  You also say -- let's go back to your report now.  Still on

15  paragraph 18.  "District 144 divides Twiggs and Wilkinson Counties

16  into different districts; they have historically been in the same

17  district."

18  **A.**  Yes, that's correct.

19  **Q.**  You say they are communities of interest?

20  **A.**  You could say that, yes.

21  **Q.**  Twiggs County is also park of the Macon metro area according

22  to the U.S. Census Bureau; is that right?

23  **A.**  I don't know that for a fact.  If you say so.

24  **Q.**  I can show you the metro area if you want.

25  **A.**  Fine.

1    **Q.**  Wilkinson County is not part of the metro area; right?

2    **A.**  I don't have that information.

3    **Q.**  All right.  Would you pull up PDX 50 just to look at it, just

4    to confirm.  Okay.

5        So you can see this is the Macon, Warner Robins combined

6    statistical area, U.S. Census Bureau, Twiggs County in Wilkinson;

7    right?

8    **A.**  I see that there, yes.

9    **Q.**  Okay.  Uniting Twiggs County with the other parts of that

10   metropolitan statistical area would also respect communities of

11   interest?

12   **A.**  I think a long-standing relationship between two counties that

13   have shared the same representation would be something I would

14   consider a higher priority than this designation from the U.S.

15   Department of Commerce as to what a metropolitan statistical area

16   would be.

17   **Q.**  But you would agree that metro areas are something that one

18   should consider in the community of interest analysis?

19   **A.**  I don't usually get into metropolitan statistical areas.  It's

20   not something I refer to.

21   **Q.**  It is in the eye of the beholder?

22   **A.**  I guess, if that's what you want to say.

23   **Q.**  Okay.  And you also -- we can look at the declaration again,

24   paragraph 18, you say Milledgeville was included in District 44

25   because of race.  Is that your conclusion?

1  **A.**   Yes.

2  **Q.**   Milledgeville is white?

3  **A.**   I don't know the demographics specifically of the City of

4  Milledgeville.

5  **Q.**   Well, PDX 51, it's the American Community Survey Data or data

6  on Milledgeville's population.  Keep going.

7  **A.**   That appears to be what the American Community Survey shows.

8  **Q.**   Okay.

9  **A.**   I don't usually refer to the American Community Survey since

10  those are estimate data and not official census data.

11  **Q.**   Understood.  We can go to Alpha 1, page 360.  All right.

12      And you in your report criticize the illustrative District 144

13  for splitting Baldwin and Putnam Counties.  Do I have that right?

14  Paragraph 18 of your report?

15  **A.**   I think it's the way that it split the counties, but yes.

16  **Q.**   Look at paragraph 18 really quick.  I just want to make sure I

17  have it right.  There we go.

18  **A.**   Yes, the cities of Eatonton and Milledgeville.

19  **Q.**   The district drawn in the adopted House plan in the same area

20  respects county boundaries?

21  **A.**   Yes.

22  **Q.**   Look at Alpha 1, page 360, back at that map of the 2021

23  enacted plan.  It looks like it splits Baldwin County; is that

24  right?

25  **A.**   There is one precinct there.

1  **Q.**  It looks like it splits Putnam County, too; right?

2  **A.**  Yes, it does.

3  **Q.**  Let's turn to paragraph 19 in your declaration.  And you say

4  the illustrative House plan connects areas that have nothing in

5  common.  That Albany and Thomasville have nothing in common.

6  **A.**  Are you asking a question?  I didn't hear.

7  **Q.**  I'm asking you if that's what it says.

8  **A.**  That's what it says.

9  **Q.**  Are you aware that they are the two largest cities in the

10  southwest Georgia area?

11  **A.**  Yes, but that doesn't mean they have something in common.

12  **Q.**  And are you aware they are connected by the old Dixie Highway

13  and specifically, the 62-mile stretch?

14  **A.**  I'm sure that they are.  Most of the large cities have some

15  connection somewhere.

16  **Q.**  And you're aware that they work together on economic and

17  regional development?

18  **A.**  I do not do that type of analysis.

19  **Q.**  All right.  Let's talk about that voter registration analysis

20  very quickly.  We'll go back to paragraph ten in your report,

21  please.  Ten in your report, please.

22  **A.**  Which one?

23  **Q.**  Paragraph ten.  You say the Cooper State Senate plan adds

24  majority black districts using the any-part black voting age

25  population census metric.  Six of the new districts created have a

1   registration of less than 50 percent; is that right?

2   **A.**   Yes.

3   **Q.**   Okay.  Now we can pull up PDX 18.  Now, this is the raw data

4   that you used with your analysis; right?

5   **A.**   It looks like it, yes.

6   **Q.**   Okay.  And if we can just -- what you did is, you took each

7   precinct and you took the total number of black registered voters

8   in the numerator and the total number of registered voters in the

9   denominator; is that right?

10  **A.**   I don't create the formula that goes into the data column that

11  we use.

12  **Q.**   Okay.  You didn't do this analysis?

13  **A.**   So this is all built into our system in a way we pull from --

14  the Secretary of State's office provides this data to us, we

15  compile this into a format that goes into our system -- we pull it

16  into our system, and then it's allocated to our geographic files.

17  **Q.**   Okay.

18  **A.**   I'm not the person who does that.

19  **Q.**   Let's look at the summary table in the second tab here.  So I

20  recreated the analysis, the second tab, please.  Okay.  So here we

21  have in the yellow, these are the majority black districts in the

22  illustrative Senate plan, and the green ones are the ones that you

23  say are under 50 percent black registered voters; right?  So now

24  we have those here, and you can see in most of the questions from

25  the Court earlier, if you percent registered voters who are black

1  using your analysis, 45.9 percent; right?

2  **A.**  Correct.

3  **Q.**  49.5, 49.1, you can go down quickly -- scroll through the

4  rest.  Right.  48, 47, okay.  If we back out that unknown number,

5  because we know the denominator includes folks of unknown race;

6  right?

7  **A.**  Right.

8  **Q.**  Some of whom could be black?

9  **A.**  Correct.

10 **Q.**  So when we don't include the unknown number, do you think that

11 those are still under 50 percent?

12 **A.**  I have not done the analysis, but I think you could say the

13 same, that the unknown number could also be white population which

14 could affect the number the other way.

15 **Q.**  So you don't know if your assessment of the Sixth District is

16 accurate?

17 **A.**  I have not pulled out one portion of it.  I'm looking at the

18 race category for the voter registration as it allocates within

19 our data.

20 **Q.**  If we could go to the third tab very quickly.

21     So if you back out the unknown, what happens to those numbers?

22 Are any of them still under 50 percent?  53, 53, 52.  Go back up

23 to the top.  They're all over 50 percent; right?

24 **A.**  That's what that shows.

25 **Q.**  Okay.

**A.** But I don't know that you can exclude that percentage.  They are a percentage of the voters in the district.  You just don't know what they identify their race as.

**Q.** So you don't know if your assessment is accurate?

**A.** I'm saying that the data we use is what it is.  It is precinct by level data that we pull from the Secretary of State's office to give us an idea of what the registration numbers are.  I'm saying that according to our data, those numbers are under 50 percent.

**Q.** If we had to -- when you include unknown race in the denominator but not in the enumerator --

**A.** You can pull things in and out all you want to; it's going to change the numbers.  That's what you do when you play with the numbers.  I'm looking at straight across the voter registration, all of the fields, what the percentage is.  I don't know what is in the field.  I don't know what is in the other field.  I don't feel I'm at liberty to pull it out of the voter registration data, because I don't know.  I just can't eliminate it and say that would -- that's one race or another.  I can't tell you that.

**Q.** And if we know the race of those unknown voters, it might be over 50 percent for every single district?

**A.** If we knew the race of unknown voters, they wouldn't be unknown.  They would be in the race categories that they would be defined as.

MR. SAVITZKY:  Okay, I think that's it.  Thank you very much, Ms. Wright.

1          THE COURT:  Redirect?

2          MR. TYSON:  Thank you, Your Honor.

3    REDIRECT EXAMINATION

4    BY MR. TYSON:

5    **Q.**  Ms. Wright, just a couple of questions.  Mr. Hamilton asked

6    you about the time period it took for the Legislature to adopt the

7    map.  Do you recall that?

8    **A.**  Yes.

9    **Q.**  Did drawing the three redistricting maps take longer than six

10   days?

11   **A.**  Yes.

12   **Q.**  Any estimate of how long it took?

13   **A.**  A couple of months, maybe.

14          THE COURT:  Drawing the maps took a couple of months?

15          THE WITNESS:  Yes.

16   BY MR. TYSON:

17   **Q.**  Mr. Savitzky asked you a lot of questions about communities of

18   interest and educational attainment and labor force participation.

19   Do you recall that testimony?

20   **A.**  Yes.

21   **Q.**  Do you ever use the educational attainment of voters as a

22   factor when you're drawing redistricting maps?

23   **A.**  No, I do not.

24   **Q.**  Do you ever use the socio -- I should say the labor force

25   participation rate with voters when you're drawing redistricting

1  maps?

2  **A.**   No.

3  **Q.**   Mr. Savitzky showed you some maps about the Fall Line Freeway.

4  Do you recall that testimony?

5  **A.**   Yes.

6  **Q.**   Okay.  And you indicated you had tried to drive from or driven

7  from Augusta to Warner Robins.  Is there an interstate that

8  connects those two cities?

9  **A.**   No, there's not.

10  **Q.**   Did you have to take multiple different highways to get

11  across?

12  **A.**   Yes.

13  **Q.**   I know we can all thank Senator Warnock for getting us from

14  Columbus to Macon, but right now is there an interstate that

15  connects those cities?

16  **A.**   No, there's not.

17  **Q.**   And on the maps that Mr. Savitzky showed you, did the highways

18  that were in the highlighted portion go into Houston County or

19  into Macon?

20  **A.**   I believe they went into Macon.  I didn't see anything that

21  went into Houston.

22  **Q.**   On the charts that Mr. Savitzky showed you right at the end

23  there, I was trying to count the number of districts that showed

24  below 50 percent on voter registration, but majority on AP black

25  VAP -- and I believe I counted six districts that were below 50

1  percent on voter registration using your metric.  Does that sound

2  right to you?

3  **A.**  Six is what I had in my report.  So that also sounds accurate.

4         THE COURT:  The information you'd already given to me,

5  would also show a percentage for -- or actually the total

6  registered voters and white voters as well?

7         MR. TYSON:  Yes, Your Honor.  I think Ms. Wright could

8  also provide all of the racial categories for voters for each of

9  the plans, if that would work.

10        THE WITNESS:  Could I clarify, too, the data we use is

11  from the general election of 2020, because we create that file

12  every two years to correspond to the precincts as they were used

13  for each general election.  So the data that we would be pulling

14  from was from November of 2020's data from the Secretary of

15  State's office into the file, because we know that that is what

16  was used for that election, those precinct boundaries.

17        THE COURT:  That's pretty much up to date then?

18        THE WITNESS:  Yes.

19        MR. TYSON:  That's all I have, Ms. Wright.  Thank you.

20        THE COURT:  Any recross?

21        MR. HAMILTON:  Yes, Your Honor.

22  RECROSS-EXAMINATION

23  BY MR. HAMILTON:

24  **Q.**  A couple of questions here.  You said it took a couple of

25  months to draw the maps?

1  **A.**  Yes.

2  **Q.**  When you draw remedial maps, it takes considerably less time;

3  isn't that true?

4  **A.**  Yes.

5  **Q.**  In fact, when you worked with Judge Jones in the Crumbly case,

6  you drew that map between May 2 and May 7, 2012; correct?

7  **A.**  That's correct.  It's much easier to draw a local

8  redistricting map then a statewide one.

9         MR. HAMILTON:  Thank you.  No further questions.

10        THE COURT:  Recross?

11        MR. SAVITZKY:  No, Your Honor.

12        THE COURT:  Thank you.

13        THE WITNESS:  Thank you, Your Honor.

14        MR. TYSON:  Your Honor, while Ms. Wright is leaving, we

15  would like to go ahead and move Exhibit 41 into evidence, the

16  report that we just finished discussing.

17        THE COURT:  Any objection?

18        MR. HAMILTON:  No objection.

19        THE COURT:  Any objection from the Alpha Phi attorneys

20  for Exhibit 41 coming into evidence?

21        THE DEPUTY CLERK:  Which report is that?

22        MR. TYSON:  Ms. Wright's report.

23        MR. HAMILTON:  I'm sorry, Your Honor, you moved the

24  admission of Ms. Wright's report?

25        MR. TYSON:  I just did.

1      MR. HAMILTON:  We object to the admission of

2  Ms. Wright's report, as I previously argued, Your Honor.  I just

3  want to state that for the record.  I recognize the Court has

4  overruled the objection.

5      THE COURT:  All right.  I think Alpha did as well.

6      MR. SAVITZKY:  Yes.

7      THE COURT:  All right.  It is admitted.  I'm allowing it

8  in over objection.  I'm allowing Ms. Wright's declaration in over

9  objection.

10     (State's Exhibit 41 was received and marked into

11  evidence.)

12     MR. TYSON:  Thank you, Your Honor.  It's noon.  I

13  believe I can get through Mr. Morgan's direct relatively quickly.

14  It is mostly statistics, and it's in the report.

15     THE COURT:  Let's do direct, and we will break for

16  lunch, and Dr. Morgan can talk to the New Jersey situation and

17  come back after lunch and do the cross.

18     MR. TYSON:  That will work.  Mr. Morgan.

19     THE COURT:  Thank you.

20     THE DEPUTY CLERK:  Do you solemnly swear that the

21  evidence you shall give in the matter now before this Court, shall

22  be the truth, the whole truth and nothing but the truth, so help

23  you God?

24     THE WITNESS:  Yes.

25     THE DEPUTY CLERK:  Have a seat.  If you could please

1  state and spell your name for the record.

2              THE WITNESS:  My name is John Morgan, J-O-H-N,

3  M-O-R-G-A-N.

4              THE DEPUTY CLERK:  Thank you.

5  JOHN MORGAN, having been duly sworn, takes the stand and testifies

6  as follows:

7  DIRECT EXAMINATION

8  BY MR. TYSON:

9  **Q.**  Good afternoon, I guess, Mr. Morgan.

10  **A.**  Good afternoon.

11  **Q.**  For us to get started here, can you briefly summarize for the

12  Court your background and experience in the area of redistricting?

13  **A.**  Sure.  I first started redistricting in 1991.  So this is my

14  fourth redistricting cycle.

15      The day after I graduated from the University of Chicago, I

16  immediately went to Lansing, Michigan, and started doing

17  redistricting plans there; the next week, basically.  So this is

18  my fourth redistricting cycle.  I've done redistricting work in 20

19  states.  And this time around, I've been involved in the Michigan

20  Independent Redistricting Commission, the Virginia Commission for

21  Redistricting.  I've been involved with the New Jersey Legislative

22  and Congressional Redistricting Commission, and I've been involved

23  in a few other states as well for this cycle.

24  **Q.**  And when you draw maps for a commission, are you the expert

25  map drawer for that commission?

1    **A.**   Yes.

2    **Q.**   Have you evaluated district plans drawn by others as part of

3    your work?

4    **A.**   Yes.

5    **Q.**   And is the process of redistricting analyzing demographic data

6    topics, would that require technical and specialized knowledge?

7    **A.**   Yes, I would say so.

8    **Q.**   Have you ever participated in a case where remedial plans were

9    drawn?

10   **A.**   Yes.

11   **Q.**   Have you ever been admitted as an expert by any court on

12   redistricting and demographic data?

13   **A.**   Yes, I have.

14   **Q.**   And can you briefly give us a few examples of your prior

15   admission as an expert?

16   **A.**   Sure.  In the New Mexico State House case, which was a

17   state -- before the state court, I was an expert brought in on

18   that trial.  And the plan that was adopted was principally drawn

19   by me with guidance from the Court.  The Court -- I spent a lot of

20   time testifying in court, you know, made suggestions, and we made

21   changes to that.  That was in New Mexico.  I also filed expert

22   reports in Gwinnett County here, Fayette County, expert reports

23   for Virginia in the Congressional redistricting.  I've also been

24   called to testify as a fact witness in several cases.  I've worked

25   with Legislative bodies all across the county.

1  **Q.**  And we were talking before -- are there many people in the

2  county that do what you do in terms of drawing redistricting maps?

3  **A.**  There are a few.  I like to say we're kind of like cicadas.

4  We go underground for ten years, and every ten years we come out

5  of the ground.  But at this point, it turns out, I'm probably one

6  of the most experienced people in the county.  This is my fourth

7  circle.

8         MR. TYSON:  And, Your Honor, we would move pursuant to

9  Federal Rule of Evidence 702, that Mr. Morgan be qualified as an

10 expert on redistricting and the analysis of demographic data.

11        THE COURT:  Do you wish to voir dire?

12        MS. KHANNA:  No, Your Honor.  We'll ask during cross.

13        MR. SAVITZKY:  Same, Your Honor.

14        THE COURT:  I'll allow Mr. Morgan to testify as an

15 expert in this area.

16 **Q.**  Mr. Morgan, the Court has read your declarations.  We've read

17 those.  I don't want to repeat them.  If you want paper copies,

18 they are in the dark-colored notebook there to your right, numbers

19 one, two, and three.  What I want to have us do is briefly walk

20 through your declarations.  Exhibit 1 is the declaration you

21 submitted in the Alpha Phi Alpha case; is that correct?

22 **A.**  Yes.

23 **Q.**  You conducted an analysis of Mr. Cooper's plans on that, using

24 your redistricting process; correct?

25 **A.**  Yes.  I loaded the plans into the redistricting software, and

1  I looked at the data from those plans.

2  **Q.**  And you provided opinion in paragraph nine, the information on

3  the number of majority black districts using any-part black voting

4  age population; right?

5  **A.**  Yes, I do.

6  **Q.**  Okay.  And in paragraph ten, you prepared a chart showing the

7  number of majority black State Senate districts comparing 2021,

8  the Democratic proposal, and Mr. Cooper's plans; is that right?

9  **A.**  Yes.  And also there were some contemporaneous plans

10  introduced by the Democratic caucus, I believe.

11  **Q.**  And you note on this chart there's an increase of the

12  districts between 50 and 52 percent AP black VAP; is that right?

13  **A.**  Yes, comparing those three plans there and comparing the

14  adopted plan to the Cooper plan.

15  **Q.**  And based on your experience in redistricting, is that notable

16  in any way?

17  **A.**  Yes.  I mean, that is definitely an increase, and those are at

18  the lower end of the black percentages here, yes.

19  **Q.**  Have you seen situations in your work where districts that

20  were barely majority did not necessary elect a candidate of

21  choice?

22        MS. KHANNA:  Objection, your Honor.  This is outside of

23  the scope of his report.

24        MR. TYSON:  I just asked in terms of his factual

25  knowledge, Your Honor.  Not expert testimony.

1          THE COURT:  I will allow him to testify as to facts, but

2     not as an expert.

3          MR. TYSON:  Thank you.

4          THE WITNESS:  Yes.  And specifically in Virginia, I'm

5     aware of situations where districts that were barely majority

6     black voting age population did not elect candidates of choice.

7     In fact, the current Lieutenant-Governor of Virginia was elected

8     in one such district, although that district was higher percentage

9     in 2001.  But I'm thinking of District 75, which was a district

10    that was drawn in the remedial plan and then in 2021, the -- the

11    candidate of choice, I believe, from the minority community was

12    not reelected.

13         MS. KHANNA:  Objection.

14         THE COURT:  Well, I see your point.  Mr. Tyson, he's

15    going into material in Virginia about percentages.  I am going to

16    sustain the objection based on that, because that's not just

17    something that is factual that an everyday person can look up and

18    see.  I will sustain the objection on that.

19         MS. KHANNA:  Thank you, Your Honor.

20         MR. TYSON:  Thank you, Your Honor.

21    BY MR. TYSON:

22    **Q.**  Mr. Morgan, you also noted in your next paragraph, 11, that

23    the remedial Senate plan has 19 majority black Senate Districts?

24    **A.**  Yes, using the AP black voting age population, which was the

25    metric that was used in Mr. Cooper's report, primarily.

1 **Q.** And so eight of those 19 are in that 50-to-52 percent range,

2 looking at those two paragraphs together?

3 **A.** That's correct.

4 **Q.** And similarly for the State House districts, Mr. Cooper's

5 plan, can you just tell us about what happens from the -- compared

6 to the 2021 adopted plan to Mr. Cooper's plan, that 50-to-52

7 percent range of AP VAP black?

8 **A.** There are five more districts in that range.

9 **Q.** And Mr. Cooper's includes five more districts above the

10 adopted plan number of the majority black districts?

11 **A.** Yes.  The total number bottom of the chart shows the total

12 majority black districts using AP VAP black.

13 **Q.** And you conducted an incumbent analysis on Mr. Cooper's plan?

14 **A.** Yes, I did, on the initial plan, and then I did look at the

15 second report by Mr. Cooper.

16 **Q.** And based on those analyses, Mr. Cooper's plans, even his

17 second version of the plan, still compare more incumbents than the

18 adopted plans?

19 **A.** Yes, that's correct.

20 **Q.** You ran the core constituency reports.  Can you please briefly

21 explain to the Court what the core constituency reports look for?

22 **A.** Sure.  In the core constituency, you compare a draft plan or a

23 plan you want to use to an existing plan or any plan.  So, for

24 example, you would show in Mr. Cooper's plan and Mr. Esselstyn's

25 plan -- Dr. Esselstyn's and Dr. Cooper's plan, you can compare

1  those.  In this case what I ran was on Dr. Cooper's plan versus

2  the enacted plan to see which districts were in common.

3  **Q.**  And you found there was only one district for both plans that

4  was in common with the 2021 plans in Mr. Cooper's plan?

5  **A.**  That's correct.  I believe it was House District 3.  I

6  identified it in the report.  That's right.  It's the same in both

7  places.

8  **Q.**  And Mr. Cooper's plans, the next part of your analysis, split

9  more precincts and more counties than the adopted plans?

10  **A.**  Yes, that's correct.

11  **Q.**  And then you conducted a compactness analysis here, Chart 5.

12  Are the bolded numbers indicating the district that is more

13  compact on these metrics?

14  **A.**  Yes, that's correct.

15  **Q.**  Let's look at your declaration in the Grant case.  This would

16  be -- Exhibit 2.

17    And I see you conducted the same analysis for the plans drawn

18  by Mr. Esselstyn; is that right?

19  **A.**  That's right.

20  **Q.**  And as to the number of majority black districts in

21  Mr. Esselstyn's plan, can you tell us what happens to the

22  districts between 50 and 52 percent black as compared to the

23  adopted plan?

24  **A.**  Yes.  In his plan there are two more districts in that

25  category.  So it goes from one in the adopted plan to three in the

1    Esselstyn plan.

2  **Q.** And then what about districts between 52 and 55 percent?

3  **A.** That goes from one to three.

4  **Q.** And Mr. Esselstyn's plan adds three majority black Senate

5    Districts over the adopted plan?

6  **A.** Yes.  The way he counted them, he says there are three, yes,

7    and there are three.

8  **Q.** Next I want to look at paragraph 12 for majority black House

9    Districts.  Can you tell the Court what happened to the number of

10   districts between 50 and 52 percent AP black VAP on the adopted

11   plan versus the remedial plan?

12 **A.** Yes.  There were two in the adopted plan, and the Esselstyn's

13   plan there were 11.  So that's an increase of nine.  It's a change

14   of nine.

15 **Q.** And Mr. Esselstyn's plan adds five additional districts above

16   the 2021 adopted plan on AP black VAP?

17 **A.** That's right.

18 **Q.** You also conducted an analysis, an incumbency analysis for

19   Mr. Esselstyn's plans, and can you summarize your findings to the

20   Court on that?

21 **A.** Yes.  There were more incumbents paired on that plan than the

22   adopted plan.

23 **Q.** Is that true for the House plan and the Senate plan?

24 **A.** I believe so.

25 **Q.** You indicate that you ran a core constituency report.  How did

1  Mr. Esselstyn's plans differ in comparison to the adopted plans

2  from Mr. Cooper's?

3  **A.**  Well, Mr. Esselstyn's plan had a lot more districts that were

4  in common between the enacted plan and his plan.  So in that sense

5  what I would say is it is possible that there were areas of the

6  state that were not changed.

7          MR. SAVITZKY:  Your Honor, objection.  I don't think

8  either of the reports compare the Esselstyn plan to the Cooper

9  plans together.

10          MR. TYSON:  Your Honor, Mr. Morgan ran those plans.  I

11  was trying to refer to the adopted plan.  How much does

12  Mr. Cooper's plan differ from the adopted plan -- Mr. Esselstyn's

13  plan differs from the adopted plan.  I think Mr. Morgan can

14  testify about there is a difference between those two, and one is

15  better than the others.

16          MR. SAVITZKY:  So that's a comparison of the Esselstyn

17  plan and the Cooper plan, which is not in either reports.

18          THE COURT:  Let's go with this, Mr. Tyson.  He testified

19  about the Esselstyn plan, the adopted plan, the Cooper plan.  I

20  can make the determination based on what he testifies.

21          MR. TYSON:  Certainly, Your Honor, thank you.

22          MR. SAVITZKY:  Thank you.

23          THE COURT:  Sustained.

24  BY MR. TYSON:

25  **Q.**  In your reports on split geography, what do they show in terms

1    of splits for the House and Senate plan versus Mr. Esselstyn's

2    House and Senate plans?

3    **A.**   You're referring to?

4    **Q.**   Paragraph 21 and then paragraph 22.

5    **A.**   The adopted plan split 29 counties and 47 precincts.  The

6    Esselstyn plan split 34 counties and 49 precincts.

7    **Q.**   And then for the House plan, does Mr. Esselstyn's plan split

8    more counties?

9    **A.**   Yes, 69 in the counties in the adopted plan and 184 voting

10   precincts, and in the adopted plan and the Esselstyn plan, there

11   are 70 counties and 191 voting precincts.

12   **Q.**   A similar chart on compactness, in Chart 5, shows the

13   different calculated scores?

14   **A.**   Yes, I believe those were the districts that were identified

15   as new majority African-American districts in Mr. Esselstyn's

16   report, and that's why those were shown.

17   **Q.**   And the districts that are bold, they are the districts that

18   are more compact using those various calculations?

19   **A.**   Yes.

20   **Q.**   Let's move next to Pendergrass Exhibit 3.  And Pendergrass you

21   evaluated a Congressional plan drawn by Mr. Cooper?

22   **A.**   Yes.

23   **Q.**   In paragraph 9 you indicated you counted the number of

24   majority non-white districts.  What is a majority non-white

25   district?

1   **A.**   Well, in this case, you would take a value such as the

2   non-Hispanic white, and then the converse of that would be the

3   total minority population.  So you would look at the non-Hispanic

4   white, and the converse of that would give you the information on

5   majority non-white.

6   **Q.**   So I would be -- just so I'm clear, so a 49.99 percent

7   non-Hispanic white district would be considered a majority

8   non-white district?

9   **A.**   Yes.

10  **Q.**   And how many of those kinds of districts does the adopted

11  Congressional plan have?

12  **A.**   There are five districts that are majority non-white voting

13  age population.

14  **Q.**   And that's out of 14 districts total?

15  **A.**   Yes, 14.

16  **Q.**   You indicate that Mr. Cooper's plan reduced the any-part black

17  voting age population in District 13.  In your view, was that part

18  of him -- well, let me ask it this way.

19       Did Mr. Cooper's plan reduce the black population in District

20  13?

21  **A.**   Yes.

22  **Q.**   And you also prepared in Chart 1 core retention analysis; is

23  that right?

24  **A.**   Yes.

25  **Q.**   So what does this core retention analysis show?

1  **A.**  This is similar to the other points we discussed, we're

2  comparing the Esselstyn plan to the adopted plan, or separately

3  comparing the Cooper plan to the adopted plan.  In this case we're

4  comparing the Pendergrass Congressional plan to the adopted

5  Congressional plan to see how they compare.  I'm sorry.

6        THE COURT:  Wait a minute.

7        THE WITNESS:  No, no, I'm sorry.  May I correct myself,

8  please.  This is to the plan from -- the benchmark plan.

9  BY MR. TYSON:

10  **Q.**  The 2012 plan?

11  **A.**  Right.  Sorry, I did want to correct myself.  So in this case

12  we're looking at the enacted plan.  How does it compare to keeping

13  territory in the preexisting plan from 2012 or -- yeah.  And then

14  in this case, we're looking at the remedial or the Cooper plan and

15  how it keeps those groups together.  Sorry, I misspoke on that.

16  **Q.**  So am I reading it correctly then that of the 2011 version of

17  the Congressional plan, that's District 6, less than five percent

18  of the population that was in that District 6 is in District 6 on

19  Mr. Cooper's plan?

20  **A.**  Yes.  The district numbered six, five percent of the

21  population.

22  **Q.**  You also indicated in paragraph -- let's see, one more thing

23  on that before I leave that issue.

24     The 2021 adopted plan, it looks like the lowest number of core

25  retention is District 6, but it's still 52.86 percent black; am I

1  reading that right?

2  **A.**  Yeah, in relation to the 2012 plan, that's correct.  I believe

3  these were districts that were changed in the Cooper plan.  There

4  were other districts that were unknown.  Presumably, they could

5  have been drawn the same way.

6  **Q.**  And so on the 2021 plan, it retained at least -- well, more

7  than half of the population that was already in District 6?

8  **A.**  Yes.

9  **Q.**  You also indicated that you compared Mr. Cooper's remedial

10  Congressional plan to the 2021 adopted plan.  And what did you

11  find out about District 6 in that analysis?

12  **A.**  District 6 is very changed.  So none of the population in the

13  adopted plan is in the Cooper version District 6.

14  **Q.**  And you indicate that there was a substantial discontinuity

15  between the districts in the Cooper remedial plan and the adopted

16  plan.  Do you see that?

17  **A.**  Yes.

18  **Q.**  What do you mean by substantial discontinuity?

19  **A.**  Well, again, if you're looking -- comparing the adopted plan

20  to the Cooper plan, there were -- districts did not intersect --

21  and specifically District 6, intersected none -- no population at

22  all.

23  **Q.**  And in Mr. Cooper's remedial plan, you found 15 splits more

24  counties and precincts than the adopted plan?

25  **A.**  Yes.  The adopted plan splits 12 counties and 44 voting

1 precincts.   The remedial Cooper plan splits 14 counties and 49

2 precincts.

3 **Q.**   Then you ran a series of compactness scores again for Chart 2.

4 And correct again that the bold numbers indicate the more compact,

5 using that particular calculation?

6 **A.**   Yes, that's correct.

7 **Q.**   Have you reviewed Mr. Cooper's rebuttal report to the

8 Legislative Districts, your analysis of the Legislative Districts

9 he drew?

10 **A.**   Yes, I did.

11 **Q.**   Have you ever seen a jurisdiction use the percentage of

12 bachelor's degrees in a county to draw maps?

13 **A.**   I have not, no.

14 **Q.**   The last thing I want to ask you about, Mr. Morgan.   So in

15 attachment to Mr. Cooper's Pendergrass report, page 68 of that

16 report, do you see this population summary report here?

17 **A.**   Yes.

18 **Q.**   And this is 2020 census data for the illustrative plan?

19 **A.**   Yes.

20 **Q.**   So in looking at this number, Mr. Cooper reports -- do you

21 know what 18 plus SR black is?

22 **A.**   Yes.   In Mr. Cooper's report he indicated that SR is

23 single-race black.

24 **Q.**   So on this analysis --

25           MR. SAVITZKY:  Your Honor, objection.  I don't think

1    this is discussed anywhere in Mr. Morgan's report.

2              MR. TYSON:  Your Honor, this is a report that he was

3    commenting on and reviewing its data.  I think he can comment

4    about the data that's evaluating.

5              THE COURT:  This data came from?

6              MR. TYSON:  Mr. Cooper's report.

7              THE COURT:  Why can't he tell us what is in Mr. Cooper's

8    report?

9              MR. SAVITZKY:  Well, he didn't mention it in his own

10   report.

11             THE COURT:  I'm going to allow it.

12             MR. TYSON:  And just very briefly, Your Honor.  I'm not

13   going to belabor this.

14   BY MR. TYSON:

15   **Q.**  District 5 of this AP -- I'm sorry, single race to voting age

16   population, the percentage is -- on single race -- I'm sorry,

17   Mr. Morgan.  I've got myself turned around here.

18       18 plus single-race black is single-race black voting age

19   population; right?  You just said that; right?

20   **A.**  Yes.

21   **Q.**  So on that metric, District 6 is below 50 percent, or is

22   District 6 below 50 percent?

23   **A.**  It's below 50.  It is 48.01.

24   **Q.**  And is District 13 below 50 percent on that metric?

25   **A.**  Yes, it's 49.4.

1                MR. TYSON:  That's all the questions I have for you.

2                THE COURT:  We'll break for lunch.

3                How long do you need talking to people from New Jersey?

4                THE WITNESS:  A couple of hours.  3:30.

5                THE COURT:  Let's do this then.  Let's bring Mr. Alford

6     in at 1:30, and we'll do direct and cross on Alford.  At 3:30 you

7     all do cross on Dr. Morgan.

8                MR. TYSON:  That will work.  Dr. Alford is available.

9                THE COURT:  Thank you.  We'll be back here at 1:30.

10    Have a good lunch.

11                (Whereupon, the hearing broke for lunch at 12:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by me in the case

8  aforesaid.

9      This the 12th day of February, 2022.

10

11

12

13

14                      /s/Viola S. Zborowski_____
                        VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                      OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25