1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    ALPHA PHI ALPHA FRATERNITY,    )
     INC., ET AL.,                  )
5                   PLAINTIFFS,     )
                                    )  DOCKET NO. 1:21-CV-05337-SCJ
6         -VS-                      )  VOLUME 6 - AFTERNOON SESSION
                                    )
7    BRAD RAFFENSPERGER,            )
                                    )
8                   DEFENDANT.      )
     _____
9    COAKLEY PENDERGRASS,           )
     ET AL.,                        )
10                  PLAINTIFFS,     )
                                    )  DOCKET NO. 1:21-CV-5339-SCJ
11        -VS-                      )
                                    )
12   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
13                  DEFENDANTS.     )
     _____
14   ANNIE LOIS GRANT, ET AL.,      )
                                    )
15                  PLAINTIFFS,     )
                                    )  DOCKET NO. 1:22-CV-00122-SCJ
16        -VS-                      )
                                    )
17   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
18                  DEFENDANTS.     )
     _____
19
          TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
20            BEFORE THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT JUDGE
21               MONDAY, FEBRUARY 14, 2022

22

         VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23   OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
               UNITED STATES DISTRICT COURT
24                  ATLANTA, GEORGIA
                      404-215-1479
25          VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

─────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT─────

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3    KEVIN J. HAMILTON, ESQ.
      ABHA KHANNA, ESQ.
 4    SOPHIA LIN LAKIN, ESQ.
      ARI J. SAVITZKY, ESQ.
 5    SEAN J. YOUNG
      RAHUL GARABADU
 6    ROBERT BOONE
      ABIGAIL SHAW
 7    ALEX W. MILLER
      MAURA DOUGLAS
 8    ANURADHA SIVARAM
      EDWARD WILLIAMS
 9    JENNESA CALVO-FRIEDMAN
      GEORGE P. VARGHESE
10

11

12   ON BEHALF OF THE DEFENDANT:

13    BRYAN P. TYSON, ESQ.
      LOREE ANNE PARADISE, ESQ.
14    BRYAN JACOUTOT, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                (HELD IN OPEN COURT AT 12:28 P.M.)
 2           THE COURT:  Let me put a couple of cases on the record,
 3      the citations I've been talking about.  One of the cases I was
 4      talking about this morning is the Democratic National Committee v.
 5      Wisconsin State Legislature.  That's 1941 Supreme Court 28, cited
 6      October 26, 2020.  The other case I talked about this morning is
 7      the Democratic National Committee v. Mark Bostlmann,
 8      B-O-S-T-L-M-A-N-N, Secretary of Wisconsin Elections Commission.  I
 9      also talked this morning about People's First of Alabama v.
10      Secretary of State for the State of Alabama, and that's 815 Fed
11      appendix 505.  And Curley versus Raffensperger, 397 F. Supp. 3rd
12      1334.  And I mentioned those cases, and then I needed to put the
13      cite on there.
14           All right, Mr. Tyson, you represent the people of the
15      State of Georgia, all of them, all 10 million.  Would it hurt --
16      you argued that the train has left the station, that this election
17      is started, it's too late to stop it now.  But the plaintiffs'
18      argument is it's not going to hurt, it's not going to cause that
19      much confusion or it's not going to cause that much disruption as
20      opposed to people's rights to slow that train down and reschedule
21      it.  Why are they not right about that?
22           MR. TYSON:  Well, Your Honor, I think there are a couple
23      of major things, and I've written down something Mr. Esselstyn
24      said actually, a really good line where he called redistricting a
25      wonderfully complicated puzzle.  I feel like in a lot of ways that
```

1  is what you have to deal with, too.  And I think it is a very

2  important question because if there is dilution of voters in

3  Georgia on account of race or color, we -- and that is a very

4  serious charge the plaintiffs bring.  I don't want to discount

5  that at all.

6          THE COURT:  I agree.

7          MR. TYSON:  I think what you see here, though, is a

8  couple of things:  One is the dilution has to be on account of

9  race or color.  You already hit on this at one point, I was

10 planning on talking about it, the partisan nature versus the

11 racial nature.  So the question we have to work through -- because

12 redistricting is partisan, as Senator Carter has testified.  And

13 Justice Alito said in the Cooper case, Cooper v. Harris, at 137

14 Supreme Court at page 1490, the Courts have to exercise

15 extraordinary caution in distinguishing race-based redistricting

16 from politics-based redistricting, because if they don't, they

17 will invite the losers in the redistricting process to seek to

18 obtain in court what they could not achieve in the political

19 arena.

20         And so my biggest thought when you ask the -- my

21 opposing counsel what is the difference in this case in Alabama,

22 and the thing that came to mind for me is, I think this is

23 actually a much harder case than the Alabama case.  In a lot of

24 ways, Alabama was a lot more clear-cut.  There was a district they

25 knew about, they could have drawn it, they didn't draw it.

1          In this case, we have a lot more complicated facts that
2     go into it, a lot more types of issues with geographic limitations
3     and communities of interest and data and statistics.  We've talked
4     about COVID delays in the census, delays in the timeline.  And so
5     at the end of the day, the people of Georgia have to have their
6     voice heard through the election process.  And we as the State,
7     rightly or wrongly, we have all these series of this complicated
8     machine that we put together to make this thing operate the way it
9     needs to.
10          THE COURT:  Is that sort of the argument that the
11     Plaintiffs are making, that more people are affected in Georgia by
12     this than Alabama?  You have a House District, three Senate
13     Districts and five House Districts.  You have more people affected
14     by these allegations that, hey, you're denying African-Americans a
15     chance to have a person of their choice to vote for and represent
16     them, as compared to one person compared to eight people.
17          MR. TYSON:  Certainly, Your Honor.  I think that is
18     correct.  That is a distinction that more people would be affected
19     by the remedial plans here, certainly.  Again, I think it comes
20     back to the lack of this clear entitlement to relief on the
21     likelihood of the success and the merits.
22          So I thought what we could do is talk through all eight
23     Districts, just talk through the ones that we've worked through
24     and try to take a look at that.  I think what we can see is, there
25     it not a likelihood of success on the merits of these.

1          I want to start with the census because we made this

2 point several times.  That there's been a massive number of new

3 African-American voters in Georgia.  That's a great thing.  I

4 don't think anybody disputes that Georgia as a growing state and a

5 diverse state is a wonderful thing.  But the testimony was that

6 the overall proportion of the black voters moved from a half a

7 point from 2010 to 2020 on the single-race black number, and

8 one-and-a-half points on the any-part black number.  So, yes, the

9 chart showed this increasing number of raw numbers going up, but

10 as a percentage of the population, there's not nearly as many

11 shifts as the plaintiffs have made that out here.  So I think it's

12 important to remember as we look at these Districts that the

13 overall growth is not nearly as significant a percentage basis as

14 it is a raw-number basis.

15          THE COURT:  I think Metro Atlanta showed, like, 484,000

16 additional people in the last ten years.

17          MR. TYSON:  Yes, sir.

18          THE COURT:  So wouldn't that -- if you take out -- if

19 you just concentrate on that number, would that percentage be

20 higher than half a point and one point?

21          MR. TYSON:  I believe in metro Atlanta it is higher than

22 that, Your Honor.  The statewide number was that --

23          THE COURT:  I understand in these other counties, at

24 least by Richmond and the south end of the Dalton, the number you

25 increase that may not be that high, which brings down the raw

1  number.  But if you look at two of the Senate districts in metro

2  Atlanta they're proposing --

3          MR. TYSON:  Yes, that's correct, Your Honor.  And I

4  think, again, if you look at all of the different numbers and

5  things that we have, the number of majority non-white districts

6  that we talked about there where white people are not a majority

7  is up -- I can't remember the number -- there is additional

8  numbers of those this time around.

9          The other thing I think that is important to remember is

10 people live in different places.  And so if people are

11 geographically dispersed, it could be harder to lasso -- "lasso"

12 is the wrong word -- put people into a district together to make a

13 majority of a single race.  That's what Bartlett v. Strickland

14 requires in the plaintiffs' showing here.

15         So in terms of just looking at the districts, I wanted

16 to start with the House just to kind of walk our way through

17 there.  Because I think it's important that we have two experts

18 that said they could draw additional districts, but they only

19 agreed on a couple of areas of the state about that on the House.

20 So Mr. Esselstyn doesn't draw a district in southwest Georgia;

21 Mr. Cooper does.  Mr. Cooper doesn't draw a district in kind of

22 the western metro, the 64 up there; Mr. Esselstyn does.  They both

23 drew two Districts south of Atlanta.  So we'll talk about that.

24 Mr. Esselstyn drew two Districts in middle Georgia; Mr. Cooper

25 drew one.  I think the plaintiffs have made very clear as we've

 1  gone through this process, these are illustrative only.  We are

 2  looking at this -- as we look through these, number one, the

 3  variations are so tight, I'm not sure there is another way to draw

 4  a lot of these districts.

 5          But the second thing is the plaintiffs kind of seem to

 6  want to have it both ways, these maps are only illustrative, but

 7  then we have no timeline concerns and you can just adopt these

 8  maps and implement those.  And so it really needs to be kind of

 9  one or another.  For Mr. Cooper especially when he changes the

10  boundaries of at least every district except for one district from

11  the 2021 plans, that's a huge piece we'll get into on the Purcell

12  side of things.

13          So let me just look through -- let's start with 149 and

14  145 where we talked about this.  And again, I think this is

15  important because we're trying to answer the question what did the

16  Legislature fail to do here, what did they not do that they should

17  have.

18          THE COURT:  Okay.

19          MR. TYSON:  When District 149 -- I've taken these

20  numbers -- these are from Ms. Wright's spreadsheets that she sent

21  around on Friday.  So you see 149 is barely a majority of AP black

22  VAP.  It's not majority on single-race black VAP, and it is a

23  majority on the black voter registration number.

24          Similarly, 145 is very close on AP black VAP, below

25  majority on single race, below majority on black registered

1   voters.  But I think the thing that sometimes can be, well, number
2   one, this finger that goes up to Milledgeville, if you have a
3   district that is 52.0 percent black and is going up to
4   Milledgeville to gather population, there is probably not a whole
5   lot of other ways to configure this and keep it as a majority.  So
6   that's sort, I think, of one piece of the puzzle as you sort
7   through that.
8          But the other piece is what this does to Districts 142
9   and 143.  So District 142 remains majority black, but only barely
10  by .14, and it's below majority on single-race and below majority
11  on registration.
12         THE COURT:  Both of those right now are represented by
13  African-Americans?
14         MR. TYSON:  They are, Your Honor.  And District 143
15  similarly drops below majority on those single-race and black
16  voter registration.  So, yes, Mr. Esselstyn did create four
17  districts here, but he created four districts that just barely
18  cleared that 50-percent threshold.  And then most of them are
19  below majority on kind of all the other metrics that you would
20  consider or look at along the way, along with the issue of the
21  public comments that you raised about Macon and what happens
22  there.
23         So again, for this area, if you focus on race, and I'll
24  talk more about this in a minute, the fact that you can create
25  four majority black districts in this area just because you can do

1  it doesn't mean Section 2 requires it.  That's what we want to get

2  through as we work through these pieces.

3          The next is Mr. Cooper's in the same vicinity.  He

4  talked about what he did in this area.  And his testimony was he

5  went and got black voters out of Eatonton to add them to other

6  majority black counties around there, and in doing that he still

7  only got barely above majority on VAP, below majority on single

8  race, and majority on registration.

9          So again, these are complicated issues to try to sort

10 through and work through.

11         For the south Atlanta ones, we have districts with

12 Mr. Esselstyn both in Fayette and Clayton and in Henry.  And again

13 for the Fayette one, we have a majority white county in Fayette

14 County, getting a large black population from Clayton County to

15 make that district majority black.  Ms. Wright couldn't identify

16 any of the connections here, and I think it is significant that

17 both the plaintiffs' experts struggled to explain what communities

18 were involved.  And I know we talked about, well, sometimes we

19 have to draw the line and put disparate communities together.  The

20 challenge is if you're putting disparate communities together on

21 the basis of race, that's what LULAC tells us from the Supreme

22 Court, that's where it gets problematic.

23         THE COURT:  Why do we have -- what evidence can you

24 point to that indicates that the predominant factor in drawing it

25 this way was race?

1          MR. TYSON:  As far as what requires race, I think there

2     are several factors.  So both of the map drawers testified that

3     they turned on racial shading and dots at various points where

4     they were drawing the map.  They, obviously, were looking for

5     racial makeup of populations.

6          They -- these maps include features that you wouldn't

7     have on other kind of configurations.  So the finger on District

8     149 splitting Clayton County in a couple of different places to go

9     in and add population there, other ones we'll talk about where

10    there appears to be racial decisions made in the map drawing.

11    They make changes to other districts that are significant.  So we

12    talked about Senate 18 and kind of where that ends up putting the

13    disparate communities together.  And I think it is important to

14    remember when a jurisdiction faces a racial gerrymandering case,

15    their defense is, oh, traditional redistricting principles, that

16    is what we always do.  And courts have to look and say, well, did

17    you really follow those consistently, or did you just, you know,

18    do them in this one and kind of ignore them in this particular

19    area.

20         So we have maps from both map drawers that is the most

21    majority black districts they drew of any configuration.  Those

22    maps split more counties, they split more precincts, they paired

23    more incumbents, they have higher deviations, every single factor

24    you would consider in service of a racial goal in terms of what

25    happened with maps as a whole.  So I think that's where this Court

1  can look and say these aren't appropriate remedies, because

2  they're drawn primarily based on race.

3        And I think another important point from LULAC is,

4  Justice Kennedy said the mathematical possibility of a racial bloc

5  does not make a district compact.  The fact that you can do this

6  doesn't necessarily mean that it's automatically a district that

7  is required by Section 2.  Because if it's a racial gerrymander,

8  it's not a remedy the Court can order, because if the Legislature

9  did it, it would be unconstitutional.

10        THE COURT:  Well, when I look at these two maps, I'm

11  still struggling to say, okay, your argument said these maps more

12  or less were written predominantly for race to get the right

13  number of blacks.  But don't you have to consider that?  I think

14  Mr. Cooper may have said that's why you're looking at a drawing.

15  Don't you have to consider whether they're African-Americans in

16  this pocket?  Don't you have to look at that?

17        MR. TYSON:  Certainly, Your Honor.  I think this is one

18  of those interesting pieces that House Section 2 has developed.

19  Because in the '80s and '90s for your Section 2 cases, you would

20  have a county government.  So they have five commissioners, they

21  were all elected at large, and you had a core of black voters in

22  the city of the county, for example.

23        And so, basically, if you drew a circle around those

24  voters in the middle, there's a majority district.  Simple, easy

25  to demonstrate.

1          As we've moved kind of beyond those types of Section 2

2     claims to where we are now, this is where it gets really difficult

3     because you see the number of districts that Mr. Esselstyn had to

4     reconfigure to make this district appear here.  And again, back to

5     this wonderfully complicated puzzle.  Everything you do -- I think

6     of districting like a water balloon; you squeeze in one place,

7     it's going to pop up somewhere else.  And so when you're making

8     these kinds of adjustments, you have to, obviously, be aware of

9     race when you're drawing -- I understand what he's saying, but

10    also you're not going to create these districts but for trying to

11    reach some sort of racial goal.  And it's not as simple as there

12    is a naturally occurring community here.  It's instead, I can

13    connect this part of Clayton County with this part of Fayette

14    County, and I can make a district emerge that's majority black.

15          THE COURT:  I guess it kind of goes into the argument

16    regarding clarity of Section 2 in that you wouldn't try to draw

17    the map, you know, going to a majority white district.  So you

18    wouldn't go for the majority.  When you go tat way, then it's

19    predominantly race and it's not correct.

20          MR. TYSON:  Certainly.  And for jurisdictions who are

21    drawing, it's very hard to give them advice about what to do here.

22    Because you have the one line of cases that talks about you can't

23    focus too much on race, and it's a racial gerrymander of voting

24    rights where you have to take into account race, and there used to

25    be pretty good running room, I would say, between those, where you

```
 1   knew where the boundaries were.

 2            As Chief Justice Roberts said in the Alabama case, the

 3   Supreme Court's case law in this is a muddle now.  It's very hard

 4   to discern when a jurisdiction is considering race too much, which

 5   is what some of the other three-judge panel cases you had to hear

 6   about these maps allege, and we didn't consider race enough, which

 7   is essentially what the plaintiffs are arguing here.

 8            THE COURT:  You raise a good point here.  The maps

 9   adopted by the State, I could say why would you need 75 percent

10   minority voters in a particular Senate District or even 65

11   percent?  But you have six districts that have 65 percent or

12   higher.  Why?

13            MR. TYSON:  So, Your Honor, I think looking at this map

14   here actually will tell exactly why.  If you look in this area of

15   South DeKalb County right here, this is an area that is heavily,

16   heavily African-American.  And so is the area here in Clayton is

17   also heavily African-American, North Henry is, Rockdale is, all

18   the way around this area.  So you see this shape of District 91

19   that starts in a heavy minority area and radiates out into a

20   whiter area.  That's why you see a lot of vacant strip-looking

21   districts on the maps --

22            THE COURT:  Yes.

23            MR. TYSON:  -- because you're running to make it where

24   it's not too high in the terms of the overall black percentage.

25   But that again makes it a challenge to draw, because if you just
```

1  drew a box in South DeKalb County, that would be a 90-percent

2  black district or higher.

3         THE COURT:  So why can't you draw it to reduce it down

4  from the 75 percent to the 65 percent?

5         MR. TYSON:  And, essentially, you would just run out of

6  people.  If you start in the middle of DeKalb County, and all of a

7  sudden you make a district as thin as it can be, and you get to an

8  end of where you're trying to get to -- out of the core of DeKalb

9  County, you may be arguing it's your ideal population size before

10 you get to a more diverse population.

11        THE COURT:  Well, I think Ms. Khanna asked Mr. Morgan

12 yesterday, when does it become packed?  So I ask you that

13 question:  When does it become packed?

14        MR. TYSON:  And it's a hard question to answer.  What

15 Mr. Morgan said --

16        THE COURT:  He didn't answer it.  In my opinion, he did

17 not answer.  He gave an answer.

18        MR. TYSON:  Yes.  I give you kind of my description of

19 what I could do.

20        THE COURT:  Well, he gave an answer.  Okay.

21        MR. TYSON:  Yes.  My general view on that is you have a

22 70-percent district, and next door you have, say, a 45-percent

23 district, and you can very easily move population from the one to

24 the other and make both a majority.  I would consider that a

25 situation where you could argue that 70-percent district is

```
 1  packed.  If you have a 60 percent, a 60 percent, a 60 percent, and
 2  a 70 percent, and there's really no way to shift population
 3  because that's where it gets very dependent on the geography
 4  you're dealing with.  And so in that situation, I wouldn't
 5  consider a high percentage district packed.
 6          I also find it interesting that on the -- I think it's
 7  the Democratic House plan, there are actually some districts above
 8  90 percent, and they are in this South DeKalb area on there.  So
 9  it's difficult to draw in those particular parts of the state
10  where the population is -- is largely minority.
11          THE COURT:  Okay.
12          MR. TYSON:  SO we have these districts again kind of
13  barely there in terms of the population.  We have the testimony
14  from Ms. Wright about 117 and kind of the more rural areas of
15  Henry.  Again, you're still barely over 50 percent on your black
16  VAP, under on your single race, under on your registration.  So
17  again, this gets us back to what did the Legislature fail to do
18  here, and is there really many other ways to configure this?  I
19  think the answer here is probably not, given the high tolerances
20  that we have.
21          Mr. Cooper's in the same area is different but suffers
22  from some of the same issues.  He, obviously, has a higher
23  district.  His is 60-and-a-half percent.  I think in part because
24  he takes the southern part of Fayette County out.  But even with
25  this configuration, we had testimony about the difference in
```

1  Clayton County and Spalding County that are put together in this
2  district to kind of add an additional district.

3        We also have Ms. Wright testified all these other
4  districts around it that are reconfigured, they're still majority
5  black.  The Legislature still drew them that way -- not this way,
6  but they are in the same general vicinity, but ultimately this one
7  was added, and you had to connect those pieces of Clayton and
8  Spalding to make that a reality.

9        THE COURT:  Well, Mr. Tyson, anyone can make the
10  argument that Spalding County is more rural than Clayton.

11        MR. TYSON:  Yes, Your Honor.

12        THE COURT:  You have some situations where you're going
13  to have urban and rural.

14        MR. TYSON:  Certainly, and you always have that, because
15  we have to get the same number of people.  And so again, I think
16  the issue is not so much -- okay, you're going to have people who
17  are -- I'm in an area of Cobb County which is much more built out;
18  West Cobb is more rural-ish, more like Paulding County.  If you
19  connected those two, you could say they're all suburban counties,
20  that's it, it's all suburban Atlanta, even though it's different
21  in character.  You can't really reach from one to the other to run
22  it; you'd have too many people if you try to do that.

23        So there are situations when you're radiating out from a
24  very populated area, you will have -- you've got to connect some
25  areas that are rural and urban together, that happens, the

1   suburban and ex-urban as we heard about.

2        But at the end of the day, I think it comes back to the

3   "why."  If it is truly a population-based calculation, and you

4   have to, as my mom would say, you have to draw the line somewhere,

5   you have to grab some amount of population.  If that's the reason,

6   that's one thing.  If it's "I have to take this population in to

7   get this district as a majority black district," now we have a

8   different problem.

9        THE COURT:  What would make me believe that that map was

10  drawn predominantly based on race then?

11       MR. TYSON:  So, Your Honor, I believe Ms. Wright's

12  testimony on this one was the changes around it -- so if it's 75,

13  78, 109, those districts that were around it, all the

14  reconfiguration up there, that created the space essentially to

15  push District 73 farther south.  The breaking of the Clayton

16  County border, which had been upheld, I believe, on the Democratic

17  plan and on the State adopted plan and the reuniting of those

18  communities.

19       Now, if the legislation had configured Clayton County

20  similarly to Mr. Cooper and this was the leftover population, I

21  think I would have less concern about them being a -- it would be

22  a population-based decision at that point.  But when you're going

23  through these county boundaries along the way and finding a

24  significant reconfiguration, that's where the concern from

25  Ms. Wright and her testimony about this being a race-based draw.

1          THE COURT:  Ms. Wright, I understand she testified the

2     way she testified.  She said "apparently" in a lot of situations,

3     but she never explained what -- she said apparently was done.  But

4     there was never any explanation that followed why it was

5     apparently.

6          MR. TYSON:  Certainly, Your Honor.  And I think, like

7     she testified, you can't always know what is in the mind of the

8     map drawer.  You have to take and figure out, look at what you did

9     and try to discern what were your goals based on what you see.  So

10    if, for example, we saw a plan that had every city was kept whole

11    and we split every county in service of keeping every city whole,

12    we could probably reasonably conclude that the map drawers'

13    primary focus was keeping cities whole, because that was the only

14    consistent feature we can find.  I think that's -- I'm not going

15    to speak for Ms. Wright, but I'm assuming that's why she had

16    "apparent" there, because she is looking at this saying, I can't

17    figure out any other explanation so it's apparently racial, but

18    she's leaving open the possibility there might be something else.

19    She just can't identify what that is.

20          So we also have District 110 is similar.  It's also

21    below majority on black registered voters.  It also unites areas

22    around McDonough with Griffin and a lot of the differences we

23    talked about in this area as well.  And again, a lot of this is,

24    like Ms. Wright said, is driven by the reconfiguration of other

25    districts around this that lead to these kinds of splits and this

1  kind of approach.

2          I believe this was also the district she testified that

3  split one of the neighborhoods that was there in Henry County,

4  where there is a division here.

5          This District 153 and the configuration of Southwest

6  Georgia, one of the areas where Mr. Cooper and Mr. Esselstyn

7  disagreed, their testimony there is, there really is no reason to

8  connect a House district like this with Thomasville to Albany, a

9  three-way split of Sumter County doesn't make sense, and the fact

10 that Mr. Esselstyn didn't draw a district here, I think, is also

11 incredibly specific and relevant to this.

12         THE COURT:  Well, as you heard, I have a concern about

13 this one.

14         MR. TYSON:  Yes, Your Honor.  And District 64 is an

15 unusual district, I would say.  We had the testimony about taking

16 Fulton voters, connecting them through Douglas and into Paulding.

17 But again, this is a district that's barely majority, it's not

18 majority on single race, it's not majority on registration.

19         So again, taking a look at what we've drawn here and the

20 reconfiguration around it as an aside, you can see in District 60,

21 for example, here, this is another example of having to string a

22 district along to lower the overall black percentage in the

23 district.  So you have a higher black percentage in this portion

24 of the district moving along the Chattahoochee River into a whiter

25 area as you move into North Fulton.  These are some examples of,

```
 1  again, of districts that would be drawn to lower the percentage
 2  just because of the concentration of voters in that area.
 3          So that's the House plan.  Those are the House
 4  Districts.  And again, I think at the end of the day, the relative
 5  lack of agreement and then the lack of clarity in terms of where
 6  the Legislature failed to draw these, I think the only agreement
 7  is that South Atlanta area and Middle Georgia, and then there was
 8  a question of how much and what length the Legislature should have
 9  gone to.  And given Mr. Cooper was drawing his plans before the
10  Legislature even was drawing their plans, my expectation is if
11  we -- if the Legislature had drawn districts like this, we might
12  have been here on a preliminary injunction on a racial
13  gerrymandering claim instead of a Section 2 claim, just because of
14  the difficulty of considering those issues.
15          So let's look at the Senate.  There was more agreement
16  on the Senate plans than there was on the House.  I think that's
17  clear, number one.
18          District 23 can only be made majority by connecting, as
19  we talked a lot about, Augusta with Warner Robins and Houston
20  County here.  It's a district that is above 50 on AP, below 50 on
21  single race, below 50 on black registration.
22          Mr. Esselstyn configured that same district differently.
23  But both of the configurations required District 22 to leave
24  Richmond County.
25          Ms. Wright testified about splitting of Greene County
```

```
1    for minority population and other areas in Wilkes County.  And
2    again, the same problem, we get to a majority AP black VAP
3    district for the one that's so close that it's not majority on
4    single race or on voter registration.
5              And I think for these districts, in particular, there is
6    not evidence or testimony from the plaintiffs about what is
7    connecting the various communities contained in these districts.
8    You have to have Milledgeville.  You have to have Augusta to try
9    to form a district here that is majority black in this part of the
10   state.  And ultimately, we would submit this is a textbook LULAC
11   example, you're coming halfway across the State of Georgia in a
12   single State Senate District to unite communities based on race
13   and achieve a racial goal.
14             District 28 is also suffering from a similar fate here.
15   You have a Fayette, Spalding, Clayton district on Mr. Cooper's
16   configuration.  And as you look at the numbers with him, only
17   Clayton County has a majority black population in the '70s, and
18   both Fayette and Griffin/Spalding do not.  And so again, we're
19   connecting these to create a district here that was not previously
20   there before.  It is a majority on single race.  It's below
21   majority on black voter registration.
22             Mr. Esselstyn is in the same general vicinity, but he
23   puts a lot of Fayette County into another black majority district
24   here that runs into Clayton.  And instead, he connects Clayton
25   County with North Fayette, South Fulton and down into Newnan to
```

1  get a district that is a little stronger and is majority black on
2  all three of those.  But on either configuration, you have to have
3  Clayton County in the district.
4        Ms. Wright couldn't really identify the interest there,
5  and said going to Newnan to her looked exactly like what she would
6  consider to be a race focus on that configuration of
7  Mr. Esselstyn's, and a three-way split of Clayton County on
8  Mr. Cooper's plan there on the left.
9        District 17 and District 25 in the Henry County area,
10 these also are configured differently in the same Henry County
11 area.  There was no testimony, though, about Stonecrest united
12 with McDonough and some of the rural areas of Henry County.  This
13 is a very strongly black district, in terms of it's over 62
14 percent, 60 percent on single race, 55 percent on registration.
15 Mr. Esselstyn doesn't go up into DeKalb County, but it does go and
16 has to use population in Clayton County here in the south part to
17 make it a majority black district.  It's a little bit lower on the
18 overall numbers, but it is there.  Again, I think we're at the
19 same point of connecting these different communities to achieve a
20 racial goal and then reconfiguring, for example, District 10 again
21 as majority black, going all the way from South DeKalb down
22 through Henry and into Butts County to enable the creation of
23 District 25.
24        So again, all these pieces, the division of counties,
25 the increase in deviation, the increase in precincts -- although

1  the plaintiffs give lip service to traditional redistricting

2  principles, these plans have to sacrifice at least some of those

3  in service of the racial goal that they have on these plans.

4          Moving to Coweta -- I mean, it's congressional, I'm

5  sorry.  District 6 we talked about this.  Testimony from

6  Mr. Cooper couldn't really explain his decision to take this part

7  of Cobb versus the western part or the eastern part.  Ms. Wright

8  testified that this district into Fayette cut several precincts,

9  and she couldn't explain what was going on with that little

10 appendage here.

11         THE COURT:  The argument is made, though, it wouldn't

12 go -- if you took it east or west, it goes up to Kennesaw.  My

13 question is, if you go west or east, would it make a difference?

14 She said I don't think it would make a difference.  We're just

15 talking about population.

16         MR. TYSON:  Your Honor, I don't want to testify on this,

17 but I am familiar with Cobb County and know that this part of Cobb

18 County has a higher -- is much more diverse in terms of its

19 population makeup than the western part of Cobb County or even the

20 eastern part of Cobb County.  So this is a -- when we first looked

21 at this and looked at it with Ms. Wright, this was a pretty

22 obvious reach for population in this district.  I believe she

23 testified about that.

24         THE COURT:  Let me look at these numbers for a minute.

25 Below 50 on registration.

1          MR. TYSON:  And again, I think this is also where the

2     wonderfully complicated puzzle comes into effect because these

3     changes to District 6 mean that District 13 needs population.  And

4     so 13 on Mr. Cooper's plan now runs all the way over to -- I think

5     it's Jones County, which I think Mr. Cooper admitted and

6     Ms. Wright said was a rural part of the state with Clayton and

7     Fayette there.  So you're making sacrifices kind of in every

8     direction, and it drops that District 13 down below 50 on single

9     race and below 50 on registration.

10          So again, all these different places, you touch it in

11     one place, it does have effects in other parts of the state and

12     the other configurations.  Again, the plaintiffs say this is just

13     illustrative; the Legislature can figure something else out.  But

14     given the tolerances that are this tight, it's difficult to

15     configure.  Although I would assume it's very difficult to

16     configure these districts in some other way.  And the plaintiffs

17     haven't showed you that there is another possible way to do this.

18          The allegation is the Legislature should have drawn this

19     district, but if the Legislature drew this district, again, I

20     think we'd be here on a racial gerrymandering claim as opposed to

21     a Section 2 claim.

22          THE COURT:  One of the arguments that came up on a

23     number of cases regarding the citizens in Southwest Cobb County

24     being connected with people in Northwest Georgia, no similarities.

25     I think your argument said, well, we actually have population.

1  But isn't that something -- the argument being made by the

2  plaintiffs in some case where we have to find the population?

3          MR. TYSON:  Certainly, Your Honor, it's always a factor

4  you want to consider especially for a Congressional District

5  because it's so large.  And so that's why you see Mr. Cooper when

6  he fixes that southwest up to northwest, he ends up putting

7  Clayton and Fayette in with rural counties to the east of the

8  state.  So ultimately, you know, you have to find the population

9  somewhere.  You have to be able to include people.  And that's

10 going to involve situations where you have disparate communities.

11         I can't remember if we talked about this or not.  I know

12 I talked with Ms. Wright at one point about District 14; one of

13 the things that it does is it stops at the mountain range there.

14 It doesn't go all the way across the top of the state.  There are

15 factors like that, there is geography you have to consider.  So

16 the Legislature, I think, as a policy-making body, can hear from

17 the public, they can make those calls, we're going to put this

18 with this, they can say, well, put Bartow in, and may decide,

19 well, Congressman Loudermilk lives there, we don't want to take

20 his home county.  So we'll take a piece of Cobb instead.  They can

21 make those decisions, but, again, those aren't racial decisions.

22 And I think that's the concern is if you're making those same

23 types of decisions based on race, that's where you're stepping

24 beyond what's allowed as an actual remedy in this situation.

25         So we also talked about, and you mentioned -- had

1    discussion about District 18.  I think this is another important
2    point that when you start making these types of changes, there are
3    other effects in other districts.

4           So we talked about District 23 and 26 and how that
5    configuration results in this meandering district for District 18.
6    And so the Legislature is having to balance all of these different
7    interests while trying to also take into account traditional
8    principles in other places as well.  And so I think this is a
9    significant part of Mr. Cooper's testimony where he said, yeah, I
10   didn't pay as close attention to District 18 because I was really
11   focused on the majority black districts.  That's yet again an
12   indication he was focused primarily on race, and that's our
13   concern with this as remedies as to the maps.

14          I think ultimately one point this hole drives to, this
15   is an emergency preliminary injunction proceedings, and these are
16   very, very complicated questions to have to sort out.  Ms. Wright
17   said the Legislature spent several months working on these plans.
18   More time will assist the Court in sorting through a lot of this.
19   So I think looking at those pieces, not on a preliminary
20   injunction standard, will also be helpful in determining is there
21   a Section 2 violation here.  Because, again, if it's not dilution
22   of votes on account of race or color, then we don't have a
23   violation of Section 2 and these maps are completely lawful.

24          So I wanted to just kind of close out the Gingle's one
25   piece with Justice Kennedy in LULAC where he talked about there is

1  no precise rule governing Section 2 compactness.  The inquiry

2  should take into account traditional districting principles, such

3  as maintaining communities of interest and traditional boundaries.

4  And he has some citations and then says, "The recognition of

5  non-racial communities of interest reflects the principle that a

6  state may not assume from a group of voters' race that they think

7  alike, share the same political interests, and will prefer the

8  same candidates at the polls."  And that's 548 U.S. at page 433.

9          And I think again, if the Legislature had engaged in the

10  connection of these non-racial or these communities together based

11  on race, it would be engaging in exactly the type of analysis that

12  the Supreme Court has said that you can't make that assumption;

13  you have to look at more things than just the race of the

14  individuals you're putting into districts.

15          So ultimately, the Section 2 -- I mean, essentially what

16  the plaintiffs have shown us is if you focus primarily on race, if

17  you racially gerrymander, you can draw some additional majority

18  black districts.  That, to me, is not a very remarkable

19  proposition because, yes, if you focus on one particular thing,

20  you can probably keep squeezing out additional districts, make

21  districts even longer, and then you could probably find some more.

22  But that's where the race consciousness affects the illustrative

23  plans that you've been given here and is not an appropriate

24  consideration as we look at the geographic compactness of the

25  minority community.

1          THE COURT:  So you're saying it's not enough minorities

2    in the state to draw this extra Congressional district and three

3    Senate Districts and five House Districts?

4          MR. TYSON:  No, Your Honor.  The people are definitely

5    there.  Again, it's a question of how do you configure it.  If,

6    for example, you drew a series of ten -- let's say you brought

7    every district into metro Atlanta, say.  If you just cut through

8    the counties, bring things along, I think back to the Cynthia

9    McKinney district in the 1990s, the red plan of Savannah.  That

10   was a district that could be drawn, and the people were there to

11   support making that a majority African-American district.

12         THE COURT:  Well, here you have 14 Senate districts in

13   2006.  You increased the African-American population of Georgia by

14   16 percent, 484,000 out of a million people, yet you have no

15   increase whatsoever in Senate districts.  You have 47

16   majority/minority House Districts.  Again, you increased the

17   numbers by 16 percent, yet it only goes up two.  How do you

18   rationalize that?  I understand what you're saying about the

19   overall increase is half percent, 1.5 percent, but in the Senate

20   there is no additional ones even if they're increasing population.

21   The House clearly at least makes the argument,  well, we increased

22   two.  But in the Senate all that increased population, but no

23   increase in the representation part.  That's the argument.

24         MR. TYSON:  Yes, Your Honor, and I think it is a

25   very -- it's really important to look at because I think it's more

1    complicated than just there's people; therefore, there should be

2    more districts.

3         THE COURT:  All right.

4         MR. TYSON:  For example, if all of those individuals --

5    I'm not saying this is what happened, but let's just say all those

6    individuals moved evenly distributed across North Georgia, let's

7    say.  There's -- there is a numerical increase, there's not enough

8    of a compact community to form an additional district.  I think

9    that's ultimately what we're trying to get to in Section 2; we

10   just can't look at total numbers.  We have to look at the

11   geographic compactness of the minority community.  So if all of

12   those individuals moved into a part of Atlanta, geographically

13   compact and more of a community there, yes, that district should

14   be drawn.

15        The evidence before you, though, is this is the number,

16   this is the effect, and it's missing a step in the analysis that's

17   needed to look at the geographic compactness of the community.

18        THE COURT:  Compactness of the numbers are not there is

19   your argument?

20        MR. TYSON:  Yes, Your Honor.

21        So ultimately we have maps drawn primarily based on

22   race.  We would submit the plaintiffs can't succeed on prong one

23   for that reason.  And I know Ms. Khanna referenced the Davis case

24   in the Eleventh Circuit about what do we look at in terms of

25   Section 2 versus racial gerrymandering.  I think we also have to

1    look at Abbott, we also have to look at Cooper, and you also have

2    to look at some of the more recent Supreme Court cases and, again,

3    we get into this muddle of what is the Court to do.  If the same

4    maps that can prove a Section 2 violation would be racial

5    gerrymandering if the Legislature drew them, then I think we're at

6    a significant problem in terms of the remedy phase of this.  And I

7    think that's why the logic of the Eleventh Circuit that you have

8    to show something you can order as a remedy makes sense as a

9    limiting principle.  Because if it can be ordered as a remedy, the

10   Legislature could have drawn it.  Those are things that fit within

11   the constitutional bounds of limiting racial gerrymandering.

12           So moving to prongs two and three.  This is our racial

13   polarization question.  And I think at the end of the day, there

14   is not a whole lot to say here.  I think the issue is pretty clear

15   the plaintiffs' experts didn't consider causation as they

16   testified.  They just ran the numbers.  We found this

17   polarization.

18           I think we had some questions for Dr. Handley in terms

19   of her lack of confidence intervals in the primaries.  Ultimately,

20   I don't think it makes a lot of difference to your analysis which

21   is, we would submit, on account of race or color matters here,

22   too.  Because if we find that racially-polarized voting exists,

23   and it is not on account of race or color that this dilution is

24   happening, it's because of partisanship, for example, then there

25   is no Section 2 violation again on that point.

1            So whether you consider the political versus racial
2    polarization here or consider it as part of the totality, it's
3    very relevant to is this voter dilution partisan, alleged voter
4    dilution partisan, or is it racial?  Ultimately, that requires a
5    remedy from the Court.
6            You have Dr. Alford's testimony on that.  Both
7    Dr. Palmer and Dr. Handley also used these reconstituted election
8    results to say, well, we're confident these districts will elect
9    candidates of choice.  But if what we have is partisanship in our
10   polarization, then that's not that remarkable of a proposition.
11   If you put a majority of Democrats into a district, it will elect
12   Democrats.  That's essentially the analytical process that's
13   happened.
14           As we talked about all of the new majority black
15   districts added for both Mr. Cooper and Mr. Esselstyn that have
16   Republican incumbents currently.  Several of the House Districts,
17   there was some testimony on this, also have Republican incumbents.
18   And so there is definitely a partisan impact here from making and
19   advancing the claims that the plaintiffs have made, and that
20   brings us back to Justice Alito's concern about coming to the
21   Court to achieve a partisan outcome under the guise of a Voting
22   Rights Act.  We all want to make sure that -- the Voting Rights
23   Act is far too important of a law for it to be used for partisan
24   purposes.
25           So I'll just briefly add, too, on this, the amicus brief

1  from Harvard, I don't think it really adds anything.  They didn't

2  post copies of the map that they drew.  They said we produced some

3  maps, we haven't looked at them, so I don't think there is much to

4  say on that.

5          So as to the Gingle's precondition, we submit the

6  plaintiffs have not clearly established they can succeed on the

7  merits.  And definitely to Justice Kavanaugh's piece, there is not

8  a clear-cut finding here at least on the Gingle's prong.  This is

9  a very difficult question to try to resolve.

10         So next we have the totality of the circumstances.  And

11 while the plaintiffs have pointed out it's the unusual case where

12 you find the first three Gingle's prongs and don't find the

13 totality, the Eleventh Circuit also requires you as the fact

14 finder to weigh all of these different pieces.  And so I'll just

15 briefly talk through those, and, again, I think the totality

16 demonstrates we're in a partisan situation, not a racial

17 situation.

18         So first, I think everyone agrees, Georgia has a

19 terrible history of official state-sponsored racism.  I don't

20 think there is any question about that.  But the evidence that the

21 plaintiffs have given you, a lot of that ends around the 1980s.

22 And things get a lot murkier as time goes by.  And the more recent

23 examples they've given you are cases that you're hearing on our

24 verified action case or open questions about Senate Bill 202, they

25 also -- a lot of what is going on there is partisan in nature.

1          And so that, I think, begs the question of what have we

2   actually found here?  And the Eleventh Circuit has warned in

3   Greater Birmingham Ministries in 992 Fed 3rd at 1332, while we

4   credit plaintiffs' argument about Alabama's history of

5   voting-related discrimination, we also reiterate our caution about

6   allowing the old outdated intentions of previous generations to

7   taint Alabama's ability to enact voting legislation.  So I think,

8   again, you have to weigh this out and look at the entire context

9   of the situation that happens with the history of discrimination

10  in Georgia.

11          On racially-polarized voting, we talked about the

12  partisan nature of that was, what's the situation there.  I think

13  that can be weighed appropriately under this piece of totality,

14  it's not under prongs two and three.

15          Third, the voting practices that tend to discriminate,

16  this I find to be fascinating because Georgia has, as Dr. Jones

17  testified, some things that make it very easy to get access to the

18  polls.  We've had automatic voting registration, for example,

19  we've had that for six years now.  And we have -- the other thing

20  that is interesting about this is, one of the prototypical

21  practices that is given is the majority vote requirement here, but

22  the majority vote requirement, if that didn't exist, Senator

23  Purdue would have won reelection and Senator Ossoff would not have

24  been successful.  So these factors don't necessarily clearly go

25  one way or the other like they did in different parts of Georgia's

1   history.  We all agree there is no candidate slating process.  Not

2   an issue there.

3         On the evidence of socioeconomic standing of black

4   voters, I think, again, the evidence is what it is.  The census

5   data shows what it shows, but ultimately on account of race or

6   color, it comes into play here because the socioeconomic situation

7   has to hinder political participation.  That's the analysis of

8   this prong of the totality.

9         And so the massive record-breaking turnout of

10  African-American voters in 2020 that Dr. Jones testified about,

11  that would tend to indicate there's not nearly the difficulty in

12  participating in the political process as maybe has occurred --

13  definitely has occurred in the past in Georgia and not as much

14  more recently.  But I think this is again one of those factors

15  that doesn't weigh heavily in favor of the plaintiffs.

16        Dr. Jones testified about some terrible racial appeals

17  and campaigns, and, obviously, those shouldn't have happened and

18  they're terrible.  I don't agree, though, that the fact that these

19  candidates who made the appeals were unsuccessful isn't relevant,

20  because I think if the appeals had worked, the candidates might

21  have been successful in the outcome.  The fact they attacked

22  Senator Warnock and he still won, it at least shows that these

23  racial appeals don't work in Georgia the way they used to.  So,

24  again, I don't think that factor weighs heavily in favor of the

25  plaintiffs.

1          The extent the election is a difficult one, Georgia

2    elected a number of black officials.  But we have kind of a rising

3    group of black Republicans.  Commissioner Fitzjohnson in the

4    Public Service Commission will stand for election this year.

5    Herschel Walker's success in the Senate race so far.  We have

6    Vernon Jones running for Congress in the 10th District, a majority

7    white area.  This situation has gotten a lot more muddled than it

8    used to be in terms of the lack of overall success of candidates.

9          And then in terms of responsiveness, and the tenuousness

10   of the policy, again, what we have are largely political disputes.

11   Georgia Republicans didn't expand Medicaid.  That is a position

12   Republicans have relatively consistently taken across the country.

13   So, again, we don't have strong evidence of lack of

14   responsiveness, and ultimately we have maps that are very similar

15   to Democratic proposals, similar to the plans that existed

16   previously.

17          Mr. Morgan's analysis in the Congressional plans shows

18   most of their districts retained their core, so whether the

19   Legislature had that as that particular part of their principles

20   or not, they drew maps that way that largely retained district

21   cores.

22          And so the last thing I'll say in totality is, there is

23   five majority non-white Congressional Districts on the current

24   map.  So if we're in a situation where I don't think anybody would

25   contest that those districts aren't going to elect the candidate

1  of choice in a minority community by electing Democrats, five

2  divided by 14 is about 35 percent of the population.  So in

3  DiGrandi, one of the things that the Supreme Court said you have

4  to take into account in proportionality of elections is,

5  obviously, an indication that minority voters have an equal

6  opportunity to participate in the political process and to elect

7  representatives of their choice.  So that's DiGrandi 512 U.S. at

8  1020.

9           So we would submit on all of these factors, both on

10 Gingle's and on the totality, the plaintiffs have not shown

11 they're likely to succeed on the merits.

12          Going to prong two, just briefly, I think the simple

13 answer there is, if there is a Section 2 violation, the harm is

14 irreparable.  And because we submit there is no Section 2

15 violation, then there is not an irreparable harm.  So I think

16 those two go hand-in-hand.

17          So let's get to the one I know is most posterior in

18 terms of Purcell and all of our equities and public interest.

19          So this is just a quote from Justice Kavanaugh.  We

20 recognize it's not precedent.  We recognize it's not binding, but

21 I think it is a helpful guide.  And as we talked about, again,

22 Justice Kavanaugh found that factors one and four were present in

23 the Alabama case.  I think we've -- as we talked through things

24 here, factor one is I think even more present in this case than it

25 was in Alabama, just given the complexity of what's being done.

1   But I think we consistently see that there -- number one, there is

2   an entitlement to relief, injunction in Section 2.  And I think

3   the Shelby County opinion says, in the appropriate case, yes, that

4   happens.  We have Section 2 claims pending against the Senate Bill

5   202 Legislation.  I fully expect we will have preliminary

6   injunctions filed about those, and those cases have been pending

7   for a while.

8              But we have consistently seen in the 2020 cycle any

9   relief ordered by a District Court that changed the election

10  structure was stayed by the Eleventh Circuit.  So the New Georgia

11  Project, all Judge Ross did in that case was just to extend the

12  time to receive absentee ballots.  And the Eleventh Circuit said,

13  no, you can't do that.

14             THE COURT:  She did it in the middle of the election.

15             MR. TYSON:  Yes, Your Honor.

16             THE COURT:  People were already voting.  So I looked at

17  that case, but I said, well, this is in the middle of the

18  election.  I'm not saying -- I would never make comments on my

19  colleague's decisions because they're all much smarter than I am,

20  but that's the same situation.

21             MR. TYSON:  Exactly.  I think it is good to underscore

22  the logic behind what is going on here.  I think the Eleventh

23  Circuit in that opinion said, you have to have clear rules of the

24  road so you know what the rules are.  And ultimately as we talk

25  about that, I think, the concern here.  We're on track, the train

```
 1  is rolling down the tracks.  If we have to rebuild the tracks
 2  quickly, it's hard to move the train from one to the other,
 3  essentially.
 4          So I think that one other important point is the
 5  plaintiffs have said over and over that the State is not entitled
 6  to one free election.  But I think that ignores just that we are
 7  in a very unprecedented moment right now with the delays in the
 8  census due to COVID.  We had a much later special session.
 9          The governor did what he did in terms of the maps.
10  Can't speak for him.  He's not here to talk about that.  But
11  meanwhile, election officials have to get their job done.  They
12  don't have an option.  And they've begun that process.
13          THE COURT:  What do I say -- again, I have not made any
14  final decision in this case whatsoever.  If I rule on behalf of
15  the State, this equity is a moot point.  But if I did on any of
16  these eight proposed maps rule on behalf of the plaintiff, what do
17  I say to those voters if I say, yeah, I think there is a violation
18  of Section 2 here, but it's too late to do anything about it now?
19  Is that it, too late, sorry?
20          MR. TYSON:  I agree, Your Honor.  That is a very, very
21  difficult thing to say to somebody, that you believe the maps are
22  in violation of Section 2, but yet we just can't do anything about
23  it.  I think the key point, though, is -- and I know you had this
24  discussion with Mr. Williams -- I don't think the maps become
25  unlawful when you find the likelihood of success.  Because you're
```

```
 1   forward-looking in the case.  I think about the photo ID case, it
 2   was very important.  So some Georgia voters had to have a photo ID
 3   for voting, that was stayed as a preliminary injunction.  But
 4   ultimately Judge Murphy found it didn't violate the law, and the
 5   process went into effect.  So I think something similar would have
 6   to happen here that it's -- we're at a point in the election
 7   process that it's too late.  I understand it is a difficult
 8   message to communicate to somebody that under the circumstances.
 9   But again, we think that is why there is not a question here about
10   all this.  You see partisanship at most, essentially.
11          So I just want to dwell on -- we talked about the
12   underlying merits.  I don't want to belabor that point.  But I do
13   want to talk about the cost -- the significant cost, confusion, or
14   hardship.  And I think of this as kind of two pieces.  I think of
15   the piece if we move the qualifying day and don't move the
16   election, and then I think about if we move qualifying and the
17   election, what happens.  And we have a different set of problems
18   kind of with both.
19          So you heard from Mr. Barnes and Ms. Bailey about if we
20   move qualifying but not the election, you have election officials
21   are going to have to input all of the information into the voter
22   registration database, touch every street segment, work their way
23   along there.  Mr. Barnes has to wait on them to finish that task
24   so he can start building ballot combinations.  And we're already
25   on this incredibly difficult timeline to get to the UOCAVA
```

1    deadline for the overseas and military voters.  Both Ms. Boren and

2    Ms. Bailey testified this could be a several-week-long process

3    depending on the extent of the changes.  And that could cause a

4    significant issue for election officials.  And so there's,

5    obviously, a difficulty for election officials in that scenario,

6    and endangering the timeliness of being able to send out absentee

7    ballots to the oversea voters.

8           And that's why the Alpha Phi plaintiffs have said, well,

9    just change the election.  You have the power, you can just change

10   it.  But again, that leads to its own host of kind of confusions

11   and difficulties.  So, first, we have the runoff timeline that

12   Judge Boulee has in front of him in the Senate Bill 202 cases.  If

13   he ultimately concludes Georgia couldn't shorten its timeline for

14   nine weeks to four weeks, then we have to build in time for a

15   nine-week runoff.  And so we're facing a different set of

16   deadlines there.

17          THE COURT:  You raise a question there.  If Judge Boulee

18   does not go to 28 days and he keeps it to 45 days, does that not

19   make the plaintiff's argument that much better?  Well, you do have

20   time, Judge.

21          MR. TYSON:  Well, I don't believe so, Your Honor.  I

22   think the reality is that piece only applies kind of between the

23   election and the runoff.  So it doesn't affect the time to get

24   ready for the election, it may help you have the runoff be easier,

25   but I think that would be all for that.

1           THE COURT:  Not the primary.

2           MR. TYSON:  Then we heard all of the elections officials

3   testify, talked about what would happen.  They've already secured

4   polling places for the year.  They've already talked to their

5   schools, their churches, all that.  That's our vacation bible

6   school situation, what would happen if we did that.

7           Dr. Burton when he testified, and if you read that

8   moving polling places has a massive impact for minority voters, in

9   particular.  Bishop Jackson talked about that he thought voters

10  could find their polling places if they moved, but agreed in the

11  verified action case, he felt that moving polling places was a

12  tactic of voter suppression.

13          Every one of the state and county officials are grateful

14  for the offer for the AME churches.  There are very specific

15  Americans with Disabilities Act requirements for accessibility,

16  power requirements for the machines, a lot of things that have to

17  go into selecting a polling place.  It's so not just as simple as

18  calling up the church next door that is not having vacation bible

19  school that week and moving the precinct there.

20          The other piece, and Mr. Barron talked about it, he

21  thought he could get this done.  But if we're relying on the June

22  2020 primary as an example of how this -- what would happen here,

23  we've delayed elections before, we've looked at the pictures, we

24  recall the "Hey, Dixie" headline, Complete meltdown.  I don't

25  think anybody wants to look at the June 9th primary as kind of a

 1  model for how we have to handle this going forward.  We don't want

 2  to invite the chaos in 2022 that we had to deal with 2020 as we

 3  worked through moving polling places and changing locations.

 4          And so Carter's testimony about his special election,

 5  that was one election that was happening.  We weren't running all

 6  of the elections at the same time.  So I don't think that has a

 7  huge value along the way.  And I think we thoroughly discussed the

 8  election officials' request for more time.  That was in the

 9  summer, late summer where they had time to prepare for this.  It's

10  different now, as Ms. Bailey had talked about.

11          The last piece on this, I think is important, is the

12  potential whiplash effect.  Let's say you enter relief and delay

13  the election and we go to the Eleventh Circuit, and the Eleventh

14  Circuit says, no, you're going back on the schedule; well, if we

15  had already dropped a polling place for a county here, and we add

16  it over here, it just invites --

17          THE COURT:  That is a very real concern to the Court.

18          MR. TYSON:  I think it's a real concern for election

19  officials as well if we were to go down that road.

20          So ultimately we also have the confusion for voters and

21  candidates.  That's another important piece of the puzzle.  That's

22  going to be an issue we have to work through and sort through

23  along the way.  So let me just go to -- I think something we

24  talked quite a bit about, letting an election go forward on an

25  illegal map.  What are we going to do if you're convinced the map

1    is illegal, what happens?

2         You spoke to Mr. Williams about 2001.  We had maps for

3    the State House and State Senate that were precleared that were

4    used in the 2002 election and then ultimately were found

5    unconstitutional by the three-judge panel.  Oh, so we have

6    precedent there.

7         You talked about Ms. Boren and the city county election

8    officials along the way there.  I think it's one of those

9    interesting things about county commission boundaries, in

10   particular.  We have some counties in Georgia who have not

11   redistricted their county commission districts in 40 years.  And

12   as long as nobody sues them, they keep using the same maps.

13        THE COURT:  If you name them today, some of them may get

14   sued.

15        MR. TYSON:  Exactly.  It would be a pretty good idea for

16   a plaintiff's lawyer, though, because you're guaranteed your fees

17   in those cases.

18        THE COURT:  Ms. Khanna, can you give us those names?

19        MR. TYSON:  But I also went and looked, Your Honor, and

20   there are some other situations and cases where maps were found to

21   be illegal and were not enjoined for use in an election.  So we

22   put a few here.  You referenced some of them, Putnam, Eli case,

23   Golarden.  The Covington case in North Carolina I thought was

24   interesting.  The North Carolina Courts specifically declined to

25   change election dates because they thought it would cause

1  considerable confusion, inconvenience, and uncertainty among

2  voters, candidates, and election officials.  The Bostelmann case

3  from Wisconsin was a COVID case.  The district court found it was

4  a likely constitutional violation, but said the priority of a

5  federal court taking the extraordinary step of delaying a

6  statewide election at the last minute, and the federalism problems

7  that are necessarily implicated, led to not move that election

8  date.  But even with that statement, this is the case where the

9  Court entered relief as to absentee ballots and had the Supreme

10  Case ultimately stay.

11        THE COURT:  Let me say to everybody, on three of these

12  cases, when you read them, the time is less than the amount of

13  time I have, but the important thing about these cases, if the

14  analysis they give the Court should look at in making a

15  determination, I think the Democratic case was less than six

16  weeks.  It's not the time.  It's the evidence they give on what I

17  have to look at and what they want by making a decision not to go

18  forward.  They're going to get the job done.  That's the argument

19  there.

20        MR. TYSON:  Yes, Your Honor.  So I think we go back and

21  the plaintiffs said, you know what, county officials are going to

22  get the job done.  Your Honor, county election officials are some

23  of the hardest-working and most vilified public servants that I

24  know.  I represented county election officials who decided after

25  decades in the 2018 election and everything that went down, they

1  were done.  They were not going to work the elections anymore.

2  Mr. Barnes testified about -- he doesn't tell people what he does

3  for a living because of what happened in 2020.  After he and I

4  walked out when he testified that day, he said he tells his

5  daughter not to tell people what her dad does because of his

6  concerns about the impact of that.  So I look at all of that and

7  say, of course these officials are going to tell you they get the

8  job done.  That's what they do.  They work so hard to get this

9  right.  And given all of the massive disruption we have here, if

10  we were to make these kind of changes, I just think at what cost

11  are we doing that?  We had elections in 2018 that were challenged

12  on a lot of issues.  We had elections also in 2020 that were very

13  seriously contested.  Let's not invite further chaos into the

14  process of 2022 by changing the maps at this point.

15       This case isn't over after today.  We'll go through

16  discovery and work through this process.  We can work through

17  these serious and challenging things to try to get this right.  I

18  think that the most important thing for all Georgian voters at the

19  end of the day is that we get this right.

20       So with that, Your Honor, I want to thank you for your

21  time and hearing this case.  Thank you to Ms. Wright for all her

22  hard work.  Our opposing counsel have been great to work with all

23  the way along.  We appreciate being on a short timeline.  Our

24  court reporters who have had to put up with my speed talking and

25  others, and all of the staff that have worked here, we're grateful

1    for the chance to present this case to Your Honor and for your

2    conversation.

3            THE COURT:  Ms. Khanna, you have ten minutes and the

4    Court will not interrupt you one second.

5            MS. KHANNA:  Thank you, Your Honor.  And I appreciate

6    the extra time and I appreciate the Court asking these questions.

7    It's nothing worse after finding out after you read the opinion,

8    what the issues were that were really important to the judge.  So

9    I want to be able to address some of those in the next ten minutes

10   that I think that I've heard from you and the questions you've

11   asked of the various counsel in this case.

12           I want to talk about a couple points about the merits

13   and then focus more on the equities.  Mr. Tyson argued that you've

14   got to establish that this undisputed polarized voting that we

15   have is on account of race and not on partisanship.  A lot of the

16   argument that the State presents, it's just partisan politics.

17   Apparently, it is disregarded that the people who are most

18   affected by whatever those partisan motives are are black voters.

19           But when it comes to what Section 2 plaintiffs need to

20   prove, whether they need to prove whether it was race that is

21   driving polarized voting or party, there is no such standard.  We

22   do not have to prove that intent.  And while that might be the

23   State's preferred standard, that we have to disentangle the two,

24   that is by no means the Supreme Court's standard, the Eleventh

25   Circuit's standard or this Court's standard.

1          In Gingle's, the Supreme Court said, quote, all that
2   matters under Section 2 and under a functional theory of vote
3   dilution is voter behavior and not its explanations.  In Carleton
4   Branch, the Eleventh Circuit said, quote, plaintiffs need not
5   prove causation or intent in order to prove a prima facie case of
6   racial block voting.

7          The reason behind this standard, the reason why Courts
8   have said, no, you don't have to establish that race-based intent
9   is because Congress in reauthorizing the Voting Rights Act
10  rejected any intent-based element for Section 2, any requirement
11  that the plaintiffs need to establish racial animus.  Not only
12  because that would set an unfairly and unduly high bar for
13  plaintiffs, but because they determined it was just not
14  productive.  It's not productive for the State of Georgia for
15  communities who are trying to rectify the problem to be charging
16  voting officials and legislators with racism.  You don't
17  have -- you don't have to make accusations of racism or racial
18  animus to establish that the racial dynamics, political racial
19  dynamics as established through the Gingle's factors and the
20  Senate factors, result in a Section 2 violation.

21         Second point on the merits.  I have to imagine the Court
22  was shaking its head the same way I was when you heard Mr. Tyson
23  say in response to the question of how is it okay to connect these
24  Cobb County voters with these rural voters out west, and Mr. Tyson
25  responded, well, you've got to find population somewhere.  And

1  somehow when Mr. Cooper said that same exact thing, all the red

2  flags went up.  And what I understood from that comment, what I

3  understand from the State's position is you've got to find

4  population somewhere.  And if the people that you find just happen

5  to be white, even if they are a hundred miles away and share no

6  community of interest whatsoever, that's all good.  But if you

7  have to find people, population somewhere, but the people you find

8  happen to be in a diverse community, which is what Mr. Cooper

9  testified, less than 20 miles from the core of the district and

10  shared multiple, practical similarities of interests with

11  everybody else in the district, then that cannot be done.  That

12  cannot be the standard.

13       That is not the standard under Section 2, and despite,

14  you know, Mr. Tyson said he had nothing much to say about Davis

15  other than the Court should take another look at more recent

16  Supreme Court precedent in Abbott and Cooper on racial

17  gerrymandering.  I actually know a lot of Abbott and Cooper on

18  racial gerrymandering.  I was involved in those cases as well.

19  And I think the Court can comb those opinions and it will find

20  nothing that nutures the standards for Section 2 violations.

21       One final point on the merits, Your Honor, and I think

22  this is something of course Your Honor already knows, while we are

23  hearing these cases together for the convenience of the State and

24  the parties, these are three separate cases.

25       THE COURT:  Yeah.

1          MS. KHANNA:  They need not rise and fall together on the

2     merits or on the equities.  This Court may find that the

3     Congressional claim in Pendergrass is simpler and cleaner since it

4     involves the addition of just one district, a common sense

5     district.  This Court may find that changes to the Senate map are

6     more complicated than the House Districts map and, therefore, less

7     feasible for implementation in time for 2022.  The Court must

8     weigh the facts and the evidence in each case on its own terms.

9          THE COURT:  That's very important.

10          MS. KHANNA:  I want to turn to the equities now, Your

11     Honor.

12          And I want to talk about Purcell for a moment.  Purcell

13     does not hold that any change in an election calendar before an

14     election year is prohibitive.  Purcell does not hold that all

15     election laws are frozen in place for the 11 months that precede a

16     general election.  Justice Kavanaugh reaffirmed that in his

17     concurrence to the Alabama state order where he said that Purcell

18     is not an absolute bar.  And nothing that Your Honor mentioned

19     what the Eleventh Circuit said about Purcell, nothing that I know

20     in the Eleventh Circuit has applied an absolute bar using Purcell

21     to apply an absolute bar.  And I firmly believe that in any case

22     if I had done that, Mr. Tyson would have found it.

23          Purcell is about the public interest.  That is something

24     Your Honor has asked about multiple times and I appreciate that.

25     The public interest.  And it's important.  Let's go back to what

 1  was Purcell about?  Purcell was about voters; not candidates, not

 2  election administrators, not judges, not lawyers.  The Supreme

 3  Court wanted to protect voters from disenfranchisement less than

 4  four weeks before an election.

 5          So weaponizing Purcell to give a green light to district

 6  maps that violate voters' fundamental rights is not only

 7  inconsistent, it is inequitable.  Mr. Carter in talking about the

 8  voter confusion, Mr. Carter half joked that, you know, if he was a

 9  candidate and maps are changed, he'd receive 30 text messages

10  about what would be required before Election Day.  But that's

11  hardly an exaggeration.  The modern campaign infrastructure is

12  designed to keep voters informed; candidates who want to get

13  elected will keep voters informed.  As the witnesses testified,

14  churches, activists, political parties will keep voters informed

15  and have the means and the ability and are structured to do just

16  that.  So the Court can be assured that the risks of voter

17  confusion here, which I believe should be paramount when

18  determining the equities, are low, indeed.

19          Your Honor, Mr. Tyson talked about whether previous

20  Georgia elections or previous elections Georgia has allowed

21  unlawful maps to go forward.  And I believe what Your Honor was

22  referring to was Lazio, what Mr. Tyson referred to was Lazio.

23  There is a very important distinction between this case and Lazio.

24  In Lazio the maps were adopted in spring of 2002.  The election

25  was held in November of 2002.  The complaint filed challenging

1   those maps was filed in March of 2003.  There was not a complaint

2   pending.  There was not a substantial likelihood of success on the

3   merits that had already been determined by the time the election

4   rolled around.  The election already happened, and then came the

5   lawsuit and then came the remedy.  And that's true for the

6   Covington case and many of the cases that the State put up on the

7   screen there as well.  Multiple elections had already gone forward

8   before the claim was even brought.  Absolutely not the case here

9   where plaintiffs filed their lawsuit within hours from the maps

10  being enacted and as soon as they possibly could before any

11  election could be held on those maps.

12          Your Honor asked me and asked counsel for the Alpha

13  plaintiffs, how should the Court look at the Alabama State order,

14  and I know you've gotten several answers here.  Ultimately, Your

15  Honor, I don't think the Court has to close its eyes to that

16  decision to recognize that it still needs to keep its razor focus

17  on the law as it stands and the record before it today.  If this

18  Court decides to issue a preliminary injunction, it may be that

19  some days or weeks down the line, the Court also decides that the

20  state will have met its burden for this Court to issue a stay.  If

21  this Court decides to issue a preliminary injunction, it may be

22  that the State appeals; it may be that three judges from the

23  Eleventh Circuit also think it should be stayed.

24          THE COURT:  I know I said I wasn't going to ask you a

25  question, but you raised a question.  If the Court issues the

1   injunction just like in the Alabama case, I fully expect Mr. Tyson

2   to file an emergency motion for a stay.  How do you

3   differentiate -- I think you can, but are you saying the Court

4   could say, okay, even though I found the likelihood to succeed on

5   the injunction, I can find the can likihood to succeed on the

6   stay?  If I find irreparable harm on the injunction, can I not

7   find irreparable harm on the stay?  If I find the equities favor

8   the plaintiffs, can I find the -- on the injunction, can I find

9   the equities favor the plaintiffs on the stay?  If I find that the

10  public interest favors the plaintiffs, can I turn around and find

11  on the stay, the public interest favors the stay?  Do you see what

12  I'm saying?

13          MS. KHANNA:  It's a very good question, Your Honor.  You

14  can rest assured what position I will be taking.

15          THE COURT:  I know what you'll be taking.  But the

16  question is, you understand, it sounds like you're contradicting

17  yourself.

18          MS. KHANNA:  I understand, Your Honor.  There is a

19  standard for district courts to stay their own judgments, and this

20  would not be the first time for a district court to actually do

21  that -- if the Court decides that's important.

22          THE COURT:  I've read that.  You're absolutely right.

23  It seems like a contradiction.  There are some district courts

24  that have done it and stayed their ruling to give the State time

25  to, you know, ask the Eleventh Circuit or the Supreme Court to see

 1  how they're doing.

 2          That leads to my second question.  You guys are great

 3  lawyers.  I like asking you questions, all of y'all.  I wish I

 4  could pack you all up and bring you all along.  The question --

 5  one more time, Mr. Tyson, I have not decided.  This discussion is

 6  going to be a moot point.

 7          The Court issues the injunction, does not grant the

 8  State's stay request, two to three weeks down the line,

 9  hypothetical, I issue the injunction on March the 2nd.  And then

10  if the injunction says, all right, no qualifying on March 7, and

11  then I don't grant the State's request for emergency stay, and

12  then two to three weeks later it is the Eleventh Circuit, or the

13  Supreme Court says, no, we're issuing the stay.  Look at all

14  that's happened in the meantime.

15          MS. KHANNA:  I think have three responses.

16          THE COURT:  I know you have one.

17          MS. KHANNA:  One, that's kind of the way -- Your Honor

18  knows as anyone better in this room, that's the way the judicial

19  system works; right?

20          THE COURT:  Look at the chaos it has caused in

21  between -- not chaos.  I think that's too strong.  Look at the

22  disruption and cost and maybe confusion, cost of those two to

23  three weeks.

24          MS. KHANNA:  Your Honor, I think Mr. Tyson or Your Honor

25  called it whiplash.

 1          THE COURT:  Yeah.

 2          MS. KHANNA:  And I get that.  I get that different

 3   courts making different rulings at different times can cause some

 4   confusion to the people who are subject to their orders.  That was

 5   the issue in Purcell.

 6          THE COURT:  Because you've got to admit based on what we

 7   have in front of us, that would be a possibility.

 8          MS. KHANNA:  It would be a possibility.  As a practical

 9   matter, Your Honor may choose, if this is a motion to stay, to say

10   I'm not going to stay the whole case pending appeal, but I'll stay

11   pending an Eleventh Circuit ruling on a motion to stay.  There are

12   ways to fix that stop gap.

13          THE COURT:  Put a time period on it.

14          MS. KHANNA:  For some limited time period, exactly.  As

15   a real matter, Your Honor, what another Court may do down the line

16   cannot implicate and cannot hamstring what this Court must do on

17   the law and the record before it.

18          THE COURT:  Well, this Court must consider what has been

19   done as precedence.  My immediate precedence is the Eleventh

20   Circuit, and then, of course, the Supreme Court.  I can't just --

21   I can't sit here and guess or assume, you're absolutely right

22   about that.  What -- what -- nor can I not consider -- there's a

23   reason why I was reading all these cases this weekend -- consider

24   what is the precedent out there, what has been done.  In other

25   words, my wife would have loved if I had paid more attention to

1   her on a Sunday afternoon instead of reading these cases, but

2   that's the reason why you've got to as a judge, in particular

3   District Court Judge, I have to say what they have done?  And

4   looking at what have they done, consider what would they do in

5   this case.  You agree?  Well, you don't have to agree with that.

6          MS. KHANNA:  That's exactly right, Your Honor.  You do

7   have to comb through the precedent, and the precedent that I'm

8   aware of that the Court has talked about that Mr. Tyson has raised

9   before this Court involves different cases, unique facts, unique

10  timelines, and it does not paint them with a broad brush.

11         THE COURT:  I agree.

12         MS. KHANNA:  And it would be wrong, I think, for this

13  Court to suggest or to be concerned that the Eleventh Circuit may

14  or may not do that in the future, because it really has not done

15  that yet, neither has the Supreme Court nor the 11th Circuit have

16  said there is an absolute bar in these areas.

17         THE COURT:  It has not.  But Eleventh Circuit has

18  reversed district court judges that they perceived what they

19  thought disrupted an election.

20         MS. KHANNA:  That's right, Your Honor.  I'm sure it has

21  also gone the other way.

22         THE COURT:  I spoke with Judge Rosenbloom -- Rosenbaum,

23  excuse me, and Judge Rosenbaum -- and I can't remember the name of

24  the case, because I read it yesterday.  They said Purcell is not

25  automatic.

1          MS. KHANNA:  I believe that is the Peoples' First case,
2    Your Honor.
3          THE COURT:  Alabama case, yeah.  Not automatically just
4    because it's there, you don't automatically say we're not going to
5    go forward.  So you're right.  It's on both sides.
6          MS. KHANNA:  Speaking of precedent, Your Honor, I want
7    to think about -- I touched on this earlier last week -- think
8    about the precedent that this Court would set.  And I understand
9    it doesn't necessarily bind other courts, but you know the Alabama
10   stay order was issued a week ago.  This Court is going to be one
11   of the first to really do anything in light of that order or not.
12   And if this Court were to feel like its hands were tied by that
13   order or by Purcell, think about the precedent that will help set
14   for future courts and cases.  This is not just this year, Your
15   Honor.  That's in every election year.  And that's not just in
16   redistricting cases, Your Honor.  That's in all voting rights
17   cases.
18         THE COURT:  I've given that a lot of thought.
19         MS. KHANNA:  And I'm sure Your Honor has, and we do not
20   want to encourage other courts or any states to think that states
21   can do whatever they want with voting rights in any election year
22   and courts must have a hands-off approach.  This is not the law.
23         I just want to finish on one final point, Your Honor.
24   Mr. Tyson a week ago started his opening statement by suggesting
25   that this Court should assume the rule of armchair quarterback.  I

1 was thinking about this last night, as the whole country was

2 watching the Super Bowl and I was in a hotel conference room with

3 my colleague working through this closing and probably having more

4 fun than anyone.

5          The idea of the armchair quarterback, Your Honor, is not

6 the right analogy.  Plaintiffs are not asking this Court to be an

7 armchair quarterback.  We're asking it to assume its proper role

8 as referee.  We have referees on the field to ensure an even

9 playing field and to ensure both sides are playing by the rules,

10 and when they don't, to make it right.  The new Congressional and

11 Legislative maps enacted by the State do not play by the rules.

12 They clearly violate Section 2 of the Voting Rights Act, one of

13 the most momentous pieces of legislation Congress has ever

14 enacted, and now a referee is needed to make the choice to make

15 things right, no matter what the other team or the commentators in

16 the box may say in response.

17          Your Honor, the Pendergrass and Grant plaintiffs

18 respectfully request this Court to make factual findings and draw

19 legal conclusions consistent with the evidence and grant their

20 motion for preliminary injunction.

21          Thank you for giving me the opportunity to speak.

22          THE COURT:  Thank you, Ms. Khanna.  Is there anything

23 else anybody else feels they need to bring to my attention or tell

24 me?  Now is the time.

25          No, you're out of time.  You've got your orders.  I'm

1  sorry.

2          MS. LAKIN:  I simply have the exhibits, the list of

3  exhibits.  Should I just -- would you like me to actually read

4  those into the record?

5          THE COURT:  Let's put them in the record, make sure

6  Mr. Tyson and Ms. Khanna have copies.  You don't have to read them

7  into the record.

8          MS. LAKIN:  They're all within the binders themselves,

9  and we should be all set.

10          THE COURT:  What I'm going to do, Mr. Tyson and

11  Ms. Khanna, I'm going to look at them and I will issue a written

12  order this afternoon saying I'm allowing this.  Mr. Tyson, I'm

13  allowing this over objection from the State.  The State indicated

14  they don't think any newspaper articles should come in.  Your

15  record will be perfected that way.  If I don't allow them, I will

16  note the exception why I didn't allow them.  But y'all will get a

17  written order on this one.

18          Let me just say to all of the lawyers, it has been an

19  honor and pleasure to hear you all present this case.  It is a

20  judge's dream to have you all arguing the law well prepared.  I

21  was telling my staff the other day, I said, you know, they made it

22  difficult for me because they all came in really prepared.  So I

23  want to thank you all.  I want to applaud you all.  It's a real

24  joy, and I will do a case with any of y'all anywhere.

25          Findings of fact and conclusions of law is due Friday.

1    My staff will start working on this, this afternoon.  I cannot

2    give anybody an exact date.  As I told you, we're going to try to

3    do this as fast as possible.  I recognize what I have in front of

4    me.  So that's definitely a consideration.

5            Thank you all.  I apologize for you missing lunch.  If I

6    could -- I can't -- I would buy you all lunch, but I can't.  I

7    can't for a lot of reasons.  But thank you all, and have a great

8    day and a great week.

9            (Whereupon, the hearing concluded at 1:50 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9      This the 14th day of February, 2022.

10

11

12

13

14                    /s/Viola S. Zborowski_____
                      VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

────────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT────────