# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ARKANSAS STATE
CONFERENCE NAACP *et al.*                                    PLAINTIFFS

v.                          Case No.: 4:21-cv-01239-LPR

THE ARKANSAS BOARD OF
APPORTIONMENT *et al.*                                       DEFENDANTS

<u>**ORDER**</u>

This is a § 2 Voting Rights Act case. The Plaintiffs are the Arkansas State Conference NAACP ("the Arkansas NAACP") and the Arkansas Public Policy Panel ("the Panel").[1] The Defendants are the Arkansas Board of Apportionment ("the Board"), the Board's three members, and the State of Arkansas.[2] The Board's three members—who are sued in their official capacities only—are Governor Asa Hutchinson, Attorney General Leslie Rutledge, and Secretary of State John Thurston.[3] The sole claim alleged in the Complaint is that the 2021 reapportionment plan for the Arkansas House of Representatives ("the Board Plan"), which was approved by the Board, "dilutes Black voting strength in violation of Section 2 of the Voting Rights Act . . . ."[4]

Section 2(a) of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any

---

[1] *See* Compl. (Doc. 1) ¶¶ 3–4.

[2] *Id.* ¶¶ 5–9.

[3] *Id.* ¶¶ 7–9.

[4] *Id.* ¶¶ 34–35. When the Court uses the term "reapportionment plan," it is in reference to the redistricting for the Arkansas House of Representatives that has occurred as a result of the 2020 census.

citizen of the United States to vote on account of race or color . . . ."[5]  Section 2(b) further clarifies

this prohibition as follows:

> A violation . . . is established if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or election in the State or political
> subdivision are not equally open to participation by members of a [protected] class
> of citizens . . . in that its members have less opportunity than other members of the
> electorate to participate in the political process and to elect representatives of their
> choice.[6]

The Supreme Court has long held that the scope of § 2's prohibition encompasses the alleged

dilution of Black votes.[7]

This is not a case alleging intentional or purposeful discrimination by the Board or its

members.  As Plaintiffs themselves emphasize, "[i]n 1982, 'Congress substantially revised § 2 to

make clear that a violation could be proved by showing discriminatory effect alone and to establish

as the relevant legal standard the "results test" . . . .'"[8]  Plaintiffs have repeatedly made clear in

their filings and in their oral presentations that their case is primarily focused on the results of the

Board Plan.[9]  The nub of their argument is as follows:

> The challenged plan contains just eleven majority-Black House districts even
> though more than sixteen percent of the state's population is Black[,] and it would
> be possible to draw sixteen (out of 100) geographically compact, majority-Black
> House districts.  As a result, the challenged plan impermissibly dilutes Black voting
> strength in violation of Section 2.[10]

---

[5] 52 U.S.C. § 10301(a).

[6] *Id.* § 10301(b).

[7] *See, e.g., Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332–33 & 2333 n.5 (2021) (collecting cases).

[8] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 8 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 35–36 (1986)).

[9] *See, e.g., id.* at 8, 10; Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1096:20–23 (Plaintiffs' counsel: "Section 2 of the
Voting Rights Act . . . prohibits voting practices and procedures that result in unequal electoral opportunity on the
basis of race, color or membership in a language minority.").

[10] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 1.

Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction.[11]  From what the Court has seen thus far, there is a strong merits case that at least some of the challenged districts in the Board Plan are unlawful under § 2 of the Voting Rights Act.[12]  For the reasons discussed below, however, the Court cannot reach the merits.  After a thorough analysis of the text and structure of the Voting Rights Act, and a painstaking journey through relevant caselaw, the Court has concluded that this case may be brought only by the Attorney General of the United States.  Before dismissing this case, however, the Court will give the United States five calendar days from the date of this Order to join the case as a plaintiff.  If the United States chooses to become a plaintiff in this case, it is the Court's intention to move expeditiously to a final merits determination.

## I.  BACKGROUND AND PROCEDURAL HISTORY

The Arkansas Constitution requires that districts for the Arkansas House of Representatives be redrawn every ten years upon completion of the census.[13]  The census is performed by the federal government, which shares the data (once it is compiled) with Arkansas.  The Board uses this census data to draw new district lines for the Arkansas House of Representatives and the

---

[11] Pls.' Mot. for Prelim. Inj. (Doc. 2).  During the preliminary injunction hearing, Plaintiffs orally moved to exclude portions of the testimony of two witnesses offered as experts by the Defendants.  The Court conditionally allowed the testimony but took the motions under advisement.  *See* Prelim. Inj. Hr'g Tr., Vol. III (Doc. 88) at 598:18–24 (Dr. Brad Lockerbie); Prelim. Inj. Hr'g Tr., Vol. IV (Doc. 93) at 901:15–23 (Andy Davis).  These two *Daubert* motions are also pending before the Court.

[12] By using the word "strong," this Court does not mean to imply, and is not implying, that "the underlying merits are entirely clearcut in favor of the plaintiff."  *Merrill v. Milligan*, Nos. 21-1086 & 21-1087, 2022 WL 354467, at *2 (U.S. Feb. 7, 2022) (Kavanaugh, J., concurring in Order granting stay of preliminary injunction).  The strength of the merits case is predicated on the current analytical framework by which the Supreme Court decides vote-dilution cases.  The seminal Supreme Court case on vote dilution is *Thornburg v. Gingles*, 478 U.S. 30 (1986).  That case, and its progeny, are "notoriously unclear and confusing."  *Merrill*, 2022 WL 354467, at *3 (Kavanaugh, J., concurring in Order granting stay of preliminary injunction).  Indeed, "it is fair to say that *Gingles* and its progeny have engendered considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim."  *Id.*, at *4 (Roberts, C.J., dissenting from Order granting stay of preliminary injunction) (collecting cases and scholarly articles).

[13] Ark. Const. art. 8, §§ 1, 2, 4.

Arkansas Senate.[14]   Because there was a significant delay in collection and compilation of the census data by the federal government, there was a concomitant significant delay in providing the necessary data to Arkansas (and other states).[15]   Accordingly, the Board Plan was not released to the public until October 29, 2021.[16]   On November 29, 2021, after a one-month comment period, the Board adopted the Board Plan.[17]   The Board Plan took legal effect on December 29, 2021.[18] That same day, the Arkansas NAACP and the Panel filed this lawsuit and the pending Motion for a Preliminary Injunction.[19]

As it was originally filed, Plaintiffs' Motion for a Preliminary Injunction sought "preliminary injunctive relief prohibiting the State from implementing the dilutive plan for the 2022 election cycle and from failing to implement a plan that complies with Section 2."[20] Essentially, Plaintiffs requested that the Court require the creation of a new districting plan for the 2022 election.   Plaintiffs also requested expedited consideration of the Motion, explaining that they needed to obtain the requested preliminary relief before March 1, 2022.[21]

On December 30, 2021, one day after the Plaintiffs' Complaint and Motion were filed, the Court set a schedule that wrapped up motion briefing by Thursday, January 20, 2022, and called

---

[14] *Id.*

[15] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 37 ("[T]he State started the redistricting process later than usual because of the delayed release of the census data . . . ."); Prelim. Inj. Hr'g Tr., Vol. IV (Doc. 93) at 1045:21–1046:16 (Josh Bridges, from the Arkansas Secretary of State's Office, testifying that "[i]t's not only the House and Senate district boundaries that were held up by the delay of the census data . . .").

[16] Prelim. Inj. Hr'g Tr., Vol. IV (Doc. 93) at 748:4–6.

[17] *Id.* at 748:7–15; Compl. (Doc. 1) ¶ 12.

[18] Compl. (Doc. 1) ¶ 12.

[19] Compl. (Doc. 1); Pls.' Mot. for Prelim. Inj. (Doc. 2).

[20] Br. in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 3) at 1.

[21] *Id.* at 40.

for a motion hearing to begin on Monday, January 24, 2022.[22]  Subsequently, Defendants asked for an extension of both the briefing schedule and the hearing date.[23]  The Court granted this request in part and denied it in part, providing a smaller extension than Defendants sought.  The Court reshuffled the schedule so that briefing would wrap up on Wednesday, January 26, 2022, and the hearing would begin on Thursday, January 27, 2022.  The Court explained that "[t]here [was] good cause for a very limited extension . . . considering how fact intensive this case is and the size and scope of Plaintiffs' filings," but that "Plaintiffs [were] . . . correct about the importance of getting to a decision without delay."[24]  The Court attempted to balance these two competing interests.

---

[22] First Scheduling Order (Doc. 9).

[23] Defs.' Mot. for Extension of Time (Doc. 30).  In the meantime, on December 31, 2021, Plaintiffs filed a motion asking the Court to recuse from this case.  (Doc. 27).  Plaintiffs were clear that the motion was not predicated on an allegation of an actual conflict or actual bias, but rather was focused on the alleged appearance of impartiality.  The Court denied the motion, concluding that a reasonable person would not question the Court's impartiality.  *See* Order Den. Pls.' Mot. for Recusal (Doc. 42).

Subsequently, on January 14, 2022, Plaintiffs subpoenaed seven witnesses to testify at the preliminary injunction hearing, including the Governor, the Arkansas Attorney General, and Arkansas Secretary of State.  Defendants moved to quash the subpoenas of these three state officials, but did not move to quash the subpoenas of the other four potential Board-staff witnesses.  *See* Defs.' Mot. to Quash (Doc. 59).  The Court quashed the three subpoenas, concluding that (in the context of a preliminary injunction hearing) requiring the testimony of these state officials would be unduly burdensome when balanced against the minimal relevance of their potential testimony and the availability of similar information from other sources, both documentary and testimonial.  *See* Order Granting Defs.' Mot. to Quash (Doc. 74).  However, in that Order, the Court noted that, at the close of evidence at the preliminary injunction hearing, the Court would allow Plaintiffs to proffer to the Court (in an *ex parte* manner) written questions that they still wanted to ask the three state officials.  *Id.* at 16–17 n.69.  The Court explained that, if the questions and developments at the preliminary injunction hearing warranted requiring information from the constitutional officers, the Court would make the state officials answer the written questions.  *Id.*  At the close of evidence at the preliminary injunction hearing, Plaintiffs said: "[W]e believe that we elicited the testimony we wanted from the lower level witnesses and don't need to proffer any questions for the constitutional officers."  Prelim. Inj. Hr'g Tr., Vol. IV (Doc. 93) at 1089:4–12.

Plaintiffs issued two additional subpoenas for testimony from Kevin Niehaus, Director of Public Relations for Secretary of State Thurston, and Andres Rhodes, Counsel to Governor Hutchinson.  Defs.' Br. in Supp. of Mot. to Quash (Doc. 80) at 1.  These subpoenas were issued one day before the preliminary injunction hearing began.  Upon motion of the Defendants, the Court quashed these subpoenas because they asked for testimony within an unreasonable timeframe.  Prelim. Inj. Hr'g Tr., Vol. I (Doc. 86) at 28:24–29:19.  Federal Rule of Civil Procedure 45(d)(3)(A)(i) tells a court to quash subpoenas that "fail[] to allow a reasonable time to comply."  The subpoenas commanded that testimony be given somewhere around 48–72 hours after they were issued.  That is not a reasonable timeframe, especially since Plaintiffs had known for weeks that a hearing was going to take place.

[24] Second Scheduling Order (Doc. 37).

Briefing proceeded on schedule.  However, sometime during the weekend of January 23, 2022, and despite being vaccinated and boosted, court personnel (me) contracted COVID-19.[25] This necessitated moving the preliminary injunction hearing to Tuesday, February 1, 2022.[26]  The preliminary injunction hearing consisted of four lengthy days of testimony—interrupted by a two-day winter storm that closed the courthouse—and one lengthy day of closing arguments and legal presentations.  The hearing ended on Tuesday, February 8, 2022.

A fairly seismic development occurred as the preliminary injunction hearing was coming to a conclusion.  Recall that Plaintiffs were originally asking, as a matter of preliminary relief, that the Court require the creation of a new districting plan for the upcoming 2022 election.   In opposition to this request, Defendants argued that such relief would be impossible to implement without causing potentially catastrophic confusion and administrative errors given the current election schedule.[27]  Plaintiffs disagreed with this apocalyptic prognostication, suggesting that there was plenty of time before the election, and that the Court could extend or move any problematic election-related deadlines.[28]  Plaintiffs' argument on this point relied heavily on a recent decision from a federal court in Alabama granting preliminary relief similar to the relief Plaintiffs wanted in our case.[29]  But their reliance on this decision turned out to be premature.

_____

[25] *See* Order (Doc. 63).

[26] *See* Notice of Hr'g (Doc. 66).

[27] Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 53) at 73–77.

[28] Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 42–46; Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1133:4–1134:4.

[29] *See* Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 44–45 (citing *Milligan v. Merrill*, No. 2:21-cv-1530 (N.D. Ala. Jan. 24, 2022)).  The *Milligan* plaintiffs challenged Alabama's congressional map on constitutional and statutory grounds.  *Milligan*, slip op. at 2.  *Milligan* was consolidated with *Singleton v. Merrill* for the "purpose of expedited preliminary injunction proceedings" and heard by a three-judge panel.  *Id.*  *Singleton* was solely a constitutional challenge to Alabama's congressional map.  *Id.*  On January 24, 2022, the three-judge panel found that the *Milligan* plaintiffs were "substantially likely to establish that the [congressional map] violates Section Two of the Voting Rights Act," and that "the other requirements for preliminary injunctive relief" had been proven.  *Id.*, slip op. at 4–5. Accordingly, the three-judge panel granted the *Milligan* plaintiffs' motion for a preliminary injunction and enjoined the Alabama Secretary of State from "conducting any congressional elections according to" the challenged map.  *Id.*,

On the penultimate day of the preliminary injunction hearing in our case, the Supreme

Court stayed the preliminary injunction that had been granted by the federal district court in

Alabama.  In a statement concurring in the grant of the stay, Justice Kavanaugh (joined by Justice

Alito) explained that the Alabama district court's order violated the *Purcell* principle that "federal

courts ordinarily should not enjoin a state's election laws in the period close to an election."[30]

Essentially, the concurrence explained that the merits of the Alabama case were "not clearcut in

---

slip op. at 5.  The three-judge panel also stayed Alabama's candidate-qualification deadline for fourteen days to allow sufficient time to draw a new congressional map.  *Id.*, slip op. at 6–7.

One member of that three-judge panel, Judge Manasco, was sitting as a single judge in *Caster v. Merrill*, No. 2:21-cv-1536-AMM (N.D. Ala. Jan. 24, 2022).  The *Caster* plaintiffs challenged the congressional map solely on § 2 grounds.  *Id.*, slip op. at 1.  The *Milligan* and *Caster* parties "coordinate[d] their presentations of their statutory claims" and the parties agreed "that all evidence admitted in either case was admitted in both cases . . . ."  *Id.*, slip op. at 4. Accordingly, in *Caster*, Judge Manasco "adopt[ed] the recitation of the evidence, legal analysis, findings of fact and conclusions of law explained in the preliminary injunction, memorandum opinion and order" entered in *Milligan*.  *Id.*

[30] The concurrence elaborated on the *Purcell* principle as follows:

> This Court has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and this Court in turn has often stayed lower federal court injunctions that contravened that principle.

> That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled.  Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.  It is one thing for a State on its own to toy with its election laws close to a State's elections.  But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

> Some of this Court's opinions, including *Purcell* itself, could be read to imply that the principle is absolute and that a district court may *never* enjoin a State's election laws in the period close to an election.  As I see it, however, the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures.  Although the Court has not yet had occasion to fully spell out all of its contours, I would think that the *Purcell* principle thus might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Merrill*, 2022 WL 354467, at *2 (Kavanaugh, J., concurring in Order granting stay of preliminary injunction) (collecting cases) (internal citations omitted).

favor of the plaintiffs" and that the plaintiffs had not established that the election-related changes ordered by the district court were "feasible without significant cost, confusion, or hardship."[31]

In response to this development, Plaintiffs in our case took two tacks. Plaintiffs first argued that there was some legally significant daylight between the situation in Alabama and the one here in Arkansas. Specifically, Plaintiffs suggested that they had a more clearcut case than the one in Alabama, and that the election schedule in Arkansas would make judicially imposed changes easier to accomplish and less burdensome on state and county election officials.[32] Without getting into the weeds too much, it suffices to say that this argument is an incredibly difficult sell. Indeed, Plaintiffs likely know as much—which explains their new, alternative request for relief. That new request would have the Court allow the 2022 elections to take place using the challenged Board Plan, but then order a special election for all Arkansas House districts in 2023 using a new map.[33]

## II. DISCUSSION

Sometimes one or more threshold issues prevent a judge from reaching the merits of a motion or a case. This is one of those times. And the Court is well aware that the inability to "get to the merits" can be frustrating to the parties, lawyers, and public alike. In such circumstances, it is important for a judge to fully explain what the threshold issues are and why they are so important. That discussion follows.

Our democratic republic is anchored by a strong federal government of enumerated powers. Both its strength and its status as a government of enumerated powers are vital to the American experiment. And they are not just a happy accident. They are a product of experience, crisis,

---

[31] *Id.* at *3.

[32] Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1135:17–1136:7.

[33] *Id.* at 1136:9–1138:14.

deliberate thought, and significant compromise.  During the Revolutionary War, the States created a confederation with an intentionally weak central government.[34]  For numerous reasons, that set-up proved disastrous.[35]  Soon, nearly everyone in the founding era understood the need to strengthen the central government.[36]  This feeling ultimately gave birth to a constitutional convention.[37]  Although some wanted to maintain (but moderately strengthen) the central government created by the Articles of Confederation, most sought to alter our confederated system into a federated one and create a vastly stronger national government.[38]  The debates at the constitutional convention and during the ratification era were focused on how strong the new national government should be and how to ensure that a national government strong enough to function effectively would not trample on the rights and liberties of its people.[39]

The genius of our founders lay in their answer to this latter question.  They came up with two principal restraints to place upon the federal government that remain with us to this day.  First, unlike the state governments, the federal government is a government of enumerated powers.  That means that the federal government (including the judiciary) only has the specific powers affirmatively set forth in the Constitution.[40]  Second, the enumerated powers are intentionally divided among the three branches of the federal government in a way that motivates each branch

---

[34] G. Edward White, *Revisiting the Ideas of the Founding*, 77 Cin. L. Rev. 969, 972–74 (2009).

[35] Gregory E. Maggs, *A Concise Guide to the Articles of Confederation as a Source for Determining the Original Meaning of the Constitution*, 85 Geo. Wash. L. Rev. 397, 414–17 (2017).

[36] *Id.* at 417.

[37] *Id.* (citing 32 Journals of the Continental Congress 1774–1789, at 71–74 (Roscoe R. Hill ed., 1936)).

[38] Peter J. Smith, *Sources of Federalism: An Empirical Analysis of the Court's Quest for Original Meaning*, 52 UCLA L. Rev. 217, 234–38 (2004).

[39] *The Federalist No. 45*, at 289 (James Madison) (Clinton Rossiter ed., Signet Classics 2003) [hereinafter *Federalist*]; *Federalist No. 84*, at 515–19 (Alexander Hamilton).

[40] *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819).

to use its powers to curb the potential excesses of the other branches.[41]   Every American knows the name of this principle: checks and balances.   What every American might not know—but should—is that the creation of a limited and divided government combined with the use of checks and balances is the great bulwark of our liberty.[42]   Of course, the Bill of Rights and later amendments to the Constitution contain incredibly important protections of individual liberty.   But the founders knew that such amendments would amount to little more than words on a page unless the federal government was structured in a way that inherently prevented (or at least mitigated) aggrandizements of power.

Indeed, in Federalist No. 47, James Madison acknowledged the critical importance "of the political maxim that the legislative, executive, and judiciary [branches] ought to be separate and distinct."[43]   He called this an "essential precaution in favor of liberty," and explained that "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty . . . ."[44]   In Federalist No. 78, quoting no less a source than Montesquieu's Spirit of Laws, Alexander Hamilton emphasized that "there is no liberty if the power of judging be not separated from the legislative and executive powers."[45]   He added that "liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other [branches] . . . ."[46]   It should be no surprise, then, that the most famous of the Federalist Papers, No. 51, is dedicated to the principle of checks and balances:

---

[41] *Federalist No. 51*, at 318–19 (James Madison).

[42] *See Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) ("Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours.").

[43] *Federalist No. 47*, at 297 (James Madison).

[44] *Id.* at 297–98.

[45] *Federalist No. 78*, at 465 (Alexander Hamilton).

[46] *Id.*

> To what expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several [branches] as laid down in the Constitution?  The only answer that can be given is that as all these exterior provisions are found to be inadequate the defect must be supplied, by so contriving the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places.
>
> . . .
>
> [T]he great security against a gradual concentration of the several powers in the same [branch] consists in giving to those who administer each [branch] the necessary constitutional means and personal motives to resist encroachments of the others.[47]

The foregoing principles enshrined in the structure of the Constitution are relevant to our case in two ways.  First, Article III of the United States Constitution only extends the federal judicial power to "cases or controversies."[48]  The case-or-controversy requirement ensures that federal courts do not step outside their constitutional boundaries by rendering advisory opinions.[49]  Second, the Constitution expressly gives Congress the power to create "inferior Courts,"[50] like the federal district and circuit courts.  This includes the power to define by statute the subject-matter jurisdiction of federal courts, *i.e.*, which cases a federal court has the authority to decide.  Federal courts must do their utmost to scrupulously honor these constitutional limitations and statutory checks on judicial power.

### A. Standing

In most cases, and certainly in this one, the Article III case-or-controversy requirement boils down to a standing analysis.  Standing is the "irreducible constitutional minimum" that must

---

[47] *Federalist No. 51*, at 317–19 (James Madison).

[48] *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016).

[49] *Pub. Water Supply Dist. No. 8 of Clay Cnty., v. City of Kearny*, 401 F.3d 930, 932 (8th Cir. 2005).

[50] U.S. Const. art. III, § 1.

be met before a federal court has the constitutional authority to adjudicate a plaintiff's claim.[51]
When a plaintiff seeks to invoke the federal judicial power, he or she must sufficiently allege: (1)
that he or she has suffered an injury-in-fact; (2) that the injury is fairly traceable to the alleged
wrongdoing of the defendant; and (3) that a favorable judicial decision will cure the injury.[52]  The
Article III case-or-controversy requirement is so important that a federal court has an independent
obligation to ensure that a plaintiff has standing even if a defendant does not raise the issue.[53]

In *Lujan v. Defenders of Wildlife*, the Supreme Court explained that "each element [of
standing] must be supported in the same way as any other matter on which the plaintiff bears the
burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of
the litigation."[54]  Accordingly, before this Court could grant the pending Motion for a Preliminary
Injunction, Plaintiffs would have to prove with actual evidence that they were "likely to prevail"
on the Article III standing issue.[55]  However, as discussed elsewhere in this Order, the Court is not
reaching the merits of the Motion for a Preliminary Injunction.  Accordingly, at most, the standing
analysis in this Order should reflect the plausibility standard applicable at the motion-to-dismiss
stage.[56]

There is no question that an individual Black voter living in a district alleged to violate § 2
of the Voting Rights Act would meet the requirements for Article III standing.  But there are no

---

[51] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[52] *Id.*

[53] *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

[54] *Lujan*, 504 U.S. at 561.

[55] *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc) (holding that the "likely to prevail" standard applies when a plaintiff seeks a preliminary injunction to prevent "government action based on presumptively reasoned democratic processes").

[56] *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

individual voters in this case.  Instead, both Plaintiffs are organizations that seek to enforce § 2 on behalf of their members.  That is, Plaintiffs seek to proceed based on "associational standing," essentially by stepping into the shoes of their members.  To do so at this stage of the litigation, Plaintiffs must allege sufficient facts that, if proven, would establish that: (1) the organization's members have standing to sue in their own right; (2) the interests asserted in the lawsuit are "germane" to the organization's purpose; and (3) the lawsuit does not require the individual members to participate in the litigation.[57]  This is known as the *Hunt* test.

Supreme Court precedent is clear that redistricting lawsuits must proceed district-by-district.[58]  Accordingly, to have constitutional standing to bring a vote-dilution claim, an individual plaintiff (or in this case, a member of the Plaintiff-organizations) must live in a district that is allegedly "packed" or "cracked."[59]  Plaintiffs' Complaint alleged that the Arkansas NAACP and the Panel each has "members who are African-American registered voters in each of the areas where the plaintiffs allege that vote dilution is occurring."[60]  The Complaint went on to allege that "[t]hese members are irreparably harmed by living and voting in districts whose boundaries dilute Black voting strength."[61]  The Court was concerned that the language used in the Complaint—especially the phrase "each of these areas"—was vague and general.  At no point in the Complaint

---

[57] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[58] *See Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. . . . The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked.  This disadvantage to the voter as an individual therefore results from the boundaries of the particular district in which he resides.") (cleaned up); *see also Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (stating that racial gerrymandering claims must proceed "district-by-district").

[59] *Gill*, 138 S. Ct. at 1930–31.  *Gill* was a partisan gerrymandering case.  The Court reached its conclusion by relying on racial gerrymandering cases such as *United States v. Hays*, 515 U.S. 737 (1995).  Many lower courts have applied the reasoning of *Hays* and *Gill* to determine whether a plaintiff has standing to pursue a § 2 vote-dilution claim.  *See Larry v. Arkansas*, No. 4:18-cv-00116, 2018 WL 4858956, at *5–8 (E.D. Ark. Aug. 3, 2018) (collecting cases).

[60] Compl. (Doc. 1) ¶¶ 3–4.

[61] *Id.*

did Plaintiffs expressly allege that they had members in all of the particular districts they were challenging.

The Court requested that the Plaintiff-organizations provide more information to ensure that both could proceed under the associational standing doctrine.[62]  Specifically, the Court asked each Plaintiff-organization to inform the Court whether it had members in all of the Board Plan districts that allegedly diluted Black voting strength.[63]  Both organizations filed supplemental declarations.[64]  From these declarations, it is clear that each organization is alleging that it has members in each of the challenged districts.  In the context of this case and at this stage of the litigation, those allegations are really all that is necessary to meet the first prong of *Hunt*.[65]  And no one is arguing that Plaintiffs have any problems with respect to the second or third prong of *Hunt*.

At the preliminary injunction hearing, through witness examination and then in argument, Defendants emphasized that the Panel does not have a traditional membership structure and has an overly broad definition of members that includes, for example, anyone who has donated to the Panel even once in the last three years.[66]  If the Court were to reach the merits of the Motion for a Preliminary Injunction, evidence such as this might impact the determination of whether the Panel is likely to actually meet the first prong of the *Hunt* test.  But since the Court cannot reach the

---

[62] Order (Doc. 44) at 2 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 270–71).

[63] *Id.*

[64] *See* Decl. of Bill Kopsky on Behalf of the Panel (Doc. 57); Decl. of Barry Jefferson on Behalf of the Arkansas NAACP (Doc. 58).

[65] What about redressability?  There have been no allegations that Plaintiffs' members who reside in the challenged Board Plan districts would ultimately end up in any of the majority-Black districts presented in Plaintiffs' Illustrative Plan.  The Court has considered this issue and finds that requiring such allegations is unnecessary.  The Illustrative Plan serves to show that a remedy is *possible*.  It is not meant to be the Plaintiffs' exact or only remedy.  *See, e.g.*, *Mo. State Conf. NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018).

[66] *See* Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1176:17–1179:2.

merits of the Motion for a Preliminary Injunction, the standing analysis is confined to whether the Panel sufficiently alleged that it has members in all relevant districts. It did. Because the Panel therefore has standing, the Court need not address any argument concerning the Arkansas NAACP's standing.[67]

### B. Subject-Matter Jurisdiction

The existence of an Article III case or controversy is necessary for a federal district court to hear and decide a lawsuit. But it is not sufficient. A federal district court must also have subject-matter jurisdiction over the suit. Subject-matter jurisdiction is conferred on a federal district court by statute.[68] And the requirement that a judge not act unless a statute gives him or her jurisdiction to do so is the principal manifestation (as to the judiciary) of the horizontal separation of powers that our founders knew was critical to the success of our form of government.[69] That is likely why courts have an independent obligation to assure themselves that they have subject-matter jurisdiction over a lawsuit before they reach the merits.[70]

This is the threshold issue that prevents the Court from reaching the merits of Plaintiffs' Motion for a Preliminary Injunction. In short, because no private right of action exists to enforce § 2 of the Voting Rights Act, none of the jurisdictional statutes identified by Plaintiffs actually confer jurisdiction on this Court. Before explaining in detail how the Court reached this conclusion, it is worthwhile to make clear the specific question before the Court. The question is

---

[67] *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011).

[68] *Patchak v. Zinke*, 138 S. Ct. 897, 907 (2018) ("[W]ith limited exceptions, a congressional grant of jurisdiction is a *prerequisite* to the exercise of judicial power.").

[69] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (noting that a court acting "beyond the bounds of authorized judicial action . . . offends fundamental principles of separation of powers"); *see also supra* notes 41–49 and accompanying text.

[70] *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

not whether the Court believes the Voting Rights Act has been and continues to be a force for good and progress in our society. (I do.) The question is not whether the Court believes that sometime in the last fifty-seven years Congress should have expressly included a private right of action in the Voting Rights Act. (I do.) The question is not whether the Court believes cases like this one are important to pursue. (I do.) The narrow question before the Court is only whether, under current Supreme Court precedent, a court should imply a private right of action to enforce § 2 of the Voting Rights Act where Congress has not expressly provided one. The answer to this narrow question is no. Only the Attorney General of the United States can bring a case like this one.

### 1. *Judicial Implication of a Private Right of Action to Enforce § 2*

It is undisputed that Congress did not include in the text of the Voting Rights Act a private right of action to enforce § 2. Plaintiffs contend that this Court should—actually, Plaintiffs contend that this Court must—nonetheless judicially imply a private right of action to enforce § 2.[71] In a concurring opinion in a recent § 2 case, *Brnovich v. Democratic National Committee*, Justice Gorsuch (joined by Justice Thomas) wrote separately to "flag" an issue "not decide[d]" by the Supreme Court that day: the existence or non-existence of a private right of action to enforce § 2.

> Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. Lower courts have treated this issue as an open question.[72]

It is to this "open question" the Court now turns.[73]

---

[71] In response to the Court's request to the parties for briefing on the private-right-of-action question, the United States submitted a Statement of Interest. (Doc. 71). The Court has reviewed this Statement and the law it cited. The United States' legal argument is generally the same as Plaintiffs' legal argument. Accordingly, for the most part, the Court's references to the Plaintiffs' legal arguments should be taken to include the similar legal arguments raised by the United States.

[72] 141 S. Ct. at 2350 (Gorsuch, J., concurring).

[73] Plaintiffs contend that the private-right-of-action question is not really an "open" one. Their point seems to be that because (1) no court has affirmatively held that § 2 is not privately enforceable, (2) some courts have held that § 2 is privately enforceable, and (3) many courts have assumed that § 2 is privately enforceable, then the only possible conclusion is that § 2 is privately enforceable. Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 37–41. This argument

The Supreme Court's current jurisprudence on implied private rights of action is notoriously tight-fisted.  That's to be expected; after all, the question at hand is whether a court should "read into" a statute something that Congress did not "write into" the statute.  What a strange thing for courts to do—especially in the modern era.

A line of Supreme Court cases, beginning with *Alexander v. Sandoval*, has made quite clear that judicially implied private rights of action are now extremely disfavored.[74]  If Congress wants private litigants to be able to enforce federal statutes, Congress should express that desire in the statute.  *Sandoval* and its progeny don't entirely foreclose the possibility of implied private rights of action.  However, those cases do set pretty strict requirements for when a court may imply a private right of action to enforce a statutory provision.  First, Congress must use rights-creating language in the statutory provision at issue.[75]  Second, Congress must provide for a private remedy.[76]  Both are necessary before a private party can enforce a federal statute.  The Court need not determine whether § 2 of the Voting Rights Act contains rights-creating language.  Even if it does, Plaintiffs cannot show that Congress provided for a private remedy to enforce § 2.

_____

is in one sense reasonable.  It certainly gives the Court pause to be the first federal court in the nation to affirmatively conclude that the judiciary may not imply a private right of action to enforce § 2.  However, to the extent Plaintiffs mean to suggest that this Court is somehow bound by the way other courts have treated this question, Plaintiffs are wrong.  As explained in this Order, neither the Supreme Court nor the Eighth Circuit has decided this issue one way or the other.  It is true, as Justice Gorsuch noted, that the Supreme Court has assumed the existence of a judicially-implied private right of action.  So has the Eighth Circuit.  But assumptions like these are not binding.

[74] 532 U.S. 275 (2001); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

[75] *Sandoval*, 532 U.S. at 286–88.

[76] *Id.*  Typically, plaintiffs suing under 42 U.S.C. § 1983 don't have much trouble satisfying the private-remedy prong of the test "because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes."  *Gonzaga Univ.*, 536 U.S. at 284.  Section 1983 "presumptively" creates a private remedy, *id.*, although that presumption can be rebutted if the rights-creating statute contains a remedial scheme that is "sufficiently comprehensive" to suggest that Congress intended to preclude the § 1983 remedy.  *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981); *see also Sandoval*, 532 U.S. at 290.  In any event, Plaintiffs do not bring suit in this case under § 1983.  Thus, the only question for the Court is whether the Voting Rights Act itself contains a private right of action to enforce § 2.

When analyzing whether Congress provided for a private remedy to enforce a particular provision of federal law, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create . . . a private remedy."[77] "Statutory intent on this . . . point is determinative."[78] To discern the statutory intent, a court begins (and often ends) by examining "the text and structure" of the statute.[79] If this examination makes it clear one way or the other whether the statute provides a private remedy, then the private-remedy inquiry ends.

### a. The Text and Structure of the Voting Rights Act

Section 2 of the Voting Rights Act has two subsections. The first subsection prohibits a State or political subdivision from imposing or applying any voting qualification, prerequisite, standard, practice, or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ."[80] The second subsection elaborates on how a violation of the "results test" set forth in the first subsection is proven.

Section 2's scope goes well beyond the voting guarantees of the Constitution. For example, while the Fourteenth Amendment and § 2 of the Voting Rights Act both prohibit vote dilution based on race, a racially dilutive voting map violates the Fourteenth Amendment only if the map was enacted or maintained with discriminatory *intent*.[81] On the other hand, § 2 is violated if the results of a map dilute Black voting strength, even if the purpose behind the map was entirely race-

---

[77] *Sandoval*, 532 U.S. at 286.

[78] *Id.*

[79] *Id.* at 288 n.7.

[80] 52 U.S.C. § 10301(a).

[81] *See Rogers v. Lodge*, 458 U.S. 613, 617–22 (1982); *see also City of Mobile v. Bolden*, 446 U.S. 55 (1980). The Supreme Court has never held, nor even "suggested," that the Fifteenth Amendment addresses vote dilution. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) *(Reno II)*.

neutral.  To be clear, § 2 protects a right different from, and broader than, the right secured by the Constitution.[82]

Section 2 is completely silent as to the remedies available for a violation of that statutory provision.  Of course, Congress is not required to place a remedy in every provision of every statute it passes.  The Voting Rights Act is a large and complex statute.  It is necessary to consider the text and structure of the entire Act when analyzing whether the Act "manifests an intent 'to create . . . a private remedy'" for § 2 violations.[83]

Section 12 of the Act ("Civil and criminal sanctions") appears to be the only remedial provision that Congress provided for violations of § 2.[84]  A comprehensive reading of § 12 clearly establishes that it is focused entirely on enforcement proceedings instituted by the Attorney General of the United States.  That's a problem for the Plaintiffs because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."[85]

For example, consider subsections (a) and (c) of § 12.  Those subsections provide that anyone who violates, attempts to violate, or conspires to violate §§ 2, 3, 4, 5, 10, or 11 of the Act shall be fined up to $5,000 and/or be imprisoned for up to five years.[86]  It would be highly

---

[82] *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) *(Reno I)*.  As discussed in more detail below, the Voting Rights Act itself distinguishes between constitutional and statutory rights.  *Compare* 52 U.S.C. §§ 10302, 10310, *with* 52 U.S.C. § 10308.

[83] *Gonzaga Univ.*, 536 U.S. at 284 (emphasis removed) (quoting *Sandoval*, 532 U.S. at 286); *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017) ("Congressional intent or meaning is not discerned by considering merely a portion of a statutory provision in isolation, but rather by reading the complete provision in the context of the statute as a whole.").

[84] 52 U.S.C. § 10308.

[85] *Sandoval*, 532 U.S. at 290; *see also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 457–58 (1974); *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.").

[86] 52 U.S.C. § 10308.  Subsection (b) is not relevant to this case.

unusual—to say the least—to conclude that Congress intended for private enforcement of such fines and imprisonment.[87]  There is nothing in the Act to suggest Congress intended §§ 12(a) and (c) to be enforced by private parties.  Indeed, Plaintiffs do not argue that §§ 12(a) or (c) creates or suggests a private right of action to enforce § 2.

There's even more to § 12 that suggests a private right of action cannot be implied to enforce § 2.  Consider § 12(d):

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by [§§ 2, 3, 4, 5, 10, or 11], section 1973e of Title 42, or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes.[88]

So, when "there are reasonable grounds to believe" that a violation of § 2 is forthcoming, § 12(d) affirmatively authorizes the Attorney General of the United States to seek a preliminary or permanent injunction to prevent the violation.  But § 12(d) makes no mention of private parties, which (as noted above) strongly implies their exclusion.  This is another problem for the Plaintiffs, especially considering that injunctive relief to prevent a § 2 violation is exactly what they seek. It'd be hard to find a provision more on point than this one.

Neither party (nor the United States) argues about whether § 12(f) supports a private right of action. However, that is the only portion of § 12 that might potentially cut in Plaintiffs' favor. It is therefore worth a detailed discussion.  Section 12(f) provides:

> The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of chapters 103 to 107 of this

---

[87] *See, e.g.*, *Frison v. Zebro*, 339 F.3d 994, 999 (8th Cir. 2003) (noting that "it is well-settled that criminal statutes will rarely [provide a private right of action under] § 1983") (collecting cases).

[88] 52 U.S.C. § 10308(d).

title shall have exhausted any administrative or other remedies that may be provided by law.[89]

Read in isolation, this subsection might indicate that Congress thought any person could bring suit to enforce § 2 (part of Chapter 103).  After all, it is unnatural to talk of anyone other than a private litigant as having to exhaust administrative remedies.

But we know that § 12(f) must be read "in view of its structure and of the physical and logical relation" to the rest of § 12.[90]  And once § 12(f) is read in light of § 12(e), it becomes apparent that § 12(f) is not creating, recognizing, or assuming a private right of action.  Section 12(e) provides:

> Whenever . . . there are observers appointed . . . [and] any persons allege to such an observer within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under chapters 103 to 107 of this title or registration by an appropriate election official and (2) their eligibility to vote, they have not been permitted to vote in such election, the observer shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded.  Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto.  The district court shall hear and determine such matters immediately after the filing of such application.  The remedy provided in this subsection shall not preclude any remedy available under State or Federal law.[91]

The "person asserting rights" language in § 12(f) is not describing a hypothetical private plaintiff in a § 2 enforcement proceeding.  Instead, "the person asserting rights" language in § 12(f) is referencing a person on whose behalf the Attorney General of the United States brings suit under § 12(e).

---

[89] *Id.* § 10308(f).

[90] *Gillespie*, 867 F.3d at 1043 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)).

[91] 52 U.S.C. § 10308(e).

On this read of the two subsections, § 12(f)'s discussion of exhaustion of remedies makes perfect sense.  It means that the Attorney General of the United States does not have to wait to pursue a § 12(e) action until the individual voter exhausts administrative remedies or other legal remedies (such as state law remedies or § 1983 litigation).  Correspondingly, § 12(e) reserves for the voter "remed[ies] available under State or Federal law," but it does not create any new remedies.[92]  Essentially, §§ 12(e) and (f) work in combination such that the Attorney General of the United States can quickly bring a § 12(e) suit on behalf of a voter, while the voter can individually bring his or her own suit under state law or other federal law if such law provides a private right of action.  Nothing about this set-up suggests—much less requires—the conclusion that § 12(f) recognizes or assumes the private enforceability of § 2.

Plaintiffs primarily point to two other sections of the Voting Rights Act to suggest that the statute manifestly intended to create a private right of action to enforce § 2.  Neither section carries the water they want it to.  Let's first consider § 3 of the Voting Rights Act, which appears to authorize specific relief in certain lawsuits brought by either the Attorney General of the United States or an "aggrieved person" (*i.e.*, an injured potential voter).[93]  The difficulty for Plaintiffs is that § 3 is speaking of relief only for cases where the Attorney General of the United States or an aggrieved person "institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment."[94]  In 1982, Congress amended § 2 to reach conduct that would

---

[92] *Id.*

[93] *Id.* § 10302.

[94] The precise order of the words used, but not the words themselves, differ between § 3's subsections.  Subsection (a) says "[w]henever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . ."  52 U.S.C. § 10302(a).  Subsection (b) says "[i]f in a proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . ."  *Id.* § 10302(b).  Finally, subsection (c) says "[i]f in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting

not violate the Constitution.[95]   After the 1982 amendment, a proceeding to enforce § 2 of the Voting Rights Act is not a proceeding "to enforce the voting guarantees of the fourteenth or fifteenth amendment"[96] because the voting rights protected by § 2 are different from, and broader than, the far narrower guarantees in the Fourteenth and Fifteenth Amendments. [97]

Section 14 is no different.  Section 14 allows for attorneys' fees, expert fees, and other litigation costs to be awarded to the "prevailing party, other than the United States," in "action[s] or proceeding[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment."[98] By its text, § 14 is obviously concerned only with lawsuits brought to enforce the Fourteenth or Fifteenth Amendment.  Plaintiffs' best argument here is that, contrary to the clear text of § 14, the Eighth Circuit has granted attorneys' fees in § 2 cases in reliance on this provision.  But those cases can't bear the weight plaintiffs put on them.  In those cases, no party argued that a § 2 claim falls outside the scope of § 14 because it is not a "proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."[99]  So the Eighth Circuit did not resolve such an issue.  The

---

guarantees of the fourteenth or fifteenth amendment . . . ."  *Id.* § 10302(c).  These minor differences are irrelevant to the interpretative analysis.

[95] *Chisom v. Roemer*, 501 U.S. 380, 393 (1991).

[96] *Reno I*, 520 U.S. at 482 ("Because now the Constitution requires a showing of intent that § 2 does not, a violation of § 2 is no longer *a fortiori* a violation of the Constitution.  Congress itself has acknowledged this fact.").

[97] Plaintiffs contend that the Court is misreading § 3.  Plaintiffs read the various subsections in § 3 to say that the *statute* under which the proceeding is instituted—not the proceeding itself—must enforce the voting guarantees of the Fourteenth or Fifteenth Amendment; Plaintiffs then contend that the Voting Rights Act is such a statute.  *See* Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1165:22–1167:19.  The biggest flaw in this argument is that it violates the normal canons of statutory construction and the ordinary rules of grammar.  To accept Plaintiffs' position, the Court would have to rewrite the relevant subsections.  Instead of speaking of "a proceeding under any statute *to enforce* the voting guarantees of the fourteenth or fifteenth amendment," the hypothetically rewritten statute would speak of "a proceeding under any statute *that enforces* the voting guarantees of the fourteenth or fifteenth amendment."  Without such a revision, it is unclear to the Court how Plaintiffs' reading could be the right one.  And, obviously, courts don't just rewrite statutes.  We assume Congress chose its words intentionally.

[98] 52 U.S.C. § 10310(e).

[99] In *Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, the dispute was whether attorneys' fees were appropriate even though "the district court did not need to reach the [plaintiffs'] civil rights violations claims."  771 F.2d 1153, 1159 (8th Cir. 1985).  Moreover, in that case the plaintiffs had brought a Fourteenth Amendment challenge. *Id.* at 1155.  In *Jeffers v. Clinton*, only the amount of the fees awarded was at issue, and the plaintiffs' motion for

assumption (or dicta) in those cases—that § 14 fees and costs are somehow applicable to a § 2 case—is not binding on this Court. Certainly, it is not controlling on the bigger question of whether § 2 is privately enforceable. The text of § 14 is clear. Section 14 is about proceedings to enforce the guarantees of the Fourteenth or Fifteenth Amendment. That is not what a § 2 case does.

For the reasons described above, the Court concludes that the text and structure of the Voting Rights Act does not "manifest[] an intent 'to create . . . a private remedy'" for § 2 violations.[100]   If anything, the text and structure strongly suggest that exclusive enforcement authority resides in the Attorney General of the United States.[101]   Accordingly, under the private-right-of-action jurisprudence that the Supreme Court currently employs, this Court cannot imply a private right of action to enforce § 2 of the Voting Rights Act.

### b.  Precedent Does Not Support a Private Right of Action

Plaintiffs dedicated very little of their arguments to the text and structure of the Voting Rights Act. Most of their arguments were about precedent. Fair enough. But on closer examination, the precedent they cite is not all that they make it out to be.

---

attorneys' fees came after rulings that both § 2 and the Fifteenth Amendment had been violated. 992 F.2d 826, 828 (8th Cir. 1993). In *Emery v. Hunt*, the parties were not disputing whether "plaintiffs [were] entitled to an award of attorney fees under" § 14 and 42 U.S.C. § 1988. 272 F.3d 1042, 1046 (8th Cir. 2001). The issue was whether fees were appropriate where the plaintiffs were only successful on a state law claim. *Id.* The Eighth Circuit said the unsuccessful § 2 claim was sufficiently "related" to the successful state law claim to justify attorneys' fees. *Id.* at 1047. Finally, in *Bone Shirt v. Hazeltine*, the only issue in front of the Eighth Circuit was whether § 14's allowance of expert fees should be applied retroactively. 524 F.3d 863, 865 (8th Cir. 2008).

[100] *Gonzaga Univ.*, 536 U.S. at 284 (quoting *Sandoval*, 532 U.S. at 286).

[101] Plaintiffs rely on the 1982 committee reports from the Senate and House. Specifically, Plaintiffs note that both reports include a brief statement that § 2 contains a private right of action. *See* Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 38–39. This is precisely the way legislative history should not be used. Where the text and structure give a clear answer, the inquiry is at an end. *Sandoval*, 532 U.S. at 288 n.7. Committee reports—which are neither passed by Congress nor signed by the President—are not law. *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 942 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."); *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators."). Committee reports cannot be employed by unelected judges to alter the effect of the actual words used in the bill that became law.

We should start at (or close to) the beginning. In 1969, four years after the Voting Rights Act became law, the Supreme Court decided *Allen v. State Board of Elections*.[102] In *Allen*, the Supreme Court implied a private right of action to enforce § 5 of the Voting Rights Act. The *Allen* Court readily acknowledged that Congress did not include in the text of the Voting Rights Act a private right of action. Nevertheless, the Court went on to judicially create just such a private right of action based on policy considerations:

> The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. For example, the provisions of the Act extend to States and the subdivisions thereof. The Attorney General has a limited staff and often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government.
>
> …
>
> The guarantee of [§] 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to [§] 5, might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement of the prohibition.[103]

*Allen* has been relegated to the dustbin of history. As far as its specific holding regarding private enforceability of § 5, the Supreme Court's 2013 *Shelby County v. Holder* decision essentially precludes any enforcement of § 5 (whether private enforcement or enforcement by the Attorney General of the United States).[104] And as far as *Allen*'s reasoning, the Supreme Court has since made clear that private rights of action are not to be implied merely because they are "desirable . . . as a policy matter, or [] compatible with the statute."[105] *Allen* is a hallmark example of this sort of discredited rationale. In fact, the Supreme Court has specifically identified *Allen* as a defective

---

[102] 393 U.S. 544 (1969).

[103] *Id.* at 556–57.

[104] 570 U.S. 529 (2013).

[105] *Sandoval*, 532 U.S. 286–87.

product of an outdated jurisprudence that too loosely implied private rights of action where Congress had created none:

> During this "*ancien regime*," the Court assumed it to be a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose. Thus, as a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself.[106]

Long story short, everyone agrees that the Supreme Court's current private-right-of-action jurisprudence has abandoned the reasoning of *Allen* in favor of the newer, stricter standard set forth in *Sandoval* and its progeny.

This is not the end of the story.  In 1996, well after the 1982 amendments to the Voting Rights Act, the Supreme Court decided *Morse v. Republican Party of Virginia*.[107]  *Morse* had no majority opinion.  Five of the Justices, however, agreed to imply a private right of action to enforce § 10 of the Voting Rights Act.   Justice Stevens, writing for himself and Justice Ginsburg, announced the judgment of the Court.   Justice Stevens explained that "[t]he District Court dismissed appellants' claim under § 10 of the Act because that section only authorizes enforcement proceedings brought by the Attorney General and does not expressly mention private actions."[108]  But the Supreme Court reversed this ruling.

Justice Stevens acknowledged that the district court's ruling "might have been correct if the Voting Rights Act had been enacted recently," but concluded that the ruling "fail[ed] to give effect to our cases holding that our evaluation of congressional action 'must take into account its contemporary legal context.'"[109]   Justice Stevens seems to have recognized that the Supreme

---

[106] *Ziglar*, 137 S. Ct. at 1855 (internal citations omitted).  *Ziglar* cited *Allen* as an example of this type of concerning judicial creativity.  *Id.*

[107] 517 U.S. 186 (1996).

[108] *Id.* at 230.

[109] *Id.* at 230–31 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698–99 (1979)).

Court's 1996 jurisprudence was far less likely than its 1965 jurisprudence to tolerate the free-wheeling style of judicially implying private rights of action espoused by the *Allen* Court.  (And that was even before *Sandoval*.)  But despite this recognition, Justice Stevens believed that the implied-right-of-action analysis should still account for the "highly liberal standard for finding private remedies" that was commonplace in the 1960s.[110]  According to Justice Stevens, considering this "contemporary legal context" was the proper way to determine what Congress wanted when it passed the Voting Rights Act.[111]  So, for example, it was important to Justice Stevens (if not dispositive) that Congress "acted against a 'backdrop' of decisions in which implied causes of action were regularly found."[112]  The three Justices concurring in the judgment—Justices Breyer, O'Connor, and Souter—were far more succinct.  Essentially, they found "that the rationale of [*Allen*] applies with similar force" to § 10.[113]

Much like *Allen* itself, the *Morse* approach to the private-right-of-action analysis does not survive *Sandoval* and its progeny.  In *Sandoval*, the Supreme Court expressly refused to "revert . . . to the understanding of private causes of action that held sway . . . when [the statute] was enacted."[114]  The Court was explicit that use of "contemporary legal context" to smuggle the old

---

[110] *Id.* at 231.

[111] *Id.*

[112] *Id.*  Justice Stevens also pointed to § 3's "aggrieved person" language and § 14's allowance of attorneys' fees as implying a private right of action to enforce § 10.  *Id.* at 233–34.  He noted, however, that § 10 "*by its terms*" is "a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments."  *Id.* at 234 (emphasis added).  Section 2, on the other hand, is *by design* not such a statute.  *See supra* notes 95–97 and accompanying text.

[113] *Id.* at 240 (Breyer, J., joined by O'Connor and Souter, JJ., concurring in the judgment) (citing S. Rep. No. 97-417, pt. 1, p. 30 (1982)).  Justice Breyer also suggests that *Allen* applies to § 2.  But this is purely dicta.

[114] *Sandoval*, 532 U.S. at 287.  Consistent with this admonition, the Supreme Court has recently cautioned against employing outdated methods of statutory interpretation when construing § 2 of the Voting Rights Act.  In *Brnovich*, the Supreme Court stated that when addressing § 2 in a new context, "a fresh look at the statutory text is appropriate" because current "statutory interpretation cases almost always start with a careful consideration of the text . . . ."  141 S. Ct. at 2337.  Simply because previous § 2 cases had "jumped right to the" legislative history was not a reason to abandon the prevailing method of statutory interpretation in *Brnovich* and the same holds true here.  *Id.* (discussing the dispositive weight given to legislative history in *Gingles* and subsequent vote-dilution cases).

ways of judicial invention into modern times was a non-starter.[115]   According to *Sandoval*, "contemporary legal context" is only relevant "to the extent it clarifies text."[116]  It cannot be used to read into a statute a private remedy that is not there.[117]

To be sure, *Allen* and *Morse* are binding precedent insofar as they held that §§ 5 and 10 are privately enforceable.  But these cases cannot be stretched any further.[118]  Any discussion about private enforcement of § 2 in those cases is not only dicta, but dicta based on methods of interpretation that the Supreme Court has long since abandoned.  Absent binding precedent that extends *Allen* or *Morse* to § 2, those cases are simply inapplicable here.

The only potentially binding precedent comes from a 1989 Eighth Circuit case, *Roberts v. Wamser*.[119]  In that case, the Eighth Circuit framed "the precise issue [as] whether the Voting Rights Act can properly be understood as granting an unsuccessful candidate the right to maintain

---

[115] *Sandoval*, 532 U.S. at 288.

[116] *Id.*

[117] Even if the contemporary-legal-context principle were still in good standing, it wouldn't help Plaintiffs very much. Some courts have concluded that Congress' decision to add "or aggrieved person" to § 3 in 1975 indicated a desire for the entire Voting Rights Act to be privately enforceable.  *See, e.g.*, *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 652–53 (11th Cir. 2020), *cert. granted and judgment vacated*, 141 S. Ct. 2618 (2021); *Fla. State Conf. of NAACP v. Lee*, No. 4:21-cv-187, 2021 WL 6072197, at *8–9 (N.D. Fla. Dec. 17, 2021).  But that language could just as easily be nothing more than congressional recognition that there was now (because of *Allen*) an implied private right of action in § 5.

Indeed, that latter interpretation appears to get stronger with time.  In 1982, when Congress intentionally divorced § 2 from the Fourteenth and Fifteenth Amendments, it left § 3 intact.  Doing so when § 3 speaks only of proceedings to enforce constitutional voting rights at least suggests § 3 was not referencing a private right of action to enforce § 2. Congress knew, at the time of the 1982 amendments, that the Supreme Court was considerably narrowing its private-right-of-action jurisprudence, including by not treating prior cases implying private rights of action for one section of a statute as automatically creating a private right of action for other sections of the same statute.  *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 577–78 (1979) (refusing to extend the implied private right of action from *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964)); *see also Allen*, 393 U.S. at 557 (relying on *Borak* to imply a private right of action in § 5 of the Voting Rights Act).  Congress had every reason to know that, if it wanted to create a private right of action for § 2, it could have and should have spoken more clearly.

[118] *See Stoneridge*, 552 U.S. at 165 ("Concerns with judicial creation of a private cause of action caution against its expansion.  The decision to extend the cause of action is for Congress, not for us.  Though it remains the law, the [previously implied] private right should not be extended beyond its present boundaries.").

[119] 883 F.2d 617 (8th Cir. 1989).

a judicial challenge to allegedly discriminatory voting procedures that allegedly caused him to lose the election."[120]  The Eighth Circuit treated § 2 of the Voting Rights Act as privately enforceable. Latching onto the "aggrieved person" language in § 3 of the Act, *Roberts* suggested that an "aggrieved person" could bring a § 2 lawsuit.  Thus, the outcome of the case turned on whether an unsuccessful candidate counted as an "aggrieved person."[121]  Ultimately, the Eighth Circuit held that an unsuccessful candidate is not an "aggrieved person" because the candidate is not someone "whose voting rights have been denied or impaired."[122]

*Roberts*'s holding is simply that a losing candidate cannot bring suit to enforce § 2 of the Voting Rights Act.  Even if one over-stretched the concept of a holding, *Roberts* at most controls the question of whether a losing candidate meets the definition of "aggrieved person" as that term is used in § 3.  But *Roberts* did not purport to announce a sweeping rule that all voters can enforce § 2 of the Voting Rights Act.  Even if it had wanted to do so, any such rule would have been unnecessary to the resolution of the case and would therefore have constituted non-binding dicta. *Roberts* is most fairly read as saying that *if* private enforcement of § 2 is authorized, then that authorization *would* be found in the "aggrieved person" language of § 3.  And because an unsuccessful candidate does not fall within the definition of "aggrieved person," that candidate would not be authorized to sue *whether or not* § 3 in fact authorized or contemplated private enforcement of § 2 in other contexts.

To be clear, *Roberts*'s 30,000-foot discussion of private enforcement of § 2 is dicta.  Dicta from the Eighth Circuit, of course, is often of great persuasive value.  However, *Roberts*'s brief

---

[120] *Id.* at 620.

[121] *Id.* at 621.

[122] *Id.* at 624.

and highly generalized discussion of *Allen* and § 3 has been seriously "enfeebled" by *Sandoval* and later Supreme Court cases in the same way that *Allen* and *Morse* have been.[123]  Any persuasive value from *Roberts* has long since faded into jurisprudential oblivion.[124]  Under the current Supreme Court framework, it would be inappropriate to imply a private right of action to enforce § 2 of the Voting Rights Act.[125]  Section 2 can and should be enforced by the Attorney General of the United States.

### 2. Defendants' Potential Waiver of the Private-Right-of-Action Issue

In addition to their substantive arguments on the private-right-of-action question, Plaintiffs also raise a procedural argument.  Specifically, Plaintiffs contend that the Court should ignore the private-right-of-action question (at least for now) because Defendants did not raise it in their Opposition to the Motion for a Preliminary Injunction.[126]  At bottom, Plaintiffs' argument is that the question of the existence of a private right of action to enforce a statute is not a jurisdictional question, but rather a merits question.  If the private-right-of-action question is jurisdictional, the Court has an independent obligation to decide the issue.  If, however, Plaintiffs are right that the

---

[123] *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064–65 (8th Cir. 2017).

[124] The Eighth Circuit's silent assumption in *Cross v. Fox* that a private person could bring a § 2 case is not an affirmative holding that would control.  23 F.4th 797 (8th Cir. 2022).

[125] There's one further issue lurking at the margins that merits mention.  Even if a court determined that a private right of action should be implied to enforce § 2, it is unclear why that right should be available to anyone other than a voter. In the context of this case, the question would be whether the implied private right of action is expansive enough to allow organizations to sue on behalf of voters.  That seems to be a different question than the Article III associational standing question. *See Stoneridge*, 552 U.S. at 165 ("The determination of who can seek a remedy has significant consequences for the reach of federal power."); *United Food & Com. Workers Union v. Albertson's, Inc.*, 207 F.3d 1193, 1198 (10th Cir. 2000) (finding that labor organization was not statutorily authorized to bring suit on behalf of members); *Cnty., Mun. Emps' Supervisors & Foreman's Union Local No. 1001*, 240 F. Supp. 2d 827, 831 (N.D. Ill. 2003) ("[I]t would seem dubious at best to permit a carefully defined statutory provision to be overridden by [Article III associational standing]—a doctrine that Congress has not chosen to incorporate in ERISA . . . ."); *see also* Perry Grossman, *The Case for State Attorney General Enforcement of the Voting Rights Act Against Local Governments*, 50 Mich. J.L. Reform 565 (2017). In any event, the Court need not answer this question today as it concludes § 2 is not privately enforceable.

[126] Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 37.

private-right-of-action question is a merits question, then the issue is waivable and, in this instance, was waived by Defendants for purposes of the Motion for a Preliminary Injunction.

Plaintiffs' argument has some force to it.  Indeed, in the Order requesting briefing on the private-right-of-action question, the Court specifically raised the potential waiver issue and asked the parties to address it.[127]  In response, Plaintiffs pointed to two Supreme Court cases: *Verizon Maryland, Inc. v. Public Service Commission of Maryland* and *Steel Co. v. Citizens for a Better Environment*.[128]  In *Verizon*, while briefly addressing a party's argument that subject-matter jurisdiction was lacking because "the [statute being enforced] does not create a private cause of action," the Supreme Court quoted an oft-repeated line from *Steel Co.* that appears to settle the jurisdictional-vs.-merits issue:

> It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case.[129]

Justice Gorsuch's concurrence in *Brnovich*—the very concurrence that flagged the private-right-of-action question as an "open question" in the lower courts—took the same position: "Because no party argues that the plaintiffs lack a cause of action here, and because the existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction, this Court need not and does not address that issue today."[130]

---

[127] The Court directed the parties in the case at bar to address: (1) whether the Court has an independent obligation to determine whether the Voting Rights Act provides a private right of action to enforce § 2; and (2) whether the Voting Rights Act contains a private right of action.  The Court made clear that if the private-right-of-action question was ultimately not jurisdictional, it would not raise the matter *sua sponte*.  The Court likewise stated that Defendants would be considered as having waived any private-right-of-action arguments for purposes of the Motion for a Preliminary Injunction because they did not raise such arguments in their Response to the Motion.  *See* Order (Doc. 55).

[128] Pls.' Reply in Supp. of Prelim. Inj. (Doc. 68) at 37 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002) (quoting *Steel Co.*, 523 U.S. at 89).

[129] *Verizon*, 535 U.S. at 642–43 (quoting *Steel Co.*, 523 U.S. at 89).

[130] *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring) (internal citations omitted).

So far so good for the Plaintiffs. But there's a wrinkle. Just a few weeks ago, the Eighth Circuit handed down a case called *Cross v. Fox*.[131] In *Cross*, the Eighth Circuit very clearly held that the existence (or non-existence) of a private right of action is a jurisdictional question because it is inextricably connected to a plaintiff's asserted basis for subject-matter jurisdiction.

> [T]he ICRA does not contain a private right of action to seek injunctive or declaratory relief in federal court, and therefore, the district court lacked subject-matter jurisdiction under 28 U.S.C. § 1331.
>
> In *Santa Clara Pueblo*, the Supreme Court held that the ICRA does not "authorize the bringing of civil actions for declaratory or injunctive relief to enforce its substantive provisions." The only federal remedy for ICRA violations authorized by Congress is a writ of habeas corpus, which is not sought here. "Congress' failure to provide remedies other than habeas corpus was a deliberate one." Accordingly, "actions seeking other sorts of relief for tribal deprivations of rights must be resolved through tribal forums."
>
> Absent a private right of action to enforce the ICRA in federal court for the relief sought, there can be no jurisdiction under 28 U.S.C. § 1331. Therefore, the district court did not err in dismissing the ICRA claims.[132]

The conclusion reached by the Eighth Circuit in this portion of *Cross* was not haphazard. Indeed, the rest of the *Cross* opinion reveals a court very intently focused on the jurisdiction-vs.-merits question and very sensitive of the potential to conflate one with the other.[133]

---

[131] 23 F.4th 797 (8th Cir. 2022).

[132] *Id.* at 802–03 (internal citations omitted). It is worth noting that the Eighth Circuit's jurisdictional holding on the ICRA claim in *Cross* was on an entirely "separate ground" than that of the district court. *Id.* at 802. The district court dismissed for failure to exhaust tribal remedies and acknowledged that the exhaustion requirement in that case was a "matter of comity, not a jurisdictional prerequisite." *Cross v. Fox*, 497 F. Supp. 3d 432, 436 (D.N.D. 2020) (quoting *Stanko v. Oglala Sioux Tribe*, 916 F.3d 694, 699 (8th Cir. 2019)).

[133] In a previous portion of the *Cross* opinion, the Eighth Circuit addressed a § 2 Voting Rights Act claim—specifically the argument that § 2 did not proscribe the activities of Indian tribes. 23 F.4th at 801. The *Cross* Court explained that, because § 2's language prohibits acts by "States and political subdivision[s]," and because Indian tribes are not "States [or] political subdivision[s]," § 2 does not apply to Indian tribes. *Id.* The *Cross* Court further explained that, unlike the ICRA issue, this issue was not jurisdictional:

> Although we agree that the VRA does not regulate Indian tribes, the parties improperly treated this provision as jurisdictional. "Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits-related determination." The proper course is to

Before *Cross,* there was a fair level of confusion in the Eighth Circuit caselaw as to whether the existence of a private right of action implicated subject-matter jurisdiction.[134]  *Cross* seems to answer the question—at least on this Court's reading of it.  Defendants share this Court's reading of *Cross*, and Plaintiffs do not really contest this reading.[135]  Instead, Plaintiffs argue that (1) *Cross* is inconsistent with two other recent Eighth Circuit cases, and (2) *Cross* is inconsistent with Supreme Court precedent.[136]

With respect to their first argument, Plaintiffs point to *United States v. Harcevic*[137] and *Principal Securities, Inc. v. Agarwal*.[138]  *Harcevic* was decided in 2021, and *Agarwal* was decided seventeen days after *Cross*.  But neither of these cases touch on the presence (or absence) of a private right of action.  Instead, both are concerned with what *Cross* would easily consider to be merits issues.

*Harcevic* involved a federal prosecution for providing material support to terrorists.  That case reiterated the longstanding rule that a defect in a criminal indictment "affect[s] the merits of a case," but does not implicate a federal court's "jurisdiction to adjudicate the criminal case."[139]  The Eighth Circuit held that the "district court had jurisdiction to adjudicate whether the indictment

---

determine whether the VRA's limitation on coverage to states and political subdivisions "is jurisdictional or simply an element of a plaintiff's claim for relief."

*Id.* (internal citations omitted).

[134] *Compare Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 736 n.3 (8th Cir. 2005) ("Because the Housing Authority did not raise the issue, and because the question of whether a statute creates a private right of action is not a question of subject matter jurisdiction, we need not determine whether such a right exists."), *with Anthony v. Cattle Nat'l Bank & Tr. Co.*, 684 F.3d 738, 739 (8th Cir. 2012) (affirming district court's ruling that "federal-question jurisdiction did not exist" because there was no "private right of action").

[135] Prelim. Inj. Hr'g Tr., Vol. V (Doc. 94) at 1152:23–1154:22.

[136] *Id.*

[137] 999 F.3d 1172 (8th Cir. 2021).

[138] No. 20-3312, 2022 WL 273267 (8th Cir. 2022).

[139] 999 F.3d at 1179.

charged Harcevic with conduct that violated [the statute]."[140]   *Harcevic* is about whether a claim

had been established, not whether the United States had the legal authority to bring any such claim

in the first place.

Likewise, *Agarwal* was not a private-right-of-action case.   In *Agarwal,* a company sued

Mr. and Mrs. Agarwal to enjoin an arbitration proceeding that the Agarwals had filed with the

Financial Industry Regulatory Authority.[141]   The district court issued the injunction, and the

Agarwals appealed.[142]   The Eighth Circuit noted that the Federal Arbitration Act "does not permit

a court to enjoin arbitration based on an issue's nonarbitrability."[143]   However, the *Agarwal* Court

ignored the problem because the Agarwals did not raise it: "The Agarwals have not raised an issue

regarding the district court's authority to enter an injunction enjoining arbitration.   Because the

issue is not jurisdictional or in the nature of a jurisdictional bar, the Agarwals have waived the

cause-of-action issue and we decline to address it."[144]   The Eighth Circuit was not discussing

whether the plaintiff-company had the legal authority to bring an action under the Federal

Arbitration Act, which would be a private-right-of-action question.   Instead, the *Agarwal* Court

was discussing whether the Federal Arbitration Act contains a prohibition on "wrongful

arbitration."[145]   That's a merits issue that does not implicate or call into question *Cross*'s holding.

With respect to Plaintiffs' second argument—that *Cross* is inconsistent with Supreme

Court precedent—the short answer is that the Eighth Circuit's decision in *Cross* comes long after

---

[140] *Id.*

[141] 2022 WL 273267, at *1.

[142] *Id.*

[143] *Id.* at *3.

[144] *Id.* (citing *Steel Co.*, 523 U.S. at 89).

[145] *Id.*

the Supreme Court precedent that Plaintiffs identify.  We are not in a situation where the Eighth Circuit has issued a ruling and then a later Supreme Court case overrules or otherwise clearly vitiates the Eighth Circuit's decision.  Because *Cross* comes (significantly) after the Supreme Court precedents at issue, this Court has no choice but to follow *Cross*.  This Court cannot assume that the Eighth Circuit missed, ignored, or acted contrary to the Supreme Court cases identified by Plaintiffs.  Rather, this Court must assume the Eighth Circuit believes *Cross* is a faithful understanding and application of Supreme Court precedent.  Said another way, whether Plaintiffs are correct that *Cross* contravenes *Verizon* and *Steel Co.* is a question that only the Eighth Circuit or the Supreme Court can address.  Until one or both of them does so, this Court is bound by *Cross*.

This is especially true because *Cross* does not appear to be some kind of one-off outlier.[146] There are published cases in the First, Fifth, Sixth, Seventh, and Ninth Circuits containing language that suggests that the existence (or non-existence) of a private right of action is a jurisdictional inquiry because the absence of a private right of action is fatal to subject-matter jurisdiction.[147]  Unpublished cases in the Third and Eleventh Circuits appear to say the same

---

[146] The *Cross* Court cites previous Eighth Circuit cases as holding that the private-right-of-action question is jurisdictional.  23 F.4th at 800.

[147] *See E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 961 (7th Cir. 2021) ("A federal right of action is a separate requirement, and § 1331 does not *itself* provide a right of action."); *Buntin v. City of Boston*, 857 F.3d 69, 72 (1st Cir. 2017) ("[T]he federal courts lack subject-matter jurisdiction if [the statute] does not provide [plaintiff] with a private right of action for damages."); *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 767 F.3d 554, 566 (6th Cir. 2014) ("Because the absence of a private right of action means the district court lacked subject-matter jurisdiction . . . ."); *Int'l Union of Operating Eng'rs, Loc. 150 v. Ward*, 563 F.3d 276, 281 (7th Cir. 2009) ("Thus, when the basis of the action is a federal statute, a federal cause of action must exist for a federal court to hear a given claim; the general grant of federal question jurisdiction contained in § 1331, without a federal cause of action, is not enough."); *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1229 (9th Cir. 2008) ("If, however, [the statute] does not contain a private right of action, the district court properly dismissed the [statutory] claim for lack of subject matter jurisdiction."); *Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006) ("We hold there is no private cause of action under HIPAA and therefore no federal subject matter jurisdiction over Acara's asserted claims.").

thing.[148]  So do cases from federal district courts in the Fourth, Tenth, and D.C. Circuits.[149]  It's difficult to believe that all these circuit and district courts would be openly flouting, or unaware of, Supreme Court precedent.[150]

Perhaps the Eighth Circuit (and other circuits) are trying to distinguish between elements of a claim on the one hand and a plaintiff's legal authority to bring suit on the other.  For an example related to the case at bar, consider the following two questions: (1) does a private party have the ability to bring suit under § 2 of the Voting Rights Act *at all*; and (2) would the private party be able to successfully establish a violation of § 2.  Might it be that the "firmly established" rule from *Steel Co.*—that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction"—is only concerned with the second question, and does not address whether the first question is jurisdictional?  There's certainly a fair way to derive this

---

[148] *See Nelson v. Bank of Am., N.A.*, 446 F. App'x 158, 159 (11th Cir. 2011) (affirming district court's "holding that there was no private right of action under [the statute] and that, as a result, it lacked subject matter jurisdiction."); *Gallenthin Realty Dev., Inc. v. BP Prods. of N. Am.*, 163 F. App'x 146, 151 (3d Cir. 2006) ("Because no private right of action—express or implied—is provided by [the statute], the District Court properly concluded that [the statute] cannot serve as a basis for the exercise of federal court jurisdiction.").

[149] *See Volvo Group N. Am., LLC v. Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am.*, 451 F. Supp. 3d 570, 576 (W.D. Va. 2020) ("Because . . . [the statute] does not create a private right of action, the court lacks subject matter jurisdiction over Volvo's claim."); *Elec. Priv. Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 36–38 (D.D.C. 2019) (dismissing "for lack of subject matter jurisdiction" because the statute provided "no private right of action"); *Hampton Univ. v. Accreditation Council for Pharmacy Educ.*, No. 4:20-cv-118, 2021 WL 3566867, at *2 (E.D. Va. Aug. 12, 2021) ("A claim can be dismissed for lack of subject-matter jurisdiction when the federal law invoked by a private plaintiff does not include a private right of action."); *Express Dev., Inc. v. Okla. Hous. Fin. Agency*, No. CIV-14-280-C, 2014 WL 12843857, at *2 (W.D. Okla. May 19, 2014) ("Consequently, there is no private right of action under [the statute] and the Court lacks subject matter jurisdiction to consider Plaintiffs' claims.").

[150] A rule that private rights of action are jurisdictional seems more in line with the Supreme Court's emphasis on the separation-of-powers principles that underlie both the private-right-of-action analysis and the federal courts' obligation to assure themselves of their subject-matter jurisdiction. *See, e.g.*, *Patchak*, 138 S. Ct. at 907 ("Congress' power over federal jurisdiction is 'an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.'") (quoting *Steel Co.*, 523 U.S. at 101); *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018) (noting the "separation-of-powers concerns that counsel against courts creating private rights of action"); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) ("[T]his Court has recently and repeatedly stated that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.").  Congress holds the power to decide what cases the federal courts hear. *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007).  Congress' ability to decide exactly who gets to bring suit is a substantial aspect of that power. *Stoneridge*, 552 U.S. at 165.

distinction from *Steel Co.*[151]   The problem is that later Supreme Court cases (such as *Owasso Independent School District No. I-011 v. Falvo*[152] and *Verizon*[153]) apply the *Steel Co.* rule to private-right-of-action questions.[154]   At any rate, the tension in the caselaw is something that is going to have to be resolved by the Eighth Circuit or the Supreme Court.[155]   For now, this Court is duty-bound to follow the Eighth Circuit's recent holding in *Cross.*

In the present case, Plaintiffs base the Court's subject-matter jurisdiction on several statutes: 28 U.S.C. § 1331,[156] 28 U.S.C. § 1343(a)(3)–(4),[157] 28 U.S.C. § 1357,[158] 28 U.S.C. §

---

[151] In *Steel Co.*, there was no dispute that a private right of action existed. 523 U.S. at 87 (discussing the statute's "citizen-suit provision" that authorized "any person [to] commence a civil action"); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68 (2007) ("[W]e concluded in [*Steel Co.*] that establishing the elements of an offense was not made a jurisdictional matter merely because the statute creating the cause of action was phrased as providing for 'jurisdiction' over such suit.").

[152] 534 U.S. 426 (2002).

[153] 535 U.S. 635 (2002).

[154] The Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.* is different. 572 U.S. 118 (2014). In that case, the Supreme Court acknowledged that the statutory provision at issue was privately enforceable and analyzed whether a particular private plaintiff was among the class of private plaintiffs to which the private right of action extended. *Id.* at 128–29. *Lexmark* boiled down to a question of whether the plaintiff's asserted injury was "within the zone of interests protected by the statute," and whether that injury was "proximately caused by" the defendant's statutory violation. *Id.* at 137. *Lexmark*'s treatment of this issue as a merits question does not suggest that the question of whether a statute is privately enforceable at all is a merits question.

[155] In some sense, Justice Gorsuch's concurrence in *Brnovich* helps illustrate the lack of clarity on this topic. Justice Gorsuch cites *Mata v. Lynch*, 576 U.S. 143 (2015) (which in turn cites *Steel Co.*) for the proposition that private-right-of-action questions are not jurisdictional. *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring). But neither *Mata* nor *Steel Co.* were private-right-of-action cases. Instead, just like *Steel Co.*, the issue in *Mata* went to whether the plaintiff *could succeed* on the merits of the underlying claim. *Mata*, 576 U.S. at 149–50 (noting a court "retains jurisdiction even if [a plaintiff's] appeal *lacks merit*") (emphasis added). Whether the plaintiff was statutorily authorized to bring that claim at all was not in dispute in *Mata. Id.*

[156] 28 U.S.C. § 1331 provides subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

[157] 28 U.S.C. § 1343(a)(3)–(4) provide subject-matter jurisdiction over "any civil action *authorized by law to be commenced by any person* to redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; [or to] recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." (emphasis added).

[158] 28 U.S.C. § 1357 provides subject-matter jurisdiction over "any civil action commenced by any person . . . to enforce the right of citizens of the United States to vote in any State."

2201(a),[159] and 52 U.S.C. § 10308(f).[160]  But, of course, jurisdictional statutes do not create private rights of action.[161]  Each of these statutes only confer jurisdiction on the Court if the Voting Rights Act provides a private right of action to enforce § 2.  Because the Court has concluded above that the Voting Rights Act does not provide such a private right of action, these jurisdictional statutes do not confer jurisdiction on the Court.  This is not a problem that Defendants can waive.[162]  Therefore, the Court is without jurisdiction to hear and decide this matter, unless and until the Attorney General of the United States joins the case. [163]

## CONCLUSION

Earlier in this Order, the Court wrote of the genius of our Constitution.  The Court would be remiss not to point out that the Constitution was and is an imperfect document, as any document

---

[159] 28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal obligations of any interested party seeking such declaration, whether or not further relief is or could be sought."

[160] 52 U.S.C. § 10308(f) provides subject-matter jurisdiction over "proceedings instituted pursuant to [§12 of the Voting Rights Act]."

[161] *Touche Ross & Co.*, 442 U.S. at 577 ("The source of plaintiffs' rights must be found, if at all, in the substantive provisions of the [statute] which they seek to enforce, not in the jurisdictional provision."); *see also Ohlendorf v. United Food & Com. Workers Int'l Union*, 883 F.3d 636, 642 (6th Cir. 2018) (citing *Touche Ross & Co.*, 442 U.S. at 577).

[162] Given the fairly unique procedural posture of this case, the waiver discussion may well be an academic exercise. Here's why.  Upon agreement of the parties, the Court extended the deadline for an answer or a motion to dismiss to fourteen days after the Court resolved the Motion for a Preliminary Injunction. *See* Order Granting Unopposed Motion to Extend Responsive Pleading Deadline (Doc. 47).  So, Defendants have not yet filed an answer or a motion to dismiss.  Accordingly, if the private-right-of-action question is really a merits question, Defendants would have waived the argument only for purposes of the Motion for a Preliminary Injunction.  They remain free to raise the issue in their answer or a motion to dismiss.  And it seems like they will do so, considering that they extensively briefed the issue in their Surreply in Opposition to Plaintiffs' Motion for a Preliminary Injunction, and argued the issue during the preliminary injunction hearing.  Moreover, given the Court's ruling today, not raising the private-right-of-action issue in an eventual answer or motion to dismiss would be close to malpractice.

[163] Defendants agree that, under *Cross*, the private-right-of-action question is jurisdictional.  Defs.' Surreply in Opp'n to Pls.' Mot. for Prelim. Inj. (Doc. 77) at 5–6.  Defendants also agree that no private right of action exists. *Id.* at 7–12.  However, Defendants nevertheless ask this Court to reach the merits of the Motion for a Preliminary Injunction. *Id.* at 6.  After reviewing the applicable caselaw, the Court does not believe it can reach the merits of the Motion after determining it does not have jurisdiction to hear the case. *See Pub. Sch. Sys. of Mo. v. State Street Bank & Trust Co.*, 640 F.3d 821, 825 (8th Cir. 2011); *Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, 551 F.3d 812, 816 (8th Cir 2009).

created by people is likely to be.  Everyone knows the Constitution had many defects—ranging from minor to serious—that required attention from later generations of Americans.[164]  In addition to its defects, the Constitution had one vile sin: The acceptance and prolonging of the subjugation and enslavement of nearly an entire race of Americans.  This depravity led to a Civil War, but that War and the Amendments that followed have yet to fully root out the vestiges of our country's original sin.  The Court is keenly aware that the Voting Rights Act has been and continues to be an important instrument for ensuring racial equality in voting, which in turn helps to advance racial equality in society.  And the Court is keenly aware that many people are concerned about whether the Voting Rights Act will remain a strong tool for equality in the future.  It is to them the Court wishes to convey the following.

First, as explained elsewhere in today's Order, nothing in this Order forecloses enforcement of § 2 of the Voting Rights Act.  Today's Order simply means that the Attorney General of the United States must be the plaintiff in such an enforcement action.  It is true that the Statement of Interest filed by the Department of Justice in this case says that there "are limited federal resources available for Voting Rights Act enforcement . . . ."[165]  But this has the recognizable scent of a litigating position that doesn't necessarily line up with reality.  Indeed, in June of 2021, the Attorney General of the United States made clear that the Department of Justice intends to prioritize enforcement of the Voting Rights Act:

> To meet the challenge of the current moment, we must rededicate the resources of the Department of Justice to a critical part of its original mission: enforcing federal law to protect the franchise for all voters.

_____

[164] *See, e.g*, U.S. Const. am. XII (fixing the manner in which the President and Vice-President were elected so as to avoid those officials being from two different parties); U.S. Const. am. XXII (limiting the President to essentially two terms); U.S. Const. am. XIX (providing women the right to vote).

[165] United States' Statement of Interest (Doc. 71) at 8.

In 1961, Attorney General Robert Kennedy called into his office the newly appointed Assistant Attorney General for Civil Rights, Burke Marshall; and Marshall's now First Assistant, John Doar.  At that time, before the 1965 Act with its preclearance provision was enacted, the only way to guarantee the right of Black Americans to vote was to bring individual actions in each county and parish that discriminated against them.

Kennedy told his assistants that was what he wanted to do.  "Well General," Burke Marshall replied, "if you want that, we've got to have a lot more lawyers."

Well, today we are again without a preclearance provision.  So again, the Civil Rights Division is going to need more lawyers.  Accordingly, today I am announcing that—within the next thirty days—we will double the division's enforcement staff for protecting the right to vote.

We will use all existing provisions of the Voting Rights Act, the National Voter Registration Act, the Help America Vote Act, and the Uniformed and Overseas Citizens Absentee Voting Act to ensure that we protect every qualified American seeking to participate in our democracy.

We are scrutinizing new laws that seek to curb voter access, and where we see violations, we will not hesitate to act.

We are also scrutinizing current laws and practices in order to determine whether they discriminate against Black voters and other voters of color.[166]

Protecting the civil and political rights of Black Americans has been a primary mission of the Department of Justice since its inception.[167]  In the Voting Rights Act itself, Congress "authorized to be appropriated such sums as are necessary to carry out the provisions of [the Voting Rights Act]."[168]  The Court is confident that the Attorney General of the United States has the resources to litigate this Voting Rights Act case.

---

[166] Merrick B. Garland, Att'y Gen. of the United States, Policy Address Regarding Voting Rights (June 11, 2021), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivered-policy-address-regarding-voting-rights.  The Court takes judicial notice of the fact that this speech appears on the Department of Justice's website. *See* Fed. R. Evid. 201.

[167] Garland, *supra* note 166 (noting that "only a few weeks after [ratification of the Fifteenth Amendment], Congress created the Department of Justice, and President Grant charged it with enforcing the [Ku Klux Klan] Act and protecting the rights promised by the Fourteenth and Fifteenth Amendments").

[168] 52 U.S.C. § 10312.

Second, the private-right-of-action question is an important one.  This Court will not be the last word on it.  And this Court is thankful for that.  Judges should not be allergic to acknowledging that any one of our legal conclusions might be wrong.  Judges are just humans in robes.  We try to have as high a batting average as possible, but no one can get it right all of the time.  All a judge can do is try his or her best to fairly, honestly, and faithfully interpret and apply the statute at issue and the relevant caselaw.  If the strength of Plaintiffs' private-right-of-action arguments is really as overwhelming as they suggest it is, then the Eighth Circuit or the Supreme Court will overrule today's decision.[169]  And even if the Eighth Circuit or Supreme Court affirm today's ruling that a private right of action cannot be implied to enforce § 2 of the Voting Rights Act, Congress has the power to enact an express private right of action in the Voting Rights Act if it so chooses.

Finally, it is important to note that today's decision has nothing to do with lawsuits to enforce the protections of the Fourteenth and Fifteenth Amendments.  Voters can still bring suits to prevent violations of their constitutional rights, including the right to vote and the right to equal protection under the law.  But only the Attorney General of the United States may bring suit to enforce § 2 of the Voting Rights Act.  The Court will hold the Judgment of Dismissal in this case for five calendar days to allow the Attorney General of the United States time to decide whether to join this case as a plaintiff and press on with this litigation.

---

[169] It is true, of course, that appeals take time.  But here, where the Supreme Court has essentially made clear in *Merrill* that a district court should not order a new redistricting map and alter election-related deadlines at this point in the election cycle, this Court would almost certainly not have been able to require a new map be used in the 2022 election anyway.  Whether or not this Court agrees with the Supreme Court's decision in *Merrill*, this Court would have had to faithfully apply its reasoning.

IT IS SO ORDERED this 17th day of February 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE