**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| COAKLEY PENDERGRASS; TRIANA ARNOLD JAMES; ELLIOTT HENNINGTON; ROBERT RICHARDS; JENS RUECKERT; and OJUAN GLAZE, <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; JANICE JOHNSTON, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board, <br><br> Defendants.* | CIVIL ACTION FILE NO. 1:21-CV-05339-SCJ |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

* Pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs have automatically substituted Janice Johnston, in her official capacity, for Anh Le, in her official capacity, based on recent changes to the composition of the State Election Board.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PROPOSED FINDINGS OF FACT .......................................................................... 3

    I.      Plaintiffs ......................................................................................... 3

    II.     Defendants ...................................................................................... 4

    III.    Likelihood of Success on the Merits ............................................. 5

        A.     First Gingles Precondition: Numerosity and Compactness ............ 5

              1.     Numerosity ............................................................................ 6

                    a.     Demographic Developments .................................... 7

                    b.     2021 Congressional Plan ......................................... 11

                    c.     Illustrative Congressional Plan ............................... 12

              2.     Geographic Compactness ..................................................... 16

                      a.     Population Equality .................................................. 17

                      b.     Contiguity ................................................................. 17

                      c.     Compactness ............................................................. 17

                      d.     Preservation of Political Subdivisions ..................... 21

                      e.     Preservation of Communities of Interest ................. 23

                      f.     Core Retention ......................................................... 28

                      g.     Racial Considerations .............................................. 30

        B.     Second Gingles Precondition: Political Cohesion ........................... 34

        C.     Third Gingles Precondition: Bloc Voting ........................................ 36

D.    Totality of Circumstances ................................................................ 39

    1.    Senate Factor One: History of Voting-Related Discrimination ........................................................................... 39

        a.    Political violence against Black Georgians ............... 40

        b.    Pre-Voting Rights Act ................................................ 41

        c.    Post-Voting Rights Act .............................................. 43

        d.    Redistricting-Related Discrimination ....................... 46

    2.    Senate Factor Two: Racially Polarized Voting .................... 48

    3.    Senate Factor Three: Discriminatory Voting Procedures .... 51

    4.    Senate Factor Four: Candidate Slating ................................ 52

    5.    Senate Factor Five: Contemporary Socioeconomic Disparities ................................................................................. 53

    6.    Senate Factor Six: Racial Appeals in Georgia Campaigns ... 56

    7.    Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office .................................................... 59

    8.    Senate Factor Eight: Official Nonresponsiveness ............... 60

    9.    Senate Factor Nine: Absence of Justification for SB 2EX ..... 62

    10.    Proportionality ...................................................................... 62

IV.    Irreparable Harm ...................................................................................... 63

V.    Balance of Harms ...................................................................................... 65

A.    Harm to Defendants ......................................................................... 65

    1.    The 2022 Election Calendar ................................................. 65

2. The Voter Reallocation Process ............................................. 65

3. Implementation of New Maps ............................................. 67

4. Primary Delay ..................................................................... 71

B. Harm to Voters and Candidates..................................................... 74

1. Voters ................................................................................. 74

2. Candidates ......................................................................... 75

VI. Public Interest ............................................................................ 77

PROPOSED CONCLUSIONS OF LAW ........................................................... 82

I. Plaintiffs are substantially likely to succeed on the merits of their Section 2
claim. ............................................................................................. 82

A. Plaintiffs have satisfied the first Gingles precondition because an
additional, compact majority-Black congressional district can be
drawn in the western Atlanta metropolitan area............................. 85

1. The Black population in the western Atlanta metropolitan
area is sufficiently numerous to form an additional majority-
Black congressional district. ................................................. 87

2. The Black population in the western Atlanta metropolitan
area is sufficiently compact to form an additional majority-
Black congressional district. ................................................. 88

B. Plaintiffs have satisfied the second Gingles precondition because
Black Georgians are politically cohesive. ........................................ 96

C. Plaintiffs have satisfied the third Gingles precondition because white
Georgians engage in bloc voting to defeat Black-preferred
candidates. .................................................................................... 98

D. The totality of circumstances demonstrates that SB 2EX denies Black
Georgians equal opportunity to elect their preferred candidates to
Congress........................................................................................ 100

iv

1.      Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination. ............................................... 103

2.      Senate Factor Two: Georgia voters are racially polarized. 105

3.      Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination. .......................................... 109

4.      Senate Factor Four: Georgia has no history of candidate slating for congressional elections. ..................................... 110

5.      Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process. ................................ 110

6.      Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns. ....................... 112

7.      Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts. ................................................... 112

8.      Senate Factor Eight: Georgia is not responsive to its Black residents. ............................................................................ 113

9.      Senate Factor Nine: The justification for SB 2EX is tenuous. ........................................................................... 113

10.     Proportionality does not weigh against Plaintiffs' claim ... 114

E.      Defendants' additional legal arguments lack merit. ..................... 116

1.      Section 2 confers a private right of action. ......................... 116

2.      This case is properly before a single-judge district court. . 116

II.     Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction. ............................................................................ 116

III.    The balance of equities and the public interest favor injunctive relief. ... 117

IV.   Any remedial plan must contain an additional congressional district in which Black voters have a demonstrable opportunity to elect their candidates of choice. ...............................................................119

PROPOSED ORDER GRANTING INJUNCTIVE RELIEF ............................................119

## INTRODUCTION

Pursuant to the Court's coordinated order of February 14, 2022, see Doc. No. 72, Plaintiffs respectfully submit the following proposed findings of fact, conclusions of law, and proposed order granting preliminary injunctive relief.

This case presents a straightforward application of Section 2 of the Voting Rights Act of 1965. Plaintiffs have demonstrated that the Black population in the western Atlanta metropolitan area is sufficiently large and compact to form an additional majority-Black congressional district. They have further shown that Georgia's pronounced racially polarized voting prevents Black voters in majority-white congressional districts from electing their candidates of choice. The totality of circumstances makes clear that the Georgia Congressional Redistricting Act of 2021 ("SB 2EX") denies Black voters an equal opportunity to participate in the state's political processes and elect their preferred candidates to the U.S. House of Representatives. To prevent the irreparable harm of vote dilution for Plaintiffs and all Black Georgians, this Court can and should remedy this violation of federal law and provide preliminary injunctive relief in advance of the 2022 midterm elections.

In response, Defendants have attempted to confound the proceedings by manufacturing additional hurdles that they claim Plaintiffs must clear to secure relief—for example, drawing an illustrative plan without consideration of race, or

1

proving that racially polarized voting is the result of race and not partisanship. But the Eleventh Circuit has clearly disclaimed such requirements. Make no mistake: Plaintiffs have proven the merits of their Section 2 claim under the law as it exists today, even if that is not the law that Defendants would prefer.

There is ample time in advance of the May 24 primary election for either the Georgia General Assembly or this Court to implement a remedial congressional plan that complies with the Voting Rights Act—and if the Court deems otherwise, it may reschedule the primary election, consistent with Georgia's previous election calendar, to afford sufficient time for a remedy. The State should not be allowed to evade judicial review of SB 2EX, especially where Governor Brian Kemp delayed final enactment—refusing to take any action on the map for over a month—in an attempt to forestall timely relief. Simply put, diluting the voting strength of Georgia's Black voters would impose significantly greater irreparable harm than requiring the implementation of a lawful congressional plan— whatever administrative inconvenience might result. For these reasons and those that follow, the Court should grant Plaintiffs' motion for preliminary injunction.

## PROPOSED FINDINGS OF FACT

### I.    Plaintiffs

1.    Plaintiff Coakley Pendergrass is a Black resident of Cobb County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX13 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 1–2.[1] Under the enacted congressional plan, the Rev. Pendergrass resides in Congressional District 11. PX13 ¶ 4; Doc. No. 63 ¶ 3.

2.    Plaintiff Triana Arnold James is a Black resident of Douglas County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX14 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 4–5. Under the enacted congressional plan, Ms. James resides in Congressional District 3. PX14 ¶ 4; Doc. No. 63 ¶ 6.

3.    Plaintiff Elliott Hennington is a Black resident of Cobb County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX15 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 7–8. Under the enacted congressional plan, Mr. Hennington resides in Congressional District 14. PX15 ¶ 4; Doc. No. 63 ¶ 9.

---

[1] Citations to Plaintiffs' preliminary injunction hearing exhibits are designated as "PX." Citations to Defendants' preliminary injunction hearing exhibits are designated as "DX." Citations to preliminary injunction hearing exhibits filed by the plaintiffs in Alpha Phi Alpha Fraternity Inc. v. Raffensperger, No. 1:21-CV-05337-SCJ (N.D. Ga.), are designated as "AX."

4.      Plaintiff Robert Richards is a Black resident of Cobb County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX16 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 10–11. Under the enacted congressional plan, Mr. Richards resides in Congressional District 14. PX16 ¶ 4; Doc. No. 63 ¶ 12.

5.      Plaintiff Jens Rueckert is a Black resident of Cobb County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX17 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 13–14. Under the enacted congressional plan, Mr. Rueckert resides in Congressional District 14. PX17 ¶ 4; Doc. No. 63 ¶ 15.

6.      Plaintiff Ojuan Glaze is a Black resident of Douglas County, Georgia, who is registered to vote and intends to vote in future congressional elections. PX18 ¶¶ 2, 4–5; Doc. No. 63 ¶¶ 16–17. Under the enacted congressional plan, Mr. Glaze resides in Congressional District 13. PX18 ¶ 4; Doc. No. 63 ¶ 18.

## II.   Defendants

7.      Defendant Brad Raffensperger is the Georgia Secretary of State and is named in his official capacity. Doc. No. 63 ¶ 19.

8.      Defendant Sara Tindall Ghazal is a member of the State Election Board and is named in her official capacity. Doc. No. 63 ¶ 20.

9.      Defendant Janice Johnston is a member of the State Election Board and is named in her official capacity. Doc. No. 63 ¶ 21.

10.     Defendant Edward Lindsey is a member of the State Election Board and is named in his official capacity. Doc. No. 63 ¶ 22.

11.     Defendant Matthew Mashburn is a member of the State Election Board and is named in his official capacity. Doc. No. 63 ¶ 23.

### III.    Likelihood of Success on the Merits

12.     Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim.

#### A.     First <u>Gingles</u> Precondition: Numerosity and Compactness

13.     Plaintiffs' mapping and demographics expert, Mr. William S. Cooper, demonstrated that the Black population in the western Atlanta metropolitan area is sufficiently large and geographically compact to form a majority of the voting-age population in an additional congressional district.

14.     The Court has accepted Mr. Cooper in this case as qualified to testify as an expert in redistricting and census data. Feb. 7, 2022, Morning Tr. 38:16–39:2. The Court finds Mr. Cooper credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Mr. Cooper's testimony and conclusions.

15.     Mr. Cooper's illustrative congressional plan contains an additional majority-Black congressional district comprised of portions of Cobb, Douglas, Fulton, and Fayette Counties in the western Atlanta metropolitan area. The plan

complies with the traditional districting principles adopted by the Georgia General Assembly to guide its redistricting efforts during 2021. See PX 40.

16.     Mr. John B. Morgan, one of Defendants' two mapping experts, does not meaningfully dispute that Mr. Cooper's illustrative plan adheres to traditional districting principles. Instead, he merely confirms the accuracy of Mr. Cooper's reported data and statistics as to preservation of political subdivisions and compactness without ever suggesting that Mr. Cooper's illustrative plan fails to comply with these (or any other) criteria. See DX3.

17.     Ms. Gina Wright, Defendants' other mapping expert, offers only conclusory criticisms of Mr. Cooper's illustrative map that assign purportedly improper motivations to race-neutral mapping decisions. See DX41. Ms. Wright has not demonstrated that Mr. Cooper's illustrative map fails to comply with traditional districting principles.

18.     In sum, the Court credits the analysis and conclusions of Mr. Cooper and concludes that his findings demonstrate that Plaintiffs have satisfied the factual predicates of the first Gingles precondition.

### 1.     Numerosity

19.     The Court concludes that Mr. Cooper has established that the Black population in Georgia is sufficiently numerous to comprise a majority of the

voting-age population in an additional congressional district located in the western Atlanta metropolitan area.

### a.    Demographic Developments

20.    The U.S. Census Bureau releases data to the states after each census for use in redistricting. This data includes population and demographic information for each census block. Doc. No. 63 ¶ 24.

21.    The Census Bureau provided initial redistricting data to Georgia on August 12, 2021. Doc. No. 63 ¶ 25.

22.    From 2010 to 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.6 percent from 2010. Doc. No. 63 ¶ 26; PX1 ¶ 13.

23.    As a result of this population growth, the state retained 14 seats in the U.S. House of Representatives. Doc. No. 63 ¶ 27.

24.    Georgia's population growth since 2010 can be attributed entirely to gains in the overall minority population. PX1 ¶ 14 & fig. 1.

25.    From 2010 to 2020, Georgia's Black population increased by almost half a million people, up almost 16 percent since 2010. Doc. No. 63 ¶ 28; PX1 ¶ 15.

26.    Between 2010 and 2020, 47.26 percent of the state's population gain was attributable to Black population growth. Doc. No. 63 ¶ 29; PX1 ¶ 14 & fig. 1.

27.   Georgia's Black population, as a share of the overall statewide population, increased between 2010 and 2020, from 31.53 percent in 2010 to 33.03 percent in 2020. PX1 ¶ 16.

28.   As a matter of total population, any-part ("AP") Black Georgians comprise the largest minority population in the state (at 33.03 percent). Doc. No. 63 ¶ 32.

29.   From 2010 to 2020, Georgia's white population decreased by 51,764, or approximately 1 percent. Doc. No. 63 ¶ 30; PX1 ¶ 15.

30.   Based on the 2020 census, non-Hispanic white Georgians now comprise a razor-thin majority of the state's population (50.06 percent). PX1 ¶ 17.

31.   Georgia's Black population has increased in absolute and percentage terms since 1990, from about 27 percent in 1990 to 33 percent in 2020. Over the same time period, the percentage of the population identifying as non-Hispanic white has dropped from 70 percent to 50 percent. Doc. No. 63 ¶ 31; PX1 ¶ 21 & fig. 3.

32.   Since 1990, the Black population has more than doubled: from 1.75 million to 3.54 million, an increase that is the equivalent of the populations of more than two congressional districts. The non-Hispanic white population has also

increased, but at a much slower rate: from 4.54 million to 5.36 million, amounting to an increase of only about 18 percent over the three-decade period. PX1 ¶ 22.

33.    Georgia has a total voting-age population of 8,220,274, of whom 2,607,986 (31.73 percent) are AP Black. Doc. No. 63 ¶ 33; PX1 ¶ 18 & fig. 2.

34.    The total estimated citizen voting-age population in Georgia in 2019 was 33.8 percent AP Black. Doc. No. 63 ¶ 34; PX1 ¶ 20.

35.    The Atlanta Metropolitan Statistical Area ("MSA") consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Doc. No. 63 ¶ 35; PX1 ¶ 12 n.3.

36.    The Atlanta MSA has been the key driver of population growth in Georgia during this century, led in no small measure by a large increase in the region's Black population. PX1 ¶ 24 & fig. 4.

37.    The population gain in the Atlanta MSA between 2010 and 2020 amounted to 803,087 persons—greater than the population of one of the state's congressional districts—with about half of the gain coming from an increase in the Black population, which increased by 409,927 (or 23.07 percent). PX1 ¶ 29 & fig. 5.

38.     Under the 2000 Census, the population in the 29-county Atlanta MSA was 29.29 percent AP Black, increasing to 33.61 percent in 2010, and increasing further to 35.91 percent in 2020. Since 2000, the Black population in the Atlanta MSA has grown from 1,248,809 to 2,186,815 in 2020—938,006 persons—accounting for 75.1 percent of the statewide Black population increase and 51.4 of the Atlanta MSA's total population increase. Doc. No. 63 ¶ 36; PX1 ¶ 24 & fig. 4, ¶ 60.

39.     Under the 2000 Census, the population in the 29-county Atlanta MSA was 60.42 percent non-Hispanic white, decreasing to 50.78 percent in 2010, and decreasing further to 43.71 percent in 2020. PX1 ¶ 24 &fig. 4.

40.     Between 2010 and 2020, the non-Hispanic white population in the Atlanta MSA decreased by 22,736 persons. Doc. No. 63 ¶ 37; PX1 ¶ 24 & fig. 4.

41.     According to the 2020 Census, the Atlanta MSA has a total voting-age population of 4,654,322 persons, of whom 1,622,469 (34.86 percent) are AP Black. The non-Hispanic white voting-age population is 4,342,333 (52.1 percent). PX1 ¶ 30 & fig. 6.

42.     The 11 core counties of the Atlanta Regional Commission ("ARC") service area are Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Henry, and Rockdale. Feb. 7, 2022, Morning Tr. 96:3–10.

10

43.     According to the 2020 Census, the 11 ARC counties account for more than half (54.7 percent) of the statewide Black population. After expanding the region to include the 29 counties in the Atlanta MSA (including the 11 ARC counties), the Atlanta metropolitan area encompasses 61.81 percent of the state's Black population. PX1 ¶ 27.

44.     Based on the 2020 Census, the combined Black population in Cobb, Fulton, Douglas, and Fayette Counties is 807,076 persons, more than necessary to constitute an entire congressional district—or a majority in two congressional districts. PX1 ¶ 40 & fig. 7; see also id. at 45. More than half (53.27 percent) of the total population increase in these four counties since 2010 can be attributed to the increase in the Black population. Id. ¶ 41.

### b.     2021 Congressional Plan

45.     The 2021 congressional plan reduces Congressional District 6's AP Black voting-age population ("BVAP") from 14.6 percent under the prior congressional plan to 9.9 percent. Doc. No. 63 ¶ 49; PX1 ¶ 38.

46.     Under the 2021 plan, Congressional District 13 has an AP BVAP of over 66 percent. Doc. No. 63 ¶ 50.

47.     Under the 2021 plan, Congressional Districts 3, 11, and 14 border Congressional District 13. Doc. No. 63 ¶ 51.

48.     Mr. Cooper observed that "District 13 is packed with African-American voters. Under the 2021 plan it's almost 65 percent, a little bit over 65 percent black voting age." Feb. 7, 2022, Morning Tr. 44:17–45:6. Mr. Cooper concluded that "it's clear to [him] based on [his] demographic analysis that it would be very easy to unpack that population so that there are fewer African Americans living in the district but still a clear majority black voting age population district. And in so doing create an additional majority black district in western metro Atlanta that would include a little part of Fayette County and south Fulton County, . . . eastern Douglas County and central Southern Cobb County." Id. at 45:7–14.

49.     Mr. Cooper further observed that "the fragmentation of the black population . . . is most evident in Cobb County. Cobb County has been split four ways under the enacted plan . . . . As it now stands, the enacted plan takes population that is just a few minutes away from downtown Atlanta in western Cobb County and puts it in District 14, which goes all the way to the suburbs of Chattanooga." Feb. 7, 2022, Morning Tr. 46:11–47:4.

### c.     Illustrative Congressional Plan

50.     Analyzing these demographics and the enacted congressional map, Mr. Cooper concluded that "[t]he Black population in metropolitan Atlanta is

sufficiently numerous and geographically compact to allow for the creation of an additional compact majority-Black congressional district anchored in Cobb and Fulton Counties (District 6 in the Illustrative Plan)." PX1 ¶ 10; see also id. ¶¶ 42, 59. This "additional congressional district can be merged into the enacted 2021 Plan without making changes to six of the 14 districts: CD 1, CD 2, CD 5, CD 7, CD 8, and CD 12 are unaffected." Id. ¶ 11; see also id. ¶ 46 ("The result leaves intact six congressional districts in the enacted plan, modifying eight districts in the 2021 Plan to create an additional majority-Black district in and around Cobb and Fulton Counties."); Feb. 7, 2022, Morning Tr. 51:6–20 (Mr. Cooper's testimony describing unchanged districts).

51.     Mr. Cooper drew an illustrative congressional plan that includes an additional majority-Black congressional district (illustrative Congressional District 6) in the western Atlanta metropolitan area. Doc. No. 63 ¶ 52; PX 1 ¶ 47 & fig. 8.

52.     Mr. Cooper's illustrative Congressional District 6 has an AP BVAP of 50.23 percent and a non-Hispanic Black citizen voting-age population ("BCVAP") of 50.69 percent. Doc. No. 63 ¶ 53; PX1 ¶ 47; Feb. 7, 2022, Morning Tr. 54:3–5, 55:6–11.

13

53.     Mr. Cooper's illustrative congressional plan includes three majority-Black districts using the any part BVAP metric and five majority-Black districts using the non-Hispanic BCVAP metric. Doc. No. 63 ¶ 55.

54.     Neither Mr. Morgan nor Ms. Wright disputes that Mr. Cooper's illustrative Congressional District 6 is a majority-Black district under both the AP BVAP and non-Hispanic BCVAP metrics See DX3 ¶ 8 (Mr. Morgan's expert report noting that illustrative district has a "50.2% any-part Black voting age population"); DX41 ¶ 29 (Ms. Wright's expert report acknowledging that illustrative Congressional District 6 is "over the 50% threshold on any part Black"). Ms. Wright admitted during the hearing that Mr. Cooper's illustrative Congressional District 6 has a BVAP of 50.23 percent. See Feb. 11, 2022, Morning Tr. 83:3–7. Mr. Morgan admitted similarly. See Feb. 11, 2022, Afternoon Tr. 233:23–234:1.

55.     Although Ms. Wright claimed that Mr. Cooper's illustrative Congressional District 6 "is below 50% Black on voter registration" (DX41 ¶ 29), she admitted during the hearing that more than 8 percent of registered voters are of unknown race and that this qualifying information was not included in her expert report. Feb. 11, 2022, Morning Tr. 71:10–78:12.

14

56.     Notably, Mr. Cooper's illustrative plan does not reduce the number of preexisting majority-Black districts in the enacted congressional plan. See PX2 ¶ 5 & fig. 1.

57.     Mr. Cooper testified that creating an additional majority-Black congressional district in the western Atlanta metropolitan area by uniting the Black communities in Cobb, Douglas, Fulton, and Fayette Counties "was extremely easy to do" and "not a complicated plan drawing project." Feb. 7, 2022, Morning Tr. 52:20–53:8; see also id. at 69:4–9 (Mr. Cooper's testimony responding, when asked "[h]ow [] this illustrative plan compare[s] to other maps that you have drawn over the last 30 years," that "it was extraordinarily easy to draw this additional majority black district in the western part of metro Atlanta" and that "[i]t basically just draws it[self]"); id. at 75:7–12 (Mr. Cooper's testimony: "There are no complexities here like there might be in other states. This is just drop-dead obvious.").

58.     Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Cooper's illustrative congressional plan contains an additional majority-Black district.

### 2.   Geographic Compactness

59.   Plaintiffs' illustrative plan demonstrates that the Black population in the western Atlanta metropolitan area is sufficiently geographically compact to constitute a voting-age majority in an additional congressional district.

60.   The Court also finds that the illustrative plan is consistent with traditional redistricting principles.

61.   The redistricting guidelines adopted by the General Assembly to guide its redistricting efforts included population equality, compactness, contiguity, respect for political subdivision boundaries and communities of interest, and compliance with Section 2 of the Voting Rights Act. PX40. Mr. Cooper's illustrative map adheres to these and other neutral districting criteria. See Feb. 7, 2022, Morning Tr. 48:16–50:21 (Mr. Cooper's testimony describing traditional districting principles employed during map-drawing process).

62.   Mr. Cooper explained that none of the traditional districting principles predominated when drawing his illustrative congressional plan; instead, he "tried to balance them all" and "did not prioritize anything other than specifically meeting the one-person, one-vote zero population ideal district size." Feb. 7, 2022, Morning Tr. 50:22–51:2.

### a.    Population Equality

63.    The Court finds that Mr. Cooper's illustrative congressional map complies with the one-person, one-vote principle.

64.    There is no factual dispute on this front. Mr. Cooper's expert report demonstrates that his illustrative plan contains minimal population deviation. See PX1 at 67; Feb. 7, 2022, Morning Tr. 55:12–18 (Mr. Cooper's testimony noting that population equality is "reflected with perfection [in his illustrative map] because the districts are plus or minus one person").

### b.    Contiguity

65.    The Court finds that Mr. Cooper's illustrative congressional map contains contiguous districts.

66.    Again, there is no factual dispute on this issue. See Feb. 7, 2022, Morning Tr. 62:4–14 (Mr. Cooper's testimony confirming that his illustrative districts are contiguous).

### c.    Compactness

67.    The Court finds that Mr. Cooper's illustrative congressional map has comparable compactness scores to Georgia's enacted 2021 congressional plan.

68.    As Defendants' mapping expert Mr. Morgan explained, "[g]enerally speaking, . . . the compactness scores are usually useful in comparing one plan to

another . . . . I wouldn't designate a single number that way but when you do a lot of comparisons, you can see some cases where things are considerably less compact than others." Feb. 11, 2022, Afternoon Tr. 225:18–226:11.

69.     Mr. Cooper testified similarly that "there is no bright line rule" for compactness, "nor should there be" given that "so many factors [] enter into the equation"—including, in Georgia, the fact that "municipal boundaries in many [c]ounties [] are not exactly compact." Feb. 7, 2022, Morning Tr. 60:14–61:3.

70.     The parties' experts evaluated the enacted congressional plan and Mr. Cooper's illustrative plan using the Reock and Polsby-Popper analyses, two commonly used measures of a district's compactness. See PX1 ¶ 54 & fig. 10; DX1 ¶ 17 & chart 2.

71.     The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. PX1 ¶ 54 n.11; see also Feb. 7, 2022, Morning Tr. 59:21–60:4 (Mr. Cooper's testimony describing compactness measures).

72.     The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter. The measure is always between 0 and 1,

with 1 being the most compact. PX1 ¶ 54 n.12; <u>see also</u> Feb. 7, 2022, Morning Tr.

60:5–13 (Mr. Cooper's testimony describing compactness measures).

73.      Mr. Cooper reported that the mean Reock score for his illustrative

plan is .40, compared to a mean score of .43 for the enacted plan, and that the mean

Polsby-Popper score for this illustrative plan is .23, compared to .25 for the enacted

plan. PX1 ¶ 54 & fig. 10; <u>see also</u> <u>id.</u> at 78, 81. Mr. Morgan confirmed these figures

in his report. <u>See</u> DX3 ¶ 17; <u>see also</u> Feb. 11, 2022, Afternoon Tr. 243:3–9.

74.      The following table included in Mr. Morgan's report (DX1 ¶ 17 &

chart 2) demonstrates that, on a district-by-district level, the compactness

measures of Mr. Cooper's illustrative districts are comparable to—and, in some cases, better than—the districts in the enacted map:[2]

| Proposed Remedial Districts /Adopted Districts | Adopted Plan Reock | Cooper Remedial Plan Reock | Adopted Plan Polsby-Popper | Cooper Remedial Polsby-Popper |
|---|---|---|---|---|
| Congress 003 | **0.46** | 0.40 | **0.28** | 0.25 |
| Congress 004 | **0.31** | 0.29 | **0.25** | 0.21 |
| Congress 006 | **0.42** | 0.38 | **0.20** | 0.16 |
| Congress 009 | 0.38 | **0.40** | 0.25 | **0.32** |
| Congress 010 | **0.56** | 0.40 | **0.28** | 0.18 |
| Congress 011 | **0.48** | 0.40 | **0.21** | 0.16 |
| Congress 013 | 0.38 | **0.42** | 0.16 | **0.25** |
| Congress 014 | 0.43 | **0.48** | **0.37** | 0.34 |

75.     Mr. Morgan offered no opinion on the compactness of Mr. Cooper's illustrative plan and at no point offered any opinion or conclusion that Mr. Cooper's illustrative plan is not reasonably compact. See Feb. 11, 2022, Afternoon Tr. 243:19–244:1; see also Feb. 7, 2022, Morning Tr. 61:4–15 (Mr. Cooper's testimony explaining that "practically speaking, there is no difference" between compactness measures for illustrative and enacted congressional plans).

---

[2] This table reflects only those eight congressional districts that were changed in any way in Mr. Cooper's illustrative congressional plan.

76.     Mr. Morgan conceded that there is no minimum compactness threshold for districts under Georgia law. See Feb. 11, 2022, Afternoon Tr. 228:3–16.

77.     Mr. Cooper testified that the compactness measures for his illustrative congressional plan are "[i]n the usual range. There is no problem with the compactness per se in either" the enacted or illustrative congressional plans. Feb. 7, 2022, Morning Tr. 61:16–20.

78.     After reviewing the compactness measures supplied by the expert reports received in this case and listening to the expert testimony provided at the preliminary injunction hearing, the Court concludes that the districts in Mr. Cooper's illustrative plan are reasonably compact.

79.     The Court finds that Mr. Cooper's illustrative congressional plan is consistent with the traditional districting principle of compactness.

### d.     Preservation of Political Subdivisions

80.     Based on the record, the Court concludes that Mr. Cooper's illustrative congressional plan complies with the districting criterion of respecting political subdivision boundaries.

81.     Mr. Cooper testified that he "attempted to avoid splitting counties where unnecessary and avoid splitting towns and municipalities." Feb. 7, 2022,

Morning Tr. 55:19–56:2. However, he also noted that "to meet one-person, one-vote in the congressional plan, it is absolutely necessary to split some counties." Id. at 56:3–5. In those cases, Mr. Cooper "would try to split the county by precinct," though splitting precincts was also sometimes necessary to achieve population equality. Id. at 56:6–10. If splitting a precinct were necessary, Mr. Cooper "would follow, if possible, a municipal boundary or an observable boundary like a road or waterway. And in some cases, generally following observable boundaries, but also relying on a census bureau boundary that is established, known as a block group." Id. at 56:11–19.

82.     Overall, county, VTD, and municipal splits are comparable between the enacted congressional plan and Mr. Cooper's illustrative plan. Although 13 counties are split in Mr. Cooper's illustrative plan (compared to 12 in the enacted plan), Mr. Cooper's illustrative plan includes fewer unique county-district combinations than the enacted plan—14 compared to 19—indicating fewer splits overall. See PX1 ¶ 55 & fig. 11; id. at 84, 88; Feb. 7, 2022, Morning Tr. 56:20–57:21 (Mr. Cooper's testimony distinguishing between number of counties that are split as opposed to number of splits total).

83.     Mr. Cooper's illustrative congressional plan splits fewer municipalities than the enacted plan: 79 compared to 90. See PX1 ¶ 55 & fig. 11; id.

at 92–93, 95–96; Feb. 7, 2022, Morning Tr. 57:22–58:4 (Mr. Cooper's testimony describing municipality splits).

84.     Mr. Cooper's illustrative congressional plan splits only five more VTDs than the enacted plan. See PX1 at 84–86, 88–90; Feb. 7, 2022, Morning Tr. 58:5–59:3 (Mr. Cooper's testimony describing VTD splits).

85.     As compared to the enacted congressional plan, in which Cobb County is divided among four congressional districts, Mr. Cooper's illustrative plan divides Cobb County among only two congressional districts. Feb. 7, 2022, Morning Tr. 46:23–47:1, 53:9–22.

86.     The Court finds that Mr. Cooper's illustrative congressional plan respects the boundaries of political subdivisions.

### e.     Preservation of Communities of Interest

87.     Based on the record, the Court concludes that Mr. Cooper's illustrative congressional plan complies with the districting criterion of respecting communities of interest.

88.     Mr. Cooper, Ms. Wright, and lay witnesses all confirmed that Mr. Cooper's illustrative Congressional District 6 better preserves communities of interest in the western Atlanta metropolitan area than the enacted map.

89.     Referring to the enacted Congressional District 14, Mr. Cooper testified, "I think you would be hard-pressed to find anything with relation to south Cobb County that would connect that part of District 14 to the remainder, particularly since District 14 extends way to the north. So it's really — it's really getting into an Appalachian Regional commission territory. It's just not the same." Feb. 7, 2022, Morning Tr. 47:5–15. When asked by the Court how he would describe southwest Cobb County, Mr. Cooper responded, "Suburban." Id. at 47:16–18.

90.     Jason Carter, a former member of the State Senate and candidate for Governor of Georgia during the 2014 election, agreed that the treatment of Cobb County in the enacted congressional map does not serve a clear community of interest, noting that it "looks like . . . you are taking bits and pieces of Cobb County and you are sticking them in these districts that are very, very different from Cobb County." Feb. 10, 2022, Afternoon Tr. 127:8–20. Mr. Carter explained that "that part of Cobb is essentially Metro Atlanta. It's a suburban part. . . . And if you look at [Chattooga] County or some of these others, we are talking about rural, mountain counties in essence that are not part of the Metro Atlanta area at all and [confront] very different sets of issue, it would seem to me." Id. at 127:21–128:8. He further explained the difficulties that Cobb County residents would have in securing representation due to being included in more rural-reaching

congressional districts: "[I]f you are in a part of that district that is, again, buried as an appendage, in a district that has a significant number of other interests, then you are not going to have the amount of responsiveness that you would otherwise have." Id. at 132:1–22.

91.   Ms. Wright similarly testified that southwest Cobb County "is municipalized. It is developed." Feb. 11, 2022, Morning Tr. 33:19–34:3. She also confirmed that this area is "part of metro Atlanta." Id. at 34:4–5. By contrast, she described Polk and Bartow Counties in northwest Georgia—which are connected with southwest Cobb County in the enacted congressional plan—as "more rural counties." Id. at 34:6–11.

92.   Mr. Cooper explained that he looked at maps of Georgia's regional commissions and metropolitan statistical areas to guide his preservation of communities of interest. Feb. 7, 2022, Morning Tr. 62:15–63:17; see also Feb. 11, 2022, Morning Tr. 90:5–91:12 (Ms. Wright's testimony broadly defining communities of interest to include regions with shared commercial and economic interests).

93.    As depicted in his expert report (PX1 ¶ 47 & fig. 8), Mr. Cooper's illustrative Congressional District 6 is comprised of pieces of four counties—Cobb, Douglas, Fulton, and Fayette—that are among the 11 core ARC counties:



94.    As Mr. Cooper testified, "these [c]ounties are all part of core Atlanta," and the "distances are fairly small" between them. Feb. 7, 2022, Morning Tr. 92:23–25; see also id. at 96:22–25 (Mr. Cooper's testimony characterizing 11 ARC counties as core Atlanta area).

95.     Mr. Cooper also testified that he was aware of the creation of at least four majority-Black Georgia State Senate districts in the western Atlanta metropolitan area under the newly enacted legislative maps. See PX2 ¶ 3; Feb. 7, 2022, Morning Tr. 103:4–14. He explained that "four Senate districts is one congressional, 14 times four is 56. So that's why I was so confident at the outset that it was going to be likely that I could draw the additional majority black district in that part of the state." Feb. 7, 2022, Morning Tr. 103:15–22.

96.     Commenting on Mr. Cooper's illustrative Congressional District 6, Mr. Carter testified, "I mean clearly that's like [a] suburban district. That is a relative fast-growing suburban Atlanta district. I mean to me to me, if you look at that, you can say I know the issues that this area confronts. Here is I-20. Here is, you know, the various other way to get around and that's—probably all of that is within I don't know, 45 minutes of this courthouse." Feb. 10, 2022, Afternoon Tr. at 133:8–18.

97.     Mr. Carter described the interests that residents of the western Atlanta metropolitan area share, such as similar suburban school districts, transportation concerns ("the Atlanta traffic reports affect everybody's life in that part of West Cobb and it affects basically nobody's life in Gordon County"), and healthcare concerns. Feb. 10, 2022, Afternoon Tr. 128:9–129:11. Applying these

27

shared concerns to Mr. Cooper's illustrative Congressional District 6, Mr. Carter testified, "[T]hese folks are [going to] have similar transportation issues. They are going to have similar housing issues. They're going to have [] their healthcare issues, and, you know, between Fulton and Cobb, and to a much greater extent, Douglas is a fast growing county from a school district standpoint, but they are going to be in the kind of environments that are going to look familiar to each other." Id. at 133:19–134:2. Asked about shared infrastructure concerns, Mr. Carter responded, "I think from an infrastructure standpoint, there is no doubt that the infrastructure needs here are really cohesive because you've got the traffic issues that are there. . . . And that also includes [] land use management. . . . [T]he Chattahoochee River runs through here and you are talking about drainage and land use and as these things are growing fast, the connectedness of this area is really real. So that infrastructure piece is another thing that links it together." Id. at 134:3–18.

98.    The Court finds that Mr. Cooper's illustrative congressional plan respects communities of interest.

### f.    Core Retention

99.    Preservation of existing district cores was not an enumerated districting principle adopted by the General Assembly. See PX40.

100.    Mr. Cooper could not avoid drawing illustrative districts with lower core retention scores than the districts in the enacted congressional plan in light of his objective of satisfying the first <u>Gingles</u> precondition. As he explained in his expert report, "Core retention is largely irrelevant when an election plan is challenged on the grounds that it violates Section 2[] of the VRA. The very nature of the challenge means that districts adjacent to the demonstrative majority-minority district must change, while adhering to traditional redistricting principles." PX2 ¶ 4.

101.    During his testimony at the hearing, Mr. Morgan conceded that illustrative plans are necessarily different from enacted plans. Feb. 11, 2022, Afternoon Tr. 214:1–3.

102.    Even still, Mr. Cooper's illustrative plan leaves six of Georgia's 14 congressional districts entirely untouched. <u>See</u> PX1 ¶¶ 11, 46; Feb. 7, 2022, Morning Tr. 51:6–20 (Mr. Cooper's testimony describing unchanged districts).

103.    The Court concludes that Mr. Cooper's illustrative congressional plan complies with traditional districting principles, including those adopted by the General Assembly.

### g.   Racial Considerations

104.   The Court further concludes that Mr. Cooper did not subordinate traditional districting principles in favor of race-conscious considerations.

105.   Mr. Cooper was asked "to determine whether the African American population in Georgia is 'sufficiently large and geographically compact' to allow for the creation of an additional majority-Black congressional district in the Atlanta metropolitan area." PX1 ¶ 8 (footnotes omitted); see also Feb. 7, 2022, Morning Tr. 98:8–16. He testified that he was not asked to either "draw as many majority black districts as possible" or "draw every conceivable way of drawing an additional majority black district." Id. at 98:17–24. And if in his expert opinion an additional majority-Black district could not have been drawn, Mr. Cooper testified that he would have reported that to counsel, as he has "done [] in other cases." Feb. 7, 2022, Morning Tr. 98:25–99:24.

106.   Mr. Cooper testified that race "is something that one does consider as part of traditional redistricting principles" because "you have to be cognizant of race in order to develop a plan that respects communities of interest, as well as complying with the Voting Rights Act[,] because one of the key tenets of traditional redistricting principles is the importance of not diluting the minority vote." Feb. 7, 2022, Morning Tr. 48:4–15.

107.   Mr. Cooper emphasized that other considerations were also taken into account when he drew his illustrative map: the traditional districting principles described above. Feb. 7, 2022, Morning Tr. 48:16–20. Although he "was aware of the racial demographics for most parts of the state," race "certainly did not predominate." Id. at 51:3–5; see also id. at 99:25–100:9 (Mr. Cooper's testimony: "I looked at all of the factors that are part of the traditional redistricting principles and tried to balance them. So I tried to draw a compact district, a district that didn't split very many political subdivisions, and we [have] already seen that the plan that I've drawn splits fewer municipalities than the adopted [] plan. And I looked at other factors, . . . the various traditional redistricting factors. The idea was to balance those factors and show that a district could be created if it could be created."); id. at 101:25–102:13 (similar).

108.   Although Ms. Wright opined that she "cannot explain the decision to take District 6 into Fayette County" in Mr. Cooper's illustrative map (DX41 ¶ 29), Mr. Cooper explained that "[t]o meet one-person one-vote requirements, one has to split Fayette County between District 13 and District 6 because if you put all of Fayette County in District 13, it would be overpopulated by . . . several thousand people." Feb. 7, 2022, Morning Tr. 64:22–65:8. Mr. Cooper noted that "the northern part of Fayette County" is "a racially diverse area. That is not overwhelmingly

black. It's balanced [with] some part[s] of Cobb County where there is no racial majority." Id. at 82:6–83:1.

109.    Similarly, Ms. Wright suggested that "District 13 reaches into Newton County in an unusual way that cannot be explained by normal redistricting principles" (DX41 ¶ 29), but Mr. Cooper again explained that this was done "to balance populations out" because inclusion of all of Newton County in Congressional District 4 would have made that district overpopulated. Feb. 7, 2022, Morning Tr. 66:11–67:1.

110.    Ms. Wright also claimed that "District 6 specifically grabs Black voters near Acworth and Kennesaw State University to connect them with other Black voters in South Cobb, Douglas, and Fulton Counties" (DX41 ¶ 29), but Mr. Cooper explained that this decision was also made "to ensure that District 6 met population equality." Feb. 7, 2022, Morning Tr. 65:14–21. Mr. Cooper noted that the northern arm of his illustrative Congressional District 6 is not in "an area that is predominately black. It is a racially diverse area[.]" Id. at 65:21–66:2; see also id. at 84:4–7 (Mr. Cooper's testimony: "I was not trying to maximize the black voting age population of District 6 by going into Kennesaw and Acworth"); id. at 85:18–86:4 (Mr. Cooper's testimony: "I had to go in some direction and pick up fairly heavily populated areas, and I knew Kennesaw and Acworth were racially diverse

so from a community of interest standpoint it made sense to include that with central Cobb County, which is also racially diverse, and southern Cobb County, which is more predominantly black."); id. at 97:5–10 (Mr. Cooper's testimony: "That was an area with relative racial diversity. I thought it would fit into a majority black district. But I was not trying to identify majority black blocks to put into District 6 from that area.").

111.   Indeed, when asked if "there [were] densely populated black areas in those [c]ounties that you didn't include in your illustrative map," Mr. Cooper confirmed that "there would be ways to enhance the black voting age population, not just in District 6 but elsewhere, by changing lines and perhaps splitting some additional [c]ounties." Feb. 7, 2022, Morning Tr. 66:3–10; see also id. at 97:11–19 (Mr. Cooper's testimony agreeing that he could have "done further changes to the plan that was adopted, perhaps, splitting an additional [c]ounty or something to find other areas to draw a majority black district").

112.   In response to Ms. Wright's suggestion that "[t]he divisions of Cobb, Fayette, and Newton Counties do not make sense as part of normal redistricting principles" and were made "in service of some kind of specific goal" (DX41 ¶ 29), Mr. Cooper confirmed that he did not have a single specific goal in mind when drawing his illustrative congressional map, explaining that he was asked "to

determine whether or not an additional majority black district could be created, but that was not the goal per se. I had to also follow traditional redistricting principles and then make an assessment as to whether that one additional black district could be [drawn]. I determined that it could be, but that was not my goal per se." Feb. 7, 2022, Morning Tr. 68:5–20.

113.   The Court finds that race did not predominate in the drawing of Mr. Cooper's illustrative congressional plan.

### B.   Second **Gingles** Precondition: Political Cohesion

114.   Plaintiffs' racially polarized voting expert, Dr. Maxwell Palmer, demonstrated that Black voters in Georgia are politically cohesive.

115.   The Court has accepted Dr. Palmer as qualified to testify as an expert regarding redistricting and data analysis. Feb. 10, 2022, Morning Tr. 47:18–19. The Court finds Dr. Palmer credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Palmer's testimony and conclusions.

116.   Dr. Palmer conducted a racially polarized voting analysis of Congressional Districts 3, 11, 13, and 14, both as a region (the "focus area") and individually. Doc. No. 63 ¶ 56; PX5 ¶ 9; Feb. 10, 2022, Morning Tr. 52:3–7.

117.   Dr. Palmer employed a statistical method called Ecological Inference ("EI") to derive estimates of the percentages of Black and white voters in the focus

area that voted for each candidate in 31 statewide elections between 2012 and 2021. PX5 ¶¶ 10, 12; Feb. 10, 2022, Morning Tr. 49:19–50:1, 51:15–18.

118.   Dr. Palmer's EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. PX5 ¶ 10; Feb. 10, 2022, Morning Tr. 51:19–52:2.

119.   Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. PX5 ¶ 13. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. Evidence of racially polarized voting is found when Black voters and white voters support different candidates. Id.

120.   In every election examined, across the focus area and in each congressional district, Black voters had clearly identifiable candidates of choice. PX5 ¶ 15, & figs. 2–3, 6; Feb. 10, 2022, Morning Tr. 52:21–54:10.

121.   In the 2016–2020 elections, Black voters on average supported their preferred candidates with an estimated vote share of 98.5 percent. PX5 ¶¶ 6,15.

122.   Defendant's racially polarized voting expert, Dr. John Alford, does not dispute Dr. Palmer's conclusions as to the second <u>Gingles</u> precondition. <u>See</u> Feb. 11, 2022, Afternoon Tr. 154:15–17.

123.   Based on the expert reports and testimony provided in this case, the Court concludes that Black voters in the congressional focus area are politically cohesive.

### C.   Third <u>Gingles</u> Precondition: Bloc Voting

124.   Dr. Palmer also demonstrated that white voters in the congressional focus area vote as a bloc to defeat Black-preferred candidates.

125.   In each congressional district examined and in the focus area as a whole, white voters had clearly identifiable candidates of choice for every election examined. Feb. 11, 2022, Afternoon Tr. 73:7–13; PX5 ¶ 16 & figs. 2–4.

126.   In the 2012–2021 elections, white voters were highly cohesive in voting in opposition to the Black candidate of choice in every election. On average, Dr. Palmer found that white voters supported Black-preferred candidates with an average of just 11.5 percent of the vote. PX5 ¶ 16. In other words, white voters on average supported their preferred candidates with an estimated vote share of 88.5 percent. <u>Id.</u>

127.   Overall, Dr. Palmer found "strong evidence of racially polarized voting across the focus area" as a whole and in each individual congressional district he examined. Feb. 10, 2022, Morning Tr. 48:3–8; see also PX5 ¶¶ 6, 18.

128.   As a result of this racially polarized voting, candidates preferred by Black voters have generally been unable to win elections in the focus area outside of majority-Black districts. Feb. 10, 2022, Morning Tr. 48:9–13. Excluding the majority-Black Congressional District 13, Black-preferred candidates were defeated by white bloc voting in all 31 elections in the focus area that Dr. Palmer examined. PX5 ¶ 21.

129.   Black-preferred candidates never won in any individual congressional district outside of Congressional District 13—that is, Black-preferred candidates lost in every district except the existing majority-Black district. PX5 ¶ 21.

130.   Defendants' expert Dr. Alford does not dispute Dr. Palmer's conclusions as to the third Gingles precondition. Feb. 11, 2022, Afternoon Tr. 159:7–11.

131.   Dr. Alford testified that he "kn[e]w from [] past work that [Dr. Palmer is] competent at doing EI analysis," so he thus assumed that Dr. Palmer's analysis was correct regarding the existence of racially polarized voting for the geographies

37

examined. Feb. 11, 2022, Afternoon Tr. 143:14–21. Although Dr. Alford raised speculative concerns about Dr. Palmer's results being more attributable to partisanship rather than race, see DX6, he admitted on cross-examination that he did not identify any errors that would affect Dr. Palmer's analysis or conclusions. Feb. 11, 2022, Afternoon Tr. 153:3–7.

132.    Using the returns from the 31 statewide elections, Dr. Palmer also analyzed whether Black voters in Mr. Cooper's illustrative Congressional District 6 could elect their candidates of choice. He concluded that Black-preferred candidates would have been consistently elected in the new majority-Black district with an average of 66.7 percent of the vote. PX5 ¶¶ 22–23; Feb. 10, 2022, Morning Tr. 58:13–18.

133.    Based on the expert reports and testimony provided in this case, the Court concludes that white voters in the congressional focus area vote as a bloc to usually defeat Black-preferred candidates, and that Black voters in Mr. Cooper's illustrative Congressional District 6 would be able to elect their candidates of choice.

**D.     Totality of Circumstances**

134.    The Court finds that each of the relevant Senate Factors—which inform Section 2's totality-of-circumstances inquiry—points decisively in Plaintiffs' favor.

**1.     Senate Factor One: History of Voting-Related Discrimination**

135.    Plaintiffs presented the expert report of Dr. Orville Vernon Burton to address Georgia's history of voting-related discrimination. See PX7. The Court has accepted Dr. Burton as qualified to testify as an expert on the history of race discrimination and voting. Feb. 10, 2022, Morning Tr. 7:6–11. The Court finds Dr. Burton credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Burton's testimony and conclusions.

136.    The Court finds that Georgia has an extensive and well-documented history of discrimination against its Black citizens that has touched upon their right to register, vote, and otherwise participate in the political process. "Throughout the history of the state of Georgia, voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to disenfranchise minority voters." PX7 at 8. As Dr. Burton's expert report demonstrates, Georgia's history of discrimination spans from the Reconstruction Era to the present day.

### a.     Political violence against Black Georgians

137.    The Court finds that political violence suppressed the ability of Black Georgians to participate equally in the political process.

138.    Dr. Burton reported that between 1867 and 1872, "at least a quarter of the state's Black legislators were jailed, threatened, bribed, beaten or killed." PX7 at 12. This violence, often perpetrated by the Ku Klux Klan, enabled white Georgians to regain control of the levers of power in the state. Id. at 12–15. After seizing control of the state legislature through a campaign of violence and intimidation, white Democrats called a new constitutional convention chaired by the former Confederate secretary of state. That convention resulted in the Constitution of 1877, which effectively barred Black Georgians from voting through the implementation of a cumulative poll tax. Id. at 15.

139.    Violence, and the threat of it, "was constant for many Black Georgians after white Democrats controlled the state in the late 19th and first part of the 20th century." PX7 at 21. In addition to mob violence, Dr. Burton's report explained that Black Georgians endured a form of state-sanctioned violence through debt peonage and the convict lease system, which effectively amounted to "slavery by another name." Id. And violence against Black Georgians surged after the First

World War, with many white Georgians holding "a deep antipathy" toward Black veterans. Id.

140.    Between 1875 and 1930, there were 462 lynchings in Georgia. PX7 at 24. Only Mississippi had more reported lynchings during that time. These lynchings "served as a reminder for Black Georgians who challenged the status quo, and in practice lynchings did not need to be directly connected to the right to vote to act as a threat against all Black Georgians who dared to participate in the franchise." Id.

### b.    Pre-Voting Rights Act

141.    "While Georgia was not an anomaly, no state was more systematic and thorough in its efforts to deny or limit voting and officeholding by African-Americans after the Civil War." PX7 at 8 (quoting Laughlin McDonald, A Voting Rights Odyssey: Black Enfranchisement in Georgia 2–3 (2003)). Although Georgia's 1865 Constitution abolished slavery, it limited the franchise to white citizens and barred Blacks from holding elected office. Id. at 9; Feb. 10, 2022, Morning Tr. 8:23–9:9. To be sure, the federal government forced Georgia to extend the right to vote to Black males in 1867. See PX7 at 10. But Georgia responded with a series of facially neutral policies that had the intent and effect of "render[ing] black participation in politics improbable." Id. at 15.

41

142.   Georgia's 1877 Constitution, for example, did not explicitly disenfranchise Black citizens but made it practically impossible for Black Georgians to vote by implementing a "cumulative poll tax for elections, so that potential voters had to pay all previous unpaid poll taxes before casting a ballot." PX7 at 15. Relatedly, Georgia prohibited Black voters from participating in the Democratic Primary. Id. at 16. Because Georgia was a one-party Democratic state, the "white primary" effectively eliminated Black participation in the state's politics. Id.

143.   In 1908, Georgia enacted the Felder-Williams Bill, which broadly disenfranchised many Georgians but contained numerous exceptions that allowed most whites to vote, including "owning forty acres of land or five hundred dollars' worth of property," "being able to write or to understand and explain any paragraph of the U.S. or Georgia Constitution," or being "persons of good character who understand the duties and obligations of citizenship." PX7 at 17. In conjunction with the Felder-Williams Bill, Georgia enacted a voter registration law allowing any citizen to "contest the right of registration of any person whose name appears upon the voters list." Id. at 18.

144.   These laws "were devastatingly effective at eliminating both Black elected officials from seats of power and Black voters from the franchise." PX7 at

20. At the time of the Felder-Williams Bill, there were 33,816 Black Georgians registered to vote. Two years later, only 7,847 Black voters were registered—a decrease of more than 75 percent. Id. From 1920 to 1930, the combined Black vote total in Georgia never exceeded 2,700. Id. And by 1940, "the total Black registration in Georgia was still only approximately 20,000, around two or three percent of eligible Black voters." Id. By contrast, "fewer than six percent of white voters were disenfranchised by Georgia's new election laws." Id.

### c.    Post-Voting Rights Act

145.    Congress enacted the Voting Rights Act of 1965 to address these discriminatory practices. Among the Voting Rights Act's provisions was the preclearance requirement that prohibited certain jurisdictions with well-documented practices of discrimination—including Georgia—from making changes to their voting laws without approval from the federal government. PX7 at 33.

146.    The Voting Rights Act, however, "did not translate into instant success" for Black political participation. PX7 at 33. Among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens by 1976. Id. at 34; Feb. 10, 2022, Morning Tr. 14:3–9. And these disparities were directly

attributable to Georgia's continued efforts to enact policies designed to circumvent the Voting Rights Act's protections and suppress the rights of Black voters. PX7 at 34. From 1965 to 1981, the Department of Justice objected to more voting changes from the state of Georgia than any other state in the country. Id. at 36; Feb. 10, 2022, Morning Tr. 15:7–15.

147.    The Court finds that Georgia's efforts to discriminate against Black voters persisted well past 1981. After the U.S. Supreme Court effectively ended the Voting Rights Act's preclearance requirement in Shelby County v. Holder, 570 U.S. 529 (2013), Georgia was the only former preclearance state that proceeded to adopt "all five of the most common restrictions that impose roadblocks to the franchise for minority voters, including (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting, and (5) widespread polling place closures." PX7 at 46.

148.    Dr. Burton discussed several of these restrictions in his report. See PX7 at 46–54. For example, "in a 2015 memo to local election officials, then-Secretary of State Kemp encouraged counties to reduce voting locations, noting that 'as a result of the Shelby vs. Holder Supreme Court decision, [counties are] no longer required to submit polling place changes to the Department of Justice for preclearance.'" Id. Later that year, Georgia began closing polling places in

primarily black neighborhoods. Id. at 47. "By 2019, eighteen counties in Georgia closed more than half of their polling places, and several closed almost 90 percent." Id. (internal quotations omitted). These closures depressed turnout in affected areas and led to substantially longer waiting times at the polls. According to one study in 2020, "about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places." Id. at 48.

149.    Georgia also engaged in "systematic efforts to purge the voting rolls in ways that particularly disadvantaged minority voters and candidates" in the aftermath of Shelby County. PX7 at 48. In the period from 2012 to 2018, Georgia removed 1.4 million voters from the eligible voter rolls—and these purges disproportionately impacted Black voters. Id. at 48–49. While the State described these purges as "voter list maintenance," Dr. Burton testified that Georgia used similarly neutral terms to describe its voter registration law enacted in 1908 to keep Black Georgians off the voter rolls. Feb. 10, 2022, Morning Tr. 38:22–39:7.

150.    Georgia also enacted Senate Bill ("SB") 202 in the spring of 2021 following significant increases in Black voter turnout. SB 202 targets methods of voting that Black voters used extensively in the 2020 general election. Among other

things, SB 202 (1) reduces the time available to request an absentee ballot, (2) increases identification requirements for absentee voting, (3) bans state and local governments from sending unsolicited absentee ballot applications, (4) limits the use of absentee ballot drop boxes, (5) bans mobile polling places, and (6) prohibits anyone who is not a poll worker from giving food or drink to voters in line to vote. PX7 at 50.

151. Dr. Burton found, and the Court agrees, that "[t]hese disenfranchising measures have racial roots." PX7 at 53. The growth of Georgia's nonwhite population over the past 20 years and the corresponding increase in minority voting power has provided a "powerful incentive" for those in power at the state and local level to "place hurdles in the path of minority citizens seeking to register and vote." Id.

### d.    Redistricting-Related Discrimination

152. The Court also finds that Georgia used redistricting as a means to suppress Black political influence, and that these efforts have continued into the 21st century.

153. Georgia's legislative and congressional districts were grievously malapportioned in the years preceding the enactment of the Voting Rights Act. See PX7 at 29; Feb. 10, 2022, Morning Tr. 11:21–12:18. In 1957, the Atlanta-based

Congressional District Five was the second-most populous congressional district in the United States, with an estimated population of 782,800 — about twice the size of the average congressional district. PX9 at 29. By 1960, Fulton County was the most underrepresented county in a state legislature of any county in the United States. Id. DeKalb County was the third-most underrepresented county. Id.

154. Georgia's redistricting plans were subject to the Voting Rights Act's preclearance requirement. In the 40 years following its enactment, Georgia did not complete a redistricting cycle without objection from the Department of Justice. PX7 at 37–41. The Atlanta metropolitan area was often the focal point of Georgia's efforts to suppress Black political influence through redistricting. For example, the Department of Justice rejected Georgia's 1971 congressional plan, which cracked voters throughout Congressional Districts Four, Five, and Six to give the Atlanta-based Fifth District a substantial white majority. Id. at 37–38; see also Georgia v. United States, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 of Voting Rights Act). It also rejected the congressional redistricting plan passed by Georgia following the 1980 Census, which contained white majorities in nine of the state's ten congressional districts, even though Georgia's population was nearly 30 percent Black. PX7 at 38; see also Busbee v. Smith, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying

preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), aff'd, 459 U.S. 1166 (1983); PX42 (1982 objection letter from Department of Justice asserting that "the proposed [congressional] plan divides an apparently cohesive black community of Fulton and DeKalb Counties").

155.    In 2015, after Shelby County, the Georgia General Assembly engaged in mid-cycle redistricting. Doc. No. 63 ¶ 57. The Georgia General Assembly reduced the Black and Latino voting-age populations in House Districts 105 and 111, both of which had become increasingly diverse over the prior half-decade. See Feb. 11, 2022 Morning Tr. 12:22–25.  Ms. Wright agreed that a court found that this redistricting effort "moved many black voters from districts where their votes would have made an impact into districts where they did not." Id. at 13:11–20.

### 2.    Senate Factor Two: Racially Polarized Voting

156.    As Dr. Palmer testified, racially polarized voting is "when majorities of voters of different racial or ethnic groups vote cohesively, that is, majorities of each group vote for the same candidates. And then polarization is when . . . voters of different groups are supporting different candidates." Feb. 10, 2022, Morning Tr. 48:22–49:4.

157.   As discussed at length above, see supra Part III.B–C, voting in Georgia is racially polarized because Black and white voters cohesively support opposing candidates. There is no factual dispute about the existence of racial polarization in the focus area, the relevant congressional districts, and Georgia more generally.

158.   As discussed in the Conclusions of Law below, the reasons why Black and white voters overwhelmingly support opposing candidates in Georgia is irrelevant to Section 2's effects-based inquiry. But even if those reasons were relevant, it is Defendants' burden to prove that political ideology is the only reason this racially polarized voting exists. This they have failed to do.

159.   The only evidence Defendants offered on this issue is Dr. Alford's observation that Black voters overwhelmingly prefer Democratic candidates and white voters overwhelmingly support Republican candidates. See Feb. 11, 2022, Afternoon Tr. 171:8–16 (Alford). But the fact that Black and white voters overwhelmingly support different political parties in Georgia tells us nothing about the cause of Georgia's racially polarized voting, and it certainly does not exclude the possibility that race and issues related to race contribute to that polarization.

160.   Other courts have discounted Dr. Alford's analyses on this ground. See, e.g., Lopez v. Abbott, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) ("At this

juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); Texas v. United States, 887 F. Supp. 2d 133, 181 (D.D.C. 2012), vacated on other grounds, 570 U.S. 928 (2013) ("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit.").

161.   Moreover, the Court finds that racial attitudes and racialized politics do influence the historical and ongoing polarization among Black and white Georgians.

162.   As Dr. Burton testified, the partisan alignment of Black and white voters in Georgia is due in part to historical positions those two parties have taken on issues related to race, such as civil rights legislation. Feb. 10, 2022, Morning Tr. 20:13–21:10.

163.    That is still the case today: members of the Democratic and Republican Parties diverge deeply on issues inextricably linked to race both on a national level and in Georgia in particular. Feb. 10, 2022, Morning Tr. at 21:11–22:8.

### 3.    Senate Factor Three: Discriminatory Voting Procedures

164.    The Court further finds that Georgia — from the end of the Civil War to the present day — has enacted a wide variety of discriminatory voting procedures that have burdened Black Georgians' right to vote, including unusually large election districts and majority-vote requirements.

165.    Dr. Burton testified that Georgia deliberately malapportioned its legislative and congressional districts to dilute the votes of Black Georgians throughout the twentieth century. Feb. 10, 2022, Morning Tr. 12:7–18. In 1957, for example, Georgia's Congressional District 5 — consisting of Fulton, DeKalb, and Rockdale Counties — was the second most populous congressional district in the United States. PX7 at 29. And by 1960, Fulton County was the most underrepresented county in its state legislature of any county in the United States; DeKalb County was in third place. Id.

166.    Georgia further manipulated the structure of its elections to suppress the political power of Black Georgians. After enactment of the Voting Rights Act, numerous Georgia counties with sizeable Black populations shifted from voting

51

by district to at-large voting, ensuring that the white population could elect all the representatives in the district at issue. PX7 at 34. As Dr. Burton's report discussed in detail, Georgia also adopted a majority-vote requirement, "numbered-post voting," and staggered voting in the 1960s and 70s to limit Black voting strength. Id. at 35.

167.   The Court further finds that these efforts have persisted well into the 21st century. Georgia shuttered polling places in predominantly Black communities beginning in 2015, perpetrated extensive purges from the State's voter registration rolls that disproportionately affected Black voters from 2012 to 2018, and enacted SB 202 in the spring of 2021, which restricted methods of voting used by Black Georgians to vote in record numbers during the 2020 election. PX7 at 46–50. SB 202 also authorized the State Election Board, and by extension the General Assembly, to replace county election board members. By June 2021, Georgia county commissions had replaced ten county election officials, most Democrats and half of them Black. Id. at 52.

### 4.   Senate Factor Four: Candidate Slating

168.   There is no slating process involved in Georgia's congressional elections.

**5.      Senate Factor Five: Contemporary Socioeconomic Disparities**

169.    The Court further finds that Black Georgians bear the effects of discrimination in areas like education, employment, and health, which hinder their ability to participate effectively in the political process.

170.    Plaintiffs submitted the expert report of Dr. Loren Collingwood, who analyzed data from the American Community Survey ("ACS") along with voter-turnout data from the Georgia Secretary of State's office. PX11 at 2. The Court accepts Dr. Collingwood as qualified to testify as an expert on demographics and political science. The Court finds Dr. Collingwood credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Collingwood's testimony and conclusions.

171.    The Court finds, based on Dr. Collingwood's report, that Black Georgians are disadvantaged socioeconomically relative to non-Hispanic white Georgians across multiple metrics. PX11 at 3.

172.    According to Census estimates, the unemployment rate among Black Georgians (8.7 percent) is nearly double that of white Georgians (4.4 percent). Doc. No. 63 ¶ 58.

173.    According to Census estimates, White households are twice as likely as Black households to report an annual income above $100,000. Doc. No. 63 ¶ 59.

174.   According to Census estimates, Black Georgians are more than twice as likely—and Black children in particular more than three times as likely—to live below the poverty line. Doc. No. 63 ¶ 60.

175.   According to Census estimates, Black Georgians are nearly three times more likely than white Georgians to receive SNAP benefits. Doc. No. 63 ¶ 61.

176.   According to Census estimates, Black adults are more likely than white adults to lack a high school diploma—13.3 percent as compared to 9.4 percent. Doc. No. 63 ¶ 62.

177.   According to Census estimates, 35 percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24 percent of Black Georgians over the age of 25. Doc. No. 63 ¶ 63.

178.   Black Georgians are more likely to report a disability than white Georgians (11.8 percent compared to 10.9 percent) and are more likely to lack health insurance (18.9 percent compared to 14.2 percent, among 19-64-year-olds). PX11 at 3.

179.   The Court further finds that Black Georgians participate in the political process at substantially lower rates than whites Georgians. Black Georgians vote at significantly lower rates than White Georgians, and this is true at statewide, county, and precinct levels—including in the Atlanta MSA. PX11 at

3, 6–16. Dr. Collingwood also found racial disparities in other forms of voter participation: Black Georgians are less likely to attend political meetings, display political signs like yard signs and bumper stickers, contact public officials, and donate money to political campaigns. Id. at 18.

180.   The Court finds that the socioeconomic disparities discussed above are a cause of lower political participation rates by Black Georgians. As Dr. Collingwood explained in his expert report, there is extensive literature in political science demonstrating a strong and consistent link between socioeconomic status and voter turnout. For example, studies have shown that wealth and education drive donation behavior, campaign volunteering, and voting. PX11 at 6. Other research has shown that neighborhoods with higher shares of home foreclosures during the 2008 financial crisis subsequently experienced drops in voter turnout. Id.

181.   The Court agrees with Dr. Collingwood's conclusion that "[t]his overwhelming academic literature shows that the socioeconomic disadvantages suffered by Black Georgians will affect their ability to participate in the political process." PX11 at 6.

### 6.    Senate Factor Six: Racial Appeals in Georgia Campaigns

182.    The Court further finds that Georgia's political campaigns have been characterized by both overt and subtle racial appeals.

183.    Georgia has a long and sordid history of such appeals in political campaigns that continues to this day. Dr. Burton's expert report discusses some of the earliest racial appeals in Georgia politics in response to the expansion of Black rights after the Civil War. See, e.g., PX7 at 11–12. Dr. Burton further testified that modern racial appeals in Georgia are rooted in the political realignment that followed from Democrats' support for civil rights legislation in the 1960s, after which white Georgians overwhelmingly switched to the Republican Party. Feb. 10, 2022, Morning Tr. 20:18–21:13.

184.    This realignment gave rise to the "Southern strategy," which refers to efforts by Republican politicians to use racialized politics and race-based appeals to attract racially conservative white voters. PX8 at 3. Dr. Burton explained in his supplemental expert report that "[t]he effectiveness of . . . the 'Southern strategy' had a profound impact on the development of the nearly all-white Republican Party in the South." Id. Associating the Democratic Party with the Black community allowed the Republican Party to become the majority party in what

had traditionally been the solid Democratic South—and Republican politicians continue to employ this strategy today. Id.

185.   Dr. Burton further explained that Georgia is a "flash point of this modern strategy." PX8 at 6. The rise of the Republican Party in Georgia "was grounded on fiscal conservatism, opposition to integration (particularly busing), and a growing demand among white suburbanites for 'law and order.'" Id. at 4. And notwithstanding substantial increases in its nonwhite population over the past two decades, Georgia remains a majority-white state—such that Republicans continue to benefit from a pattern of voting that is polarized along racial lines. Id. at 6.

186.   The Court also credits the expert report and testimony of Dr. Adrienne Jones. See AX5. Like Dr. Burton, Dr. Jones concluded that racial resentment and fear have often been incorporated into political campaign strategies in the State of Georgia. Id. at 25. Dr. Jones further concluded that modern political campaigns in Georgia heavily feature both explicit racial appeals and subtle racial appeals in the form of dog-whistle politics. Id.

187.   Dr. Jones provided numerous examples of dog-whistle politics in recent Georgia campaigns, demonstrating that racial appeals remain a feature of Georgia politics today. Many of these appeals attempted to galvanize white voters

against gubernatorial candidate Stacey Abrams in 2018. For example, a robocall targeting Abrams referred to her as the "Negress Stacey Abrams" and a "poor man's Aunt Jemima." AX5 at 26–27; PX48. Later in that campaign, her opponent, now-Governor Kemp, circulated photos of members of the New Black Panther Party marching in support of Ms. Abrams—even though she had never associated with that group. Id. at 27; PX49.

188.   Other examples abound. During the 2021 runoff election for the U.S. Senate, now-Senator Raphael Warnock was the target of both overt and subtle racial appeals. Senator Warnock's opponent, former Senator Kelly Loeffler, accused him of being "too extreme" because he had defended Barack Obama's former pastor, Jeremiah Wright, whom Senator Loeffler accused of being "divisive" and "hurtful" in "call[ing] on Americans to repent for their worship of Whiteness." AX5 at 27. Warnock's opponent also created two versions of a negative ad against him—one with Warnock's skin artificially darkened and one with his skin retaining its actual complexion—and spent 10 times as much money promoting the former version. Id.

189.   The Court finds that these examples, among others discussed in Dr. Jones's expert report, see AX5 at 28–29, and submitted as evidence by Plaintiffs,

see PX43–PX54, show that racial appeals continue to play an important role in Georgia's political campaigns.

### 7. Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office

190. The Court finds that Black Georgians have been historically underrepresented in elected office—a trend that continues to this day.

191. At the time of the Voting Rights Act's passage, Black Georgians constituted 34 percent of the voting-age population, and yet the state had only three elected Black officials. PX7 at 32.

192. By 1980, Black Georgians comprised only 3 percent of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. PX7 at 38–39. That particular trend has not changed: while more Black Georgians have been elected in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. In the most recent General Assembly elections, for example, none of the House's Black members was elected from a district where white voters exceeded 55 percent of the voting-age population, and none of the State Senate's Black members was elected from a district where white voters exceeded 47 percent of the voting-age population. Id. at 53–54.

193.    Although Black Georgians comprise more than 33 percent of the state's population, the Georgia Legislative Black Caucus has only 14 members in the Georgia State Senate—25 percent of that chamber—and 41 members in the Georgia House of Representatives—less than 23 percent of that chamber. Doc. No. 63 ¶ 64.

194.    In early 2021, one news outlet reported that Georgia had a total of only 66 Black legislators—less than 28 percent of the General Assembly. PX56; see also PX57.

195.    Black officials have been underrepresented across Georgia's statewide offices as well. Georgia has had 77 governors, none of whom has been Black. Doc. No. 63 ¶ 65; PX58.

196.    Senator Raphael Warnock is the first Black Georgian to serve Georgia in the U.S. Senate—after more than 230 years of white senators. Doc. No. 63 ¶ 66; PX60.

### 8.    Senate Factor Eight: Official Nonresponsiveness

197.    The Court further finds that there is a significant lack of responsiveness on the part of elected officials to the particularized needs of Black Georgians.

198. Dr. Collingwood's expert report demonstrated significant socioeconomic disparities between Black and white Georgians, which contribute to the lower rates at which Blacks engage their elected representatives. PX11 at 18. And as explained in the expert report of Dr. Traci Burch, "public policies are important for creating and sustaining racial disparities," and the persistence of these disparities "demonstrate[s] the lack of responsiveness of public officials to the needs of Georgia's minority communities." AX6 at 28.

199. Dr. Burch further found that, consistent with these ongoing disparities, Black Georgians are less satisfied than white Georgians with their elected representatives. A survey conducted in 2020 by The Atlanta Journal-Constitution found that 74.9 percent of white Georgians were very or somewhat satisfied "with the way things are going in Georgia," compared to only 44.4 percent of Blacks Georgians. AX6 at 28. Dr. Burch's report further showed that Black Georgians consistently report lower satisfaction with the quality of local services they receive when compared to white Georgians. Id.

200. The Court further finds that the dilution of Black voting power in the challenged congressional plan only exacerbates this nonresponsiveness. Mr. Carter explained that cracking Black voters into districts with a significant number of competing interests ensures that these voters will "not . . . have the amount of

responsiveness that [they] would otherwise have." Feb. 10, 2022, Afternoon Tr. 132:11–15.

### 9.      Senate Factor Nine: Absence of Justification for SB 2EX

201.   The Court further finds that Georgia's justifications for SB 2EX are tenuous. Defendants failed to present evidence justifying their refusal to draw an additional majority-Black congressional district in the western Atlanta metropolitan area.

### 10.     Proportionality

202.   The adopted 2021 congressional plan contains two majority-Black districts using the AP BVAP metric. Doc. No. 63 ¶ 48.

203.   Two districts out of Georgia's total of 14 congressional districts equates to 14.29 percent.

204.   Four districts out of Georgia's total of 14 congressional districts equates to 28.57 percent.

205.   Black Georgians now comprise 33.03 percent of the state's population. Doc. No. 63 ¶ 32.

206.   Even if an additional district where Black voters could elect their candidate of choice were included in the state's congressional map, white voters would still be able to elect their candidate of choice in eight out of 14 congressional

districts, or 57.14 percent—even though non-Hispanic white Georgians comprise a razor-thin majority of the state's population (50.06 percent, according to the 2020 Census). PX1 ¶ 17.

## IV.   Irreparable Harm

207.   The Court finds that because the enacted congressional plan denies Plaintiffs and other Black Georgians an equal opportunity to participate in Georgia's political process, conducting the 2022 midterm elections under this plan would cause them irreparable harm.

208.   This Court has no power to provide any form of relief to Plaintiffs with respect to the 2022 elections once those elections have passed.

209.   There are no "do-overs" in elections. As such, the harm Plaintiffs identify in this case is, by definition, irreparable once an election is held under the enacted congressional plan.

210.   The testimony presented at the hearing underscores the extent to which an election held under an unlawful map would threaten voters' fundamental rights.

211.   Bishop Reginald Jackson is the Bishop of the Sixth District of the AME Church, which includes 520 churches and 90,000 members across the State of Georgia. Feb. 9, 2022, Afternoon Tr. 129:5–23, 133:9–11.

212.    Bishop Jackson testified that voter confidence would be diminished if the 2022 elections were conducted using unlawful district maps. According to Bishop Jackson, "if [the AME Church] thought something was inappropriate, first of all it would disappoint [them,] . . . [and] if [they] thought that there was something inappropriate or out of line, [they] would expect that [to] be corrected." Feb. 10, 2022, Morning Tr. 136:10–18. According to Bishop Jackson, "[i]f there was some problem with the maps that need[ed] to be adjusted, [the church] would hope that those adjustments would be made so that [church members'] votes would not only matter but that [they] would count." Id.

213.    Richard Barron, the Fulton County Elections Director, testified that proceeding under maps that were perceived to be discriminatory against African Americans "could have an effect" on voter confidence "especially when [combined] with some of the effects of S.B. 202." Feb. 9, 2022 Morning Tr. 91:1–5. Barron agreed that voters of color are negatively impacted by voting under maps that dilute their voting power. Id. at 101:1–3 (Q. Do you think that voters of color are also negatively impacted by voting under maps that dilute their voting power? A. Yes. They would be affected by that as well.").

## V.    Balance of Harms

214.    The Court further finds that the irreparable harm that Plaintiffs would suffer absent an injunction far outweighs any inconvenience an injunction will cause Defendants.

### A.    Harm to Defendants

#### 1.    The 2022 Election Calendar

215.    The candidate qualifying period for the May 2022 primary election begins on March 7, 2022, and ends on March 11, 2022. DX4.

216.    County registrars can begin mailing absentee ballots on April 5, 2022. DX4. Absentee ballots for overseas voters must be mailed by April 9, 2022. Feb. 8, 2022, Afternoon Tr. 88:4–8.

217.    The early voting period for the May 2022 primary election begins on May 2, 2022. DX4.

218.    The primary election is scheduled to be held on May 24, 2022. DX4. The primary election runoff is scheduled for June 21, 2022. Id.

219.    The General Election is scheduled to be held on November 8, 2022. Id.

#### 2.    The Voter Reallocation Process

220.    Before the Secretary of State's office can create ballots for use in the primary election, county elections officials must allocate voters to their correct

districts by updating street segments in Georgia's voter registration database. DX4 ¶¶ 6–7.

221.    Although Defendants' representative witness from the Secretary of State's office, Michael Barnes, testified that "[c]ounty registrars generally need several weeks to complete the reallocation process for voters in their particular counties," DX4 ¶ 8, Mr. Barron testified that "it would take [his office] somewhere in the 2-to-3 week range" to reallocate voters to remedial districts. Feb. 9, 2022, Morning Tr. 84:7–10. The Court credits Mr. Barron's testimony on this subject.

222.    Although Mr. Barnes testified that the Secretary of State's office has instructed county elections officials to complete the voter reallocation process by February 18, 2022, he conceded on cross-examination that this deadline was not established by state law. See Feb. 8, 2022, Afternoon Tr. 85:16–24 (Mr. Barnes's testimony: "Q. That's not a deadline established by state law, is it? A. No, it is not.").

223.    After local officials reallocate voters, the Secretary of State's office begins creating ballot combinations. DX4 ¶ 8. A ballot combination lists the congressional, state legislative, and local districts that appear on a given ballot. Id. ¶ 9. The Secretary of State's office has previously created more than 2,000 ballot combinations using districts used in previous election cycles. Id.

224.   Typically, the Secretary of State's office creates ballot combinations seven to ten days after candidate qualifying ends. Feb. 9, 2022, Morning Tr. 115:1–5.

225.   After creating ballot combinations, the Secretary of State's office generates proofs of every ballot combination and sends those proofs to county elections officials for their review. Id. ¶ 13.

226.   State and county elections officials must then review the ballot combinations and make all necessary edits in time to mail absentee ballots to overseas and military voters. Id. ¶ 14.

227.   Mr. Barron testified that county elections officials can review and proofread ballot combinations in five to seven days. Feb. 9, 2022, Morning Tr. 82:9–16 ("Q. About how long does it usually take for your team to do that? A. Three to four days. And then we'll send them back to the State with corrections, and then we usually have two to three days afterward. Q. So about six or seven days total, you think? A. Yes. Q. Can you complete the process faster, if you had to? A. Probably. We probably could get it done in maybe five days.").

### 3.   Implementation of New Maps

228.   Mr. Barnes and Defendants' local election administration expert, Ms. Lynn Bailey, testified that when the implementation of a remedial plan has no

effect on an existing district, state and local officials need not complete any additional work to implement the plan in that district. Feb. 8, 2022, Afternoon Tr. 85:11–15 (Mr. Barnes's testimony: "Q. And so long as those counties remain untouched by the remedial plan, nothing about the remedial plan is going to change that; right, by definition? A. . . . I'm not familiar with all the intricacies of the court case, but I would assume that you are correct."); Feb. 9, 2022, Morning Tr. 62:18–23 (Ms. Bailey's testimony: "Q. In 90 of the 159 Georgia counties, there are no changes in the plaintiff's illustrative map. So if Judge Jones entered that as a remedial order, in most of the counties of the state, there would be no change, at least as a result of the remedial order, right? A. Correct.").

229.   This was confirmed by Ms. Nancy Boren, the Muscogee County Elections Director. See Feb. 9, 2022, Morning Tr. 116:15–21 ("Q. . . . So if you received remedial maps or new maps for this election cycle that—let's take the Congressional map, for example, that made no changes to Muscogee County, would it require you—and you received those new maps on March 3rd or 4th, could you still—would you still be prepared for qualifying on March 7? A. Yes."). The Court credits Ms. Boren's testimony on this subject.

230.   Moreover, when implementation of a remedial map changes only a subset of a county's VTDs, the map is easier for local officials to implement. Feb.

9, 2022, Morning Tr. 44:17–25 (Ms. Bailey's testimony: "Q. If the new redistricting map changes only some of the data . . . there is some work for the County Board to do, but less than what they had to do originally, isn't that correct? A. Sure. Q. They could rely on what they've already done? A. To some extent hopefully, yes."); id. at 60:4–11 (Ms. Bailey's testimony: "Q. So, for example, Senate District 36 right here where this Courthouse sits, the illustrative map proposed by the plaintiff doesn't change anything about this district. So if Judge Jones enters a remedial order for the rest of the state, it's not going to affect the work right here in Senate District 36 at all, that work is continued, is that right? A. I think that's an accurate statement."); id. at 116:22–117:1 (Ms. Boren's testimony: "Q. And if you received legislative maps that made minimal changes and had few—a small number of split precincts, could you receive new maps on March 3rd or 4th and be prepared for qualifying on March 7? A. Yes.").

231.   Mr. Barron testified that Fulton County can conduct the May 24, 2022, election on time so long as Fulton County has a new ballot to proofread by April 1, 2022. Feb. 9, 2022, Morning Tr. 86:3–4 ("As long as we can have a ballot to proof by April 1, we should be alright.").

232.   Mr. Cooper's "additional congressional district can be merged into the enacted 2021 Plan without making changes to six of the 14 districts: CD 1, CD

2, CD 5, CD 7, CD 8, and CD 12 are unaffected." PX1 ¶ 11; see also id. ¶ 46 ("The result leaves intact six congressional districts in the enacted plan, modifying eight districts in the 2021 Plan to create an additional majority-Black district in and around Cobb and Fulton Counties."); Feb. 7, 2022, Morning Tr. 51:6–20 (Mr. Cooper's testimony describing unchanged districts).

233.    Overall, county, VTD, and municipal splits are comparable between the enacted congressional plan and Mr. Cooper's illustrative plan. Although 13 counties are split in Mr. Cooper's illustrative plan (compared to 12 in the enacted plan), Mr. Cooper's illustrative plan includes fewer unique county-district combinations than the enacted plan—14 compared to 19—indicating fewer splits overall. See PX1 ¶ 55 & fig. 11; id. at 84, 88; Feb. 7, 2022, Morning Tr. 56:20–57:21 (Mr. Cooper's testimony distinguishing between number of counties that are split as opposed to number of splits total).

234.    Mr. Cooper's illustrative congressional plan splits only five more VTDs than the enacted plan. See PX1 at 84–86, 88–90; Feb. 7, 2022, Morning Tr. 58:5–59:3 (Mr. Cooper's testimony describing VTD splits).

235.    In light of the limited impact that implementation of Mr. Cooper's illustrative congressional map would have on state and local elections officials, the Court finds that it is feasible for state and local elections officials to implement a

remedial congressional map in time to create and review ballot combinations by April 1, 2022, and hold the primary election on May 24, 2022.

### 4.   Primary Delay

236.   Georgia officials have successfully administered several primary elections that were delayed. Feb. 8, 2022, Afternoon Tr. 86:5–22 (Mr. Barnes's testimony: "Q. . . . [Y]ou have seen primary election dates moved in Georgia? A. I have worked in the state long enough to see primary dates at different times, yes, sir. Q. In fact, you only would have to have worked in the elections administration for a couple of years to have seen those changes because the primary dates moved in 2020. A. Due to the pandemic it was moved, yes, sir. Q. Moved twice? A. Yes, sir, it was.").

237.   Ms. Boren testified that if the primary election were delayed to the current runoff date in June, Muscogee County would have no need to hire new poll workers or secure new polling places. Feb. 9, 2022, Morning Tr. 111:20–25 ("Q. And if the primary election was pushed to the current runoff date, would you need to hire new poll workers or secure new polling places? A. We have already secured polling places and early voting locations, as well as poll workers in anticipation of the runoff date.").

71

238.   Mr. Barron testified that moving the 2022 primary date to later in the summer would "give [Fulton County] more time to prepare for the election." Feb. 9, 2022, Morning Tr. 89:4–14.

239.   Ms. Bailey testified that it would be feasible to hold a primary runoff election in August. Feb. 9, 2022, Morning Tr. 47:10–15 ("Q. But you have no reason to believe that holding a primary runoff in August would not be feasible, that wouldn't work? A. I think that from the election official's perspective, that . . . we could make that work, of course.").

240.   Mr. Barron testified that delaying the primary would have little impact on Fulton County's ability to secure polling places. He testified that delaying the primary would make it "easier for [schools], if we vote when there is no school in session." Feb. 9, 2022, Morning Tr. 89:4–14. Mr. Barron further testified that "it's easy to move dates" for government buildings "[a]nd most of the churches that we use [] are available on Tuesdays." Id. at 89:4–14.

241.   Ms. Bailey agreed that churches and schools would likely be available for a later summer primary election. Feb. 9, 2022, Morning Tr. 58:1–6 ("Q. . . . And one of the reasons why you all were advocating for a primary in the summertime, because it was easier to get polling locations? A. Right, and I don't disagree with that at all."); id. at 68:5–8 (Q. And so for church locations, there's no reason to think

that a church would be less available on a given Tuesday if this Court were to reschedule the primary election? A: There is not, per se.").

242.   Bishop Jackson, whose AME Church offered the State of Georgia more than 500 potential polling places, testified that the churches would remain available for use even if the primary were delayed. Feb. 9, 2022, Afternoon Tr. 135:6–9 ("Q. And if the maps were changed or the election dates were changed, do you still think that some of the 500-odd AME churches would still be able to serve as polling locations? A. Oh, without a doubt.").

243.   Ms. Bailey testified that if the primary were delayed from May 24 to July 27, state and county elections officials would have the same 95-day period of time to prepare for the 2022 primary election that they would have if no remedial maps were ordered and the primary election was held on May 24. Feb. 9, 2022, Morning Tr. 45:19–46:6, 47:22–24.

244.   Ultimately, the state and county election officials who testified agreed that they have the ability to "get the job done no matter what." Feb. 8, 2022, Afternoon Tr. 74:16–25 (Mr. Barnes's testimony); <u>see also</u> Feb. 9, 2022, Morning Tr. 58:14–18 (Ms. Bailey's testimony: "Q. But regardless of what happens in this litigation, whatever the deadlines that ultimately get set, you still have confidence

that election officials will be able to do their job to the best of their ability; correct? A. I do. I do.").

245.   In light of the limited impact that implementation of Mr. Cooper's congressional map would have on state and local election officials, the Court finds that it is feasible to implement a remedial congressional map in time to hold the primary election on June 24, 2022, or July 27, 2022.

**B.    Harm to Voters and Candidates**

246.   The Court finds that the risk of hardship or confusion for Georgia voters and candidates would be low if a new congressional map were implemented in advance of the 2022 midterm elections.

**1.    Voters**

247.   The Court finds that Georgia voters would be timely informed of any changes to the enacted maps or the election calendar.

248.   According to Bishop Jackson, Georgia's AME churches participate in Operation Voter Turnout, a program through which the churches collaborate to provide "voter registration, voter education, voter mobilization, and [voter] organization." Feb. 10, 2022, Morning Tr. 130:12–25. Each local church has an organizing committee with the name and address of all church voters. Id. at 131:1–13.

249.   Mr. Carter confirmed that the risk of voter confusion is low because of the scope of voter-education efforts in the state: "[T]here is so much voter communication going on from candidates, from other organizations. I mean the voter communication infrastructure with everything else is enormous, and I think there's no doubt that, you know — that the key is are the voters going to get educated about that. And the answer is definitely. . . . I will get 30 text personally telling me that [the] election date has changed." Feb. 10, 2022, Afternoon Tr. 149:25–150:20.

### 2.   Candidates

250.   Mr. Carter testified, based in part on his experience navigating rescheduled special elections during his first run for the State Senate, that the risk of harm to candidates as a result of new maps is low. See Feb. 10, 2022, Afternoon Tr. 147:13–151:16.

251.   Describing the hardships imposed on him due to changed election dates, Mr. Carter testified, "I was inconvenienced . . . . It's hard but [you] ultimately deal with it." Feb. 10, 2022, Afternoon Tr. 148:3–7.

252.   Mr. Carter noted that the candidate qualification deadline is "basically irrelevant to the candidate except for people who are trying to run unopposed." Feb. 10, 2022, Afternoon Tr. 148:11–20.

253.   Mr. Carter further explained that moving the primary date would have little practical effect on most campaigns, requiring only that campaigns educate voters about new dates and deadlines. <u>See</u> Feb. 10, 2022, Afternoon Tr. 149:25–150:20.

254.   When asked about the hardship imposed on a candidate who is required to run in a redrawn district, Mr. Carter testified, "It clearly matters what district you are running, right, no doubt. . . . As a candidate, I don't have any right to a district. It's not my district. It's the voter's district. And so, I want the voters to have the right district and then I'm going to run or not run but I think that, you know, all of the campaigns that are out there now have the contingency plan. They know that there's litigation and if the map changes, they'll make new choices but it seems to me that, again, it definitely matters to the candidate, but the candidate is not the center of that question[,] it's the voters, and the candidate doesn't have a right to the district." Feb. 10, 2022, Afternoon Tr. 148:24–149:18.

255.   Mr. Carter continued: "If you tell a candidate they have to run in the changed map, that candidate will adjust their campaign. They will do a variety of things. They will try to make sure that they can get elected in this new district. If you tell voters they are barely in a district that will not respect their interest or that they don't have the same voice, I don't how to remedy that after the fact. A

candidate can adjust. A candidate you can, you know, engage in this communication campaign, but voters don't get to adjust. If they are in an illegal district, they are [in] an illegal district. And that to me is big." Feb. 10, 2022, Afternoon Tr. 150:21–151:16.

## VI.   Public Interest

256.   Finally, the Court finds that an injunction would serve the public interest by vindicating Black Georgians' fundamental voting rights and ensuring that the State does not benefit from its intentional delay in enacting new districting maps.

257.   The Court also finds that there is sufficient time for the General Assembly (or, if necessary, this Court) to draw a congressional map that complies with Section 2 of the Voting Rights Act for use in the state's May 24, 2022, primary election.

258.   On November 22, 2021, the Georgia General Assembly passed SB 2EX, which adopted a new congressional districting plan that revised existing congressional district boundaries. Doc. No. 63 ¶ 46.

259.   Governor Brian Kemp then waited 38 days to sign SB 2EX into law, on December 30, 2021. Doc. No. 63 ¶ 47.

260.   <u>The Atlanta Journal-Constitution</u> reported, "While there was never a doubt that Kemp would sign the redistricting bills, he waited over a month since they passed the General Assembly. The delay stalled legal action until the new maps were written into state law." PX37.

261.   Plaintiffs in this case did not delay in filing suit. Indeed, they filed this suit just <u>hours</u> after SB 2EX was signed into law. Doc. No. 1.

262.   Georgia's candidate qualification period begins on March 7, 2022. DX4. The state's primary is scheduled for May 24, 2022. <u>Id.</u>

263.   Due to the temporal gap between the candidate qualification deadline and the primary election, this Court can extend the filing deadline without creating any need to alter the primary election date.

264.   Recent practices in other states indicate that there is sufficient time for Georgia to enact a new plan in time for the 2022 primary election.

265.   North Carolina law provides that when a court invalidates a redistricting plan, it can give the legislature as few as 14 days to craft a new plan. <u>See</u> N.C. Gen. Stat. § 120-2.4(a). Despite not being bound by that rule, federal courts have followed the practice. After invalidating a congressional plan on February 5, 2016, the U.S. District Court for the Middle District of North Carolina gave the legislature until February 19 to enact a new plan. <u>Harris v. McCrory</u>, 159

F. Supp. 3d 600, 627 (M.D.N.C. 2016) (three-judge court). Similarly, after invalidating a congressional plan on January 9, 2018, the same court gave the legislature until January 24 to enact a new plan. See Common Cause v. Rucho, 279 F. Supp. 3d 587, 691 (M.D.N.C.) (three-judge court), rev'd on other grounds, 138 S. Ct. 823 (2018).

266.   Other federal courts have ordered similarly abbreviated timelines. See, e.g., Larios v. Cox, 300 F. Supp. 3d 1320, 1357 (N.D. Ga. 2004) (three-judge court) (ordering General Assembly to enact new legislative plans within two-and-a-half weeks).

267.   After state courts invalidated North Carolina's congressional and state legislative plans in 2019, the legislature drew a new congressional plan in less than three weeks and new state legislative plans (involving nearly 80 districts) in even less time. See Harper v. Lewis, No. 19-CVS-012667 (N.C. Super. Ct. Oct. 28, 2019); Common Cause v. Lewis, No. 18-CVS-014001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019).

268.   Just last month, after invalidating Ohio's legislative plans, the Ohio Supreme Court ordered that new plans be drawn in just ten days. See League of Women Voters of Ohio v. Ohio Redistricting Comm'n, Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022).

269.   The Court further finds that it retains the power to move the candidate qualification period or even the primary election itself as necessary to afford relief. See, e.g., Sixty-Seventh Minn. State Senate v. Beens, 406 U.S. 187, 201 n.11 (1972) ("[T]he District Court has the power appropriately to extend [election-related] time limitations imposed by state law."); United States v. New York, No. 1:10-cv-1214 (GLS/RFT), 2012 WL 254263, at *2 (N.D.N.Y. Jan. 27, 2012) (moving primary date to ensure UOCAVA compliance); Quilter v. Voinovich, 794 F. Supp. 760, 762 (N.D. Ohio 1992) (three-judge court) (noting that court ordered rescheduling of primary election to permit drawing of remedial legislative plans); Busbee v. Smith, 549 F. Supp. 494, 519 (D.D.C. 1982) (adopting special election calendar).[3]

---

[3] Larios v. Cox, 305 F. Supp. 2d 1335 (N.D. Ga. 2004) (per curiam) (three-judge order), is particularly instructive. There, the three-judge court observed that it "has broad equitable power to delay certain aspects of the electoral process if necessary" to ensure the implementation of remedial legislative plans in a malapportionment case. Id. at 1342. It then explained that "there is no reason why the court could not extend [the candidate qualification] period if this proves to be necessary to ensure constitutional elections," noting in particular that, at that time, "the Georgia General Assembly contemplated precisely that scenario for elections immediately following the redistricting process, establishing a qualifying period for the election year subsequent to redistricting that is substantially later than any dates" that the court contemplated. Id. at 1343.

270.     Just this cycle, Kentucky moved its candidate filing date by 18 days because of redistricting delays; this action did not impact the state's normally scheduled primary date. See Ky. H.B. 172 (2022).

271.     This Court's exercise of its inherent power to adjust the election calendar would allow the State to "easily . . . make the change" to Georgia's congressional and legislative maps "without undue collateral effects." Merrill v. Milligan, Nos. 21A375, 21A376, slip op. at 4 n.1 (Kavanaugh, J., concurring).

272.     The feasibility of a revised calendar is underscored by the fact that, until 2014, Georgia's primary election fell in July of election years—and, in years following the release of census data, even later. See H.B. 310, 152d Gen. Assemb., 2d Sess. (Ga. 2014).

273.     Moreover, mapping expert Blakeman B. Esselstyn testified that, among other things, limiting the extent to which a remedial plan affects existing districts and counties and splits precincts helps ensure expeditious implementation. Feb. 8, 2022, Afternoon Tr. 119:3–6.

274.     Mr. Cooper's illustrative congressional plan alters only eight of Georgia's 14 congressional districts and splits only five more precincts than the enacted plan—only 49 VTDs out of the state's 2,698, and in just 12 of the state's 159 counties. See PX ¶ 11, Ex. M-1.

275.   The Court thus finds that delaying the candidate qualification deadline or the 2022 primary dates would allow the State additional time to feasibly implement a remedial congressional plan for the 2022 elections.

## PROPOSED CONCLUSIONS OF LAW

276.   Plaintiffs have satisfied each of the four elements of a preliminary injunction by showing that: (1) they are substantially likely to succeed on the merits; (2) there is a substantial threat that Plaintiffs and other Black Georgians will face irreparable harm in the absence of an injunction; (3) irreparable harm to Plaintiffs far outweighs any harm an injunction would cause to Defendants; and (4) a preliminary injunction will serve the public interest. See Friedenberg v. Sch. Bd., 911 F.3d 1084, 1090 (11th Cir. 2018).

## I.   Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim.

277.   Plaintiffs have satisfied all elements of their straightforward Section 2 claim.

278.   Section 2 of the Voting Rights Act renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

279.    A single-member congressional district plan that dilutes the voting strength of a minority community may violate Section 2. <u>LULAC v. Perry</u>, 548 U.S. 399, 423–42 (2006) (plurality op.).

280.    "Dilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." <u>Thornburg v. Gingles</u>, 478 U.S. 30, 46 n.11 (1986).

281.    Dilution of a minority community's voting strength violates Section 2 if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

282.    "The essence of a Section 2 claim . . . is that certain electoral characteristics interact with social and historical conditions to create an inequality in the minority and majority voters' ability to elect their preferred representatives." <u>City of Carrollton Branch of NAACP v. Stallings</u>, 829 F.2d 1547, 1554–55 (11th Cir. 1987).

283.   "[P]roof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters[] is not required under Section 2 of the Voting Rights Act." Carrollton Branch, 829 F.2d at 1553.

284.   Rather, the question posed by a Section 2 claim is "whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." Gingles, 478 U.S. at 44 (internal quotation marks and citation omitted); see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1342 (11th Cir. 2015) ("A discriminatory result is all that is required; discriminatory intent is not necessary.").

285.   While "federal courts are bound to respect the States' apportionment choices," they must intervene when "those choices contravene federal requirements," such as Section 2's prohibition of vote dilution. Voinovich v. Quilter, 507 U.S. 146, 156 (1993).

286.   A Section 2 plaintiff challenging a districting plan as dilutive must satisfy three criteria, first set forth by the Supreme Court in Gingles.

287.   The three Gingles preconditions are: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-

member district"; (2) the minority group must be "politically cohesive"; and (3) he white majority must "vote[] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50.

288.   "The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." Growe v. Emison, 507 U.S. 25, 40 (1993).

**A.   Plaintiffs have satisfied the first <u>Gingles</u> precondition because an additional, compact majority-Black congressional district can be drawn in the western Atlanta metropolitan area.**

289.   To satisfy the first <u>Gingles</u> precondition, Plaintiffs must show that the Black population in Georgia is "sufficiently large and geographically compact to constitute a majority in a single-member district." <u>LULAC</u>, 548 U.S. at 425 (quoting <u>Johnson v. De Grandy</u>, 512 U.S. 997, 1006–07 (1994)); <u>see also</u> <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 979 F.3d 1282, 1303 (11th Cir. 2020).

290.   Although "[p]laintiffs typically attempt to satisfy [the first <u>Gingles</u> precondition] by drawing hypothetical majority-minority districts," <u>Clark v.</u>

Calhoun Cnty., 88 F.3d 1393, 1406 (5th Cir. 1996), such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible." Clark v. Calhoun Cnty., 21 F.3d 92, 95 (5th Cir. 1994); see also Bone Shirt v. Hazeltine, 461 F.3d 1011, 1019 (8th Cir. 2006) (same); Solomon v. Liberty Cnty., 899 F.2d 1012, 1018 n.7 (11th Cir. 1990) (en banc) (Kravitch, J., specially concurring) ("So long as the potential exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act." (emphasis added) (citing Gingles, 478 U.S. at 50 n.17)).

291.    "When applied to a claim that single-member districts dilute minority votes, the first Gingles condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." De Grandy, 512 U.S. at 1008.

292.    The Court concludes that Plaintiffs have shown that Georgia's Black population is sufficiently numerous and geographically compact to support the creation of an additional majority-Black congressional district.

1.      **The Black population in the western Atlanta metropolitan area is sufficiently numerous to form an additional majority-Black congressional district.**

293.   Plaintiffs have shown that Georgia's Black population is sufficiently large to constitute a majority in an additional congressional district in the western Atlanta metropolitan area.

294.   Under the first <u>Gingles</u> precondition, the Court must answer an objective numerical question: "Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" <u>Bartlett v. Strickland</u>, 556 U.S. 1, 18 (2009) (plurality op.).

295.   The burden of proof is "a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." <u>Bartlett</u>, 556 U.S. at 19–20.

296.   When a voting rights "case involves an examination of only one minority group's effective exercise of the electoral franchise[,] . . . it is proper to look at <u>all</u> individuals who identify themselves as black" when determining a district's BVAP. <u>Georgia v. Ashcroft</u>, 539 U.S. 461, 474 n.1 (2003); <u>see also</u> <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 118 F. Supp. 3d 1338, 1343 n.8 (N.D. Ga. 2015) ("[T]he Court is not willing to exclude Black voters who also

identify with another race when there is no evidence that these voters do not form part of the politically cohesive group of Black voters in Fayette County.").

297.   Mr. Cooper drew an illustrative plan that contains an additional majority-Black congressional district in the western Atlanta metropolitan area. This additional district was drawn while balancing traditional redistricting criteria.

298.   Neither Defendants nor their experts dispute that Plaintiffs have satisfied the numerosity requirement. Indeed, both Mr. Morgan and Ms. Wright conceded that this requirement has been met in both their expert reports (DX3 ¶ 8; DX41 ¶ 29) and at the hearing. See Feb. 11, 2022, Afternoon Tr. 233:23–234:1 (Mr. Morgan's testimony); Feb. 11, 2022, Morning Tr. 83:3–7 (Ms. Wright's testimony).

299.   For these reasons, the Court concludes that Plaintiffs have shown that Georgia's Black population is large enough to constitute a majority in an additional congressional district.

> **2.   The Black population in the western Atlanta metropolitan area is sufficiently compact to form an additional majority-Black congressional district.**

300.   The Court further concludes that Plaintiffs are likely to show that Georgia's Black population can form an additional congressional district that is reasonably compact.

301.    Under the compactness requirement of the first <u>Gingles</u> precondition,
Plaintiffs must show that it is "possible to design an electoral district[] consistent
with traditional redistricting principles." <u>Davis v. Chiles</u>, 139 F.3d 1414, 1425 (11th
Cir. 1998).

302.    It is important to emphasize that compliance with this criterion does
not require that the illustrative plans be equally or more compact than the enacted
plan; instead, this criterion requires only that the illustrative plans contain
reasonably compact districts. An illustrative plan can be "far from perfect" in
terms of compactness yet satisfy the first <u>Gingles</u> precondition. <u>Wright v. Sumter
Cnty. Bd. of Elections & Registration</u>, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018),
<u>aff'd</u>, 979 F.3d 1282 (11th Cir. 2020).

303.    "The first <u>Gingles</u> precondition does not require some aesthetic ideal
of compactness, but simply that the black population be sufficiently compact to
constitute a majority in a single-member district." <u>Houston v. Lafayette Cnty</u>, 56
F.3d 606, 611 (5th Cir. 1995) (quoting <u>Clark</u>, 21 F.3d at 95).

304.    "While no precise rule has emerged governing § 2 compactness,"
<u>LULAC</u>, 548 U.S. at 433, plaintiffs satisfy the first <u>Gingles</u> precondition when their
proposed majority-minority district is "consistent with traditional districting
principles." <u>Davis</u>, 139 F.3d at 1425.

305.    These traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents. Thus, while Plaintiffs' evidence regarding the geographical compactness of their proposed district does not alone establish compactness under § 2, that evidence, combined with their evidence that the district complies with other traditional redistricting principles, is directly relevant to determining whether the district is compact under § 2." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013) (citations omitted), aff'd in part, rev'd in part on other grounds, 775 F.3d 1336 (11th Cir. 2015).

306.    "[T]here is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." Chen v. City of Houston, 206 F.3d 502, 519 (5th Cir. 2000).

307.    The remedial plan that the Court eventually implements if it finds Section 2 liability need not be one of the maps proposed by Plaintiffs. See Clark, 21 F.3d at 95–96 & n.2 ("[P]laintiffs' proposed district is not cast in stone. It [is] simply presented to demonstrate that a majority-black district is feasible in [the

jurisdiction]. . . . The district court, of course, retains supervision over the final configuration of the districting plan.").

308.   The Court concludes that Mr. Cooper's illustrative congressional map satisfies the criteria of population equality and contiguity. There is no factual dispute on these issues.

309.   The Court further concludes that Mr. Cooper's illustrative congressional map satisfies the criterion of compactness. Defendants' experts do not dispute this conclusion; they instead report the same statistics as Mr. Cooper without questioning whether this principle is satisfied. Indeed, their testimony confirms that Mr. Cooper's illustrative plan has compactness scores comparable to—and, in some cases, better than—the enacted congressional plan.

310.   The Court further concludes that Mr. Cooper's illustrative congressional map preserves political subdivision boundaries. Although his plan splits marginally more VTDs and one additional county, his plan also contains fewer unique district-county splits. Mr. Cooper's illustrative congressional map also surpasses the enacted map in minimizing municipality splits. Neither Defendants nor their experts have meaningfully suggested that Mr. Cooper's illustrative map fails to comply with this principle.

311.   The Court further concludes that Mr. Cooper's illustrative congressional map preserves communities of interest. Unlike the enacted congressional map, which divides the western Atlanta metropolitan area (Cobb County in particular) among multiple districts — including predominantly white districts that stretch into rural parts of western and northern Georgia — Mr. Cooper's illustrative Congressional District 6 unites suburban areas of the core Atlanta area, which share common concerns involving education, transportation, and healthcare.

312.   Although not an enumerated principle adopted by the General Assembly, the Court concludes that Mr. Cooper's illustrative congressional map satisfies the criterion of core retention. Although some alteration of the enacted map is inevitable in a Section 2 case, Mr. Cooper's map alters only eight of Georgia's 14 districts.

313.   Finally, the Court concludes that race did not predominate in the drawing of Mr. Cooper's illustrative congressional map. Defendants provided no evidence that race predominated in the drawing of any of Mr. Cooper's illustrative districts, and he provided race-neutral reasons for the individual line-drawing decisions that Ms. Wright called into question. Defendants offered no evidence to rebut Mr. Cooper's account.

314.   Moreover, it is hardly remarkable that Mr. Cooper testified that the creation of an additional majority-Black district required some consideration of race. Both the U.S. Supreme Court's and Eleventh Circuit's "precedents <u>require</u> [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." <u>Davis</u>, 139 F.3d at 1425. Because Section 2 requires the intentional creation of a majority-Black district, it "necessarily requires considerations of race." <u>Fayette Cnty.</u>, 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that <u>Gingles</u>, <u>Nipper</u> [<u>v. Smith</u>, 39 F.3d 1494 (11th Cir. 1994)], and [<u>Southern Christian Leadership Conference v. Sessions</u>, 56 F.3d 1281 (11th Cir. 1995),] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." <u>Davis</u>, 139 F.3d at 1425.

315.   As a result, and contrary to Defendants' unsupported assertions, courts adjudicating Section 2 claims should "not determine as part of the first <u>Gingles</u> inquiry whether Plaintiffs' Illustrative Plan subordinates traditional redistricting principles to race." <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1306; <u>see also</u> <u>Fayette Cnty.</u>, 118 F. Supp. 3d at 1344–45 (reaffirming this principle on remand).

316.    Defendants' focus on racial predominance is a misplaced application of racial gerrymandering case law, an independent area of law wholly distinct from the claim that Plaintiffs raise here. The Eleventh Circuit has previously rejected attempts to conflate these doctrines—by, for example, relying on <u>Miller v. Johnson</u>, 515 U.S. 900 (1995), as Defendants do here—finding the argument "unpersuasive" because these doctrines "address very different contexts." <u>Davis</u>, 139 F.3d at 1425.

317.    Even if racial predominance were a relevant consideration in a Section 2 case (it is not), and even if race did predominate in Plaintiffs' illustrative plan (it did not), Plaintiffs are still likely to succeed on the merits of their claim because their illustrative plan is motivated by an effort to comply with the Voting Rights Act and is sufficiently tailored to achieving that end. <u>See</u> <u>Miller</u>, 515 U.S. at 916 (explaining in racial gerrymandering cases that it is "plaintiff's burden . . . to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district[s]," after which state must "satisfy strict scrutiny" by demonstrating that plan "is narrowly tailored to achieve a compelling interest").

318.    The U.S. Supreme Court has "assume[d], without deciding, that . . . complying with the Voting Rights Act was compelling." <u>Bethune-Hill v. Va. State</u>

Bd. of Elections, 137 S. Ct. 788, 801 (2017). Indeed, the redistricting guidelines adopted by the General Assembly confirm that compliance with the Voting Rights Act is a compelling state interest. See PX40.

319.    In this context, narrow tailoring does not "require an exact connection between the means and ends of redistricting," but rather just "'good reasons' to draft a district in which race predominated over traditional districting criteria." Ala. Legis. Black Caucus v. Alabama, 231 F. Supp. 3d 1026, 1064 (M.D. Ala. 2017) (quoting Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 278 (2015)).

320.    In other words, even if racial predominance were relevant here, Plaintiffs' compliance with Section 2 of the Voting Rights Act constitutes "good reason" to create a race-based district, and the remedy would be narrowly tailored even if it were not the only manner in which to draw the additional majority-Black congressional district. Accordingly, even if strict scrutiny applied here (which it does not), Plaintiffs' illustrative plan satisfies it.

321.    In light of this precedent, Defendants' insistence that faithful application of Supreme Court caselaw produces an "unconstitutional" result would require the Court to find that Section 2 of the Voting Rights Act is itself unconstitutional. But this Court may not ignore precedent; nearly four decades ago, the Eleventh Circuit held that Section 2 "is a constitutional exercise of the

congressional enforcement power under the Fourteenth and Fifteenth Amendments." United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1550 (11th Cir. 1984). This Court holds the same. See In re Hubbard, 803 F.3d 1298, 1309 (11th Cir. 2015) (explaining "the fundamental rule that courts of this circuit are bound by the precedent of this circuit").

322.   Applying controlling Section 2 caselaw, the Court concludes that Plaintiffs have demonstrated that the Black population in the western Atlanta metropolitan area is sufficiently large and geographically compact to support an additional majority-Black congressional district.

### B.   Plaintiffs have satisfied the second Gingles precondition because Black Georgians are politically cohesive.

323.   The second Gingles precondition requires that "the minority group must be able to show that it is politically cohesive." 478 U.S. at 51.

324.   Plaintiffs can establish minority cohesiveness by showing that "a significant number of minority group members usually vote for the same candidates." Solomon, 899 F.2d at 1019 (Kravitch, J., specially concurring); see also Gingles, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2." (internal citations omitted)).

325.    Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. See, e.g., Gingles, 478 U.S. at 52–54; Nipper v. Smith, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994).

326.    Courts have recognized EI as an appropriate analysis for determining whether a plaintiff has satisfied the second and third Gingles preconditions. See, e.g., Rose v. Raffensperger, No. 1:20-CV-02921-SDG, 2022 WL 205674, at *11 (N.D. Ga. Jan. 24, 2022); Patino v. City of Pasadena, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); Benavidez v. City of Irving, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), aff'd 461 F.3d 1011 (8th Cir. 2006).

327.    The second Gingles precondition is satisfied here because Black voters in Georgia are politically cohesive. See 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." Id. at 68. Dr. Palmer's analysis clearly demonstrate high levels of cohesiveness among Black Georgians in supporting their preferred candidates, both across the congressional focus area and in the individual districts that comprise it. Defendants' expert Dr. Alford does not contest this conclusion.

328.    This conclusion is also consistent with previous findings of political cohesion among Black Georgians. See, e.g., Wright, 301 F. Supp. 3d at 1313 (noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same candidate"); Lowery v. Deal, 850 F. Supp. 2d 1326, 1329 (N.D. Ga. 2012) ("Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting black candidates."). Defendants have offered no evidence suggesting that this is no longer the case.

### C.    Plaintiffs have satisfied the third Gingles precondition because white Georgians engage in bloc voting to defeat Black-preferred candidates.

329.    The third Gingles precondition requires that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51.

330.    As to the third Gingles precondition, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." 478 U.S. at 56.

331.    No specific threshold percentage is required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or

cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." <u>Gingles</u>, 478 U.S. at 56.

332.   The Court concludes that Dr. Palmer's analysis demonstrates high levels of white bloc voting in the congressional focus area and the individual districts that comprise it. The Court also finds that candidates preferred by Black voters are almost always defeated by white bloc voting except in those areas where they form a majority. Defendants' expert Dr. Alford does not contest this conclusion.

333.   This conclusion is again consistent with the findings of previous courts. <u>See, e.g.</u>, <u>Whitest v. Crisp Cnty. Bd. of Educ.</u>, No. 1:17-CV-109 (LAG), 2021 WL 4483802, at *3 (M.D. Ga. Aug. 20, 2021) ("African Americans in Crisp County are politically cohesive in elections for members of the Board of Education, but the white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education."), <u>appeal docketed sub nom. Postell v. Crisp Cnty. Sch. Dist.</u>, No. 21-13268 (11th Cir. Sept. 21, 2021); <u>Wright</u>, 301 F. Supp. 3d at 1317 (finding that "[t]he third Gingles factor is satisfied" after concluding that "there can be no doubt black and white voters consistently prefer different candidates" and that "white voters are usually

able to the defeat the candidate preferred by African Americans"). Defendants have offered no evidence suggesting that this is no longer the case.

334.    The Court also concludes that Dr. Palmer's analysis demonstrates that Black voters would be able to elect their candidates of choice in Mr. Cooper's illustrative Congressional District 6. Again, Dr. Alford does not contest this conclusion.

**D.    The totality of circumstances demonstrates that SB 2EX denies Black Georgians equal opportunity to elect their preferred candidates to Congress.**

335.    The Court concludes that the totality of circumstances confirms what Plaintiffs' satisfaction of the <u>Gingles</u> preconditions indicates: SB 2EX denies Black voters in Georgia an equal opportunity to elect their congressional candidates of choice.

336.    Because each of the relevant considerations discussed below weighs in favor of a finding of vote dilution, Plaintiffs have demonstrated that the enacted congressional plan violates Section 2 of the Voting Rights Act.

337.    Once a Plaintiff satisfies the three <u>Gingles</u> preconditions, the court considers whether the "totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect

100

representatives of their choosing as compared to other members of the electorate." <u>Fayette Cnty.</u>, 775 F.3d at 1342.

338.   "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three <u>Gingles</u> factors but still have failed to establish a violation of § 2 under the totality of the circumstances." <u>Fayette Cnty.</u>, 775 F.3d at 1342 (quoting <u>Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 4 F.3d 1103, 1135 (3d Cir. 1993)).

339.   In cases where Plaintiffs have satisfied the <u>Gingles</u> preconditions but the court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, than an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." <u>Jenkins</u>, 4 F.3d at 1135.

340.   The determination of whether vote dilution exists under the totality of the circumstances requires "a searching practical evaluation of the past and present reality," which is an analysis "peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the

contested" district map. Gingles, 478 U.S. at 79 (internal quotation marks and citations omitted).

341.   To determine whether vote dilution is occurring, "a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors. The Senate Report [from the 1982 Amendments to the Voting Rights Act] specifies factors which typically may be relevant to a § 2 claim[.]" Gingles, 478 U.S. at 44.

342. The "Senate Factors" include: (1) "the history of voting-related discrimination in the State or political subdivision"; (2) "the extent to which voting in the elections of the State or political subdivision is racially polarized"; (3) "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting"; (4) "the exclusion of members of the minority group from the candidate slating processes"; (5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process"; (6) "the use of overt or subtle racial appeals in political campaigns"; and (7) "the extent to which members of the

minority group have been elected to public office in the jurisdiction." <u>Gingles</u>, 478 U.S. at 44–45.

343.   "The [Senate] Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's . . . use of the contested practice or structure is tenuous may have probative value." <u>Gingles</u>, 478 U.S. at 45.

344.   The Senate Report's "list of typical factors is neither comprehensive nor exclusive." <u>Gingles</u>, 478 U.S. at 45. "Ultimately, <u>Gingles</u> 'calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes.'" <u>Rose</u>, 2022 WL 205674, at *3 (quoting <u>Brooks v. Miller</u>, 158 F.3d 1230, 1239 (11th Cir. 1998)).

345.   "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1566 n.33 (quoting S. Rep. No. 97-417, pt. 1, at 29 (1982)).

### 1.   Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination.

346.   It cannot be disputed that Black Georgians have experienced franchise-related discrimination. "African-Americans have in the past been subject to legal and cultural segregation in Georgia[.]" <u>Cofield v. City of LaGrange</u>, 969 F.

Supp. 749, 767 (N.D. Ga. 1997). "Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting. This act was accurately called the 'Disfranchisement Act.' Such devices that limited black participation in elections continued into the 1950s." Id.

347.    This Court has recently taken judicial notice of the fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021). As it previously described, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." Fayette Cnty., 950 F. Supp. 2d at 1314.

348.    The history described above and recounted by Dr. Burton demonstrates that voting-related discrimination is not a vestige of the past and persists to this day. The first Senate Factor thus weighs heavily in Plaintiffs' favor.

**2.      Senate Factor Two: Georgia voters are racially polarized.**

349.    It is also indisputable that Black and white Georgians consistently support opposing candidates. Dr. Palmer provided clear evidence that this is the case, which Dr. Alford did not contest.

350.    "The second Senate Factor focuses on 'the extent to which voting in the elections of the State or political subdivision is racially polarized.'" <u>Wright</u>, 979 F.3d at 1305 (quoting <u>LULAC</u>, 548 U.S. at 426). "This 'factor will ordinarily be the keystone of a dilution case.'" <u>Id.</u> (quoting <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1566).

351.    Defendants are wrong to suggest that this factor asks the Court to look into the subjective minds of voters and ask why they are voting in a racially polarized manner. Eleventh Circuit case law makes clear that Plaintiffs are not required to prove that Georgia's racially polarized voting results from any particular racial attitudes. Plaintiffs are not required "to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." <u>Askew v. City of Rome</u>, 127 F.3d 1355, 1382 (11th Cir. 1997); <u>see also</u> <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1321 n.29 (explaining that plaintiffs "are not required to prove[] racial animus" within electorate).

352.   Because "racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates," Plaintiffs "need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." Carrollton Branch, 829 F.2d at 1557–78 (quoting Gingles, 478 U.S. at 74). "It is the difference between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." Gingles, 478 U.S. at 63. In other words, "[a]ll that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations." Id. at 73; see also Marengo Cnty. Comm'n, 731 F.2d at 1557 ("[R]acially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." (quoting Gingles, 478 U.S. at 74)).

353.   The dicta in the Eleventh Circuit's Solomon opinion did not alter binding precedent on this issue. That opinion's analysis focused on just two of the Senate Factors: the level of minority candidate success and the tenuous

justifications of the challenged electoral scheme. See Solomon, 221 F.3d at 1228-34. In fact, the district court decision that the Solomon court affirmed had concluded that racially polarized voting is not dependent upon the subjective thoughts of voters. See Solomon v. Liberty Cnty., 957 F. Supp. 1522, 1543 (N.D. Fla. 1997) (concluding that "the presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under Section 2").

354.   Putting case law aside, requiring courts to inquire into the reasons why Georgians vote in a racially polarized manner would directly contradict Congress's explicit purpose in turning Section 2 into an entirely effects-based prohibition. That purpose was to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials or entire communities." S. Rep. No. 97-417, pt. 1, at 36 (1982); see also Solomon, 899 F.2d at 1016 n.3 (Kravitch, J., specially concurring) (explaining that this theory "would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test"). It would also erect an evidentiary burden that "would be all but impossible" for Section 2 plaintiffs to satisfy. Gingles, 478 U.S. at 73 (describing "inordinately difficult burden" this theory would place on plaintiffs

(quotations omitted)); <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1321 n.29 (characterizing defendants' theory as "unpersuasive," as it would make it "nearly impossible for § 2 plaintiffs because defendants could always point to some innocent explanation for the losing candidates' loss"). "To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of <u>Mobile v. Bolden</u>, 446 U.S. 55 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim." <u>Gingles</u>, 478 U.S. at 71.

355.   Even if the reasons why Black and white voters overwhelmingly support opposing candidates in Georgia were relevant to the totality-of-circumstances analysis, it would be Defendants' "obligation to introduce evidence" and "affirmatively prove, under the totality of the circumstances, that racial bias does not play a major role in the political community." <u>Nipper</u>, 39 F.3d at 1524–26 nn.60, 64. After all, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1567. Section 2 plaintiffs are therefore under "no obligation" to "search . . . out" such evidence "and disprove [non-racial explanations] preemptively." <u>Nipper</u>, 39 F.3d at 1525 n.64.

356.    Here, Defendants have failed to prove "that racial bias does not play a major role in the political community." Nipper, 39 F.3d at 1524 n. 60. In support of their assertion that policy ideology and not race explains Georgia's racially polarized voting, Defendants and their expert offer the simple fact that Black voters prefer Democrats and white voters prefer Republicans. But as Plaintiffs have shown, that fact tells us nothing about whether race and issues inextricably linked to race impact the partisan preferences of Black and white voters. Indeed, Plaintiffs offered substantial evidence that race and issues inextricably linked to race do play a part in those preference today.

357.    In sum, the second Senate Factor pays no attention to the subjective motivations behind the racially polarized voting that occurs in Georgia. But even if it did, there has been no showing that partisan ideology, and not race, is causing that polarization.

358.    The second Senate Factor thus weighs heavily in Plaintiffs' favor.

### 3.    Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.

359.    Senate Factor Three "considers 'the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually

large election districts, majority vote requirements, and prohibitions against bullet voting.'" <u>Wright</u>, 979 F.3d at 1295 (quoting <u>Gingles</u>, 478 U.S. at 44–45).

360.   As discussed above and throughout Dr. Burton's expert report, Georgia's history is marked by electoral schemes that have enhanced the opportunity for discrimination against Black voters—some of which persist to this day. This factor thus weighs in Plaintiffs' favor.

### 4. Senate Factor Four: Georgia has no history of candidate slating for congressional elections.

361.   It is undisputed that Georgia uses no slating process for its congressional elections. As a result, this factor is irrelevant to this case.

### 5. Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process.

362.   The Eleventh Circuit has "recognized in binding precedent that 'disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation.'" <u>Wright</u>, 979 F.3d at 1294 (quoting <u>Marengo Cnty. Comm'n</u>, 731 F.2d 1546, 1568). "Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." <u>Id.</u> (quoting <u>Marengo Cnty.</u>, 731 F.2d at 1568–69); <u>see also</u> <u>United States v. Dallas</u>

Cnty. Comm'n, 739 F.2d 1529, 1537 (11th Cir. 1984) ("Once lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation.").

363.   This Court recently credited evidence that "twice as many Black Georgians as white Georgians live below the poverty line; the unemployment rate for Black Georgians is double that of white Georgians; Black Georgians are less likely to attain a high school or college degree; and Black Georgians die of cancer, heart disease and diabetes at a higher rate than white Georgians." Fair Fight, slip op. at 44 (internal citations omitted). In addition, Plaintiffs have offered unrebutted evidence that Black Georgians suffer socioeconomic hardships stemming from centuries-long racial discrimination, and that those hardships impede their ability to participate in the political process. Defendants no do not dispute this evidence, nor do they otherwise contest Dr. Collingwood's analysis or conclusions.

364.   Because Defendants do not rebut Plaintiffs' evidence on this factor, it weighs heavily in favor of a finding of vote dilution.

### 6. Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns.

365. This factor "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296 (quoting Gingles, 478 U.S. at 45).

366. This Court recently credited evidence of racial appeals in recent Georgia elections. See Fair Fight, slip op. at 45–46. In addition, Plaintiffs have submitted substantial evidence—corroborated by Dr. Jones—that overt and subtle racial appeals remain common in Georgia politics.

367. This factor thus weighs in Plaintiffs' favor.

### 7. Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.

368. This factor "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). "If members of the minority group have not been elected to public office, it is of course evidence of vote dilution." Marengo Cnty. Comm'n, 731 F.2d at 1571.

369. Plaintiffs' evidence demonstrates that Black Georgians are underrepresented in statewide elected offices and rarely succeed in local elections outside of majority-Black districts.

370.   This factor thus weighs in Plaintiffs' favor.

**8.   Senate Factor Eight: Georgia is not responsive to its Black residents.**

371.   "The authors of the Senate Report apparently contemplated that unresponsiveness would be relevant only if the plaintiff chose to make it so, and that although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1572.

372.   Here, Plaintiffs have submitted evidence that elected officials are unresponsive to the needs of Black Georgians—including and especially the socioeconomic disparities identified in Dr. Collingwood's report.

373.   This factor thus weighs in Plaintiffs' favor.

**9.   Senate Factor Nine: The justification for SB 2EX is tenuous.**

374.   Defendants have offered no justification for the General Assembly's failure to draw an additional majority-Black congressional district in the western Atlanta metropolitan area. And Mr. Cooper's illustrative plan demonstrates  that it is possible to create such a plan while respecting traditional redistricting principles—just as the Voting Rights Act requires.

375.   This factor thus weighs in Plaintiffs' favor.

### 10.   Proportionality does not weigh against Plaintiffs' claim.

376.   In addition to analyzing the Senate Factors, the Court may also consider the extent to which there is a mismatch between the proportion of Georgia's population that is Black and the proportion of congressional districts in which they have an opportunity to elect their candidates of choice. See De Grandy, 512 U.S. at 1000. While the Voting Rights Act does not expressly mandate proportionality, see 52 U.S.C. § 10301(b), this inquiry "provides some evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a minority group. LULAC, 548 U.S. at 438 (internal quotation marks omitted).

377.   Though not dispositive, disproportionality is relevant to the totality-of-circumstances analysis. See, e.g., Bone Shirt, 336 F. Supp. 2d at 1049; Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 281 F. Supp. 2d 436, 455–56 (N.D.N.Y. 2003).

378.   The De Grandy proportionality inquiry requires the Court to consider the number of enacted congressional districts where Black voters constitute an effective voting majority of the population. See, e.g., Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist., 894 F.3d 924, 940 n.12 (8th Cir. 2018); Fairley v.

Hattiesburg, 584 F.3d 660, 673 (5th Cir. 2009); Black Pol. Task Force v. Galvin, 300 F. Supp. 2d 291, 312 (D. Mass. 2004) (three-judge court).

379. At most, only four congressional districts under the enacted map have BVAPs that exceed 50 percent—less than 29 percent of Georgia's 14 congressional districts.

380. Because the statewide Black population exceeds 33 percent, proportionality does not weigh against Plaintiffs' Section 2 claim.

381. Indeed, the present disproportionality weights in favor of a finding of vote dilution given that Black Georgians were significantly responsible for the state's population growth over the past ten years. See Bone Shirt, 336 F. Supp. 2d at 1049 (accepting evidence from Mr. Cooper showing that minority group's population "rapidly increas[ed in] both their absolute numbers and share of the population" and finding that plaintiffs "presented evidence of disproportionality").

*     *     *

382. Because Plaintiffs have satisfied the three Gingles preconditions, and because each of the considerations relevant to the totality-of-circumstances inquiry in this case indicates that SB 2EX denies Black Georgians an equal opportunity to elect their candidates of choice to the U.S. House of Representatives, Plaintiffs have

shown a substantial likelihood of proving that SB 2EX violates Section 2 of the Voting Rights Act.

### E. Defendants' additional legal arguments lack merit.

383.   The Court further reiterates that the additional legal arguments raised in Defendants' motion to dismiss and opposition to Plaintiffs' motion for preliminary injunction (Doc. Nos. 38, 40) lack merit and do not require dismissal of Plaintiffs' claim.

#### 1.   Section 2 confers a private right of action.

384.   As the Court previously concluded, Section 2 confers a private right of action. See Doc. No. 50 at 17–20.

#### 2.   This case is properly before a single-judge district court.

385.   As the Court previously concluded, this case is properly before a single-judge district court. See Doc. No. 50 at 6–17.

## II.   Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction.

386.   "Courts routinely deem restrictions on fundamental voting rights irreparable injur[ies]." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014); see also, e.g., Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) (similar); Williams v. Salerno, 792 F.2d 323, 326 (2d Cir. 1986) (similar). That is certainly case for Section 2 violations. See, e.g., Dillard v.

Crenshaw County, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (concluding that Section 2 vote-dilution violation was "clearly" irreparable harm). "Casting a vote has no monetary value. It is nothing other than the opportunity to participate in the collective decisionmaking of a democratic society and to add one's own perspective to that of his or her fellow citizens." Jones v. Governor of Fla., 950 F.3d 795, 828–29 (11th Cir. 2020). Accordingly, "[t]he denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." Id.

387.   The Section 2 violation found here will irreparably damage Plaintiffs' right to participate in the political process. Accordingly, the Court finds that, absent preliminary injunctive relief, Plaintiffs will suffer irreparable harm if they are forced to vote under Georgia's unlawful congressional plan.

**III.   The balance of equities and the public interest favor injunctive relief.**

388.   The Court concludes, based on the findings of fact above, that implementation of a remedial congressional map would be feasible in advance of the 2022 midterm elections. Any "inconvenience" or administrative cost the State and candidates might bear in remedying Georgia's unlawful congressional plan thus "does not rise to the level of a significant sovereign intrusion" to tilt the

equities against vindicating Plaintiffs' voting rights. <u>Covington v. North Carolina</u>, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017) (three-judge court).

389.   To the extent the State needs more time to implement a remedial plan, the Court may "extend the time limitations imposed by state law" related to its election deadlines. <u>Beens</u>, 406 U.S. at 201 n.11.

390.   Federal courts that have recently invalidated congressional districting plans during the first months of an election year have given the corresponding state legislature two weeks to enact new plans. <u>Harris</u>, 159 F. Supp. 3d at 627; <u>Common Cause</u>, 279 F. Supp. 3d at 691. State courts have required maps to be drawn in even less time. <u>See, e.g.</u>, <u>League of Women Voters of Ohio</u>, 2022 WL 110261, at *28 (ordering new state legislative plans to be drawn within 10 days).

391.   Vindicating voting rights is indisputably in the public interest. <u>See, e.g.</u>, <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>, 408 F.3d 1349, 1355 (11th Cir. 2005). "Ultimately," the Court's "conclusion that the plaintiffs have a substantial likelihood of success on the merits disposes of this question in short order. The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election." <u>Jones</u>, 950 F.3d at 831; <u>see also</u> <u>Husted</u>, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

**IV.    Any remedial plan must contain an additional congressional district in which Black voters have a demonstrable opportunity to elect their candidates of choice.**

392.    Having concluded that SB 2EX is substantially likely to violate Section 2 and that a preliminary injunction is appropriate under the circumstances, the Court turns to the question of what a proper remedial plan must contain.

393.    Where, as here, Plaintiffs have established a Section 2 violation based on the State's failure to create an additional district in which Black voters have an opportunity to elect their preferred candidates, a plan containing an additional congressional district in which Black voters have a demonstrable opportunity to elect their preferred candidates would remedy their injury.

### PROPOSED ORDER GRANTING INJUNCTIVE RELIEF

394.    Because all four of the preliminary injunction factors support relief, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

395.    The Court ENJOINS Defendants, as well as their agents and successors in office, from using SB 2EX in any election, including the 2022 primary and general elections.

396.    Having found it substantially likely that SB 2EX violates Section 2 of the Voting Rights Act and that an injunction is warranted, the Court now addresses the appropriate remedy.

397.   The Court is conscious of the powerful concerns for comity involved in interfering with the State's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task with the federal courts should make every effort not to pre-empt." Wise v. Lipscomb, 437 U.S. 535, 539 (1978). As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet" the requirements of Voting Rights Act "by adopting a substitute measure rather than for the federal court to devise . . . its own plan." Id. at 540.

398.   The Court also recognizes that Plaintiffs and other Black voters in Georgia whose voting rights have been injured by the violation of Section 2 of the Voting Rights Act have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a lawful apportionment plan. Therefore, the Court will require that a new congressional plan be drawn forthwith to remedy the Section 2 violation.

399.   In accordance with well-established precedent, the Court allows the General Assembly 14 days from this Order to adopt a remedial congressional plan.

400.   This Court retains jurisdiction to determine whether any remedial congressional plan adopted by the General Assembly remedies the Section 2

violation by incorporating an additional district in which Black voters have a demonstrable opportunity to elect their candidates of choice.

401.   In the event that Georgia is unable or unwilling to enact a remedial plan within 14 days that satisfies the requirement set forth above, this Court will proceed to draw or adopt a remedial plan for use during the 2022 primary and general elections.

402.   Because time is of the essence, the Court in the meantime invites the parties' proposals on (a) special masters to assist the Court in evaluating and/or adopting any remedial plan as needed, and (b) whether and how to amend Georgia's election calendar to accommodate a remedial plan. The parties should submit their proposals within three business days of this order.

Dated: February 18, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

122

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing <u>Plaintiffs' Proposed Findings of Fact and Conclusion of Law</u> has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using a font type of Book Antiqua and a point size of 13 for all text except for footnotes, which appear in a point size of 12.

Dated: February 18, 2022      **Adam M. Sparks**
*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing <u>Plaintiffs' Proposed Findings of Fact and Conclusion of Law</u> with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: February 18, 2022      **Adam M. Sparks**
*Counsel for Plaintiffs*