# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| COAKLEY PENDERGRASS; TRIANA ARNOLD JAMES; ELLIOTT HENNINGTON; ROBERT RICHARDS; JENS RUECKERT; and OJUAN GLAZE,<br><br>   Plaintiffs,<br><br> v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; WILLIAM S. DUFFEY, JR., in his official capacity as chair of the State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the State Election Board; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and JANICE W. JOHNSTON, in her official capacity as a member of the State Election Board,<br><br>   Defendants. | CIVIL ACTION FILE NO. 1:21-CV-05339-SCJ |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................3

LEGAL STANDARD............................................................................5

ARGUMENT ........................................................................................6

I.    *Gingles* One: An additional compact majority-Black congressional district can be drawn in the western Atlanta metropolitan area. ...........8

II.    *Gingles* Two: Black Georgians in the focus area are politically cohesive. .............................................................................................16

III.    *Gingles* Three: White Georgians engage in bloc voting to defeat Black-preferred candidates in the focus area. ...............................................18

IV.    Under the totality of circumstances, the enacted map denies Black voters equal opportunity to elect their preferred candidates to Congress. ......................................................................................................19

    A.    Senate Factor One: Georgia has an ongoing history of official voting-related discrimination. ..................................................20

    B.    Senate Factor Two: Georgia voters are racially polarized........25

    C.    Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination. .................................................28

    D.    Senate Factor Four: Georgia has no history of candidate slating for congressional elections.......................................................29

    E.    Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process. .......................................29

F.     Senate Factor Six: Racial appeals are prevalent in Georgia's political campaigns. ..................................................................33

G.     Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts. ........................................................36

H.     Senate Factor Eight: Georgia is not responsive to its Black residents. .................................................................................37

I.     Senate Factor Nine: The justification for the new congressional map is tenuous.........................................................................38

CONCLUSION ........................................................................................40

## INTRODUCTION

Last February, this Court concluded that Plaintiffs "have shown that they are likely to ultimately prove that certain aspects of the State's redistricting plans are unlawful." ECF No. 97 ("PI Order") at 10. What was true at the preliminary injunction stage is still true today: This matter is a textbook Section 2 case. By failing to include a district in the western Atlanta metropolitan area where Black voters can elect their preferred candidates, Georgia's congressional map denies them equal access to the political process in violation of the Voting Rights Act.

Plaintiffs' experts have reaffirmed and reinforced their opinions and reports since the Court's ruling last year. William Cooper, Plaintiffs' demographic and mapping expert, reestablished that a compact majority-Black district can be readily drawn in the western Atlanta suburbs. Dr. Maxwell Palmer, who analyzed racially polarized voting, and Dr. Loren Collingwood, who examined socioeconomic and political disparities between Black and white Georgians, supplemented and reconfirmed their findings using 2022 election data. And Dr. Orville Vernon Burton, who explored Georgia's history of discriminatory voting practices and racialized politics, expanded his discussion of the factors relevant to the Section 2 inquiry.

Defendants' experts, by striking contrast, have done *nothing* in the past 12 months to remedy the analytical and evidentiary shortcomings that the Court

highlighted in its preliminary injunction order. John Morgan submitted a cursory rebuttal report that fails to challenge Mr. Cooper's illustrative map on any meaningful metric. Dr. John Alford *confirmed* Dr. Palmer's findings of racially polarized voting, offering only his (misguided) views on the legal significance of these undisputed facts. And Plaintiffs' expert evidence on the other components of the Section 2 inquiry has gone completely unaddressed and unrefuted. In short, Defendants have failed to raise *any* genuine dispute of material fact relevant to the elements of Plaintiffs' claim.

The denial of Plaintiffs' preliminary injunction motion was based not on the merits—indeed, the Court concluded that "the *Pendergrass* Plaintiffs have satisfied their burden to show a substantial likelihood of success as to Illustrative Congressional District 6"—but instead on the determination that there was "insufficient time to effectuate remedial relief for purposes of the 2022 election cycle." *Id*. at 220, 236–37. Freed from those equitable concerns and considering virtually the same body of evidence that informed the Court's earlier ruling, Plaintiffs respectfully submit that summary judgment is now warranted, and that a new congressional map that complies with Section 2 and ensures Black Georgians equal access to the political process is required.

# BACKGROUND

The Court's preliminary injunction order recounted much of the factual and procedural background in this matter, including the Georgia General Assembly's enactment of the Georgia Congressional Redistricting Act of 2021 and the litigation that followed. *See* PI Order 11–16. Plaintiffs will therefore focus this section on the demographic developments in Georgia over the past decade.

Between 2010 and 2020, Georgia's population grew by over 1 million people—a 10.57% increase that can be attributed entirely to gains in the state's minority population. Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Summ. J. ("SUMF") ¶¶ 1–2; Ex. 1 ("Cooper Report") ¶¶ 13–14, fig.1.[1] During that decade, Georgia's Black population grew by 484,048 people, accounting for 47.26% of the state's overall population gain. SUMF ¶¶ 3–4; Cooper Report ¶ 15, fig.1. Georgia's any-part Black population now constitutes 33.03% of the statewide population and is the largest minority group in the state. SUMF ¶¶ 5–6; Cooper Report ¶ 16, fig.1. By contrast, Georgia's white population *decreased* by 51,764 people between 2010 and 2020; non-Hispanic white Georgians now comprise a

---

[1] All exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with this motion.

razor-thin majority of the state's population at only 50.06%. SUMF ¶¶ 7–8; Cooper Report ¶¶ 15, 17, fig.1.

The Atlanta Metropolitan Statistical Area ("MSA") has been the key driver of population growth in Georgia during this century, led in no small measure by a large increase in the region's Black population. SUMF ¶ 16; Cooper Report ¶ 25, fig.4.[2] The population gain in the Atlanta MSA between 2010 and 2020 amounted to 803,087 people—more than the population of one congressional district—with about half of that gain coming from an increase in the region's Black population. SUMF ¶ 17; Cooper Report ¶ 30, fig.5. Over the past two decades, the Black population in the Atlanta MSA has grown from 1,248,809 in 2000 to 2,186,815 in 2020—an increase of 938,006 people—accounting for 75.1% of the statewide Black population increase and 51.4% of the Atlanta MSA's total increase during that period. SUMF ¶ 19; Cooper Report ¶ 26, fig.4. The decrease in the region's white population has been just as evident: Under the 2000 census, the Atlanta MSA's

---

[2] As defined by the U.S. Office of Management and Budget, the Atlanta MSA consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. SUMF ¶ 15; Cooper Report ¶ 12 n.3.

population was 60.42% non-Hispanic white, decreasing to 50.78% in 2010 and then to just 43.71% in 2020. SUMF ¶ 22; Cooper Report ¶ 27, fig.4.

According to the 2020 census, the 11 core counties comprising the Atlanta Regional Commission ("ARC") service area account for more than half of the statewide Black population. SUMF ¶ 20; Cooper Report ¶ 28. The combined Black population in just four of these counties (Cobb, Fulton, Douglas, and Fayette) is 807,076 people, more than would be sufficient to constitute an entire congressional district—or a majority in two congressional districts. SUMF ¶ 26; Cooper Report ¶ 42, fig.8.

## LEGAL STANDARD

"The principal function of the motion for summary judgment is to show that one or more of the essential elements of a claim or defense . . . is not in doubt and that, as a result, judgment can be rendered as a matter of law." *Tomlin v. JCS Enters., Inc.*, 13 F. Supp. 3d 1330, 1335 (N.D. Ga. 2014) (alteration in original) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)). When there is no genuine dispute as to any material fact, the moving party is entitled to judgment as a matter of law on all or any part of a claim. Fed. R. Civ. P. 56(a).

Once the moving party has met its initial burden of proving that no genuine issue of material fact exists, the burden shifts to the opposing party to establish

otherwise. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). To avoid summary judgment, the opposing party must "go beyond the pleadings" and designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In so doing, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, it "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1479 (11th Cir. 1991)). "Evidence that is 'merely colorable, or is not significantly probative' of a disputed fact cannot satisfy a party's burden, and a mere scintilla of evidence is likewise insufficient." *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## ARGUMENT

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically
> cohesive minority group members, whether by fragmenting the

6

> minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994); *see also Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) ("Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice[.]"); PI Order 16–19, 27 (exploring history of Voting Rights Act).

To prevail on their Section 2 claim, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986); *see also* PI Order 28–29 (describing *Gingles* preconditions). Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44; PI Order 29–32 (describing Senate Factors).

## I.   *Gingles* One: An additional compact majority-Black congressional district can be drawn in the western Atlanta metropolitan area.

Plaintiffs readily satisfy the first *Gingles* precondition because it is possible to "create[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (plurality opinion) (quoting *De Grandy*, 512 U.S. at 1008); *see also* PI Order 51–55 (summarizing applicable legal standards, including numerosity and compactness requirements).

Expert demographer William Cooper has again offered an illustrative plan that unequivocally satisfies the first *Gingles* precondition, demonstrating that the Black community in the western Atlanta metropolitan area is sufficiently large and geographically compact to comprise more than 50% of the voting-age population in an additional congressional district. SUMF ¶¶ 31, 43; Cooper Report ¶ 10; Ex. 8 ("Morgan Dep.") at 65:10–66:13; *see also* PI Order 35–38 (reviewing Mr. Cooper's relevant experience and methodology and finding "his methods and conclusions [] highly reliable"). Given the striking increase in the Atlanta metropolitan area's Black population during this century, *see supra* at 4–5, Mr. Cooper used this region as the focal point for his analysis. SUMF ¶ 34; Cooper Report ¶ 35. Mr. Cooper's additional majority-Black district—illustrative Congressional District 6—is

anchored in the western Atlanta suburbs, encompassing all of Douglas and parts of Cobb, Fayette, and Fulton counties:



SUMF ¶¶ 32, 35; Cooper Report ¶¶ 10, 51, 86–87, Ex. I-2. The Black population of Mr. Cooper's illustrative Congressional District 6 exceeds 50% under various metrics, SUMF ¶¶ 36–39; Cooper Report ¶ 73, figs.11 & 14; Ex. 6 ("Morgan Report") ¶ 12, and his illustrative plan includes this additional district without reducing the number of preexisting majority-Black districts in the enacted plan, SUMF ¶ 33; Cooper Report ¶ 73, fig.14; Morgan Dep. 65:10–66:13.

Mr. Cooper's illustrative plan undeniably complies with traditional redistricting principles, including the guidelines adopted by the General Assembly to inform its 2021 redistricting efforts. SUMF ¶ 46; Exs. 10–11. As in the enacted

plan, population deviations in Mr. Cooper's illustrative plan are limited to plus-or-minus one person from the ideal district population, and his districts are contiguous. SUMF ¶¶ 47–49; Cooper Report ¶¶ 52–53, fig.11; Morgan Dep. 62:4–7, 62:14–17; *see also* PI Order 71, 76. The mean and lowest compactness scores of Mr. Cooper's illustrative plan are similar or identical to the corresponding scores for the enacted plan and Georgia's prior congressional plan. SUMF ¶¶ 50, 53; Cooper Report ¶¶ 78–79 & n.12, fig.13; Morgan Report ¶ 22; Morgan Dep. 55:18–57:5; *see also* PI Order 71–76. In particular, Mr. Cooper's additional majority-Black district, illustrative Congressional District 6, is as compact as the average for the enacted plan on the Polsby-Popper scale and *more* compact than the enacted plan's average on the Reock scale; it is also more compact than the enacted Congressional District 6 on both measures. SUMF ¶¶ 54–55; Cooper Report Exs. L-1 & L-3; Morgan Dep. 57:15–60:2.

Mr. Cooper's illustrative plan is also comparable to (and, in several instances, better than) the enacted plan in preserving political subdivisions. Although both Mr. Cooper's illustrative plan and the enacted plan split 15 counties, the illustrative plan scores better across four other metrics: county splits (unique county/district combinations), split municipalities, municipality splits (unique municipality/district combinations), and voting district splits. SUMF ¶¶ 58–60; Cooper Report ¶¶ 81–82,

fig.14; Morgan Report ¶ 20; Morgan Dep. 44:6–46:16, 54:7–11, 54:18–55:6; *see also* PI Order 76–79.

Mr. Cooper's illustrative Congressional District 6 also better preserves communities with shared interests in the western Atlanta metropolitan area. The enacted map splits majority-non-white Cobb County among four congressional districts, including three majority-white districts—one of which, Congressional District 14, begins in southwest Cobb County and stretches up to Appalachian north Georgia and the Chattanooga suburbs:



SUMF ¶¶ 61–63; Cooper Report ¶¶ 60, 65, 68, 73, fig.14, Ex. G. In Mr. Cooper's plan, by contrast, Cobb County is split between only three districts,[3] and his

---

[3] As an additional improvement, Mr. Cooper assigned all but noncontiguous zero-population areas of Marietta (population 60,972) to his Congressional District 6,

illustrative Congressional District 6 unites Atlanta-area urban, suburban, and exurban voters in Cobb, Douglas, Fulton, and Fayette counties, all of which are core metro counties under the ARC:



**Enacted Plan**    **Mr. Cooper's Illustrative Plan**

SUMF ¶¶ 61, 63–64; Cooper Report ¶¶ 60, 65, 68, Exs. G & H-1; *see also* PI Order 79–85 (finding that "Mr. Cooper's Illustrative Congressional Plan sufficiently respects communities of interest in the western Atlanta metropolitan area" given "the relative geographic proximity . . . of the proposed district" and "that the areas

---

whereas the enacted plan divides populated areas of the city between Congressional Districts 6 and 11. SUMF ¶ 66; Cooper Report ¶ 69.

constituting illustrative Congressional District 6 are developed and suburban in nature and generally face the same infrastructure, medical care, educational, and other critical needs").

Additionally, Dr. Maxwell Palmer confirmed that Black voters would be able to elect their preferred candidates in Mr. Cooper's illustrative Congressional District 6. In the proposed district, Black-preferred candidates would have won all 31 statewide races from 2012 through 2021 with an average of 66.1% of the vote. SUMF ¶¶ 40–41; Ex. 2 ("Palmer Report") ¶¶ 9, 23, 25, fig.5, tbl.8.[4] Plaintiffs therefore satisfy the first *Gingles* precondition. *See LULAC*, 548 U.S. at 430 (first *Gingles* precondition requires "reasonably compact districts with a sufficiently large minority population to elect candidates of its choice" (quoting *De Grandy*, 512 U.S. at 1008)).

Defendants' mapping expert, John Morgan, has provided no opinions to contest this conclusion or otherwise undermine Plaintiffs' satisfaction of the first *Gingles* precondition. *See* PI Order 42–46 (finding that Mr. Morgan's "testimony lacks credibility" and thus "assign[ing] little weight to his testimony"). Indeed, he

---

[4] Dr. Palmer also concluded that the candidates of choice for Black voters would continue to win in Congressional District 13, the only district from which Mr. Cooper's illustrative Congressional District 6 was drawn that previously performed for Black-preferred candidates. SUMF ¶ 42; Palmer Report ¶ 26.

*does not dispute* that the Black population in the Atlanta metropolitan area is sufficiently numerous and geographically compact to allow for the creation of an additional majority-Black congressional district consistent with traditional redistricting principles. *See* Morgan Dep. 65:10–66:13; *see also* PI Order 69–71 (finding that earlier iteration of illustrative Congressional District 6 "comports with traditional redistricting principles" and thus satisfied compactness requirement). Indeed, Mr. Morgan does not dispute that Mr. Cooper's illustrative plan equalizes population, *see* Morgan Dep. 62:4–7; is contiguous, *see id.* at 62:14–17; is similarly compact as the enacted plan, *see* Morgan Report ¶ 22; Morgan Dep. 55:18–57:5; and preserves political subdivisions the same as or better than the enacted plan, *see* Morgan Report ¶ 20; Morgan Dep. 44:6–46:16, 54:7–11, 54:18–55:6—in other words, satisfies the redistricting principles that the General Assembly itself adopted as guidelines when drawing Georgia's enacted congressional districts. SUMF ¶ 46; Exs. 10–11.

Mr. Morgan's only apparent complaints with Mr. Cooper's illustrative plan are neither persuasive nor meaningful. First, he objects to the illustrative plan's "discontinuity" with Georgia's prior congressional plan and the enacted plan. Morgan Report ¶¶ 14, 18. But, as the Court previously noted, the preservation of existing district cores was not an enumerated guideline adopted by the General

Assembly. *See* PI Order 85–86. And, in any event, Mr. Cooper's illustrative plan leaves six of the 14 districts in the enacted plan unchanged, SUMF ¶ 68; Cooper Report ¶¶ 11, 51; Morgan Report ¶ 18—a degree of core retention that previously led the Court to "find[] that not only does Mr. Cooper's Illustrative Congressional Plan comply with the traditional districting principles and the General Assembly's guidelines, his plan also does not alter existing district cores in a manner that counsels against finding that it satisfies the first *Gingles* precondition," PI Order 86–87.

Second, Mr. Morgan offers a single sentence claiming that "care [was] taken" by Mr. Cooper "to avoid changing the racial make-up" of his illustrative Congressional District 6. Morgan Report ¶ 17. But this conclusory assertion is, as Mr. Morgan implicitly conceded in his deposition, wholly unsupported by any meaningful analysis or discussion in his expert report. *See* Morgan Dep. 52:1–53:4. Mr. Morgan's idle speculation does not meaningfully counter Mr. Cooper's assertion that no one factor—neither racial considerations nor anything else—predominated in the drawing of his illustrative congressional plan. SUMF ¶ 45; Cooper Report ¶ 50; *see also* PI Order 37, 87–92. And baseless conjecture can hardly serve as evidence sufficient to defeat summary judgment. *See Kernel Recs. Oy*, 694 F.3d at 1301 ("'Although all justifiable inferences are to be drawn in favor of the nonmoving

15

party,' 'inferences based upon speculation are not reasonable.'" (citations omitted) (first quoting *Baldwin County v. Purcell Corp.*, 971 F.2d 1558, 1563–64 (11th Cir. 1992); and then quoting *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986))).

Ultimately, Mr. Morgan's brief declaration in this matter is little more than a recitation of the metrics already reported by Mr. Cooper, and certainly does nothing to dispute that Plaintiffs' illustrative map fulfills the applicable criteria under Section 2. Indeed, by acknowledging the numerosity and compactness of the Atlanta metropolitan area's Black population and recognizing that Mr. Cooper's illustrative plan satisfies the relevant neutral criteria, Mr. Morgan has all but conceded Plaintiffs' compliance with the first *Gingles* precondition.

## II.   *Gingles* Two: Black Georgians in the focus area are politically cohesive.

Plaintiffs satisfy the second *Gingles* precondition because Black voters in the area where Mr. Cooper has drawn an additional majority-Black congressional district are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68; *see also* PI Order 172 (explaining second *Gingles* precondition).

16

Dr. Palmer analyzed political cohesion and racially polarized voting in a focus area comprising the five congressional districts from which Mr. Cooper's illustrative majority-Black district was drawn. SUMF ¶ 69; Palmer Report ¶ 10, fig.1. To perform his analysis, Dr. Palmer examined precinct-level election results and voter turnout by race and employed a widely accepted methodology called ecological inference analysis. SUMF ¶¶ 70–72; Palmer Report ¶¶ 8, 11, 13–14; Ex. 9 ("Alford Dep.") at 36:11–37:12; *see also, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018) (recognizing ecological inference as "the 'gold standard' for use in racial bloc voting analyses"), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); PI Order 176–78 (finding that Dr. Palmer's "methods and conclusions are highly reliable").

Dr. Palmer found that Black voters in Georgia are extremely cohesive, with a clear candidate of choice in all 40 elections he examined—a conclusion with which Defendants' expert, Dr. John Alford, readily agreed. SUMF ¶¶ 73–74; Palmer Report ¶¶ 15–16 & n.13, figs.2 & 3, tbl.1; Ex. 3 ("Suppl. Palmer Report") ¶ 5, tbl.1; Ex. 7 ("Alford Report") at 3; Alford Dep. 37:13–15. Across the focus area, Black voters supported their candidates of choice with an average of 98.4% of the vote in the 40 elections Dr. Palmer examined, a finding reflected in each of the five component congressional districts as well. SUMF ¶¶ 75–77; Palmer Report ¶¶ 7, 16,

19, fig.4, tbls.2, 3, 4, 5 & 6. Plaintiffs therefore satisfy the second *Gingles* precondition. *See* 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving [] political cohesiveness[.]"); *see also* PI Order 185–86 (concluding that "Plaintiffs have satisfied their burden to establish that Black voters in Georgia (at least for those regions examined) are politically cohesive").

## III.   *Gingles* Three: White Georgians engage in bloc voting to defeat Black-preferred candidates in the focus area.

Finally, Plaintiffs satisfy the third *Gingles* precondition because, in the area where Mr. Cooper proposes a new majority-Black district, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51; *see also* PI Order 197–98 (explaining third *Gingles* precondition).

Dr. Palmer found high levels of white bloc voting in opposition to the candidates whom Black voters cohesively supported—another finding endorsed by Dr. Alford. SUMF ¶ 78; Palmer Report ¶ 17, figs.2 & 3, tbl.1; Suppl. Palmer Report ¶ 5, fig.1, tbl.1; Alford Report 3; Alford Dep. 38:20–39:8. In the same 40 elections Dr. Palmer analyzed, white voters in the focus area overwhelmingly opposed Black voters' candidates of choice: On average, only 12.4% of white voters supported Black-preferred candidates, and in no election did white support exceed 17%. SUMF

¶ 79; Palmer Report ¶¶ 7, 17. Consequently, across the focus area, white-preferred candidates won the majority of the vote in all 40 elections. SUMF ¶ 82; Palmer Report ¶¶ 8, 22, tbl.7. Dr. Palmer reported the same results at the district level: White voters cohesively opposed Black-preferred candidates in each of the five congressional districts, and only in the majority-Black Congressional District 13 did Black-preferred candidates win larger shares of the vote in the 40 elections. SUMF ¶¶ 80–81, 83–85; Palmer Report ¶¶ 8, 20, 22, fig.4, tbls.2, 3, 4, 5, 6 & 7; Suppl. Palmer Report ¶ 4; Cooper Report ¶ 73, fig.14.

In short, Black voters' candidates of choice are consistently defeated in the focus area by white bloc voting, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition. *See* 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice."); *see also* PI Order 198–200 (crediting "Dr. Palmer's analysis and testimony" and concluding that "Plaintiffs have satisfied their burden under the third *Gingles* precondition").

## IV.    Under the totality of circumstances, the enacted map denies Black voters equal opportunity to elect their preferred candidates to Congress.

Considering the "totality of circumstances," Georgia's enacted congressional map denies Black voters an equal opportunity to elect their preferred congressional representatives. 52 U.S.C. § 10301(b). Notably, "it will be only the very unusual

case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Again, this is not an unusual case.

The factors outlined in the Senate Judiciary Committee report accompanying the 1982 Voting Rights Act amendments—the Senate Factors—are "typically relevant to a § 2 claim" and guide this analysis. *LULAC*, 548 U.S. at 426; *see also Gingles*, 478 U.S. at 36–37 (listing Senate Factors). They are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, pt. 1, at 29 (1982)).

Here, each of the relevant Senate Factors confirms that the enacted congressional map denies Black voters equal electoral opportunities.

### A.     Senate Factor One: Georgia has an ongoing history of official voting-related discrimination.

"It cannot be disputed that Black Georgians have experienced franchise-related discrimination." PI Order 205. Indeed, "Georgia electoral history is marked by too many occasions where the State, through its elected officials, enacted discriminatory measures designed to minimize black voting strength." *Brooks v.*

*State Bd. of Elections*, 848 F. Supp. 1548, 1572 (S.D. Ga. 1994); *see also, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 593 F. Supp. 3d 1320, 1342 (N.D. Ga. 2021) (taking judicial notice of fact that, "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting"). As the Eleventh Circuit has similarly acknowledged, "[t]he voting strength of blacks has historically been diminished in Georgia in numerous ways, including property ownership requirements, literacy tests, and the use of the county unit system which undermined the voting power of counties with large black populations." *Brooks v. Miller*, 158 F.3d 1230, 1233 (11th Cir. 1998). Although these discriminatory actions have evolved over the years, they have persisted; as a result of this centuries-long effort to marginalize and disenfranchise Black Georgians, they still lack equal access to the state's political processes today.

Dr. Orville Vernon Burton prepared an extensive (and unrebutted) examination of the history of voting-related discrimination in Georgia, emphasizing a sordid and recurring pattern: After periods of increased nonwhite voter registration and turnout, the State finds methods to disfranchise and reduce the influence of minority voters. SUMF ¶ 86; Ex. 4 ("Burton Report") at 2, 9–10; *see also* PI Order 207 (finding Dr. Burton "highly credible," his "historical analysis [] thorough and methodologically sound," and his "conclusions . . . reliable"). Indeed, "[w]hile

Georgia was not an anomaly, no state was more systematic and thorough in its efforts to deny or limit voting and officeholding by African-Americans after the Civil War." SUMF ¶ 95; Burton Report 10 (quoting Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* 2–3 (2003)). Following Reconstruction, these tactics included poll taxes, a white-only primary system, and use of majority-vote requirements and at-large districts. SUMF ¶¶ 96–104; Burton Report 10–12, 14–26. Efforts at de jure disenfranchisement were reinforced by rampant political terror and violence against Black legislators and voters; between 1875 and 1930, Georgia witnessed 462 lynchings—second only to Mississippi— which, as Dr. Burton explained, "served as a reminder for Black Georgians who challenged the status quo" and "did not need to be directly connected to the right to vote to act as a threat against all Black Georgians who dared participate in the franchise." SUMF ¶¶ 87–94; Burton Report 14–26.

While enactment of the Voting Rights Act altered Georgia's trajectory, it did not end efforts to prevent the exercise of Black political power. SUMF ¶¶ 105–06; Burton Report 36–43. By 1976, among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens; these disparities were directly attributable to Georgia's continued efforts to enact policies designed to circumvent the Voting

Rights Act's protections and suppress the rights of Black voters. SUMF ¶ 107; Burton Report 36. Notably, between 1965 and 1980, nearly *30%* of the Department of Justice's objections to voting-related changes under Section 5 were attributable to Georgia—more than any other state in the country. SUMF ¶ 108; Burton Report 3, 39. When Congress reauthorized the Voting Rights Act in 1982, it specifically cited systemic abuses by Georgia officials intended to obstruct Black voting rights. SUMF ¶ 109; Burton Report 3, 42.

Georgia's voting-related discrimination extended to its redistricting efforts. SUMF ¶¶ 119–21; Burton Report 32. Prior to the effective termination of the Section 5 preclearance requirement following *Shelby County v. Holder*, 570 U.S. 529 (2013), federal challenges and litigation were common features of the state's decennial redistricting—indeed, the Department of Justice objected to reapportionment plans submitted by Georgia during each of the four redistricting cycles following enactment of the Voting Rights Act because the maps diluted Black voting strength. SUMF ¶¶ 122–26; Burton Report 40–44; Exs. 12–13; *see also, e.g.*, *Georgia v. United States*, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 in part because it diluted Black vote in Atlanta-based congressional district); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge court) (denying preclearance based on evidence that

Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983).

Significantly, racial discrimination in voting is not consigned to history books; efforts to dilute the political power of Black Georgians persist today. Following *Shelby County*, Georgia was the only former preclearance state that proceeded to adopt "all five of the most common restrictions that impose roadblocks to the franchise for minority voters, including (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting, and (5) widespread polling place closures." SUMF ¶ 111; Burton Report 48–49. Throughout the first two decades of the 21st century, the State investigated Black candidates and organizations dedicated to protecting the voting rights of Georgia's minority voters; investigations into alleged voter fraud in the predominantly Black City of Quitman and into the efforts of the New Georgia Project and the Asian American Legal Advocacy Center ended without convictions or evidence of wrongdoing. SUMF ¶ 110; Burton Report 45–46. In 2015, Georgia began closing polling places in primarily Black neighborhoods; by 2019, 18 counties closed more than half of their polling places and several closed nearly 90%, depressing turnout in affected areas and leading to substantially longer waiting times at the polls. SUMF ¶¶ 112–13; Burton Report 49–50. The State has also engaged in "systematic efforts to purge the

24

voting rolls in ways that particularly disadvantaged minority voters and candidates"—between 2012 and 2018, Georgia removed 1.4 million voters from the eligible voter rolls, purges that disproportionately impacted Black voters. SUMF ¶¶ 115–16; Burton Report 50–51.

Ultimately, the growth of Georgia's nonwhite population over the past 20 years—and the corresponding increase in minority voting power—has, in Dr. Burton's words, "provide[d] a powerful incentive for Republican officials at the state and local level to place hurdles in the path of minority citizens seeking to register and vote." SUMF ¶ 118; Burton Report 60. Georgia's efforts to discriminate against Black voters has simply not stopped. *See* PI Order 205–09 (finding that "Plaintiffs have demonstrated the history of voting-related discrimination in Georgia" and "[t]he first Senate Factor thus weighs decisively in Plaintiffs' favor").

## B.   Senate Factor Two: Georgia voters are racially polarized.

Courts have repeatedly found that voting throughout Georgia is racially polarized. *See, e.g.*, *Fayette Cnty.*, 775 F.3d at 1340 (Fayette County "[v]oters' candidate preferences in general elections were racially polarized"); *Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (three-judge court) ("[V]oting in Georgia is highly racially polarized."); *Wright*, 301 F. Supp. 3d at 1319 ("Sumter County's voters [are] highly polarized."). These findings were

confirmed in the focus area and in its constituent congressional districts by Dr. Palmer's analysis discussed above: Black voters overwhelmingly support their candidates of choice, and white voters consistently and cohesively vote in opposition to Black-preferred candidates. SUMF ¶¶ 128–36; Palmer Report ¶¶ 7, 16–17, 19–20, figs.2, 3 & 4, tbls.1, 2, 3, 4, 5, & 6; Suppl. Palmer Report ¶¶ 4–5, fig.1, tbl.1; Alford Report 3; Alford Dep. 37:13–15, 38:20–39:8, 44:8–16, 45:10–12; *see also supra* at 16–19.

Far from disputing this polarization, Defendants' expert Dr. Alford confirmed it, both in his expert report, *see* Alford Report 3 ("As evident in Dr. Palmer's [reports], the pattern of polarization is quite striking."), and in his deposition, *see* Alford Dep. 44:8–16, 45:10–12 ("This is clearly polarized voting, and the stability of it across time and across office and across geography is really pretty remarkable."). Voting in the focus area is undeniably polarized along racial lines, and the second Senate Factor thus tips strongly in Plaintiffs' favor.

Neither Dr. Alford's expert report nor Defendants' prior arguments change this conclusion. As at the preliminary injunction stage, Dr. Alford maintains that the polarization is better explained by partisanship than race. But his analysis is guided by the wrong question. The inquiry implicated by this Senate Factor is objective, not subjective: *how* Black and white Georgians vote, not *why* they vote that way. As this

26

Court previously explained, "to satisfy the second *Gingles* precondition, Plaintiffs need not prove the causes of racial polarization, just its existence." PI Order 174. This critical emphasis on correlation rather than causation finds its basis in the concerns that animated revisions to Section 2 decades ago; as this Court explained,

> applying the standard advocated by Defendants would undermine the congressional intent behind the 1982 amendments to the VRA—namely, to focus on the *results* of the challenged practices. Congress wanted to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials or entire communities." As the Eleventh Circuit long ago made clear, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting."

*Id.* at 175–76 (alterations in original) (citations omitted) (first quoting S. Rep. No. 97-417, pt. 1, at 36; and then quoting *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984)).

Dr. Alford conceded in his deposition that the relevance of his analysis hinges not on the *fact* of racial polarization, which is not in dispute, *see* Alford Report 3; Alford Dep. 44:8–16, 45:10–12, but on a threshold *legal* question, *see* Alford Dep. 114:13–21 ("[I]f the judge thinks the law doesn't require anything other than that the two groups vote differently without any connection to race . . . , then that's the law."). That legal question has already been addressed—and resolved—by this Court. *See* PI Order 209–10 (concluding that "the Court's analysis on the second and

27

third *Gingles* preconditions controls here" and "[t]he second Senate Factor thus weighs in Plaintiffs' favor").

### C. Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.

As discussed above, Georgia has employed a variety of voting practices that have discriminated against Black voters. *See supra* at 20–25; *see also* SUMF ¶ 154; Burton Report 11–55. In addition to the malapportionment of legislative and congressional districts to dilute the votes of Black Georgians throughout the 20th century, SUMF ¶¶ 155–56; Burton Report 31, and the continuing use of polling place closures, voter purges, and other suppressive techniques, SUMF ¶ 159; Burton Report 49–55, numerous Georgia counties with sizeable Black populations shifted from voting by district to at-large voting following enactment of the Voting Rights Act, thus ensuring the electoral success of white-preferred candidates, SUMF ¶ 157; Burton Report 32–33.

Moreover, even though the *Gingles* Court specifically highlighted the use of majority-vote requirements as meaningful evidence of ongoing efforts to discriminate against minority voters, *see* 478 U.S. at 45, Georgia continues to impose a majority-vote requirement in general elections, including elections to the U.S. House of Representatives, SUMF ¶ 158; Burton Report 34; O.C.G.A. § 21-2-501. The combination of a majority-vote requirement and racially polarized voting

ensures that Black voters cannot elect their candidates of choice when they are a minority of a jurisdiction's population, even when the white vote is split. *See City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (describing how such circumstances "permanently foreclose a black candidate from being elected"); *see also* PI Order 210–11 (finding that "Plaintiffs have shown there has been a history of voting practices or procedures in Georgia that have enhanced the opportunity for discrimination against Black voters" and "this factor weighs in Plaintiffs' favor").

### D. Senate Factor Four: Georgia has no history of candidate slating for congressional elections.

Because Georgia's congressional elections do not use a slating process, this factor has no relevance to Plaintiffs' claim. SUMF ¶ 160; PI Order 211.

### E. Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process.

Georgia's Black community continues to suffer as a result of the state's history of discrimination. Dr. Loren Collingwood's (also unrebutted) expert report concluded that, "[o]n every metric, Black Georgians are disadvantaged socioeconomically relative to non-Hispanic White Georgians," disparities that "have an adverse effect on the ability of Black Georgians to participate in the political process, as measured by voter turnout and other forms of political participation." SUMF ¶ 161; Ex. 5 ("Collingwood Report") at 3; *see also* PI Order 214 (finding

29

"Dr. Collingwood to be credible, his analysis methodologically sound, and his conclusions reliable"). While "the burden is not on the plaintiffs to prove" that these disparities are "causing reduced political participation," *Marengo Cnty.*, 731 F.2d at 1569, Dr. Collingwood has concluded that this is the case, as the data show a significant relationship between turnout and socioeconomic disparities; as health, education, and employment outcomes increase, so does voter turnout. SUMF ¶ 162; Collingwood Report 3.

The disparities and disadvantages experienced by Black Georgians impact nearly every aspect of daily life:

- The unemployment rate among Black Georgians (8.7%) is nearly double that of white Georgians (4.4%). SUMF ¶ 163; Collingwood Report 4.

- White households are twice as likely as Black households to report an annual income above $100,000. SUMF ¶ 164; Collingwood Report 4.

- Black Georgians are more than twice as likely as white Georgians to live below the poverty line—and Black children more than *three times* as likely. SUMF ¶ 165; Collingwood Report 4.

- Black Georgians are nearly three times as likely as white Georgians to receive SNAP benefits. SUMF ¶ 166; Collingwood Report 4.

- Black adults are more likely than white adults to lack a high school diploma—13.3% as compared to 9.4%. SUMF ¶ 167; Collingwood Report 4.

- Thirty-five percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24% of Black Georgians over the age of 25. SUMF ¶ 168; Collingwood Report 4.

Dr. Collingwood further concluded that these racial disparities hold across nearly every county in the state. SUMF ¶ 169; Collingwood Report 4–6.

The evidence strongly suggests that the socioeconomic disparities imposed on Black Georgians impact their levels of political participation. Dr. Collingwood explained that extensive literature in the field of political science demonstrates a strong and consistent link between socioeconomic status and voter turnout: In general, voters with higher income and education are disproportionately likely to vote and participate in American politics. SUMF ¶¶ 171–72; Collingwood Report 7. This pattern is evident in Georgia. Dr. Collingwood found that, in elections between 2010 and 2022, Black Georgians consistently turned out to vote at lower rates than white Georgians—a gap of at least 3.1 percentage points (during the 2012 general election) that reached its peak of 13.3 percentage points during the 2022 general election. SUMF ¶ 173; Collingwood Report 7–8. This trend can be seen at the local level as well, including in the Atlanta metropolitan area: During each general

election, white voters exceeded the turnout rates of Black voters in all but a handful of Georgia's 159 counties, and white voters had higher rates of turnout in 79.2% of the 1,957 precincts analyzed. SUMF ¶¶ 174–75; Collingwood Report 8–19. White Georgians are also more likely than Black Georgians to participate in a range of political activities, including attending local meetings, demonstrating political participation through lawn signs and bumper stickers, working on campaigns, attending protests and demonstrations, contacting public officials, and donating money to campaigns and political causes. SUMF ¶ 178; Collingwood Report 34–38.

Comparing rates of Black voter turnout with educational attainment, Dr. Collingwood found that each 10-point increase in the percentage of the Black population without a high school degree decreases Black turnout by 3.5 percentage points, and that Black turnout rises 2.3 percentage points for each 10-point increase in the percentage of the Black population with a four-year degree. SUMF ¶ 176; Collingwood Report 24–26. The pattern holds between voter turnout and poverty: Black turnout falls 4.9 percentage points for each 10-point increase in the percentage of the Black population below the poverty line, SUMF ¶ 177; Collingwood Report 28, confirming the link between socioeconomic disadvantage and depressed political participation, *see* PI Order 211–15 (finding that "Plaintiffs have offered unrebutted evidence that Black Georgians suffer socioeconomic hardships stemming

from centuries-long racial discrimination, and that those hardships impede their ability to fully participate in the political process," and concluding that "Plaintiffs' evidence on this factor weighs in favor of a finding of vote dilution").

### F. Senate Factor Six: Racial appeals are prevalent in Georgia's political campaigns.

As Dr. Burton concluded, "[r]acism, whether dog whistled or communicated directly, became a hallmark of" Georgia politics during the second half of the 20th century. SUMF ¶ 183; Burton Report 66. Although *explicit* racial appeals are no longer commonplace, *implicit* racial appeals—which, as political scientists have explained, use coded language, subtext, and visuals to activate racial thinking—are still a recurring feature of Georgia campaigns and contribute to the state's polarized voting. SUMF ¶¶ 179–82; Burton Report 62–64.

Georgia politicians have long employed implicit racial appeals to win elected office, from future U.S. House Speaker Newt Gingrich's invocation of "welfare cheaters" during his first run for Congress in 1978—one campaign aide later said, "[W]e went after every rural southern prejudice we could think of"—to Governor Brian Kemp's repeated use of coded language and insinuation during his (successful) campaigns against Stacey Abrams in 2018 and 2022. SUMF ¶¶ 184–90, 194; Burton Report 65–70 (quoting Dana Milbank, *The Destructionists: The Twenty-Five Year Crack-up of the Republican Party* 66 (2022)). During the 2022

gubernatorial election, Governor Kemp's campaign deliberately darkened Abrams's face in campaign advertisements "to create a darker, more menacing image," while the 2020 U.S. Senate race saw implicit racial attacks on now-Senator Raphael Warnock and his church, the landmark Ebenezer Baptist Church. SUMF ¶¶ 191–93, Burton Report 68–70. These and other racial appeals have been amplified by local, state, and national news outlets since the 2016 election, SUMF ¶ 200; Exs. 14–25— thus ensuring that racialized campaigning remains an ingrained feature of Georgia's political environment.

Notably, some racial appeals from recent Georgia campaigns carry haunting echoes of the state's tragic history of discrimination and disenfranchisement. After Abrams planned a campaign rally in Forsyth County during the 2022 election, the local Republican Party issued a digital flyer attacking her and Senator Warnock and urging "conservatives and patriots" to "save and protect our neighborhoods"—a call reminiscent of the infamous Forsyth County pogrom in 1912, when Black residents were forcibly expelled. SUMF ¶ 195; Burton Report 70 (quoting Maya King, *In Georgia County With Racist History, Flier Paints Abrams as Invading Enemy*, N.Y. Times (Sept. 16, 2022), https://www.nytimes.com/2022/09/16/us/politics/stacey-abrams-forsyth-georgia-republicans.html).

Governor Kemp and other Georgia politicians have recently embraced another gambit with familiar undertones: the unsubstantiated specter of voter fraud in the Atlanta metropolitan area and other areas with large Black populations, which mirrors the efforts of white Georgians during and after Reconstruction to restrict and eliminate Black suffrage. SUMF ¶¶ 196, 199; Burton Report 70–74. Plurality-Black Fulton County has been at the center of these baseless allegations of fraud, with former President Donald Trump spreading conspiracy theories about the county as part of his effort to overturn Georgia's 2020 election results. SUMF ¶ 197; Cooper Report Ex. D; Burton Report 73–74. In one particularly pernicious incident, two Black poll workers in Fulton County, Ruby Freeman and Shaye Moss, were targeted by former President Trump and his campaign with allegations that they had engaged in "surreptitious illegal activity"; the two women received harassing phone calls and death threats, often laced with racial slurs, with suggestions that they should be "strung up from the nearest lamppost and set on fire"—in Dr. Burton's words, "horribly echoing the calls for lynchings of Black citizens from earlier years who were attempting to participate in the political process." SUMF ¶ 198; Burton Report 73–74 (quoting Jason Szep & Linda So, *Trump Campaign Demonized Two Georgia Election Workers—and Death Threats Followed*, Reuters (Dec. 1, 2021), https://www.reuters.com/investigates/special-report/usa-election-threats-georgia).

Ultimately, although racial appeals might have become more coded in recent campaigns, they are no less insidious—and no less a facet of Georgia's political landscape. *See* PI Order 215–17 (finding that "Plaintiffs have presented sufficient evidence for this factor to weigh in their favor").

### G. Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.

As a consequence of Georgia's history of voter suppression and racial discrimination, Black Georgians have struggled to win election to public office.

At the time of the Voting Rights Act's passage, Black Georgians constituted 34% of the state's voting-age population, and yet Georgia had only *three* elected Black officials. SUMF ¶ 201; Burton Report 35. By 1980, Black Georgians comprised just 3% of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. SUMF ¶ 202; Burton Report 41. That particular trend has not changed: While more Black Georgians have been elected to office in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. SUMF ¶ 203; Burton Report 55–57. In the 2020 legislative elections, for example, no Black members of the Georgia House of Representatives were elected from districts where white voters exceeded 55% of the voting-age population, and no Black members of the Georgia State

Senate were elected from districts where white voters exceeded 47%. SUMF ¶ 204; Burton Report 56; *see also supra* at 19 (noting that Black-preferred candidates prevail only in focus area's majority-Black congressional district).

Although Black Georgians now comprise more than 33% of the state's population, SUMF ¶ 5; Cooper Report ¶ 16, fig.1, the Georgia Legislative Black Caucus had only 16 members in the State Senate and 52 members in the House after the 2020 election—less than 30% of each chamber. SUMF ¶ 205; Burton Report 56. Black officials have been underrepresented across Georgia's statewide offices as well: Although Georgia recently reelected a Black member of the U.S. Senate, Senator Raphael Warnock is the *first* Black Georgian to hold that office—after more than 230 years of white senators. SUMF ¶ 206; Burton Report 53, 68; *see also* PI Order 217–18 (finding that "[b]ased on the evidence presented, . . . this factor [] weighs in Plaintiffs' favor").

### H.   Senate Factor Eight: Georgia is not responsive to its Black residents.

Although the Eleventh Circuit has noted that "[u]nresponsiveness is considerably less important under" a Section 2 results claim, *see Marengo Cnty.*, 731 F.2d at 1572, it is nonetheless true that Georgia has long neglected the needs of its Black residents. As discussed above, *see supra* at 29–33, Black Georgians face clear and significant disadvantages across a range of socioeconomic indicators,

including education, employment, and health, SUMF ¶ 207; Collingwood Report 3; Cooper Report ¶¶ 83–85. Dr. Collingwood articulated the inevitable conclusion; as he explained, "[i]t follows that the political system is relatively unresponsive to Black Georgians; otherwise, we would not observe such clear disadvantages in healthcare, economics, and education." SUMF ¶ 208; Collingwood Report 4; *see also* PI Order 218–19 (finding that this factor "weighs in [Plaintiffs'] favor").[5]

## I.     Senate Factor Nine: The justification for the new congressional map is tenuous.

Finally, no legitimate governmental interest justifies denying Black Georgians the ability to elect their candidates of choice. Defendants cannot justify the refusal to draw an additional majority-Black congressional district in the western Atlanta metropolitan area, especially given that drawing districts to account for the numerosity and compactness of Georgia's Black community is required by the

---

[5] As if to underscore the apathy (and antipathy) of certain elected officials, one of the districts into which Cobb County's Black voters are cracked, Congressional District 14, *see supra* at 11, is currently represented by Congresswoman Marjorie Taylor Greene, who has a history of making racist statements and videos—claiming, among other things, that the Black community's progress is hindered by Black gang activity, drugs, lack of education, Planned Parenthood, and abortions, SUMF ¶ 187; Burton Report 69. During the 117th Congress, the U.S. House of Representatives voted to strip Congresswoman Greene of her assignments on the House Budget and Education and Labor committees "in light of conduct she has exhibited." SUMF ¶ 209; Exs. 26–27.

Voting Rights Act. *See* PI Order 219 (concluding that "[t]his factor [] weighs in Plaintiffs' favor" because "Mr. Cooper's illustrative maps demonstrate that it is possible to create such maps while respecting traditional redistricting principles— just as the Voting Rights Act requires").

Nor, for that matter, can the enacted congressional map's treatment of Cobb County and the western Atlanta suburbs be justified. As discussed above, *see supra* at 11–13, the enacted plan splits majority-non-white Cobb County into parts of four districts, including three majority-white districts: Congressional Districts 6, 11, and 14. SUMF ¶ 210; Cooper Report ¶¶ 60, 65, 73, fig.14. Southwest Cobb County—including its constituent Black voters—is inexplicably included in Congressional District 14, which stretches into Appalachian north Georgia and the suburbs of Chattanooga. SUMF ¶ 211; Cooper Report ¶¶ 60, 68, Ex. G. Douglas County is similarly divided; its western half is drawn into Congressional District 3, which stretches west and south into majority-white counties along the Alabama border. SUMF ¶ 212; Cooper Report Exs. D & G. While equal-population requirements might sometimes justify combining urban and rural voters, Mr. Cooper's illustrative plan demonstrates that voters in the western Atlanta metropolitan area can be united in a single district comprising Douglas County and

parts of Cobb, Fulton, and Fayette counties, all of which are core counties under the ARC. SUMF ¶ 213; Cooper Report ¶ 68, Ex. H-1.

## CONCLUSION

Despite having more than a year to prepare a defense of the enacted congressional plan, Defendants have left Plaintiffs' evidence effectively unrefuted. Any disputes that they and their experts have managed to raise are of a purely legal character—and were already considered by the Court and resolved in Plaintiffs' favor following last year's preliminary injunction proceeding.

Given that they have submitted credible, unrebutted expert evidence proving the required elements of a Section 2 vote-dilution claim, Plaintiffs respectfully request that the Court grant summary judgment in their favor and order the adoption of a new congressional plan for Georgia that complies with the requirements of federal law.

Dated: March 20, 2023

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing ***Brief in Support of Plaintiffs' Motion for Summary Judgment*** has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: March 20, 2023

**Adam M. Sparks**
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing ***Brief in Support of Plaintiffs' Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: March 20, 2023

**Adam M. Sparks**
*Counsel for Plaintiffs*