## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COAKLEY PENDERGRASS; TRIANA
ARNOLD JAMES; ELLIOTT
HENNINGTON; ROBERT RICHARDS;
JENS RUECKERT; and OJUAN GLAZE,

        Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State;
WILLIAM S. DUFFEY, JR., in his official
capacity as chair of the State Election
Board; MATTHEW MASHBURN, in his
official capacity as a member of the State
Election Board; SARA TINDALL
GHAZAL, in her official capacity as a
member of the State Election Board;
EDWARD LINDSEY, in his official
capacity as a member of the State Election
Board; and JANICE W. JOHNSTON, in
her official capacity as a member of the
State Election Board,

        Defendants.

CIVIL ACTION FILE
NO. 1:21-CV-05339-SCJ

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    First *Gingles* Precondition: Numerosity and Compactness ........................... 1

    A.    Numerosity ...................................................................................... 1

        1.    Demographic Developments ..................................................... 1

            a.    Statewide ........................................................... 1

            b.    Atlanta Metropolitan Area ................................. 3

        2.    Enacted Congressional Plan ..................................................... 6

        3.    Illustrative Congressional Plan ................................................ 6

    B.    Geographic Compactness ............................................................... 10

        1.    Population Equality .................................................................. 11

        2.    Contiguity ................................................................................ 11

        3.    Compactness ............................................................................ 11

        4.    Preservation of Political Subdivisions .................................... 14

        5.    Preservation of Communities of Interest ................................ 16

        6.    Core Retention ........................................................................ 18

II.   Second *Gingles* Precondition: Political Cohesion ........................................ 19

III.  Third *Gingles* Precondition: Bloc Voting .................................................... 23

IV.   Totality of Circumstances ............................................................................. 24

    A.    Senate Factor One: History of Voting-Related Discrimination .......... 24

        1.    Political Violence Against Black Georgians ........................... 25

2.      Pre-Voting Rights Act ..............................................26

3.      Post-Voting Rights Act .............................................28

4.      Redistricting-Related Discrimination .....................................32

B.      Senate Factor Two: Racially Polarized Voting ...................................34

1.      Quantitative Evidence................................................34

2.      Qualitative Evidence.................................................37

C.      Senate Factor Three: Discriminatory Voting Procedures ..................42

D.      Senate Factor Four: Candidate Slating.................................................43

E.      Senate Factor Five: Contemporary Socioeconomic Disparities .........43

F.      Senate Factor Six: Racial Appeals in Georgia Campaigns ................46

G.      Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office.................................................................................53

H.      Senate Factor Eight: Official Nonresponsiveness...............................54

I.      Senate Factor Nine: Absence of Justification for Enacted Congressional Plan ..............................................................................55

J.      Proportionality.....................................................................................58

Pursuant to Federal Rule of Civil Procedure 56 and LR 56.1(B)(1), NDGa, Plaintiffs COAKLEY PENDERGRASS, TRIANA ARNOLD JAMES, ELLIOTT HENNINGTON, ROBERT RICHARDS, JENS RUECKERT, and OJUAN GLAZE file this statement of undisputed material facts in support of their motion for summary judgment.

The following facts are undisputed and constitute all material facts necessary to a determination in Plaintiffs' favor.

## I.     First *Gingles* Precondition: Numerosity and Compactness

### A.     Numerosity

#### 1.     Demographic Developments

##### a.     Statewide

1.     Between 2010 and 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.57% from 2010. Ex. 1 ("Cooper Report") ¶ 13, fig.1.[1]

2.     Georgia's population growth since 2010 can be attributed entirely to gains in the overall minority population. Cooper Report ¶ 14, fig.1.

3.     Between 2010 and 2020, Georgia's Black population increased by 484,048 people, up almost 16% since 2010. Cooper Report ¶ 15, fig.1.

---

[1] All exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with Plaintiffs' motion.

4.    Between 2010 and 2020, 47.26% of the state's population gain was attributable to Black population growth. Cooper Report fig.1.

5.    Georgia's Black population, as a share of the overall statewide population, increased between 2010 and 2020, from 31.53% in 2010 to 33.03% in 2020. Cooper Report ¶ 16, fig.1.

6.    As a matter of total population, any-part ("AP") Black Georgians comprise the largest minority population in the state, at 33.03%. Cooper Report fig.1.

7.    Between 2010 and 2020, Georgia's white population decreased by 51,764 people, or approximately 1%. Cooper Report ¶ 15, fig.1.

8.    Non-Hispanic white Georgians now comprise a majority of the state's population at 50.06%. Cooper Report ¶ 17.

9.    Georgia's Black population has increased in absolute and percentage terms since 1990, from about 27% in 1990 to 33% in 2020. Cooper Report ¶ 22, fig.3.

10.    Over the same time period, the percentage of the population identifying as non-Hispanic white has dropped from about 70% to 50%. Cooper Report ¶ 22, fig.3.

11.     Since 1990, the Black population has more than doubled: from 1.75 million to 3.54 million, an increase that is the equivalent of the populations of more than two congressional districts. Cooper Report ¶ 23, fig.3.

12.     The non-Hispanic white population has also increased, but at a much slower rate: from 4.54 million to 5.36 million, amounting to an increase of about 18% over the three-decade period. Cooper Report ¶ 23, fig.3.

13.     Georgia has a total voting-age population of 8,220,274, of whom 2,607,986 (31.73%) are AP Black. Cooper Report ¶ 18, fig.2.

14.     The total estimated citizen voting-age population in Georgia in 2021 was 33.3% AP Black. Cooper Report ¶ 20, fig.2.

### b.     Atlanta Metropolitan Area

15.     As defined by the U.S. Office of Management and Budget, the Atlanta Metropolitan Statistical Area ("MSA") consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Cooper Report ¶ 12 n.3.

16.   The Atlanta MSA has been the key driver of population growth in Georgia during this century, led in no small measure by a large increase in the region's Black population. Cooper Report ¶ 25, fig.4.

17.   The population gain in the Atlanta MSA between 2010 and 2020 amounted to 803,087 persons—greater than the population of one of the state's congressional districts—with about half of the gain coming from an increase in the region's Black population, which increased by 409,927 (or 23.07%). Cooper Report ¶ 30, fig.5.

18.   Under the 2000 census, the population in the 29-county Atlanta MSA was 29.29% AP Black, increasing to 33.61% in 2010 and then to 35.91% in 2020. Cooper Report ¶ 26, fig.4.

19.   The Black population in the Atlanta MSA has grown from 1,248,809 in 2000 to 2,186,815 in 2020—an increase of 938,006 people—accounting for 75.1% of the statewide Black population increase and 51.4% of the Atlanta MSA's total population increase. Cooper Report ¶ 26, fig.4.

20.   According to the 2020 census, the 11 core counties comprising the Atlanta Regional Commission ("ARC") service area account for more than half (54.7%) of the statewide Black population. Cooper Report ¶ 28.

4

21.    After expanding the region to include the 29 counties in the Atlanta MSA (including the 11 ARC counties), the Atlanta metropolitan area encompasses 61.81% of the state's Black population. Cooper Report ¶ 28.

22.    Under the 2000 census, the population in the Atlanta MSA was 60.42% non-Hispanic white, decreasing to 50.78% in 2010 and then to 43.71% in 2020. Cooper Report ¶ 27, fig.4.

23.    Between 2010 and 2020, the non-Hispanic white population in the Atlanta MSA decreased by 22,736 persons. Cooper Report ¶ 30, fig.5.

24.    According to the 2020 census, the Atlanta MSA has a total voting-age population of 4,654,322 persons, of whom 1,622,469 (34.86%) are AP Black. Cooper Report ¶ 31, fig.6.

25.    The non-Hispanic white voting-age population in the Atlanta MSA is 2,156,625 (46.34%). Cooper Report ¶ 31, fig.6.

26.    Based on the 2020 census, the combined Black population in Cobb, Fulton, Douglas, and Fayette counties is 807,076 persons, more than would be sufficient to constitute an entire congressional district—or a majority in two congressional districts. Cooper Report ¶ 42, fig.8.

27.     More than half (53.27%) of the total population increase in these four counties since 2010 can be attributed to the increase in the Black population. Cooper Report ¶ 43.

### 2.     Enacted Congressional Plan

28.     The enacted congressional plan reduces Congressional District 6's AP Black voting-age population ("BVAP") from 14.6% under the prior congressional plan to 9.9%. Cooper Report ¶ 40.

29.     Under the enacted plan, Congressional District 13 has an AP BVAP of 66.75%. Cooper Report ¶ 41.

30.     Another district in the Atlanta MSA, Congressional District 4, also has an AP BVAP in the 60% range. Cooper Report ¶ 40.

### 3.     Illustrative Congressional Plan

31.     As Plaintiffs' mapping expert, William S. Cooper, concluded—and Defendants' mapping expert, John Morgan, does not dispute—the Black population in the Atlanta metropolitan area is sufficiently numerous to allow for the creation of an additional majority-Black congressional district. Cooper Report ¶ 10; Ex. 8 ("Morgan Dep.") at 65:10–66:13 (not disputing this conclusion).

32.    Mr. Cooper prepared an illustrative congressional plan with an additional majority-Black district anchored in the western Atlanta metropolitan area—Congressional District 6. Cooper Report ¶¶ 10, 86–87.

33.    Mr. Cooper's illustrative congressional plan adds an additional majority-Black district without reducing the number of preexisting majority-Black districts in the enacted congressional plan. Cooper Report ¶ 73, fig.14; Morgan Dep. 65:10–66:13 (not disputing this conclusion).

34.    Given the increase in the Atlanta metropolitan area's Black population during this century, Mr. Cooper used this area as the focal point for his illustrative majority-Black district. Cooper Report ¶ 35.

35.    Mr. Cooper's illustrative Congressional District 6 encompasses all of

Douglas and parts of Cobb, Fayette, and Fulton counties:



Cooper Report ¶ 51, Ex. I-2.

36.    Mr. Cooper's illustrative Congressional District 6 has an AP Black

population of 396,891 people, or 51.87% of the district's population. Cooper Report

fig.11.

37.    Mr. Cooper's illustrative Congressional District 6 has an AP Black

voting-age population of 50.23%. Cooper Report ¶ 73, fig.14; Ex. 6 ("Morgan

Report") ¶ 12 (agreeing that Mr. Cooper's illustrative Congressional District 6 has "50.23% any-part Black voting age population").

38.     Mr. Cooper's illustrative Congressional District 6 has a non-Hispanic Black citizen voting-age population of 50.18%. Cooper Report ¶ 73, fig.14.

39.     Mr. Cooper's illustrative Congressional District 6 has a non-Hispanic Department of Justice ("DOJ") Black citizen voting-age population of 50.98% Cooper Report ¶ 73, fig.14.[2]

40.     Plaintiffs' racially polarized voting expert, Dr. Maxwell Palmer, analyzed the performance of Black-preferred candidates in Mr. Cooper's illustrative Congressional District 6. Ex. 2 ("Palmer Report") ¶ 23.

41.     In each of the 31 statewide races from 2012 through 2021, the Black-preferred candidate won a larger share of the vote in Mr. Cooper's illustrative Congressional District 6, with an average of 66.1%. Palmer Report ¶¶ 9, 23, 25, fig.5, tbl.8.

42.     In the 31 statewide races from 2012 through 2021, the Black-preferred candidate also won a larger share of the vote in Mr. Cooper's illustrative

_____

[2] The non-Hispanic DOJ Black citizen voting-age population includes voting-age citizens who are either non-Hispanic single-race Black or non-Hispanic Black and white. Cooper Report ¶ 57 n.10.

Congressional District 13 (the only district from which Mr. Cooper's illustrative Congressional District 6 was drawn that previously performed for Black-preferred candidates), with an average of 62.3%. Palmer Report ¶ 26.

### B.   Geographic Compactness

43.   As Mr. Cooper, concluded—and Mr. Morgan does not dispute—the Black population in the Atlanta metropolitan area is sufficiently geographically compact to allow for the creation of an additional majority-Black congressional district consistent with traditional redistricting principles. Cooper Report ¶ 10; Morgan Dep. 65:10–66:13 (not disputing this conclusion).

44.   In drafting his illustrative plan, Mr. Cooper sought to minimize changes to the enacted congressional plan while abiding by traditional redistricting principles: population equality, compactness, contiguity, respect for political subdivision boundaries, respect for communities of interest, and the non-dilution of minority voting strength. Cooper Report ¶¶ 48, 50.

45.   Mr. Cooper balanced these considerations, and no one factor predominated. Cooper Report ¶ 50.

46.   The guidelines for drafting congressional plans adopted by the redistricting committees of the Georgia State Senate and Georgia House of Representatives during the 2021 cycle included the following: population equality

("plus or minus one person from the ideal district size"), contiguity, compactness, consideration of the boundaries of counties and precincts, and consideration of communities of interest. Exs. 10–11.

### 1. Population Equality

47.    Mr. Cooper's illustrative Congressional District 6 has a total population of 765,137 people. Cooper Report fig.11.

48.    As in the enacted congressional plan, population deviations in Mr. Cooper's illustrative plan are limited to plus-or-minus one person from the ideal district population of 765,136. Cooper Report ¶ 53, fig.11; Morgan Dep. 62:4–7 (not disputing that Mr. Cooper's illustrative congressional plan achieves population equality).

### 2. Contiguity

49.    The districts in Mr. Cooper's illustrative congressional plan are contiguous. Cooper Report ¶ 52; Morgan Dep. 62:14–17 (not disputing that districts in Mr. Cooper's illustrative congressional plan are contiguous).

### 3. Compactness

50.    The average and low compactness scores of Mr. Cooper's illustrative congressional plan are similar or identical to the corresponding scores for the enacted congressional plan and Georgia's prior congressional plan, and within the norm for

plans nationwide. Cooper Report ¶ 78 & n.12, fig.13; Morgan Report ¶ 22 (agreeing that "Cooper [] congressional plan has similar mean compactness scores to the 2021 enacted plan"); Morgan Dep. 55:18–57:5 (agreeing that Mr. Cooper's illustrative congressional plan has similar mean compactness scores to enacted congressional plan and same mean Polsby-Popper score as enacted congressional plan).

51.    The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. Cooper Report ¶ 79 n.13.

52.    The Polsby-Popper test computes the ratio of each district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact. Cooper Report ¶ 79 n.14.

53.    The following table compares the compactness scores for Mr. Cooper's illustrative congressional plan, the enacted congressional plan, and the state's prior congressional plan adopted in 2012:

|  | Reock | | Polsby-Popper | |
|---|---|---|---|---|
|  | *Mean* | *Low* | *Mean* | *Low* |
| **Illustrative Plan** | .43 | .28 | .27 | .18 |
| **Enacted Plan** | .44 | .31 | .27 | .16 |
| **Prior Plan** | .45 | .33 | .26 | .16 |

Cooper Report ¶ 79, fig.13.

54.    The Reock score for Mr. Cooper's illustrative Congressional District 6 is 0.45, which is more compact than the average Reock score of the enacted congressional plan (0.44) and the Reock score of the enacted Congressional District 6 (0.42). Cooper Report Exs. L-1 & L-3; Morgan Dep. 57:15–59:6 (agreeing that Mr. Cooper's illustrative Congressional District 6 scores 0.03 higher on Reock scale than enacted Congressional District 6).

55.    The Polsby-Popper score for Mr. Cooper's illustrative Congressional District 6 is 0.27, which is as compact as the average Polsby-Popper score of the enacted congressional plan (0.27) and more compact than the Polsby-Popper score of the enacted Congressional District 6 (0.20). Cooper Report Exs. L-1 & L-3; Morgan Dep. 59:7–60:2 (agreeing that Mr. Cooper's illustrative Congressional

13

District 6 scores 0.07 higher on Polsby-Popper scale than enacted Congressional District 6).

### 4. Preservation of Political Subdivisions

56.     Mr. Cooper drew his illustrative plan to follow, to the extent possible, county boundaries. Cooper Report ¶ 49.

57.     Where Mr. Cooper split counties to comply with one-person, one-vote requirements, he generally used whole 2020 census voting districts ("VTDs") as sub-county components; where VTDs were split, he followed census-block boundaries that are aligned with roads, natural features, municipal boundaries, census-block groups, and post-2020-census county commission districts. Cooper Report ¶ 49.

58.     Mr. Cooper's illustrative congressional plan is comparable to—if not better than—the enacted congressional plan and prior congressional plan in terms of split counties and municipalities and county, municipality, and VTD splits. Cooper Report ¶ 81, fig.14.

59.     The following table compares political subdivision splits (excluding unpopulated areas) for Mr. Cooper's illustrative congressional plan, the enacted congressional plan, and the prior congressional plan:

|  | Split Counties | County Splits | Split Cities/Towns | City/Town Splits | VTD Splits |
|---|---|---|---|---|---|
| **Illustrative Plan** | 15 | 18 | 37 | 78 | 43 |
| **Enacted Plan** | 15 | 21 | 43 | 91 | 46 |
| **Prior Plan** | 16 | 22 | 40 | 85 | 43 |

Cooper Report ¶ 81, fig.14.

60.     Although both Mr. Cooper's illustrative congressional plan and the enacted congressional plan split 15 counties, the illustrative plan scores better across the other four categories: county splits (i.e., unique county/district combinations), split municipalities, municipality splits (i.e., unique municipality/district combinations), and VTD splits. Cooper Report ¶ 82, fig.14; Morgan Report ¶ 20 (agreeing that "[t]he Cooper [] congressional plan splits the same number of counties as the 2021 adopted congressional plan at 15"); Morgan Dep. 44:6–46:16, 54:7–11, 54:18–55:6 (not disputing numbers of split counties, county splits, split cities/towns, city/town splits, and VTD splits reported by Mr. Cooper).

### 5.      Preservation of Communities of Interest

61.      Mr. Cooper's illustrative plan splits majority-non-white Cobb County among three congressional districts, whereas the enacted congressional plan divides the county among four, including three majority-white districts—Congressional Districts 6, 11, and 14:

|           *Enacted Plan*           |   *Mr. Cooper's Illustrative Plan*   |
|:---:|:---:|



Cooper Report ¶¶ 60, 65, 73, fig.14, Exs. G & H-1.

62.    Under the enacted congressional plan, southwest Cobb County is in Congressional District 14, which stretches to the suburbs of Chattanooga in northwest Georgia:



Cooper Report ¶ 60, Ex. G.

63.    Mr. Cooper's illustrative Congressional District 6 unites Atlanta-area urban, suburban, and exurban voters, whereas the enacted congressional plan combines Appalachian north Georgia with the Atlanta suburbs. Cooper Report ¶ 68.

64.    Mr. Cooper's illustrative congressional plan combines voters in the western Atlanta metropolitan area: Illustrative Congressional District 6 unites all or part of Cobb, Douglas, Fulton, and Fayette counties, all of which are core counties under the ARC. Cooper Report ¶ 68.

65.     Douglas County is contained entirely in Mr. Cooper's illustrative Congressional District 6, whereas the enacted congressional plan divides the county between Congressional Districts 6 and 11, splitting Douglasville (population 34,650). Cooper Report ¶ 70.

66.     In Cobb County, Mr. Cooper's illustrative congressional plan assigns all but noncontiguous zero-population areas of Marietta (population 60,972) to Congressional District 6, whereas the enacted congressional plan divides populated areas of Marietta between Congressional Districts 6 and 11. Cooper Report ¶ 69.

67.     The enacted congressional plan also divides populated areas of Smyrna (population 55,663) between Congressional Districts 11 and 13, whereas Smyrna is not split in Mr. Cooper's illustrative plan. Cooper Report ¶ 69, Ex. M-4.

### 6.     Core Retention

68.     Mr. Cooper's illustrative plan leaves six of the 14 districts in the enacted plan unchanged: Congressional Districts 1, 2, 5, 7, 8, and 12. Cooper Report ¶¶ 11, 51; Morgan Report ¶ 18 (agreeing that "[i]n the Cooper [] congressional plan, six districts are the same as the enacted plan (1, 2, 5, 7, 8 and 12)").

18

## II.     Second *Gingles* Precondition: Political Cohesion

69.     Dr. Palmer conducted a racially polarized voting analysis of enacted Congressional Districts 3, 6, 11, 13, and 14, both as a region (the "focus area") and individually. Palmer Report ¶ 10, fig.1.

70.     Dr. Palmer employed a statistical method called ecological inference ("EI") to derive estimates of the percentages of Black and white voters in the focus area that voted for each candidate in 40 statewide elections between 2012 and 2022. Palmer Report ¶¶ 8, 11, 13–14; Ex. 9 ("Alford Dep.") at 36:11–37:12 (agreeing that EI is best available method for estimating voting behavior by race and with Dr. Palmer's methodology and results).

71.     Dr. Palmer's EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. Palmer Report ¶ 11.

72.     Dr. Palmer's EI process proceeded as follows: First, he examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election and, if a significant majority of the group supported a single candidate, then identified that candidate as the group's candidate of choice; and second, he compared the preferences of white voters to the preferences of Black voters. Palmer Report ¶ 14.

19

73.     Black voters in Georgia are extremely cohesive, with a clear candidate of choice in all 40 elections Dr. Palmer examined. Palmer Report ¶ 16, figs.2 & 3, tbl.1; Ex. 3 ("Suppl. Palmer Report") ¶ 5, fig.1, tbl.1; Ex. 7 ("Alford Report") at 3 ("Black voter support for their preferred candidate is typically in the 90 percent range and scarcely varies at all across the ten years examined from 2012 to 2022. Nor does it vary in any meaningful degree from the top of the ballot elections for U.S. President to down-ballot contests like Public Service Commissioner."); Alford Dep. 37:13–15 (agreeing with Dr. Palmer's conclusion that Black Georgians are politically cohesive).

74.     The following table presents the estimates of support for the Black-preferred candidates in the 40 elections Dr. Palmer examined; the solid dots correspond to an estimate in a particular election, and the gray vertical lines behind

each dot (which might not be visible because they are relatively small) are the 95%

confidence intervals for the estimate:



Palmer Report ¶ 15 & n.13, fig.2.

75. On average, across the focus area, Black voters supported their

candidates of choice with 98.4% of the vote in the 40 elections Dr. Palmer examined.

Palmer Report ¶¶ 7, 16.

76.     Black voters are also extremely cohesive in each congressional district that comprises the focus area, with a clear candidate of choice in all 40 elections Dr. Palmer examined:



Palmer Report ¶ 19, fig.4, tbls.2, 3, 4, 5 & 6.

77.     On average, in the 40 elections Dr. Palmer examined, Black voters supported their candidates of choice with 97.2% of the vote in Congressional District 3, 93.3% in Congressional District 6, 96.1% in Congressional District 11, 99.0% in Congressional District 13, and 95.8% in Congressional District 14. Palmer Report ¶ 19.

### III.    Third *Gingles* Precondition: Bloc Voting

78.    White voters in Georgia are highly cohesive in voting in opposition to the Black-preferred candidate in every election Dr. Palmer examined. Palmer Report ¶ 17, figs.2 & 3, tbl.1; Suppl. Palmer Report ¶ 5, fig.1, tbl.1; Alford Report 3 (noting that "estimated white voter opposition to the Black-preferred candidate is typically above 80 percent" and is "remarkably stable"); Alford Dep. 38:20–39:8 (agreeing that white voters generally vote in opposition to Black voters, which can operate to defeat minority-preferred candidates).

79.    On average, across the focus area, white voters supported Black-preferred candidates with only 12.4% of the vote, and in no election that Dr. Palmer examined did this estimate exceed 17%. Palmer Report ¶¶ 7, 17.

80.    White voters are also highly cohesive in voting in opposition to the Black-preferred candidate in each district that comprises the focus area. Palmer Report ¶ 20, fig.4, tbls.2, 3, 4, 5 & 6.

81.    On average, in the 40 elections Dr. Palmer examined, white voters supported Black-preferred candidates with 6.7% of the vote in Congressional District 3, 20.2% in Congressional District 6, 16.1% in Congressional District 11, 15.5% in Congressional District 13, and 10.3% in Congressional District 14. Palmer Report ¶ 20.

82.     Across the focus area, white-preferred candidates won the majority of the vote in all 40 elections Dr. Palmer examined. Palmer Report ¶¶ 8, 22, tbl.7.

83.     The white-preferred candidate also received a larger share of the vote than the Black-preferred candidate in all 40 elections Dr. Palmer examined in Congressional Districts 3, 6, 11, and 14. Palmer Report ¶¶ 8, 22, tbl.7.

84.     Only in the majority-Black Congressional District 13 did the Black-preferred candidate win a larger share of the vote in the 40 elections Dr. Palmer examined. Cooper Report ¶ 73, fig.14; Palmer Report ¶¶ 8, 22, tbl.7.

85.     These findings were confirmed by the endogenous election results from the 2022 general election, in which Black-preferred candidates were defeated in Congressional Districts 3, 6, 11, and 14. Suppl. Palmer Report ¶ 4.

## IV.     Totality of Circumstances

### A.     Senate Factor One: History of Voting-Related Discrimination

86.     Georgia has an extensive and well-documented history of discrimination against its Black citizens that has touched upon their right to register, vote, and otherwise participate in the political process; as Dr. Orville Vernon Burton explained, throughout the history of the state of Georgia, voting rights have followed a pattern where, after periods of increased nonwhite voter registration and turnout,

the State has passed legislation, and often used extralegal means, to disenfranchise minority voters. Ex. 4 ("Burton Report") at 10.

### 1. Political Violence Against Black Georgians

87.   Between 1867 and 1872, at least one-quarter of the state's Black legislators were jailed, threatened, bribed, beaten, or killed. Burton Report 14.

88.   This violence, often perpetrated by the Ku Klux Klan, enabled white Georgians to regain control of the levers of power in the state. Burton Report 14–17.

89.   After seizing control of the state legislature through a campaign of violence and intimidation, white Democrats called a new constitutional convention chaired by the former Confederate secretary of state; that convention resulted in the Constitution of 1877, which effectively barred Black Georgians from voting through the implementation of a cumulative poll tax. Burton Report 17.

90.   Violence, and the threat of it, was constant for many Black Georgians as white Democrats controlled the state in the late-19th and first part of the 20th centuries. Burton Report 23.

91.   In addition to mob violence, Black Georgians endured a form of state-sanctioned violence through debt peonage and the convict lease system, which effectively amounted to "slavery by another name." Burton Report 24.

92.     Violence against Black Georgians surged after the First World War, with many white Georgians holding "a deep antipathy" toward Black veterans. Burton Report 25.

93.     Between 1875 and 1930, there were 462 lynchings in Georgia; only Mississippi had more reported lynchings during that time. Burton Report 26.

94.     These lynchings "served as a reminder for Black Georgians who challenged the status quo, and in practice lynchings did not need to be directly connected to the right to vote to act as a threat against all Black Georgians who dared to participate in the franchise." Burton Report 26.

### 2.     Pre-Voting Rights Act

95.     "While Georgia was not an anomaly, no state was more systematic and thorough in its efforts to deny or limit voting and officeholding by African-Americans after the Civil War." Burton Report 10 (quoting Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* 2–3 (2003)).

96.     Although Georgia's 1865 constitution abolished slavery, it limited the franchise to white citizens and barred Black Georgians from holding elected office. Burton Report 11.

97.     The federal government forced Georgia to extend the right to vote to Black males in 1867, but the State responded with a series of facially neutral policies

that had the intent and effect of "render[ing] black participation in politics improbable." Burton Report 12, 18.

98.   Georgia's 1877 constitution, for example, did not explicitly disenfranchise Black citizens but made it practically impossible for Black Georgians to vote by implementing a cumulative poll tax for elections, such that a potential voter had to pay all previous unpaid poll taxes before casting a ballot. Burton Report 17.

99.   Relatedly, Georgia prohibited Black voters from participating in Democratic Party primaries; because Georgia was a one-party Democratic state, the "white primary" effectively eliminated Black participation in the state's politics. Burton Report 19.

100.   In 1908, Georgia enacted the Felder-Williams Bill, which broadly disenfranchised many Georgians but contained numerous exceptions that allowed most white citizens to vote, including owning 40 acres of land or 500 dollars' worth of property; being able to write or to understand and explain any paragraph of the U.S. or Georgia constitution; and being "persons of good character who understand the duties and obligations of citizenship." Burton Report 20 (quoting McDonald, *supra*, at 41).

101.   In conjunction with the Felder-Williams Bill, Georgia enacted a voter-registration law allowing any citizen to contest the right of registration of any person whose name appeared on the voter list. Burton Report 21.

102.   These laws "were devastatingly effective at eliminating both Black elected officials from seats of power and Black voters from the franchise": At the time of the Felder-Williams Bill, there were 33,816 Black Georgians registered to vote, while two years later, only 7,847 Black voters were registered—a decrease of more than 75%. Burton Report 22.

103.   From 1920 to 1930, the combined Black vote total in Georgia never exceeded 2,700, and by 1940, the total Black registration in Georgia was still only approximately 20,000, around 2–3% of eligible Black voters. Burton Report 22.

104.   By contrast, less than 6% of white voters were disenfranchised by Georgia's new election laws. Burton Report 22.

### 3.   Post-Voting Rights Act

105.   Congress enacted the Voting Rights Act of 1965 to address these discriminatory practices; among its provisions was the preclearance requirement that prohibited certain jurisdictions with well-documented practices of discrimination—including Georgia—from making changes to their voting laws without approval from the federal government. Burton Report 36.

106.   The Voting Rights Act, however, did not translate into instant success for Black political participation in Georgia. Burton Report 36.

107.   Among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens by 1976, and these disparities were directly attributable to Georgia's continued efforts to enact policies designed to circumvent the Voting Rights Act's protections and suppress the rights of Black voters. Burton Report 36.

108.   Between 1965 and 1980, nearly 30% of the U.S. Department of Justice's objections to voting-related changes under Section 5 were attributable to Georgia—more than any other state in the country. Burton Report 3, 39.

109.   When Congress reauthorized the Voting Rights Act in 1982, it specifically cited systemic abuses by Georgia officials intended to obstruct Black voting rights. Burton Report 3, 42.

110.   Throughout the first two decades of the 21st century, the State initiated investigations of Black candidates and organizations dedicated to protecting the franchise rights of Georgia's minority voters; investigations into alleged voter fraud in the predominantly Black City of Quitman and the efforts of the New Georgia Project and the Asian American Legal Advocacy Center ended without convictions or evidence of wrongdoing. Burton Report 45–46.

111.   After the U.S. Supreme Court effectively ended the Voting Rights Act's preclearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013), Georgia was the only former preclearance state that proceeded to adopt "all five of the most common restrictions that impose roadblocks to the franchise for minority voters, including (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting, and (5) widespread polling place closures." Burton Report 48–49.

112.   In 2015, for example, Georgia began closing polling places in primarily Black neighborhoods. Burton Report 49.

113.   By 2019, 18 counties in Georgia closed more than half of their polling places and several closed almost 90%, depressing turnout in affected areas and leading to substantially longer waiting times at the polls. Burton Report 50.

114.   According to one study, in 2020, about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places. Burton Report 50.

115.   Georgia also engaged in "systematic efforts to purge the voting rolls in ways that particularly disadvantaged minority voters and candidates" in the aftermath of *Shelby County*. Burton Report 50.

116.   In the period from 2012 to 2018, Georgia removed 1.4 million voters from the eligible voter rolls—purges that disproportionately impacted Black voters. Burton Report 50–51.

117.   Following significant increases in Black voter turnout, Georgia enacted Senate Bill ("SB") 202 in the spring of 2021, which targeted methods of voting that Black voters used extensively in the 2020 general election; among other things, SB 202 (1) increases identification requirements for absentee voting, (2) bans state and local governments from sending unsolicited absentee-ballot applications, (3) limits the use of absentee-ballot drop boxes, (4) bans mobile polling places (except when the governor declares an emergency), and (5) prohibits anyone who is not a poll worker from giving food or drink to voters in line to vote. Burton Report 53.

118.   The growth of Georgia's nonwhite population over the past 20 years and the corresponding increase in minority voting power has, as Dr. Burton explained, "provide[d] a powerful incentive for Republican officials at the state and local level to place hurdles in the path of minority citizens seeking to register and vote." Burton Report 60.

### 4.    Redistricting-Related Discrimination

119.    Georgia's legislative and congressional districts were grievously malapportioned in the years preceding the enactment of the Voting Rights Act. Burton Report 32.

120.    In 1957, the Atlanta-based Congressional District 5 was the second-most populous congressional district in the United States, with an estimated population of 782,800—about twice the size of the average congressional district. Burton Report 32.

121.    By 1960, Fulton County was the most underrepresented county in a state legislature of any county in the United States; DeKalb County was the third-most-underrepresented county. Burton Report 32.

122.    Georgia's redistricting plans were subject to the Voting Rights Act's preclearance requirement, and in the 40 years following its enactment, Georgia did not complete a redistricting cycle without objection from the U.S. Department of Justice. Burton Report 40–44.

123.    The Atlanta metropolitan area was often the focal point of Georgia's efforts to suppress Black political influence through redistricting; for example, the U.S. Department of Justice rejected Georgia's 1971 congressional plan, which cracked voters throughout Congressional Districts 4, 5, and 6 to give the Atlanta-

based Congressional District 5 a substantial white majority. Burton Report 40; *Georgia v. United States*, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 of Voting Rights Act).

124. The U.S. Department of Justice also rejected the congressional redistricting plan passed by Georgia following the 1980 census, which contained white majorities in nine of the state's 10 congressional districts, even though Georgia's population was nearly 30% Black. Burton Report 40; *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge court) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); Ex. 12 (1982 objection letter from U.S. Department of Justice asserting that "the proposed [congressional] plan divides an apparently cohesive black community of Fulton and DeKalb Counties").

125. During the 1990 redistricting cycle, the U.S. Department of Justice twice rejected Georgia's state reapportionment plan before finally approving the third submission. Burton Report 42; Ex. 13 (1992 objection letter from U.S. Department of Justice asserting that "the submitted [congressional] plan minimizes the electoral potential of large concentrations of black population in several areas of the state").

33

126.   During the 2000 redistricting cycle, the U.S. District Court for the District of Columbia refused to preclear Georgia's State Senate redistricting plan, which decreased the Black voting-age population in the districts surrounding Chatham, Albany, Dougherty, Calhoun, Macon, and Bibb counties. Burton Report 43.

127.   In 2015, after *Shelby County*, the General Assembly engaged in mid-cycle redistricting, reducing the Black and Latino voting-age populations in House Districts 105 and 111, both of which had become increasingly diverse over the prior half-decade. Burton Report 40, 44.

### B.   Senate Factor Two: Racially Polarized Voting

#### 1.   Quantitative Evidence

128.   Dr. Palmer found strong evidence of racially polarized voting across the focus area he examined and in each of Congressional Districts 3, 6, 11, 13, and 14. Palmer Report ¶ 7; Suppl. Palmer Report ¶ 4; Alford Report 3 ("As evident in Dr. Palmer's [reports], the pattern of polarization is quite striking."); Alford Dep. 44:8–16, 45:10–12 ("This is clearly polarized voting, and the stability of it across time and across office and across geography is really pretty remarkable.").

129.   Black voters in Georgia are extremely cohesive, with a clear candidate of choice in all 40 elections Dr. Palmer examined. Palmer Report ¶ 16, figs.2 & 3,

tbl.1; Suppl. Palmer Report ¶ 5, fig.1, tbl.1; Alford Report 3 ("Black voter support for their preferred candidate is typically in the 90 percent range and scarcely varies at all across the ten years examined from 2012 to 2022. Nor does it vary in any meaningful degree from the top of the ballot elections for U.S. President to down-ballot contests like Public Service Commissioner."); Alford Dep. 37:13–15 (agreeing with Dr. Palmer's conclusion that Black Georgians are politically cohesive).

130.   On average, across the focus area, Black voters supported their candidates of choice with 98.4% of the vote in the 40 elections Dr. Palmer examined. Palmer Report ¶¶ 7, 16.

131.   Black voters are also extremely cohesive in each congressional district that comprises the focus area, with a clear candidate of choice in all 40 elections Dr. Palmer examined. Palmer Report ¶ 19, fig.4, tbls.2, 3, 4, 5 & 6.

132.   On average, in the 40 elections Dr. Palmer examined, Black voters supported their candidates of choice with 97.2% of the vote in Congressional District 3, 93.3% in Congressional District 6, 96.1% in Congressional District 11, 99.0% in Congressional District 13, and 95.8% in Congressional District 14. Palmer Report ¶ 19.

133.   White voters in Georgia, by contrast, are highly cohesive in voting in opposition to the Black-preferred candidate in every election Dr. Palmer examined. Palmer Report ¶ 17, figs.2 & 3, tbl.1; Suppl. Palmer Report ¶ 5, fig.1, tbl.1; Alford Report 3 (noting that "estimated white voter opposition to the Black-preferred candidate is typically above 80 percent" and is "remarkably stable"); Alford Dep. 38:20–39:8 (agreeing that white voters generally vote in opposition to Black voters, which can operate to defeat minority-preferred candidates).

134.   On average, across the focus area, white voters supported Black-preferred candidates with only 12.4% of the vote, and in no election that Dr. Palmer examined did this estimate exceed 17%. Palmer Report ¶¶ 7, 17.

135.   White voters are also highly cohesive in voting in opposition to the Black-preferred candidate in each district that comprises the focus area. Palmer Report ¶ 20, fig.4, tbls.2, 3, 4, 5 & 6.

136.   On average, in the 40 elections Dr. Palmer examined, white voters supported Black-preferred candidates with 6.7% of the vote in Congressional District 3, 20.2% in Congressional District 6, 16.1% in Congressional District 11, 15.5% in Congressional District 13, and 10.3% in Congressional District 14. Palmer Report ¶ 20.

## 2.      Qualitative Evidence

137.    Dr. Burton explored the relationship between race and partisanship in Georgia politics. Burton Report 57–62.

138.    As Dr. Burton explained, "[s]ince Reconstruction, conservative whites in Georgia and other southern states have more or less successfully and continuously held onto power. While the second half of the twentieth century was generally marked by a slow transition from conservative white Democrats to conservative white Republicans holding political power, the reality of conservative white political dominance did not change." Burton Report 57.

139.    Notably, the Democratic Party's embrace of civil rights legislation— and the Republican Party's opposition to it—was the catalyst of this political transformation, as the Democratic Party's embrace of civil rights policies in the mid-20th century caused Black voters to leave the Republican Party (the "Party of Lincoln") for the Democratic Party. Burton Report 57–58.

140.    In turn, the Democratic Party's embrace of civil rights legislation sparked what Earl Black and Merle Black describe as the "Great White Switch," in which white voters abandoned the Democratic Party for the Republican Party. Burton Report 58.

141. The 1948 presidential election illustrated this phenomenon: South Carolina Governor J. Strom Thurmond mounted a third-party challenge to Democratic President Harry Truman in protest of Truman's support for civil rights, including his integration of the armed forces. Thurmond ran on the ticket of the so-called Dixiecrat Party, which claimed the battle flag of the Confederacy as its symbol. Thurmond's campaign ended Democratic dominance of Deep South states by winning South Carolina, Alabama, Mississippi, and Louisiana. Burton Report 58.

142. This trend continued into the 1964 and 1968 elections. In 1964, the Republican nominee, Barry Goldwater, won only six states in a landslide defeat to President Lyndon B. Johnson: his home state of Arizona and all five states comprising the Deep South (South Carolina, Georgia, Alabama, Mississippi, and Louisiana). Goldwater was the first Republican presidential candidate to win Georgia's electoral votes. Burton Report 58.

143. Goldwater told a group of Republicans from Southern states that it was better for the Republican Party to forgo the "Negro vote" and instead court white Southerners who opposed equal rights. Burton Report 59.

144. Four years later, Georgia's electoral votes were won by George Wallace, another third-party presidential candidate who ran on a platform of vociferous opposition to civil rights legislation. Burton Report 58.

145.   The effectiveness of what was called the "Southern strategy" during Richard Nixon's presidency had a profound impact on the development of the nearly-all-white modern Republican Party in the South. Burton Report 59.

146.   Matthew D. Lassiter, an historian of the Atlanta suburbs, observed that "the law-and-order platform at the center of Nixon's suburban strategy tapped into Middle American resentment toward antiwar demonstrators and black militants but consciously employed a color-blind discourse that deflected charges of racial demagoguery." Burton Report 60 (quoting Matthew D. Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* 234 (2006)).

147.   As Dr. Burton concluded, "[w]hite southerners abandoned the Democratic Party for the Republican Party because the Republican Party identified itself with racial conservatism. Consistent with this strategy, Republicans today continue to use racialized politics and race-based appeals to attract racially conservative white voters." Burton Report 59.

148.   Georgia is a flash point of this modern strategy: According to Dr. Peyton McCrary, an historian formerly with the U.S. Department of Justice, "[i]n Georgia politics since 2002, state government is dominated by the Republican Party, the party to which now most non-Hispanic white persons belong. The greatest electoral threat to the Republican Party and Georgia's governing elected officials is

the growing number of African American, Hispanic, and Asian citizens, who tend strongly to support Democratic candidates. The increase in minority population and the threat of increasing minority voting strength provides a powerful incentive for Republican officials at the state and local level to place hurdles in the path of minority citizens seeking to register and vote. That is what has happened." Burton Report 60 (quoting Expert Rep. of Dr. Peyton McCrary at 8, *Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Apr. 24, 2020), ECF No. 339)).

149.   Dr. Burton explained that racial bloc voting "is so strong, and race and partisanship so deeply intertwined, that statisticians refer to it as multicollinearity, meaning one cannot, as a scientific matter, separate partisanship from race in Georgia elections." Burton Report 61.

150.   Dr. Burton further noted that while "Republicans nominated a Black candidate—Herschel Walker, a former University of Georgia football legend—to challenge Senator Raphael Warnock in the 2022 general election for U.S. Senate," "Walker's nomination only underscores the extent to which race and partisanship remain intertwined. Republican leaders in Georgia admittedly supported Walker because they wanted to 'peel[] off a handful of Black voters' and 'reassure white swing voters that the party was not racist.'" Burton Report 61 (quoting Cleve R. Wootson Jr., *Herschel Walker's Struggles Show GOP's Deeper Challenge in*

*Georgia*, Wash. Post, https://www.washingtonpost.com/politics/2022/09/22/herschel-walker-georgia-black-voters (Sept. 22, 2022)).

151.   The significant impact of race on Georgia's partisan divide can be further seen in the opposing positions taken by officeholders in the two major political parties on issues inextricably linked to race; for example, the Democratic and Republican members of Georgia's congressional delegation consistently oppose one another on issues relating to civil rights, based on a report prepared by the NAACP. Burton Report 74–75.

152.   The Pew Research Center found a similar divergence on racial issues between Democratic and Republican voters nationwide. Burton Dec. 75–76.

153.   In a poll of 3,291 likely Georgia voters conducted just before the 2020 election, among voters who believed that racism was the most important issue facing the country, 78% voted for Joe Biden and 20% voted for Donald Trump; among voters who believed that racism was "not too or not at all serious," 9% voted for Biden and 90% voted for Trump; and among voters who believe that racism is a serious problem in policing, 65% voted for Biden and 33% voted for Trump. Burton Report 76.

## C.      Senate Factor Three: Discriminatory Voting Procedures

154.   Georgia—from the end of the Civil War to the present day—has enacted a wide variety of discriminatory voting procedures that have burdened Black Georgians' right to vote, including unusually large election districts and majority-vote requirements. Burton Report 11–55.

155.   Georgia deliberately malapportioned its legislative and congressional districts to dilute the votes of Black Georgians throughout the 20th century; in 1957, for example, Georgia's Congressional District 5—consisting of Fulton, DeKalb, and Rockdale counties—was the second-most-populous congressional district in the United States. Burton Report 31.

156.   By 1960, Fulton County was the most underrepresented county in its state legislature of any county in the United States; DeKalb County was the third-most-underrepresented county. Burton Report 31.

157.   After enactment of the Voting Rights Act, numerous Georgia counties with sizeable Black populations shifted from voting by district to at-large voting, ensuring that the white population could elect all representatives in the voting district at issue. Burton Report 32–33.

158.   Georgia also adopted a majority-vote requirement, "numbered-post voting," and staggered voting in the 1960s and 1970s to limit Black voting strength. Burton Report 34.

159.   These efforts have persisted well into the 21st century: Georgia shuttered polling places in predominantly Black communities beginning in 2015, perpetrated extensive purges from the state's voter-registration rolls that disproportionately affected Black voters from 2012 to 2018, and enacted SB 202 in the spring of 2021, which restricted methods of voting used by Black Georgians to vote in record numbers during the 2020 election. Burton Report 49–55.

### D.   Senate Factor Four: Candidate Slating

160.   Georgia has no history of candidate slating for congressional elections. ECF No. 97 at 211.

### E.   Senate Factor Five: Contemporary Socioeconomic Disparities

161.   Dr. Loren Collingwood concluded that, "[o]n every metric, Black Georgians are disadvantaged socioeconomically relative to non-Hispanic White Georgians," disparities that "have an adverse effect on the ability of Black Georgians to participate in the political process, as measured by voter turnout and other forms of political participation." Ex. 5 ("Collingwood Report") at 3.

162.   The data show a significant relationship between turnout and disparities in health, employment, and education; as health, education, and employment outcomes increase, so does voter turnout in a material way. Collingwood Report 3.

163.   The unemployment rate among Black Georgians (8.7%) is nearly double that of white Georgians (4.4%). Collingwood Report 4.

164.   White households are twice as likely as Black households to report an annual income above $100,000. Collingwood Report 4.

165.   Black Georgians are more than twice as likely as white Georgians to live below the poverty line—and Black children more than three times as likely. Collingwood Report 4.

166.   Black Georgians are nearly three times more likely than White Georgians to receive SNAP benefits. Collingwood Report 4.

167.   Black adults are more likely than white adults to lack a high school diploma—13.3% as compared to 9.4%. Collingwood Report 4.

168.   Thirty-five percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24% of Black Georgians over the age of 25. Collingwood Report 4.

169.   These racial disparities across economics, health, employment, and education hold across nearly every county in the state. Collingwood Report 4–6.

170.   The socioeconomic data provided by Mr. Cooper (based on the 5-Year 2015–2019 American Community Survey) further demonstrate that socioeconomic disparities by race exist at the county and municipal levels throughout Georgia, with non-Hispanic white Georgians consistently maintaining higher levels of socioeconomic wellbeing. Cooper Report ¶¶ 83–85.

171.   Extensive literature in the field of political science demonstrates a strong and consistent link between socioeconomic status and voter turnout. Collingwood Report 7.

172.   In general, voters with higher income and education are disproportionately likely to vote and participate in American politics. Collingwood Report 7.

173.   In elections between 2010 and 2020, Black Georgians consistently turned out to vote at lower rates than white Georgians—a gap of at least 3.1 percentage points (during the 2012 general election) that reached its peak of 13.3 percentage points during the 2022 general election. Collingwood Report 7–8.

174.   This trend can be seen at the local level as well: During each general election, white voters exceeded the turnout rates of Black voters in all but a handful of Georgia's 159 counties, and of 1,957 precincts Dr. Collingwood analyzed, white voters had higher rates of turnout in 79.2% of precincts. Collingwood Report 8–15.

175.   Voter turnout in the Atlanta metropolitan area is consistent with the overall statewide trend. Collingwood Report 16–19.

176.   Each 10-percentage-point increase in the size of the Black population without a high school degree decreases Black turnout by 3.5 percentage points, and Black turnout rises 2.3 percentage points for each 10-percentage-point increase in the percentage of the Black population with a four-year degree. Collingwood Report 24–26.

177.   Black turnout falls 4.9 percentage points for each 10-percentage-point increase in the percentage of the Black population below the poverty line. Collingwood Report 28.

178.   White Georgians are more likely than Black Georgians to participate in a range of political activities, including attending local meetings, demonstrating political participation through lawn signs and bumper stickers, working on campaigns, attending protests and demonstrations, contacting public officials, and donating money to campaigns and political causes. Collingwood Report 34–38.

## F.     Senate Factor Six: Racial Appeals in Georgia Campaigns

179.   Although explicit racial appeals are no longer commonplace, implicit racial appeals remain common and contribute to Georgia's racially polarized voting. Burton Report 62.

180. In the words of Princeton University political scientist Tali Mendelberg, an implicit racial appeal "contains a recognizable—if subtle—racial reference, most easily through visual references." Burton Report 63–64 (quoting Tali Mendelberg, *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality* 9, 11 (2001)).

181. Ian Haney López, the Chief Justice Earl Warren Professor of Public Law at Berkeley Law, described an implicit racial appeal as a "*coded* racial appeal," with "one core point of the code being to foster deniability" since the "explicit racial appeal of yesteryear now invites political suicide"; accordingly, one characteristic of implicit racial appeals is that they are usually most successful when their racial subtext goes undetected. Burton Report 63 (quoting Ian Haney López, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* 4, 130 (2013)).

182. Implicit racial appeals use coded language to activate racial thinking and prime racial attitudes among voters; such racial cues include phrases like "welfare queen," "lazy," "criminal," "taking advantage," "corruption," "fraud," "voter fraud," and "law and order." Burton Report 63–64.

183.   Dr. Burton explained that "[r]acism, whether dog whistled or communicated directly, became a hallmark of" Georgia politics during the second half of the 20th century. Burton Report 66.

184.   During his first successful campaign for Congress in 1978, future U.S. Speaker of the House Newt Gingrich ran against Virginia Shephard, a white Democrat; he distributed a flyer showing his opponent in a photo with Black Representative Julian Bond, which read: "If you like welfare cheaters, you'll love Virginia Shephard. In 1976, Virginia Shephard voted to table a bill to cut down on welfare cheaters. People like Mrs. Shephard, who was a welfare worker for five years, and Julian Bond fought together to kill the bill." Burton Report 65 (quoting Dana Milbank, *The Destructionists: The Twenty-Five Year Crack-up of the Republican Party* 66 (2022)).

185.   One of Gingrich's campaign aides later said, "[W]e went after every rural southern prejudice we could think of." Burton Report 65 (quoting Milbank, *supra*, at 66).

186.   In the 1990s, Republican Congressman Bob Barr addressed the Council of Conservative Citizens, a descendant of the Jim Crow-era white citizens councils. Burton Report 66.

187.   North Georgia Congresswoman Marjorie Taylor Greene has recorded videos stating, among other things, that Black people's progress is hindered by Black gang activity, drugs, lack of education, Planned Parenthood, and abortions. Burton Report 69.

188.   Georgia's more recent campaigns were rife with racial appeals; for example, during the 2018 gubernatorial election, now-Governor Brian Kemp circulated a photograph of members of the New Black Panther Party attending a rally for his opponent, Stacey Abrams, with the accompanying message: "The New Black Panther Party is a virulently racist and antisemitic organization whose leaders have encouraged violence against whites, Jews, and police officers. SHARE if you agree that Abrams and the Black Panthers are TOO EXTREME for Georgia!" Burton Report 67.

189.   During that same election, a robocall created by a fringe right-wing group circulated in the Atlanta suburbs before the election, with a speaker imitating Oprah Winfrey and stating, "This is the magical Negro, Oprah Winfrey, asking you to make my fellow Negro, Stacey Abrams, governor of Georgia." Burton Report 68.

190.   Ultimately, as one commentator noted following the 2018 election, the use of racial appeals in Georgia and elsewhere helped candidates during that election cycle. Burton Report 68 (citing Jarvis DeBerry, *The Dirty South: Racist Appeals*

*Didn't Hurt White Candidates; Did They Help Them Win?*, NOLA.com (Nov. 17, 2018), https://www.nola.com/opinions/article_2affbc92-aaf4-5c6c-88d6-9fe1db466 492.html).

191.   The 2020 election for the U.S. Senate also saw use of racial appeals, with attacks on now-Senator Raphael Warnock and the Ebenezer Baptist Church, where Senator Warnock preaches. Burton Report 68–69.

192.   During that election, Warnock's opponent, former Senator Kelly Loeffler, was photographed with Chester Doles, a former "Grand Klaliff" of the Ku Klux Klan in North Georgia and a member of the neo-Nazi National Alliance, and did an interview on the One America News Channel with Jack Posobiec, "a TV pundit associated with white supremacy and Nazism." Burton Report 69 (quoting Leon Stafford, *Campaign Check: Warnock Tests Loeffler's View That She's Not Racist*, Atlanta J.-Const. (Dec. 22, 2020), https://www.ajc.com/politics/senate-watch/campaign-check-warnock-tests-loefflers-view-that-shes-not-racist/SOWX3 GL3ARDJNBFDWWZYQ75BVM).

193.   During the 2022 gubernatorial election—a rematch between Governor Kemp and Stacey Abrams—Governor Kemp's campaign deliberately darkened images of Abrams's face in campaign advertisements "in an effort to create a darker, more menacing image." Burton Report 70.

50

194.   Governor Kemp repeatedly attacked Abrams in the general election as "upset and mad"—"evoking the trope and dog whistle of the 'angry Black woman'"—while his Republican primary opponent, former Senator David Perdue, said in a televised interview that Abrams was "demeaning her own race" and should "go back where she came from." Burton Report 70 (first quoting Abby Vesoulis, *Did Brian Kemp Deploy a Dog Whistle During His Debate Against Stacey Abrams?*, Mother Jones (Oct. 18, 2022), https://www.motherjones.com/politics/2022/10/Georgia-debate-governor-abrams-kemp; and then quoting Ewan Palmer, *David Perdue Doubles Down on 'Racist' Stacey Abrams Remarks in TV Interview*, Newsweek (May 24, 2022), https://www.newsweek.com/david-perdue-racist-stacey-abrams-go-back-georgia-1709429).

195.   After Abrams planned a campaign rally in Forsyth County, in suburban Atlanta, the Republican Party of Forsyth County issued a digital flyer that was "a 'call to action' encouraging 'conservatives and patriots' to 'save and protect our neighborhoods,'" and accused both Abrams and Senator Warnock of being "designers of destructive [radicalism]" that would be "crossing over our county border"; the flier carried echoes of the infamous pogrom in Forsyth County in 1912, when most of the Black people in the county were forcibly expelled. Burton Report 70 (quoting Maya King, *In Georgia County With Racist History, Flier Paints*

*Abrams as Invading Enemy*, N.Y. Times (Sept. 16, 2022), https://www.nytimes.com/2022/09/16/us/politics/stacey-abrams-forsyth-georgia-republicans.html).

196.   Governor Kemp and other Georgia politicians have also spread the unsubstantiated specter of "voter fraud" in the Atlanta metropolitan area and other areas with large Black populations—another coded term that echoes the efforts of conservative white Georgians during and after Reconstruction to restrict and eliminate Black suffrage. Burton Report 70–74.

197.   Plurality-Black Fulton County has been at the center of these allegations of voter fraud, with former President Donald Trump promoting baseless conspiracy theories about the county as part of his effort to overturn the 2020 election results in Georgia. Cooper Report Ex. D; Burton Report 73–74.

198.   Two Black poll workers in Fulton County, Ruby Freeman and Shaye Moss, were targeted by former President Trump, his campaign, and Rudy Giuliani with allegations that they had engaged in "surreptitious illegal activity"; the two women received harassing phone calls and death threats, often laced with racial slurs, with suggestions that they should be "strung up from the nearest lamppost and set on fire"—in Dr. Burton's words, "horribly echoing the calls for lynchings of Black citizens from earlier years who were attempting to participate in the political

process." Burton Report 73–74 (quoting Jason Szep & Linda So, *Trump Campaign Demonized Two Georgia Election Workers—and Death Threats Followed*, Reuters (Dec. 1, 2021), https://www.reuters.com/investigates/special-report/usa-election-threats-georgia).

199.   During the 2022 election cycle, other political candidates—including Governor Kemp, Congressman Jody Hice (running for secretary of state), and State Senator Butch Miller (running for lieutenant governor)—continued to sound the drumbeat of voter fraud, with particular focus remaining on Fulton County. Burton Report 74.

200.   Since the 2016 election, local, state, and national news outlets have repeatedly reported on instances of racial appeals in Georgia campaigns. Exs. 14–25.

### G.    Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office

201.   At the time of the Voting Rights Act's passage, Black Georgians constituted 34% of the voting-age population, and yet the state had only three elected Black officials. Burton Report 35.

202.   By 1980, Black Georgians comprised only 3% of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. Burton Report 41.

203.   While more Black Georgians have been elected in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. Burton Report 55–57.

204.   In the 2020 legislative elections, no Black members of the Georgia House of Representatives were elected from districts where white voters exceeded 55% of the voting-age population, and no Black members of the Georgia State Senate were elected from districts where white voters exceeded 47% of the voting-age population. Burton Report 56.

205.   After the 2020 elections, the Georgia Legislative Black Caucus had only 16 members in the Georgia State Senate and 52 members in the Georgia House of Representatives—less than 30% of each chamber. Burton Report 56.

206.   Senator Raphael Warnock is the first Black Georgian to serve Georgia in the U.S. Senate after more than 230 years of white senators. Burton Report 53, 68.

### H.   Senate Factor Eight: Official Nonresponsiveness

207.   Black Georgians face clear and significant disadvantages across a range of socioeconomic indicators, including education, employment, and health. Collingwood Report 3; Cooper Report ¶¶ 83–85.

208.   As Dr. Collingwood explained, "[i]t follows that the political system is relatively unresponsive to Black Georgians; otherwise, we would not observe such clear disadvantages in healthcare, economics, and education." Collingwood Report 4.

209.   During the 117th Congress, the U.S. House of Representatives voted to remove Congresswoman Marjorie Taylor Greene from the House Committee on the Budget and the House Committee on Education and Labor "in light of conduct she has exhibited." Exs. 26–27.

## I.   Senate Factor Nine: Absence of Justification for Enacted Congressional Plan

210.   The enacted congressional plan splits majority-non-white Cobb County into parts of four districts, including three majority-white districts: Congressional Districts 6, 11, and 14. Cooper Report ¶¶ 60, 65, 73, fig.14.

211. Under the enacted congressional plan, southwest Cobb County is included in Congressional District 14, which stretches into Appalachian north Georgia and the suburbs of Chattanooga:



Cooper Report ¶¶ 60, 68, Ex. G.

212.   Under the enacted congressional plan, western Douglas County is included in Congressional District 3, which stretches west and south into majority-white counties along the Alabama border:



Cooper Report Exs. D & G.

213.   While the population requirements of congressional districts might sometimes require mixing urban and rural voters, Mr. Cooper's illustrative congressional plan demonstrates that the western Atlanta metropolitan area can be united in a district with all or part of Cobb, Douglas, Fulton, and Fayette counties, all of which are core counties under the ARC. Cooper Report ¶ 68, Ex. H-1.

**J.     Proportionality**

214.   Georgia's enacted congressional plan includes two majority-Black districts based on percentage Black voting-age population, three majority-Black districts based on percentage non-Hispanic Black citizen voting-age population, and four majority-Black districts based on percentage non-Hispanic DOJ Black citizen voting-age population. Cooper Report ¶ 73, fig.14.

215.   Mr. Cooper's illustrative congressional plan includes three majority-Black districts based on percentage Black voting-age population, three majority-Black districts based on percentage non-Hispanic Black citizen voting-age population, and five majority-Black districts based on percentage non-Hispanic DOJ Black citizen voting-age population. Cooper Report ¶ 73, fig.14.

216.   Only 49.96% of Black voters in Georgia reside in majority-Black districts under the enacted congressional plan, while 82.47% of non-Hispanic white voters live in majority-white districts—a difference of 32.51 percentage points. Cooper Report ¶ 74, fig.15.

217.   Under Mr. Cooper's illustrative congressional plan, 57.48% of the Black voting-age population resides in majority-Black districts, while 75.50% of the non-Hispanic white voting-age population resides in majority-white districts—a difference of 18.01 percentage points. Cooper Report ¶ 74, fig.15.

Dated: March 20, 2023

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing ***Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: March 20, 2023

<u>**Adam M. Sparks**</u>
*Counsel for Plaintiffs*