**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| COAKLEY PENDERGRASS, *et al.*, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION |
| BRAD RAFFENSPERGER, *et al.*, | FILE NO. 1:21-CV-05339-SCJ |
| *Defendants*. | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

After engaging in a months-long process in 2021 that sought broad input and despite COVID-related Census delays, Georgia implemented a redistricting map for Congress that split fewer counties than prior plans and that elected five Black members of Congress. Plaintiffs claim this map results in "a denial or abridgement of the right . . . to vote on account of race or color," 52 U.S.C. § 10301(a), because they say the General Assembly had an obligation to draw one additional majority-Black congressional district, so the adopted map constitutes illegal vote dilution.

But Section 2 of the Voting Rights Act does not allow this Court to infer vote dilution "from mere failure to guarantee a political feast," *Johnson v. De*

*Grandy*, 512 U.S. 997, 1017 (1994) (majority op.), because the "[f]ailure to maximize cannot be the measure of § 2." *Id.*

This means that Section 2 is not simply a checklist—"do we have a map with more districts, polarized voting, and a history of discrimination? End of analysis!"—instead, this Court is required to "conduct an intensely local appraisal of the design and impact of a voting system." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997)). And the alleged deprivation "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc)); *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2359 (2021) (Section 2 asks whether an election law interacts with conditions "to ***cause*** race-based inequality in voting opportunity") (Kagan, J, dissenting) (emphasis added). This local appraisal also does not mean the adopted plan has to beat Plaintiffs' maps in a "beauty contest." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (O'Connor, J.). This is at least in part because "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022).

Instead of engaging in a wholesale review of the legislature's choices in this case, this Court must answer one fundamental question, in an area of law that is "notoriously unclear and confusing," *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring):

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew districts without a single additional majority-Black congressional districts in metro Atlanta? If so, why?

As discussed below, Plaintiffs cannot prevail on their claims after discovery. This Court should determine that Plaintiffs have failed to present evidence that Georgia's congressional map dilutes the right to vote on account of race or color and dismiss this case.

First, this Court must dismiss the members of the State Election Board (SEB) as Defendants, because no evidence demonstrates they played any role in the redistricting process, and they cannot provide Plaintiffs with any relief.

Second, the map proposed by Plaintiffs does not meet prong one of *Thornburg v. Gingles*, 478 U.S. 30 (1986), because it is improperly focused on race and thus cannot be implemented as a remedy and because it does not demonstrate the State should have drawn an additional majority-Black district. Plaintiffs' experts utilized racial shading, racial splits, and other tools

3

while drawing and could not identify communities beyond race when preparing the maps that united disparate communities of Black voters. Indeed, if Georgia had used the same processes Plaintiffs' expert used, it would be accused of racial gerrymandering.[1]

Third, the second and third prongs of *Gingles* are not met because Plaintiffs' experts studiously avoided any analysis of the cause of the polarization they found, opting instead to refer to any voting pattern where the majority votes to defeat the minority as "racially polarized." But the requirement of Section 2's text that any vote dilution be "on account of race or color" requires that it not be "on account of politics." Plaintiffs' failure to address this issue in discovery is fatal to their claims.

Fourth, Georgia already elects more Black and Black-preferred members of Congress than the proportion of Black individuals in the population. This bars any claim that the General Assembly failed to draw additional majority-Black congressional districts.

---

[1] In fact, while Georgia is accused of not considering race enough in this case by failing to draw a sufficient number of majority-Black districts, it is accused of considering race too much by plaintiffs who say the congressional plans are racial gerrymanders in the *Ga. NAACP* and *Common Cause* three-judge panel cases.

As discussed below, after discovery, there is no material fact in dispute that could cause this case to continue. This Court should grant judgment as a matter of law to Defendants.

## FACTUAL BACKGROUND[2]

### I.    Georgia's redistricting plans.

Following the delayed release of Census data in 2021,[3] the Georgia General Assembly began working on redistricting maps ahead of its November 2021 special session. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. SMF ¶ 3; Wright Dep. 68:17-69:7. Consistent with past redistricting cycles, the joint House and Senate committees also held a series of "listening sessions" across the state to hear from citizens about maps, including several Zoom meetings. SMF ¶ 4; Kennedy Dep. 171:13-20, 194:1-195:10. And for the first time in 2021,

---

[2] As required by this Court's instructions, III. I., all citations to the record are included in the brief and in the accompanying Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

[3] That Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points statewide. SMF ¶ 1; Cooper Report, ¶ 14, Figure 1. But further Census data has shown decreases in the Black Citizen Voting Age Population between 2019 and 2021. SMF ¶ 2; Cooper Dep. 38:24-39:10.

the General Assembly provided a public comment portal online, seeking comments from the public. SMF ¶ 5; Wright Dep. 252:20-253:4. After holding a committee education day where a variety of stakeholder groups presented about map-drawing, the committees adopted guidelines to govern the map-drawing process. SMF ¶ 6; Kennedy Dep. 161:1-4; Rich Dep. 214:19-215:7.

To prepare maps, Gina Wright, the director of the Joint Reapportionment Office, worked with a leadership group to work on the congressional map from an earlier draft from Sen. Kennedy. SMF ¶ 7; Wright Dep. 28:19-30:23. Political considerations were important, including placing portions of Cobb County into District 14 to increase political performance in other parts of the state. SMF ¶ 8; Wright Dep. 111:16-112:10; 158:4-21.

The resulting Congressional map reduced the number of split counties from the prior plan. SMF ¶ 9; Cooper Report, ¶ 81, Figure 14. The Governor signed the plan on December 30, 2021, and it was used in the 2022 elections. SMF ¶ 10; [Doc. 120], ¶ 33.

## II. Role of SEB.

Discovery in this case demonstrates that the members of the SEB have nothing to do with the redistricting process. Despite the opportunity for extensive discovery, the only material fact related to the SEB's role in Plaintiffs' claims is what the SEB said in its responses to interrogatories, that

they "were not involved in the map-drawing process." SMF ¶ 11; Responses to Interrogatories, Response No. 2. Discovery has revealed no basis to conclude that the SEB plays any role in the implementation of any district map. As a result, there is no dispute of any material fact regarding their involvement.

### III.    The individual Plaintiffs.

All of the individual Plaintiffs in this case consider themselves to be members of the Democratic Party, have held positions in the Democratic Party, and most of them have never voted for a Republican candidate. SMF ¶¶ 12-35; James Dep. 38:20-22, 40:20-41:8, 41:9-18; Pendergrass Dep. 25:17-19, 26:4-5, 9-15, 26:5-6, 26:21-27:8, 26:6-8, 27:20-25; Hennington Dep. 36:23-37:9, 37:20-38:7; Richards Dep. 44:21-23; Rueckert Dep. 29:7-13, 30:20-23; Glaze Dep. 33:9-11. Given the political nature of the polarization discussed below and the impact of partisanship in this case, the political goals of Plaintiffs are relevant for this Court's consideration.

### IV.    Plaintiffs' proposed maps.

Plaintiffs began planning for this litigation before the Georgia maps were even complete—retaining experts to work on alternative maps around the same time as the special session convened. SMF ¶ 36; Cooper Dep. 8:14-8:23. After the Governor signed the maps, Plaintiffs immediately sued.

### A. Overall *Pendergrass* maps.

Plaintiffs' goal in offering their illustrative plan was to determine whether they could draw one additional majority-Black[4] district beyond those drawn by the state plan. SMF ¶ 37;  Cooper Dep. 14:15-15:2. This is despite the fact that five of Georgia's fourteen members of Congress are Black individuals. SMF ¶ 39; Cooper Dep. 19:19-21.

When Mr. Cooper was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located. SMF ¶ 40; Cooper 24:12-25:6. Unlike the legislature, Mr. Cooper did not have any political data available to him. SMF ¶ 41; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14;  Cooper Dep. 56:8-11. Mr. Cooper's preliminary injunction plans contained the maximum number of Black districts he drew for any congressional plan in Georgia. SMF ¶ 42; Cooper Dep. 14:15-15:2.

---

[4] Map-drawers distinguish "majority-minority" from "majority-Black." Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district. SMF ¶ 38; Cooper Dep. 16:14-20.

**B. Illustrative congressional plan.**

Mr. Cooper created one additional majority-Black congressional district on his illustrative plan, which is titled District 6.[5] SMF ¶ 43; Cooper Report, ¶ 53. Despite relying on the existence of four state Senate districts in the same area, Cooper Report, ¶ 45, large geographic areas of Senate Districts 39 and 38 in Fulton County were not included in illustrative District 6. SMF ¶ 45; Cooper Dep. 49:5-49:15. Unlike Mr. Cooper's preliminary injunction plan, Cobb County is split three ways in the plan he submitted with his expert report. SMF ¶ 46; Cooper Dep. 51:3-6. To create the one additional majority-Black district, Mr. Cooper had to alter eight of the existing 14 congressional districts, but was careful to avoid altering Districts 2, 5, and 7, all of which currently elect Black Democratic members of Congress. SMF ¶ 47; Cooper Report, ¶ 51; Cooper Dep. 36:5-36:14.

In illustrative District 6, the only portion of a county in the district that is majority-Black in voting age population is Fulton County. SMF ¶ 48; Cooper Dep. 77:12-17. Without the portion of Fulton County that Mr. Cooper moved out of District 13 into illustrative District 6, the remaining components of the

---

[5] This is a change from the plan he submitted five years ago in a different Section 2 case challenging Georgia's prior congressional districts, which analyzed a South Georgia area to create a new majority-Black district in rural Georgia. SMF ¶ 44; Cooper Dep. 42:10-42:18, 43:4-13.

district would not allow it to be majority-Black. SMF ¶ 49; Cooper Dep. 78:6-11.

In order to create District 6 as a majority-Black district, Mr. Cooper adjusted other districts in ways that he could not explain. He connected urban areas in North Fulton with rural areas in Bartow County. SMF ¶ 50; Cooper Dep. 59:6-60:1. He connected Cobb County with rural parts of Georgia going all the way down to Columbus, Georgia in District 3. SMF ¶ 51; Cooper Dep. 63:15-24, 64:17-65:4. The only connection he could identify to this similar configuration of enacted District 14 was that Heard and Troup counties were closer to Atlanta. SMF ¶ 52; Cooper Dep. 65:20-66:2. He also agreed that his illustrative 13 connected urban (and heavily Black) parts of Clayton County with rural areas out to Jasper County. SMF ¶ 53; Cooper Dep. 73:13-17.

And when asked why he connected majority-Black Hancock County (from the Black Belt, according to his testimony in other cases) to the North Carolina border, he could only point to population equality.[6] SMF ¶ 54; Cooper Dep. 68:6-69:2, 70:16-22; 86:5-8.

---

[6] He also could not explain why he included Athens/Clarke County in the same district as Hancock County and Rabun County. SMF ¶ 55; Cooper Dep. 71:21-72:11.

## ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County, Ga.* 821 F. Supp. 685, 687 (N.D. Ga. 1993).

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

In order to show a Section 2 violation, a plaintiff bears the burden of first proving *each* of the three *Thornburg v. Gingles*, 478 U.S. 30 (1986), preconditions[7]:

---

[7] These preconditions are also frequently referred to in cases as the *Gingles* "prongs." *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 17 (2009); *Johnson*, 296 F.3d at 1073.

> Specifically, plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate.

*Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994) (quoting *Gingles*, 478 U.S. at 50-51). Only after establishing the three preconditions does a court begin a review of the so-called "Senate Factors" to assess the totality of the circumstances. *Id.* at 1512; *Gingles*, 478 U.S. at 79; *De Grandy*, 512 U.S. at 1011. Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1567 (11th Cir. 1997). And of course, while these preconditions are *necessary* to proving a Section 2 claim, they are not *sufficient*. *De Grandy*, 512 U.S. at 1011 (*Gingles* preconditions are not "sufficient" to "prove a § 2 claim.").

## I.   Members of the SEB must be dismissed because any injuries are not traceable to nor redressable by the SEB.

As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action

of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974
F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.
555, 560 (1992)). The problem for Plaintiffs is that the Georgia legislature, not
the SEB, designs the legislative districts at issue. Indeed, the SEB has no say
in the matter one way or another, and Plaintiffs have not located any evidence
that the named members of the SEB had any say in the design of the maps or
in their implementation. The SEB is not implicated in this action, and its
members in their official capacity should be dismissed as parties to it. "Because
the [SEB] didn't do (or fail to do) anything that contributed to [Plaintiffs'
alleged] harm, the voters… cannot meet Article III's traceability requirement."
*Jacobson,* 974 F.3d at 1253 (quoting *Lewis v. Governor of Ala.,* 944 F.3d 1287,
1301 (11th Cir. 2019) (internal quotations omitted)).

The only basis Plaintiffs even identify to assert claims against the SEB
members is based on their general statutory duty to "formulate, adopt, and
promulgate such rules and regulations, consistent with law, as will be
conducive to the fair, legal, and orderly conduct of primaries and elections."
[Doc. 120, ¶¶ 18-22], citing O.C.G.A § 21-2-31(2). But this is only a generalized
duty that was insufficient in *Jacobson* when the plaintiffs could not show the
Secretary of State of Florida had any role in the design of the ballots they
claimed injured them. "In the absence of any evidence that the Secretary

13

controls ballot order, the voters and organizations… cannot rely on the Secretary's general election authority to establish traceability." 974 F.3d at 1254. In *Lewis,* the Eleventh Circuit came to a similar conclusion. There, plaintiffs challenged a minimum-wage law promulgated by the State and sued the Alabama Attorney General because of "a host of provisions of the Alabama Code that generally describe the Attorney General's [enforcement] authority." *Lewis,* 944 F.3d at 1300. But these generalized duties did not establish traceability to the plaintiffs' injuries, in part because the statute at issue in the plaintiffs' complaint "envisions no role for the Attorney General." *Id.* at 1299.

The same is true here. Because Plaintiffs have produced no evidence in discovery that any of the individually named SEB members designed or implement the maps in any substantive way, they should be dismissed from this case.

## II.   **Plaintiffs cannot establish the first *Gingles* precondition.**

As this Court already found, illustrative plans cannot "subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2." [Doc. 97, p. 87] (citing *Davis*, 139 F.3d at 1424). The evidence demonstrates that Plaintiffs have gone beyond that limitation here.

As Mr. Cooper testified, he used racial shading and other techniques in his efforts to create the new majority-Black district. *See Miller v. Johnson*, 515 U.S. 900, 925 (1995) (use of racial shading in district maps). He was unable to identify factors that connected areas of his new majority-Black district beyond the common community of interest shared by all Black individuals. And when he split counties, he did so in ways that ensured higher concentrations of Black voters were included in the portions of counties in the new majority-Black district, while also being unable to explain other configurations of districts that ran from the heavily Black areas north to the mountains. This cannot meet prong one.

The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F.3d at 1530-31; *see also Burton*, 178 F.3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). Whatever plan is used to demonstrate the violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F.3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Id.* at 1530-31.

Additionally, Plaintiffs have presented no evidence of the geographic compactness of the Black community in the new configuration of District 6 aside from the fact that it was drawn—and the only majority-Black portion of the new District 6 is in a single county that is already located in a majority-Black district on the enacted plan. This absence of evidence supports a grant of summary judgment to Defendants. *Marion*, 821 F. Supp. At 687. The Supreme Court also requires that the size and geographic compactness portions of the first *Gingles* prong relate to the community, not to any potential district created by a plaintiff: "The first *Gingles* condition refers to *the compactness of the minority population*, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (emphasis added) (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)).

Mr. Cooper's districts combine distinct minority communities, often with intervening white population, and reduce districts so that several are barely majority-Black. Mr. Cooper could identify practically nothing beyond the race of the voters in a number of his districts that united them—in clear violation of the requirements of *LULAC*: "there is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition

contemplates." *Id.*; SMF ¶ 56; Cooper Dep. 68:6-69:2, 70:16-22, 73:13-17, 86:5-8.

### III.   Plaintiffs cannot establish the second and third *Gingles* preconditions.

Even if Plaintiffs have shown a proper remedy, they still cannot prevail because they have not shown legally significant racially polarized voting. The basis for a Section 2 vote-dilution claim must be more than a simple failure to win elections—because, in a majoritarian system, "numerical minorities lose elections." *Holder v. Hall,* 512 U.S. 874, 901 (1994) (Thomas, J., concurring) (citations omitted). In order to succeed, Plaintiffs must show that minority voters, although able to vote, are unable to elect their preferred candidates because their votes have been "submerge[ed]" in a majority that votes as a "racial bloc" against them. *Gingles,* 478 U.S. at 46, 49-52. And this racial bloc voting, by its very terms, must be attributable to *race*, rather than, for example, race-neutral partisan politics. Otherwise, it is just *majority* bloc voting or, as Justice White put it, "interest-group" politics. *Id.* at 83 (White, J., concurring). And "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993).

**A. To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not *majority* bloc voting attributable to ordinary partisan politics.**

In its ruling denying Plaintiffs' respective motions for preliminary injunction in this action, this Court "conclude[d] as a matter of law that, to satisfy the second *Gingles* precondition, Plaintiffs need not prove the causes of racial polarization, just its existence." *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1303 (N.D. Ga. 2022). Relying on the plurality opinion in *Gingles,* this Court stated "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. *It means simply that the race of voters correlates with the selection of a certain candidate or candidates*; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* (emphasis original) (quoting *Gingles*, 478 U.S. at 62). But a closer review of the opinions shows that a majority of the justices in *Gingles* declined to endorse this approach to majority-bloc voting.

Justice White, in a concurring opinion, called it little more than "interest-group politics." *Gingles,* 478 U.S. at 83. Justice O'Connor, writing for the remaining justices, declared flatly that "I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not

necessary to the disposition of this case." *Id.* at 101 (O'Connor, J., concurring). And it is important to note that Justice O'Connor arrived at this conclusion after endeavoring to construe what she called the "compromise legislation" of the amended Section 2. That is, the calculated equivocation in Part B of Section 2 that expressly disclaims a right to proportional representation cannot be given any substantive effect if all that matters when establishing racially polarized voting is whether minority voters and majority voters are voting differently. But the plurality view does just that:

> [T]he combination of the Court's definition of minority voting strength and its test for vote dilution results in the creation of a right to a form of proportional representation in favor of all geographically and politically cohesive minority groups that are large enough to constitute majorities if concentrated within one or more single-member districts. *In so doing, the Court has disregarded the balance struck by Congress in amending § 2* and has failed to apply the results test as described by this Court in *Whitcomb* and *White.*

*Id.* at 85 (emphasis added) (O'Connor, J., concurring in the judgment). Thus, while this Court was correct in identifying what a plurality of Justices in *Gingles* described as "racially polarized voting," it is just as true that an equally sized plurality of the *Gingles* Court rejected that view. When combined with Justice White's admonition against construing Section 2 as enshrining interest-group politics into law, the former plurality does not carry the day.

But even if this Court still disagrees with Defendants on this point, there is a remaining issue: The contrary view—that racial bloc voting is present anywhere a minority happens to vote for a different candidate than the majority—would raise serious questions about the constitutionality of Section 2, which cannot be validly understood to require changes in districts solely because of partisan voting behavior.

> **1. *Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting."***

Section 2 is designed to root out racially discriminatory laws. The text requires Plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). It is Plaintiffs' burden to show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens… in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Section 2 thus requires Plaintiffs to show that the "challenged law… *caused*" them, "on account of race" to have less opportunity

to elect their preferred candidates than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.,* 992 F.3d 1299, 1329 (11th Cir. 2021) (emphasis in original).

The text explicitly does *not* "guarantee" partisan victories or "electoral success." *LULAC,* 548 U.S. at 428 (citation omitted). If minority voters' preferred candidates lose for non-racial reasons, such as failing to elect candidates because they prefer Democrats in Republican-dominated areas, they nonetheless have *precisely* the same opportunity as "other members of the electorate," and they have correspondingly not suffered any "abridgement" of their right to vote "on account of race." 52 U.S.C. § 10301. Section 2 does not, in other words, relieve racial minorities of the same "obligation to pull, haul, and trade to find common political ground" that affects all voters. *De Grandy,* 512 U.S. at 1020.

This view is not some recent legal phenomenon, but rather was borne out in *Gingles* itself. As Justice O'Connor explained, the view advocated by Plaintiffs here (and the view espoused by the plurality in *Gingles*) would effectively overturn *Whitcomb v. Chavis,* one of the two Supreme Court precedents that the "[a]mended § 2 intended to codify." *Gingles,* 478 U.S. at 83 (citations omitted). In *Whitcomb,* the Court explained that although residents in one area of Marion County consistently lost elections, that was because they

21

"vote[d] predominantly Democratic," and Republicans generally won elections in the county. 403 U.S. at 153. "[H]ad the Democrats won all of the elections or even most of them, the ghetto would have no justifiable complaints about representation." *Id.* at 152. And the failure of *Democrats* was insufficient to show illegality. Thus, in *Gingles*, Justice O'Connor stressed that *Whitcomb* required courts to differentiate between situations where race explains voting patterns from those where the partisan "interests of racial groups" simply "diverge." 478 U.S. at 100.

Section 2 cannot be rationally interpreted as prohibiting certain election practices when Republicans are in the majority but requiring other election practices where Democrats dominate. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird v. Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). Instead, as the Senate Report makes clear, the amended Section 2 applies only where "racial politics … dominate the electoral process." S. Rep. at 33 (emphasis added).

The alternative view would mandate not only a partisan preference but a racial preference. Here, for instance, Black Democrats—like white Democrats, Asian Democrats, and Latino Democrats—ordinarily fail to elect their preferred candidates because the majority of Georgia voters generally

choose Republicans.[8] Although Plaintiffs claim that Black voters alone among that group are entitled to districts in which they are guaranteed electoral success, "Section 2 requires an electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez v. City of Aurora*, 535 F.3d 594, 598 (7th Cir. 2008). Section 2 does not require courts to mandate that Black Democrats vote more successfully than white Democrats. *Clements*, 999 F.2d at 861 ("[W]hite Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent.").

Moreover, to hold that there is no racial component beyond simply observing that majority and minority voters vote differently would also eviscerate another aspect of Section 2: its emphatic rejection of a right to proportional representation. 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Avoiding a *requirement* of

---

[8] With several notable exceptions in statewide races in 2020, 2021, and 2022.

proportionality was a central focus of Congress in amending Section 2. *See Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).

Given all this, it should be no surprise that other circuits have rejected a view of Section 2 that showing polarization is enough. The Fifth Circuit, for instance, has held that Section 2 plaintiffs cannot succeed when they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855. Likewise, the First Circuit holds that "plaintiffs cannot prevail on a VRA Section 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to [race]." *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995). And Judge Tjoflat has opined that, even if a plaintiff has provided evidence of racial bloc voting, a "defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances." *Nipper*, 39 F.3d at 1524 (plurality opinion).

To be sure, the courts disagree on whether the third *Gingles* factor or the totality phase is the appropriate time to ensure racial, as opposed to merely partisan, polarization exists. The Fifth Circuit, for instance, holds that there

is no third *Gingles* factor without proof of racial, as opposed to partisan, polarization. *Clements*, 999 F.2d at 892. The Second Circuit—as this Court held at its Order denying the preliminary injunction—holds that the inquiry should be conducted at the totality-of-the-circumstances phase of analysis. *Goosby v. Town Bd.*, 180 F.3d 476, 493 (2d Cir. 1999); *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (noting differences among circuit courts).

But this minor disagreement does not matter much. The key point is that Plaintiffs, who bear the ultimate burden of proof, must establish that race is the reason they supposedly lack equal "opportunity." 52 U.S.C. § 10301(b). And if voting patterns establish, instead, that Republicans always win (regardless of race), then non-Republican voters of *all* races have exactly the same opportunity to elect their candidates of choice, in every case. This is why this Court should require proof of racial bloc voting as part of the third *Gingles* factor (if race is not the "domina[nt]" reason for bloc voting, there can be no "racial bloc voting." S. Rep. at 33 (emphasis added)), even if the analysis is ultimately the same. As discussed below, Plaintiffs' lack of evidence on this point is fatal to their claims here.

### 2. If § 2 allowed partisan bloc voting to form the basis of a claim, it would be unconstitutional.

Beyond being irreconcilable with the text or binding precedent, a view that racial bloc voting requires only that majority and minority voters vote differently would also make Section 2 unconstitutional. Congress enacted Section 2 under its power to enforce the Fifteenth Amendment, which prohibits only "purposeful discrimination," not laws that merely "resul[t] in a racially disproportionate impact." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980) (citation omitted); *see also* U.S. CONST. amend. XV. Section 2's results test goes beyond the constitutional provision that it purports to enforce, which makes sense to the extent that Section 2 can be understood as a tool for addressing invidious racial discrimination. But Congress certainly cannot place a particular political party in a favored electoral position. Congress may use its enforcement power only as a "congruen[t] and proportional[] ... means" to "remedy or prevent" the unconstitutional "injury" of intentional discrimination. *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). The Fifteenth Amendment's enforcement power does not allow Congress to "alter[] the meaning" of the Constitution. *Id*. at 519. Accordingly, to ensure that Section 2 stays within the bounds of the Fifteenth Amendment, the results test

must be "limited to those cases in which constitutional violations [are] most likely." *Id*. at 533 (citation omitted).

If Section 2 were interpreted in a way that plaintiffs can establish racial bloc voting merely by showing that minorities and majorities vote differently, it would not fit within those constitutional bounds. As Justice White explained in his dissent in *Bolden*, the original results test was designed to target "objective factors" from which discrimination "*can be inferred*." 446 U.S. at 95 (emphasis added). The amendments to Section 2 were meant to "restore" that test. *Gingles*, 478 U.S. at 43-44 & n.8 (citations omitted). And Plaintiffs' interpretation does not alter this "objective factors" test.

What is more, interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause by compelling state action to benefit one racial group at the expense of others. *See* U.S. CONST. amend. XIV, § 1. "[S]ubordinat[ing] traditional race-neutral districting principles" to increase minority voting strength violates the Constitution. *Miller*, 515 U.S. at 916. Where Section 2 is used not to undo racial bias but to undo a pattern of partisan voting, in favor of one (and only one) racial minority, that must be unconstitutional.[9]

---

[9] At a minimum, such an interpretation of Section 2 raises constitutional questions and should be avoided if possible. "When a serious doubt is raised

**B. There is no racial bloc voting here because partisan politics, not race, explains the voting patterns highlighted by Plaintiffs, and Plaintiffs' experts offer no evidence disputing this.**

With the proper rule in place, Plaintiffs' claim fails under Section 2 because they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not ... partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855.

As established above, a successful Section 2 claim requires that *race*, not *party*, is the cause of "divergent voting patterns." *Id.* at 861. Plaintiffs must, therefore, *prove* as much. But Plaintiffs here did not even try to do so, instead just throwing up their hands or arguing that race and party are too inseparable ever to be considered separately.

But one cannot determine whether the voting patterns of Georgia voters are due to *racial* politics when they only examine general elections because, as Plaintiffs' experts own reports clearly indicate, Black voters in Georgia

---

about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). That is doubly true where the interpretation would "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts should interpret statutes to do so only when congressional intent is "unmistakably clear." *Id.* (citations omitted).

overwhelmingly vote for Democrats and against Republicans. Dr. Palmer's decision not to review any primary results in his report undermines the usefulness of the data and analysis he presents as purported evidence of racial polarization in Georgia's elections. SMF ¶ 57; Palmer Dep. 59:23-60:01; Alford Dep. 29:07-30:01. But even without the benefit of viewing the stark drop-off in polarization once party is controlled for by examining primary elections, Dr. Palmer's data still only demonstrates two things: The race of the candidate *does not* change voting behavior of Georgia voters; and the party of the candidate *does.* SMF ¶ 58; Alford Dep. 54:18-22.

Plaintiffs' purported evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party. This is, as Justice White described in *Gingles,* "interest group" politics. Plaintiffs' own political goals in bringing this case further illustrate that the issues in this case are not a matter of race, but rather that the "most political activity in America"[10] had political consequences they do not like.

Moreover, Plaintiffs' own experts do not offer evidence from primaries, where the issue of polarization could be viewed apart from party. That is

---

[10] *See, e.g.*, Charles S. Bullock III, *Redistricting: The Most Political Activity in America* (2nd Ed. 2021).

simply not enough for Plaintiffs to carry their burden of proving racial polarization sufficient to satisfy prongs two and three of *Gingles*. To the contrary, all the Court has before it is evidence establishing that party, rather than race, explains the "diverge[nt]" voting patterns at issue. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Plaintiffs' failure to offer any other evidence ends this case because they failed to show that prongs two and three of *Gingles* are met.

## IV. Plaintiffs cannot succeed because proportionality bars their claims.

When applying § 2 of the Voting Rights Act to single-member legislative district challenges, if "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting age population," no violation of Section 2 can be found. *De Grandy,* 512 U.S. at 1000. This is because when the minority group in question enjoys "rough proportionality," there is no evidence that "voters in either minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id*. at 1024 (quoting 52 U.S.C. § 10301(b)). The Voting Rights Act "was passed to guarantee minority voters a fair game, not a killing." *Bartlett*, 556 U.S. at

29 (Souter, J., dissenting). This is why the Supreme Court has generally looked to the "rough proportion of the relevant population." *Id*.

Proportionality in this context is analyzed by comparing "the number of districts where minority voters can elect their chosen candidate with the group's population percentage." *Id*.[11] Because Section 2 focuses on "equal political opportunity," when considering districts that elected members proportional to their population, the Supreme Court did "not see how . . . district lines, apparently providing political effectiveness in proportion to voting age numbers, deny equal political opportunity." *De Grandy*, 512 U.S. at 1014.

The Supreme Court gave further direction in *LULAC*, finding that the relevant geographic area for a proportionality analysis is the entire state. *LULAC*, 548 U.S. at 437. In *LULAC*, the Supreme Court explained that the proportionality inquiry entails "comparing the percentage of total districts that are [African-American] opportunity districts with the [African-American]

---

[11] The proportionality analysis that is part of the totality-of-the-circumstances review in Section 2 cases is distinct from the *language* in Section 2 regarding proportional representation. *Solomon*, 221 F.3d at 1223, n.5 ("it is important to keep the concepts of 'proportionality' and 'proportional representation' distinct"). While no minority group has a *right* to proportional representation under Section 2, the degree of *achievement* of proportional representation may be relevant to evaluating whether minority voters have formed effective voting majorities in districts roughly proportional to their population. *Id*.

share of the citizen voting-age population." *Id*. at 436. This is because this Court must determine "whether the absence of that additional district constitutes impermissible vote dilution." *Id*. at 437.

While proportionality is not a safe harbor for a jurisdiction, *LULAC*, 548 U.S. at 436, it is an extremely relevant factor to consider whether an equal opportunity to participate in the political process exists. *See*, *e.g.*, *African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F.3d 1345, 1355 (8th Cir. 1995) (evidence of "persistent proportional representation" sufficient to support grant of summary judgment to jurisdiction); *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291, 301 (5th Cir. 2016) (same).

In the 2022 election cycle, the 2021 congressional plan elected five Black Democratic candidates to the 14 congressional districts. SMF ¶ 59; Cooper Dep. 19:19-21. That constitutes 35.7% of the Georgia congressional delegation. The Any-Part Black VAP for Georgia as a whole is 31.73%, and the 2021 AP Black CVAP is 33.3%. SMF ¶ 60; Cooper Report, ¶ 18, Figure 2. Thus, the percentage of Black candidates and Black-preferred candidates being elected is more than roughly proportional to the percentage of Black individuals in Georgia.

Given the rough proportionality in Congress, along with the fact that both of Georgia's U.S. senators are Black-preferred candidates because they are Democrats (Sen. Ossoff was elected in 2021 and Sen. Warnock was re-

elected in 2022), Plaintiffs' claim that Black voting strength in Georgia's congressional races was diluted by the 2021 congressional redistricting plan is without merit. SMF ¶ 61; Palmer Dep. 53:2-54:2. Black voters in Georgia have demonstrated that they have an equal opportunity to participate in the political process and to elect representatives of their choice. Consequently, Plaintiffs' claim for a Section 2 violation fail as a matter of law.

## CONCLUSION

After discovery, there remains no issue of any material fact in this case. This Court must dismiss the members of the SEB as defendants. Plaintiffs have not shown their proposed remedial map can function as a remedy, but even if they have, the lack of evidence of legally significant racially polarized voting is fatal to their claims because they have not shown the *Gingles* preconditions are met. Even if this Court agrees with Plaintiffs on those points, the rough proportionality already achieved by Black voters in Georgia is sufficient to bar their claims. This Court should grant summary judgment to Defendants and dismiss this case.

Respectfully submitted this 20th day of March, 2023.

> Christopher M. Carr
> Attorney General
> Georgia Bar No. 112505
> Bryan K. Webb

Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendants*

34

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
