```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,           :
                                      :
 5           PLAINTIFFS,              :
     vs.                              :  DOCKET NUMBER
 6                                    :  1:17-CV-2989-AT
     BRIAN P. KEMP, ET AL.,           :
 7                                    :
             DEFENDANTS.              :
 8

 9

10        TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11          BEFORE THE HONORABLE AMY TOTENBERG

12             UNITED STATES DISTRICT JUDGE

13                    MAY 1, 2018

14                    10:47 A.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1                 A P P E A R A N C E S   O F   C O U N S E L

 2

 3     FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
       SCHOENBERG:

 4

 5         DAVID D. CROSS
           MORRISON & FOERSTER, LLP
 6
           HALSEY G. KNAPP, JR.
 7         KREVOLIN & HORST, LLC

 8

       FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:
 9

10         ROBERT ALEXANDER McGUIRE, III
           ROBERT McGUIRE LAW FIRM
11
           BRUCE P. BROWN
12         BRUCE P. BROWN LAW

13

       FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
14     WILLIAM DIGGES, III, AND RICARDO DAVIS:

15         CARY ICHTER
           ICHTER DAVIS, LLC
16

17     FOR THE STATE OF GEORGIA DEFENDANTS:

18
           JOHN FRANK SALTER, JR.
19         ROY E. BARNES
           THE BARNES LAW GROUP, LLC
20

21     FOR THE FULTON COUNTY DEFENDANTS:

22
           KAYE WOODARD BURWELL
23         CHERYL RINGER
           OFFICE OF THE FULTON COUNTY ATTORNEY
24

25                                          (...CONT'D...)
```

```
 1   (...CONT'D....)

 2

 3   FOR THE DEKALB COUNTY DEFENDANTS:

 4
         BENNETT DAVIS BRYAN
 5       DEKALB COUNTY DEPARTMENT OF LAW

 6

 7   FOR THE COBB COUNTY DEFENDANTS:

 8
         DANIEL WALTER WHITE
 9       HAYNIE LITCHFIELD & WHITE

10

11   FOR THE DEFENDANT MERLE KING, IN HIS INDIVIDUAL CAPACITY AND
     HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE CENTER FOR
12   ELECTION SYSTEMS AT KENNESAW STATE UNIVERSITY:

13
         ROBERT S. HIGHSMITH
14       GRANT EDWARD SCHNELL
         HOLLAND & KNIGHT, LLP
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; May 1, 2018.)

 3              THE COURT:  Good morning.  Please have a seat.  We're

 4    here for a status conference in Donna Curling, et al. vs. Brian

 5    Kemp, et al., Civil Action Number 1:17-CV-2989.  Because we

 6    have been talking on the phone, I think we should just go ahead

 7    through the exercise of formally introducing ourselves and

 8    yourselves.  So if we could begin over here, that would be

 9    great.

10              MR. McGUIRE:  Robert McGuire for the Coalition for

11    Good Governance.

12              MR. ICHTER:  Your Honor, Cary Ichter for the

13    Coalition for Good Governance.  And I am also representing

14    William Digges, Laura Digges, Ricardo Davis, and, if the third

15    amended complaint is permitted, Megan Missett.

16              THE COURT:  Thank you.

17              MR. BROWN:  Your Honor, Bruce Brown for the

18    Coalition.

19              MR. CROSS:  Good morning, Your Honor.  David Cross

20    with Morrison & Foerster representing Donna Curling, Donna

21    Price, Jeffrey Schoenberg.

22              MR. KNAPP:  Morning, Your Honor.  Halsey Knapp of

23    Krevolin & Horst on behalf of the same plaintiffs, Donna

24    Curling, Donna Price, and Jeff Schoenberg.

25              MR. WARD:  Morning, Your Honor.  Bryan Ward of
```

1    Holcomb & Ward formerly representing the plaintiffs in this

2    case and looking to confirm that status today.

3              THE COURT:  All right.  Thank you very much.

4              MR. SALTER:  Good morning, Your Honor.  John Salter

5    for Barnes Law Group for Secretary of State Kemp and the State

6    Election Board defendants.  And with me is Mr. Barnes of my

7    firm.  And we have got everybody else.

8              MS. BURWELL:  Good morning, Your Honor.  Kaye Burwell

9    for Fulton County.

10             MS. RINGER:  Cheryl Ringer, Fulton County.

11             THE COURT:  Very good.

12             MR. BRYAN:  Bennett Bryan on behalf of the Dekalb

13   County defendants.

14             MR. WHITE:  Daniel White from Haynie Litchfield &

15   White representing Cobb County.

16             MR. HIGHSMITH:  Good morning, Your Honor.  Robert

17   Highsmith and Greg Schnell with Holland & Knight representing

18   retired Kennesaw State professor Merle King.

19             THE COURT:  Very good.  All right.  If I was more of

20   a scholar, I would have something better to say than what a

21   fine mess.  But that is what it looks like at the moment.

22             Let's deal with what is maybe the simplest thing.

23   Mr. Ward, you are trying to clarify are you relieved of your

24   duties here?  Is that what you are trying to do?

25             MR. WARD:  Yes, Your Honor.

```
 1              THE COURT:  It would look like there's plenty of

 2    counsel here on behalf of the plaintiffs and that that may be

 3    part of the issue.

 4              But do plaintiffs' counsel of all the variety of

 5    plaintiffs here believe that Mr. Ward has effectively been

 6    replaced?

 7              MR. McGUIRE:  We do, Your Honor, on behalf of the

 8    Coalition, yes.

 9              MR. ICHTER:  Yes, Your Honor, on behalf of the

10    individual plaintiffs I represent as well.  Yes.

11              MR. CROSS:  Your Honor, I don't believe we have an

12    issue with that.

13              THE COURT:  All right.  I mean, we have local counsel

14    and we have -- for everybody; right?  I mean, we have got -- so

15    we don't really -- Mr. Ward's services are not necessary.

16              Obviously you may want to talk with Mr. Ward at some

17    point relative to transitioning issues.  But I think that that

18    is so.  So I think the firm is properly relieved of its duties

19    and responsibilities.  And thank you for appearing.

20              MR. WARD:  Thank you, Your Honor.

21              THE COURT:  Of course, you are welcome to stay with

22    us.

23              MR. WARD:  I think I'll take off.

24              THE COURT:  Could I go too?

25              All right.  Let me go to the next thing, which seemed
```

1    simple but not so simple to me.  I'm having difficulty

2    completely understanding the different teams.  I mean, I

3    understand who represents the Curling -- what we call the

4    Curling plaintiffs, old plaintiffs.  And then what I don't

5    understand completely is the -- so we'll call those the Curling

6    non-Coalition plaintiffs.

7          But then there are two groups of counsel for the

8    Coalition and the Coalition plaintiffs.  And that is a little

9    confusing to me.  So I have got Mr. McGuire and Mr. Brown

10    representing the Coalition for Good Governance alone.  And then

11    I have Mr. Ichter and Mr. Ney representing also, as I

12    understand it, the Coalition for Good Governance, plus three

13    individual plaintiffs, plus not yet added Ms. Missett; is that

14    right?

15          MR. ICHTER:  Yes, Your Honor.

16          THE COURT:  So what is -- I mean, I understand --

17    what is the difference?  I mean, if the Coalition for Good

18    Governance is appearing alone but it is also appearing with

19    these three individual plaintiffs, what is that all about?

20          MR. McGUIRE:  Your Honor, we -- obviously the

21    transition counsel was the result of a conflict that arose

22    among the plaintiffs.  So what we have attempted to do here is

23    essentially structure it so that we -- the Coalition plaintiffs

24    as a group are in sync on what they want to pursue in the

25    lawsuit.  And so common representation makes sense.

1          At the same time, we are sensitive to what just

2    happened and want to prevent a repeat of it.  So therefore we

3    have ensured that Mr. Ichter represents the individuals

4    separately and Mr. Brown and I represent the Coalition

5    separately.  So in the event of an issue arising between the

6    individuals and the entity, the Court won't be faced with the

7    same problem that just happened.  So it is just basically

8    managing -- defensively managing potential for a conflict.

9          THE COURT:  Okay.  But it does sort of result in my

10   having three groups of plaintiffs, doesn't it?  I mean, do

11   you -- your client will exclusively be CGG?

12         MR. McGUIRE:  Yes.

13         THE COURT:  And does that mean that though because

14   CGG is also being represented here in the capacity of -- being

15   represented by Mr. Ichter and Mr. Ney that you consult with

16   them about your -- when I get briefs, are they going to be from

17   all -- all four of you, or am I going to be getting two sets of

18   briefs?  I mean, at this point --

19         MR. McGUIRE:  Our expectation is that we would all be

20   filing one single brief because we are operating jointly.  It

21   is purely a worst case scenario anticipation just to avoid the

22   kind of issue that arose recently.

23         THE COURT:  All right.

24         MR. McGUIRE:  We don't expect that to happen, by the

25   way.  But once burned.

```
 1               THE COURT:  All right.  And, Mr. Ichter and Mr. Ney,
 2     do you agree with that?
 3               MR. ICHTER:  Yes, Your Honor.
 4               THE COURT:  And as to the -- I'm not sure how I
 5     refer -- let me just refer to them as the Digges plaintiffs
 6     only because it is too confusing otherwise.
 7               MR. ICHTER:  Yes, Your Honor.
 8               THE COURT:  As to Ms. Missett -- if I remember
 9     correctly, Ms. Missett -- I didn't unfortunately put a tab on
10     the allegation -- her allegations in the complaint.  I assume
11     it is going to be in the parties' section.
12               Ms. Missett is a Fulton County voter?
13               MR. ICHTER:  Yes, ma'am.
14               THE COURT:  She intends to vote in the upcoming
15     elections in Fulton County.  And did she vote before?  I just
16     can't --
17               MR. ICHTER:  Yes, Your Honor.
18               THE COURT:  Because I see -- you know, Paragraph 27
19     deals with she has been a member of the CGG since 2000 -- March
20     of 2018.  And I'm just looking for the individual allegations
21     involving her.  If somebody can point them to me other than
22     that --
23               MR. SALTER:  Page 13, Judge.
24               THE COURT:  What?
25               MR. SALTER:  13.  Is that right?
```

```
 1              THE COURT:  Yes.  Well, I've gotten Page 13.
 2    Page 13, I realize --
 3              MR. McGUIRE:  Page 56, Your Honor.
 4              THE COURT:  Page 56.  All right.  Thank you.
 5         So the amended complaint that you seek to include and
 6    have me authorize seeks to proceed against a smaller number of
 7    defendants and only on Counts 1 and 2.
 8              Why are we keeping -- if you are releasing other
 9    counties, why are we keeping Fulton County in?  What is your
10    theory?
11              MR. ICHTER:  Well, Your Honor, if I can defer to
12    Mr. McGuire and Mr. Brown on that, they will be taking the lead
13    on that.
14              THE COURT:  That's fine.
15              MR. McGUIRE:  Your Honor, the counties are
16    responsible for enforcing the State Board -- State Election
17    Board rules, and the counties also have discretion to adopt
18    localized procedures so that they -- Fulton County is the
19    largest county.  It is one where a significant amount of the
20    events that are relevant to the claims took place.  And so we
21    think that as an exemplar of how the state defendants' conduct
22    is manifested at the local level where voters actually interact
23    with the system it is important to have a county defendant in
24    the case.
25              And so we tried to narrow it as much as possible
```

1  while also keeping the core of the claims that we want to

2  proceed on.  So that is why we have Fulton in.

3          THE COURT:  Because the Sixth District was primarily

4  Fulton are you saying or -- because this originally -- this

5  litigation in part originally came out of that whole Sixth

6  District vote and I'm just -- even though I know you are not

7  looking for retrospective relief at this point.

8          But my recollection is that the reason why we had

9  Dekalb and Cobb was the Sixth District had Dekalb and Cobb in

10  it as well.

11          MR. McGUIRE:  Right.

12          THE COURT:  Are you just not interested in the Sixth

13  District any longer?

14          MR. McGUIRE:  We are -- we are interested.  But the

15  voting system that we're challenging is a statewide voting

16  system.  All the different counties I guess technically could

17  be defendants.  But they don't need to be in order for us to

18  make the claims that we are making against the state.

19          And the reason we want to have Fulton County in, as I

20  said, is because at the county level is where the voters

21  interact with the system.  This case did originate in the

22  events surrounding the CD6 election.  But now that we're

23  seeking prospective relief, those events are important as

24  factual background indication -- evidence of past harm, which

25  is relevant to making a showing of threatened injury.  So we

1    think that in the interest of economizing the case we can

2    pursue Cobb and Dekalb facts if we make them nonparties and

3    just pursue it through nonparty discovery.

4            So we are not saying that there won't be discovery

5    directed at them.  We intend for there to be.  But we didn't

6    think that it would facilitate the case for us to keep them in

7    as parties if we didn't need to.

8            THE COURT:  So I mean, really the Curling plaintiffs

9    agree that on one and two and many things can go by the wayside

10   but they insist that they need mandamus relief.  That is -- I

11   think that is 9 -- Count 9.  And I assume that is in part

12   because of the intricacies of state law regarding sovereign

13   immunity and where more recent decisions have left us.

14           Why do you think you don't need mandamus --

15           MR. McGUIRE:  Well, so --

16           THE COURT:  -- just from a plaintiffs' perspective?

17   I mean, I realize the defendants think you-all need to go away

18   altogether.  But that is something else.

19           MR. McGUIRE:  I have to tread carefully here because

20   I'm reluctant to be critical of the second amended complaint.

21   However, we do have issues with Count 9 and the other counts.

22   So based on that I think --

23           THE COURT:  But if they are maintaining it, you are

24   still -- I realize that you are going under a different theory.

25   How do you think -- just even given the fact that we're here

1    today on this whole scheduling issue and there's differences

2    between you-all, how do you think this is from a pragmatic

3    perspective as experienced counsel -- and I have a lot of very

4    experienced counsel here -- is going to not be a nightmare in

5    terms of working out and confusing and difficult?

6           Do you think -- do you just think it is going to get

7    better once we get over this hurdle or what?

8           MR. McGUIRE:  I'm hopeful that it would get better.

9    I'm cautiously pessimistic that it will based on the

10   surrounding -- the events surrounding our attempt to amend.  I

11   think the plaintiffs -- the Curling plaintiffs and the

12   Coalition plaintiffs genuinely do have serious differences in

13   how they want to pursue the case.

14          I'm not sure if Your Honor is receptive at all to the

15   idea of severance.  But I think both of us as separate groups

16   would be.  And I know that some of the defendants have

17   expressed that they would be as well.

18          THE COURT:  Well, tell me how you think that

19   severance would work here.  I mean, why wouldn't I essentially

20   be deciding some of the same precise things in two different

21   cases?  Or would you be saying -- how could we efficiently

22   handle this without the Court basically needing basically to

23   get an alter ego in order to do the rest of my caseload?

24          MR. McGUIRE:  Well, the benefit of severance -- I

25   mean, from our perspective, the benefit of severance is that we

1    don't have co-plaintiffs who are seeking to sort of act as

2    gatekeepers on our case.  And so there may be some efficiencies

3    in terms of scheduling hearings in common, potentially, you

4    know, working together so that everybody can conduct

5    depositions at the same time, if that is desirable to avoid

6    things.

7            But I think the main thing for us is severance is

8    attractive to us because it seems that every move we make in

9    the case is otherwise potentially going to have a two-front

10   battle, one against the defendants and one against our own

11   co-plaintiffs and to the extent we could minimize that by

12   having them go their own way and us go our own way and

13   coordinating where the logistics is served by doing that.

14           Now, as far as the question of whether the Court is

15   granting the same relief, I think if we are allowed to pursue

16   the third amended complaint we will be seeking a much narrower

17   band of relief than the Curling plaintiffs currently would be

18   pursuing under the second amended complaint.

19           They seem to be inclined to try and come closer to

20   our position through a stipulated dismissal.  But they still

21   want to proceed under a complaint that we have some issues

22   with.  And we think we just prefer to proceed under our -- the

23   claims we frame as we frame them.

24           So as far as the relief goes, I think we are sort of

25   pointing in the same direction on some things.  But there is a

1    lot more that they are currently going after than we are.

2         THE COURT:  All right.  So because you are the new

3    counsel on the block with suggesting a new complaint, I'm sort

4    of really starting off just with you-all trying to poke at what

5    the implications are of what you are suggesting.

6         You know, I know you believe that you had to proceed

7    like this under an amended complaint.  And I do understand

8    that.  And the Eleventh Circuit decision in *Klay* points in that

9    direction.  Though I think the parties could stipulate to lots

10   of different things -- ways of basically proceeding here.  I

11   mean, we wouldn't have to be quite so formalistic if everyone

12   could agree on something.  Because then it would abbreviate

13   some of the briefing.  And no one wants to go through still

14   another set of briefing on this motion to dismiss.  And I'm not

15   sure how much it would change things anyway.  But it might

16   change some.

17        But to the extent you have the same claims, are you

18   asking to be -- because of the new amended -- basically be in

19   the position of saying I allow you to have the amended

20   complaint and it will obviously render moot technically the

21   prior motion to dismiss and here we go forward in the next

22   motion to dismiss because the state is very vigorous about

23   asserting its sovereign immunity claims.  Maybe there won't be

24   a qualified immunity, but there is still a sovereign immunity

25   claim.

1          How do you perceive you would handle that in a way so

2    that we are not basically next fall still dealing with the

3    procedural motions?

4          MR. McGUIRE:  Right.  Well, we are ready to proceed

5    at whatever speed can get this moving.  So I mean, we would ask

6    for expedited briefing.  And I think as far as to the extent --

7    the other side and our co-plaintiffs are suggesting that what

8    we are asking for is the same relief.  You know, if that is the

9    case under -- they suggest we're asking for it under the same

10   theories.

11         We think we're asking for it in a much more

12   defensible manner.  To the extent that there is anything right

13   about what they are saying, the briefing should be capable of

14   being very expedited on our third amended complaint because it

15   is a much narrower complaint in that case.

16         THE COURT:  So I hate to ask you for an entire

17   preview.  But I think it probably would be helpful to me when

18   you say this -- and maybe it is not so easy to answer for you

19   off-the-cuff.  But that is what -- I would like to understand

20   as Counts 1 and 2 were there, what do you think -- before and

21   were briefed -- but they faced immunity -- a variety of

22   different types of immunity defenses, plus the res judicata

23   defense, among others, what are you going to add to that

24   picture in terms of being able to respond?

25         And yes, you have a narrower -- you have narrower

1    claims as a whole, and we don't have as many claims.  But we

2    still have basically the fundamental sovereign immunity and res

3    judicata issue here.

4          MR. McGUIRE:  So our perspective based on, first of

5    all, the sovereign immunity is that when we were seeking

6    prospective injunctive relief under federal cause of action

7    1983 that the state defendants don't benefit from sovereign

8    immunity and neither do the counties.

9          And so we think that that problem is solved with the

10   third amended complaint because we are only seeking prospective

11   relief against defendant named only in their official

12   capacities.  We're not seeking nominal damages.  We're not

13   seeking anything against them individually.  And we're not

14   seeking anything that is retrospective.

15         So we believe we have addressed the sovereign

16   immunity issues, and there are no qualified immunity issues

17   given that they are not named personally.

18         As far as res judicata, I would say if the basis for

19   res judicata is the state court case in which -- that involved

20   the CD6 election that case was targeted towards changing the

21   voting method in a past election.  It was -- it was targeted

22   specifically by -- well, it wasn't -- the ruling as I read it

23   was on jurisdictional grounds.  It wasn't based on the merits

24   of the claims.

25         And so to the extent that there is any -- I just

1    don't think there is any res judicata defense in the case.

2          THE COURT:  And, finally, the county defendant has

3    requested either a complete release or a partial release or

4    some type of measures to mitigate the burden of their keeping

5    in storage in excess of 200 voting machines.

6          Do you have a position as to that?

7          MR. McGUIRE:  Well, so our position on that is that

8    there is important evidence on those machines.  And the

9    defendant -- this is a bit of a problem of the defendants' own

10   making because they have opposed discovery in this case.  And

11   if we had been allowed to pursue discovery prior to this point,

12   we would have probably gotten off of those machines by now what

13   we need.

14         I think that their concerns can be accommodated if we

15   can do the discovery that we would want to do on those

16   machines.  And we are quite -- we have talked to our experts

17   about what we would need off those machines, and we know

18   exactly what we need to do.

19         THE COURT:  What is that?

20         MR. McGUIRE:  So the DRE machines have -- they have

21   memory located in two locations.  There is a memory card, which

22   is removable, and there is a hard drive.  And what those two

23   different things record is they record the cast vote records

24   that are cast in that machine, the actual ballots as cast by

25   the voters.  So you have that in two different locations.  And

```
 1   those same cast vote records are also going to be stored on
 2   what is called a GEMS server, which is at the county level.
 3            THE COURT:  You are going pretty fast for somebody
 4   who doesn't -- who doesn't live and breathe election machines.
 5            MR. McGUIRE:  Apologies.
 6            THE COURT:  And my permanent law clerk, Ms. Cole,
 7   just walked in.  Just start again on that since you were
 8   talking so fast.
 9            MR. McGUIRE:  I'm sorry.
10            THE COURT:  That is quite all right.
11            MR. McGUIRE:  So the DRE is basically -- it is a
12   touch screen computer.  When the voter votes, it records and
13   submits their ballot.  It creates a cast vote record, which is
14   just a list of your choices.
15            And it stores that in two different locations.  There
16   is a hard drive on the DRE machine, and there is a removable
17   memory card.  And so it stores that cast vote record in both
18   places.  The software does that, software that is put on to the
19   machine from, you know, the central repository that was
20   formerly maintained by KSU.
21            And that -- the case, as you know, is all about the
22   vulnerability about the system, the vulnerability of the system
23   to hacking and the potential that malicious software has been
24   introduced at some point in the chain.
25            So the discovery we want to do is directed at finding
```

1   out if malicious software has, in fact, created discrepancies

2   between votes that are stored in multiple locations, all of

3   which should be the same.

4          So what we want to do with the machines that were

5   used in the previous elections is get an image of the cast vote

6   records on the various -- in the various locations where they

7   are stored and have our experts compare them to identify any

8   discrepancies between the different places.

9          So what we -- and every time they use the machines,

10  my understanding is that they overwrite some of this data.  So

11  if they use the machines, there is a risk that we won't be able

12  to do the comparison we want because the data we want to look

13  at will be eliminated.

14         So our experts tell us that it is fairly simple to

15  get the information off the machines.  And if we can get the

16  information off the machines in the process of them preparing

17  them for use in the next election, that would work very

18  smoothly and it would accomplish our goals and it would

19  accomplish their goals.

20         So we are not opposed to the release, but we just

21  want to make sure we are able to get the evidence off of those

22  machines that we need.

23         THE COURT:  And how long do you think that would

24  take?

25         MR. McGUIRE:  If you were to do it as a solo project,

1    it could take some time.  If you were to integrate it into

2    their existing -- their existing method for preparing the

3    machines, it might be a lot quicker.

4         So what our experts tell us is that the memory cards

5    can simply be copied.  They are removable.  You remove it.  You

6    copy it on to a medium, and you are done.  The hard drive can

7    be -- it is a little bit more involved.  You have to open the

8    machine and take a chip out of the motherboard, replace it with

9    a chip that then receives a download of the contents, and then

10   you reverse that.  Take your chip back and put their original

11   chip back.

12        So it is a fairly -- it is not -- I mean, it is not a

13   lot of time.  But given the number of machines, it would add up

14   to a little bit of time.

15        THE COURT:  And you would need to do this in each

16   county?

17        MR. McGUIRE:  We would like to do it in Dekalb,

18   Fulton, and Cobb, yes.

19        THE COURT:  How many machines are there in Dekalb?  I

20   only heard the number.  I guess it was 270 I think was

21   mentioned for Fulton or something like that.

22        MS. BURWELL:  It is 762 for Fulton.

23        THE COURT:  Boy, look what reading at 11:00 at night

24   does to you.  All right.  762 that are in storage.

25        MR. BRYAN:  Your Honor, in Dekalb, it is 800.

1          MR. McGUIRE:  To clarify, Your Honor, on the hard

2    drives, we understand it is more involved.  So we are willing

3    to do that by a sampling methodology if that would facilitate

4    things.

5          MR. WHITE:  There's 618 set aside in Cobb, which is

6    about a third of our machines.

7          THE COURT:  Okay.  And so what would be the -- have

8    you gotten any idea of what the sample would be that you would

9    like to do?

10          MR. McGUIRE:  That we have not done.  We would have

11    to -- we don't have a statistician who has given us a sample

12    size yet.  But we can do it fairly quickly if we knew that is

13    how we were going to proceed.

14          THE COURT:  And I know that there is this battery

15    issue that you are worried about.  Why did you feel like you

16    couldn't have worked out something with them about -- the

17    plaintiffs' counsel about the battery?  I don't know that that

18    was going to scramble the data because you charged something.

19          MS. RINGER:  Every attempt to work something out with

20    plaintiffs' counsel on this issue was just -- we were not able

21    to get further.  There was a plan to identify machines.  We

22    turned over information about the various precincts and how

23    many machines were kept for the various precincts.  And then

24    kind of discussions stopped.  And then we had a switch of

25    counsel.

```
 1            THE COURT:  But what about the battery?

 2            MS. RINGER:  Well, we had gone forward thinking that

 3     we were going to get a sample size that would be identified and

 4     then we would have a set of machines that we could move forward

 5     on and not the others.

 6            The battery issue is just something that my clients

 7     have recently told me about with respect to the sequestration

 8     of the machines because the machines have not been touched.  So

 9     that is something they just brought up in their recent

10     affidavit.

11            THE COURT:  All right.

12            MR. BARNES:  Your Honor, could I say something?

13            THE COURT:  Well, it would be hard to oppress you in

14     my considered experience.  But it should be wise, I hope.

15            MR. BARNES:  Well, I don't know about that.

16            THE COURT:  Come on.  Give me some help.

17            MR. BARNES:  Of course, we represent the Secretary of

18     State's office here.  And turning loose a bunch of folks, you

19     know, to teach them how to hack, if there is such a malevolent

20     person around, is something of great concern for us.

21            And the preliminary issue is --

22            THE COURT:  I didn't hear them saying to teach them

23     how to hack.  He wants to see whether -- his experts want to

24     know whether there was hacking or something because there is

25     differences in the data -- in the data collected from different
```

```
 1   sources.
 2            MR. BARNES:  And that takes me to the next issue.
 3            THE COURT:  All right.
 4            MR. BARNES:  And the issue is, as I understand it --
 5   and I could be wrong now -- but that under Icqbal and others,
 6   you come into court with a proof, with an allegation.  All
 7   right.  This is what has happened, we are not to do.  Just
 8   not -- you don't file a suit as a general fishing expedition
 9   that is going along.  And that seems what is being here.  Well,
10   we don't know.  But we want to see and everything else.
11            We are right in the middle of an election that starts
12   May the 22nd here.  And we are supposed to take so many
13   machines off.  And there has been no proof of, listen, this is
14   what is wrong, and this is how it caused a harm.  So I think we
15   are a long way from -- and that ought to be all decided on a
16   motion to dismiss.
17            And, of course, to date we have not -- we don't know
18   who is on first or what is on third.  And so I just want to
19   voice early a concern here about right in the middle of
20   election season -- and this case has been pending a long time.
21   You told them if they wanted a preliminary injunction, come
22   forward and present your proof.
23            We think that the matter ought to proceed with
24   whatever -- whoever is representing who and whatever they are
25   going to claim, make it and allow us under the rules to say
```

1   that is insufficient and therefore and for what reasons.  Just

2   not say, well, we need this many machines, and we need to have

3   a fishing expedition, and we think that something is wrong

4   and -- but we really don't know.

5            So I just wanted to voice that at a very early stage.

6            THE COURT:  Well, I understand your concern.  But you

7   seem like you condemned me to the motion to dismiss swamp

8   forever.  But go ahead.

9            MR. McGUIRE:  I would just -- we are definitely

10  sensitive to the concerns about moving the case forward.  We

11  actually want to file a motion for preliminary injunction and

12  have an idea of timing that we would like to have you consider

13  if you are interested in hearing it.

14           THE COURT:  So what is your proposed schedule?

15           MR. McGUIRE:  So we -- we think it is probably -- I

16  mean, well, it is not possible to have this happen before the

17  May 22nd election at this point.  So we are looking at the

18  November 6th election.

19           And we worked backwards on a calendar.  And early

20  voting starts, we believe, around Monday, October 15.  If Your

21  Honor were to rule and give the defendants time to -- if you

22  were to rule for us and were to give the defendants time to

23  react to that ruling and it took them 30 days, which we have

24  reason to believe is a sufficient amount of time, would be part

25  of our preliminary injunction case, that would mean a ruling

1    would need to be out by Friday, September 14.

2         If we worked backwards from that date, we could have

3    a preliminary injunction hearing -- we think it may be a two-

4    to three-day hearing in mid-August.  And backing up from that

5    for briefing, five weeks, four weeks would get us to the middle

6    of July.  So if we could file our preliminary injunction motion

7    by the middle of July, if we could start discovery now -- we

8    don't have a lot of discovery to do for a preliminary

9    injunction motion.  But we do have some we would like to do,

10   including getting the information off these machines.  We would

11   be ready to go.  And I think we could maybe have this case

12   hopefully handled by the time of the November the 6th election.

13        THE COURT:  I mean, the problem with your proposal is

14   that the state has been and the defendants as a whole have been

15   very clear that they are not going to consent to any discovery

16   before I rule on their motions to dismiss and that they have a

17   right to take that posture under governing law.

18        And whether I think that makes sense under the

19   particular circumstance or not is kind of irrelevant since that

20   is the prevailing law.  And that is why I tried to move the

21   motions to dismiss originally so quickly.  So that is really

22   the problem about the schedule.

23        MR. McGUIRE:  My understanding -- and that is part of

24   why we made such an effort to eliminate immunity defenses from

25   the third amended complaint because my understanding was that

1    the case law that requires that discovery be stayed is related

2    to the fact that there are immunity defenses, immunity from

3    suit, immunity from liability.

4             And, you know, on one hand, they have removed this

5    case to federal court.  So it is arguable under *Lapides* that

6    they have waived immunity from suit.  They may still have

7    immunity from liability with certain claims in the second

8    amended complaint.  But they don't have immunity defenses to

9    our third amended complaint.

10            And so if our third amended complaint were accepted,

11   our belief is that the underlying rationale for suspending

12   discovery goes away and we could begin discovery right away.

13            THE COURT:  Does the state agree?

14            MR. BARNES:  No, we don't agree.

15            MR. SALTER:  No.

16            MR. BARNES:  I mean --

17            THE COURT:  Not as to the merits you understand?

18   Just as to the discovery issue.

19            MR. BARNES:  I understand.  Let me say -- of course,

20   we don't think -- I say this with a caveat, which you know.  We

21   don't think this states a cause of action.  However, let's

22   assume that they win on everything.  You are going to issue an

23   order by October 15 and we have got -- I mean, issue an order

24   by September 14.  And if you were to say that there had to be a

25   whole new election system, do you think we could implement one

1   statewide before the November 6th election?  There is no way.

2   And it is because of, with all due respect, my brothers and

3   sisters over here have delayed the case because they are

4   fighting amongst themselves --

5          MR. SALTER:  Six months.

6          MR. BARNES:  -- for six months.  And here we are in

7   the midst of an election, and we're supposed to go out and tell

8   all these candidates out here -- even if he's right, even if he

9   is right, we're supposed to go down there and tell them, I know

10  y'all spent about $30 or $40 million on television.  We're not

11  going to have an election this year.

12         That is just impractical and crazy.  And they are an

13  architect of their own misfortune.  And so there is no way even

14  if you won, even if they won on everything, that we could

15  implement -- the State of Georgia could implement -- how many

16  precincts are there in the state?  There's 159 counties.  So

17  there are 3- or 4000 at least precincts to get a new machine

18  in, get it tested under state law, get done all of this and

19  everything else, and get it out to have an election in

20  November.

21         That is -- that is just impractical.  This -- if they

22  want to -- everybody admits we are going to replace these.  We

23  don't think there has been any harm.  They have formed a

24  bipartisan commission over here trying to do -- see what they

25  are going to put in and all this other stuff.

```
 1              I mean, you cannot create the crisis and then say we
 2    have got to do this.  You know, drop everything else.  And I
 3    have got a few notary fees I need to take in.  I mean, we're
 4    not going to be just --
 5              THE COURT:  All right.  I got the point.  But what
 6    about the -- did you think that the amended complaint
 7    addressed -- basically avoids the immunity issues in terms of
 8    just simply the litigation so that we can get going if I
 9    proceed -- if we were to proceed under this?
10              MR. SALTER:  We'll reserve on that.
11              MR. BARNES:  I can't tell you because I don't know
12    all of the allegations that are going to be there.  But
13    initially no, I don't think it does.  I think there is still a
14    good claim constitutionally and under Georgia law and federal
15    law that this is an improper action that has been brought.  And
16    we would be glad to brief all of that.
17              MR. CROSS:  Your Honor, may I just address that one
18    issue?
19              THE COURT:  Yes.
20              MR. CROSS:  I actually went back and took a look at
21    the motions to dismiss.  And the motions to dismiss that assert
22    sovereign immunity, the state defendants in particular, they
23    assert that only as to Claims 6, 7, and 10.  And both -- all
24    plaintiffs are looking to seek to dismiss those claims whether
25    it is through the third amended complaint or stipulated
```

1    dismissal.  So we are in agreement on our side that sovereign

2    immunity -- in fact, all the immunity claims are out of this

3    case, whether we proceed under Rule 41 or Rule 15.

4            THE COURT:  All right.

5            MR. BARNES:  Well, let us get the complaint.  Let us

6    get whatever they are going to file.  This case is still

7    administratively closed.  Let's get what they are going to do.

8            THE COURT:  Well, we have -- we have the new group of

9    plaintiffs' proposed amended complaint.  We just --

10           MR. BARNES:  I know.  Is there going to be an

11   amendment on this side?  I mean, you know, there is really

12   three or four groups here.  So I don't know.  Am I going to get

13   one complaint?  Am I going to get two or three or four?

14           Let them file their complaint.  Let us look at the

15   allegations.  And we follow the law.  I mean, you know, we

16   follow the rules and the law.  We're down here all the time.

17   There is no -- there is no emergency that has been demonstrated

18   after a six-month delay that should take this out of the normal

19   course of the case -- the handling of the case.

20           THE COURT:  All right.

21           MR. HIGHSMITH:  Your Honor, might I be heard on

22   behalf of Mr. King very briefly?

23           THE COURT:  Yes, you may.  Can you come forward,

24   though?

25           MR. HIGHSMITH:  The simplicity, Your Honor -- and

thank you.  Robert Highsmith on behalf of Mr. King.  Mr. Ward's issue perhaps was the most simple issue before the Court today. But I would argue that Mr. King runs a close second in that I don't believe that anyone behind me still wants any relief from Mr. King.

There is no center for election systems any longer. Under the watchful eye of the plaintiffs, all of the machines and data and everything was transferred to the Secretary of State's office.  Kennesaw State will continue to preserve Mr. King's emails and files and all of that under their normal obligations.

Mr. King retired from Kennesaw State at the end of last year and has no role whatsoever in Kennesaw State, let alone the administration of the state's election systems.

My understanding, dim though it may be given the complexity, is that the only disagreement among plaintiffs is not whether or when to get Mr. King out of the case but how.

And we are -- we just want Mr. King out of this case because no one wants any relief from him.  They are talking only now about prospective relief.  And the other group of plaintiffs that still want to proceed under the second amended complaint, it is our understanding -- not speaking for them -- that they would be happy to dismiss Mr. King because he has no further role in the administration of the state's election system and hasn't for quite some time.

1          With that, we seek the Court's guidance on -- and at

2     the moment, by the way, Your Honor, there is, of course, a

3     pending motion on qualified immunity for Mr. King.  That is

4     when he did still have a role in this.  But now as soon as the

5     Court reopens the case, we will be prepared to file a motion,

6     if necessary -- and we hope that it wouldn't be -- a motion to

7     dismiss Mr. King on mootness grounds because there is

8     absolutely -- there is no relief currently being sought or

9     contemplated to be sought against Mr. King.

10          So that is our contribution to the efficient

11     administration of the case, Your Honor, is to hopefully end

12     today no longer being in the case.

13          THE COURT:  All right.  So Mr. Cross, Mr. Knapp,

14     would you respond to that?  Because you're the ones who still

15     have a complaint with Mr. King in it.  And then I'll start

16     asking you other questions.

17          MR. CROSS:  Okay.  Your Honor, our position is that

18     Mr. King can and should be dismissed under Rule 41.  We have

19     actually agreed to all the terms that they proposed, which were

20     consistent with the terms that we proposed a week or so ago.

21     The holdup is not us.  The holdup is the other plaintiffs have

22     refused to do that for reasons that are not clear to us since

23     they also are asking to have him out.  They are insisting that

24     it happen only through their third amended complaint.

25          They have cited *Klay*.  *Klay* is explicit.  I mean, the

1   language they themselves cite in *Klay*, the court -- to the

2   extent it was a holding that even bears on this case, the court

3   said that Rule 41 permits dismissing all claims against a

4   particular defendant.

5           Everyone on our side of the table seems to agree on

6   that.  You will have to direct that question to them as to why

7   they won't allow it.

8           THE COURT:  All right.

9           Mr. McGuire, Mr. Ichter, or Mr. Brown, whoever is

10  going to be answering --

11          MR. McGUIRE:  Yes.

12          THE COURT:  -- what is your answer as to that?

13          MR. McGUIRE:  So Mr. King will be dismissed if our

14  third amended complaint is accepted because we don't have any

15  claims against him.

16          Now, having said that, our solution to moving forward

17  is to amend the complaint in the manner we have proposed.  And

18  I think that it is unfair to us to take part of what we have

19  proposed and ask us to do it now when it is part of an entire

20  complaint that we wish to amend.  Each part by itself is a

21  separate part.

22          And so they are happy to do what they think works

23  under *Klay*.  We didn't think it worked under *Klay*, and we filed

24  our third amended complaint three weeks before the idea of a

25  stipulation ever arose.  So, you know --

```
 1              THE COURT:  What is the downside for why -- I mean, I
 2    think you are right as a whole that the way to deal with the
 3    status of the case in getting things cleaned up is with a
 4    potentially amended complaint.  But -- because you are not --
 5    there are so many moving parts.
 6              But, you know, we're releasing a party, which is much
 7    more a classic Rule 41 item.  I mean, you can do it the way you
 8    are talking about.  You can -- I don't think you can just get
 9    rid of claims on a Rule 41 basis but just as to Mr. King.
10              MR. McGUIRE:  Right.  Well, this arose -- this only
11    arose the first time last night after 9:00 P.M. for us.  So we
12    haven't really had a lot of time to consider that as an
13    alternative to the full amendment by stipulation.  So I'm kind
14    of talking off the top of my head on it.
15              I mean, I think in principal the third amended
16    complaint makes some agency obligations about Mr. King that
17    allow us to still pursue the necessary discovery and the
18    necessary claims against the state based on his actions.  I'm
19    not sure if those claims are -- his allegations are included as
20    well in the second amended complaint.  And so for that reason,
21    having him as a party if the second amended complaint is what
22    we have to travel under may be preferable to dismissing him by
23    stipulation from the second amended complaint.
24              And, Your Honor, if I may, I was hoping I could
25    address as well the points that Governor Barnes made.  We are
```

1    not -- first of all, as I mentioned, we intend to prove that

2    this can be done in 30 days.  We intend to offer proof as part

3    of our preliminary injunction motion.  And we are going to rely

4    on the example in Virginia, which did exactly this within 30

5    days.  They made the decision to abandon the DREs and instead

6    use one of the methods that we are proposing here, which

7    doesn't involve the purchase of a single new machine.  All it

8    does is it involves Georgia using one of the three statutorily

9    authorized mechanisms that are already in place for conducting

10   elections.

11           DREs are just one of several methods that Georgia can

12   use to conduct elections.  It has been doing paper ballots for

13   hundreds of years.  And it has been doing optical scanning of

14   paper ballots for at least since the '80s.  So we are not

15   asking Georgia to do anything other than take what it currently

16   does in DRE elections from mail-in and provisional absentee

17   ballots and do it for all the ballots.

18           It is a matter of just taking the existing ballot

19   orders and increasing them and running them through a scanner

20   instead of using the DREs.  It is a solution that we'll prove

21   is feasible within the time frame that we're asking the Court

22   to grant relief.

23           THE COURT:  All right.  Well, let me -- Mr. Cross,

24   are you going to address the posture of the case?

25           MR. CROSS:  Yes, Your Honor.  Your Honor, the posture

```
 1   we find ourselves in is -- I will confess is one of
 2   unprecedented in my experience where what has gotten us to this
 3   point is an inability to coordinate with parties on our own
 4   side.
 5           I'm not sure how we cross that bridge.  Severance has
 6   been proposed.  We certainly would support severance if we
 7   could do so without any prejudice to our clients.  I have
 8   concerns about how that would work, and I have not heard a
 9   proposal from anyone in this case that would explain how that
10   would work.
11           Our bottom line on the third amended complaint is we
12   do believe that everything that they want to achieve through
13   the third amended complaint for the most part can be achieved
14   through Rule 41.
15           As Your Honor acknowledged at the start of this, the
16   parties can stipulate to dismissals.  *Klay* does not deal with
17   that situation.  In *Klay*, it was a situation where the
18   plaintiff, first of all, didn't even put in a stipulation.  It
19   was a notice of dismissal in response to motions by the
20   defendants.  And it would have severely prejudiced the
21   defendants in that case because the dismissal there was
22   intended to deprive them of their arbitration rights.
23           The Court had found certain claims were arbitrable
24   and certain were not.  And the plaintiff wanted to get around
25   going into arbitration and said, I'll just dismiss the
```

1    arbitrable claims.  And the defendants, of course, objected to

2    that.  And so *Klay* is nowhere near where we are here or where

3    we could be if the folks behind me would simply come along

4    where the rest of the parties seem to want to get to, which is

5    let's dismiss the claims that nobody wants to pursue.  Everyone

6    has agreed on our side as to which claims should proceed with

7    the exception of one claim, which I'll turn to, which is the

8    mandamus claim.

9           We agree on which parties should be in.  And there is

10   at least one case that we cited in *Bell* that they don't

11   address, the *Bell* case from the Northern District of Alabama,

12   where that was done.  There was nothing to suggest that there

13   is Eleventh Circuit precedent that prevents the parties from

14   proceeding by stipulation.

15          The third amended complaint, on the other hand,

16   reopens this case to a motion to dismiss.  And I don't hear

17   anything from Mr. McGuire on how that is going to play out in

18   the schedule he has got, other than some vague notion of

19   expedited briefing.

20          And let's just pause for a moment on what Governor

21   Barnes had to say.  They have had the third amended complaint

22   now for weeks.  I think about a month.  And to this day they

23   don't yet have a position on basic issues of sovereign

24   immunity.  And his response to the Court was, let them file the

25   complaint.  Then we'll look at it, and then we'll brief it.

1          This is just going to be further delay.  And as far

2    as I can tell, it is going to be June or July before we even

3    get motions to dismiss briefings done and Your Honor gets a

4    chance to rule on them.  So how we get to a PI hearing in July

5    when we can't even proceed on discovery -- I don't see how that

6    works.

7          Rule 41 cuts through it all.  My understanding -- and

8    defendants can correct me if I'm wrong -- at least most of the

9    defendants have indicated that they will agree to stipulated

10   dismissals that carve this case down as long as we can resolve

11   preservation issues, which we're happy to work with them on.

12   We can deal with that separate and apart from dismissals.

13         What the other plaintiffs have -- the Coalition

14   plaintiffs have to do is they have to show -- and they

15   acknowledge this -- that justice requires an amendment to the

16   complaint.  And that is a rigorous standard, Your Honor.

17         As they acknowledge, as long as the Court finds any

18   substantial reason -- that is the language -- to deny it, then

19   the Court should deny it.  There are lots of substantial

20   reasons, and they haven't come forward with justice required.

21         The only argument they make that justice requires it

22   here is this notion that the second amended complaint was a

23   product of conflicted counsel.  I will tell Your Honor we take

24   serious issue with that representation because it plays fast

25   and loose with the facts in a way that is quite disturbing to

1    us.  I have been through the record.  I have talked to my

2    clients.  There was no notion of conflict in this case until

3    after the second amended complaint was filed.  And the notion

4    that that complaint in any way doesn't reflect the vision and

5    the sound judgments behind counsel representing all those

6    parties in any normal situation where there are going to be

7    some disagreements and those things get netted out -- that just

8    simply is not an accurate representation to the Court.

9           The other point that I'll make is they haven't

10   articulated any need here.  The closest thing they come to is

11   they have a single claim in conclusory argument in their reply

12   where they say the third amended complaint includes essential

13   allegations.

14          They have never articulated what allegations are

15   essential.  And as we sit here today, the Coalition plaintiffs

16   joined in the opposition to the motions to dismiss filed by the

17   defendants.  That opposition stands today.  So unless they are

18   going to stand up in this courtroom and say that they now agree

19   with some aspect of the motions to dismiss such that the second

20   amended complaint is so infirm that we're going to lose all of

21   our claims or the claims that they care about, then there is no

22   need for it.  And what it is going to do is inject considerable

23   cost and considerable delay as we start this process all over.

24          We should move forward in a cooperative fashion.

25   Let's get this done through Rule 41 dismissals and get

1  discovery going so we can actually move forward with a case

2  that will get us relief before the November election, Your

3  Honor.

4           The other thing I did want to respond to --

5           THE COURT:  In terms of the Rule 41 dismissals, that

6  takes care of some of the parties.  I don't know whether you

7  are willing to get rid of all the parties that are identified

8  by your -- by Mr. McGuire's and Mr. Ichter's complaint.

9           MR. CROSS:  We agree with them to dismiss the same

10 parties, the same defendants, that they wish to dismiss.  We

11 agree with them that any defendants that were sued in their

12 official capacity -- I'm sorry -- in their personal capacity

13 should be sued only in their official capacity.

14          In the *Bell* case, again a similar thing was done in

15 the reverse I believe.  They dismissed official capacity claims

16 and kept the defendants in their personal capacity.  We seek to

17 do the reverse.  But I would argue the decision shows that can

18 be done by stipulated dismissal.

19          And we seek to dismiss all the claims they do except

20 we want to keep Count 9 on mandamus.  Mr. McGuire today said

21 they have concerns -- I won't get into the substance of their

22 concerns because conversations with us are obviously

23 privileged.  At least at this stage.

24          The only concern they have ever expressed to us about

25 Count 9 though that I will say is a purely tactical concern.

1    We have never heard any notion that there is a substantive

2    deficiency that they believe that that claim should not

3    proceed.

4            And so, again, as I said before, we have not heard

5    from them and I doubt we'll hear today that they think -- that

6    they are suddenly going to join in the motions to dismiss,

7    which leaves us with no need for a third amended complaint.

8            THE COURT:  So you are basically thinking you would

9    just have a -- whether under Rule 41 or otherwise, I mean, if

10   you-all could agree, you would just simply tailor the case and

11   then have an agreement that these claims are -- particular

12   claims or parties are out and the parties are under Rule 41 and

13   the claims may be just by agreement of counsel?

14           MR. CROSS:  Yes.  And *Klay* also does acknowledge that

15   you can achieve the same results under Rule 15 with, you know,

16   a stipulated dismissal of some sort.  It doesn't have to be a

17   new complaint.

18           THE COURT:  No, it doesn't have to be.  But the

19   parties would probably have to agree to that.

20           MR. CROSS:  Exactly.  I guess that is where I come

21   out, Your Honor, is:  Whether we do it under Rule 15 or under

22   Rule 41, we can take the existing complaint, carve it down to

23   the claims we all care about -- we'll have to work out in some

24   fashion Count 9 on the mandamus claim -- but get it down to the

25   other two claims, the parties that we want in official capacity

1   only.  And it is not a new complaint.  So there is no new

2   motions to dismiss.  And Your Honor then would simply decide

3   the motions before you on the remaining claims as to the

4   remaining defendants.

5          And I very much agree with our co-plaintiffs that all

6   the immunity claims are out.  I believe that is clear on the

7   face of the motions to dismiss.

8          What concerns me is not only the delay aspect we're

9   going to run into but a second bite at the apple.  I mean, the

10  state defendants explicitly in their motion to dismiss asserted

11  sovereign immunity only as to three claims, none of which would

12  survive what both of us want to do on our side of the case.

13         The notion that they would now get to file a new

14  motion to dismiss and expand those sovereign immunity arguments

15  to other claims, that just creates more problems and we

16  shouldn't be opening that Pandora's box.

17         THE COURT:  All right.

18         MR. CROSS:  One thing I did want to respond to if I

19  could, Your Honor, is this notion of proof that Mr. -- that

20  Governor Barnes made.  For me, it epitomizes why this case is

21  so important and why we need to move quickly.

22         We have heard about this commission and how the

23  commission is going to do some work.  But ultimately where they

24  come out each time we are confronted in this case with them is

25  the notion that it is a fishing expedition.  It is hard to

1   understand how in today's world where every U.S. intelligence

2   agency that has looked at election hacking -- and it has come

3   out with the conclusion that there was real true interference

4   at some level in the most recent general election by Russia, if

5   not others.

6           How anyone could stand in this courtroom and say it

7   is nothing but fishing -- and in this particular case, there

8   are findings by independent experts about real vulnerabilities,

9   Your Honor.  And those have been ignored for years, time and

10  time again.

11          And so to stand here -- and the FBI, of course, had

12  to come in and take a server because even the FBI was so

13  concerned that the state wasn't doing anything.  So I did not

14  want to leave unanswered the notion that any of the plaintiffs

15  on our side of the case are simply looking to fish.  We are way

16  beyond that, Your Honor.

17          There is substantial reason to believe that these

18  vulnerabilities are more than vulnerabilities, that something

19  actually occurred.  And whether it has occurred or will occur,

20  we are also told by every U.S. intelligence agency that the

21  interference in our elections is going to happen again in the

22  next general election.  And they would have this state go into

23  a general election with machines that absolutely are not

24  secure.  And Mr. McGuire is absolutely right.  There are

25  alternatives available to them that can be easily implemented.

1   And we should be moving forward to that end as quickly as

2   possible.

3           THE COURT:  And did you have anything further to say

4   about the question of the enormous argued burden on the

5   defendants and the defendants that you also might be dismissing

6   as to holding the machines in reserve?

7           MR. CROSS:  We -- we agree that some sampling

8   approach should be able to be worked out.  I do take issue with

9   the notion from the defendants that they find themselves where

10  they are because of the plaintiffs.  We have asked them many

11  times -- my prior counsel, I understand, asked them for some

12  proposal.

13          To my knowledge, they have never come forward with

14  any proposal on sampling.  They have the machines.  They have

15  access to these machines that we don't have.  They are in a far

16  better position to figure out what sort of sampling might work

17  at least as an opening proposal.  They have never done that.

18          Their sole approach is to say, it is burdensome, we

19  should be released.  That doesn't meet their burden as to get

20  released.  So if they want to engage in a meaningful dialogue

21  and figure that out, have the appropriate experts involved,

22  we're happy to do that.  We have asked them for that.  We just

23  haven't gotten it.

24          And I do agree with Mr. McGuire.  I think it would

25  prejudice our clients substantially if they suddenly just

1    released claims, wrote over the data that existed there, and

2    then particularly because if we release those counties, release

3    those machines, the remaining defendants may later argue -- you

4    know, attack our own expert analysis in saying it is not a

5    reliable analysis because we didn't have data from the machines

6    that were released.

7          So they have got to come forward with a proposal, and

8    I think they have to consider waiving certain arguments that

9    they would make in the absence of -- or if we proceed with a

10   statistical analysis sampling, Your Honor.

11         THE COURT:  So let me just hear from --

12         MR. SALTER:  Your Honor, may I make one add to tack

13   on to what Roy said on behalf of the state before we kick it to

14   everybody's talk about the logistics of the preservation issue?

15         I have talked with Mr. Cross at some length.  And I

16   do think that there is probably some way to work that out

17   amongst the defendants.  But that is not my issue, so I'm not

18   going to speak to it.

19         What I would like to point out is what basically --

20   if you look at a -- I'm agnostic as to which complaint we

21   defend against.  I think we have arguments -- whether you want

22   to talk about the tactical issues of sovereign immunity and

23   whether or not there is a direct appeal as to that, we have

24   arguments on basically constitutional standing.  As to either

25   one of those, we have arguments about res judicata.

1           I think Your Honor asked a question of, I think, to

2   the Coalition's lawyer earlier this morning about whether or

3   not there is a bar there.  We think there is.  We think that

4   has become more apparent has time has moved on.

5           What you really have as you step back and look at the

6   evolution of this case, which has really kind of morphed a lot,

7   I think, to understate it, what started out as kind of an

8   election contest regarding the Sixth Congressional district,

9   then in September and August of last year became an argument

10  about a compromise in a data breach case kind of.  You've had

11  those cases.  We have some before you, data breach issues.

12          Now, if the third amended complaint becomes the

13  one -- and I think there should only be one.  Just have that

14  tender mercy on the state to only have to defend one set of

15  operative facts.  Then now we're talking about really what is

16  kind of a -- takes on the complexion more of an equal

17  protection challenge to the DRE machine process, which is

18  really exactly what I think went up to the Supreme Court of

19  Georgia in the *Favorito vs. Handel* case.

20          We are really playing whack-a-mole with the

21  complaints, and we would just ask to let us have one, one

22  operative complaint, and work from there and let us evaluate

23  that.  I didn't come today prepared to give you chapter and

24  verse on sovereign immunity, qualified immunity.  Because Roy

25  asked me last week what is -- where are we at.  And the honest

1    answer is I don't know.  Because I don't know yet which set of

2    facts once we unfreeze this case -- and I understand my friends

3    on the other side want to do discovery and all that stuff.  I

4    just need to know who is on first and what operative facts I'm

5    defending against.

6              Because if you look at the third amended complaint,

7    yeah, some of the claims at kind of a superficial level sound

8    like a culled-down version, and we appreciate that.  We want to

9    work towards streamlining this because no one can complain of

10   that fairly.  Right.

11             But the facts that are being pled in the proposed

12   third amended complaint concern things like, well, we didn't

13   get to observe the way ballots were counted in November and in

14   December of 2017, so on and so forth.

15             So even if the claims kind of bear some superficial

16   resemblance in terms of their general subject matter, we really

17   have operative complaints that are going -- that the way they

18   get to that argument about that count and whether or not relief

19   should be granted on that count go through a different set of

20   facts.

21             We just ask that they bring peace to the valley on

22   this side by whatever way you get there.  By severance if they

23   want to do that.  If they agree to part ways, my clients --

24   I'll tell you:  The state defendants are not happy about having

25   to defend two cases in front of you either on this particular

1    issue, having to defend -- having to staff a defense on two

2    different theories.  I don't know of a way around that right

3    now.  Because to me -- and generally me and Roy are the suing

4    lawyers, not the defending lawyers.

5            There is a great respect amongst plaintiff's lawyers

6    about being the master of your own complaint.  And they both

7    get that in my view.  Both of them deserve that right.  And I

8    don't want to be boxed in, with all due respect to my

9    friends -- and I've gotten to know some of them, and I have

10   litigated with a couple of them before either together or on

11   other sides before.  But they do get the right to pick their

12   strategy and their tactics for their own clients.

13           I'm going to tell you -- nothing against these

14   lawyers personally -- we don't have that right now.  I mean, it

15   is -- you said it was a mess.  It is a mess.  And we just need

16   to figure out some way just to practically go forward so that

17   there is not a waiver as to one issue.  If we go up to the

18   Court of Appeals -- and I'm not telling you -- I can't predict

19   what is going to happen.

20           But how would you be -- how would you feel if you

21   were on that panel trying to figure out, well, somebody waived

22   that issue as to this person, as to that claim, as to that

23   defendant, but not as to this claim, that defendant, and that

24   issue.  We really do need -- before we unfreeze this case, we

25   do need to figure out a practical way to let the issues be

 1   presented, to let a record be created, motions be filed and

 2   decided in a way that is clear for any court that has the

 3   luxury of hearing this case further.

 4          And that is all I'll say for right now.  Thank you,

 5   Judge.

 6          THE COURT:  Well, I just go back -- before I get back

 7   into the weeds about the machines, since I do think that is

 8   a -- you know, a real issue -- but I also think it is a real

 9   issue from the plaintiffs' perspective -- is:  What do the

10   plaintiffs view, Mr. McGuire, as the material additional

11   allegations?

12          You told me how you have trimmed things.  I do -- I

13   did note that there were allegations as to events that occurred

14   after the filing of the second amended complaint and

15   particularly as to the ability -- being foreclosed from the

16   ability to observe the count.

17          MR. McGUIRE:  So, Your Honor, there are additional

18   allegations related to spoliation, which can lead to

19   evidentiary inferences.  That is one.  There are additional

20   allegations that bolster standing, which are important,

21   particularly given that there is some dissention perhaps

22   between the plaintiffs and some of the people who were members

23   of my client, Coalition, ceased to be members due to that

24   dissension.  And so it is important for us to maintain standing

25   from the filing of the complaint until judgment.  And so that

1    is why we have added some allegations that address that and are

2    obviously very crucial to the Coalition that it be able to

3    ensure standing.

4           You know, I think -- again, I am reluctant to

5    criticize the second amended complaint because I don't -- I

6    mean, I don't want to harm our co-plaintiffs.

7           THE COURT:  I'm not asking you to criticize.  I just

8    want to know what is new.  And what I would suggest is that

9    you -- so that I don't have to run some sort of redline between

10   the two of them, that you actually go and just indicate -- go

11   ahead and identify all of the paragraphs -- I don't mean at

12   this moment -- that you think actually add material allegations

13   or materially modify something.

14          MR. McGUIRE:  Well, we can -- the redline would be --

15   it is a very different document.  I don't think redline would

16   be particularly helpful.

17          THE COURT:  No.  I know.  But I tried a case last

18   week all the way through -- the verdict was at 5:30 yesterday.

19   So this is -- you know, I'm trying to make a decision here that

20   will not take you another month to know what is happening.  So

21   that is why I'm saying, if you just are telling me read

22   everything over again, fine, I'll do that again.

23          But if there is something in particular that you want

24   to draw my attention to, then you could do that this week and

25   that would be helpful.

```
1              MR. McGUIRE:  Would you welcome a filing on that that

2    just identifies the --

3              THE COURT:  Yes.

4              MR. McGUIRE:  -- paragraphs?  We can certainly do

5    that.  And just -- if I may just while I'm here address a

6    couple of things that were said.

7              THE COURT:  All right.

8              MR. McGUIRE:  Mr. Cross suggested that delay is going

9    to be an issue here if we are allowed to proceed under the

10   third amended complaint because of the motions to dismiss.  If

11   you look at the timeline that I suggested with respect to the

12   preliminary injunction, it is actually not the case.

13             Once the immunity issues are out, discovery can

14   proceed.  That would happen parallel with any motions to

15   dismiss, which would be very similar to what have already been

16   filed and shorter.

17             THE COURT:  Well, what about if there are res

18   judicata arguments?  Does that affect my -- is that similarly

19   sort of going to affect your ability to go forward or not?

20             MR. McGUIRE:  It shouldn't.  Because it sounds from

21   what Mr. Salter said like their res judicata argument is based

22   on Favorito instead of on the earlier Curling case.  If that is

23   the case, Favorito didn't involve any individuals who are

24   currently plaintiffs or who are members of the Coalition that

25   give us associational standing.
```

```
 1            THE COURT:  I heard him saying more that is the

 2   principle involved here as opposed to -- and maybe he wasn't.

 3   But --

 4            MR. McGUIRE:  Well, I mean, the issue of -- I

 5   recently dealt with res judicata in a different case.  But in

 6   that -- so I'm somewhat familiar with the Restatement (Second)

 7   of Judgments, which deals with the issue of preclusion and

 8   claim preclusion.  And, you know, I didn't specifically prepare

 9   to address that question today.

10            But what I recall from my review of the Restatement

11   (Second) of Judgments is that the burden is on the party

12   asserting the issue in claim preclusion to identify

13   specifically what is precluded, you know, the grounds that were

14   litigated in the earlier case that would be re-litigated in a

15   new case.

16            And the Favorito case is quite old.  And the

17   equipment that was at issue there is different equipment.  It

18   is a different configuration.  And so I don't think it is

19   appropriate to bar us from litigating voting security concerns

20   with Georgia's current system based on a ruling that dealt with

21   a different system.

22            THE COURT:  No.  I understand that.  I'm more worried

23   about what happened in the Fulton County Superior Court.  And

24   really the fact that you -- there was this case.  There was a

25   motion for preliminary injunction.  And Judge Adams -- though
```

1    it was, I understand, beyond what was in front of her, she just

2    dismissed the whole case rather than just simply denying the

3    motion.  I mean, it was -- I'm sure that was a surprise.  But

4    that is what she did.

5         It might be -- you know, it might have been something

6    you could take up in the Georgia Supreme Court or the Court of

7    Appeals.  But instead the plaintiffs decided to come here with

8    a somewhat different complaint but arguably many of the same

9    claims that were implicit or directly raised in the other case.

10   That is what my concern is.

11        MR. McGUIRE:  Right.  Well, so in that case, she

12   specifically -- at the argument in that case, she specifically,

13   I think, in her ruling noted that Section 1983 wasn't pled in

14   that case.  And so these claims are 1983 claims.  And when she

15   ruled on the basis of standing, it couldn't have been a merits

16   ruling on 1983 claims.

17        And because she ruled on the standing, which is a

18   threshold issue, the rule of res judicata that claims you might

19   have brought but didn't are barred shouldn't apply because we

20   didn't get past the threshold question of standing.  And so

21   this case shouldn't be barred by that case for that reason.

22        Then my last point, Your Honor, related to the

23   machines is that I believe we -- I may have misheard Mr. Cross.

24   But, you know, our desire is that we select the sample and have

25   our experts select the sample that we want to do discovery on

1    and not that the defendants select the sample.

2            And for us to do that, we -- I understand that they

3    have told the Court today the number of machines that are

4    reserved.  We have no inventory of those machines, what

5    precincts they are from.  That would help us design a

6    statistically meaningful sample.  So we would need that in

7    order to put that together.  Thank you.

8            MS. RINGER:  Just to that point, Your Honor, we did

9    provide information -- I believe Dekalb County did as well --

10   regarding the machines.  Maybe prior counsel has it.  But that

11   is why we were waiting for the sampling to come from prior

12   counsel on plaintiffs' side.  We provided information about the

13   various machines at the various precincts.  And so we can

14   provide that again if you can't retrieve that from prior

15   counsel.

16           THE COURT:  If you could provide it again given

17   everything else, it would be helpful.

18           MS. RINGER:  Yes, ma'am.

19           THE COURT:  If you could provide it this week.  Would

20   Fulton County wish to be heard about these issues?  Mr. Salter

21   and Governor Barnes have responded I think on behalf of the

22   state.  I don't know if there was any more they wanted to say.

23   But --

24           MR. BARNES:  I've said enough.

25           MS. BURWELL:  Your Honor, we would.

```
1              THE COURT:  Would you mind coming up to the podium.
2    Thank you.
3              MS. BURWELL:  Oh, sure.  Kaye Burwell, Your Honor.
4    We would agree with the arguments made by the state.  With
5    respect to the machines that are still being held, as Your
6    Honor knows, there is an election coming up.  Early voting has
7    already begun.  And so to the extent that we have been -- we
8    have provided information on the number of machines we have.
9    And to the extent that the Court is going to require us to
10   continue to keep machines in abeyance, we would ask that the
11   Court require the plaintiffs to get back with us this week with
12   respect to the number that they think is an accurate sampling
13   so that we can address that with the Court, if it is more than
14   we think we need to carry out a fair and efficient and
15   effective election because we are -- again have already started
16   early voting.
17             THE COURT:  Okay.
18             MS. BURWELL:  Thank you.
19             THE COURT:  Well, that is a very good aspirational
20   goal, and I think we can try to move quickly.  But I don't know
21   that we're going to get everything by Friday.  But if you can
22   go back and send out the memo to them this afternoon, I'm going
23   to talk to them about what their time frame is.
24             MS. BURWELL:  Well, that would be helpful, Your
25   Honor, because they have alleged throughout that they have
```

experts.  And so you would think that ten months down the road

that they would have an indication since we did provide months

ago that information.

          THE COURT:  Right.

          MS. BURWELL:  Thank you.

          THE COURT:  Mr. Cross -- oh, I'm sorry.  Go ahead.

          MR. BRYAN:  Your Honor, may I approach just briefly?

          THE COURT:  Yes.

          MR. BRYAN:  Your Honor, Bennett Bryan on behalf of

the Dekalb County defendants.  Again, obviously the county

defendants -- Dekalb County defendants have no problem being

dismissed from this case.  And we look forward to the quick

resolution of that issue.

          In terms of -- I just briefly would like to address

the notion that we have -- the county defendants haven't done

anything to try to resolve this litigation hold issue.  I mean,

obviously we have had discussions with prior counsel.  We were

working towards finding a sampling number.  And then actually

even as recently as, you know, April 16, I sent an email to all

counsel saying, you know, would you at least agree to release

450 of the 800 units.  And I haven't heard an explanation as

to, you know, why the 350 units wouldn't fall within that.

          We can deal with those down the road even after we

are dismissed, Your Honor.  But we have been working in good

faith.  And my client has indicated that it is necessary -- in

order to be able to hold this election on May 22nd that we need

450 of the DRE units released by May 4th in order to be able to

do the proper testing and in order to be able to make sure that

those machines are in operating conditions for the May 22nd

election.

Otherwise, we will have long lines.  We will have,

you know, other potential issues that will arise.  And, Your

Honor, I do believe that we have been making very good faith

efforts.  And the only response we have gotten is no to

anything until you provide us with some sort of statistical

sample, which, again, I don't believe that is our duty.  But I

don't understand why 350 units wouldn't fall within that

statistical sample, whatever it is.

Thank you.

THE COURT:  Thank you.

What about Cobb?

MR. WHITE:  Your Honor, Daniel White for Cobb County.

Again, I just -- I want to say amen to what my brother from

Dekalb said, which is we look forward to being dismissed from

this case.  We are glad that all the plaintiffs agree Cobb

County is no longer needed in this case.

I just wanted -- for the record, I wanted to point

out that Cobb is just in a slightly different position in terms

of our preservation hold.  Cobb's elections -- their municipal

elections last fall were small enough that we weren't in the

1    initial discussions about providing a sample because we said,

2    you know, we can put a third of our machines aside, which is

3    essentially what we had used in the spring.  So Cobb has been

4    holding these 600-plus machines to the side awaiting some type

5    of proposed -- well, with the original understanding last fall

6    that all this was going to be resolved on an expedited schedule

7    and be done by March.  So nothing has been done with those

8    machines.

9           I know Fulton has addressed this.  And Dekalb and

10   Cobb agree.  The best practices for these machines is to rotate

11   them out of the cycle and service them.  And it extends battery

12   life, and it helps you tune up the machines.  We now have a

13   third of our equipment sitting to the side.

14          And so even though this case is ostensibly about, you

15   know, safe voting machines and security breaches, the actions

16   of the plaintiffs are actually harming the voters of these

17   counties right now by saying, please hold a third, a quarter of

18   your machines out and let them sit there and not recharge and

19   don't touch them and don't clean them up.

20          So although they want -- they are claiming to want to

21   protect the voters here, their actions and their own delays

22   within their own parties fighting amongst each other are

23   actually doing the opposite of what they are claiming here.

24   And they are causing these machines to sit to the side and not

25   get serviced.

1          And then with this new expedited proposed schedule,

2     even though Dekalb and Cobb are being said, we'll let you out

3     of the case, but we still want you to hold your machines to the

4     side, and then we want you to get ready really fast for a new

5     election, you know, next fall -- that is not going to help the

6     voters either.  Then you're asking us to tune up -- if we get

7     our machines back, you are asking us to tune those up in, you

8     know, three weeks or prepare some type of new system.

9          So the basic points I wanted to get on the record for

10    Cobb today was:  We are ready to be released from this case.

11    We can't be a little bit pregnant.  We are either in the case

12    or out.  Either we are like the other 158 counties -- I know

13    they want to keep Fulton in -- or we're not.

14          I don't think there should be any obligation on Cobb

15    or Dekalb -- if we are not in the case and we don't get to come

16    to the hearings and argue our position, then we shouldn't be

17    subject to some kind of litigation hold that operates as a

18    de facto injunction.

19          And I hear what they are saying is that we have one

20    side saying, well, we can do sampling; we have another side of

21    the plaintiffs saying you need to propose to us, you know, what

22    is significant or what is appropriate.  It is not our job to

23    make their case.

24          THE COURT:  All right.  Well, how many -- Dekalb said

25    they needed 450 of the 800 back, as I understood what you said.

```
1              MR. BRYAN:  Yes, Your Honor.

2              THE COURT:  So how many of the 618 do you need back?

3              MR. WHITE:  It would be -- I mean, the best practice

4    would be able to get all of them on there.  And so I don't have

5    a specific number.  But it would be in the range of the 450 to

6    500 so that -- particularly for November.  We could --

7              THE COURT:  I'm talking about right now for May 22nd.

8    Half?  One-third?  I mean, I think you are being optimistic

9    that we're going to have such a huge turnout May 22nd since I

10   have a mate who is pretty politically conscious and he came out

11   this morning as I was leaving and said, do you know there is a

12   primary on May 22nd?

13             MR. WHITE:  We'll just agree with Dekalb that 450 --

14   just -- we just need to know from the other side what do they

15   need to prove their case.

16             THE COURT:  All right.  Thank you.

17             Did Fulton have a number?  I can't remember.  I mean,

18   Dekalb said 450.  Did you-all have a number?

19             MS. BURWELL:  I think ours would be about the same,

20   Your Honor.  We didn't ask specifically.  But yes.

21             THE COURT:  Okay.

22             MR. CROSS:  Your Honor, on the preservation issue,

23   the exchange that just played out, I think, highlights the

24   issue.  Let me be clear.  I agree with Mr. McGuire.  We would

25   want our own experts to determine the statistical sampling
```

```
 1    size.  My only point before was, as I understand it from the
 2    experts we have consulted, there is certain information we have
 3    to have from the defendants to do that and we don't have it.
 4              THE COURT:  You haven't gotten it?
 5              MR. CROSS:  We haven't gotten it.  You know, the fact
 6    that they are still here themselves without any notion of what
 7    they believe would be an appropriate sample -- and at least one
 8    or two of the counties seem to just be pulling numbers out of
 9    the air -- means we can't just agree willy-nilly to what they
10    want to do.
11              THE COURT:  All right.  Did Fulton share its analysis
12    with any of the other counties?
13              MS. RINGER:  I can't remember who -- if Dekalb was on
14    the conference call.  We did a conference call with Dekalb
15    or -- I believe one of the counties and prior counsel.  So it
16    wasn't all counties involved.  But we had a discussion, and the
17    information was shared.  I will find the information.
18              THE COURT:  And provide it to everybody at once so
19    that they -- I think it would be very helpful to facilitate the
20    glee of Cobb and Dekalb and make it actual if you were actually
21    to participate in that whole process -- it is a reasonable
22    request -- before anything happens here.  Otherwise, you know,
23    it is hard to move off of square one.
24              And I understand all of the public policy arguments
25    that everyone has made.  But it would also seem it is
```

 1    interested in the voters -- in the interest of the voters and
 2    of each of the counties that they actually have this
 3    information looked at.
 4          We can't -- you may think the lawsuit has no merit.
 5    But even so, we have some profound issues regarding integrity
 6    of the voting process.  And everyone has to be concerned.  And,
 7    you know, it would have been great if the legislature had
 8    finished addressing it so we could just have it taken care of.
 9    I don't know what is going to happen with this commission, nor
10    do any of you.
11          But, anyway, I don't think you are disadvantaged by
12    the fact that you've got to go and look at where these -- these
13    machines are.  This is not onerous.  And to get a resolution,
14    that is what you're going -- I think that is what Cobb and
15    Dekalb have to do.  And quickly so that we can deal with this
16    and also let you go free.
17          MR. CROSS:  The one point I do want to emphasize,
18    Your Honor, is that it is not enough for them to come forward
19    and tell us how many machines they need.  Statistically
20    significant sampling is going to be critical here because
21    otherwise we can't release machines.
22          THE COURT:  I understand.  Do you want to provide
23    some -- it is a little hard because I don't know what -- and
24    you don't know what Fulton provided.  And maybe they provided
25    the type of information that you can use in order to -- that is

1     why I wanted them to share it with everybody right away.

2            But I'm going to just say you're going to distribute

3     it -- be able to do it today.  You ought to leave here with an

4     actual time to talk with everyone about what you think is

5     necessary.  And I assume you have some expert onboard.

6            So I'm expecting that you can have a phone call by

7     Thursday about this once you have looked at it.  It is Tuesday,

8     I believe.  And by Thursday you should be able to have that

9     call.  And I would think that you would be able to come up with

10    a proposal no later than next Tuesday.

11           MR. CROSS:  That certainly would be the hope for our

12    clients, Your Honor.  Yes.

13           The only other issue I wanted to address briefly, if

14    I may, Your Honor, is the notion of res judicata with respect

15    to discovery.  I agree with what Mr. McGuire said.  He focused

16    more on the Georgia state court's case.  I did want to come

17    back to Your Honor's -- because I do believe Your Honor was

18    right that the defendants aren't relying solely on that.  They

19    are also relying on *Curling* one.

20           And I would respectfully submit that this is one of

21    the easier issues in the motion to dismiss briefing for the

22    Court because when you look at the factors it is not even a

23    close call.  There is no identity of parties between the two

24    cases.  There is some overlap, but there are a lot of new

25    parties both on the plaintiffs' side and the defendants' side.

1    That eliminates it there.

2           There is also no identity of subject matter.  The

3    original was focused on the particular June 20, 2017, runoff

4    election as opposed to looking for statewide relief as to

5    particular vulnerabilities.

6           And there is also no full and fair opportunity to

7    litigate the claims here.  For example, constitutional claims,

8    as I believe Mr. McGuire may have mentioned, weren't at issue

9    there.

10          So I would submit, regardless of how this case

11   proceeds, the immunity issues are off the table based on their

12   own prior briefing and what all of us are looking to dismiss on

13   the plaintiffs' side.  And the res judicata should not be any

14   bar to discovery.  And so we should be able to proceed

15   expeditiously.

16          THE COURT:  All right.  So Mr. Salter made some

17   points about everyone should be a master of their own

18   complaint.  And I cook up a witch's brew by not letting

19   everyone be the masters of their own compliant and have you-all

20   in the same case and who has waived what.  And everyone on

21   your -- the plaintiffs' side of the room, even though you have

22   different clients and now -- and somewhat different positions,

23   seem to be nodding your heads.

24          But how would I end up not being in my own witch's

25   brew in trying to figure out what applies to what and having

1    potentially not completely consistent rulings because of the

2    fact that everyone is arguing this a little bit differently in

3    a different case?  How would I be able to move this forward in

4    an efficient basis?

5              MR. CROSS:  If the cases were severed?

6              THE COURT:  That is right.

7              MR. CROSS:  I hate to say I agree with Your Honor

8    only because I would like these cases to be severed.  But I

9    confess in all the discussions I have had with both

10   co-plaintiffs and defendants I do not have an answer to that

11   question.  And I have not heard anyone come forward with an

12   answer to that question.

13             And my concern with severance would be that it does

14   create what could be a perverse situation in addition to the

15   issues Your Honor has addressed on efficiencies and other

16   things.  If we're all going for the same or similar overlapping

17   preliminary injunction on a statewide basis against essentially

18   the same defendants -- so we're all essentially seeking largely

19   the same relief -- then it feels like we suddenly end up in a

20   race to get to a preliminary injunction.

21             On the one hand, maybe that will drive some

22   expediency and efficiency we haven't yet seen.  On the other

23   hand, I think it is going to create some less desirable conduct

24   in terms of how these cases are going to proceed.

25             So I don't know how Your Honor has preliminary

1    injunction hearings and overlapping cases seeking overlapping

2    relief on overlapping conduct.  As much as that would be my

3    dream not to have to deal with the lack of cooperation that we

4    have run into in this case, I'm not sure how it works.  But I

5    welcome anybody to come forward and explain it.

6                    THE COURT:  Yes.  Mr. McGuire?

7                    MR. McGUIRE:  Just on that note, I would add I

8    acknowledge the difficulties of severance.  And I believe my

9    position is pretty much the same as Mr. Cross'.  Our position

10   is pretty much the same.

11            But if these cases had been filed separately by

12   separate groups of plaintiffs and they had been consolidated,

13   right, which would probably be in the interest of judicial

14   economy and is the equivalent of what we have now, we would not

15   be required to live with their allegations.  We would be

16   allowed to pursue our own claims that we had brought in our

17   separate action.

18            That is why severance is not something that we

19   brought as a motion to sever.  Instead, we simply want to

20   proceed on our own claims in a third amended complaint.  And

21   severance is something that everyone has kind of thrown out

22   because -- as a way to get out of this situation of having --

23   what the defendants have characterized as dissenting complaints

24   in the same case.

25            But, obviously, it seems like it would be the lesser

1    of the two evils to have us proceeding on our claims and them

2    proceeding on their claims.  Because that kind of thing happens

3    in consolidated cases as well as cases filed by multiple

4    plaintiffs.  It is not as unusual as has been portrayed, as

5    Your Honor would well know.

6          And as far as the Fulton machines go and the Dekalb

7    machines and all that, there is one other point I wanted to

8    raise so that I put it in front of the Court.  It is very

9    related.  It is a discovery question -- a discovery issue

10   really.

11         And obviously we have asked that the third amended

12   complaint be accepted and discovery be opened.  The May 22nd

13   election is less than 30 days away.  And we do have some

14   discovery that we would like to direct at the conduct of that

15   election, specifically a Rule 34 observation of certain

16   procedures.  Because one of the obvious defenses in this case

17   is that the existing procedures and statutory authority and

18   regulations, the rules, how you are supposed to conduct

19   elections, provides a level of protection.

20         And so for us to anticipate and be able to address

21   that, we need to observe how the election is actually conducted

22   because we have reason to understand that it is not conducted

23   entirely in accordance with the safeguards that are on the

24   books.  They are often conducted differently.

25         And -- you know, so we would like to do a Rule 34

1    inspection within 30 days.  So from that perspective, I would

2    just like to put on the Court's radar if we're allowed to

3    proceed with discovery that we like to do some expedited

4    discovery directed at the May 22nd election.

5            That is it for us.  Thank you, Your Honor.

6            MR. BARNES:  Your Honor, may we reply to that?

7            THE COURT:  Yes.

8            MR. BARNES:  There are already procedures for

9    observation.

10           THE COURT:  But they are alleging that people are not

11   being allowed in.

12           MR. BARNES:  Say again.

13           THE COURT:  They are alleging that people are not

14   being allowed in to watch the count.

15           MR. BARNES:  What is the proof of that?  I mean --

16           THE COURT:  Well, I mean, that is their sworn

17   allegations that people have been shut out.

18           MR. BARNES:  Well, Your Honor, here is the point.

19   Let's -- how is that practically going to work?  Every

20   candidate is entitled to have an observer at the polls.  And

21   then there are some -- and I can present evidence because I've

22   got the fellow here from State Elections.

23           There's some places in every poll that nobody is

24   allowed to go to for obvious reasons except the actual poll

25   workers that have been trained and certified as required by

1    Georgia law.

2          So are we going to allow somebody to come in other

3    than -- in the first place, where are we going to put all these

4    folks? -- other than candidates -- and candidates --

5          THE COURT:  We're not talking about a cast of

6    thousands.

7          MR. BARNES:  Well, so you have got candidates that

8    are entitled to have their observer there.  And they do that.

9    And then --

10         THE COURT:  In the super secret one -- room when they

11   are counting?  I mean, you said there is -- there is the one

12   the candidates' representative.  Then you said then there is

13   another place --

14         MR. BARNES:  There are places --

15         THE COURT:  -- that no one gets to go in.

16         MR. BARNES:  Nobody goes in there except --

17         THE COURT:  What is that place?  What is that

18   function where no one gets to go into it?

19         MR. BARNES:  The function is to make sure that nobody

20   goes in and changes ballots.  Because they are sworn

21   officers -- poll officers that have to go through certain

22   training on --

23         THE COURT:  So no representative of either candidate

24   goes in there?

25         MR. BARNES:  No.

```
 1              THE COURT:  All right.

 2              MR. BARNES:  So I think it is just very impractical

 3    on what -- I mean, is this person going to -- is this person

 4    going to say, oh, well, I want to see this while we are trying

 5    to conduct an election?  I mean, an observer can only observe

 6    what is going on.

 7              THE COURT:  Well, what does the state law say?  I

 8    mean, in terms of the -- I thought that the state law provided

 9    for public -- basically to be accessible to public observation.

10              MR. BARNES:  Absolutely.  And they are.  That is the

11    way the candidates do it.

12              THE COURT:  But what about this -- I'm just going to

13    give it -- the super secret place.

14              MR. BARNES:  Well, let me ask -- where is he?  Come

15    up here.  I'll let -- he is a lawyer.  So I'll let him directly

16    answer.

17              THE COURT:  I'm sorry.  The gentleman is counsel

18    for --

19              MR. GERMANY:  Yes.  Ryan Germany, general counsel for

20    the Secretary of State's office.

21              THE COURT:  For the Secretary of State's office.

22    Okay.

23              MR. GERMANY:  I will say, first of all, like Governor

24    Barnes, I didn't come, you know, specifically prepared, but I'm

25    happy to share --
```

1          THE COURT:  I won't hold you to anything.  What you
2    know.
3          MR. GERMANY:  So yes.  Everything is generally
4    publicly observable.  But there is a difference between
5    something being publicly observable -- the super secret place
6    y'all are talking about is really the GEMS server.
7          THE COURT:  The GEMS server.
8          MR. GERMANY:  It is not the polling place.  At the
9    polling place, there's poll watchers, poll monitors from each
10   party, and everything there is observable.
11         What happens afterwards when the votes are counted
12   and they are input into the server, you know, there's passwords
13   and there's security.  There's things that -- even though the
14   process is publicly viewable, you can kind of -- a lot of
15   counties have it set up where you can view into the room.  But
16   you can't go into the room.
17         THE COURT:  You can view it like there are windows?
18         MR. GERMANY:  Yes, ma'am.  Yes, ma'am.
19         MR. BARNES:  That is very common.
20         THE COURT:  All right.  Well, what I would suggest is
21   this:  That plaintiffs' counsel identify what their request is
22   specifically.  I don't know what their request is.
23         MR. BARNES:  We don't either.
24         THE COURT:  So I'm assuming you can get that out by
25   tomorrow.

```
 1            MR. McGUIRE:  Yeah.  We actually emailed it this

 2    morning, the draft Rule 34 request.

 3            MR. SALTER:  It is so vague we don't know what they

 4    want.  We literally got this email as we were leaving from the

 5    office to come down here.  So there has not really been a good

 6    faith conferring about this.

 7            THE COURT:  All right.  Well, try to make it more

 8    specific in light of the information shared.  And, again,

 9    please try to -- counsel should identify what their concerns

10    about it are in writing by Friday.

11            And I would like to talk to you-all next week because

12    there seems to be a lot in motion here.  I would like to be --

13    you provided a lot of information and assistance to me today.

14    I will look at it some more.

15            I was trying to look at my schedule, which is fairly

16    packed next week.  But I think it is reasonable to think I

17    could be available by 4:00 on May 9.

18            Do you think that is so?

19            COURTROOM DEPUTY CLERK:  Yes.

20            MR. BARNES:  Here or on the phone?

21            THE COURT:  Well, there are a lot of you.  I can do

22    it by phone if you can't come in.  But there are a lot of you.

23    It is a little harder to keep -- but I'm going to do whatever

24    it is I have to do in order to talk to you again and have you

25    have made progress about the -- or perhaps not but you've
```

```
1    actually talked about both the machines, that you have

2    exchanged information.  You-all will tell me you've actually

3    talked on the phone and you have actually shared information

4    with each other whether about -- the issues about what machines

5    can be released, what sort of -- or cannot be released and how

6    you are going to go about that or the question of the

7    inspection.

8          Because I think that that is a reasonable -- I mean,

9    that is a reasonable request.  And we're not talking about a

10   cast of thousands.  I assume it is an expert or something like

11   that wants to be able to observe.

12         MR. McGUIRE:  Yeah.  We denominated our designee, but

13   can certainly have an expert or someone they are comfortable

14   with.

15         MR. BARNES:  I don't think there is any question of

16   observing.  The question is are we going to have to give them

17   passwords and go in where nobody --

18         THE COURT:  Well, that is why I want them to tell

19   you.  You have identified what the issues are.  And that is

20   something for them to think about and for you to get back

21   about.  I mean, I think that it has been useful to flag what

22   the issues are and whether you are looking to be in the room

23   where all the computer activity is and are you looking for --

24   I'm not sure that you -- how much you learn by watching them

25   enter a password though if, in fact, there's windows that you
```

can watch what they are doing.

Of course, if you are all going to have a three-hour breakdown as happened in Fulton in the Sixth District, then that is going to raise suspicions again.  I mean, that is just the reality.  I don't know what happened.  But I think that how it is handled -- and I can understand why they want to be able to at least visually monitor that.

MR. SALTER:  Your Honor, there are state laws, as I understand it, about this.  And we are content to be told to follow the state law about it regarding poll observation.  I mean, that is the bottom line.  Everybody understands that.  Everybody apparently --

**(Unintelligible cross-talk.)**

MR. SALTER:  And to that point --

THE COURT:  I didn't hear what her point was.

MR. SALTER:  -- even while this case has been frozen, we have been getting Open Records Act requests, and we have been complying with those to the extent that we can.

I beg your pardon.  Thank you.  I beg your pardon for not standing up, Judge.

THE COURT:  That is quite all right.

MR. CROSS:  Is there --

THE COURT:  I'm sorry.

MR. HIGHSMITH:  One more item on behalf of Mr. King, if I may, Your Honor.

1          THE COURT:  Yes.  And I'll keep thinking about

2  Mr. King, but I think we have got to resolve some of these

3  issues.

4          MR. HIGHSMITH:  I certainly understand.  And I

5  think -- well, I don't know why Mr. McGuire won't dismiss us.

6  I don't know.  So I won't presume to speculate.

7          Would the Court permit us to file a motion to dismiss

8  Mr. King on the grounds I alluded to earlier despite the case's

9  current posture being closed and see if by some chance the

10  various groups of plaintiffs might not oppose that motion,

11  which would have them not have to retreat from their amended

12  complaint position or their doctrinal opposition to a Rule 41

13  agreement and simply have the Court grant an unopposed motion

14  as opposed to any retreat by the various plaintiffs' groups?

15  Might we have leave simply to file that motion?

16          THE COURT:  Let me hear from counsel.  Thank you.

17          MR. HIGHSMITH:  Thank you, Your Honor.

18          MR. CROSS:  On that particular point, Your Honor, I

19  would just simply say if Mr. King wants to make an oral motion

20  today we wouldn't oppose it.

21          I did want to add two quick things if I could.

22          THE COURT:  All right.  Let me just hear -- I'm being

23  literal-minded here -- Mr. McGuire.

24          MR. McGUIRE:  I might not have caught it all.  But he

25  said that he wanted to make a motion just to dismiss his client

```
 1    -- the claim involving his client?
 2              THE COURT:  Yes.
 3              MR. McGUIRE:  The concern I stated earlier is that
 4    I'm not sure the second amended complaint has necessarily the
 5    allegations to allow us to go after Mr. -- the discovery we
 6    would need to do with Mr. King.  I mean -- well, it doesn't
 7    have agency allegations, I don't believe, in it.
 8              And so from our perspective, we are hesitant to start
 9    carving things out of the second amended complaint unless we
10    know we're going to be able to proceed on the third.  We have
11    no objection to dismissing him in the context of the third.
12    But I don't --
13              THE COURT:  All right.  Thank you.  I've got it.  I
14    would prefer, Counsel, if you can at least wait two weeks.
15              MR. HIGHSMITH:  Of course, Your Honor.
16              THE COURT:  But I will be in touch with you about
17    that.  All right.  And we'll be -- if you're on the phone call,
18    you can raise it.  If you are not on the phone call, you can
19    still simply write me about it and we'll have another phone
20    call probably.  But I'm not going to be available the week of
21    the 14th.
22              MR. HIGHSMITH:  We're going to participate in the
23    case fully and vigorously and zealously unless and until the
24    Court orders otherwise.
25              THE COURT:  Yes.  I mean, it seems like you're going
```

1 to get there.  I just would prefer not to trigger a whole new

2 set of briefing if I could avoid it.

3    MR. HIGHSMITH:  It was a last ditch request, Your

4 Honor.

5    THE COURT:  I understand.  All right.  So my

6 understanding is that the Fulton -- what Fulton's attorney said

7 was that previous individuals who were blocked were not poll

8 watchers.  Is that what you said?

9    MS. RINGER:  Yes, Your Honor.  Of course, I'm not --

10 if, in fact -- Your Honor, Cheryl Ringer for Fulton County.

11 If, in fact, Your Honor does admit the -- or allow the third

12 amended complaint, you know, we would have additional

13 statements to say.

14    But the individuals were not designated as poll

15 workers.  They also had recording equipment, which is something

16 that only poll watchers are allowed to have.  Section 21-2-406

17 that has been cited in the third amended complaint is about

18 public performance of duties by officials.  It does not state

19 how, in fact, public performance is to be handled.  It just

20 says superintendents, poll officers --

21    THE COURT:  Just go slower.

22    MS. RINGER:  -- and other officials engaged in the

23 conducting of primaries and elections under this chapter shall

24 perform their duties in public.  OCGA 21-2-408 gives more

25 specifics with regard to poll watchers and poll watchers who

1    have to be designated and identified a certain period of time

2    beforehand.  Even they are not allowed to have recording

3    equipment.  Whereas, the individuals that were so-called barred

4    or removed had recording equipment.

5         THE COURT:  Did they have video, or did they have

6    audio or both?

7         MS. RINGER:  Both.  Camera phones.

8         THE COURT:  All right.  Well, you can all be prepared

9    to address that when -- I mean, I think that you should be

10   prepared to address that and have given me some -- something

11   about that.

12        Is everyone available on Wednesday at 4:00 even if

13   just by phone?

14        MR. CROSS:  That was one issue I was going to raise

15   Your Honor, is if there is any chance we could do the 10th or

16   the 11th because I am in a deposition in L.A. on the 9th.

17        MR. BARNES:  What is the date?

18        MR. CROSS:  May 9.

19        MR. WHITE:  Your Honor, Cobb could be available

20   until -- by phone until 5:00.  I have a city council meeting

21   that evening in Marietta.

22        MR. BARNES:  Are you talking about -- what time are

23   you talking about, Your Honor?  4:00?

24        THE COURT:  Well, I was talking about 4:00.  But

25   apparently Mr. Cross is in L.A. in the heart of probably a

1    deposition at that point at 1:00.  I have a pretty rugged

2    schedule the rest of the week.  That is why I -- we'll get back

3    to you.  What you should do is -- I have more time --

4              MR. BARNES:  Thursday I'm already scheduled for

5    hearings.

6              THE COURT:  Well, the problem is:  If I put it --

7    push it up until the 8th, then I have to push all your other

8    time frames up too.  And the 8th is the other time I could do

9    it.

10             MR. CROSS:  The 8th doesn't work for me either, Your

11   Honor.  And Mr. Knapp will cover if we need to for us.

12             One other final issue I had, Your Honor, is:  With

13   respect to the process Your Honor has laid out to go forward in

14   the next week or so and trying to resolve the preservation

15   issues --

16             THE COURT:  It is not just the preservation issues.

17   It is the request for production.  And then I'm going to be

18   hearing from them right away about what is the difference in

19   their complaint.  And I'm going to be reviewing this in light

20   of the information you have all provided.  Because as I said, I

21   kind of walked into this a little more blind than I would have

22   liked.  But I thought no matter what, I needed to have -- as

23   you thought, I needed to have a status conference so I could

24   understand better what was happening.

25             MR. CROSS:  And we appreciate that, Your Honor.  The

1    request I was going to make, which I confess is unusual but I

2    think critical based on experience to date, is could we get a

3    directive from the Court that our co-plaintiffs will coordinate

4    and communicate with us rather than, for example, sending out

5    discovery requests that we have never seen.  It just creates

6    complications for everyone in the case.

7            So if we could at least see things before they go out

8    and have some sort of normal, usual, professional relationship,

9    I think it will make it easier for everyone.

10           MR. SALTER:  We join.

11           MR. BROWN:  Your Honor, the discovery that is being

12   referenced is the Rule 34 request, which was sent out this

13   morning.  And in the interest of time, we sent it to everybody

14   so that everybody could have it before today's hearing.

15           Obviously, the plaintiffs have no objection to

16   conferring with the other plaintiffs before serving discovery.

17   And we will continue to do so.

18           THE COURT:  Thank you.  And I am expecting that you

19   will look at the information from Fulton County and try to

20   assess it together as well.  It would be a good trial practice.

21   But I'm also expecting -- as I said, I think that if Dekalb and

22   Cobb are serious about wanting to get some of these machines,

23   I'm going -- you need to be hustling to look at what -- having

24   a real conversation about what information is needed.

25           And I don't want you to leave today without a phone

```
1    date, and I'm going to leave it to -- I couldn't figure out all
2    the scheduling.  Ms. McConochie will work with you about it.
3    But I think since you are all here and you are not the easiest
4    people to reach, I would suggest you work on it now.
5              MR. BARNES:  Well, the time you suggested was May
6    the 9th at 4:00?
7              THE COURT:  Right.
8              MR. BARNES:  Okay.  Is that all right with you?
9              MR. BROWN:  It is all right with us.
10             MR. KNAPP:  Good with me, Your Honor.
11             THE COURT:  With all of the county --
12             MR. WHITE:  Well, I just was going to say if we are
13   going to -- is it going to be a phone conference or will that
14   be here in person?  Because the only problem I have is I have
15   to be back in Marietta for a city council meeting.
16             THE COURT:  We'll do it as a phone conference.
17             MR. BRYAN:  Your Honor, I will be out of the country
18   next week.  But I will make sure that Dekalb County is
19   represented by counsel whenever it is you schedule it.
20             THE COURT:  All right.
21             MR. SALTER:  At the risk of creating problems, I'm
22   just going to flag one thing and that is I'm out of the country
23   from July the 5th until July the 23rd.  And I didn't want to
24   sandbag anybody with that.  We've got a leave in.
25   Non-refundable tickets with my wife and children to Europe.
```

```
 1              THE COURT:  Wonderful.

 2              MR. SALTER:  Just saying -- just putting it out

 3    there.

 4              THE COURT:  Lucky for you, I'm not -- I'm not here

 5    those two weeks either.

 6              MR. BARNES:  His wife, my daughter, and

 7    grandchildren.  I want them to go.

 8              MR. ICHTER:  We're not opposed to taking depositions

 9    in Paris.

10              MR. SALTER:  On the state's dime, Cary.

11              THE COURT:  That kind of tends to poison a vacation.

12              MR. SALTER:  Thank you, Your Honor.

13              THE COURT:  We're going to work with the schedule.  I

14    understand why, Mr. McGuire, you want to get to a trial.  I'm

15    very impressed that you think you can do it that quickly.  But,

16    you know -- and I'm sorry.  I'm starting to have a nosebleed.

17    This is what trials do to me.  Let me just hold -- excuse me.

18              Let me just say briefly:  I jumped over many hurdles

19    to try to get you -- to get a trial -- be able to do this on a

20    swift basis before.  And I couldn't because of all the things

21    that happened.  So I'm a little bit jaded about all of this and

22    the possibility of it happening in a reasonable way.

23              I'll listen to it all.  But we're lucky if we get,

24    frankly, everything functional in a position for decision by

25    the fall at all.  But I hear you.  And if there is some magic
```

1   way of doing this, great.  But I have really a miserable

2   schedule not made easier by Mr. Barnes and his other case

3   and --

4              MR. BARNES:  It is not me, Judge.  It is that lawyer

5   from Boston.

6              THE COURT:  -- which Holly is suffering with too.

7   And excuse me for being a bloody mess here.  You can see what

8   you have invoked in combination with everybody else.  So we

9   really jumped through hurdles before.

10             I realize none of you -- the plaintiffs' counsel were

11  here before, though the Coalition was.  And, you know, I don't

12  know what -- how the Coalition's responsible for some of this.

13  But I'm not sure the Coalition is a simple client either.

14             So I'm going to do my best.  But I'm not going to

15  basically make myself have a bloody nose every day through this

16  let me just say.  So I care about the integrity of the election

17  system.  But this is a very challenging case and with all sorts

18  of new challenges.  And let's be real about it.

19             But we are going to look at all this and get going

20  one way or the other.  Look at the way -- I would say one last

21  thing is that, when we talk on Wednesday, defendants -- the

22  state defendants and Fulton County need to be able to, you

23  know, positively state where they think now that they have

24  looked at the amended complaint and the posture of the

25  defendants -- the plaintiffs here as to the other -- the

1    Curling plaintiffs as to what claims they want to proceed on --
2    where you are on sovereign immunity because we need to know
3    that.  And you-all need to have actually communicated that, I
4    think, so that everyone is not -- that everyone is not reacting
5    on the fly.
6              So, you know, I think by Monday night, you need to
7    communicate that to the plaintiffs' counsel and drop me a note
8    as well.  You don't have to put it on the docket.  But at least
9    drop me a note as to where you are at.
10             MR. SALTER:  Could we put it to Tuesday night, Your
11   Honor?
12             THE COURT:  Tuesday night?  Well, then how about
13   Tuesday afternoon?
14             MR. SALTER:  Fair enough.  That would be better.
15             THE COURT:  Say Tuesday at 1:00 then.
16             MR. SALTER:  Thanks.
17             MR. BARNES:  And, Judge, you know, we're going to
18   need a little discovery too after we see --
19             THE COURT:  Really?  That surprises me.
20             MR. BARNES:  You know, I would like to take one or
21   two depositions.
22             MR. SALTER:  Let's not stay here all afternoon.
23             THE COURT:  Now, I have a sentencing on the 9th that
24   starts at 2:00.  And I don't know what that case is right now.
25             Is that a reentry, or what is that case?

```
 1              COURTROOM DEPUTY CLERK:  No, Your Honor.  I believe
 2    it is drugs.
 3              THE COURT:  It is drugs.  All right.  We'll try to
 4    start promptly.  But watch out for a phone -- watch out for any
 5    emails if we're delayed.  You know, I'm not quick on hearings.
 6    So --
 7              MR. BARNES:  Thank you, Your Honor.
 8              MR. SALTER:  Thank you, Judge.
 9              THE COURT:  All right.
10              COURTROOM SECURITY OFFICER:  Court stands in recess.
11                   (The proceedings were thereby concluded at
12                   12:42 P.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

85 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the

1st day of May, 2018.

_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT