# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| COAKLEY PENDERGRASS; TRIANA ARNOLD JAMES; ELLIOTT HENNINGTON; ROBERT RICHARDS; JENS RUECKERT; and OJUAN GLAZE, | CIVIL ACTION FILE NO. 1:21-CV-05339-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; WILLIAM S. DUFFEY, JR., in his official capacity as chair of the State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the State Election Board; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and JANICE W. JOHNSTON, in her official capacity as a member of the State Election Board, | |
| Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.    *Allen* confirms that Black Georgians in the western Atlanta suburbs can constitute a voting majority in a reasonably configured congressional district. ...................................................................................................... 3

    A. Mr. Cooper's Illustrative Congressional District 6 is reasonably configured. ......................................................................................4

    B. Defendants' disputes with areas outside of Illustrative Congressional District 6 do not undermine Plaintiffs' satisfaction of the first *Gingles* precondition. .................................................................................7

    C. Race does not predominate in Mr. Cooper's illustrative plan. ......................8

        1.  *Allen* holds that mere awareness of racial considerations is insufficient to establish predominance. ....................................................................9

        2.  *Davis* also forecloses a finding of racial predominance. ......................10

II.    *Allen* confirms that Plaintiffs have indisputably satisfied the second and third *Gingles* preconditions. ..................................................................... 12

    A. The record contains undisputed evidence of racially polarized voting.......13

    B. Section 2 does not require Plaintiffs to prove that racially polarized voting results from racial motivations. .................................................................15

    C. *Allen* reiterates that Section 2's effects test is constitutional. ......................16

CONCLUSION................................................................................................17

CERTIFICATE OF COMPLIANCE ........................................................20

CERTIFICATE OF SERVICE ..................................................................21

## INTRODUCTION

The Supreme Court's decision in *Allen v. Milligan* confirms that Plaintiffs have satisfied the familiar requirements of *Thornburg v. Gingles* that "ha[ve] governed our Voting Rights Act jurisprudence since it was decided 37 years ago." *Allen v. Milligan*, No. 21-1086, ---U.S.----, ---S. Ct.----, 2023 WL 3872517, at *10 (June 8, 2023).

In satisfaction of the first *Gingles* precondition, Plaintiffs introduced a reasonably configured illustrative map that "shows it is *possible* that the State's map has a disparate effect on account of race." *Id.* at *13 (emphasis in original). As to the second and third *Gingles* preconditions, there is no material dispute that Black Georgians in the western Atlanta suburbs are "politically cohesive" and that "the white majority" in the area "votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* at *9 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986)). Plaintiffs' unrebutted evidence thus satisfies these preconditions under the Section 2 standard that has existed for the past four decades and as reaffirmed and applied by the Court in *Allen*.[1]

---

[1] Plaintiffs focus their argument in this brief on *Allen*'s application of the *Gingles* preconditions. *See also* Hr'g Tr. at 44–45 (May 18, 2023), Ex. 1 (noting that "[i]f the Court determines that the totality analysis requires fact finding or the weighing of evidence, it remains free to issue summary judgment on

Rather than rebutting Plaintiffs' evidence, Defendants attempted to transform this "intensely local appraisal" into a thicket of novel prerequisites and bars to relief—requiring race-blind map drawing, preservation of communities of interest outside the area where the relevant minority group resides, and proof of causation. But *Allen* forecloses Defendants' attempts to prevail under a revised interpretation of Section 2 that never came to pass.

*Allen* "reiterat[es] that §2 turns on the presence of discriminatory effects, not discriminatory intent." *Allen*, 2023 WL 3872517, at *13; *see also id.* at *22 (Kavanaugh, J., concurring) ("[A]s this Court has long recognized—and as all Members of this Court today agree—the text of §2 establishes an effects test, not an intent test."). It makes clear that race consciousness does not equate to racial predominance. *Id.* at *15–16 (plurality opinion). It confirms that an illustrative map can be "reasonably configured" even if it splits communities of interest elsewhere in the state. *Id.* at *10–11. And it reaffirms that proof of racially polarized voting satisfies the second and third *Gingles* preconditions without showing that the racial polarization is caused by racial motives rather than partisan ones. *Id.* at *11.

the undisputed fact[s] of the *Gingles* preconditions, and . . . reserve for trial the ultimate determination of liability. . . . *Gingles* is an objective, straightforward test.").

2

Defendants cannot prevail under the familiar *Gingles* framework because they hardly made any evidentiary showing at all. Their defense of the enacted map hinged entirely on their hope that the law was going to change. It didn't. *Allen* confirmed that this Court properly applied the *Gingles* framework at the preliminary injunction phase and that Defendants' arguments are entirely unfounded.

## ARGUMENT

### I.  *Allen* confirms that Black Georgians in the western Atlanta suburbs can constitute a voting majority in a reasonably configured congressional district.

*Allen* makes clear that Plaintiffs have satisfied the first *Gingles* precondition by showing that Black Georgians in the western Atlanta suburbs are "'sufficiently large and geographically compact to constitute a majority in a reasonably configured district.'" *Allen*, 2023 WL 3872517, at *9 (alteration adopted) (quoting *Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam)).

Defendants have already conceded that the Black community in the western Atlanta metropolitan area is sufficiently large to constitute a majority in a congressional district. Statement of Undisputed Material Facts in Supp. Of Pls.' MSJ ("SUMF") ¶¶ 31, 43 (Mar. 20, 2023), ECF No. 173-2; Decl. of William S. Cooper ("Cooper Rep.") ¶ 10 (Jan. 12, 2022), ECF No. 34-1; Dep. of John B. Morgan ("Morgan Dep.") at 65:10–66:13 (Feb. 13, 2023), ECF No. 157. Defendants

contended only that Plaintiffs have not satisfied the first *Gingles* precondition's compactness requirement. But *Allen* makes clear that Defendants' criticisms are unfounded. Mr. Cooper's Illustrative Congressional District 6 is reasonably configured because it complies with traditional redistricting criteria, including compactness. Defendants' emphasis on communities of interest in areas other than the western Atlanta suburbs does not undermine Plaintiffs' showing because the focus of the inquiry is the illustrative district where the relevant minority group resides. And contrary to Defendants' repeated refrain, race did not predominate in Mr. Cooper's illustrative plan, as mere awareness of race is insufficient to establish predominance. Plaintiffs have indisputably satisfied the first *Gingles* precondition.

### A. Mr. Cooper's Illustrative Congressional District 6 is reasonably configured.

As with the illustrative plans he proposed in *Allen*, the plan Mr. Cooper proposes here is "reasonably configured" because it indisputably "comports with traditional districting criteria." *Allen*, 2023 WL 3872517, at *9. *Allen* concluded that Mr. Cooper's Alabama plans were reasonably configured because their districts were compact, had no obvious irregularities, had equal populations, were contiguous, and respected existing political subdivisions. *Id.* at *10. Here, Mr. Cooper's illustrative plan undoubtedly comports with the same criteria.

4

**Compactness.** *Allen* concluded that one of Mr. Cooper's Alabama plans was compact because its "districts [were] roughly as compact as the existing plan." *Id.* So too here. The mean and lowest compactness scores of Mr. Cooper's illustrative plan are similar or identical to the corresponding scores for the enacted plan and Georgia's prior congressional plan. SUMF ¶¶ 50, 53; Cooper Rep. ¶¶ 78–79 & n.12, fig.13; Expert Rep. of John B. Morgan ("Morgan Rep.") ¶ 22 (Mar. 20, 2023), ECF No. 174-7; Morgan Dep. at 55:18–57:5; *see also* Order Denying Mot. for Prelim. Inj. ("PI Order") at 71–76 (Feb. 28, 2022), ECF No. 97. Mr. Cooper's additional majority-Black district, Illustrative Congressional District 6, is as compact as the average for the enacted plan on the Polsby-Popper scale and *more* compact than the enacted plan's average on the Reock scale; it is also more compact than the enacted Congressional District 6 on both measures. SUMF ¶¶ 54–55; Cooper Rep. Exs. L-1, L-3; Morgan Dep. at 57:15–60:2. And Defendants' mapping expert, John Morgan, does not dispute that Mr. Cooper's illustrative plan is similarly compact as the enacted plan. *See* Morgan Rep. ¶ 22.

**No obvious irregularities.** *Allen* explained that Mr. Cooper's Alabama plans lacked "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find them sufficiently compact." *Allen*, 2023 WL 3872517, at *10 (internal quotation marks omitted). Here, Mr. Cooper's Illustrative

Congressional District 6 similarly lacks any obvious irregularities, and Defendants have not argued otherwise.

**Equal population.** *Allen* observed that Mr. Cooper's Alabama plans "contained equal populations." *Id.* Here, as in the enacted plan, population deviations in Mr. Cooper's illustrative plan are limited to plus-or-minus one person from the ideal district population. SUMF ¶¶ 47–49; Cooper Rep. ¶¶ 52–53, fig.11; Morgan Dep. at 62:4–7, 62:14–17; *see also* PI Order at 71, 76. Defendants do not dispute that Mr. Cooper's illustrative plan equalizes population. *See* Morgan Dep. 62:4–7.

**Contiguity.** *Allen* noted that Mr. Cooper's Alabama plans were contiguous. *Allen*, 2023 WL 3872517, at *10. So too is the illustrative plan he offered in this case, SUMF ¶¶ 47–49; Cooper Rep. ¶¶ 52–53, fig.11; *see also* PI Order at 71, 76, another fact Defendants do not dispute, *see* Morgan Dep. at 62:14–17.

**Political Subdivisions.** *Allen* held that Mr. Cooper's Alabama plans "respected existing political subdivisions, such as counties, cities, and towns." *Allen*, 2023 WL 3872517, at *10. Here, Mr. Cooper's illustrative plan indisputably preserves political subdivisions as well as or better than the enacted plan. *See* Morgan Rep. ¶ 20; Morgan Dep. at 44:6–46:16, 54:7–11, 54:18–55:6. Although both Mr. Cooper's illustrative plan and the enacted plan split 15 counties, the illustrative

plan scores better across four other metrics: county splits (unique county/district combinations), split municipalities, municipality splits (unique municipality/district combinations), and voting district splits. SUMF ¶¶ 58–60; Cooper Rep. ¶¶ 81–82, fig.14; Morgan Rep. ¶ 20; Morgan Dep. at 44:6–46:16, 54:7–11, 54:18–55:6; *see also* PI Order at 76–79.

* * *

Mr. Cooper's illustrative plan is thus reasonably configured because it indisputably comports with the same "traditional districting criteria" that the Court approved in *Allen*.

## B. Defendants' criticisms regarding areas outside of Illustrative Congressional District 6 do not undermine Plaintiffs' satisfaction of the first *Gingles* precondition.

The fact that an illustrative plan splits communities of interest in areas outside of the proposed remedial district has no bearing on whether the district is reasonably configured. In *Allen*, after recognizing that the plaintiffs' proposed remedial district preserved one community of interest, the Court rejected Alabama's argument that the district was not reasonably configured because it split a different community of interest, and reaffirmed that a district court hearing a Section 2 challenge has no need "to conduct a 'beauty contest[ ]' between plaintiffs' maps and the State's." *Allen*, 2023 WL 3872517, at *11. Rather, as the Court previously made clear in *LULAC v.*

7

*Perry*, 548 U.S. 399 (2006), the Section 2 compactness inquiry relates to the "compactness of the minority population" whose voting strength is improperly diluted. 548 U.S. at 433; *see also id.* at 430 (examining geographic compactness of minority group "where th[e] district sits").

*Allen* thus renders meaningless Defendants' complaints regarding Mr. Cooper's purported inability to identify the common interests of voters in districts *other* than the new majority-Black district. *See* Defs.' Br. in Supp. of MSJ ("Defs.' Mot.") at 16–17 (Mar. 20, 2023), ECF No. 175-1. Because the compactness of the minority group is used to assess "the opportunity that § 2 requires [and] that the first *Gingles* condition contemplates," *LULAC*, 548 U.S. at 433, there is neither a requirement nor a reason for Plaintiffs to demonstrate the shared interests of communities outside of the geographic area where they have alleged vote dilution. And here, as discussed above, *see supra* at 5, Mr. Cooper's Illustrative Congressional District 6 satisfies the relevant compactness requirement by combining communities with shared interests in the western Atlanta suburbs.

### C. Race does not predominate in Mr. Cooper's illustrative plan.

*Allen* requires rejection of Defendants' argument that race predominates in Mr. Cooper's illustrative plan. Because Mr. Cooper considered race to the same extent that he did in developing the illustrative plans he submitted in *Allen*, this Court

should similarly find that race does not predominate in Mr. Cooper's Georgia plan. Moreover, because no majority of the *Allen* Court endorsed a new standard for assessing racial predominance, the Eleventh Circuit's decision in *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), remains good law, and it too compels the conclusion that race does not predominate in Mr. Cooper's illustrative plan.

### 1. *Allen* concludes that mere awareness of racial considerations is insufficient to establish predominance.

*Allen*'s conclusion that "in the context of districting . . . aware[ness] of racial considerations . . . is permissible," *Allen*, 2023 WL 3872517, at *15 (plurality opinion) (internal quotations omitted), forecloses Defendants' argument that race predominates in Mr. Cooper's illustrative plan merely because he "*sometimes*" observed "little dots showing where the minority population is concentrated" and thus was "*aware*" of racial information. Pls.' Statement of Additional Material Facts ("SAMF") ¶ 1 (Apr. 19, 2023), ECF No. 189-2; Dep. of William S. Cooper ("Cooper Dep.") at 24:12–25:6 (Mar. 20, 2023), ECF No. 167 (emphases added). *Allen* recognized that "[t]he question whether additional majority-*minority* districts" can be drawn "involves a 'quintessentially race-conscious calculus.'" *Allen*, 2023 WL 3872517, at *15 (plurality opinion) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)) (emphasis in original)). Consequently, "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law." *Id.*

at *16 (plurality opinion). The Supreme Court has "long drawn" a line "between consciousness and predominance." *Id.* Race predominates when "'race-neutral considerations come into play only after the race-based decision had been made.'" *Id.* at *15 (plurality opinion) (alteration adopted) (quoting *Bethune-Hill* v. *Va. State Bd. of Elections*, 580 U. S. 178, 189 (2017)).

Here, as in *Allen*, race did not predominate in Mr. Cooper's illustrative plan because he gave "equal weighting" to "several other factors." *Id.*; *see* PI Order at 92. Mr. Cooper attested that neither race nor any other single factor predominated in the drawing of his illustrative plan. SAMF ¶ 5; Cooper Rep. ¶ 50. Rather, he balanced several traditional redistricting criteria including population equality, compactness, contiguity, respect for political subdivision boundaries, respect for communities of interest, and the non-dilution of minority voting strength. Cooper Rep. ¶¶ 48, 50.

At most, the evidence indicates that Mr. Cooper was *aware* of race when he drew his illustrative congressional plan. But *Allen* compels the conclusion that Mr. Cooper's mere awareness of race is insufficient to establish predominance.

### 2. *Davis* also forecloses a finding of racial predominance.

Because no majority of the Court announced a new standard for finding racial predominance, *Davis* remains binding in this Circuit, and *Davis* likewise compels the conclusion that mere awareness of race is insufficient to establish predominance.

*Davis* rejected the argument that race predominates in an illustrative plan merely because "race was a factor" in the mapmaker's "process of designing the proposed" remedy. *Davis*, 139 F.3d at 1426. Instead, it recognized that Section 2 "*require[s]* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Id.* at 1425. Thus, "[t]o penalize [plaintiffs] for attempting to make the very showing that *Gingles* [and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id. Davis* held that race does not predominate when a mapmaker "adhere[s] . . . to traditional redistricting criteria," testifies that "race was not the predominant factor motivating his design process," and explains that he never sought to "maximize the number of majority-minority" districts. *Id.* at 1426.

Here, Mr. Cooper adhered to traditional redistricting criteria, *see supra* at 4–7. He attested that neither race nor any other single factor predominated in the drawing of his illustrative plan. SAMF ¶ 5; Cooper Rep. ¶ 50. And he did *not* attempt to maximize the number of majority-Black districts in his illustrative plan. SAMF ¶ 2; Cooper Dep. at 18:18–19:18. *Allen* and *Davis* thus require the Court to find that race does not predominate in Mr. Cooper's illustrative plan.

11

## II.   *Allen* confirms that Plaintiffs have indisputably satisfied the second and third *Gingles* preconditions.

Plaintiffs have satisfied the second and third *Gingles* preconditions because Black Georgians in the Western Atlanta suburbs are "politically cohesive" and "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *See Allen*, 2023 WL 3872517, at *9 (quoting *Gingles*, 478 U.S. at 51). The second precondition, "concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected." *Id.* "The third precondition, focused on racially polarized voting, 'establishes that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* (quoting *Growe v. Emison*, 507 U. S. 25, 40 (1993)). Satisfying these preconditions creates the inference that polarization is on account of race. *See Nipper v. Smith*, 39 F.3d 1494, 1525–26 (11th Cir. 1994) (en banc).

Defendants did not dispute the material facts that support Plaintiffs' satisfaction of the second and third *Gingles* preconditions. Defendants instead argued that they were entitled to summary judgment because Plaintiffs failed to prove that the racial polarization was caused by racial motives rather than partisan ones. *See, e.g.*, Defs.' Reply Br. at 10 (May 3, 2023), ECF No. 202 ("This is not a factual dispute because everyone agrees on the facts. It is only the conclusion drawn from those facts that is at issue."). Defendants even argued that Section 2's well-

12

settled effects test is unconstitutional. Defs.' Mot. at 26. But *Allen* rejected Defendants' "attempt[ ] to remake . . . §2 jurisprudence anew." *Allen*, 2023 WL 3872517, at *11. Instead, it confirmed that the second and third *Gingles* preconditions are straightforward, objective inquiries that do not include a causation requirement. *Id.* Plaintiffs' undisputed evidence of racially polarized voting easily satisfies the second and third *Gingles* preconditions.

**A. The record contains undisputed evidence of racially polarized voting.**

Plaintiffs' undisputed evidence of racially polarized voting is just as strong as the evidence submitted in *Allen*. There, "Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote." *Id.* (internal quotation marks omitted) (citation omitted). Even the state's expert in that case conceded that "the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." *Id.* (internal quotation marks omitted).

Here, Dr. Palmer found that Black voters in Georgia are extremely cohesive, with a clear candidate of choice in all 40 elections he examined—a conclusion with which Defendants' expert, Dr. John Alford, readily agreed. SUMF ¶¶ 73–74; Expert Rep. of Dr. Maxwell Palmer ("Palmer Rep.") ¶¶ 15–16 & n.13, figs.2 & 3, tbl.1 (Jan. 12, 2023), ECF No. 34-2; Suppl. Expert Rep. of Dr. Maxwell Palmer ("Suppl.

13

Palmer Rep.") ¶ 5, tbl.1 (Mar. 20, 2023), ECF No. 174-4; Expert Rep. of Dr. John

R. Alford ("Alford Rep.") at 3 (Mar. 20, 2023), ECF No. 174-8; Dep. of Dr. John

Alford ("Alford Dep.") at 37:13–15 (Mar. 17, 2023), ECF No. 158. Across the focus

area, Black voters supported their candidates of choice with an average of 98.4% of

the vote in the 40 elections Dr. Palmer examined, a finding reflected in each of the

five component congressional districts as well. SUMF ¶¶ 75–77; Palmer Rep. ¶¶ 7,

16, 19, fig.4, tbls.2, 3, 4, 5 & 6. Plaintiffs therefore satisfy the second *Gingles*

precondition. *See* 478 U.S. at 56 ("A showing that a significant number of minority

group members usually vote for the same candidates is one way of proving []

political cohesiveness[.]"); *see also* PI Order at 185–86 (concluding that "Plaintiffs

have satisfied their burden to establish that Black voters in Georgia (at least for those

regions examined) are politically cohesive").

Dr. Palmer also found high levels of white bloc voting in opposition to the

candidates whom Black voters cohesively supported—another finding Dr. Alford

did not dispute. SUMF ¶ 78; Palmer Rep. ¶ 17, figs.2 & 3, tbl.1; Suppl. Palmer Rep.

¶ 5, fig.1, tbl.1; Alford Rep. at 3; Alford Dep. at 38:20–39:8. On average, only 12.4%

of white voters supported Black-preferred candidates, and in no election did white

support exceed 17%. SUMF ¶ 79; Palmer Rep. ¶¶ 7, 17. Consequently, across the

focus area, white-preferred candidates won the majority of the vote in all 40

elections. SUMF ¶ 82; Palmer Rep. ¶¶ 8, 22, tbl.7. Dr. Palmer reported the same results at the district level: White voters cohesively opposed Black-preferred candidates in each of the five congressional districts, and only in the majority-Black Congressional District 13 did Black-preferred candidates win larger shares of the vote in the 40 elections. SUMF ¶¶ 80–81, 83–85; Palmer Rep. ¶¶ 8, 20, 22, fig.4, tbls.2, 3, 4, 5, 6 & 7; Suppl. Palmer Rep. ¶ 4; Cooper Rep. ¶ 73, fig.14. In short, the undisputed evidence shows that Black voters' candidates of choice are consistently defeated in the focus area by white bloc voting, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition.

**B. Section 2 does not require Plaintiffs to prove that racially polarized voting results from racial motivations.**

Rather than disputing Plaintiffs' evidence of racially polarized voting, Defendants "attempt[ed] to remake . . . §2 jurisprudence anew," *Allen*, 2023 WL 3872517, at *11, by contending that the second and third *Gingles* preconditions require Plaintiffs to prove that racially polarized voting is caused by racially discriminatory motives. *See, e.g.*, Defs.' Reply Br. at 12 ("Plaintiffs claim Defendants improperly require them to prove [that] race, not party, is the cause of polarization. But this is precisely their burden of proof." (internal quotation marks omitted)). But *Allen* squarely rejected this argument. It confirmed that Supreme Court "precedents and the legislative compromise struck in the 1982 amendments

clearly rejected treating discriminatory intent as a requirement for liability under §2." *Allen*, 2023 WL 3872517, at *19.

*Allen* also "reiterat[ed] that §2 turns on the presence of discriminatory effects, not discriminatory intent." *Id.* at *13; *see also id.* ("'Congress . . . used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination.'" *Id.* (quoting *Gingles*, 478 U. S., at 71, n. 34 (plurality opinion))). Thus, *Allen* makes clear that Defendants were wrong when they argued that "establishing racial polarization requires something more than just different races voting for different parties." Defs.' Reply Br. at 8. These principles foreclose Defendants' repeated protestations that Plaintiffs cannot satisfy the second and third *Gingles* preconditions without showing that racially polarized voting in the focus area is motivated by race rather than partisanship or any other factor.

### C. *Allen* reiterates that Section 2's effects test is constitutional.

*Allen* also rejected Defendants' arguments that Section 2 is unconstitutional. *See* Defs.' Mot. at 26–27. For nearly sixty years, the Supreme Court has held and reaffirmed that "[t]he VRA's 'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'" *Allen*, 2023 WL 3872517, at *21 (quoting *City of Rome v. United*

16

*States*, 446 U.S. 156, 177 (1980)); *accord South Carolina v. Katzenbach*, 383 U.S. 308–309, 329–337 (1966). *Allen* also recognized that proper application of the *Gingles* framework alleviates the equal protection concern that Defendants raised because federal courts have "authorized race-based redistricting as a remedy for state districting maps that violate § 2" for four decades. *Allen*, 2023 WL 3872517, at *21. No constitutional considerations arise unless race predominates in an illustrative map, and for the reasons discussed in *Allen*, those concerns are not present here. *See id.* at *23 (Kavanaugh, J., concurring) ("Alabama asserts that §2, as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's remedial or preventive authority under the Fourteenth and Fifteenth Amendments. As the Court explains, the constitutional argument presented by Alabama is not persuasive in light of the Court's precedents.").

## CONCLUSION

Plaintiffs have satisfied the *Gingles* preconditions. Defendants' arguments on summary judgment relied on their subjective expectation that the U.S. Supreme Court might upend settled Section 2 precedent. The Court refused to do so. The Court's decision in *Allen* reaffirmed that the familiar requirements of *Thornburg v. Gingles* remain good law, and applying *Allen* to the undisputed material facts in this case shows that Plaintiffs are entitled to summary judgment on, at the very least, the

*Gingles* preconditions. Plaintiffs respectfully request that the Court enter summary judgment in their favor on, at the very least, the three *Gingles* preconditions, and allow the rest of Plaintiffs' claim to proceed to trial.

**[signatures on following page]**

18

Dated: June 22, 2023

By: **Adam M. Sparks**

Joyce Gist Lewis

Georgia Bar No. 296261

Adam M. Sparks

Georgia Bar No. 341578

**KREVOLIN & HORST, LLC**

One Atlantic Center

1201 West Peachtree Street, NW, Suite 3250

Atlanta, Georgia 30309

Telephone: (404) 888-9700

Facsimile: (404) 888-9577

Email: JLewis@khlawfirm.com

Email: Sparks@khlawfirm.com

Respectfully submitted,

Abha Khanna*

Jonathan P. Hawley*

Makeba A.K. Rutahindurwa*

**ELIAS LAW GROUP LLP**

1700 Seventh Avenue,

Suite 2100

Seattle, Washington 98101

Phone: (206) 656-0177

Facsimile: (206) 656-0180

Email: AKhanna@elias.law

Email: JHawley@elias.law

Email: MRutahindurwa@elias.law

Michael B. Jones

Georgia Bar No. 721264

**ELIAS LAW GROUP LLP**

250 Massachusetts Avenue NW,

Suite 400

Washington, D.C. 20001

Phone: (202) 968-4490

Facsimile: (202) 968-4498

Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

19

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs' Supplemental Brief in Support of Their Motion for Summary Judgment has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: June 22, 2023                    **Adam M. Sparks**
                                        *Counsel for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing Plaintiffs' Supplemental Brief in Support of Their Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: June 22, 2023

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*