TRIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COAKLEY PENDERGRASS, et al.,

   Plaintiffs,

v.

BRAD RAFFENSPERGER, et al.,

   Defendants.

CIVIL ACTION FILE

No. 1:21-CV-5339-SCJ

## ORDER

This matter appears before the Court on the Parties' Cross-Motions for Summary Judgment (Doc. Nos. [173][1]; [175]).

Full briefing on these Motions—responses in opposition (Doc. Nos. [187]; [189]) and replies in support (Doc. Nos. [200]; [202])—has been completed. The

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Parties have also submitted supplemental briefing (Doc. Nos. [212], [214]) following the Supreme Court's decision in Allen v. Milligan, 599 U.S. ---, 143 S. Ct. 1487 (2023).

The Parties' Motions for Summary Judgment are now ripe for review. The inquiry into a vote dilution claim must involve a "comprehensive, not limited canvassing of relevant facts." Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). The Court has thoroughly analyzed the Parties' Statements of Material Facts, the Record, and the Parties' arguments and ultimately determines that each Motion must be **DENIED**. Material questions of fact remain as to all aspects of Plaintiffs' claims, and the Court cannot rule for one Party without making factual determinations, weighing evidence, and assessing the credibility of the experts. Unlike on a motion for a preliminary injunction, these determinations are impermissible on motions for summary judgment.

*   *   *   *   *

"The political franchise of voting . . . is regarded as a fundamental political right, because [it is] preservative of all other rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). The Supreme Court's "paramount concern has remained an individual and personal right—the right to an equal vote."

2

Gaffney v. Cummings, 412 U.S. 772, 781 (1973) (Brennan, J., concurring). And the "[p]assage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of [American] citizens: the right to vote." Bartlett v. Strickland, 556 U.S. 1, 10 (2009).

In the intervening fifty-eight years since the passage of the Voting Rights Act ("VRA") and thirty-seven years since its most substantive amendment, the VRA has been used to ensure that minority voters have an equal opportunity to participate in elections and elect candidates of their choice. Specifically, "Section 2 was enacted to [prohibit], in all 50 States, any 'standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color.'" Shelby Cnty. v. Holder, 570 U.S. 529, 536 (2013). "Section 2 is permanent [and] applies nationwide." Id. at 537.

During the Supreme Court's October 2022 Term, it heard argument on Section 2 challenges to Alabama's congressional map. <u>Allen</u>, 143 S. Ct. 1487.[2]  On June 8, 2023, in a 5-4 decision, Chief Justice Roberts delivered the opinion of the Court and affirmed the three-judge court's order granting plaintiffs a preliminary injunction. <u>Id.</u> at 1504. The majority[3] conducted a clear error review of the lower

───────────────

[2] The Court engages in a more thorough discussion of <u>Allen</u> in the summary judgment order in <u>Alpha Phi Alpha Fraternity, Inc., et al. v Brad. Raffensperger</u>, 1:21-cv-5337-SCJ, (N.D. Ga. July 17, 2023).

[3] Chief Justice Roberts delivered the opinion of the Court except as to Part III-B-1, in which Justice Kavanaugh concurred. <u>Allen</u>, 143 S. Ct. at 1510–12. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" <u>Marks v. United States</u> 430 U.S. 188, 193 (1977) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976)). <u>But see</u> <u>Horton v. Zant</u>, 941 F.2d 1449, 1464 n.32 (11th Cir. 1991) ("[P]lurality opinions are not binding on [the Eleventh Circuit]; however, they are persuasive authority."). Part III-B-1 of <u>Allen</u> is not the Court's holding; rather it is the Court's reasoning for rejecting a part of Alabama's proposed test. Thus, the <u>Allen</u> majority's holding is binding.

Justice Kavanaugh's concurrence likewise rejected Alabama's attempt to create a new test for Section 2. He reasoned that under the doctrine of statutory *stare decisis*, "the Court has ordinarily left the updating or correction of erroneous statutory precedents to the legislative process." <u>Allen</u>, 143 S. Ct. at 1517 (Kavanaugh, J., concurring) (quoting <u>Ramos v. Louisiana</u>, 140 S. Ct. 1390, 1413 (2020)). He rejected that the <u>Gingles</u> test requires the number of majority-minority districts be proportional to the minority population because under that formulation, "States would be forced to group together geographically dispersed minority voters into unusually shaped districts," which is not the test. <u>Id.</u> at 1518. Justice Kavanaugh also declined to address the constitutional question of whether Section 2 should continue to govern into the future because it was not raised before the Court. <u>Id.</u> at 1519.

4

court's factual findings and applied them to the virtually untouched and longstanding test from Thornburg v. Gingles, 478 U.S. 30 (1986).

Unequivocally, the Allen majority asserted:

> Gingles has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of § 2 as Gingles construed it. And we have applied Gingles in one § 2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country.

143 S. Ct. at 1504. Thus, following Allen, the standards governing Plaintiffs' Section 2 challenges are the same as those the Court applied in its preliminary injunction order.

## I.   BACKGROUND[4]

On December 30, 2021, Plaintiffs filed their VRA Section 2 claim against Defendants.[5] Doc. No. [1]. Plaintiffs—who include several Black Georgians residing in Cobb and Douglas Counties—sued Georgia Secretary of State Brad Raffensperger, Judge William S. Duffey, Jr., as the Chair of the State Election Board ("SEB"), and four individual members of the SEB. Doc. No. [120], ¶¶ 11–22.

Plaintiffs seek to enjoin the use of the congressional redistricting plan ("SB 2EX" or the "Enacted Plan") that was enacted following the 2020 Decennial Census. Doc. No. [120], ¶¶ 1–2, 7. Plaintiffs allege that SB 2EX violated Section 2

---

[4] The Court derives the following facts from the Parties' submissions (Doc. Nos. [173-1]; [173-2]; [175]; [176]; [187]; [188]; [189]; [189-1]; [189-2]; [200]; [201]; [201-1]; [202]; [203]) and the Record. Pursuant to Local Rule 56.1(B), when a fact is undisputed, the Court includes the fact. For the disputed facts, the Court reviews the Record to determine if a dispute exists and, if so, whether the dispute is material. If the dispute is not material, the Court cites the fact and the opposing party's response. Where the dispute is material and the opposing party's response reflects the Record more accurately, the Court modifies the proposed fact and cites the record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the Record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the Record.

[5] Subsequently, Plaintiffs amended their complaint, and this Amended Complaint is now the operative pleading in this case. Doc. No. [120].

of the VRA by failing to include an additional majority-minority[6] congressional district in the western Atlanta region. Doc. No. [120], ¶¶ 4–6.

The 2020 Census revealed that Georgia's Black population increased in the last decade from 31.53% to 33.03% and constitutes the largest minority population in the state. Doc. No. [188], ¶¶ 5–6. Georgia's voting age population

---

[6] The Court takes judicial notice that the parties in <u>Anne Lois Grant, et al. v. Brad Raffensperger, et al.</u>, 1:22-cv-122-SCJ, Doc. No. [192], ¶ 58 (N.D. Ga. Mar. 20, 2023) agree that "[m]ap-drawers distinguish 'majority-minority' from 'majority-Black.' Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district." The Court clarifies that as a legal term of art, majority-minority districts and opportunity districts can refer to districts where a single-minority group is the majority population of a particular district. See <u>Allen</u>, 148 S. Ct. 1506–14 (using the term majority-minority districts to describe districts where the Black population, alone, exceeded 50% of the proposed district); <u>Abbott v. Perez</u>, 138 S. Ct. 2305, 2315 (2018) ("[i]n a series of cases tracing back to [<u>Gingles</u>], we have interpreted this standard to mean that, under certain circumstance[s], States must draw 'opportunity' districts in which minority groups form 'effective majorit[ies].'" (cleaned up) (quoting <u>League of United Latin Am. Citizens v. Perry</u>, 548 U.S. 399, 426 (2006) ("LULAC"))). Thus, when the Court uses the term majority-minority districts it encompasses majority-Black districts.

7

is 31.73% any-part Black. Id. ¶ 13.[7] Non-Hispanic whites now constitute a slim-majority (50.06%) of Georgia's 2020 population. Doc. No. [174-1], ¶ 17.[8]

The growth of Georgia's minority population—as well as the population growth in the State as a whole—has largely occurred in the Atlanta Metropolitan Statistical Area (MSA), which includes 29 counties.[9] Doc. Nos. [188], ¶ 15; [174-1], ¶ 25. The any-part Black population in the MSA increased from 33.61% in 2010

---

[7] The Court uses the any-part Black or any-part Black voting age population ("APBVAP") for purposes of determining numerosity. "[I]t is proper to look at *all* individuals who identify themselves as [B]lack in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the inquiry involved "an examination of only one minority group's effective exercise of the electoral franchise." Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003), superseded by statute in other part, Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 276–77 (2015).

[8] Defendants object to this statement because "the citation only refers to the percentage, not the timeline" for the statistic. Doc. No. [188], ¶ 8. The Court resolves this objection by taking judicial notice of the 2020 U.S. Census Bureau Data. See United States v. Phillips, 287 F.3d 1053, 1055 n.1 (11th Cir. 2002) (citing Hollis v. Davis, 941 F.2d 1471, 1474 (11th Cir. 1991) and Moore v. Comfed Savings Bank, 908 F.2d 834, 941 n.4) (taking judicial notice of the United States Census Bureau's 1990 census figures). Pursuant to 2020 U.S. States Census, Georgia's total population was 10,711,908 and the non-Hispanic white population was 5,362,156, which was approximately 50.06% of the total population. U.S. Census Bureau, Table S2901 (Jul. 13, 2023, 9:00 AM), https://data.census.gov/cedsci/table?q=S2901&g=0400000US13&tid=ACSST1Y2021 .S2901.

[9] The counties in the MSA are Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Doc. No. [188], ¶ 15.

to 35.91% in 2020. Doc. No. [174-1], ¶ 26. The Atlanta Regional Commission (made up of 11 core counties in metro Atlanta, all of which are in the MSA) account for 54.7% of Georgia's total any-part Black population. Doc. No. [188], ¶ 20. The MSA in total constitutes 61.81% of Georgia's total Black population. Id. ¶ 21.

Plaintiffs are challenging Congressional Districts ("CD")-3, 6, 11, 13, and 14 in the Enacted Plan. Doc. No. [120], ¶ 36. Specifically, SB 2EX decreases the APBVAP in Enacted CD-6 from 14.6% to 9.9%, while Enacted CD-13 has an APBVAP of 66.75%. Doc. No. [174-1], ¶¶ 40–41. Enacted CD-4, moreover, also has an APBVAP in the 60% range. Doc. No. [174-1], ¶ 40; see also Doc. No. [174-2], 25 (indicating the "% 18+ AP Black" in Enacted CD-4 was "54.52%").

In February 2022, the Court held a six-day preliminary injunction hearing on Plaintiffs' Section 2 challenge.[10] Doc. Nos. [90]–[95]. While finding Plaintiffs

---

[10] This case will proceed as a coordinated trial with two other Section 2 cases, Case No. 1:21-cv-5337 and Case No. 1:22-cv-122, that also challenge Georgia's legislative and congressional maps. There are pending motions for summary judgment in the coordinated cases as well. For purposes of clarity, the Court has chosen to resolve each case's motions for summary judgment by separate Orders. But like the preliminary injunction hearing, and in the interest of judicial efficiency, the Court will hold one coordinated trial for the three cases.

were likely to succeed on the merits, in light of the Supreme Court's stay order in Merrill v. Milligan, 142 S. Ct. 879 (2022),[11] the Court nevertheless denied Plaintiffs' request for a preliminary injunction because of the proximity to the upcoming elections. Alpha Phi Alpha Fraternity, Inc. v. Raffensperger, 587 F. Supp. 3d 1222, 1233–34 (N.D. Ga. 2022). The case thereafter proceeded through discovery. At the close of discovery, the Parties filed Cross-Motions for Summary Judgment. Doc. Nos. [173]; [175].

According to Plaintiffs' mapping expert—and not disputed by Defendants' own expert—the Black population in the Atlanta metropolitan area is large enough to create an additional majority-Black congressional district. Doc. Nos. [188], ¶¶ 26, 31; [174-1], ¶ 42. Plaintiffs submit an illustrative congressional districting plan ("Illustrative Plan") with an additional majority-Black district ("Illustrative District 6" or "Illustrative CD-6") that is "anchored in Cobb, Douglas, and Fulton Counties, along with a small part of Fayette County." Doc. No. [174-1], ¶ 55. Illustrative CD-6 has an APBVAP of

---

[11] The Allen case was initially filed under the caption Merrill v. Milligan. On January 26, 2023, the State moved to remove the secretary of state (John H. Merrill) from the action and replace him with his successor (Wes Allen). See Notification Regarding Substitution of Party Pursuant to S. Ct. R. 35.3, Allen v. Milligan, 143 S. Ct. 1487 (2023), (No. 21-1086).

51.87%, an APBVAP of 50.23%, and a non-Hispanic Black voting-age population of 50.18%. Doc. No. [188], ¶ 36–38.

The core of the instant Motions for Summary Judgment is whether SB 2EX's violates Section 2 because it impermissibly dilutes the Black population's votes in the western Atlanta region. The Court held a hearing on these Motions (and the summary judgment motions in the related cases) on May 18, 2023. Doc. No. [207]. The Parties submitted supplemental briefs following the Supreme Court's Allen decision. Doc. Nos. [212]; [214]. Thus, having the benefit of full briefing and argument, the Court turns to resolve the Parties' Cross-Motions.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A fact is 'material' if it is a legal element of the claim under the applicable

substantive law which might affect the outcome of the case." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (citing <u>Anderson</u>, 447 U.S. at 248).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party meets its burden merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the non-moving party. <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by showing specific facts of a genuine dispute. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or

making credibility determinations." <u>Stewart v. Booker T. Washington Ins.</u>, 232 F.3d 844, 848 (11th Cir. 2000). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. <u>Fitzpatrick</u>, 2 F.3d at 1115 (citations omitted).

"[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." <u>3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.</u>, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). Rather, cross motions for summary judgement "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Id</u>. (citing <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538–39 (5th Cir. 2004)).

## III.   ANALYSIS

Having reviewed the Parties' briefing, the Court denies both Defendants' and Plaintiffs' Motions for Summary Judgment. "Voting rights cases are inherently fact-intensive[.]" <u>Nipper v. Smith</u>, 39 F.3d 1494, 1498 (11th Cir. 1994). This is especially the case for:

> [S]ection 2 vote dilution claims alleging that . . . minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice. In such cases, courts must conduct a "searching

13

> practical evaluation of the 'past and present reality'" of
> the electoral system's operation.

Id. (quoting Gingles, 478 U.S. at 45). "Because a claim of vote dilution must be

evaluated with a functional, rather than a formalistic, view of the political

process, the Supreme Court has emphasized the importance of 'an intensely local

appraisal of the design and impact' of the electoral structure, practice, or

procedure at issue." Id. (quoting Gingles, 478 U.S. at 79); see also Rogers v. Lodge,

458 U.S. at 613, 621 (1982).

The Court proceeds by first addressing Defendants' Motion because

Defendants move for summary judgment on the Gingles preconditions.

Defendants' success on any of their arguments would be dispositive. The Court

then turns to Plaintiffs' Motion for Summary Judgment.

## A.    **Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on Plaintiffs' claim.

Doc. No. [175-1]. Defendants first argue that  Plaintiffs do not have standing to

assert their claims against the members of the SEB because the alleged injury is

not traceable to or redressable by the SEB. Id. at 12–14. Defendants then move for

summary judgment on the merits of Plaintiffs' Section 2 claim arguing that

Plaintiffs failed to adduce facts that support the three Gingles preconditions.

14

Id. at 14–30. Finally, Defendants contend that there is no Section 2 violation because Georgia's Black-Democrat congressional delegation is proportional to Georgia's APBVAP. Id. at 30–35.

### 1.    *Plaintiffs' Standing Against SEB Defendants*

Defendants first argue that Plaintiffs failed to adequately assert Article III standing against the SEB. Doc. No. [175-1], 12–14. The Court disagrees. "Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits federal courts to hearing actual "Cases" and "Controversies." U.S. Const. art. III, § 2; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60 (1992). Overall, Article III's standing requirement seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).

"Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing." Fair Fight Action, Inc., et al. v. Brad Raffensperger, et al., 1:18-cv-5391-SCJ,

15

Doc. No. [612], 7 (N.D. Ga. Feb. 16, 2021) (citing <u>Focus on the Fam. v. Pinellas</u> <u>Suncoast Transit Auth.</u>, 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities)); <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005); <u>Johnson v. Bd. of Regents of Univ. of Ga.</u>, 263 F.3d 1234, 1267 (11th Cir. 2001)). While standing is generally determined when the plaintiff's complaint is filed, "it must persist throughout a lawsuit." <u>Ga. Ass'n of Latino</u> <u>Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections</u>, 36 F.4th 1100, 1113 (11th Cir. 2022).

To establish standing, a plaintiff must show three things:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Lujan</u>, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted). "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest

16

on . . . mere allegations, but must set forth by affidavit or other evidence specific

facts." Clapper, 568 U.S. at 411–12 (internal quotations and citations omitted);

see also Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 777 F.2d

598, 607 n.24 (11th Cir. 1985) (noting that standing "is a legal determination based

on the facts established by the record.").

Defendants argue that Plaintiffs' injuries are not traceable to nor

redressable by the SEB. Doc. No. [175-1], 12–14. Defendants do not meaningfully

contest that Plaintiffs have alleged an injury-in-fact,[12] or that Plaintiffs have

adequately alleged standing over Defendant  Secretary of State Raffensperger.[13]

---

[12] "To demonstrate an injury-in-fact for purposes of a vote dilution claim, Plaintiffs must show that they (1) reside and are registered voters in districts where alleged dilution occurred, and (2) are members of a protected class whose voting strength was diluted." Rose v. Raffensperger, 511 F. Supp. 3d 1340, 1352 (N.D. Ga. 2021) (citing Broward Citizens for Fair Dists. v. Broward Cnty., No. 12-60317-CIV, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012) (collecting cases)); cf. United States v. Hays, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action[.]"). Because the named Plaintiffs reside in the congressional districts at issue (Doc. No. [120], ¶¶ 11–16), Plaintiffs have asserted sufficient injury-in-fact; see also Section III(B)(1) infra (resolving whether Plaintiffs have sufficiently stated a district-specific injury).

[13] Reapportionment litigation is redressable against the Secretary of State. "[T]he Georgia Secretary of State is a necessary party [in challenges to electoral maps] because []he is designated by state law as being responsible for administering state-wide

Accordingly, the Court will now determine whether Plaintiffs have adequately asserted (a) the traceability and (b) the redressability of their injuries to the SEB.

### a)  Traceability

"To establish causation [for standing,] a plaintiff need only demonstrate, as a matter *of fact*, a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Charles H. Wesley Educ. Found, 408 F.3d at 1352 (internal quotations omitted) (citing Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1003 (11th Cir. 2004)). An injury is traceable to an election official responsible for the election administration process or for a rule that allegedly caused the plaintiff's injury. Compare Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1116 (finding the traceability requirement met when a plaintiff made allegations that a state election official failed to provide bilingual voting materials and information, which caused the organizational plaintiff's diversion of resources) with Jacobson v. Fla. Sec.'y of State, 974 F.3d 1236, 1253 (11th Cir. 2020) (finding the alleged injury was not traceability to an election

_____

elections, and accordingly we cannot require that state-wide elections in Georgia be conducted using constitutional apportionment system in h[is] absence." Larios v. Perdue, 306 F. Supp. 2d 1190, 1199 (N.D. Ga. 2003).

18

official who was not responsible for the policy). Establishing traceability is sufficient to establish causation, but only for purposes of standing. See Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1116.

Defendants argue that Plaintiffs' alleged injuries are not traceable to the SEB because there is "no evidence . . . that any of the individually named SEB members designed or implemented the maps in any substantive way . . . ." Doc. No. [175-1], 14. The Court agrees with Defendants that there is no evidence in the Record that the SEB takes any direct action in the administrative implementation of Georgia's congressional maps. Doc. No. [202], 4 (arguing there is "no authority that the SEB builds ballots or that the SEB plays any role in the counties' implementation of the challenged congressional map."). Administrative implementation of the maps, however, was not Plaintiffs' requested relief. Plaintiffs instead seek to "[e]njoin Defendants, as well as their agents and successors in office, from *enforcing or giving any effect to the  boundaries of the congressional districts* as drawn in SB 2EX, including an injunction *barring Defendants from conducting any further congressional elections under the enacted map*." Doc. No. [120], 29 (emphasis added). Plaintiffs argue that "the SEB maintains broad powers and responsibilities . . . to ensure the fair and orderly

19

administration of elections." Doc. No. [189], 5. At this stage of the case, this requested relief is broad enough to be traceable to the SEB.

Under Georgia law, moreover, the SEB has a statutory duty to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Georgia law also tasks the SEB with "investigat[ing] or authoriz[ing] the Secretary of State to investigate, when necessary or advisable[,] the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney . . . ." Id. at § 21-2-31(5). Furthermore, the SEB is "vested with the power to issue orders, after the completion of appropriate proceedings, directing compliance with [election code] or prohibiting the actual or threatened commission of any conduct constituting a violation . . . . " O.C.G.A. § 21-2-33.1(a). The Enacted Plan provides that "[t]he provisions of this Act shall be effective for the primary and general elections of 2022 for the purpose of electing the representatives who are to take office in 2023. Successors to those representatives and future successors shall likewise be elected under the provisions of this Act." See SB 2EX § 2(f).

Additionally, Georgia law tasks the SEB with oversight authority over the counties. <u>See</u> O.C.G.A. § 21-2-31(1) ("It shall be the duty of the [SEB] . . . [t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections[.]"); <u>id.</u> at § 21-2-31(2) ("[t]o formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation . . . ."); <u>id.</u> at § 21-2-31(5) ("[t]o investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution."). The Court finds that these statutes give the SEB broad statutory authority to oversee the bodies that implement election law.

Georgia law assigns to the county board of registrars the "duty of determining and placing the elector in the proper congressional district[.]"

21

O.C.G.A. § 21-2-226(b). Thus, a lawsuit seeking to enjoin placing electors in specific congressional districts is fairly traceable to the SEB because the SEB has oversight powers over the entities that make such determinations.[14]

Defendants argue that violations of Section 2 are not traceable to the SEB because the SEB has only "a generalized duty that was insufficient in Jacobson . . . ." Doc. No. [175-1], 13. In Jacobson, the Eleventh Circuit held that the ballot order was not traceable to the Florida Secretary of State, even though she had the general duty to oversee elections, because the legislature expressly delegated sole authority over ballot creation to an independent body. 974 F.3d at 1242, 1253–54.

Unlike in Jacobson, the SEB does not have just a generalized duty to oversee elections. The SEB has the authority to investigate "irregularities in primaries and elections . . . ." O.C.G.A. § 21-2-31(5). It can hold hearings if it finds such irregularities. Id. at § 21-2-33.1(a). The SEB also has the power to issue orders

---

[14] The Court also finds that a mixed question of law and fact may exist on this issue. In Fair Fight v. Raffensperger, --- F. Supp. 3d ---, 2022 WL 4725887, at * 39 (N.D. Ga. Sept. 30, 2022), this Court cited to both the above-listed statutes and the testimony of Georgia's former director of elections as proof that the SEB has oversight authority over the counties. To the extent that this determination is a mixed question of law and fact, it is inappropriate to decide it at summary judgment.

22

and sanctions to ensure compliance with election laws, rules, and regulations. Id. In essence, the SEB is responsible for ensuring that both general and primary elections are run in accordance with state laws. Additionally, there is no statutory limitation to the SEB's oversight in districting matters. See generally O.C.G.A. §§ 21-2-31, 21-2-32.

Similarly, Defendants citation to Lewis v. Governor of Alabama, 944 F.3d 1287 (11th Cir. 2019) is inapposite. Doc. No. [175-1], 14. In Lewis, the plaintiffs created an extra-textual duty for the Alabama Attorney General and then sought to bring a challenge for violation of said duty. Id. at 1297–98. The Eleventh Circuit rejected this theory because the Attorney General "ha[d] no legal duty to inform anyone of anything under these circumstances . . . ." Id. at 1298. In the case *sub judice*, again, the statutes defining the SEB's power affirmatively create oversight duties over the implementation of election laws. The SEB exercises broad oversight authority over elections laws, which seemingly include both SB 2EX and O.C.G.A. § 21-2-226(b). Both laws, moreover, have the force and effect of implementing the Enacted Plan of which Plaintiffs complain. Accordingly, the Court is not persuaded by Defendants' reliance on Lewis and finds that that Plaintiffs' injuries are fairly traceable to the SEB and its members.

23

Plaintiffs challenge the implementation and use of an allegedly unlawful congressional map, over which the SEB has statutory oversight authority. The Court finds that the alleged injury is thereby fairly traceable to the SEB for purposes of standing.

### b) Redressability

An injury is redressable when "a decision in a plaintiff's favor would significantly increase the likelihood that she would obtain relief . . . ." Lewis, 944 F.3d at 1301 (cleaned up). That is true so long as the Court's judgment may remedy the plaintiff's injury, "whether directly or indirectly." Id. (quotation marks omitted); see also Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1116 (stating it must be "likely," not merely "speculative," that the alleged injury will be redressed by a favorable decision). Thus, if a state election official lacks the authority to redress the alleged injury, the Court cannot enter a judgment to remedy the plaintiff's injury, and the plaintiff lacks standing. See, e.g., Jacobson, 974 F.3d at 1269 (finding the plaintiffs lacked standing because the defendant election official did not control the complained-of ballot-listing injury, which meant she could not redress the alleged injury).

24

In this case, the Court finds Plaintiffs' alleged injury is redressable by the SEB. First, the Court must determine "whether a decision in [Plaintiffs'] favor would 'significant[ly] increase . . . the likelihood' that [they] 'would obtain relief that directly redresses the injury' that [they] claim[] to have suffered." <u>Lewis</u>, 944 F.3d at 1301 (quoting <u>Harrell v. Fla. Bar</u>, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). "Second, 'it must be *the effect of the court's judgment on the defendant*' — not an absent third party — 'that redresses the plaintiff's injury, whether directly or indirectly.'" <u>Id.</u> (citing <u>Digit. Recognition Network, Inc. v. Hutchinson</u>, 803 F.3d 952 (8th Cir. 2015)).

The implementation of the Enacted Plan is an action affecting both general and primary elections. Plaintiffs ask the Court to enjoin Defendants from enforcing or giving any effect to the boundaries in the Enacted Plan. Doc. No. [120], 29. The SEB has the authority to ensure compliance with the implementation of the Enacted Plan by passing rules or regulations regarding its implementation, conducting hearings and investigations on failures to implement, and issuing sanctions to ensure compliance with the law. <u>See</u> Section III(A)(1)(a) <u>supra</u>. Because the Court can enjoin the SEB from taking any of these

25

actions with respect to the Enacted Plan, the Court finds that the injuries are redressable by the SEB.

*    *    *    *    *

The Court finds that Plaintiffs adequately asserted Article III standing with respect to the SEB. Plaintiffs have alleged an injury based upon an allegedly unlawful congressional map, the injury is fairly traceable to the SEB under various Georgia statutes, and the Court can award a remedy that is redressable by the SEB. The Court acknowledges that Plaintiffs have not pointed to any factual evidence of the SEB's direct actions in implementing or passing SB 2EX. However, under the broad language of the aforementioned Georgia statutes and finding all inferences in the light most favorable to the non-moving party,[15] the SEB is not "entitled to judgment as a matter of law."[16] Fed. R. Civ. P. 56(a).

─────────────────

[15]  In reviewing a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-movant. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). Thus, in stating the facts, we afford Plaintiffs, the non-movants, all credibility choices and the benefit of all reasonable inferences the facts in the Record yield. Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010).

[16]  Assuming arguendo that Plaintiffs' case lacks standing against the SEB, this Action would proceed against the Secretary of State. Because the Secretary of State is

26

### 2. The *Gingles* Preconditions

Turning to Defendants' merits arguments, the Court concludes that Defendants have not shown they are entitled to summary judgment, as a matter of law, on the undisputed facts as it relates to the three <u>Gingles</u> preconditions.

Section 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one

---

responsible for administering the elections, the Court can "enjoin the holding of elections pursuant to the [Enacted Plans] (assuming, of course, that the plan [] in fact [violates Section 2]) and subsequently require elections to be conducted pursuant to a [legal] apportionment system . . . ." <u>Larios</u>, 306 F. Supp. 2d at 1199; <u>see also</u> note 13 <u>supra</u>.

circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b).

In order to prevail on a Section 2 VRA claim, Plaintiffs must satisfy three "preconditions." Gingles, 478 U.S. at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district . . . ." Wisc. Legis. v. Wisc. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (*per curiam*) (citing Gingles, 478 U.S. at 46–51). "A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Allen, 143 S. Ct. at 1503 (citing Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 272 (2015)).[17] "Second, the minority group must be able to show that

---

[17] In supplemental briefing, Defendants "agree with how Justice Alito proposes to address [racial predominance]." Doc. No. [214], 9. That is, Defendants argue that a "plaintiff 'must show at the outset that such a[n additional majority-minority] district can be created without making race the predominant factor in its creation.'" Id. (alteration in original) (quoting Allen, 143 S. Ct. at 1551 (Alito, J., dissenting)). To the extent that Defendants argue that Plaintiffs must show, as part of the first Gingles precondition that race did not predominate the drawing of the illustrative maps, the Court agrees. The Court, however, declines to adopt the test in Justice Alito's dissent *in toto*.

it is politically cohesive." <u>Gingles</u>, 478 U.S. at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." <u>Id.</u>

Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. <u>Id.</u> at 45–46; <u>see also</u> <u>id.</u> at 36–38 (identifying several factors relevant to the totality of circumstances inquiry).

### a)      The First *Gingles* Precondition

Under the first <u>Gingles</u> precondition, the "minority group must be sufficiently large and [geographically] compact to constitute a reasonably configured district . . . ." <u>Wisc. Legis.</u>, 142 S. Ct. at 1248. "A district will be reasonably configured, . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." <u>Allen</u>, 143 S. Ct. at 1503 (citing <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 272). To determine whether Plaintiffs have met the numerosity and compactness requirements, the Court must evaluate the specific challenged district and not the state as a whole. <u>Cf.</u> <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 268 ("[T]he District Court's analysis of racial gerrymandering

[under the Equal Protection Clause] of the State 'as a whole' was legally erroneous.").[18]

Defendants make a number of arguments pertaining to the first Gingles precondition. The Court addresses these arguments as follows: (1) whether Mr. Cooper allowed race to predominate his drawing of the Illustrative Plan, (2) if the Illustrative Plan is sufficiently compact, and (3) if the Illustrative Plan could operate as a remedial plan.

### (1)    *Racial predominance*

First, the Court rejects Defendants' argument that Plaintiff's expert, Mr. Cooper's use of racial shading alone is fatal to Plaintiffs' claim. Defendants argue that because the legislature could not have used racial shading when it drew the Enacted Plan, Plaintiffs' expert likewise is precluded from using racial shading when drawing his Illustrative Plan. Doc. No. [175-1], 15. Defendants also suggest that race *per se* predominates if an expert uses racial shading. See Doc. No. [214], 7 ("If the legislature had used racial shading, did not use

---

[18]  Although Ala. Legis. Black Caucus, concerned constitutional redistricting challenges, the Supreme Court applied its analysis to a Section 2 challenge in Allen, 143 S. Ct. at 1503, 1519.

political data, and drew without reviewing any public comments, it would be accused of racial gerrymandering . . . .").[19]

Precedent establishes that the Court evaluates whether race impermissibly *predominated* the drawing of the Illustrative Plan, or whether his Illustrative Plan is simply race conscious. "The contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law. The line that we have long drawn is between consciousness and predominance." Allen, 143 S. Ct. at 1512 (plurality opinion). Defendants' argument, however, conflicts with this existing precedent. See also Davis v. Chiles, 139 F.3d 1414, 1425–26 (11th Cir. 1998) (finding clear

---

[19] Whether Defendants are accused of racial gerrymandering or if the Enacted Plan is, in fact, gerrymandered, constitute two different inquiries. The Supreme Court acknowledged that a State's awareness of race when it draws its districts is not *per se* racial gerrymandering:

> [W]e have assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed . . . complying with the VRA is a compelling state interest, and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny . . . .

Abbott, 138 S. Ct. at 2315 (citations omitted). "[T]he legislature always is *aware* of race when it draws district lines . . . . That sort of race consciousness does not lead inevitably to impermissible race discrimination." Shaw v. Reno, 509 U.S. 630, 646 (1993). Thus, because the State is not prohibited from reviewing race when it draws its congressional maps, neither is Plaintiffs' expert in drawing the Illustrative Plans for the first Gingles precondition.

31

error with the district court's finding of racial predominance based on an expert's testimony that he was asked to draw additional majority-minority districts in an area with a high concentration of Black citizens).

The Court finds material disputes of fact exist over whether race predominated the drawing of Illustrative CD-6. Mr. Cooper stated that at times he used racial shading or dots to determine whether the Black population existed in the western Atlanta metropolitan area. Doc. No. [167], ("Cooper Dep. Tr.") Tr. 24:24–25:1 ("I think I mention in my last testimony that I used sometimes little dots showing where the minority population is concentrated. So I was aware of that."). Mr. Cooper also testified that this awareness *did not predominate* the drawing the illustrative plan.

> Q:    When you were drawing both the illustrative plan for the preliminary injunction hearing and the illustrative plan in your 12/5 report, it would be fair to say your goal was to add a majority black congressional district above the number drawn by the General Assembly; is that right?
>
> A:    No, that was not my goal. My goal was to determine whether it was possible while, at the same time, to include traditional redistricting principles . . . .
>
> Q:    Do you know what principles the Georgia Legislature used for the drawing of its congressional plans?

32

A:      Well, I've seen a – there's a document   that's posted on the General Assembly's website that  identifies the factors to take into consideration.  I  submit for both House, Senate, and congressional plans.

Q:      Did  you  rely  on  that  document  about  the principles  for  drawing  plans  when  creating  your illustrative plans in this case?

A:      Yes. That document is pretty straightforward and typical guidelines that any state would issue . . . .

A:      Well, I mean, if the goal is to  draw the maximum number  possible,  then  it  would   certainly  be  high priority.  *When I draw plans, I'm  always trying to balance traditional redistricting  principles.*  So I would never have that as a goal  unless it was just some sort of hypothetical example to  show what could be drawn, perhaps even showing that well, it could be drawn, but it would violate traditional redistricting principles.

Q: So it's fair to say when you're drawing a map, you're taking into account a variety of different considerations at any given point; right?

A: Absolutely. Yes.

Id. at 14:3–11; 15:6–16; 19:5–18 (emphasis added).

In summary, Mr. Cooper testified that he was aware of race, but that race did not predominate when he drew the Illustrative Plan. He asserted moreover that he considered a variety of factors, including those used by the Georgia

33

legislature when drawing the Illustrative Plan. Thus, Mr. Cooper's awareness of race in conjunction with his evaluation of traditional redistricting principles is consistent with Eleventh Circuit precedent.[20] As Plaintiffs argue (Doc. No. [212], 12–13), the Eleventh Circuit has held:

> [P]recedent[] *require[s]* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate. To penalize [a plaintiff] for attempting to make the very showing . . . would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action.

Davis, 139 F.3d at 1425.

Moreover, Mr. Cooper's racial awareness is distinguishable from Miller v. Johnson, 515 U.S. 900, 919 (1995). In Miller, one of the DOJ line attorneys testified at trial that he took "[a] map of the State of Georgia shaded for race, shaded by minority concentration, and overla[id] the districts that were drawn

---

[20]  Plaintiffs furthermore contend that the Supreme Court affirmed Mr. Cooper's illustrative plans in Allen, and, in this case, Mr. Cooper "considered race to the same extent that he did in developing the [Allen] illustrative plans . . . .". Doc. No. [212], 10. Any assessment of Mr. Cooper's consideration of race in this Illustrative Plan, however, requires weighing and evaluating facts in a manner inappropriate for summary judgment.

by the State of Georgia and see how well those lines adequately reflected black voting strength." Id. at 925 (cleaned up) (citing Johnson v. Miller, 864 F. Supp. 1354, 1362 n.4 (S.D. Ga. 1994)). The Georgia legislature then used that metric to draw its congressional plan. Id. at 924–25. The Supreme Court analyzed these congressional districts and determined there was "powerful evidence" that "every [objective districting] factor that could realistically be subordinated to racial tinkering in fact suffered that fate." Id. at 919 (alteration in original) (quoting Johnson, 864 F. Supp. at 1384).

Having the benefit of a fully developed trial record, factual findings, and credibility determinations, the Supreme Court found that race predominated the drawing of the district in Miller. At this stage of the case, however, Record evidence indicates that Mr. Cooper was aware of racial demographics at times, but also that he considered traditional redistricting principles and did not let race predominate when he draw the Illustrative Plan. Cooper Dep. Tr. 14:3–11; 15:6–16; 19:5–18. Because the awareness of racial demographics and the use of racial shading is not *per se* impermissible, any determination that race predominated the drawing of Illustrative CD-6 turns on Mr. Cooper's credibility.

35

On summary judgment, such credibility determinations are inappropriate, and thereby the Court denies Defendants' Motion.

### (2)   *Compactness factors*

Second, Defendants have not shown they are entitled to summary judgment on the compactness inquiry because there is Record evidence from which a factfinder could conclude that the minority population in Illustrative CD-6 is compact. "Under § 2 . . . the compactness inquiry . . . refers to the compactness of the minority population, not . . . the compactness of the contested district." LULAC, 548 U.S. at 433 (citing Bush v. Vera, 517 U.S. 952, 997 (1996)). A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. Id. (citing Vera, 517 U.S. at 979).

Defendants argue that "Plaintiffs have presented no evidence of the geographic compactness of the Black community in the new configuration of District 6 aside from the fact that it was drawn . . . ." Doc. No. [175-1], 16. The Court disagrees. There is Record evidence that the APBVAP in Illustrative CD-6 is comparatively as compact as the Enacted Plan. The relevant factors for compactness under the first Gingles precondition include: population equality, contiguity, empirical compactness scores, the eyeball test for irregularities and

36

contiguity, respect for political subdivisions, and uniting communities of interest. See Reynolds v. Sims, 377 U.S. 533, 598 (1964) (population equality); LULAC, 548 U.S. at 433 (communities of interest); Vera, 517 U.S. at 959-60 (contiguity, eyeball test); Cooper v. Harris, 581 U.S. 285, 291, 312 (2017) (political subdivisions, partisan advantage, empirical compactness measures).

It is undisputed that the districts in the Illustrative Plan achieve population equality and are contiguous. Doc. No. [188], ¶¶ 48, 49. Additionally, it is undisputed that Illustrative CD-6 has better empirical compactness scores than Enacted CD-6.[21] Id. ¶¶ 54, 55; see also Doc. No. [157] ("Morgan Dep. Tr.") Tr. 57:15–19 ("Q: According to your report, Mr. Cooper's Illustrative District 6 is more compact on the Reock Scale than Enacted District 6? A: Yes."); id. 59:7–11

---

[21] Mr. Cooper utilized the Reock test and Polsby-Popper test to assess the numerical compactness of his districts. "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." Alpha Phi Alpha, 587 F. Supp. 3d at 1275 n.24. "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi \text{Area}/(\text{Perimeter}^2)$. The measure is always between 0 and 1, with 1 being the most compact." Id. at 1275 n.26.

Undisputedly, Illustrative CD-6 has a Reock score of 0.45 and a Polsby-Popper score of 0.27, compared to the Enacted CD-6, which has a Reock score of 0.44 and a Polsby-Popper score of 0.20. Doc. No. [188], ¶¶ 53–55.

("Q: According to your report, Mr. Cooper's Illustrative District 6 is also more compact on the Polsby-Popper Scale than the Enacted District 6; is that correct? A: Yes.").

Questions of fact that cannot be resolved on summary judgment, however, remain as to the eyeball test, respect for political subdivisions, and communities of interest. See Section III(B)(1) infra. Thus, the Court cannot award summary judgment on Illustrative CD-6's compactness.[22] See Allen, 143 S. Ct. at 1504 (crediting the lower court's factual findings that the "produced [illustrative] districts [were] roughly as compact as the existing plan[,] . . . contained equal populations, were contiguous, and respected existing political subdivisions . . . .").[23]

---

[22] Even for the factors that are undisputed—population equality, contiguousness, empirical compactness scores—the Court cannot determine whether race predominated the creation of Illustrative CD-6 without weighing facts that are in dispute or evaluating Mr. Cooper's credibility.

[23] Defendants also argue that the congressional map in the case *sub judice* differs from the redistricting plans in Allen. Doc. No. [214], 9. The Court acknowledges these differences. However, precedent makes clear that questions about redistricting under Section 2 are "'intensely local appraisals of the design and impact' of the contested electoral mechanisms." Gingles, 478 U.S. at 79 (quoting Rogers, 458 U.S. at 621–22). The fact that the maps in Allen differ from Plaintiffs 'maps alone does not warrant summary judgment.

### (a)   eyeball test

The eyeball test is commonly utilized to determine if a district is compact or not. See Allen, 143 S. Ct. at 1504 (crediting the district court's findings that the illustrative maps were compact because they did not contain "tentacles, appendages, bizarre shapes or any other obvious irregularities" (quoting Singleton v. Merrill, 582 F. Supp. 3d 924, 1011 (N.D. Ala. 2022))); see also Doc. No. [209] ("Hearing Tr.") Tr. 39:9–12 (Plaintiffs' contend that Defendants "do not even dispute that the eyeball test tells us that illustrative District 6 is compact."). Use of any "eyeball test" to assess irregularities, however, is necessarily a matter for the factfinder. See Ala. State Conf. of NAACP v. Alabama, 612 F. Supp. 3d 1232, 1266, (M.D. Ala. 2020); Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011). Thus, questions of fact remain that cannot be resolved on summary judgment.

### (b)   respect for political subdivisions

There are also material disputes of fact as to whether Mr. Cooper respected existing political subdivisions. Plaintiffs assert and Defendants dispute that "Mr. Cooper sought to minimize changes to the [Enacted Plan] while abiding by traditional redistricting principles . . . [*i.e.*,] respect for political subdivision

boundaries . . . ." Doc. No. [188], ¶ 44. It is undisputed, however, the Illustrative CD-6 splits Cobb County three ways. Id. ¶ 56. Mr. Cooper maintains that he split counties merely to comply with one-person, one-vote requirements. Id. ¶ 57. Thereby, to determine whether Mr. Cooper respected political subdivisions requires both credibility and factual determinations. This inquiry cannot be completed on summary judgment.

### (c)   communities of interest or combinations of disparate communities

Defendants also argue that Illustrative CD-6 combined disparate communities and thereby does not unite communities of interest. Doc. No. [175-1], 4, 15. Defendants dispute that Illustrative CD-6 united Atlanta-area urban, suburban, and exurban voters, because it also includes rural portions of Douglas County. Doc. No. [188], ¶ 63. Again, this dispute as to whether Illustrative CD-6 contains communities of interest or disparate communities must be determined by a factfinder and cannot be decided on summary judgment.

The case law is not clear about what constitutes a community of interest. In LULAC, the Supreme Court noted, "[w]hile no precise rule has emerged

40

governing § 2 compactness, the 'inquiry should take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries.'" <u>LULAC</u>, 548 U.S. at 433 (quoting <u>Abrams v. Johnson</u>, 521 U.S. 74, 92 (1992)). The Court went on to reason that "in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." <u>Id.</u> at 435 (citing <u>Abrams</u>, 521 U.S. at 111–12 (Breyer, J., dissenting)). However, race being the only uniting factor between Latino communities that are 300-miles apart, without more, is not a sufficient compactness finding under Section 2. <u>Id.</u> "The mathematical possibility of a racial bloc does not make a district compact."[24] <u>Id.</u>

Although a definitive test has not emerged, it is abundantly clear that the determinations about communities of interest are questions of fact. Most recently, in <u>Allen</u>, the Court credited the district court's factual finding that Alabama's Black Belt region could be a community of interest. <u>Allen</u>, 143 S. Ct. at 1505

---

[24] Factors that have been considered by Courts in the past include: socio-economic status, education, employment and health. <u>LULAC</u>, 548 U.S. at 433 (quoting the district court's decision). Other considerations may included shared media sources, public transportation infrastructure, schools, and places of worship. <u>Vera</u>, 514 U.S. at 964.

41

("The District Court understandably found [State witness's testimony about a community of interest] insufficient to sustain Alabama's 'overdrawn argument that there can be no legitimate reason to split' the Gulf Coast region." (citing Singleton, 582 F. Supp. 3d at 1015)). Similarly, the Court in LULAC emphasized that the district court needed and failed to make a factual finding about the compactness of the challenged district. LULAC, 548 U.S. at 433–35. Without the benefit of trial evidence or the ability to weigh the Record evidence, the Court clearly cannot heed the Supreme Court's guidance in making these necessary factual determinations.

### (3)    *Proposed Remedy*

Finally, Defendants argue that they are entitled to summary judgment because the Illustrative Plan cannot be ordered as a remedy. Doc. No. [175-1], 15. "In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, the plaintiff has not shown compliance with the first prong of Gingles." Id. Plaintiffs respond by arguing that Defendants have identified no meaningful deficiencies with Mr. Cooper's Illustrative Plan that would render it an impermissible remedy. Doc. No. [189], 14. In the reply

brief, Defendants do not clarify precisely which of their alleged faults as to the Illustrative Plan precludes it from being a viable remedy.

The Defendants' Statement of Material Facts (Doc. No. [176]), Plaintiffs' Response (Doc. No. [189], 14), and the assertions made at the Hearing suggest that their argument, at least in part, relates to the compactness of Illustrative Districts other than CD-6. See, e.g., Doc. Nos. [176], ¶ 53 ("Mr. Cooper agreed that his [Illustrative District] 13 connected urban (and heavily Black) parts of Clayton County with rural areas out to Jasper."); [189], 14 ("Defendants fault Mr. Cooper's purported inability to identify the common interest of Black voters in different parts of congressional districts *other* than the new majority-Black district."); Hearing Tr. 51:14–20 ("[Mr. Cooper's] District 10, also. Really, he couldn't explain the explanation for that beyond population equality. It starts in majority-Black Hancock County. There's a lot of discussion about the Black [B]elt in our preliminary injunction hearing. And Clarke County was part of that. It includes Clarke all the way up to Raburn and Towns Counties.").

The Court has already addressed Defendants' challenges related to racial predominance and lack of compactness. See Section III(A)(2)(a)(1) and (2) supra.

However, the Court will now directly address <u>Nipper</u>'s remedial requirements, specifically, as it relates to the compactness of non-remedial districts.

In <u>Nipper</u>, the Eleventh Circuit held that "the first threshold factor of <u>Gingles</u> [ ] require[s] that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice." <u>Nipper</u>, 39 F.3d at 1531 (plurality opinion). The Eleventh Circuit later clarified that "[t]his requirement simply serves 'to establish that the minority has the potential to elect a representative of its own choice from some single-member district.'" <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1199 (11th Cir. 1999) (quoting <u>Nipper</u>, 39 F.3d at 1530). Additionally, "[i]f a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury." <u>Id.</u>; <u>see also</u> <u>Brooks v. Miller</u>, 158 F.3d 1230, 1239 (11th Cir. 1998) (holding that "[i]f the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite").

Under <u>Nipper</u>, the question of remedy relies on whether the alternate scheme is a "workable remedy within the confines of the state's system of

44

government." <u>Nipper</u>, 39 F.3d at 1533. For example, in <u>Wright v. Sumter County Board of Elections and Registration</u>, 979 F.3d 1282, 1304 (11th Cir. 2020), the Eleventh Circuit found that the first <u>Gingles</u> precondition had been met because the special master's maps showed that at least three majority-Black districts could have been drawn in that area, meaning "that a meaningful remedy was available."

As the Court already addressed above, neither Supreme Court nor Eleventh Circuit precedent requires that Plaintiffs' Illustrative Plans be drawn race-blind or that the Illustrative Plans are race-neutral. <u>See</u> Section III(A)(1) <u>supra</u>. In fact, the Supreme Court recently rejected Alabama's argument to do just that. <u>Allen</u>, 143 S. Ct. at 1512 (plurality opinion), 1518. And the Eleventh Circuit has long held that the first <u>Gingles</u> precondition specifically requires that Plaintiffs take race into consideration. <u>Davis</u>, 139 F.3d at 1425–26. Also, the Court has already determined that there is Record evidence from which a factfinder could conclude that the minority population in Illustrative CD-6 is compact.

As to Defendants' argument that to be a viable remedy, Plaintiffs must prove that *all* districts in the Illustrative Plan are compact, this is not the law. <u>LULAC</u>, 548 U.S. at 430 ("To be sure, § 2 does not forbid the creation of a

45

noncompact majority-minority district." (citing <u>Vera</u>, 517 U.S. at 999 (Kennedy, J., concurring))). "Simply put, the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right." <u>Id.</u>; <u>see also</u> <u>id.</u> at 430–31 ("[S]ince, there is no § 2 right to a district that is not reasonably compact, the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district.") (citing <u>Abrams</u>, 521 U.S. at 91–92). The Court understands <u>LULAC</u> and <u>Vera</u> to mean that in order for there to be a Section 2 remedy, a plaintiff must show that it is possible to create a compact majority-minority district.[25] However, if an affected district is not remedial under Section 2, this compactness inquiry is not required.

Furthermore, the Eleventh Circuit's case law seems to suggest that so long as the legislature could implement the Illustrative Plan within the confines of State law and without undermining the administration of justice, then it has

---

[25] The Court is less persuaded by Plaintiffs' contention that <u>Allen</u> itself "confirms that an illustrative map can be 'reasonably configured' even if it splits communities of interest elsewhere in the state." Doc. No. [212], 4. While <u>Allen</u> certainly addresses communities of interest and split communities in the Black Belt and the Gulf Coast region, the Supreme Court did not engage with the argument being made by Defendants. <u>Allen</u>, 143 S. Ct. at 1504–05.

provided an available remedy. See Burton, 178 F.3d at 1199; Wright, 979 F.3d at 1304. Thus, Defendants' argument that Plaintiffs failed to provide an Illustrative Plan that could be implemented because non-remedial districts are not compact is unavailing. LULAC, 548 U.S. at 430; Bush, 517 U.S. at 999.[26]

As such, the Court rejects Defendants' argument that the Illustrative Plans do not satisfy Nipper's remedial requirement. Therefore, there is no basis for summary judgment on this contention.

*   *   *   *   *

In sum, the Court concludes that there are material disputes of fact as to whether race predominated when Mr. Cooper drew the Illustrative Plan and

_____

[26] Assuming *arguendo* that Nipper requires Plaintiffs to produce evidence that all districts in the Illustrative Plan are reasonably compact and comply with traditional redistricting principles, the Court too finds that material disputes of fact remain. As an example, Plaintiffs' dispute the contention that "[t]he only connection Mr. Cooper could identify to this similar configuration of enacted District 14 [and Illustrative CD-3] was that Heard and Troup counties were closer to Atlanta." Doc. No. [189-1], ¶ 52; Cooper Dep. Tr. 65:20–66:2. Mr. Cooper testified that he drew Illustrative CD-3 in part "to keep District 2 intact and not change it" (id. at 65: 9–12), "the lay of the land is closer" (id. at 66:2), and that the counties are "a part of Metro Atlanta" (id. at 66:3–11). The Court finds that there is evidence that Mr. Cooper evaluated traditional redistricting principles other than race when drawing these illustrative districts. Id. at 14:3–11; 15:6–16; 19:5–18. A determination of whether these considerations show that race predominated the drawing of Mr. Cooper's Illustrative Plan, as a whole, is a question of credibility, which is inappropriate on a motion for summary judgment.

47

whether he respected traditional redistricting principles. The Court cannot decide these disputes as to the first <u>Gingles</u> precondition on summary judgment.

### b) <u>Second and Third *Gingles* Preconditions</u>

Likewise, the Court denies Defendants' Motion for Summary Judgment as to second and third <u>Gingles</u> preconditions. The second <u>Gingles</u> precondition requires Plaintiffs to show that "the minority group . . . is politically cohesive" and the third precondition requires Plaintiffs to show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51.

#### (1)   *Required showing for second and third Gingles preconditions*

As the Court ruled in its Preliminary Injunction Order, the second and third <u>Gingles</u> preconditions require only that Plaintiffs show that minority-voter political cohesion and racial bloc voting exists, not the reason for its existence. <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1303 ("The Court concludes as a matter of law that, to satisfy the second <u>Gingles</u> precondition, Plaintiffs need not prove the causes of racial polarization, just its existence."); <u>id.</u> at 1312 ("[T]he third

precondition involves the same evaluation as to the voting preferences of the majority groups as the second precondition does for the minority group . . . .").

Defendants still advance purely legal arguments that Plaintiffs must prove that race, not partisanship, explains racial bloc voting and minority voter political cohesion under the second and third Gingles preconditions. Doc. No. [175-1], 17–27. First, Defendants argue that precedent requires the Court to determine whether race is the cause of the vote dilution. Doc. No. [175-1], 20–25. Second, Defendants argue that failing to show that race and partisanship caused racial bloc voting makes Section 2 not congruent and proportional to the Fifteenth Amendment (i.e., the constitutional authority supporting Section 2). Id. at 25–27. Third, Defendants argue that Plaintiffs must show the racial group's voting patterns change in relation to the race of the candidate. Hearing Tr. 87:25–88:7; Doc. No. [214], 10–14, 17–18. Finally, Defendants argue that the holdings in Mobile v. Bolden, 446 U.S. 55 (1980) and Whitcomb v. Chavis, 403 U.S. 124 (1971) require the Court to evaluate the causes of the racial polarization at the preconditions phase of the trial. Doc. No. [214], 10–17.

**(a)**   <u>**race-based voting**</u>

As for the first argument—that "the Court should require proof of racial bloc voting as part of the third <u>Gingles</u> factor" (Doc. No. [175-1], 25)— Defendants argue that the Court should decide this at the <u>Gingles</u> preconditions phase, rather than at the totality of the circumstances (*i.e.*, Senate Factors) phase, because "the analysis is ultimately the same." <u>Id.</u> As was the case in the preliminary injunction order, the Court disagrees. Precedent establishes that evaluating the reasons behind racial bloc voting and minority political cohesion are inappropriate at the <u>Gingles</u> preconditions phase.

The <u>Gingles</u> plurality concluded "the reasons [B]lack and white voters vote differently have no relevance to the central inquiry of § 2. By contrast, the correlation between race of voter and the selection of certain candidates is crucial to that inquiry." <u>Gingles</u>, 478 U.S. at 63. Only three other Justices joined this portion of Justice Brennan's opinion. However, four other Justices likewise found that the reasons for minority political cohesion and racial bloc voting are not relevant in establishing the <u>Gingles</u> preconditions. Justice O'Connor wrote:

> Insofar as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut

50

> this showing by offering evidence that the divergent
> racial voting patterns may be explained in part by causes
> other than race, such as an underlying divergence in the
> interests of minority and white voters.

Gingles, 478 U.S. at 100 (O'Connor, J., concurring). Justice White is thereby the

only Justice to suggest that Court should consider the race of the candidates in

addition to the race of the voter at the precondition phase to show the causes of

the polarization. Id. at 83 (White, J., concurring).

Although only a plurality of the Justices signed onto Justice Brennan's

analysis regarding proof of racial bloc voting and minority cohesion, all but one

Justice agreed that the reasons that Black voters and white voters vote differently

is irrelevant to proving the existence of the second and third Gingles

preconditions. Thus, the second and third Gingles preconditions can be

established by the mere existence of minority group political cohesion and

majority voter racial bloc voting. See Chisom v. Roemer, 501 U.S. 380, 404 (1991)

("Congress made clear that a violation of § 2 could be established by proof of

discriminatory results alone.").

While Justice Brennan's language regarding the "effects test" is a part of

the plurality, the Supreme Court has since made clear that under Section 2,

Plaintiffs need only prove the existence of racially polarized voting and minority

voter political cohesion at the <u>Gingles</u> preconditions phase. Most recently, the Supreme Court confirmed that the Section 2 analysis is an effects test. "[F]or the last four decades, this Court and the lower federal courts have repeatedly *applied the effects test* of § 2 as interpreted in <u>Gingles</u> and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." <u>Allen</u>, 143 S. Ct. at 1516–17 (emphasis added).

Eleventh Circuit precedent also supports that Plaintiffs are not required to prove that race caused racial bloc voting or minority voter cohesion to satisfy the second and third <u>Gingles</u> preconditions. Judge Tjoflat's plurality opinion in <u>Nipper</u> explained:

> Proof of the second and third <u>Gingles</u> factors—demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process.

39 F.3d at 1254. <u>Nipper</u> thus did not require the plaintiffs to prove that race was the cause of the second and third <u>Gingles</u> preconditions, or disprove that other reasons could account for the polarization. Rather, Judge Tjoflat went on to opine that "[t]he defendant may rebut the plaintiff's evidence by demonstrating the

52

absence of racial bias in the voting community; for example, by showing that the community's voting patterns can be best explained by other, non-racial circumstances." Id.

Following Nipper, the Eleventh Circuit clarified the appropriate test for finding a Section 2 violation:

> [The plaintiff] must, at a minimum, establish the three now-familiar Gingles factors . . . . Proof of these three factors does not end the inquiry, however . . . . This is because it is entirely possible that bloc voting (as defined by Gingles[]) could exist, but that such bloc voting would not result in a diminution of minority opportunity to participate in the political process and elect representatives of the minority group's choice . . . . To aid courts in investigating a plaintiff's section 2 claims, the Gingles court identified other factors that may, in the "totality of the circumstances," support a claim of racial vote dilution.

Solomon v. Liberty Cnty. Comm'rs, 221 F.3d 1218, 1225 (11th Cir. 2000). Thus, it is firmly rooted in both Supreme Court and Eleventh Circuit precedent that Plaintiffs do not have to prove the causes of polarized voting at the preconditions phase of a Section 2 claim.[27]

---

[27] Defendants also argue that Greater Birmingham Ministries v. Sec'y of State, 992 F.3d

In summary, eight Supreme Court Justice who decided <u>Gingles</u> previously agreed that the second and third <u>Gingles</u> preconditions do not require Plaintiffs to prove that race is the cause of the minority groups political cohesion or majority racial bloc voting. In <u>Allen</u>, the Supreme Court reaffirmed that Section 2 is an effects test. <u>Allen</u>, 143 S. Ct. at 1516–17. Following <u>Gingles</u>, the Eleventh Circuit in both <u>Nipper</u> and <u>Solomon</u> confirmed that the potential reasons for vote polarization is relevant only to the totality of the circumstances phase, not the <u>Gingles</u> preconditions. [28] The Court will likewise consider

---

1299 (11th Cir. 2021), created a causation requirement as a part of the second and third <u>Gingles</u> preconditions. Doc. No. [175-1], 20–21. The portion of <u>Greater Birmingham Ministries</u> discussing causation, however, is in the Court's analysis of the totality of the circumstances and burden of proof, not in reference to the <u>Gingles</u> preconditions. 992 F.3d at 1329–30; <u>see id.</u> (determining plaintiffs "ma[d]e no mention of the three 'necessary preconditions' and they ma[d]e no attempt to articulate he existence of . . . 'minority cohesion or bloc voting, and majority bloc voting.'") (quoting <u>De Grandy</u>, 512 U.S. at 1011). Accordingly, the Court finds that <u>Greater Birmingham Ministries</u> is not instructive of Plaintiffs' burden for establishing the <u>Gingles</u> preconditions.

[28] The Court further rejects Defendants' citations to various non-binding cases in an attempt to distinguish the aforementioned binding authority. Defendants first cite <u>Vecinos De Barrio Uno v. City of Holyoke</u>, 72 F.3d 973, 983 (1st Cir. 1995). Doc. No. [175-1], 24. In <u>Uno</u>, however, the First Circuit, likewise, did not require plaintiffs to disprove partisanship as a part of the <u>Gingles</u> preconditions. It held that "the second and third preconditions are designed to assay whether racial cleavages in voting patterns exist and, if so, whether those cleavages are deep enough to defeat

Defendants' evidence of a non-racial motivation at the totality of the circumstances phase.

To be clear, even in the totality of circumstances inquiry, Defendants' partisanship argument may be relevant as to whether the political process is equally open to minority voters, but it is not dispositive. At no point do Plaintiffs have the *burden* of proving the causes behind a lack of equal opportunity for minority voters to participate in the political process. Allen, 143 S. Ct. at 1507

———————————

minority-preferred candidates time and again." 72 F.3d at 983. Once these preconditions are proven, they "give rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." Id.

Defendants also cite to a non-binding Fifth Circuit case, League of United Latin American Citizens v. Clements, 999 F.2d 831, 855 (5th Cir. 1993). Doc. No. [175-1], 24. In Clements, the Fifth Circuit took an opposite approach, finding it "difficult to see how the record in this case could possibly support a finding of liability" when "Plaintiffs [had] not even attempted to establish proof of racial bloc voting by demonstrating that race, not . . . partisan affiliation, is the predominate determinant of political preference." Clements, 999 F.2d at 855 (quotations omitted). For its part, the Fourth Circuit has rejected the Fifth Circuit's approach. United States v. Charleston Cnty., 365 F.3d 341, 347–48 (4th Cir. 2004) ("[T]he approach most faithful to the Supreme Court's case law 'is one that treats causation as irrelevant in the inquiry into the three Gingles preconditions, but relevant in the totality of circumstances inquiry.'" (quoting Lewis v. Alamance Cnty., 99 F.3d 600, 615–16 n.12 (4th Cir. 1996))).

Given the Court's interpretation of the Supreme Court's statements on the matter and the Eleventh Circuit's binding precedent, the Court agrees with the First and Fourth Circuits. Thus, the Court reserves its consideration of whether partisanship or race is the driving force behind the differences in racial voting patterns for the totality of the circumstances inquiry, not as part of the Gingles preconditions.

("[W]e have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent."); see also id. ("[T]he Gingles test helps determine whether th[e] possibility . . . that the State's map has a disparate effect on account of race . . . is reality by looking to the polarized voting preference and frequency of racially discriminatory actions taken by the State, past and present.").

### (b)   congruence and proportionality: Fifteenth Amendment

Second, Defendants argue that "[i]f Section 2 were interpreted in a way that [P]laintiffs can establish racial bloc voting merely by showing that minorities and majorities vote differently, it would not fit within th[e] constitutional bounds . . . of the Fifteenth Amendment . . . ."[29] Doc. No. [175-1], 26–27. Section 2 of the VRA provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color

---

[29] "The right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

56

52 U.S.C. § 10301(a).

"[U]nder the analysis set forth by the statutory text and embraced by the Supreme Court in <u>Chisom</u> and [the Eleventh Circuit] in <u>Johnson</u>, [courts] must consider whether the challenged law results in a denial or abridgment of the right to vote on account of race or color." <u>Greater Birmingham Ministries</u>, 992 F.3d at 1329 (citing <u>Chisom</u>, 501 U.S. at. 403–04; <u>Johnson v. Governor of Fla.</u>, 405 F.3d 1214, 1227 (11th Cir. 2005)). The Court's "analysis [on the denial or abridgment of the right to vote] turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." <u>Id.</u>

For this inquiry, the Court must "ask whether the totality of facts . . . showed that the new scheme would deny minority voters equal political opportunity." <u>De Grandy</u>, 512 U.S. at 1013–14. And, according to the Eleventh Circuit, "[t]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account

of some other racially neutral cause." Solomon, 221 F.3d at 1225 (quoting Nipper,

39 F.3d at 1515 (plurality opinion)).

Thus, the Court reiterates that whether racial bloc voting is on account of

race or on account of other, race-neutral reasons—*i.e.*, partisanship—is relevant

only at the totality of the circumstances phase of the Section 2 analysis. To be

successful in their Section 2 case, Plaintiffs bear the ultimate burden of proving

that they satisfied the three Gingles preconditions *and* that, under the totality of

circumstances, the Enacted Plan has the effect of abridging minority-voters' right

to an equal vote on account of a race. Plaintiffs' burden on the Senate Factors

thereby keeps the Gingles test congruent and proportional to the Fifteenth

Amendment because the Court still must determine whether the challenged

districts resulted in the abridgment of minority voter's equal opportunity to

participate in the electoral process.

### (c)     race of the candidate

Third, at the hearing on the Motion for Summary Judgment and in their

supplemental brief, Defendants advanced the argument that, as part of the

second and third Gingles preconditions, Plaintiffs must show that the race of the

candidate changed voters' behavior. Hearing Tr. 87:25–88:7 ("I think that the

inference [of] . . . <u>Gingles</u> 2 and 3 . . . only arises once you've met the burden, once you've come forward with the evidence. And the submission we're looking at here is, we have no evidence that voter behavior changes in the slightest based on the race of the candidates."); <u>see also</u> Doc. No. [214], 17–18.

The Court finds that an inquiry into voter preferences as it relates to the race of the candidate is not necessary to prove the second and third <u>Gingles</u> preconditions. In fact, the Supreme Court in <u>De Grandy</u> expressly disclaimed Defendants' proposed test:

> The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumption reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens.

512 U.S. at 1027 (citation omitted). And, again in <u>LULAC</u>, the Supreme Court affirmed a finding that Texas's Congressional District 23 violated Section 2, even though Texas intentionally created a district that would elect a Latino representative:

> To begin the <u>Gingles</u> analysis, it is evident that the second and third <u>Gingles</u> preconditions—cohesion among the minority group and bloc voting among the majority population—are present in District 23. The

59

> District Court found "racially polarized voting" in south and west Texas, and indeed "throughout the State." The polarization in District 23 was especially severe: 92% of Latinos voted against Bonilla in 2002, while 88% of non-Latinos voted for him. Furthermore, the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district. For all these reasons, appellants demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third <u>Gingles</u> requirements.

548 U.S. at 428 (plurality opinion) (citations omitted) (quoting <u>Session v. Perry</u>, 298 F. Supp. 2d. 451, 492–93, 496–97 (E.D. Tex. 2004)).[30] In <u>LULAC</u>, the plurality found that it was "evident" the plaintiffs successfully proved the second and third <u>Gingles</u> preconditions because 92% of Latinx voters voted against Bonilla, even though Congressman Bonilla is Latino. <u>Id</u>. at 427. If plaintiffs were required to prove that white voters did not vote for Latinx candidates and that Latinx voters voted for Latinx candidates, then, necessarily, the second and third <u>Gingles</u> preconditions would not have been "evidently" met in <u>LULAC</u>. Indeed,

---

[30] The Court notes that only two Justices—Justice Kennedy and Justice Breyer—joined this portion of the <u>LULAC</u> opinion. However, none of the concurrences or dissents discuss the second or third <u>Gingles</u> preconditions. <u>See generally</u> <u>LULAC</u>, 548 U.S. at 447–520.

the plaintiffs in LULAC would not have been able to prove the second and third Gingles preconditions in that geographic area.

The Eleventh Circuit has concluded that it is not a clear error to give greater weight to elections involving Black candidates, but cautioned "[w]e do not mean to imply that district courts *should* give elections involving [B]lack candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error." Johnson v. Hamrick, 196 F.3d 1216, 1221–22 (11th Cir. 1999) (emphasis in original). In fact, the Eleventh Circuit went on to clarify "that this Court 'will not automatically assume that the [B]lack community can only be satisfied by [B]lack candidates.'" Id. at 1222 n.6 (quoting Askew v. City of Rome, 127 F.3d 1355, 1378 (11th Cir. 1997)).

In sum, the Supreme Court has noted that an assumption that voter preference of minorities hinge on the race of the candidate is "false as an empirical matter." De Grandy, 512 U.S. at 1027. The Eleventh Circuit also cautions courts against assuming that the Black community will be satisfied with any Black candidate. Thus, the Court rejects Defendants candidate-based argument as a matter of law.

61

> **(d)** **precedential arguments following**
> **_Allen_**

Finally, in supplemental briefing, Defendants argue that <u>Allen</u>'s majority treatment of <u>Bolden</u> requires that the Court determine the causes of racial polarization. Doc. No. [214], 12–19. Defendants begin their argument by stating "[t]he majority opinion does not provide much direct guidance for lower courts on a plaintiff's evidentiary burden in satisfying the third <u>Gingles</u> precondition, because that precondition was not squarely at issue in <u>Allen</u>." <u>Id.</u> at 10. Defendants furthermore state that "Supreme Court did not offer any additional clarity on [the third <u>Gingles</u> precondition] because there was 'no reason to disturb the District Court's careful factual findings, which are subject to clear error review _and have gone unchallenged by Alabama in any event_." <u>Id.</u> at 15 (quoting <u>Allen</u>, 143 S. Ct. at 1505). Despite these caveats, Defendants also argue that the majority opinion reaffirmed the causation test from <u>Bolden</u>.

The basis of Defendants' argument is the majority opinion's historical background discussion of the 115 years between the passage of the Fifteenth Amendment and the 1982 amendments to the VRA, and specifically its

reference to the Bolden decision. Allen, 143 S. Ct. at 1498–1501. The majority's treatment of Bolden contains only a summation of the holding, the resulting backlash, the congressional debates, and the ultimate passage of the 1982 amendments to the VRA. Id. At no other point in the majority opinion, does Chief Justice Roberts discuss the viability of any precedent that came out of Bolden. In fact, the Gingles plurality expressly rejected the test that Defendants propose:

> Finally, we reject the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' *racial hostility* toward [B]lack candidates. To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of Mobile v. Bolden . . . and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim.

Gingles, 478 U.S. at 70–71 (citation omitted).

The Court declines to read the majority opinion's citation to Bolden as a reversion to the pre-Gingles frameworks. [31] The Court understands that

---

[31] Defendants also argue that Allen restores the precedent from Whitcomb. Doc. No. [214], 14–17. As an initial note, neither the Allen majority opinion, nor any of the concurrences or dissents, make any citation to or mention of Whitcomb. Moreover, the

Defendants disagree with the Court's reading of the effects test outlined by the plurality in <u>Gingles</u>; however, as the case law stands today and as noted in detail above, the Court finds that Plaintiffs do not have to prove that race is the cause of majority-bloc voting. As the Defendants noted, <u>Allen</u> did not disturb the case law regarding the third <u>Gingles</u> precondition. Rather, at the preconditions phase Plaintiffs need to prove the existence of majority-bloc voting, and then at the totality of the circumstances phase the Court may evaluate its causes.

*    *    *    *    *

---

sentence cited by Defendants— "[t]he third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote at least plausibly on account of race'" (Doc. No. [214], 14 (first alteration in original) (second alteration omitted) (citing <u>Allen</u>, 143 S. Ct. at 1503))—does not create a causation requirement. The majority opinion defines, "on account of race or color" to mean "'with respect to' race or color," and therefore it does "not connote any required purpose of racial discrimination." <u>Allen</u>, 143 S. Ct. at 1507.

Moreover, "[a] district is not equally open . . . when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." <u>Id</u>. The Court understands this statement to mean that (1) at the preconditions phase, Plaintiffs must prove the existence of racial bloc voting and (2) at the totality of the circumstances phase, Plaintiffs must show both past and present racial discrimination in Georgia that results in the voting process not being equally open to minority voters. To be clear, in the Court's view, nothing in the Supreme Court's <u>Allen</u> decision supports Defendants' suggestion of the revitalization of <u>Whitcomb</u> or <u>Bolden</u>.

64

In summary, the Court finds that as a matter of law, to satisfy the second and third <u>Gingles</u> preconditions, Plaintiffs must show (1) the existence of minority voter political cohesion and (2) that the majority votes as a bloc, usually to defeat the minority voter's candidate of choice. As a part of these preconditions, Plaintiffs do not have to prove that race is the sole or predominant cause of the voting difference between the minority and majority voting blocs, nor must Plaintiffs disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting. The Court rejects Defendants arguments to the contrary.

### (2)    *Record evidence of racial bloc voting*

Turning to the Record evidence, the Court finds that there is sufficient evidence of both minority voter political cohesion and majority racial bloc voting to create a question of fact and defeat Defendants' Motion for Summary Judgment.

Defendants first argue that Plaintiffs' expert, Dr. Palmer, only evaluated general elections for voting blocs, which is insufficient to establish that race is the reason that Black voters vote differently from the white majority. Doc. No. [175-1], 28. Defendants summarize the expert conclusions by stating

"Dr. Palmer's data still only demonstrates two things: [t]he race of the candidate *does not* change voting behavior of Georgia voters; and the party of the candidate *does*." Doc. No. [175-1], 29; see also id. ("Plaintiffs' purported evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters supports one party and a minority of voters support another party."). In short, according to Defendants, "all the Court has before it is evidence establishing that party, rather than race, explains the 'diverge[nt]' voting patterns at issue . . . Plaintiffs' failure to offer any other evidence ends this case." Id. at 30 (alteration in original) (citing Gingles, 478 U.S. at 100 (O'Connor, J., concurring)). The Court rejects this argument as it has already determined that Plaintiffs do not have to prove the causes of racial bloc voting to satisfy the second and third Gingles preconditions. See Section III(A)(2)(b)(1)(a) supra.

The Court instead finds that there is sufficient evidence in the Record that the minority population is politically cohesive. As explained in greater detail when resolving Plaintiffs' Motion for Summary Judgment, the expert testimony and Record evidence submitted shows political cohesion amongst the APBVAP in Illustrative CD-6 and that the majority population typically votes as a bloc to

66

defeat the minority voters' candidate of choice. <u>See</u> Section III(B)(3) <u>infra</u>. Specifically, it is undisputed that in the 40 elections Dr. Palmer examined 98.4% of Black voters supported their candidate of choice. Doc. No. [188], ¶ 75. Defendants' expert even testified that "Black voter support for their preferred candidate is typically in the 90 percent range and scarcely varies at all across the ten years examined from 2012 to 2022." <u>Id.</u> ¶ 73 (citing Doc. No. [158] ("Alford. Dep. Tr.") Tr. 37:13–15). Accordingly, the Court finds that the testimony of both Plaintiffs' expert and Defendants' expert provides evidence that Black voters are politically cohesive sufficient to defeat Defendants' Motion for Summary Judgment as to the second <u>Gingles</u> precondition.

Similarly, the Court finds that there is Record evidence that the white majority usually votes as a bloc to defeat the minority voter's candidate of choice for the third <u>Gingles</u> precondition. It is undisputed that, in in the focus area, 12.4% of white voters supported Black-preferred candidates and that in no election did that support exceed 17%. Doc. No. [188], ¶ 79. Defendants' expert testified that "estimated white opposition to the Black-preferred candidate is typically above 80 percent" and "is remarkably stable." <u>Id.</u> ¶ 78. Although the raw data is not disputed, Defendants' and their expert argue that Dr. Palmer

67

should have evaluated primary election data. Doc. Nos. [175-1], 28-29; Alford Dep. Tr. 29:11–30:1. The Court finds that these arguments relate to Dr. Palmer's credibility, which cannot be decided as summary judgment. Thus, Defendants' Summary Judgment Motion on the third Gingles precondition must be denied.

### (3)    *Temporal limitations*

In supplemental briefing, Defendants argue that there are potential limitations about the temporal applicability of Section 2. Doc. No. [214], 17–18. Defendants begin by arguing that courts are shifting focus away from preferences based upon the race of the candidate, which is a departure from Gingles. Id. at 17–18. As the Court noted above, eight of the nine Justices agreed that the race of the candidate was not relevant at the Gingles preconditions phase of the inquiry. Additionally, the Eleventh Circuit and Supreme Court's more recent jurisprudence has expressly rejected or cautioned against a reliance on the race of the candidate when evaluating a potential Section 2 violation. Thus, the Court finds this temporal argument unavailing. See Section III(A)(2)(b)(1)(c) supra.

Defendants also argue that "Justice Kavanaugh's concurring opinion—the *fifth* vote—makes abundantly clear that the constitutionality of the law is not at

all settled into the future." Doc. No. [214], 19 (emphasis in original). In <u>Allen</u>,

Justice Kavanaugh opined:

> Justice [Thomas] notes, however, that even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future . . . . But Alabama did not raise that temporal argument in this Court, and therefore I would not consider it at this time.

143 S. Ct. at 1519. The Court finds this argument unavailing. As the precedent

currently stands, five Justices agreed that the <u>Gingles</u> framework remains and

affirmed the <u>Allen</u> three-judge court's decision finding that Alabama violated

Section 2 of the VRA. Although the two dissents raised arguments about the

constitutionality of the <u>Gingles</u> framework, neither stated that Section 2 of the

Voting Rights Act by itself should be deemed unconstitutional. <u>See generally</u>

<u>Allen</u>, 143 S. Ct. at 1519–48 (Thomas, J., dissenting); <u>id.</u> 1548–57 (Alito, J.,

dissenting). In accordance with the binding majority opinion, the Court rejects

Defendants' temporal argument. The Court finds that Plaintiffs may move

forward with their Section 2 claims.

*   *   *   *   *

69

To summarize the foregoing analysis on the second and third <u>Gingles</u> preconditions in this case: the Court finds that, under the current binding precedent, Plaintiffs must show the existence of (1) political cohesion amongst minority voters, and (2) that the white majority typically votes as a bloc to defeat the Black-preferred candidate. The second and third <u>Gingles</u> preconditions specifically do not require Plaintiffs to prove that race causes the bloc voting or disprove that race-neutral factors caused the bloc voting. None of Defendants' arguments to the contrary persuade the Court otherwise.

The Court also finds that Plaintiffs pointed to sufficient evidence in the Record of the existence of both minority voter cohesion and racial bloc voting to defeat Defendants' Motion for Summary Judgment as to the second and third <u>Gingles</u> preconditions. Accordingly, Defendants' Motion for Summary Judgment on the second and third <u>Gingles</u> preconditions is denied.

### 3. *Proportionality*

Finally, Defendants argue that because Black Democratic candidates are elected in a proportional number of districts to the overall Black Georgian population, Plaintiffs Section 2 claim must fail. The Court also rejects Defendants' proportionality argument.

Defendants specifically cite that in the 2022 election cycle, under the Enacted Plan, five Black Democratic candidates were elected in the 14 congressional districts, which totals 35.7% of Georgia's congressional delegation. Doc. No. [175-1], 32. Black Georgians encompass 31.73% of Georgia's voting age population. Doc. No. [188], ¶ 13.

Plaintiffs argue that a grant of summary judgment on proportionality is inappropriate because proportionality is not dispositive and is relevant only for the totality of the circumstances analysis. Doc. No. [189], 34. Additionally, Plaintiffs dispute Defendants' metric for establishing proportionality because it evaluates the proportion of the Black voting age population and the number of Black candidates elected to Congress, not the proportion of the Black voting age population and the number of Black-opportunity districts. Id. at 35–36.

The Court agrees that as a matter of law proportionality is an insufficient basis to dismiss a Section 2 case. The Supreme Court has expressly rejected proportionality as a safe harbor for Section 2 violations. De Grandy, 512 U.S. at 1017–18 ("Proportionality . . . would thus be a safe harbor for any districting scheme. The safety would be in derogation of the statutory text and its considered purpose, however, and of the ideal that the Voting Right Act of 1965 attempts to

71

foster."). While evidence of proportionality may be useful in the totality of the circumstances inquiry, it cannot serve as the basis for granting summary judgment.

Even if proportionality could function as a safe harbor, Defendants' test is incorrect. In De Grandy, the Supreme Court found that there was no Section 2 violation where "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." 512 U.S. at 1000; see also LULAC, 548 U.S. at 436 (allowing courts to "compar[e] the percentage of total *districts* that are [Black] opportunity districts with the [Black] share of the citizen voting-age population" (emphasis added)). In short, courts can look at the proportion of majority-minority *districts* as it relates to the proportion of minority voters to determine if the voting systems are equally open to minority voters.

Under the proper proportionality assessment, therefore, 28.57% of the districts in the Enacted Plan (4 of 14 congressional districts) are majority-minority districts and 31.73% of Georgia's voting age population is AP Black. Doc. No. [174-1], ¶¶ 18, 73. It is undisputed that the Enacted Plan has "four majority-Black districts based on percentage non-Hispanic DOJ Black citizen voting-age

72

population."[32] Doc. Nos. [188], ¶ 214; [174-1], ¶ 73. Using this metric, the number of majority-minority districts is not directly proportional to the percentage of the APBVAP.[33] Thus, under the proper proportionality metric, Defendants are not entitled to summary judgment based on proportional representation.[34]

---

[32] "Georgia's [Enacted Plan] [also] includes two majority-Black districts based on percentage Black voting-age population, [and] three majority-Black districts based on percentage non-Hispanic voting age population . . . ." Doc. Nos. [188], ¶ 214; [174-1], ¶ 73.

[33] It is true that when comparing the race of the candidate rather than the number of districts (as Defendants suggest), Georgia's Black Democrat congressional delegation is proportional to the APBVAP—35.7% of Georgia's congressional delegation is made up of Black Democrats and Georgia's APBVAP is 31.73%. Id. (citing Doc. No. [189-1], ¶ 60). Again, this is the wrong metric for the proportionality inquiry.

[34] To be clear, proportionality cannot be used as a safe harbor, *and* it may not be used as a benchmark for determining whether there was a Section 2 violation. 52 U.S.C. § 10301(b) ("*Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); see also Gingles, 478 U.S. at 84 (O'Connor, J., concurring) ("[Section] 2 unequivocally disclaims the creation of a right to proportional representation."); Allen, 143 S. Ct. at 1532 (Thomas, J., dissenting) ("[W]hat benchmark did the District Court find that Alabama's enacted plan was dilutive? The answer is as simple as it is unlawful: The District Court applied a benchmark of proportional control based on race."); S. Rep. 97-417, at 31 ("This disclaimer is entirely consistent with the above mentioned [S]upreme [C]ourt and [C]ourt[s] of [A]ppeals precedents, which contain similar statements regarding the absence of any right of proportional representation. It puts to rest any concerns that have been voiced about racial quotas.").

In sum, by rejecting the Defendants' proportionality argument, the Court is in no way suggesting that a lack of proportional representation constitutes a violation of Section 2, or that Section 2 affirmatively requires proportional representation. Nor is the Court using proportionality as a benchmark for determining whether Georgia's electoral process is equally open to minority voters.

73

### 4.      *Conclusions on Defendants' Motion for Summary Judgment*

Consequently, the Court **DENIES** Defendants' Motion for Summary Judgment. The Court finds that there are triable issues of fact as it relates to standing and the <u>Gingles</u> preconditions. With respect to proportionality, Defendants rely on the incorrect test and seek to employ it at the improper stage of the analysis. [35] Accordingly, the Court denies Defendants' Motion for Summary Judgment.

### B.      <u>**Plaintiffs' Motion for Summary Judgment**</u>

Plaintiffs likewise move for summary judgment on their Section 2 claims. Doc. No. [173]. For Plaintiffs to be successful they must affirmatively meet their burden of proof and show they are entitled to summary judgment on all three <u>Gingles</u> preconditions, as well as show the election process is not equally open to Black voters under the Enacted Plan based on the totality of the circumstances Senate Factors. The Court now addresses each of these requirements and

---

[35] Defendants did not move for summary judgment on the Senate Factors. The Court, however, discusses the disputes of fact on the totality of the circumstances inquiry in greater detail below. <u>See</u> Section III(B)(4) <u>infra</u>.

ultimately concludes that questions of fact, outstanding credibility determinations, and weighing of evidence precludes granting Plaintiffs' Motion.

### 1.    *Plaintiffs' Standing to Bring Their Section 2 Case*

Preliminarily, the Court addresses Defendants' contention that Plaintiffs have failed to provide summary judgment Record evidence of their standing to bring this Section 2 case. Defendants specifically argue Plaintiffs failed to provide adequate proof of their respective residences for purposes of establishing a district-specific injury, which is required for Section 2 cases. Doc. No. [187], 11–12. Defendants reject usage of the stipulated facts from the preliminary injunction phase as evidence of standing on summary judgment. Id. at 12 n.4. Plaintiffs reply that they have shown they are registered voters in the western Atlanta region where the additional majority-minority district would be drawn. Doc. No. [200], 4. Plaintiffs submit declarations from the named Plaintiffs about their residences in the western Atlanta area. Doc. Nos. [201-1]–[201-6].

The Court determines that Plaintiffs' submitted declarations are sufficient for showing an injury for purposes of standing on summary judgment. Generally, the Court "should not consider [] new evidence without giving the [opposing party] an opportunity to respond." Atl. Specialty Ins. v. Digit Dirt

Worx, Inc., 793 F. App'x 896, 901 (11th Cir. 2019) (quoting Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)). This principle applies to "new evidence . . . submitted . . . in a reply brief." Id.

Here, Defendants had the opportunity to oppose the Court's consideration of Plaintiffs' reply brief evidence, both by filing a motion to strike or by raising it at the Summary Judgment Hearing. Defendants did neither. They also had the opportunity to submit supplemental briefing following the Supreme Court's Allen decision and did not raise any concern about the Plaintiffs' evidence. Defendants, moreover, did not move to file a sur-reply, which is not expressly prohibited by the Court's Local Rules and is within the Court's discretion to grant. Cf. Dynamic Depth, Inc. v. Captaris, Inc., No. 1:07-CV-1488-CAP, 2009 WL 10671407, at *1 (N.D. Ga. June 9, 2009) ("[T]he court will not allow such sur-replies as a routine practice and will only permit them in exceptional circumstances."); Chemence Med. Prod., Inc. v. Medline Indus., 119 F. Supp. 3d 1376, 1383 (N.D. Ga. 2015). ("Generally, surreplies are not authorized and may only be filed under unusual circumstances, *such as when a party raises new arguments in a reply brief.*" (emphasis added)). Indeed, a district court's consideration of new evidence in a reply brief has been affirmed when the

opposing party failed to move the court for permission to file a sur-reply. Cf. United States v. Carter, 506 F. App'x 853, 860 (11th Cir. 2013).

Accordingly, considering the evidence contained in Plaintiffs' declarations, the Court is satisfied that the Plaintiffs have shown district-specific injury for their Section 2 case.[36]

### 2.    First _Gingles_ Precondition

As Plaintiffs bear the burden of proof, they must show undisputed evidence that the minority population is sufficiently numerous and compact to create an additional majority-minority district. Alpha Phi Alpha, 587 F. Supp. 3d at 1252 ("[T]he first Gingles precondition requires showings that the relevant minority population is 'sufficiently large and geographically compact to constitute a majority in a single-member district[.]'" (quoting LULAC, 548 U.S. at 425). Plaintiffs, moreover, must put forth an Illustrative Plan that meets these requirements which could, as a legal matter, be a remedial map. Nipper, 39 F.3d at 1530 ("[T]he issue of remedy is part of the plaintiff's prima facie case in [S]ection 2 vote dilution cases."); see also Section III(A)(2)(a)(3) supra.

_____

[36] Furthermore, Defendants' Statement of Material Facts also indicates that the named Plaintiffs live in the affected districts. See Doc. No. [189-1], ¶¶ 17, 24, 28, 30, 33.

Defendants responded by arguing that Plaintiffs failed to prove compactness as a matter of law.[37] For compactness, Plaintiffs must show that it is "possible to design an electoral district[] consistent with traditional redistricting principles . . . ." Davis, 139 F.3d at 1425. Even if a group is sufficiently large, "there is no [Section] 2 right to a district that is not reasonably compact." Singleton, 582 F. Supp. 3d at 956 (quoting LULAC, 548 U.S. at 430).

The Parties do not dispute that the Court can look to Georgia's General Assembly redistricting guidelines to determine if Plaintiffs have met their burden to prove compactness on undisputed facts. Doc. No. [188], ¶ 46; see also Alpha Phi Alpha, 587 F. Supp. 3d at 1257. These guidelines, as entered into the Record, include population equality, compliance with the VRA Section 2,

---

[37] While the first Gingles precondition ultimately requires Plaintiffs to show both numerosity and compactness, because the Court determines that a question of fact precludes granting summary judgment on compactness, it reserves any ruling on numerosity because the numerosity inquiry can be intertwined with the compactness inquiry, and at trial, the Court will best be able to develop a full and complete record on the issue. Cf. Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015) ("We have found it particularly 'important in voting dilution cases that the district court scrupulously comply with the requirements of [Rule 52(a)] and make findings of fact and conclusions of law in sufficient detail that the court of appeals can fully understand the factual and legal basis for the court's ultimate conclusion.'" (quoting McIntosh Cnty. Branch of the NAACP v. City of Darien, 605 F.2d 753, 757 (5th Cir. 1979))).

compliance with the Georgia and Federal Constitutions, contiguity, county and precinct splits, compactness, communities of interest, and avoiding pairing of incumbents.[38] Doc. Nos. [174-11], 3; [174-12], 3.

The Parties dispute whether Mr. Cooper, in crafting Illustrative CD-6, followed these traditional redistricting principles, adequately balanced the required considerations, and did not allow race to predominate.[39] Doc. No. [188], ¶¶ 43, 45. In support of their position, Defendants broadly argue that Mr. Cooper cannot (and does not) indicate that he adhered to traditional redistricting principles. Doc. No. [187], 13–15.

---

[38] The Georgia Redistricting Guidelines are also consistent with the traditional redistricting principles outlined in Supreme Court precedent. See Reynolds, 377 U.S. at 598 (population equality); LULAC, 548 U.S. at 433 (communities of interest); Vera, 517 U.S. at 959–60 (contiguity, eyeball test); Cooper, 581 U.S. at 291, 312 (political subdivisions, partisan advantage, empirical compactness measures).

[39] The Court is unconvinced by Defendants' argument that Mr. Cooper failed to explain why he proposed Illustrative CD-6 in metro Atlanta, rather than placing a majority-minority district in east Georgia. Doc. No. [187], 13–14. Mr. Cooper clearly asserted why he chose to put the additional minority-majority Black district in metro Atlanta when he stated that "the dramatic increase in Georgia's Black population in metro Atlanta during this century [made] the obvious focal point for determining . . . an additional majority-Black district . . . in . . . Metro Atlanta." Doc. No. [174-1], ¶ 35. Mr. Cooper's deposition testimony corroborates this assertion. Cooper Dep. Tr. 43:4–13.

79

Defendants cite to Mr. Cooper's deposition where he admits that the "threshold" for "objective number of county splits that make[] a plan consistent with the traditional principle" of avoiding county-splits is "difficult" and "could vary." Cooper Dep. Tr. 28:7–15. He goes on to admit that the Enacted Plan is not inconsistent with traditional redistricting principles because it splits one more county than the Illustrative Plan. Id. at 28:23–29:2. Similarly, the compactness analysis "ends up being so much [more] subjective [than objective] in terms of how you interpret it." Id. at 29:17–19.

Defendants specifically take issue with Plaintiffs' evidence regarding communities of interest in the Illustrative Plan. Doc. No. [187], 14. The "traditional principle of historical and cultural connections," (i.e., communities of interest) Mr. Cooper admitted was "subjective" and without "specific definition." Cooper Dep. Tr. 32:9–22. While not a challenged district, [40]

---

[40] Plaintiffs, in their reply, contend that Defendants' arguments and evidence relating to the unchallenged districts in the Illustrative Plan should not be considered in the communities of interest inquiry. Doc. No. [200], 6–7. Whether communities of interest must be shown for all districts in an illustrative map (or, conversely, just the challenged district/area), is a disagreement common to both Plaintiffs and Defendants' Motions. See Section III(A)(2)(a)(2)(c) supra. As noted above, neither Nipper nor Supreme Court precedent seems to require that districts outside of the remedial district be compact.

Mr. Cooper acknowledged a community of interest was admittedly absent in Illustrative CD-10. Id. at 70:70:16–22 ("They are different. And so I am open to other suggestions for how one might draw District 10."). He further admitted that Illustrative CD-13 combines urban areas (in Clayton County) with rural areas (in Fayette, Spalding, Butts, and Jasper Counties). Id. at 73:13–17; see also id. at 64:1–16 (discussing issues with communities of interest considerations in Illustrative CD-14).

Plaintiffs argue that Defendants mischaracterize Mr. Cooper's testimony and ignore the fact that Illustrative CD-6 includes counties which are all part of the "core counties" of Atlanta and the MSA. Doc. No. [200], 8 (citing Cooper Dep. Tr. 54:6–20). Plaintiffs maintain that Defendants' own expert, Mr. Morgan, failed to undermine the relatively superior performance of the Illustrative Plan (as far as compactness and traditional redistricting principles go) in relation to the Enacted Plan. Doc. No. [173-1], 16–19.

---

See Section III(A)(2)(a)(2)(c) supra. Regardless of whether the Court considers only Illustrative CD-6 or all the of the districts in the Illustrative Plan, there is a dispute of fact that precludes summary judgment, and so the Court will not linger further than it already has on the applicability of evidence for the unchallenged districts. See Section III(A)(2)(a)(2)(c) supra.

Ultimately, the Court cannot conclude that the evidence of communities of interest in the Illustrative Plan is undisputed. As the above discussion illustrates, Defendants' and Plaintiffs' interpretations of Mr. Cooper's testimony regarding communities of interest differ significantly and cannot be resolved without weighing testimony and assessing credibility—an inappropriate inquiry for the summary judgment stage.

As with Defendants' Motion, the Court certainly acknowledges that Plaintiffs have submitted different pieces of undisputed evidence that Mr. Cooper's Illustrative Plan satisfies some traditional redistricting principles under the first Gingles precondition. It is undisputed that Mr. Cooper's Illustrative Plans' districts are contiguous and achieve population equality. Doc. Nos. [188], ¶ 49; [174-1], ¶ 52; Morgan Dep. Tr. 62:16–17. The compactness scores from the Reock and Polsby-Popper analyses are undisputed and show the Illustrative Plan outperforms the Enacted Plan under these quantitative measures of compactness. [41] Doc. Nos. [188], ¶¶ 53–55; [174-1], ¶ 79; Morgan Dep.

_____

[41] The Court may also engage in an "eyeball test" to determine if an illustrative map is compact or not. See Alpha Phi Alpha, 587 F. Supp. 3d at 1259; Hearing Tr. 39:9–12

Tr. 56:5–60:12. Defendants' expert, Mr. Morgan, testified that there was no reason to dispute that the Illustrative Plan split one fewer county, fewer cities and towns, and fewer voting districts than the Enacted Plan.[42]  Id. at 44:15–22, 45:15–46:16.

Despite these concessions, however, Plaintiffs' evidentiary support for the Illustrative Plan is not without material dispute; thus, the Court cannot grant summary judgment on the first Gingles precondition.

### 3.      Second and Third Gingles Preconditions

The Court now turns to assessing Plaintiffs' arguments and evidence relating to the second and third Gingles preconditions. In short, the Court

---

(Plaintiffs' contending that Defendants "do not even dispute that the eyeball test tells us that illustrative District 6 is compact."). No clear concession on the "eyeball test" has been made in the summary judgment Record or briefing on Plaintiffs' Motion, however, and the Court defers any determination about the "eyeball test" for trial. See, e.g., Ala. State Conf., 612 F Supp. 3d at 1266; Fair and Balanced Map, 835 F. Supp. 2d at 570; see also Section III(A)(2)(a)(2)(a) supra.

[42]  Mr. Morgan emphasizes the "discontinuity" between the Illustrative Plan and the prior 2010 Enacted Plan. Doc. No. [174-7], ¶ 18. This "core retention" point is less persuasive in the light of the recent Allen decision, where the Supreme Court rejected Alabama's argument that having a high degree of core retention was insufficient to defeat a Section 2 claim. Allen, 143 S. Ct. at 1505 ("[T]his Court has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan.").

concludes an outstanding credibility determination on the experts' testimony precludes summary judgment.

The second <u>Gingles</u> precondition analysis requires showing that Black voters in the affected area are politically cohesive. <u>Gingles</u>, 478 U.S. at 49. The Court looks to see if Black voters vote cohesively to "show[] that [B]lacks prefer certain candidates whom they could elect in a single-member, [B]lack majority district." <u>Id.</u> at 68. "The second [precondition] shows that a representative of its choice would in fact be elected." <u>Allen</u>, 143 S. Ct. at 1503.

"The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." <u>Id.</u> Put slightly differently, this analysis looks at whether "the white majority votes sufficiently as a bloc . . . usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51 (citations omitted). Thus, the second <u>Gingles</u> precondition focuses on the voting preferences of the minority group, while the third looks at preferences of the majority.

Plaintiffs submit Dr. Palmer as an expert on politically cohesive voting in Georgia. Dr. Palmer utilized statistical methods to assess the significance of

voters' racial polarization in the Enacted CD-3, 6, 11, 13, and 14. Doc. No. [188], ¶¶ 69–70.

Defendants do not dispute that Dr. Palmer's analysis concluded that "Black voters in Georgia are extremely cohesive . . . ." Id. ¶ 73. Defendants' expert, Dr. Alford, likewise admits as much. Alford Dep. Tr. 37:13–15 (agreeing that "[B]lack Georgians are politically cohesive"). Specifically, in the congressional districts assessed, Dr. Palmer's analysis shows—and Defendants do not dispute—Black voters supported the Black-preferred candidate 98.4% of the time, and thus show as a group they have a clear candidate of choice. Doc. Nos. [188], ¶¶ 75–76; [174-3], ¶¶ 7, 16. This conclusion held across each of the districts at issue. Doc. Nos. [188] ¶ 77; [174-3] ¶ 19.

Dr. Palmer furthermore concluded, and Defendants do not dispute, that white Georgia voters are "highly cohesive" in voting in opposition to the Black-preferred candidate. Doc. Nos. [188], ¶¶ 78, 79 (showing, on average, only 12.4% of white voters voted for Black-preferred candidates in the congressional districts at issue); [174-3], ¶¶ 7, 17. These low percentages of white voters' support for Black-preferred candidates also holds in each congressional district assessed. Doc. No. [188], ¶ 80; [174-3], ¶ 20. Dr. Alford admits that "white voters

are generally voting in a different direction . . . than [B]lack voters." Alford Dep. Tr. 39:5–6. In fact, the results from Dr. Palmer's analysis show Black-preferred candidates were only successful in majority-Black congressional districts. Doc. Nos. [188], ¶ 84; [174-3], ¶¶ 8, 21; [174-4], ¶ 4.

Defendants argue, however, that this data alone presents an incomplete assessment. Doc. No. [187], 21 ("[T]he polarization that Dr. Palmer found tells us little (if anything) about the existence and extent of *racial* polarization in Georgia elections." (emphasis in original)). Defendants contend that while Black and white Georgians tend to vote for opposing candidates, this result can be attributed to partisanship. Id. at 22–24.

In an effort to explain this data and the empirical results at issue, Defendants first cite to the fact that Dr. Palmer only assesses general, not primary, elections. Doc. Nos. [200-1], ¶ 16; [168] (Palmer Dep. Tr.) Tr. 59:23–60:1. Defendants argue that primary elections would be the best method of controlling for partisanship in order to determine if race is causing the split between white and Black voters.[43] Doc. No. [200-1], ¶ 17; Alford Dep. Tr. 156:1–13 (encouraging

---

[43] Plaintiffs dispute that assessing primaries would have adequately controlled for partisanship and isolated race as the controlling variable. Doc. No. [200-1], ¶¶ 17, 40.

an analysis to disentangle the partisanship effect from the race effect by "look[ing] at some elections where that party signal is not going to be such as a strong driver," such as in primary elections).

Defendants also make a variety of legal claims in support of their partisanship argument. As far as Defendants' legal arguments are concerned, the Court has already rejected that the cause of polarization is not relevant to the second and third <u>Gingles</u> preconditions. The Court has also already rejected Defendants' suggestion that the VRA as applied by Plaintiffs' is unconstitutional. <u>See</u> Section III(A)(2)(b)(1)(b) <u>supra</u>.

Despite the rejection of Defendants' legal arguments, Dr. Alford's criticisms of Dr. Palmer's conclusions and Defendants' overall contention that "Dr. Palmer's data is lacking in several key respects" (Doc. No. [187], 22), nevertheless presents a credibility determination that requires the Court to assess the weight of Dr. Palmer's conclusions. <u>See</u> Alford Dep. Tr. 156:1–57:22 (stating that Dr. Palmer's conclusions would be stronger if he had used a different data set that included primary elections evidence); Doc. No. [187], 22 (arguing that Dr. Palmer's analysis is incomplete because it fails to consider the United States Senate race between two Black candidates). These criticisms demand the Court

assess the weight and credibility of both Dr. Alford's and Dr. Palmer's opinions; thus the Court defers such determinations for trial. Cf. Ga. State Conf., 775 F.3d at 1343 (encouraging "scrupulous[]" compliance with Rule 52(a)'s fact finding requirement in bench trials because "sifting through the conflicting evidence and legal arguments and applying the correct legal standards is for the district court in the first instance" (alteration adopted) and in Section 2 cases, the deferential clear error review is afforded to the district court's findings (quoting McIntosh NAACP, 605 F.2d at 759)). Accordingly, the Court denies Plaintiffs' Motion for Summary Judgment on the second and third Gingles preconditions.[44]

### 4.    Totality of the Circumstances: Senate Factors

Plaintiffs also submit that they are entitled to summary judgment on the Senate Factors. In a Section 2 case, after evaluating the Gingles preconditions, the final assessment to determine whether vote dilution has actually occurred requires "assess[ing] the impact of the contested structure or practice on minority

---

[44] While summary judgment may not be granted on the second and third Gingles preconditions, the Parties may still stipulate to the numerous undisputed facts regarding cohesion among Black voters and bloc voting by white voters, for purposes of trial. Cf. also Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.").

electoral opportunities on the basis of objective factors." <u>Gingles</u>, 478 U.S. at 44 (citations omitted). To do so, the Court looks at the VRA's 1982 Amendments' Senate Report, which specifies the factors relevant for a Section 2 analysis. "The totality of circumstances inquiry recognizes that application of the <u>Gingles</u> factors is 'peculiarly dependent upon the facts of each case.'" <u>Allen</u>, 143 S. Ct. at 1503 (quoting <u>Gingles</u>, 478 U.S. at 79). The totality of the circumstances' inquiry is fact intensive and requires weighing and balancing various facts and factors, which is generally inappropriate on summary judgment. <u>See</u> <u>Rose v. Raffensperger</u>, 1:20-cv-2921-SDG, 2022 WL 670080, at *2 (N.D. Ga. Mar. 7, 2022) ("[T]he Court . . . cannot appropriately evaluate the totality of the circumstances before trial."). The Court now turns to Plaintiffs' evidence on the Senate Factors, and ultimately concludes that resolution of the totality of the circumstances inquiry is improper for summary judgment.

a)      <strong><u>Senate Factor 1: historical evidence of discrimination</u></strong>

The first Senate Factor is Georgia's history of official, voting-related discrimination. <u>See</u> <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1314. The Court previously determined that the evidence submitted at the preliminary injunction

89

hearing was sufficient to show a likelihood of success of proving Georgia had a history of discrimination. Id.

Defendants do not contest Georgia's long history of discrimination against minorities, and namely Georgia's Black population. Doc. No. [187], 25. Defendants however argue that Plaintiffs failed to submit evidence showing that this discrimination is not conflated with "partisan incentives." Id. Defendants, moreover, argue that Plaintiffs' evidence ignores the more recent 2011 DOJ preclearance of Georgia's congressional plan, which was granted on Georgia's first attempt. Id. Defendants finally assert that some of Plaintiffs' evidence is improper since the allegedly discriminatory regulations are either not at the

behest of the State (i.e., polling-place closures[45]) or have been determined to be

legal (i.e., voter list maintenance[46]). Id. at 26.

In assessing the historical evidence at issue, the Court is mindful of the

Eleventh Circuit's guidance about the scope of evidence to assess to support a

finding historical discrimination. See League of Women Voters of Fla. Inc. v. Fla.

---

[45] Defendants cite this Court's opinion and order in Fair Fight, 2021 WL 9553855, at *12 in support of this argument. Doc. No. [187], 26.There the Court held that the plaintiffs did not have standing to challenge the moving and closing of polling places against the named state defendants because "[s]tate law explicitly assigns responsibility for determining and changing precincts and polling places to the county superintendents." Id. (citing O.C.G.A. §§ 21-2-70(4), -261(a), -262(c)–(d), -265(a)–(b), -265(e)).

    The Court, however, does not find this prior holding to be determinative in assessing the Section 2 Senate Factor. The Court's Fair Fight decision determined that the State's "authority to prescribe rules and provide guidance to the county superintendents [did] not make this issue *traceable* to Defendants." Id. (emphasis added). The authority and guidance given to counties, however, could still bear more generally on minority discrimination despite being insufficient for standing's redressability and traceability requirements.

[46]    Likewise, Defendants cite to the Court's order in Fair Fight Action Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ, 2021 WL 9553856, at *15–18 (N.D. Ga. Mar. 31, 2021) in support of voter list maintenance previously being declared legal. Doc. No. [187], 26. There the Court found that the state defendant's list maintenance procedures did not violate the First and Fourteenth Amendments, under the Anderson-Burdick framework. Id. This legal determination, however, does not preclude the Court from considering the State's voter list maintenance procedures as potential evidence of discrimination in this Section 2 totality of the circumstances inquiry. Though, of course, as a matter of the evidence's weight, the Court—when acting as a trier of fact—could consider the State's interest and the federal legal authority to oversee voter lists.

Sec'y of State, 66 F.4th 905, 922–23 (11th Cir. 2023). Specifically, the Court in no way wishes to suggest that its review of Georgia's long history of racial discrimination is being used to infer that "a racist past is evidence of current intent." Id. at 923 (quoting Greater Birmingham Ministries, 992 F.3d at 1325).

The Court is also careful to avoid conflating discrimination based on general party affiliation with racial discrimination. Id. at 924. To be sure, the correct assessment for historical discrimination looks to the "circumstances surrounding the passing of the law in question." Id. at 923 (quotation and citation omitted).

The Court nevertheless notes some tension in the recent Eleventh Circuit case and the Supreme Court's affirmance of the 3-judge court in Allen, 143 S. Ct. at 1506 (determining that "[w]e see no reason to disturb the District Court's careful factual findings" which included a conclusion that "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." (citations and quotations omitted)). In fact, a look at the lower court decision shows that the three-judge court did not "fully discount Alabama's shameful history" despite the "instruction" that past discrimination is not indicative of present unlawful discrimination. Singleton, 582 F. Supp. 3d at 1020;

see id. ("If Alabama's history of jailing Black persons for voting and marching in support of their voting rights is sufficiently recent for a plaintiff to recall firsthand how that history impacted his childhood, then it seems insufficiently distant for us to completely disregard it in a step of our analysis that commands us to consider history."); id. at 1020–21 (considering that, in the decades following the VRA, that the DOJ has sent hundreds of election observers to Alabama and that numbers of proposed changes to the voting systems in Alabama had been blocked). However, the lower court in Singleton also engaged with recent evidence of discrimination, precisely the successful racial gerrymandering challenges to state legislative districts after the 2010 census and the fact that federal courts have "recently ruled against or altered local at-large voting systems . . . ." Id.

Section 2 requires a "searching practical evaluation of the past and present reality" of "racially discriminatory actions taken by the state." Allen, 143 S. Ct. at 1504, 1507 (citations omitted). The Court takes this principle to mean that Georgia's long history of race discrimination is relevant, but the Court cannot rely on the wrongs of the past to find racial discrimination in the present.

Plaintiffs must show that Georgia, presently and in its recent history, continues to have racial discrimination that permeates its election fabric.

With these legal considerations and limitations in mind, the Court turns to Plaintiffs' evidence. Plaintiffs, in support of the history of discrimination in Georgia, submit the report of Dr. Burton.[47] Doc. No. [174-5]. Dr. Burton's report recounts the history of discriminatory practices against Black voters since the Civil War. Id. at 12–36. The report also discusses Georgia's efforts to stifle Black political participation following the VRA. Id. at 36–47. In this assessment, Dr. Burton specifically emphasizes Georgia's lengthy and harsh history of discrimination, even in comparison to other southern states. See, e.g., Doc. Nos. [188], ¶ 95; [174-5], 10.

As for more recent discrimination—i.e., since Shelby County's elimination of preclearance—Plaintiffs cite evidence that Georgia has adopted all five of the

_____

[47] Defendants raise numerous objections to Plaintiffs' Statement of Material Facts under Local Rule 56.1(B)(1) for not being "separately numbered." The Court acknowledges that several of Plaintiffs facts include many different facts that likely should have been split into separate paragraphs. The Court, however, does not find Plaintiffs' factual assertions are so complicated or convoluted that Defendants could not substantively address each fact in their response. Accordingly, the Court looks to the Record evidence presently available in resolving Plaintiffs' Motion.

"most common restrictions that impose roadblocks to the franchise of minority voters, including (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting, and (5) widespread polling place closures."[48] Doc. No. [174-5], 49–50. Dr. Burton contends that polling place closures are primarily in Black neighborhoods and have resulted in much longer wait times

---

[48] Defendants object that this fact (1) is non-compliant with the Local Rules (i.e., not separately numbered), (2) is factually incorrect given prior cases' determinations on these "roadblocks," and (3) is hearsay. Doc. No. [188], ¶ 111. The Court previous considered and overruled objections (1) and (2) the separate numbering and the factual inaccuracies. See notes 45–47 supra.

As for the third objection , to the evidence being inadmissible hearsay, the Court determines that Dr. Burton's reliance on the U.S. Commission on Civil Rights' statements on minority voting can be considered as summary judgment evidence because it could be reduced to an admissible form at trial. Expert witnesses may base their opinions on inadmissible evidence if other experts would reasonably rely on that evidence in forming an opinion. See Fed. R. Evid. 703; Knight through ex rel. Kerr v. Miami-Dade Cnty., 856 F.3d 795, 809 (11th Cir. 2017) ("[A]n expert may rely on hearsay evidence as part of the foundation for his [or her] opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" (quoting United States v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987))).

Here, Dr. Burton recounted in his report that he "employed the standard methodology used by historians and other social scientists in investigating the adoption, operations, and maintenance of election laws," which included examining "relevant scholarly studies, newspaper coverage of events, reports of local, state or federal governments, relevant court decisions, and the record in court cases . . . ." Doc. No. [174-5], 9. In the Court's view, the U.S. Commission on Civil Rights statement constitutes a "report[] of . . . [the] federal government[,]" and thus falls within the gamut of Rule 703 and can be considered to resolve this Motion.

95

to vote.[49] Id. at 51. Burton further cites to "voter purges and challenges" from 2012 until 2018, which all "particularly disadvantaged minority voters and candidates."[50] Id.

Defendants contest the relevancy of this evidence in the light of the redistricting plans entered in the instant case. While the Court has overruled Defendants objections to the Court's *consideration* of this evidence, supra notes 45–48, the Court nevertheless cannot *assess* the relevance or assign any weight to this evidence on summary judgment. Evaluating Georgia's discrimination efforts in recent years, and particularly in its passage of the redistricting plans at issue is necessarily a question of fact, and requires weighing evidence and appraising credibility. Thus, this factor is not determinative at summary judgment.

---

[49] Defendants again object to Dr. Burton's citation of an online newspaper forum as hearsay evidence. Doc. No. [188], ¶¶ 114–15. Just as with the Court's conclusion in note 48 supra, Dr. Burton's use of the online newspaper source is within the standard methods and considerations for historical research that can be reducible to admissible form at trial under Rule 703. See Doc. No. [174-5], 9 (indicating Burton's "standard methodology" included examining "newspaper coverage of events").

[50] Defendants' hearsay objection to the support for this statement (Doc. No. [188], ¶ 115) is overruled for the same reasons as the prior hearsay objections. See notes 48–49 supra. Defendants' objections about the separate numbering of the relevant facts and their conflict with the Court's prior findings on the list-maintenance process are overruled for the same reasons as articulated in notes 45–46, supra.

**b)** <u>Senate Factor 2: racial polarization</u>

The second Senate Factor assesses "the extent to which voting in the elections of the State or political subdivision is racially polarized." <u>Wright</u>, 979 F.3d at 1305 (quoting <u>LULAC</u>, 548 U.S. at 426). The Court in its preliminary injunction order noted that "the Court's analysis on the second and third <u>Gingles</u> preconditions controls here." <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1316.

While the Court agrees with its prior resolution of this Senate Factor under the second and third <u>Gingles</u> preconditions, pursuant to persuasive authority and given the argument presented in the summary judgment filings, it finds it prudent to also consider Defendants' polarization argument. <u>See</u> Section III(A)(2)(b)(1)(a) <u>supra</u>; see also <u>Nipper</u>, 39 F.3d at 1524 (plurality opinion) (finding that Defendants may rebut evidence of polarization by showing racial bias is based on non-racial circumstances); <u>Uno</u>, 72 F.3d at 983 (racial polarization "will endure *unless* and *until* the defendant adduces credible evidence tending to prove the detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system." (emphasis in original)).

In the light of these prior statements and on the summary judgment standard the Court must apply to resolve Plaintiffs' Motion, the Court determines that there remains a dispute of fact on this factor. As already indicated, Defendants contest the rigor of Dr. Palmer's data—and thereby the strength of his overall conclusion—on the polarization of Georgia voters. Doc. No. [187], 26–27. Specifically, Defendants contend that Dr. Palmer's failure to consider primary election evidence impugns and weakens his analysis of racial polarization because he fails to control for partisanship. Doc. No. [200-1], ¶ 16–17, 40; Alford Dep. Tr. 29:11–30:1, 156:1–157:22.

As it did for the second and third <u>Gingles</u> preconditions—and with higher potential consequences in the totality of the circumstances inquiry—the Court determines that any assessment of racial polarization requires the weighing of evidence and Dr. Alford's and Dr. Palmer's credibility. This inquiry is inappropriate for summary judgment. <u>See</u> Section III(B)(3) <u>supra</u>.

### c)    **Senate Factor 3: Georgia's voting practices**

For the third Senate Factor, the Court considers "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as

98

unusually large election districts, majority vote requirements, and prohibitions against bullet voting." <u>Gingles</u>, 478 U.S. at 44–45. The evidence supporting this factor is not distinct, nor must it be, from the first Senate Factor assessing Georgia's discriminatory practices. Cf. <u>Singleton</u>, 582 F. Supp. 3d at 1020 ("We analyze these [] Senate Factors together because much of the evidence that is probative of one of them is probative of more than one of them.").

In support of this Senate Factor, Plaintiffs specifically cite evidence of discrimination relating to malapportionment, polling place closures, voter purges, and shifting from counties voting by district to voting at-large. Doc. No. [173-1], 31. Defendants dispute that this evidence supports Plaintiffs' Motion, mainly because, in their view, county-level decisions on voting practices are not transferrable to the State. Doc. No. [187], 27.

Given the overlap in evidence submitted, the Court reaffirms its analysis from Senate Factor 1 for Senate Factor 3. There is a material dispute over these discriminatory practices, and thus, the Court cannot form the basis to grant summary judgment.

### d)    Senate Factor 5:[51] socioeconomic disparities

As the Court's prior preliminary injunction order specified, the Eleventh Circuit's precedent "recognize[s]" that "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation." Wright, 979 F.3d at 1294 (quoting United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1568 (11th Cir. 1984) (citing and quoting 1982 Senate Report at 29 n.114)). "Where these conditions are shown, and where the level of [B]lack participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." Id. (quoting Marengo Cnty., 731 F.2d at 1568–69); see also Marengo Cnty., 731 F.2d at 1569 (approving Fifth Circuit precedent requiring that "when there is clear evidence of present socioeconomic or political disadvantage resulting from past discrimination . . . the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather is on those

---

[51] Senate Factor 4—a history of candidate slating for congressional elections—is not at issue because Georgia's congressional elections do not use a slating process. Doc. No. [173-1], 32; see also Alpha Phi Alpha, 587 F. Supp. 3d at 1317.

100

who deny the causal nexus to show that the cause is something else." (citing Cross v. Baxter, 604 F.2d 875, 881–82 (5th Cir. 1979))).

Here, Plaintiffs submitted evidence of the disproportionate socioeconomic conditions between Black and white Georgians through the expert report and testimony of Dr. Loren Collingwood. Doc. Nos. [174-6]; [186]. Dr. Collingwood expressly concludes that "Black Georgians face clear and significant disadvantages in [education, employment, and health] that reduce their ability to participate in the political process." Doc. No. [174-6], 4. Dr. Collingwood specifically opines that the unemployment rate of Black Georgians is double that of white Georgians, and that Black Georgians are more likely to live below the poverty line and less likely to have high school or college degree. Id. at 5. Dr. Collingwood's findings extend across Georgia and are present in most counties. Id. at 7. Moreover, Dr. Collingwood connected these socioeconomic disparities with political science research that causally connects these disparities to depressed voter turnout. Id. at 8. Dr. Collingwood finally determined that white Georgians were more likely than their Black peers to participate in most political activities. Id. at 36, 39.

101

Defendants do not meaningfully contest these findings and conclusions, but instead suggest that the cause of these differences is not socioeconomically driven, but rather on account of the "motivation" of Black voters. Doc. Nos. [200-1], ¶ 51; [186] (Collingwood Dep. Tr.) Tr. 64:1–19. In support of their "motivation" theory, Defendants cite to the 2012 Presidential Election of President Obama and the 2018 Gubernatorial election with Stacey Abrams as a candidate—where the difference in voter turnout between Black and white voters was much narrower. Doc. Nos. [200-1], ¶ 52–53; [187], 27–28.

The Court is mindful of the Eleventh Circuit precedent that does not require Plaintiffs prove what is causing depressed political participation when socioeconomic disparities have been shown. See, e.g., Wright, 979 F.3d at 1294; Marengo Cnty., 731 F.2d at 1569. The Court is also aware of the prior rejection of a district court's speculation that "if the [B]lacks could overcome voter apathy and turn out their votes, they could succeed in spite of polarization." Id. at 1568 (quoting Clark v. Marengo Cnty., 469 F. Supp. 1150, 1163 (S.D. Ala. 1979)).

Nevertheless, Defendants have placed the credibility of Dr. Collingwood's testimony and conclusions at issue. Thus, while the Court agrees with Plaintiffs' contentions regarding the law, the Court still cannot resolve this Senate Factor on

summary judgment because it would require the Court to assess Dr. Collingwood's credibility.

### e) Senate Factor 6: racial appeals

Next, the Court considers "whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296 (quoting Gingles, 478 U.S. at 45). Plaintiffs submit expert evidence of racial appeals in Georgia's campaigns through Dr. Burton's expert report. Doc. No. [174-5].

In his report, Dr. Burton assesses mainly implicit racial appeals in campaigns throughout Georgia's history, with a specific focus on the Gubernatorial races in 2018 and 2022, and the 2020 Senate race. Id. at 68–71. Defendants argue that Dr. Burton's evidence of racial appeals is insufficient because (1) there is no evidence of racial appeals in congressional races (i.e., the relevant elections challenged by Plaintiff), (2) in several of the statewide races with evidence of racial appeals the candidate making the racial appeal lost the election, and (3) Plaintiffs' evidence is inadmissible hearsay. Doc. No. [187], 28–29.

On the latter point, the Court has already determined that an expert can use otherwise inadmissible hearsay evidence, as long as it is of a variety generally

103

relied upon in the field for expert testimony. Fed. R. Evid. 703; <u>see also</u> note 48 <u>supra</u>. The newspapers, academic papers, and other sources regarding the history and use of racial appeals in Georgia used by Dr. Burton fall within this exception. Doc. No. [174-5], 9 (articulating that this analysis used the "standard methodology" of historians, which included "examin[ing] relevant scholarly studies, newspaper coverage of events, reports of local, state or federal governments, relevant court decisions, and the record in court cases . . . ."). Thus, Dr. Burton's recounting of these statements may be admissible at trial, and thereby can be considered in resolving the instant Motion.

As for Defendants' contention that the evidence of racial appeals must relate to the challenged election, the Court finds no support for this point in the cited caselaw. In <u>Rose</u>, which Defendants cite in support (Doc. No. [187], 29), the district court assessed "political campaign advertisements in Georgia generally" and furthermore stated that "the type of campaign to which they relate is relevant to the weight this evidence carries." 619 F. Supp. 3d at 1266. The district court then went on to find plaintiffs' evidence of racial appeals to be insufficient—i.e., to "not carry the weight [p]laintiffs seek to place on them"—because "while there was some evidence of racial appeals made during political campaigns in

statewide Georgia races generally, there was no evidence of such appeals in [the elections at issue]." Id. Thus, to the extent Rose is a guide, the Court can consider evidence of racial appeals in Georgia elections generally and thereafter determine the weight of such evidence in the light of the elections specifically challenged. This weighing, however, cannot be completed on summary judgment. Nor can the Court consider the weight to give racial appeals when the candidate making the appeal loses his or her election. Doc. No. [185] (Burton Dep. Tr.) Tr. 127:2–23. Thus, the Court cannot resolve this factor on summary judgment.

    f) **Senate Factor 7: underrepresentation and success outside of majority-minority districts of Black candidates**

  The Court next considers "the extent to which members of the minority group have been elected to public office in the jurisdiction." Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). Once again, Plaintiffs rely on Dr. Burton's report, which specifies that, historically, Black candidates have not been successful in majority white districts. Doc. No. [174-5], 42. Dr. Burton indicates that this difficulty persists to the present, where "most Black candidates in Georgia are only able to win in districts which are majority Black." Id. at 56.

Defendants do not meaningfully contest this evidence but instead submit that this factor requires a factual inquiry inappropriate for summary judgment. Doc. No. [187], 29–30. The Court agrees. Plaintiffs cite to evidence of Georgia House and Senate elections, as well as statewide federal elections. Doc. No. [173-1], 39–40. The applicability (i.e., weight) of this evidence with regards to *federal congressional elections*, however, requires an assessment that the Court cannot instantly undertake. Thus, this factor cannot be weighed for purposes of summary judgment.

### g) Senate Factor 8: Georgia's unresponsiveness to Black residents

"[U]nresponsiveness is of limited importance under section 2 . . . ." Marengo Cnty., 731 F.2d at 1572. In fact, the Eleventh Circuit has said that "unresponsiveness would be relevant only if the plaintiff chose to make it so . . . ." Id.

For this factor, Plaintiffs primarily cite the same expert-based socioeconomic disparities evidence from Senate Factor 5, and Dr. Collingwood's opinion specifically that "it follows" from these disparities that Georgia is generally unresponsive to Black Georgians. Doc. Nos. [188], ¶ 208; [174-6], 5. Defendants contend that citing to socioeconomic disparities alone is insufficient

106

for this factor to weigh in favor of Plaintiffs. Doc. No. [187], 30. It is true that a

sister district court has held "Senate Factor 8 focuses on a lack of responsiveness,

not disproportionate effect, and . . . that it requires something more than an

outsized effect correlated with race." Rose, 619 F. Supp. 3d at 1267. The Court

evaluated this evidence at the preliminary injunction phase. Alpha Phi Alpha,

587 F. Supp. 3d at 1320. The Court finds that at least a question of fact and a

weighing of evidence is required to assess the presence of socioeconomic

disparities and whether they indicate unresponsiveness. Thus, summary

judgment on this factor is inapposite.

### h)   Senate Factor 9: justification for Enacted Plan

Finally, the Court assesses the justification for the Enacted Plan. See

Singleton, 582 F. Supp. 3d at 1024 ; Alpha Phi Alpha, 587 F. Supp. 3d at 1320.

Plaintiffs submit that the Illustrative Plan, which creates an additional

majority-minority district, shows that Defendants lacked justification for  the

Enacted Plan. Doc. No. [173-1], 41–42. Defendants respond that the real

motivation behind the Enacted Plan was not race, but partisanship, and that

Plaintiffs have failed to engage with this alternative explanation. Doc. No. [187],

30–31. At this stage in the proceedings, the Court cannot assess the motivations

behind Defendants' enactment of the current map. While the partisanship argument is certainly relevant for the Court's assessment of this factor, such a determination requires weighing facts and assessing credibility. Thereby, this factor likewise cannot be resolved or considered for summary judgment.

### 5.   *Proportionality*

Defendants briefly, at the conclusion of their response to Plaintiffs' Summary Judgment Motion, reraise their proportionality argument and assert that Plaintiffs' Motion has failed to address proportionality. Doc. No. [187], 31. The Court has already rejected Defendants' proportionality argument, see Section III(A)(3) supra, and reiterates that the outstanding questions of fact and credibility precludes summary judgment resolution of the matter.

### 6.   *Conclusion on Plaintiffs' Summary Judgment Motion*

Plaintiffs failed to show that there were no material disputes of fact and that they are entitled to summary judgment as a matter of law. Plaintiffs have not prevailed on summary judgment at any of the three Gingles preconditions or on the totality of the circumstances inquiry. Thus, the Court denies Plaintiffs' Motion. Doc. No. [173].

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment. Doc. No. [175]. The Court also **DENIES** Plaintiffs' Motion for Summary Judgment. Doc. No. [173]. As the Court noted consistently throughout this Order, there are material disputes of fact and credibility determinations that foreclose the award of summary judgment to either Party. Additionally, given the gravity and importance of the right to an equal vote for all American citizens, the Court will engage in a thorough and sifting review of the evidence that the Parties will present in this case at a trial.

Accordingly, the case will proceed to a coordinated trial with Alpha Phi Alpha Fraternity, Inc., et al. v. Brad Raffensperger, No. 1:21-cv-5339-SCJ and Annie Lois Grant et al. v. Brad Raffensperger et al., No. 1:22-cv-122-SCJ. The Second Amended Scheduling Order shall govern the forthcoming proceedings. Doc. No. [210].

**IT IS SO ORDERED** this 17th day of July, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

109