## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CURLING PLAINTIFFS' REPLY IN SUPPORT
## OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................1

II.  ARGUMENT .............................................................................3

A.  Defendants Abandon Claims that the DRE System Is Secure.........................3

B.  Georgia Law Explicitly Provides for Paper Ballots in Lieu of DREs
    under the Circumstances Here, just as the Curling Plaintiffs Propose .............5

C.  Defendants Fail to Show that the Public Interest Is Better Served by
    the Admittedly-Unreliable DREs than Absentee Paper Ballots ......................8

   1.  Defendants' Predictions of Chaos Are Speculative and
       Contradictory.................................................................8

   2.  Defendants Fail to Show that the Requested Relief Would Be
       More Burdensome than the Current DRE-Based System............................9

   3.  Defendants' Feasibility Arguments Are Speculative and Contrary
       to the Facts ................................................................10

D.  Balancing the Equities Heavily Favors Plaintiffs ...........................15

E.  Any Burden on the State from Implementing a Change Is the Result
    of Defendants' Inexplicable Delay ..........................................16

F.  Defendants' Remaining Arguments Fail ........................................19

   1.  The Curling Plaintiffs Have Standing ......................................19

   2.  The Curling Plaintiffs Are Likely to Succeed on the Merits ................20

   3.  The Curling Plaintiffs Will Suffer Irreparable Harm.......................23

III. CONCLUSION...........................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Benisek v. Lamone,*
   138 S. Ct. 1942 (2018) .............................................................18

*Common Cause/Ga. v. Billups,*
   554 F.3d 1340 (11th Cir. 2009) .............................................20

*Farnum v. Burns,*
   548 F. Supp. 769 (D.R.I. 1982) .............................................15

*Favorito v. Handel,*
   285 Ga. 795 (2009) .................................................................21

*League of Women Voters of Fla. v. Detzner,*
   No. 4:18-CV-2851-MW/CAS,
   2018 WL 3545079 (N.D. Fla. July 24, 2018)........................23

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014) .................................................15

*Ne. Ohio Coal. for Homeless v. Husted,*
   696 F.3d 580 (6th Cir. 2012) ...................................................4

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) .................................................23

*Otu v. Papa John's USA, Inc.,*
   400 F. Supp. 2d 1315 (N.D. Ga. 2005) .................................19

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) ...................................................................22

*Reynolds v. Sims,*
   377 U.S. 533 (1964) ...............................................................24

*Stein v. Cortes,*
   223 F. Supp. 3d 423 (E.D. Pa. 2016).....................................21

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014) ...................................................................................20

*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) .......................................... 8, 15

*Weber v. Shelley*,
   347 F.3d 1101 (9th Cir. 2003) .............................................................21

*Wexler v. Anderson*,
   452 F.3d 1226 (11th Cir. 2006) .........................................................22

**Other Authorities**

O.C.G.A. § 21-2-281 (2017)...............................................................................6

O.C.G.A. § 21-2-334 (2017) ...................................................................... 6, 17

O.C.G.A. § 50-5-71 (2017) .............................................................................13

O.C.G.A. §§ 21-2-384–86 (2017)....................................................................7

O.C.G.A. § 21-2-50 (2017) ..............................................................................8

## I.     INTRODUCTION

Defendants provide no basis for this Court to deny the Curling Plaintiffs' Motion.  They substitute conjecture for facts and legal authority and implicitly concede the inherent unreliability of the current DRE-based system.  But they refuse to do anything about it this year.  This violates the U.S. Constitution and Georgia state law and necessitates injunctive relief.

*First*, Defendants do not dispute any of the serious vulnerabilities inherent in the current DRE-based system.  Defendants offer no response to Plaintiffs' experts (or Congressional findings), leaving those findings unrefuted.  Neither do they respond to the U.S. intelligence community's unanimous findings that Russia's efforts to interfere in U.S. elections are real and intensifying.  They do not dispute that the DRE-based system lacks any ability to audit and verify the results.  And they do not refute that the central server for Georgia's DRE-based system was accessible to hackers for an extended period of time and that nothing has been done to ensure it was not hacked.  These unrefuted facts are dispositive.

*Second*, Defendants gloss over the fact that the relief the Curling Plaintiffs seek is already required or authorized by Georgia law.  They essentially embrace the Curling Plaintiffs' proposed remedy while simultaneously condemning it.  Defendants admit that Georgia voters "possess an unlimited legal right to cast their

vote by paper absentee ballot" (Dkt. No. 265 at 20) and that "the adequate remedy available … is to vote via absentee ballot," which "are paper ballots and are read with optical scanners" (Dkt. No. 267 at 4).  Defendants nonetheless refuse to provide absentee ballots to all voters, in violation of Georgia law, and *speculate* that doing so *might* be infeasible.  Their refusal to comply with the law necessitates injunctive relief—their claim that they are required to use DREs is plainly wrong.

*Third*, Defendants' complaints about implementing the reasonable measures proposed by the Curling Plaintiffs completely ignore the question that matters: whether the potential costs and burdens of those measures are so much *more*—if at all—than the costs and burdens of the current DRE-based system so as to render them unworkable for the 2018 elections.  Defendants provide no comparison at all of the costs and burdens of the Curling Plaintiffs' proposals *to those the State and counties would incur under the current DRE-based system*.  They also ignore the nearly $11 million in federal funding Georgia received for this purpose.  Defendants' admission that the State and counties are required to provide absentee ballots for all Georgia voters reveals that their insistence on DREs is not only unnecessary but a waste of resources that could be used to handle paper ballots.

*Fourth*, Defendants seek to turn the law on its head.  They argue that they are entitled to burden the right to vote "to ensure that elections are *fair, honest and*

*efficient*."  (Dkt. No. 265 at 1 (emphasis in original) (citation omitted).)  But Defendants are doing *the opposite*.  They seek to burden—and potentially eviscerate—the right to vote simply to preserve a system that indisputably *cannot* ensure a fair, honest, and efficient election at a time when sophisticated hacking efforts are inevitable.

*Lastly*, Defendants' laches argument is meritless and not well taken by the Curling Plaintiffs, who are not responsible for any delay in these proceedings. They have worked diligently to advance this case and found themselves stymied in this litigation due to circumstances not of their making and over which they had no control.  The only delay that is relevant here is that of Defendants.  That little time now remains to adopt critical protective measures is the result of Defendants' inexplicable nonfeasance in the months and years since these issues were flagged by federal authorities, experts, and others.  Defendants have left this Court as the last resort to ensure a reasonably secure, reliable election for Georgia voters.

II.    **ARGUMENT**

   **A. Defendants Abandon Claims that the DRE System Is Secure**

Defendants no longer defend their indefensible system, failing to submit a single declaration from an election security expert in response to Curling Plaintiffs' overwhelming evidence that the current system is unreliable.  They simply ignore

the findings of renowned election security experts Professors Alex Halderman and

Duncan Buell, as well as other cybersecurity and election experts, Congress, the

national security establishment, and the White House.  (*See* Dkt. Nos. 260-1, 260-

2, and 260-3.)  Moreover, the Chief Information Officer for the Secretary of State,

Merritt Beaver[1], is forced to admit the serious security weaknesses that occurred on

his watch, as confirmed by Mr. Lamb.  (Dkt. No. 265-1 ¶ 6.)  Defendants do not

even try to show the DREs are reliable.  This is dispositive:  a system that is

indefensibly unsecure cannot reliably count Plaintiffs' votes, which constitutes

grave, irreparable harm.  *See, e.g.*, *Ne. Ohio Coal. for Homeless v. Husted*, 696

F.3d 580, 599 (6th Cir. 2012) (affirming that vote dilution from treatment of

wrong-precinct ballots constituted irreparable harm).

Despite the lack of any showing in this litigation that the DREs are secure,

Defendant Kemp has continued to *publicly* make unsubstantiated claims that the

DREs are secure.[2]  These unsupported statements contradict the universal and

unrefuted findings from experts and federal officials.  (*See* Dkt. Nos. 260-1, 260-2,

---

[1] Mr. Beaver does not cite any formal election security training.

[2] Kemp reportedly stated: "Georgians should know that their votes count because our voting equipment remains accurate and secure."  Ben Nadler, *Georgia's Kemp wants verifiable voting, but not right away*, Washington Post (Aug. 16, 2018), https://www.washingtonpost.com/politics/georgias-kemp-wants-verifiable-voting----after-his-race/2018/08/16/90426f7a-a17b-11e8-a3dd-2a1991f075d5_story.html.

and 260-3.)  By repeating these inaccurate claims as recently as last week, Defendant Kemp is misleading voters into using DREs, effectively depriving them of their "unlimited legal right" to choose to vote on absentee paper ballots. Because many voters do not understand the inherent vulnerabilities in DREs and because Defendant Kemp himself continues to disclaim those vulnerabilities publicly, many voters do not know to exercise their right—or even that they have the right—to vote by absentee paper ballot.  This requires injunctive relief.

Given the unrefuted showing that Georgia's DRE-based system is inherently and seriously unreliable, at a time when sophisticated interference is intensifying, this Court cannot lawfully allow Defendants to subject the Curling Plaintiffs and other Georgia voters to that system.  This would violate both the U.S. Constitution and Georgia law, requiring a fair, honest, and efficient election.

### B. Georgia Law Explicitly Provides for Paper Ballots in Lieu of DREs under the Circumstances Here, just as the Curling Plaintiffs Propose

Given Defendants' inability to defend the DREs in the face of unrefuted evidence establishing serious vulnerabilities with those machines—coupled with Georgia's unique vulnerabilities resulting from public access to its backend server used to manage the election and all the DREs across the state—Georgia law provides for the use of paper absentee ballots instead of DREs.  The Georgia

5

legislature had the foresight, when adopting the DRE-based system years ago, to provide a statutory alternative if, and when, that system should become unreliable, as it is today. Specifically, Georgia law provides that *entire* elections may be conducted using paper ballots if DREs become "impracticable." O.C.G.A. § 21-2-281. Georgia law further provides:

> [I]f, for any [] reason, at any primary or election the use of voting machines wholly or in part is not practicable, the superintendent may arrange to have the voting … conducted by paper ballots. In such cases, paper ballots shall be printed . . . the primary or election shall be conducted by the poll officers, and the ballots shall be counted and return thereof made in the manner required by law for such nominations, offices, or questions, insofar as paper ballots are used.

O.C.G.A. § 21-2-334. Defendants simply ignore the legislature's foresight and offer no reason why they did not, many months ago, implement this statutory alternative to provide a secure election this year. They must now do so.

No reasonable argument can be made that the admittedly-unsecure DREs are "practicable" in the face of intensifying election interference from sophisticated nation-states such as Russia—nor do Defendants even attempt such an argument. What the legislature unfortunately could not foresee was an administration that has refused to comply with its duty to ensure "legality and *purity* in all primaries and elections." O.C.G.A. § 21-2-31 (emphasis added).

Defendants' argument that using all absentee paper ballots this year *might*

6

not work because this would require a time-consuming notice and comment process to create new rules and regulations is wrong and misleading.  Defendants admit that Georgia law already requires officials to make absentee ballots available to every voter.  O.C.G.A. §§ 21-2-384–86; (Dkt. Nos. 265 at 20; 267 at 4.).  As a result, the State and counties are already legally required to have procedures for printing, providing, collecting, and counting those paper ballots.[3]  Under the Curling Plaintiffs' approach, they need only expand their *existing* procedures for those ballots.  Tellingly, Defendants fail to cite to any new rule or regulation they purportedly would need.[4]  In fact, Georgia law already empowers the Secretary of State and the State Election Board members, separate from authority to promulgate rules and regulations, "[t]o furnish … envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections" and "[t]o take such other action, consistent with law, as the board may determine to be conducive to the fair,

---

[3] *See,* State of Georgia, Elections Division, *The Poll Worker Manual* (2016), https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll%20 Worker%20Training%20Manual.pdf.

[4] Georgia already should be greatly increasing the number of absentee ballots available for the upcoming election.  With the extensive national attention on Georgia's unreliable system, more voters are likely to exercise their "unlimited legal right" to vote by absentee paper ballot.  As a result, Georgia should be preparing for many more absentee ballots than ever before.  Defendants' implication that they are not doing this highlights the need for injunctive relief.

7

legal, and orderly conduct of primaries and elections." O.C.G.A. §§ 21-2-50, -31.

### C. Defendants Fail to Show that the Public Interest Is Better Served by the Admittedly-Unreliable DREs than Absentee Paper Ballots

Defendants' public interest arguments focus entirely on cost and administrative burden. But, this Court has found these exact hardships insufficient and "substantially outweighed" compared to the threat of disenfranchising voters. *United States v. Georgia*, 892 F. Supp. 2d 1367, 1376-77 (N.D. Ga. 2012). Despite Defendants' bluster, their witnesses largely explain that Curling Plaintiffs' requested relief actually is achievable in the time remaining. (*See, e.g.,* Dkt. No. 265-3 ¶¶ 4-5, 9-10, 13-17.) Defendants have failed to show that the Curling Plaintiffs' injunction is so infeasible as to be against the public interest.

### 1.  Defendants' Predictions of Chaos Are Speculative and Contradictory

Defendants admit that all Georgia voters have an "unlimited legal right" to vote by absentee paper ballots—and that "the adequate remedy available . . . is to vote via absentee ballot" (Dkt. No. 267 at 4)—while simultaneously arguing that it is impossible for all Georgia voters to exercise this right. Defendants' speculative arguments about the infeasibility of absentee paper balloting for all voters cannot be reconciled with the undisputed law in Georgia guaranteeing that "unlimited legal right." (Dkt. No. 265 at 20.) Given this undisputed right, either Defendants

implicitly admit that their intended actions for the 2018 election will violate that right, or their conjecture about the feasibility of enforcing that right with absentee paper ballots statewide—in lieu of DREs—is simply wrong.  Either way, injunctive relief is warranted and appropriate.

### 2.    Defendants Fail to Show that the Requested Relief Would Be More Burdensome than the Current DRE-Based System

Defendants provide no information at all about the substantial costs and resources of administering the current DRE-based system.  As a result, they provide no basis to conclude that the Curling Plaintiffs' simpler approach would require *more* resources and be unworkable.  Defendants' silence on this dispositive issue perhaps stems from the fact that the costs of administering DRE systems and paper-ballot systems with optical scanners actually can be comparable.[5]  In the absence of the Curling Plaintiffs' requested relief, Georgia will expend significant effort and resources to develop the programming needed for the DREs, program and test each of thousands of DREs, train election officials across the state to use those machines[6], and provide the necessary technical support to try to keep those

---

[5] Lawrence Norden, *The Machinery of Democracy: Voting System Security, Accessibility, Usability, and Cost*, NYU Brennan Ctr. for Justice, at 127 (2006), https://www.brennancenter.org/sites/default/files/publications/Machinery_Democracy.pdf.

[6] Defendants admit that training has not even begun.  (Dkt. No. 265-3 ¶ 22.)

thousands of machines functioning properly statewide (in the face of intensifying, sophisticated hacking efforts), among many other time-consuming and costly requirements to administer the DRE-based system.[7]  And this is in addition to the effort and resources required to ensure every voter who wants to vote by absentee paper ballot can do so, since every voter has that "unlimited legal right."

Defendants' failure to take into account the likely costs and resources that would be saved by the Curling Plaintiffs' approach renders their feasibility claims irrelevant.  Having elected not to address the "practical realities" of the Curling Plaintiffs' approach *as compared to the DRE-based system*, Defendants have failed to meet their burden to show that the requested relief will impose burdens so heavy as to outweigh voters' constitutional rights (and to justify unreliable DRE voting).

### 3.   Defendants' Feasibility Arguments Are Speculative and Contrary to the Facts

Defendants rely on rampant speculation for their arguments addressing the impact on the public interest of the Curling Plaintiffs' requested relief.  (*See*, *e.g*., Dkt. No. 265-6 ¶ 5 ("There are *potential* issues with the implementation of paper ballots . . ."); Dkt. No. 265-1 ¶ 8 ("Moving to paper ballots in such an abbreviated

---

[7] Given the imminent threat of Russian interference, Defendants also will need to try to determine some way of auditing the DRE results, which necessarily will be costly, technically challenging, and highly inefficient.  Defendants offer no ideas for how to do this or what resources it will require.

time frame *could potentially* damage Georgia's election security").  This Court

ordered the parties to answer this question: "Would statewide implementation of

the requested relief in an expedited, limited time frame *actually* compromise the

reliability and functionality of the voting system . . . ?"  (Dkt. No. 259 at 1-2

(emphasis added).)  Defendants provide no answer and no basis for this Court to

find that it would.

Defendants instead resort to irrelevant scare tactics.  For example,

Defendants invoke the specter of "hanging chads" (Dkt. No. 265 at 27), despite

their irrelevance to Georgia's existing paper ballots.  (Dkt. No. 265-6 ¶ 3.)  They

even imply that switching to paper ballots statewide would result in World War II-

era ballot stuffing.  (Dkt. No. 265 at 4.)  It is incredible that those entrusted with

ensuring "legality and purity in all primaries and elections" argue that they

themselves—and the thousands of hard-working election officials across the

state—are incapable of doing that with absentee paper ballots, which they admit

Georgia law already guarantees *every voter* in the state.  O.C.G.A.§ 21-2-31.

 Defendants' purported concerns about disenfranchisement, chaos at the

polls, and voter confusion ignore a key aspect of the relief sought by the Curling

Plaintiffs.  (Dkt. No. 265-5 ¶ 8.)[8]  The Curling Plaintiffs propose mailing absentee ballots to all registered voters, along with instructions and information about early voting.  (Dkt. No. 260-7.)  Voters will have weeks to return the absentee ballots, either by mail (in pre-addressed, postage-paid envelopes)[9] or by dropping them at one of Georgia's existing locations that serve this very purpose.[10]  This relief reduces voter confusion, educating voters well in advance of Election Day and giving them ample time to seek assistance.  (Atkeson Decl. ¶ 19.)  It also removes current barriers to voting.  By mailing everyone a ballot without having to request one and facilitating the return of the ballot at no cost to the voters, voter turnout likely will increase, as it typically has under similar systems.  (*Id.* ¶ 11.)  This will also reduce crowds, lines, and burden at polling locations, as many voters likely

---

[8] Defendants claim that "[a]ny change in voting system between elections is confusing to both voters and poll officials."  (Dkt. No. 265-5 ¶ 8.)  Since they admit the current system needs to be replaced, their claims of confusion from the Curling Plaintiffs' requested relief carry no weight.  (Dkt. No. 265 at 1; Dkt. No. 265-2 ¶ 4.)  Thus, confusion is inevitable according to Defendants.

[9] The Secretary of State for the State of Washington recently implemented statewide, postage prepaid ballots for 2018 primary and midterm elections.  The state has used a mail-in paper ballot system since 2011.  *See* Ryan Blethen, *Ballots are on the way for Washington state voters, who won't have to dig for stamps anymore*, The Seattle Times (July 19, 2018), https://www.seattletimes.com/seattle-news/politics/ballots-are-on-the-way-for-washington-state-voters-who-wont-have-to-dig-for-stamps-anymore/.

[10] Ga. Sec'y of State, Absentee Voting: A Guide for Registered Voters, v.1 2014, at 4-6 (2014), http://sos.ga.gov/admin/uploads/Absentee_Voting_Guide_20142.pdf.

will take advantage of this convenient option in lieu of in-person, Election Day-voting. (*Id.* ¶¶ 11, 23.) Moreover, this approach will decrease the lines, confusion, and delay caused by the frequent errors and breakdowns associated with the use of DRE machines. (Henderson Decl. ¶ 7.) Thus, Defendants' concerns about long lines and lack of resources at polling places are unfounded and contrary to the facts.

Defendants' purported cost concerns fare no better. (Dkt. Nos. 265-4 ¶ 17 (citing the "significant . . . financial burden"); 265-5 ¶ 6 (same).) Not only do they fail to show that the requested relief will cost more than the current DRE-based system, they neglect to mention the $10.8 million Georgia received from the Election Assistance Commission in July 2018 for the very purpose of securing Georgia's elections. (Atkeson Decl. ¶ 17.) Much, if not all, of the costs involved could be covered by these funds.[11] Defendants also ignore that aspects of the Curling Plaintiffs' proposed relief are offsetting: the greater the costs of return postage for absentee ballots, the lesser the burden at the polls.

Defendants next resort to objections about the time and energy it will take to implement the Curling Plaintiffs' requested relief. (Dkt. Nos. 265-2 ¶ 12

---

[11] Defendants claim a special session of the General Assembly would be required to appropriate the necessary funds. (Dkt. No. 265 at 12.) But, Georgia law grants emergency purchasing authority to any state officer or board. O.C.G.A. § 50-5-71.

13

("difficult logistical challenge");  265-4 ¶ 17 ("significant administrative…

burden").)  Not only do these concerns fail as a matter of law, Defendants concede

there is still time for the necessary preparations.  For example, they have not even

begun testing DREs or training poll workers.  (Dkt. Nos. 267, Ex. 1 ¶ 4; 265-3 ¶

22.)  And again, all training needed for the requested relief is consistent with

existing procedures, as Defendants are already obligated to mail absentee ballots

(upon request) and to provide paper ballots at the polls.[12]

Finally, Defendants warn of logistical challenges.  Not only does this also

fail as a matter of law, it ignores many obvious, practical solutions.  For example,

Defendants speculate that they may not be able to obtain sufficient paper from their

existing vendor.  (Dkt. No. 265-3 ¶ 6.)  Tellingly, they evidently did not contact the

vendor to actually determine this.  Regardless, Defendants can acquire paper from

numerous sources.  (Atkeson Decl. ¶ 24.)  Defendants also suggest that all counties

would need to purchase a significant volume of scanners, which they speculate

may not be available.  (Dkt. Nos. 265 at 7-8; 265-2 ¶ 20-22.)  But many counties

would not need additional machines, as they are small enough to use their current

stock (or even quickly hand-count, if necessary).  (Atkeson Decl. ¶ 35.)  The few

---

[12] *See generally* State of Georgia, Elections Division, *The Poll Worker Manual*
(2016), https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20
Poll%20Worker%20Training%20Manual.pdf.

large counties that would need additional machines could lease, rent, or purchase a small quantity of high-volume central scanners.  (*Id.* ¶ 33.)  Defendants provide no basis for this Court to conclude otherwise.

In sum, Defendants' speculative claims of cost and burden, as opposed to proven impossibility, are legally insufficient to deny voters the right to have their votes accurately counted.  *United States v. Georgia*, 892 F. Supp. 2d at 1376-77.

### D. Balancing the Equities Heavily Favors Plaintiffs

Defendants argue that because election preparations have already begun under the current DRE-based system, it is too late to take steps to secure the election.  (Dkt. No. 265 at 16.)  But the mere fact that the "election machinery is already in gear" is no justification to tread on voters' rights by forcing them to use a system that is admittedly unreliable.  "The right to vote is fundamental . . . [a]nd a *tight timeframe before an election does not diminish that right*."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 229 (4th Cir. 2014) (remanding to district court for preliminary injunction on October 1) (emphasis added).  Defendants' own cases illustrate the extents to which courts have gone to protect the right to vote, even if it means delaying elections when holding them would be unconstitutional.  *See Farnum v. Burns*, 548 F. Supp. 769, 775 (D.R.I. 1982) (enjoining senatorial election for unconstitutional apportionment plan).

15

The Curling Plaintiffs do not seek such drastic relief.  Their proposal seeks to take advantage of the *existing* framework for absentee paper ballots, to which every voter has an "unlimited legal right."  (Dkt. No. 265 at 20.)  The Curling Plaintiffs have provided unrebutted evidence of the unreliability of the current system and the feasibility—and reasonableness—of the requested relief.  Any costs and burdens associated with this relief are far outweighed by the consequences if the Court does nothing.

### E. Any Burden on the State from Implementing a Change Is the Result of Defendants' Inexplicable Delay

To the extent there is any increased burden in implementing a change now, the responsibility for this lies squarely with Defendants, who have blocked and delayed change at every turn.  Although Defendants trumpet the SAFE Commission, it was not convened until April 2018, a year after news of election interference by Russia.[13]  It has met once and achieved nothing.  (Dkt. Nos. 260-1 at 11; 265 at 1.)  Before the November 2016 election, Defendant Kemp rejected offers of federal aid to bolster Georgia's election security, claiming that "[t]he question remains whether the federal government will subvert the Constitution to

---

[13] In addition to ignoring these broader threats, Defendants' agents also ignored the actual vulnerabilities of Georgia's backend election server for over six months before taking any action. (Dkt. No. 258-1 ¶ 16.)

achieve the goal of federalizing elections under the guise of security."[14]  Defendant

Kemp did not request EAC assistance until July 2018, prompting an admonishment

by members of Congress that "Georgia needs to move with greater urgency to

address its greatest vulnerability – paperless voting machines."[15]

Additionally, the State Defendants have sought to prevent the counties from

exercising their statutory discretion to implement change themselves.  In an August

1, 2018 letter to county election officials statewide, the State Elections Division

Director claimed that counties could not utilize paper ballots.  (Dkt. No. 258-1 at

103.)  Such statements directly contradict Georgia law, which expressly allows the

counties to arrange for paper ballots where the use of voting machines is not

practicable, as is the case here.  O.C.G.A.§ 21-2-334.

Defendants also have delayed this litigation.  The Curling Plaintiffs have

long sought discovery to inform their motion for preliminary injunction.  (*See* Dkt.

No. 179 at 7).  Defendants have repeatedly objected, demanding rulings on

meritless arguments regarding standing and immunity in their motions to dismiss

---

[14] Eric Geller, *Elections security: Federal help or power grab?*, Politico (Aug. 28, 2016), https://www.politico.com/story/2016/08/election-cyber-security-georgia-227475.
[15] *See* U.S. Comm. on H. Admin. – Democrats, *Election Security Update: Top 18 Most Vulnerable States*, at 4 (July 2018), https://democrats-cha.house.gov/sites/democrats.cha.house.gov/files/Election_Security_Update.pdf.

before discovery could proceed.  (*See* Dkt. Nos. 186 at 26:13-22; 228 at 4.)

Tellingly, Defendants make *no mention* of immunity and devote only passing

attention to standing.  (*See* Dkt. No. 265 at 21).  And they provide extensive

declarations about which the Curling Plaintiffs lack discovery.  The Court warned

Defendants' about their approach last fall, but they persisted:

> And if the defendants insist on invoking their rights to basically stay
> discovery while I look at the motions to dismiss—you have a right to
> do that, but I will say also then you're pressing up against your own
> deadlines and time frame in the end. And I take note of that because *it
> is not simply the plaintiffs' fault under these circumstances*.

(Dkt. No. 60 at 5:12-24 (emphasis added).)

Thus, Defendants' laches argument is frivolous, particularly against the

Curling Plaintiffs, who have made every attempt to streamline the issues and move

forward as expeditiously as possible.  At every turn, they have been met with

unnecessary complication and obstruction by Defendants and other parties.[16]  (*See*

Dkt. No. 229.)  Defendants' insistence on filing yet another motion to dismiss in

---

[16] In contrast, courts have denied motions for preliminary injunction due to delay
where the moving party was aware of the conduct underlying their claims for years
before filing suit at the last minute. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944
(2018) (affirming denial where plaintiffs did not move for injunction until three
years after filing complaint).  The Curling Plaintiffs anticipated a need for limited
discovery to refute the allegations that would be raised in declarations opposing
their motion for preliminary injunction.  The delay from Defendants and others
forced the Curling Plaintiffs to file without discovery.

response to the Coalition Plaintiffs' *narrowed* Third Amended Complaint was merely a vehicle for further delay which the Curling Plaintiffs sought to avoid. Defendants cannot use their own delay to prevent the Court from granting injunctive relief, much less attempt to attribute delay to the Curling Plaintiffs.

### F.  Defendants' Remaining Arguments Fail

Defendants devote little attention to the merits of the Curling Plaintiffs' claims.  This comes as no surprise given their inability to refute the admitted unreliability of DREs.  As a result, the question before this Court is not whether there is a constitutional violation, but simply what the proper remedy should be.

### 1.    The Curling Plaintiffs Have Standing

Apart from vague, generalized claims, Defendants fail to address any—much less each—individual Plaintiffs' standing and make no argument that *the Curling Plaintiffs* do not meet the three requirements for standing.  Defendants do not respond to the Curling Plaintiffs' standing arguments at all.  This is dispositive as to the Curling Plaintiffs.  *See Otu v. Papa John's USA, Inc.*, 400 F. Supp. 2d 1315, 1328 (N.D. Ga. 2005) (finding party conceded claim where it failed to respond to legal arguments related to claim).

Moreover, Defendants' argument that there is no injury-in-fact unless and until the Curling Plaintiffs show the actual deprivation of their votes is incorrect as

19

a matter of law.[17] *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("A plaintiff need not have the franchise wholly denied to suffer injury.") (citation omitted). Being forced to choose between voting in-person on an unsecure DRE or going through the current, cumbersome procedural steps required to obtain an absentee paper ballot constitutes injury-in-fact. *Id.* at 1351-52. The Curling Plaintiffs also face the imminent risk of disenfranchisement as a result of interference, which provides additional grounds for standing. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (future injury is enough where there is a "substantial risk" of harm). Defendants' snarky portrayal of this risk as "speculative" or "hypothetical" (Dkt. No. 265 at 3, 6) contradicts the unrefuted findings of the intelligence community and others and should be ignored.

### 2.   The Curling Plaintiffs Are Likely to Succeed on the Merits

Defendants concede much more than they dispute in addressing the likelihood of success. The following facts are unrebutted: (1) Georgia's DREs are inherently unsecure and there is no way to confirm whether there has been a breach or to verify the results; (2) the central server that served all DREs was exposed for

---

[17] Ms. Curling was disenfranchised under the current system when she sought to avoid DREs by voting absentee. (Dkt. No. 260-4 ¶¶ 5-11.) Her experience highlights the harm voters face trying to vote absentee in the current DRE-centric system. Defendants entirely ignore this fact.

over six months and was breached at least twice; and (3) there have been, *and are ongoing*, efforts to interfere with U.S. elections, *including specifically Georgia's election system*, by sophisticated nation-state actors.  These facts, coupled with the fact that Defendants have done nothing meaningful in response, render each of the cases on which Defendants rely for their argument wholly inapposite.

Defendants' heavy reliance on *Favorito v. Handel*, 285 Ga. 795 (2009), is misplaced.  The sole issue before the court—nearly a decade ago—was the lack of a verifiable record.  The reliability risk inherent to the lack of verification is greatly amplified today by the now-admitted vulnerabilities in DREs and the imminent risk of interference.  Similarly, in *Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003), there was no evidence that the defendants' conduct *increased the likelihood of electoral interference*—as is the case here—by their refusal to respond to a threat of harm.  And in *Stein v. Cortes*, 223 F. Supp. 3d 423, 440 (E.D. Pa. 2016), the court found little evidence of tampering in Pennsylvania in 2016, given the state's robust processes throughout its "highly dispersed system."  Georgia's central election server, on the other hand, was exposed for months, and Defendants provide only the vague, conclusory claim that "[t]he way that KSU stored and transmitted data is not the way that those tasks are undertaken now."  (Dkt. No.

21

265-1 ¶ 6.)  Defendants fail to even acknowledge the Curling Plaintiffs' showing that the server may already be infected with malware from that exposure.[18]

Finally, *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006), actually supports the Curling Plaintiffs' position.  It dealt with the narrow question of whether the manual recount procedure for Florida counties relying upon DREs was unconstitutional.  452 F.3d at 1231.  The court recognized the state's duty "to ensure that elections are fair, honest, and efficient."  *Id.* at 1232.  Defendants' refusal to replace DREs violates this duty, as illustrated by the fact that the Curling Plaintiffs and other voters have severely diminished confidence regarding whether their votes are counted.  Defendants have offered no compelling reason to value vague, speculative administrative ease over securing the election.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

Indeed, Defendants fail to identify *any* precise, "sufficiently weighty" regulatory interests that justify the continued use of DREs beyond the speculative

---

[18] Pennsylvania later mandated a statewide system with a paper record by 2019, which Defendants have refused to do in Georgia.  Michael Rubinkam, *Pennsylvania to Require Voting Machines With Paper Backup*, USA News & World Report (Feb. 9, 2018), https://www.usnews.com/news/best-states/pennsylvania/articles/2018-02-09/pennsylvania-to-require-voting-machines-with-paper-backup.

side effects of implementing a change. *League of Women Voters of Fla. v. Detzner*, No. 4:18-CV-2851-MW/CAS, 2018 WL 3545079, at \*10 (N.D. Fla. July 24, 2018). Defendants make no attempt to describe why or how the use of DREs achieves fair, accurate, and efficient elections better than paper ballots, and the empirical evidence shows otherwise. In fact, Defendants admit that the use of absentee paper ballots is an "adequate remedy" to make the election more secure—the very relief the Curling Plaintiffs seek. (Dkt. No. 267 at 4.) Defendants' only reason for not securing Georgia's elections is that it is not the way things have been done. This fails as a matter of law.

### 3.    The Curling Plaintiffs Will Suffer Irreparable Harm

"[I]rreparable injury is presumed when '[a] restriction on the fundamental right to vote' is at issue." *League of Women Voters of Fla.*, 2018 WL 3545079, at \*13 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Defendants cannot rebut this presumption. First, Defendants' dismissal of the imminent risk of interference as a "hypothetical" possibility is unsupported and alarming. There is a substantial risk that the Curling Plaintiffs' and other Georgia voters' votes will not be counted in the next election and will fall prey to an attack on Georgia's admittedly vulnerable system—the results of which cannot be verified. Law enforcement officials, federal election officials, and the election

23

security community all recognize that the threat is imminent and prescribe specific actions to mitigate that risk.  (Dkt. No. 260-1 at 3, 8-10.)  Defendants provide no evidence to the contrary, and their refusal to acknowledge this imminent threat or to adopt recommended measures leads to irreparable harm.  Defendants' obstinacy highlights that this Court is the last resort for a secure, reliable election in Georgia.

Second, Defendants' claim that the Curling Plaintiffs must show their own votes will be lost ignores the well-established principle that the right to vote encompasses more than "the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth . . . .  It also includes *the right to have the vote counted at full value without dilution or discount.*" *Reynolds v. Sims,* 377 U.S. 533, 555 n.29 (1964) (emphasis added) (citation omitted).  Even if their votes are not altered or lost, the Curling Plaintiffs' rights still will be harmed if their votes are diluted because of interference that affects the *outcome* of an election.  Because DREs cannot be independently audited or votes verified, there is little ability to determine whether election results are legitimate or the product of manipulation.

For this reason, the ability for the Curling Plaintiffs to vote absentee via paper ballot does not prevent irreparable harm.  Even if some—or most—voters are able to vote by paper ballot under the current, cumbersome absentee system, there is still the substantial risk that their votes will be discounted or negated as a

24

result of interference with the votes cast on DREs. *Even a small number of DRE votes could be enough to swing a specific election if manipulated.* Moreover, because of Defendants' insistence on prioritizing DREs, it is uncertain whether a voter who chooses to vote absentee by paper ballot under the current system will have their vote counted, as illustrated by Ms. Curling's disenfranchisement. Defendants do not—and cannot—dispute that she already has suffered irreparable harm given her attempts to "cast the paper ballot [she] perceive[d] as more secure," (Dkt. No. 265 at 24), only to learn months later that her vote did not count.

## III.   CONCLUSION

The Curling Plaintiffs fully appreciate the gravity of their request but respectfully submit that a preliminary injunction from this Court is the only way to protect their right to vote against manipulation or dilution this year. Plaintiffs' requested relief places all voters on an equal playing field and protects *all voters* against interference. Defendants have provided no basis for this Court to find that the requested relief is so much more burdensome than the costly, complex, unsecure DRE-based system to warrant subjecting voters to that unreliable system.

25

Dated: August 20, 2018                    Respectfully submitted,

                                          /s/ David D. Cross
                                          David D. Cross (*pro hac vice*)
                                          John P. Carlin (*pro hac vice*)
                                          Jane P. Bentrott (*pro hac vice*)
                                          Catherine L. Chapple (*pro hac vice*)
                                          Robert W. Manoso (*pro hac vice*)
                                          MORRISON & FOERSTER LLP
                                          2000 Pennsylvania Avenue, NW
                                          Suite 6000
                                          Washington, DC 20006
                                          Telephone: (202) 887-1500
                                          DCross@mofo.com
                                          JCarlin@mofo.com
                                          RManoso@mofo.com
                                          CChapple@mofo.com
                                          JBentrott@mofo.com

                                          Halsey G. Knapp, Jr.
                                          GA Bar No. 425320
                                          Adam M. Sparks
                                          GA Bar No. 341578
                                          KREVOLIN & HORST, LLC
                                          1201 West Peachtree Street, NW
                                          Suite 3250
                                          Atlanta, GA 30309
                                          HKnapp@khlawfirm.com
                                          Sparks@khlawfirm.com

                                          *Counsel for Plaintiffs Donna Curling,*
                                          *Donna Price & Jeffrey Schoenberg*

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,
Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,
Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

   /s/ David D. Cross
David D. Cross

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2018, a copy of the foregoing CURLING

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR

PRELIMINARY INJUNCTION was electronically filed with the Clerk of Court

using the CM/ECF system, which will automatically send notification of such

filing to all attorneys of record.

　/s/ David D. Cross
David D. Cross

28