# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

COAKLEY PENDERGRASS; TRIANA
ARNOLD JAMES; ELLIOTT
HENNINGTON; ROBERT RICHARDS;
JENS RUECKERT; and OJUAN GLAZE,

      Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State,

      Defendant.

CIVIL ACTION FILE
NO. 1:21-CV-05339-SCJ

## PLAINTIFFS' OBJECTIONS TO THE GEORGIA GENERAL ASSEMBLY'S REMEDIAL CONGRESSIONAL PLAN

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

   I.   The Court struck down Georgia's congressional plan and provided the State with clear guidance on a proper remedy. .............................................................2

   II.  The General Assembly adopted a congressional plan that defies this Court's ruling. .........................................................................................................4

LEGAL STANDARD ...........................................................................................5

ARGUMENT ........................................................................................................5

   I.   SB 3EX fails to fully remedy Georgia's Section 2 violation. .........................5

      A.  SB 3EX does not sufficiently remedy the actual vote dilution identified by the Court. ...........................................................................................6

      B.  SB 3EX cannot remedy the Section 2 violation by denying minority electoral opportunities elsewhere in Georgia. ...................................................8

   II.  SB 3EX independently violates Section 2.....................................................12

      A.  *Gingles* One: The minority population in old CD 7 is sufficiently large and compact to form a majority in a single-member district. ...................................12

      B.  *Gingles* Two: The minority community in the old CD 7 was politically cohesive. .........................................................................................................15

      C.  *Gingles* Three: White Georgians engage in bloc voting to defeat minority-preferred candidates in new CD 7. ...................................................................17

      D.  Under the totality of the circumstances, SB 3EX denies minority voters equal opportunities to elect their preferred candidates to Congress..................18

CONCLUSION ....................................................................................................25

**INTRODUCTION**

The Court's detailed ruling gave the General Assembly a simple task: create an additional majority-Black congressional district in an explicitly defined vote dilution area encompassing Congressional Districts ("CDs") 3, 6, 11, 13, and 14 while maintaining the existing minority opportunity districts elsewhere in the state. Rather than follow this Court's clear guidance, the General Assembly (1) shuffled Black voters from *outside* of the vote-dilution area into the new majority-Black district, while excluding over 50,000 Black voters from *within* the vote-dilution area from any remedy whatsoever, and (2) dismantled CD 7, a majority-minority district anchored in majority-minority Gwinnett County that it had no need to alter—let alone eliminate—in creating the new majority-Black district in west-metro Atlanta. In so doing, the General Assembly's "remedial" congressional plan openly defies this Court's order, fails to fully remedy the Section 2 violation, and independently violates Section 2.

This Court has engaged in nearly two years of proceedings leading up to its careful determination that Georgia's congressional map violates Section 2 and its detailed instructions on the proper remedy for that violation. The General Assembly's purported remedy makes a mockery of that process, the Court's ruling, and the Voting Rights Act, and reflects the State's continued refusal to afford minority voters equal opportunity to participate in the electoral process. Plaintiffs

have waited nearly two years and an entire election cycle for the relief to which they are entitled. This Court must enjoin the General Assembly's new congressional plan and proceed to adopt a lawful congressional plan in time for the 2024 elections.

## BACKGROUND

I. **The Court struck down Georgia's congressional plan and provided the State with clear guidance on a proper remedy.**

On October 26, 2023, the Court found that Georgia's 2021 congressional plan (SB 2EX) violated Section 2 of the Voting Rights Act. Doc. 286 at 273–74, *Pendergrass v. Raffensperger*, No. 1:21-CV-05339-SCJ (N.D. Ga. Oct. 26, 2023). The Court made several careful and critical determinations in coming to its conclusion. *First*, based on the illustrative map submitted by Plaintiffs' expert Bill Cooper, the Court found that Georgia's Black population is sufficiently large and geographically compact to constitute a majority in an additional congressional district in west-metro Atlanta, and that such a district could be drawn while adhering to traditional redistricting principles (*Gingles* 1). Doc. 286 at 174–75.

*Second*—relying on the analysis of Plaintiffs' expert Dr. Maxwell Palmer and concessions from Defendant's expert Dr. John Alford—the Court found that "Black voters in Georgia are extremely politically cohesive" (*Gingles* 2), Doc. 286 at 204, and that "white voters were highly cohesive in voting in opposition to the Black candidate of choice" (*Gingles* 3), *id.* at 206. The Court concluded that there was "'very clear' evidence of racially polarized voting" across the focus area as a whole

and in each individual congressional district Dr. Palmer examined. *Id.* at 207–08 (*quoting Allen v. Milligan*, 599 U.S. 1, 22 (2023)).

*Third*, in finding that the totality of the circumstances demonstrates that the political process is not currently equally open to Black Georgians, the Court endorsed Plaintiffs' expert Dr. Vernon Burton's observation "of a historical pattern that following an election, the General Assembly responsively passes voting laws that disproportionately impact Black voters in Georgia"—a pattern that continues to the present with the recent passage of SB 202. Doc. 286 at 230. The Court observed that "[d]espite the growth in the Black population in the affected areas and the voter polarization between white and Black Georgians . . . the Enacted Congressional Plan did not increase the number of majority-Black districts in the Atlanta metro area . . . [which] in effect dilutes and diminishes the Black population's voting power in that area of the State." *Id.* at 272.

Based on the well-established legal standard, the Court concluded that "SB 2EX violates Section 2 of the Voting Rights Act as to the following districts/areas: Enacted Congressional Districts 3, 6, 11, 13, and 14." *Id.* at 514. The Court provided the General Assembly more than six weeks to adopt a remedial congressional plan "consistent with[ its] Order." *Id.* at 510; *see also id.* at 508–09 ("[T]he parameters and the instructions around what the State of Georgia is supposed to do to comply with Section 2 of the VRA is a critical part of this Court's order."). The Court held

that an appropriate remedy "involves an additional majority-Black congressional district in west-metro Atlanta." *Id.* at 509. It further instructed that the "State cannot remedy the Section 2 violation[] described herein by eliminating minority opportunity districts elsewhere in the plan[]." *Id.* at 509–10.

## II. The General Assembly adopted a congressional plan that defies this Court's ruling.

On December 8, 2023, Georgia enacted purported remedial plan SB 3EX. Doc. 312. SB 3EX creates a new majority-Black CD 6 in west-metro Atlanta, encompassing parts of Cobb, Fulton, Douglas, and Fayette Counties. *See* Remedial Expert Report of Bill Cooper ("Cooper Remedial Rep.") ¶ 8. Twenty-five percent of new CD 6 draws from old CD 5, a majority-Black district wholly outside the Section 2 violation area. *Id.* ¶ 21.

SB 3EX also drastically reconfigures CD 7, stretching it across six counties and transforming it from a majority-minority district to a majority-white district. Old CD 7 comprised a 57.81% minority citizen voting age population (CVAP). Cooper Remedial Rep. Ex. A-3. New CD 7, however, cuts the minority CVAP by more than half. *Id.* Ex. A-2.

SB 3EX thus eliminates a minority opportunity district. While minority voters in old CD 7 had the opportunity to elect their candidates of choice 76% of the time, new CD 7 will never enable minority voters to elect their preferred candidates. Remedial Expert Report of Dr. Maxwell Palmer ("Palmer Remedial Rep.") at ¶ 17.

As a result, rather than creating "an additional opportunity district" as instructed by this Court, Doc. 286 at 511, SB 3EX maintains the same number of minority opportunity districts as the previous map.

## LEGAL STANDARD

Section 2 violations demand relief that "completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1442 (11th Cir. 1988) (quoting S. Rep. No. 97-417 at 31, 97th Cong., 2d Sess. 31 (1982)); *see also White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same). "This Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252–53 (11th Cir. 1987).

SB 3EX falls far short of this standard.

## ARGUMENT

### I.     SB 3EX fails to fully remedy Georgia's Section 2 violation.

By adopting a new congressional plan that purports to remedy the vote dilution in *west*-metro Atlanta by reaching *outside* the area where this Court found a Section 2 violation and simultaneously eliminating a minority opportunity district in *east*-metro Atlanta, the General Assembly has failed to adequately remedy the Section 2 violation identified by the Court.

**A. SB 3EX does not sufficiently remedy the actual vote dilution identified by the Court.**

Despite this Court's detailed ruling specifying the precise location of the Section 2 violation—and thus the Section 2 remedy—new CD 6 only partially draws from that area, drawing in voters outside of the vote-dilution area who already had an opportunity to elect their preferred candidates at the expense of providing an opportunity district for those voters this Court found had suffered a vote-dilution injury. *See Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("If a § 2 violation is proved for a particular area . . . [t]he vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State.").

This Court specifically defined the area of Georgia where the Section 2 violation occurred: "Enacted CDs 3, 6, 11, 13, and 14." Doc. 286 at 514. Plaintiffs' illustrative majority-Black CD 6 drew exclusively from this area. *See* Cooper Remedial Rep. ¶ 21. As a result, all of the Black voters in Plaintiffs' illustrative CD 6 were located in an area where their votes were diluted in violation of Section 2.

By contrast, the new majority-Black CD 6 under SB 3EX only partially draws from this area of proven vote dilution. More than a *quarter* of the district's population is drawn from old CD 5—which lies entirely outside the location of the Section 2 violation, *id.*, and which, indeed, already elected Black-preferred congressional candidates under the previous map, Palmer Remedial Rep. ¶ 20 & fig.5. The 2023 Plan excludes 51,717 Black Georgians of voting age in the vote

dilution area who would have had an opportunity to elect their preferred candidates in Plaintiffs' Illustrative CD 6 but are shut out of a Section 2 remedy in the 2023 Plan. Cooper Remedial Rep. ¶ 22. Consequently, SB 3EX purports to remedy the Section 2 violation by ignoring Black Georgians whose voting strength was—and still is—unlawfully diluted, instead populating the new CD 6 with Black voters who already had the opportunity to elect their candidates of choice.

SB 3EX also reconfigures CD 7 in a manner antithetical to the vote dilution found in west-metro Atlanta. Old CD 7, like CD 5, fell entirely outside the area found to be in violation of Section 2. Nevertheless, new CD 7 takes *74%* of its population from the vote dilution area, including CD 6, the majority of which are white voters. *See* Cooper Remedial Rep. ¶ 20. The remaining 26% of the new district's population (drawn from the previous CDs 5, 7, and 9) is also majority white. *See id.* In other words, new CD 7 stretches across six counties to draw in white voters as far north as Lumpkin County and connect them with Black voters who reside in the area where the Court ruled that their voting strength was unlawfully diluted. These Black voters are placed in a newly fabricated majority-white district where they are still denied the opportunity to elect their candidates of choice.

Thus, rather than "*completely* remed[ying] the prior dilution of minority voting strength," *Dall. Cnty. Comm'n*, 850 F.2d at 1442 (emphases added), SB 3EX fails to fully remedy the "significant harm" suffered by those Black voters in Georgia

"whose voting rights have been injured by the violation of the Section 2." Doc. 286 at 510. This Court should reject the General Assembly's plan for failing to fully remedy the prior map's Section 2 violation. *See, e.g.*, *Cane v. Worcester County*, 35 F.3d 921, 927 (4th Cir. 1994) (affirming rejection of Section 2 remedy that perpetuated challenged vote dilution).

**B.   SB 3EX cannot remedy the Section 2 violation by denying minority electoral opportunities elsewhere in Georgia.**

This Court's ruling specified that "the State cannot remedy the Section 2 violation[]" identified in SB 2EX "by eliminating minority opportunity districts elsewhere in the plan[]." Doc. 286 at 509–10. This instruction is consistent with "controlling precedent," which makes clear that the "appropriate remedy" in a Section 2 redistricting case "is a congressional redistricting plan that includes either an *additional* majority-Black congressional district, or an *additional* district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 6567895, at *1 (N.D. Ala. Oct. 5, 2023) (per curiam) (three-judge court) (emphases added) (citing *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009); *see also, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1309 (11th Cir. 2020) (affirming Section 2 remedy that included "one more" minority opportunity district than afforded by the previous plan). States cannot "trade off" "the rights of some minority voters under § 2 . . . against the rights of other members of the same minority class" by offsetting

minority gains in one part of the map with minority losses in other parts of the map. *Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994); *see also LULAC v. Perry*, 548 U.S. 399, 441–42 (2006) (finding Section 2 violation where "[t]he State chose to break apart a Latino opportunity district to protect the incumbent congressman from the growing dissatisfaction of the cohesive and politically active Latino community" and "then purported to compensate for this harm by creating an entirely new district" elsewhere).

Rather than heed the Court's direction, however, the General Assembly "chose to break apart" a minority opportunity district in east-metro Atlanta. Specifically, SB 3EX dismantled old CD 7, which was a majority-minority district, *see* Doc. 286 at 264, anchored in majority-minority Gwinnett County, Cooper Remedial Rep. ¶ 16. As Dr. Palmer explains, old CD 7 provided Black, Latino, and Asian voters the opportunity to elect their preferred candidates: Minority-preferred candidates "were able to win 76% of the elections from 2012 to 2022, . . . and every statewide election after 2016, with an average of 56.4% of the vote." Palmer Remedial Rep. ¶ 17 & fig.4, tbl.3. This includes the 2022 congressional election, the only election actually conducted under the old CD 7. *Id.*

Under SB 3EX, CD 7 has been dismantled, stretched across six counties from the top of Fulton County up through Dawson and Lumpkin Counties, and redrawn as a majority-white district in which minority-preferred candidates would no longer

prevail in *any* of the elections analyzed. Cooper Remedial Rep. ¶ 20; Palmer Remedial Rep. ¶ 17 & fig.4, tbl.3. Accordingly, although new CD 6 provides (some) Black voters in the vote-dilution area the opportunity to elect their preferred candidates, the elimination of a minority-opportunity district in CD 7 means that Georgia's purported "remedy" to the Section 2 violation zeroes out the number of minority-opportunity districts statewide.

Significantly, neither the dismantling of CD 7 nor the denial of preexisting minority opportunity generally was required to remedy the Section 2 violation in this case. Plaintiffs' illustrative congressional plan, for instance, added a new majority-Black district in west-metro Atlanta without reaching outside the vote dilution area, without changing CD 7, and without eliminating or diminishing minority opportunity statewide. Cooper Remedial Rep. ¶ 9. In so doing, the illustrative plan better advanced the State's own redistricting criteria than SB 3EX. The illustrative plan on balance scores higher on the Reock and Polsby-Popper scales than SB 3EX overall, Cooper Remedial Rep. ¶ 31 & fig.3, and with respect to CD 6 and CD 7 specifically. The illustrative plan also contains fewer split counties, individual county splits, municipality splits, and regional commission splits. *Id.* ¶¶ 33–37 & figs.4–5.

\* \* \*

Ultimately, the General Assembly's disregard for this Court's order and insistence on capping minority voting strength is unsettlingly familiar. This is not the first time a state has openly defied a court order mandating a Section 2 remedy. *Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at \*3–4 (N.D. Ala. Sept. 5, 2023), *appeal dismissed sub nom. Milligan v. Co-Chairs of Alab. Permanent Legis. Comm. on Reapportionment*, No. 23-12922-D, 2023 WL 6568350 (11th Cir. Oct. 3, 2023) ("[W]e are deeply troubled that the State enacted a map that the State readily admits does not provide the remedy we said federal law requires. . . and [w]e are disturbed by the evidence that the State. . . ultimately did not even nurture the ambition to provide the required remedy."). In fact, Section 2 itself "springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power," *De Grandy*, 512 U.S. at 1018, and was designed to combat states' increasingly creative means of voting discrimination. The General Assembly's attempt to minimize and zero out minority voting opportunity in a purported "remedy" to the State's Section 2 violation is precisely the sort of gamesmanship Section 2 was meant to stamp out.

But fortunately for Georgia voters, it is the Court, and not the General Assembly, who determines "what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Separation-of-powers principles and the basic rule of law foreclose the State

from ignoring a court order, even if the basis for its intransigence is the hope that the law might change. *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 17–20 (1958) (per curiam) ("If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery[.]" (quoting *United States v. Peters*, 9 U.S. 115, 136 (1809))). The General Assembly might not like what the Court has ordered, but it must abide by it. Here, it failed to do so. This Court must enjoin SB 3EX as an unlawful and insufficient remedy to the Section 2 violation.

## II.     SB 3EX independently violates Section 2.

"It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2." *Dall. Cnty. Comm'n*, 850 F.2d at 1437 (quoting *Dillard*, 831 F.2d at 249). SB 3EX does not clear this bar: Because old CD 7 was protected under Section 2, its dismantling independently constitutes unlawful vote dilution.

### A.     *Gingles* One: The minority population in old CD 7 is sufficiently large and compact to form a majority in a single-member district.

Old CD 7 consisted of the southern portion of Gwinnett County and the northeastern tip of neighboring Fulton County. This iteration of the district satisfied the numerosity and compactness requirements of the first *Gingles* precondition.

**Numerosity.** Under the 2022 enacted plan, CD 7's combined Black, Latino, and Asian CVAP[1] well exceeds 50%, *see* Cooper Remedial Rep. ¶ 13—thus satisfying the numerosity requirement of the first *Gingles* precondition. *See Bartlett*, 556 U.S. at 18 (numerosity requirement involves "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?").

Significantly, the Eleventh Circuit has long recognized that Section 2 protects "coalition" districts, in which politically cohesive minority populations are aggregated to satisfy the numerosity requirement. In *Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, the Eleventh Circuit observed that "[t]wo minority groups (in th[at] case blacks and hispanics) may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." 906 F.2d 524, 526 (11th Cir. 1990). In other words, so long as different minority communities cohesively support the same candidates, they can be counted together for purposes of the first *Gingles* precondition. This holding has been consistently applied by this and other district courts in the Eleventh Circuit. *See, e.g.*,

---

[1] Although Plaintiffs' original Section 2 claim primarily employed the Black voting-age population as the relevant metric for this precondition, courts have concluded that CVAP is the appropriate measure in Section 2 cases involving Latino, Asian, and other "population[s that] include[] a substantial number of immigrants." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).

*Ga. State Conf. of NAACP v. Gwinnett Cnty. Bd. of Registrations & Elections*, No. 1:16-cv-2852-AT, 2017 WL 4250535, at *2 (N.D. Ga. May 12, 2017); *Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1279–80 (M.D. Ala. 2013) (three-judge court), *vacated on other grounds*, 575 U.S. 254 (2015); *Broward Citizens for Fair Districts v. Broward County*, No. 12-60317-CIV, 2012 WL 1110053, at *6 (S.D. Fla. Apr. 3, 2012); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1368 (N.D. Ga. 2001).[2]

**Compactness.** Under the first *Gingles* precondition, compactness requires "an electoral district[] consistent with traditional districting principles." There can be no dispute that old CD 7 satisfied this requirement. The population of old CD 7 was only one person greater than the ideal district population. *See* Cooper Trial Rep., Ex. G. In terms of mathematical compactness, old CD 7 was more compact than the

---

[2] Although a recent decision of this Court suggested that *Hardee County*'s "assertion about coalition districts was dicta," *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-05338-ELB-SCJ-SDG, 2023 WL 7093025, at *16 (N.D. Ga. Oct. 26, 2023) (per curiam) (three-judge court), another three-judge panel in this circuit concluded that they "[we]re bound by" *Hardee County* and its recognition of coalition claims. *Ala. Legis. Black Caucus*, 989 F. Supp. 2d at 1280. Moreover, the U.S. Supreme Court previously cited *Hardee County* when it "[a]ssum[ed] (without deciding) that it was permissible . . . to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2." *Growe v. Emison*, 507 U.S. 25, 41 (1993). Courts in other circuits have cited to *Hardee County* for the same proposition. *See Pope v. County of Albany*, 687 F.3d 565, 572 n.5 (2d Cir. 2012); *Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1048 (E.D. Va. 2021), *vacated as moot*, 42 F.4th 266 (4th Cir. 2022); *Frank v. Forest Cnty.*, 336 F.3d 570, 575 (7th Cir. 2003).

average district in the old congressional plan using the Reock score and the *most* compact of the districts using the Polsby-Popper score, *see* Doc. 286 at 52—a conclusion confirmed using the eyeball test, *see id.* at 185. Old CD 7 included just two counties—Gwinnett and Fulton. Cooper Trial Rep., Ex. G. Finally, like Plaintiffs' illustrative CD 6, old CD 7 "combine[d] areas of suburban metro Atlanta," "communities [that were] relatively close in proximity." *Id.* at 191. In short, there is little doubt that old CD 7—drawn by the General Assembly and preserved in Plaintiffs' illustrative plan—was reasonably compact for purposes of the first *Gingles* precondition.

## B. *Gingles* Two: The minority community in the old CD 7 was politically cohesive.

Old CD 7 consisted of a politically cohesive minority community, in satisfaction of the second *Gingles* precondition. As Dr. Palmer demonstrates, minority voters in the focus area that comprises old CD 7 vote cohesively for the same candidates in each of the 41 statewide electoral contests examined from 2012 to 2022. Palmer Remedial Rep. ¶¶ 13–14 & fig.3. Specifically, Black, Latino, and Asian voters all voted cohesively, individually and as a group, in support of the same candidates. *Id.* The estimated vote share of minority-preferred candidates in any given election Dr. Palmer analyzed was always significantly above 75% for Black, Latino, and Asian voters in the focus area. *Id.*; *see Thornburg v. Gingles*, 478 U.S. 30, 56 (1986) ("A showing that a significant number of minority group members

usually vote for the same candidates is one way of proving [] political cohesiveness[.]").

Further, testimony from the Georgia General Assembly Special Session hearings bolster this statistical evidence. Jennifer Lee, the policy director for Asian Americans Advancing-Justice Atlanta, testified before the House Reapportionment and Redistricting Committee on December 5, 2023, explaining that western Gwinnett County is very racially and ethnically diverse, and 1 in 3 residents are immigrants. Hr'g on SB 3EX at 1:44:54 (Ga. 2023).[3] She shared that one of her staff members, whose family originated from Mexico, was asked why he worked for an Asian American organization, and he replied that while attending a diverse high school in Lilburn, he realized his experience translating for his parents—who did not speak English and faced barriers as a result—was similarly shared by his Asian and Black immigrant friends, which drew him to an organization that worked in coalition with other immigrant communities to advance causes important to these minority groups, such as language accessibility. *Id.* at 1:45:45. This story highlights not only the coalition building that occurred in CD 7, but the shared lived experiences of these minority groups.

---

[3]   Available at https://vimeo.com/showcase/8988912?video=891095002 (last accessed Dec. 11, 2023).

**C.**  *Gingles* **Three: White Georgians engage in bloc voting to defeat minority-preferred candidates in new CD 7.**

Plaintiffs also satisfy the third *Gingles* precondition because in the focus area "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. Dr. Palmer found high levels of white bloc voting in new CDs 4, 7, 9, 10 and 13—portions of which together comprised old CD 7—in opposition to minority-preferred candidates. Palmer Remedial Rep. ¶¶ 11, 13 & figs. 2–3. The estimated white vote share for minority-preferred candidates in any given election Dr. Palmer analyzed never reached 25 % in the focus area. *Id.* fig.3.

As Dr. Palmer concluded, under old CD 7, minority-preferred candidates "were able to win 76% of the elections from 2012 to 2022, including the 2022 U.S. House election and every statewide election after 2016, with an average of 56.4% of the vote." *Id.* ¶ 17. But under SB 3 EX, minority-preferred candidates "would not have won *any of these elections*, and average only 32.9% of the vote." *Id.* (emphasis added). Thus, the evidence shows racially polarized voting in the focus area where white voters vote cohesively in opposition to defeat the minority preferred candidate, unless minority voters comprise the majority of the district. *Id.* ¶¶ 16–17.

**D. Under the totality of the circumstances, SB 3EX denies minority voters equal opportunities to elect their preferred candidates to Congress.**

Finally, this is not "the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quotation omitted). This Court has already determined that both the past and present reality in Georgia demonstrate that the political process is not equally open to Black voters. Doc. 286 at 273; *See Dall. Cnty. Comm'n*, 850 F.2d at 1438–40 (readopting prior findings related to factors 2, 3, 5, and 7 to hold that a remedial plan "perpetuates rather than ameliorates the inequities" in the prior plan). The Court's prior ruling applies with equal force to the minority coalition, as Plaintiffs are not required to demonstrate that each minority voter suffers the *exact* circumstances. *See Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1082 (E.D. Va. 2021), *vacated and remanded on other grounds*, 42 F.4th 266 (4th Cir. 2022) (acknowledging that "Asian, Hispanic, and Black communities have experienced different forms of discrimination" but nonetheless satisfied the Senate Factors as a coalition).[4]

---

[4] *Cf. Holloway*, 42 F.4th at 300 (Gregory, C.J., dissenting) (noting that "the district court was not required to find evidence showing that all nine factors were met—much less evidence that *each* factor was satisfied with respect to *each* discreet minority group" because such a legal standard would result in "an inflexible rule that runs counter to the textual command of § 2, which requires that a determination of

Here, Plaintiffs supplement their evidence to demonstrate that the political process is also not equally open to Latino and Asian voters in the area in and around CD 7:

**Senate Factor 1.** Georgia has a history of passing laws that disproportionately impact minority communities, including Latino and Asian communities. In early 2007, for example, Georgia began providing lists to county officials of persons "flagged as potentially ineligible [to vote] based on, inter alia, non-citizenship." Expert Rep. of Joseph Bagley, Ph.D. at 236–37, *Common Cause et al. v. Raffensperger*, No. 1:22-CV-00090 (Jan. 13, 2023), Doc. 82. After the matching system was submitted for Section 5 preclearance, the Justice Department found that: (1) the system was inaccurate, (2) the errors disproportionately affected minority voters, and (3) "applicants who are Hispanic, Asian or African American are more likely than white applicants, to statistically significant degrees, to be flagged for additional scrutiny." *Id.* at 237 (citing *Morales v. Handel*, No. l:08-CV-3 172-JTC (N.D. Ga., Oct. 27, 2008); Loretta King, Acting Assistant Attorney General, Civil Rights Division, to Hon. Thurbert E. Baker, May 29, 2009, Civil Rights Division Section 5 Objection Letters). As another example: Following the 2012 redistricting cycle, then-House Minority Leader Stacy Abrams argued that the new maps

---

whether a violation has occurred be based on the totality of the circumstances" (cleaned up)).

"destroyed any remaining coalition districts and amounted to 'a resegregation of Georgia into a party of white Republicans and black Democrats, leaving Latinos and Asians to fend for themselves.'" Expert Rep. of Joseph Bagley, Ph.D., *Common Cause et al. v. Raffensperger*, No. 1:22-CV-00090 (Jan. 13, 2023) (citing Charles Bullock, "The History of Redistricting in Georgia," *Georgia Law Review*, Vol. 52, No. 4, pp. 1095–96).

**Senate Factor 5.** As Dr. Loren Collingwood's expert report demonstrates, "[w]hite households and individuals have clear socio-economic and health advantages over minorities in Gwinnett singly and Gwinnett and Fulton combined" —the two counties that comprised old CD 7. Remedial Expert Report of Loren Collingwood ("Collingwood Remedial Rep.") at 1. Based on his analysis of a variety of metrics, Dr. Collingwood concludes that particularly in Gwinnett County, "minorities are broadly cohesive on a variety of socio-economic measures . . . and share experiences especially related to the poverty line and income." *Id.* at 3.

**Senate Factor 7.** Lack of minority electoral success also supports the coalition. Just as Georgia has never had a Black Governor, Doc. 32-1 at 25, Georgia has also never had a Latino or Asian Governor.[5] Nor has Georgia ever elected a

---

[5]   Former Georgia Governors, *Nat'l Governors Ass'n,* available at https://www.nga.org/former-governors/georgia/ (last accessed Dec. 8, 2023).

Latino or Asian Georgian to the U.S. Senate or House of Representatives.[6] Defendants themselves, in asking the Court to take judicial notice of minority candidate election results, only identified one Latino (Commissioner John King) and one Asian American (Justice Carla McMillian) as evidence of minority electoral success. Doc. 224 at 5–6.

**Senate Factor 8.** The State's proposed remedy in response to the Section 2 injury suffered and proved by Black Georgians demonstrates its determination to impose a ceiling on minority opportunity in the State and only underscores how unresponsive elected officials are to the needs of the State's minority voters.

**Senate Factor 9.** Finally, the policies underlying the State's proposed remedial map are tenuous at best and reprehensible at worst. The General Assembly did not have to eliminate CD 7 in order to remedy vote dilution in west-metro Atlanta. Any suggestion to the contrary, *see, e.g.*, Hr'g on SB 3EX before the Georgia Senate on December 5, 2023 at 3:13:13, 2023 Gen. Assemb. (Ga. 2023)[7] (Sen. John Kennedy claiming that "[d]rawing the new sixth district . . . impacted the surrounding districts, . . . [which] created pressure on the seventh district"), is

---

[6] Members of the U.S. Congress from Georgia, available at https://www.congress.gov/members?q=%7B%22member-state%22%3A%22Georgia%22%7D (last accessed Dec. 8, 2023).

[7] Available at https://vimeo.com/showcase/9076378?video=891194231 (last accessed Dec. 11, 2023).

entirely pretextual. *See Veasey v. Abbott*, 830 F.3d 216, 235–36 (5th Cir. 2016) (explaining that pretextual justifications are circumstantial evidence of intentional discrimination). The General Assembly was well aware that the Illustrative Plan— found by this Court to be a lawful remedy to the Section 2 violation, Doc. 286 at 198–200, demonstrated the ability to draw a new minority opportunity district without undoing existing minority opportunities statewide. *See e.g.*, Hr'g on SB 3EX Before the House of Representatives on December 7, 2023 at 2:15:19, 2023 Ga. Assemb. (Ga. 2023)[8] (minority leader stating that Plaintiffs' illustrative map was introduced with a few changes and new map dismantles minority opportunity district in Gwinnett County).

Nor was the General Assembly's reconfiguration of CD 7 in service of traditional districting principles. To the contrary, CD 7's Reock score drops from 0.50 to 0.34, and its Polsby-Popper score drops from 0.39 to 0.24. Cooper Remedial Rep. fig.3. While it used to include just two counties, CD 7 now stretches across six counties, splitting six additional municipalities in the process. *Id.* fig.4.

The General Assembly not only disregarded its own redistricting criteria in redrawing CD 7, it also disregarded binding Eleventh Circuit precedent concluding that Section 2 protects coalition districts. *See Concerned Citizens of Hardee Cnty.*,

---

[8]  Available at  https://vimeo.com/showcase/8988696?video=891910081  (last accessed Dec. 11, 2023).

906 F.2d at 526. Despite this Court's admonition that "the [S]tate cannot remedy the Section 2 violations described herein by eliminating minority opportunity districts elsewhere in the plans," Doc. 286 at 509–10, several legislators insisted that "minority opportunity" meant "majority-Black" because Section 2 protects only majority-Black districts. 12/5 Senate Hr'g at 2:08:00 (statement of Senator Shelly Echols stating "while [Judge Jones] doesn't define that term, it's clear he's referencing to existing majority-Black districts"), despite Eleventh Circuit precedent to the contrary, 12/7 Hr'g at 2:21:35 (Rep. James Beverly discussing *Concerned Citizens of Hardee County* as the "leading case" in the Eleventh Circuit recognizing the protection of coalition districts "like the one in Gwinnett"). The General Assembly's decision to eliminate a coalition district thus rested on "a legal mistake." *Cooper*, 581 U.S. at 306.

Indeed, the fact that the General Assembly "intentionally drew district lines in order to destroy" CD 7, an "otherwise effective" coalition district, "raise[s] serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett*, 556 U.S. at 24. The General Assembly was well aware of CD 7's status as a coalition district, *see, e.g.,* 12/7 Hr'g at 2:09:01 (noting SB 3EX "eliminates a minority opportunity district in Gwinnett County by obliterating Georgia's 7th congressional district, a majority-minority district where 67% of the voting age population is comprised of Black, Hispanic, and Asian-American voters"); Doc. 286 at 264–65. The

contemporaneous statements of legislators indicate that race was top of mind when they decided to eliminate minority opportunity in CD 7. One legislator insisted that he "thought [the] 2021 plans were fair" because the state's five Black members of Congress are "more than a third of the 14 [Georgia] ha[s]," even though Georgia is "a state with 31% [Black] population," further stating that the new congressional plan "essentially guaranteed that there will be five [Black members of Congress] going forward if our racially polarized voting patterns continue, and Blacks still choose candidates of their own race." Hr'g on SB 3EX before the Georgia Senate on December 5, 2023 at 2:54:20, Gen. Assemb. (Ga. 2023).[9] These statements are not only eerily similar to remarks the Eleventh Circuit found "particularly disturbing" in *Dillard v. City of Greensboro* for perpetuating an unfounded belief in "the propensity of [B]lack voters allegedly to vote only for [B]lack candidates," 74 F.3d 230, 234 (11th Cir. 1996), they completely disregard this Court's thorough proportionality analysis, *see* Doc. 286 at 262-67, as well as Section 2's emphasis on the rights of minority voters rather than the existence of minority candidates, *see id.* at 237 ("Race of a candidate is not dispositive for a polarization inquiry.").

\* \* \*

---

[9] Available at https://vimeo.com/showcase/9076378?video=891194231 (last accessed Dec. 11, 2023).

In sum, the totality of the circumstances supports a finding that SB 3EX fails to provide minority voters equal opportunity to elect their candidates of choice.

## CONCLUSION

The General Assembly's task was clear: it must provide Black voters in the vote-dilution area the opportunity to elect their candidates of choice while preserving existing minority opportunity districts. It has failed. Plaintiffs respectfully ask the Court to enjoin SB 3EX for failing to remedy the original Section 2 violation and independently violating Section 2 anew. Because the State has proven "unwilling to enact [a] remedial plan . . . that satisf[ies] [the Court's] requirements," this Court should "proceed to draw or adopt remedial plans," Doc. 286 at 511, to ensure Plaintiffs obtain relief in time for the 2024 election.

Dated: December 12, 2023

Respectfully submitted,

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **PLAINTIFFS' OBJECTIONS TO THE GEORGIA LEGISLATURE'S REMEDIAL CONGRESSIONAL PLAN** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using font types of Times New Roman, point size of 14, and Century Schoolbook, point size of 13.

Dated: December 12, 2023    **Adam M. Sparks**
               Adam M. Sparks
               *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing **PLAINTIFFS' OBJECTIONS TO THE GEORGIA LEGISLATURE'S REMEDIAL CONGRESSIONAL PLAN** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: December 12, 2023    **Adam M. Sparks**
               Adam M. Sparks
               *Counsel for Plaintiffs*