# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>BRAD RAFFENSPERGER,<br><br>   *Defendant.* | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05337-SCJ |
| ANNIE LOIS GRANT, *et al.*,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>BRAD RAFFENSPERGER,<br><br>   *Defendant.* | CIVIL ACTION<br><br>FILE NO. 1:22-CV-00122-SCJ |
| COAKLEY PENDERGRASS, *et al.*,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>BRAD RAFFENSPERGER,<br><br>   *Defendant.* | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05339-SCJ |

## CONSOLIDATED RESPONSE TO PLAINTIFFS' OBJECTIONS REGARDING REMEDIAL PLANS

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

FACTS REGARDING REMEDIAL PLANS ........................................ 4

    I.    The 2023 special legislative session. ................................ 4

    II.   The Congressional remedial plan (SB 3EX). ........................ 4

        A.    Drafting and adoption of plan. ............................... 4

        B.    Facts regarding Congressional remedial plan. .................. 6

    III.  The Senate remedial plan (SB 1EX). ........................... 8

        A.    Drafting and adoption of plan. ............................... 8

        B.    Facts regarding Senate remedial plan. ........................ 11

    IV.  The House remedial plan (HB 1EX). ........................... 14

        A.    Drafting and adoption of plan. ............................... 14

        B.    Facts regarding House remedial plan. ........................ 17

    V.   Implementation of the remedial plans. ......................... 22

STANDARD ON REVIEW OF REMEDY ........................................ 23

RESPONSES TO PLAINTIFFS' OBJECTIONS .................................... 25

    I.    The General Assembly is not limited to the districts listed in the Court's Order when creating a remedial plan (*APA/Grant/Pendergrass*). ................................... 25

        A.    Unlike racial gerrymandering cases, Section 2 claims involve regions, and the legislature drew the new districts precisely where this Court required them to be drawn. ............. 26

            *1.*  *The new majority-Black districts are not drawn "somewhere else in the State."* ........................... 27

            *2.*  *The new majority-Black districts are all in the areas defined by the Court.* .......................... 31

i

B.    The General Assembly must take more into account than the Court or Plaintiffs' experts when creating remedial plans. ... 36

  1.  *Plaintiffs insisted repeatedly that illustrative plans were only illustrative, but now say they are mandatory.* ............ 37

  2.  *The General Assembly may take partisanship into account in its remedial plans.* ............................................ 39

  3.  *The legislature is under no obligation to adopt Plaintiffs' plans.* ................................................... 40

C.    The remedial plans solve the violations the Court found because they add the required districts in the regions identified by the Court .................................................................. 41

  1.  *The correct calculation is not the "net" amount of Black voters that moved because the Court did not order that as a remedy.* ............................................................ 43

  2.  *The General Assembly moved existing districts north, while Plaintiffs moved existing districts south.* .................. 44

  3.  *Plaintiffs offer no plan that complies with the General Assembly's policy goals on the enacted plans while also drawing any additional majority-Black districts.* .............. 45

  4.  *APA Plaintiffs claim some districts are packed when they are within the same thresholds of districts on the 2021 plans that were not challenged.* ......................................... 45

D.    This Court should not engage in a "beauty contest" with any other plans offered by Plaintiffs. ......................................... 46

  1.  *Comparisons to a brand-new illustrative plan are inappropriate at this stage (APA).* ....................................... 46

  2.  *Comparisons to illustrative plans are inappropriate at this stage (APA/Grant/Pendergrass).* ............................... 47

II.   **The remedial plans do not eliminate existing minority opportunity districts (*APA/Grant/Pendergrass*).** .......................... 48

A.    The remedial plans increase the number of majority-Black districts and do not eliminate any existing majority-Black districts (*APA/Grant/Pendergrass*). ............................................. 49

B.      Crossover districts are not required by Section 2 or binding precedent (*Grant*). .......................................................................... 50

C.      Coalition districts are not required by Section 2, binding precedent, or the facts of these cases (*Pendergrass*). .................... 54

     1.  *Coalition districts are not required by or protected under Section 2 of the VRA*. ........................................................... 55

     2.  *Plaintiffs have presented no evidence of minority voters forming coalitions that are protected.* ................................. 57

D.      Districts which elect Democrats are not required by Section 2 or binding precedent (*Amici/APA/Grant/Pendergrass*). ........ 58

**III.  SB 3EX does not independently violate Section 2 of the VRA (*Pendergrass*).** ........................................................................ 60

A.      There is no sufficiently large and geographically compact minority group that constitutes a majority in enacted Congressional District 7 (first *Gingles* precondition). ................. 61

B.      The second and third *Gingles* preconditions emphasize the political nature of Plaintiffs' claims. ............................................. 63

C.      The totality of the circumstances does not support a finding of lack of equal openness as to a combination of Black, Latino, and Asian voters in prior Congressional District 7. .................... 64

     1.  *Senate Factor 1: This Court cannot import its findings about Black voters to Latino and Asian voters.* .................. 64

     2.  *Senate Factor 2: No evidence on racially polarized voting beyond what was already presented.* ....................... 66

     3.  *Senate Factor 3: No evidence regarding discriminatory voting practices in the jurisdiction.* ..................................... 67

     4.  *Senate Factor 5: Socioeconomic indicators for Latino and Asian voters are of limited utility in this context.* ....... 67

     5.  *Senate Factor 6: No evidence of racial appeals in campaigns* ............................................................................. 69

     6.  *Senate Factor 7: Extent of election of Latino and Asian officials is not relevant when they are not the relevant*

*minority group*.................................................................... *70*

7. *Senate Factor 8: This Court cannot presume unresponsiveness, as it already found*................................ *70*

8. *Senate Factor 9: This Court already determined the State's policies were partisan and they remained so.* ......... *71*

D. *Pendergrass* Plaintiffs have not shown a Section 2 violation from changing the character of District 7. ................................... 72

**IV.   This Court should not adopt Plaintiffs' plans (*APA/Grant/Pendergrass*).** .................................................................. **73**

**V.   Time is of the essence to ensure election officials can administer the 2024 elections (*APA/Grant/Pendergrass*)............ 73**

**CONCLUSION** ............................................................................... **74**

# INTRODUCTION

Plaintiffs all agree or do not contest that Georgia has created "an additional majority-Black congressional district in west-metro Atlanta; two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb." *Compare* Order,[1] p. 509 *with* [APA Doc. 354, p. 18], [Grant Doc. 317, pp. 6–7], [Pendergrass Doc. 317, p. 6]. This critical concession should end the Court's inquiry, and Georgia should be permitted to implement the compliant remedial plans without further delay.

The sole basis for Plaintiffs' objections is apparently that they simply wish the General Assembly had accepted their maps instead of drawing its own, despite repeatedly insisting at trial that their maps were merely illustrative of what could be drawn. The objections to the remedial plans reinforce what Defendant has said from the beginning: that Plaintiffs' case is about electing more Democrats. Indeed, the fact that the General Assembly

---

[1] For ease of reference, citations to documents in each case's docket are referenced by the case name. The Court's final order in all three cases is referenced as "the Order" throughout this brief. All page number citations are to the blue numbers added by the ECF system at the top of each page.

added the required majority-Black districts while not substantially increasing Democratic political performance is apparently why Plaintiffs object to the plans. But this Court has consistently said this case is about the number of *majority-Black districts*—not Democratic districts and not particular candidates. The Court expressly found that "the number of Black-preferred *candidates* who are successfully elected is not the proper consideration for proportionality," Order, p. 478 (emphasis added), but rather the number of majority-Black *districts* was the proper consideration for determining equal openness. But now that the trial is over, Plaintiffs advance the theory that Georgia is required to protect even majority-white districts due solely to the fact that they currently elect Democratic officials, even though this is not what the Voting Rights Act or this Court required. *See, e.g.,* [Grant Doc. 317, pp. 16–17].

Ultimately, Plaintiffs advance three objections to the remedial plans: (1) this Court indirectly limited the districts the General Assembly could modify, so going outside of those boundaries was improper; (2) the individual line-drawing decisions made by the General Assembly are invalid for a variety of asserted reasons; and (3) the General Assembly eliminated "minority opportunity districts," which was not separately defined in the Order and about which Plaintiffs and Amici offer at least three different proposed

definitions. All of the proposed definitions relate to partisan outcomes and not the Black population of those districts, which is what this Court required.

As this Court has recognized, "redistricting and reapportioning legislative bodies is a legislative task [which] the federal courts should make every effort not to preempt." Order, p. 509 (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)). Thus, even if this Court would have drawn districts differently, it cannot substitute its judgment for that of the General Assembly when the legislature has fully complied with this Court's Order regarding the creation and location of new majority-Black districts.

At the end of the day, the remedial plans ensure that Black voters in Georgia are more likely to be in a majority-Black district both statewide and in the districts listed by the Court in its Order than they were previously. And the remedial plans draw extensively on Plaintiffs' illustrative plans in the creation of the new majority-Black districts, in some cases including more than 80% of the exact geography proposed by Plaintiffs. This Court cannot reject the remedial plan simply because it does not accommodate Plaintiffs' political goals. The Court should overrule Plaintiffs' objections and allow the State of Georgia to utilize its chosen district lines in the 2024 election cycle.

## FACTS REGARDING REMEDIAL PLANS

### I.      The 2023 special legislative session.

On the same day the Court issued the Order enjoining the State from using the entirety of the 2021 redistricting plans for Congress, state Senate, and state House, Governor Brian Kemp issued a call for the legislature to assemble in special session to consider updated district boundaries. That special session began on November 29, 2023, and adjourned *sine die* on December 7, 2023. Governor Kemp signed the updated district plans for Congress (SB 3EX), state Senate (SB 1EX), and state House (HB 1EX) into law on December 8, 2023, meeting the deadline set by this Court for the adoption of remedial plans.

### II.     The Congressional remedial plan (SB 3EX).

#### A.      Drafting and adoption of plan.

On December 1, 2023, Senate Reapportionment and Redistricting Chair Sen. Shelly Echols released a draft Congressional plan. Dec. of Gina Wright, (attached as Ex. A), ¶ 13. At a hearing on December 4 that also took public comment on the draft, Sen. Echols explained the process she used to create the plan. Tr. (Dec. 4, 2023) Senate Reapportionment and Redistricting Comm. Hearing (attached as Ex. F) at 5:13–22. Working with Ms. Wright, Sen. Echols' first step was to locate District 6 as a new majority-Black district in western metro Atlanta, as required by the Court's Order. *Id*. at 6:1–7:3, 8:12–9:5. That

4

change led to the reconfiguration of nine districts using traditional redistricting principles, including ensuring the partisan balance of the plan did not change. *Id*. at 7:4–8:11.

The changes to District 6 pushed adjoining districts to the east, with District 13 moving substantially east and Districts 4 and 5 less so. *Id*. at 9:6–11:12. In the process, those districts moved into the area formerly occupied by District 7. *Id*. The General Assembly was careful to ensure that it added a new majority-Black district, as this Court required, and in the location this Court instructed. *Id*. at 11:13–23.

Looking at north Georgia, District 14 shifted north in Cobb County and District 11 took more of Cobb County along with Gordon County, while maintaining the same boundary line in Cherokee County as previously. *Id*. at 11:24–12:14. District 7 then moved north to accommodate the shift of population from the west side of metro Atlanta, up to a split of Hall County that recognizes a community of interest around Lake Lanier on the Forsyth-Hall border. *Id*. at 12:15–13:7. Districts 9 and 10 retained their prior character, while making modest adjustments for Congressman Clyde's home county and maintaining county boundaries to assist election officials. *Id*. at 13:8–14:7. During the entire drawing process, the General Assembly was constantly balancing a number of considerations and was sensitive to ensure it did not eliminate any existing minority opportunity districts. *Id*. at 14:8–16:14.

The Senate Committee approved the Congressional plan to send it to the Senate floor on December 4, 2023, and it passed in a party-line vote on December 5, 2023. *See* Status History of SB 3EX, https://www.legis.ga.gov/legislation/65853. The House took up the bill the same day, ultimately passing it on the floor on December 7, 2023. *Id*.

**B.      Facts regarding Congressional remedial plan.**

The Congressional remedial plan increases the number of majority-Black districts by one when using total AP Black population and by two when using AP Black voting age population. Report of Dr. Michael Barber,[2] attached as Ex. B (Barber Report), § 2.2. The new majority-Black district is District 6, which moves from 9.91% AP Black VAP to 51.75% AP Black VAP. Barber Report, § 2.2, Table 1.

District 6 contains more than 70% of the population that was included in the Cooper Illustrative Congressional District 6, including more than 80% of the Black voting age population that was included in that district. Barber Report, § 2.4. The district is located in western metro Atlanta and includes portions of Cobb, Douglas, and Fulton Counties. Wright Dec. ¶ 17. The General

--------

[2] To assist the Court in evaluating the remedial plans, Defendant retained a new political-science expert, Dr. Michael Barber, to provide additional information related to the remedial plans and their performance. Dr. Barber's CV is included with his report.

Assembly relied on several of the communities of interest this Court relied on when evaluating the area, including highways and healthcare systems. Ex. F at 8:18–23. District 6 includes the entire cities of Fairburn, Union City, and South Fulton up through the entirety of Powder Springs, Austell, and Smyrna. *Id.* at 8:24–9:5; Wright Dec. ¶ 17.



The Congressional remedial plan increases the number of Black individuals of voting age who live in majority-Black districts on a statewide basis. Barber Report, § 2.3. On the 2021 Congressional plan, 27% of Black individuals of voting age in Georgia lived in a majority-Black district. *Id*. On the Congressional remedial plan, 46.4% of Black individuals of voting age in Georgia now live in a majority-Black district. *Id*. Further, the 2023 remedial plan includes nine majority-white Congressional districts, as this Court indicated it would expect on a remedial plan. Order, p. 265 n.72.

Using total AP Black Population, there is no question that the State moved from four majority-Black Congressional districts (2, 4, 5, 13) to five majority-Black Congressional districts on the Congressional remedial plan (2, 4, 5, 6, 13). Wright Dec. ¶ 18. This means that Black voters are now a majority in either 35.7% (using total population) or 28.6% (using voting-age population) of all Congressional districts in a state with a Black voting-age population of 31.73%. *See* Order, p. 265.

## III.   The Senate remedial plan (SB 1EX).

### A.      Drafting and adoption of plan.

When the Senate Reapportionment and Redistricting Committee convened on the first day of the special session, Sen. Echols explained the process of drawing the Senate plan, which involved heavy reliance on Gina Wright. Tr. (Nov. 29, 2023) Senate Reapportionment and Redistricting Comm.

Hearing (attached as Ex. C) at 2:25–4:8. Sen. Echols then outlined the process for creating the two majority-Black districts in south metro Atlanta, including meetings with Senators so she could understand the communities of interest that were involved. *Id*. at 6:1–6. Vice-Chair Sen. Bo Hatchett explained the various considerations that went into the drawing process, beginning with compliance with this Court's Order. *Id*. at 7:10–8:16.

Sen. Echols then explained the changes that were made to the 15 Senate districts that were modified to add Districts 17 and 28 as the new majority-Black districts required by this Court. *Id*. at 8:17–9:21. Sen. Echols also explained the process of taking into account traditional redistricting principles and other considerations that went into the design of the plan. *Id*. at 9:22–23:24. In that explanation, she detailed the various communities and other factors considered for each of the 15 districts that were modified. *Id*. District 42, which was previously in DeKalb County, moved to the southeast and took much of the territory that had been in the previous District 17, including areas that shared strong connections and are rural in character. *Id*. at 16:18–17:9. District 43 and 55 both moved north, while maintaining the community connections that existed previously. *Id*. at 17:10–18:5. Districts 10 and 41 shifted to make room for the districts moving north out of Henry County after the creation of District 17. Id. at 18:6–19. District 44 also shifted north to create

9

room for new District 17, and ensures that the boundaries of the City of Decatur are followed. *Id*. at 19:5–18.

On the other side of metro Atlanta, the Senate plan does not make changes to Districts 16, 34, and 36 because it was able to move other districts. *Id*. at 19:19–20:8. District 39 kept most of its current configuration. *Id*. District 38 shifted north and east to accommodate the addition of District 28 in the south, and now is wholly within Fulton County instead of including portions of Cobb. *Id*. at 20:9–18. Districts 33 and 35 likewise shift north to make room for District 28 in south Metro Atlanta, while still maintaining a strong number of connections and communities and keeping Powder Springs whole in District 33. *Id*. at 20:19–21:15. After the creation of all of these districts, there was significant population left in the areas around Coweta and Heard counties, which became the new District 6. *Id*. at 21:16–19. The configuration of that district avoided a split of Coweta County while also moving north into Carroll County, recognizing a number of communities in that area. *Id*. at 21:19–22:7. Small adjustments were made to District 30 to round out the population, while recognizing the communities in that area. *Id*. at 22:8–22.

The resulting Senate plan does not pair any incumbents of either political party. *Id*. at 10:24–11:9.

The Senate remedial plan was approved by the Senate committee on November 30, 2023 before receiving approval of the Senate on December 1,

2023 and the House on December 5, 2023. *See* Status History of SB 1EX, https://www.legis.ga.gov/legislation/65851.

**B.    Facts regarding Senate remedial plan.**

The Senate remedial plan increases the total number of majority-Black districts by two and decreases the total number of majority-white districts by two. Barber Report, § 3.2. The new majority-Black districts are (1) District 17, which moves from 32.01% AP Black VAP to 63.61% AP Black VAP and (2) District 28, which moves from 19.51% AP Black VAP to 56.42% AP Black VAP. *Id.* The plan increases the number of split counties by one. Wright Dec. ¶ 23.



Barber Report, p. 15.

District 17 contains nearly 80% of the total population that was included in the Esselstyn Illustrative Senate District 25 and more than 40% of the total population that was included in Cooper Illustrative Senate District 16. Barber Report, § 3.5. This district includes portions of Henry and Clayton Counties, which are both in south Metro Atlanta.[3] Wright Dec. Ex. 2. District 17 was designed to include most of Stockbridge and McDonough along with the panhandle of Clayton County. Ex. C at 11:22–12:4.



District 28 includes more than half of the population from Cooper Illustrative Senate District 20 and more than half of the population from Esselstyn Illustrative Senate District 35. Barber Report, § 3.2. Sen. Echols

---

[3] The following maps are drawn from the Wright Dec. Ex. 2 and show only changed districts in color.

recognized that the different Plaintiff experts in the *APA* and *Grant* cases had placed District 28 in two different south-Atlanta locations. Ex. C at 12:10–18. Sen. Echols chose to anchor the district in South Fulton while minimizing changes to some adjoining districts, with the resulting configuration ensuring that Black voters in Fulton, Fayette, and Clayton Counties are all placed in majority-Black districts. *Id*. at 12:19–13:1. The configuration of District 28 in south metro Atlanta also connected suburbs that are experiencing growth and assisted election officials by not making changes in some areas. *Id*. at 13:2–13. Wright Dec. ¶ 20.



The Senate remedial plan increases the number of Black individuals of voting age who live in majority-Black districts. On the 2021 Senate plan, 49.7% of Black individuals of voting age in Georgia lived in a majority-Black district.

Barber Report, § 3.3. On the Senate remedial plan, 53.5%% of Black individuals of voting age in Georgia now live in a majority-Black district. *Id.* In looking at just the districts the Court identified as setting the area of Section 2 violations, the percentage of Black individuals of voting age living in a majority-Black district also increases on the Senate remedial plan. Barber Report, § 3.3.

## IV.   The House remedial plan (HB 1EX).

### A.      Drafting and adoption of plan.

When the House Reapportionment and Redistricting Committee convened on the first day of the special session, Chairman Rep. Rob Leverett explained the map he had created to the committee, beginning with the Order of this Court. Tr. (Nov. 29, 2023) House of Representatives Reapportionment and Redistricting Comm. Hearing (attached as Ex. D) at 18:22–19:17. After explaining the design of each of the five new majority-Black districts, *id.* at 19:18–22:18, Rep. Leverett then explained the other changes that resulted from adding those new districts, noting the "ripple effects" occurring in other areas due to the creation of the majority-Black districts. *Id.* at 22:19–23:9. Rep. Leverett created the plan with Ms. Wright and explained the other traditional redistricting principles he followed in creating the plan, including input from other House members of both political parties. *Id.* at 23:14–26:12. The resulting plan changed 56 districts and paired four sets of incumbents, three

14

sets of Democrats paired with other Democrats and one set of a Republican paired with a Republican, along with drawing a Republican into a majority-Democratic district. *Id*. at 24:12–25.

Rep. Leverett then explained all of the various changes and interests that went into the districts, beginning in Douglas County, going into Macon, then up through south Metro Atlanta, with Ms. Wright also weighing in about the process. *Id*. at 26:13–34:18. The ripple effect from the creation of District 64 pushed other districts north into Fulton and Cobb Counties, leading to the collapse of District 40, which was a majority-white district in Cobb County. *Id*. at 26:20–27:10. That led to the movement of District 40 to the western side of the metro Area. *Id*. at 27:11–25.

Similarly, changes in Macon also pushed other districts north, with some movement in Houston County. *Id*. at 28:1–22. The plan eliminates a county split in Jasper County, which was previously split. *Id*. at 29:1–5. District 135 shifts to pair two Republican incumbents, and other districts shift on the eastern side to make room for some of the Henry County changes. *Id*. at 29:6–19.

In the metro area, District 82 moves from DeKalb down to south metro and the other Henry and Clayton area districts shift north, and makes changes at the request of Democratic Rep. Demetrius Douglas. *Id*. at 29:20–30:7. Configuring Henry County and south DeKalb in the way the House did allows

15

the plan to avoid making further changes to Clayton County to ease the burdens on election officials in implementing the plan. *Id*. at 30:8–12.

The ripple effects continue through Morgan and Newton, reaching back into DeKalb and up into Gwinnett County. *Id*. at 30:19–31:12. Consistent with the prior configuration of DeKalb County districts, the new configuration of districts stripes from north to south, ensuring that almost all incumbents in that area have a district in which to run. *Id*. at 31:7–32:4. When getting into Gwinnett County, as Rep. Leverett explained, the "wave is starting to dissipate," with several changes to that area. *Id*. at 32:5–13.

After fully explaining the changes and answering committee questions, *id*. at 33:11–40:3, Rep. Leverett then held time for public comment on the proposed plan. *Id*. at 40:4–16. The only other House redistricting plan presented to the House committee, by Democratic Leader Rep. James Beverly, only created four additional majority-Black districts instead of the five this Court required. *See* Tr. (Nov. 30, 2023) House Reapportionment and Redistricting Comm. Hearing (attached as Ex. E) at 26:18–29:19.

The House plan was approved by the committee on November 30, 2023, before going on to be approved by the House on December 1, 2023, and the Senate on December 5, 2023. *See* Status History of HB 1EX, https://www.legis.ga.gov/legislation/65850.

16

**B.     Facts regarding House remedial plan.**

The remedial state House plan increases the number of majority-Black districts by five and decreases the number of majority-white districts by five. Barber Report, § 4.2. The new majority-Black districts are (1) District 64 (west Metro Atlanta), which goes from non-majority Black to 52.43% AP Black VAP; (2) District 74 (south Metro Atlanta), which goes from non-majority Black to 66.0% AP Black VAP; (3) District 117 (south Metro Atlanta), which goes from non-majority Black to 62.93% AP Black VAP; (4) District 145 (metro Macon), which goes from non-majority Black to 50.30% AP Black VAP; and (5) District 149 (metro Macon) which goes from non-majority Black to 50.03% AP Black VAP. Barber Report, § 4.2, Table 9. The House remedial plan decreases the overall number of split counties in the state by one. Wright Dec. ¶ 30.

17



Barber Report, p. 26.

District 64 contains more than half of the total population that was included in the Esselstyn Illustrative House District 61. Barber Report, §4.4. This district configuration enabled the reduction of one district in Douglas

County, splitting the county into three districts rather than four, so that District 64 is located entirely in Douglas County.[4] Wright Dec. ¶ 26.



District 74 contains 80.8% of the population that was included in Cooper Illustrative House District 74. Barber Report, § 4.5, Table 12. Rep. Leverett consulted the Plaintiffs' expert district for that configuration. Ex. D at 20:10–17. This district is located in Clayton and Henry Counties, which are in south Metro Atlanta. Wright Dec. ¶ 24.

---

[4] The following maps are drawn from the Wright Dec. Ex. 3 and show only changed districts in color.



District 117 includes nearly 70% of the population included in Esselstyn Illustrative House District 117. Barber Report, § 4.5, Table 12. This was part of the goal of Rep. Leverett, and the district includes almost all of McDonough and portions of Locust Grove, using I-75 as a boundary line. Ex. D at 20:22–21:8. This district is located wholly in Henry County, which is in south Metro Atlanta. Wright Dec. ¶ 27.



Districts 145 and 149 include significant portions of the population included in the Esselstyn versions of the Macon area. Barber Report, § 4.6, Table 13. Rep. Leverett included the county seat of Forsyth County in District 145 and mostly utilized updated precincts in Macon, while protecting incumbents. Ex. D at 21:9–22. District 149 had what Rep. Leverett called a better configuration than Mr. Esselstyn's version, using a highway in Jones County instead of Twiggs and Wilkinson Counties to connect Macon and Milledgeville, and avoiding changing the existing split of Baldwin County. *Id.* at 21:23–22:13. The addition of those districts means that there are now four majority-Black districts that are anchored in the Macon area, Districts 142, 143, 145, and 149. Barber Report, § 4.2, Table 9.



The House remedial plan increases the number of Black individuals of voting age who live in majority-Black districts. On the 2021 House plan, 53.5% of Black individuals of voting age in Georgia lived in a majority-Black district. Barber Report, § 4.3. On the House remedial plan, 56.6%% of Black individuals of voting age in Georgia now live in a majority-Black district. *Id*. In looking at just the districts the Court identified as setting the area of Section 2 violations, the percentage of Black individuals of voting age living in a majority-Black district goes from 53.7% to 74.3% on the House remedial plan. *Id*.

## V.    Implementation of the remedial plans.

In their committee presentations, the chairs of redistricting committees in both chambers emphasized the importance of ease of implementation of the new remedial plans. Ex. C at 14:18–23; Ex. D at 24:1–4, 25:20–24. Ms. Wright's office prepares the maps for county election officials to utilize in reassigning voters after each change in district boundaries. Wright Dec. ¶¶ 31–32. Across all three plans, the total number of counties that are required to make changes to district boundaries as a result of the remedial plans is 20 out of 159 or only about 12.6% of the counties in Georgia. Wright Dec. ¶ 33. Minimizing the number of counties that have to make changes is a benefit to the county election officials who have to implement the new plans. Wright Dec. ¶ 34.

Further, when creating the remedial plans, Ms. Wright utilized updated precincts where those were available from counties. Wright Dec. ¶¶ 36–40.

Because counties change precinct boundaries frequently, the number of split Census VTDs does not indicate whether the plan can be easily administered or not, but Ms. Wright relied on updated precinct boundaries, not Census VTDs, when creating districts for the remedial plans. *Id*.

## STANDARD ON REVIEW OF REMEDY

"[A] district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings." *Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F.3d 1282, 1302-03 (11th Cir. 2020). And "any proposal to remedy a Section 2 violation must itself conform with Section 2." *United States v. Dallas Cty. Comm'n*, 850 F.2d 1433, 1437-38 (11th Cir. 1988) (quoting *Dillard v. Crenshaw Cty.*, 831 F.2d 246, 249 (11th Cir. 1987)). Thus, the inquiry for this Court in this case is whether the proposed remedial plan "*completely* remedies the prior dilution of [Black] voting strength and *fully* provides equal opportunity for [Black] citizens to participate and to elect candidates of their choice." *Dallas Cty. Comm'n*, 850 F.2d at 1442 (emphasis in original).

As this Court explained, that means the Court must evaluate the remedial plans to determine if they include "an additional majority-Black congressional district in west-metro Atlanta; two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district

in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb" without eliminating any existing minority opportunity districts. Order, pp. 509–11. If the plans do this—and otherwise comply with Section 2 and applicable law—then that is the end of the inquiry.

This Court already explained that it would utilize the *Gingles* standard to determine whether the remedial plans "provide[] Black voters with an additional opportunity district." Order, p. 511. Each district plan passed by the General Assembly provides exactly the districts this Court required to provide additional opportunities for Black voters.[5] And "States retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw v. Hunt*, 517

---

[5] In case there is any question, the relevant minority group in this case is Black voters. Order, p. 9 ("the Court determines that in certain areas of the State, the political process is not equally open to Black voters."); *see also id*. at 96, 107 (*APA* Cooper legislative plans involved majority-Black districts); 115 (*Grant* Esselstyn only considered Black population); 142 (Palmer only evaluated Black and white voter cohesion, not other minority groups); 149 (Handley only evaluated Black and white voter cohesion, not other minority groups); 201 (*Pendergrass* reference to minority community was to Black voters); 209, 211 (question in *Pendergrass* case was equal openness of process as to "affected Black voters"); 242 (electoral structure was found to affect Black voters); 272-273 (findings as to Black voters); 274 (question in *APA* and *Grant* cases was equal openness of process to Black voters); 405-406 (findings regarding Black community in context of Section 2 violation); 426-427 (question in *APA* and *Grant* cases was equal openness of process as to "affected Black voters"); 510 (injury was to "Plaintiffs and other Black voters in Georgia"); 511 (remedy will be assessed to determine "whether it provides Black voters with an additional opportunity district").

U.S. 899, 917 n.9 (1996) (citing *Voinovich v. Quilter*, 507 U.S. 146, 156–157 (1993); *Growe v. Emison*, 507 U.S. 25, 32–37 (1993)).

## RESPONSES TO PLAINTIFFS' OBJECTIONS

While each Plaintiff group filed its own objections, this Court directed Defendant to file a single response brief of up to 75 pages. [APA Doc. 348, p. 2]; [Grant Doc. 309, p. 2]; [Pendergrass Doc. 309, p. 2]. Because many of the objections overlap, this brief considers all the various objections raised by the Plaintiff groups.

**I.    The General Assembly is not limited to the districts listed in the Court's Order when creating a remedial plan (*APA/Grant/Pendergrass*).**

Plaintiffs selected the districts the Court identified as part of the regions in which it found Section 2 violations. *See* Order, pp. 512–13, nn.138, 139. Plaintiffs now take the novel view that this Court imposed limits on what the General Assembly could redraw when it delineated the relevant area the Plaintiffs now designate as the "vote dilution area." Plaintiffs do not cite any authority for the proposition that legislative remedies are limited to a "vote dilution area," and Defendant was unable to find any case that uses that term in this context. And it makes sense that such a limitation cannot exist, because of the federalism concerns this Court earlier identified limiting the Court's authority to interfere in legislative decision-making.

25

This Court enjoined the entirety of the plans at issue and directed the General Assembly to adopt "a substitute measure" that complies with the Court's Order. Order, p. 509 (quoting *Wise*, 437 U.S. at 540). As discussed below, this Court did not affirmatively limit the General Assembly's process for creating remedial plans and could not do so.

### A. Unlike racial gerrymandering cases, Section 2 claims involve regions, and the legislature drew the new districts precisely where this Court required them to be drawn.

To have a claim under Section 2 regarding districts, plaintiffs must only live in a *region* that could support an additional majority-minority voting district because the harm is vote dilution, not necessarily the boundaries of individual districts. *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018) (three-judge court). That is different from a racial gerrymandering claim, where the individuals have to live in the challenged *districts*—because they are challenging the configuration of those specific district boundaries. *United States v. Hays*, 515 U.S. 737, 745 (1995); *accord Dillard v. Baldwin Cty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000).

That is why this Court's Order did not find the particular district *boundaries* it listed violated Section 2. The Order explained that a lack of equal openness existed in certain *areas* of the state and proceeded to describe those areas through the identification of districts contained in Plaintiffs' complaints. Order, pp. 512–13. It is Plaintiffs who artfully reinterpret the Court's Order as

26

requiring something different. The Court did not mandate the General Assembly redraw every district in those defined areas. The Court did not limit the General Assembly to only redrawing districts in those areas. It gave specific instructions on what the General Assembly needed to do to remedy the vote dilution the Court found in those areas—draw the additional majority-Black districts in the defined *regions*, not redraw every *district* in the list of districts. Order, p. 509.

1.   **The new majority-Black districts are not drawn "somewhere else in the State."**

Even if the State was not limited to the specific districts, Plaintiffs still complain that new majority-Black districts are located "somewhere else in the State." *See, e.g.*, [APA Doc. 354, p.12] (quoting *Shaw*, 517 U.S. at 917). But this charge makes no sense when viewed in light of the facts of *Shaw* and the districts actually drawn by the General Assembly.

Plaintiffs are correct that a Section 2 violation cannot be remedied by creating a new majority-Black district "somewhere else in the state," *Shaw*, 517 U.S. at 917, but that fact leaves open the question of what exactly constitutes "somewhere else in the state." Without pointing to any authority in support, Plaintiffs urge this Court to adopt a standard that states must draw remedial districts *precisely and only* in the districts specified by the Court in the liability phase of the proceedings, and that they must not venture *anywhere*

outside those areas. [APA Doc. 354, p. 12]; [Grant Doc. 317, pp. 9–15]; [Pendergrass Doc. 317, pp. 8–10]. But there is no support for such a narrow interpretation of the State's remedial authority under Section 2 in either this Court's Order or in precedent.

First, this Court identified the *injury* and the *remedy* in two distinct parts of the Order. The Court found the area of injury to encompass a list of districts that defined an area. Order, p. 514. But immediately preceding that list, the Court articulated what the State must do to remedy the injury found in these areas: for each map, draw a remedial plan that created new districts in particular regional locations.[6] *Id*. at 509. Separating the identified area of injury from the broader region in which to locate the remedial districts makes sense given the federalism concerns in voting rights cases, as this Court recognized: "The Court is conscious of the powerful concerns for comity involved in interfering with the State's legislative responsibilities. As the Supreme Court has repeatedly recognized, 'redistricting and reapportioning

---

[6] Members of the General Assembly expressed gratitude for the specificity of what the General Assembly needed to do to comply with the Court's order. *See* Ex. D, 19:5–12 (Rep. Leverett); Tr. (Dec. 1, 2023) House Floor Debate (attached as Ex. H) at 4:4–5:2; Tr. (Dec. 1, 2023) Senate Floor Debate (attached as Ex. G) 21:21–22:21 (Sen. Watson), 145:4–148:15 (Sen. Kennedy); Tr. (Dec. 7, 2023) House Floor Debate (attached as Ex. I) at 71:11–72:4 (Rep. Leverett).

legislative bodies is a legislative task [which] the federal courts should make every effort not to preempt.'" Order, p. 509 (quoting *Wise*, 437 U.S. at 539).

To that end, when vote dilution is found, that "does not mean that a § 2 plaintiff has the right to be placed in a majority-[Black] district once a violation of the statute is shown. *States retain broad discretion in drawing districts to comply with the mandate of § 2.*" *Shaw*, 517 U.S. at 917 n.9 (emphasis added).[7]

Thus, while the Court found an injury in specific "districts/areas" of the state, it couched the location of the remedial districts in broader terms. The Court properly declined to go so far as to limit the State to crafting a remedial district *wholly within* particular regions. Rather, the Court stated that the districts must be more broadly *in* particular regions, for example, the South Metro Atlanta area. That is exactly what the General Assembly did in the remedial plans, and nothing in the cases relied on by Plaintiffs suggests this Court should find otherwise.

In *Shaw,* which Plaintiffs quote extensively, the Department of Justice declined to preclear a redistricting map under Section 5 because it failed to give effect to minority voting strength in the south-central to southeastern portions of North Carolina, in violation of the VRA. North Carolina responded,

---

[7] This binding precedent from the Supreme Court ends APA Plaintiffs' complaints about Mr. Woods being left out of a majority-Black district on the remedial plans. [APA Doc. 354, p. 17].

in part, by drawing a new majority-Black District 12, which "spans the Piedmont Crescent" of the state. 517 U.S. at 917. More specifically, the district was anchored in the *north* central part of the state and emanated outward to the *west* and finally settled in the southwestern portion of the state:



In other words, the district at issue in that case *never* even touched the area identified as having the voting-rights violation. In fact, it quite studiously avoided it. For this reason, the *Shaw* court found the "black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn." *Id.* The remedial plans before the Court here could scarcely be more distinguishable.

### 2. *The new majority-Black districts are all in the areas defined by the Court.*

Even if Plaintiffs are correct and the legislature was limited to the enumerated districts for drawing new majority-Black districts, the evidence before the Court demonstrates that the new districts are drawn primarily within the areas and districts identified by the Court. Barber Report, §§ 3.4, 4.4–4.6. Unlike the situation in *Shaw*, each district includes significant areas from the districts identified by the Court in its ordering paragraphs. That is true of the Senate plan:



Barber Report, p. 19.

That is also true of the various House districts—and visual inspection demonstrates that the lack of overlap is primarily the result of Plaintiffs not including existing majority-Black districts in their list of districts in their Complaints, when those districts would certainly have to be modified in any plan—and were modified by Plaintiffs in their illustrative plans. For example, the "hole" around District 64 where Plaintiffs claim the General Assembly went outside of the defined area is where existing majority Black districts were located, when obviously those districts would be reconfigured when creating new majority-Black districts:



Barber Report, p. 32.

32

Further, Mr. Cooper made a similar change in his new proposed remedial plan in the same area, which actually includes even fewer Black voters from the specified districts as a percentage than the enacted remedial plan:



Barber Report, p. 32.

The south metro and Macon areas show the same reality—the new districts are drawn in the areas the Court identified:



Barber Report, p. 34.



Barber Report, p. 37.

Plaintiffs' claims that the vote dilution the Court found is not remedied cannot withstand scrutiny because the General Assembly added the new majority-Black districts in the areas specified.

If Plaintiffs' approach is correct, holding a special session of the General Assembly was little more than a box-checking exercise to get to a court-drawn plan. But Plaintiffs ignore binding precedent: the General Assembly, as a political branch, is permitted to and did take far more into account than this Court when drawing districts. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

## B. The General Assembly must take more into account than the Court or Plaintiffs' experts when creating remedial plans.

As this Court already recognized, "redistricting and reapportioning legislative bodies is a legislative task [which] the federal courts should make every effort not to preempt." Order, p. 509 (quoting *Wise*, 437 U.S. at 539). When assessing a district plan, this Court must recognize "the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott*, 138 S. Ct. at 2324 (quoting *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995)). The legislature's adopted remedial plans not only comply with the Court's Order, but also reflect "a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." *McGhee v. Granville Cty.*, 860 F.2d 110, 115 (4th Cir. 1988).

36

Thus, despite Plaintiffs' hyperbole about the remedial plans,[8] this Court must presume the good faith of the legislature when evaluating the remedial plans. *Abbott*, 138 S. Ct. at 2324-25. And "[p]rinciples of federalism and common sense mandate deference to a plan which has been legislatively enacted." *Tallahassee Branch of NAACP v. Leon Cty.*, 827 F.2d 1436, 1438 (11th Cir. 1987).

### 1.   *Plaintiffs insisted repeatedly that illustrative plans were only illustrative, but now say they are mandatory.*

APA Plaintiffs' position at trial was that their illustrative plans were, as labeled, merely illustrative and that the legislature would have the opportunity to draft its own plans in case of a violation. *See, e.g.*, Trial Tr. at 235:8–237:9. But now that the General Assembly has undertaken that task, all Plaintiffs have abruptly changed course and essentially argue that their illustrative plans are mandatory, because individuals who were included in a majority-Black district on their illustrative plan are not included in a majority-Black district on the remedial plans. [Pendergrass Doc. 317, p. 8-9]; [APA Doc.

---

[8] Plaintiffs repeatedly claim the legislature "defied" this Court's order; *Pendergrass* Plaintiffs refer to the legislature's actions as "reprehensible," [Pendergrass Doc. 317, p. 23]; and Plaintiffs accuse Georgia of acting like Alabama. Rep. Leverett remarked that the accusation that Georgia was acting like Alabama "is really a low blow" when a similar charge was made in the legislative debate because his "goal this whole session has been to – to do just not what they did, to do everything the opposite from what they did." Ex. I at 67:12–68:3.

354, p. 21]; [Grant Doc. 317, p. 9]. But that is not the law and not what the Court ordered.

Again, a Section 2 claim is based on a *region* where vote dilution is occurring, not a right of every single Black individual to be placed into a majority-Black district. *Shaw*, 517 U.S. at 917 n.9. Adopting an interpretation of Section 2 that requires every Black voter in a region to be placed into a majority-Black district is constitutionally suspect and not at all required by Section 2. Indeed, courts expect some members of challenged minority groups to be left outside majority-minority districts on remedial plans. *See Shaw,* 517 U.S. at 917 n.9; *McGhee*, 860 F.2d at 118–119 (collecting cases).

Further, Plaintiffs complain about changes made to other districts after the legislature added the required majority-Black districts. But at trial, APA Plaintiffs objected when Defendant attempted to cross-examine their experts on changes made to other districts on the illustrative plans. Trial Tr. 234:12– 235:6; 270:19–271:21; 274:4–14; 275:23–276:13. While earlier objecting to the level of scrutiny of their illustrative plans, Plaintiffs now seek to apply a new standard to the remedial plans. But, as discussed above, the changes made to other districts was thoughtful and part of the General Assembly's entire process for considering the new plans.

### 2. *The General Assembly may take partisanship into account in its remedial plans.*

Contrary to APA Plaintiffs' arguments, the General Assembly is free to take partisanship into account when drawing a remedial plan. This Court already found the legislature had partisan motives in the creation of the 2021 plans, and the chairs clearly indicated they considered election returns and other partisan data as part of the creation of the remedial plans, while ensuring they were complying with the Court's Order. Order, pp. 260–62, 475–77, 489–91.

The entire point of the legislature having the first opportunity to draw a remedial plan is because it considers more factors as a political branch than a Court can. *Tallahassee Branch of NAACP*, 827 F.2d at 1438. The cases APA Plaintiffs cite offer nothing to rebut that reality. *League of United Latin American Citizens v. Perry*, 457 F. Supp. 2d 716, 721 (E.D. Tex. 2006), involved a court-drawn plan, not review of a legislatively enacted plan. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440-41 (2006), specifically recognizes that incumbent protection can be a legitimate factor in redistricting and did not involve a remedial plan. Thus, while Plaintiffs continue to cite cases about court-drawn remedial plans, they fail to recognize that relevant precedent and basic federalism concerns permit the legislature to take a

variety of factors into account, which the evidence shows the General Assembly did in this case.

### 3.  *The legislature is under no obligation to adopt Plaintiffs' plans.*

This may be self-evident, but Plaintiffs and this Court cannot require the General Assembly to accept the Plaintiffs' plans. This Court recognized this when it ruled that the General Assembly "has an illustrative remedial plan to *consult*" in its Order. Order, p. 515 (emphasis added). Nothing required the legislature to adopt those plans.

Plaintiffs attempt to lock in certain districts by claiming that the legislature could not alter those districts, for example in Douglas County. [Grant Doc. 317, pp. 10-11]. But they can only claim that the population of particular new majority-Black districts lives "outside of the vote-dilution area" because they removed districts that were already majority-Black from their defined list of districts in their Complaints. For example, looking at House District 64 shows that Plaintiffs claim a significant amount of population from outside the list of districts they created, but only because they artificially excluded most of the population of Douglas County—population that must change in the creation of the district, as Mr. Cooper did when creating another proposed remedial district in the same area. *Id.*; Barber Report §§ 4.4, 4.5.

Further, the facts demonstrate that the legislature did consult the illustrative plans. In fact, each new majority-Black district utilizes significant population from the Plaintiffs' illustrative plans while also accounting for other traditional redistricting principles:

| Remedial District | Illustrative District | % Total Pop in Remedial from Illustrative | % Total BVAP in Remedial from Illustrative |
|---|---|---|---|
| CD-6 | Cooper CD-6 | 72.5% | 80.8% |
| SD-17 | Esselstyn SD-25 | 78.6% | 76.6% |
| SD-28 | Esselstyn SD-35 | 52.6% | 55.8% |
| HD-64 | Esselstyn HD-61 | 54.7% | 52.2% |
| HD-74 | Cooper HD-74 | 80.8% | 81.8% |
| HD-117 | Esselstyn HD-117 | 69.2% | 70.2% |
| HD-145 | Esselstyn HD-142 | 57.8% | 59.1% |
| HD-149 | Esselstyn HD-149 | 57.2% | 64.3% |

Data from Barber Report, §§ 2.4, 3.5, 4.4, 4.5, 4.6.

The General Assembly was aware of the particular districts this Court relied on in its Order, and Ms. Wright loaded Plaintiffs' illustrative districts into her mapping software as she prepared to draw the plans to review them. Wright Dec. ¶ 11. Again, the General Assembly complied with this Court's Order.

### C. The remedial plans solve the violations the Court found because they add the required districts in the regions identified by the Court.

Plaintiffs do not seriously contest *whether* the new majority-Black districts were drawn because they cannot. *Grant* Plaintiffs' experts Dr. Palmer and Mr. Esselstyn even agree that the Senate remedial plan includes two

41

additional performing majority-Black districts and that the House remedial plan includes five additional performing majority-Black districts. [Grant Doc. 317-1, ¶¶ 11, 31]; [Grant Doc. 317-2, pp. 2–3].

The remedial Congressional plan goes from two AP Black VAP majority districts to four. Barber Report, § 2.2. The remedial state Senate plan goes from 14 AP Black VAP majority districts to 16 (28.6% of the 56 Senate districts). Barber Report, § 3.2. The remedial state House plan goes from 49 AP Black VAP majority districts to 54 (30% of the 180 House districts). Barber Report, § 4.2. And the legislative plans both reduce the number of majority-white districts by the same amount and do not eliminate any existing majority-Black districts. Beyond complaining that the districts are not drawn within their list of districts,[9] Plaintiffs do not contest that the new majority-Black districts are drawn where they are supposed to be drawn. That is sufficient to end the analysis. Unhappy with that result, Plaintiffs next propose a variety of additional possible ways to measure compliance, none of which apply here.

---

[9] Plaintiffs' own remedial and illustrative plans also make changes outside of the "vote dilution area" as they call it, with the clearest example being Mr. Cooper's remedial plans, which change significant areas outside of the list of districts. Barber Report, §§ 4.4, 4.5.

### 1.   The correct calculation is not the "net" amount of Black voters that moved because the Court did not order that as a remedy.

APA Plaintiffs propose a system of how many Black *voters* moved in and out of majority-Black districts as the method to measure compliance. [APA Doc. 354, pp. 18–19]. But this is not what the Court required. The mission for the General Assembly was not to ensure that every Black *voter* who was not previously in a majority-Black district would be moved into such a district. The mission was to draw the majority-Black *districts* this Court required in its Order.

And the result of that drawing means that more Black individuals of voting age will now be included in majority-Black districts. Barber Report, §§ 2.3, 3.3, 4.3. While complaining that there was a reshuffling of Black voters from existing majority-Black districts, Plaintiffs ignore the fact that their own illustrative plans also moved Black voters from existing majority-Black districts into new majority-Black districts—indeed, Plaintiffs' whole theory throughout this litigation was that the General Assembly had improperly grouped Black voters together, when they should have been separated to create additional majority-Black districts.

Thus, Plaintiffs' claims of a "shell game" are actually an indictment of their own approach. Having persuaded this Court that new majority-Black *districts* were required, they now propose to move the goalposts to require that

43

particular Black *voters* must be moved into and out of districts to ensure a political outcome. That is not what the Voting Rights Act nor this Court requires.

### 2. *The General Assembly moved existing districts north, while Plaintiffs moved existing districts south.*

Plaintiffs recognize that the legislature shifted districts north instead of south once the new majority-Black districts were added. [APA Doc. 354, p. 19]. That is exactly what the chairs explained happened in the metro Atlanta area, which resulted in the collapse of majority-white districts north of the new majority-Black districts. *See* Ex. C at 9:6–14, 16:18–25, 18:6–17; Ex. D. at 23:2–4, 29:24–30:12. This is logical because adding new majority-Black districts on a plan requires eliminating districts somewhere else. Plaintiffs criticize this approach for an obvious reason—the majority-white districts that were eliminated were electing Democratic candidates.

Plaintiffs also relied extensively at trial on the increase in Black voters in Georgia and in metro Atlanta, but now again switch their arguments and claim that only Black voters in certain areas can be considered to be moved into majority-Black districts in the remedial plan. *See, e.g.*, [APA Doc. 354, p. 19]; [Grant Doc. 317, p. 14]; [Pendergrass Doc. 317, pp. 8–9]. Again, the General Assembly's charge was to draw new majority-Black districts, which

necessarily requires including Black voters, including those who were not previously in majority-Black districts.

At the end of the day, the remedial plans ensure that Black voters in Georgia are more likely to be in a majority-Black district both statewide and in the districts listed by the Court in its Order than they were previously.

### 3. Plaintiffs offer no plan that complies with the General Assembly's policy goals on the enacted plans while also drawing any additional majority-Black districts.

While APA Plaintiffs offer brand-new remedial plans, no Plaintiff group offers any plan that starts with the legislature's policy decisions and goals, including its partisan goals, and then draws the additional majority-Black districts. Rather, all of Plaintiffs' proposed plans eliminate Republican districts, which is inconsistent with the General Assembly's legitimate partisan goals. Thus, there is no basis for this Court to consider plans that lack the necessary deference to legislative bodies. *Tallahassee Branch of the NAACP*, 827 F.2d at 1438.

### 4. APA Plaintiffs claim some districts are packed when they are within the same thresholds of districts on the 2021 plans that were not challenged.

APA Plaintiffs also claim that some House districts become "packed" on the remedial House plan. [APA Doc. 354, p. 25]. But the BVAP percentages for all the districts on the remedial plan are within the same range as the districts on the 2021 plan, including districts that were not challenged. Barber Report,

§ 4.2, Table 9. Thus, even if this Court had found packing in particular places, the districts are still within the acceptable range from the 2021 House plan.

**D.    This Court should not engage in a "beauty contest" with any other plans offered by Plaintiffs.**

Finally, Plaintiffs question the General Assembly's decision-making by proposing a "beauty contest" of the remedial plans versus their plans, claiming the General Assembly could have moved fewer voters or changed compactness scores in ways they prefer. [APA Doc. 354, p. 21]; [Grant Doc. 317, pp. 18-20].

### 1.    *Comparisons to brand-new illustrative plans are inappropriate at this stage (APA).*

First, the APA Plaintiffs cite no authority for the submission of new plans from Mr. Cooper as alternatives to the 2023 plans, and it is improper for this Court to consider these plans as part of Plaintiffs' objections. The issue before the Court now is whether the remedial plans comply with the Court's Order. Only if the Court finds that one or more of the 2023 plans does not comply should there be consideration of alternative plans, whether from a Special Master or otherwise. As long as the 2023 plans comply with the Court's Order by remedying the Section 2 violations the Court found, it does not matter that Mr. Cooper has created allegedly "better" plans. *Cf. Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 U.S. Dist. LEXIS 155998, at *99 (N.D. Ala. Sept. 5, 2023) (no basis for "beauty contest" between valid plans).

46

At the liability stage of the APA case, Mr. Cooper produced illustrative plans, was deposed on them, and was examined on them extensively at trial. Plaintiffs should not be allowed to submit new plans for Mr. Cooper as alternatives to the 2023 plans, because (in fairness to Defendant) this would require essentially a second trial as to the lawfulness of Mr. Cooper's new plans and risk the exact "infinity loop" that the three-judge court in *Singleton* sought to avoid, *see Singleton*, 2023 U.S. Dist. LEXIS 155998, at *152, as well as causing further delay in the implementation of new maps when time is of the essence.

While Plaintiffs may believe certain changes were "unnecessary," that does not automatically mean the General Assembly's decision-making violates the Constitution or the VRA. And that is the only standard that matters—not whether Plaintiffs would have drawn districts differently if they were a majority of the General Assembly. *McGhee*, 860 F.2d at 115.

### 2.   *Comparisons to illustrative plans are inappropriate at this stage (*APA/Grant/Pendergrass*).*

Further, this Court should not compare the remedial plans to the illustrative plans on other metrics because of the General Assembly's wide latitude for complying with this Court's Order. To be clear, the Court is not required to conduct a "beauty contest" between the 2023 remedial plans and Plaintiffs' illustrative plans. *See Allen v. Milligan*, 143 S. Ct. 1487, 1505 (2023).

"When evaluating a defendant's proposal, a court is not to inquire whether the defendants have proposed the very best available remedy, or even whether the defendants have proposed an appealing one." *United States v. Euclid City Sch. Bd*., 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009). The Court's "analysis in the first instance" is limited to whether the remedial plans correct the Section 2 violation that the Court previously found. If the remedial plans correct that violation, then the Court may consider any claims by Plaintiffs that the remedial plans "violate[] federal law anew." *Singleton*, 2023 U.S. Dist. LEXIS 155998, at *140. That is why comparisons to compactness scores or other metrics are inappropriate at this stage—the only question is whether the remedial plans comply with this Court's Order and other binding precedent.

## II.   The remedial plans do not eliminate existing minority opportunity districts (*APA/Grant/Pendergrass*).

Faced with the reality that the remedial plans retain all existing majority-Black districts from the 2021 plans and add the required majority-Black districts where the Court directed, Plaintiffs spend most of their objection briefs alleging that the State failed to comply with another part of this Court's instructions—the requirement not to eliminate any existing minority opportunity districts. But the General Assembly also fully complied with this portion of the Court's Order.

A.   **The remedial plans increase the number of majority-Black districts and do not eliminate any existing majority-Black districts (*APA/Grant/Pendergrass*).**

As shown by Dr. Barber's report, the remedial plans increase the number of majority-Black districts and do not eliminate any existing majority-Black districts elsewhere in the plans. Barber Report, §§ 2.2, 3.2, 4.2. Instead, in the legislative plans there is a corresponding decrease in majority-white districts and in the Congressional plan, there is a decrease in non-majority-Black districts. Significantly, the legislative plans do not eliminate any district where minority voters constituted a majority of the voting-age population.

Despite Grant Plaintiffs' attempts to re-imagine this Court's instructions [Grant Doc. 317, p. 15], this Court did not give the same instruction as the *Singleton* court. Instead, this Court clearly required additional *majority-Black districts*, which the General Assembly has created. Thus, under the definition of minority opportunity district that is most logical based on this Court's ruling and discussion of opportunity districts in this case, *see, e.g.*, Order, pp. 106, 145–46, 211, 268, 417–20, 427, and 511, no existing minority opportunity districts—that is, no majority-Black districts—were eliminated in any of the remedial plans. That should end the analysis of the legislature's compliance on that point.

Further, the legislative plans have the same number of districts that are majority-minority, but not majority-Black, as the 2021 enacted plans. Barber

Report, §§ 3.2, 4.2. This means the change in the legislative plans is a reduction in the number of majority-white districts. And none of the remedial plans decrease the number of majority-Black districts. All of them increase that number.

But that is not enough for all Plaintiffs and Amici except for the *APA* Plaintiffs. Instead, they propose at least three different definitions of "minority opportunity districts," none of which are appropriate under Section 2, any binding cases, or the facts of these cases.

## B.   Crossover districts are not required by Section 2 or binding precedent (*Grant*).

*Grant* Plaintiffs argue that the proper definition of "minority opportunity district" is a crossover district, where white voters and Black voters vote for the same candidates. [Grant Doc. 317, p. 16]. They then propose that a series of five districts, four of which were majority-white, are protected by the VRA because they were previously electing Democratic candidates but now will elect Republican candidates. *Id*. at 16–17. Not only is the dismantling of majority-white districts something to be expected when this Court ordered the creation of new majority-Black districts, but Plaintiffs' arguments about crossover districts are not supported by any legal theory.

Plaintiffs admit, as the Supreme Court explained in *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality op.), that "as a statutory matter, § 2

50

does not mandate creating or preserving crossover districts." *Id*. at 23. This is because crossover districts cannot satisfy the majority-minority rule required under the first *Gingles* precondition:

> Minority groups in crossover districts cannot form a voting majority without crossover voters. In those districts minority voters have the same opportunity to elect their candidate as any other political group with the same relative voting strength.

*Id*. at 20. If this Court concludes, as Plaintiffs request, that majority-white districts are somehow protected by Section 2 or that the General Assembly could not dismantle them as part of compliance with the Court's Order, it would guarantee Black voters an electoral advantage which is neither a "wrong" under the Voting Rights Act nor a valid remedy. *Id.* at 15.

Crossover districts are also not protected by the VRA because it would be "difficult to see how the majority-bloc-voting requirement" of the third *Gingles* precondition would be satisfied "where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Id.* at 16. Yet this is precisely what the *Grant* Plaintiffs ask this Court to do when they ask this Court to consider crossover districts to be "minority opportunity districts." [Grant Doc. 317, p. 17]. They seek to insulate

these districts solely based on the fact that they currently elect Democratic members to the General Assembly.[10]

If crossover districts are not required or protected under federal law, as Plaintiffs concede, then this Court cannot order their creation or preservation even if it is attached to some other relief ordered pursuant to a demonstrated Section 2 violation. "Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place." *Voinovich,* 507 U.S. at 156. That means this Court cannot order the State to protect a district for which federal law does not otherwise mandate protection. "[T]he federal courts are bound to respect the States' apportionment choice unless those choices contravene federal requirements." *Id.* at 156–57.

In the end, "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Bartlett*, 556 U.S. at 15. This is because Section 2 is not a guarantee of political success—"minority voters are not immune from the obligation to pull, haul, and trade to find common

---

[10] Indeed, as discussed below, interpreting the VRA to protect political parties rather than membership in a minority group is an unconstitutional interpretation of the VRA because it means it is no longer congruent and proportional to address equal political opportunity for Black voters. *See City of Boerne v. Flores*, 521 U.S. 507, 518 (1997).

political ground." *Johnson v. De Grandy,* 512 U.S. 997, 1020 (1994). If this Court finds that crossover districts are "minority opportunity districts," then it is requiring the legislature to protect political coalitions rather than ensuring the equality of Black electoral opportunities. Protecting political coalitions would violate Section 2 because nothing in Section 2 requires legislatures to draw election districts in such a manner as "to give minority voters the **most potential** or the **best potential,** to elect a candidate," as Plaintiffs are requesting here. *Bartlett*, 556 U.S. at 15 (emphasis added). Instead, as this Court correctly found, it only requires new opportunity districts that are majority-Black when a violation is shown. Order, pp. 509–11. Proceeding as the *Grant* Plaintiffs urge would place this Court in "the untenable position of predicting many political variables and tying them to race-based assumptions," which courts are not permitted to do and which this Court has already expressly said it would not do. *Bartlett*, 556 U.S. at 17–18; Order, pp. 240–42.

Thus, the legislature is not prevented by Section 2 or by this Court's Order from eliminating existing majority-white districts to create majority-Black districts—indeed, there is no other way it could have complied with the Order.

### C.    Coalition districts are not required by Section 2, binding precedent, or the facts of these cases (*Pendergrass*).

*Pendergrass* Plaintiffs argue that the term "minority opportunity district" instead protects coalition districts—that is, districts where the total number of non-white voters is more than 50%. [Pendergrass Doc. 317, pp. 10–12]. But this is not required by Section 2. And even if it was, *Pendergrass* Plaintiffs have not presented evidence of a viable political coalition here.

Further, while claiming that "minority opportunity district" means "coalition district," *Pendergrass* Plaintiffs also ignore this Court's discussion of enacted Congressional District 7. In the Order, this Court did not call enacted Congressional District 7 a minority opportunity district, but rather referred to it as a "majority-minority district." Order, p. 255. And *Pendergrass* Plaintiffs' reliance on *League of United American Citizens v. Perry*, 548 U.S. 399 (2006) (*LULAC*), does not help them here. [Pendergrass Doc. 317, p. 9]. In *LULAC*, the district at issue had been 57.5% majority-Latino before redistricting. 548 U.S. at 427. Congressional District 7 under the 2021 plans was not majority-Black (or majority of any single race), and *Pendergrass* Plaintiffs did not introduce evidence at trial of voting patterns of non-Black minorities in enacted Congressional District 7. There is no basis for this Court to conclude that coalition districts are "minority opportunity districts."

### 1.    Coalition districts are not required by or protected under Section 2 of the VRA.

Beginning with the text of Section 2, it expressly protects "members of *a class* of citizens" and "members of *a protected class*." 52 U.S.C. § 10301(b) (emphasis added). Both references are to a singular class of citizens, not to multiple classes of citizens who happen to be politically aligned. Similarly, paragraph (a) prohibits voting practices that result "in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. 10301(a), which ties the protections of Section 2 to membership in a particular racial group, not in a coalition of races. *See also Nixon v. Kent Cty.*, 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc). From the text alone, it is clear that Section 2 protects opportunities for single racial groups, not combinations of various groups.

Further, the continuing development of Section 2 law shows that coalition claims are not valid. As discussed above, *Bartlett* explained that crossover districts are not required, in part because there is no "special protection to a minority group's right to form political *coalitions*." 556 U.S. at 15 (emphasis added). The Sixth Circuit has completely rejected coalition-district claims under Section 2. *Nixon*, 76 F.3d at 1386. And while the Fifth Circuit previously authorized coalition district claims, it is currently

55

considering whether to overturn its precedent *en banc*. *Petteway v. Galveston Cty.*, 86 F.4th 214, 218 (5th Cir. 2023).

The only Eleventh Circuit precedent on this point was a statement in introductory language in *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990). That statement was not part of the holding of the case because the plaintiffs in that case presented no evidence of cohesion and because the statement was only in the explanation of the *Gingles* preconditions section, not the analysis. *Id.* As a three-judge panel in this district recently concluded, the Eleventh Circuit's "assertion about coalition districts was dicta." *Ga. State Conference of the NAACP v. Georgia*, Civil Action No. 1:21-cv-05338-ELB-SCJ-SDG, 2023 U.S. Dist. LEXIS 192070, at *47 (N.D. Ga. Oct. 26, 2023) (three-judge court) (citing *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010)).

Thus, the text of Section 2 exclusively contemplates individual minority groups as falling within its purview. And under all binding precedent, the existence of coalition-district claims as a remedy under Section 2 is—at best— "something of an open question." *Ga. State Conference of the NAACP*, 2023 U.S. Dist. LEXIS 192070, at *46. In light of the unambiguous text of Section 2, this Court should resolve that question against coalition districts. At the very least, there is not sufficient law to rely on to determine that a coalition of minority

voters would be sufficient under the first *Gingles* precondition to show a Section 2 violation.

### 2. Plaintiffs have presented no evidence of minority voters forming coalitions that are protected.

But even if coalition districts could be a valid showing for the first *Gingles* precondition, Plaintiffs have not presented sufficient evidence here because they have presented no evidence that Black, Latino, and Asian voters are cohesive in any context except in general elections. [Pendergrass Doc. 317-2, p. 2]; Barber Report, § 2.2. Thus, Plaintiffs have presented no evidence that shows that Black, Latino, and Asian voters support the same candidates when partisanship is not a factor. They can only show that these racial groups support Democratic candidates in the general election.

Without primary data, Plaintiffs have not presented any evidence that the cohesion they say exists is anything more than partisan political behavior by voters. Without this data, there is no proof of things like situations where "hispanic voters supported and worked for black candidates" or any evidence that Asian voters, Latino voters, and Black voters "worked together and formed political coalitions." *Concerned Citizens of Hardee Cty.*, 906 F.2d at 527.

Further, *Pendergrass* Plaintiffs must rely on a coalition of Black, Latino, *and* Asian individuals, because the Black and Latino CVAP numbers without Asian citizens in the enacted Congressional District 7 are below 50%.

Pendergrass PX-1 (Cooper Report), Ex. K-1 (p. 119); Barber Report, § 2.2. Only by adding Asian citizens does the analysis push the minority citizen voting age population of enacted Congressional District 7 over 50%. Barber Report, § 2.2. But, as discussed below, *Pendergrass* Plaintiffs have not presented evidence on many points for Asian voters, including evidence of historical discrimination or socioeconomic status disparities that affect Asian voters.

Further, making changes to Congressional District 7, even if it was a functioning coalition district, does not "offset" minority gains in one part of the state with losses in another. [Pendergrass Doc. 317, pp. 10-11]. Not only are the changes made to create the required new majority-Black district primarily in metro Atlanta instead of across the state, the Supreme Court has still only ever considered questions of offsets with a single race of voters, not coalitions. *De Grandy*, 512 U.S. at 1019. And there is no question that the remedial plans add opportunities for Black voters, which is what this Court required.

## D. Districts which elect Democrats are not required by Section 2 or binding precedent (*Amici/APA/Grant/Pendergrass*).

Finally, Amici from the three-judge panel cases offer a third possible definition of "minority opportunity district," which is a district which reliably

elects a Democrat. *See* [APA Doc. 363,[11] pp. 12-13]. To illustrate how difficult it is to make this case even from decisions of other trial courts, Amici place the bracketed word "[minorities]" in their quote from *Wright v. Sumter Cty. Bd. of Elections & Registration*, No. 1:14-CV-42 (WLS), 2020 U.S. Dist. LEXIS 17348, at *12 (M.D. Ga. Jan. 29, 2020), to replace the phrase "African Americans in Sumter County" in that quote. This sleight-of-hand effectively rewrites the meaning of the quoted passage. Amici also misread this Court's Order—it did not require "drawing *additional* Black opportunity districts" in a political-performance sense, [APA Doc. 363, p. 12]. Instead, this Court required "additional majority-Black . . . districts." Order, p. 509.

In contrast to the Court's requirements, Amici's definition of "effective for Black voters" refers solely to districts that elect Democrats. [APA Doc. 363-1, p. 7]. While Amici include some primary data from 2018 in an attempt to avoid relying exclusively on general-election data, they only identify a single district where they claim there is a divergence between primary and general election performance.[12] *See* [APA Doc. 363-1, pp. 5–6]. In other words, Amici simply re-imagine this Court's Order to require political coalitions, *Bartlett*,

---

[11] The Court authorized Amici to file the same brief in all three cases. It was filed at [APA Doc. 363], [Grant Doc. 321], and [Pendergrass Doc. 322]. For ease of reference, this brief refers to the APA docket numbers.

[12] This approach is in sharp contrast to the parties to these cases, who offer no primary data at this stage.

556 U.S. at 26, and then use the phrases "Black-preferred" and "white-preferred" to refer to Democrats and Republicans, respectively. [APA Doc. 363-1, pp. 5-6].

Not only does reading Section 2 to require protection of political coalitions violate *Bartlett*, it also would make Section 2 unconstitutional because it would no longer be congruent and proportional to addressing equal political opportunity for Black voters. *See City of Boerne*, 521 U.S. at 518. This Court should reject a definition of "minority opportunity district" that is designed to ensure Democratic political performance through the VRA.

## III. SB 3EX does not independently violate Section 2 of the VRA (*Pendergrass*).

Faced with the full compliance of the General Assembly with this Court's Order, *Pendergrass* Plaintiffs launch one final line of attack—that the prior Congressional District 7 is required by Section 2 and thus any changes to its boundaries is itself a violation of Section 2. [Pendergrass Doc. 317, pp. 14–27].

Initially, finding a Section 2 violation on 12 pages of briefing and a handful of exhibits on an expedited basis without the opportunity for discovery, cross-examination or any other procedural protections defies the required "intensely local appraisal" this Court must carry out in the context of Section 2, especially on claims that have never been raised in this case. *Wright*, 979

F.3d at 1288. But even if this Court considers the merits of Plaintiffs' claims,

their claim of a separate Section 2 violation fails.

**A.    There is no sufficiently large and geographically compact minority group that constitutes a majority in enacted Congressional District 7 (first *Gingles* precondition).**

In order to find that numerosity of minority voters exists in enacted

Congressional District 7, *Pendergrass* Plaintiffs must rely on a connections

among three separate minority groups. [Pendergrass Doc. 317, p. 15]. Using

the CVAP metric Plaintiffs rely on, they cannot reach a majority without

including Asian voters, as shown by Mr. Cooper's expert report in this case,

which shows the total Black and Latino CVAP in enacted Congressional

District 7 is 43.64% using the highest metrics.

| District | % NH Single-Race Black CVAP* | % NH DOJ Black CVAP** | % Latino CVAP | % SR NH White CVAP |
|---|---|---|---|---|
| 001 | 29.16% | 29.67% | 4.49% | 63.10% |
| 002 | 49.55% | 50.001% | 3.17% | 44.62% |
| 003 | 22.53% | 22.86% | 3.38% | 71.12% |
| 004 | 57.71% | 58.46% | 3.98% | 32.82% |
| 005 | 51.64% | 52.35% | 3.48% | 39.75% |
| 006 | 9.72% | 10.26% | 5.63% | 76.60% |
| 007 | 31.88% | 32.44% | 11.20% | 43.69% |
| 008 | 30.46% | 30.76% | 3.79% | 63.40% |
| 009 | 10.03% | 10.34% | 7.35% | 77.37% |
| 010 | 22.11% | 22.56% | 4.06% | 70.80% |
| 011 | 17.57% | 18.30% | 6.28% | 71.12% |
| 012 | 36.60% | 37.19% | 3.39% | 56.94% |
| 013 | 66.36% | 67.05% | 5.80% | 23.21% |
| 014 | 13.19% | 13.71% | 6.20% | 78.21% |

Pendergrass PX-1 (Cooper Report), Ex. K-1 (p. 119); *see also* Barber Report, §

2.2. Despite the necessity of including Asian voters, the *entirety* of *Pendergrass*

Plaintiffs' evidence for this sweeping three-part political coalition is the

election analysis of Dr. Palmer and the testimony of a single individual before

a legislative committee. [Pendergrass Doc. 317, pp. 17-18].

For all the reasons outlined in Section II.C. above, coalition districts are

not required by Section 2. But even if they are, for purposes of the first *Gingles*

precondition, *Pendergrass* Plaintiffs have presented no evidence of situations

where "hispanic voters supported and worked for black candidates" or any

evidence that Asian voters, Latino voters, and Black voters "worked together

and formed political coalitions," *Concerned Citizens of Hardee Cty.*, 906 F.2d at

527, beyond similar voting behavior in partisan general elections. This is far

more akin to offering only "anecdotal testimony regarding individual

instances" instead of offering data supporting coalition claims in any context

that is not partisan, such as primary data. *Id. Pendergrass* Plaintiffs ask this

Court to merely presume a coalition exists because three groups of non-white

voters support Democratic candidates in general elections—that is not

sufficient to meet the numerosity requirement of the first *Gingles* precondition

because no majority exists otherwise.

**B.    The second and third *Gingles* preconditions emphasize the political nature of Plaintiffs' claims.**

*Pendergrass* Plaintiffs offer Dr. Palmer's analysis of elections from 2012 to 2022 in enacted District 7 for the proposition of cohesion among voters. But while Dr. Palmer studiously avoids giving names of candidates or party affiliation of candidates, the data demonstrates that the cohesion in general elections only is in support of Democratic candidates. [Pendergrass Doc. 317-2, pp. 10-11]. But as other experts before this Court explained, primaries can be a "barrier for Black-preferred candidates." Order, p. 151 (citing Dr. Handley's testimony). *Pendergrass* Plaintiffs have presented no evidence that Black, Latino, and Asian voters support the same candidates in primaries or that those primary elections are not barriers for Black-preferred (or Asian-preferred or Latino-preferred) candidates.

While this Court found that concerns about partisanship are properly raised in the totality of the circumstances analysis, the unique nature of the coalition claims advanced here requires analysis at the *Gingles* preconditions stage. And this Court already concluded that drawing districts where Black voters are a majority was necessary because of racially polarized voting. Order, pp. 419–20. Without more, *Pendergrass* Plaintiffs cannot carry their burden regarding the political cohesion required under the *Gingles* preconditions by

adding all non-white voters together based solely on support for candidates in partisan general elections.

**C.    The totality of the circumstances does not support a finding of lack of equal openness as to a combination of Black, Latino, and Asian voters in prior Congressional District 7.**

*Pendergrass* Plaintiffs present the entirety of their totality of the circumstances evidence in just seven pages of their brief. But that evidence cannot support a finding of a lack of equal openness as to Black, Latino, and Asian voters in the prior Congressional District 7.

### 1.    *Senate Factor 1: This Court cannot import its findings about Black voters to Latino and Asian voters.*

As this Court made clear, the findings it made about the history of discrimination in these cases were about the history involving Black voters.[13] Order, pp. 213–33. *Pendergrass* Plaintiffs now rely on an expert report from another case to establish a brand-new Section 2 claim involving coalition districts, which have never been at issue in this case. As discussed above, this Court should reject the attempt to find a coalition as a matter of law and on the *Gingles* preconditions.

---

[13] Defendant has been unable to locate any reference to Asian voters or Latino voters in the Order that are unrelated to district statistics.

But even if this Court considers what *Pendergrass* Plaintiffs offer, it proves nothing about a history of discrimination as to Latino and Asian voters. *Pendergrass* Plaintiffs identify three instances with passing references to both Latino and Asian voters, the newest of which is more than a decade old. [Pendergrass Doc. 317, pp. 21–22]. They rely on Georgia citizenship-check processes, where individuals who previously provided documentary proof they were *not* citizens are asked for details if they later register to vote. This Court has already ruled that the process complies with the Constitution and with Section 2 of the VRA. *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1235, 1250 (N.D. Ga. 2022). And that process is still in place despite attempts to enjoin it, while it is also currently the subject of litigation in *Georgia Coalition for the People's Agenda v. Raffensperger*, Case No. 1:18-cv-04727-ELR (N.D. Ga.). *Pendergrass* Plaintiffs next rely on a process from 2008-2009 involving matching records that is also similar to what this Court upheld in *Fair Fight Action*. Finally, *Pendergrass* Plaintiffs cite to an 11-year-old statement by then-Rep. Stacey Abrams regarding the 2011 redistricting, which involved plans that were drawn under Section 5 of the VRA and precleared by the U.S. Department of Justice.[14]

---

[14] To be clear, even under Plaintiffs' view, the General Assembly created a coalition district on the 2021 enacted Congressional plan, undermining then-Rep. Abrams' claims.

These three isolated instances, one of which has been upheld against almost-identical claims of racial discrimination, do not suffice to carry Plaintiffs' burden to show a history of discrimination against Latino and Asian voters in Georgia. This is a far cry from the evidence this Court relied on for the first Senate factor in its Order, which was focused on Black voters. Order, pp. 216–32.

> **2.    *Senate Factor 2: No evidence on racially polarized voting beyond what was already presented.***

*Pendergrass* Plaintiffs offer no evidence at all regarding the second Senate factor, which is where this Court would analyze the potential impact of partisanship. As this Court explained, determining "whether voter polarization is on account of partisanship and race is a difficult issue to disentangle." Order, p. 235. The same issues explained by Dr. Alford infect the analysis offered here, with no evidence by *Pendergrass* Plaintiffs of any connection between race and partisanship of Latino and Asian voters at this point in the case, unlike the evidence presented to the Court regarding Black voters. Order, p. 236–37. Further, *Pendergrass* Plaintiffs have presented no evidence regarding the success of Latino or Asian candidates based on the racial makeup of a district. Order, p. 239. And *Pendergrass* Plaintiffs have presented no evidence regarding the history of the Republican Party and Latino and Asian voters. Order, p. 241. Without any evidence on this point,

this Court cannot conclude that failing to preserve the 2021 enacted Congressional District 7 means the political processes are not equally open to Latino and Asian voters.

### 3. Senate Factor 3: No evidence regarding discriminatory voting practices in the jurisdiction.

*Pendergrass* Plaintiffs also offer no evidence regarding Senate Factor 3, or any impact of particular voting practices in the jurisdiction on Latino and Asian voters. Again, without evidence about the impact on the alleged coalition, there is no basis for a finding of a lack of equal openness.

### 4. Senate Factor 5: Socioeconomic indicators for Latino and Asian voters are of limited utility in this context.

For socioeconomic indicators, *Pendergrass* Plaintiffs offer a new three-page report by Dr. Collingwood, summarizing American Community Survey (ACS) data. Dr. Collingwood did not review data on Latino or Asian Georgians as part of his expert reports or testify regarding these groups in his direct trial testimony. *See* Trial Tr. at 692:9–15, 19–24 (09/07/23) (nothing in Dr. Collingwood's reports about Asian-Americans in Georgia).

Dr. Collingwood's new report has a number of flaws, especially as *Pendergrass* Plaintiffs wish to use it. First, by its terms, the data is only available at the county level and not at the district level, so this Court cannot reach conclusions about the voters who are actually within the boundaries of enacted Congressional District 7. [Pendergrass Doc. 317-5, p. 1].

67

Second, Dr. Collingwood admits in footnote 1 that he was missing data for Pacific Islanders, compared to Asian-Americans generally, thus admitting the existence of at least one subgroup within Asian-Americans for which he does not have data. [Pendergrass Doc. 317-5, p. 1 n.1]. This Court cannot assume that all Asian voters are similar. *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2258 ("the Asian American community is not a monolith") (Sotomayor, J., dissenting).

Third, Dr. Collingwood's report summarizes ACS data, which by its nature lumps multiple distinct ethnic groups together. According to the ACS page on the U.S. Census Bureau website, "People who identify with the terms 'Hispanic' or 'Latino' are those who classify themselves in one of the specific Hispanic or Latino categories listed on the American Community Survey questionnaire and various Census Bureau survey questionnaires – 'Mexican, Mexican Am., Chicano' or 'Puerto Rican' or 'Cuban' – as well as those who indicate that they are 'another Hispanic, Latino, or Spanish origin.'" *See* https://www.census.gov/acs/www/about/why-we-ask-each-question/ethnicity. Thus, "Latino" is a broad category embracing numerous subgroups, and Dr. Collingwood has not attempted to account for the differences among those subgroups, instead just relying on the concept that they are all similar.

Further, the socioeconomic data he presents does not demonstrate a consistency across Latino and Asian households, with Asian individuals far

closer to (and in some cases exceeding) white socioeconomic standards he cites. For example, Dr. Collingwood's data shows that Asian individuals have higher rates of college education than whites [Pendergrass Doc. 317-5, p. 2, Table 1]. Other data shows a lack of connection with the alleged coalition, with more white individuals disabled than Asian and Latino individuals and a lower unemployment rate for Asian and Latino individuals than for white individuals. *Id.* Again, this evidence does not demonstrate consistency of socioeconomic standards for Black, Latino, and Asian voters, which would be required to find that Senate Factor 5 favors *Pendergrass* Plaintiffs in their attempt to establish a coalition in this area.

Thus, *Pendergrass* Plaintiffs have only presented inconsistent socioeconomic data and presented no evidence of Asian and Latino voter participation. *Compare* [Pendergrass Doc. 317, p. 22] *with* Order, pp. 242–50]. Without more, this Court cannot conclude that there is any impact on the political participation of Black, Latino, and Asian voters in the area of enacted Congressional District 7.

### 5. *Senate Factor 6: No evidence of racial appeals in campaigns.*

*Pendergrass* Plaintiffs also present no evidence at all on any racial appeals affecting Latino and Asian voters. Thus, this Court cannot conclude that the political campaigns in the area of enacted Congressional District 7 are

"characterized by subtle or overt racial appeals." *Wright*, 979 F.3d at 1296. As it did in its Order, this Court should assign no weight to this factor. Order, p. 252.

6.    ***Senate Factor 7: Extent of election of Latino and Asian officials is not relevant when they are not the relevant minority group.***

It is unclear how *Pendergrass* Plaintiffs ask this Court to apply Senate Factor 7, because they seek to rely on the lack of Latino or Asian elected officials. But Plaintiffs admit Georgia currently has a statewide elected Latino official and a statewide Asian-American official. [Pendergrass Doc. 317, p. 23]. Also, Plaintiffs do not address the statewide Latino and Asian populations, which are significantly smaller than the Black population in Georgia.

7.    ***Senate Factor 8: This Court cannot presume unresponsiveness, as it already found.***

*Pendergrass* Plaintiffs revisit the same approach this Court already rejected regarding unresponsiveness, simply assuming that unresponsiveness exists because they do not like the remedial Congressional plan. *Pendergrass* Plaintiffs present no evidence of a "determination to impose a ceiling on minority opportunity in the State" nor any evidence of unresponsiveness. Just as during the trial, they simply ask this Court to assume unresponsiveness. This Court already found this kind of approach to Senate Factor 8 is not appropriate, and it should not be utilized here either. Order, pp. 259–60.

**8.      Senate Factor 9: This Court already determined the State's policies were partisan and they remained so.**

Perhaps most surprising given the requirement of presuming the good faith of the legislature, *Pendergrass* Plaintiffs attack the motivations of the General Assembly in adopting the remedial plans. This Court earlier found that the motivations for the 2021 redistricting plans were non-tenuous because they were partisan, Order, pp. 260–62, and the statements of legislators in the 2023 special session match that approach—they repeatedly emphasized that they were seeking to achieve partisan ends while also complying with the Court's Order and taking into account a variety of traditional redistricting principles and communities of interest. *See, e.g.*, Ex. C at 10:22–11:12; Ex. D at 24:21–25,

*Pendergrass* Plaintiffs also attempt to import the entirety of their "beauty contest" approach into this Senate factor, claiming that the mere fact that the General Assembly lowered the compactness scores for districts it had previously created showed some improper intent. *Pendergrass* Plaintiffs again claim that coalition district precedent is "binding," [Pendergrass Doc. 317, pp. 24-25], when that is simply not true.

Finally, *Pendergrass* Plaintiffs walk right up to the line of alleging intentional racial discrimination by the General Assembly during the 2023 special session. Not only does this ignore the required presumption of good

71

faith to legislative actions, it is inappropriate to conclude based on a single legislator's statement. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021). Further, this claim ignores the careful, deliberative process the General Assembly undertook and explained in committee meetings about the plan. *See* Facts Regarding Remedial Plans, Sections II–V, above. *Pendergrass* Plaintiffs have not offered any evidence that supports a finding of intentional racial discrimination, nor is that appropriate to consider under this Senate factor.

Just like the evidence at trial, partisanship by a political branch is not a tenuous justification and does not support a finding of a Section 2 violation here.

### D.   *Pendergrass* Plaintiffs have not shown a Section 2 violation from changing the character of District 7.

*Pendergrass* Plaintiffs are wrong on the law and have not put forward sufficient evidence to support their claims about enacted Congressional District 7. Although it originally drew Congressional District 7 as a coalition district in 2021 as an exercise of state policy, the General Assembly is not *required* to draw a coalition district where Congressional District 7 was previously located. Even if it was, *Pendergrass* Plaintiffs have not put forward sufficient evidence of a coalition that could support a Section 2 claim in that area based on the *Gingles* preconditions, especially considering the significant

differences in Asian, Latino, and Black voters in the district. Further, *Pendergrass* Plaintiffs have not shown that the totality of the circumstances shows a lack of equal openness for Asian, Latino, and Black voters in the area covered by the former Congressional District 7. As a result, *Pendergrass* Plaintiffs have not shown that the Congressional remedial plan has any Section 2 violation in it, and there is no reason to stop the State from using that plan in the 2024 elections.

## IV.     This     Court     should     not     adopt     Plaintiffs'     plans (*APA/Grant/Pendergrass*).

Even if this Court determines that the General Assembly plans should not be used, it should not adopt Plaintiffs' plans outright. This Court is required to defer to the legislative policy determinations as far as is possible except in situations where there are separate violations of Section 2 or the Constitution. *Tallahassee Branch of NAACP*, 827 F.2d at 1438. The Court now has the benefit of the General Assembly's remedial plans and must defer to the policy decisions made in those plans as far as is possible. Because none of Plaintiffs' plans were drawn with those policy goals in mind, they are not appropriate remedies for this Court to order.

## V.     Time is of the essence to ensure election officials can administer the 2024 elections (*APA/Grant/Pendergrass*).

As this Court is aware, the administration of elections is a complicated endeavor, and works backward from the date of the election. *Alpha Phi Alpha*

*Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1321 (N.D. Ga. 2022). Under the 2024 election calendar, which is attached as Ex. J, the addition of the Presidential Preference Primary in March 2024 complicates the election schedule this year. Nomination petitions can be circulated as early as January 11, 2024, and qualifying for the May Primary and November General elections begins on March 4, 2024 at 9:00am. Ex. J, pp. 1, 3. Time is of the essence to ensure the parameters of the election are set before the eve of the election. *Purcell v. Gonzales*, 549 U.S. 1, 4–5 (2006) (per curiam); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020).

## CONCLUSION

The Georgia General Assembly took this Court and its obligations to Georgia voters seriously and fulfilled the mission this Court gave it—to create additional majority-Black districts in defined areas, while also complying with other traditional redistricting principles.

Plaintiffs admit the General Assembly drew the districts this Court required. And their objections are based on partisanship rather than in fact or law. But Plaintiffs' mere dislike of the political outcome of their case is not a legal ground for the Court to reject the remedial plans. Georgia's remedial maps fully comply with this Court's Order and the Voting Rights Act. This Court should overrule Plaintiffs' objections and allow Georgia to use its chosen district maps in the 2024 election cycle.

Respectfully submitted this 18th day of December, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Telephone: 678-336-7249

*Counsel for Defendant Secretary of State
Brad Raffensperger*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the

foregoing Response Brief has been prepared in Century Schoolbook 13, a font

and type selection approved by the Court in L.R. 5.1(B).

> _/s/ Bryan P. Tyson_
> Bryan P. Tyson