# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COAKLEY PENDERGRASS; TRIANA
ARNOLD JAMES; ELLIOTT
HENNINGTON; ROBERT RICHARDS;
JENS RUECKERT; and OJUAN GLAZE,

        Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State,

        Defendant.

CIVIL ACTION FILE
NO. 1:21-CV-05339-SCJ

## PLAINTIFFS' REPLY IN SUPPORT OF OBJECTIONS TO THE GEORGIA GENERAL ASSEMBLY'S REMEDIAL CONGRESSIONAL PLAN

## INTRODUCTION

The State of Georgia is playing games. Defendant's brief deploys a series of word games, carefully categorizing districts to congratulate lawmakers for adding "majority-Black districts" by eliminating "non-majority-Black districts" in the congressional plan, Doc. 327 at 49, while shrugging off the Court's instruction that the State must not eliminate "minority opportunity districts" across Georgia. It invites this Court and Plaintiffs into a game of whack-a-mole, surfacing a new violation each time the Court stamps out another, hoping that Plaintiffs and the Court will eventually tire in the years-long effort in holding the State accountable under the law. And its purported remedy is little more than a shell game, shuffling Black voters among districts to minimize their voting power statewide, avoid a full remedy to the Section 2 violation, and evade this Court's instructions.

But for Georgia's Black voters, compliance with the Voting Rights Act is no game. It is an issue of law for which that they have fought, that they have won, and for which they are—fully and finally—entitled to a remedy. Having been given an opportunity to right its wrong, the State of Georgia has failed its Black voters once again. This Court should strike down the General Assembly's remedial congressional plan and take steps toward adoption of a lawful congressional plan.

# ARGUMENT

## I.   A Section 2 violation can only be remedied by a redistricting plan that cures the established vote dilution.

The General Assembly has failed to adequately remedy the Section 2 violation identified by the Court by reaching *outside* the vote dilution area to purportedly craft a remedy and, in evidencing its contempt for complying with the task at hand, eliminating minority opportunity elsewhere in the State. Defendant proffers two defenses in response to Plaintiffs' objections: (1) the additional-majority Black district is generally located in the west-metro Atlanta region and thus satisfies the Court's directive, and (2) eliminating a majority-minority district *does not* go against the Court's order that the State cannot eliminate minority-opportunity districts. Both arguments are riddled with factual inaccuracies and legal error.

### A.   SB 3EX does not sufficiently remedy the actual vote dilution identified by the Court.

The injury found by this Court is the dilution of Black voting strength in the areas encompassing "[e]nacted CDs 3, 6, 11, 13, and 14." Doc. 286 at 514. The General Assembly purports to provide a Section 2 remedy by reaching into CD 5. Doc. 317 at 8. The General Assembly's decision to trade off the voting rights of Black voters *within* the vote dilution area against those of Black voters *outside* of the vote dilution area thus violates the plain language of the Court's order, avoids

providing a Section 2 remedy for thousands of Black voters suffering a Section 2 injury, and fails to completely remedy the Section 2 violation.

Contrary to Defendant's suggestion, the notion that vote dilution remedies should be limited to defined areas of vote dilution injury is hardly a "novel view," Doc. 327 at 30. The Court has the power to require new state legislative plans that draw exclusively from the vote-dilution areas because "[t]he scope of [a] federal court's power to remedy apportionment violations is defined by principles of equity." *See Arbor Hill Concerned Citizens v. Cnty. of Albany*, 357 F.3d 260, 262 (2d Cir. 2004) (per curiam). "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). And in the Section 2 context specifically, all parties agree that Plaintiffs are entitled to a remedial plan that "*completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1442 (11th Cir. 1988) (citing S. Rep. No. 417, 97th Cong. 2d Sess. 26, *reprinted in* 1982 U.S. Code Cong. & Adm. News 177, 208); *see also White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 752 (N.D. Ohio 2009) ("[A] legally acceptable plan is one that corrects the existing Section 2 violation without creating one anew."); *Ketchum v. Byrne*, 740 F.2d 1398,

1412 (7th Cir. 1984) (remedial plan did not remedy the Voting Rights Act violation because it did not eliminate "the illegal dilution of minority voting strength" and did not "grant to minority citizens a reasonable and fair opportunity to elect candidates of their choice as that concept has been understood in redistricting jurisprudence"). Thus, in Section 2 cases, the "right and remedy are inextricably bound together, for to prove vote dilution by districting one must prove the specific way in which dilution may be remedied by redistricting." *McGhee v. Granville County*, 860 F.2d 110, 120 (4th Cir. 1988). It is Defendant who offers the "novel view" that a Section 2 remedy can be divorced from the Section 2 violation. Based on the applicable legal standard, the 2023 remedial plan is a plainly insufficient remedy.[1]

Defendant argues that the 2023 remedial plan increases the number of Black voters who live in majority-Black districts on a statewide basis, Doc. 327 at 13, but the Court should consider this against the backdrop of the overall Black voting age population's ability to elect their candidates of choice in the State. Under the 2021 plan, 1,471,996 Black voters, or 56.4%, lived in districts in which they could elect preferred candidates. Doc. 318-3 (adding the 18+AP Black numbers of those in CDs 2, 4, 5, 7, and 13). Under 2023 remedial plan, that number *slightly* increases to

---

[1] It makes no difference that "th[e] Court identified the injury and the remedy in two distinct parts of its [o]rder." Resp. at 28. "[T]he nature of the violation," not the style of the headings in a court order, "determines the scope of the remedy," *see Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971).

1,499,511 Black voters, or 57.5%, lived in districts in which they could elect their preferred candidates. Doc. 318-2 (adding the 18+ AP Black numbers of those in CDs 2, 4, 5, 6, and 13). Conversely, under the Illustrative plan, 1,668,269 Black voters, or 63%, lived in districts in which they could elect their preferred candidates. Doc. 318-1. (adding the 18+AP Black numbers of those in CDs 2, 4, 5, 6, 7, 13).

These numbers are striking not because *every* Plaintiff or Black voter in Georgia must be placed in a majority-Black district, *contra* Doc. 327 at 34, but because they demonstrate the extent to which the General Assembly studiously avoided any practical relief for tens of thousands of Black voters still being deprived of equal opportunity to the electoral process in the very areas the Court identified as requiring a remedy. The plan simply "perpetuates the vote dilution that this case seeks to resolve." *United States v. Osceola County*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006).

**B.    The remedial plan fails to remedy the Section 2 violation because it eliminates a minority opportunity district elsewhere in the state.**

By eliminating minority-opportunity CD 7, Defendant disregarded the Court's order that any remedy could not "eliminat[e] minority opportunity districts elsewhere in the plans." Doc. 286 at 510. Defendant's expert Dr. Barber identifies the 2023 remedial map's fatal flaw: It maintains the same number of majority-minority districts as the 2021 plan. Doc. 327-2 § 2.2; *cf.* Doc. 286 at 9–10 (in determining that the political process is not equally open to Black voters, noting that

5

all of Georgia's population growth was attributable to the minority population, however, the number of majority-Black congressional districts remained the same).

Defendant tries to engage the Court in a game of semantics. On the one hand, Defendant chooses his words carefully to distinguish between "majority-Black," "majority-white," "non-majority-Black," and "majority-minority" districts in defense of the remedial plan. *See, e.*g., Doc. 327 at 54 (using all the above terms). On the other hand, Defendant presumes that the Court couldn't possibly have meant what it said when it delineated between "majority-Black," "majority-minority" and "minority opportunity" districts. *Compare* Doc. 286 at 263–66, 510 *with* Doc. 326 at 54 (Defendant arguing the Court must have meant "majority-Black" when it used the term "minority opportunity"). But if the Court had intended to limit its instruction to bar elimination of "majority-Black districts" it would have said so.[2]

Because the General Assembly's purported remedy comes at the expense of Black voters in the vote dilution area *and* a minority opportunity district elsewhere in the plan, in direct contravention of this Court's order, it fails to completely remedy

---

[2] Nor can Defendant's creative math save the remedial plan. Defendant suggests that the Court assumed any remedy would have nine majority-white districts. Doc. 327 at 13. But Defendant carefully ignores the Court's analysis *the very next page* correctly detailing that the Illustrative Plan contains eight of 14 (not nine of 14) majority-white districts and acknowledging that CD 7 was a majority-minority district. Doc 286 at 264–67.

the violation found by this Court. The Court should strike down the State's unlawful map.

## II.   SB 3EX independently violates Section 2.

The 2023 congressional plan not only perpetuates the Section 2 violation found by this Court, it creates a new Section 2 violation on its own. Defendant's contention that Plaintiffs have failed to satisfy the Section 2 standard ignores binding precedent and rehashes arguments already rejected by this Court.

Defendant does not dispute that Black, Latino, and Asian Georgians in the 2021 version of CD 7 together are sufficiently numerous and geographically compact to comprise a majority of the voting age population in a reasonably-configured congressional district. Instead, Defendant's counter to Plaintiffs' satisfaction of *Gingles* 1 rests entirely on the hope that coalition districts are not protected under Section 2. Doc. 327 at 79. It is no surprise that Defendant prefers to hang his hat on Sixth Circuit precedent rather than Eleventh Circuit precedent. For all the reasons delineated in Plaintiffs' objection to the remedial plan, the Eleventh Circuit recognizes that Section 2 protects coalition districts in which politically cohesive minority populations are aggregated to satisfy the numerosity requirements. Doc. 317 at 15.

As to the second and third *Gingles* preconditions, Defendant does not meaningfully engage with Plaintiffs' evidence that old CD 7 consisted of a politically

cohesive minority community. *See* Doc. 327 at 68-69. Instead, Defendant insists—as he has done throughout this litigation to no avail—that Dr. Palmer was required to analyze primaries in order to establish political cohesion. But Defendant cites no authority that the *Gingles* analysis requires an analysis of primaries. Nor could he "Primary elections have limited probative value in determining inter-group cohesion." *Petteway v. Galveston County*, No. 3:22-CV-57, 2023 WL 6786025, at *17 (S.D. Tex. Oct. 13, 2023), *amended sub nom. Petteway v. Galveston Cnty., Texas*, No. 3:22-CV-57, 2023 WL 6812289 (S.D. Tex. Oct. 15, 2023), *and aff'd sub nom. Petteway v. Galveston Cnty., Texas*, No. 23-40582, 2023 WL 7442949 (5th Cir. Nov. 10, 2023). In *Petteway*, the court noted that coalitions "get built in the general election, not the primary election," that primary elections have lower turnouts so "the resulting estimates are less robust," and that "candidate preferences are not as likely to be as strong" in a primary contest.[3] *Id.* (quotation omitted); *see also* Doc. 97 at 178 (Court noting that Dr. Palmer "provided measured and thoughtful responses" to questions about why he did not use primary data). Just as before, the Court should reject Defendant's attempt to insert a new requirement into the *Gingles* framework.

---

[3] While the district court's order is stayed pending rehearing *en banc*, the Fifth Circuit noted that the district court "appropriately applied precedent" and affirmed the court's Section 2 violation finding. *Petteway v. Galveston Cnty., Texas*, 86 F.4th 214, 218 (5th Cir. 2023), *reh'g en banc granted,* 86 F.4th 1146 (5th Cir. 2023).

Finally, with respect to the totality of the circumstances, Defendant complains that Plaintiffs fail to prove each factor for each individual minority group, but no such showing is required. *Holloway v. City of Va. Beach*, 531 F. Supp. 3d 1015, 1082 (E.D. Va. 2021), *vacated and remanded on other grounds*, 42 F.4th 266 (4th Cir. 2022); *see also United States v. Marengo Cnty. Comm'n,* 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (noting there is "no requirement that any particular number of factors be proved, or that a majority of them point one way or the other"). And the totality of the circumstances demonstrates that the political process is not equal open to Black, Latino, and Asian voters in the areas encompassing old CD 7.

*Senate Factor 1.* Plaintiffs present evidence that minority voters have experienced discrimination in the State. Doc. 317 at 21. As he did at the liability phase, Doc. 286 at 224–27, Defendant argues that some of the methods of discrimination have been upheld as lawful in the courts, Doc. 327 at 70, but ignore that the history of discrimination inquiry requires focusing on disproportionate impact, *see* Doc. 286 at 233. This factor weighs in Plaintiffs' favor.

*Senate Factor 2.* Having once failed to convince the Court to alter its racially polarized voting analysis, Defendant seeks a do-over and argues that Plaintiffs cannot show voter polarization on account of race, instead of partisanship. Doc. 327 at 71. And while this Court acknowledged the difficulty of disentangling partisanship and race as the cause of voter polarization, it explained in its order that the risk of a

Section 2 violation "is greatest . . . where minority voters are submerged in a majority voting population that regularly defeats their choices." Doc. 286 at 235 (quoting *Allen v. Milligan*, 599 U.S. 1, 41 (2023) (cleaned up)). Defendant does not dispute Dr. Palmer's analysis that Black, Latino, and Asian voters in old CD 7 vote cohesively for the Democratic candidate, and that white voters vote cohesively in opposition to the minority-preferred candidate (i.e., the Republican candidate). The Court should find this factor in Plaintiffs' favor.

*Senate Factor 5.* Defendant does not meaningfully address Dr. Collingwood's analysis or conclusions. Instead, Defendant argues that the data is only at the county level, Doc. 327 at 72, but Dr. Collingwood's analysis focuses on the counties that encompassed old CD 7. Collingwood Remedial Rep. at 1. That some portions of the counties are not within old CD 7 does not detract from his overall conclusions which show clear socio-economic and health disparities among minority groups in that area compared to white voters. *Id.* Second, Defendant attempts to mislead the Court to question the accuracy and relevance of the entirety of Dr. Collingwood's data because he calculated household median income—and not all the other factors analyzed—only among Asian individuals since Pacific Islander data was missing. Doc. 327 at 73. Third, Defendant contends that the Court should not credit Dr. Collingwood's report because he relies on ACS data, as he did at trial and at preliminary injunction, which this Court credited. Doc. 286 at 158–59. And finally,

Defendant points out the few instances where Asian Georgians in the focus area achieve similar degrees of success as white voters, such as high rates of education, Doc 327 at 74, but that does not negate the evidence that "minorities are broadly cohesive on a variety of socio-economic measures . . . and share experiences especially related to the poverty line and income." Collingwood Remedial Rep. at 3. In the end, this factor too weighs decisively in Plaintiffs' favor.

*Senate Factor 7.* Defendant's reliance on Plaintiffs' evidence that one Latino and one Asian-American has been elected statewide as demonstrative of electoral success is laughable. Doc. 327 at 75. There can be no doubt that being in a class of one establishes the meager extent to which members of the minority group—here, Black, Latino, and Asian Georgians—have been elected to public office.

*Senate Factor 8.* Defendant argues that Plaintiffs present no evidence of a determination to impose a ceiling on minority opportunity in the State, Doc. 317 at 23, but the defiance of the General Assembly during the special session and Defendant's defense of its behavior in his response brief speak for themselves. If there was any doubt before, there can be no doubt now that elected officials have not only failed to respond to the needs of the State's minority voters, they have *refused* to respond.

*Senate Factor 9.* While the Court found that the motivations for the 2021 redistricting plans were non-tenuous because they were partisan, the distinguishing

factor with the "statements of the legislators in the 2023 special session match[ing] that approach" is that this time the General Assembly had before it the extensive findings, conclusions, and guidance from this Court on the need to provide a meaningful remedy to the State's Section 2 violation. Instead of following the letter and spirit of the Court's order and binding precedent, Defendant and the General Assembly misread and mischaracterized the law as set forth by this Court to meticulously craft a remedy that thwarts any actual additional minority opportunity in the State. Doc. 327 at 76–77.

Defendant complains that that "no Plaintiff group offers any plan that starts with the legislature's policy decisions and goals, including its partisan goals, and then draws the additional majority-Black districts." Doc. 327 50. But the reason is obvious: in a state where race and partisanship are "inex[tric]ably linked," Doc. 327 at 237, any lawful remedy would necessarily increase the opportunity for Black-preferred candidates. Indeed, Defendant's own expert agrees that "race is the strongest predictor" of a person's actual partisan affiliation. *Rose v. Raffensperger*, 619 F. Supp. 3d 1241, 1255 (N.D. Ga. 2022), *rev'd on other grounds Rose v. Sec'y, State of Ga.*, No. 22-12593, 2023 WL 8166878 (11th Cir. Nov. 24, 2023) (citing Michael Barber & Jeremy Pope, *Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public*, Am. Pol. Res. (2022), at 4–5). The State's partisan

preferences cannot override compliance with the Voting Rights Act, either in the first instance or on remedy.

## CONCLUSION

The General Assembly failed to enact a remedial plan that provides Black voters in the vote dilution area the opportunity to elect their candidates of choice while preserving existing minority opportunity districts. As a result, SB 3EX fails to adequately remedy the vote dilution injury. Not only has the General Assembly failed to remedy the Section 2 violation found by this Court, it has taken the opportunity to inflict a new Section 2 violation on Georgia's minority voters. This Court should not countenance the State's persistent refusal to comply with the law or the voting rights of its own citizens. It should enjoin SB 3EX as an unlawful remedy and/or an independent violation of Section 2 and proceed to adopt a lawful congressional plan in time for the 2024 elections.

Dated: December 19, 2023

Respectfully submitted,

By **s/ Adam M. Sparks**

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF OBJECTIONS TO THE GEORGIA LEGISLATURE'S REMEDIAL CONGRESSIONAL PLAN** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using font types of Times New Roman, point size of 14, and Century Schoolbook, point size of 13.

Dated: December 19, 2023            **s/ Adam M. Sparks**
                                     Adam M. Sparks
                                     *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF OBJECTIONS TO THE GEORGIA LEGISLATURE'S REMEDIAL CONGRESSIONAL PLAN** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: December 19, 2023            **s/ Adam M. Sparks**
                                     Adam M. Sparks
                                     *Counsel for Plaintiffs*