IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **COAKLEY PENDERGRASS, et al.,**  Plaintiffs,  v.  **BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,**  Defendant. | **CIVIL ACTION FILE**  No. **1:21-CV-05339-SCJ** |

## ORDER

This action is before the Court to address Plaintiffs' objections to SB 3EX, the remedial congressional plan ("2023 Remedial Congressional Plan"). Doc. No. [317].[1] As explained below, the Court **OVERRULES** Plaintiffs' objections and **APPROVES** the 2023 Remedial Congressional Plan.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers cited herein are those imprinted by the Court's docketing software.

## I. BACKGROUND

Plaintiffs filed this suit alleging that Georgia's congressional electoral plan passed by the General Assembly (SB 2EX, henceforth the "2021 Enacted Congressional Plan") diluted the votes of Black Georgians in violation of Section Two of the Voting Rights Act of 1965 ("Section 2"). This Court conducted a bench trial on Plaintiffs' claims as well as the claims from two related cases alleging Section 2 violations in relation to Georgia's 2021 enacted State House and Senate electoral plans.[2] Following the trial, this Court issued a consolidated Opinion and Memorandum of Decision on October 26, 2023, containing its Findings of Fact and Conclusions of Law. Doc. No. [286] ("October 26, 2023 Order"). Ultimately, this Court concluded that the 2021 Enacted Congressional Plan violated Section 2 in the western part of metro Atlanta. To remedy the statutory violation, the Court ordered the creation of one additional majority-Black congressional district in the west-metro Atlanta area. Id. at 509. The Court also stated that "the State

---

[2] See Alpha Phi Alpha v. Raffensperger, No. 1:21-cv-05337-SCJ and Grant v. Raffensperger, No. 1:22-CV-00122-SCJ. The Court addresses the Alpha Phi Alpha and Grant Plaintiffs' objections to the State's remedial plans in separate orders.

cannot remedy the Section 2 violations . . .by eliminating minority opportunity districts elsewhere in the plans." Id. at 509–10.

In accordance with Supreme Court precedent, this Court afforded the General Assembly an opportunity to meet the requirements of Section 2 by adopting substitute measures. Id. (citing Wise v. Lipscomb, 437 U.S. 535, 539–40 (1978)). During a special session beginning November 29, 2023, the General Assembly passed the 2023 Remedial Congressional Plan. On December 8, 2023, Governor Brian Kemp signed the bill into law. Doc. No. [312].

Plaintiffs objected to the 2023 Remedial Congressional Plan (Doc. No. [317]), Defendant responded (Doc. No. [327]), and Plaintiffs replied (Doc. No. [328]). This Court conducted a hearing on the objections and the response thereto on December 20, 2023. Doc. No. [329]. With this background and the Parties' arguments in mind, the Court resolves Plaintiffs' objections to the 2023 Remedial Congressional Plan as follows.

**II.   OBJECTIONS**

Plaintiffs argue that the Georgia legislature not only violated the Court's Order but also generated a remedial plan that "independently" violates Section 2 by (1) moving voters from outside of the "explicitly defined vote dilution area

3

encompassing 2021 Congressional Districts ("2021 CDs") 3, 6, 11, 13, and 14" into the new majority-Black congressional district ("CD") 6 while failing to remedy the vote dilution of 50,000 Black voters from the "vote dilution area" (Doc. No. [317], 6-7) and (2) dismantling 2021 CD 7—a majority-minority district in Gwinnett County—when there was no need to dismantle the district.

Plaintiffs contend that the 2023 Remedial Congressional District is a reshuffling of Black voters rather than a remedy to the vote dilution identified by the Court. Doc. No. [317], 3. To illustrate this argument, Plaintiffs point out that 25% of 2023 CD 6 draws from a majority-Black district outside of the areas at issue here. Id. at 6–7. Plaintiffs further argue that the new plan breaks up 2021 CD 7, cutting the previous 57.81% minority citizen voting age population in this district in half, resulting in the elimination of a "minority opportunity district" despite the Court's express instruction that the Georgia could not remedy the Section 2 violation by eliminating "minority opportunity districts elsewhere in the plan". Id. (citing the October 26, 2023 Order at 509–10). The result, according to Plaintiffs, is the creation of one Black-majority district at the expense of a minority-opportunity district, "zero[ing] out the number of minority-opportunity districts statewide." Id. at 13.

4

Finally, Plaintiffs claim that the dismantling of 2021 CD 7 independently violates Section 2 because 2021 CD 7 met the factors required by Thornburg v. Gingles, 478 U.S. 30 (1986), and thereby was protected by the Voting Rights Act. Id. at 14. Plaintiffs go on to argue that the evidence they have submitted in support of their objections to the 2021 Congressional Remedial Plan establishes that the Gingles preconditions as well as the totality of the circumstances are satisfied with respect to 2021 CD 7. Id. at 15–24.

In response, Defendant points out that the Court's order required new districts in specific *regions*, as opposed to specific *districts*. Doc. No. [327], 31–32. Defendant recognizes that a Section 2 violation cannot be remedied by creating a new majority-Black district "somewhere else in the state." Id. at 32. Defendant nevertheless emphasizes that this prohibition does not require remedial districts precisely or only in the districts specified by the Court following the liability phase of the proceedings. Id. at 32–33. Furthermore, Defendant asserts that the remedial districts were placed in the geographic areas specified by the Court. Id. at 36. Additionally, Defendant argues that the "minority opportunity district" Plaintiffs complain of losing was a coalition district (i.e., districts where there are of multiple racial minority groups who combine to elect the group's candidate of

choice) and are not required by Section 2. Id. at 60. Therefore, according to Defendant, the State has complied with this Court's order and the elimination of 2021 CD 7 does not violate Section 2, which completes this Court's inquiry.

## III. LEGAL STANDARD

The initial task before this Court is to determine whether the 2023 Remedial Congressional Plan remedies the Section 2 violations identified in the October 26, 2023 Order through the creation of an additional congressional district in the area identified by the Court in which Black voters have a demonstrable opportunity to elect their candidate of choice. The Eleventh Circuit has instructed that the new plan must "completely remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." United States v. Dallas Cnty. Comm'n, 850 F.2d 1433, 1437–38 (11th Cir. 1988) (quoting S.REP. No 97-417, at 31 (1982)); see also Dillard v. Crenshaw Cnty., 831 F.2d 246, 252–53 (11th Cir. 1987) ("This Court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation."). Nonetheless, a complete remedy "does not mean that a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown." Shaw v. Hunt, 517 U.S. 899, 917

n.9 (1996). This is because the State retains broad discretion in drawing districts to comply with the mandate of Section 2. Id. (citing Voinovich v. Quilter, 507 U.S. 146, 156–57 (1993); Growe v. Emison, 507 U.S. 25, 32–37 (1993)).

Next, the Court must determine whether the elimination of 2021 CD 7 violated this Court's order, which stated, "[t]he State cannot remedy the Section 2 violations described herein by eliminating minority opportunity districts elsewhere in the plans." Doc. No. [286], 509–10. Similarly, the Court must consider whether the elimination of 2021 CD 7 results in a plan that independently violates Section 2.

## IV. ANALYSIS

As an initial matter, the Court rejects the foundational assumption of Plaintiffs' arguments: that because the October 26, 2023 Order listed specific congressional districts where it found that Plaintiffs had proven vote dilution—referred to now by Plaintiffs as the "vote dilution area"—the State was confined to making changes in those districts when creating the 2023 Remedial Congressional Plan. First, Plaintiffs cite no relevant authority to support this

view.[3] Second, and more importantly, the Court derived its delineation of specific districts from the list of districts Plaintiffs challenged in the lawsuit. The Court did not, and could not, confine the General Assembly to working only within the enumerated districts to create the additional majority-Black district. Cf. Shaw, 517 U.S. at 917 n.9 ("States retain broad discretion in drawing districts to comply with the mandate of § 2."). Rather, the Court set forth geographic guidance by specifying an additional majority-Black district in west-metro Atlanta. Doc. No. [286], 509.

It is certainly true that the State cannot remedy vote dilution by creating a safe majority-Black district somewhere else in the State. See Shaw, 517 U.S. at 917. In identifying the geographic area in which vote dilution was found, the Court listed 2021 CDs 3, 6, 11, 13, and 14. Doc. No. [286], 514. Those districts are shown below, circled in red:

---

[3] Plaintiffs cite Shaw v. Hunt, 517 U.S. 899, 917 (1996) in which the Supreme Court held, "[i]f a § 2 violation is proved for particular areas . . . [t]he vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-[B]lack district somewhere else in the state." As discussed below, the geographic discrepancy in Shaw was actually "somewhere else in the state," which is not the situation in this case. Shaw, 517 U.S. at 917.

8



In the 2023 Remedial Congressional Plan, the General Assembly drew an additional majority-Black Congressional district, CD 6, "in western metro Atlanta . . ., located in portions of Cobb, Douglas, and Fulton Counties." Doc. No. [327-1], 8. As can be seen from the 2023 Remedial Congressional Plan below, 2023

CD 6 falls squarely within the geographic area of state specified by the Court's order:



10

Thus, the instant case is not remotely akin to what the Shaw Court described as "somewhere else in the state." Shaw, 517 U.S. at 917.

Plaintiffs' objections contain the overarching theme that the 2023 Remedial Plans do not cure vote dilution for enough Black voters in the specified area. However, it is certain that "the inevitably rough-hewn, approximate redistricting remedy" will result in some members of the minority group residing outside of the minority-controlled districts. McGhee v. Granville Cnty., 860 F.2d 110, 119 (4th Cir. 1988). Thus, Plaintiffs' only remaining argument is that the location of the additional majority-Black district proposed by Plaintiffs helps more Black voters than the placement of CD 6 in the 2023 Remedial Congressional Plan. To put it more starkly, Plaintiffs contend that their illustrative plan is a better remedy than the State's 2023 Remedial Congressional Plan. Because this Court cannot intrude upon the domain of the General Assembly, however, it declines Plaintiffs' invitation to compare the 2023 Remedial Congressional Plan with a plan preferred by Plaintiffs and crown the illustrative plan the winner. See Allen v. Milligan, 599 U.S. 1, 21 (2023) ("The District Court . . . did not have to conduct a beauty contest between plaintiffs' maps and the State's.") (quoting Singleton v. Merrill, 582 F. Supp. 3d 924, 1012 (N.D. Ala. 2022)).

11

The next objection raised by Plaintiffs pertains to the elimination of 2021 CD 7, a majority-minority district located in east-metro Atlanta. Plaintiffs presume that the Court's instruction to the State to refrain from eliminating "minority opportunity districts" encompassed 2021 CD 7. From its onset, however, this case has been about Black voters – as necessitated by Plaintiffs' Complaint. See generally Doc. Nos. [1] (Original Complaint); [120] (Amended Complaint). The Court's entire analysis of political cohesiveness, the second Gingles precondition, has pertained to Black voters. Doc. No. [286], 203-205. This Court has made no finding that Black voters in Georgia politically join with another minority group or groups and that white voters vote as a bloc to defeat the candidate of choice of that minority coalition. Therefore, the Court's reference to "minority opportunity districts" in the October 26, 2023 Order could not refer to any potential coalition district. Thus, the dismantling of CD 7 in the 2023 Remedial Plans did not violate this Court's order.

Finally, Plaintiffs contend that the 2023 Remedial Congressional Plan independently violates Section 2 by eliminating CD 7. To prevail on a new Section 2 claim, Plaintiffs would have to satisfy the same standard they did with respect to the 2021 Enacted Congressional Plan, i.e., demonstrate the existence of the

12

three Gingles prerequisites (numerosity/compactness, political cohesiveness, and white bloc voting) as well as show under the "totality of circumstances, that the political process is not equally open to minority voters." Milligan, 143 S. Ct. at 1503 (quoting Gingles, 478 U.S. at 45–46). Notably, Plaintiffs offer evidence to support this new claim *for the first time* in conjunction with their objections. Doc. Nos. [317-2], [317-5]. There was no evidence introduced at trial regarding a coalition of minority voters. In essence, Plaintiffs now seek to litigate a whole new basis for a Section 2 violation involving a combination of three minority groups at the remedial stage of their case—which up until now has involved only *Black* voters. This is the type of challenge to a remedial districting plan that demands development of significant new evidence and therefore is more appropriately addressed in a separate proceeding. See Covington v. North Carolina, 283 F. Supp. 3d 410, 427 (M.D.N.C.), aff'd in part, rev'd in part, 138 S. Ct. 2548 (2018). Accordingly, the Court declines to decide the merits of Plaintiffs' new Section 2 claim premised on a coalition of minority groups.[4]

---

[4] The Court will not opine on the legal and factual issues presented in Plaintiffs' new Section 2 claim: whether Section 2 protects coalition districts and if there is an evidentiary basis for Plaintiffs' Section 2 claim of a coalition district around the area of

As the Court recognized in its October 26, 2023 Order, "redistricting and reapportioning legislative bodies is a legislative task [which] the federal courts should make every effort not to preempt." Doc. No. [294], 509. Here, the committee and floor debate transcripts make clear that the General Assembly created the 2023 Remedial Congressional Plan in a manner that politically protected the majority party (i.e., the Republican Party) as much as possible. Doc. Nos. [327-6], Tr. 9:3–6; [327-9], Tr. 9:3–5. However, redistricting decisions by a legislative body with an eye toward securing partisan advantage does not alone violate Section 2. See Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484, 2501 (2019). In fact, the Supreme Court has expressly stated that federal judges have no license to reallocate political power between the two major political parties,

---

2021 CD 7. The Court acknowledges that it cannot approve a remedial plan with a known Section 2 violation. Cf. Dallas Cnty. Comm'n, 850 F.2d at 1437 ("It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2." (quoting Dillard, 831 F.2d at 249)). However, based on the evidence in the record in this case, the Court cannot say that a Section 2 violation exists in the 2023 Remedial Congressional Plan. The Court makes clear that it is not indicating whether such claim *could* be supported after full factual development and presentation of evidence post-discovery. Rather, the Court finds that such new Section 2 claim is better suited for a separate case, not as part of the remedial proceedings at issue in this Order. See Covington, 283 F.Supp.3d at 427 ("[S]ome challenges to a remedial districting plan . . . demand development of significant new evidence and therefore [are] more appropriately addressed in a separate proceeding.").

given the lack of constitutional authority and the absence of legal standards to direct such decisions. Id. at 2507; see also Seastrunk v. Burns, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy. Thus, even where a legislative choice of policy is perceived to have been unwise, or simply not the optimum choice, absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment."). Plaintiffs' objections to the contrary are overruled.

## V.  CONCLUSION

The Court finds that the General Assembly fully complied with this Court's order requiring the creation of a majority-Black congressional district in the region of the State where vote dilution was found. The Court further finds that the elimination of 2021 CD 7 did not violate the October 26, 2023 Order. Finally, the Court declines to adjudicate Plaintiffs' new Section 2 claim based on a coalition of minority voters. Hence, the Court **OVERRULES** Plaintiffs' objections (Doc. No. [317]) and **HEREBY APPROVES** SB 3EX.

**IT IS SO ORDERED** this 28th day of December, 2023.

*/s/ Steve C. Jones*
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**