IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION |
| vs. ) | |
| ) | FILE NO. 1:17-cv-2989-AT |
| BRAD RAFFENSPERGER, ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |

**COALITION PLAINTIFFS' BRIEF ADDRESSING ROLE OF THE
STATE DEFENDANTS IN LOCAL ELECTIONS**

During the May 24, 2019 telephone conference, the Court raised the issue of how a temporary or permanent injunction prohibiting DREs to be used as voting devices would affect the administration of upcoming local and municipal elections, given that the Secretary of State, the State Board, and Fulton County are the only named parties to this action, and counties and municipalities are responsible for administering and certifying their own elections. This issue is discussed in the State's Response [Doc. 367] to this Court's Show Cause Order issued on April 26, 2019 [Doc. 365] and the Defendants' Response to Coalition Plaintiffs' Status Report [Doc. 362].

As explained in greater detail below in Part A, an injunction prohibiting the Secretary of State from using DREs will, in effect, prohibit their use statewide because the Secretary of State, by law and by longstanding practice, is the party responsible for programming the DREs and all voting system components for every county election. O.C.G.A. §21-2-50(a)(15). Very few municipalities conduct their own DRE-based elections.[1] If the Secretary does not program the DREs, there is no practical means for the counties and the vast majority of the municipalities to begin conducting elections using the DRE system. As explained in Part B, granting injunctive relief will not result in undue prejudice to municipalities that have been relying upon counties for election assistance because counties and municipalities regularly enter into intergovernmental agreements providing for such assistance, and there is no reason to believe such mutually beneficial agreements will be curtailed bcause of the entry of injunctive relief.

### A. Georgia Law Delegates Voting System Programming Responsibility to the Secretary of State

Rule 19(a)(1) of the Federal Rules of Civil Procedure requires that a person be joined as a party if that joinder will not deprive the court of jurisdiction and if in

---

[1] In response to an informal request for information, counsel for State Defendants informed counsel for Coalition Plaintiffs that there are only seven small municipalities which operate their own DRE based elections, and those are programmed by a third party vendor. Counsel for the State Defendants also informed counsel for Coalition Plaintiffs that the Secretary's office programs all county elections.

2

that person's absence complete relief cannot be granted. Because the presence or absence of the local county boards of elections or municipalities has no bearing on whether complete relief can be granted with respect to upcoming elections, they are not necessary parties and Plaintiffs need not join them. *See, e.g., League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 733 (N.D. Ohio 2005), *rev'd on other grounds*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008).

The State Defendants' arguments concerning the necessity of joining additional parties as defendants ignore the Secretary's obligations under State law. O.C.G.A. § 21-2-50(a) (as amended April 2, 2019), provides:

> 21-2-50 (a) The Secretary of State shall exercise all the powers granted to the Secretary of State by this chapter and shall perform all the duties imposed by this chapter, which shall include the following:
>
>      . . .
>
> (15) To develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in the state.[2]

---

[2] Act 24 (HB316), enacted earlier this year, amended the statute to delete the words "direct recoding electronic (DRE)" before the words "voting systems," making it clear that the Secretary has a duty to provide ballot design, ballot building, programming of tabulation equipment for all voting systems in use in the state.

Because the Secretary has the statutory obligation to "develop, program, build, and review ballots for use by counties and munipalities" on voting systems, if the Secretary is enjoined to not program or permit the State's DREs to be used as standard voting devices, that injunction will have the practical effect of stopping counties and most municipalities from using DREs.[3]  As a practical matter, therefore, no additional parties need to be joined as defendants.

## B.     Municipal and County Local Elections Will Not be Impaired

In a related argument raised in their April 11, 2019 Status Report [Doc. 362, page 10], the State Defendants argue that if counties are "unable to use their existing election system to conduct municipal elections, they may choose not to enter into contractual agreements with the affected municipalities, leaving the municipalities with limited time to implement and fund an interim election system."  This State Defendants' concerns are misplaced and not borne out by the facts or the law.

First, the argument that counties would be "unable to use their existing election system" is premised upon a misunderstanding of the injunctive relief that Plaintiffs have been[4] and will be seeking.  The injunctive relief that Plaintiffs seek

---

[3] Plaintiffs' motion will not apply to the use of DREs as assistive devices for disabled voters.
[4] *See* Doc. 351, pages 8 to 9.

4

calls for only a modest modification of the current Diebold voting system, *not* for the replacement of the Diebold voting system.  The only component that will change is the DRE touchscreen voting units. The Diebold GEMS election management system, the Diebold ExpressPoll books, and Diebold Accu-Vote scanners would continue to function as the backbone of the voting system, and the DRE touchscreen voting units may still be used to assist disabled voters.  Given the cost savings associated with not having to program, test, transport and store DRE touchscreen voting machines, it is reasonable to assume little or no net cost increase to the counties with the granting of injunctive relief, and no cause for the county election boards to break their longstanding agreements and traditions with their local municipalities.

      The benefits to both the counties and the municipalities of entering into such agreements will remain the same.  Coordinating elections avoids duplicating costs, shares administrative costs, and eliminates local voter confusion of having different election logistics for county and municipal elections conducted on the same day.  Intergovernmental agreements will continue to be of mutual benefit to the counties and the municipalities and their voters in paper ballot elections.

      Second, the State Defendants' argument exaggerates the number of municipalities that rely upon their host counties for election assistance.  In

testimony to Georgia's SAFE Commission in June 2018, Georgia's Director of Elections Chris Harvey estimated that less than one half of Georgia's municipalities coordinate their elections with their home counties. According to Mr. Harvey, most of the municipalities which elect not to coordinate with their home counties elect to use hand-counted paper ballots, and some borrow county equipment or use "tech solutions" of their own.[5]

Third, to the extent that municipalities need assistance, the Secretary will still have the statutory duty to provide such assistance, including the programming of the voting system, pursuant to O.C.G.A. § 21-2-50(a), discussed above, which obligates the Secretary to "develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in the state." The phrase "voting systems in use in the state" includes the voting system that will be in place if the injunction is granted: hand-marked paper ballots used with optical scanning voting systems, with the GEMS election management system (and potentially, DRE touchscreen voting machines for disabled voters).

In addition, Defendant State Board of Elections is charged with the duty "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and

---

[5] Transcript of SAFE Commission meeting June 13, 2018, pages 77 to 78, attached as Exhibit A.

other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31.  The State Defendants' argument concerning the risks that municipalities will be unduly prejudiced by the granting of injunctive relief assumes that the Secretary and the State Board will offer no assistance nor provide for uniform processes despite their statutory obligation to do so.

## CONCLUSION

For the foregoing reasons, effective relief may be granted by this Court without the joinder of any additional party-defendants because enjoining the Secretary of State will, in effect, stop the use of DREs statewide as a standard voting device.  In addition, granting the relief will not cause municipalities any significant additional trouble or expense.

Respectfully submitted this 29th day of May, 2019.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC |  (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis and Megan Missett*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

>*/s/ Bruce P. Brown*
>Bruce P. Brown

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day caused the foregoing to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 29th day of May, 2019.

*/s/ Bruce P. Brown*
Bruce P. Brown

EXHIBIT A

Page 1

SECURE, ACCESSIBLE & FAIR ELECTIONS COMMISSION

STATE OF GEORGIA

---

The above-entitled SAFE Commission meeting was held before Patrick Stephens, Certified Court Reporter, in and for the State of Georgia, commencing at 9:02 a.m. on this, the 13th day of June, 2018, in the Sewell Mill Library & Cultural Center, Marietta, Georgia 30068.

---

TRANSCRIPT LEGEND

| | |
|---|---|
| - | (Interjection of thought for clarification) |
| -- | (Interruption of thought) |
| ... | (Trailing off or did not complete thought) |
| (ph) | (Phonetically) |
| [sic] | (In its original form) |

1     MR. HARVEY: And there are -- there are other ways

2  also to deal with that that weren't present in 2000 also.

3  You have voter-review commissions; you have other ways to

4  deal with a -- a potentially spoiled ballot.

5     SENATOR JACKSON: Okay. You mentioned that we have

6  6.5 million voters.

7     MR. HARVEY: Approximately.

8     SENATOR JACKSON: What's the percentage of those who

9  actually vote?

10    MR. HARVEY: It depends. I believe, at the last

11 primary, the number was around 1.2 -- 1.3 million, so I

12 don't -- I'd have to do quick math, which I'm not prepared

13 to do on the spot.

14    SENATOR JACKSON: About 20 percent.

15    MR. HARVEY: If -- if that's -- now, obviously, we had

16 much higher turnout last year in the -- in the presidential

17 election, but it really varies based on -- based on what

18 the issues are, what the candidates are. You know,

19 primaries don't generally get as much; you know, runoffs

20 tend to get a little bit less.

21    I believe our -- and I don't have the statistics in

22 front of me -- I can certainly provide them for you -- but

23 I believe in the last general election, in November of '16,

24 we had more voters than ever voting. So I -- I can't tell

25 you what percentage that is but, in terms of gross numbers,

1    I believe more Georgians voted in November of 2016 than had
2    ever voted before.  So those numbers are trending upward,
3    but I don't have specific percentages.
4        SENATOR JACKSON:  Thank you.
5        MR. RUSSO:  (Indicating.)
6        REPRESENTATIVE FLEMING:  Mr. Russo?
7        MR. RUSSO:  Thank you very much.
8        REPRESENTATIVE FLEMING:  Grab it closer to you there.
9        MR. RUSSO:  Chris, thank you for your presentation
10   today.  Do you know how many municipalities do not contract
11   with the counties to administer their elections?
12       MR. HARVEY:  That's a good question.  I don't have a
13   number.  I believe there are 600-and-something
14   municipalities in Georgia.  And, just so you know,
15   municipalities are able to hold their own elections and
16   municipalities can use paper ballots.
17       I mean, you have got some very, very small cities in
18   Georgia that are not bound by the rest of these rules.  I
19   believe -- and it's just speculation.  I believe that less
20   than half of them contract with counties.
21       MR. RUSSO:  Do the ones that don't contract with the
22   counties -- do they use separate equipment or do they use
23   the county's equipment?
24       MR. HARVEY:  It depends.  In some cases, they use the
25   county equipment.  I think, more often than not, they use

Page 78

1    paper ballots or they use their own tech solution.  They
2    can use -- yeah, they can use the machines but then every
3    -- if you use the machines, you know, it generates
4    additional work and additional sophistication.  But they're
5    -- the law certainly allows them to use the machines.
6         MR. MCDONALD:  Do you think that that will --
7         REPRESENTATIVE FLEMING:  Sure.
8         MR. MCDONALD:  So, theoretically, if half of them --
9    even under the same primaries, that they would have two
10   different polling places where people would have to go two
11   different places to vote for the municipal and the county?
12        MR. HARVEY:  In some cases, yes.
13        MR. MCDONALD:  All right.
14        MR. HARVEY:  A lot of the times, they're combined but,
15   in some places, yeah, you have to go to two different
16   places to vote.
17        REPRESENTATIVE FLEMING:  Okay.
18        MR. JABLONSKI:  (Indicating.)
19        REPRESENTATIVE FLEMING:  Yes, absolutely, counsel.
20   Here, take my mic -- oh, you've got Dr. Lee's.
21        MR. JABLONSKI:  Hey, Chris.  Good to see you again.
22        MR. HARVEY:  Yes, sir.
23        REPRESENTATIVE FLEMING:  Speak right close to it
24   there.
25        MR. JABLONSKI:  How's that?  Oh, better.  There are

Page 79

1   several things that have always concerned me, but one of
2   the principal ones is the case with a spoiled ballot. And
3   it's absolutely true that the law says that -- you know, if
4   you spoil the ballot, it is not counted, if you even mark
5   it up. But some of these -- as you've pointed out, some of
6   these markups are done in a way where the intent of the
7   voter is clear. Is anything done to review -- review
8   spoiled ballots to see if the intent of the voter can be
9   ascertained?
10       MR. HARVEY: There is an allowance for that, where
11   counties have voter-review commissions where it's a -- it's
12   a bipartisan commission and, if they can tell the -- you
13   know, if they can determine the intent of the voter, they
14   will recreate -- they will duplicate that ballot and it
15   will be counted, so that can happen.
16       MR. JABLONSKI: Okay.
17       REPRESENTATIVE FLEMING: Other questions from any
18   members of the commission? Anybody else? I don't see
19   anybody to my right and I don't see any questions to my
20   left. Okay. Well, Chris, you did an excellent job. And,
21   once again, thank you for all of that good information.
22       MR. HARVEY: Thank you, sir.
23       REPRESENTATIVE FLEMING: I do think the secretary has
24   informed us it'll take a second to set up for our next
25   presenter so I'll tell you what we will do: We will take a