# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## COALTION PLAINTIFFS' REPLY BRIEF
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### JULY 18, 2019

## Table of Contents

I.   INTRODUCTION ........................................................................... 1

II.  THE UPCOMING ELECTIONS: WHAT IS AT STAKE ......................... 2

   A.   Scope of Injunctive Relief on Upcoming Elections............................ 2

      1.   Injunctive Relief Will Apply to All Categories of Elections ...................... 2

      2.   The Number of Upcoming Elections ........................................... 4

   B.   Plaintiffs Have Standing and Have Joined All Necessary Parties.... 5

III. PLAINTIFFS REMAIN LIKELY TO SUCCEED ON THE MERITS ..... 6

   A.   Failure to Address the Impact of the KSU Breach .............................. 8

   B.   Lieutenant Governor's Race .......................................................... 10

      1.   The Undervote Rate in the November 2018 Lieutenant Governor's Contest is Proof of a Constitutional Violation ........................................... 10

      2.   Explanations for the Lieutenant Governor Undervote Rate are   Facially Implausible or Factually Incorrect ...................................................... 11

   C.   DREs Harmed and Disenfranchised Voters in the 2018 Election ..... 14

   D.   Breach of Ballot Secrecy .............................................................. 17

   E.   "Speculation" and Evidentiary Presumptions................................. 21

IV. BALANCE OF THE EQUITIES FAVOR PLAINTIFFS AND INJUNCTIVE RELIEF IS IN PUBLIC INTEREST ........................................ 22

   A.   Defendants Exaggerate the Cost of Implementing Coalition Plaintiffs' Proposed Remedy .......................................................... 25

      1.   Georgia Law Prohibits Counties From Charging Municipalities for Optical Scanners (or Other Machines)........................................... 26

      2.   Counties and Municipalities Will Not Need to Procure Additional Optical Scanners in 2019 ..................................................................... 26

      3.   Defendants Exaggerate the Cost of Printing Additional Ballots .............. 31

      4.   Substantial Cost Savings Not Having to Prepare DREs.......................... 31

   B.   Defendants Exaggerate the Difficulty of Implementing the Coalition Plaintiffs' Proposed Remedy .......................................... 32

      1.   Remedy Feasible and Familiar .................................................. 33

      2.   Voters Will Not be Confused by Using Paper Ballots ............................ 36

      3.   Paper Ballots Are Secure......................................................... 37

   C.   Injunctive Relief Will Not Harm the Rights of Persons Who Need Assistance Casting a Ballot ......................................................... 38

D.   THE COALITION PLAINTIFFS' REMEDY IS THE ONLY PRACTICAL SOLUTION .. 42

**V.  EPOLLBOOKS.................................................................................................. 43**

## I.      INTRODUCTION

Unless injunctive relief is granted, the State will have no constitutionally acceptable voting system in hundreds of upcoming county and municipal elections in 2019 and, potentially, beyond.  It is not good enough – for our democracy and under the Constitution – to deprive voters in these upcoming races of this "fundamental political right" that is "preservative of all rights," *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886), simply because the Defendants will attempt deploy a massive new untested system, a system unlikely to be constitutionally acceptable.

This Motion seeks not only to provide Georgia voters with a constitutional alternative in 2019, but also to provide a secure alternative for the 2020 elections. The risk that the State's new system will not be purchased, programmed, tested and installed state-wide to be deployed before the 2020 elections is very high.  Military and overseas ballots must be mailed by February 8, 2020,[1] requiring ballot building to begin by early January.  If this preliminary injunction is granted, Georgia citizens will have a constitutional alternative in 2020 in the likely event the implementation of the new system is delayed.

---

[1] 52 U.S.C. § 20302.

## II.   THE UPCOMING ELECTIONS: WHAT IS AT STAKE

In their Responses, Defendants offer conflicting and inconsistent descriptions of the elections that will be conducted by hand-marked paper ballots if injunctive relief is granted and, as a result, minimize its positive impact.  To set the record straight, the Coalition Plaintiffs will describe the impact of injunctive relief upon upcoming elections and address standing and necessary party joinder.

### A.   Scope of Injunctive Relief on Upcoming Elections

#### 1.   *Injunctive Relief Will Apply to All Categories of Elections*

An order granting Coalition Plaintiffs' motion will effectively prohibit DREs throughout Georgia, including in federal, state, county and municipal elections.[2] The Secretary of State is the sole source of lawful DRE programming for all elections.  O.C.G.A. § 21-2-50(a)(15).  If he is enjoined from providing "programming and machine configurations for DRE voting units," (Doc. 419 at 2), as the motion prays, no election official in the state will have the means of programming or configuring DRE voting units.[3]

---

[2] This issue is also addressed in Coalition Plaintiffs' Brief Addressing Role of State Defendants in Local Elections, May 29, 2019 (Doc. 379).

[3] There are seven municipalities for which this injunctive relief would raise different issues, according to counsel for the State Defendants.  (*See* Doc. 379 at 2 n.1).  According to Michael Barnes, these municipalities do not use the Secretary for DRE programming, and instead obtain DRE programming directly from ES&S.  Whether this arrangement is even lawful is open to question, given the absence of statutory authority.  Even if technically lawful, however, Mr.

The foregoing appears to be undisputed with respect to federal, state-wide and county[4] elections, the State Defendants contend, however, that an order granting the injunction would not prohibit municipalities from conducting DRE elections because the "State Defendants do not control municipal elections."  (Doc. 472 at 18).  While it is true that the Secretary does not "control municipal elections," the Secretary, and the Secretary alone, has the duty under O.C.G.A. § 21-2-50(a)(15) to provide the programming and machine configurations for DRE voting units.  The State Defendants contend that O.C.G.A. § 21-2-50(a)(15) "is not an exclusive grant of authority to the Secretary," but it is a grant of authority, and no similar authority is granted to any county or municipality.  The State Defendants also contend § 21-2-50(a)(15) refers only to "ballot design" and "the proposed injunction would be to the DRE machines."  (Doc. 472 at 20).  But "ballot design" is the core function of the GEMS databases that the Secretary programs and configures.  Finally, the State Defendants contend that "even if

---

Barnes testified that the Secretary requires ES&S to obtain the Secretary's "validation" of any GEMS database created by ES&S for those municipalities' use.  Significantly, whether these few cities will be precluded as a practical matter from using DREs if the motion is granted does not have a material net impact upon Plaintiffs' likelihood of success on the merits and the balance of the equities.

[4] Counsel for the State Defendants informed counsel for the Coalition Plaintiffs that the Secretary's office programs all county election.  (*See* Doc. 379 at 2 n.1).

ballot design were enjoined, Georgia law still authorizes local superintendents to prepare the form and arrangement of ballots for DRE systems." (*Id.* (citing O.C.G.A. § 21-2-379.4 and O.C.G.A. § 21-2-70.1)).  Neither of these statutes gives municipalities any such authority.[5]

### 2.   *The Number of Upcoming Elections*

The best evidence available to Coalition Plaintiffs indicates that, between October 1 and the end of 2019, there will be between 252 and 400 municipal elections and between 30 and 42 county elections.[6]  Additionally, a number of municipalities will hold runoff elections on December 3, 2019.[7]

---

[5] O.C.G.A. § 21-2-379 applies only if use of "optical scanning voting systems" becomes impracticable and, when that is the case, gives superintendents the authority to print "appropriate ballots."  The statute does not mention ballots or DRE systems, much less authorize local superintendents to prepare the form and arrangement of ballots, as the State Defendants contend.  O.C.G.A. § 21-2-70.1 is a general statement of the power and duties of superintendents but does not authorize programming of DRE systems.

[6] This data was collected from county websites and public records, and from phone calls with counties and municipalities.  (Marks Decl., Exhibit A hereto, *passim*).  There are several reasons for the ranges in these numbers.  Most obviously, the deadlines for qualifying for most municipal elections are not until late August and elections are not held in uncontested races.  However, the range estimated for municipal elections this year is consistent with historical data reported by the Georgia Secretary of State's office for elections between 2001 and 2009: during those years, between 242 and 323 cities and towns held municipal elections per election cycle.

[7] In 2001, 291 municipalities held elections.  *See* Georgia Secretary of State, Voter Turnout by Demographics - November 6, 2001 Election, available at: https://sos.ga.gov/elections/TurnoutByDemographics/2001_1106/cfv2001-11-06muni565.pdf. In 2003, 242 municipalities held elections.  *See* Georgia Secretary of State, Voter Turnout by Demographics - November 4, 2003 Election, available at: https://sos.ga.gov/elections/TurnoutByDemographics/2003_1104/cfv2003-11-04_565.pdf.  In 2005, 280 municipalities held elections.  *See* Georgia Secretary of State, Voter Turnout by

The importance of this relief to the outcome of the November 2019 municipal and county elections cannot be overstated. "Significant public policy is decided in municipal elections, many times by just a handful of votes and sometimes by just one.  Municipal elections, given their stakes but frequently small size, generally demand the most precision in election security and accuracy." (Martin Decl., June 19, 2019, Doc. 413 at 272 ¶ 9).

In 2020, county and municipal elections will continue and the Presidential Preference Primary is scheduled for March 24, 2020.  For the Presidential Preference Primary, military and overseas ballots must be mailed by February 8, 2020, 52 U.S.C. § 20302, requiring ballot building to begin by early January.

B.   **Plaintiffs Have Standing and Have Joined All Necessary Parties**

As to standing, this Court already held that the Coalition Plaintiffs "have alleged enough of a causal link between the State Defendants' conduct and their injury for standing purposes" and that the State Defendants are "in a position to

---

Demographics - November 8, 2005 Election, available at: https://sos.ga.gov/elections/TurnoutByDemographics/2005_1108/11-08-05_age.pdf.  In 2009, 323 municipalities held elections.  *See* Georgia Secretary of State, Voter Turnout by Demographics - November 3, 2009 Election, available at: https://sos.ga.gov/elections/TurnoutByDemographics/2009_1103/2009_november_muni_general_by_municipalitiy_age_race_gender569.pdf. Data from 2007 is not available at the municipal level.

redress the Plaintiffs' alleged injury." *Curling v. Kemp,* 334 F. Supp. 3d 1303, 1318 (N.D. Ga. 2018).

As to necessary parties, the State Defendants contend that hundreds of municipalities must be joined to this litigation so that the Court can "accord complete relief" under Rule 19(a)(1)(A) of the Federal Rules of Civil Procedure. (Doc. 472 at 22-23). Rule 19(a)(1)(A), however, requires only that the parties necessary for according complete relief to "existing parties" be joined. An injunction precluding the Defendants from programming DREs, and for the other relief requested, will accord Plaintiffs complete relief against *these Defendants*.

## III.   PLAINTIFFS REMAIN LIKELY TO SUCCEED ON THE MERITS

The Court has ruled that the "State's continued reliance on the use of DRE machines in public elections likely results in 'a debasement or dilution of [Plaintiffs'] vote[s],' even if such conduct does not completely deny Plaintiffs the right to vote." *Curling,* 334 F. Supp. 3d at 1322 (internal citations omitted). More recent evidence supporting Plaintiffs' claims should not obscure the substantial evidentiary record supporting this Court's initial finding.

That evidence established without any possible contradiction that DREs are profoundly insecure and unreliable. The U.S. House Intelligence Committee Chairman called for a complete ban on electronic voting; the U.S. Senate Select

Committee on Intelligence concluded that DREs "are at highest risk of security flaws" and that "[s]tates should rapidly replace outdated and vulnerable voting systems" with machines that "have a voter-verified paper trial;" the Secretary of Homeland Security called electronic voting a "national security concern;" and the Congressional Task Force on Election Security found that DRE "machines have been shown over and again to be highly vulnerable to attack." (*See* Doc. 258-1 at 11-13 (with citations)). The National Academy of Science, "the highest authority" for science, technology, and engineering, concluded after a two year review that "[e]very effort should be made to use human-readible paper ballots in the 2018 federal election." (Doc. 285-1 at 4-5).

The unanimous conclusion that paperless DREs cannot be used in the United States rests upon two simple and undisputed facts: the risk of *undetectable* manipulation of DREs is very high and the results of elections on DREs cannot be audited or verified. No further proof is necessary: DREs are unconstitutional because using them places an unreasonable burden on the right to vote particularly where, as here, reasonable alternatives for accountable elections are available. There is no evidence that Georgia's DRE machines are somehow better than the DRE machines that have been universally condemned by the national security and scientific communities. The only question is how much worse they are.

A.     **Failure to Address the Impact of the KSU Breach**

The Court concluded in 2018 that the State had not addressed "the impact of the Kennesaw State University breach," *Curling,* 334 F. Supp. 3d at 1323, and the same remains true today.  The State Defendants assertion that they have taken "concrete steps to address security concerns after the alleged breaches at Kennesaw State University," (Doc. 472 at 32).  These steps, however, are aimed only at protecting the servers at the Center for Election Security from a *future* intrusion like the one at KSU, and do not address the actual statewide impact of the breaches at Kennesaw State University.

Coalition Plaintiffs presented expert testimony on what the State would need to do to address the impact of the KSU breach.  "A massive, time-consuming effort would be required to address the security breaches that occurred in Georgia," which would require "experienced technicians to give hands-on attention to individual machines (tens of thousands of pieces of equipment), one at a time." (Bernhard Decl., Doc. 258-1 at 41, ¶ 44).  Defendants do not dispute that such an effort is necessary to address the impact of the KSU breach.  Defendants also do not dispute that such an effort has never been undertaken.

The State Defendants are simply in denial.  The State Defendants *still* describe the breaches at KSU as "alleged."  But the breaches were confirmed not

8

only by Logan Lamb, but also by Chris Grayson and *in writing* by KSU Instructor Professor Allen Green *and* KSU Chief Information Officer Stephen Gay.  (Exhibit B hereto, Barnes Dep., Ex. 21 at CGG00000118-119).[8]  The State Defendants go on to state: "*beyond Mr. Lamb's statements,* there is still no evidence that Mr. Lamb accessed any component of Georgia's voting system that is used to conduct actual elections in Georgia," (Doc. 472 at 61-62).  But they have no reason to doubt Mr. Lamb's veracity.  Indeed, immediately after Mr. Lamb reported his access to KSU, the university checked Mr. Lamb's credentials and confirmed he was "a credible security individual." (Doc. 471-10 at 61:9-10).

Mr. Lamb's declaration is not the only evidence.  For example, a memo authored and authenticated by Michael Barnes in his deposition lists the folders that remained server open to the internet on the elections.kennesaw.edu from at least the time of Mr. Lambs' discovery in August 2016 until March 3, 2017.  There was one folder for each of Georgia's 159 counties into which Mr. Barnes' team had "placed files generated for that individual county," including data files for the county's ExpressPoll units that, according to Mr. Barnes, "are used to create voter

---

[8] When the State Defendants filed the Deposition of Mr. Barnes (Doc. 472-10) the exhibits to the transcript were unavailable.  The State Defendants are in the process of filing those exhibits, which are voluminous, and Coalition Plaintiffs have simply attached as Exhibit B pertinent pages of Barnes Exhibit 21.

access cards given to voters," "election database files containing the ballot content for a given election," and, significantly, an actual GEMS database file containing a "demonstration election database."  (Exhibit B hereto, at page CGG0000029-30; *see also* Doc. 503, Deposition of Joseph Kirk, at 171:16-174:14 (Bartow County elections supervisor downloads bulk updates for electronic poll books from elections.kennesaw.edu)).  Mr. Barnes further testified that the demonstration (or "training") database was a real Georgia GEMS database, but just smaller than a database built for a particular election.  (Doc. 472-10 at 50:24-51:24).

### B.   Lieutenant Governor's Race

#### 1.   *The Undervote Rate in the November 2018 Lieutenant Governor's Contest is Proof of a Constitutional Violation*

Coalition Plaintiffs have presented unrebutted evidence that the DRE machine undervote rate in the November 2018 Lieutenant Governor's race is so much higher than the paper absentee ballot undervote rate "that [it] cannot reasonably be ascribed to chance" and that votes and potential votes in the Lieutenant Governor's race on DRE machines were lost or not recorded properly. (Doc. 419-1 at 21-25; Doc. 419-1, Ex. A, Stark Decl., at 61-62 ¶¶ 22-23.) Defendants offer no evidence to counter that amassed by Plaintiffs indicating the likelihood that "malfunction, misconfiguration, bugs, hacking, or other error or malfeasance caused some DREs not to record votes in the Lt. Governor's contest."

(Doc. 419-1, Stark Decl. at 62 ¶ 23; *see also* Doc. 387-2, Halderman Decl. ¶ 10 (noting "the potential for widespread malfunctions among the DREs, as well as potential malfeasance")).

2.  *Explanations for the Lieutenant Governor Undervote Rate are Facially Implausible or Factually Incorrect*

With respect to the DRE machine-paper ballot disparity, the State Defendants implausible or factually supported theories.  The State Defendants speculate that supporters of other Democratic candidates dislike the Democratic candidate for Lieutenant Governor, Ms. Amico. (Doc. 472 at 51). This explanation for the DRE machine undervote disparity does not address why DRE machine voters "disliked" Ms. Amico at unprecedented levels while paper ballot voting patterns stayed at their historical rate, a point confirmed by Dr. Stark's analysis. (*See* Doc. 419, Stark Decl. at 61 (analyzing the "disparity in undervote rates by voting technology" and finding "[t]he undervote rate in the Lt. Governor's contest is substantially higher for ballots cast on direct-recording electronic (DRE) equipment than for ballots cast by mail using paper ballots").[9]

---

[9] The undervote rate in the Lieutenant Governor's race on DRE machines was approximately 3.9 percent during early voting and 4.5 percent on Election Day, compared to 1.0 percent among absentee votes cast by paper ballot.  (Doc. 421 ¶¶ 17-18).

Another theory advanced that the State Defendants is that there was a massive influx of new voters who believed the Governor and Lieutenant Governor ran on the same ticket (Doc. 472 at 51), and therefore skipped the race for Lieutenant Governor.  This theory, again, does not explain why only DRE machine voters, and not absentee or provisional voters, were confused, (Doc. 419-1, Stark Decl. at 61-61 ¶¶ 22-23, Doc. 421, Brill Decl. at 4-5, ¶¶ 17-19), or why Georgians voting for Lieutenant Governor had never experienced anything approaching this kind of problem in past elections spanning a generation.  (*See*, *e.g.*, Doc. 421, Brill Decl., ¶ 13 & Ex. A. at 13 tbl. 2 (Lt. Governor undervote rate was 0.8% in 2014, 0.3% in 2010, 1.2% in 2006 and 0.9% in 2002)).

Defendants further contend that  "[b]allot design and the layout of the DRE units may have led voters to inadvertently skip over the election," and "[v]oters may have been confused because. . . the Governor and Lieutenant Governor appearing on the same page of the DRE screen instead of on separate screens." (Doc. 472 at 50).  This theory also is factualy unsupported and, if true, would prove that voting on DRE machines disenfranchised voters seeking to vote in the November 2018 Lieutenant Governor's election in violation of the U.S. Constitution.

In *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002), the plaintiffs alleged the State was employing "voting systems with inadequate education of voters, inadequate training of and assistance from election judges, and inadequate ballot design," in particular "confusing ballot designs" resulting in situations where "voters sometimes cannot properly match the names of candidates." *Id*. at 892.[10] In *McGuffage*, the plaintiffs further alleged ballot design flaws and other issues caused "disparate rates of undervotes indicat[ing] that Plaintiffs. . . bear a greater risk that their votes will not be counted than do other voters." 209 F. Supp. 2d at 897. The court found that substantive due process was implicated because "election officials, by the choice of vote counting procedures, [are] assign[ing] greater importance and weight to the votes cast by one portion of the electorate." *Id*. at 901. Similarly, in this case, if Defendants' contentions are true, ballot designs on DRE machines are disenfranchising voters using those devices while voters casting paper absentee paper or provisional ballots suffer no harm. (*See* Doc. 419-1 at 61-62, Stark Decl. ¶¶ 22-23; Doc. 421 at 4-5, Brill Decl., ¶¶ 17-19).

---

[10] *See also Stewart v. Blackwell*, 444 F.3d 843, 848, 850-51, 872 (6th Cir. 2006) (discussing "overvotes, undervotes, and inconsistent vote tabulations" and holding use of punch card voting technology violated the fundamental right to vote under both strict scrutiny and rational basis review), *vac'd as moot by* 473 F.3d 692 (6th Cir. 2007) (mooted because defendants changed challenged voting system).

As expert in election administration Amber McReynolds observes, using hand marked paper ballots would have allowed election officials to resolve the question of what caused the undervote in the 2018 election for lieutenant governor through an audit or recount of paper ballots, if such an undervote had occurred on paper ballots.  (Doc. 413 at 227-28, McReynolds Decl. ¶ 24.[11]  A simple audit or recount "would quickly reveal whether the votes were missed, miscounted or whether there was a ballot design problem."  *Id*.  ¶ 24.  Since Georgia's voting machines do not have an auditable record of votes, however, determining the cause of the undervote "cannot be resolved without litigation forensic discovery because there is no auditable record of votes."  McReynolds Decl., Doc. 413 at 227.  This forensic discovery is much more intensive than the testing purportedly done of some machines by the State.  *Compare id.*, *with* Doc. 472 at 49-50 (citing Barnes testimony).

### C.     DREs Harmed and Disenfranchised Voters in the 2018 Election

This Court has already found existence of constitutional harm, as stated in its September 2018 order.  *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1324 (N.D. Ga. 2018).  Defendants' attempt to minimize the evidentiary support for this finding,

---

[11] Ms. McReynolds notes that "[t]o my knowledge, this is the largest vote count irregularity and controversy involving electronic voting machines ever detected in this country."  *Id.* ¶ 23.

*see*, *e.g.*, Doc. 472 at 31-39, is belied by first hand accounts from voters, pollwatchers and election officials in the 2018 elections.

There are hundreds of declarations from voters establishing confusion and disenfranchisement in the record.  (Doc. 412 and 413).  In addition, Gwinnett County Director of Elections Lynn Ledford described in a recent deposition the extent of voter confusion and disenfranchisement that is being caused by the DRE machines and faulty epollbooks.  According to Ms. Ledford, faulty memory cards caused DRE machines to break down, causing voting to cease at two Gwinnett County polling places for long periods of time and voters to leave the polling place without voting.  (*See* Ledford Dep. 159-63, 166 (due to faulty voter access cards, multiple polling locations were "behind most of the day," long lines formed, and voters left without voting as a result); Doc. 412 at 106, 117-18 (voters faced wait times of up to 4-5 hours); *id*. at 109-10 (due to voting machine malfunction and long wait times, "of the 70+ people who were in line, about 90% of the people just left); *see id*. at 20-33, 104-05, 122-24, 126, 129, 131-33, 139-40, 145, 152-61, 265-67, 288-89 (poll book malfunction requiring voters to wait extended periods of time, return to the polls later, or vote provisional ballots when they should have been entitled to vote a regular ballot)).

Furthermore, voters faced problems with "self-casting" ballots. In these situations, voters were in the process of making their candidate selections when their ballots were cast—finally and irretrievably entered—without the voter intending to cast the ballot and without allowing them an opportunity to review their selections.  (*See* Ledford Dep. 101-03 ("Once it's cast, it's cast. There's no way to retrieve a ballot"); *id*. at 109 (voter complained, "I have no idea if my ballot will be counted"); Doc. 412 at 35-42 (voting machine errors prevented voters from reviewing their ballots for accuracy)).

Ultimately, many voters who cast ballots on DRE machines were not convinced that their ballots were counted, correctly or at all, as demonstrated by scores of complaints that the DRE machine vote summary screen showed a vote for a candidate they did not select, an error message or an other malfunction made them doubt their vote was properly cast.  (Doc. 412 at 44-84 (voting machines flipped votes to opposite candidates, contrary to voter choice); *id*. at 86, 91-102 (voting machine malfunctions resulted in voters doubting their votes were counted); Ledford Dep. 103-07 ("we can't tell if it's the voter or the machine")).

The disenfranchisement and severe burdening of Gwinnett County voters' rights in the 2018 election is sufficient harm for this Court to find that future use of DRE voting machines violates the right to vote.  *See*, *e.g*., *Martin v. Kemp*, 341 F.

Supp. 3d 1326, 1340-41 (N.D. Ga. 2018) (injunction granted on absentee ballot

signature mismatch issue); *Ga. Coalition for the People's Agenda v. Kemp*, 347 F.

Supp. 3d 1251, 1268 (N.D. Ga. 2018) (injunction granted with regard to proof of

citizenship for voter registration issue); *Spirit Lake Tribe v. Benson Cty.*, N.D., No.

2:10-CV-095, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010) (injunction granted

requiring polling places to remain open); *Common Cause/Ga. v. Billups*, 406 F.

Supp. 2d 1326, 1375-76 (N.D. Ga. 2006) (injunction granted prohibiting Georgia

from requiring voters to present a Photo ID to vote in person).

    D.    **Breach of Ballot Secrecy**

As Coalition Plaintiffs explained in their opening brief, newly obtained

evidence proves that DRE electronic ballots are not anonymous, a fact that

increases the likelihood of success (Doc. 419-1 at 33 to 35) and tips the equities

decisively in Plaintiffs' favor.  (*Id.* at 35 to 36).

In their brief (*id.* at 27), Plaintiffs featured a startling admission by the State

Defendants that ballot images generate by GEMS disclose the identity of the voter:

"Disclosure of this ballot image would be in direct contradiction with the

Constitution of Georgia which requires votes be cast by secret ballot," and

"disclosure of cast vote images would destroy the secrecy of the ballot mandated

by the Constitution of Georgia and recognized by the Supreme Court."  (Doc. 369

at 22-23).  One would have expected the State Defendants to address this

admission in their Response.  Instead, as if ignoring this admission would make it

go away, the State Defendants do not mention the Motion to Quash at all and,

although they hedge, seem to take the opposite position, stating that "the identity of

the voter *cannot* be determined through the ballot image reports alone, or in

connection with any other part of Georgia's election system."  (Doc. 472 at 55

(emphasis in original)).  The State Defendants make no attempt to reconcile these

conflicting positions.[12]

 In addition, evidence obtained since the filing of the Motion confirms that

the DREs were originally programmed to record the identity of the voter so that the

vote could be retrieved if the qualifications of the voter were "challenged."

(Barnes Dep. Doc. 472-10 at 103-04).  Though the State Defendants contend that

the "challenged voter" procedure is no longer used (because of a change in the

law), there is no evidence that the capability of the DREs to record and retain a

voters' identity has ever been changed.  Indeed, the State Defendants' unsupported

assertion that state law provides "safeguards in place to prevent tracing," (Doc. 472

---

[12] Counties also take the position that DREs create records that compromise ballot secrecy.  In addition to Gwinnett, Morgan and Rockdale Counties (discussed in the Coalition Plaintiffs' initial brief, Doc. 419-1 at 31-33), Ben Hill County stated in response to an open records request that ballot image reports "are not subject to public disclosure" in part because it would violate Georgia's constitutional guarantee of ballot secrecy.  (Doc. 419-1 at 476).

at 59), further undercuts their position: why and how could the State be guarding against tracing something it claims is impossible?

As if recognizing the weakness of its claim on the facts, the State Defendants hedge by arguing that, even if the DREs do violate ballot secrecy, Georgia voters' constitutional right to a secret ballot applies only against the "general public" and *not against the State*. (Doc. 472 at 48). But the right to secret ballot, expressly enshrined in the Georgia constitution, Ga. Const. Art. 2 § 1 ¶ I, is absolute. State law requires that Georgia's electronic voting system "shall permit voting *in absolute secrecy* so that no person can see or know for whom any other elector has voted or is voting." Ga. Code. Ann. § 21-2-379.1 (emphasis added). *See also Miller v. Kilpatrick*, 230 S.E.2d 328, 329 (Ga. Ct. App. 1976) ("It is basic in the American democratic process of elections that an individual voter's right to privacy as to how he casts his ballot is inviolate."); Ga. Code Ann. § 21-2-70(13) (county and municipality superintendents must protect secret ballot); Ga. Code Ann. § 21-2-322 (voting machines must protect secret ballot); Ga. Code Ann. § 21-2-365 (optical scanning voting system must protect secret ballot); Ga. Code Ann. § 21-2-373 (write-in vote procedures must protect secret ballot); Ga. Code Ann. § 21-2-386(5) (absentee ballot procedures must protect secret ballot).

In fact, a primary purpose of ballot secrecy is to ensure that the *State* cannot know for whom an individual voted and thus cannot retaliate against or fail to count that individual's vote. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995) (describing the secret ballot as "the hard-won right to vote one's conscience without fear of retaliation"); *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (secret ballot is "necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud").

It is precisely this risk that underpins Coalition Plaintiffs' ballot secrecy claims: a reasonable risk of reprisal or vote manipulation is sufficient to chill political participation and injure the right to vote. *See Buckley v. Valeo*, 424 U.S. 1, 74 (1976) ("The evidence offered need show only a reasonable probability that the compelled disclosure … will subject them to threats, harassment, or reprisals from either Government officials or private parties."); *Brown v. Socialist Workers '74 Campaign Cmte.*, 459 U.S. 87, 96 (1982) (discussing the "threat to First Amendment rights that would result from" disclosures of a voter's support of minor party).

In sum, the State Defendants admission that the DREs create records the compromise ballot secrecy increases the likelihood of success on Plaintiffs' claims that the DREs place a substantial and unjustified burden on the right to vote.

*Anderson v. Celebreeze,* 460 U.S. 780, 789 (1983).  In addition, replacing DREs with hand marked paper ballots would further the substantial state interest in protecting ballot secrecy.

E.   **"Speculation" and Evidentiary Presumptions**

There is deep irony to Defendants' charge that Plaintiffs' case is built on "speculation," given that the defectivness of the DREs is caused by the threat of *undetectable* malware combined with the complete absence of any paper trail. This is not a case in which one would expert to find evidence of undetectable malware or an uncounted or miscounted vote.  And, as this Court held, the real threat that votes might not be counted, a threat that Plaintiffs' have proven in this case, constitutes actionable constitutional harm.  *Curling,* 334 F. Supp. 3d at 1316 (citing numerous cases).

In addition, Plaintiffs anticipate presenting at the hearing evidence sufficient to warrant appropriate evidentiary sanctions.  First, the State Defendants have plainly misrepresented facts about the GEMS database.  The details of this misrepresentation should be public, but at this time are under seal or confidential. Having unfairly blocked and delayed discovery, the Defendants' arguments about the absence of evidence should be severly discounted, if not ignored entirely.

Second, as Coalition Plaintiffs set forth in their initial brief in support of injunctive relief (Doc. 258-1 at 17-19), the Secretary has knowingly destroyed massive amounts of relevant data after this litigation was filed.  This includes not only the servers at KSU, as the Court described in its September 2018 opinion, *Curling*, 334 F. Supp. 3d at 1310, but also memory cards and DREs themselves. Plaintiffs do not need any evidentiary presumptions to carry their burden at this stage of the litigation, but will be entitled to them at trial on the merits.

## IV.   BALANCE OF THE EQUITIES FAVOR PLAINTIFFS AND INJUNCTIVE RELIEF IS IN PUBLIC INTEREST

In their opening Brief (Doc. 419-1 at 5- 8), Coalition Plaintiffs established, with copious references to documentation and expert opinions, that the relief sought is modest in scope and remedies the core defect in Georgia's current system for in-person voters: the absence of a "paper trail or any other means by which to independently verify or audit the recording of *each* elector's vote."  (May 21, 2019 Order, Doc. 375 at 4) (emphasis by the Court).  Coalition Plaintiffs also explained the key to the feasibility of the relief: that Georgia currently processes paper absentee ballots and paper provisional ballots in essentially the same way that Georgia would be processing all the ballots if relief were granted.  (*Id.*). Defendants do not dispute that Coalition Plaintiffs' remedy is tailored as narrowly as possible to address the probable constitutional violations. Coalition Plaintiffs

also showed using hand marked paper ballots and scanning "is the most widely accepted voting method in the nation." (*Id.* at 9).

Apart from launching an attack on truly auditable hand marked paper ballot voting (which rests uneasily alongside the State's upcoming purchase of unauditable voting using paper ballots marked by computers), addressed below, the State Defendants do not contest the fundamental reasonableness, efficiency and *feasibility* of Coalition Plaintiffs' proposed relief.  Instead, Defendants focus almost entirely on the alleged financial cost of the Coalition Plaintiffs' proposal – indeed, the cost of the relief dominates Defendants' submission.  These assertions of cost are wildly exaggerated, as we shall show. But, first, context is helpful.

First, the financial cost of the remedy in this case – as in most cases – is commensurate with the scope of the constitutional violation.  Many paper ballots must be purchased to protect many voters' constitutional right to have their votes counted.  Some optical scanners may need to be purchased so that those ballots can be scanned quickly on election night.  Additional expense may be incurred to audit election results – an expense not incurred today because the system is completely unauditable.

Plaintiffs have amassed a substantial amount of hard evidence and expert testimony establishing that the net cost to the State, the counties and the

municipalities is negligible.  But even if there were measurable costs, courts have broad and flexible power to remedy constitutional violations, even if that relief could, beyond threatening economic harm, cause serious "injury and harm" to the public.  *Brown v. Plata*, 563 U.S. 493, 500 (2011) ("[t]he release of prisoners in large numbers. . . is a matter of undoubted, grave concern"); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a [constitutional] violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

Georgia and other district courts have, time and again, granted relief to voting rights plaintiffs over objections from the State that doing so will incur significant expenditures of money or other resources.  *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (observing "Georgia's potential harm amounts to expenditures of time and money that will be incurred in performing UOCAVA remedial tasks" but finding "that the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweighs the cost and inconvenience that might be suffered by Georgia"); *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) (granting preliminary injunction where fundamental right to vote was burdened despite "inconvenience

and expense" to state); *Ga. State Conf. of the NAACP v. Georgia*, 2017 WL 9435558, at \*5 (May 4, 2017) (noting "Defendants argue. . . that the grant of injunctive relief will cause them to suffer greater harm, particularly in light of the proximity of the runoff" including "the need to hire temporary workers to quickly process the backlog of voter registration applications" but finding that harm "minimal compared to the potential loss of a right to vote altogether by a group of people"); *see also Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-CV-095, 2010 WL 4226614, at \*5 (D.N.D. Oct. 21, 2010) (holding the harm to plaintiffs if deprived of their right to vote "outweighs any monetary harm" to county

Second, in considering equitable relief, a balance must be struck that takes into account the cost to the public of granting equitable relief, as this Court explained in its order denying relief in 2018.  But the Court's primary concern in 2018 was not that the proposed relief would cost the Defendants money, but that *voters* would potentially be prejudiced by the chaos and confusion predicted by the Defendants if equitable relief were granted.  The core of Defendants' argument now is not that *voters* will be prejudiced, but that the State will have to pay some additional money to bring its election system into constitutional compliance.

A.      **Defendants Exaggerate the Cost of Implementing Coalition Plaintiffs' Proposed Remedy**

### 1. Georgia Law Prohibits Counties From Charging Municipalities for Optical Scanners (or Other Machines)

Georgia law prohibits counties from "levy[ing] a fee for use of state owned voting equipment." O.C.G.A. § 21-2-300(e)(2) (only permitting counties to charge municipalities for "actual expenses" related to the election). Virtually all Georgia municipalities that run elections on DRE machines rent or their election equipment, including optical scanners, from the counties. *See*, *e.g.*, Doc. 413, Martin Supp. Decl. ¶ 36 & n.2; *see also* Ledford Dep. 43:18-44:20, 45:10-19; Doran Dep. 22:21-23:17; Hill Decl. ¶¶ 17, 22; Warren Decl. ¶¶ 16, 22. Since counties may not charge cities for using state-owned optical scanners and other equipment, Defendants' concern that municipalities will "bear the brunt" of Plaintiffs' proposed relief is overblown. This is a particularly important factor in considering the cost of the 2019 municipal elections: since not all municipalities hold elections at the same time (many are uncontested), a counties' existing inventory of equipment goes much further.

### 2. Counties and Municipalities Will Not Need to Procure Additional Optical Scanners in 2019

Contrary to Defendants' assertions (*see* Doc. 472 at 59), election officials confirm that in counties both big and small, there will be no need to purchase additional optical scanners in 2019 because the number currently on hand is

sufficient to have at least one optical scanner in every municipal polling place or, alternatively, to conduct a central count in which ballots are tabulated at county election offices.[13]  In 2020, local jurisdictions can determine whether additional units are necessary.

*Populous Counties*:  Consider, for example, a populous jurisdiction such as Gwinnett County, which has approximately 600,000 registered voters.  (Ledford Dep. 24:13-17).  Gwinnett County already owns between 32 and 36 optical scanners that could be used to implement Plaintiffs' proposed remedy in the November 2019 elections.  (Ledford Dep. 179:1-5).  That number is more than enough to run the elections of the seven cities with whom Gwinnett County signed intergovernmental agreements to loan DRE machines in 2019 (and 2017): Duluth, Lawrenceville, Lilburn, Norcross, Peachtree Corners, Snellville, and Sugar Hill. (*Id*. 43:18-44:10).  According to Gwinnett County Elections Director Lynn Ledford, each municipality in Gwinnett County needs between two to four optical scan units to run an election by hand-marked paper ballots.  (*Id*. 178:1-25).  Even if all seven municipalities hold an election – which does not occur when races are uncontested (*id*. 45:1-19) – and all seven municipalities requested the maximum

---

[13] Under Georgia law, each county may choose between central count or precinct scanning.   O.C.G.A. § 21-2-483(a); *see also* Doc. 419-1 at 2 n.2.

number of optical scanners suggested by Ms. Ledford (four) (*id*. 178:1-25), the Gwinnett County BORE could provide a sufficient number of scanners for all seven municipalities while having four to eight excess scanners left over.

*Rural Counties*:  Implementation of the Coalition Plaintiffs' proposed remedy is even more straightforward in less populous jurisdictions.  Consider Hancock County's one municipality, the City of Sparta, which has approximately 1,000 registered voters and between 500 to 700 votes in city elections.  (Hill Decl. ¶¶ 19-21; Warren Decl. ¶¶ 18-21 (in the November 2015 Sparta municipal election, 575 were cast in the mayoral contest and 545 votes were cast in the at-large city council race)).  Ms. Hill and Mr. Warren confirm that if a court were to issue an order on or before October 1, 2019 that Sparta's November 2019 municipal election must be conducted using hand-marked paper ballots, election officials could easily switch to using hand-marked paper ballots for Sparta's November 2019 election by either (1) using the Accu-vote optical scanners already used for mail ballots in conjunction with the GEMS server used for all ballot tabulation and reporting, or (2) by hand-counting the paper ballots.  (Hill Decl. ¶ 18; Warren Decl. ¶ 17).  In fact, all of Sparta's hand-marked paper ballots could be tabulated quickly in less than two hours using one optical scanner, which Sparta has borrowed from the Hancock County BOER in past elections such as those held in

November 2015, March 2016, and November 2017.  (Hill Decl. ¶¶ 17, 26; Warren Decl. ¶¶ 16, 26).

Similarly, in Morgan County, which has a little over 14,100 registered voters, (Doran Dep. 22:10-13), the Morgan County Board of Elections may be conducting elections on behalf of three municipalities in 2019: Madison, Buckhead, and Rutledge.  (*Id*. 41:6-12; *see also id.* 22:21-23:12).  The Madison County BORE already has two optical scanners (*see id*. at 85:3-7), so even if each city ended up holding an election and wanted to have an optical scanner on site, the burden would be minimal.

Defendants' numbers do not take into account that, in implementing the Coalition Plaintiffs' remedy, some county election superintendents will choose to conduct a "central count" in which paper ballots are scanned at a central location such as a county board of elections office.  Take Bartow County, where the county board of elections has contracted with seven municipalities to run their elections in 2019: Adairsville, Cartersville, Emerson, Euharlee, Kingston, Taylorsville, and White.  (Doc. 503, Kirk Dep. 57:1-5).  Joseph Kirk, the Elections Supervisor for Bartow County, confirms that it will be feasible for the Bartow County Board of Elections to conduct the 2019 municipal elections using hand-marked paper ballots using a central count method of tabulating ballots.  Kirk Dep. 213:5-13.  Bartow

County election officials could securely transport completed paper ballots from the municipal polling places to the Board of Elections office, just as is done today with provisional ballots cast at polling places on Election Day, where the county's four functional optical scanners would be located and the paper ballots would be tabulated.  (*See id*. 213:5-13, 41:25-42:3).

Similarly, Chatham County Elections Director Russell Bridges acknowledges that central scanning is an option that his county could employ in the November 2019 election.  (*See* Doc. 472 ¶ 15 (discussing fiscal impact "particularly if central scanning is used")).  A central count is also feasible in more populous counties like Chatham for countywide contests; Gwinnett County Elections Director Lynn Ledford notes that when all counties had to conduct a statewide recount in 2000 or 2001, Gwinnett County was able to conduct a complete recount and scan all of its hand-marked paper ballots in a day and a half. (Ledford Dep. 41:13-42:7).

Even in the event that counties ultimately decide to purchase additional optical scanners, the costs will not approach the totals that Defendants suggest in their brief.  (Doc. 472 at 65-66).  Optical scan machines cost little more than the cost of transportation.  In 2016, Adams County, Colorado sold 154 Diebold Accu-Vote optical scanners to Georgia for the cost of transportation.  (Doc. 277 at 89).

Ms. Ledford confirmed, Georgia counties may purchase working, proven optical

scanners from jurisdictions around the country that have excess capacity.  (Ledford

Dep. 183:4-20; *see also* Doc. 277 at 88-89 (El Paso County, Colorado currently

has 250-300 excess optical scanners); Doc. 277 at 110).

> ### 3. *Defendants Exaggerate the Cost of Printing Additional Ballots*

Similarly, county election officials may order pre-printed ballots at a cost of

no more than $0.26 per page – approximately half of what officials in Chatham and

Gwinnett Counties suggest for printing ballots on demand at the polling place.

(*Compare* Doc. 277 at 87, *with*, *e.g.*, Ledford Dep. 85:19-86:25).

> ### 4. *Substantial Cost Savings Not Having to Prepare DREs*

The most glaring mistake in Defendants' analysis of cost is their failure to

take into account the tremendous costs saved by jurisdictions due to no longer

having to spend to prepare DRE machines.  The process of preparing DRE voting

machines for use is intensive: in Gwinnett County, the process of testing the

machines alone takes four to five weeks.  (Ledford Dep. 88:19-89:10).  The

process includes designing the DRE machine ballot at the State level, checking the

DRE machine ballot at the county level, tagging them and designating them to

polling sites, conducting the diagnostic testing, the logic and accuracy testing,

testing the sight and hearing keypad (and, in Gwinnett County, translating the

ballot into Spanish and testing the Spanish language election materials), sealing the DRE unit, putting the units on a truck, delivering them to and unloading them at the polling site, unsealing the units, and preparing them for use on Election Day itself.  (Ledford Dep. 59:11-60:21, 60:22-61:12).  Not having to take these steps will save taxpayers a significant amount of money but is not accounted for anywhere in Defendants' calculations.

For example, former Hancock County Elections Supervisor and City of Sparta Election Superintendent Aretha Hill and former Sparta Registrar and Absentee Ballot Clerk Marion Warren confirm that the cost of a Sparta election conducted by hand-marked paper ballots will be cheaper than the cost of an election conducted on DRE voting machines.  Exhibit C, Declaration of Aretha Hill (Hill Decl.), ¶ 29; Exhibit D, Declaration of Marion Warren (Warren Decl.), ¶ 29.  When Ms. Hill investigated the cost issue in 2015, she found that paying for conducting Logic and Accuracy testing on the DRE machines and for a DRE machine technician would cost Sparta approximately $5,000, a cost was far greater than the cost of printing additional paper ballots.  Hill Decl. ¶ 30.

B.    **Defendants Exaggerate the Difficulty of Implementing the Coalition Plaintiffs' Proposed Remedy**

### 1.    Remedy Feasible and Familiar

In support of their Motion, the Coalition Plaintiffs submitted three affidavits from experts explaining in detail the general feasibility of implementing this relief, addressing training, lines, security and other issues.  (*See generally* Doc. 413, Exhibits D-F, Declarations of McReynolds, Hoke, and Martin).  Defendants do not rebut this evidence.

Instead, the State Defendants repeat vague and unsupported statements about the burden.  This is not surprising, as the State Defendants have an unfortunate track record of exaggerating administrative burdens in innumerable voting rights cases brought in federal court.[14]  *See also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340-41 (N.D. Ga. 2018) (rejecting Defendants' argument "that it would be unduly burdensome to employ a new procedure this close to the election and that Plaintiffs should have brought their actions sooner"); *Ga. Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (addressing Defendant's administrative burden argument and ultimately concluding "this burden. . . is

---

[14] Judge Batten has noted the State's propensity for raising "administrative burden" arguments. *Ga. State Conf. of the NAACP v. Kemp*, No. 1:17-CV-1427-TCB-WSD-BBM (N.D. Ga. Apr. 24, 2018), Hr'g Tr. 35:18-36:18 ("[t]hat is what they told me with the 6th Congressional District race.  They just said this would just be so difficult it would be really hard.  And I looked at them and said I think you can do it.  And this really resembles that to me.  I haven't read anything, with a right this important, that they are able to say that they just can't make it happen.")  This transcript is attached hereto as Exhibit E.

minimal"); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1375-76 (N.D.

Ga. 2006) (noting "Defendants' evidence indicates that local elections officials lack

sufficient time to conduct training for poll workers and to educate the public" in

addition to "confusion for voters, poll workers, and elections officials" but

nonetheless ruling in Plaintiffs' favor).

Here again Defendants overstate the difficulty in protecting "a right this

important." (Batten, J., *supra* note 14). Gwinnett and Chatham Counties, two of

Georgia's largest counties, have already successfully run elections entirely using

hand-marked paper ballots read by optical scanners – the Coalition Plaintiffs'

remedy in this case and the voting method currently used for absentee and

provisional balloting. (Ledford Dep., Doc. 471, at 33:1-21, 35:12-16). Gwinnett

County used the hand-marked paper ballot-optical scan system for elections held in

2000 and 2001, and certified the results as accurate. (*Id*. at 35:5-11; 53:15-18).

Under Gwinnett County's procedure, voters fed their paper ballots into optical scan

units, which read the ballots and tabulated results onto memory cards, which are

similar to currently used for DRE machines, and those cards were brought back to

the board of elections' office for tabulation and certification. (*Id*. 36:22-37:1,

39:24-40:15). Ms. Ledford, who served as the Assistant Elections Director prior to

becoming Elections Director in 2001 and was involved in the implementation of

hand-marked paper ballot voting, has no concerns about the integrity of the elections conducted in Gwinnett County using hand-marked paper ballots. (*Id*. 22:2-25; 35:17-36:2; 38:22-39:1).

Some counties and cities have already conducted an analysis of the feasibility of switching to hand-marked paper ballots. In Morgan County, Jennifer Doran, the County Elections Director, has conducted an initial investigation and made a presentation to the board on the subject. (Doran Dep., Doc. 469, at 30:16-31:8). Her investigation was thwarted when she was given legal advice by the county attorney and Elections Director Chris Harvey that Morgan County "could not on its own decide to conduct a paper ballot election." (Doc. 469 at 38:1-10).[15] She investigated the cost and logistics involved with moving to hand-marked paper ballots, and agrees that "many steps" in the voting and election administration process would remain the same under Plaintiffs' proposed remedy. (*Id*. at 31:9-32:16, 35:5-20). Ms. Doran confirmed the switch to paper ballot would have no impact on how ballots themselves are composed, reviewed, or printed: the County would simply need to increase the number of ballots to print at $.40 a ballot and

---

[15] This advice was given after this Court's decision in September 2018, which held to the contrary. (Doc. 469 at 53:11-54:1; *see Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018) (rejecting State Defendants' argument that Georgia law mandated the use of DREs; instead, O.C.G.A. § 21-2-383(b) requires advance voters to vote by DRE, but only in jurisdictions in which DRE voting systems are used at the polling place).

she could use the same staff she has now.  (*See id*. 32:10-16, 36:4-37:25, 44:4-44:12).

In Hancock County, Sparta city officials, including Mayor William Evans, chose to use paper ballots for Sparta's 2015 election because they did not trust the accuracy of election results cast on Georgia's DRE machines.  City officials had concluded implementing paper ballot elections was feasible and believe currently that election officials have all of the necessary equipment and know-how to conduct Sparta's November 2019 municipal election using hand-marked paper ballots, whether optical scanners or hand counting is used.  (Hill Decl. ¶¶ 13, 15, 24; Warren Decl. ¶¶ 12, 14, 24).

### 2.   *Voters Will Not be Confused by Using Paper Ballots*

Defendants' claim that voters would be confused by using hand-marked paper ballots, Doc. 472 at 75-76, is speculative and specious.  As they concede, hand-marked paper ballots are already used for absentee and provisional voting; hundreds of thousands of paper ballots are cast in Georgia elections.  (*See*, *e.g.*, *id*. at 68 (250,000 paper ballots were used in 2018); *see also* Doc. 471, Ledford Dep., at 73:14-17 (Gwinnett County processed approximately 18,000 absentee paper ballots in the November 2018 general election), 95:11-96:11 (more than 2,500 provision ballots)).  Other jurisdictions have moved to paper ballots and

experienced smooth rollouts.  *See*, *e.g.*, Wilson Supp. Decl., Doc. 387-4, ¶¶ 3-6

(Maryland); Martin Supp. Decl., Doc. 413, at 283-84 ¶¶ 41-42 (New York), 48-51;

McReynolds Supp. Decl., Doc. 413, at 219 ¶¶ 6 (Colorado), 37-38.

### 3.   *Paper Ballots Are Secure*

Defendants' allegation of physical security vulnerabilities regarding hand

marked paper ballots is misleading.  (*See* Doc. 472 at 28-29).  First, Georgia

election officials already have a process for polling place paper ballot security and

the secure transfer of the paper provisional to the election superintendent.  (*See* Ga.

Comp. R. & Regs. 183-1-12-.06(9); Ledford Dep. 124:19-22; Kirk Dep. 90:7-

91:12).  Second, paper absentee ballots are already kept in secure "ballot vaults,"

which each have their own key lock code that is changed between every election.

(Lynn Ledford Dep. Tr. 123:24-124:6).  It would be administratively easy for poll

officers to apply the process they already use for secure transfer of provisional

ballots and storage of absentee paper ballots to a system where the standard voting

method is hand marked paper ballots.  Martin Decl., Doc. 277 at 80; *see also*

McReynolds Decl., Doc. 277 at 118-19 ("Paper ballots . . . can be and should be

physically secured at all times, with chain of custody logs and [surveillance] to

make any tampering both limited (one ballot box) and detectable.")).  Finally,

Georgia's proposed use of ballot marking devices will mark a ballot that is a

"blank sheet of paper," Ga. Code Ann. § 21-2-2(32.1).  The blank sheets of paper used by BMDs pose a greater risk because there is no preprinted numbered ballot stub to control the inventory of paper ballots issued and voted .

Finally, Defendants ignore security issues raised with the handling of memory cards – security issues that dwarf the problems associated with paper ballots.  For example, the Gwinnett County BORE imposes no security controls on cities that use Gwinnett's DRE machines for municipal elections.  Ledford Dep. 46:1-47:21.  Any municipal employee may pick up the DRE machines.  *Id*. 173:1-21.  Those DRE machines have memory cards inserted into them, which frequently has electronic data from prior elections.  *Id*. 177:5-16.  In fact, the internal memory on Gwinnett County's DRE machines – which will be employed in the 2019 municipal elections – have not had their internal memory wiped since at least 2017 and perhaps earlier.  Ledford Dep. 177:18-22.

### C.    Injunctive Relief Will Not Harm the Rights of Persons Who Need Assistance Casting a Ballot

Defendants argue that injunctive relief will infringe the voting rights of persons with disabilities.  In the process, Defendants concede the fundamentally flawed nature of DREs.[16]

Crucially, the injunction sought by the Coalition Plaintiffs by its terms does not dictate how the State should meet its duty to protect accessibility for voters with disabilities: "Provided, however, that this Order does not prohibit the use of electronic or other appropriate voting units for persons with disabilities."  (Doc. 419 at 2).  Contrary to Defendants' assertions, the Coalition Plaintiffs are not seeking to force the Defendants to use DREs for voters with disabilities. Coalition Plaintiffs would urge the Defendants to provide persons with disabilities with the best voting systems and alternatives available.  Ultimately, it will be Georgia's responsibility to adopt a voting system that protects *all* rights of *all* of its voters.

---

[16] Given their history, Defendants' argument in this regard is somewhat cynical; Georgia has a substantial record of violating the rights of persons with disabilities. *See, e.g.*, *U.S. v. Georgia*, 546 U.S. 151 (2006) (partially paraplegic inmate's claims of egregious disability discrimination in Georgia prison not barred by sovereign immunity); *Olmstead v. L.C.*, 527 U.S. 581 (1999) (Georgia unlawfully institutionalized persons with mental disabilities); *R.W. v. Bd. of Regents of the Univ. Sys. Of Georgia*, No. 1:13-cv-2115-LMM, 2016 WL 8607395, *1 (N.D. Ga. June 7, 2016) (trial found Georgia discriminated against university student with schizophrenia); *Hunter v. Cook*, No. 1:08-cv-2930-TWT, 2013 WL 5429430 (N.D. Ga. Sept. 27, 2013) (trial found Georgia discriminated against and failed to provide sufficient medical care to children with disabilities); *U.S. v. Georgia*, Order, No. 1:10-cv-249-CAP (N.D. Ga. Oct. 29, 2010) (settlement resolving claims that Georgia improperly institutionalized persons with disabilities).

The State's proposal—that all voters in Georgia, including voters with disabilities, should be subjected to an ongoing constitutional violation because it is not practicable to solve the entire problem at once—is illogical. It could not survive even rational basis review because the perpetuation of a constitutional violation is not a "legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (when the rational basis test applies, a state action is permissible "so long as it bears a rational relation to some legitimate end.").

It is well within the Court's power and discretion to fashion a preliminary equitable remedy that begins to address the violations in a pragmatic fashion. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Board of Education,* 349 U.S. 294, 300 (1955) (*Brown II*); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."). When courts redress constitutional violations that affect wide swaths of the public, "[f]ull implementation of … constitutional principles may require" varied solutions and courts should consider whether an approach "constitutes good faith

40

implementation." *Brown II*, 349 U.S. at 299. In an equal protection context, "having once found a violation, the district judge … should make every effort to achieve the greatest possible degree" of remedy, "taking into account the practicalities of the situation." *Davis v. Bd. of Sch. Com'rs of Mobile Cty.*, 402 U.S. 33, 37 (1971).

This is not to say that any preliminary injunction should disregard the needs of persons with disabilities.  We urge the Court to ensure that these persons' rights are taken into account to the fullest extent possible at this stage. The ADA requires states to give persons with disabilities equal access to all opportunities to exercise their right to vote, including through the provision of appropriate auxiliary aids. 42 U.S.C. § 12132. Persons with disabilities should have a choice about how they vote so that they can use the method that works best for them. *See* 28 C.F.R. § 35.160 (b)(2) ("In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities."). Some may want to vote absentee using their own assistive technology at home to mark their ballot.  Others may choose to vote independently with an assistive device in the polling place. Finally, there may be those who want to use a paper ballot but need assistance. For these voters, a poll worker could help the voter mark the paper ballot and be sworn to secrecy as to the contents of the

vote.[17] Georgia's recently enacted Act 24 envisions an array of assistive methods such as these for voters with disabilities. *See* HB 316 §§ 26, 27, 30, 31, 34 (2019); *see also* O.C.G.A. § 21-2-300(a)(4) (State may conduct pilot programs for voting system technologies).

There are many ways that the State could ensure that voters with disabilities retain an equal, independent, and accessible method of voting, while beginning the necessary process of ensuring that all persons are not subjected to unconstitutional methods of voting in Georgia.[18]

### D.    The Coalition Plaintiffs' Remedy is the Only Practical Solution

Coalition Plaintiffs' proposed relief is the only practical means available to the Court to protect the 2019 and 2020 elections from Georgia's unreliable and unauditable electronic voting system. Several million Georgia votes will be cast in a variety of federal, state, county and municipal elections between now and the 2020 presidential election and the Georgia's elections must become secure and auditable. Coalition Plaintiffs offer an inexpensive immediate solution that requires

---

[17] If necessary, two bipartisan poll workers could participate in this task to make sure the voter is assisted fairly; each would be sworn to secrecy.

[18] For example, Georgia Tech has one of the most respected research organizations for assistive technologies in the world. Center for Assistive Technology and Environmental Access ("CATEA")  (https://www.catea.gatech.edu ).

no system conversion and little disruption to the current processes to deliver auditable elections within a few weeks of an order by this Court.

The State's proposed new ballot marking device system offers no auditability or accountability than the present DRE system, presents massive implementation challenges, and is unlikely to be implemented in a timely manner. The Curling Plaintiffs' proposed relief of a new hand marked paper ballot system is the correct long term solution, but will require years to implement. The new statewide voting system at the core of Curling Plaintiffs' proposed relief would require that the State procure, program, test and deploy a brand new system and thousands of components to 159 counties, all in time for November 2019 municipal elections.  This is not a practical solution for November 2019 or even the 2020 presidential election cycle.

## V.    EPollbooks

The only opposition to the Coalition Plaintiffs' proposed remedies relating to electronic pollbooks is the argument that ordering Defendants to instruct county superintendents to offer provisional ballots to individuals who do not appear on voting rolls is a disfavored "obey-the-law" injunction, because these individuals are already entitled to provisional ballots.  (Doc. 472 at 53).  Defendants misconstrue both the law as to "obey-the-law" injunctions and the specific

injunctive relief the Coalition requests.  Under Defendants' construction of "obey-the-law" injunctions, almost every injunction would be invalid because they instruct the enjoined party to comply with a legal obligation.  However, as the cases cited by Defendants explain, an "obey-the-law" injunction is one which simply tells the enjoined part to obey the law, without any specific direction as to how to obey the law.  Thus, in *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996), the injunction improperly ordered the defendant not to discharge stormwater into United States water, "if such discharge would be in violation of the Clean Water Act."  And in *Walker v. City of Calhoun*, 682 F. App'x 721, 724 (11th Cir. 2017), the injunction ordered that defendant's post-arrest procedures to "comply with the Constitution."  The problem with those injunctions was not that the defendants were being ordered to do something that the law already required, but, rather, that the injunction did not provide the party enjoined with sufficient information as to the scope of the injunction.  Here, as stated in our opening Memorandum, "The injunctive relief sought in this case addresses the separate problem of voters being denied provisional ballots in the first place," and provides specifics as to what Defendants should be enjoined to do.  (*See* Doc. 419-1 at 42).

For the foregoing reasons, the Coalition Plaintiffs' Motion for Preliminary Injunction should be granted.

Respectfully submitted this 18th day of July, 2019.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis and Megan Missett*

*/s/ John Powers*
Ezra Rosenberg (*pro hac vice motion pending*)
John Powers*
David Brody*
jpowers@lawyerscommittee.org
dbrody@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Attorneys for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of

LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day caused the foregoing to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 18st day of July, 2019.

<div style="text-align: right;">

*/s/ Bruce P. Brown*
Bruce P. Brown

</div>

EXHIBIT

A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## DECLARATION OF MARILYN MARKS

**MARILYN MARKS** hereby declares as follows:

1.      I am Executive Director of Coalition for Good Government ("CGG"), a Plaintiff in this action.

2.      The estimates of November 2019 Georgia municipal and county elections anticipated was prepared under my direction by Bea Brown, a CGG intern, assisted by Aileen Nakamura, a CGG volunteer.

3.      Ms. Brown and Ms. Nakamura obtained the prelimary data on Georgia's upcoming 2019 elections by contacting each of the 159 counties and the 535 Georgia municipalities to obtain public records or speak with an official concerning plans for county and municipal elections in 2019, as well as reviewing official election information on county and municipal websites.

4.      A worksheet was kept to update data as it developed. The data collection efforts were begun in May and updated through July 18, 2019.

5.      The data collected included the method of voting---whether paper ballot or DRE, as well as the source of programming for the DRE machines, if used.

6.      A large number of municipalities have not yet determined whether they will be required to conduct November elections, as candidate qualifying paper are not yet due.

7.      Reasonable estimates can be made based on feedback from each juridistions and the review of 2015 and 2017  municipal elections which was also conducted by Ms. Brown and Ms. Nakamura.

8.      I personally reviewed the updates at least weekly for new information and reasonables of the data being acquired. I believe that the data represents the best estimate available of Georgia's November 2019 anticipated elections.

9.      Attached hereto as Exhibit 1 is a true and correct photograph I took of a Hart ballot marking device sample ballot printed on blank ballot card stock.  Exhibit 2 is a photograph from the internet of an example of an ES&S ballot marking device ballot printed by the ExpressVote machine on ballot card stock. The image reflects the appearance of actual ES&S ExpressVote ballots I have seen and worked with.

10.     Exhibit 3 is an image retrieved from the internet of a traditional printed numbered pad of paper ballots of the style used throughout the country for ballot inventory control and with which I have personal experience using in a polling place.

In accordance with 28 U.S.C. § 1746, I pledge under penalty of perjury that the foregoing is true and correct.

Executed on this date, July 18, 2019.

Marilyn Marks

EXHIBIT

1



```
S0000111
ELECTION: GENERAL ELECTION
ELECTION DATE: 11/08/2016
PRECINCT: 748-050 SPG 15 050
```

```
U.S. PRESIDENT AND U.S. VICE PRESI·REP DONALD J  TRUMP
U.S. SENATE -----------------REP SENATOR JOHN BOOZMAN
U.S. CONGRESS DISTRICT 03·REP CONGRESSMAN STEVE WOMACK
STATE REPRESENTATIVE DISTRICT 89 DIS·REP JEFF WILLIAMS
COUNTY JUDGE----------------------REP JOSEPH K  WOOD
COUNTY ASSESSOR-------------REP ASSESSOR RUSSELL HILL
CIRCUIT CLERK---------REP CIRCUIT CLERK KYLE SYLVESTER
CONSTABLE DISTRICT 01 DISTRI·REP CONSTABLE JOHN DUGGAR
MAYOR SPRINGDALE--------------------MAYOR DOUG SPROUSE
CLERK/TREASURER SPRINGDALE------------NO SELECTION MADE
ALDERMAN WARD 1 POSITION 2 SPRINGDALE--------ERIC FORD
ALDERMAN WARD 2 POSITION 2 SPRINGDALE-------RAY DOTSON
ALDERMAN WARD 3 POSITION 2 SPRINGDALE------JEFF WATSON
ALDERMAN WARD 4 POSITION 2 SPRINGDALE-----JEREMY LYNCH
ISSUE NO. 1---------------------------FOR ISSUE NO. 1
ISSUE NO. 2---------------------------FOR ISSUE NO. 2
ISSUE NO. 3------------------------NO SELECTION MADE
ISSUE NO. 4---------------------------FOR ISSUE NO. 4
ISSUE NO. 5---------------------------FOR ISSUE NO. 5
ISSUE NO. 6---------------------------FOR ISSUE NO. 6
ISSUE NO. 7---------------------------FOR ISSUE NO.7
UNOPPOSED CANDIDATES-----------------NO SELECTION MADE
```

EXHIBIT

2



Official Vote Record

Precinct 101

@f7c-rv73-hwiju

Demonstration Election
Sample County, GA
December 17, 2018      75294v1

Page 1 of 1

To cast your ballot, you must take this record to the separate scanning station and scan it.

Governor
Lieutenant Governor
Secretary of State
Attorney General
U.S. Representative in 116th Congre
State Senator from 6th District
Proposition 1

| CHOICE | ORDER | |
| --- | --- | --- |
| REX PARK | 3 | LIB |
| MAY ARMSTRONG | 2 | DEM |
| DORIS JAMES | 1 | REP |
| SHELLEY SIMS | 2 | DEM |
| BOB JONES | WRITEIN | |
| CLAY CRAIG | 2 | DEM |
| YES | 1 | |

** END OF PAGE **

EXHIBIT

3

000001 +

VOTER: PLEASE DO NOT REMOVE STUB
IF STUB DETACHES, PLEASE RETURN WITH BALLOT

PSI.17.00.0007

# OFFICIAL BALLOT

**Special Election**
**Tuesday, November 7, 2017**
**Shiawassee County, Michigan**
**New Haven Township, Precinct 1**

SAMPLE

**LOCAL SCHOOL DISTRICT**

**PROPOSAL SECTION**

**OWOSSO PUBLIC SCHOOLS**
**BONDING PROPOSAL**

Shall Owosso Public Schools, Shiawassee County, Michigan, borrow the sum of not to exceed Forty-Five Million Five Hundred Fifty Thousand Dollars ($45,550,000) and issue its general obligation unlimited tax bonds therefor for the purpose of:

erecting, furnishing, and equipping additions to the existing high school, including classrooms, a media room, a multi-purpose performance education space, and a gymnasium, in order to convert it to a secondary building to include both a middle school and a high school; erecting, furnishing, and equipping a multi-purpose cafeteria/educational room addition to each of the existing elementary schools; remodeling, furnishing and refurnishing, and equipping and re-equipping school buildings; acquiring and installing instructional technology in school buildings; and preparing, developing, and improving sites?

The following is for informational purposes only:

The estimated millage that will be levied for the proposed bonds in 2018 is 4.73 mills ($4.73 on each $1,000 of taxable valuation). The maximum number of years the bonds of any series may be outstanding, exclusive of any refunding, is thirty (30) years. The estimated simple average annual millage anticipated to be required to retire this bond debt is 4.28 mills ($4.28 on each $1,000 of taxable valuation).

The school district does not expect to borrow from the State to pay debt service on the bonds. The total amount of qualified bonds currently outstanding is $-0-. The total amount of qualified loans currently outstanding is $-0-. The estimated computed millage rate may change based on changes in certain circumstances.

(Pursuant to State law, expenditure of bond proceeds must be audited, and the proceeds cannot be used for repair or maintenance costs, teacher, administrator or employee salaries, or other operating expenses.)

YES ◯

NO ◯



EXHIBIT

B

March 3, 2017

Election-related files

elections.kennesaw.edu

The voting system and electronic pollbooks used in Georgia require files to be named in compliance with the application's requirements.  As a consequence, many of the files will have identical names, but their contents vary by county.

Some of the pollbook related files will only contain voter registration values.  These files are used to update the electors list, indicating voters who were issued ballots during advance/early voting.  Other pollbook files will contain the state's entire electors list.

The folder names relate to the content contained within the files placed within the folders, back to the county to which they are assigned.   We developed a folder for each county (159) and within each folder we placed files generated for that individual county.

Examples of files posted for a county to pull down:

./Appling County/Proof/Audio/Appling Audio.zip – This zip file contains audio files linked within the county's election database.  This files are posted so a county can proof whether the candidate's name, ballot information headers, race headers are all present and recorded properly.  The file is zipped due to file size.

./Appling County/Proof/Ballot/01 – Appling.zip – This zip file contains ballot proofs for a given election.  These files are provided to each county to allow them to confirm that the contents of their ballots are accurate for the given election.  The file is zipped due to files size.

./Appling County/Proof/Ballots/Ballot and Audio Proofs Signoff  v2.pdf – This file is provided to every county when proofing audio files and ballot proofs.  We require each county to return a signed signoff form to our office after they have completed their proofing.  This form allows the completed election database to be released from us to the jurisdiction for use in the given election.  "V2" indicates that this is the second version of this form.

./Appling County/ExpressPoll/Numbered  List/001 (11-08-2016).pdf – This file is provided to every county after the completion of the given election.  This file contains a list of those voters who participated at their assigned polling location on Election Day in sequential order.

./Appling County/ExpressPoll/ABSFile/PollData.db3 – This is a data file for use within the assigned county on their ExpressPoll units that are used to create voter access cards given to voters during the Advance Voting period.  No individual voter data is contained within this file.  A file of this nature is created for each county prior to a given election. "ABS" relates to voters casting ballots prior to Election Day.

./Appling County/ExpressPoll/ABSFile/Expoll.resources – This file accompanies the above mention file.  The resource file instructs the ExpressPoll device what operations to allow and what buttons to display on screen to the user of the ExpressPoll device.

./Baldwin County/ExpressPoll/ED_Files/November 2016 General Voter Lookup.zip – This file is not built for all counties.  This file is only built for those counties who request it from our office.  This file contains the elector's list for the county for the given election, but it is not used to create any voter access cards.  The file is zipped due to size of the files content.

./Baldwin County/ExpressPoll/ED_Files/November 2016 General Voter Lookup Password Memo.pdf – This file accompanies the above mentioned file.  This file contains what the passwords are to access the data contained in the zipped file above when loaded onto an ExpressPoll.  These passwords are changed for every election.

./Cherokee County/ExpressPoll/ED_Files/November2016GeneralElectionDay.zip – This is not a file posted for each county.  This file is only posted to those counties who produce the storage media loaded into the jurisdictions' ExpressPolls themselves.  Counties that do this operation are: Fulton, Cobb, Dekalb, Gwinnett, Forsyth, Chatham, Muscogee, Henry, Columbia, Clayton, and Cherokee. This file contains the full elector's list for the state for a given election.

./Cherokee County/ExpressPoll/ED_Files/November 2016 General Election Day Password Memo.pdf - This file accompanies the above mentioned file.  This file contains what the passwords are to access the data contained in the zipped file above when loaded onto an ExpressPoll.  These passwords are changed for every election.

./Clayton County/GEMS_DB/****.gbf – This is a file posted to a county only in select circumstances.  This is an election database file containing the ballot contents for a given election.  These files are accessed by the GEMS application.

./Pickens County/ExpressPoll/ED_Files/ExpReport.exe – File allows a county to produce a numbered list of voters directly from the ExpressPoll media, when installed on the ExpressPoll media.

./Pickens County/ExpressPoll/ED_Files/System.Data.SQLite.DLL – This file allows the file mentioned above to operate on the ExpressPoll.  The above file is inoperative without this file.

./Richmond County/GEMS_DB/2. GEMS Instructions.pdf – This is a manual on GEMS operations.  Only posted if requested by a county.

./Richmond County/GEMS_DB/GeneralDemo.zip – Only posted if requested by a county.  Contains a demonstration election database.

This concludes the types of files placed within the county folders for distribution to counties

CGG 00000030



From: **Steven Dean** stevendean@kennesaw.edu
Subject: Re: Vulnerability on the elections.kennesaw.edu website
Date: March 1, 2017 at 11:48 PM
To: Merle S. King mking@kennesaw.edu
Cc: Barnes Michael mbarne28@kennesaw.edu

Acknowledging that I've seen this. See you tomorrow.

Steven Dean
Technical Coordinator
KSU Center for Election Systems
3205 Campus Loop Road
Kennesaw, GA 30144
P: 470-578-6900 F: 470-578-9012

On Mar 1, 2017, at 11:44 PM, Merle S. King <mking@kennesaw.edu> wrote:

> FYI.
>
> Sent from my iPad
>
> Begin forwarded message:
>
>> **From:** "Stephen C. Gay" <sgay@kennesaw.edu>
>> **Date:** March 1, 2017 at 11:10:16 PM EST
>> **To:** Merle King <mking@kennesaw.edu>. Steven Dean <sdean29@kennesaw.edu>
>> **Cc:** Lectra Lawhorne <llawhorn@kennesaw.edu>,  "William C. Moore" <wmoore36@kennesaw.edu>
>> **Subject: Fwd: Vulnerability on the elections.kennesaw.edu website**
>>
>> Merle.
>>
>> I received the following email. and call, tonight regarding a directory traversal vulnerability on elections.kennesaw.edu. I immediately activated our Incident Response Team and, through the use of burp suite, we were able to recreate the vulnerability described below. In the vulnerability recreation, we were able to pull voter information in database files for counties across the state and the data elements included DOB. Drivers License Number, Party Affiliation, etc. Understanding the risk associated with this vulnerability, we have closed all firewall exceptions for elections.kennesaw.edu to contain the incident. I have asked Bill Moore to act as point for this incident and we need to coordinate with your team on the web logs for elections.kennesaw.edu first thing tomorrow morning. The logs will help us understand the scope of the breach and allow us to advise the CIO as to next steps.
>>
>> I will be temporarily out of pocket for a short time tomorrow, then remote thereafter, but your cooperation in this incident response is appreciated.
>>
>> Stephen C Gay CISSP CISA
>> KSU Chief Information Security Officer & UITS Executive Director
>> Information Security Office
>> University Information Technology Services (UITS)
>> Kennesaw State University
>> Technology Services Bldg, Room 031
>> 1075 Canton Pl, MB #3503
>> Kennesaw. GA 30144
>> Phone: (470) 578-6620
>> Fax: (470) 578-9050
>> sgay@kennesaw.edu
>>
>> ----- Forwarded Message -----
>> **From:** "Andy Green" <agreen57@kennesaw.edu>
>> **To:** "Stephen C Gay" <sgay@kennesaw.edu>
>> **Sent:** Wednesday, March 1, 2017 9:55:27 PM
>> **Subject:** Vulnerability on the elections.kennesaw.edu website
>>
>> Stephen,
>>
>> Thanks for taking the time to talk with me tonight. As I mentioned during our call, I was contacted by a friend in the security space here in Atlanta earlier tonight. My friend relayed to me the existence of a Drupal plug-in vulnerability that a friend of his located on the elections.kennesaw.edu website. The vulnerability allows for directory traversal without authentication, leaving files exposed.
>>
>> My friend shared with me that the exposed directories contained. among other things:
>> - voter registration detail files, including DOB and full SSN.
>> - PDFs of memos to county election officials which contained full credentials for ExpressPoll Election Day access, for the November 2016 election

CGG 00000118

November 2016 Election.

I was able to verify the presence of the vulnerability myself, and was able to traverse directories without authenticating. I did not download any of the voter data files to verify his statement, for obvious reasons. However, I did successfully open a PDF in my browser window, located in the Fulton County Elections/ExpressPoll/ED  Files/ folder for proof of concept.

The base URL of interest is http://elections.kennesaw.edu/sites/default/files - please note that the URL must be http, as use of https will return a 404 error

I'm told the researcher works for a reputable organization. I'm also told that the organization may be interested in going public with this at some point, due to the seriousness of the matter as well as the related publicity it would generate for the organization My sense is that there is a desire to go public in a coordinated, responsible manner, in order to give the university appropriate time to remediate the vulnerability. This is certainly not set in bedrock, as I'm just the middleman here. However, given that they reached out to me as opposed to releasing to the public, I'm hopeful that my sense is correct.

If I can be of further service, including facilitating communication between all parties, please don't hesitate to let me know.

Thanks

Andy Green, MSIS

Lecturer of Information Security and Assurance
BBA-ISA program coordinator
KSU Student ISSA chapter faculty sponsor
KSU Offensive Security Research Club faculty sponsor

Michael J. Coles College of Business
Kennesaw State University - A Center of Academic Excellence in Information Assurance Education
560 Parliament Garden Way NW, MD 0405
Kennesaw, GA 30144-5591
agreen57@kennesaw.edu
http://coles.kennesaw.edu/faculty/green-andrew.php
Ph: 470-578-4352
Burruss Building, Room #490

73656d7065722070617261747573

E
X
H
I
B
I
T

C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al.,

        Plaintiffs,

v.

BRAD RAFFENSPERGER, et al.,

        Defendants.

Civil Action No.
1:17-cv-02989-AT

## <u>DECLARATION OF ARETHA HILL</u>

Pursuant to 28 U.S.C. § 1746, I, Aretha Hill, hereby declare as follows:

1. I have personal knowledge of the matters stated herein and would testify to the same if called as a witness in Court.

2. I am over eighteen years of age and am otherwise competent to testify.

3. I served as the Election Superintendent for the City of Sparta between 2015 and 2017.  I served in this position for Sparta's November 2015 general election, the March 2016 mayoral special election, and the November 2017 general election.

4. As Elections Superintendent for the City of Sparta, I was responsible for managing all aspects of Sparta's elections, including absentee voting and voting on Election Day.

5. I served as the Elections Supervisor for Hancock County between 2011 and 2014.  I worked in elections in Hancock County for more than two decades prior to being hired as Elections Supervisor.

6. As Elections Supervisor, I was responsible for running elections conducted in Hancock County, including but not limited to overseeing maintenance and upkeep of the county's DRE machines, managing the absentee voting process, training poll workers, providing election-related information to the public, and counting and certifying election results.

7. I am a lifelong resident of Hancock County.

8. I am concerned about the security and reliability of the current electronic voting system and the DRE voting machines that are currently being used in Hancock County and Sparta municipal elections.

9. Hand marked paper ballots permit election officials to conduct an audit or recount, if necessary, to detect any errors or discrepancies.

10. Accurate audits or recounts cannot be done with the current DRE machines because they do not generate paper receipts of the individual votes cast.

2

11. The City of Sparta is the only incorporated municipality in Hancock County.

12. In the November 2015 election, my first election serving as the Registrar and Absentee Ballot Clerk for the City of Sparta, Allen Haywood, who is white, was challenging longtime Mayor William Evans, Jr., who is Black.  The election was hotly contested.

13. Prior to the November 2015 election, I advocated for the use of paper ballots because I did not trust the accuracy of election results cast on Georgia's DRE machines.  Other Sparta officials, including Marion Warren and Mayor William Evans, shared my concerns about the DRE machines, and the City made the decision to use paper ballots for the November 2015 election.

14. Then-Elections Supervisor Tiffany Medlock and a group of citizens backing Allen Haywood's mayoral campaign preferred that DRE voting machines be used for the election, but they never argued that conducting the election using the DRE machines would be cheaper.

15. In 2015, after the City of Sparta leadership chose to use paper ballots for the 2015 municipal election, private plaintiffs including Allen Haywood successfully obtained a court order in Georgia State Superior Court that required the City of Sparta to use DRE voting machines for the 2015 election, over the objection of counsel for the City of Sparta.

16. Sparta ultimately used DRE voting machines in the November 2015, March 2016, and November 2017 municipal elections.

17. Sparta used one optical scanner for the November 2015, March 2016, and November 2017 municipal elections to count absentee and provisional ballots.  Sparta borrowed the optical scanner from the Hancock County BOER.

18. If a court were to issue an order on or before October 1, 2019 that Sparta's November 2019 municipal election must be conducted using hand-marked paper ballots, election officials could easily switch to using hand-marked paper ballots for Sparta's November 2019 election by either using the (1) Accu-vote optical scanners already used for mail ballots in conjunction with the GEMS server used for all ballot tabulation and reporting, or (2) by hand-counting the paper ballots.

19. There are approximately 1,000 registered voters in the City of Sparta at any given point in time, although the exact number fluctuates from time to time depending on list maintenance activities and the registration of new voters.

20. Between 500 and 700 ballots are cast in a typical election in Sparta.

21. In the November 2015 Sparta municipal election, 575 were cast in the mayoral contest and 545 votes were cast in the at-large city council race.

The returns from the November 2015 Sparta election are appended as Exhibit A to this declaration.

22. All of the ballots cast, including those cast in person on Election Day, can be easily and quickly counted using the one optical scanner Sparta always borrows from the Hancock County BOER.

23. All of the ballots cast can also be counted by hand employing security protocols through a bipartisan review process.

24. The officials conducting Sparta's election have the necessary equipment and know-how to conduct Sparta's November 2019 election using hand-marked paper ballots, whether optical scanners or hand counting is used.

25. The Hancock County BOER currently has at least five optical scanners.

26. Using one optical scanner, it will take less than two hours to scan all of the paper ballots completed by voters in the Sparta November 2019 election even if turnout is high relative to past elections.

27. In the Sparta elections run on DRE machines in 2015 and 2016, we printed approximately 200-300 paper ballots for absentee voting and approximately 20-30 paper ballots for provisional voters.  We used three DRE machines.

28. The additional cost of printing the approximately 1,000 paper ballots that would be needed for running Sparta's election using hand-marked paper

ballots – roughly 700 to 800 more paper ballots than would be printed in a DRE election – would be more than offset by not having to do Logic and Accuracy testing on the DRE machines, not having to pay for maintenance and upkeep on the DRE machines, not having to hire a DRE technician, not having to train poll workers on how to use the DRE machines, and not having to pay other overhead costs that would no longer be necessary due to the absence of DRE machines.

29. The cost of a Sparta election conducted by hand-marked paper ballots will be cheaper than the cost of an election conducted on DRE voting machines.

30. In my capacity as Sparta Elections Superintendent, I researched the issue of whether conducting a Sparta election would be cheaper using paper ballots or using DRE machines in 2015.  I found that paying for conducting Logic and Accuracy testing on the DRE machines and for a DRE machine technician would cost Sparta approximately $5,000.  That cost was far greater than the cost of printing additional paper ballots.  I informed Sparta officials of this fact when we were considering whether or not to make the move to paper ballots in 2015.

31. This was a factor in Sparta's initial decision to use paper ballots in the November 2015 election.

6

32. The Hancock County BOER maintains an adequate number of optical scanners to scan all of the hand-marked paper ballots that will be cast by voters in future county election.

33. The Hancock County BOER has an adequate number of optical scanners to scan any hand-marked paper ballots that might be cast during any early voting period in future county elections.

34. Sparta municipal elections were administered on Election Day using paper ballots prior to the Georgia Secretary of State's certification of the current electronic voting system and DRE machines prior to 2002.

35. Most Sparta voters are familiar with casting votes by hand-marked paper ballots, which are currently in use for absentee voting.

36. I will have greater confidence in the accuracy of the election results reported for Sparta's 2019 municipal election if hand-marked paper ballots are used instead of DRE voting machines.

37. Hancock County currently has no plans to conduct a county-level election in 2019, to the best of my knowledge.

38. I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of July, 2019, in Sparta, Georgia.


_Aretha L. Hill_

Aretha Hill

# Exhibit A

For Paper Ballot Precincts,
Vote Recorder,
and
Optical Scan Precincts

**USE BALL POINT PEN**
**Bear Down You Are Making Four Copies**

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendent.
**PINK** sheet to Clerk of Superior Court.
**GOLDENROD** sheet to be posted immediately outside
polling place.

SECRETARY OF STATE

NOV 19 2015

ELECTIONS DIVISION

# PRECINCT RETURNS

### FOR SPECIAL ELECTION

__11/3/2015__ ____at Large____ ____City of Sparta____
(Date)          (PRECINCT)          (Place name of City or County as applicable)

| FOR THE OFFICES OF AND CANDIDATES (Insert Titles of Offices and Names of Candidates) | TOTAL NUMBER OF VOTES RECEIVED |
|---|---|

**FOR** _City Council_

_Paul McGhee_

_MEREDITH Ransom_

| | |
|---|---|
| Received _____ | 328 Votes |
| " _____ | 227 " |
| " _____ | " |

**FOR** _____

| | |
|---|---|
| Received _____ | Votes |
| " _____ | " |
| " _____ | " |
| " _____ | " |
| " _____ | " |
| " _____ | " |

#### WRITE-IN CANDIDATES (Insert Titles of Offices and Names of Candidates)

| | |
|---|---|
| Received _____ | Votes |
| " _____ | " |
| " _____ | " |

We, the undersigned Managers and Clerks, do jointly and severally certify that the above is a true and correct count of the votes cast in this Precinct. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this __3__ day of _November_ 20 _15_. SIGNED IN QUADRUPLICATE.

_Barbara Leslie_ (Seal)          _Aretha Hill_ (Seal) Chief Manager.

_Brenda Walker_ (Seal)          _____ (Seal) Assistant

_Minior Horn_ (Seal)          _____ (Seal) Managers.

_____ (Seal) } Clerks.

_____ (Seal)

_____ (Seal)

Form—S4A-SP-02-M-C

**USE BALL POINT PEN**
Bear Down You Are Making Four Copies

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendant.
**PINK** sheet to City Clerk.
**GOLDENROD** sheet to be posted immediately at
the City Hall (City) or Courthouse.

# CONSOLIDATED MUNICIPAL RETURNS

SECRETARY OF STATE

NOV 19 2015

ELECTIONS DIVISION

### FOR

(  ) SPECIAL ELECTION
( ✓ ) GENERAL ELECTION
(  ) RUNOFF ELECTION

_NOVEMBER 3, 2015_
DATE

_Sparta_
(MUNICIPALITY)

| FOR THE OFFICES OF AND CANDIDATES (Insert Titles of Offices and Names of Candidates) | TOTAL NUMBER OF VOTES RECEIVED | |
|---|---|---|
| FOR _Mayor_ | | |
| _William Evans, Jr_ | Received | _254_ Votes |
| _R. Allen Haywood_ | " | _314_ " |
| _Rosemary O'Neill_ | " | _7_ " |
| | " | " |
| | " | " |
| | " | " |

**WRITE-IN CANDIDATES**
(Insert Titles of Offices and Names of Candidates)

| | Received | Votes |
|---|---|---|
| | " | " |

We, the undersigned Superintendent/Supervisor of Elections and his/her Assistants, do jointly and severally certify that the above is a true and correct count of the votes cast in this City. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this _____ day of _____, 20_____. SIGNED IN QUADRUPLICATE.

_Barbara Leslie_ (Seal)        _Aretha Hill_ (Seal)
_____ (Seal)          Superintendent/Supervisor Of Elections
_Brenda Walker_ (Seal)
_____ (Seal)  } Assistants
_____ (Seal)
_____ (Seal)
_____ (Seal)

Form CR-M-03

**USE BALL POINT PEN**
Bear Down You Are Making Four Copies

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendant.
**PINK** sheet to City Clerk.
**GOLDENROD** sheet to be posted immediately at
the City Hall (City) or Courthouse.

# CONSOLIDATED MUNICIPAL RETURNS

SECRETARY OF STATE
NOV 19 2015
ELECTIONS DIVISION

## FOR

( ) SPECIAL ELECTION
( ✓ ) GENERAL ELECTION
( ) RUNOFF ELECTION

*November 3, 2015*
DATE

*Sparta*
(MUNICIPALITY)

| FOR THE OFFICES OF AND CANDIDATES (Insert Titles of Offices and Names of Candidates) | TOTAL NUMBER OF VOTES RECEIVED |
|---|---|
| FOR *City Council* | |
| *William Case* | Received **55** Votes |
| *Betty Hill* | " **219** " |
| *Sarah Patillo* | " **79** " |
| *Tom Roberts* | " **325** " |
| *Sandra Faye Ross Sherrod* | " **223** " |
| | " " |

### WRITE-IN CANDIDATES
(Insert Titles of Offices and Names of Candidates)

| | |
|---|---|
| | Received _____ Votes |
| | " _____ " |

We, the undersigned Superintendent/Supervisor of Elections and his/her Assistants, do jointly and severally certify that the above is a true and correct count of the votes cast in this City. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this _____ day of _____, 20_____. SIGNED IN QUADRUPLICATE.

*Barbara Leslie* _____ (Seal)
*Smith Harr* _____ (Seal)
*Brenda Walker* _____ (Seal)
_____ (Seal)
_____ (Seal)  } Assistants
_____ (Seal)
_____ (Seal)

*Aretha Hill* _____ (Seal)
Superintendent/Supervisor Of Elections

Form CR-M-03

E

X

H

I

B

I

T


D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al.,

       Plaintiffs,

v.

BRAD RAFFENSPERGER, et al.,

       Defendants.

Civil Action No.
1:17-cv-02989-AT

## <u>DECLARATION OF MARION WARREN</u>

Pursuant to 28 U.S.C. § 1746, I, Marion Warren, hereby declare as follows:

1. I have personal knowledge of the matters stated herein and would testify to the same if called as a witness in Court.

2. I am 62 years of age and am otherwise competent to testify.

3. I served as the Registrar and Absentee Ballot Clerk for the City of Sparta between 2015 and 2016.  I served in this position for Sparta's November 2015 general election, as well as the March 2016 mayoral special election.

4. I am a lifelong resident of Hancock County.

5. I served in the United States Air Force in active duty between 1978 and 1982 and in the National Guard between 1982 and 1989.  I worked as an

1

audio/visual maintenance specialist.  I took numerous temporary duty assignments and was stationed for periods in Nebraska and Germany.

6.  I have been active in Hancock County elections and have been regularly attending Hancock County Board of Elections and Registration meetings between 2014 and the present.

7.  I am concerned about the security and reliability of the current electronic voting system and the DRE voting machines that are currently being used in Hancock County and Sparta municipal elections.

8.  I have personally received complaints from voters who were concerned that the votes they cast on the current DRE voting machines were not properly recorded and tabulated.

9.  For example, after the November 2018 election, I received complaints from electors attempting to vote at the Devereaux and Secondarian polling places. They said they tried to vote for Democratic candidates in the 2018 general election but, when they reviewed their vote, the display panel on the DRE machine indicated that they had voted for one or more Republican candidates.

10. The City of Sparta is the only incorporated municipality in Hancock County.

11. In the November 2015 election, my first election serving as the Registrar and Absentee Ballot Clerk for the City of Sparta, Allen Haywood, who is white, was challenging longtime Mayor William Evans, Jr., who is Black.  The election was hotly contested.

12. Prior to the November 2015 election, I advocated for the use of paper ballots because I did not trust the accuracy of election results cast on Georgia's DRE machines, based on reports I had read from the Brennan Center and other organizations.  Other Sparta officials, including Elections Superintendent Aretha Hill and Mayor Evans, shared my concerns about the DRE machines, and the City made the decision to use paper ballots for the November 2015 election.

13. Then-Elections Supervisor Tiffany Medlock and a group of citizens backing Allen Haywood's mayoral campaign preferred that DRE voting machines be used for the election, but they never argued that conducting the election using the DRE machines would be cheaper.

14. In 2015, after the City of Sparta leadership chose to use paper ballots for the 2015 municipal election, private plaintiffs including Mr. Haywood successfully obtained a court order in Georgia State Superior Court that

required the City of Sparta to use DRE voting machines for the 2015 election, over the objection of counsel for the City of Sparta.

15. Sparta used DRE voting machines in the November 2015, March 2016, and November 2017 municipal elections.

16. Sparta used one optical scanner for the November 2015, March 2016, and November 2017 municipal elections to count absentee and provisional ballots. Sparta borrowed the optical scanner from the Hancock County BOER.

17. If a court were to issue an order on or before October 1, 2019 that Sparta's November 2019 municipal election must be conducted using hand-marked paper ballots, election officials could easily switch to using hand-marked paper ballots for Sparta's November 2019 election by either using the (1) Accu-vote optical scanners already used for mail ballots in conjunction with the GEMS server used for all ballot tabulation and reporting, or (2) by hand-counting the paper ballots.

18. There are approximately 1,000 registered voters in the City of Sparta at any given point in time, although the exact number fluctuates from time to time depending on list maintenance activities and the registration of new voters.

19. As of the November 2017 municipal election, there were approximately 952 registered voters in Sparta, according to a report generated by the Georgia Secretary of State's office

20. Between 500 and 700 ballots are cast in a typical election in Sparta.

21. For example, in the November 2015 Sparta municipal election, 575 were cast in the mayoral contest and 545 votes were cast in the at-large city council race.  The returns from the November 2015 Sparta election are appended as Exhibit A to this declaration.

22. All of the ballots cast, including those cast in person on Election Day, can be easily and quickly counted using the one optical scanner Sparta always borrows from the Hancock County BOER.

23. All of the ballots cast can also be counted by hand employing security protocols through a bipartisan review process.

24. The election officials conducting Sparta's election have all of the necessary equipment and know-how to conduct Sparta's November 2019 municipal election using hand-marked paper ballots, whether optical scanners or hand counting is used.

25. The Hancock County BOER currently has at least five optical scanners.

26. Using one optical scanner, it will take less than two hours to scan all of the paper ballots completed by voters in the Sparta November 2019 election even if turnout is high relative to past elections.

27. In the Sparta elections run on DRE voting machines in 2015 and 2016, we printed approximately 200-300 paper ballots for absentee by-mail voting and approximately 20-30 paper ballots for provisional voters.  We used three DRE machines.

28. The additional cost of printing the approximately 1,000 paper ballots that would be needed for running Sparta's election using hand-marked paper ballots  – roughly 700 to 800 more paper ballots than would be printed in a DRE election – will be more than offset by not having to do Logic and Accuracy testing on the DRE machines, not having to pay for maintenance and upkeep on the DRE machines, not having to hire a DRE technician, not having to train poll workers on how to use the DRE machines, and not having to pay other overhead costs that would no longer be necessary due to the absence of DRE machines.

29. The cost of a Sparta election conducted by hand-marked paper ballots will be cheaper than the cost of an election conducted on DRE voting machines.

This was a factor in Sparta's initial decision to use paper ballots in the November 2015 election.

30. The Hancock County BOER maintains an adequate number of optical scanners to scan all of the hand-marked paper ballots that will be cast by voters in future county election.

31. The Hancock County BOER has an adequate number of optical scanners to scan any hand-marked paper ballots that might be cast during any early voting period in future county elections.

32. Sparta municipal elections were administered on Election Day using paper ballots prior to the Georgia Secretary of State's certification of the current electronic voting system and DRE machines prior to 2002.

33. Many Sparta voters are familiar with casting votes by hand-marked paper ballots, which are currently in use for absentee voting and for casting provisional ballots.

34. I will have greater confidence in the accuracy of the election results reported for Sparta's 2019 municipal election if hand-marked paper ballots are used instead of DRE voting machines.

35. Hand marked paper ballots permit election officials to conduct an audit or recount, if necessary, to detect any errors or discrepancies.

36. True and accurate audits or recounts cannot be done with the current DRE machines because they do not generate paper receipts of the individual votes cast.

37. To my knowledge, which is based on my attendance at Hancock County BOER meetings, there are no plans for Hancock County to conduct a county-level election in 2019.

38. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of July, 2019, in Sparta, Georgia.


Marion Warren

# Exhibit A

For Paper Ballot Precincts,
Vote Recorder,
and
Optical Scan Precincts

**USE BALL POINT PEN**
**Bear Down You Are Making Four Copies**

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendent.
**PINK** sheet to Clerk of Superior Court.
**GOLDENROD** sheet to be posted immediately outside
polling place.

SECRETARY OF STATE

NOV 19 2015

ELECTIONS DIVISION

# PRECINCT RETURNS

### FOR SPECIAL ELECTION

_11/3/2015_   _at Large_   _City of Sparta_
(Date)         (PRECINCT)    (Place name of City or County as applicable)

| FOR THE OFFICES OF AND CANDIDATES (Insert Titles of Offices and Names of Candidates) | TOTAL NUMBER OF VOTES RECEIVED |
|---|---|

**FOR** _City Council_

_Paul McGhee_
_MEREDITH Ransom_

| | Received _____ 328 _____ Votes |
| | " _____ 227 _____ " |
| | " _____ " |

**FOR** _____

| | Received _____ Votes |
| | " _____ " |
| | " _____ " |
| | " _____ " |
| | " _____ " |
| | " _____ " |

**WRITE-IN CANDIDATES (Insert Titles of Offices and Names of Candidates)**

| | Received _____ Votes |
| | " _____ " |
| | " _____ " |

We, the undersigned Managers and Clerks, do jointly and severally certify that the above is a true and correct count of the votes cast in this Precinct. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this _3_ day of _November_ 20 _15_. SIGNED IN QUADRUPLICATE.

_Barbara Leslie_ (Seal)          _Aretha Hill_ (Seal) Chief Manager.
_Brenda Walker_ (Seal)          _____ (Seal)  Assistant
_mater How_ (Seal)          _____ (Seal)  Managers.
_____ (Seal)    } Clerks.
_____ (Seal)
_____ (Seal)

Form—S4A-SP-02-M-C

**USE BALL POINT PEN**

Bear Down You Are Making Four Copies

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendant.
**PINK** sheet to City Clerk.
**GOLDENROD** sheet to be posted immediately at
the City Hall (City) or Courthouse.

# CONSOLIDATED MUNICIPAL RETURNS

SECRETARY OF STATE

NOV 19 2015

ELECTIONS DIVISION

### FOR
(   ) SPECIAL ELECTION
( ✓ ) GENERAL ELECTION
(   ) RUNOFF ELECTION

NOVEMBER 3, 2015
DATE

Sparta
(MUNICIPALITY)

| **FOR THE OFFICES OF AND CANDIDATES**<br>(Insert Titles of Offices and Names of Candidates) | **TOTAL NUMBER OF VOTES RECEIVED** |
|---|---|

FOR Mayor

| | | |
|---|---|---|
| William Evans, Jr | Received | 254 Votes |
| R. Allen Haywood | " | 314 " |
| Rosemary O'Neill | " | 7 " |
| | " | " |
| | " | " |
| | " | " |

**WRITE-IN CANDIDATES**
(Insert Titles of Offices and Names of Candidates)

Received _____ Votes
" _____ "

We, the undersigned Superintendent/Supervisor of Elections and his/her Assistants, do jointly and severally certify that the above is a true and correct count of the votes cast in this City. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this _____ day of _____, 20_____. SIGNED IN QUADRUPLICATE.

Barbara Leslie (Seal)

_____ (Seal)

Brenda Walker (Seal)

_____ (Seal)  } Assistants

_____ (Seal)

_____ (Seal)

_____ (Seal)

Aretha Hill (Seal)
Superintendent/Supervisor Of Elections

Form CR-M-03

**USE BALL POINT PEN**
Bear Down You Are Making Four Copies

**WHITE** sheet to Secretary of State.
**YELLOW** sheet to Superintendant.
**PINK** sheet to City Clerk.
**GOLDENROD** sheet to be posted immediately at
the City Hall (City) or Courthouse.

# CONSOLIDATED MUNICIPAL RETURNS

SECRETARY OF STATE
NOV 19 2015
ELECTIONS DIVISION

### FOR
(  ) SPECIAL ELECTION
( ✓ ) GENERAL ELECTION
(  ) RUNOFF ELECTION

*November 3, 2015*
DATE

*Sparta*
(MUNICIPALITY)

---

| FOR THE OFFICES OF AND CANDIDATES (Insert Titles of Offices and Names of Candidates) | TOTAL NUMBER OF VOTES RECEIVED |
|---|---|

FOR *City Council*

| Candidate | | Votes |
|---|---|---|
| *William Case* | Received | 55 |
| *Betty Hill* | " | 219 |
| *Sarah Patillo* | " | 79 |
| *Tom Roberts* | " | 325 |
| *Sandra Faye Ross Sherrod* | " | 223 |
| | " | |

---

### WRITE-IN CANDIDATES
(Insert Titles of Offices and Names of Candidates)

| | | Votes |
|---|---|---|
| | Received | |
| | " | |

---

We, the undersigned Superintendent/Supervisor of Elections and his/her Assistants, do jointly and severally certify that the above is a true and correct count of the votes cast in this City. IN TESTIMONY WHEREOF, We have hereunto set our hands and seals this _____ day of _____, 20_____. SIGNED IN QUADRUPLICATE.

*Barbara Leslie* _____ (Seal)        *Aeetha Hill* _____ (Seal)
*mitt Hty* _____ (Seal)                    Superintendent/Supervisor Of Elections
*Brenda Walker* _____ (Seal)
_____ (Seal)
_____ (Seal)  } Assistants
_____ (Seal)
_____ (Seal)
_____ (Seal)

Form CR-M-03

E
X
H
I
B
I
T

E

```
 1                    United States District Court
                      Northern District Of Georgia
 2                         Atlanta Division

 3
     Georgia State Conference )
 4   of the NAACP, et al.,    )
                              )
 5              Plaintiffs,)
                              )          Civil Action
 6        vs.             )          File No1:17-CV-1427-TCB-WSD-BBM
                              )
 7                           )          Atlanta, Georgia
     Brian Kemp            )          April 24, 2018
 8   in his official capacity )          2:00 p.m.
     as Secretary of State    )
 9   for the State of Georgia,)
                              )
10              Defendant. )
     _____)
11

12
                     Transcript MOTIONS Hearing before:
13
                     THE HONORABLE BEVERLY B. MARTIN,
14               11th Circuit Court of Appeals Judge

15             THE HONORABLE TIMOTHY C. BATTEN, SR,
                     United States District Judge
16
                     THE HONORABLE WILLIAM S. DUFFEY, JR.
17                   United States District Judge

18
     APPEARANCES:
19
         FOR THE PLAINTIFF:          William Vance Custer, IV
20                                   Jon M. Greenbaum
                                     Attorneys at Law
21
         FOR THE DEFENDANT:          John J. Park, Jr.
22                                   Attorney at Law

23
     Lori Burgess, Official Court Reporter
24   (404) 215-1528

25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
```

1          JUDGE BATTEN:  All right.  Thank you.  We will hear

2     from the movants.

3          MR. CUSTER:  May it please the Court.  We are here

4     for the motion of preliminary injunction.  For the interest of

5     efficiency, I am not going to repeat what was in our briefs.

6     I know that you've read those, so let's get straight to the

7     key issue in this case.  Why we believe we have shown a

8     substantial likelihood of success on the merits.  The evidence

9     here, we submit, demonstrates all the classic elements of a

10     racial gerrymander.  One, it involved an unnecessary

11     mid-decade redistricting.  Two, it was motivated to protect

12     white incumbents against a significant and surging

13     African-American and minority migration into their districts,

14     and to protect them against capable and qualified candidates

15     who were the preferred choice for African-American voters in

16     those districts.  It used methods that were not traditional

17     redistricting methods.  It resulted in transfers of white

18     voters into the districts.  It resulted in the transfer of

19     African-American voters out of the districts.  And both

20     parties, witnesses for both sides, concede that those

21     transfers resulted in the white incumbent succeeding in

22     successive elections.

23          JUDGE DUFFEY:  Can you tell me so I can

24     differentiate between the two kinds of evidence, because I

25     think I understood the position in the briefs, but what would

1    be the direct evidence?

2              MR. CUSTER:  The direct evidence, we would submit,

3    is the testimony about what happened here and the historical

4    evidence of intent.  And although the --

5              JUDGE DUFFEY:  So what specifically would that be?

6              MR. CUSTER:  Although the emails themselves, which

7    are the focal point of our case, are obviously not direct

8    evidence.  The testimony authenticating those emails and the

9    long picture they paint of a racial intent, we submit, is

10   direct evidence.

11             JUDGE DUFFEY:  But the emails are generally are

12   emails to Mr. O'Connor.  The person who draw the map was Ms.

13   Wright.  What would be the direct evidence of their intent,

14   and specifically the intent as manifested in the drawing of

15   the maps?

16             MR. CUSTER:  One, we don't believe the evidence that

17   Ms. Wright drew the maps without input from third parties is

18   credible.  It's inconsistent with the testimony.  For

19   instance, the head of the reapportionment committee, Mr. Nix,

20   testified that he consulted with Mr. O'Connor on a daily

21   basis.  He had inputs into the maps.  Representative

22   Efstration testified he had input into the drawings of the

23   maps.  These maps were drawn in secret in a conference room

24   with the Republican leadership.  We simply do not believe it

25   is a credible position to take as they do that Ms. Wright went

1    into a darkened conference room without outside influence and

2    without peeking at race, which she already knew the answer to.

3    She already knew African-Americans --

4              JUDGE BATTEN:  So what do you with that knowledge?

5    What is she supposed to do with that knowledge?  Block it out

6    of her mind?

7              MR. CUSTER:  She obviously can't block it out of her

8    mind, but she also can't claim that it didn't enter into these

9    decisions, especially when the results belie the suggestion

10   that race was not involved in drawing the lines.

11             JUDGE DUFFEY:  The Supreme Court has said that

12   racial considerations just can't be the predominant

13   consideration.  The predominant consideration has to be racial

14   and not political.

15             MR. CUSTER:  You are absolutely correct.  But here

16   what we have shown is that race is the predominant

17   consideration.  They didn't start drawing these maps because

18   Democrats were moving into these districts.  The record, the

19   long train of emails shows they started drawing these maps

20   because of African-American migration into these districts --

21             JUDGE DUFFEY:  Well I know, but you've made the

22   comment throughout your briefs in both that because there is

23   such political polarization that in fact blacks generally vote

24   Democratic.  And if that was the test you could never

25   politically redistrict because, by necessity, there would

| | |
|---|---|
| 1 | always be a disproportionate number of blacks affected because |
| 2 | they predominantly, including your expert says, that they vote |
| 3 | Democratic. |
| 4 | MR. CUSTER:  Absolutely.  But we go one step further |
| 5 | in the proof here.  The proof shows they went out to identify |
| 6 | black groups, African-American voting groups, and they moved |
| 7 | those groups into adjoining districts.  And not only that, |
| 8 | but -- |
| 9 | JUDGE DUFFEY:  Because they were black? |
| 10 | MR. CUSTER:  Absolutely.  Absolutely. |
| 11 | JUDGE DUFFEY:  Tell me what, in Ms. Wright's |
| 12 | deposition testimony, did she say that she used racial |
| 13 | information at all in drawing the districts initially? |
| 14 | MR. CUSTER:  Some of her testimony suggests she had |
| 15 | the window open in which the racial data -- running total of |
| 16 | the racial data was shown.  Now, she denies that -- that |
| 17 | testimony is a little bit conflicted in her various testimony. |
| 18 | But the written -- |
| 19 | JUDGE DUFFEY:  She is unequivocal that she did not |
| 20 | use racial information to draw the maps. |
| 21 | MR. CUSTER:  I grant you -- |
| 22 | JUDGE DUFFEY:  I guess what I hear you saying is |
| 23 | that you are saying she didn't tell the truth. |
| 24 | MR. CUSTER:  Absolutely.  We do not think that is |
| 25 | credible.  And in fact, the -- |

1          JUDGE BATTEN:  That is the only way you can win, if
2     she is not telling the truth.
3          MR. CUSTER:  That is not true.  We believe that if
4     we show purpose -- and this is what the Supreme Court said in
5     the most recent cases, in *Bethune-Hill* and in the *Cooper* case,
6     if we show that there was a racial purpose behind these
7     changes, the burden then shifts to the State to show a
8     compelling interest.  They can't do that.  They haven't tried
9     to do that, much less --
10          JUDGE MARTIN:  May I -- so after 18 years of doing
11     this job in one capacity or another I have done several of
12     these panels.  And on one I actually went into Ms. Wright's
13     office and watched her use the Maptitude tool.  And my
14     recollection is vivid in that the racial designation was right
15     there on the screen for all of us to see.  And so if you drew
16     the line this way, the racial makeup would be this one thing;
17     if you drew it slightly on the other side of the street, it
18     could be another.  And so did you understand her testimony to
19     be that she -- I mean, she says, ordinarily I like to have the
20     political data combination, I like to have the political data
21     as well as the racial data, the population data, all those
22     other things.  That is one that I recall of her deposition.
23     So is it your understanding of her deposition that she had
24     somehow removed that information --
25          MR. CUSTER:  No.

1          JUDGE MARTIN:  -- and then once she had drawn the

2     lines she put it back in to check the racial makeup?

3          MR. CUSTER:  As we understand her testimony, her

4     claim presently is that she did not put that information on

5     the screen as she was drawing the maps, that she only looked

6     at it at the end.  The individual who carried the bill at the

7     legislature, Representative Nix, who was the chair of the

8     reapportionment committee, said that information was on the

9     screen as the maps were being drawn.

10          JUDGE BATTEN:  Not for this particular map.

11          MR. CUSTER:  For this particular map.

12     Representative Nix carried these bills, 566.  And he testified

13     that the race data was -- the race screen was open while he

14     was viewing the maps and viewing the alternatives for the

15     maps.

16          JUDGE BATTEN:  You incredulously asked whether or

17     not Ms. Wright peeked at the information.  Who cares?  I mean,

18     she knows the information, doesn't she?

19          MR. CUSTER:  Of course she does.

20          JUDGE BATTEN:  So who cares if she peeked?

21          MR. CUSTER:  It doesn't matter that she peeked.  I

22     just --

23          JUDGE BATTEN:  So you believe it is difficult to

24     believe her assertion that she didn't look?

25          MR. CUSTER:  That is absolutely correct.  It doesn't

1    matter whether she looked or not.  She knew that

2    African-Americans predominated in the McDonough Circuit,

3    predominated in the Stage Coach Circuit, and the Stockbridge

4    West Circuit, and predominated in downtown Lawrenceville.

5    Those were no secrets.

6              JUDGE BATTEN:  Who else is at fault?  I want to know

7    if Dan O'Connor is at all at fault.

8              MR. CUSTER:  We believe he is.

9              JUDGE BATTEN:  What did he do wrong?

10              MR. CUSTER:  We believe he is the mastermind --

11              JUDGE BATTEN:  Because in your Amicus sure praised

12    him.

13              MR. CUSTER:  I think Mr. O'Connor has an

14    extraordinary reputation down at the legislature.  He is

15    referred to as the guru of numbers and analytics.

16              JUDGE DUFFEY:  Do you think that he exerted his

17    influence over Ms. Wright as she was drawing these maps and

18    caused her to unduly consider race as opposed to what she said

19    she was doing, which is looking at --

20              MR. CUSTER:  Mr. O'Connor and the Republican

21    leadership in the House.  Mr. O'Connor is just the Speaker's

22    agent.  He is clearly a political operative.  He was appointed

23    to the reapportionment office after was being a political

24    operative.  He reported to the Speaker's office at the

25    beginning of the session saying we need to redistrict these

```
1    two districts.  He supplies the justification for
2    redistricting these two districts, which is that both of these
3    districts are approaching what Mr. O'Connor identifies as the
4    danger line, 35 to 40 percent, when the districts begin to
5    flip from Republican to Democrat.  And it is Dan O'Connor that
6    then communicates throughout the session.  At the beginning of
7    the session he communicates with the Speaker.  Then he
8    communicates with the Speaker Pro Tem.  Then he communicates
9    with the head of the reapportionment office.  His fingers and
10   his fingerprints are all over this bill.  Dan O'Connor is
11   simply acting as the instrument of the Republican leadership.
12   And the emails demonstrate that.
13             JUDGE BATTEN:  So they are influencing him, or he is
14   influencing them?
15             MR. CUSTER:  He testified that he understood that it
16   was his job to keep the Republicans in power in the Georgia
17   House.  He is purely --
18             JUDGE BATTEN:  Anything wrong with that?
19             JUDGE DUFFEY:  Isn't that everybody's job, whether
20   you are a Democrat or Republican?  Wasn't that the Democrats's
21   job when they controlled the seat?
22             MR. CUSTER:  I would submit it is unusual for a
23   full-time State employee to engage in partisan activities.
24   But nonetheless, that was his job and he was carrying out the
25   instructions --
```

1          (Reporter Note:  Speakers talk over each other.)

2          JUDGE BATTEN:  -- Tom Murphy did that for three

3     decades.

4          MR. CUSTER:  Absolutely.  I am not going stand here

5     and defend Tom Murphy either, Your Honor.  The emails that we

6     do have paint a picture of Dan O'Connor talking about one

7     thing to the Republican leadership again and again and again.

8     And it is not changing Democrats in these districts, it is

9     changing migrations of African-Americans.  The email to Chuck

10    Efstration four months before.  The email to a political

11    consultant three months before, one month before the session.

12    The email to the Speaker's office and the Chief of Staff.  In

13    the session his email to Speaker Pro Tem Jones.

14          JUDGE DUFFEY:  What evidence do you have, and where

15    in the deposition of Ms. Wright, did anybody say I want to

16    talk to you, Ms. Wright, about how Dan O'Connor, or anybody

17    else, instructed you or guided you to look at this racial data

18    in order to draw these districts?

19          MR. CUSTER:  I can't quote you -- excuse me just a

20    moment.  (pause).  I can't quote you the exact testimony where

21    she said Dan O'Connor or we asked her if Dan O'Connor

22    instructed her.  But, what she --

23          JUDGE DUFFEY:  I don't think that question was ever

24    asked.

25          MR. CUSTER:  It may not have been asked.

1          JUDGE DUFFEY:  Why not?

2          MR. CUSTER:  You know, I don't know.  I didn't take

3     that deposition.  But I can tell you what that Ms. Wright

4     described was a series of meetings that she had with a variety

5     of different legislators, and these maps were not crafted in

6     one sitting by Gina Wright.  To suggest that that is the case

7     is simply inconsistent with the record.  In fact, as we

8     seek --

9          JUDGE BATTEN:  Why is it that each participant in

10    all of these conversations that are discussed disavows

11    changing the district lines based on race?  Are they all

12    lying?

13         MR. CUSTER:  I think they are all incorrect, Your

14    Honor.  The -- the --

15         JUDGE DUFFEY:  Well they --

16         MR. CUSTER:  The consistent contemporaneous --

17         JUDGE DUFFEY:  Excuse me.  If you think they are

18    not telling the truth, don't use the words like "incorrect."

19    Tell me plainly what the plaintiff's position is with respect

20    to the disavowals of the people who were deposed.

21         JUDGE BATTEN:  By everybody.

22         MR. CUSTER:  They are absolutely incorrect.  I don't

23    know how to say it.  I am not going to accuse them of perjury,

24    but in every single one of these redistricting cases, and you

25    can look at all of them, there is always a disavowal that race

1     was the issue.

2              JUDGE DUFFEY:  That is not true.  I've read these

3     cases.  And in fact, in a number of the cases, including the

4     Supreme Court, there was an admission that race was the

5     driving factor, and that is what has led to this point --

6              MR. CUSTER:  In fact, the only case -- the only

7     thing that we don't have in this case is an admission.  What

8     we do have is an uninterrupted stream of contemporaneously

9     prepared documents that point to one issue, and that is -- and

10    that is race.

11             JUDGE BATTEN:  I don't think the evidence is that

12    unambiguous.

13             JUDGE DUFFEY:  I don't either.

14             JUDGE MARTIN:  Maybe it's my turn.  So you know a

15    lot more about -- all of y'all know a lot more about these

16    voting cases than I do.  But both sides were citing *Bush*

17    *versus Vera* for kind of opposite propositions.  One of the

18    things I wanted to check with you about was, I know Justice

19    O'Connor in the plurality opinion referred to, quote, "The

20    bizarre shaping and noncompactness."  We don't have that in

21    this case, do we?

22             MR. CUSTER:  We do have a lessening of compactness.

23    This is not one of those cases where there is an

24    extraordinarily bizarre shape.  However, I would suggest to

25    you that the truth is in the numbers.  And let me focus you on

1    one issue that you may not have considered.  I know there is a

2    lot of data overload in these documents, but let me sharpen

3    the issue just a little bit.  One thing that you will see in

4    all of Dan O'Connor's writings is a focus or his attempt to

5    focus the Republican leadership on numbers.  One is 30 to 35

6    percent.  That is when the district becomes a target for

7    Democrats, and the other number is the 40 percent.  That is

8    the tipping number.  And he says that more than once.  And we

9    have included those documents in your packet.

10              But let's just look at where the numbers end up.

11    After all these changes, we end up with the Caucasian

12    population, according to the 2010 census, going up a few

13    percent.  We end up with the African-American population,

14    according to the 2010 census, going down about two percent.

15    The important number, according to Mr. O'Connor, is the black

16    registration number and you can see that in 2015 it is

17    creeping up towards that red line.  It is 36.7 percent.  And

18    they reduce it very close to the 35 percent number.

19              Now, they would suggest that after all of these

20    changes that is purely accident that Mr. O'Connor doesn't get

21    these numbers down to just 35 percent.  But you also see the

22    same pattern in 111.  And then they make ten different changes

23    in 111, but again, you get the same pattern.  Caucasian voters

24    go up about two percent, the black voter population, according

25    to the 2010 census, goes down about two percent.  And that

1     number which is so threatening to Mr. O'Connor, the black

2     voter registration number that is caused by this black

3     migration is, again, shaved down to 35.3 percent.  And we are

4     to believe that all of that is purely happenstance after

5     that -- those are the numbers --

6              JUDGE DUFFEY:  It is not happenstance.  If you

7     listen to Ms. Wright's description of what she had to do in

8     the adjustments that she had to make to accomplish what she

9     admitted that she was trying to accomplish, which was to

10    improve the incumbent's prospects for being reelected, that

11    there were a number of different decisions that she had to

12    make that took into account mainly some of the traditional

13    redistricting criteria.  And so you make it look like she said

14    I've got to get this up three percent, I have to get this down

15    three percent.  Let me just pick off because Dan O'Connor said

16    so.

17             MR. CUSTER:  And she has the data that finely

18    refined on a political level, but she doesn't have the data

19    that finely refined on a racial level.

20             JUDGE DUFFEY:  Which means that she might have

21    over-compensated in order to accomplish the political purpose

22    that might have driven those numbers up because I agree it

23    wasn't --

24             MR. CUSTER:  Not only -- excuse me -- (pause).  My

25    co-counsel has corrected me, Your Honor, as is frequently the

| | |
|---|---|
| 1 | case. The problem is, they did -- they increased their splits |
| 2 | and they changed their splits. They changed the splits in |
| 3 | Gwinnett County. And they went from two splits to five splits |
| 4 | down in Henry County. And they don't know how that number is |
| 5 | going to break at the split level, because all they have at |
| 6 | the block level is racial data. That is all they have to |
| 7 | operate on. They are making just broad assumptions about the |
| 8 | political data at the block level. And that's what the |
| 9 | Supreme Court, I believe it was in the *Bush v. Vera* case, said |
| 10 | was indicative of race-based decision making. If you are |
| 11 | putting more African-Americans on the districts going out than |
| 12 | coming in, which was the case in several of these decisions |
| 13 | she made, it belies her contention that race was not a factor. |
| 14 | She had to have race to carve the data this precisely. I |
| 15 | don't know where I am precisely, Judge Batten. |
| 16 | JUDGE BATTEN: We haven't given you much of a chance |
| 17 | to stay on task, which you intended to do. I need to change a |
| 18 | little bit and just ask you, what is the significance of the |
| 19 | fact that House Bill 566 passed the House unanimously? Every |
| 20 | Republican and every Democrat voted in favor of it. How can |
| 21 | we come in after the fact and find that the Democrats, you |
| 22 | know, and agree with the Democrats that the map was |
| 23 | predominantly based on race? |
| 24 | MR. CUSTER: Your Honor, that is obviously a |
| 25 | question we've anticipated. It is obviously a big defense |

1    that the defendants have raised.  I think you have to look at

2    the context of how House Bill 566 was actually introduced into

3    the House.  It was drafted in secret in the reapportionment

4    conference room.  The bill itself was not dropped until May --

5    March 5th.  Those bills are unintelligible.  I can't read it.

6              JUDGE BATTEN:  We know how the bill was enacted.  We

7    read the briefs and we understand what you are saying, I am

8    sure about that.  But I just, to me, I am a little concerned

9    about intervening in the legislative process, how they do

10   their work.  Are we supposed to give them a letter grade for

11   the job they did passing this bill, or are we supposed to take

12   nothing from the fact that the Democrats voted in favor of

13   this?

14             MR. CUSTER:  Well, I have two responses to that.

15   First of all, Your Honor, I think there is a good deal of

16   evidence to suggest that the true nature of this bill was

17   concealed from the Democrats, and that disinformation was

18   provided to them during the session.  Plus I think perhaps

19   they took too much comfort from the fact that only Republican

20   districts were being manipulated here.  No district -- no

21   Democratic district was being manipulated.  And so when you

22   had the bill drop on the 5th, it comes to the House on the

23   11th with only two days for them to review the maps.  Maybe

24   they missed it.  Obviously the Senate picked it up.  When it

25   got to the Senate enough time had passed that people began to

```
1    realize what was going on and there was a debate on the Senate
2    floor.  But to your legal question, can you disregard what the
3    House said and did, I think the answer is absolutely.  If you
4    find that there was a predominant racial purpose, you not only
5    can disregard what the House did, you should disregard what
6    the House did.
7              JUDGE MARTIN:  Can I ask you to give me -- what is
8    your best evidence of racial bias in the drawing of these
9    lines?
10             MR. CUSTER:  I think the best evidence of the
11   drawing of these lines are the consistent stream of emails,
12   communications between Dan O'Connor and the key Republican
13   leadership.  I would probably start out with Representative
14   Nix simply because he is chairman of the committee, and he
15   said that he worked with Dan O'Connor on a daily basis.  I
16   would probably next point to the communications between
17   defense counsel and the Speaker's office.  Because O'Connor
18   clearly says that the Speaker makes the decision on whether or
19   not there is going to be tweaking.  This is not a case where a
20   low-level career bureaucrat, and I don't mean to demean
21   Ms. Wright, but this was not conceived by a low-level career
22   bureaucrat.
23             JUDGE BATTEN:  And people that high up that ladder
24   were so dumb as to memorialize their racist intent?
25             MR. CUSTER:  You know, the only person that
```

1    memorialized their racist intent was Dan O'Connor.  The record

2    is amazingly devoid of communications back to him.  Dan

3    O'Connor is the proverbial loose lips in this scheme.

4         JUDGE DUFFEY:  So if that is true, if the people

5    that he was writing to rejected, as I suspect they would have,

6    any claim that or any desire that he might have to racially

7    manipulate this redistricting, what is the evidence that Dan

8    O'Connor sat on Ms. Wright's shoulder and said, look at that

9    box over there, you've got to go further?  Because I think

10   what you just said is that you don't believe that the senior

11   administrator, people that are in political office, were

12   saying, Dan that is great job, go and do what you need to do,

13   and that in fact Dan O'Connor had the authority to do that.

14        MR. CUSTER:  No, I think it is just the opposite,

15   Judge Duffey.  If you will look at these emails you see no

16   rejection of the proposals by Dan O'Connor.  You see no one

17   who says, no that's not the way we are going to do it.  When

18   he sends these emails, they say, thank you Dan.  Thank you for

19   that information.  And they regard him so highly --

20        JUDGE BATTEN:  How dumb would they have to be to say

21   thank you for the racial impropriety?  I mean --

22        MR. CUSTER:  That is what they did.  I agree.  That

23   is what they did.  He sends them these emails and they thank

24   him for it again and again and again.  There is only one

25   person as I recall from the group who said they really didn't

| 1 | like Dan O'Connor.  I believe that is Representative Andrews. |
| 2 | But to a person, the rest of them said he was their guy in the |
| 3 | reapportionment office.  And we can't divorce and they can't |
| 4 | divorce Dan O'Connor from these maps. |
| 5 | JUDGE MARTIN:  You know -- |
| 6 | JUDGE DUFFEY:  That is what you say, I understand |
| 7 | that.  But you know, all of us do a lot of criminal law, and |
| 8 | ultimately in criminal law, to show a conspiracy, you have to |
| 9 | show by a preponderance of the evidence that there was an |
| 10 | understanding between everybody.  I just don't see the |
| 11 | evidence of that here.  I understand that you've got these |
| 12 | pieces and that you are trying to weave this relationship |
| 13 | between Dan O'Connor and the emails and ultimately that gets |
| 14 | forced upon Ms. Wright, but a lot of it seems speculative and |
| 15 | conjecturous to me. |
| 16 | JUDGE BATTEN:  My experience similarly is, in the |
| 17 | race cases, that 1983 cases, Title VII cases, you know, often |
| 18 | the animus is readily inferred.  But I am loathe to find -- to |
| 19 | make an inevitable inference of racism -- not animus -- but |
| 20 | racism here.  I just don't think the evidence is that strong. |
| 21 | I just -- I hear what you are saying.  You are saying, look at |
| 22 | these emails and everybody authenticated them and they were |
| 23 | going back and forth, but every one of them denies -- there is |
| 24 | no smoking gun.  That is what I am trying to say.  I don't |
| 25 | think there is a smoking gun.  Do you? |

1           MR. CUSTER:  Judge Batten, I do think there is a

2    smoking gun.  I think all of this email documentation taken as

3    a whole is a smoking gun.  You may could take one of those

4    documents and disprove it.  One, if it were not to the

5    Speaker, if it were not to the Speaker Pro Tem, if it were not

6    to the head of the reapportionment committee if it were not

7    photo vice chair of this reapportionment committee, and other

8    members of that committee and other people affected, you may

9    be able to explain away that bomb shell of emails that Dan

10   O'Connor wrote.  But no one disabused him.  Everyone seemed to

11   be on board with what Dan O'Connor was proposing.

12          JUDGE DUFFEY:  You know, there is a hypothesis here

13   that you don't address, and that is, if you read all of the

14   information that comes from exit polls and national or state

15   elections, one of the principal things they focus on is

16   demographic changes as it affects political power of a party

17   within a specific jurisdiction in which there is held an

18   election, and I think to say that every time somebody talks

19   about the changes in demographics and the concentration of

20   minorities in a state that, I totally agree with you that we

21   are racially polarized to the extreme when it comes to

22   politics, that that sort of information tells you that there

23   are shifts, and to understand that there are shifts in

24   demographics that can affect partisan abilities for parties to

25   have their candidates elected, it is interesting information,

1    I think useful information, for somebody to say we are
2    probably going to lose that district.
3                MR. CUSTER:  You know --
4                JUDGE DUFFEY:  You don't give any credit to that.
5                MR. CUSTER:  No, I do give credit for that.  But our
6    evidence goes beyond that.  Because to make the decisions they
7    made, they had to go beyond the political data.  They had to
8    rely on the racial data to get to this end result.  They
9    didn't have access to racial data at the street-by-street --
10   excuse me -- they didn't have an access to political data at a
11   street-by-street level, which is what they needed to do to
12   make these surgical changes.  The reason these changes had to
13   be so surgical is because you not only had to make the
14   district you were changing better for that incumbent, but you
15   also had to make sure that in the process of doing so you
16   didn't make the surrounding districts worse for those
17   incumbents.  What they feared most was that they --
18               JUDGE DUFFEY:  They were all made worse for those
19   incumbents.
20               JUDGE BATTEN:  Safely worse for the incumbents.
21               MR. CUSTER:  Safely worse.  Thank you, Your Honor.
22   They clearly were.  What you didn't want to end up with was,
23   instead of one vulnerable district, three vulnerable
24   districts.  So they had to move the African-American voters by
25   only two percent.  And you can't do that and split districts

1    without knowing the racial data at the split precinct level.

2    And they had that -- that is the only place they had access to

3    information that was would guide the splitting, was the racial

4    data at the street-by-street level, which only came from the

5    census.

6                JUDGE BATTEN:  All right.  Thank you, counsel.

7                MR. CUSTER:  Thank you, Your Honor.

8                JUDGE BATTEN:  Even though it is past the time, we

9    will give a little rebuttal back to Mr. Greenbaum.  All right.

10   Mr. Park?

11               MR. PARK:  Yes, Your Honor.  May it please the

12   Court.  I am Jack Park, and I am one of the attorneys for

13   Secretary of the State Kemp.  I would like to start with Dan

14   O'Connor, because his deposition testimony tells you that he

15   had nothing to do with drawing the lines in the plan.  On page

16   134 of his deposition he is asked:

17               "So I am going to ask you with respect to District

18   105.  Was District 105 changed to eliminate a split precinct?"

19               "I don't recall."

20               "You don't recall that as being a primary reason,

21   correct?"

22               "I wasn't involved in this.  I don't recall."

23               "Sure.  But is it fair to say that the primary

24   objective of District 105 was to make it safer for the

25   Republican incumbent?"

1          "Well again, I wasn't involved in that so I won't

2   speculate."

3          With respect to House District 111 he said again, "I

4   wasn't involved in the, you know, map drawing of 111" on page

5   140 of his deposition.  So the evidence suggests that it was

6   Ms. Wright and Ms. Wright alone who drew the plans.  Now those

7   plans had to be acceptable to the members she drew them for.

8   And --

9          JUDGE MARTIN:  Can you answer my question for me?

10         MR. PARK:  Yes, ma'am.

11         JUDGE MARTIN:  With my experience seeing the

12   Maptitude application used, and my experience was that the

13   racial information was the most detailed of any, you know,

14   description of the population on the map, I mean, do you

15   understand Ms. Wright's testimony to be -- I mean, she said

16   usually she worked with that on there; right?  I mean, on page

17   105 or whatever of her deposition.

18         MR. PARK:  What I understand her deposition

19   testimony to be in essence is there is a pending changes box

20   and you can decide what goes in that pending changes box.  And

21   for the purpose of this case she started with the political

22   data.  She started with the political data for a good reason

23   because these aren't black majority districts.

24         JUDGE MARTIN:  But the political data is the most

25   recent voting history that you have available, right?

1          MR. PARK:  2014 statewide races that are contested.

2          JUDGE MARTIN:  Okay, but as I understand it, the

3    computer program says generally this, you know, this division

4    of voting voted in this percentage.  So it just spreads that

5    equally.  It shows the voting history just kind of equally

6    across the voting area; is that right?

7          MR. PARK:  Her testimony -- you know precinct

8    results; right?

9          JUDGE MARTIN:  Yeah.

10         MR. PARK:  You know precinct results.  And what she

11   testifies the software does, is if you are going to split the

12   precinct down to census blocks, it allocates them to census

13   blocks and it allocates them in a rational manner.  If nobody

14   lives in those blocks, it's not going to put people in it.

15         JUDGE MARTIN:  But bottom line, you have much more

16   detailed information about race than you do about voting

17   history.  I mean, based on what I saw.

18         MR. PARK:  That is correct, you do.  What you do

19   have, though, is an estimate of the behavior of blocks within

20   a precinct, an estimate of the political behavior of blocks

21   within a precinct that you can use to make a judgment as to

22   the affect of a change on the political outcome.

23         JUDGE MARTIN:  And didn't she say then, after she

24   drew it, she came back and looked at the racial data when she

25   was, quote, finished?  Is that --

1          MR. PARK:  That is correct, Your Honor.  And she

2    would do that because these districts start with 33, 31

3    percent black voting age population; right?  In order to elect

4    the candidate of their choice, they are going to need votes

5    from non-blacks.

6          JUDGE MARTIN:  When you say their choice, you

7    mean --

8          MR. PARK:  The African-American community in the

9    district.  They need non-African-American votes.  In fact,

10   they are getting some.

11         JUDGE MARTIN:  But you are not saying that was her

12   motive, right?  She was very up front about the fact that

13   people had come to see her and say I need a little boost for

14   105.

15         MR. PARK:  Correct.

16         JUDGE MARTIN:  I guess Representative Chandler went

17   to her house.

18         MR. PARK:  Representative Chandler went to --

19         JUDGE MARTIN:  Went to Ms. Gina Wright's house and

20   explained to her, right?  I mean, that was her testimony.

21         MR. PARK:  I don't recall her going to her house,

22   but Representative Chandler did want a boost to her district.

23         JUDGE DUFFEY:  But didn't Ms. Wright also meet with

24   members, maybe not as a whole, but of the black caucus to talk

25   to them about the redistricting that was going to go on in

1    2015?

2           MR. PARK:  That was her testimony.  And

3    Representative Strickland said that he knew that the minority

4    leader, Ms. Abrams, knew about the changes.

5           JUDGE MARTIN:  But I mean, just in general she, on

6    page 22 of her deposition, she said, you know, these folks

7    that were coming to talk to her about District 105 were

8    looking for a political advantage to see if there was any way

9    to give a political boost, meaning a boost to the incumbent;

10   right?

11          MR. PARK:  Correct.

12          JUDGE MARTIN:  You know, so my experience has been

13   over the years, and the law has changed, but that is legally

14   acceptable to redraw lines to give an incumbent a boost.

15          MR. PARK:  Incumbent protection is generally

16   recognized as a legitimate purpose of drawing districts.

17          JUDGE MARTIN:  And you seem to openly acknowledge

18   that is what happened here, both for 105 and 111; is that

19   right?

20          MR. PARK:  That is correct.  And 111 was driven at

21   least in part by Rutledge's move into McDonough.

22          JUDGE MARTIN:  But I mean, there was an adjustment

23   on --

24          MR. PARK:  There was an adjustment, but Strickland

25   was winning with 53 percent of the vote.

1          MR. PARK:  But I mean in both.  White voters were

2     moved in and black voters were moved out.

3          MR. PARK:  Some of both.

4          JUDGE MARTIN:  Yeah.  I mean, white were voted in

5     and moved in, blacks moved out.

6          MR. PARK:  There may have been more white voters in

7     than --

8          JUDGE MARTIN:  Well I know in May it was, but I mean

9     I guess your position is that we can do that.

10         MR. PARK:  But -- and it wasn't exclusively them.

11    And we can do it.  If it -- it happens to correlate with

12    politics, but race and politics are two entirely different

13    considerations.

14         JUDGE MARTIN:  You know, I noticed that in the *Bush*

15    *v. Vera* case, Justice O'Connor in the plurality opinion

16    referred to it as a, quote, mixed motive case.  And that's

17    kind of what we have here; right?  I mean, we know that race

18    was impacted.  It is just a matter of evaluating which motive

19    fell to which category, political, race.  Is that -- is that a

20    fair -- I mean, that is the way she characterized it in *Bush*

21    *v. Vera,* but would you characterize that case that way?

22         MR. PARK:  No, Your Honor.  Because redistricting

23    law puts the burden on the plaintiffs to show that race

24    predominated over other --

25         JUDGE MARTIN:  I am not asking you that, as far as

1    procedure.  But you acknowledge this is a mixed motive case?

2              MR. PARK:  No, I don't.  Her testimony is politics

3    drove it.  The plaintiffs would have you focus on race as the

4    motive, and it's their burden to show that race predominated.

5              JUDGE MARTIN:  Let me ask you this other fact

6    question.  So as I understand it, Representative Nix said when

7    he was looking at these maps with Gina Wright the race

8    information was there.  Have I got that right?

9              MR. PARK:  I think there is testimony that he

10   thought that back in 2015 when he looked at it he saw racial

11   data.  Yes.

12             JUDGE MARTIN:  And she was there with him?

13             MR. PARK:  Correct.  He was in a meeting in her

14   office.

15             JUDGE BATTEN:  What do you do with that?  She says

16   it wasn't there and he says it was there.

17             MR. PARK:  You have to see both of them and decide

18   who you believe.  There is a value to seeing witnesses testify

19   and being cross-examined.

20             JUDGE MARTIN:  What about this, that there was a

21   series of, I mean, just based on my own experience again,

22   there is a series of meetings maybe in the early on meetings

23   when Representative Nix was there, the race data was there

24   when they were playing with the lines for Districts 105 and

25   111 and then later in the process maybe she took that out.

1    Would that be consistent with the evidence?

2            MR. PARK:  No.  I don't think so, Your Honor.

3    Because I -- you know, Mix doesn't really have an interest in

4    105 or 111.

5            JUDGE MARTIN:  Well --

6            MR. PARK:  The folks who are interested in 105 and

7    111 are Efstration and Chandler in 105, and then Rutledge and

8    Welch and -- well, it is now Mathiak in 73, and was

9    Strickland.  Strickland is no longer there, he is now in the

10   Senate.  It is a guy named Cauble, and there is one more whose

11   name I can't recall off the top of my head.

12           JUDGE MARTIN:  Can I ask you, you know, just again,

13   I don't live in this world and you do, I mean, is this kind

14   of -- I know that *Bush v. Vera* is a 1996 case where there was

15   some recognition that it was, you know, you could consider

16   incumbency.  But I just don't remember that type of thing

17   going on in these cases that I've been involved with.  Is

18   that -- I mean, is it your position that it's okay to consider

19   that in ways that were not okay before *Shelby County* was

20   decided in 2013?  I don't -- did you follow all of that?

21           MR. PARK:  I think it was okay both before and after

22   *Shelby County*.

23           JUDGE MARTIN:  No doubt --

24           MR. PARK:  Now if your changed your plan, before

25   *Shelby County,* you would have to send it up to DOJ and go

1   through that process.  And it was opaque at the best.

2                JUDGE MARTIN:  Maybe people feel bolder to try stuff

3   that they wouldn't have tried when they knew it was subject to

4   preclearance.  Is that fair?

5                MR. PARK:  I think that it's a political process,

6   and the political process has to be fair to --

7                JUDGE MARTIN:  No, my characterization, I mean, that

8   people are a little bold now that they don't have to go

9   through --

10               MR. PARK:  I think it is overstated.  I think the

11  political process has to be generally transparent and fair.

12  And there is no evidence in the House, the Georgia House, that

13  this was unfair or not transparent.  And if you think about,

14  you know, after the census, you are going to have to redraw.

15  It is going to be done by the majority, and you -- because

16  that plan has to be passed by the legislature.  It's got to

17  pass the legislature be signed by the Governor, so it has to

18  take care --

19               JUDGE MARTIN:  But that is not what we are talking

20  about.  We are talking about something in 2015.  It wasn't

21  based on a new census.

22               MR. PARK:  Correct.  And then also, you know, you

23  have the Constitution and the Voting Rights Act that say you

24  have to do certain things with respect to race.  And *Thornburg*

25  *v. Gingles* says if you have a compact contiguous group of

1    minority citizens that is big enough to be a majority in a

2    single member district, you draw a district around them.  And

3    that makes sense because that's where people live.  You know.

4    You try --

5              JUDGE MARTIN:  But I mean --

6              MR. PARK:  What you want to do is draw where people

7    live.

8              JUDGE MARTIN:  So she said, Ms. Wright again, and I

9    found her to be very impressive, certainly very knowledgeable

10   about the Maptitude tool, but she talked about, you know, the

11   obligations of drawing these things.  She said if you are

12   trying to balance population and you can't do it within the

13   realms of keeping the precincts whole, but she always tried to

14   do that first, but sometimes it happened that you had to

15   divide a precinct.  But that is not what happened here, is it?

16   I mean, she --

17             MR. PARK:  She made some of the moves that she made

18   to even out the population.  If you look at her declaration,

19   which is clearer, because it doesn't have the questions moving

20   around, than her deposition testimony, what she says is

21   that -- I lost my point.  But if you look at her

22   declaration --

23             JUDGE MARTIN:  But you would agree with me that, I

24   mean, it was balanced before, you know, she --

25             MR. PARK:  Correct.  But when she redoes it, she has

| | |
|---|---|
| 1 | to keep it within tolerance as well.  So some of the moves she |
| 2 | made in Gwinnett, when she added black majority blocks in |
| 3 | Lawrenceville-D to 105, were driven for population purposes. |
| 4 | There were a number of changes in 111 that were driven for |
| 5 | population. |
| 6 | JUDGE MARTIN:  And this is kind of a bad fact for |
| 7 | you, isn't it?  I mean after she got through doing what she |
| 8 | did, there were five split precincts where there had only been |
| 9 | two before. |
| 10 | MR. PARK:  She did explain though that Henry County |
| 11 | has pretty large precincts.  So it's supposed -- |
| 12 | JUDGE MARTIN:  But the goals, they were together. |
| 13 | So if your goal was to keep them together, then you just leave |
| 14 | it the way it was and have two split precincts instead of five |
| 15 | split precincts, which is where we wound up after this |
| 16 | redistricting; right? |
| 17 | MR. PARK:  Correct.  That is where it ended up, with |
| 18 | five split precincts.  But splitting precincts, while |
| 19 | discouraged, is not unconstitutional. |
| 20 | JUDGE DUFFEY:  Even in *Bush,* doesn't the plurality |
| 21 | opinion notice specifically state that when you are protecting |
| 22 | incumbencies, that might be more of a reason to depart from |
| 23 | traditional criteria for redistricting.  And in fact, often |
| 24 | those departures are more explainable when you try to protect |
| 25 | incumbency than it would be to look at race exclusively. |

```
 1              MR. PARK:  I think that is correct, Your Honor.  But
 2    I don't think we really deviated substantially from the
 3    criteria.  We split a few more precincts in 105.  We put one
 4    back together.  We split a few more in 111, but we put one
 5    back together for which we get criticized in 105.  So --
 6              JUDGE BATTEN:  These denials, disavowals by all of
 7    the players of any racist intent, how are we to not be
 8    suspicious that that's part of their clear understanding of
 9    how the game is played?  They know the Federal courts are
10    looking over their shoulder to watch what they are doing, even
11    after Shelby County and with the Voting Rights Act in the 14th
12    Amendment.  So these are sophisticated people who are coming
13    in here and saying I really didn't use race as a motive.  How
14    else can they prove it than what the evidence -- the evidence
15    they have here?  Nobody is going to come out and admit it
16    explicitly.  What other proof would you expect the plaintiffs
17    to provide that they were right than what they have already
18    provided?
19              MR. PARK:  Circumstantial evidence of a district
20    shape, a substantially greater correlation between the move --
21    the racial move and political moves.  Here, you know, again,
22    these are cross-over districts at best.  The plaintiffs have
23    got to get 16, 17 percent of the non-African voters to go with
24    them.  So you know, they are just real difficult districts to
25    say -- there is an obligation to protect them.  And for all of
```

1    their complaints about politics they say, well, you know, we

2    are coming, we are going to get these districts, and that is a

3    political consideration.  The Democrats want to win them and

4    the Republicans don't want to lose them.

5             JUDGE DUFFEY:  Can I ask a perspective question?

6    With the two cases before to Supreme Court now on political

7    gerrymandering, let's assume that the Supreme Court, despite

8    their questioning during the oral arguments, can find a way to

9    give some certainty to states, and let's say that they find

10   and basically say political gerrymandering in some respects is

11   unconstitutional.  Will that affect this case?  I mean, is

12   this political gerrymandering?

13            MR. PARK:  It is done for political purpose.  The

14   test that they used in Wisconsin was something of a wasted

15   votes theory.

16            JUDGE MARTIN:  Efficiency.

17            JUDGE BATTEN:  Right.

18            MR. PARK:  Which is a -- probably needs more than

19   one or two House districts to show that you are wasting votes.

20   It is kind of a -- almost a statewide claim.  Because, you

21   know, the Democrats pile up votes in Atlanta and don't pile

22   them up outside in the country.

23            JUDGE DUFFEY:  What of the Maryland case?

24            MR. PARK:  The Maryland case, in the Maryland case

25   the people complaining have the advantage of living in the

1      district they are complaining about.  They don't in Wisconsin.
2      The Maryland case is a difficult case.  Having looked at the
3      transcript, some members of the Court think it has a vehicle
4      problem.  And just -- which may be a good way to docket.  You
5      know.  If they can say that Wisconsin plaintiffs lack
6      standing, and the vehicle is bad, and -- then everybody is
7      free to politically gerrymander for another decade.  I don't
8      think you could prove wasted votes on these two districts, if
9      that is the theory.  Now there may be another theory.  I
10     guess --
11             JUDGE BATTEN:  That is one for sale right now.
12             MR. PARK:  That is correct, Your Honor.  But we
13     don't think that the Plaintiffs have shown a substantial
14     likelihood of prevailing on the merits.  And I will just say
15     that the process is ongoing.  Absentee ballots have gone out,
16     some have been received, and early voting person starts
17     Monday.
18             JUDGE BATTEN:  Let me ask you about the remedy
19     issue.  If we agree with the Plaintiffs, you know, you haven't
20     come out and said we can't pull this off, have you?
21             MR. PARK:  It is too late to pull --
22             JUDGE BATTEN:  That is what they told me with the
23     6th Congressional District race.  They just said this would
24     just be so difficult it would be really hard.  And I looked at
25     them and said I think you can do it.  And this really

1    resembles that to me.  I haven't read anything, with a right

2    this important, that they are able to say that they just can't

3    make it happen.

4              MR. PARK:  There is a good reason why this case is

5    different from Congressional 6.  Here the plaintiffs's remedy

6    would have you moving all of those people who were moved back

7    into the old districts.  So what the election officials first

8    have to do is tell all of those voters, you know, what we told

9    you about a month ago about where you voted and who you were

10   voting for, never mind that, we have new instructions for you.

11   That's the first problem.  If you do that in Gwinnett County,

12   they are going to have to translate those notices into Spanish

13   because they are 203 jurisdiction.  You've got -- so you've

14   got that in front of you at a time where roughly a month out

15   from election day people going to -- going to the polls to

16   vote, they can vote early, they are already voting.  So I

17   would respectfully suggest that it is too late to stop the

18   train at this point.

19              JUDGE BATTEN:  All right.

20              JUDGE DUFFEY:  Is there any anybody qualified in

21   either of these districts that would not qualify if you went

22   back to the 2012 map?

23              MR. PARK:  Yes, Your Honor.  In Ms. Wright's

24   declaration, towards the end of it she points to House

25   District 111, the two people would not qualify.  And in House

```
 1    District 105 one person would not qualify.  So unless the
 2    Court were to get really creative in qualifications as part of
 3    its remedy, you would end up disqualifying some folks.  And we
 4    don't think creativity in remedies is appropriate.
 5                JUDGE BATTEN:  All right.  Thank you, sir.
 6                MR. PARK:  Thank you, Your Honor.
 7                MR. GREENBAUM:  May it please the Court.  John
 8    Greenbaum for the plaintiffs.  Let me start with what the
 9    legal standard is.  We don't have to show that the
10    representatives were racist, we don't have to show that they
11    had racial animus.  We do have to show that race was the
12    predominant motive.  And we can show that, even if it's to
13    achieve a partisan end.  And I will refer you to the Supreme
14    Court's latest racial gerrymandering case, *The People vs.*
15    *Harris*.  In footnote 7 the Court says:  If legislators use
16    race as a predominant districting criterion with the end goal
17    of advancing their partisan interests, that's going to
18    implicate strict scrutiny.  And that is what we have here.
19    The main goal, the end goal, was to protect these Republican
20    incumbents.  And how do they get there?  They use race as the
21    means for getting there.  First of all, race was the reason
22    why they did needed to do this in the first place.  Highly
23    unusual thing to redistrict mid decade from a planned drawn by
24    the legislature that had not been found unconstitutional, that
25    a court had not redrawn.  Very unusual what Georgia did here,
```

1    which actually separates itself out from all of the other

2    cases -- from all the cases that the Supreme Court has

3    decided, and makes this more suspect that Georgia did it.  Why

4    did they do it?  Because of the racial demographic changes

5    going on in Henry and Gwinnett Counties, and in particularly

6    in Districts 105 and 111.  The districts were getting blacker

7    and the results were getting closer.  And so they --

8                JUDGE DUFFEY:  Excuse me.  The reason why they --

9    the concern is, as you've told us a number of times, is this

10   racial polarization, is that as they get blacker, they know

11   that they are Democratic voters.

12               MR. GREENBAUM:  That's right.

13               JUDGE DUFFEY:  So it's almost as if you could never

14   have a case where you know -- if you have a jurisdiction where

15   for some reason it is all minorities, and therefore the

16   supposition I think that the data would show that they

17   probably are all going to vote Democratic, and you were trying

18   to protect an incumbent, which you are allowed to do, you

19   would say I could never touch that one because as soon as I do

20   it is going to look like I am moving blacks out of that

21   district into another district to protect the incumbent in the

22   district to which they reside.  It is Hobson's choice.

23               MR. GREENBAUM:  So let me unpack that, Judge Duffey.

24   The first thing about incumbent protection, what the Georgia

25   standard is, in their rules, and this is consistent with what

1          courts have found, this is what you are allowed to do.  You

2          are allowed, in a redistricting process, to not -- to pair

3          incumbents together.  That is what they are talking about in

4          terms of incumbent protection.  When, instead, the goal is I

5          want to protect a particular incumbent whose district

6          demographics are changing, and save that incumbency, that gets

7          no protection at all.  And you can look -- I will tell you two

8          places where you can look for this.  The Supreme Court case in

9          *Lulac versus Perry*, where that is what Texas tried to do, move

10         voters out and move voters in, and the Court said, no you

11         can't do that to protect this incumbent, at a time in which

12         Latinos in that case were about to be able to elect their

13         candidate of choice.  The same facts here.  Also you can look

14         at this Court's three-judge Court's decision, *Larios v. Cox*

15         where the Court lays it out in detail that the type of

16         incumbency -- when they are talking about what type of

17         incumbency protection is legally acceptable, it is not pairing

18         incumbents together, which is not an issue in this case.  So

19         there is no -- there is no special protection for incumbents,

20         especially when you are using the fact that the racial

21         demographics of a district are changing and that minority

22         voters are finally going to be able to elect their candidates

23         of choice, you can't use incumbency protection as the reason

24         why; it is not a legitimate reason that justifies.

25                   JUDGE DUFFEY:  I understand that you can do it, but

1    it doesn't justify racially moving people from one place to

2    another to avoid a racial gerrymandering, but you can protect

3    incumbents, that that is a legitimate end means, and you can

4    consider that in the way that they go about that to determine

5    whether or not the primary motivation is that they are moving

6    minorities as opposed to Democrats.

7           MR. GREENBAUM:  If you are using race as a means to

8    protect an incumbent, I would submit to you, Judge Duffey,

9    that that is a racial gerrymander.

10          JUDGE DUFFEY:  But the question is whether or not

11   that happened here.

12          MR. GREENBAUM:  Oh, it is exactly what happened

13   here.  If you look at -- if you look at some of the -- so

14   first of all, the racial demographics are changing.  There is

15   no doubt about that.  The defendants don't dispute that.  And

16   that is what was causing them to have to redistrict in the

17   first place.  And then you look at some of the choices that

18   were made -- if you look at Gwinnett County, one of the

19   interesting things that they did in Gwinnett County -- I don't

20   know if we have the detail on this -- is the Harbins -- the

21   Harbins precinct that had been fully in 104 previously and now

22   gets split between 104 and 105.  This map might not show it,

23   but we actually have the big maps.  What happens in -- it's

24   over here in the right-hand corner, towards the right-hand

25   corner.  And what happens is, Harbins 104 is a majority white

1    precinct.  They move it in -- they move a portion of it into

2    105.  The split is very interesting.  The portion that got

3    moved into 105 is less than 15 percent black.  The portion

4    that stayed in 104 was more than 30 percent black.  So there

5    you clearly --

6              JUDGE DUFFEY:  If you left that you would have an

7    odd-looking district.

8              MR. GREENBAUM:  Well, because the other thing

9    that -- the other thing that the legislature did was it moved

10   the other Harbins precinct into 105, which is about 90 percent

11   white and about 12 percent black.  So that's right.

12             JUDGE DUFFEY:  So your argument is that they

13   shouldn't have done any of this and we should go back to the

14   2002 map, but it was also in that map that they put together

15   two previously segments of a single, or used to be a single,

16   precinct.  Isn't that right?

17             MR. GREENBAUM:  Well, in 2015 they did put together

18   a precinct in Lawrenceville and they split another one.  But

19   the main motivation was they wanted to get the Harbins

20   precincts into 105; that was Gina Wright's testimony that is

21   what motivated that.  But the split in the Harbins precinct

22   between the 30 plus percent portion staying in 104 and the

23   under 15 percent portion staying in 105 is indicative of a

24   racial intent.  Because as we know, they can't estimate

25   partisan performance at the block level.  They can estimate

1    race, but they can't estimate partisanship.  Then if we move

2    to -- we move to 111 --

3            JUDGE BATTEN:  Well, there is just not that

4    empirical a study.  There is a lot of subjectivity that goes

5    into the calculus.  This isn't just to these maps.  And

6    this -- this data is particularly valuable because it goes

7    down to the race, down to the block level, and the other

8    doesn't.  I understand what you are saying, but there is still

9    a whole lot of subjectivity in making guesstimates as to where

10   people are going to vote.

11           MR. GREENBAUM:  I would agree with that, Your Honor,

12   but the fact that they actually made the decision to split the

13   precinct there is -- and the fact that the population splits

14   in that way, why else do it?  Why else do it?  And going back

15   originally, why did they redistrict in the first place?  They

16   didn't need to do it.  They needed to make these districts

17   safer for the Republican incumbents.  Those were the orders

18   that the legislature gave to Gina Wright.  How do you do it?

19           JUDGE BATTEN:  And there is nothing wrong with those

20   orders.

21           MR. GREENBAUM:  There is nothing wrong unless race

22   is the motivation behind why they did it.  And that race is a

23   key part in terms of actually how they went about doing it.

24           JUDGE DUFFEY:  So you believe the test is that we

25   would have to find evidence, direct or circumstantial, that

1    these changes that somebody sat there and said we get a

2    partisan benefit from this, but we also need to move blacks

3    from this district into the new district or from the new

4    district into the old district?

5              MR. GREENBAUM:  I wouldn't quite phrase it that way.

6    What I would say is, going back to the fact that if you are

7    using race as a means to achieve a partisan end, that that is

8    a racial gerrymander, and that's --

9              JUDGE DUFFEY:  But you would have to consciously say

10   we are going to move minorities, race is going to be

11   predominant, we are going to move minorities from one district

12   to another or from that district back into this other

13   district, but somebody has to have said race is important in

14   order to accomplish our objective.

15             MR. GREENBAUM:  You know, I would disagree with

16   that, given what everybody knows about racial polarization in

17   Georgia.  You said it yourself, Judge Duffey, everybody knows

18   voting is racially polarized in Georgia.  That is not news to

19   anybody.  Even Gina Wright said she was aware of studies

20   showing that voting is racially polarized.  Everybody knows

21   it.  And these legislators were smart enough -- maybe

22   Mr. O'Connor -- Mr. O'Connor is very candid and very

23   forthright in his emails.  It is interesting that the

24   legislators don't say anything to the contrary.  And why is

25   it -- you know, we had an extensive discovery effort.  Why is

1    it that we have no emails between the legislators themselves

2    on this?  They didn't produce any to us.  They knew what --

3    they knew what was going on here.  O'Connor told them -- if

4    you want O'Connor, who the Speaker installed in that office to

5    protect Republican interest told them, told Efstration, told

6    the Speaker's office, told the Speaker Pro Tem, this is what

7    we need to do to make these seats safer for the Republican

8    incumbents.

9            JUDGE BATTEN:  At the risks of being overly

10   pedantic, is this different from *Romer v. Evans* where the

11   Court drew the inevitable inference of animus?  Do you say

12   that that is what -- that we are basically doing the same

13   thing here, is that we have to draw this inevitable inference

14   that race did in fact predominate?

15           MR. GREENBAUM:  Well yes, I think it is inevitable,

16   Your Honor.  But the one thing I would hesitate on, as I said,

17   we don't have to prove animus here.  It is very clear in these

18   cases --

19           JUDGE BATTEN:  I didn't mean by referring to *Evans*

20   that I think you do, I know you don't.  It is just whether it

21   was the predominant factor.

22           MR. GREENBAUM:  Sure.

23           JUDGE BATTEN:  But the point is, the Court drew what

24   it called an inevitable inference, and I think your proof, I

25   think, is not as strong as I am sure you would like it to be.

1    And I am wondering if you are asking us to engage in that type

2    of inference drawing.

3              MR. GREENBAUM:  We are, but I would actually submit

4    to you, and I've done voting rights for 20 years, that this

5    proof is pretty strong.  I mean, rarely are you going to get

6    this level of candor in terms of emails.  I mean, people are

7    usually sophisticated enough in this day and age -- maybe in

8    the mid 1990's, you know, I remember Bill Gates in the

9    Microsoft case said all of this stuff in emails.  People

10   really don't do that to this degree anymore.  One of the

11   things that is very interesting about this too is that why the

12   legislators -- if you look at all of the emails we submitted

13   in this case, I think there is only one legislator who uses

14   his Georgia email in all of the email traffic, and I think

15   that might be Representative Welch.  Why are they using their

16   private emails?  They are conducting state business here.  I

17   mean, there is something -- there is something that really

18   smells badly about this.  I mean, there is no doubt about

19   that.

20             JUDGE BATTEN:  All right.  Thank you, counsel.

21   We're adjourned.

22                  (end of hearing at 3:04 p.m.)

23                          * * * * *

24

25

1          REPORTER'S CERTIFICATION

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6                              _____
                               Lori Burgess
7                              Official Court Reporter
                               United States District Court
8                              Northern District of Georgia

9                              Date:  May 1, 2018

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25