## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## COALITION PLAINTIFFS' REPLY IN SUPPORT OF RULE 59(E) MOTION TO ALTER OR AMEND THE JUDGMENT

The Coalition Plaintiffs file this Reply in Support of their Rule 59(e) Motion to Alter or Amend the Judgment (Doc. 605).

## I.    Introduction and Summary

The State Defendants' Response to Coalition Plaintiffs' Rule 59(e) Motion confirms that the State Defendants are putting the 2020 elections at increased risk by not taking seriously their obligations to "have a backup plan ready to be put in place" for the 2020 elections, as this Court directed in its Order of August 15, 2019 (Doc. 579 at 146).  The State Defendants are not piloting the hand-marked paper ballot system in nearly enough elections, do not have any plans to test the results of the pilot elections or to evaluate the success or failure of the pilot elections, and have no plans at all for the First Quarter 2020 elections.  Further, there is a

substantial likelihood that the use of the Dominion ballot marking devices will be enjoined,[1] making a well-tested backup system imperative.

Even more alarming, very recent news accounts confirm that election registration systems, which would include electronic pollbooks, are a likely target for malicious attacks in 2020.[2] Election security watchdogs such as the Brennan Center have made extensive nationwide outreach campaigns urging contingency planning with updated paper pollbook backups.[3]  Paper copies of voter registration database information (which the Court's Order directs)  are not particularly useful and will *not* protect Georgia in the event the vulnerable electronic pollbooks are unavailable or malfunctioning on Election Day.  This is because the paper voter registration lists the State Defendants plan to "advise" the counties to print are not updated to show who has voted in early voting.  If the Court grants the Motion to Amend, and if the State Defendants ensure that paper copies of *updated pollbooks*

---

[1] On October 4, 2019, the Curling Plaintiffs filed a Motion for Preliminary Injunction prohibiting Defendants "from using any system or devices for voting, including the Dominion ballot-marking device ('BMD')-based system, that does not use hand-marked paper ballots as the primary method of recording the elector's votes."  (Doc. 619 at 1).  The Coalition Plaintiffs anticipate filing a motion seeking similar relief.

[2] https://www.cnn.com/2019/10/03/politics/russia-voter-suppression-warning/index.html

[3] https://www.brennancenter.org/our-work/analysis-opinion/want-simple-way-increase-election-security-use-paper

(not paper copies of dated voter registration databases) are provided to each polling location, then Georgia will be able to conduct an election if the electronic pollbooks are malfunctioning or compromised.

The State Defendants do not acknowledge or address the risks associated with the electronic pollbooks: they are treating these nation-wide security threats with the same nonchalance and overconfidence that they displayed in response to the chorus of warnings about the DREs.  The State has not even certified the epollbook model ("Poll Pads," supplied by a company called "KNOWiNK")[4]  or specified the configuration that the State intends to integrate with the new Dominion system.  Since the new Dominion system will be using data from the current voter registration database, it also is crucial that the State Defendants be ordered to determine the root causes of  the pollbook problems encountered in the recent elections, whether the problems reside in the voter registration database or Diebold's ExpressPollbooks, or both.

The need for updated paper pollbook backups becomes all the more important when one considers the conversion risks associated with the transition from one pollbook system to another and the integration of 7,750 new Poll Pads

---

[4] The electronic pollbooks selected by the State are "Poll Pads," (Doc. 590, Tr. at 35), which are apparently supplied by a company called KNOWiNK. *See* https://knowink.com.

with 33,000 new Dominion ballot marking devices and a new election management system on an extremely challenging schedule.  The high risk of failure can be mitigated with the proposed low tech fail-safe methods.

A backup plan for 2020, even with a well-tested hand-marked paper ballot system, is incomplete without backup and contingency plans for electronic pollbooks, particularly in light of increased external threats, conversion risks, and Georgia's history of electronic pollbook problems.  The amendments sought by Coalition Plaintiffs relating to electronic pollbooks will not burden the State Defendants and are essential for safe and reliable elections in 2020.

## II.    Amendments Relating to the 2020 Backup Plan

### A.    Summary of Relief Sought

In their Motion, the Coalition Plaintiffs outlined the facts showing that the State Defendants will not have a effective backup plan ready to be put in place for the March 24, 2020 Preference Primaries.   (*See generally* Doc. 605-1 at 5 - 8). To decrease the risk of massive voter disenfranchisemenet in 2020, the Coalition Plaintiffs moved the Court to amend the order to increase the number of pilot elections using hand-marked paper ballots in the November 2019 election to ten, and instruct the State to be prepared for the possibility that the Court would order additional hand-marked paper ballot elections in the First Quarter 2020.  Coalition Plaintiffs also proposed that the State Defendants be required to audit all hand-

marked paper ballot pilot election results and to report to the Court on their plan for evaluating the effectiveness of all pilots.[5]

## B.   State Defendants' Response and Coalition Plaintiffs' Reply

### 1.   Number of Pilot Counties

In response to the Coalition Plaintiffs' argument that piloting hand-marked paper ballots in four "small municipal elections" in one county is insufficient, the State Defendants say that the selected jurisdictions have more active registered voters than 139 Georgia counties.  (Id. at 15).  But in 2011, only 10,160 votes were cast in these four municipal elections and, in 2015, only 8,993.[6]  The purpose of this pilot is to develop and test the State's readiness to use hand-marked paper ballots in the state-wide 2020 elections that will see more than 8 million votes cast in 159 counties and 2,655 precincts over the course of the year.  A pilot in only one

---

[5] The Coalition Plaintiffs also moved the Court to order the State Defendants to conduct pilots of any December runoffs.  In response, the State Defendants do not oppose this relief, noting that they now plan to do so anyway.  (Doc. 616 at 5-6).  The State Defendants go further to criticize as "unsupported" the Coalition Plaintiffs' statement in their opening brief that the State Defendants had "no plans" for piloting runoffs.  (Id. at 15). This criticism is not fair or accurate. Prior to filing the Motion, counsel for the Coalition Plaintiffs emailed counsel for the State Defendants and asked specifically whether the State planned to conduct the pilots of any runoffs. Counsel for the State Defendants did not respond to the email.  Prior to the filing of their Response, the State Defendants had disclosed no plans relating to the runoffs.

[6] See Cobb County Elections website,  https://www.cobbelections.org/ElectionHistory.php.

county in an election that will not attract more than 10,000 voters in a handful of polling places with short, simple ballots will not be sufficient to troubleshoot the system or provide an adequate pool of trained election officials.

The State Defendants' next argument is that there is not enough time to expand the pilots because the pilot program was "designed during the summer and it is not possible to increase the number of participating counties on this short a timeline" and that the Coalition Plaintiffs "waited until September 12 to request this change." (Doc. 616 at 15). This is factually incorrect. The hand-marked paper ballot pilot was not "designed during the summer"; it was ordered by the Court on August 15, 2019, and the limited selection of the four Cobb County municipalities was not announced by the State Defendants until the August 27, 2019 telephone Status Conference. (Doc. 590, Tr. at 49). During the telephone conference, the Court suggested that the parties "meet and confer" about any need to clarify the Order. (*Id.,* Tr. at 44-45). The Coalition Plaintiffs initiated the process on September 2, the parties conferred on September 5, and the Coalition Plaintiffs promptly filed their Motion on September 12, 2019. (Doc. 605).

As to the State Defendants' contention that they are unable to expand the hand-marked paper ballot pilot, the Response presents conflicting narratives. On the one hand, the State Defendants expect all parties to take on faith the State Defendants' promise that they can easily complete the largest, most complex, and

high risk voting system conversion in the history of the nation without a hitch, and they take umbrage at any suggestion that the State Defendants might be unable to meet this challenge or might claim inability for tactical advantage.  (Doc. 616 at 1-2).  On the other hand, when the question is whether the State Defendants should work harder and faster to develop a thoroughly tested and robust backup plan by adding ten more elections to the pilot, the State Defendants protest (without any analysis or explanation) that doing so is simply too hard.

That response is insufficient, and the State Defendants' Response betrays more generally an attitude resistant to the Court's Order.  The theme of the Response is that the BMD installation is going so smoothly and the state election officials are so competent that no backup plan is necessary. Yet the Court has already found that a backup plan is required.  The Court held: "the State must have a backup plan ready to be put in place because the risk inherent in the aggressive implementation schedule and the State's own demonstrated functionality issues may compromise the schedule."  (Doc. 579 at 146).   By selecting elections in only one county that are not likely to attract more than 10,000 voters, the State Defendants are not conscientiously developing a "backup plan ready to be put in place." The State Defendants should be given explicit direction to add ten more counties with elections to the pilot in accordance with Coalition Plaintiffs' Proposed Order.  This is the minimum effort reasonably necessary to prepare a

genuine backup plan.  It is absurd for the State Defendants to suggest that this modest expansion of the pilots is either too difficult or not reasonably necessary. The pilots need not use the new Dominion system, but can use the currently installed Accuvote paper ballot scanners and GEMS election management system.

In addition, since the filing of the Defendant's brief, news stories have emerged of operational problems with the Dominion system using the same hardware and software, although in a different configuration than Georgia plans.[7] Given the enormity of the technical and administrative challenge, never attempted by any other state, the need for rapidly scalable contingency plans is obvious for even the most well-staffed and capable election departments.

### 2.    First Quarter 2020 Elections

The parties disagree about how many special elections are likely to be held in the First Quarter of 2020.  There is no dispute that elections occur in the First Quarter every year, but the exact number will not be known until December and January, as most are the result of unplanned vacancies.

The question presented by the Motion is what election systems the State Defendants should use for any First Quarter 2020 elections that do occur.  As to

---

[7]  https://www.wafb.com/2019/10/01/early-voting-errors-prompt-paper-ballots/

this question, the State Defendants still have no plan.  This alone is a red flag signaling the State Defendants' failure or inability to appreciate the challenges of implementing a new system with the 2020 Presidential elections fast approaching.

The State Defendants acknowledge that they are not permitted to use the DRE/GEMS system for any elections after 2019.[8]  They then state, in a cryptic non-sequitur: "No further fallback plan is required, especially when the rollout remains on track to conduct the March 2020 Presidential Preference Primary with the new system."  (Doc. 616 at 16).  But the issue here is not what system will be used for the March 24, 2020 Presidential Preference Primary.  The issue is what systems will be used in the elections that precede the March 2020 Presidential Primary.  While the State Defendants imply that they may have enough "scanners" to handle first quarter elections, they do not address the more complex equipment and integration issues of new servers, installed and debugged election management system software, ballot marking devices, electronic pollbooks, trained

---

[8] As to whether the State Defendants intend to use the DRE/GEMS system after 2019, the State Defendants are less than explicit: "the State will ensure that any special elections prior to the March 2020 Presidential Preference Primary will be consistent with the Court's directives regarding the DRE/GEMS system."  (Doc. 616 at 16).  If State Defendants had no plans at all to use the DRE/GEMS system under any circumstances after 2019 (for example, regardless of any appeal or attempted stay), then the State Defendants presumably would have just said so.

management, etc.  The State Defendants have *no plans* for the gap between the retirement of the DRE/GEMS system at the end of 2019 and the projected installation and debugging of the new Dominion system, which we are told is "on track" for March 24, 2020, and not before.

The State obviously needs to anticipate having First Quarter 2020 elections since they happen every year.  The timing, location, number and scope of these elections are unpredictable.  For example, one state legislative district special election can span mulitiple counties. In 2011, a February House District 136 election involved six countes. A January 8, 2013 Senate District 11 election involved six counties. In 2015, a January 6, 2019 House District 120 election involved four counties.[9] If similar special elections were suddenly required in First Quarter 2020, the State would not be prepared to deploy anything other than the banned DRE system, it appears. Given the need to develop a robust back-up plan for auditable elections, and the absence of any effective alternative, the State should be ordered to pilot hand-marked paper ballots in every special First Quarter 2020 election.

---

[9] Information obtained from https://sos.ga.gov/index.php/Elections/current_and_past_elections_results.

The next question is whether hand-market paper ballots should be piloted with the Dominion election management system and the new Dominion scanners, or instead piloted with the existing certified AccuVote scanners and the GEMS (not DRE) election management system and, as the Coalition Plaintiffs have requested. The Curling Plaintiffs object to using any part of the GEMS system with hand-marked paper ballots. This objection is not well-taken. So long as the results are audited, hand marked paper ballots tabulated by Accu-Vote optical scanners are reliable. (Indeed, using hand marked paper ballots with the Diebold Accuvote scanners was the system that the Curling Plaintiffs and the Coalition Plaintiffs sought in the 2018 Prelimininary Injunction Motions (Doc. 258 and Doc. 260)). In addition, Curling's position is based on the assumption (which the Coalition Plaintiffs believe is excessively optimistic) that the Dominion election management system is inherently superior and will be ready to deploy without operational issues using hand-marked paper ballots in the First Quarter 2020 elections.

Moreover, there are significant near term advantages of a pilot using hand-marked paper ballots plus GEMS. Conversion risks extend not only to the BMD devices, but also to the Dominion election management system and electronic pollbooks, all of which must be fully integrated. The State will continue to use the GEMS system through 2019 for the non-pilot elections, and has the experience and

training to use GEMS and the AccuVote scanners, with hand-marked paper ballots, in the First Quarter 2020 elections.  The Coaliton Plaintiffs' proposal to test hand-marked paper ballots in the First Quarter 2020 elections would give the State a constitutional and auditable backup system that can be rapidly deployed in the event the State is unable to implement the Dominion voting system  on time or is unable for any reason to use the new system with hand-market paper ballots. Without doubt,  hand-market paper ballots with post-election audits should be used for the First Quarter 2020 elections.

### 3.  Audits

With respect to audits, the State Defendants contend that it would be "reckless" to audit the results of the hand-marked paper ballot pilot elections before the State Defendants have an "opportunity to run a pilot of any kind of audit first."  (Doc. 616 at 17).  The State Defendants do not explain this objection, and seem to have it backwards: *not* auditing election results is "reckless." Whether it is called an audit, or a "pilot" audit, there is every reason to audit the results of the piloted hand-marked paper ballot elections, particularly since the State needs to be ready to deploy the hand-marked paper ballot system state wide as its backup for the 2020 Presidential Preference Primaries and Presidential Election.  Without an audit, problems with the backup plan and potential implementation issues will not be exposed or addressed.  Moreover, it is not "reckless" to audit a pilot election:

the State Defendants in their Response disclose plans for a pilot audit of the November 2019 City of Cartersville elections, which will be conducted using the new Dominion system. The Coalition Plaintiffs' requested relief relating to the audits should be granted.

4.    **Reporting**

Unless specifically ordered by the Court to do so, the State Defendants will not likely evaluate, analyze or report on the success or failure of the pilots or the progress of the new voting system implementation, including the complex integration of new electronic pollbook components.  In their Response, the State Defendants do not articulate any objection to being required to do so.  Thus, the Court should amend the Order to add the following reporting requirements:

a.    A plan for conducting audits of hand-marked paper ballot pilot elections to be submitted no later than October 15, 2019 (Doc. 605 at 4);

b.    Results of the audits of the hand marked paper ballot piloted elections no later than 17 days after election day.  (Doc. 605 at 2).

c.    Information concerning the First Quarter 2020 elections, as soon as such elections are called and State Defendants are notified.  (Doc. 605 at 3).

d.    Plan for evaluating the effectiveness of all pilots and, by no later than November 26, 2019, submission of a status report summarizing the

performance of the systems in the pilots.  (Doc. 605 at 4).   Though the proposed deadline for submitting the plan has passed, the State Defendants should have developed such a plan on their own and should be ordered to disclose that plan to the Court promptly.  In any event, the State Defendants should be ordered to provide an evaluation of the piloted elections – both the pilots  using the BMDs and the pilots using hand-marked paper ballots.

   e. The Secretary's immediate response to the certification issues raised in the request for reexamination  filed with the Secretary of August 19, 2019 and an updated anticpated timeline for the Dominion system rollout.

## III. AMENDMENTS RELATING TO EPOLLBOOKS

The Coaliton Plaintiffs' amendments relating to epollbooks, and the State Defendants' Responses, are addressed below:

### A. Scope and Timing of Analysis

Coalition Plaintiffs moved the Court to expand the scope of the State's required analysis and troubleshooting of the "voter registration database" to include "ExpressPollbooks" and to make explicit that the analysis needed to address data errors and defective software.  (Doc. 605-1 at 13). Without knowing the root cause of the long-term chronic epollbook problems, the risk is too high that Diebold ExpressPollbook problems will recur in the new system.  Such defects

could stem from flawed software, voter registration data errors, errors in transmission from the voter registration database to the pollbooks, data mishandling, or malware in various applications.[10]

In their Response, the State Defendants say that they will not use Diebold Express pollbooks after 2019 and that it would be a waste of resources to analyze them for the source of the deficiencies already shown by the evidence to cause voter disenfranchisement.  The State Defendants are utterly unconcerned about the cause or potential repetition of the errors —whether those defects are from the voter registration database, which will be used going forward, or the ExpressPoll data, data handling, or its software.

Initially, the State Defendants say nothing about the remedial action that the Court has ordered relating to the voter registration database, where much prior elections voter disenfranchisement likely originated.  More alarming, it is currently

_____

[10] In addition, it was not clear from the Coalition Plaintiffs' reading of the Order whether the State Defendants' action plan for analysis was due to be submitted to the Court by January 3, 2020, or whether the actual work of repairing the electronic pollbooks had to be completed by January 3, 2020.  Coalition Plaintiffs accordingly proposed that an October 1, 2019 deadline for the submission of the plan be added to the Order. Otherwise an unsatisfactory plan may well be submitted on January 3, 2020, with no time to remedy the epollbooks and voter registration database before First Quarter elections.

unclear whether there is an implementable replacement electronic pollbook
component as part of the new Dominion voting system.  As stated in the Request
for Reexamination, Coalition Plaintiffs noted that no new electronic pollbook was
certified by Secretary Raffensperger in the Domininon voting system. (Doc. 586 at
15-16).  Further, significant difficulty with the integration of the "Poll Pad"
electronic pollbook components apparently selected by the State has been reported
in at least one other jurisdiction.[11]  It is essential to have certified electronic
pollbooks that properly function with BMDs because the electronic pollbooks
integrate with the BMD voting unit to issue accurate ballot styles to the voters.
That integration is why Georgia has traditionally certified electronic pollbooks as
an integrated component of the voting system.[12] It is not known why Defendant
Raffensperger has failed to certifiy an integrated electronic pollbook component
for the new voting system.  This reinforces the urgent need to discover  the sources
of the current Diebold pollbook problems to avoid the recurrence of problems with
whatever pollbook will be used beginning in January.

---

[11] https://www.inquirer.com/politics/philadelphia/philly-epollbook-electronic-systems-should-not-be-used-city-says-20190917.html

[12] Attached as Exhibit A is the May 8, 2008 certification of Georgia' voting system, including the electronic pollbooks.  *See also* September 12, 2018 Hearing Transcript at 185.

### B.     Paper Copies of Epollbooks

The Court's Order requires that a paper backup copy of the voter registration database be delivered to each precinct, with the intent of providing a usuable official and accurate record in the event of epollbook malfunctions.  The Coalition Plaintiffs, seeking to assure that the paper backup would be current (*after updating for early voting*) and manageable, moved to amend the Order to provide that "one paper printout of the pollbook for that polling place" be provided, rather than the printout of the "voter registration list for that precinct, as the Court Order requires. (Doc. 605-1 at 14). The proposal that a more manageable paper document (the pollbook) in each polling location be substituted for the full voter registration database in every precinct, was simply to reduce the number and size of the printouts to facilitate full compliance. But whichever paper document is used, it is essential to have it updated and printed after early voting, and that it be used as official documents for polling place adjudication.

In response to the Coalition Plaintiffs' narrow (but extremely important) recommended amendment to the Order, the State Defendants argue that Defendant State Election Board's regulations "requires pollworkers to use the ExpressPoll instead of printed lists," requiring the use of Diebold branded pollbooks. This is an alarming response.  The State Defendants have been ordered by this Court to provide a paper backup for a reason, and that is to prevent the type of massive

disenfranchisement and confusion described in the Court's Order. The State Defendants obviously cannot avoid complying with this Court's Order by referencing regulations enacted by Defendants' State Board, particularly regulations governing outdated equipment that the State has no intention of using any longer. The State Defendants further argue that they merely "advise" the counties to print paper voter lists, but such lists are of little value if they are not mandated and updated after early voting.

The State Defendants' primary defense to every argument relating to defective electronic pollbooks is the availability of provisional ballots to cure election-day epollbook problems. This is exactly the attitude that continues to cause the State of Georgia to disenfranchise Georgia voters. As the Court observed in the most recent telephone conference: "there was a lot of evidence as to people not being able to cast provisional ballots or being discouraged from doing it and giving up." (Doc. 590, Tr. at 43).

Without question, there is an urgent need for printed copies of updated pollbooks in light of the increased threats of cyber attacks, the conversion risks, and the State's failure or inability to certify a new electronic pollbook system. For these reasons, the Coalition Plaintiffs' Motion relating to epollbooks should be granted.

## Conclusion

The State Defendants are overconfident and underinformed about the ease of transitioning to new voting and electronic pollbook systems.  Their track record does not justify reliance on their judgment or assurances.  The State Defendants must prove readiness for 2020 and doing so will require considerably more effort.

The Coalition Plaintiffs will continue to exercise their right and responsibility of monitoring the State Defendants' compliance with this Court's Order, including engaging in post-judgment discovery.[13]  In the meantime, the Rule 59(e) Motion to Amend should be granted.

Respectfully submitted this 8th day of October, 2019.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (Doc. No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

---

[13] *See United States v. Conces,* 507 F.3d 1028, 1039 (6th Cir. 2007) (affirming district court's decisions relating to post-judgment discovery for the purpose of monitoring defendant's compliance with the court's judgment and award of injunctive relief).

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
  *Ricardo Davis & Megan Missett*

*/s/ John Powers*
Ezra D. Rosenberg
John Powers
David Brody
Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300
*Counsel for Coalition Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

_/s/ Bruce P. Brown_
Bruce P. Brown

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2019, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

<u>*/s/ Bruce P. Brown*</u>
Bruce P. Brown

EXHIBIT A



## OFFICE OF SECRETARY OF STATE

*I, Karen C. Handel, Secretary of State of the State of Georgia, do hereby certify that*

The AccuVote TS R6 and the AccuVote TSX Voting System, consisting of GEMS version 1.18.22G, AVTS firmware version 4.5.2, AVOS firmware version 1.94w, Encoder software version 1.32, Key Card Tool 1.01, ExpressPoll 4000 and ExpressPoll 5000 firmware version 2.1.2 with card writer 1.1.4.0, manufactured by Premier Election Solutions, Inc. formerly known as Diebold Election Systems, Inc., 1253 Allen Station Parkway, Allen, Texas 75002, has been thoroughly examined and tested and found to be in compliance with the applicable provisions of the Georgia Election Code, the Rules of the Secretary of State, and as a result of this inspection, it is my opinion that this kind of Direct Record Electronic voting system and its components can be safely used by the electors of this state in all primaries and elections as provided in Chapter 2 of Title 21 of the Official Code of Georgia; provided however, I hereby reserve my opinion to reexamine this Direct Record Electronic voting system and its components at anytime so as to ensure that it continues to be one that can be safely used by the voters of this state.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of my office, at the Capitol, in the City of Atlanta, this 8th day of May, in the year of our Lord Two Thousand and Eight and of the Independence of the United States of America the Two Hundred and Thirty-Second.

Karen C. Handel, **Secretary of State**