## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br><br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## MOTION OF COALITION PLAINTIFFS TO FILE NOTICE OF FILING EVIDENCE AND REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF ON PAPER POLLBOOK BACKUPS

Coalition Plaintiffs move the Court for leave to file the Notice of Filing Evidence and Request for Immediate Injunctive Relief on Paper Pollbook Backups ("the Notice") (attached as Exhibit A). The Notice filed in connection with the Coalition Plaintiffs' August 2, 2020 filing of additional evidence (Doc. 755). The Notice explains the evidence showing that the continued failure of the Defendants to have a workable paper backup to the electronic pollbooks contributed significantly to massive failures of the June 9, 2020 statewide Primary. The Motion is filed at this time given the pendency of two almost immediate elections for which relief is needed to avoid continuing disefranchisement. In the filing, the Coalition Plaintiffs also request that this Court grant the portion of its Motion for Preliminary Injunction (Doc. 640) relating to paper pollbook backups.

This Motion should be granted because the Notice is appropriate and should assist the Court in resolving these issues.

Respectfully submitted this 2nd  day of August, 2020.

*/s/ Bruce P. Brown*              */s/ Robert A. McGuire, III*
Bruce P. Brown                   Robert A. McGuire, III
Georgia Bar No. 064460           Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC            (ECF No. 125)
1123 Zonolite Rd. NE             ROBERT MCGUIRE LAW FIRM
Suite 6                          113 Cherry St. #86685
Atlanta, Georgia 30306           Seattle, Washington 98104-2205
(404) 881-0700                   (253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600


*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

*/s/ Ezra D. Rosenberg*
Ezra D. Rosenberg
John Powers
David Brody
Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300

*Counsel for Coalition Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown

4

EXHIBIT

A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**

**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## COALITION PLAINTIFFS' NOTICE OF FILING EVIDENCE AND REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF ON PAPER POLLBOOK BACKUPS

Coalition Plaintiffs file this Notice to submit additional evidence showing that the continued failure of the Defendants to have a workable paper backup to the electronic pollbooks contributed significantly to massive failures of the June 9, 2020 statewide Primary.  In its July 30, 2020 Order, the Court stated:

> It is unclear what actions, if any, the State has undertaken to address these deficiencies in the electronic pollbooks and MVP voter registration interface or new versions of such in advance of June 2020 elections or the elections to be held in August and November 2020. While the Court at this juncture has only preliminary evidence in the record before it that addresses these claims in their current form, the Court notes that alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle.

(Doc. 751 at 23).  Though complex issues relating to the security and reliability of the voter registration and electronic pollbook operations will remain, a simple step that can be taken now to reduce the impact of another system failure is to provide

each precinct with an *updated* paper pollbook that can be used when the electronics malfunction.  This simple solution will keep people voting when the electronic pollbooks malfunction, whether because of technical problems, poor pollworker training, equipment shortages, or malicious attack.  This relief is necessary so that Georgia does not repeat in the immediately upcoming elections (August 11 and September 29)  the complete meltdown experienced in the June 9 primary.

As discussed below, this is the relief that Coalition Plaintiffs sought in their September 12, 2019 Rule 59(e) Motion (Doc. 405) and again in their October 23, 2019 Motion for Preliminary Injunction.  (Doc. 640-2 at 4-5).  The issue has been fully briefed by the parties.  (Doc. 640-1 at 32-33; Doc. 658 at 54; Doc. 680 at 29-32).  There are no *Purcell*-type issues relating to this relief: it is easily implemented and will have an immediate positive effect on Election Day voting in Georgia, including the August 11, 2020 election, the September 29, 2020 special election for John Lewis's seat, the November 3, 2020 election, and related run-off elections.

In this filing, Coalition Plaintiffs will in Part A summarize the procedural history of Coalition Plaintiffs' claims relating to paper pollbook backups and the mountains of evidence already on file demonstrating the longstanding serious deficiencies in Georgia's registration and pollbook systems.  Coalition Plaintiffs will also summarize the extensive and recent efforts that the Coalition and its

counsel have undertaken to resolve this issue without court intervention.  In Part B, Coalition Plaintiffs will review the new evidence (pre-filed at Doc. 755) showing that the extensive voting delays and chaos in the June 9, 2020 elections were, to a great degree, a direct result of the ongoing failure of the State Defendants to provide the precincts with useful paper pollbook backups.  In Part C, Coalition Plaintiffs will explain the relief sought.

### A.    Procedural and Factual Background

In their June 21, 2019 Motion for Preliminary Injunction, the Coalition Plaintiffs moved for injunctive relief requiring the Secretary to direct the use of "an updated paper back-up of the pollbook in the polling places for adjudicating voter eligibility and precinct assignment problems."  (Doc. 419 at 4).[1]  In its August 15, 2019 Order granting in part Plaintiffs' Motion, this Court found substantial evidence of voters being disenfranchised because of electronic pollbook problems.[2]  Based on these findings, the Court granted injunctive relief,  referencing the recommendation of the National Academies of Sciences,  that "all jurisdictions

---

[1] This requested relief was renewed in the Coalition Plaintiffs' October 23, 2019 Motion.  (Doc. 640-2 at 4-5).

[2] "Forty-six individual voters described issues with the electronic pollbook, including voters not being listed as registered, wrong addresses listed for the voters, incorrect polling places, and listing voters have already voted."  (Doc. 579 at 98).  The Court also summarized the evidence submitted by Coalition Plaintiffs relating to problems in the preceding November 6, 2018 general election.  (Doc. 579 at 106 - 111, citing Doc. 258-1 at 62 et seq.)

using electronic pollbooks 'should have backup plans in place to provide access

to *current* voter registration lists in the event of any disruption.'" (Doc. 579 at 148

n. 101) (emphasis added).  The Court ordered:  "The State Defendants should

require all County Election Offices to furnish each precinct location with at least

one printout of the voter registration list for that precinct."  (Doc. 579 at 150).  The

Court concluded:

> Finally, the Court views the significant voter registration database and
> related ExpressPoll deficiencies and vulnerabilities demonstrated in
> this case as a major concern both relative to burdening or depriving
> voters' ability to actually cast ballots.  The Court therefore requires
> the State Defendants to develop procedures and take other actions to
> address the significant deficiencies in the voter registration database
> and the implementation of the ExpressPoll system.

(Doc. 579 at 152-153).

On September 12, 2019, the Coalition Plaintiffs filed a Rule 59(e) motion

requesting, among other relief, that the Court modify its directive to require the use

of an *updated* paper pollbook backup at each precinct, rather than the voter

registration list (Doc. 605 at 5).  The paper print out of the voter registration list, as

currently provided in the polling places, is not updated to reflect all early or

absentee mail ballot voting and therefore cannot be used as a backup to

malfunctioning electronic pollbooks to issue regular or emergency ballots.  As the

Coalition Plaintiffs explained, the clarification was necessary to assure "that the

paper backup would be current (*after updating for early voting*)."  (Doc. 621 at 17)
(emphasis in original).  In its October 23, 2019, Order Granting in Part and
Denying In Part the Rule 59(e) Motion, the Court stated:

> The Court recognizes the Coalition Plaintiffs' motion was timely
> filed, however, a number of pragmatic considerations make the Court
> hesitant to modify this provision of the Order now that early voting
> has begun for the November 2019 election cycle.  The Court
> potentially willing to consider this request for subsequent election
> cycles but only after hearing more concretely from the State regarding
> pragmatic implementation issues at a short conference or hearing.
> Therefore, the Coalition Plaintiffs' request that the Court modify
> directive 2 on page 150 of the preliminary injunction Order to require
> the use of a paper pollbook backup is DENIED at this time.

(Doc. 637 at 2-3).

Those "pragmatic implementation issues" have yet to be articulated by the
Defendants despite Coalition's ongoing efforts to resolve this issue.  The Court
further reiterated its "expectation that the parties would use good judgment and
their knowledge of the Court's Order of August 15th as a whole in proceeding."
(Doc. 637 at 2).  Yet, after the continuing repetition of the same e-pollbook
problems over the course of nine months, the Court's clear intent in ordering relief
to avoid a repetition of pollbook malfunction that create disenfranchisement has yet to
be implemented, nor the failure to do so explained.

In their October 23, 2019 Motion for Preliminary Injunction that seeks
injunctive relief relating to the BMDs and other components of the State's new
Dominion Election System, the Coalition Plaintiffs moved again for an order

directing the Secretary to require paper pollbook backups.  (Doc. 640 at 32).

Coalition Plaintiffs explained: "There is no reason to believe that the systemic

problems with epollbooks will disappear with the transition to a new electronic

pollbook component system.  If anything, the rapid transition to a new epollbook

system and the integration challenges will make these problems more severe."

(Doc. 640 at 34).  In response, the State Defendants argued that it already provides

a paper copy of the registered voters.  (Doc. 658 at 54).  As Coalition Plaintiffs

explained in their Reply, "what is needed is not the 'paper copy of the registered

voters for each precinct,' as the State recites, but the *updated* copy of the

pollbook."  (Doc. 680 at 30).[3]

Meanwhile, the quality and reliability of the new "KnowInk" PollPads were

piloted in several counties' municipal and county elections in November 2019, the

December runoffs, and the first quarter 2020 special elections in State House

District 171 and Senate District 13.  Multiple PollPad problems were observed by

Coalition's members in numerous different polling locations in each of the

elections.  Observer Elizabeth Throop spent 34 hours observing early, Election

Day and run-off voting in 11 polling places in Paulding, Carroll, and Lowndes

---

[3] The briefing on the paper pollbook backup also contains discussion of State Election Board regulations.  (*See* Doc. 658 at 54; Doc. 680 at 30).  As discussed below, new regulations were promulgated in February 2020.  The new regulations, though incomplete and not being followed by the Defendants, are not inconsistent with the relief that is sought by Coalition Plaintiffs.  *See infra* Part C.

counites in the November pilot.  (Doc. 680-1 at 83-91).  Ms. Throop made the

following prescient observations:

> Based on my observations on the polling places it is my strong
> opinion that the risks of pollbook failure, malfunction, "bugs," and
> insufficient poll worker training mandate the need for a back-up
> default paper pollbook that can be used as the official reference if the
> Poll Pad information is not available. . . . This over-reliance on
> electronic records seems to create an unacceptable risk for 2020 high
> turnout elections.

(Doc. 680-1 at 83-89).

The issue of the paper pollbook backup arose again in the December 6, 2019

status conference.  Coalition Plaintiffs' counsel referenced the PollPad problems

encountered in the November pilots, noting that requiring a paper pollbook backup

would be an effective safeguard that would not be burdensome to Defendants.

(Doc. 679 at 69-70).  The Court then asked counsel for Defendants: "why wouldn't

the state just do that?"  (Doc. 679 at 71).  In response, counsel for the State

Defendants stated: "the state already provides a paper pollbook backup in each

precinct," but then clarified that it was the voter registration list that the state

provided, something that counsel may have believed (incorrectly) was the same

thing as the paper pollbook backup.  (*Id.* at 72).  At this point, the Court stated: "I

encourage you-all to talk about it. . . . Because there is a lot of frustration

obviously in the check-in process.  And it could only benefit the State in my

mind."  (*Id.* at 74).

After the December 6, 2019 Status Conference, the Coalition Plaintiffs made a number of efforts, including efforts as recently as the last 10 days, to resolve this issue outside the litigation on various fronts, all unsuccessful.  On December 20, 2019, CGG's counsel emailed counsel for the Defendants urging Defendants to require paper pollbooks at each polling place, updated to reflect early and absentee voting.  (*See* Doc. 699-1 at 6).  Counsel noted: "The Secretary has never articulated any reason to *not* provide a paper copy of the pollbooks, updated to reflect early and absentee voting."  (*Id.*).  On December 26 and 30, 2019, counsel reiterated these demands, requesting a response.  (Doc. 755 at 160-161).  No substantive response was forthcoming.

With the pandemic, paper pollbook backups became even more imperative because the few pollworkers who were available did not have time or opportunity to be trained on the new electronic pollbooks, it was clear there was going to be a shortage of trained technicians to assist in the event of problems, and some polling places were being changed at the last minute.  On March 23, 2020, Coalition submitted detailed recommendations to Secretary Raffensperger for the 2020 elections in light of the pandemic, including the recommendation that the State Election Board require election superintendents to be provided with paper pollbook backups "given the potential for disruptions of online services and the foreseeable difficulties of locating technical help."  (Doc. 755 at 30).  Anticipating the massive

polling place chaos and disenfranchisement that would result from the likely failure of the PollPad system, between March and June, and then after the June meltdown, the Coalition made repeated written and in-person pleas to the State Election Board, with no success.  (Doc. 755 at 6-8).

Most recently, Coalition Plaintiffs' counsel on July 20, 2020, sent a detailed email to counsel for the Fulton Defendants and the State Defendants.  In the email, counsel repeated the need for paper pollbook backups and invited counsel to "meet and confer" on the issue.  (Doc. 755 at 166-167). The State Defendants' lawyers responded and engaged in a lengthy telephone conference, which led to additional email communications, but the issue was not resolved.  *(Id.* at 158).  Even though Fulton County was the epicenter of the Election Day meltdown on June 9, counsel for the Fulton County Board did not respond to the July 20, 2020 email requesting a conference.  Coalition Plaintiffs' counsel sent the Fulton County Defendants' counsel another email on July 28, 2020, but again received no response. (Doc. 755 at 158, 169).

### B.   Electronic Pollpad Problems Cause Extreme Delays in June 9, 2020 Election

As the Court noted in its July 30, 2020 Order, "alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle."  (Doc. 571 at 23).  The fact that primary cause of the "meltdown" was the failure to have operable paper pollbook backups cannot be overstated. This

long-predicted and completely unnecessary collapse of the electoral process could have been in large part avoided if the Defendants had been willing to simply print and use inexpensive paper pollbook backups to issue ballots to eligible voters. The Defendants' recklessness in refusing to print current paper pollbooks is indefensible.

Coalition Plaintiffs have filed declarations of eye-witness accounts of the significant problems relating to the electronic pollbooks (PollPads) leading directly to extremely long delays in the voting process and, inevitably, substantial voter disenfranchisement.  (Doc. 755).  All of these problems could have been avoided had the Secretary provided to each precinct an updated paper pollbook backup. Such updated lists could have been used in place of the malfunctioning electronic pollbooks to check in voters, adjudicate eligibility, and allow voters to cast emergency ballots to clear the lines efficiently.

For example, in a report to the Cobb County Board of Registration and Elections on June 19, 2020, Cobb County Election Director Janine Eveler gave a damning report of the June 9 polling place problems, including numerous problems with the electronic pollbooks (PollPads).  (Doc. 755 at 36-40).  Director Eveler told Board Members of the extensive difficulties her department had through the weekend prior to Election Day attempting to upload the information into the PollPads.  (*Id.* at 38 line 31).  She reported the complexity of setting up polling

places the morning of Election Day because of the difficulties in securing the

equipment, with the goal of getting "at least one voting unit working by 7am." (*Id.*

at 39 line 12).  Many polls were still being set up after the polls opened, causing

longer lines to form. (*Id.,* line 14-15).  "On election day, many polls reported that

their poll pads were not syncing, or that they could not encode cards."  (*Id.,* line

25-26).  "We were given no instructions on how to resolve these syncing issues."

(*Id.,* line 26-27).

Malfunctioning electronic pollbooks were the bottlenecks creating the long

lines throughout the metro-Atlanta area.  For example,

At Central Park Recreation polling place in Fulton County:

- ▪ Voters arriving at 10 a.m. had more than a four hour wait to vote.

  (Doc. 577 at 11-12).  "[V]oting was almost to a complete standstill"

  because the electronic pollbooks "were not working and this was

  causing the delay as pollworkers were issuing provisional ballots,

  which took the workers and voters a long time to complete."  (*Id.* at

  12).

- ▪ "During much of my time inside the polling place, the Pollpad check

  in station was not even occupied by workers, presumably because

  workers had abandoned their attempts to make the Pollpads work, and

  were issuing provisional ballots instead."  (*Id.*).

- That the malfunctioning pollbooks were causing the delays was evidenced by the fact that there were "unoccupied touch screens even though the line was hours long." (*Id.*).

- The precinct's registered voters list supplied by the Secretary was completely useless other than as a reference for issuing provisional ballots. "I observed no pollworkers actually using the precinct's registered voters list in place in place of electronic pollbooks to issue emergency ballots or electronic touchscreen ballots at Central Park Recreation (or, in fact, in any of the other voting locations that I visited)." (*Id.* at 12-13).

- Had the polling place been supplied with an updated paper pollbook backup, the lines would have been reduced substantially, "as emergency ballots would have been quickly issued and voted and scanned by the voters, or alternatively or concurrently, touchscreen access codes could by keyed into the BMDs for activation by the pollworkers to permit voting on the touchscreen machines." (*Id.* at 13).

At Park Tavern polling place in Fulton County:

- The eyewitness verifies accuracy of PBS video showing extremely long lines snaking into Piedmont Park; "my estimate of the voter wait time at 11:30 a.m. was over 3 hours." (*Id.* at 14);

- Delays were caused by a combination of too few BMDs and malfunctioning electronic pollbooks.  Both problems, however, could have been mitigated if the polling location had been equipped with paper pollbook backups (to check in voters and issue emergency ballots). An adequate supply of emergency ballots is already required to be supplied to each precinct.  This simple solution would have "kept the lines moving throughout the day."  (*Id.* at 14).

At Miller Grove Middle School polling place in DeKalb County:

-  Voter wait time exceeded two and one-half hours.  (*Id.* at 15). Long, slow-moving line of voters "snaked around the corridor of the school . . . and into the gymnasium." (*Id.* at 14).

- The "line was moving slowly because voter check in was taking so long."  (*Id.* at 15).

- Another witness observed: "when I left at 1:30 pm, voters were again waiting 1 ½ hours to vote.  Despite the long lines, I never saw more than half of the 12 BMD touchscreen voting machines at the polling place in use at any one time."  (*Id.* at 101).

At Antioch A.M.E. Church polling place in DeKalb County

- The PollPads were not working when the polls opened at 7 a.m.  By 7:45 a.m., the technical problems had been "called in."  Technicians arrived at 8:33 a.m., but left without being able to get the PollPads to work.  Technicians returned at 9:41 with two replacement PollPads.  The first voter checked in at Antioch at 9:51, almost three hours after the polls opened.  (*Id.* at 74-75).

- There was no voting at all at Antioch for the first hour as pollworkers attempted unsuccessfully to operate the PollPads.  For the next hour and a half to two hours, there was only provisional voting because there was no useful paper backup of the electronic PollPads.  (*Id.*)

At Dunwoody Library polling place in DeKalb County

- By 8:15 a.m., voting on the BMDs had not started and voters had been waiting for over an hour.  "It appeared that voters were not being checked in and not issued paper emergency ballots.  It appeared that there was no back up pollbook available to permit ballot issuance with the PollPad equipment down."  (*Id.* at 124).

At Gwinnett County Water Department polling place in Gwinnett County

- There was a two hour wait in line to vote. (*Id.* at 125). The BMD machines had not been delivered until 8:30 and were not set up until 9:15. (*Id.* at 126).

- Over three hours after the polls opened, at 10:10, the first voters were checked in on the PollPads and voted on a BMD. (*Id.*).

At JC07 polling place in Fulton County

- The BMDs did not start working until 10:30 a.m. and provisional ballots were used until the machines were operational. (*Id.* at 127).

- "Provisional ballots, which are a very slow method of voting, were used for voting until the machines were operational. Emergency ballots were not issued based on a paper pollbook to speed up the lines." (*Id.*).

At Cross Keys polling place in DeKalb County

- There was an over two hour wait in line to vote, with 200 people crammed into the hallways with no social distancing procedures. (*Id.*).

- BMDs were not operational until 11:00 a.m. (*Id.* at 128).

- But the bottleneck was the electronic pollbooks: the six BMDs were not all in use. "The pollworkers did not attempt to use a paper back

up of the pollbook to check in voters or issue emergency ballots."

(*Id.*).

At Sope Creek Elementary, Cobb County

- The voter arrived at 6:50; did not leave after voting until 9:03.  (*Id.* at 148).

- By 7:35 a.m., no one had voted and people started to leave the lines without voting.  (*Id.* at 145).

- Pollworkers did not know of the availability of provisional or emergency ballots.  (*Id.* at 145-56).

- Inside the voting area, 4 PollPads were set up but only one was in use.  (*Id.* at 146).

- "Water and a chair were requested for a gentleman who was 'collapsing from overheating.' When I returned to the parking lot, I was that emergency responders were tending to him and loading him into the ambulance.  Sadly, he was not able to cast his vote this morning."  (*Id.* at 148).

At Legacy Church, Cobb County:

- The voter arrived at 6:45 a.m. and left after voting at 8:45 a.m.

- When the polls opened, no PollPads were working  At 8 a.m., one PollPad was working.  A voter who was one of the first three in line took an hour to vote.  (*Id.* at 154).

- The voting machines were not operational when voting began. Knowing from a Coalition posting on Facebook that polling locations should have emergency paper ballots to use if the machines were down, the voter asked the poll manager about using paper ballots.  He responded: "That takes twice as long."  Pollworkers then rebooted the whole system, but the machines were still inoperable after the reboot. (*Id.* at 152).  Around 7:30 a.m., "the poll manager announced that they would be 'going to paper ballots even though we got no instructions on that.'"  (*Id.* at 154).

- "This was the worst voting experience I have ever had, as it was a total fiasco."  (*Id.* at 155).

## C.    Effective Relief Can be Granted Immediately

The problem and the solution are well understood and the Motion requires no further briefing.  The Court has previously found that a backup to the electronic PollPads is necessary to protect the right to vote: "If voters' capacity to cast votes are thwarted through an inaccurate express pollbook voting check-in or voter website, this burdens their right to cast votes, scrambles election day voting

procedures, and ultimately, in turn affects voting results."  (Doc. 579 at 89-90).
The Defendants have never articulated a coherent reason for not providing paper
pollbook backups and their failure to do so led directly to the "Complete
Meltdown"[4] on June 9, 2020.  There is no reason to believe that, without these
changes, the same problems will not arise again.

Coalition Plaintiffs note that the State Election Board revised its regulations
on paper pollbook backups in February 2020 to make it clear that such backups
may be used in place of the electronic pollbooks:

> Electronic poll books shall be the primary method for checking in
> voters and creating voter access cards, but the superintendent shall
> cause every polling place to be equipped with a paper backup list that
> of every registered voter assigned to that polling place.  The paper
> backup list shall be used in case the electronic poll books do not
> properly function.  The superintendent shall cause poll workers to be
> adequately trained in checking in voters on both electronic poll books
> and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19 (adopted February 12, 2020).  The passage of
this regulations does not obviate the need for injunction relief, however, for three
reasons.  First, though the regulation says to use the paper backup list "in case the
electronic poll books do not properly function," the regulation does not explicitly
require that the paper pollbooks be updated after early voting. If the pollbook is not

---

[4] https://coalitionforgoodgovernance.sharefile.com/d-s8b9d3ca459e42638

current, pollworkers cannot reasonably issue ballots, other than provisional ballots. Second, based on the eye-witness accounts of the June 9, 2020 election, there is no evidence that this regulation is being followed or that, if it is, it is effective to cure the problems associated with electronic pollbook malfunctions.  Third, and closely related, the regulation does not explicitly require the counties to give voters whose eligibility is established by reference to the paper backup an emergency ballot, and instead could be read to allow pollworkers to continue to undertake the time-consuming and potentially disenfranchising process of giving such voters provisional ballots.  Thus, the injunctive relief requested – which is not inconsistent with the new Board rule – is necessary to prevent the long lines and disenfranchisement caused by the present system.

In addition, compliance with an appropriate order is even easier now for the State Defendants that it would have been with the old Diebold System.  A stated feature of the KnowInk (PollPad) system is its ability to print up-to-the minute pollbooks at the Secretary of State's offices or at central county offices.  (Doc. 755 at 16).  Such files could be created by the Secretary and electronically transferred to the counties over the weekend prior to Election Day, or downloaded by the counties themselves, and then printed and distributed to each precinct.  Such a common sense solution would save voters tens of thousands of hours and keep people voting when the electronic pollbooks malfunction, whether because of

technical problems, poor pollworker training, e-pollbook data errors, or malicious attack.

To make compliance by the Defendants easier and most effective, and to reduce the potential for the scope or purpose of the relief to be misunderstood, Coalition Plaintiffs are proposing that the relief be modified in two respects, and a modified proposed order (limited to the paper pollbook backup issue) is attached as Exhibit 1.  First, since the purpose of the relief is to allow election officials to adjudicate the eligibility of voters on Election Day so that they may cast a vote (and not have to complete a provisional ballot), the amended proposed order makes this intent express by adding the clause "to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot."

Second, through the course of collecting evidence on the new systems, Coalition Plaintiffs have discovered that the training that the State currently offers to pollworkers on the issuance of emergency ballots (including the source of pollbook information) is not only insufficient but affirmatively misleads and confuses pollworkers, and as a result will continue to disenfranchise voters.[5] The State must immediately clarify its instructions to pollworkers for issuing

---

[5] *See* Doc. 755 at 76-79 (with links to training videos, describing mistakes in the training instructions).

emergency ballots before the August 11 election, whether or not the requested relief is granted. Hence, the amended proposed order adds a clause stating: "to take every reasonable measure to ensure that county election officials and pollworkers are trained as to how to generate and use paper pollbook backups and emergency ballots in conformity with this Order."

Given the simple, inexpensive and immediately available ability to print and distribute the paper pollbook backup copies, Coalition Plaintiffs believe that an order could be entered as late as August 7 and still be effective for the August 11, 2020 Election Day.  If that is not feasible, then Coalition Plaintiffs request that this relief be granted in time for Defendants to be in compliance by the September 29, 2020 special election for Representative John Lewis' seat in Congress.

Respectfully submitted this 2nd  day of August, 2020.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

/s/ Robert A. McGuire, III
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

*/s/ Ezra D. Rosenberg*
Ezra D. Rosenberg
John Powers
David Brody
Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300

*Counsel for Coalition Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown

EXHIBIT

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## PROPOSED ORDER GRANTING PLAINTIFFS' MOTION FOR
## <u>PRELIMINARY INJUNCTION ON PAPER POLLBOOK BACKUPS</u>

This matter is before the Court on the request of Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Megan Missett, and Ricardo Davis (the "Coalition Plaintiffs"), to enter relief, sought in the Coalition Plaintiffs' October 23, 2019 Motion for Preliminary Injunction (Doc. 640) relating to paper pollbook backups.

Upon considering the motion and supporting authorities, the response from the Defendants, and the evidence and pleadings of record, the Court finds that Plaintiffs are likely to succeed on the merits of their claims, that they will be irreparably harmed if this motion is not granted, that the balance of equities tip in Plaintiffs' favor, and that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

The Court accordingly GRANTS the motion and issues the relief set forth below.

UNTIL FURTHER ORDER OF THIS COURT:

Effective immediately, the Secretary shall direct every county election superintendent (1) to provide at each polling place at least one paper back-up of the pollbook for use on Election Day, which paper back-up shall be updated after the close of absentee in-person voting (early voting); (2) to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment; (3) to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot; and (4) to take every reasonable measure to ensure that county election officials and pollworkers are trained as to how to generate and use paper pollbook backups and emergency ballots in conformity with this Order.

SO ORDERED this ___ day of _____, _____.

_____
U.S. District Court Judge Amy Totenberg