IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,       :
                              :
    Plaintiffs,            :
                              :
v.                            :       CIVIL ACTION NO.
                              :       1:17-cv-2989-AT
                              :
BRAD RAFFENSPERGER, *et al.*,  :
                              :
    Defendants.            :

## **OPINION AND ORDER**

This case requires the Court to consider whether Georgia's practices and procedures for administering voter access to the ballot at the polls unconstitutionally impact the voting process and unduly burden the exercise of qualified citizens to choose their elected representatives.  The relief that the Coalition Plaintiffs seek here is a limited common sense remedy to the real and repetitive voting impediments Plaintiffs have experienced at the precinct threshold and the substantial threat that they will face from these impediments anew in the 2020 general election if preliminary injunctive relief is not granted.

In tandem with the Plaintiffs' motions for injunctive relief seeking to bar the State of Georgia from requiring the use of electronic ballot marking devices (BMDs) for all in-person voters on election day, the Coalition Plaintiffs have filed a stand-alone Motion for Preliminary Injunction on Paper Pollbook Backups [Doc.

800].  Although this separate motion seeks as a discrete measure of moderate relief to order the Secretary of State to require the use of a paper backup of the electronic pollbook to prevent voter disenfranchisement, the Court intended to deal with this request for relief in an omnibus Order addressing all pending claims and relief requests that the two groups of Plaintiffs lodge against the voting system. However, in light of new evidence brought to light by Plaintiffs in the late evening hours on Friday, September 25, 2020, that may impact the Court's issuance of its decision on these other issues, the Court enters this Order now to avoid delay and so the State Defendants can begin preparations necessary to implement the relief ordered below.

## I.    Introduction and Overview

The Coalition Plaintiffs' Motion seeks to address dysfunctions in the voter registration information database system as well as the pollbook voter check-in system that they contend fundamentally impact the voting process and voter access to the ballot.  They argue that the same practices are continuing that the Court previously made major critical findings about in its Order of August 15, 2019.  (Doc. 579 at 62-112.)  Specifically, they contend that deficiencies in the voter registration database system and pollbooks as well as their handling by State Defendants effectively block or deter some voters from exercising their right to vote or casting a vote without experiencing inordinate burdens.  These alleged burdens include: long waiting lines due to voting equipment and registration data record related failures; voters being required to cast provisional ballots that may not

2

ultimately "count" or voters' exclusion from voting after they were incorrectly advised (based on the flawed or non-updated voter registration data available in the voter registration list or the pollbook) that they were not registered or were registered at a different precinct.  Plaintiffs allege that these type of major systemic deficiencies continue to thwart and burden the voting process. Defendants admit that the voter registration database (ENET), which is used by county registrars to maintain and update voter registration records was not replaced and that information from this system is what is loaded into the new electronic pollbooks for each election.[1] (Defs.' Mot. to Dismiss, Doc. 645 at 11, n. 14; *see also* Dec. 6, 2019 Tr. at 11.)

The Coalition Plaintiffs' Motion for Preliminary Injunction on Paper Pollbook Backups [Doc. 800] seeks to require the Secretary of State to direct county election superintendents to use a paper backup of the electronic pollbook at each precinct polling location that is updated after the close of absentee in-person early voting to facilitate issuance of regular or emergency ballots on election day.

Given the complex findings and analysis already covered by the Court's review of several lengthy preliminary injunction motions and issuance of related procedural orders over the last two years of intensive litigation, the Court refers the reader to its earlier orders for a further overview of the course of proceedings,

---

[1]  Defendants represent that this voter information was been loaded in flat text files from the old system and therefore was not contaminated by any malware.  (Defs.' Mot. to Dismiss, Doc. 645 at 11, n. 14; *see also* Dec. 6, 2019 Tr. at 11.)

relevant legal context, rulings, and factual findings. (*See, e.g.*, Doc. 309, September 17, 2018 Order (denying motion to dismiss and motion for preliminary injunction); Doc. 579, August 15, 2019 Order (granting in part preliminary injunction motions); Doc. 751, July 30, 2020 Order (granting in part and denying in part Defendants' most recent motion to dismiss including new BMD claims); Doc. 768, August 7, 2020 Order (denying without prejudice Plaintiffs' initial motions for preliminary injunction, Docs. 619 and 540, that facially challenged the BMD system and were filed in October, 2019, long prior to the 2020 election cycle, and summarizing case history).

Consequently, the Court notes that it has already addressed and rejected the State Defendants' renewed contention that Plaintiffs' request for relief related to pollbooks falls outside the bounds of the case as pled and presented to this Court. (*See, e.g.*, Order on Motion to Dismiss, Doc. 751 at 20-25; August 15, 2019 Order, Doc. 579 at 88-89.) The relief measures requested by the Coalition Plaintiffs are clearly associated with their contentions regarding the Defendants' non-implementation of some of the relief granted in the Court's August 15, 2019 Order. The Secretary of State still maintains the voter registration data system and its multiple interfaces with other databases through its ENET system. Starting in the summer of 2019, the Secretary of State's Office assumed exclusive management responsibility for day-to-day operations of the ENET system, in place of its contractor. The State's ENET system still feeds precinct level voter data and data reports to the electronic pollbooks for poll workers' use in voter check-in and

4

approval and provision of access cards needed for ballot generation and voting machine access.[2] Similarly, Plaintiffs have repeatedly advocated in their amended and supplemental complaints, motions, and briefs as well as at court hearings for the relief addressed in the current motion before this Court.

## II.   Legal Standards

### A.      Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy" designed to prevent irreparable harm to the parties during the pendency of a lawsuit before a final decision on the merits can be rendered. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief . . . in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Federal Trade Comm'n v. United States Oil and Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984). To support a preliminary injunction, Plaintiffs must present evidence that clearly establishes: (1) a substantial likelihood of success on the merits on their claims; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the

---

[2] The State announced initially in July, 2019 that it would shift management of the ENET system away from an outside vendor in-house to the Secretary of State's office. The evidence Defendants have now presented, primarily in two sealed declarations signed by David Hamilton, Chief Information Officer for the Office of the Georgia Secretary of State (one signed on August 26, 2020 (Doc. 819-1) and one signed on September 4, 2020 (Doc. 862)), are inconsistent in representations regarding actual specific concrete progress in addressing the security and functionality of the software operation of this database, except as a planned imminent priority for some time in the coming months.

defendants; and (4) that granting the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor," and may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *McDonald's Corp.*, 147 F.3d at 1306 (11th Cir. 1998).

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court."). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam); *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (noting that a court of equity may "'mold each decree to the necessities of the particular case' and 'accord full justice' to all parties"). In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at

2087 (citation omitted). And the Supreme Court has repeatedly advised, "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Kansas v. Nebraska*, 574 U.S. at 456 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) and *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 552 (1937)).

### B.   Standard for Challenging Constitutionality of State Election Laws/Systems

When considering the constitutionality of an election law, the Court applies the framework established by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi*. Under this framework, referred to as the *Anderson-Burdick* test, when deciding whether a state election law violates the due process rights guaranteed by the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). "[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014). A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434; *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). But "reasonable,

nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 788). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318-19; *Billups*, 554 F.3d at 1352.

## III.   Discussion

The Coalition Plaintiffs move for a preliminary injunction order requiring State Defendants to provide each precinct polling location a paper backup of the pollbooks for voter check-in in the event of disruption of the electronic pollbook during in-person voting on election day.  In its August 15, 2019 Order, this Court previously ordered the State Defendants, among other things, to: (1) develop and implement procedures to be undertaken by election officials to address errors and discrepancies in the voter registration database; and (2) require all County Election Offices to furnish each precinct location with at least one printout of the voter registration list for that precinct.  The Court ordered this relief after Plaintiffs presented evidence that the Defendants' administration of a vulnerable and compromised voter registration database and inaccurate voter registration express pollbook voting check-in had substantially burdened voters' exercise of their right to cast votes.  The Court further found that the State's adoption of a new electronic pollbook for voter check-in for use with the State's legacy voter registration

software and database would not by itself remedy these demonstrated problems or alleviate the imminent threat to voters' exercise of their right to vote.

In their current motion, the Coalition Plaintiffs request modification of this Court's August 15, 2019 Order.  Specifically, the Motion requests that the Court order the Secretary of State to direct every county election superintendent:

(1) to provide at each polling place at least one paper back-up of the pollbook for use on Election Day, which paper back-up shall be updated after the close of absentee in-person voting (early voting);

(2) to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment;

(3) to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot; and,

(4) to take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots in conformity with this Order.

Coalition Plaintiffs do not, as Defendants suggest, seek to bar the use of electronic pollbooks.  (*See* Resp., Doc. 815 at 18-19.)  They request the use of an updated paper pollbook backup at each precinct polling place, rather than the voter registration list, because the voter registration list provided as the backup at the precinct level under the existing practices is not updated to reflect all early or absentee mail ballot voting.  As a result, the Coalition Plaintiffs assert that a voter

registration list does not serve as a backup to malfunctioning or non-operational electronic pollbooks (due to any of a host of reasons) for the purpose of issuing regular or emergency ballots on election day.  And although the State Election Board adopted a regulation providing for a paper backup list in February 2020 in connection with an emergency voting regulation, the Coalition Plaintiffs assert that the regulations are incomplete, are not followed, and ultimately do not address the basic "debilitating impact of a repeated system failure to provide each precinct with an updated paper pollbook that can be used when the electronics malfunction." (Coalition Pls.' Br. Supp. Mot., Doc. 800-1 at 3.)

State Defendants oppose Plaintiffs' motion and assert that no injunctive relief is necessary because: (a) the Secretary already provides a paper backup of the electors list for use in each precinct which includes a voter's precinct assignment;[3] and (b) updated voter information is included in the electronic pollbooks after early voting.[4]  But this position does not address Plaintiffs' concern and the evidence presented of widespread malfunctions and failures in operational use of the electronic pollbooks on election day.  State Defendants further assert that "[e]ven if an updated electors list could be printed by precinct and delivered to the counties in three days between the end of early voting and election day, a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" therefore "an updated

---

[3] Resp. at 21-22, citing O.C.G.A. § 21-2-224(f).
[4] Resp. at 21-22, citing O.C.G.A. § 21-2-401(b).

electors list could not adjudicate voter eligibility in all situations." (Resp. at 24.) Finally, Defendants contend that requiring the Secretary to provide an updated and reconciled paper pollbook backup would be administratively burdensome and costly, and would require county election officials to train poll workers "on an entirely new protocol with only weeks to go before the election." *Id.*  Resp. at 24.

The Court discusses below first the background electoral system information that surrounds the issues in dispute here and then Plaintiffs evidentiary showing as to the basis for their claims for relief.

### A.   Georgia's Election Requirements Relating to Electors List and Pollbooks and Emergency Procedures When Use of Electronic Voting Equipment is Impossible or Impractical

Georgia's Election Code provides that "[e]ach elector who makes timely application for registration, is found eligible by the board of registrars and placed on the official list of electors, and is not subsequently found to be disqualified to vote *shall be entitled to vote* in any primary or election."  O.C.G.A. § 21-2-224(d) (emphasis added).  Voters whose names are not found on the official electors list for a precinct are generally prohibited from voting under Georgia's Election Code.[5]

---

[5] The Georgia Election Code provides that individuals whose names do not appear on the list of registered electors should be allowed to cast provisional ballots and have their votes counted if they later prove their eligibility. O.C.G.A. §§ 21-2-418, 419.  This statutory provision was enacted to fulfill the state's obligations under the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083(a)(1)(A).  Consistent with HAVA, Georgia is required to implement a single centralized, computerized, statewide voter registration list containing the name and registration information of every legally registered voter in the State. 52 U.S.C. § 21083(a)(1)(A). "ENET" is the statewide digital data record of voter registrations used in Georgia. This database system is also supposed to be regularly updated to reflect voting status for use in electronic pollbooks. Poll workers access the pollbooks to verify voters' registration and voting status and to generate a voter access card that activates the specific electronic ballot linked to the voter's residence address.

*See* O.C.G.A. § 21-2-224(g) ("No person whose name does not appear on the official list of electors shall vote or be allowed to vote at any election, except as otherwise provided in this article."); O.C.G.A. § 21-2-224(h) ("All persons whose names appear on the list of electors placed in the possession of the managers in each precinct and *no others*, except as otherwise provided in this article, shall be allowed to deposit their ballots according to law at the precinct in which they are registered.") (emphasis added).  Under these provisions, inaccuracies in the official electors list may result in the denial of eligible and qualified voters' rights to cast a ballot and have their vote counted.

"The official list of electors eligible to vote in any primary or election shall be prepared and completed at least five calendar days prior to the date of the primary or election in which the list is to be used."  O.C.G.A. § 21-2-224(f).[6] The electors list "prepared and distributed to the poll officers of each precinct *shall include* only the elector's name, address, ZIP Code, date of birth, voter identification number . . . congressional district, state Senate district, state House district, county commission district, if any, county or independent board of education district, if any, and municipal governing authority district designations, if any, and such other voting districts, if any."  O.C.G.A. § 21-2-224(g) (emphasis added).  Under the statute, the official electors list "prepared and distributed to the poll officers of each precinct *may also include* codes designating that an elector

---

[6] The Election Code also provides that an official list of inactive electors be prepared and distributed to the poll officers of each precinct. *See* O.C.G.A. § 21-2-224(g); O.C.G.A. § 21-2-401(b).

has voted by absentee ballot." *Id.* (emphasis added).  And O.C.G.A. § 21-2-401(b) requires that "[t]he registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list *shall indicate* the name of *any elector who has been mailed or delivered an absentee ballot*." (emphasis added).

The State Election Board's regulation on the pollbooks and paper backup, adopted on February 12, 2020, provides:

> Election superintendents shall cause each polling place to be equipped with an appropriate number of electronic poll books within the county during primaries, elections, and runoffs. Electronic poll books shall be the primary method for checking in voters and creating voter access cards, but the superintendent shall cause every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place. The paper backup list shall be used in case the electronic poll books do not properly function. The superintendent shall cause poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19(1).  The regulation requires that "[p]rior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to *accurately* mark all persons who have been issued or cast absentee ballots in the election." Ga. Comp. R. & Regs. 183-1-12-.19(8) (emphasis added).  And, "[f]or electors whose names are added to the voter registration rolls after the preparation of the electronic poll books, the registrars *shall provide a printed supplemental list* for use at the affected polling places." Ga. Comp. R. & Regs. 183-1-12-.19(10) (emphasis added).

Georgia's Election Code also provides for the implementation of emergency procedures in the event of electronic equipment failure or malfunction or where the use of such equipment is not feasible under certain circumstances. Under O.C.G.A. 21-2-281, allowing for the use of paper ballots where the use of voting equipment is impossible or impracticable, the statute provides "[i]n any primary or election in which the use of voting equipment is impossible or impracticable, for the reasons set out in Code Section 21-2-334, the primary or election may be conducted by paper ballot in the manner provided in Code Section 21-2-334." O.C.G.A. § 21-2-334 in turn provides:

> If a method of nomination or election for any candidate or office, or of voting on any question is prescribed by law, in which the use of voting machines is not possible or practicable, or in case, at any primary or election, the number of candidates seeking nomination or nominated for any office renders the use of voting machines for such office at such primary or election impracticable, or if, for any other reason, at any primary or election the use of voting machines wholly or in part is not practicable, the superintendent may arrange to have the voting for such candidates or offices or for such questions conducted by paper ballots. In such cases, paper ballots shall be printed for such candidates, offices, or questions, and the primary or election shall be conducted by the poll officers, and the ballots shall be counted and return thereof made in the manner required by law for such nominations, offices, or questions, insofar as paper ballots are used.

To facilitate the purpose of these statutory provisions, the State Election Board adopted the following regulation outlining procedures for election superintendents to implement in the event of an emergency requiring the use of paper ballots:

> If an emergency situation makes utilizing the electronic ballot markers impossible or impracticable, as determined by the election

14

superintendent, the poll officer shall issue the voter an emergency paper ballot that is to be filled out with a pen after verifying the identity of the voter and that the person is a registered voter of the precinct. Emergency paper ballots shall not be treated as provisional ballots, but instead shall be placed into the scanner in the same manner that printed ballots in the polling place are scanned. The election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place. The poll manager shall store all emergency ballots in a secure manner and ensure that all used and unused emergency ballots are accounted for. All unused emergency ballots shall be placed into a secure envelope and sealed such that the envelope cannot be opened without breaking such seal.

If an emergency situation exists that makes voting on the electronic ballot markers impossible or impracticable, the poll manager shall alert the election superintendent as soon as possible. The existence of an emergency situation shall be in the discretion of the election supervisor. However, if a poll manager is unable to contact the election superintendent after diligent effort, the poll manager shall have the ability to declare that an emergency situation exists at the polling place. The poll manager shall continue diligent efforts to contact the election superintendent, and shall inform the superintendent as soon as possible of the situation at the polling place. The election superintendent, in his or her discretion, shall either overrule or concur with the declaration of emergency circumstances. While the determination of an emergency situation is in the discretion of the election superintendent, the types of events that may be considered emergencies are power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes.

Ga. R. & R. 183-1-12.11(2)(c)&(d).  The Secretary of State's Office sent out the following guidance to election superintendents explaining the emergency procedures:

15



## USING EMERGENCY PAPER BALLOTS

If an emergency situation makes utilizing the electronic ballot markers impossible, impracticable, or if emergency ballots are otherwise needed as determined by the election superintendent, the poll officer shall issue the voter an emergency paper ballot that is to be filled out with a pen after verifying the identity of the voter and that the person is a registered voter of the precinct. While the determination of an emergency situation is in the discretion of the election superintendent, the types of events that may be considered emergencies are power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes. (SEB Rule 183-1-12-.11 (2) (c) & (d))

### Items Needed:
- Emergency Ballots
  - The election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters assigned to a polling place. (SEB Rule 183-1-12-.11 (2)(c))
  - Emergency Ballots must be secured prior to use.
- Pens
  - Dominion Voting Approved Pens
    - Sharpie Fine Point Black (part #: 30001 SKU: 071641300019).
    - Paper Mate Flair M Medium Point Black, (part #: 8430152, SKU: 041540843016).

### Voting Procedures:
- The poll officer shall verify the identity of the voter and that the person is a registered voter of the precinct.
- On the Poll pad, the poll officer will select "Emergency Ballot" instead of "Touchscreen," and hit "submit" in order to finalize check-in of the voter. No voter access card is needed or created.
- The poll officer shall provide an emergency ballot to the voter that is to be filled out with a pen.
- The voter shall mark their ballot with a pen in an area that provides voter privacy.
- The voter shall scan their ballot in the scanner connected to the ballot box.
- Emergency ballots shall not be treated as provisional ballots, but instead shall be placed into the scanner in the same manner that printed ballots in the polling place are scanned.
- All unused emergency ballots shall be placed into a secure envelope and sealed such that the envelope cannot be opened without breaking such seal.



PLAINTIFF EXHIBIT

**11**

1:17-cv-02989

## B. Testimony of Secretary of State's Director of Elections

In response to the Coalition Plaintiffs' Motion, the State Defendants rely on the declaration testimony of the Secretary of State's Director of Elections, Chris Harvey, who has "more than a decade [of] acquired firsthand knowledge of Georgia's election processes at both the state and county level." (Harvey Decl., Doc. 815-1 ¶ 2.) As mandated by Georgia law, the Secretary of State's Office provides each county with a paper copy of the official electors list by precinct, which includes the name, address, and district combination information for each voter assigned to a precinct. (*Id.* ¶ 3.) According to Harvey, "[i]f the electors list is pulled after a voter has requested a mail-in absentee ballot or the voter has voted absentee, either by mail or in-person early voting, the electors list will include a notation indicating that the voter has voted absentee or requested a mail-in absentee ballot." (*Id.*)

The Secretary of State's Office contracts with an outside vendor to print the paper copy of the electors list. (*Id.* ¶ 4.) There is no established date for when the electors list is printed for each election. Rather, "[t]he electors lists are ordered by the liaison for their county, usually starting the Friday after the voter registration deadline, and each list is ordered individually." (*Id.*) According to Harvey, "[l]arger counties are usually printed last – sometimes not until the week before the election to give the counties as much time as possible to enter any remaining eligible voter registrations." (*Id.*) In addition, the Friday prior to the date of the election, the Secretary of State's Office "generates" a "supplemental list" that

17

contains the information for "voters added to ENET between the time when the electors list is initially pulled for an election and the date the supplemental list is pulled." (*Id.* ¶ 5.) The "supplemental list is generated in ENET and the counties are able to print those lists and distribute them to the polling places." (*Id.*)

Prior to the opening of the polls on election day, county registrars are required to provide poll managers in each precinct with a copy of the electors list – which is in practice the electronic pollbooks. (*Id.* ¶¶ 8-9.) The list in the electronic pollbook is "updated after the close of early voting with current voter information, including whether voters have outstanding mail-in absentee ballots and whether those ballots have been returned or the voter voted in person during early voting."[7] (*Id.* ¶ 9.) According to Harvey, "[i]f a voter is not located in the electronic pollbook or an electronic pollbook is malfunctioning for any reason, the paper copy of the official electors list can be used to determine whether a voter is assigned to the precinct and polling location." (*Id.* ¶ 7.)

ENET includes information about absentee voting, including whether a voter has requested a mail-in absentee ballot but not returned it, whether a voter has returned a mail-in absentee ballot, whether the mail-in absentee ballot was accepted or rejected, and whether a voter voted in-person during early voting. (*Id.* ¶ 12.) Harvey states that, "[w]hen a voter requests an absentee ballot but then appears at the polls on Election Day without their ballot in hand, the poll official

---

[7] Voters who vote in person at the polls during the early voting period use the electronic voting system in Georgia but are still designated as having cast an absentee ballot.

should check with the registrar to ensure that no absentee ballot has been accepted for that voter prior to having the voter execute a cancellation affidavit and then vote using the BMD." (*Id.* ¶ 13.) According to Harvey, "[t]hat process applies whether the voter is checked in using the PollPad[8] or a paper list."[9] (*Id.*) However, he also attests that "[e]lectronic pollbooks allow counties to receive updated information from the electors list after the close of early voting during the three days prior to Election Day." (*Id.* ¶ 16.)

At the public hearing before this Court on September 11, 2020, Mr. Harvey clarified that the supplemental list printed the weekend before the election will only include newly registered voters added to ENET after the official electors list is loaded into the PollPads. (Tr. Vol. II, Doc. 905 at 218-19.) The supplemental list does not include information as to whether individuals have cast a ballot during early/absentee voting prior to election day. (*Id.*) Mr. Harvey also testified that the Secretary of State does not provide a new updated paper backup of the electors list prior to a runoff election to Counties for distribution to the precinct polling locations. (*Id.* at 219-20.)

---

[8] The PollPad is the device containing the electronic pollbook. The Secretary of State's purchase of the current KnowInk PollPads is covered under the terms of its BMD voting system contract with Dominion. Dominion provides technical assistance in connection with the PollPads' use. However, the PollPads still operate off of the ENET database system now managed by the Secretary of State's office.

[9] He further states that "a paper printout of the electors list after the close of early voting would not capture voters who return absentee ballots after the updated electors list is printed and would not eliminate the need for the poll official to check with the registrar prior to allowing the voter to proceed with the voting process." (*Id.* ¶ 15.)

The State Defendants object to Plaintiffs' request for a "paper pollbook backup that reconciles early and absentee voting prior to election day" in their brief in opposition to the motion as being logistically impossible for the Secretary of State's Office to prepare in the few days before the election. (Resp., Doc. 815 at 5.) However, Mr. Harvey testified at the injunction hearing that if the data could be generated and provided digitally to the counties so the election superintendents themselves could print the paper backup copy of the updated report, he would have no objection to making that available to the counties. (*Id.* at 221-22.) And State Defendants confirmed in a filing subsequent to the hearing that the information is available in ENET and in a separate Absentee Voter Report, which allows poll officials to check whether an absentee ballot has been requested and accepted, assuming the absentee voting data has been timely entered into ENET by county election officials. (*See* State Defs.' Resp. to Court, Doc. 895.)

## C. Plaintiffs' Evidence Regarding Problems with State's New Voting System, Systemic Malfunctions of Electronic PollPads, and Lack of Coordinated Training on New Equipment and SEB Emergency Procedures

State Defendants argue that Plaintiffs have failed to demonstrate that required usage of the KnowInk PollPads alone violates the fundamental right to vote because the evidence submitted does not identify systemic issues or demonstrate unconstitutional burdens on voting. Defendants argue that Plaintiffs have "identified a variety of disconnected issues related to the KnowInk PollPads, namely technical issues and training of poll workers, but they have not provided evidence of systemic problems with the electronic pollbooks resulting in

disenfranchisement of voters." But this argument is completely divorced from the compelling evidence presented in this case in connection with each of the motions for relief.

In prior orders, this Court outlined in extensive detail critical deficiencies and vulnerabilities that impacted the reliability and integrity of the State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks and data, and the State's electronic voter registration system and database. (*See* September 17, 2018 Order, Doc. 309 at 4-12, 34-38; August 15, 2019 Order, Doc. 579 at 21-90.)

These concerns were at the center of the Court's consideration in ordering relief in August 2019 and remain a focus of this case even as the State implements the BMDs in connection with multiple other components and the State's main election system server, including the voter registration database, that carry over into the new election system.[10]  (*See* July 30, 2020 Order, Doc. 751 at 20-21.)  As this Court noted in its August 15, 2019 Order:

---

[10] As detailed in the August 15, 2019 Order, Doc. 579 at 39-41, the National Academies of Sciences Report issued in September 2018, concerning the integrity of voting systems and the risks associated with digital technology, determined:

> [A]ll digital information – such as ballot definitions, voter choice records, vote tallies, or voter registration lists – is subject to malicious alteration; there is no technical mechanism currently available that can ensure that a computer application – such as one used to record or count votes – will produce accurate results; testing alone cannot ensure that systems have not been compromised; and any computer system used for elections – such as a voting machine or e-pollbook – can be rendered inoperable.

National Academies of Sciences, Engineering, and Medicine, et al. Securing the Vote: Protecting American Democracy 42, 80 (National Academies Press, 2018) ("National Academies Report" or "NAS Report").  The NAS report also noted several cybersecurity risks regarding electronic pollbooks and voter registration databases. It detailed concerns about "unauthorized access to or

The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU.  Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information.   Inaccuracy in this voter information thus triggers obstacles in the voting process.  New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

---

manipulation of the registrant list" because voter registration databases are "often connected, directly or indirectly, to the Internet or state computer networks." (Doc. 285-1, Ex. 1 at 57.) As an example of the vulnerability of electronic voter databases, the report listed the server error that left 6.5 million voter records in Georgia exposed for six months in 2016-17. (*Id.* at 58.) The NAS report listed a number of ways in which cyberattacks on electronic voter registration data or e-pollbooks could disrupt elections: 1) by altering voter registration databases used to generate pollbooks; 2) by altering the record of which eligible voters have actually voted; and 3) by a "denial-of-service" attack, which would shut down voting altogether. (*Id.* at 72.) Thus, the NAS report recommends that "[j]urisdictions that use electronic pollbooks should have backup plans in place to provide access to current voter registration lists in the event of any disruption." (*Id.*)

After holding hearings, reviewing intelligence, and hearing testimony from state election officials and U.S. Government authorities responsible for election security, the U.S. Senate Select Committee on Intelligence also concluded that voter registration databases and electronic pollbooks, which can be accessed over the internet, are vulnerable components of the U.S. Election infrastructure. (SSCI Report at 57.) The July 2019 SSCI report noted that Russian government cyber actors engaged in operations to scan the election-related state infrastructure of all fifty states and conducted research on "general election-related web pages, voter ID information, election system software, and election service companies" and that Russian operatives were able to penetrate the voter registration databases and access voter registration data from Illinois and at least one other state. (*Id.* at 8, 22.)

Counties in Georgia were targeted as well. In July 2018, Special Counsel Robert Mueller released an indictment that alleges that a Russian operative "visited the websites of certain counties in Georgia, Florida, and Iowa" on or about October 28, 2016. (Doc. 471-7 at 3.) As a result, the SSCI report recommends that state officials "[u]pdate software in voter registration systems" and "[c]reate backups, including paper copies of state voter registration databases." (SSCI Report at 57.)

The voter registration database, ENET, which is used by county registrars to maintain and update voter registration records and determine ballot precinct information was not replaced with the adoption of the new Dominion BMD election system.  As described by Mr. Harvey, voter information from the existing ENET system is loaded into the new electronic pollbooks for each election. (Harvey Decl., Doc. 815-1 ¶ 12.)[11]  Other than a switch to the new KnowInk PollPad electronic pollbooks, Defendants have offered nothing to indicate concretely any action taken in response to issues experienced by voters in November 2018 and more recent elections to ensure that the information from ENET and the operation of the electronic pollbooks is reliable, accurate, and updated.

Plaintiffs submitted a volume of evidence of the impact of these issues on voters' ability to cast votes, as detailed in the Court's August 2019 Order, and more recently in the BMD pilot elections and the 2020 primary elections.  In connection

---

[11] Defendants contend, and offer the declaration of Dr. Eric Coomer of Dominion, that information from ENET is not electronically transmitted, and therefore cannot corrupt the new pollbook system, because only a flat text file from ENET (that will be run through a security scan) will be loaded into the pollpads for use during elections.  This contention appears to be in conflict with other evidence regarding the operation of the KnowInk pollbooks via WiFi and Harvey's statement in his declaration that "[e]lectronic pollbooks allow counties to receive updated information from the electors list after the close of early voting during the three days prior to Election Day," and the information in Dominion's public contract documents about the capacity of the KnowInk pollbooks to receive up to the minute voter information on election day.  As a prime example, the Secretary of State's summary report of the November 5, 2019 pilot elections reports that "Some Poll Pads were not able to produce Voter Cards to activate the BMDs . . . The issue was discovered upon the opening of the polls and was reported from Bartow, Carroll, Cobb, and Paulding by approximately 7:20 am . . . By 7:40 am the SOS office directed that KnowInk and Dominion do a universal fix by loading the dataset through a WiFi connection.  That was executed and the Poll Pads then began to function properly by approximately 8:20 am." (Doc. 675-1 at 4.) Plaintiffs have offered testimony of cybersecurity experts to rebut the State's assertion that the other two voter registration systems, the My Voter Page (MVP) and the Online Voter Registration system, do not interface with ENET.

with their prior motions, Plaintiffs presented evidence that the State's technology failures (whether caused by malicious interference, out of date software, or human error by county registrars in failing to update voter registration information) have resulted in voting disruption.[12]  For example, numerous declarations from voters highlighted instances where a voter's registration status on MVP, the "outward-facing system used to provide information to voters" did not match the voter registration status in the electronic pollbooks used to check in voters at the voting polls. (*See* Doc. 579 at 98-111.)   And as recounted in the August 15, 2019 Order, forty-six individual voters described issues with the electronic pollbook, including voters not being listed as registered, wrong addresses listed for the voters, incorrect polling places, and listing voters as having already voted. (*Id.*)   Many of the voters were offered a provisional ballot, but several voters were not.   Instead, a large number of voters were told that they had to go to a different precinct to vote.   Some of these voters would not have had enough time to travel to the precinct shown on the voter rolls in time to cast a ballot before the polls closed.   (*Id.* at 99.)   Six of

---

[12] The Court also takes judicial notice of the evidence and the Court's findings in *Common Cause Georgia v. Kemp*, 347 F.Supp.3d 1270 (N.D. Ga. 2018). This evidence included sworn declarations of voters (and poll watchers) who faced hurdles in their registration status and even in obtaining the opportunity to cast provisional ballots at the polls after they were affirmatively told they were not on the registration rolls, despite having voted from the same home in the recent past or affirmatively representing they had timely registered and were regular voters. The Court found that "[r]epeated inaccuracies were identified in the voter registration system that caused qualified voters likely to lose their vote or to be channeled at best into the provisional voting process because their registration records did not appear or had been purged from the data system. For example, there was evidence from voters that they were registered but were told they were not in the registration system; there was evidence that voters were sometimes refused provisional ballots or if provided provisional ballots, sometimes had to return to the polls to insist on this. Similarly, there was evidence from Common Cause poll monitors and hotline workers to the same effect." *Id.* at 1293–94.

these voters were shown in the registration system as having already voted when they showed up at the polls to cast their ballots.  (*Id.* at 99-101.)  Several voters described their being informed at the polls that their addresses did not match the information in the pollbooks, while their family members who resided at the same address were found in the pollbooks and allowed to cast a regular ballot.  (*Id.* at 102-04, 106.)

The evidence supporting Plaintiffs' most recent motions suggests such failures have potentially been left unremediated, are accompanied by other glitches associated with the implementation of the new electronic pollbook system, or both. Each of the named individual Plaintiffs submitted declarations in connection with the Curling Plaintiffs' current motion and the Coalition Plaintiffs' earlier preliminary injunction motion challenging the State's new voting system, attesting to the impacts on their First and Fourteenth Amendment rights.[13]  (*See* Decl. of Donna A. Curling, Doc. 785-3; Decl. of Donna Price, Doc. 785-4; Decl. of Jeffrey H. Schoenberg, Doc. 785-5; Exs. D-G to Coalition Pls.' October 23, 2019 Mot., Doc. 640-1.)

Coalition member Plaintiff Megan Missett, a Fulton county voter and member of the Coalition, prefers to vote on election day at her neighborhood precinct and participate in the community exercise of voting because she values

---

[13] Marilyn Marks, the Executive Director of Plaintiff Coalition for Governance, also submitted a declaration verifying the allegations in the Coalition Plaintiffs' Third Am. Complaint, Doc. 226, and First Supplemental Complaint, Doc. 628, regarding the burden on the Coalition's organizational and associational interests as a result of the State's actions.  (*See* Decl. of Marilyn Marks, Ex. C to Coalition Pls.' October 23, 2019 Mot., Doc. 640-1.)

the shared civic experience of voting at the polls.  (Decl. of Megan Missett, Doc. 640-1 at 149-154.)  Missett attests that this choice is burdened by obstacles to voting created by erroneous pollbooks and Georgia's electronic voting machines. Aware of systemic problems with electronic pollbooks resulting in eligible voters being turned away from their correct polling place, sent to the wrong polling places, denied access to voting, or being forced to vote provisionally, Missett attended meetings with Georgia election officials regarding data migration to the new electronic pollbook system.  Following the meeting, Missett remained deeply concerned about the State's lack of planning required to fix systemic problems in voter's ability to access the polls.  As a result, she attests that she is required to choose between the risks associated with in-person voting and the burdens and risks associated with absentee mail voting. Missett is actively engaged in efforts to further the Coalition's mission and in 2019, devoted 950 hours to voting rights, voter registration and candidates' campaign activities.  In her ongoing conversations with potential voters, many who are aware of criticisms of the BMD system and the unresolved problems of the electronic pollbooks, voters have expressed to her that they question whether it is worth voting because of the high number of mail ballot rejections.  Missett is also concerned about recommending mail ballots with the rules Georgia uses to issue and accept mail ballots.

In their declarations, Plaintiffs William Digges III and Laura Digges state they both plan to vote by absentee mail ballot even though their preference is to vote on election day at their local precinct and participate in the community

26

experience with the benefit of the latest information on matters on the ballot. (Decl. of William Digges, III, Doc. 640-1 at 167-170; Decl. of Laura Digges, Doc. 640-1 at 162-65.) This is due, in part, to their knowledge of the systemic problems with electronic pollbooks that caused people to be sent to wrong polling place, or be denied a ballot, or be forced to vote provisionally. To ensure they can verify their votes before casting their ballots, and to avoid the risk of being turned away from their polling station due to electronic pollbook malfunctions, William and Laura Digges attest that they are being forced to make the unfortunate choice to vote in advance by mail, giving up the benefits of voting in person at the polling place with friends and neighbors. According to the Digges, the additional requirements associated with casting an absentee ballot and the possibility of a delivery failure or a signature mismatch determination by elections officials operate as a significant disadvantage – in order to cast a paper ballot that can be recounted and audited.

Plaintiff Ricardo Davis similarly plans to vote by absentee mail ballot in part because of documented problems with electronic pollbooks. (Decl. of Ricardo Davis, Doc. 640-1 at 156-160.) As Chairman of the Constitution Party of Georgia, Davis would prefer to vote in person in order to be visible to his party's candidates and members voting on election day, but believes the electronic systems create too much risk of his vote being inaccurately recorded. Davis is also concerned about the reliability of Georgia's optical scan machines to accurately count paper absentee ballots without proper audits to confirm accuracy of reported outcomes.

In their current motions, the Coalition Plaintiffs provided substantive evidence demonstrating a system wide problem of malfunctioning electronic PollPads beginning with the November 2019 pilot elections, again in the June 2020 primary election, and most recently in the August 2020 runoff elections that resulted in voter disenfranchisement and that is likely to continue in the upcoming Federal Congressional and Presidential elections.   They also have previously shown in connection with their 2018 and 2019 preliminary injunction motions the lack of security and vulnerability of the State's election server then in use and a pervasive pattern of voter registration data errors in the ENET database.   (*See* September 17, 2018 Order, Doc. 309; August 15, 2019 Order, Doc. 579.)

**BMD Pilot Elections**

The Secretary of State's Executive Summary of the November 2019 pilot elections in six Georgia counties using the new voting system disclosed numerous issues with the PollPads and a resulting failure to timely open the polls.[14]  (Doc. 675-1) (explaining that five of six pilot counties had an issue upon opening of polls with some PollPads).  Some of the failures specifically identified in the 2019 pilots persisted at polling locations in the June 9, 2020 primary election.  (*Compare* Doc. 675-1 *with* Doc. 755.)

In connection with the 2019 pilot elections using the BMD system and associated pollbooks, poll managers received notice during early voting and on

---

[14] A seventh county, Cobb, conducted a pilot election using hand-marked paper ballots, along with the new electronic PollPads, precinct scanners, and election management system.  (Doc. 675-1 at 3.)

election day that there was a "state-wide problem" with the e-pollbooks necessitating a change in procedures to require voters to complete a paper application/oath before being checked in at the PollPad station.  (Suppl. Decl. of Rhonda Martin, Doc. 680-1 at 74-76; Decl. of Aileen Nakamura, Doc. 680-1 at 134; Decl. of Elizabeth Throop, Doc. 755 at 103.)[15]  Poll workers experienced problems with the operation of the PollPads during the pilot elections because they had not been informed they needed WiFi in order for the PollPads to work. (Nakamura Decl., Doc. 680-1 at 134; Throop Decl., Doc. 755 at 103-04.)  While the PollPads were inoperable at the White Oak Park precinct in Paulding County, voters were advised by the poll manager they could use provisional ballots and would have to cure them later, but they declined and indicated they would come back later. According to Nakamura, "[t]here was apparently no paper pollbook back up or appropriate voter registration record to work around this malfunction." (*Id.* at 133.)  When Elizabeth Throop arrived at the Lakeshore Recreation Center voting precinct in Carroll County[16] at 7:45 a.m. on November 5, 2019, the PollPads were not working and neither the poll manager nor the Dominion representative could fix the problem.  (Throop Decl., Doc. 755 at 104.)  Voters waited while the poll supervisor used his access card and passwords to permit voting on the BMDs.  A later report from the Secretary of State indicated that the PollPads had been mis-

---

[15] Rhonda Martin, Aileen Nakamura, and Elizabeth Throop are registered Georgia voters and members of the Coalition for Good Governance.  They served as poll watchers and public observers during the elections.
[16] Carroll County was a pilot county for use of the BMD in the November 2019 elections.

programmed, a fix had been executed via WiFi, and that PollPads were functioning properly by 8:20 a.m.  However, according to Throop, based on her personal observations, PollPads at the Lakeshore precinct were not functioning properly until after 10:00 a.m. with a temporary fix.  The Secretary of State's report on the pilot elections did not identify any problems at the Lakeshore Recreation Center precinct on November 5, 2019.  During a special election held on January 28, 2020 in Mitchell County, the PollPad would not allow a voter to check in because the system indicated that she had previously voted.   (Throop Decl., Doc. 755 at 104-05.)  The poll manager called the county election office, was informed the woman had not already voted, and gave her a voter access card.

Several poll workers complained of a lack of training on the new voting machines and PollPads.  One poll worker at a polling location in Hiram, Paulding County indicated they had only received the equipment one week prior to the election and had been scrambling.  Nakamura observed poll managers and workers in Paulding and Bartow counties still receiving training on how to operate the PollPad on election day. (*Id.* at 140-141.)

At the November 21, 2019 meeting of the Morgan County Board of Election, the elections director Jennifer Doran reported on the pilot elections and pointed out her concerns about problems with the operation of the new equipment, including ballot marking devices rebooting on their own after they were already in service for voting, ballots jamming in scanners, and PollPads failing to encode

voter access cards for the BMDs. (Suppl. Decl. of Jeanne Dufort, Doc. 680-1 at 175; Ex. 1 to Dufort Decl., Doc. 680-1 at 181-85.)

Floyd Rose, a registered voter in Lowndes County offered a declaration recounting his experience attempting to vote in the December 2019 runoff election on the State's new equipment. (Decl. of Floyd E. Rose, Doc. 680-1 at 191-93.) After Mr. Rose and his wife, Estella, moved from one address in Valdosta to another, they updated their address in the voter registration system and on their driver's licenses in July 2018. Mr. Rose voted in person at the Lowndes County Board of Elections early voting location in the November 2018 general election and the November 2019 municipal election. On each of these occasions, Mr. Rose presented his driver's license upon checking in at the polls and was allowed to vote with no problem. Mr. Rose attempted to vote at the Lowndes County Board of Elections early voting location in the December 3, 2019 runoff election but was told that the pollbook records did not match his current address on his driver's license. He was given a provisional ballot, but it was rejected although he is an eligible elector in the city of Valdosta. His wife, Estella Rose, who resides at the same address was permitted to cast a regular ballot in both the November 2019 election and the December 2019 runoff with no problem. The poll workers did not refer to a paper pollbook to determine whether Mr. Rose was eligible to vote. Mr. Rose attended the December 3, 2019 provisional vote count at the Lowndes County Board of Elections to question why his provisional ballot was rejected but was given

no satisfactory answers.  Mr. Rose was upset about being disenfranchised by what appears to be errors in the electronic pollbooks.

### June 9, 2020 Primary Election

As reflected in an informal transcript of the Cobb County Election Board Meeting held on June 19, 2020 after the primary election, Cobb County experienced significant difficulties and delays in the June primary as a result of malfunctions and failures of the electronic PollPads and a lack of training on how to deal with such disruptions in the voting process.   (Ex. D to Marks Decl., Doc. 755 at 37-40.)  According to Janine Eveler, Director of Elections for Cobb County, the County received complaints from voters on the last Friday of advanced voting with lines up to 6 hours long because the system went down for regular maintenance in the middle of voting.  Voters reported receiving the wrong ballot because the County did not have an accurate list of whether the individual had voted in the March election. Eveler reported to the Board that during the June 9, 2020 primary, many polls in Cobb County reported that their PollPads were not syncing, they could not encode voter cards, or they could not log in.  The County was given no instructions on how to resolve these syncing issues.  According to Eveler, the State provided no troubleshooting guides.  Cobb County did not have the resources to deliver required WiFi devices to resolve these problems at multiple polling sites or to staff the multiple phone calls from poll workers.  Eveler explained that the new system is a "complicated multi-component" system, "each with a possibility of failure."  (Doc. 755 at 38-40.)  For example, "[t]he PollPad has a very

small connection point for the encoder that failed in many polls and cards were not able to be properly encoded." (*Id.* at 40.)

Cobb County experienced significant issues with a lack of poll worker training in advance of the June primary due to the pandemic, employees working from home, and the resignation of their training supervisor. (Ex. D to Marks Decl., Doc. 755 at 37-38.) Eveler, Cobb County's Director of Elections, stated to the Board that although the State supplied some videos and setup instructions, there was no coordinated poll worker training provided by the State. When most of the training was initiated in February and March before postponement of the primary election, the State's forms and instructions for training were still under development. As a result, the Cobb County elections division developed its own online training, but did not dedicate enough time to training poll workers on emergency procedures. Poll managers at various precinct locations reacted with different procedures when they were faced with emergencies.

Laurel Dowswell served as a poll worker at the Smyrna 7A precinct at Life Church Smyrna Assembly of God polling location on June 9, 2020. (Decl. of Laurel Dowswell, Doc. 809-11.) She was stationed at the PollPads for almost the entire day. Though she attests the PollPads worked effectively for the most part, they would not sync with each other for most of the day to provide updates to the pollbook data. Her precinct did not have on hand a paper pollbook backup for voter look-up if the PollPads had errors or malfunctions. According to Dowswell, her precinct had to issue a lot of provisional ballots due to voters not receiving their

absentee ballot, voters receiving absentee ballots and deciding to vote in person, or voters appearing in the pollbook as being in the wrong polling place. Dowswell's polling location also experienced several BMDs becoming inoperable and having to be reset multiple times and voters having to scan their ballots multiple times before they were accepted. She reports that the wait time for the constant flow of voters ranged from 2 hours in the morning, to 1 hour around 1:00 pm, and around 5:00 pm the wait increased to 1 and ½ hours. Despite the equipment malfunctions and wait times, Dowswell does not believe any emergency paper ballots were used.

Marilyn Marks served as an authorized poll watcher for polling locations in Fulton and DeKalb counties in the June 9, 2020 primary election. (Marks Decl., Doc. 755 at 5-16.) At the Central Park Recreation polling center, the wait time to vote at 10:00 a.m. was estimated at 4 hours. Voting was almost at a complete standstill due to inoperable electronic pollbooks. Marks observed no poll workers using the precinct's paper list of registered voters to check in voters. Poll workers resorted to issuing provisional ballots with only a single provisional voting station.[17]  During this time, some BMDs sat unoccupied while the line to vote was hours long.

---

[17]  As noted earlier, provisional ballot votes are not automatically counted and credited. Instead, the County Board of Registrars must review all provisional ballots no later than the day after the primary or election in which such provisional ballot was cast  and determine if the ballot may be cast and affirmatively counted based on the registration and voting status (including precinct) of the individual voter. Voters are given a three-day window of time to cure any deficiency identified that would preclude the voter's ballot from being counted.   O.C.G.A. §§ 21-2-418, 419.

Joy Wasson observed the same conditions at the South Hairston precinct in DeKalb County where two PollPads were down and no one had voted after waiting for an hour after polls should have opened.  (Wasson Decl., Doc. 755 at 74.)  The Chair of the DeKalb Board of Registration and Elections issued a statement indicating technical issues with the new state-issued voting machines.  (Ex. C to Wasson Decl.)

Elizabeth Throop observed the June 9, 2020 primary election at the Miller Grove voting precinct in DeKalb County from 7:30 a.m. to 1:30 p.m.  (Doc. 755 at 101.)  During the 6 hours she was present, the two PollPads used for voter check-in created a bottleneck resulting in voters waiting a minimum of 90 minutes to vote.  Despite the lines, Throop never saw more than half of the 12 BMD touchscreen voting machines in use at any one time.  The PollPads would not scan the voter's driver's license and poll workers were having to enter the driver's license data by hand into the PollPad, and asking voters to review the information line by line to verify it had been entered correctly.  At times, poll workers were looking up names on a paper list.

Samantha Whitley observed multiple polling locations in Fulton, DeKalb, Gwinnett, and Athens-Clarke counties on June 9, 2020.[18]  (Decl. of Samantha Whitley, Doc. 755 at 124-28.)  At 8:15 a.m. at the Dunwoody Library, voters had been waiting over an hour and very few people had voted.  It appeared that no BMD

---

[18] Whitley is an analyst for the Coalition for Good Governance and authorized poll watcher for the Constitution Party.

was in use, voters were not being checked in because the PollPad equipment was down, there was no back up pollbook available, and poll workers were not issuing emergency paper ballots. At 9:15 a.m. at the Gwinnett County Water Department, the line was over 2 hours long. The polling location had not received the voting machines until 8:30 a.m. that morning and no electronic voting equipment had been set up for use by voters. Poll workers began issuing provisional ballots at 7:51 a.m. and did not appear to be properly trained on the emergency or provisional ballot procedures. The first voters were checked in using the PollPads at 10:10 a.m. and voting began on the BMDs at 10:15 a.m. Poll workers appeared to be unfamiliar with the equipment and only the poll manager and a state representative were able to assist voters with equipment or scanner problems. At 10:45 a.m. the line to vote was 2 hours long.

At 3:55 p.m. Whitley arrived at JC07 in Fulton County where the line was approximately an hour long. (*Id.* at 126-27.) The poll manager explained that voters had to vote provisionally until 10:30 a.m. because the BMDs were not operational. Neither a paper pollbook nor emergency ballots were used to decrease voter wait times. When Whitely arrived at the Cross Keys School polling location in DeKalb County at 5:00 p.m., 200 people were waiting in line to vote. A poll worker explained that BMDs were not operational until 11:00 a.m. There were six BMDs and two electronic PollPads in the polling location. The PollPads were causing the longest delay and poll workers did not attempt to use a paper backup to check in voters or issue emergency ballots.

36

Cobb County voter Angela Stone arrived at her polling location at Sope Creek Elementary at 6:50 a.m. on June 9, 2020. (Decl. of Angela Stone, Doc. 755 at 145-148.) At 7:30 a.m. it was reported that the system was down and no one had voted. A few people left the line. Ms. Stone called the Secretary of State's Office, the Cobb County election liaison, and the Cobb County elections office to inquire about the availability of emergency or provisional ballots. Inside the building, Stone saw that there were four PollPads set up but only one was in use. She also saw only two out of six BMDs in use and voters were being escorted by poll workers to each voting station. At the check-in desk, Stone learned that the PollPads would not validate the voter access cards for use in the BMDs. Around 8:45 a.m., Stone observed a poll worker proclaim that the paper backup list of voters had been found. After flipping through the first few pages, the poll workers indicated the manual process would take too long and decided to continue voter check-in on a single operational PollPad. Stone also overheard a poll worker describing the problems they had encountered over the phone and determined that the PollPads had been not been plugged in correctly. The problem was resolved and the poll workers began issuing the voter access cards.

Cobb County voter Lynn Palazzo described the June 9, 2020 primary as the worst voting experience she has encountered. (Decl. of Lynn Palazzo, Doc. 755 at 150-55.) She arrived at her polling place at 6:45 a.m. and voted two hours later at 8:45 a.m. Palazzo had intended to vote absentee by mail for the June 9th election; however, the ballot she received was dated May 19, 2020. Because there were no

instructions indicating that the ballot dated May 19 could be used for the June primary, she discarded it.  When Palazzo arrived at her polling place at 6:45 a.m., there were ten to twelve people in line ahead of her.  Ten minutes after the polls opened, voters were informed by a poll official that the PollPads were down and they should consider coming back later in the day.  The poll worker stated, "no one knows what the heck they're doing because we weren't allowed to open these ahead of time." (*Id.* at 151.)  Palazzo asked the poll manager about using emergency paper ballots, but he expressed his opposition indicating "that takes twice as long." (*Id.*) The poll manager did not seem to be aware of the election code provision for using paper ballots in an emergency situation.  Instead, he had been advising voters to leave and come back later.  After waiting in line for an hour, only two people had been able to vote.  Around 7:50 a.m., the poll manager announced they would start using paper ballots even though they had been provided no instruction on such a switch.  One person voted using a provisional ballot.  Around 8:00 a.m. poll workers were able to start using one operational PollPad.  Palazzo was concerned by the informal procedures used by the assistant poll manager to record the cancellation of her absentee ballot.  She finally voted on a voting machine at 8:45 a.m. and left concerned about the lack of poll worker training to handle the emergency situations that arose during the election.

Several voters also reported problems with the Secretary of State's online voter registration verification system on election day.  Voters could not check their voter registration status or polling place assignment on the My Voter Page on the

Secretary of State's website.  (Marks, Doc. 755 at 15; Wasson Decl., Doc. 755 at 74; Whitley Decl., Doc. 755 at 124-2; Stone Decl., Doc. 755 at 145.)

Ballot Recap Sheets from Fulton County in the June 9, 2020 primary indicate material differences between the number of ballots cast and the number of voters recorded in the PollPads as having been checked in at some Fulton County precincts.  (*See* Ex. D to Marks Decl., Doc. 802 at 46-52.)  According to the declaration of Marilyn Marks, the Ballot Recap Sheet is used to ensure that the number of voters and ballots cast in the polling place as shown by the public counters on the PollPads, the BMD touchscreens, and the precinct scanner reconcile at the close of voting.  (Marks Decl., Doc. 802 at 22.)  This is apparent from the language at the bottom of each of the Ballot Recap Sheets shown below:

| SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1- 3 should match) | TOTAL |
|---|---|
| 1.  TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 481 |
| 2.  TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 455 |
| 3.  POLL PAD CHECKINS + SUPPLEMENTAL VOTERS  *From Poll Pad Recap – Line F* | 472 |

Poll Manager and both Assistant Managers must sign.

Poll Manager          Assistant Manager          Assistant Manager

SIGNED WRONG PRECINT
SIGNED

This form was completed by EPC staff and
signed by poll workers after completion.          Ballot Recap-20

| SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1- 3 should match) | TOTAL |
|---|---|
| 1.  TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 530 |
| 2.  TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 530 |
| 3.  POLL PAD CHECKINS + SUPPLEMENTAL VOTERS  *From Poll Pad Recap – Line F* | 635 |

Poll Manager and both Assistant Managers must sign.

Poll Manager          Assistant Manager          Assistant Manager

**SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1- 3 should match)**

| | TOTAL |
|---|---|
| 1. TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 311 |
| 2. TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 328 |
| 3. POLL PAD CHECKINS + SUPPLEMENTAL VOTERS *From Poll Pad Recap – Line F* | 344 |

Poll Manager and both Assistant Managers must sign.

Poll Manager    Assistant Manager    Assistant Manager

This form was completed by EPC staff and
signed by poll workers after completion.            Ballot Recap-20

---

**SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1- 3 should match)**

| | TOTAL |
|---|---|
| 1. TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 300 |
| 2. TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 286 |
| 3. POLL PAD CHECKINS + SUPPLEMENTAL VOTERS *From Poll Pad Recap – Line F* | 504 |

Poll Manager and both Assistant Managers must sign.

Poll Manager    Assistant Manager    Assistant Manager

This form was completed by EPC staff and
signed by poll workers after completion.            Ballot Recap-20

---

h) TOTAL BALLOTS

**SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1- 3 should match)**

| | TOTAL |
|---|---|
| 1. TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 840 |
| 2. TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 865 |
| 3. POLL PAD CHECKINS + SUPPLEMENTAL VOTERS *From Poll Pad Recap – Line F* | 889 |

Poll Manager and both Assistant Managers must sign.

Poll Manager    Assistant Manager    Assistant Manager

40

| SECTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1 - 3 should match) | TOTAL |
|---|---|
| 1.  TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 659 |
| 2.  TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 623 |
| 3.  POLL PAD CHECKINS + SUPPLEMENTAL VOTERS  *From Poll Pad Recap – Line F* | 645 |

Poll Manager and both Assistant Managers must sign.

Poll Manager          Assistant Manager          Assistant Manager

**This form was completed by EPC staff and
signed by poll workers after completion.**

| CTION C: GRAND TOTALS - NUMBER OF PERSONS VOTING (all totals 1 - 3 should match) | TOTAL |
|---|---|
| TOTAL BALLOTS ISSUED & CAST - *SECTION A; (e)* | 115 |
| TOTAL BALLOTS CAST ON SCANNER - *SECTION B; (h)* | 100 |
| POLL PAD CHECKINS + SUPPLEMENTAL VOTERS  *From Poll Pad Recap – Line F* | 118 |

Manager and both Assistant Managers must sign.

Manager          Assistant Manager          stant Manager

(Ex. D to Marks Decl., Doc. 802 at 46-52.)

The Curling Plaintiffs (who actively supported the Coalition Plaintiffs' pollbook motion, *see, e.g.,* Doc. 901 7-8), also collected voter complaints made regarding the June 9, 2020 election directly to the Secretary of State's office from an array of voters from polling locations across the state.  (*See* Doc. 855-4 at 49, 59, 66).  As one voter from Marietta described, "I went to vote and upon trying to receive the green voter card, it 'jammed' and they couldn't issue it to me.  They tried again and it said 'already voted.'  I had to fill out a provisional ballot." (Doc. 855-4 at 49.)  A second voter from Powder Springs complained about voting delays because the machines were not working, resulting in the line of voters being wrapped around the building as early as 7:30 a.m.  (Doc. 855-4 at 59.)  The voter

placed a call to the Cobb County Board of Elections to learn the office was unaware of the problem with malfunctioning voting machines at the precinct. Voters began asking for provisional ballots and were advised that they were not available until the end of the day causing some voters to leave because of the inability of poll workers to provide any time frames for voting or access to provisional ballots. A sheriff deputy came to the precinct and shared that the problem was statewide, due to programming, and was not the result of poll worker error. The voter reported being provided a provisional ballot at 9:15 a.m. after the PollPad failed to scan the voter's identification. Particularly exasperated by this voting experience, the voter concluded: "I am 66 years old & cannot believe a nation that successfully sent astronauts to the moon in the 60's continues to fail citizens in the most basic tenant [sic] of a democracy." (*Id.*)

Another voter from Suwanee, in Gwinnett County, discussed a concerning experience they had in attempting to vote in person:

> I had filled out an absentee ballot that I decided not to mail in or drop in a drop box, so I brought it to my precinct. It was collected and canceled by a poll worker so that I could vote in person. I was given a green card to take to the voting machine. When I inserted the card, no ballot came up, just a message that said the card was not valid. I returned to the line and explained that my card did not work in the machine. I had witnessed this happen to two other voters while I was there and they were given new cards, returned to the voting machine and cast their votes. When the poll worker attempted to give me a new card, she received a message that told her I had already voted. A phone call was made for guidance. I was told to fill out a provisional ballot, which I did. Since I was the first person in my precinct to submit a provisional ballot, I verified that no other ballots were in the container for holding such ballots and signed a statement saying so. I placed my ballot in the slot and the poll worker closed the lid over the

ballot box, at which point he was supposed to lock the box.  There was just one problem – there was no lock for the box.  I was asked 'Are you cool with just putting it in here like this?'  I said, 'I suppose so, since there appears there is no other way to submit my vote.  This was the very thing I was hoping to avoid by going to my polling place.  I did not want to merely leave my ballot in a box that could potentially be tampered with – although, I must say, I felt better about leaving it at my precinct than in a box at the park.  To summarize, the whole experience left me feeling a little uneasy about the whole process with the new equipment that was being used for the first time.  The poll workers were as confused as I was as to why some of the cards were not working, and mine, in particular, stating that I had voted already when my absentee ballot was confirmed cancelled.  Luckily, I had nowhere to be at the time, or it would have been doubly frustrating, as the whole process to cast my vote took about 45 minutes at a precinct with no line.  Most unsettling, though, was the fact that the system showed I had voted, when I had not and the lack of security in finally submitting my ballot to an unlocked box.  This IS NOT ACCEPTABLE.  It is imperative that these problems be fixed prior to November.

(Doc. 855-4 at 66.)

### August 2020 Runoff Election

The Coalition Plaintiffs presented evidence that many of the same equipment problems persisted in the August 11, 2020 runoff election.

Harri Hursti, an expert in voting system and cybersecurity for the Coalition Plaintiffs, served as public observer, poll watcher, and as the Coalition's expert for purposes of a Rule 34 inspection at certain precincts during the August 2020 runoff election. (Decl. of Harri Hurst, Doc. 802 at 6-13.) Marilyn Marks accompanied Mr. Hursti during his observations. (Decl. of Marilyn Marks, Doc. 802 at 16-22.)  During their visit to the polling location at Peachtree Christian Church, Hursti and Marks talked with the poll manager about the emergency procedures and the paper pollbook backup.  They learned from the poll manager

that "he rarely opens the sealed envelopes with the printed voter lists" and "that it would be a very unusual emergency such as losing all power and battery backup" for over 30 minutes that would "cause him to use such a paper backup list." (Doc. 802 at 17.) The poll manager showed Hursti and Marks the paper voter list that appeared to have been prepared for the June 9 primary election and had not been updated for the August 11 runoff.  (Decl. of Harri Hurst, Doc. 802 at 9; Ex. A to Decl., Doc. 802 at 14; Marks Decl., Doc. 802 at 18.)  The poll manager also explained that provisional ballots are used for all "emergencies" and that any voter issued a paper ballot would be required to complete provisional paperwork and submit it as a provisional ballot.  (Marks Decl., Doc. 802 at 18.)

As a result of the problems encountered with the PollPads during the June 9 primary election, KnowInk decided to disable the password protection for the PollPads for use in the August 11 Runoff.  (Hursti Decl., Doc. 802 at 9-10.) According to Hursti, "the electronic pollbooks are based on general purpose consumer grade hardware and operating systems.  They are not and cannot be adequately secured against malfunctioning or attacks.  They require the standard, universally recommended risk reduction practice of having current paper pollbook backups to be used to issue ballots in the event of emergencies, equipment unreliability, or e-pollbook discrepancies."  (*Id.* at 7, ¶ 5(a).) Hursti further attests that Georgia's practice of "[p]ermitting operation of the electronic pollbooks without password protection is an unacceptable practice from a voting system, or any system processing sensitive data, security standpoint [and] measures like

removing passwords, and therefore weakening the security should never be a workaround to reliability issues." (*Id.* at 10, ¶¶ 11-12.) Moreover, as Hursti explained in his December 16, 2019 declaration, WiFi is not a secure method of handling the type of sensitive data used in a voting system and the WiFi connection issues experienced in the 2019 pilot elections demonstrated the KnowInk WiFi configuration was not reliable based on many variables ranging from weather, to competing traffic, to polling place configuration. (Doc. 680-1 at 89-90.)

Poll workers at the Central Park Recreation Center reported PollPad problems again during the August 11 runoff. (Hursti Decl., Doc. 802 at 11-12.) The PollPads failed to synchronize for check-in and poll workers diverted to a manual process to add up the totals for the poll books. The problem was resolved by 9 a.m. when one of the poll workers accessed the WiFi and Bluetooth setting of the PollPads.

The Fanplex polling location in Fulton County experienced accuracy issues with the electronic pollbooks on August 11. (Hursti Decl., Doc. 802 at 12.) Voters belonging to a new precinct (0F1) were not found on the electronic pollbook system. Poll watchers and poll workers reported that once the poll officials followed instructions provided over the telephone by the county elections office, the voters in 0FI precinct appeared in the PollPads. However, all voters in the 0F1 precinct were reportedly displayed as having voted a mail ballot, even though this was not accurate.

For the August 11, 2020 runoff, Michael Stippich, a registered voter in Fulton County, attempted to vote at the FanPlex precinct, where it took him 3 hours to vote during the June 9 primary. (Decl. of Michael Stippich, Doc. 800-5.) When he arrived, there were no lines and he expected to be in and out within five minutes. After handing the poll worker his driver's license for scanning, Stippich was informed there was an error for his precinct 0F1. He was asked to step aside and wait. Other people from the 0F1 precinct arrived and experienced the same issue. Stippich waited 45 minutes for poll workers to resolve the problem after speaking with the county elections office. After poll workers located the precinct in the system, the PollPads indicated Stippich and the other voters from 0F1 had requested absentee ballots or already voted absentee. Stippich explained that he had not applied for an absentee ballot and always voted in person. He was issued a provisional ballot. Stippich was concerned that an entire precinct would be forced to vote using provisional ballots because the PollPads were not functional and there was no updated paper backup of the polling list.

John T. Peterson, a registered voter in Cherokee County, worked as a Field Support Technician for Dominion Voting in the August 11, 2020 runoff election. (Doc. 800-4.) After answering an advertisement posted on Twitter, Peterson received training on August 7 at a warehouse stocked with voting equipment used by Dominion Voting for the election. Peterson received two to three hours of training on how to set up PollPads, BMDs, printers, and scanners, how to turn the equipment on and off, and where to locate all power buttons, cables and

connections.   Peterson also received a Dominion manual which contained troubleshooting steps.  According to Peterson, the field technicians were advised as part of their training that they were not permitted to touch the equipment at the polls during the election.

On August 11, 2020, Peterson was assigned to a precinct at New Beginnings United Methodist Church in Kennesaw, Cobb County.  Peterson assisted with assembly of the PollPads as none of the poll workers seemed familiar with setting up the equipment. When the polls opened, only seven out of the ten BMDs were working, three of them would not turn on.  Peterson was surprised he had not been asked to assist in troubleshooting the issue. By 9:30 a.m., technical issues had caused two more BMDs to become inoperable and one BMD printer was jammed. Because Peterson was not permitted to touch the equipment, poll workers had to wait for a Dominion technician.

In sum, the Coalition Plaintiffs presented compelling evidence demonstrating that the PollPads failed to perform many of their critical functions during the 2019 pilot elections, the June 2020 primary election, and again in the August 2020 runoff election.  These include failing to read driver's license barcodes to verify registration status during voter check-in, failing to record voter signatures upon check-in resulting in poll workers having to resort to manual processes, failing to accurately report if a voter has voted previously, and failing to encode ballot access cards to allow voters to cast ballots on the BMDs.  As a result, voters waited for hours because of delays and malfunctions with the operation of the

PollPads.  In many instances of such bottlenecks created by operational problems with the PollPads, poll workers did not use paper pollbooks as a backup to aid voter check-in and facilitate voting.  Many voters were required to use provisional ballots, and in some instances, those ballots were rejected without explanation from election officials.

### D.    Injunctive Relief Factors

In determining whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim related to the paper pollbook backup, the Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson v. Celebrezze,* 460 U.S. at 789. Although Coalition Plaintiffs do not characterize the magnitude of the burden on their constitutional rights explicitly in their pollbook motion, they assert that that the undisputed evidence shows that using unreliable and unsecure electronic pollbooks without an updated paper backup disenfranchises voters.  And Plaintiffs have vigorously advocated the need for such relief in these proceedings, dating back at least to the July 2019 preliminary injunction hearing and then again, in additional questions following the Court's issuance of the Order of August 15, 2019, asking the Court to substitute the requirement of provision of pollbooks in place of the less helpful voter registration lists as a backup during voting. (*See, e.g*., Plaintiffs' Rule 59(e) Motion, Doc. 605; Order, Doc. 636.)  The Court in its later conferences with counsel encouraged the State Defendants' counsel to cooperate in addressing this issue.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) ("The right to vote is fundamental, forming the bedrock of our democracy."). Voting is, indisputably, a right "'of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). The right to vote includes "the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). State and local laws that unconstitutionally burden that right are impermissible. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Building on the foundation of evidence from the prior injunction motions, Plaintiffs have presented additional evidence in connection with the State's new voting system and inaccuracy problems in its legacy ENET voter registration database. Plaintiffs' new evidence indicates that the State has yet to work out the host of bugs afflicting its implementation of an entirely new electronic voting system, and along with its contractor, has adopted measures that jeopardize the security of the voter check-in system, including disabling the default password protection of the PollPads and allowing the PollPads to operate on an unreliable and unsecure WiFi connection to transfer sensitive voter data. Plaintiffs' declaration testimony establishes that the threshold bottleneck during voter

check-in significantly has contributed to long lines and waiting periods of hours (far greater than 30 minutes) and caused voters to leave and be deterred from voting.  This evidence combined with issues related to the power supply limitations at multiple polling places (causing equipment shutdowns), repeated issues with the operation of the PollPads and BMDs themselves, and ineffective or nonexistent "non-technical" backup systems in place has led to a severe burden on the rights of voters.

This Court previously held that "[i]f voters' capacity to cast votes are thwarted through an inaccurate express pollbook voting check-in or voter website, this burdens their right to cast votes, scrambles election day voting procedures, and ultimately, in turn affects voting results." (August 15, 2019 Order, Doc. 579 at 89-90.)  The totality of the evidence presented in connection with the elections conducted thus far on the State's new system provides no indication that the circumstances facing voters described above will be better in the November Presidential election.  The imminent harm faced by Plaintiffs and other Georgia electors is of a constitutional magnitude.[19]  *See Democratic Exec. Comm. of Florida*

---

[19]  In addition to the burdens faced by the individual Coalition member Plaintiffs, the Coalition has a protected interest in pursuing its organizational goals of preserving and advancing the constitutional liberties and individual rights of citizens, with an emphasis on preserving and protecting the rights of its members that are exercised through public elections without having to divert resources and personnel to counteract Defendants' challenged actions. (*See* Coalition Pls.' Suppl. Compl. ¶ 214; Third Am. Compl. ¶ 140-141.) *See Georgia Coalition for People's Agenda, Inc. v. Kemp*, 347 F.Supp.3d 1251, 1268 (N.D. Ga. 2018) (finding that "Plaintiffs, as an organization, will also suffer irreparable injury distinct from the injuries of eligible voters. Without an injunction to address the citizenship verification procedure, Plaintiffs' organizational missions, including registration and mobilization efforts, will continue to be frustrated and organization resources will be diverted to assist with the citizenship mismatch issue. Such

*v. Lee*, 915 F.3d at 1321 (characterizing disenfranchisement by signature mismatch rules as imposing a serious burden on the right to vote); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many."); *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) ("Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted."). The Court therefore finds that Coalition Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim that the State Defendants' failure to provide an updated paper pollbook as a backup in the event of electronic equipment malfunctions, outages, or other emergency circumstances and to provide adequate training to election superintendents and staff on the implementation of its new voting system and emergency protocols unnecessarily burdens the rights of Georgia voters.

Defendants suggest there is no constitutional violation because voters have the option to vote absentee to avoid problems with the pollbooks. However, the evidence offered in this case and others in this district, of which the undersigned takes judicial notice, demonstrates that Georgia's absentee voting process also

---

mobilization opportunities cannot be remedied once lost."); *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006) (finding irreparable harm to community organizations engaged in collecting and submitting voter registration applications, where their voter registration operations had been interrupted and they were losing valuable time to engage in core political speech and association and to add new registrants to the election rolls).

poses other risks of voter disenfranchisement.  (*See* August 15, 2019 Order, Doc.

579 at 90, n. 71) (noting that Plaintiffs offered declarations from fourteen voters

who reported that they returned their absentee ballots by the deadline, but the

Secretary of State's website indicates the ballot was not counted); *see also New

Georgia Project v. Raffensperger*, 1:20-cv-1986-ELR, August 31, 2020 Order, Doc.

134 at 57-58 ("Plaintiffs have shown that Georgia voters can be and have been

disenfranchised by the current receipt deadline through no fault of their own. [See,

e.g., Doc. 59-6 ¶ 6] (Plaintiff voter received her absentee ballot on the day before

Election Day). In 2018—a time free from the current complications of the COVID-

19 pandemic and related strains on voting infrastructure—over 3,500 absentee

ballots were rejected in Georgia for arriving after the Election Day receipt deadline.

[Doc. 59-1 at 4]. During the June 2020 Primary Election, the number of rejected-

as-late ballots doubled to 7,281. [Doc. 105-1 at 13]. This evidence suggests the

burden on many voters will be severe.").

       The harm suffered by a voter in being turned away from the polls (or from

being shuffled into a provisional ballot process with no guarantee that their ballot

will be counted) is permanent.  It is well-settled that an infringement on the

fundamental right to vote amounts in an irreparable injury. *See Elrod v. Burns*,

427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018)

("The Court finds that [p]laintiffs have established irreparable injury as a violation

of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.,* 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law."). And "of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted." *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1315 (finding that "[b]ecause of the way Florida has scheduled its election process, some voters who submit a vote-by-mail ballot by the stated deadline are not notified about a signature mismatch until after it is too late to demonstrate their eligibility to vote" and "[a]s a result, their votes do not count, and they are disenfranchised").   And the Eleventh Circuit again recently recognized that although "voters have no judicially enforceable interest in the outcome of an election," they do "have an interest in their ability to vote and in their vote being given the same weight as any other." *Jacobson v. Florida Sec'y of State*, --- F.3d -‑--, 2020 WL 5289377, at *5 (11th Cir. Sept. 3, 2020).

The burden faced by Plaintiffs and other voters can only be upheld as constitutional if the State's opposition to relief is justified by legitimate state interests of sufficient weight.  Where, as here the burden is severe, the State's justifications must be narrowly tailored and advance a compelling state interest.

The only interest put forward by the State Defendants to justify their refusal to provide a reconciled and updated paper backup is a generic "interest in timely and accurate administration of elections" and in the use of electronic pollbooks as the primary method of determining voter eligibility. (Resp., Doc. 815 at 19-20.) But Plaintiffs are not challenging use of electronic pollbooks.  And Defendants do not explain how the provision of an updated paper backup for use during emergency situations where errors in the electronic system persist or pollbooks become inoperable is inconsistent with their "interest in timely and accurate administration of elections."  To the contrary, Plaintiffs' evidence suggests that such a backup would serve both the Defendants' stated interests as well as the constitutional interests advocated by Plaintiffs.  The Secretary of State's Election Director testified at the hearing before this Court that he had no objection to providing counties with the information necessary to prepare such an updated paper backup.  Richard Barron, Director of Registrations and Elections for Fulton County, the county with the largest voter population in Georgia, similarly testified that he had "no issue" with the paper pollbook relief request sought by Plaintiffs, after having testified regarding the KnowInk PollPad operational failure in multiple precincts in both the July and August 2020 elections that was identical to that experienced in Dekalb and Clayton Counties. Barron testified that a paper backup updated through the end of early voting would be helpful to eliminate the need for poll workers to call the county election office during voting. (Vol. II, Tr. at 165) ("The more voters you have that are marked that have voted the fewer calls

you – the precinct is going to have to make to your call center.  That is what that would eliminate."); (*Id.* at 167) ("The more updated it [the list] it is I guess the better – you know, the fewer calls they are going to have to have to make. . . . It also would cut down the number of calls the poll managers would have to make to our office."). According to Barron's hearing testimony, the information Plaintiffs seek in paper form (which would match what is loaded into the electronic pollbooks), "would make the list more accurate as to who has voted and who still is eligible to vote if you do it at the end of early voting." (*Id.* at 166.)  And Mr. Barron further stated that a solution to the PollPad and other related voting bottlenecks would be to have multiple paper pollbooks in the precincts. (*Id.* at 168) ("I mean, that would be the remedy. That way you could cut a line down pretty quickly if you have extra paper pollbooks and you have ballots – emergency ballots.").

The State Defendants' articulated opposition to relief is contradictory.  On the one hand, they assert that as supplemental voter lists are provided to the counties which in turn provide such to the precincts, the Plaintiffs are requesting an unenforceable "obey the law" injunction.  On the other, they assert that the requested relief would cause confusion and change the rules of the election by calling for an entirely new protocol.  Of course, neither of these alternative contentions are accurate.  As laid out in the preceding sections, the registration lists currently provided in paper do not show voting status (as should be reflected in the updated information in the electronic pollbooks) and so they cannot be used

in the same way for check-in and issuance of access cards to the voting machines when the electronic pollbooks experience outages or malfunctions.

Defendants contend that if a paper pollbook backup is required to adjudicate voter eligibility, county election officials would be required to train poll workers on an entirely new protocol. (Harvey Decl. ¶ 17.)  To the contrary, Plaintiffs request that, in the event problems with the PollPads arise, election workers should refer to a paper copy of the pollbook that contains the same information that Mr. Harvey represents is in the electronic pollbooks – updated information from the electors list after the close of early voting during the three days prior to election day.  And because O.C.G.A. § 21-2-224(g) allows for the "official electors list" to include information on whether a person has voted absentee, Plaintiffs' requested injunction does not request a change in the State's election procedures, nor does it impose a new procedure or requirement. See O.C.G.A. § 21-2-224(g) (providing that the official electors list "prepared and distributed to the poll officers of each precinct *may also include* codes designating that an elector has voted by absentee ballot") (emphasis added).   As evidenced by the Secretary of State's own training manual, poll workers are currently trained to use a paper list of electors in the precinct and are directed to refer to the paper list to keep processing voters if the polling place loses power or the PollPads stop working.  Thus, an order directing poll workers to use a paper backup for voter check-in and processing would not be a new protocol and would not require additional training.  The only change would be that the paper backup copy Plaintiffs request would be more complete and

accurate than the current paper electors list and would mirror the information in the e-pollbook. (Ex. B to Marks Decl., Doc. 802 at 27.) *See also* Poll Worker Manual 2020 Edition (updated April 2020) available on the Secretary of State's website at https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll%20Worker%20Training%20Manual.pdf.

As further justification for opposing relief, Defendants assert that "a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" and therefore "an updated electors list could not adjudicate voter eligibility in all situations."  But this assertion acknowledges that an updated list can be used to properly adjudicate voter eligibility for some voters and therefore does not justify denying relief merely because an updated list might not capture every voter. (A poll manager, consistent with current practice, would simply then call the County Elections Office to confirm the voting status for a much smaller, select number of voters.).

The Plaintiffs' concrete, personal, and measurable injury from the potential for imminent and arbitrary denial or burdening of access to the franchise, if in error, far outweighs the State's articulated concerns.  *See Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1296 (N.D. Ga. 2018) (finding "the threatened injury to Plaintiff as an organization and the individuals who cast provisional ballots as a result of irregularities in their voter registration status outweighs any harm to Defendant from the imposition of the ordered injunctive relief").  Assuring that all eligible voters are permitted to vote strengthens rather than undermines

the integrity of the election process.  *See Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1325–26 (concluding that "the serious burden on voters outweighs Florida's identified interests: the state's interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted; the state has not shown that its interest in facilitating timely and orderly election processing will be impaired by providing the injured voters with a reasonable opportunity to have their votes counted; and public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault"); *Martin*, 341 F. Supp. 3d at 1340 (stating that the court "does not understand how assuring that all eligible voters are permitted to vote undermines [the] integrity of the election process. To the contrary, it strengthens it").

The Court is not persuaded by Defendants' assertions that the relief requested by Plaintiffs would be too burdensome to implement in advance of the November elections.[20]  Provision of the updated information in electronic format to each county election superintendent with directions that they print and distribute the paper backup to each precinct would only impose a minimal burden on Defendants.  According to the Dominion/KnowInk documents in Georgia's Request for Proposal, the KnowInk ePulse application can print voter rolls for the

---

[20] Although Mr. Harvey characterizes the "process for printing and separating by precinct the official list of electors" as "time consuming because it requires printing and distributing the individual lists to each of the 159 counties," he also admits that the Secretary of State contracts this process out to a third-party vendor. (Harvey Decl., Doc. 815-1 ¶ 6.)

pollbook and "update voter rolls minutes before an election." (Marks Decl., Doc. 755 at 16; Ex. E to Marks Decl., at 3, 7, Doc. 755 at 45-71.)[21] Alternatively, the State can generate the information from ENET and distribute the reports to the counties for printing as it already does with the supplemental list.

The State Election Board's regulation on the pollbooks and paper backup, already requires that "the paper backup list shall be used in case the electronic poll books do not properly function" and that "poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list."[22]  Ga. Comp. R. & Regs. 183-1-12-.19(1).  *See Martin,* 341 F. Supp. 3d at 1339–40 ("Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens while still furthering the State's asserted interest in maintaining the integrity of its elections.").

The public will be served by this injunction. The "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). Georgia voters have an interest in ensuring their votes are counted. *Common*

---

[21] Exhibit E to the Marks Declaration is a copy of the technical specifications as set forth in the RFP, as posted on the Secretary of State's website.

[22] Pursuant to Georgia law, the Secretary of State is the chief election official for the State. O.C.G.A. 21-2-50(b).  As the chief election official, the Secretary has the power and authority to manage Georgia's election system.  *Id.* The Secretary of State is the Chair of the State Election Board.  The State Election Board is the governmental body responsible for uniform election practice in Georgia.  O.C.G.A. 21-2-31.  Both the Secretary and the State Election Board have significant statutory authority to direct training of local election officials and set election standards.  Thus, State Defendants bear the responsibility to ensure adequate training on their new chosen system to avoid burdening the rights of the State's voters.

*Cause Georgia*, 347 F. Supp. 3d at 1300 (recognizing the "fundamental importance of the interest of voters"); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest therefore favors permitting as many qualified voters to vote as possible."); *see also Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018) ("The public interest is always served by more equitable, easier access to the ballot."). The Eleventh Circuit has also held that the knowledge that otherwise-eligible voters were not counted "would be harmful to the public's perception of the election's legitimacy," and that "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. v. Lee*, 915 F.3d at 1327.

Finally, the Court dispels the notion put forward by the State Defendants that this Court is not authorized to provide any relief when an approaching election is on the horizon, even when the relief is narrowly tailored and aligned with the state's own procedures.  First, Plaintiffs' claims and remedial requests here do not invite the Court to "supervise the administrative details of a local election," as criticized by the Eleventh Circuit in *Curry v. Baker*. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).  Unlike the state election vote tabulation contest at issue in *Curry*, Plaintiffs' current motion is brought in connection with a Federal Congressional and Presidential election. *See id.* at 1304-05 ("Subject to specific exceptions, federal courts should not be involved in settling state election disputes. Sound reasons grounded in both law and public policy establish that far better forums for disputes involving elections to state offices are found in the party

machinery and the court system of the affected state.)   Moreover, Plaintiffs'
challenge in connection with this claim concerns the Secretary of State's failure to
address the security and reliability vulnerabilities in its voter registration data
systems and infrastructure supporting its voting system over a sustained period of
time in multiple election cycles that continues to burden and threaten their ability
to exercise the franchise as recently demonstrated in the State and Federal primary
elections.   As the Eleventh Circuit itself recognized in *Curry*, "[i]n evaluating
claims arising from 'episodic events,' courts have followed the general rule that 'if
the election process itself reaches the point of patent and fundamental unfairness,
a violation of the due process clause may be indicated and relief under  § 1983
therefore in order.'" *Id.* at 1315 (quoting *Duncan v. Poythress,* 657 F.2d 691, 703
(5th Cir. Sept. 28, 1981).[23]   Indeed, as this Circuit Court has recognized,

> Federal courts have properly intervened *when the attack was,
> broadly, upon the fairness of the official terms and procedures under
> which the election was conducted.* The federal courts were not asked
> to count and validate ballots and enter into the details of the
> administration of the election. Rather they were *confronted with an
> officially-sponsored election procedure which, in its basic aspect,
> was flawed.* Due process, representing a profound attitude of fairness
> between man and man, and more particularly between individual and
> government, is implicated in such a situation.

*Duncan*, 657 F.2d at 703 (internal citations omitted) (emphasis added).   This is
one of those cases.   *Bush v. Gore*, 531 U.S. 98, 111 (2000) ("None are more
conscious of the vital limits on judicial authority than are the Members of this

---

[23] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior
to the close of business on September 30, 1981.

Court, and none stand more in admiration of the Constitution's design to leave the selection of the President to the people, through their legislatures, and to the political sphere. When contending parties invoke the process of the courts, however, it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront."). The Fourteenth Amendment due process clause protects against "the disenfranchisement of a state electorate," and "forbids state officials from unlawfully eliminating that fundamental right." *Duncan,* 657 F2d. at 704, 708.

Second, with election day six weeks away, it is not too late to order relief to address the potential for unnecessarily burdening and eliminating the rights of voters by mandating the use of emergency backup procedures in a meaningful manner.[24]

The Court's remedy is narrowly tailored and manageable within the framework of the current system without any major changes required of the Secretary of State or local election superintendents. The remedy's conformity with the overall regulatory scheme guards against any risk of confusion. Plaintiffs have been seeking this relief for a long time, and their pleas have fallen on the State's deaf ears. Accordingly, the relief here is necessary to prevent voter disenfranchisement and to ensure timely (in case of lines/delays) and accurate (up

---

[24] *See* O.C.G.A. § 21-2-224(f) ("The official list of electors eligible to vote in any primary or election shall be prepared and completed *at least five calendar days prior to* the date of the primary or election in which the list is to be used.") (emphasis added).

to date information on eligibility and qualification of voters) administration of the election.

## IV.  Remedy

As explained above, the Court finds that Plaintiffs are likely to succeed on the merits of their claim regarding the security and reliability of the voter registration database and electronic pollbook system, that they will be irreparably harmed if deprived of their right to vote, that the balance of equities weigh in Plaintiffs' favor, and that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the fundamental political right to vote."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247-48 (4th Cir. 2014) ("By definition, [t]he public interest ... favors permitting as many qualified voters to vote as possible.'") (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018) ("The public interest is always served by more equitable, easier access to the ballot.").

The evidence the Coalition Plaintiffs provided in support of their motion demonstrates a system wide problem of malfunctioning electronic PollPads beginning with the November 2019 pilot elections, again in the June 2020 primary election, and most recently in the August 2020 runoff elections in tandem with wholly inadequate backup plans and voter registration data deficiencies that

resulted in voter disenfranchisement and that is likely to continue in the upcoming Federal Presidential election.

Accordingly, the Court **GRANTS** the Coalition Plaintiffs' Motion [Doc. 800] and issues the following preliminary injunctive relief set forth below.[25]

UNTIL FURTHER ORDER OF THIS COURT:

Effective immediately, the Secretary of State shall generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook.[26]   The Secretary of State shall further direct every county election superintendent (1) to print and provide at each polling place at least one paper back-up of the pollbook for use on Election Day, which paper back-up shall be

---

[25] The Court finds that it is appropriate to waive the requirement under Rule 65(c) that Plaintiffs post security. *See New Georgia Project v. Raffensperger*, 1:20-cv-1986-ELR, August 31, 2020 Order, Doc. 143 at 67 n.33 (granting in part plaintiffs' motion for preliminary injunction and waiving bond requirement); *Georgia State Conference NAACP v. Georgia*, 1:17-CV-1397-TCB, 2017 WL 9435558, at *5 (N.D. Ga. May 4, 2017); *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Despite the mandatory nature of [Rule 65(c)'s] language, federal courts have come to recognize that the district court possesses discretion over whether to require the posting of security. Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.") (internal punctuation and citation omitted).

[26] Consistent with O.C.G.A. § 21-2-224(b) and State Election Board Rule 183-1-12-.19(8), this list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. *See* O.C.G.A. § 21-2-224(b) ("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot."); Ga. Comp. R. & Regs. 183-1-12-.19(8) ("Prior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to accurately mark all persons who have been issued or cast absentee ballots in the election."). The Secretary may generate this information directly from the PollPads or from ENET and the Absentee Voter Report referenced in their filing at Doc. 895.

updated after the close of absentee in-person voting (early voting); (2) to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d);[27] (3) to allow voters who are shown to be eligible electors on the paper pollbook backups who are not shown on the updated list as having requested an absentee mail-in ballot to cast a regular emergency ballot that is not to be treated as a provisional ballot; (4) to allow voters who are shown to be eligible electors on the paper pollbook backups but who are shown on the updated list as having requested an absentee mail-in ballot to have their absentee ballot canceled[28] and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter either surrenders the absentee ballot to the poll manager of the precinct or in the case of a voter who has requested but not yet received their absentee ballot completes an elector's oath[29] affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election; (4) to take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency

---

[27] The State Election Board's Emergency Rule, Ga. R. & R. 183-1-12.11(2)(d), defines the types of events that may be considered emergencies as "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes."

[28] *See* O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

[29] *See* O.C.G.A. § 21-2-384.

ballots, if necessary; and (5) maintain a sufficient stock of emergency paper ballots.[30]   While the Court has ordered that a minimum of one paper pollbook backup should be made available for each polling place, it is likely that more than one copy would be needed in large precincts per the testimony of Fulton County's Director of County Registration and Elections.   As precincts vary in size enormously across the counties and the State, the Court **FURTHER ORDERS** that the Secretary of State direct all local election superintendents to evaluate the need for issuance of additional copies of the  pollbook backup printouts as back-up tools for precincts based on the number of registered voters in each county precinct or polling location and to promptly advise the County Registrar's Office of the number of such additional copies needed.

## V.    Conclusion

For the reasons set forth above, the Court **GRANTS** the Coalition Plaintiffs' Motion for Preliminary Injunction on Paper Pollbook Backups, [Doc. 800] (supported by the Curling Plaintiffs) and the relief requested, as more specifically set forth herein. The narrowly tailored relief ordered directs that the State Defendants provide at least a modicum of the voting backup plan tools essential to

---

[30] This relief is consistent with State Election Board Rule 183-1-12-.19(1) that requires that election superintendents equip each polling place with the electronic pollbooks, a paper backup list, and ensure that "poll workers [] be adequately trained in checking in voters on both electronic poll books and paper backup list." Ga. Comp. R. & Regs. 183-1-12-.19(1); *see also* Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) (providing that the "election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place").

protecting voters' constitutionally protected ability and right to cast a ballot that is counted and given the same weight as any other on this coming November 3rd general election day and thereafter.[31] It is not too late for Defendants to take these reasonable concrete measures to mitigate the real potential harms that would otherwise likely transpire at precinct polling locations grappling with the boiling brew created by the combination of new voting equipment issues and old voter data system deficiencies.

**IT IS SO ORDERED** this 28th day of September, 2020.

Honorable Amy Totenberg
United States District Judge

---

[31] This relief is also consistent with the advice of the Department of Homeland Security.  As reported by the New York Times in an article yesterday, Christopher Krebs, who runs the Cybersecurity and Infrastructure Security Agency for the Department of Homeland Security "noted that the agency [i]s trying to make sure local election officials printed out their electronic poll books, which are used to check in voters, so that they ha[ve] a backup." Nicole Perlroth and David E. Sanger, Ransomware Attacks Take on New Urgency Ahead of Vote, The New York Times, September 27, 2020, available at https://www.nytimes.com/2020/09/27/technology/2020-election-security-threats.html?referringSource=articleShare.