## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DONNA CURLING, *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' CONSOLIDATED MOTION AND BRIEF IN SUPPORT OF EMERGENCY MOTION[1] TO STAY

State Defendants request a stay of this Court's Order of September 28, 2020, [Doc. 918], granting in part preliminary injunctive relief sought by Coalition Plaintiffs in their Motion for Preliminary Injunction on Paper Pollbook Backups, [Doc. 800], pending appeal of the Court's Order to the Eleventh Circuit Court of Appeals. What the Court termed a "limited common sense remedy," [Doc. 918, p. 1], is, in reality, a significant change to Georgia election law. In ordering that change, the Court applied the wrong

---

[1] There exists good cause for treating this as an emergency motion and waiving the time requirements of Local Rule 7.1. The Court ordered significant changes to voting process after the election is underway, and it will continue to cause irreparable harm as long as it remains in place. State Defendants thus asks this Court to rule on the Motion as soon as possible.

legal standard and granted relief on a claim that is not part of this case. Even on a reduced evidentiary standard, the Court also improperly took judicial notice of disputed facts and shifted the burden to State Defendants, while ignoring evidence provided by State Defendants.

Moreover, the Court "dispel[led]" State Defendants' warning that the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citations omitted) ("*RNC*"). But precedent is clear that last-minute challenges to longstanding election procedures are strongly disfavored because they threaten to disrupt the orderly administration of elections, which is essential to the functioning of our participatory democracy. *See, e.g.*, *id.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). Just last week, the Eleventh Circuit stayed another election case in this district, reiterating that "we are not on the eve of the election—we are **in the middle of it**, with absentee ballots already printed and mailed." *New Georgia Project, et al. v. Raffensperger, et al.*, 20-13360, 2020 WL 5877588, at *3 (11th Cir. Oct. 2, 2020) (emphasis added).

Staying the preliminary injunction here will ensure at least a modicum careful deliberation before mandating such a drastic change.

## PROCEDURAL BACKGROUND

### I.   Genesis

This case was filed in Fulton County Superior Court on August 4, 2017. [Doc. 1-2, p. 115[2]]. The original Complaint sought to overturn the election for the U.S. House of Representatives in the June 20, 2017 runoff under the State's election-contest procedure and a variety of other relief. [Doc. 1-2, pp. 63-69]. Four days later, on August 8, 2017, the case was removed to this Court. [Doc. 1].

Plaintiffs immediately sought to amend their complaint and, on August 12, requested "limited early and expedited discovery." [Docs. 2, 4, 7]. State Defendants moved to dismiss the case, [Doc. 8], but the Court allowed Plaintiffs' Amended Complaint. [Docs 14, 15, pp. 93-100]. The only reference to the voter-registration database in the Amended Complaint was to an incident that occurred in April 2017 involving the theft of four electronic pollbooks. [Doc. 15, ¶ 79].

Plaintiffs later filed their Second Amended Complaint (SAC) on September 15, 2017. [Doc. 70]. The SAC made clear what system Plaintiffs were challenging and seeking to enjoin: the "('DRE') voting system ('Voting

---

[2] All pinpoint citations to docket entries are to the blue ECF pagination at the top of each page.

System').") [Doc. 70, ¶¶ 3, 165]. It did not mention the voter-registration database except to reference the 2017 theft of e-pollbooks, which are no longer used, and remained focused on DREs. *Id.* at ¶¶ 3, 51, 61, 71, 87.

The case then became bogged down in changes to Plaintiffs' counsel, with the Court ultimately administratively closing the case. At this point, the Plaintiffs split into two groups: (a) the Coalition Plaintiffs and (b) the Curling Plaintiffs.[3] [Docs. 160, 189].

## II. Litigation recommences: Plaintiffs' first motions for preliminary injunction.

On May 10, 2018, the Court officially reopened the case, [Doc. 198], and held a status conference on preservation that included the scope of the issues in the case—particularly to consider whether optical scanners were part of the litigation. [Doc. 204 at 10:1-11]. After the Court granted a motion for leave to amend, the Coalition Plaintiffs filed their Third Amended Complaint (TAC). [Doc. 226]. Coalition Plaintiffs' TAC now defined "Georgia's Voting System" to include four components: (1) AccuVote DREs, (2) Diebold optical

---

[3] The Coalition Plaintiffs consist of Plaintiffs Coalition for Good Governance, Laura Digges, William Digges III, Ricardo Davis, and Megan Missett. The Curling Plaintiffs consist of Plaintiffs Donna Curling, Donna Price and Jeffrey Schoenberg.

scanners, (3) Electronic Poll Books, and (4) the GEMS software. [Doc. 226, ¶ 59]. Curling Plaintiffs continued under the SAC.

On August 3, 2018, the first motion for preliminary injunction was filed. That motion sought to mandate the use of hand-marked paper ballots in the November 2018 elections and to require precertification audits of those results. [Doc. 258, pp. 1-2]. Four days later, the Court recognized a serious problem with the motion: "Would statewide implementation of the requested relief in an expedited, limited time frame actually compromise the reliability and functionality of the voting system and therefore adversely impact the public interest in this 2018 election cycle?" [Doc. 259, pp. 1-2]. In light of this reality, the Court directed Defendants to "particularly focus on the public interest factor" in their response. *Id.* at p. 2. Also on August 7, the Curling Plaintiffs filed their own motion for a preliminary injunction, later amended. [Docs. 260, 271]. The amended motion sought no relief related to pollbooks. [Doc. 271-1].

On September 12, 2018, the first preliminary-injunction hearing convened and, after hearing argument, the Court ruled Plaintiffs had sufficiently alleged standing and that the Eleventh Amendment did not bar the case. [Doc. 307 at 33:1-22, 34:20-25]. The Court memorialized its oral

ruling on those jurisdictional issues and addressed the motions for preliminary injunction on September 17, 2019, in a 46-page order.

The Court began its discussion of the preliminary injunction motions by noting its "measure of true caution" in finding that Plaintiffs were likely to succeed on the merits, and noted that "the **case would benefit from some discovery** and a full evidentiary hearing on the merits over several days." [Doc. 309, p. 32] (emphasis added). The Court castigated State Defendants for presenting "scant evidence" at the hearing, [Doc. 309, pp. 34-35], but made no mention of its direction for Defendants to "particularly focus on the public interest factor."[4] [Doc. 259, pp. 1-2]. The Court denied Plaintiffs' motion, finding that the Defendants' argument about "resource constraints" were compelling, "with the November election just weeks away." [Doc. 309, 9. 44].

## III.   Appeal, remand, repeat.

Following the Court's September 2018 Order, State Defendants immediately appealed and moved to stay the proceedings pending the outcome of the Eleventh-Amendment defenses. [Doc. 311, 320]. After the Eleventh Circuit affirmed in part and dismissed in part in February 2019,

---

[4] The Court subsequently chided State Defendants' prior counsel—both esteemed members of the Bar, one a former Governor—for expressing their displeasure with the Court's manner of proceeding in the case. [Doc. 333].

[Doc. 338], the State obtained new counsel. [Doc. 339]. The Court then ruled on the pending motions to dismiss on May 21, 2019. [Doc. 375] and ordered discovery begin immediately, prior to any joint preliminary report. *Id.* Meanwhile, on March 14, 2019, the Georgia General Assembly adopted a new voting system, using Ballot Marking Devices ("BMDs"), which became effective on April 2, 2019. 2019 Ga. Laws Act No. 24 (H.B. 316).

Curling Plaintiffs filed their second motion for preliminary injunction on May 30, 2019, [Doc. 387], and the Court set a briefing schedule on Coalition Plaintiffs' yet-to-be-filed motion and set a hearing for July 25-26, 2019 on the motions. [Doc. 398]. Coalition Plaintiffs' motion, filed on June 21, 2019, was evidently the first mention of paper pollbook backups in this case and sought to have paper pollbooks used as "the official record on Election Day for adjudication" of voter eligibility. [Doc. 419-1, p. 42].

On August 15, 2019, the Court issued a 153-page order denying Plaintiffs' request to prohibit use of the DRE system in the 2019 elections, but enjoining its use after 2019 (which was the state's plan). [Doc. 579]. Despite discovery only being open for little more than six weeks with no expert reports, the Court declared the record in the case to be "substantial" and that Plaintiffs had "marshaled a large body of evidence," [Doc. 579, p. 5], including the "fulsome expert opinion and evidence provided in this case"—

despite the fact that not a single expert of plaintiffs had been deposed. *Id.* at 70. And the Court further relied on a "mountain of voter testimony," *id.* at 11, despite the fact that none of this voter testimony was the subject of cross-examination at any point.

The Court continued to excoriate State Defendants as "slow and poorly equipped," having "blithe blindness" to past security incidents, and having "inconsistent candor" with the Court, finding that State Defendants' conduct "casts a disturbing shadow on Defendants' posture here," as it told about the "saga" of this lawsuit. [Doc. 579, pp. 5-6, 70, 71]. The Court also opined at length about the "perilous vulnerability and unreliability of the State's electronic voter registration system"—an issue that is nowhere to be found in the various complaints in this case. [Doc. 579, pp. 7, 83, 90, 98-107, 109-112]. But in reaching that conclusion, the Court went far beyond just the issues presented. The Court went to the record of a *different* (closed) case involving the voter-registration database—which also never had formal discovery of any sort—and *sua sponte* unsealed a declaration filed in that case as further support for the Court's factual findings. [Doc. 579, p. 86-88]. The Court went on to order, among other things, that State Defendants must develop a plan about voter-registration-database issues and to counties to furnish a "printout of the voter registration list for that precinct." [Doc. 579, p. 149-50].

The Court held a status conference on August 27 to address various issues, but noted that it "may seek additional written clarification from the State Defendants and will itself provide supplemental written clarification regarding the relief ordered in section 5 on page 150 of the preliminary injunction Order in light of the information provided by Defendants." [Doc. 588]. The Court explained that issues related to the voter-registration system "had not been totally clear" when it ruled. [Doc. 598, p. 2]. Without other evidence or any citation to the operative complaints, the Court described "accuracy problems baked into the SOS voter database." [Doc. 598, p. 4].

## IV.   What is old is new again.

On August 16, 2019, the day after the Court's ruling on the second round of preliminary-injunction motions, Curling Plaintiffs sought to amend their TAC to challenge the new BMDs. [Doc. 581]. The Court set a briefing schedule for amended and supplemental complaints. [Doc. 594]. On October 15, 2019, the Court granted the motions to amend and supplement, adding the new BMDs to this case. [Doc. 626].

The operative complaints became the Curling Plaintiffs' Third Amended Complaint (TAC) [Doc. 627] and the Coalition Plaintiffs' First Supplemental Complaint (FSC) [Doc. 628]. Coalition Plaintiffs' FSC defines the "Dominion BMD System" as the (1) the election management system, (2)

the adjudication software, (3) the BMD itself, (4) the precinct scanner, and (5) the central scanner. [Doc. 628, ¶ 67]. The only mention of pollbooks in the FSC is in explaining how a voter votes and the rollout of new equipment. [Doc. 628, ¶¶ 70-71, 189].

Plaintiffs filed new preliminary-injunction motions in late 2019, asserting that voting by BMD is unconstitutional.[5] [Docs. 619, 640]. In orders issued on March 2, the Court scheduled a hearing for March 6, "for the purpose of asking some limited questions of the State's counsel, witness-representatives, and designated experts," identifying six topics and numerous sub-topics to be addressed. [Docs. 714, 715]. State Defendants also moved to dismiss the new complaints, [Doc. 645], which the Court granted in part on July 30, 2020, again ordering discovery to commence immediately.[6] [Doc. 751].

The Court denied the pending preliminary-injunction motions, finding the record "dated" and "insufficient," but permitted Plaintiffs the chance to

---

[5] Meanwhile, fact discovery ended on November 15, 2019 and Plaintiffs never submitted any expert reports as originally scheduled. [Doc. 418].

[6] In particular, the Court noted that "State Defendants ignored this Court's directives" that it would not "entertain further arguments" regarding dismissal of Plaintiffs DRE claims including arguments regarding mootness of those claims. [Doc. 751]. Faced with deciding whether to follow this Court's directive (which backfired on prior counsel) and not raise jurisdictional defenses, State Defendants moved to dismiss Plaintiffs' DRE claims as moot.

refile with additional evidence. [Doc. 768]. The Court then granted expedited

discovery, [Doc. 775], with an eye toward new preliminary-injunction

motions. Eight days later, Curling Plaintiffs filed their fourth preliminary

injunction motion, strikingly similar to the one the Court had just dismissed.

[Doc. 785]. They did not seek relief related to paper pollbooks.[7] The Court set

a briefing schedule that had all briefing, including on not-yet-filed motions,

complete within 11 days. [Doc. 788]. Coalition Plaintiffs then filed their

preliminary-injunction motion regarding paper pollbook backups on August

21, [Doc. 800], and their motion regarding BMDs on August 24. [Doc. 809].

## ARGUMENT AND CITATION TO AUTHORITY

Under Fed. R. Civ. P. 62(c), a court may stay an injunction pending

appeal. Courts consider four factors to determine whether to grant a stay

pending appeal: "(1) whether the stay applicant has made a strong showing

that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will

---

[7] The Order states that Curling Plaintiffs "actively supported the Coalition Plaintiffs' pollbook motion." [Doc. 918, p. 41]. This is incorrect. Curling Plaintiffs have at no point joined in Coalition Plaintiffs' quest for paper pollbook relief and the Court's citation ([Doc. 901, pp. 7-8]) does not support such statement. There, Defendants filed objections to the Court's *sua sponte* order to elicit feasibility evidence after close of the hearing, [Doc. 895], and the Court permitted a response from Plaintiffs, [Doc. 900]. Curling Plaintiffs' response makes *no* mention of paper pollbooks. *See generally* [Doc. 901].

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Nken,* 556 U.S. at 434. Each of these factors favors granting a stay pending State Defendants' appeal of this Court's order granting a preliminary injunction.

## I. Defendants are likely to succeed on the merits of the appeal.

The legal basis on which Coalition Plaintiffs sought the relief this Court granted is unknown. As State Defendants noted in response, Coalition Plaintiffs offered this Court *no* legal authority on which to grant their motion.[8] [Doc. 815 at 1]. Nor does the Order offer any clarity as to which provision of the U.S. Constitution demands paper pollbook back-ups.

A. <u>The Order exceeds the scope of the Court's authority by seeking to bind nonparties, re-write the Georgia Election Code, and interpret state law.</u>

i. *The Order improperly seeks to bind nonparties.*

The Court claims that the relief ordered, "would not be a new protocol and would not require additional training." [Doc. 918 at 56]. But the Court is overly optimistic. Moreover, the Court has taken it upon itself to rewrite

---

[8] The Order grants relief completely different than Coalition's complaint—which makes no mention of paper pollbooks. This alone is reason to grant a stay. *See DeBeers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945).

Georgia's election code and direct the Secretary to exercise control over non-parties to this action that neither the Secretary nor this Court possess.

In this Circuit, the constitutional limitations placed on the federal judiciary "require[] that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Jacobson v. Fla. Sec'y of State,* No. 19-14552, 2020 WL 5289377, at *12 (11th Cir. Sept. 3, 2020) (citing *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1305 (11th Cir. 2019) (emphasis original).

It is undisputed that the election superintendents and registrars of all of Georgia's 159 counties (with the exception of Fulton County) are not parties to this action. And Georgia law requires the county absentee ballot clerks or registrars—not the superintendents and not the Secretary—to confirm that an elector's absentee ballot has not yet been received by the board of registrars. *See* O.C.G.A. § 21-2-388. Yet the Court attempts to sidestep this deficiency by ordering the Secretary to direct the county superintendents to require poll workers follow the Order. The Eleventh Circuit has specifically rejected this kind of relief: "this 'notice' theory of redressability contravenes the 'settled principle[]' that 'it must be the effect of the court's judgment on the defendant—not an absent third party—that

redresses the plaintiff's injury.'" *Jacobson*, 2020 WL 5289377 at \*12 (citing *Lewis,* 944 F. 3d at 1301).

The process the Court seeks to alter through its Order is one the Secretary does not have the power to overturn or alter in the first place. Indeed, the county absentee ballot clerks and registrars are mandated by law to carry out a specific procedure, and this Court's attempts to alter that procedure do not change that fact, particularly when those local officials are not parties to the suit. O.C.G.A. § 21-2-388(2) requires registrars to "confirm[] that the elector's absentee ballot has not yet been received by the board of registrars" prior to allowing a voter to vote in the precinct on Election Day. Thus, it is not sufficient that pollworkers merely satisfy themselves as to the identity of an absentee voter that now presents at the polling place to vote in-person. They must also ***confirm*** with the registrar that the absentee ballot has not been returned before the voter can vote in person. But the Order effectively excises this necessary and non-discretionary step from Georgia law, because the Court orders the Secretary to direct every superintendent that no such additional check is required before voters who are shown as "having requested an absentee mail-in ballot" are allowed to vote on the BMDs. [Doc. 9 at 65].

As earlier noted, this is not within the capacity of this Court to order. "The Super[intendents] are obliged under state law to continue [lawful election practices]… regardless of what a federal court might say in an action that does not involve them." *Jacobson,* 2020 WL 5289377 at \*12. Further, "federal courts have no authority to erase a duly enacted law from the statute books." *Id.* (citing Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)). The courts' "power is more limited: we may 'enjoin executive officials from taking steps to enforce a statute.'" *Id.* "And we can exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit." *Id.* No injunction against State Defendants will alter the independent obligations of the non-party election superintendents and the Court exceeded its authority by ordering otherwise.

   ii. *Coalition Plaintiffs' claim presents a nonjusticiable political question.*

The Court's Order substitutes Coalition Plaintiffs' preference in the place of the State's established policies and procedures. Specifically, the Order found, ***as a matter of constitutional law***, that paper backups employed by the State are constitutionally infirm, but backups printed at a later point pass muster and must be utilized without reference to the State's statutory framework. Determining the timing of printing paper pollbook

backups and procedures for canceling absentee ballots are questions of policy with no judicially manageable standards. *See Coalition for Good Governance v. Raffensperger*, No. 1:20-cv-1677-TCB, 2020 WL 2509092, at *1, *3 (N.D. Ga. May 14, 2020) (citing *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) and *Jacobson*, No. 19-14552, 2020 WL 2049076, at *18 (11th Cir. Apr. 29, 2020) (William Pryor, J., concurring)). And, foundationally, the Elections Clause commits the administration of elections to coordinate political departments—Congress and state legislatures. U.S. Const. Art. I, § 4, cl. 1. The same determination requires an initial policy determination reserved for other officials. "It would be inappropriate for a district court to undertake this responsibility in the unlikely event that it possessed the requisite technical competence to do so." *Aktepe v. United States of America*, 105 F.3d 1400, 1404 (11th Cir. 1997).

Similar to the Eleventh Circuit's recent decision in *Jacobson*, "no judicially discernable and manageable standards exist" to determine what is the appropriate timing for printing paper backups or whether poll workers should rely only on a voter's oath, rather than verification from the registrar or absentee ballot clerk, to confirm whether voters have returned absentee ballots. *See Jacobson*, 2020 WL 5289377, at *1. As the record suggests, a paper pollbook backup would not capture all absentee voters, [Doc. 815-1, ¶

15], thus determining the equitable manner in which to reconcile voter

eligibility questions is best left to state policymakers and deserves deference.

    iii. *The Order is barred by the Eleventh Amendment.*

    Left with no suggestion of any basis in law on which to base the relief

granted—much less any vindication of federal rights—this Court vaguely

offers that "the harm faced by Plaintiffs and other [non-party] Georgia

electors is of a constitutional magnitude," [Doc. 918 at 50], and goes on to

state that "the State Defendants' failure to provide an *updated* paper

pollbook . . . and to provide adequate training[9] to election superintendents

and staff . . . unnecessarily burdens the rights of Georgia voters." *Id.* at 51

(emphasis added). But the Order offers no basis to determine what is a

sufficient *update* to avoid "unnecessarily" burdening the constitutional rights

of Georgia voters. Nor does the Order offer any clarity as to what federal

right is being "vindicated" as *Ex Parte Young* demands. *See Pennhurst State*

*School & Hosp. v. Halderman,* 465 U.S. 89, 105–106 (1984). Instead, the

Order supplants the decision of state policymakers with the preferences of

Plaintiffs, apparently because they "have been seeking this relief for a long

---

[9] State Defendants note that the Plaintiffs did not raise any purported
training deficiencies regarding the SEB's emergency rules. Indeed, the word
"train" does not appear at all in Curling Plaintiffs' TAC, [Doc. 581-2], and
only once in Coalition Plaintiffs' FSC. [Doc. 601 at ¶ 190].

time, and their pleas have fallen on deaf ears." [Doc. 918 at 62]. Such is not the standard the Constitution demands. Even still, the *Ex Parte Young* exception "'is limited to [the] precise situation' in which 'a federal court commands a state official to do nothing more than refrain from violating federal law.'" *Jacobson*, 2020 WL 5289377 at *14 (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (alterations in original). The Order enjoins no such action but instead mandates its continuation, just at a different time.

Second, the Court's Order implicates the State's sovereignty interests and impermissibly intrudes into the administrative details of elections. In previously rejecting this argument by State Defendants, the Eleventh Circuit noted that "Plaintiffs [did] not seek a court order directing the precise way in which Georgia should conduct voting," *Curling v. Sec'y of State of Georgia*, 761 F. App'x 927, 934 (2019), but that is precisely what this Court has now ordered. The Court did not grant a simple injunction prohibiting enforcement of a law as Plaintiffs sought before—instead it granted relief which mandates the use of *updated* paper pollbooks, requires nonparty county superintendents ignore state law regarding voter eligibility and canceling absentee ballots, requires training of election superintendents and pollworkers on the use of these new procedures before November 3, 2020, and

to maintain a "sufficient stock of emergency paper ballots."[10] There is no

constitutional basis which permits this Court to oversee such details of the

election. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986); *see also*

*Pettengill v. Putnam County R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1973).

B. Defendants are likely to succeed on appeal since the Court applied the incorrect legal standard, considered evidence not before the Court, and shifted the burden to Defendants.

The Order evaluates Coalition Plaintiffs' Motion as seeking claims

under the *Anderson-Burdick* framework which considers the alleged burden

on the right to vote against the interest of government. *Anderson v.*

*Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens

on plaintiffs' rights must be narrowly tailored and advance a compelling state

interest. Lesser burdens, however, trigger less exacting review, and a State's

'important regulatory interests' will usually be enough to justify 'reasonable,

nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*,

520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434

(1992)). This framework imposes no burden of proof or evidentiary showing

---

[10] The Court noted that certain of these measures are "consistent" with State law or SEB Rules. If that is the case, how does the *State's* enforcement of these "consistent" statutes possibly amount to a violation of federal law, when remedy for that purported violation is to follow existent state law? That would be an impermissible "obey-the-law" injunction. *S.E.C. v. Goble*, 682 F.3d 934, 948-52 (11th Cir. 2012).

on states. *Common Cause/GA v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). In challenges to a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *accord Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

> i. *No Due Process claim asserted by Coalition Plaintiffs is pending before the Court.*

The Court referenced "due process" and the *Anderson-Burdick* analysis throughout its Order, but the Coalition Plaintiffs' procedural due process claim was dismissed and they did not allege a substantive due process claim. *See, e.g.,* [Doc. 918 at 7, 48, 61, 62]; *see also, generally*, [Doc. 628]. Coalition Plaintiffs preliminary-injunction motion and brief did not cite to a single case as support, [Doc. 800], and State Defendants noted in their response to the motion that the FSC and motion are silent on the legal bases for the motion on paper pollbook backups, [Doc. 815].

Even if the Coalition Plaintiffs' motion on paper pollbook backups is based on the First and Fourteenth Amendment claim in the FSC, the PollPads coupled with the current paper pollbook backups are not a severe burden on the right to vote. No voters are disenfranchised because voters showing up at the polls can vote a provisional ballot and have their ballot

counted after review of the records in the voter-registration database.

O.C.G.A. §§ 21-2-418, 21-2-419(b).

    ii. *The Court took judicial notice of disputed evidence.*

The Court took judicial notice of disputed evidence and findings in other cases in this district to support its findings.[11] [Doc. 919 at 24 n.12, 51]. Evidence the Court took judicial notice of included sworn declarations of voters and poll watchers related to voter registration and provisional ballots from *Common Cause Georgia v. Kemp*, 347 F.Supp.3d 1270 (N.D. Ga. 2018). *Id.* at 24 n.12. Additionally, as support for the Court's finding that the evidence "demonstrates that Georgia's absentee voting process also poses other risks of disenfranchisement," the Court took judicial notice of evidence in a recent order in *New Georgia Project v. Raffensperger*, 1:20-cv-1986-ELR (N.D. Ga. Aug. 31, 2020). *Id.* at 51-52. Conducting fact-finding in this manner is not an appropriate use of judicial notice.

Courts may not take judicial notice of any matter that is in dispute. *Walker v. Woodford*, 454 F.Supp.2d 1007 (S.D. Cal. 2006). Federal Rule of

---

[11] The Court also took notice of a New York Times article (quoting a Department of Homeland Security official) in determining that the Court's Order was "consistent" with that advice. [Doc. 918, p. 67, n.31]. Though the evidentiary standard on a preliminary injunction is relaxed, it is not so relaxed that a federal court may utilize hearsay within hearsay, pulled from the Sunday paper to satisfy Plaintiffs' burden.

Evidence 201 "was intended to obviate the need for formal fact-finding as to certain facts that are undisputed and easily verified." *Id.* (citing *Melong v. Micronesian Claims Comm.*, 643 F.2d 10, 12 n.5 (D.C. Cir. 1980). "Since the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and in effect, directing a verdict against him as to the fact noticed, the fact must be one that only an unreasonable person would insist on disputing." *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citation omitted).

Here, the evidence and findings in *Common Cause Georgia v. Kemp* and *New Georgia Project v. Raffensperger* were disputed and unverified. Indeed, the *New Georgia Project* case is on appeal to the Eleventh Circuit because the district court's findings were not supported by the evidence in that case. *See generally New Georgia Project*, 2020 WL 5877588 (11th Cir. Oct. 2, 2020). Because the evidence in those cases did not indisputably establish the facts or the findings, which were the bases for taking judicial notice by this Court, judicial notice was inappropriate.

Even still, when a judge takes judicial notice of facts other than at the request of a party—discretionary judicial notice—the judge should notify the parties that she is doing so and afford them opportunity to be heard. *U.S. v. Garcia*, 672 F.2d 1349 (11th Cir. 1982). Here, the parties were not informed

that the Court would be taking judicial notice of the evidence and findings in

*Common Cause Georgia v. Kemp* and *New Georgia Project v. Raffensperger*.

In doing so, the Court deprived State Defendants of an opportunity to be

heard on the matter—eschewing adversarial practice.

    iii. *The Court improperly shifted the burden to the State Defendants.*

    The Court's Order conflates responsibility for compliance with prior

orders of the Court with Defendant's obligations under the Constitution. As a

result, the Order improperly shifts the Plaintiffs' burden to articulate an

injury and criticizes State Defendants for not sufficiently ameliorating a

separate issue. Instead of properly applying the *Anderson-Burdick*

framework, the Court initially claims that "Defendants have offered nothing"

on whether action was taken on the voter-registration database.  [Doc. 918 at

23] (emphasis added). Notwithstanding the Court's novel analytical

framework, *Anderson-Burdick* requires the *Plaintiffs* adequately show

evidence of systemic problems with the electronic pollbooks. And it was error

for the district court to flip the burden to Defendants to prove they have

taken steps to guard against a possibility Plaintiffs did not demonstrate.[12]

---

[12] Moreover, the Court misapplied its own new approach to Constitutional law, focusing only on where the ENet functions are physically located and ignoring other actions by the State. *See, e.g.*, Ga. Comp. R & Regs. r. 590-8-3-.01 (requiring certification of security measures).

    iv. *Even if the Court applied the correct legal standard, Plaintiffs failed to show a severe burden imposed.*

Despite their voluminous historical pleadings on the issue, it still remains unclear what precise burden is actually *caused* by electronic pollbooks. *See* [Doc. 640-1, pp. 32-33]. But even if Coalition Plaintiffs' preference is a good idea, they have not demonstrated that the current paper pollbook backups printed during early voting and distributed to the counties *severely* burdens the right to vote.

"Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in judgment) ("[T]he first step is to decide whether a challenged law severely burdens the right to vote."). Neither are mere inconveniences. *See Storer v. Brown*, 415 U.S. 724, 728–729 (1974). In challenges to a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied. *See Wexler*, 452 F.3d at 1232 (applying *Burdick* to touchscreen voting procedure); *accord Weber*, 347 F.3d at 1106.

Attempting to demonstrate a severe burden, Coalition Plaintiffs point to technical issues and poll worker training in a limited number of polling places as evidence of the problems they have observed. *See, e.g.,* [Doc. 800-2 at ¶¶16, 18, 20]; [Doc. 800-3 at ¶¶ 6, 17]; [Doc. 800-6 at ¶¶ 6, 12-17]. For

example, Coalition Plaintiffs submitted the declaration of a voter who waited to vote at the Fanplex polling place after his precinct was moved. [Doc. 800-5 at ¶¶ 4-6, 9]. According to Mr. Hursti, this was a technical issue caused by adding voters to the Fanplex location, but after poll workers spoke with the election office, the voters were located **in the PollPad**. [Doc. 800-2 at ¶ 18].[13]

All of this disregards that States must "weigh the pros and cons of various balloting systems" to make state policy and "[s]o long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Weber*, 347 F.3d at 1107; *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808-09 (1969) (noting that "a legislature need not run the risk of losing an entire remedial [electoral] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."). "[T]he mere possibility of error" is not enough to bar the use of a particular voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015).

The Court and Coalition Plaintiffs may not prefer electronic pollbooks, but the state's decision to use electronic pollbooks and paper pollbook

---

[13] Notably, the true extent of *Plaintiffs'* injury is unknown—the Court denied Defendants the opportunity to cross-examine those individuals regarding their standing and injury. [Doc. 884 (minute entry)].

backups printed at least five days prior to the election is entitled to

significant deference. *See Weber*, 347 F.3d at 1107. "Federal judges can have

a lot of power—especially when issuing injunctions. And sometimes [judges]

may even have a good idea or two. But the Constitution sets out [the Court's]

sphere of decisionmaking, and that sphere does not extend to second-guessing

and interfering with a State's reasonable, nondiscriminatory election rules."

*See New Georgia Project*, 2020 WL 5877588, at *4.

## II.     Defendants will suffer irreparable injury absent a stay.

As the Eleventh Circuit has said, along with likelihood of success on

the merits, whether the stay applicant will be irreparably injured absent a

stay is a "most critical" factor in the analysis whether to grant a stay pending

appeal. *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018). Here, this factor

weights strongly in favor of State Defendants. As addressed above, the Order

imposes a new scheme on pollworkers for processing voters—weeks before

election day—which, in turn, will require wholly new training to be hastily

developed and implemented for election officials and pollworkers.

The Supreme Court has repeatedly recognized the harm caused by

upsetting a state's election process with last minute changes. *See, e.g.*,

*Purcell*, 549 U.S. at 4-5; *Benisek*, 138 S. Ct. at 1942. Enjoining "the State

from conducting this year's elections pursuant to a statute enacted by the

Legislature . . . would seriously and irreparably harm the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Moreover, "[w]hen the district court bars 'the State from conducting this year's elections pursuant to a statute enacted by the legislature,' unless the statute is unconstitutional, an injunction would 'seriously and irreparably harm the State.'" *New Ga. Project*, 2020 WL 5877588 at *4 (11th Cir. Oct. 2, 2020) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (footnote omitted in original)). Here, the Order alters numerous state statutes and regulations to impose relief the Court has deemed "common-sense," but the Court's determination of best procedure for use of paper pollbooks does not amount to a finding that the State statute, and enforcement thereof, is unconstitutional.

Beyond preventing the State from enforcing its duly enacted laws, the Court's order is likely to impose real harm as a consequence and jeopardize the accuracy of the election. As discussed, the new hastily implemented regulation-by-court-order vitiates state law which requires pollworkers to confirm no absentee ballot has been received when a voter who has requested one appears on election day to vote. *See* O.C.G.A. § 21-2-388(2). Under the Order, poll workers would be required to allow a voter to vote, without knowing whether a ballot has already been voted by the same voter.

III.   **Grant of a stay will not substantially injure other parties and is in the public interest.**

A stay pending appeal will not threaten Coalition Plaintiffs with irreparable harm because it maintains the status quo. Coalition Plaintiffs have alleged a speculative and addressable threat of harm from the absence of a preliminary injunction. Moreover, Coalition Plaintiffs have not shown that existing measures to protect voters are so deficient that the absence of additional federal-court-ordered measures threatens them with imminent harm. *See Ledford*, 856 F.3d 1312, 1315 (11th Cir. 2017).

As discussed above, Coalition Plaintiffs have not shown that they will suffer any injury absent their requested relief. There is no evidence that the current paper copy of the pollbook for each precinct or the PollPads *cause* long lines or any of the issues Coalition Plaintiffs claim are the cause of the alleged disenfranchisement. Furthermore, to the extent credible evidence of the alleged harm is in the record, the Court specifically did not allow consideration of the injury or standing of the Coalition Plaintiffs to be examined at the preliminary-injunction hearing, despite Defendants requesting the opportunity to do so. [Doc. 884 (minute entry)]. The absence of irreparable injury must end the Court's inquiry and would make preliminary injunctive relief improper. *See Lyons*, 461 U.S. at 111–12 (1983); *see also*

*Snook v. Trust Co. of G. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of injunction because plaintiff failed to meet burden).

The public interest also favors grant of a stay pending appeal. Court orders that change election laws on the eve of an election threaten to undermine voter confidence in the integrity of the election and provide an incentive to remain away from the polls. *See Purcell*, 549 U.S. at 4-5; *Crawfor*, 553 U.S. at 197 ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages participation in the democratic process."). The Supreme Court has repeatedly cautioned against court-ordered experimentation with election processes, particularly when such experimentation is ill-defined and, like this case, occurs too close to the election itself. *See Clarno*, 20A21 (U.S. Aug. 11, 2020) (staying preliminary injunction); *RNC*, 140 S. Ct. at 1207. "An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute. *New Georgia Project*, 2020 WL 5877588, at *3. (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)).

In-person early voting begins on October 12, 2020, and Election Day is less than one month away. The relief provided by the Order stands only to cause confusion for local officials administering the election. Indeed, without the injunction, elections will still proceed with a backup paper pollbook. *See*

O.C.G.A. § 21-2-224(f). And, the Poll Pad and the backup paper pollbook is only as good as the information put into ENet by county election officials. But because county election officials receive mail-in absentee ballots from voters *after* the close of early voting, such information *still* would not be included in the Court's remedy. [Doc. 815-1 at ¶¶ 10, 15].[14]

These administrative changes also burden the public interest, since governmental defendants "are charged with ensuring the uniformity, fairness, accuracy, and integrity of [the state's] elections." *Perry*, 471 Fed. App'x. at 227. Serious disruption to state electoral processes is thus directly against the public interest in having an orderly and fair election. *Id.* The facts of this case are no exception. Because Coalition Plaintiffs cannot demonstrate the public interest favors them and have failed to show irreparable harm, a stay pending appeal of this Court's Order should be granted.

Respectfully submitted this 5th day of October, 2020.

*/s/Vincent R. Russo*

---

[14] Many courts have concluded that laches bar a last-minute challenge to longstanding election laws during or on the eve of elections. *See, e.g., Perry v. Judd*, 471 Fed. App'x. 219 (4th Cir. 2012). Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable; and (3) the delay causes the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *see also Costello v. United States*, 365 U.S. 265, 282 (1961). Each element is met here.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339

Telephone: 678-336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' CONSOLIDATED MOTION AND BRIEF IN SUPPORT OF EMERGENCY MOTION TO STAY** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Vincent R. Russo*
Vincent R. Russo
