## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**

**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

### COALITION PLAINTIFFS' RESPONSE IN OPPOSITION TO
### STATE DEFENDANTS' EMERGENCY MOTION TO STAY

Coalition Plaintiffs file this Response in Opposition to the State Defendants' Emergency Motion to Stay (Doc. 951) this Court's injunction on paper pollbook backups (Doc. 918) pending the State Defendants' appeal to the Eleventh Circuit.

### Introduction and Summary

If the Motion to Stay is granted, voters in the November 2020 Presidential Election will experience the same or likely worse "complete meltdown" that they were subjected to in the June 2020 Presidential Preference Primary. Mountains of evidence submitted by Plaintiffs established that the electronic "KnowInk" PollPads that the Secretary supplies to the counties have malfunctioned in every election in which they have ever been used. Uncontradicted evidence also confirms that the PollPads are unusually insecure and attractive targets for cyber-attack. Turnout for the November election will be many times the turnout that

overwhelmed the counties in the June Primaries.  Unless the counties are equipped with updated paper pollbook backups that can be used when the electronic PollPads malfunction, the processing of voters on Election Day will grind to a halt, particularly in large urban areas, disenfranchising thousands upon thousands of voters in the November elections and beyond.

In their Motion, the State Defendants do not claim that the PollPads are now reliable or that they are secure.  They do not hint of any plan that they have to remedy the security, training, technical, or operational problems that caused the June meltdown. The State Defendants do not argue that providing updated paper pollbook backups will be ineffective, or infeasible, or too expensive.

The State Defendants do not explain why the Court's remedy should not be granted because, at bottom, they have no quarrel with the remedy.  Instead, their grievance is that the remedy is coming from a federal court, *this* federal court in particular.  Thus, their Brief opens with a series of cowardly drive-by attacks[1] on

---

[1] The State Defendants litter their Brief with unsupported statements criticizing the Court's handling of the case.  For example, reviving harsh criticism first leveled by the State Defendants' prior counsel, the State Defendants complain that the Court "castigated" them for presenting "scant evidence" at the 2018 preliminary injunction hearing while making "no mention of its direction for Defendants 'to particularly focus on the pubic interest factor.'" (Doc. 951 at 6). This charge is unfair and incorrect on any number of levels.  First, the Court gave the direction to focus on public interest factors to the Defendants *and* the Plaintiffs.  (Doc. 259 at 2-3).  Second, the Court was referring to the pre-hearing *briefing,* not the evidentiary hearing, as the State Defendants suggest.  Third, being told to focus in one brief on the public interest did not prevent Defendants, if they had any evidence, to call witnesses at trial – like the Plaintiffs did with the impressive testimony from Professors Halderman, DeMillo, Stark and many others.  And, who can forget, rather than cross-examining these witnesses on facts relevant to the case, counsel

this Court's handling of the case generally, and follows with legal arguments that have been meritless since the Supreme Court's *Ex Parte Young* decision in 1908. The State Defendants' attitude appears to be that, since there is little chance their Motion to Stay will be granted by this Court, they should use the Brief to vent their frustration with having to defend meritorious cases in federal court brought to secure the fundamental right to vote. The State Defendants "equate contempt with courage," *Sacher v. United States*, 343 U.S. 1, 13–14 (1952) (Jackson, J.), and insulting rhetoric with intelligent analysis. Their Motion to Stay should be denied.

*****

In Part I, the Coalition Plaintiffs explain that the Motion to Stay should be denied without prejudice until the Court rules upon the Coalition Plaintiffs' pending Rule 59(e) Motion to Alter or Amend the Court's Opinion and Order

---

asked whether Professor Haldeman knew the location of the Big Chicken. Finally, note that the State Defendants here make no effort to refute the substance of the Court's finding that the Defendants' evidence was "scant," which it was; their only point is that the Court so found and, since the finding went against them, they deem it being unfairly "castigated."

The State Defendants larger point here is the suggestion that the Court has been double-crossing them. In Footnote 5, they recount how the Court advised them that another mootness argument would not likely be successful. "Faced with deciding whether to follow this Court's directive (which backfired on prior counsel) and not raise jurisdictional defenses, State Defendants moved to dismiss Plaintiffs' DRE claims as moot." What backfired on prior counsel was not anything the Court did, but their failure to call witnesses to refute the Plaintiffs' well-founded (and telegraphed) charges that the State's election system was insecure. And current counsel's complaint on raising the mootness defense is as thin-skinned as it is inane: courts frequently warn parties that motions on particular issues will not be well-received and, armed with that information, the parties are free to make appropriate strategic decisions.

(Doc. 958) ("the Rule 59(e) Motion").  In Part II, Coalition Plaintiffs will summarize the reasons that this Court's injunction should not be stayed pending appeal, when and if a timely appeal is filed.  In Part III, the Coalition Plaintiffs will address various scattered arguments advanced by the State Defendants relating to the Court's Order.

## I.      The Court Should Deny Without Prejudice The Motion to Stay Pending Appeal Because The State's Notice of Appeal Is Ineffective Until Coalition Plaintiffs' Timely Rule 59 Motion Is Decided

As an initial matter, the State Defendants' motion (Doc. 951) to stay this Court's Opinion and Order (Doc. 918) pending an appeal to the Eleventh Circuit should be denied for the simple reason that the State's Notice of Appeal (Doc. 937) is not currently effective. In other words, there presently is no appeal.

The Coalition Plaintiffs have timely invoked Rule 59 to seek clarification through alteration or amendment of the Court's Opinion and Order pursuant to Fed. R. Civ. P. 59(e).[2] (Doc. 958.) The Federal Rules of Appellate Procedure provide in Rule 4(a)(4)(B)(i) that the State's notice of appeal is not yet effective under these circumstances:

> If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or

---

[2] The Coalition Plaintiffs' Rule 59(e) motion (Doc. 958) was timely filed on October 9, 2020, which is within 28 days after entry of the Opinion and Order on September 28, 2020 (Doc. 918). Fed. R. Civ. P. 59(e).

order, in whole or in part, *when the order disposing of the last such remaining motion is entered.*

Fed. R. App. P. 4(a)(4)(B)(i) (emphasis added).[3] The Eleventh Circuit recognizes that the effect of this appellate rule is to "suspend" any notice of appeal that is filed before all timely Rule 59 motions are decided and to leave jurisdiction with the district court.  *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 745–46 (11th Cir. 2014) (holding that "a notice of appeal filed during the pendency of a Rule 59 motion is simply suspended" and the district court retains "jurisdiction to consider the Rule 59 motion"); *Narey v. Dean*, 32 F.3d 1521, 1524 (11th Cir. 1994) ("an otherwise timely notice of appeal filed before the disposition of a Rule 59 motion is not voided but instead merely lies dormant while the motion is pending, and the notice of appeal becomes effective as of the date of the order disposing of the Rule 59 motion").

Because the Coalition Plaintiffs' timely Rule 59 motion (Doc. 958) seeking alteration or amendment of the Opinion and Order (Doc. 918) has suspended the State's notice of appeal (Doc. 937), the entry of a stay pending appeal is unwarranted.  Equally important, the Court's disposition of the pending Rule 59

---

[3] A motion "to alter or amend the judgment under Rule 59," Fed. R. App. P. 4(a)(4)(A)(iv), is among the motions listed in Rule 4(a)(4)(A). This Court's Opinion and Order (Doc. 918) is an "order from which an appeal lies," and thus a "judgment." Fed. R. Civ. P. 54(a) (defining "judgment"); *see also* 28 U.S.C. § 1292(a)(1) (injunctions are immediately appealable).

motion may well eliminate whatever grounds the State perceives for appealing the Opinion and Order, and thus the Motion to Stay the Order is premature. The State's Motion to Stay should be denied for this reason alone.

## II.     The Injunction was Properly Granted and Should Not be Stayed

When and if a timely notice of appeal is filed, any Motion to Stay should be denied.

### A.     Defendants Are Unlikely to Succeed on the Merits of their Appeal

The Court's Order itself is the best refutation of the State Defendants' argument that they will be successful on the merits of their appeal. The Order, and the State Defendants' arguments relating to the Order, are briefly summarized below.

In accordance with the Supreme Court's well-settled *Anderson-Burdick* test, this Court first considered "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." (Doc. 918 at 48 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983)). The Court, after canvassing in dozens of pages a massive amount of evidence presented in support of Plaintiffs' most recent Motion, as well as in prior Motions,[4] found that the burden on the Plaintiffs' right to vote was "severe":

---

[4] In their Brief, the State Defendants make a number of unsubstantiated or completely incorrect statements relating to the Court's prior findings and rulings, both in 2018, *see supra* footnote 1, and in 2019. As to the Court's August 15, 2019 Order, which the State Defendants have not

The Court therefore finds that Coalition Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim that the State Defendants' failure to provide an updated paper pollbook as a backup in the event of electronic equipment malfunctions, outages, or other emergency circumstances and to provide adequate training to election superintendents and staff on the implementation of its new voting system and emergency protocols unnecessarily burdens the rights of Georgia voters.

(Doc. 918 at 51).

In their Motion to Stay, the State Defendants concede that *Anderson-Burdick* is the correct framework to apply (Doc. 951 at 19), but they mistakenly contend that in "challenges to a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied," (Doc. 951 at 20) (citing *Wexler v. Anderson,* 452 F.3d 1226, 1232 (11th Cir. 2006)), instead of the strict-scrutiny *Burdick* test that is employed when a constitutional burden is severe.   Defendants are wrong to suggest that which *Burdick* test is used depends upon the conduct being challenged

---

appealed, the State Defendants criticize the Court for relying on a "mountain of voter testimony" "despite the fact that none of this voter testimony was subject of cross-examination."  (Doc. 951 at 8).  This is factually incorrect: the State Defendants did cross-examine voters at the hearing and could have cross-examined more if they had chosen to take depositions.  Moreover, the State Defendants have had more than a year to submit evidence of their own refuting the Plaintiffs' "mountain" of evidence, but have made no attempt to do so.

  Worse, in a passage dripping with sarcasm, the State Defendants then describe how, in their view, the Court in the August 2019 Order "continued to excoriate State Defendants as 'slow and poorly equipped,'" "finding that the State Defendants' conduct 'casts a disturbing shadow on the Defendant's posture here,' as it told about the 'saga' of this lawsuit." (*Id*.)  The State Defendants make no effort to refute the substance of the Court's findings; again, their grievance is merely that the Court dared to find against them, despite their unconstitutional practices.

rather than the burden being imposed,[5] but even if they were correct about a lower

standard applying when an electronic-voting method is challenged, the injunction

that this Motion seeks to stay has little to do with the State's electronic-voting

method. Elsewhere in their Brief, the State Defendants contend that the injury

constitutes a "mere inconvenience," (Doc. 951 at 24), ignoring the massive amount

of evidence introduced by the Coalition Plaintiffs and the Curling Plaintiffs[6]

establishing a direct connection between the State Defendants' failure to provide

updated paper pollbook backups of the malfunctioning electronic PollPads and the

resulting voter disenfranchisement.  (Doc. 918 at 21-25 (reviewing evidence

catalogued in this Court's August 15, 2019 Order, Doc. 579 at 88-89); Doc. 918 at

28 – 31 (reviewing evidence of PollPad failures in the November 2019 BMD Pilot

Elections); *id.* at 32 – 43 (reviewing evidence of PollPad failures during the June 9,

2020 Primary Election); *id.* at 43 – 48 (reviewing evidence of same PollPad

---

[5] Moreover, even in connection with the Plaintiffs' challenge to electronic-voting methods in this case, this Court has already held that *Wexler* does not apply.  *See Curling v. Kemp,* 334 F.Supp.3d 1303, 1325 (N.D. Ga. 2018).

[6] In another unprofessional criticism, the State Defendants (Doc. 951 at 11 n. 7) criticize the Court for stating on Page 41 of its Order that the Curling Plaintiffs "actively supported the Coalition Plaintiffs' pollbook motion." Defendants argue that one of the Court's citations does not support the Court's statement, which appears to be correct, but then ignore the Court's *other* citation *and* the Court's subsequent multi-page discussion of the actual evidence submitted by the Curling Plaintiffs supporting Coalition Plaintiffs' motion: first-hand accounts from voters from Marietta, Powder Springs, and Suwanee detailing multiple problems with the electronic PollPads and the BMDs.  (Doc. 918 at 41-42).

failures during the August 2020 Runoff Election); *id.* at 54 (describing Richard
Barron's testimony regarding PollPad operational failures in "multiple precincts in
both the July and August 2020 elections that was identical to that experienced in
DeKalb and Clayton Counties.")  The State Defendants do not address this
evidence or point to any evidence that they introduced that refutes it.

The Court then considered whether the "burden faced by Plaintiffs and other
voters" is "justified by legitimate state interests of sufficient weight."  (Doc. 918 at
53).  The State argues here that it may simply assert the existence of an interest
without having to meet any burden of proving that its asserted interest actually
exists.  (Doc. 951 at 19–20.) But even if the State may simply assert the existence
of an interest served by its conduct, the mere assertion of an interest does not
excuse the State from the burden of having to persuade the Court that whatever
interest it has asserted is both legitimate and sufficiently weighty to justify the
burdens that the State's conduct will impose. In this case, the Court found that, not
only does the State Defendants' current practice serve no legitimate governmental
interest, but "a backup would serve both the Defendants' state interests" in the
"'timely and accurate administration of elections'" and "the constitutional interests
advocated by Plaintiffs" just as well. (Doc. 918 at 54).  The Court noted that Chris
Harvey, the Secretary's Election Director, testified that "he had no objection to
providing counties with the information necessary to prepare such an updated

paper backup."  Richard Barron, Fulton County's Director of Registrations and Elections, "similarly testified that he had 'no issue' with the paper pollbook relief request sought by Plaintiffs," and that updated paper backups would provide more accurate information, would be a "solution to the PollPad and other related voting bottlenecks," and would "cut a line down pretty quickly." (*Id.* at 54–55).

In their Motion to Stay, the State Defendants' only argument as to the State's supposed "interest" in operating the PollPads without having to produce an updated paper backup to mitigate any malfunctions is as follows: "The Court and Coalition Plaintiffs may not prefer electronic pollbooks,[7] but the state's decision to use electronic pollbooks and paper pollbook backups printed at least five days prior to the election is entitled to significant deference." (Doc. 951 at 26).  But there is no legitimate interest to give deference to here: the State Defendants offer no legitimate reason for a decision to use "backups" that, literally, do not "backup" the electronic pollbooks with current information.

In sum, there is substantial, unrebutted evidence demonstrating that the burden on the right to vote is severe.  Yet even if that evidence were to be

---

[7] The State Defendants offer no citation for the suggestion that the Court, or the Plaintiffs, do not "prefer electronic pollbooks."  There is no evidence, or any indication in the Order, that the Court personally has a preference for or against electronic pollbooks, and the Defendants assertion to the contrary is not supported and not appropriate.  As for the Coalition Plaintiffs, as the Court noted in its Order, "Coalition Plaintiffs do not, as Defendants suggest, seek to bar the use of electronic pollbooks."  (Doc. 918 at 9).

disregarded, and the burden were instead to be (wrongly) characterized as only

imposing a "slight burden on the right to vote," then the State Defendants would

still be unable to prevail without identifying "relevant and legitimate interests of

sufficient weight [to] justify the burden." *Democratic Exec. Comm. of Florida v.*

*Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).  Here, the State Defendants have

identified no legitimate interest of any weight that justifies the State's practice of

deliberately supplying non-*updated* paper pollbook backups.  The *Anderson-*

*Burdick* analysis with respect to this injunction is unusually clear and lopsided.  It

easily supports the Court's finding that the Coalition Plaintiffs are likely to succeed

on the merits.

### B.   The Equities Do Not Favor Staying the Injunction Pending Any Appeal

Even if the State Defendants had a better chance of succeeding on the merits

of any appeal, the equities would compel the denial of their Motion to Stay.

Indeed, the testimony of Chris Harvey alone defeats any assertion that requiring

updated paper pollbook backups will cause irreparable harm.  Mr. Harvey testified

that if the updated data could be generated and provided digitally to the counties so

the election superintendents themselves could print the paper backup copy of the

updated report, he would have no objection to making that available to the

counties.  (Tr. Vol. II, Doc. 905 at 221-22).  After the hearing, the State

Defendants confirmed that this information is available in ENET (Doc. 895).  The

State, therefore, can comply with the Order without any difficulty, much less any irreparable harm.  Given Mr. Harvey's testimony, it comes as no surprise that the State Defendants, in support of their Motion to Stay, have not cited to *any* evidence that supports their present assertion that providing an updated paper pollbook backup will cause the State Defendants irreparable harm.  The State Defendants mere allegation is insufficient; to be entitled to a stay, it must present evidence supporting its claim of irreparable harm.  *See Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 574 (5th Cir. 1974).

The State Defendants argue, again without any evidence, that "the Order imposes a new scheme on pollworkers for processing voters – weeks before election day – which, in turn, will require wholly new training to be hastily developed and implemented for election workers and pollworkers."  (Doc. 951 at 26).   The only change to the scheme is that, when the PollPads malfunction, rather than experience the frustration of the useless, dated lists that the State currently provides, pollworkers can instead reference an updated paper pollbook that has the same information as a properly functioning electronic PollPad should obtain. Enjoining the Secretary to provide this beneficial information to the counties – information that will prevent massive disenfranchisement and provide a more orderly election – will not cause anyone any harm.  If the stay is granted, on the other hand, the November 2020 Election Day is very likely to be another

"complete meltdown" with real constitutional deprivations as the result.  It is well established in Eleventh Circuit that the "denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Jones v. Governor of Fla.,* 950 F.3d 795, 828 (11th Cir. 2020).

In their Motion, the State Defendants argue that the process that the Court's Order prescribes in subsection (4) of its Order for cancelling absentee mail ballots causes irreparable harm because it violates O.C.G.A. § 21-2-388.  This issue affects only the small subset of voters who, on Election Day when PollPads are not working, are shown to have been sent an absentee ballot but who do not have their absentee ballot to surrender.  This issue is explained in greater detail in the Coalition Plaintiffs' Rule 59(e) Motion (Doc. 958-1 at 7 – 10).  Coalition Plaintiffs do not read the Order as requiring or allowing a violation of O.C.G.A. § 21-2-388; indeed, the Court cites this very statute in footnote 28 to subsection (4) of its Order and notes that the current practice of calling the County Election Office to confirm the elector's voting status (in compliance with O.C.G.A. § 21-2-388) can be effective for a much smaller, select number of voters, when there are PollPad problems.  (Doc. 918 at 65 n. 28; *id.* at 57).  As the Coalition Plaintiffs explain in their Rule 59(e) Motion, however, given the State Defendants' misreading of the Order, clarification may be warranted, and the clarification may be made without imposing any burden on election officials or having any impact upon the

effectiveness of the remedy.   (*See generally* Doc. 956-1; *see also* Doc. 918 at 57

(Court's Order rejecting Defendants' argument that updated paper pollbooks

should not be used because they cannot "adjudicate voter eligibility in all

situations").)

Finally, citing *Purcell v. Gonzalez,* 549 U.S. 1 (2006), the State Defendants

argue that the State's interest in not making changes to the election process "too

close to the election itself," (Doc. 951 at 29), tips the balance of the equities in

their favor.  To the contrary: the public interests articulated by the Supreme Court

in *Purcell* uniquely support the granting of injunctive relief regarding pollbooks in

this case (and thus support the denial of a stay pending appeal.)  First, the Supreme

Court held that that "[c]onfidence in the integrity of our electoral processes is

essential to the functioning of our participatory democracy."  549 U.S. at 4.

Reducing or eliminating the long lines that plagued the June 9 primaries will

unquestionably increase public confidence in our electoral process.

Second, *Purcell* held that in some instances court orders "can themselves

result in voter confusion and consequent incentive to remain away from the polls."

*Id.* at 4–5.  In this case, no argument can be made that the provisioning of updated

paper pollbooks will even be known to voters, much less cause them any confusion

or give them any incentive to remain away from the polls.  On the contrary, the

evidence establishes that, unless updated paper pollbook backups are provided, the

long lines that voters dread and which do disincentivize voting are all but certain to reappear on November 3, which will motivate many voters simply to stay away from the polls.  In sum, because the injunctive relief will enhance confidence in the integrity of our electoral process and increase incentive to vote, denying the stay is completely consistent with the rationale underlying *Purcell*'s frequently misapplied guidance.

## III.   OTHER ARGUMENTS ARE MERITLESS

In this Part III, the Coalition Plaintiffs address and refute the various other arguments advanced by the State Defendants in support of the Motion to Stay.

### A.   Injunction is Not "Beyond the Court's Authority"

In Part I(A) of its argument, the State Defendants claim that the Order "exceeds the scope of the Court's authority by seeking to bind nonparties, re-write the Georgia Election Code, and interpret state law."  (Doc. 951 at 12).  These arguments are meritless.

#### 1.   *The Order Does Not Bind Nonparties*

The State Defendants claim that the Order is deficient because it Orders the Secretary to require certain actions of nonparty county election superintendents.  (Doc. 951 at 13.)[8]  In this Circuit, however, an injunction may require the Secretary

---

[8] The State Defendants' argument that the Order requires nonparties to violate O.C.G.A. § 21-2-388, found on page 13 and 14 of the Motion, is addressed in Part I(B), *supra*.

of State to direct nonparty county election superintendents to take or refrain from taking action.  *See Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1346 (N.D. Ga. 2019) ("The Court finds that joining all of Georgia's counties and municipalities into this action is not feasible and is not required to provide relief to Plaintiffs where the State's Chief Election Officer charged with implementation and enforcement of the State's election system is a party."); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1282 (N.D. Ga. 2019) (same).  In *Grizzle v. Kemp*, the Eleventh Circuit held that although the Secretary cannot directly perform certain acts that are ordinarily performed by the counties, "as a member and the chairperson of the State Election Board, he has both the power and the duty to ensure that the entities charged with those responsibilities comply with Georgia's election code in carrying out those tasks .... [H]is power by virtue of his office sufficiently connect[s] him with the duty of enforcement."  634 F.3d 1314, 1319 (11th Cir. 2011).

  2. *Plaintiffs' Claim Does Not Present a Nonjusticiable Political Question*

  The State Defendants next contend that the Coalition Plaintiffs' Motion (Doc. 800) presented a nonjusticiable political question because no judicially discernable and manageable standards exist to determine what is the appropriate timing for printing paper backups.  (Doc. 951 at 16).  To the contrary: the "appropriate timing" for a "backup" to be printed is timing that is current enough

to show who has voted through early voting so that, when the PollPads

malfunction, as they are wont to do, voters will not be disenfranchised.  The

Anderson-Burdick line of cases establishes the "judicially discernable and

manageable standards" for resolving issues like the one presented by the Coalition

Plaintiffs' Motion.  Further, the case repeated cited by the State Defendants in

support of their Motion to Stay, *Jacobson v. Fla. Sec'y of State*, No. 19-14552,

2020 WL 5289377, at *19 (11th Cir. Sept. 3, 2020), carefully explains that cases

like this one, which allege a burden on the right to vote, are justiciable: "If the

statute burdened voting or associational rights even slightly, we could apply legal

standards to determine whether the burden was unconstitutional.

Under *Anderson* and *Burdick*, we would weigh the burden imposed by the law

against the state interests justifying that burden."

### 3.     *The Order is Not Barred by the Eleventh Amendment*

In its section on the Eleventh Amendment, the State Defendants collect a

number of disparate arguments to the effect that the State should not be held

accountable for violating citizens' federal constitutional rights when the violations

occur as a result of election maladministration.  This persistent claim by the State

that its "sovereignty" over elections somehow immunizes it from claims that it is

violating the Fourteenth Amendment must be rejected.  The Supreme Court has

long held that the constitutional authority of States to regulate elections must

always be exercised "in conformity to the Constitution." *United States v. Classic*, 313 U.S. 299, 314 (1941).

The State Defendants say that this Court offered "no suggestion of any basis in law on which to base the relief granted," and that the Order does not "offer any clarity as to what federal right is being 'vindicated' as *Ex Parte Young* demands." (Doc. 951 at 17.) These are bizarre, frivolous contentions.  The Order explains at length, and repeatedly, that the federal rights being vindicated are those protected by the "due process rights guaranteed by the Fourteenth Amendment," (Doc. 918 at 7), specifically, the fundamental right to vote without unjustified state-imposed burdens. (*Id.*; *see also id.* at 60-62, 63).  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) ("The Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights.").  Indeed, the State Defendants, after claiming that they do not know what federal right this case implicates, themselves cite, and discuss, the familiar United State Supreme Court cases addressing these federal rights and how they may be vindicated.  (Doc. 951 at 19-20).

As to the Eleventh Amendment: the Eleventh Circuit has held in an earlier appeal in this case that Eleventh Amendment immunity is not a defense to cases, like this one, in which prospective injunctive relief is sought against state election officials to prevent them in their official capacity from conducting elections in a

manner than does not comport with the U.S. Constitution: "Undoubtedly, *Ex Parte Young* suits are permitted when the plaintiff alleges that state election officials are conducting elections in a manner that does not comport with the Constitution." *Curling v. Raffensperger*, 761 F. App'x 927, 934 (11th Cir. 2019) (holding that the State Defendants' argument that they have Eleventh Amendment immunity to voters' Section 1983 suit runs counter to "any number of binding precedents").

The State Defendants further claim that the Order "intrudes into the administrative details of elections," citing *Curry v. Baker,* 802 F.2d 1302, 1314 (11th Cir. 1986). (Doc. 951 at 18-19).  This Court discussed and distinguished the *Curry* opinion at length in its Order.  (Doc. 918 at 60-61).  State Defendants lift a quotation out of context from Justice Scalia's opinion for the Court in *Virginia Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 255 (2011),  a case which *rejected* an Eleventh Amendment immunity defense.  Defendants then make the incomprehensible suggestion (perhaps the result of a typographical error) that the Court mandates the "continuation" of the violation of federal law.  (Doc. 951 at 18).

The State Defendants also cite *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 102 (1984), but *Pennhurst* confirms that "a suit challenging the constitutionality of a state official's action is not one against the State" for purposes of the Eleventh Amendment.  *Pennhurst* does hold that the *Ex*

*Parte Young* exception to Eleventh Amendment immunity does not apply to claims against state officials based <u>solely</u> on violations of state law.  Plaintiffs' claims here, however, are based on the State Defendants' violation of the Fourteenth Amendment, not state law.[9]

The State Defendants next claim that the Court's injunction is a prohibited "obey-the-law" injunction: "The Court noted that certain of these measures are 'consistent' with State law or SEB Rules.  If that is the case, how does the *State's* enforcement of these 'consistent' statutes possibly amount to a violation of federal law, when remedy for that purported violation is to follow existent state law. That would be an impermissible 'obey-the-law' injunction.  ."  (Doc. 951 at 19 n.10 (citing *S.E.C. v. Goble*, 682 F.3d 934, 948-52 (11th Cir. 2012)). This argument is wrong for two reasons. First, the Court did not hold that the State's enforcement of statutes consistent with the remedy violated federal law; instead, the Court held that the State's failure to provide updated paper pollbook backups for its chronically malfunctioning electronic pollbooks imminently threatens to cause

---

[9] Nothing in *Pennhurst,* however, suggests that a federal claim falls outside the *Ex Parte Young* exception merely because the validity of the federal claim is coincident with, supported by, or even premised upon, an independent violation of a state law.  *See, e.g., Duncan v. Poythress,* 657 F.2d 691, 704 (5th Cir. 1981) (affirming injunction relief under 42 U.S.C. § 1983) ("It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters *in violation of state law* so that they may fill the seats of government through the power of appointment. We therefore hold that such action violates the due process guarantees of the fourteenth amendment.") (emphasis added).

violations of federal law.  Second, Defendants misstate the law behind the dictum that "obey-the-law" injunctions are invalid. An injunction that requires conduct that is consistent with state or federal law is not an "impermissible 'obey-the-law'" injunction.  Instead, the injunctions that are invalid are ones that "merely" command the defendant to obey the law and do nothing else.  These are unenforceable because they are too vague.  *Goble,* 682 F.3d 934, 949 ("'[A]ppellate courts will not countenance injunctions that merely require someone to 'obey the law.'") (citations omitted).  The law already commands obedience, so an injunction to obey the law as a general matter adds nothing to what is already required. An enforceable injunction, however, "should clearly let defendant know what he is ordered to do or not to do" and a "court order should be phrased in terms of objective actions, not legal conclusions." *Id.*  This Court's Order does exactly what an enforceable injunction must do, and the State Defendants do not contend otherwise.

### B.    The Court Applied the Correct Legal Standard

In Part I(B) of their Brief, the State Defendants contend that they "are likely to succeed on appeal since the Court applied the incorrect legal standard,[10]

---

[10] The State Defendants do not expand upon the statement, in their subheading, that the Court applied the incorrect legal standard.  Elsewhere in their Brief, the State Defendants acknowledge that the correct legal standard is provided by the *Anderson-Burdick* line of cases, (Doc. 951 at 19), which this Court correctly applied.

considered evidence not before the Court, and shifted the burden to Defendants."

(Doc. 951 at 19.)

      1.   *Defendants Confuse Procedural Due Process and Anderson-Burdick Claims*

The State Defendants argue that no "due process claim asserted by Coalition Plaintiffs is pending before this Court" because the Coalition Plaintiffs' *procedural* due process claim was dismissed by this Court and, State Defendants contend, the Coalition Plaintiffs have not alleged another constitutional basis for their claims. This is incorrect.  While the Court did dismiss the Coalition Plaintiffs' procedural due process claims, it did not dismiss the Coalition Plaintiffs' claims based on the substantive due process guarantees of the Fourteenth Amendment, which is the constitutional provision that protects fundamental rights against infringements by the States, and which is expressly invoked by Count I of the First Supplemental Complaint.   (Doc. 751 at 24) (holding that "the Plaintiffs' claims relating to continuing, critical deficiencies in the MVP and voter registration system and electronic pollbooks are, at very least, plausible and not moot").

------------------

2.   *Any Facts "Judicially Noticed" Were Cumulative of Other Evidence Already in the Record*

Defendants next contend that they are likely to prevail on appeal because the Court twice took improper "judicial notice" of facts established in other cases. (Doc. 951 at 21 – 23).  It is clear from a reading of the Court's Order that it did not take "judicial notice" in the formal sense of "directing verdict" against Defendants "as to the fact noticed," or precluding the Defendants from introducing contrary evidence.  *United States v. Jones,* 29 F.3d 1549 (11th Cir. 1994).  More important, in each instance, the facts that the Court referred to as being judicially noticed were cumulative of the volume of evidence already introduced elsewhere by Plaintiffs in this case.  First, in its discussion of the evidence that "the information from ENET and the operation of the electronic pollbooks" was unreliable and resulted in voting disruption, the Court in a footnote stated that it "takes judicial notice of the evidence and the Court's findings in *Common Cause v. Kemp,* 347 F. Supp.3d 1270 (N.D. Ga. 2018)." (Doc. 918 at 24 n.12.) In the text of its Order, however, the Court referenced and discussed in detail the "volume of evidence" submitted by Plaintiffs in this case showing how the State's unremediated technology failures disenfranchised voters.  The Court stated: "And as recounted in the August 15, 2019 Order, forty-six individual voters described issues with the electronic pollbook, incorrect polling places, and listing voters as having already voted." (Doc. 918 (citing Doc. 579 at 98-111)).  The Court went on to discuss in detail the

evidence submitted by Plaintiffs in support of their most recent motions, including

declarations by each of the named Plaintiffs, concluding that the "Coalition

Plaintiffs provided substantive evidence demonstrating a system wide problem of

malfunctioning electronic PollPads beginning with the November 2019 pilot

elections, again in the June 2020 primary election, and most recently in the August

2020 runoff elections that resulted in voter disenfranchisement and that is likely to

continue in the upcoming Federal Congressional and Presidential elections."  (Doc.

918 at 28).  Defendants offered, and offer, *no* evidence disputing these findings.

Even if the evidence that was "judicially noticed" is not considered, therefore, the

Court's factual findings were still more than amply supported by substantial

uncontroverted evidence.

The Court also stated that it took judicial notice in response to the State

Defendants' suggestion that "there is no constitutional violation because voters

have the option to vote absentee," noting evidence suggesting that "Georgia's

absentee voting process also poses other risks of voter disenfranchisement."  (Doc.

918 at 51–52).  Again, however, the Court's finding was supported by evidence

previously introduced *in this case*; indeed, the evidence that the Court took

"judicial notice" of included evidence Plaintiffs had earlier presented in a previous

preliminary injunction motion "from fourteen voters who reported that they

returned their absentee ballot by the deadline, but the Secretary of State's website

indicated the ballot was not counted."   This evidence also was undisputed.  Thus, even if evidence that was "judicially noticed" from other cases were to be wholly excised from the Court's Order, the Court's factual conclusions would still be amply supported by other evidence in the record and cited by the Court.

3.   *The Court did not "Shift the Burden to the State Defendants"*

The State Defendants contend that this Court "shifted the burden to State Defendants, while ignoring evidence provided by State Defendants." (Doc. 951 at 2).  One might expect that the State Defendants, after accusing this Court of "ignoring evidence provided by State Defendants," would give some examples of any specific evidence that the Court ignored.  But they do not do so.  (*Id.*) In the absence of specifics, the State Defendants' complaint has no appellate merit whatsoever and should be disregarded. As for the charge that the Court "shifted the burden to State Defendants," the State Defendants do not say whether the burden that was improperly shifted was the burden of persuasion or the burden of production,[11] but in either case the argument is meritless.   The Coalition Plaintiffs met their burden of production by introducing substantial evidence supporting their

---

[11] "Contemporary writers divide the general notion of 'burden of proof' into a burden of producing some probative evidence on a particular issue and a burden of persuading the factfinder with respect to that issue by a standard such as proof beyond a reasonable doubt or by a fair preponderance of the evidence. See, e.g., E. Cleary, McCormick on Evidence § 336 (2d ed. 1972)." *Mullaney v. Wilbur*, 421 U.S. 684, 696 (1975).

prima facie case.  The Coalition Plaintiffs met their burden of persuasion by submitting evidence establishing a likelihood of success on the merits and showing that the equities tipped in favor of granting injunctive relief.  The State Defendants' argument to the contrary, which is never explained, is completely without merit and cannot justify the granting of a stay pending appeal.

### 4.   *Plaintiffs showed a severe burden*

The State Defendants argue that the Coalition Plaintiffs' did not demonstrate that "the current paper pollbook backups printed during early voting and distributed to the counties *severely* burdens the right to vote." (Doc. 915).  To the contrary: as explained above, the Court devotes thirty-four pages of its Order to discussing the evidence establishing that the failure to provide *updated* paper pollbooks has severely burdened the right to vote in election after election in Georgia.  (Doc. 918 at 21-55). Ignoring the Court's lengthy treatment of burden does not make that discussion go away.

The State Defendants try to make the same point later in their Brief, arguing: "to the extent credible evidence of the alleged harm is in the record, the Court specifically did not allow consideration of the injury or standing of the Coalition Plaintiffs to be examined at the preliminary-injunction hearing, despite Defendants requesting the opportunity to do so." (Doc. 951 at 28).  The Defendants, however, ignore that they had the opportunity to depose the named plaintiffs and could thus

have introduced deposition testimony to oppose the injunction, but they either

neglected or made a tactical decision not to do so. They cannot now claim to have

lost just because the Court was unwilling to devote limited hearing time to

rehashing an issue of standing that the Defendants have already argued and lost on

the merits at least twice before now.

For the foregoing reasons, the Motion to Stay should be denied.

Respectfully submitted this 9th day of October, 2020.

*/s/ Bruce P. Brown*                          */s/ Robert A. McGuire, III*
Bruce P. Brown                                Robert A. McGuire, III
Georgia Bar No. 064460                        Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC                          (ECF No. 125)
1123 Zonolite Rd. NE                          ROBERT MCGUIRE LAW FIRM
Suite 6                                       113 Cherry St. #86685
Atlanta, Georgia 30306                        Seattle, Washington 98104-2205
(404) 881-0700                                (253) 267-8530


*Counsel for the Coalition Plaintiffs*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis & Megan Missett*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br>**E**<br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2020, a copy of the foregoing was

electronically filed with the Clerk of Court using the CM/ECF system, which will

automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown
