IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                    :
                                            :
     Plaintiffs,                          :
                                            :
v.                                          :        CIVIL ACTION NO.
                                            :        1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,               :
                                            :
     Defendants.                          :

## **ORDER**

On September 28, 2020, the Court entered a preliminary injunction, requiring that every polling place in Georgia must have at least one updated paper pollbook backup to prevent bottlenecks at the polls on Election Day if electronic pollbooks used to check in voters experience disruptive outage or malfunction. State Defendants have filed a Motion to Stay the Order Opinion and Order of September 28, 2020, pending an appeal to the Eleventh Circuit Court of Appeals [Doc. 951]. State Defendants assert that "the Court has taken it upon itself to rewrite Georgia's election code" and that "[s]taying the preliminary injunction here will ensure at least a modicum careful deliberation before mandating such a drastic change." (Mot. at 2, 12.) This argument is a fallacy and simply removed from the *actuality* of the content of the Court's Order.[1]

---

[1] Defendants' arguments spark memories of old episodes of The Twilight Zone: "You are about to enter another dimension. A dimension not only of sight and sound but of mind. A journey into a wondrous land of imagination. Next stop – *The Twilight Zone*."

The Court's relief is an important backup to ensure timely (in case of lines/delays) and accurate (using up to date information on eligibility and qualification of voters) administration of the election *only if needed* in emergency circumstances that prevent voter check-in as usual on the PollPads.  But the relief of requiring precincts to have on hand a paper backup of information in the electronic pollbooks solely as a backstop is not monumental.[2]  Defendants' "sky is falling" and "it's the end of the world as we know it" protestations are divorced from reality. Defendants know this.

The Court **DENIES** Motion because a stay of the Court's Order would vitiate the utility of the State Defendants' own emergency processes.

## I.    Legal Standard

Federal Rule of Civil Procedure 62(d) governs when a court may stay an injunction pending appeal.  *See* Fed. R. Civ. P. 62(d). Rule 62(d) provides, in relevant part:

> While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Virginian Railway Co. v. United States*, 272 U.S. 658, 672 (1926)).  "It is instead 'an exercise of judicial discretion,'

---

[2] The Court made slight modifications to its Order to clear up Defendants' misinterpretation of the relief and entered an Amended Order on October 12, 2020.  (*See* Doc. 966.)

and '[t]he propriety of its issu[ance] is dependent upon the circumstances of the particular case.'" *Id.* (internal citations omitted).

When determining whether to grant a stay, the Court considers the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The movant bears a "heavy burden" and "must establish *each* of these four elements in order to prevail." *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (citing *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)) (emphasis in original); *see also Nken*, 556 U.S. at 433-34 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.").

In addition, "[a]lthough the first factor (i.e., a strong showing of likelihood of success on the merits) is generally the most important, the movant need not always show that [it] probably will succeed on the merits of [the] appeal." *Gonzalez ex rel. Gonzalez v. Reno*, No. 00-11424, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (citing *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).   When the balance of the equities weighs in favor of granting the stay, the movant need only show a substantial case on the merits. *Larios*, 305 F. Supp. 2d at 1337). However, "the more the balance of equities (represented by the other three factors) tilts in the opposing party's favor, the greater the movant's burden to show[] a

3

likelihood of success on the merits." *Id.* (internal marks and citations omitted). Finally, the latter two factors – harm to the opposing party and weighing the public interest – merge when the government is the opposing party, as is the case here. *Nken*, 556 U.S. at 435.

## III.   Discussion

Defendants' description and characterization of the entire course of the proceedings are not consistent with the actuality and their portrayal of the record evidence and the Court's findings paint a picture of this case that is unrecognizable.[3]

Defendants' legal arguments in support of their Motion include everything but the kitchen sink: the Court's Order grants relief on an issue that is not a part of this case, the Court's Order seeks to bind nonparty counties over whom the Secretary of State has no control or authority, the Court's Order attempts to alter Georgia's election procedures and invade the discretion of State and local election officials, the pollbook claim presents a nonjusticiable political question, the Court's Order is barred by the Eleventh Amendment, the Court applied the incorrect legal standard, considered evidence not before the Court, and shifted the burden to

---

[3] This includes the nature of the allegations in the pleadings, the scope and timing of discovery, the delay caused by Defendants' appeal of the Court's threshold jurisdiction over the claims that was essentially deemed to be frivolous by the Court of Appeals. Despite the delays in the case as a result of the Defendants' aggressive litigation strategy and motions practice, the Plaintiffs and the Court attempted to facilitate the factual development in a timely manner because of the expedited relief sought in connection with a continuing cycle of elections. Plaintiffs conducted an enormous amount of discovery and evidence gathering to support their claims. Defendants meanwhile made strategic decisions to limit their discovery, choosing not to conduct any fact or expert depositions.

Defendants, and the Court's Order will harm the State by changing the law on the eve of the election and jeopardizing the accuracy of the election.

The Court has previously addressed nearly every one of these arguments. For the reasons stated in this Court's Orders on Defendants' Motion to Dismiss and the Coalition Plaintiffs' Motion for Preliminary Injunction (Docs. 751 and 918), the Court finds that the State Defendants have not made a strong showing that they are likely to succeed on the merits of their appeal, that they will suffer harm absent a stay, or that a stay of the injunction is in the public interest.

1. **The Coalition Plaintiffs' Claim Regarding Deficiencies in the Security and Reliability of the State's Electronic Voter Registration Database and Pollbook System is Properly Before the Court**

Plaintiffs' claims in this case challenge the security and reliability of Georgia's voting system based on known and demonstrated risks and vulnerabilities in the computerized components of the system. This includes claims relating to the security and reliability of Georgia's voter registration database and electronic pollbooks. (Coalition Pls.' Third Am. Compl., Doc. 226 ¶¶ 93-120, 131-32, 152; Coalition Pls.' First Suppl. Compl., Doc. 628 ¶ 189.) Defendants know this and their attempts to pretend otherwise are not persuasive.

Despite State Defendants' selective parsing of the pleadings, Plaintiffs' allegations and claims regarding the State Defendants' handling of compromises to the "elections.kennesaw.edu" server which housed sensitive voter data have been front and center in this case since its inception and remain a concern today.

In their Third Amended Complaint, the Coalition Plaintiffs alleged security breaches of the election server previously housed at Kennesaw State University's Center for Election System compromised Georgia's voting system. (Doc. 226 ¶¶ 93-120.) Among the electronic files contained on the server were voter information registration information, voter histories and personal information of all Georgia voters. (*Id*. ¶¶ 94-97.) Plaintiffs alleged that despite warnings from an independent cyber security specialists, Defendants failed to ensure that the elections software, files, and sensitive voter data on the "elections.kennesaw.edu" server was secure and allowed the server to remain easily accessible from the public Internet for nearly a year. (*Id*. ¶¶ 97-108.) Plaintiffs further alleged that "both prior to and since the 2016 presidential election[,] foreign governments and other unknown suspect parties have actively probed state election systems in attempts to gain unauthorized access and manipulate the voter information and computer systems used to conduct American elections" and "that these efforts targeting American voting systems have included unauthorized intrusions into the very same kind of computer systems . . . found to be completely unprotected from external access in Georgia for at least seven consecutive months from August 2016 through February 2017." (*Id*. ¶¶ 107-08.) The complaint alleges that Defendants "knew that software applications, password files, encryption keys, voter information registration information, and other sensitive information critical to the safe and secure operation of Georgia's Voting System had been unsecured, breached, and compromised." (*Id*. ¶ 110; *see id*. ¶ 111 ("From at least August 2016 until the

present, the Secretary and his agents – and from at least March 2017 all Defendants – knew or should have known that the software, data, and voter information hosted on the "elections.kennesaw.edu" server at KSU had been repeatedly compromised by unauthorized access.")).   As a result, the Coalition Plaintiffs allege that voters, including Coalition member and Fulton County voter Brian Blosser, were deprived of the right to cast ballots based on errors in the system that "caused eligible voters to appear to be voters in other congressional districts or unregistered."  (*Id.* ¶¶ 131-132; *see also* ¶ 152 ("Blosser was prohibited from voting on April 18, 2017, in the CD6 Special Election when his name did not appear on the eligible voter rolls for CD6, and was instead erroneously listed as a resident of CD11. Blosser was not permitted to vote a provisional ballot, even after he made repeated attempts to have Fulton County election officials correct this system error. At a public meeting on April 22, 2017, Barron and the Fulton Board Members blamed this error on a "software glitch.")).

As Defendants' note and the Court has explained at length in prior Orders, this case began in 2017 as a suit to enjoin Georgia's Direct Recording Electronic ("DRE") based voting system.[4]  Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves.  As highlighted extensively in this Court's prior orders, Plaintiffs' claims encompassed the security

---

[4] Plaintiffs' claims also sought to enjoin the State's Global Election Management Systems ("GEMS") as a result of significant security flaws.  In prior orders, the Court has referred to the prior system as the DRE/GEMS system.  For ease of reference in this Order, the Court refers to the prior system as the DRE system.

of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database.  The Court rejected Defendants' arguments that it lacked jurisdiction to hear these claims in 2018.  Defendants appealed and lost.

After Georgia enacted legislation to replace the DREs with an electronic ballot-marking device ("BMD") based voting system, the Court enjoined the State's continued use of DREs past the completion of the 2019 election cycle.[5]  The voter registration database (ENET), which is maintained by the Secretary of State and used by county registrars to update voter registration records was not replaced in the State's transition to the BMD system.  The voter history and information from the State's pre-existing voter registration database is used to populate the new electronic pollbooks for each election.[6]

---

[5] In that same order, entered on August 16, 2019, the Court also found that the Coalition Plaintiffs were entitled to injunctive relief on their claim that the State's voter registration database and electronic pollbook system, as constituted and administered by the Secretary of State and Georgia counties, bore critical deficiencies and risks that impact the reliability and integrity of the voting system process. (Doc. 579.) The Court found that the evidence in the record demonstrated that the Defendants' administration of a vulnerable and compromised voter registration database and inaccurate voter registration express pollbook voting check-in had substantially burdened voters' capacity and their right to cast votes.  Noting that the State's adoption of a new electronic pollbook for voter check-in for use with the State's legacy voter registration software and database would not remedy these demonstrated problems or alleviate the imminent threat to voters' exercise of their right to vote, the Court required Defendants to take remedial action.  Specifically, the Court ordered the State Defendants, among other things, to (1) develop and implement procedures to be undertaken by election officials to address errors and discrepancies in the voter registration database and (2) require all County Election Offices to furnish each precinct location with at least one printout of the voter registration list for that precinct.

[6] *See* Defs.' Mot. to Dismiss at 11, n. 14; *see also* Dec. 6, 2019 Tr. at 11 (explaining that the ENET system "used to program ExpressPoll check-in units for the GEMS/DRE system" is "not being replaced" and that "[t]he same database and same data, a flat text file, will be used to populate the Poll Pads").

The Plaintiffs amended their Complaints in October 2019 to include additional claims challenging the incoming BMDs.[7]  The allegations and claims in the Coalition Plaintiffs' First Supplemental Complaint "are additional to, and do not supersede or replace, the allegations and claims stated in" their Third Amended Complaint addressing the prior DRE voting system.  (Coalition Pls.' First Supp. Compl. at 6, Doc. 628.)   The Coalition Plaintiffs First Supplemental Complaint expressly challenges the implementation of the new BMD voting system components and the integration of these devices with "Georgia's current, defective voter registration system."[8]  (Coalition Pls.' First Suppl. Compl., Doc. 628 ¶ 189.) These concerns were at the center of the Court's consideration in ordering relief in August 2019 and remain a focus of this case even as the State implements the BMDs in connection with multiple other components and the State's main election system server.[9]

---

[7] Plaintiffs had previously asserted that their Complaints already encompassed a challenge to the new BMD system.  The Court rejected this notion and indicated that if Plaintiffs wished to proceed with such a challenge, an amendment of the complaint to expressly deal with the BMD system would be necessary. The Court granted the Plaintiffs' motions to amend to add the BMD claims based on Defendants' written indication of their consent on the condition that they retained their right to "to file motions to dismiss on the merits of the new claims," and that discovery would be stayed pending a ruling on the motions.

[8] Plaintiffs challenge the State Defendants' implementation of the BMD voting system with known and demonstrated vulnerabilities that include, among other things, the Secretary of State's failure to remedy compromises in its current voter registration and internal IT systems.  (Curling Pls.' Compl. ¶¶ 75-88; Coalition Pls.' Compl. ¶¶ 135, 176-186.)

[9] As the Court found in its August 15, 2019 Order:

> The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to

Thus, any arguments that this case has nothing to do with the security of the State's voter registration database and system or the reliability of the electronic pollbooks are fantastical.

Defendants assert they are likely to succeed on appeal because "the legal basis on which Coalition Plaintiffs sought the relief this Court granted is unknown," and the Court's Order does not "offer any clarity as to which provisions of the U.S. Constitution demands paper pollbook back-ups." (Mot., Doc. 951 at 12.)

To be clear, the Court must correct one central element of the State's erroneous description of the issues in this case: Plaintiffs do not and have never challenged the State's determination to use electronic pollbooks for voter check-in – this simply was not the issue before the Court. Instead, the issue posed is that significant problems in functionality of the e-pollbooks in tandem with the defective voter registration database could effectively block voters at the threshold of the polls and preclude or burden their exercise of the franchise. (*See* September 17, 2018 Order, Doc. 309 at 4-12, 34-38; August 15, 2019 Order, Doc. 579 at 21-90; September 28, 2020 Order, Doc. 918 at 20-47.) The relief ordered was narrowly

---

passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU. Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information. Inaccuracy in this voter information thus triggers obstacles in the voting process. New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

tailored, based on the State's own designated emergency ballot statute and regulations to address these issues.  Voters who are not shown on the State's official electors list in the pollbook are not permitted to vote, except in certain situations by provisional ballots that may not ultimately be counted.  The State's failure to address inaccuracies in the official electors list (whether from compromised voter registration data or from providing an incomplete voter list as a paper backup) may result in the denial of eligible and qualified voters' rights to cast a ballot and have their vote counted.  The legal grounds for the Coalition Plaintiffs' claims are the alleged violations of the fundamental right to vote and substantive due process rights guaranteed by the First and Fourteenth Amendments.  The Court did not hold that the Constitution requires paper pollbook backups.  The Court held that the State cannot unconstitutionally burden the right of qualified voters to cast their ballots and have them counted.  It is plain and simple.

> **2.    The Court's Paper Pollbook Backup Order Imposes No Changes to Georgia' Statutory or Regulatory Regime and Requires No Changes to Georgia Election Officials' Election Procedures**

Defendants assert that "the Court ordered significant changes to [the] voting process after the election is underway, and it will continue to cause irreparable harm as long as it remains in place." This is incorrect for a number of reasons. Here are three.

**First**, the updated paper pollbook backup is a reinforcement to be used *only on* Election Day and *only then* in the event of an emergency or where the electronic

PollPads are not operational. This relief is consistent with Georgia law rather than a home-cooked remedy.  This relief does not impact any voting currently underway, including absentee mail voting or early in-person voting which began two weeks after the entry of the Order.[10]  The Order simply directs the Secretary of State to transmit at the close of absentee/in-person early voting updated voter information in a readily available format to the county election superintendents for printing for use as a backup at each polling place on Election Day.  This is the same information contained in the PollPads, i.e., an *actual* paper backup. Moreover, as the Court noted in the Order, there is no established date for when the electors list is printed for each election and updates to the list are generated the Friday before Election Day.  (*See* Order at 17-18) (discussing Elections Director's testimony describing fluidity of the provision of voter information and updates)[11].

        **Second**, the Order only directs that a paper pollbook be provided that contains all information already required by law to be used by election workers to

---

[10] As Defendants represented to the Court in the telephone conference in connection with the BMD software modification on September 28, 2020 (the same day the relief Order was entered), the only part of the election that was "underway" at that time was absentee mail voting, and  there was sufficient time to implement the BMD software fix in thousands of voting machines in 159 counties in advance of in-person voting.  Logically, Defendants' reasoning would apply to the timing of the Court's order here which requires production of updated information at the conclusion of absentee and in-person voting for use as a single paper backup only at the polls on Election Day.

[11] *See* Harvey Decl., Doc. 815-1 ¶¶ 4-5 (attesting that "[t]he electors lists are ordered by the liaison for their county, usually starting the Friday after the voter registration deadline, and each list is ordered individually," "[l]arger counties are usually printed last – sometimes not until the week before the election to give the counties as much time as possible to enter any remaining eligible voter registrations" and the Friday prior to the date of the election, the Secretary of State's Office "generates" a "supplemental list" of voters added to ENET since the electors list was initially pulled).

accurately determine voter eligibility as expressly provided in Georgia's election code. The Court's order addressed in detail Georgia's statutory and regulatory election requirements and procedures relating to the electors list, pollbooks, and emergency procedures when the use of electronic voting equipment is impossible or impractical. (Doc. 918 at 11-16.) The Court also considered the State's evidence about the administrative details and implementation of these procedures presented through the testimony of the Secretary of State's Director of Elections, Chris Harvey, who has "more than a decade [of] acquired firsthand knowledge of Georgia's election processes at both the state and county level." (*Id.* at 17) (quoting (Harvey Decl., Doc. 815-1 ¶ 2.) As the Court thoroughly explained, the paper pollbook backup ordered by the Court would simply provide the same information contained in the electronic pollbook as required by state law and therefore could be used in the same manner as the electronic pollbook to determine voter eligibility (as necessary in the event of emergencies, electronic outages, or disruptions). (*See* Order at 12-13) (quoting O.C.G.A. § 21-2-401(b) requiring that "[t]he registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. *The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot*" and Ga. Comp. R. & Regs. 183-1-12-.19(8) requiring that "[p]rior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to *accurately* mark all persons who have been issued or cast

absentee ballots in the election") (emphasis added); (*see also* Order at 17-19) (summarizing testimony of Elections Director, Chris Harvey, that, "[w]hen a voter requests an absentee ballot but then appears at the polls on Election Day without their ballot in hand, the poll official should check with the registrar to ensure that no absentee ballot has been accepted for that voter prior to having the voter execute a cancellation affidavit and then vote using the BMD" and "[t]hat process applies whether the voter is checked in using the PollPad or a paper list"); (*see also* Order at 54-57) (explaining that under the Secretary of State's own training manual, poll workers are currently trained to use a paper list of electors in the precinct and are directed to refer to the paper list to keep processing voters if the polling place loses power or the PollPads stop working and that the only change would be that the paper backup copy Plaintiffs request would be more complete and accurate than the current paper lists and would mirror the information in the e-pollbook).)

**Third**, the two elections officials who presented testimony, expressly acknowledged that the actual relief ordered would not be burdensome or disruptive. The Secretary of State's Election Director testified at the hearing before this Court that he had no objection to providing counties with the information necessary to prepare such an updated paper backup. Richard Barron, Director of Registrations and Elections for Fulton County, the county with the largest voter population in Georgia, similarly testified that he had "no issue" with the paper pollbook relief request sought by Plaintiffs, and welcomed it as an improvement

14

and a way of alleviating the burden on poll workers by cutting down on the number of required calls to determine voter eligibility.

In addition, State Defendants argue that the Court's Order alters the State's procedure and effectively excises the requirement in O.C.G.A. § 21-2-388(2) that registrars "confirm[] that the elector's absentee ballot has not yet been received by the board of registrars" prior to allowing a voter to vote in the precinct on Election Day "because the Court orders the Secretary to direct every superintendent that no such additional check is required before voters who are shown as 'having requested an absentee mail-in ballot' are allowed to vote on the BMDs." (Mot. at 14.)  This is a glaring mischaracterization and an entirely inaccurate interpretation of the Court's ordered relief.  Here's why.

The remedy's conformity with the overall regulatory scheme imposed no changes to Georgia's statutory procedures relating to voters who requested absentee ballots, but who instead decide to vote in-person.  The Court's Order recognized Defendants' concern that "a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" and therefore "an updated electors list could not adjudicate voter eligibility in all situations."  But the Court found that this concern did not justify denying relief where an updated list can be used to properly adjudicate voter eligibility for some voters and for others would require the poll workers to follow their existing protocol of contacting the county elections offices to confirm voter eligibility.  (*See* Order at 57) ("A poll manager, consistent with current practice,

15

would simply then call the County Elections Office to confirm the voting status for a much smaller, select number of voters."). Plaintiffs' proposed order, however, did not expressly account for the situation described by Defendants, and instead asked the Court to require county election superintendents to "to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment" and "to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot." Therefore, the Court included provisions in its relief intended to address this gap and to indicate that the State's existing procedures for handling such voter eligibility issues would still apply, referring expressly to the procedures outlined in O.C.G.A. § 21-2-388, providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation. (*See id.* at 65, n. 28.).

Nonetheless, because the State Defendants purport to labor under a flawed misinterpretation, the Court entered an Amended Order on October 12, 2020, clarifying that voter eligibility shall be determined in accordance with O.C.G.A. § 21-2-388 and the existing practices as described by Mr. Harvey. Specifically, the Amended Order provides that the Secretary shall direct that election superintendents "allow voters who are shown to be eligible electors on the paper pollbook backup but who are shown as having requested an absentee mail-in ballot to have their absentee ballot canceled and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter's eligibility is

confirmed by the county registrar's office and the voter's absentee ballot is canceled in accordance with the provisions of O.C.G.A. § 21-2-388." (Am. Order, Doc. 966 at 2-3) (citing O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation by either surrendering their absentee ballot to the poll manager of the precinct or in the case of a voter who has requested but not yet received their absentee ballot by completing an elector's oath affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election); *See* O.C.G.A. § 21-2-384 (regarding elector's oath); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).)

### 3. The Court's Order is Directed at the Secretary of State as the State's Chief Election Official; It Does Not Improperly Purport to Bind Nonparty-counties Over Whom the Secretary of State Claims to Lack Control or Authority

Borrowing from the Florida law script in *Jacobson v. Fla. Sec'y of State*, State Defendants assert that the Court has stepped out of bounds by ordering the Secretary of State to direct the county superintendents to require poll workers follow the Order, despite the fact that they are not parties to this action. They argue that an injunction against the State Defendants cannot alter the independent obligations of the non-party election superintendents.

As outlined above and in the Order granting Coalition Plaintiffs' motion to amend the September 28th Order, the Court-ordered relief does not change Georgia's existing procedures or in any way alter the obligations and protocols of

the county election officials in determining voter eligibility when required to resort to the paper pollbook in the event of an emergency.

Georgia law confers primary authority on the Secretary of State to manage Georgia's electoral system, including the authority to bring investigations and enforcement actions against County Boards of Election and Registrations. *See* O.C.G.A. § 21-2-50(b) (referring to the Secretary as "the state's chief election official"); *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. . . ."). The Secretary of State is the election official charged under Georgia law with responsibility for maintaining the State's voter registration database, for producing the official voter lists to county election officials for use in all elections, and as the Chair of the State Election Board is responsible for ensuring uniform election practices and procedures in the state. *See, e.g.,* O.C.G.A. § 21-2-31; O.C.G.A. § 21-2-50(b).  The express provisions of Georgia's Election Code clearly delineate the Secretary of State's authority and responsibility for administering and implementing Georgia's elections.  "The Secretary of State is designated as the chief state election official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993." O.C.G.A. § 21-2-210.  "The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state which shall be the official list of electors for use in all elections in this state."  O.C.G.A. § 21-2-211(a).  "The Secretary of State is authorized to

procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State," which "shall include, but not be limited to, computer hardware; computer software; modems, controllers, and other data transmission devices; data transmission lines; scanners and other digital imaging devices; and printers." O.C.G.A. § 21-2-211(b).[12]

The Court's Order directs the Secretary of State to follow the same procedures it has historically used in providing elector information to counties in carrying out their duties on election day.  The Secretary of State provides the official electors list, it provides the electronic PollPads, it provides the information from ENET that is used to populate the PollPads, and it generates the supplemental list from ENET for the counties to print prior to Election Day.  The Court's Order simply requires the Secretary of State to follow these same procedures in providing the updated information in electronic format to each county election superintendent with directions that they print and distribute the paper backup to each precinct which would only impose a minimal burden on Defendants.

---

[12] *Jacobson* held that the plaintiffs there lacked standing to sue the Florida Secretary of State to challenge Florida's ballot order laws because, pursuant to Florida state law, the Florida Secretary of State did not have the power to redress the plaintiffs' injuries.  As just described, Georgia law differs from Florida law on this point. For all of these reasons, this Court finds that *Jacobson's* analysis of the Florida Secretary of State's limited authority and the absence of necessary county parties in that case is not applicable here.

**4.    The Coalition Plaintiffs' Claim Does Not Present a Nonjusticiable Political Question**

This case arises in a classic First Amendment factual and legal context:  Are voters being turned back at the polls or burdened in exercising the right of franchise by the State's established process and voting equipment, as implemented, for operation of the polls?  This is the question presented by Plaintiffs' claim. Clearly, this does not pose a political question involving policy choices of the legislature. *Jacobson v. Florida Sec'y of State*, 19-14552, 2020 WL 5289377, at *18 (11th Cir. Sept. 3, 2020) (holding that a complaint that the order in which candidates appear on a ballot confers an impermissible partisan advantage to one party presented a nonjusticiable political question because it does not allege any burden on individual voting rights).  Defendants' contention that "[d]etermining the timing of printing paper pollbook backups and procedures for canceling absentee ballots are questions of policy with no judicially manageable standards," stands in direct contradiction to the testimony and the provisions of Georgia's election code.  (Mot., Doc. 951 at 15-16.)   But the Court's remedy does not tackle the question of when to print a paper pollbook backup for use on Election Day or whether different procedures should be used for canceling absentee ballots.  The question is what information should be included in the paper pollbook backup – as to that, the standards are clear, they are defined, and they remain unchanged by this Court's Order:

- The Secretary of State is responsible for establishing and maintain a list of all eligible and qualified registered electors in this state which shall be the official list of electors for use in all elections in this state.  O.C.G.A. § 21-2-211(a).

- The Election Code authorizes the Secretary of State to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State, i.e. the electronic pollbooks for use during elections. O.C.G.A. § 21-2-211(b).

- The official list of electors eligible to vote in any primary or election shall be prepared and completed at least five calendar days prior to the date of the primary or election in which the list is to be used. O.C.G.A. § 21-2-224(f)

- The official list of electors and the official list of inactive electors prepared and distributed to the poll officers of each precinct *shall include* the elector's name, address, ZIP Code, date of birth, voter identification number . . . congressional district, state Senate district, state House district, county commission district, if any, county or independent board of education district, if any, and municipal governing authority district designations, if any, and such other voting districts, if any.  O.C.G.A. § 21-2-224(g).

- The official list of electors prepared and distributed to the poll officers of each precinct *may also include* codes designating that an elector has voted by absentee ballot, has been challenged, or has been sent mail by the registrars which has been returned marked undeliverable.  O.C.G.A. § 21-2-224(g).

- The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list *shall indicate* the name of *any elector who has been mailed or delivered an absentee ballot*. O.C.G.A. § 21-2-401(b).

- Election superintendents shall cause each polling place to be equipped with an appropriate number of electronic poll books within the county during primaries, elections, and runoffs. Electronic poll books shall be the primary method for checking in voters and creating voter access cards, but the superintendent shall cause every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place. The paper backup list shall be used in case the electronic poll books do not properly function. The superintendent shall cause poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list.  Ga. Comp. R. & Regs. 183-1-12-.19(1).

- The registrars of each county shall utilize the absentee ballot subsystem of the statewide voter registration system for absentee balloting and advance voting. Ga. Comp. R. & Regs. 183-1-12-.19(3).

- Prior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to *accurately* mark all persons who have been issued or cast absentee ballots in the election. Ga. Comp. R. & Regs. 183-1-12-.19(8).

- For electors whose names are added to the voter registration rolls after the preparation of the electronic poll books, the registrars *shall provide a printed supplemental list* for use at the affected polling places. Ga. Comp. R. & Regs. 183-1-12-.19(10).

- Consistent with these provisions, the paper backup list should mirror the updated information from the electors list after the close of absentee and early voting three days prior to election day.

- When an absentee ballot which has been voted shall be returned to and received by the board of registrars, it shall be deemed to have been voted then and there; and no other ballot shall be issued to the same elector. If an elector has requested to vote by absentee ballot and has not received such absentee ballot, has such ballot in his or her possession, has not yet returned such ballot, or has returned such ballot but the registrars have not received such ballot, such elector may have the absentee ballot

canceled and vote in person on the day of the primary, election, or runoff as provided in O.C.G.A. § 21-2-388.

- County election officials and poll managers will follow the procedures outlined in O.C.G.A. § 21-2-388(2) to determine the eligibility of voter who previously requested to vote by absentee ballot but requests to vote in-person at the precinct on election day.

In the event problems with the PollPads arise, and election workers resort to using the paper backup list for voter check-in, the paper backup should match the same information the statute and regulations provide are required and that the Elections Director testified is included in the electronic pollbooks – updated information from the electors list after the close of early voting during the three days prior to election day.  According to the State Election Board regulations and the Secretary of State's own training manual, poll workers are currently trained to use a paper list of electors in the precinct and are directed to refer to the paper list to keep processing voters if the polling place loses power or the PollPads stop working. (*See* Order, Doc. 918 at 57) (citing Doc. 802 at 27 and Poll Worker Manual 2020 Edition (updated April 2020) available on the Secretary of State's website at https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll%20Worker%20Training%20Manual.pdf.).

5.     **Eleventh Amendment Immunity Does Not Apply to Bar Relief on Plaintiffs' Claims**

Hoping the third time's the charm, Defendants repeat their arguments that Plaintiffs' claims seek to vindicate special state sovereignty interests and are barred by the Eleventh Amendment. This Court rejected these arguments raised in connection with the DRE claims and again when Defendants raised them with respect to the amended BMD claims.    (*See* August 2018 Order, Doc. 309 at 29-30; see also July 30, 2020 Order, Doc. 964 at 25-33.)  Moreover, Defendants lost on their Eleventh Amendment defenses in their first appeal before the Eleventh Circuit Court of Appeals, in part because they had mischaracterized the nature of the claims and law posed in this case.   *Curling v. Secretary of Georgia*, 761 F. App'x 927, 932 (11th Cir. 2019) (stating that the State's "arguments can be disposed of without much ado because they run counter to the complaints' allegations and settled precedent" and "any number of binding precedents demonstrate why it is irrefragable that" Plaintiffs' claims satisfy the *Ex parte Young* exception to Eleventh Amendment immunity).  This mantra continues.

6.     **This Court Did Not Apply the Incorrect Legal Standard For Determining Whether the State's Election Procedures Violated Plaintiffs' Constitutional Rights and Did Not Shift the Burden to Defendants**

The Court followed the standard set forth in *Anderson* and *Burdick* in analyzing whether Plaintiffs established a substantial likelihood of prevailing on the merits of their claim related to the paper pollbook backup.  (Order, Doc. 918 at 48-62.)  This standard requires the Court to weigh the character and magnitude of

the burden the State's rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State's concerns make the burden necessary. *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

Defendants assert that "[i]n challenges to a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied." (Mot., Doc. 951 at 20 (citing *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006)). This is a misstatement of the "*Burdick* test" and its application in *Wexler*.[13] The Eleventh Court in *Wexler* described *Burdick* as a balancing test and recognized that the "level of scrutiny courts apply to state voting regulations should vary with the degree to which a regulation burdens the right to vote." *Wexler*, 452 F.3d at 1232 (citing *Burdick*, 504 U.S. at 433-34). The Eleventh Circuit has not adopted a bright-line rule that courts must apply a "lower-scrutiny" test under *Burdick* to challenges involving a state's electronic-voting method. Rather, the Eleventh Circuit recognizes that the "Supreme Court has rejected a 'litmus-paper test' for 'constitutional challenges to specific provisions of a State's election laws' and instead has applied a 'flexible standard'." *Common Cause Georgia v. Billups*, 554 F.3d at 1340, 1352 (11th Cir. 2009) (quoting *Anderson*, 460 U.S. at 789).

---

[13] The Court in *Wexler* found that the plaintiffs in that case had not alleged that voters using touchscreen machines were less likely to cast effective votes and therefore their claims regarding the alleged disparate impact of Florida's manual recount procedures did not result in a severe burden and was not subject to strict scrutiny. 452 F.3d at 1232-33.

26

Defendants do not articulate how, in their words, the Court either (i) applied the wrong legal standard, (ii) created its own "novel analytical framework," or (iii) "misapplied its own new approach to Constitutional law." Instead, Defendants simply disagree with the Court's view of the evidence, its assessment of the burden on Plaintiffs' interest in their ability to cast votes at the polls as severe, and its findings that the State's proffered interests were insufficient to outweigh that burden.

Defendants advance a convoluted theory that the Court flipped the burden to Defendants to prove they had taken steps to guard against imposing burdens on voters. It did not. The Court considered and addressed the only interest put forward by the State Defendants to justify their refusal to provide a reconciled and updated paper backup: a generic "interest in timely and accurate administration of elections" and in the use of electronic pollbooks as the primary method of determining voter eligibility. (Resp., Doc. 815 at 19-20.) Because Plaintiffs are not challenging use of electronic pollbooks, the Court's relief does not alter State's requirement that electronic pollbooks shall be used as the primary method of determining voter eligibility. The Court simply noted that Defendants did not explain how the requested relief – provision of an updated paper backup for use during emergency situations where pollbooks become inoperable or errors in the electronic system persist – was inconsistent with their "interest in timely and accurate administration of elections." And the Court found that *Plaintiffs'*

*evidence* indicates that such a backup would serve both the Defendants' stated interests as well as the constitutional interests advocated by Plaintiffs.

### 7. The Court's Relief is Not Based on Evidence Outside the Record

To create the appearance of error, Defendants contend that the Court "took judicial notice of disputed evidence and findings in other cases in this district to support its findings." (Mot., Doc. 951 at 21.)  The Court's Orders in the course of the case were extraordinarily detailed and careful, two of them stretching over 150 pages.  They explained at length the evidentiary and legal basis of the Court's findings and legal rulings.  The evidence was presented in the record before this Court.  The Court meticulously considered the evidence presented both by Plaintiffs and Defendants.  To the extent that the Court took notice of any other court rulings relative to the State's same processes (i.e., use of provisional ballots due to issues in the State's voter registration database and electronic pollbooks), this was as a point of comparison – that the same electoral issues appeared, for instance, in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018).  Defendants object to the Court's reference to its own findings and review of the evidence in connection with its injunction[14] issued in *Common Cause*, a case that was transferred to the undersigned as related to the instant case because of the allegations related to the security breach of the State's voter registration database.  (*See* 1:18-cv-5102 November 6, 2018 Order, Doc. 4, reassigning case.)

---

[14] The Secretary of State did not appeal the preliminary injunction order entered in *Common Cause*.

And finally, Defendants overstate the Court's reliance on the evidence and findings in *Common Cause* summarized in a single footnote of the Court's 67-page Order.

### 8. Defendants Will Suffer No Harm Absent a Stay; Rather Plaintiffs and the Public Will Suffer if a Stay is Granted

The relief is narrowly tailored to address a significant immediate burden to voters' access to the ballot on election day, when a high proportion of voters turn out. A stay of the Order tailored to ease those burdens would permit this burden to persist. Neither the Secretary of State's top elections official nor the head election official in charge of Fulton County, with the largest voting population in Georgia, described the precise relief ordered as creating *any* burden or "irreparable injury" to their management of the voting process. The evidence is to the contrary.

For all of the reasons enumerated herein, the Supreme Court's concerns in *Purcell v. Gonzalez* are not implicated. And indeed, in the Court's consideration of all of the relief issues presented in this case, the Court has again and again been mindful of *Purcell's* cautionary principles in refusing to enjoin the State's voting system in favor of the ultimate relief requested by Plaintiffs of a switch to hand-marked paper ballots. (*See* September 2018 Order Doc. 309; August 2019 Order, Doc. 579; and October 2020 Order at Doc. 964.) The issue of the paper pollbook backup is in a distinctly different posture from the other challenges to the voting system presented in the case: the requested relief at issue is narrow and does not disturb in any way the State's administration of its electoral rules or cause

confusion. Quite the opposite; it should serve to promote voter confidence in the integrity of the election and incentivize voting at the polls.

## II.   CONCLUSION

For the foregoing reasons, the Court finds that Defendants have failed to establish the "heavy burden" necessary to warrant a stay of the Court's preliminary injunction on the paper pollbook backup.   Accordingly, the Court **DENIES** Defendants' Motion to Stay [Doc. 951].

**IT IS SO ORDERED** this 14th day of October, 2020.

**Amy Totenberg**
**United States District Judge**