# MINUTES OF THE ELECTION LAW
# STUDY SUBCOMMITTEE
# OF THE STANDING SENATE
# JUDICIARY COMMITTEE

## SECOND HEARING
### DECEMBER 30, 2020

Honorable William T. Ligon, Chairman
Senator, District 3
Honorable John Kennedy
Senator, District 18
Honorable Bill Heath
Senator, District 31
Honorable Blake Tillery
Senator, District 19
Honorable Michael Rhett
Senator, District 33
Honorable Elena Parent
Senator, District 42

The Election Law Study Subcommittee of the Standing Senate Judiciary Committee met again on December 30, 2020 to take further evidence of the issues arising from the November Presidential election and the ongoing recounts and litigation (the "General Election"), ongoing issues in the upcoming runoffs for Senate and Public Service Commissioner on January 5, 2020 (the "Runoff Election"), the recounts and audits of the process, the current investigations taking place, the litigation that is moving forward, as well as to address issues relating to the upcoming runoffs.

The Chairman opened the meeting with a prayer for truth.

The Chairman asked for comments on the Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee on the December 3, 2020 hearings. The Report had been previously distributed to the Subcommittee. Upon motion and second, the Report was unanimously approved by the quorum present. During the meeting, Senator Rhett asked that he be recorded as voting against the approval of the Chairman's Report, and the Chairman noted that his dissent would be recorded in the minutes of the meeting.

Members of the committee present were Senator William Ligon, Senator Bill Heath, Senator Blake Tillery, and Senator Michael Rhett. Senator Brandon Beach and Senator Burt Jones also joined the meeting.

## Receipt of Further Oral Testimony

<u>**Cathy Latham**</u>

The Chairman called Ms. Cathy Latham to testify. Ms. Latham identified herself as the Chair of the "Under 80,000 Caucus," covering 129 counties in the state of Georgia.  She is also the Chair of Republican Party of Coffee County Republican Party.

Ms. Latham noted that there were problems with the Dominion Voting machines "from the git-go." The problems ranged from non-functioning scanners to a complete breakdown requiring a delivery from another county under police escort on an emergency basis.

Ms. Latham reported that the Secretary of State and the Secretary of State's office had spoken as if they would support the county but had been non-responsive. After "a couple of Zoom calls" with the Secretary of State, the office offered a new scanner, and referred her to Gabriel Sterling. Even though she was experienced, we had nothing but problems. Finally, the scanning had to be completed with unreliable scanners, and then only in batches.

Ms. Latham noted that between the June primary and the November election, her team discovered that the machines could be used to manipulate the ballots during an "adjudication."

Ms. Latham then presented a video, available on YouTube[1], showing an election official using a Dominion voting machine to assign votes randomly in an adjudication procedure.

After the video, Senator Ligon asked her to define an "adjudication."  Ms. Latham noted that adjudications occur when a ballot has been rejected by the machines for a number of reasons – for example, a stray mark on a ballot could cause there to be a need for an adjudication. Anything that causes a machine to reject a ballot will lead to an adjudication. [There has been some discussion that the Dominion Voting machines permit ballots to be marked for adjudication.]

In an adjudication, the operator must determine "voter intent" in reviewing the ballot. But it is impossible to see voter intent when the operator is reading a "QR code." In that instance, the machine determines voter intent with a process that she related to an "auto-correct" function on a computer – it is hard to otherwise determine voter intent on a machine-marked ballot.

Senator Tillery asked Ms. Latham if she was part of the recount process. She said she was and Senator Tillery asked if the numbers in the recount matched.

Ms. Latham noted that there was some variance in the machine counts, but the big difference came in the recount.  She noted that Coffee County could never reproduce Election Night results. She said they re-ran 15,000 ballots five times and received different numbers each time, with a variance of around 50 – at one time the variance was over 100 ballots for the Libertarian candidate.

Senator Heath asked if there was any way to know if a ballot had been adjudicated. Ms. Latham testified that she was not an expert, but that she had been told there was no way to know and that adjudicated ballots were not separated. She noted that, in some cases, if a ballot had a memorable entry,

---

[1] Tim Hains, Election Workers in Coffee County, Georgia demonstrate Dominion Voting Machine Flaw, Real Clear Politics (Dec. 10, 2020) at https://youtu.be/46CAKyyObls (retrieved December 30, 2020).

a poll worker could remember a ballot and that it had been adjudicated. But there is generally no way of recording that a ballot has been adjudicated and no way of auditing the adjudication.

The Chairman recognized Mr. Preston Halliburton, counsel of record for the Giuliani legal team and counsel for Ms. Latham. Mr. Halliburton noted that Ms. Latham was claiming whistleblower status.

Mr. Halliburton asked if the vote from Coffee County had been certified after the recount. Ms. Latham stated they had been certified from Election night, but not from the recount.

Mr. Halliburton asked Ms. Latham to explain the process that led to the failure to certify. Ms. Latham said that ballots were run in batches of four, and the system would identify ballots to be pulled and those were set aside. At the end of the day, those ballots were separately processed. The ballots that had jammed the system were those with QR codes, not the mail-in ballots.

Mr. Halliburton asked if there were other counties that had experienced the same problems. Ms. Latham said he knew of at least eight others counties, one off by a factor of 2.3%, and that six county officials had said they were "forced to certify" by the Secretary of State's office. One other county could not certify but uploaded their data to the Secretary of State's office and were told that the Secretary of State had found a missing batch that "magically matched." She said that each of those counties had indicated they would be willing to sign an affidavit.

Mr. Halliburton asked about the response of the Secretary of State when Coffee County refused to certify. Ms. Latham responded as follows:

> "When they came to Coffee County, they came down on a Friday. They told them that Thursday, I believe, it may have been late Wednesday, that they were coming. Three people from the Secretary of State showed up with guns and badges and handcuffs and two Dominion Tech reps. They came with the intent of intimidation. Luckily, the county attorney stayed with a supervisor so that she wasn't by herself. And basically he said, "You want to recount? We'll do a recount." There were no Democrats and no Republicans there, to watch this recount. And the attorney called to an area private school, got a group of Sophomores. They sat there and divided the ballots into 100 count batches, and they proceeded to scan them and they wouldn't scan. The Dominion Tech, ran into the problems that Coffee County ran into. The Dominion Techs, sat on the floor for two hours with a manual, trying to figure out why they couldn't get the machines to do what they needed to do."

Mr. Halliburton asked if the Secretary of State was responsive or helpful? Ms. Latham said he was "on it" or that Mr. Sterling was "on it," but emails to Mr. Sterling would be met with no response.

Senator Jones asked Ms. Latham if Coffee County have a technician on site from Dominion. Ms. Latham said that there was a Dominion technician but that he had many problems. He did not know that he was supposed to clean the machines after a certain number of scans. Senator Jones asked if the contractors were being paid by the Secretary of State or Dominion. Ms. Latham said she would "love to know" how they were being paid in every county because "That's a lot of people."

**Anne Dover**

Chairman Ligon called Ms. Anne Dover to speak over a Zoom call. Ms. Dover is the Interim Director for Cherokee County Elections. Ms. Dover identified two problems with the E-Net system, which is the system used for registering voters, and checking in ballots. First, Ms. Dover noted that many voters were receiving ballots that were not their ballots. She said that a Cherokee County ballot was sent to a Cobb County address that was not the address of the voter. She estimated that 18 such instances were identified to her office. She believed that for some reason the E-Net system was recording an address that did not belong to the voter. She said that the Secretary of State's office has been made aware of this problem.

The second problem she explained as an issue with a mismatch between the barcode and the identified voter. A barcode may populate a voter other than the voter identified on the ballot.

When the county identified the problem to the Secretary of State's office, Mr. Sterling dismissed the inaccuracies as being a local issue based on problems with the local scanners or labels, but Ms. Dover believed the problem resulted from some other error. She noted that the problem seemed to have been corrected over time in the Runoff Election. But Ms. Dover said that she was still not confident that the portal is correct or that the scanning of the absentee ballots is correct.

**John Cochran**

Mr. Cochran identified a statement he had provided to the Subcommittee, which is attached. Mr Cochran identified himself as an automation engineer with extensive experience in data validations and familiar with complex software applications designed to control "items" in U.S. industry – Mr. Cochran said that each ballot is an "item." He has authored and executed hundreds of documents related to the validation of manufacturing process systems and equipment. He expected to see documentation around the validation of the "purported risk limiting audit" in November; he saw "saw very little evidence of such documentation." He noted that he would refer to the audit as a "purported risk limiting audit" because he did not view what happened as a real risk limiting audit.

During his three days working as an observer and monitor (November 14, 16, and 17), Mr. Cochran witnessed the data collection and reporting for 410,000 ballots in Gwinnett County during the statewide risk limiting audit. Mr. Cochran noted that he made specific observations regarding the "Arlo" system – the system that was used for the "purported risk limiting audit." The Arlo software had never been used in Georgia before. We had no experience with it.

Mr. Cochrane noted that the Arlo system was purported to be an independent auditing system that was used to compare manual vote counts to the Dominion system count in Georgia. Mr. Cochran noted that the Arlo system is owned by Voting Works, a non-profit company of approximately 10 employees based in California that is primarily funded and sanctioned by the Department of Homeland Security (DHS) and the Cybersecurity and Infrastructure Security Agency (CISA). The former director of CISA, Chris Crebbs, described the Arlo software as being "open source" in order to enhance security.

Mr. Cochran described how the Arlo system was used with tallying computers in each county, and how the data was uploaded and tabulated centrally. Mr. Cochran noted all the information was "phoning home to the mothership, and … connected to the internet via local wireless network." Mr. Cochran noted that he asked a visiting consultant at the Gwinnett site, who was very familiar with Arlo, and was obviously responsible for the training of the workers there, about the location of a local Arlo server, and if local backup tallies were being kept. She responded that there were no central collection

server computer or local tallying application located in Gwinnett County or any other County in the state, as far as she was aware.

Chairman Ligon interrupted to confirm that there were no local records of the counts being kept, and that the Secretary of State's office was responsible for confirming its own results. Mr. Cochran confirmed that was his understanding.

Mr. Cochran referred to that process as a "top-down" auditing process, and it's not a preferred method of formalized validation, which deploys a bottom up approach. that whereas an audit system should be a "bottom up" system.  As Mr. Cochran put it, "The numbers from the bottom challenge the numbers at the top, not the numbers at the top tell the bottom what they counted. That's just backwards."

Mr. Cochran also noted that since the software was "open source," it could be seen and analyzed by outside sources or be easily intercepted. He also noted that the Voting Works webpage contained at least one code example that could be used to hack Arlo applications. That example includes information on how to set a programming variable to grant administrative access to any user who turns that access on.

Mr. Cochran noted that he did not believe that a bonafide audit was actually performed. A true audit would collect additional validation data in the form of independent backup data from the 159 counties. He noted that the information for such an audit was required by law to be retained and that Georgians will have the opportunity for the next 23 months to perform a more formalized, actual validation of the presidential race vote count that would be a far less intensive data validation process than counting every vote again. He noted that his affidavit contained a suggested procedure at the end of his written statement.

Finally, Mr. Cochran asked the following questions:

1.  Is there a record of who actually performed the final tally at the Secretary of State's office using the central servers cloud application?
2. Were any of these central server administrators connected to Dominion as employees or consultants?
3. Were there any electronic connections to Dominion systems or Dominion data in any way during the Arlo audit counts?
4. Were the Arlo server administrators comprised of properly trained elections officials who were employees of the state of Georgia, or appointees?
5. Were any Arlo server administrators outside consultants whose names and credentials can be shared with the public?
6. What was the process of collecting the Arlo data at the Secretary of State level?
7. Was that process witnessed by Democratic and Republican monitors?

Mr. Cochran noted that the Arlo audit could have been compromised and the fact that it was web-based and centrally tallied made it an unreliable audit. He implored the Subcommittee to obtain proof that there were no attempts to hack or manipulate the Arlo vote totals in each county or at the state's server and to share the results of a real audit publicly.

**Marci McCarthy**

The Chairman called Ms. Marci McCarthy, who identified herself as a successful business woman in the cybersecurity industry.  In 2020, Ms. McCarthy served on the voter review panels (VRPs) in Dekalb County during the presidential primary in June, the August runoffs, and the General Election. She shared her belief that the processes and controls were either altered or removed entirely for the General Election, even when they had been in place in the June presidential primary and in the August runoff.  Ms. McCarthy noted that the process changed from being a two-person bipartisan panel to a four-person non-objective panel, which resulted in two pairs of VRPs operating independently.

Ms. McCarthy also noted that, when adjudicating ballots via scanned images on the computer workstations, there were no system or physical controls and no audit capabilities either. She noted that as members of the VRPs during the General Election aftermath, they could not protect the changes that we were making to the General Election sections of the ballot. She also observed lax security, such as computer IDs being shared amongst election personnel that made it impossible to track and audit the work and the personnel responsible. Finally, she noted that the duplication of the absentee ballots and the military ballots did not have witnesses as required by Georgia election code.

Chairman Ligon asked if a new ballot was created for each absentee ballot, and Ms. McCarthy said that a new ballot was created through the system using the scanner. These ballot duplications were done by County Officials in a separate location and at a separate time, independent of VRP oversight.

She believed the Runoff Election VRPs will be conducted in the same manner. Ms. McCarthy noted that, while observing the process, she found it "troubling" that the purportedly "nonpartisan" VRPs were operating independently for five days, and the most common error was an over-vote of all five Democrat candidates. There will be no audit trail to show the changes, who made the changes, and when the changes were made.

Ms. McCarthy again repeated that there were no controls on the computers because of the common and shared passwords. As a result, there was no way to track who actually logged onto these computers, who used them, what time, when the work was performed, and how long the work was being done. Ms. McCarthy concluded that, "[w]hether intentional or plain incompetent, this effectively made it impossible to audit the work of these individuals to detect fraud and adhere to Georgia's election code."

With respect to the absentee, military, and UOCAVA ballots, those ballots had been transcribed under the supervision of the VRPs in the earlier elections, but were duplicated by unsupervised election workers in the General Election.  1,878 out of 2,500 military ballots were "transcribed" by those officials without bi-partisan supervision.

It is her understanding that this process will also be used in the Runoff Elections.

Ms. McCarthy expressed her concern that there are no checks and balances in the absentee ballot authentication process, and no defined escalation procedure.  She said all decisions were "ad hoc" decisions by a County official.  She also noticed other basic errors that led to vote miscounting – the wrong ballots being used and tabulated, even after discovery.  Finally, because outside organizations that were aligned with the Democrat party were allowed to participate in the VRPs, any decision was voted with many votes aligned against the Republican.  She concluded that there was significant bias towards Democrat votes in this configuration.

Ms. McCarthy said that, as a cybersecurity professional, she was appalled at the lack of system and physical controls that are not in place protecting the right to vote.  She said that she believed that if an audit were to be performed on the process, it would receive an "F" because it failed to protect voter's intent.

**The Story that the Data and Data Charts Reveal about the 2020 Election**

**Jovan Hutton Pulitzer**

Mr. Jovan Hutton Pulitzer identified himself as an inventor and pattern recognition expert, and part of the Gold Institute for International Strategy out of Washington, D.C.  Mr. Pulitzer noted his patents in the development of "machine readable code" and discussed how to "read" the ballots without needing to understand the code.  Mr. Pulitzer noted that he had a basic patent on machine reading QR codes or other patterns and about 200 patents in a portfolio stemming from his basic inventions.  His patents are licensed on all mobile devices (except Huawei) on approximately 12 billion devices globally.  The Dominion Voting machines could tell one story, but Mr. Pulitzer noted that his system would permit him to read the ballots and confirm whether there were inaccuracies in the tabulation.

Mr. Pulitzer noted that any time a paper was bent, folded, pushed or written on by hand, a "kenematic artifact" was created that could be read by machines.  If a ballot does not have the proper kenematic artifacts, it should be considered counterfeit. He noted that this is not new science, and if applied to detect counterfeit ballots, it would give more confidence to the people.

Senator Brandon Beach asked if the Mr. Pulitzer could assess whether ballots were counterfeit by looking at them. Mr. Pulitzer replied that he could tell if they had been folded, if they were counterfeit, whether they were filled out by a human hand, whether they were printed by a machine, or whether they were batch fed continually over and over.

Mr. Pulitzer noted that every mail-in ballot involves the printing and folding of the ballot. It is tracked through the post office, and sent to houses, where it is imprinted with a pen mark. Each imprint creates a breaking of the fiber, and a kinematic artifact, which can be read by a computer in ways that a human eye cannot see.

Mr. Pulitzer described the differences in the imprints made by a human hand and an imprint made by a machine. Each different action on a ballot creates a trail that can be traced.

But Mr. Pulitzer noted that when a ballot is "adjudicated," it eliminates the paper trail, and prevents an audit. He noted that it was "sad" that the process of protecting voters was not even up the standards that we expect from retail merchants. He asked why the Secretary of State was playing "hide and seek" with documents that are the property of the taxpayers, and subject to inspection for at least 22 months under Federal law.

Mr. Pulitzer said that possession of the ballots would show the "artifact" that the voter intended – he noted that all prior testimony had showed that the Q-code was preventing the machines from reading the ballots. He noted that the Q-code should not ever fail, but he suspected that the Q-codes may have been printed in a way that made them fail.

Mr. Pulitzer posted a picture of two ballots – both Fulton County – one with a bar code and one without. Ballots without a bar code, a key material difference between the two, are suspect. It was

unclear why a ballot would not have a bar code, but he observed that the rejections were more common in certain areas – he noted that was a "trick" that he had seen before.

In addition to the bar code, Mr. Pulitzer noted that there were different codes at the top of the ballots. He also noted that the machines that were reading the ballot were calibrating their reading by reference to a single point in the middle of a crosshair. He noted that the scanning by the machines were calibrated from a single point that was the signaling device for the ballot. Due to the material differences on the ballots, it was evident why so many ballots were rejected by the machines and sent to adjudication.

Senator Bill Heath asked Mr. Pulitzer about the "fiducials" (the boxes printed on the sides of the ballots), and Mr. Pulitzer described his view of what they added to the tabulation process. Mr. Pulitzer noted that if the machine was not calibrated correctly, it would perform a different function.

But Mr. Pulitzer noted that it would be difficult to audit the ballots that had been "adjudicated," but the original ballots could be reviewed. With his process, he would be able to determine with 100% accuracy what the voter intent on the ballot was and if the ballot was legitimate.

Mr. Pulitzer noted that he had a problem with the extraordinarily high adjudication rate. Fulton County reported 106,000 adjudications out of 113,000 ballots. He noted that was a failure in the process of operating the Dominion voting machines. He noted that the adjudication rate for the entire nation in 2016 was about 1.2%, but Fulton County was reporting adjudication rates of 93.6%. He suspected that those rates may be high because of the mismarked printing on the ballots.

Senator Beach commented that he believed there was a well-coordinated effort with several groups to commit widespread and systemic fraud from out of state voters, felons voting, and drop boxes change of custody. He noted that the video of State Farm Arena and the ballot shuffling made it hard to imagine that something fraudulent was not in evidence. He asked Mr. Pulitzer if he could identify the counterfeit ballots if the ballots from State Farm Arena were subpoenaed.

Mr. Pulitzer said that he would be able to tell which ballots were fraudulent with 100% accuracy. The more ballots he could process, the more accurate he could be in his assessment. Mr. Pulitzer noted that there is a forensic difference between a ballot that was officially printed and something that ran on a high-speed press – between a ballot completed by a human or one completed by a machine. With the ballots, a lot of information would become clear.

Senator Rhett questioned whether the information being discussed was based on personal experience working with election machines. Mr. Pulitzer responded that his techniques had not been used on ballots before, but it is exactly how counterfeit money is detected. He said that his techniques could determine if the ballots were printed in China, or if the person handling it was a smoker. He believed that this technology would be useful if applied to the physical ballot.

The Chairman thanked him for his testimony. Mr. Pulitzer said that he would donate his time to determine the authenticity of the physical ballots for the State of Georgia.

Later in the day, Mr. Pulitzer was given a couple of minutes extra time to provide a real-time announcement. He stated that some white-hat hackers had been able to get into the poll-pad system while the Run-Off Election was taking place at two different locations. It was wi-fi enabled and was

sending and receiving data. He noted that it only took one device to be connected and that other devices could daisy-chain off that connection.

He stated that this could allow data to be exchanged or that data could be siphoned-off, or that data could be modified and fed right back into the system, what he referred to as a "pump and dump in real time."

**Garland Favorito**

Garland Favorito identified himself as career professional in information technology, with 40 years of experience. Sixteen years ago he co-founded the non-partisan VoterGA, and has been working on election integrity effort Georgia ever since. Mr. Favorito discussed the litigation history that led to the new voting systems that hide the votes in QR codes. While the Secretary of State purchased Dominion Democracy Suite 5.5, the BMD (ballot marking device) system, U.S. District Court (Judge Totenberg) found deficiencies in such a system.

In response to Senator Beach's question, Mr. Favorito noted his group is currently seeking a motion to compel Fulton County to produce the ballots in question. Mr. Favorito was a State Farm Arena tabulation observer, an audit monitor, and a recount monitor. In his role as the elections director of the Constitution Party of Georgia, he helped coordinate hundreds of volunteers in dozens of counties to monitor the recount and the audit.

In Fulton County on Election Day, Mr. Favorito noticed an abnormal spike of 20,000 votes for Biden. He has not received a response to his Open Records Request for the interim results explaining that spike.

After the election, as an Audit Monitor, he noticed three boxes and stacks on tables of 100% Biden ballots. That is mathematically improbable beyond the eighth degree, if not impossible.  He testified that four auditors detected potentially fraudulent ballots – not creased from being mailed, not marked with writing instruments, and of a different paper stock. Mr. Favorito immediately filed an Open Records Request to view those ballots in the custody of the elections department.  His request has so far been ignored.

Mr. Favorito noted that the original election results accumulated votes that were hidden in a barcode. That barcode is 100% unverifiable to the voters in the state of Georgia. A recount is effectively meaningless in Georgia, because it simply rescans the same bar codes.

Mr. Favorito also pointed out three fatal flaws to the so-called "hand count" audit:  First, there was no independent monitoring of the count. Second, the data upload was not monitored at all – some counties, such as Fulton, actively prevented observation of the data upload. Third, as Mr. Cochran testified, the counties were simply forced to enter data into the Secretary of State's Arlo system, which then reported to them what the results were. The counties did not have the tools for a bottoms-up audit.

Mr. Favorito discussed other issues that called the audits into question. He also discussed the Dominion system anomalies. In Spalding County, an upload to the Dominion voting machines on the eve of Election Day caused a two-hour delay in opening of the polls. There was no audit trail of that upload.

Mr. Favorito has asked for a forensic exam on the KnowInk poll books. In response, the Secretary of State has resisted any requests for independent audits – or independence by the county officials they have tried to get fired or whom they have intimidated.

Mr. Favorito repeated the issues that led to five different totals in Coffee County, in ways that even Dominion voting techs could not explain. Mr. Favorito requested an independent forensic exam; the Secretary of State has opened an investigation.

Mr. Favorito noted that the Dominion machines flipped 37 votes from President Trump to former Vice President Biden. Mr. Favorito recited the documentation supporting that finding.

The results were in an unrebutted affidavit from the elections director of Ware County. Again, there is a need for a forensic exam. A fact check by *USA Today* was not done with any input from Mr. Favorito.  *USA Today* offered to print his rebuttal and then reneged on that.

Mr. Favorito was at State Farm Arena, where he saw multiple violations of Georgia law.  Monitors were not in places where they could monitor the room; it is curved and impossible to see around the corner. There was a skirted table, hidden ballot bags, starting and stopping the scanning without notice. All these are violations of state law.

Immediately after the unwatched ballots were scanned, Vice President Biden's tallies jumped by 136,000 votes with only 29 votes added for President Trump. Mr. Favorito noted that the change was statistically improbable and noted that David Cross, a later witness, would discuss that.

Mr. Favorito noted that the Secretary of State had tried to debunk the video of State Farm Arena with statements. But the statements have not been verified; meanwhile the video shows the workers repeatedly stuffing the same ballot stacks through counters, scanning continuing after the monitors left. Ballots are not usually held behind skirted tables; the ballots had already been separated from the signed envelopes. Mr. Favorito noted that the unlawful scanning involved tens of thousands of thousands of ballots. The evidence has been presented and not rebutted.

Mr. Favorito's group has filed suit against Fulton County to inspect the ballots. We want the independent forensic exam that Mr. Pulitzer has described, and we want the digital ballot images and the election reports. All of that should be public, but it is not, because Georgia does not operate transparent elections. That has got to change.

Mr. Favorito observed that the Secretary of State seems determined to "cover up" for Fulton County. He noted his disgust with the cover-up, the actions, and HB 316 that created the new voting systems.

## David Cross

Mr. Cross identified himself as a person who has been doing investment planning and management in Duluth, Georgia for 30 years. He identified himself as a private citizen who has been exploring the facts about what happened. He asked why he was taking time from running his business to do the work of the Secretary of State? That's inexcusable.

Mr. Cross noted that he downloaded the entire data feed from election night from the Edison feed, which comes from Scytl, which is then reported by the Secretary of State. Using his charts, Mr.

Cross identified the spikes in four states that created the margin of Vice President Biden's claim of victory in those states.

In Georgia, Mr. Favorito had noted a spoke of 136,000 votes for Biden and 29 or Trump. At around the same time, an upload of Michigan data attributed 141,000 votes for Biden, and 5,900 for Trump. In Wisconsin about the same time of night, 143,000 votes were attributed to Biden, and 25,000 for Trump. All of these numbers are statistically impossible and should be verified. Mr. Cross noted that the Secretary of State has refused to release original timestamped data. Mr. Cross observed there was no transparency from the Secretary of State.

He also testified there was no transparency in the second recount at the Georgia World Congress Center. While 13 scanners were set up, the monitors could not see anything because the scanners were running too fast, and the font on the machines was too small for anyone to read. When he noticed a bag of unsecured ballots and called witnesses over to observe what he had seen, he was removed by armed guards from the GWCC; the official alleged that he had kicked a bag because he had pointed to it with his shoe. Fortunately, a reporter took a picture of the unsecured bags.

Mr. Cross said he saw nine unsecured bags that day and believes those bags averaged about 1700 ballots per bag, which therefore may have totaled over 15,000 unsecured ballots, enough to have caused Fulton County to be de-certified. Those ballots alone likely accounted for more than the difference separating the presidential candidates.

Mr. Cross showed a photo of Bernard Talmadge, a known ballot harvester who is operating in Georgia.  He was arrested in Indiana, but charges were dropped because his known harvesting could not have affected any elections there. But he has issued hundreds of checks for $75 from his companies – The Operations Group, The Ardleigh Group, and maybe others. Copies of checks had been discovered by Mr. Cross and were presented to the Subcommittee; he was caught in Indiana, and charges were brought against people that worked for him, but they were ultimately dropped because the authorities said it couldn't have really affected anything.

Mr. Cross noted that an investigative reporter named Tom Lauder reported that people who had worked for the Operations Group and the Ardleigh Group were paid $15 per hour to produce ballots, with a quota of 10 ballots per hour, which works out to one every six minutes. Mr. Cross reported on how improbable it was – even in an apartment building – to obtain six registrations every six minutes.

Mr. Cross reported that, according the Federal Election Commission, Mr. Talmadge's companies have taken in $9.1 million for field operations, which could harvest more than 6 million ballots at the known rates above.

Mr. Talmadge's companies have taken in funds from multiple entities. Mr. Cross pointed out that the Maine Democratic Party gave Mr. Talmadge's companies $3 million – but the Maine Democrats did not even raise $3 million during the 2019/2020 election.

Since Mr. Talmadge is known to be operating in Georgia, Mr. Cross solicited information from 400 checks cashing companies and liquor stores – two called him back and sent him copies of checks from companies associated with Mr. Talmadge, using different names, such as McDream Enterprises, but having the same bank account numbers. Mr. Cross asked why other law enforcement agencies were not interested.

Mr. Cross also called the Subcommittee's attention to a video circulating on the internet of a discussion with a Chinese printer supposedly printing ballots for the General Election in Georgia. The authenticity of the video could not be proven.  But the printer alleges in the video that it would be difficult to produce a ballot using magnetic ink. Mr. Cross suggested that an independent forensic review of the ballots should review the paper stock, but also look for any traces of magnetic ink.

Finally, Mr. Cross noted that, by simply doing his own investigation, he had been able to find states with more voters than persons of voting age in the population of that state. Mr. Cross noted other areas of voter fraud being solicited in other states. Mr. Cross presented other information to the Sub-committee that would demonstrate that laws were being ignored or deliberately broken.

**Debbie Fisher (Military Votes)**

Debbie Fisher testified that she was from Cobb County and part of a VRP during the General Election.  She has also served as a monitor during the recount, the hand recount, and the last recount. She was currently monitoring the absentee ballot processing in Cobb County at Jim Miller Park.

On November 16th, during the recount, Ms. Fisher was serving on a VRP and reviewed the recount of 298 military ballots on one day. Each was neatly filled out in "perfect bubbles" with no stray marks, no X's, and no check marks. It appeared that about 90% of them had no paper folds. She also noticed that there were only two of the 298 that had blue ink versus black ink.

The watermarks were supposed to be transparent, but appeared to have been copied on some of the ballots. Based on all of these out of the ordinary features, she challenged the ballots as inauthentic.

Ms. Fisher also observed that 80% to 90% of the military ballots were being marked for Vice President Biden. She surmised that the percentage rate was out of the ordinary for military personnel from Cobb County and would have expected it to be closer to the actual allocation of votes in Cobb County, which had traditionally been more evenly divided between parties.

Upon further investigation, she determined that only Fulton County reported military ballots as a separate category, and had reported that 93% of the transcribed military ballots were cast for Vice President Biden. Ms. Fisher found that statistically improbable.

As she has gone through three processes, the number of ballots reported as military ballots has shifted. Between the first recount and the latest recount, the number of military ballots recorded decreased by 300. She also noted that she was told that the military ballots had been received "electronically" but had not been able to see an actual ballot with a signature for those ballots. Thus, it was impossible to verify if the ballots were real or not.

Senator Rhett asked if she was aware that Cobb County has passed several audits, including just recently a signature audit where they received a 99.99% accuracy rate?  Ms. Fisher responded that she was aware of that claim.

Senator Rhett asked if she was aware that the audit was supervised by the Secretary of State and the Georgia Bureau of Investigation. Ms. Fisher responded that she was aware when the GBI brought the boxes full of ballots including an unmarked box that wasn't the envelopes. She guessed that box contained the military ballots that she complained about. Ms. Fisher noted that the audits, including the last signature audit, were conducted without oversight and noted that she did not believe them.

Senator Beach asked if she had reported what she had seen to the Secretary of State. Ms. Fisher responded that she had reported her observations to the Secretary of State on three separate occasions and had not received any response except acknowledgement that her comments had been received.

Ms. Fisher took the liberty of amending and clarifying her comments in response to Mr. Beach. She noted that, with respect to the signature audit, she had observed some of the early voting and she knew that many mail-in ballots lacked the necessary "red ink" initials that would indicate that a poll worker had verified the signature.

Senator Beach thanked her for her submission but noted that a common theme was that everyone who had presented testimony had said they had reached out to the Secretary of State's office and got little to no response.

## Irregular Activities by Election Workers

### Sandra Metts

Sandra Metts worked as a poll worker in the last two elections in Clark County, Athens, Georgia on November 3rd and in a subsequent runoff at two different polling stations. While at those locations, she witnessed poll workers attempting to register out-of-state voters, poll workers actually registering voters on the same day of the election, in violation of state law, poll workers requesting favors or bribes for registering voters, and other voting irregularities.

Ms. Metts said she had called the Secretary of State's office to report these issues and has still not heard back. However, she was threatened with not being re-hired because the Secretary of State reported that she had complained. She tried to call the Secretary of State to report that her complaints were being used against her, but she did not receive any response.

Ms. Metts also reported that she has seen poll workers appearing to "find" ballots in the back room, and voters who requested same-day ballots when they had already been recorded as having cast an absentee ballot. Ms. Metts also described how easy it would be to obtain an absentee ballot under the name of another voter.

### Salleigh Grubbs

Ms. Salleigh Grubbs identified herself as being from Marietta, Georgia. Ms. Grubbs said she was present for the recount at Jim Miller Park on the 13th of November, and she had already submitted two affidavits.

But she noted a "recurring theme" – the Secretary of State's office. She said she was present when the calls came in about shredding at Jim R. Miller Park. Ms. Grubbs said she had lots of details, but that the details were being dismissed. When the observers and citizens she was working with started asking questions, those questions were being dismissed – she referred to the prior question from Senator Rhett. She said that it did not matter how much evidence they presented, they were being met with questions like, "Were those actual ballots in there?"

Ms. Grubbs noted that, in an election, all the boxes, including the boxes in question, were sealed with "evidence tape," which is called evidence tape because those papers are potential evidence. In her view, anything that goes in the evidence box is evidence. There should have been no shredding.

She noted that Jim R. Miller Park is a fairground with differing exhibit halls – A, B and C. When she went to observe, she was kept from going into Exhibit Hall B and was told that no election related activity was going on in there.

She stated that monitors were relegated to areas six feet away and "scolded, …. "yelled at," … "belittled" and "harassed" by the County officials.

Jim R. Miller Park is not a government facility – it was only being used for election purposes in this election cycle.  There could not have been election material from prior elections being shredded from that location.

There were two days of voter review panel activity going on in Exhibit Hall B with no Republican representation at all. She was purposely told not to go in there. When she heard that documents were being shredded at Jim R. Miller Park, having served there as a poll watcher, she left work and followed the shredding truck.

She called 911 and went to the police to make a report of the election fraud, but was told that the police would not even take an incident report.  Protocols had been changed 10 minutes before they reported the shredding incident and that protocol suddenly required all election fraud to be reported to the Secretary of State. The Secretary of State reported that the shredding was "routine."

Grubbs noted that the Secretary of State's office was doing nothing but obstruct the drive for transparency for the election. She specifically mentioned Gabe Sterling and Jordan Fuchs. She noted that Gabe Sterling had posted on Facebook that "Iran has worked to foment division in our nation. Those continuing to claim the election was stolen are supporting the tactical actions of Iran."

"When we have seen the fraud, we have been lied to, we have been distracted, we've been held up and we're tired of it. And it's time that you people stand up."

Ms. Grubbs said she has emailed legislators. She has formed an activist group called the Angry Patriots of Georgia.  She said she has begged the Legislature to come into session and noted that several people had given time and dollars to try to get the points about the fraud across to the legislature.

She noted that she had sent every legislator a DocuSign document – many in the legislature did not even bother to open it.  She asked if anyone cared and if anyone was listening to the people.

Ms. Grubbs said she had backed her phone up in five different places to preserve what is on it. She is afraid it will be stolen. But she noted that she is now banned from taking her personal phone into Jim R. Miller Park. She asked if the election is so clean, why is it impossible to record the tabulation? State law does not mandate that voters give up their phone to watch tabulation. Ms. Grubbs said that the cover-up indicated fraud, and she believed the Runoff Election was being operated in a fraudulent way and should be stopped.

**Testimony of Rudy Giuliani, former mayor of New York City, former U.S. Attorney**
Mr. Giuliani noted that he had testified before the Subcommittee in the prior meeting on December 3, 2020. He noted that he had listened to some prior testimony and found it credible.

Mr. Giuliani noted that the Secretary of State had said that this election was the cleanest election in history; Mr. Giuliani submitted that this was the dirtiest election in history.

Mr. Giuliani noted that, based on the evidence he had seen, "Whatever the result, this election is going to live in history. This is going to be the election that will be the dirtiest election, the most crooked election, the most manipulated election in American history." Mr. Giuliani noted that more evidence would be gathered and that it would involve "international connections." Mr. Giuliani concluded his introduction by stating:

> "[P]eople are going to look back on this and they're going to say, 'What did you do about it?' I mean, a year from now, and two years from now, people can look back on it and say, 'What did you do about the fraud? Did you just sit by and let it happen?'"

Mr. Giuliani made the following observations in the course of his testimony:

- The activity in Georgia was organized and appeared to be coordinated with activity in other states at the same time that Fulton County election officers were unlawfully scanning ballots at the State Farm Arena.

- With respect to the tabulation and recounts, Mr. Giuliani noted that the counting of ballots had to be public and had to allow inspectors but that the inspectors were being thrown out in violation of law. Mr. Giuliani suggested that ballots that were counted without inspectors present were illegal votes and should be thrown out.

- Mail-in balloting is subject to fraud, as had been predicted in the bi-partisan report authored by former President Jimmy Carter and former Secretary of State James A. Baker.  76% of European countries do not allow mail-in ballots.

- The violations are occurring in the current Runoff Election. Unless corrective action is taken by the Legislature, the violations will recur.

Mr. Giuliani noted that the U.S. Constitution gives the plenary authority over the federal election to the State Legislature: "the buck stops here." The "consent decree" negotiated by the Secretary of State was an unlawful usurpation of the State Legislature's authority. Mr. Giuliani asked whether there was anyone who believes that Georgia submitted the correct votes. Mr. Giuliani noted that, as a lawyer, he would not counsel a client to certify those numbers because they were not true and correct. He referred again to the videotape of illegal ballot stuffing at State Farm Arena and noted that alone should convince anyone that the certified numbers were not correct.

Mr. Giuliani noted that:

> 2,560 felons voted in Georgia unlawfully.
> 15,700 voters had changed their address before the election.
> 40,000 voters failed to register before they voted.
> 10,315 voters were dead before they voted, based on their obituaries.

Based on his observations, Mr. Giuliani noted that the number submitted to Washington was a lie. And he noted his belief that the Secretary of State was engaged in an unlawful coverup.

Finally, Mr. Giuliani noted that his team had tested the Dominion voting machines in Michigan and they were insecure:

> "Those machines are like Swiss cheese. You can invade them. You can get in them. You can change the vote. You can fractionalize the vote. Why would you ever fractionalize a vote?  There's not such a thing as half a vote or a quarter of a vote. Why would you have an election machine where you can change the vote? The liars who run Dominion have said, you can't change the vote. ….  Read their manual. Their manual says you can change the vote. Why should you be allowed to change a vote in a voting machine?  Once that vote goes in there, that's it. You shouldn't be able to change it. You shouldn't be able to move it from Trump to Biden or from Biden to Trump. Well, you can do that in the Dominion machine. Our people have inspected 22 Dominion machines."

Mr. Giuliani noted that his legal team had submitted affidavits from ex-military experts who had examined the machines all of whom had worked or the National Security Agency or the United States government. He noted that there were no consistent vote counts based on numerous uses of the machines. He noted that operators of the Dominion Voting machines are able to change votes between candidates. In the 22 machines examined so far, his inspectors have identified 6,000 votes that were transferred from Vice President Biden to President Trump.

Mr. Giuliani noted that every time his team would count using the machine, they would get a different count. They were able to change votes, massive number of votes, from one side to the other. He noted that his team had identified 6,000 vote changes on 22 machines, how many more machines needed to be observed?  He also questioned why the Secretary of State would not allow a transparent review:  "We'll find out really fast if this was the cleanest election in history, or the biggest scandal in terms of voting in the history of our country."

Mr. Giuliani called the prior recount efforts a "joke" and an "insult."  He noted that counting the same phony ballots over and over would always produce the same result. Examining the ballots was the only way to verify the actual process, and that was being inexplicably barred by the Secretary of State. He asked why there would be any reason to not permit the review unless the Secretary of State was actually uncertain as to whether there were votes created by one party and submitted in the manner documented in the State Farm Arena video.

Mr. Giuliani noted that Vice President Biden gained a 138,000 vote advantage during the period of unmonitored counting at State Farm Arena.

Mr. Giuliani concluded by noting the constitutional implications of not following the State Legislature's mandated Election Law.  He noted that the Founding Fathers envisioned disputed elections, cheating, stealing, and they made a choice. They made a choice of where to put the responsibility in a difficult situation like that. He noted that Article I, Section 4 of the U.S. Constitution made the State Legislature the sole entity responsible for determining the manner of election contests –

"not the Governor, not your Secretary of State who's covering up everything he can cover up, not anybody else, but you."

Mr. Guiliani asked that the Legislature use its power under the U.S. Constitution. He noted that the Constitution takes the Governor out of the process, and that the Legislature could call a Special Session at any time to correct the imbalances created by the fraud and irregularities. He also noted that it was the responsibility of the Legislature to stop the improper conduct of the election.

Mr. Giuliani noted that there was more than sufficient evidence of the impropriety -- dead voters, felons, phony ballots, phony mail-in ballots. He noted that the President ran behind the State legislators in Georgia by 4%-6%, despite his popularity, and ran ahead of state legislators in other states.

Mr. Giuliani said it was a question of courage and challenged the Georgia Legislature:

> "Do you have the courage to [fulfill your obligations under] the Constitution of the United States put on you to save our people from fraud? To save the reputation of the State of Georgia from … certifying a phony vote that led to the wrong result in an election -- which will be the verdict of history. Or, do you have the courage to put up with what's going to happen if you, in fact, change that certification and do the right thing? You'll be attacked. You'll be pilloried. You'll be described in all sorts of horrible ways, but you will wake up the next morning and look in the mirror and you'll be able to say, 'I did the right thing.'"

**Christine McKinnell**

Christine Mckinnell identified herself as a resident of Cobb County and asked the Subcommittee to look into the "poll pads" and the software that accompanied them. Ms. McKinnell noted that during the election, she was a poll manager in Cobb County. Ms. McKinnell confirmed that poll books were always wifi-enabled, syncing in real time with local boards of elections. They would scan voter identification and reveal to the poll worker the voter's party of choice.

When she went to her assigned precinct, she found that a technician named Lucas was in her "enclosed area for the entire day," despite the fact that she was not told in advance that he would be there, which was most unusual. She did not know whom he worked for either. Cobb County had its own technicians. He sat in one position down the line of poll pads most all day and was constantly using his cell phone even though cell phones were not supposed to be used in that area. Lucas did not know how to remedy the errors when they arose. There seemed to be no consistent way of dealing with the issues.

Ms. McKinnell described issues with the poll pads, ballot cancellations, and default error screens that she had not previously seen and were not in the training manuals. Though not entirely clear in her testimony, she was sharing how the poll pads would almost immediately show that the voter had voted even though they had not even had time to place a vote. She saw that same screen multiple times. Later, when she was working the "voter fraud line" in Buckhead, she received multiple calls from poll workers, managers, and assistant managers who had gotten the same screen she had seen. She noted that the error screen appeared to be associated with Republican voters only. She reported that one specific poll manager who called said that he received this screen on over 20 voters. It stuck out to him

because the voters all were young. They seemed to be first-time voters. They were in their late teens, early twenties.

She also reported on voters who found out after voting that their votes had not been recorded.

Ms. McKinnell reported that one caller noted a difference in the QR codes in Dunwoody -- Democrat ballots had one QR code on them, and Republican ballots had two QR codes.  And that they were directed to different scanners.

Ms. McKinnell noted that she had "logged in a lot of issues" and she wanted to make sure that the poll managers were following the law.  She was concerned that the election process was lawless.

**Issues Involving Retaliation**

**Dana Smith**

Dana Smith is from Hartwell, Hart County and was a poll worker in the last election. She previously testified to the committee on December 3, 2020, but returned to share that she has been retaliated against in her community by an editorial. Her husband heard from people at work who asked him, "Wow, are you comfortable with your election office really slandering your wife in the newspaper like that since she testified?"

She shared that she was not invited back as a poll worker again for the January 5th election. "So I'm pretty sure I'm not really in great standing in my own County where I live, which has been pretty difficult. I came to you as just a concerned citizen. That's who I am, who happened to work as a poll worker, and then a poll watcher. And I'm feeling a lot of repercussions for doing that."

Nonetheless, Ms. Smith then further testified to the committee that the signature verification process was broken and that poll workers were not trained to adequately verify signatures. Considering the fact that many people were registered to vote via an electronic signature provided through the driver's license process, such signatures present challenges to in the verification process. Furthermore, people's signatures change over time. Why should voters trust one person with no training and no oversight to be able to verify signatures and thus have so much power in the election process.

**Suzi Voyles**

Ms. Voyles previously testified at the December 3, 2020 Subcommittee hearing. She reminded the Subcommittee of her 20-year track record serving at polling stations in Fulton County and as a poll manager at a Sandy Springs precinct. Ms. Voyles previously testified that she had seen the extra large batch of pristine ballots in the first recount. Because of her testimony to the Subcommittee, she has been released of her job as a poll manager. Ms. Voyles asked the Subcommittee to do its job and to prevent retaliation against poll workers who come forward to testify.

**Preston Haliburton**

Mr. Haliburton noted that he was representing several plaintiffs, including persons who have been terminated simply because they appeared before the subcommittee to testify. He stated that President Trump apparently lost major cities in the middle of the night in certain swing states through improper conduct by election officials and others. He said he is still researching the issues, but he could not make it public now for fear of retaliation as well.

Mr. Haliburton said that we have a major problem in the Secretary of State's office, which might not be impropriety, but that smart people had to come together to solve the problem. He noted that no state had ever seen an administration error this massive in a presidential election. He noted that the Giuliani team was comprised of top notch people who were trying to get it right. He said this was not a farcical conspiracy, but a group trying to come up with solutions.

**Bobby Pitton**

Mr. Bobby Pitton identified himself as coming from the suburbs of Chicago, Illinois with a background in finance economics.  Mr. Pitton has an MBA from Northwestern University, Kellogg School, and working on a degree in financial engineering. Mr. Pitton analyzed the number of unique first names and unique last names in the Fulton County data sets and concluded that the number of people with unique first names and the number of people with unique surnames is so out of kilter that the only explanation could be that many people in the voter rolls are "fake" names. The voter rolls should be cleaned up and verified.

Mr. Pitton reviewed the data in Fulton County and six other surrounding counties: Cherokee, Clayton, Cobb, Fayette, Forsyth, and Gwinnett. Mr. Pitton noted that there were 66,363 first names in his dataset of people in Fulton County.  Of those names, 46,796, or 70%, have one instance, only one instance of that first name.

There are 105,558 surnames in Fulton County, but 46,000, or 43%, have only one instance. So 70% of all the names that are available for people in Fulton are unique. They have one instance of that first name, and 43% of the surnames.

Mr. Pitton noted that nationwide, there are about 150,000 last names that account for about 90% of the U.S. population. 150,000 total last names are 90% of the country. On average, each of those last names have about 2,000 persons with that last name – obviously some have significant more names, some have less.

Mt. Pitton noted that the nationwide ratio of first names to last names is about 33 to one or so. But in Fulton County, the average is more like 3 to one.

Mr. Pitton is still analyzing the data but he considered whether the surrounding counties might have additional relatives that could account for this discrepancy. But the number of unique first names jumps up, which is counterintuitive. Based on the discrepancies, he has concluded that there are many fake names, and thus these can account for many of the phantom votes.

**Lynda McLaughlin.**

Ms. Lynda McLaughlin has a background in politics and media and an MBA in business, and she is a part of the Data Integrity Group. She and her group provided some data analysis and an explanatory video to assist in understanding voter irregularities. Her analysis suggested that the Secretary of State's office is certifying with the same data that the *New York Times* reported via its Edison feed. Lynda McLaughlin stated that the certification of votes and the votes that were submitted for the State of Georgia have negative swings in them. As such, they are in error and they are not representative of the State of Georgia and how the State of Georgia's voters voted. Thus the Secretary of State's office is recording and certifying results that have negative errors and fraudulent votes in them.

**Justin Mealey**

Justin Mealey, also part of the Data Integrity Group, is a a nine and a half year veteran of the U.S. Navy where he worked as a electronic warfare technician and Arabic linguist, four years of which being spent at Fort Gordon in Augusta. Mr. Mealey also spent time as a CIA contractor as a data analyst and programmer for the National Counterterrorism Center. He currently works for a big four accounting firm.

Mr. Mealey focused on three separate data sources. The first data source is the Edison Data Source, a time-series based data. The second source is the Scytl data source. That Scytl data source bifurcates that data and sends the data to the Edison data feed which then sends that to the Secretary of State. The Secretary of State's data is actually basing the certification process off of Scytl data, for all intents and purposes. Now because the Secretary of State data gets it after the Scytl server, what happens then is the Secretary of State could possibly change that. Thus, the group also uses a third data source as well.

Mr. Mealey stressed the point that an adjudicated ballot completely destroys the ability to recreate voter intent in an audit. He noted that in Fulton County, Richard Barron said that 113,000 votes were cast, and, of those, 105,000 were adjudicated, an abnormally high number. The original ballot is replaced with a new image. With no metadata, no trail, and even from an audit perspective, it would fail because from an audit perspective they're all using the same account to audit. So one cannot know who made that change. One cannot know how many times that change was made in the past. Mr. Mealey noted that a group that changed the ballot image and then adjudicated that exact same ballot the only thing someone would see from the end perspective data-wise is that final adjudication.

**Dave Lobue**

Dave Lobue identified himself as a data scientist with over a decade of experience, working directly with structured and unstructured data across a number of industries, specialized in machine learning and more recently artificial intelligence. He has worked with a multitude of data structures in the financial services, telecommunications, and in primary research consulting industries.

Based on his review, his team identified over 40 data points where negative voting or outright vote switching across candidates has totaled over 200,000 votes. Using machine learning algorithms that are regularly used for anomaly detection of fraud and financial services, his team identified over 500 precincts with over 1 million corresponding votes that exhibited suspicious activity.

Mr. Lobue based his analysis on the fact that vote tallies were being split and transferred up and down through the evening. Votes summations should not decrease, since new votes are constantly being added, but they did.

Mr. Lobue presented videos to the Subcommittee to show patterns in Georgia and Michigan. In Fulton County, over 150 precincts voted 90% or more for Vice President Biden. That is statistically unlikely to be true. In the statewide race that was decided by less than 13,000 votes, these 150 Fulton precincts alone accounted for 152,000 Biden votes. This is a clear indicator of suspicious or outright fraudulent activity.

In DeKalb County, 94 precincts voted 90% or more for Vice President Biden. That is also statistically unlikely to be true.

Mr. Lobue noted that recorded vote totals for President Trump decreased at certain points during election night. He asked "Why are any bars going negative?" Since there are no such things as negative votes, this has no valid explanation other than fraud. Unbeknownst to the general public, votes for Donald Trump were being switched and removed from his total, which often coincided with other precinct updates, but simultaneously offset deductions so that they appeared to remain neutral to outside observers.

Mr. Lobue presented a video showing the many places in the election process where fraud could easily occur on a grand electronic scale. Drilling down into the numbers in three counties, he concluded that President Trump had over 30,000 votes simply disappear in Dodge, Dougherty, and Putnam counties.

At 9:11p.m. EST on Election Night in Bibb County, President Trump reported 29,391 votes, and Vice President Biden was reported to have 17,218 votes. Minutes later, those tallies had switched.

Because there was a time lag between each state reported aggregation of county results, this type of switch can go undetected in state reporting, as long as it falls after the latest state refresh and before the next state update.

According to the Georgia Secretary of State website, President Trump lost Georgia by 12,670 votes. Mr. Lobue's videos presented evidence that the Dominion voting systems could be programmed to react in real time to manipulate data overall so that reporting seemed fluid. No figures should go negative, but they did. The results of the election were not consistent with how the data is structured and what would be consistent with normal or routine legal voting.

## Ray Smith

Ray Smith represented himself as co-counsel for the President of the United States, Donald J. Trump. He noted that the President has a lawsuit pending in Fulton County before the Superior Court. The certification by the election by the Secretary of State relied on a slim margin a margin of 11,700 votes. But yet the Coffee County testimony alleges that various counties were forced to certify the results.

Ray Smith discussed the basis for various ongoing challenges – letters being sent to out-of-state voters, and 8,000 voters who had moved out-of-state and voted illegally in the General Election. That is 3/4ths of the difference between the candidates alone.

The Secretary of State also admitted 74 felons voted who should not have. So right there, how can they possibly certify the election? They also admitted that the 15,700 NCOA votes were voted by persons who had left the state.

Mr. Smith asked that the Senate and the House not stand by the Secretary of State's certification.

## Sen. Brandon Beach

Senator Beach thanked the Chairman and Senator Heath. He also added that the testimony was unbelievable and an embarrassment for our state. He said he was "more and more convinced now that this was a well-orchestrated, well-coordinated effort by several groups to commit widespread and systemic fraud."

Senator Beach noted that Gabe Sterling has admitted that a lady from Maryland used his address to vote in our election. He works for the Secretary of State's office. Senator Beach noted that there were double votes cast, but no action. He noted that, after the primary, the Secretary of State had a press conference, said he was going to investigate and prosecute over 1000 people that double-voted in the primary. As of December 23rd, there has not been one investigation or one prosecution.

Senator Beach noted that felons voted illegally and dead voted.  At least 37,500 ballots appeared and were counted with no supervision. Mr. Beach also discussed chain of custody failures which could lead to unknown errors.

Mr. Beach noted that people are mad. People are angry. Mr. Beach suggested that the Legislature take action and do something about this fraud. He suggested that the subcommittee focus on Fulton County and the State Farm Arena.

Senator Beach made a motion to request  that the Fulton County Board of Elections make absentee ballots from State Farm Arena from 10:30 PM to 1:30 AM on Election Night available to the Cheeley Law Group and Mr. Pulitzer to validate if those are legitimate ballots.

Sen. Tillery seconded the motion. Chairman Ligon noted that this was not a formal committee motion, but discussed recasting the motion, which Senator Beach accepted.

Senator Tillery asked if all the ballots were needed, and Bob Cheeley responded that they were.

Senator Tillery, as one of the official subcommittee members, restated the motion to request that the Fulton County Board of Elections make the absentee ballots cast in Fulton County for the November 3rd General Election available for inspection by the Cheeley group through the process that Mr. Pulitzer outlined earlier in the day. As restated, the motion was then adopted.

## Chairman Ligon

Chairman Ligon provided closing remarks, acknowledging the many people across the state who had sent him affidavits and letters and emails describing all the irregularities and fraud that they had observed, along with the ways that many had been treated with hostility. He noted that people had been barred from observing, had been belittled, and were not treated with dignity and respect as they sought to perform their civic duty as participants in the election process, a duty which is at the heart of being an American.

He made an analogy of what they had endured. It was as if a person had gone to a bank and asked to see how much was in his own account and being told that he could not see his own transactions, or even ask to see them, and further, if he asked again that a sheriff would be called to have him removed. Senator Ligon noted that the vote was more important than money because the vote determines the type of country people live in, with all of the God-given rights and liberties that the forefathers enshrined in the nation's founding documents.

He acknowledged that people know and understand that and want to see their heritage "jealously guarded and vigorously defended. And when there's an offense to it, they want to see it aggressively prosecuted and they want it corrected, and they want it set right."

He further stated, "I believe that we should come together as a [legislative] body to meet and to look into these things and to consider what should be done for this past election and what should be

done for future elections." He expressed his hope that the work of the committee and its recommenda-tions would be considered by the next legislature which meets and that serious steps would be taken to ensure that Georgians never find themselves in a position like this again. He looked forward to the day when Georgia would have a system of voting that everyone could be proud of and have confidence in so that citizens would know that the results of elections do in fact reflect the will of the people.

After thanking the members of the subcommittee, Senator Ligon adjourned the meeting.