IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,          )
                                )
        Plaintiffs,             )
                                )
vs.                             )      CIVIL ACTION NO.
                                )
BRAD RAFFENSPERGER, ET          )      1:17-CV-2989-AT
AL,                             )
                                )
        Defendants.             )


VIDEOTAPED 30(b)(6) DEPOSITION OF OFFICE OF THE
SECRETARY OF STATE
(through William "Chris" Harvey)

(Taken by the Curling Plaintiffs)

January 28, 2022

8:40 a.m.


Reported by:   Debra M. Druzisky, CCR-B-1848

1            APPEARANCES OF COUNSEL

2   On behalf of the Curling Plaintiffs:

3       DAVID D. CROSS, Esq.
        HANNAH ELSON, Esq.
4       JENNA CONAWAY, Esq.
        LOGAN WREN, Esq.
5       SONJA SWANBECK, Esq.
        REEMA SHOCAIR ALI, Esq.
6       Morrison & Foerster
        2100 L Street NW, Suite 900
7       Washington, D.C.  20037
        (202) 887-8795
8       dcross@mofo.com
        helson@mofo.com
9       jconaway@mofo.com
        lwren@mofo.com
10      sswanbeck@mofo.com
        rali@mofo.com

11

12  On behalf of the Coalition Plaintiffs:

13      CARY ICHTER, Esq.
        JILL CONNORS, Esq.
14      Ichter Davis
        3340 Peachtree Road, Suuite 1530
15      Atlanta, Georgia  30326
        cichter@ichterdavis.com
16      jconnors@ichterdavis.com

17

    On behalf of the Defendants Georgia Secretary of
18  State and State Election Board:

19      VINCENT R. RUSSO, Esq.
        CAREY MILLER, Esq.
20      Robbins Ross Alloy Belinfante Littlefield
        500 14th Street
21      Atlanta, Georgia  30318
        (678) 701-9381
22      vrusso@robbinsfirm.com
        carey.miller@robbinsfirm.com

23

24

25

1            APPEARANCES OF COUNSEL (Continued.)

2    On behalf of the Defendant Fulton County Voter
     Registration and Elections:
3
         DAVID LOWMAN, Esq.
4        Office of the Fulton County Attorney
         141 Pryor Street, Suite 4038
5        Atlanta, Georgia  30303
         (404) 612-4000
6        david.lowman@fultoncountyga.gov

7
     Also Present:
8
         Krishan Patel, videographer
9        Susan Greenhalgh
         Marilyn R. Marks
10
                      --oOo--
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                 INDEX TO EXAMINATION

 2    Witness Name:                              Page

 3    WILLIAM "CHRIS" HARVEY

 4        By Mr. Cross                              8

 5        By Mr. Ichter                           223

 6

 7

 8

 9            INDEX TO PLAINTIFF'S EXHIBITS

10      No.              Description             Page

11    Exhibit 1    1-26-22, Curling Plaintiffs'    9
                   Second Amended Notice of
12                 Deposition of Office of the
                   Secretary of State re: The
13                 above-captioned action.

14    Exhibit 2    LinkedIn profile re: Chris     35
                   Harvey.
15
      Exhibit 3    (Exhibit not identified by
16                 counsel.)

17    Exhibit 4    State Defendants 101460 thru   44
                   461, 11-6-20, E-mail string from
18                 Chris Harvey to Frances Watson
                   re: Violation.
19
      Exhibit 5    State Defendants 101471 thru   61
20                 473, 11-10-20, E-mail string
                   from Chris Harvey to Frances
21                 Watson re: Security seals on
                   B.M.D.s.
22
      Exhibit 6    State Defendants 108321,       56
23                 10-10-20, E-mail from David
                   Worley to Chris Harvey re: Hall
24                 County.

25
```

 1        INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

 2       No.              Description                  Page

 3    Exhibit 7    State Defendants 108787 thru         63
                   788, 5-28-20, E-mail string from
 4                 Chris Harvey to George Gray re:
                   Board of Elections.
 5
      Exhibit 8    State Defendants 110230 thru         78
 6                 231, 10-15-20, E-mail string
                   from Carol Heard to Chris Harvey
 7                 re: Threat assessment.

 8    Exhibit 9    State Defendants 115480 thru         92
                   482, 10-30-19, E-mail string
 9                 from Deb Cox to Chris Harvey re:
                   Encoding a supplemental voter.
10
      Exhibit 10   State Defendants 117430 thru        108
11                 431, 2-25-21, E-mail string
                   Chris Harvey from Jordan Fuchs
12                 re: Security sensitive FW: Call
                   follow-up.
13
      Exhibit 11   State Defendants 139190 thru        116
14                 192, 4-5-19, E-mail string from
                   Kevin Rayburn to Jordan Fuchs
15                 re: I bet I can hack your
                   electronic voting machines.
16
      Exhibit 12   Fortalice 1209 thru 1212,           121
17                 11-2-20, E-mail string from
                   Chris Furtick to Roy Iversen re:
18                 Computer accessed remotely.

19    Exhibit 13   Dominion 69648, 9-25-20, Chris      127
                   Harvey Post to The Buzz re: Very
20                 important announcement
                   concerning databases.
21
      Exhibit 14   Dominion 72216, 10-19-20, E-mail    131
22                 from Scott Tucker to list re: GA
                   advanced voting.
23
      Exhibit 15   Dominion 73354, 11-8-20, E-mail     140
24                 string from Kay Stimson to Jen
                   Daulby re: Voting issue in
25                 Georgia.

1        INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

2       No.              Description                 Page

3    Exhibit 16    Dominion 74766 thru 769,          148
                   11-17-20, E-mail string from
4                  Chris Harvey to Scott Tucker and
                   David Greenwalt re: Update to
5                  firewall rules for Meraki MDM
                   for poll pads, attached.
6
     Exhibit 17    Dominion 74784 thru 785,          157
7                  11-17-20, E-mail string from
                   Scott Tucker to Chris Harvey re:
8                  Memory cards.

9    Exhibit 18    Dominion 76086 thru 088, 1-7-21,  185
                   E-mail string from Tom Feehan to
10                 Blake Evans and Scott Tucker re:
                   We have a problem.
11
     Exhibit 19    State Defendants 2000997 thru     204
12                 201000, 7-16-19, E-mail string
                   from Ryan Germany to Brad
13                 Raffensperger, Jordan Fuchs and
                   Merritt Beaver re: N.A.S.S.
14                 elections committee NormShield
                   press release/score card on
15                 State Web site security.

16   Exhibit 20    State Defendants 165630 thru      210
                   632, 12-31-20, E-mail string
17                 from Angelos Keromytis to Jordan
                   Fuchs re: Election machine hack?
18                           - - -

19

20

21

22

23

24

25

Page 7

1              INDEX TO CGG PLAINTIFF'S EXHIBITS

2        No.              Description              Page

3    CGG Exhibit 1    O.C.G.A. Section 21-2-379.22 re:    251
                      Requirements for electronic
4                     ballot marking.

5    CGG Exhibit 4    10-12-20, Reuters color            268
                      photograph of presidential
6                     elections early voting at State
                      Farm Arena.
7
     CGG Exhibit 12   Secure the Vote PowerPoint re:     259
8                     Precinct Layout to Aid with
                      Privacy Training.
9
     CGG Exhibit 14   12-1-20, State of Georgia          224
10                    Official Election Bulletin from
                      Chris Harvey to County election
11                    officials and county registrars
                      re: Preserving ballot images and
12                    delivering to Sec. of State.

13   CGG Exhibit 16   Rockdale 924, 6-11-20, E-mail      275
                      from Cynthia Willingham to Scott
14                    Tucker, Chris Harvey and Kevin
                      Rayburn re: Additional training
15                    needed - tech and regional
                      manager.
16
                             -  -  -
17

18

19

20

21

22

23

24

25

```
 1              THE VIDEOGRAPHER:  Today's date is
 2         January 28th, 2022, and the time is 8:39
 3         a.m.  This will be the remote videotaped
 4         deposition of Chris Harvey.
 5              Would counsel please introduce
 6         themselves and any objection to the
 7         witness being sworn in remotely.
 8              MR. CROSS:  This is David Cross on
 9         behalf of Curling plaintiffs.
10              MR. ICHTER:  This is Cary Ichter on
11         behalf of the Coalition plaintiffs.
12              MR. RUSSO:  This is Vincent Russo on
13         behalf of the State defendants.
14              MR. LOWMAN:  This is David Lowman on
15         behalf of Fulton County defendants.
16              THE VIDEOGRAPHER:  Would the court
17         reporter please swear in the witness?
18                   WILLIAM "CHRIS" HARVEY,
19    having been first duly sworn, was examined and
20    testified as follows:
21                        EXAMINATION
22    BY MR. CROSS:
23         Q.   Morning, Mr. Harvey.
24         A.   Good morning.
25         Q.   Can you hear me okay?
```

```
1        A.   I can.

2        Q.   Do you understand that you are testifying

3   on behalf of the Secretary of State's office today

4   on a couple of specific topics?

5        A.   I do, on a couple specific topics.

6        Q.   All right.  And do you understand that

7   that means that you're testifying to the

8   Secretary's office's knowledge of information on

9   those particular topics?

10       A.   Yes.

11       Q.   All right.

12                      (Whereupon, Plaintiff's

13                       Exhibit 1 was marked for

14                       identification.)

15   BY MR. CROSS:

16       Q.   So let me, since you don't have Exhibit

17   Share, tell me if you can see what's on the screen

18   now.  It should be Exhibit 1.

19       A.   I can, yes.

20       Q.   Okay.  And you see that this is our second

21   amended notice of deposition of the Office of the

22   Secretary of State?

23       A.   Yes.

24       Q.   Have you seen this document before?

25       A.   I don't believe so.
```

1        Q.   Okay.  So let me jump to the topics.  And

2   you were designated on two topics, topics 12 and

3   18.  Do you see topic 12 up here?

4        A.   I do.

5        Q.   And it's:

6             "Communications with the U.S.

7         Election Assistance Commission

8         regarding any software changes

9         involving Georgia's current election

10        system or otherwise relating to any

11        actual or contemplated request for

12        E.A.C. approval for any aspect of

13        Georgia's current election system."

14             And am I right that you're designated to

15   testify on behalf of the Secretary's office on that

16   topic today?

17        A.   That's correct.

18        Q.   What did you do to prepare yourself to

19   testify on that topic?

20        A.   I spoke with counsel and just went through

21   my memory and recollection about communications

22   with the E.A.C.

23        Q.   Did you speak with anyone other than

24   counsel for this topic?

25        A.   No.

1      Q.   Did you review any documents to prepare

2  for this topic?

3      A.   I reviewed a lot of documents in preparing

4  for the deposition, some of them -- some of them

5  may touched -- have touched on this topic, but.

6      Q.   Are there any specific documents that come

7  to mind that you reviewed that concern this topic?

8      A.   I don't believe so.  Not -- no, not

9  specifically.

10     Q.   Okay.  So you're relying on your own

11  personal, I think you said memory or recollection

12  for this topic; is that right?

13     A.   Yes.

14     Q.   Okay.  Has there been any discussion at

15  the Secretary's office about replacing the current

16  B.M.D. system with one that does not use Q.R.

17  codes?

18     A.   Well, I left the Secretary of State's

19  office in May of this year, so I'm not familiar

20  with any communication or any discussion that's

21  taken place since then.

22          I don't believe I'm aware of any

23  discussion about replacing the B.M.D. system for

24  any other system in the time that I was there.

25     Q.   And you didn't speak to anyone in

1    preparation for today to determine whether that's

2    been discussed since you left?

3         A.    Correct.

4         Q.    What software changes -- well, strike

5    that.

6              What actual or contemplated requests for

7    E.A.C. approval were considered at the Secretary's

8    office while you were there regarding the current

9    system, if any?

10        A.    I know there was -- there was one issue

11   that came up that had to do I think with how

12   ballots were displayed.  They needed a change in

13   the -- in the software.  And that was done.

14             I didn't really have anything to do with

15   the technical aspects of it that I -- I believe

16   that's the only instance where this came up that

17   I'm aware of.

18        Q.    And that came up in the sort of late

19   September or early October time frame of 2020; is

20   that right?

21        A.    That seems about right, yes.

22        Q.    Who handled the communications with the

23   E.A.C. on that for the Secretary's office?

24        A.    I believe that the vendor Dominion

25   communicated with the E.A.C. primarily.

1          I had I think one phone call with Mona

2    Harrington, who's the executive director at the

3    E.A.C.  I believe it was for her to let me know

4    that it was -- it had been approved or it was in

5    the process of being approved or something like

6    that.  But we didn't discuss the software itself or

7    the changes, just kind of the process.

8          Q.   Do you recall that there was a

9    determination made regarding that change that it

10   was what's considered a de minimis software change?

11         A.   That's my recollection, yes.

12         Q.   Who made that determination?

13         A.   I believe that would have been the E.A.C.

14         Q.   And what's the basis for your belief that

15   the E.A.C. made that determination rather than

16   Dominion or the Secretary's office?

17         A.   Well, my understanding was that the E.A.C.

18   had to -- I'm getting some weird display on my

19   computer.  I don't know if -- okay.  It stopped.

20   It was buzzing or flipping around.

21         My understanding of the process was that

22   the vendor would submit the change, and if it were

23   a de minimis change, it would be approved by the

24   E.A.C.  And as it was approved by the E.A.C. in

25   pretty short order, I believe that's my

1    understanding, that it was a de minimis change.

2        Q.    But didn't Dominion or the Secretary's

3    office reach their own belief that it was a

4    de minimis change before it went in to the E.A.C.?

5        A.    I believe that was the position of the

6    Secretary of State's office, that they were

7    characterizing it as a de minimis change, and that

8    ultimately the E.A.C. would have to make that

9    determination.

10       Q.    Who at the Secretary's office made that

11   determination before the E.A.C.?

12       A.    I'm not sure who or if anybody made the --

13   made a final determination on whether it was a

14   de minimus change.

15       Q.    Well, whether final or not, who at the

16   Secretary's office arrived at the opinion that it

17   was a de minimus change before the E.A.C. concluded

18   that?

19       A.    I don't know.

20       Q.    What was the process at the Secretary's

21   office for arriving at that position?

22       A.    I don't know.

23       Q.    Who would you ask if you wanted to know?

24       A.    I'd probably ask either the secretary or

25   the head of the I.T. department, Merritt Beaver,

1    possibly Ryan Germany, general counsel.

2        Q.   Okay.

3        A.   And just I've lost the bottom half of my

4    screen, so I can't see -- I can't see half the

5    bottom of the screen.  I don't know what happened.

6    Let me see if I can change the view, hold on, to

7    see if that changes it.

8            Well, no, I don't seem to be able to

9    change it.  I don't know if it happened when the --

10   when you put the exhibit up, but.  But anyway, I

11   can't see Mr. Cross on the screen, which is a

12   little unusual.

13       Q.   You want to go off the record?

14           THE VIDEOGRAPHER:  We can go off the

15       record.  The time is 8:49 a.m.  We're off

16       the record.

17           (Whereupon, a discussion ensued

18        off the record.)

19           (Whereupon, there was a brief

20        recess.)

21           THE VIDEOGRAPHER:  The time is 8:55

22       a.m.  We're on the record.

23   BY MR. CROSS:

24       Q.   So Mr. Harvey, do you have Exhibit 1 up in

25   front of you now?

Page 16

 1        A.   Is it -- is it on the exhibit list or is

 2   it on the Zoom screen?

 3        Q.   It'll be on the Exhibit Share.

 4        A.   Yeah.  Okay.  Give me one second.  Exhibit

 5   1.  Okay.  I have it up now.

 6        Q.   Okay.  Also, I don't know if it's just me,

 7   but your audio seems quieter than it was before.

 8   Are you guys using a different mike?

 9        A.   No.  I don't think so.

10        MR. RUSSO:  No.

11   BY MR. CROSS:

12        Q.   Oh.  All right.  I think you're just going

13   to have to keep your voice up, Mr. Harvey.

14        A.   Okay.

15        Q.   All right.  So I'm sorry, did you say you

16   have Exhibit 1 up in front of you now?

17        A.   I do.

18        Q.   Okay.  All right.  So we were talking a

19   little bit about topic 12.  Are you -- are you

20   aware of any discussion or consideration at the

21   Secretary's office of any possible changes to the

22   current B.M.D. system beyond the one we talked

23   about in the fall of 2020?

24        A.   No.

25        Q.   So no discussion or consideration of using

1    hand-marked paper ballots, for example, as a

2    primary means of voting?

3       A.   Again, when I -- when I left the Secretary

4    of State's office earlier this year, I was not

5    aware of any discussions.  I'm not aware of any

6    discussions since then.

7       Q.   Okay.  If you wanted to know whether there

8    have been consideration or discussions at the

9    Secretary's office about potential changes to the

10   current B.M.D. system, who would you ask?

11      A.   I'd probably ask either Blake Evans, who's

12   the current election director, or possibly Gabriel

13   Sterling in the office also.

14      Q.   And Blake Evans took over in your position

15   after you left; is that right?

16      A.   That's correct.

17      Q.   Did he report to you before you left?

18      A.   He did.  He was the deputy when I was the

19   director.

20      Q.   Do you know why the Secretary's office

21   picked a Q.R. code system rather than one that

22   tabulates human readable text for the election

23   system?

24      A.   I don't.

25      Q.   Who would you ask if you wanted to know

1    the answer to that question?

2         A.   Well, ultimately, the decision was made by

3    the Secretary.  I know there was a committee that

4    was evaluating the systems.  I was not part of that

5    committee.  I don't know if they offered

6    recommendations or advice, but ultimately, it was

7    the Secretary that made the decision.

8         Q.   So if you wanted to understand why and how

9    that decision was made, is the Secretary the person

10   you would turn to for that?

11        A.   For an ultimate answer, yes.  But I

12   suspect that the members of his, you know, close

13   advisors would have been part of that process.

14   Ryan Germany, Gabriel Sterling, Jordan Fuchs

15   probably -- I suspect had conversations.  I didn't

16   have any conversations with them about that.

17        Q.   Did anyone in the Secretary's office ever

18   raise a concern about using Q.R. codes rather than

19   human readable text to tabulate ballots?

20        A.   Did anyone in the -- so member within the

21   Secretary of State's office?

22        Q.   Yes.

23        A.   Okay.  I don't believe so.  I know in

24   the -- when, actually, when -- before even

25   Secretary Raffensperger took office, when we had

Page 19

1    started with the S.A.F.E. Commission, there were

2    discussions with the S.A.F.E. Commission in the

3    office about different kinds of systems and pros

4    and cons.  But I don't believe anyone in the

5    Secretary's office raised objections once the

6    system was decided on.

7        Q.   Were there concerns raised on that issue

8    before that system was decided on in the

9    Secretary's office?

10       A.   Like I said, there were discussions about

11   it.  There were, you know, pros and cons.  There

12   were pros and cons of hand-marked versus B.M.D.s

13   versus D.R.E.s.  So people spoke about, like I

14   said, the pros and cons of the system.

15            So I, I believe that, you know, somebody

16   would have, you know, raised a question or said,

17   hey, with this you get this, but you also get that.

18   But I can't think of any specific persistent

19   objections that came about a Q.R. code.

20       Q.   What were the cons that came up in any

21   discussion regarding the current system?

22            MR. RUSSO:  Object to form.

23            THE WITNESS:  I think with the

24       current system -- again, are we talking

25       before the decision on the current system

1        or since the current system?

2    BY MR. CROSS:

3        Q.    Either.   At any point that it's been

4    discussed in the Secretary's office.

5        A.    Well, I think that the one -- one of the

6    issues about the system is that it's sort of, in a

7    word, it's sort of bulky.   You've got, you know,

8    multiple components.   You've got wires.   You've

9    got -- it takes up a fair amount of space.

10            I don't think there was any concern with

11    the -- with the way it operated.   I think people

12    liked its operation and its user friendliness and

13    things like that.

14            But it seems like the most common

15    objection or issue we had to work around was the

16    fact that it had, you know, what, five or six

17    different pieces to it for every voting station.

18            We had maybe three or four, not -- maybe

19    not five or six.   But you had the B.M.D.   You had

20    the printer.   You had the external power source.

21    You had cables connecting that stuff.   You had

22    boxes to transport it back and forth in,

23    safekeeping storage.   Those kinds of things were

24    sort of concerns or issues we had to work around.

25        Q.    You mentioned the S.A.F.E. Commission a

Page 21

1    moment ago.  Are you familiar with Wenke Lee, who

2    was the only cybersecurity expert who served on

3    that commission?

4        A.   I'm familiar with him.  I don't, certainly

5    don't know him personally.  But I spoke with him

6    and heard him speak at S.A.F.E. Commission

7    meetings.

8        Q.   And do you recall that Wenke Lee objected

9    to the State adopting a B.M.D. system?

10       A.   I --

11            MR. RUSSO:  Object to form.  Object,

12       excuse me, object to the form of the

13       question.  Lacks foundation.

14            THE WITNESS:  I do remember.

15   BY MR. CROSS:

16       Q.   Okay.  In fact, he was vocal in saying

17   that hand-marked paper ballots as a primary voting

18   system would be the best, safest system for the

19   State; right?

20            MR. RUSSO:  Object to form.

21            THE WITNESS:  I believe that's

22       correct.  I know he -- I don't remember

23       exactly what his position was on

24       everything, but I know that he was a

25       proponent of hand-marked paper ballots.

Page 22

 1    BY MR. CROSS:

 2        Q.   Do you know why the Secretary selected an

 3    election system that the sole cybersecurity advisor

 4    he put on his commission objected to?

 5            MR. RUSSO:  Object to the form of the

 6        question.

 7            THE WITNESS:  I don't know why the

 8        Secretary chose that voting system.

 9    BY MR. CROSS:

10        Q.   Who would you ask if you wanted to know

11    why the Secretary chose an election system that his

12    only cybersecurity advisor objected to?

13            MR. RUSSO:  Object to the form of the

14        question.

15            THE WITNESS:  Well, I would clarify

16        that the Secretary, then-Secretary Kemp

17        convened the S.A.F.E. Commission and

18        appointed the members, and Secretary

19        Raffensperger sort of inherited the work

20        that they did.

21            So I don't think that Mr. Lee was

22        Secretary Raffensperger's cybersecurity

23        expert, but -- I mean, I think you'd have

24        to ask the person that made the decision.

25    BY MR. CROSS:

Page 23

1      Q.   Okay.  All right.  That's a fair point on

2  the chronology.  But when you say "ask the person

3  that made the decision," is that Secretary

4  Raffensperger?

5      A.   I think so.

6      Q.   Okay.  What cybersecurity experts, if any,

7  does Secretary Raffensperger rely on for evaluating

8  the security of the election system?

9          MR. RUSSO:  Object to the form of the

10         question.  Lacks foundation.

11         THE WITNESS:  Well, I know the

12         primary office point of contact, and I

13         assume this is the same, again, since I

14         left, I'm not sure, but Merritt Beaver was

15         our C.I.O., and he sort of coordinated

16         multiple groups and people and

17         cybersecurity defenses.

18             I know that we worked with Department

19         of Homeland Security.  I know we worked

20         with a company called Fortalice.  And I

21         think he had some other individuals that

22         he could bring in for specific issues or

23         concerns or questions.

24  BY MR. CROSS:

25      Q.   Who were those individuals?

Page 24

```
1        A.   I don't know who they are.  I don't know
2    their names.  And I'm not sure if -- I know there
3    were some people that would come in and be in on
4    meetings, and I'm not sure if they were with
5    Fortalice or they were -- they were other people.
6    They may have been with Fortalice.
7        Q.   Are you aware of any forensic examination
8    of any of the voting equipment that's currently
9    used in Georgia to determine whether it's been
10   compromised by malware or in any other way?
11       A.   I know there was an examination of I want
12   to say five or six counties that was done after the
13   2020 election to confirm that the software hadn't
14   been manipulated or changed.  So I'm aware that
15   that's been done.
16       Q.   Describe that for me, if you would,
17   please.
18       A.   Well, I just know it was done.  I wasn't
19   part of planning it.  But I know that, again, there
20   were a handful of counties, I want to say five or
21   six counties, that were selected, and I believe it
22   was Pro V&V came in and randomly selected voting
23   equipment, checked the software configuration, made
24   sure nothing had been changed, and reported back
25   that, in all their examinations, they didn't find
```

Page 25

1    any differences.

2        Q.   If you wanted to learn the details of what

3    was done in that examination, who would you ask?

4        A.   I'd probably ask Jordan Fuchs.

5        Q.   And do you know, for that examination, did

6    Pro V&V look at the hash values on the equipment?

7            MR. RUSSO:  Object.  He's testified

8        he wasn't involved and didn't know

9        anything about it.

10           MR. CROSS:  If he doesn't know, he

11       can say he doesn't know.

12   BY MR. CROSS:

13       Q.   If you don't know --

14       A.   I don't know.  I don't know exactly what

15   they did.

16       Q.   Okay.  All right.  That's fine.  I just

17   wanted to see if there was any details you had.

18           Okay.  To the software change in the fall

19   of 2020 we mentioned before, did the E.A.C. express

20   any concerns about that?

21       A.   Not that I'm aware of.

22       Q.   Okay.  All right.  If you can scroll down

23   to topic 18.  It's on -- oh, there are no page

24   numbers on this.  Sorry.  It's the last topic in

25   Exhibit 1, and just let me know if you need help.

Page 26

1          A.    Okay.

2          Q.    Do you have that in front of you,

3     Mr. Harvey?

4          A.    I do.

5          Q.    Okay.  And do you see the topic here is,

6     the Secretary's office -- "your" refers to the

7     Secretary's office:

8               [As read]  "The Secretary's

9           office's process for preserving

10          information within your possession,

11          custody or control potentially

12          relevant for this matter, including

13          any communications with counties or

14          other entities or individuals

15          regarding the same."

16          Do you see that?

17          A.    Yes, sir, I do.

18          Q.    And do you understand you were designated

19     to testify on that topic as well?

20          A.    Yes.

21          Q.    Okay.  What did you do to prepare for that

22     topic?

23          A.    I spoke with counsel.  I reviewed a couple

24     of E-mails on this topic and sort of searched my

25     memory for any relevant information.

1        Q.   Did you speak with anyone other than

2   counsel?

3        A.   No.

4        Q.   Okay.  What were the documents that you

5   reviewed on this topic?

6        A.   There were a series of E-mails that were

7   centered I believe around the, right before the

8   election where there was the suspicion of the

9   hacking of ENet I think E-mails.

10          It may have been you or another attorney

11   for the plaintiffs contacting John Salter, and then

12   I think Ryan Germany got involved, and essentially

13   demanding that all documents be preserved.

14        Q.   Are you talking about the 2018 elections?

15        A.   I think so.

16        Q.   Okay.  You're talking about the situation

17   when then-Secretary Kemp announced that the

18   Democratic Party of Georgia had attempted to hack

19   some aspect of the election system in Georgia; is

20   that the incident you're talking about?

21          MR. RUSSO:  Object to form.

22          THE WITNESS:  I believe that's the

23       incident, yes.

24   BY MR. CROSS:

25        Q.   Okay.  And that was when Secretary Kemp

1    was running against Stacey Abrams for governor,

2    that's the election we're talking about; right?

3         A.   Yes.

4         Q.   Okay.  Are there any other documents you

5    reviewed for topic 18?

6         A.   I don't believe so.

7         Q.   Did the Secretary's office when this

8    lawsuit was first filed send out written

9    communication internally to employees to preserve

10   documents potentially relevant for it?

11        A.   Yes.

12        Q.   And is that -- have those communications

13   been updated as this litigation has gone through

14   amended complaints, for example, adding the B.M.D.

15   claims?

16        A.   I know that there -- over the -- over the

17   years there have been several "hold for litigation"

18   notices that have been sent out.  I can't say

19   specifically what was connected to which case, but

20   it's -- so, so that's the best I can do on that.

21        Q.   So let me just ask you broadly.  What

22   steps has the Secretary's office taken to preserve

23   information potentially relevant to this case?

24        A.   Well, like I said, we sent out -- or I

25   think Ryan Germany sent out an E-mail to all

```
1    employees telling them to save everything, don't
2    delete anything, don't throw anything away.
3            And we also sent out, I believe I sent out
4    information to the counties telling them, just
5    basically repeating the same information, that
6    there's pending litigation, preserve records.  And
7    that's basically been it, noticing people that
8    these -- this requirement is in place.
9        Q.   Does the Secretary's office have any
10   automated deletion, for example, E-mails that are
11   older than a certain period?
12       A.   I know that every E-mail is preserved for
13   at least five years.  I don't know if there's an
14   auto deleting or auto archiving after five years,
15   but my understanding talking with Merritt Beaver is
16   that everything is saved for five years.
17       Q.   What efforts were taken to ensure that
18   nothing was deleted that's potentially relevant to
19   this case, if any?
20       A.   Well, again, sending out the -- sending
21   out the notification to all the employees.  And I
22   know that I personally told employees from time to
23   time in the elections division to preserve all
24   their records, don't delete E-mails.
25            And so it was -- you know, we essentially
```

1    faced, you know, so much litigation for the last,

2    you know, six or seven years that pretty much

3    everything was covered by a "do not destroy" order

4    of one form or another.  So it just didn't -- we

5    just didn't destroy stuff.

6         Q.    When you were in the office, did you --

7    where did you tend to save files related to your

8    work?  Was it, like, on a server or a laptop?  A

9    desktop?

10        A.    We had a --

11        Q.    Some form of media?

12        A.    We had a -- each person had a server on

13   the system, and so everyone had their own drive on

14   the server.  But I also saved some stuff on my

15   laptop.  But most of the stuff I put on the server,

16   on the server drive just because it was easier to

17   access from anywhere else.

18            And then E-mails were -- E-mails were

19   stored on a server so, you know, "in" boxes

20   wouldn't fill up and things like that.

21        Q.    Do you know whether the personal drives on

22   the Secretary's servers were searched for documents

23   and produced in this case?

24        A.    I don't know.

25        Q.    If you wanted to know, who would you ask?

1      A.   I would probably ask Merritt Beaver or

2   Ryan Germany.  We've had a -- the Secretary's

3   office had a series of different open records

4   custodians or officers who were responsible for

5   gathering that stuff, and so there hasn't been a

6   single person that has, you know, been there for,

7   you know, ten years that has handled all these open

8   record requests.

9           I believe Merritt Beaver or somebody on

10  his team did all the electronic storage.  I know

11  they would do, like, search for E-mails and things

12  like that.  But Ryan Germany and Merritt Beaver

13  would be the two people who would know most about

14  that.

15     Q.   You said you personally communicated to

16  counties to preserve information potentially

17  relevant for this case.  What did you communicate

18  to them?

19     A.   I'm sorry.  Say -- I didn't hear that last

20  part.

21     Q.   Oh, sorry.  You said you communicated to

22  counties to preserve information potentially

23  relevant to litigation.  What exactly did you

24  communicate to the counties to preserve?

25     A.   I sent out a Buzz post to all the

1    counties.  You know, The Buzz was the sort of

2    election bulletin board or communication center

3    where messages could be sent back and forth to post

4    things like that.

5              And I sent out a message that was either

6    very similar or identical to what Ryan Germany had

7    sent out to our office and then would from time to

8    time remind them, and actually would have

9    counties -- and I know counties were aware of it,

10   because occasionally they would call or they would

11   ask me questions about, hey, you know, we know

12   we've got to save everything, but we need to do

13   this for a new election or we need more space, can

14   we do this.

15             And my response would always be, look, the

16   order stands, you've got to -- you've got to

17   preserve stuff in accordance with this litigation.

18        Q.   What were the -- what was conveyed to the

19   counties and individuals at the Secretary's office

20   about preserving data coming out of elections, if

21   anything?  What were they told?

22        A.   Data coming out of elections, what do you

23   mean by "data coming out of elections"?

24        Q.   So good question.  So things like ballot

25   images, tabulation data, you know, the data that's

1    generated when elections occur, what were -- what

2    was the directive internal to the Secretary's

3    office and to counties, if anything, on preserving

4    data regarding elections that take place?

5        A.    I think that's covered by law and S.E.B.

6    rules about how long that has to be preserved.  So

7    I think, generally speaking, the -- it would have

8    been to act consistently with either law or S.E.B.

9    rule.

10       Q.    Is that the same for ballot images

11   generated in elections?

12       A.    I believe so.

13       Q.    Is that the same for paper ballots?

14       A.    No.  Paper ballots have to be saved, I

15   believe it's -- I believe it's a two-year

16   requirement for preserving paper ballots, but I'd

17   certainly defer to what the law says.  I'm going on

18   memory for paper ballots.  But generally, elections

19   records have to be kept for two years.

20       Q.    What steps were taken, if any, to avoid

21   overwriting election data on B.M.D.s, scanners,

22   printers or removal media used in elections?

23       A.    Well, in some cases they could get new

24   media if they wanted to not overwrite it.  In some

25   cases they may not have a choice but to overwrite

Page 34

1   it if it was -- if they were acting in conformance

2   with the law.

3       Q.   Who would make the decision whether to

4   overwrite the data during the pendency of this

5   litigation?

6       A.   Well, ultimately, a County would.  They

7   would sometimes, you know, call and ask me, you

8   know, can I do this, should I do this.  And I

9   would -- my stock response was, look, here's what

10  the law says, you've got to make a determination,

11  talk with your county attorney.  That was -- those

12  would generally be the conversations.

13      Q.   Did you ever tell any counties that they

14  could not overwrite election data while this case

15  is pending because of preservation obligations for

16  the case, separate and apart from whatever the

17  statutory requirements are for election data?

18      A.   Ask the first part of that question again.

19      Q.   Sure.  When counties came to you and asked

20  whether they could overwrite election data since

21  this lawsuit has been pending, did you ever tell

22  any that they could not because of the preservation

23  obligations in this case?

24      A.   I don't think I did.

25      Q.   Okay.  You mentioned before an examination

Page 35

1    that was done in five to six counties of election

2    equipment.  Was that done in 2020?

3        A.   It was done -- it was done after the

4    November of 2020 election.  Whether it was done --

5    I believe it was done at the end of 2020.  It may

6    have gone over into 2021, but I don't think so.  I

7    think it was -- I think it was done in 2020.

8        Q.   Okay.  Do you know whether there was any

9    kind of written report generated on that?

10        A.   I believe I may have seen one, but I'm not

11    sure.

12        Q.   Okay.  All right.  Mr. Harvey, if you can

13    go back to Exhibit Share and pull up Exhibit 2.

14                        (Whereupon, Plaintiff's

15                        Exhibit 2 was marked for

16                        identification.)

17    BY MR. CROSS:

18        Q.   And that should be a copy of your LinkedIn

19    profile.  And just let me know when you've got

20    that.

21        A.   I've got it.

22        Q.   And you can scroll through it.  Does this

23    look to be a fair and accurate copy of your

24    LinkedIn profile?

25        A.   Yes.

1      Q.   Okay.  And does this generally capture

2   your education and work experience over the years?

3      A.   Yeah.  There are a couple things that

4   aren't on there, but generally, yes.

5      Q.   What's not on here that you would add?

6      A.   Well, for example, I took -- I think I

7   took about 12 hours of education courses between --

8   before I started teaching high school, I was

9   teaching at a private high school, and there was an

10   exemption where if you took X number of classes.

11            So I took some classes at the College of

12   Charleston, not in any degree program, but

13   basically to get a waiver of having a teaching

14   issue -- or a teaching certificate, I guess.

15            That's, I mean, that's pretty much it.  I

16   worked, I mean, I worked a couple odd jobs between

17   teaching and starting at the police department, you

18   know, kind of part-time things, but nothing of any

19   consequence.

20      Q.   I see that you taught at B.E. for a couple

21   years?

22      A.   I did.

23      Q.   Probably taught some of my friends there.

24   They certainly could have used some morality

25   teaching back then.

1      A.   I would -- I would also point out, I

2   guess, I don't know whether it's a big thing or

3   not, but between graduating from the Citadel and

4   teaching at Bishop England, part of that time at

5   the Catholic University of America, I also -- that

6   was part of three years in a Catholic seminary

7   formation program, again, not -- just because it

8   was sort of a part of my life, doesn't really have

9   any bearing on what we're talking about now, but

10  didn't want to think I was hiding that.  I just

11  didn't think that was really relevant for a

12  LinkedIn profile.

13     Q.   Okay.  Got it.

14          So when exactly did you leave the

15  Secretary's office?

16     A.   My last day in the office I think was the

17  end of May, and then I took basically vacation

18  through the month of June, and then I started with

19  P.O.S.T. on the first of July.

20     Q.   Okay.  Why did you leave the Secretary's

21  office?

22     A.   Different reasons.  I had a great

23  opportunity to go work at P.O.S.T.  You know,

24  frankly, the grind of elections was, you know,

25  after six years was taking its toll.  And you know,

```
 1    my -- you can tell most of my career has been in

 2    law enforcement, and that's where I've, you know,

 3    frankly, been the most comfortable and feel like

 4    I've got the widest knowledge base.

 5              And so that opportunity came up -- came up

 6    to work at P.O.S.T. and work on things like

 7    professional development, professional standards,

 8    improving police officer standards in Georgia.  And

 9    I thought it was a -- it was a great opportunity to

10    kind of get back to my roots.

11    Q.   Was it your decision to leave the

12    Secretary's office?

13    A.   100 percent.

14    Q.   And would you say you resigned or how

15    would you characterize your departure?

16    A.   Yeah, I would say I resigned.  I spoke

17    with Jordan Fuchs, the Deputy Secretary, and told

18    her that I was planning on leaving.  And I

19    submitted a former [sic] letter of resignation

20    sometime after that.

21              But I told her in I want to say early May

22    that I was -- what I'd like to do, that I'd like to

23    leave at the end of May and would be happy to work

24    on any type of transition or bringing in new people

25    or whatever else they wanted to do in the meantime.
```

1          But it became -- I think -- I think we

2     announced it or they announced it, like, the last

3     week of May.

4          Q.   Did you work much with David Hamilton, the

5     former C.I.S.O. at the Secretary's office when you

6     were there?

7          A.   I didn't work a lot with him.  He's one of

8     the people that I mentioned that whose name I

9     couldn't recall on some cyber issues.  I wouldn't

10    say I worked a lot with him, but I was on several

11    calls with him and Merritt if an issue or a

12    question came up, but I wouldn't say a lot.

13               (Whereupon, Ms. Shocair Ali joined

14          the deposition.)

15    BY MR. CROSS:

16         Q.   Did you work much with James Oliver, the

17    former security manager at the Secretary's office?

18         A.   He was there for a long time when I was

19    there.  I didn't really interact with him very

20    much.

21         Q.   Does it -- does it strike you as unusual

22    that, in the span of about a year or so, you as the

23    elections director, the C.I.S.O. and the security

24    manager all left the Secretary's office?

25         A.   I don't know anything about the

1    circumstances of the other folks leaving.  I know I

2    left, and I really couldn't begin to speculate as

3    to why somebody else left or what kind of

4    conclusions or inferences somebody might draw from

5    them.

6        Q.    Did you have any concerns, personal

7    concerns, about any of the conduct at the

8    Secretary's office before or when you left?

9        A.    What do you mean "conduct"?

10       Q.    Any concerns, anything that you thought,

11   well, you know, should have been handled

12   differently or someone didn't act in the way that

13   you thought that they should act?

14       A.    Well, I mean, there were things that I

15   might have done differently.  But there was --

16   there wasn't -- there wasn't anything that offended

17   my conscience or anything that I thought was wrong

18   or improper or illegal or anything like that.

19             You know, in any organization you're going

20   to have people who have to make decisions and do

21   things a certain way.  And again, I may have done

22   things differently, but my leaving wasn't a

23   repudiation or wasn't a washing my hands or

24   anything of the -- of the office.

25             I thought Secretary Raffensperger was very

1    honorable in the post-November election period.  I

2    didn't have a lot of contact with him after that.

3    But no, there was -- there was no crisis of

4    conscience or anything like that that had anything

5    to do with my leaving.

6         Q.   What would you have done differently?

7         A.   I probably would have communicated a

8    little bit more.  I found when we had staff

9    meetings and meetings of critical people in the

10   elections world and we sat around a table, we

11   tended to get a lot done.

12        We tended to see new things, hear new

13   perspectives, hear consideration or a blind spot

14   that maybe somebody wouldn't have.  And when that

15   happened, it was helpful, but that didn't happen

16   very often.

17        And so I think communication could have

18   been done better.  But you know, I understand

19   everybody's trying to do a lot of things, and it

20   was a very chaotic time.  And you know, that's,

21   again, that's just one thing that I would have done

22   maybe a little bit differently.

23        Q.   Anything else that comes to mind?

24        A.   I don't think so.  Again, you know, any

25   number of things that you could do different in the

Page 42

1    course of a year or so just in terms of

2    communication.

3            I'm a big -- I'm a big fan of

4    communication.  I think -- I think there's a lot to

5    be -- you know, some people think sitting around a

6    table in a meeting is a waste of time if you don't

7    have a, you know, a six point agenda.

8            And while I don't like, you know, endless

9    meetings for the sake of meetings, I think there's

10   a lot of information that can get exchanged that

11   way, and that just wasn't how they operated.

12   Q.    Okay.  Who at the Secretary's office was

13   ultimately responsible for security of the

14   elections system?

15   A.    Well, in a -- in a big picture, again, it

16   would -- it would be the Secretary.  But of course,

17   he hired people to help him with that.  I don't

18   know that there would be one single individual.  I

19   don't think we looked at it as a -- as a one

20   person.

21           I know on the -- on the cyber network

22   front, Merritt Beaver and his team clearly were the

23   number one line of defense.  From the -- from the

24   County point of view, I was probably the first line

25   of defense.

```
1             You know, we had 159 counties with 159

2        levels of experience and interest and knowledge and

3        courage, I mean, all these different factors.  And

4        you know, any one of those could have been a weak

5        point.

6             And so my primary job was to keep them

7        informed and to get them information, to try to

8        answer their questions as best I could, to try to

9        help them adapt to a very, very fluid and chaotic

10       election year and election circumstances.

11            You know, we had our training officer at

12       the time was, for most of the time was Bree Thomas,

13       and she also sort of worked on that front in terms

14       of making sure they knew how to do everything.

15            You know, we got -- we got C.I.S.A.

16       involved in doing physical security evaluations on

17       all the county sites.  I say "all."  I think, not

18       all 159, I think we may have stopped just a couple

19       short.  We got all the counties involved in

20       EI-ISAC, got them signed up as members for that.

21            And then you had, you know, Michael Barnes

22       and his team who, you know, built databases and got

23       that information to the counties.  And so you had

24       at least three -- at least three groups who were

25       all working together and in concert with each other
```

Page 44

```
 1    to try to keep the election system secure.
 2              And then in addition you had, it largely
 3    fell to Merritt and his team, but you had our ENet
 4    system manager, who didn't so much focus on
 5    security but would be one of the first people that
 6    would -- that would be alerted to or reported to if
 7    there was some -- anything with the system that
 8    would -- that looked unusual or needed to be
 9    addressed, and he would go immediately to Merritt.
10        Q.   All right.  Grab Exhibit 4, if you would.
11    Skip over Exhibit 3.  I accidentally put the wrong
12    one up there.  We'll come back to three later.
13                        (Whereupon, Plaintiff's
14                         Exhibit 4 was marked for
15                         identification.)
16              THE WITNESS:  I don't see Exhibit 4.
17    BY MR. CROSS:
18        Q.   If you -- sometimes you have to refresh.
19    It should be there.
20        A.   All right.  There it is.
21        Q.   All right.  So if you look at Exhibit 4,
22    you'll see that the most recent E-mail here is one
23    that you sent to Frances Watson on November 6th of
24    2020?
25        A.   It didn't get -- I just lost it.  Let me
```

Page 45

1    get it back.  I --

2         Q.   Okay.

3         A.   I hit a button instead of scrolling.

4    Okay.  I see the E-mail.

5         Q.   And so this is an E-mail that you sent to

6    Ms. Watson on November 6th of 2020; right?

7         A.   Yes, it is.

8         Q.   Okay.  And you're responding to an E-mail

9    that she sent to you and Mr. Germany the day

10   before.  Do you see that in the middle of the page?

11        A.   Give me a second to read it, because I

12   don't --

13        Q.   Sure.  Yeah.  Go ahead.

14             (Whereupon, the document was

15          reviewed by the witness.)

16             THE WITNESS:  Okay.  I've read it.

17   BY MR. CROSS:

18        Q.   And so you see that you were responding to

19   an E-mail that she sent you the day before?

20        A.   I think -- the way I see it is I forwarded

21   that to her.  I think this came in on the -- on one

22   of the complaint "in" boxes and I saw it, looks

23   like I saw it on the 6th and I sent it to her.

24             Oh, no, I see.  I do -- I do see she

25   gets -- I do see she gets it.  Okay.  Okay.  I'm

1    clear now.  I got it.

2         Q.    Okay.  And so you said this came in to one

3    of the complaint "in" boxes.  What are you -- what

4    are you referring to there?

5         A.    Well, I believe that was -- that was the

6    case.  There were I think two -- or there were a

7    number of ways you could send complaints to

8    Secretary of State's office, but the most common --

9    the two most common were click-on links on the Web

10   site, and you would come to either the elections, I

11   think it's elections complaints or complaints

12   elections or something like that, and that would

13   come to the elections office.

14             And the idea was that that's where people

15   would contact the elections folks about more sort

16   of election process questions or issues.

17             And then there was another one, I think it

18   was a Stop Voter Fraud, where you would generally

19   send complaints about this kinds of things or

20   illegal activity or allegations or something like

21   that.  But sometimes those got -- people just, they

22   found a link and they'd send an E-mail regardless

23   of what the issue was.

24             So looking at the format, like, how the

25   Laura Jones and how all that stuff is lined up like

1    that, that's typically how it would look.  When

2    somebody went in to read the E-mails that had come

3    in, that's how it would come up on your screen.

4         So what I'm thinking is that the Frances

5    Watson went in to her E-mail box or this complaint

6    E-mail box, saw this and forwarded it to us is how

7    I'm -- I mean, I -- maybe somebody could have sent

8    it to her, but I don't see an indication that

9    somebody mailed it specifically to her.  But in any

10   event, she got it and she was forwarding it to us.

11   Q.   Okay.  Do you know what steps, if any,

12   were taken to preserve potentially relevant

13   communications in those "in" boxes that you just

14   described to me?

15   A.   I mean, they're covered under the same

16   protocol that the rest of the E-mail system is, to

17   the best of my knowledge.  I mean, Merritt Beaver,

18   those are all -- those are all on the Secretary of

19   State's servers like everything else.

20   Q.   Okay.  Do you know if there were specific

21   steps taken by anyone to preserve relevant E-mails

22   in those "in" boxes, like, somebody went through,

23   made sure that those weren't getting deleted by

24   anyone after this litigation was filed?

25   A.   I don't know specifically that somebody

Page 48

1    did that.

2         Q.   Who would you ask to find out if someone

3    did that?

4         A.   Either Merritt Beaver or Ryan Germany.

5         Q.   If you look at the one that come -- oh,

6    and sorry, Frances Watson, her title here is chief

7    investigator, investigative divisions from the

8    Georgia Secretary of State.

9              What was her role generally?

10        A.   Well, she was the -- she was the chief

11   investigator.  And she would get anything that was

12   going to be investigated.  You know, some of the

13   complaints that came in would be, like, a county

14   performance issue or a process issue that we could

15   address with the County.

16             So if it was -- it was something along

17   those lines, then the elections team would

18   generally handle it.  Either I'd call or the

19   liaison or somebody would call the County and say,

20   hey, you know, you've got to do this or you should

21   have done that.

22             But if it was something that was more

23   along the lines of a violation or something that

24   the State Election Board would possibly consider

25   sanctioning for, then it was Frances's job to take

1    those complaints, evaluate them, assign them to an

2    investigator, who would then do a full

3    investigation and would gather whatever evidence,

4    statements, documents that would be pertinent to

5    the investigation.

6        Q.   And did her, the scope of her

7    responsibilities and the folks that she oversaw,

8    did that include any issues that arose that might

9    implicate security of the election system?

10       A.   It certainly could, yeah.  I mean, the --

11   I mean, this one, for example, I would say is a

12   security concern.  So yeah, they would -- they

13   would investigate pretty much anything that wasn't

14   able to be sort of resolved by talking to a County

15   about a process.

16            But whether it was a security concern or a

17   significant performance concern like, you know,

18   let's say a county wasn't giving out provisional

19   ballots to people, that would be something that,

20   you know, in that case we would call them and say,

21   hey, make sure you're doing what you're supposed to

22   be doing with the provisional ballots.

23            But if it was a significant issue, we

24   would also give it to Frances, and she would

25   dispatch somebody to go down there and gather

Page 50

1    statements or evidence about exactly what had gone

2    on if it was a significant issue.

3        Q.   So you respond to Ms. Watson in this

4    E-mail:

5             "████████████████████████

6             ████████████████"

7             Do you see that?

8        A.   Yes.

9        Q.   And was there an investigation done of the

10   concern that was raised by Laura Jones here on

11   November 5th of 2020?

12       A.   I don't know.  I assume there -- I assume

13   there was.  This is certainly the kind of thing

14   that would have risen to the level of an

15   investigation.

16       Q.   Who would you ask if you wanted to know

17   whether there was an investigation done and what

18   the outcome was?

19       A.   Well, now I'd ask the current -- I think

20   it's the interim investigator.  His name is James

21   Callaway.  Frances Watson has moved on.  She's no

22   longer there.  So I would ask Interim Chief

23   Investigator Callaway to -- he would be able to

24   give the status of any investigations.

25       Q.   When --

1        A.   And I'm --

2        Q.   Oh, I'm sorry.

3        A.   I don't want you to think I'm leaving.

4    Just my throat's real dry.  So.

5        Q.   I thought I'd run you off already.

6        A.   Come on, you know you -- I've been doing

7    this too long for you to run me off this early.

8        Q.   Well, I know you guys, the former police

9    officer, sometimes I think you enjoy this.

10       A.   No.  You're wrong about that.

11       Q.   When investigations like this were done,

12   were there typically some sort of report or an

13   investigative file that was prepared?

14       A.   Almost always.  The only time there

15   wouldn't be a report would be if it was determined

16   that this is -- you know, it was a bogus -- you

17   know, this was somehow, like, a false report or

18   they got there and found out that nothing that was,

19   you know, nothing was -- nothing had happened,

20   basically a false report.

21            So if -- so I can't imagine this not being

22   investigated and a report not being written on it.

23       Q.   Where would the investigative file,

24   including any report, typically be kept at the

25   Secretary's office?

Page 52

1      A.   It would be in the investigations

2  division.

3      Q.   Do you know whether any steps were made to

4  preserve and collect documents from the

5  investigations division for this case?

6      A.   I know that the investigative files are

7  kept for I think either five or seven years as just

8  a normal -- in the normal course of business.  I

9  don't know specifically if attempts were made to

10 get them or not or -- as part of discovery.

11     Q.   If you look at the concern raised here by

12 Laura Jones on November 5th, 2020, there are a

13 number of things that she points out here, but one

14 of the things she points out is that ███████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████

17 ██████████

18          Do you see that?

19     A.   ███████████████████████████████████████████

20 Let's see.  Well, she says that:

21             ███████████████████████████

22         ██████████████████████████████

23         ███████████████████

24             █████████████████████████████

25 ████████   █████████████████████████████████████

Page 53

```
 1        Q.   Yeah.  If you look at the third line, do

 2   you see where she writes -- well, we can start at

 3   the beginning so you've got the whole context.  She

 4   says:

 5            ████████████████████████████████

 6         █████████████████████████████████

 7         █████████████████████████████████

 8         ████████████████████████████████████

 9         ███████████████████████████████████████

10         ████████████

11        A.   Right.

12        Q.   -- "███████████" -- she goes --

13        A.   I see that.

14        Q.   Yeah.  She goes on:

15            "██████████████████████████████████

16         ████████████████████████████████

17         ██████████████████"

18            Do you see that?

19        A.   I do.

20        Q.   You also indicate --

21            THE VIDEOGRAPHER:  Sorry.  I'm sorry,

22   Mr. Cross.  There's something -- this is

23   the videographer.  There's something a

24   little weird going on with the audio.

25            So if you could --
```

Page 54

```
 1              MR. CROSS:  With Mr. Harvey?

 2              THE VIDEOGRAPHER:  I don't know if

 3         it's coming from Mr. Harvey or from your

 4         end, but --

 5              MR. CROSS:  Oh.

 6              THE VIDEOGRAPHER:  -- if you guys

 7         could just give each other maybe a half a

 8         beat between questions and answers, maybe

 9         that'll help.  I'm not sure.  But there's

10         some kind of interference.

11              MR. CROSS:  Okay.

12    BY MR. CROSS:

13         Q.   Okay.  Mr. Harvey, do you see that she

14    indicates I believe one of the machines -- well, to

15    be precise, she says:

16              [As read]  "███████████████████

17    █████████████████████████████████████████

18    ████████████████████████████████

19    ███████████████████████████████████

20    ██████████████."

21              Do you see that?

22         A.   Right.  And then she goes on to say:

23              "█████████████████████████████"

24         Q.   Right.  ███████████████████████

25              Is it fair to say that, █████████████
```

1 ████████████████████████████████████████

2 ███████████████████████████████████

3 ██████████████, that that would not comply with

4 state policies?

5     A.   I think the regulation is that, if there

6 is some type of discrepancy, either with a seal or

7 some concern, it has to be essentially -- I'm not

8 sure what the word would be.  It has to be resolved

9 or it has to be sort of examined and determined if

10 that's an issue or if that's a significant problem.

11 If you can't determine that it's good, you should

12 put it aside.

13          But I think there is -- I think there is a

14 provision in either the law or the S.E.B. rules

15 that does put the onus on the election folks to

16 resolve or, you know, or satisfy themselves that

17 that is good to use before you use it.

18     Q.   Do you know whether any analysis was done

19 of the machines described here after this complaint

20 came in to determine whether they had been

21 compromised or were otherwise unreliable for an

22 election?

23     A.   I don't know.

24     Q.   Who would you ask?

25     A.   I would ask either the Secretary of State

```
 1    investigator who did this or I would ask Fulton
 2    County.
 3         Q.   All right.  Grab the next exhibit, if you
 4    would, please, which is Exhibit 6.
 5                        (Whereupon, Plaintiff's
 6                         Exhibit 6 was marked for
 7                         identification.)
 8              THE WITNESS:  Yeah, let me refresh
 9         here.
10    BY MR. CROSS:
11         Q.   Okay.
12         A.   Okay.  I've got it.
13         Q.   Okay.  Do you see that Exhibit 6 is an
14    E-mail that you received from David Worley on
15    October 10th, 2020?
16         A.   Yes.
17         Q.   Who is David Worley?
18         A.   David Worley at the time was the
19    democratic representative to the -- appointee to
20    the State Election Board.
21         Q.   What organization was he with at this
22    time?
23         A.   Well, he was the Democratic Party
24    representative, and he was a private attorney.  I
25    don't know if that answers your question.
```

1       Q.   Got it.  Okay.  That does.  Thank you.

2            And do you see that Mr. Worley writes

3    here:

4            [As read]  "███████████████████████

5    ██████████████████████████████████████████

6    ██████████████████████████████████████████

7    █████████████████████████████████████

8    ██████████████████████████████████████████

9    █████████     █████████████████████████████

10   ██████████████████████████████████████████

11   ██████████████"

12           Do you see that?

13   A.   I do.

14   Q.   Do you recall this situation?

15   A.   I do.

16   Q.   What do you recall about the reports of a

17   ██████████████████████████████████████████?

18   A.   As I recall, █████████████████████████

19   ██████████████████████████████████████████████

20   ███████████████████████████████████████████

21   ████████████████   ████████████████████████████

22   ███████████████████████████████.

23           And for -- I was in -- I was in pretty

24   regular communication with the elections director

25   up there.  And I tended to speak with her a lot

Page 58

1    anyway.  And she called me as soon as -- as soon as

2    she became aware of this.

3           And I did notify both our -- Merritt

4    Beaver and our team.  And I'm very, very confident

5    that I probably notified the, either D.H.S. and/or

6    the F.B.I.  And I think that they were down for

7    about a day, maybe two, and then they started

8    getting some of their -- some of their access back.

9    Q.   What investigation was conducted, if any,

10   to determine whether this compromise affected the

11   election system in any way?

12   A.   I don't think there was an investigation

13   done by the Secretary of State's investigative

14   division.  I know that, as soon as we found out

15   about it, we cut off their access to ElectioNet.

16          And I believe when we did -- and this --

17   there were a couple times this happened over the

18   course of the last two or three years.  And I

19   believe Merritt's team would go and check to make

20   sure there was -- there was no indication in ENet

21   that anything had been compromised.

22          And my understanding is that, again, I

23   think it was D.H.S. or C.I.S.A. that was working

24   with them to deal with the situation.  Whether it

25   was an investigation or just a restoration, I'm not

Page 59

1    sure.

2         Q.   Why was -- why would C.I.S.A. be involved

3    in something like this?

4         A.   Well, because they were -- they were sort

5    of our go-to agency when it came to cybersecurity

6    issues.  You know, C.I.S.A. had basically put

7    itself out as the first -- you know, kind of the

8    9-1-1 call you made when you had a cyber issue,

9    especially in the elections world.

10             And so that was -- that was pretty much

11   protocol is, as soon as you had a situation like

12   that in a county, you'd let us know, you'd let

13   C.I.S.A. know, you'd let your county know and get

14   all hands on deck.

15        Q.   In your time as elections director for the

16   Secretary of State, are you aware of whether the

17   Secretary's office or counties sometimes shared

18   confidential information with C.I.S.A.?

19        A.   What do you mean --

20             MR. RUSSO:  Object to form.  Go

21        ahead.

22             THE WITNESS:  What do you mean

23        "confidential information"?

24   BY MR. CROSS:

25        Q.   So information that was not public.

Page 60

```
 1        A.   I mean, I don't know -- I don't know

 2   specifically what any -- what any county would have

 3   shared with C.I.S.A., so I don't know the answer to

 4   that question.

 5             From the Secretary of State's office, I'm

 6   not sure which -- I'm not sure if what -- I mean, I

 7   don't know because I wouldn't have been directly

 8   involved in what's going on.

 9             I would have gotten Merritt or somebody on

10   his team, or David Hamilton or something like that,

11   and they would have generally coordinated with

12   C.I.S.A.  So I don't know what information would

13   have gone back and forth.

14        Q.   Mr. Harvey, the audio's a little better

15   when you stay closer to the computer.

16        A.   Okay.

17        Q.   It's easier to hear you.

18             Sorry.  I can't remember if I asked this.

19   If you wanted to know whether ███████████████

20   referenced here in Exhibit 6 had any impact on

21   Georgia's election system, who would you ask?

22             MR. RUSSO:  Object to form.

23             THE WITNESS:  I mean, I would

24        probably ask somebody in ████████████

25        and/or Merritt Beaver.
```

Page 61

1    BY MR. CROSS:

2        Q.    Okay.  All right.  If you can go back to

3    Exhibit Share, I just realized I skipped an

4    exhibit.  Sorry.  Pull up Exhibit 5, if you would.

5                          (Whereupon, Plaintiff's

6                          Exhibit 5 was marked for

7                          identification.)

8    BY MR. CROSS:

9        Q.    Just let me know when you've got it.  And

10   you can take a moment to read through it.

11              (Whereupon, the document was

12         reviewed by the witness.)

13              THE WITNESS:  Okay.  I've read it.

14   BY MR. CROSS:

15       Q.    All right.  Do you see Exhibit 5 is an

16   E-mail that you sent to Frances Watson on November

17   10, 2020?

18       A.    Yes.

19       Q.    And that's the most recent E-mail in a

20   thread that begins with another one of these

21   complaints or concerns that looks like it came in

22   to the Secretary's office on November 9.

23              Do you see that?

24       A.    I do.

25       Q.    And if you look, the concern that came in

1     on November 9, 2020, the description of the

2     violation is "███████████████████████████

3     █████████"

4          Do you see that?

5     A.   Yes.

6     Q.   And the location is the ███████████

7     ████████████.  Do you see that?

8     A.   Yes.

9     Q.   And there's a Twitter link here.  And if

10    you read the whole context of the E-mail, you'll

11    see that whoever sent this in put up photos of

12    voting machines that were apparently, according to

13    this person, ███████████████████████.

14          Do you see that?

15    A.   I see that.

16    Q.   Do you know whether there was an

17    investigation done in this situation?

18    A.   I don't know.  But again, this is one that

19    I would certainly expect an investigation to have

20    been done.

21    Q.   If you wanted to review any -- review the

22    investigation file, any report, and understand what

23    was done and what the findings were, who would you

24    ask?

25    A.   The current acting chief, Mr. Callaway.

Page 63

```
 1        Q.   As you sit here, do you not -- you're not

 2   aware of what the outcome was of any investigation

 3   that may have been done here?

 4        A.   No, I'm not.

 5        Q.   All right.  Pull up Exhibit 7, please.

 6                       (Whereupon, Plaintiff's

 7                        Exhibit 7 was marked for

 8                        identification.)

 9   BY MR. CROSS:

10        Q.   And again, anything I pull up, Mr. Harvey,

11   you're welcome to read through, and just let me

12   know when you're ready.

13        A.   Okay.

14             MR. ICHTER:  David, for some reason

15        I've only got six exhibits in the Marked

16        Exhibits folder.  How many are there?

17             MR. CROSS:  There's seven so far.

18        You probably just need to refresh.

19             MR. ICHTER:  Okay.

20             THE WITNESS:  Okay.  This'll take me

21        a minute to read.

22             (Whereupon, the document was

23         reviewed by the witness.)

24             THE WITNESS:  Okay.  I've read it.

25   BY MR. CROSS:
```

Page 64

```
1          Q.   Okay.  Do you see that the most recent
2    E-mail here is one that you sent to George Gray on
3    May 28, 2020?
4          A.   Yes.
5          Q.   And you're responding to an E-mail that
6    you received from Mr. Gray earlier that day.  Do
7    you see that?
8          A.   Yes.
9          Q.   Who is George Gray?
10         A.   A board member of the Oglethorpe County
11   Board of Elections.
12         Q.   Do you know him personally?
13         A.   I wouldn't say I know him personally, but
14   I believe he's one that would call me from time to
15   time.  So it was sort of unusual for board members
16   to call me directly, but in -- sometimes in smaller
17   counties they would.
18              So I believe I had spoken with him on
19   occasions.  And I had probably met him at
20   conferences and things like that.  But I'm not sure
21   that I could pick him out of a line-up right now.
22         Q.   Okay.  I'm not going to ask you to do
23   that.  You -- if you look at the E-mail that he
24   sent you, he's got a number of questions that are
25   in black in this exhibit, and then there's text in
```

1    red where you provided some answers to those

2    questions.

3              Do you see that?

4        A.   Uh-huh.  Yes.

5        Q.   Sorry.  Was that "yes"?

6        A.   Yes.  I'm sorry.

7        Q.   And so I just want to -- I have a couple

8    of questions about some of the questions he has.

9    If you look at the second paragraph of his E-mail,

10   he writes:

11            "███████████████████████████████

12       ███████████████████████████████████

13       ██████████████████████████

14       ████████████████████████████████

15       █████████████████████████████████

16       ███████"

17            Do you see that?

18       A.   I do.

19       Q.   The first example he indicates refers to

20   "███████████████████████████"  Do you see that in the

21   third paragraph?

22       A.   Yes.

23       Q.   And he goes on:

24            "██████████████████████████████████

25       ███████████████████████████████████

1      ███████████████████████████████████"

2           Do you see that?

3      A.   Uh-huh.  Yes.

4      Q.   Sorry.  I need you to say -- okay.  Thank

5      you.

6      A.   Yes.

7      Q.   Sorry.  It's just a formality for the

8      record.

9           And he raises a concern about the work

10     that goes into this.  And then you have a response

11     in red.  Do you see that immediately below his

12     "████████████████████████" paragraph?

13     A.   I do.

14     Q.   And what you explain to him here is:

15          "████████████████████████████

16     ██████████████████████████████████████

17     ███████████████████████████████

18     ██████████████████████████████████████

19     ██████████████████████████████████████

20     ████████████████"

21          That's what you wrote; right?

22     A.   Yes.

23     Q.   Why were you concerned about ████████████

24     ████████████████████████████████████████████████

25     ████████████████████████?

1     A.   Well, I wasn't concerned about it.  I was

2     trying to illustrate why it's important that you

3     keep a counting on the B.M.D.s.  I mean, that's

4     just a -- you know, with some of the counties, they

5     didn't have a lot of -- you know, some counties

6     were more concerned with security, some counties

7     were less concerned with security.

8          And some of these counties, you know, they

9     wouldn't think that, well, you know, people -- you

10    know, these are respectful people, nobody would do

11    something they're not supposed to do.

12         And so I was just giving the example that,

13    ███████████████████████████████████████████████

14    ███████████████████████████████████████████████

15    ███████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ████████████

18    Q.   Understood.

19         Why is it important to take measures like

20    this to protect the B.M.D.s against potential

21    conduct of bad actors within the election system?

22    A.   Well, it's important to take -- to protect

23    all aspects of the election system.  I mean, you

24    want to protect the ballots.  You want to protect

25    the poll pads.  You want to protect the B.M.D.s.

1    You want to protect everything, because you don't

2    want anybody messing with any of it.

3            And so that's, you know, just one part of

4    it.  But you certainly don't want somebody that may

5    find a way to print counterfeit ballots or

6    unauthorized or ineligible ballots.

7        Q.   And is one of the concerns that's

8    important to protect against with the election

9    system, as you suggest here, the possibility that

10   ██████████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████████████████████████████████████?

15       A.   Was there -- was there a question?

16       Q.   Yeah.  I'm asking is that something that's

17   important to protect against.

18       A.   Oh, yes.  Yes, it is.

19            (Whereupon, Ms. Elson joined the

20        deposition.)

21   BY MR. CROSS:

22       Q.   If you come down to, you see his number

23   two is "████████████████████████."  Do you see

24   that on the next page?

25       A.   Yes.

Page 69

```
 1        Q.   And he expresses a concern about ████████

 2    ████████████████████████████████████████████

 3    █████████████████████████████████████████████

 4    ████████████████████████████████████.

 5             Do you see that?

 6        A.   I do.

 7        Q.   And then you go on in the red paragraph,

 8    the first one, you say:

 9             "███████████████████████████

10        █████████████████████████████

11        ███████████████████  █████████████

12        █████████████████████████████

13        █████████████████████████

14        █████████████████████████████

15        ███████████████████████████████

16        ████████████████████"

17             Do you see that?

18        A.   I do.

19             (Whereupon, Ms. Connors joined the

20        deposition.)

21    BY MR. CROSS:

22        Q.   How is having three people for this task,

23    how does that help with security and integrity for

24    the election system?

25        A.   Well, it's harder for three people to keep
```

Page 70

1    a secret than two and harder for two than one.  So

2    the rule of threes has generally been what you've

3    had in elections in recent history.

4           So anytime you're dealing with ballots,

5    you have three people there.  Because the

6    likelihood of having three people do the wrong

7    thing is less likely perhaps than only two.  So as

8    I explained, the principle of three is, you know,

9    going to hopefully keep people more honest.

10    Q.   Okay.  Mr. Harvey, you're -- do you vote

11   in Georgia elections?

12    A.   I do.

13    Q.   And do you vote using the B.M.D.s or

14   absentee or how do you typically vote?

15    A.   I have voted both ways.  I think last year

16   I did vote on a B.M.D. for one election.  It may

17   have been a special election.  I live in DeKalb

18   County.  But I think for the general election and

19   the run-off I voted by absentee by mail.

20           But I usually try to vote during advance

21   voting, because I like to go to a polling place and

22   see people and see what's going on.  But I was a

23   little busy late last fall.

24    Q.   But you prefer to vote in person?

25    A.   I, you know, I don't know.  If you look at

Page 71

1    my -- I -- look at my voting history, I think you'd

2    find I do it about 50/50.

3         Q.   Okay.  When you voted on the B.M.D., is it

4    fair to say that you weren't able to read the Q.R.

5    code on your ballot to determine how that Q.R. code

6    was getting tabulated?  Is that right?

7         A.   That's correct.  I -- but I did see the

8    print-out below it of what my choices were.

9         Q.   Okay.  But you understand that the human

10   readable portion of your ballot does not count in

11   any election in terms of what gets tabulated;

12   right?

13             MR. RUSSO:  Object.  Objection to

14        form.

15             THE WITNESS:  I would, while I would

16        generally agree, I believe, and I'd have

17        to go back and look at the code, I think

18        for -- if there's a recount or something

19        like that, then I think it does count.

20        So.

21             But generally, I agree with your

22        premise.

23   BY MR. CROSS:

24        Q.   A recount in Georgia simply rescans the

25   ballots; right?

Page 72

1            MR. RUSSO:  Objection.  Form.

2            THE WITNESS:  It does.  But I'm,

3        again, I'm -- I can't cite exactly where

4        it is in the code, but I believe there is

5        a provision somewhere that says, if

6        there's some inconsistency, you go with

7        what's actually printed, the name that's

8        printed on the ballot.

9    BY MR. CROSS:

10       Q.   And in order to examine the human readable

11   portion for tabulation purposes, that can occur

12   only in an audit that's authorized by the Secretary

13   of State; is that right?

14           MR. RUSSO:  Objection to form.

15           THE WITNESS:  Again, I -- I'm not

16       sure about that.  Again, I think there may

17       be some provision that, if there's some

18       type of dispute about a vote, you go with

19       the human readable form.

20   BY MR. CROSS:

21       Q.   Okay.  As a voter, would you prefer to

22   cast a vote that's scanning human readable text for

23   the tabulation rather than a Q.R. code?

24       A.   Probably.

25       Q.   Because then you could actually, you could

Page 73

1    read what's being tabulated in the first instance

2    yourself; right?

3        A.   Well, yes.  Assuming that the scanner is

4    set up and is secure and is tabulating it in

5    accordance with that.

6        Q.   Right.  Are you aware that -- well, let me

7    ask a threshold question.  Are you familiar with an

8    election security expert named Alex Halderman?

9        A.   Yes.

10       Q.   In fact, you've, I think you've testified

11   at hearings in this case with -- where you both

12   testified; right?

13       A.   Yes.  Although I've not seen -- I wasn't

14   in the room when he testified, but I'm certainly

15   familiar -- certainly familiar with his reputation

16   and his work.

17       Q.   Okay.  And what are you familiar with

18   regarding his reputation and work?

19       A.   That he's considered an expert in security

20   sys -- or election systems and security and that

21   he's been -- I guess Judge Totenberg, I don't know

22   what the designation is, but essentially designated

23   him or allowed him unprecedented access to check

24   the Georgia voting system.

25            So I mean, obviously he's got credentials

Page 74

1    to do this stuff.

2        Q.   Okay.  And you anticipated where I was

3    going.  You mentioned that he got access to

4    election equipment in Georgia.  Are you aware that

5    he prepared a report of nearly a hundred pages on

6    that analysis that was provided to the State's

7    lawyers on July 1st of last year?

8        A.   I just read that in the A.J.C. I think

9    yesterday or the day before.

10       Q.   So you did not know that before the A.J.C.

11   article?

12       A.   No.  And I, remember, I had -- I

13   essentially left the Secretary's office at the end

14   of May.

15       Q.   Okay.  So fair to say you have not read

16   that report?

17       A.   That's correct.  I have not.

18       Q.   Okay.  Would you expect the Secretary's

19   office to address any significant vulnerabilities

20   with the election system that Dr. Halderman

21   identified in that report?

22       A.   I would expect the Secretary of State's

23   office to address any vulnerabilities from any

24   source in an evaluation of, you know, considering

25   all the different factors that come in.

1        Q.   Why?

2        A.   Well, because if there's a security issue,

3    it needs to be -- if you can confirm that it is an

4    issue, you'd want to -- you'd want to fix it.  You

5    may get reports that are -- that are not security

6    issues or false reports that you want to be able

7    to, you know, counter with a fact that, hey, this

8    is a -- this is a false report or this is a -- this

9    flaw doesn't exist or whatever the case may be, I

10   think.

11        But I would expect them to certainly

12   consider anything that would come in that would be

13   able to secure the system.

14        Q.   And is it fair to say that taking

15   reasonable measures to mitigate known

16   vulnerabilities with an election system and being

17   able to tell voters that you've done that, that

18   that helps drive voter confidence in the election

19   system?

20             MR. RUSSO:  Objection.  Form.

21             THE WITNESS:  Can you ask the first

22        part of that again?

23   BY MR. CROSS:

24        Q.   Sure.  Taking measures to mitigate known

25   vulnerabilities with an election system and being

Page 76

1    able to tell voters that those measures have been

2    taken, without getting into specifics, just letting

3    voters know that measures have been taken to

4    address known vulnerabilities with an election

5    system, would you expect that to help drive voter

6    confidence in that system?

7              MR. RUSSO:  Objection to form again.

8              THE WITNESS:  I would think it would

9         be helpful.

10   BY MR. CROSS:

11        Q.   As a voter yourself, would you have more

12   confidence in a system where known vulnerabilities

13   have been addressed or in a system where known

14   vulnerabilities have not been addressed for six

15   months or more?

16             MR. RUSSO:  Objection to form.  Lacks

17        relevance.

18             THE WITNESS:  I'd want issues

19        addressed.

20   BY MR. CROSS:

21        Q.   Okay.  You were still with the Secretary's

22   office in September 2020 when Dr. Halderman

23   testified in a hearing before Judge Totenberg in

24   this case; right?

25        A.   Yes, I was.

1      Q.   And I won't get into the specifics of his

2   testimony, but just at a general level, were you

3   aware that he testified and actually did a

4   demonstration by video for the judge showing that

5   he was able to hack Georgia's B.M.D. equipment?

6           MR. RUSSO:  Objection to form.

7           THE WITNESS:  No, I'm not aware of

8      that.

9   BY MR. CROSS:

10     Q.   So even when you were the elections

11  director, no one informed you that ███████████████

12  ███████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████

15  ██████████████████████████?

16          MR. RUSSO:  Objection to form.  And

17     lacks foundation.

18          THE WITNESS:  I don't believe I -- I

19     don't believe I was aware of that.

20  BY MR. CROSS:

21     Q.   Isn't that something you would expect to

22  know as the elections director so that you could at

23  least be aware of that vulnerability in the system?

24     A.   Yeah, I would want to know that.

25     Q.   And so is it fair to say you're also not

1    aware of any measures taken by the Secretary's

2    office or any county to address that vulnerability?

3            MR. RUSSO:  Same objection.

4            THE WITNESS:  I'm not aware of

5        anything that was -- that came as a result

6        of what you're saying he did.

7    BY MR. CROSS:

8        Q.   Okay.  All right.  Take a look at Exhibit

9    8, if you would, please.

10                        (Whereupon, Plaintiff's

11                         Exhibit 8 was marked for

12                         identification.)

13           MR. RUSSO:  And David, before we go

14        into this, I need to take a break in about

15        seven minutes so we can swap.  I have

16        another matter to deal with that I

17        mentioned earlier.

18           MR. CROSS:  Do you want --

19           MR. RUSSO:  I don't know how long --

20        yeah, I don't know how long you're going

21        to need on this exhibit.  I'm not -- my

22        computer actually hasn't even brought it

23        up yet, but.

24           MR. CROSS:  I don't need to take

25        long.  I think we can get through this and

1          then take a break --

2                    MR. RUSSO:  Okay.

3                    MR. CROSS:  -- so you can switch.

4                    MR. RUSSO:  That's fine.  Okay.

5                    MR. CROSS:  Yeah.

6     BY MR. CROSS:

7          Q.   Let me know when you're ready, Mr. Harvey.

8     And obviously, take a moment to read through it.

9          A.   Yeah.  Okay.  It just popped up.  Let me

10    read it and I'll let you know.

11         Q.   Okay.

12              (Whereupon, the document was

13         reviewed by the witness.)

14              THE WITNESS:  Okay.

15    BY MR. CROSS:

16         Q.   All right.  Do you see that Exhibit 8 is

17    an E-mail you received from someone at Decatur

18    County, Georgia on -- dot gov, from an E-mail

19    address at Decatur County Georgia.gov on October

20    15, 2020?

21         A.   Yes.

22         Q.   And the subject line is ████████████;

23    right?

24         A.   Yes.

25         Q.   And if you look down in the thread, you'll

1    see that this starts with an E-mail from Carol

2    Heard, the chief elections official at Decatur

3    County, to you, copying others, on October 15,

4    2020; right?

5        A.    Correct.

6        Q.    And here Ms. Heard is reporting what she

7    refers to in the second line of her E-mail as:

8            "████████████████████████████████████

9        ████████████████████████████████████████

10       ███████████████████████████████████

11       ████████████████████████████████████████

12       ███████████████████████████"

13           Do you see that?

14       A.    Yeah, I do.

15       Q.    And she has a couple of questions.  The

16   first is:

17           "█████████████████████████████

18       ██████████████████████████████

19       ██████████████████████████████████████"

20           Do you see that?

21       A.    I do.

22       Q.    And then in your response to her later

23   that morning, if you come up to the bottom of the

24   first page, you wrote:

25           [As read]  "█████████████████████████

Page 81

1    ████████████████████████████████

2    ████████████████████████████████

3    ██████████████████████████████

4    ████████████████████████████████

5    ███████████████████████████████

6    ████████████████████"

7         Do you see that?

8    A.   Yes.

9    Q.   Given the concerning -- the security

10   concerns involving U.S. elections, ███████████

11   ███████████████████████████████████████████████

12   ███████████████████████████████████

13   ████████████████████████████████████████

14   ███████████████████████?

15        MR. RUSSO:  Objection to form.

16        THE WITNESS:  I think there actually

17   were assessments that were done.  We were

18   getting -- I think what she was asking

19   for, I got the impression she was asking

20   for ████████████████████████████████████

21   ████████████████████████████████████.

22        In actuality, we had been getting and

23   we had been sharing with counties and

24   counties had been getting through EI-ISAC

25   regular communications from C.I.S.A., and

Page 82

```
 1         I think in some cases from D.O.J. or
 2    F.B.I., about some of the threats.
 3         I think she was asking for, ████████
 4    ████████████████████████████████████████
 5    ████████████    ████████████████████████
 6    ████████████████████████████████████████
 7    ████████████████████
 8         But it's, you know, it's really clear
 9    in my memory that, basically, all the
10    communication we had with them, with the
11    counties in 2020, was essentially -- had
12    to do with threat slash challenge
13    assessments.  And those are, you know,
14    challenges from COVID that were not really
15    threats but were real concerns they had to
16    deal with.
17         But we also did share with them, you
18    know, concerns about cybersecurity at that
19    threat, and we also concern -- shared
20    concerns about, you know, groups showing
21    up at polls and possible violence.
22         So I may have undersold myself a
23    little bit by saying ████████████████████
24    ████████████████████████████████████████
25    ████████████████████████████████
```

Page 83

1 ████████████████████████████████████

2 ███████████████████

3          But then I go on to say "███████

4 ████████████████████████████████

5 ██████████████████████████."   And by

6 "████████████," that included everything

7 from disruptive people at polls to

8 misinformation to all that stuff.

9          And as I think I mentioned before,

10 you know, we'd had every -- just about

11 every county, I wish I could say every

12 county but I'm not sure we got all 159, we

13 had the new physical security assessments

14 to deal with things like violence, things

15 with intrusion and stuff like that.

16          So I -- that's what I was trying to

17 convey to her was that █████████████

18 ████████████████████████████████████

19 ██████████████████████████████████

20 ████████████████████████████.

21          But they clearly -- we had gotten and

22 we had shared a lot of information with

23 them.

24 BY MR. CROSS:

25          Q.   Okay.   Why does the Secretary of State's

Page 84

1    office rely on C.I.S.A. for information about

2    potential threats to election security?

3         A.   You trailed off at the end.  Threats to

4    what security?

5         Q.   Yeah.  Let me ask it again.  Why does the

6    Secretary's office rely on C.I.S.A. for information

7    about potential threats to election security?

8         A.   Well, we primarily relied on them for

9    threats on the cyber front, because that was

10   their -- they were sort of the designated federal

11   government partner for cyber threat and

12   cybersecurity.

13         But we also -- we also worked with the

14   F.B.I.  We would report things to the F.B.I.  I had

15   a lot of communications with the F.B.I. in the

16   course of, you know, the second half of 2020 and

17   the first part of 2021 about all this stuff, about

18   election night, about set-ups, about what they were

19   doing, about how we were going to communicate.

20         We -- the F.B.I. had a -- had an agent

21   that was basically assigned to be my direct liaison

22   on anything election front, and I would speak to

23   her probably weekly and then a couple times during

24   election day and before the election and after the

25   election.

Page 85

```
 1            So we didn't just rely on C.I.S.A.  But
 2    C.I.S.A. was primarily cyber, and then F.B.I. was
 3    more of a -- of a threat.  Like, if there had been,
 4    like, civil unrest type issues, that would have --
 5    that would have gone to F.B.I. rather than
 6    C.I.S.A., or to state, state law enforcement
 7    perhaps.
 8        Q.   Based on your experience and knowledge as
 9    the elections director, and including in the
10    communications that you had with the F.B.I. or
11    others, are you aware of any specific threats that
12    particular -- that specifically targeted Georgia
13    elections at any point?
14        A.   I don't -- I know there was a -- there was
15    a report, I believe, of a bomb threat at Fulton
16    County, or the threat of a bomb threat or -- that
17    had come in I think around the time of advanced
18    voting.
19            There was nothing like a -- like a
20    long-range forecast, for example, that said, hey,
21    the F.B.I. has determined that, you know, 200,000,
22    you know, of these people are going to come and,
23    you know, physically attack polling places.
24            But we were regularly told, and frankly,
25    on a national level through the National
```

1    Association of State Election Directors, we had --

2    we had calls at least every month, maybe every two

3    weeks, talking about sort of the national level.

4         But I don't think that there was anything

5    really specific that Georgia was on the lookout for

6    that was very different than what every state was

7    looking out for and trying to be able to respond

8    to.

9    Q.   And what was Georgia looking out for with

10   respect to cybersecurity threats for elections

11   during your time there?

12   A.   Well, anything.  You name it.  Malware

13   attacks, ransomware, disinformation, any of those

14   things, social media issues, you know, we were --

15   we were on the lookout for all of it.  And we were

16   trying to communicate that to the counties to be on

17   the lookout for, too.

18   Q.   Okay.

19   A.   But we weren't ruling anything -- we

20   weren't ruling anything out.

21   Q.   Are you aware of any instance of any

22   unauthorized access to any aspect of Georgia's

23   election system?

24   A.   What do you mean by "election system"?

25   Can you define what --

1      Q.   Sure.  So the voting equipment, the -- any

2   servers that are used, ENet, voter registration

3   database, so any unauthorized access to -- well, I

4   tell you what, let's make it narrower.

5           Let's just start with are you aware of any

6   unauthorized access to any of the voting equipment,

7   so B.M.D.s, printers, scanners?

8      A.   I don't believe so.

9      Q.   Are you aware of any unauthorized access

10   to any election servers at the state or county

11   level?

12      A.   I don't believe so.

13      Q.   Are you aware of any copying, unauthorized

14   copying or alteration of data on any voting

15   equipment in the state?

16      A.   No.

17      Q.   Are you aware of any copying or alteration

18   of data on any election servers in the state?

19      A.   No.

20      Q.   Are you aware of any unauthorized copying

21   or alteration of data on ENet or the voter

22   registration database?

23      A.   No.

24      Q.   Are you aware of any unauthorized access

25   to ENet or voter registration database?

Page 88

1      A.   No.

2           MR. RUSSO:  And David, if we could

3      just pause for one second, I want to try

4      to -- I didn't want to interrupt your line

5      of questions there, but I've got to --

6      we've got to take a quick break so I can

7      swap out here.

8           MR. CROSS:  Okay.  How long do you

9      need?

10          MR. RUSSO:  I just need a minute.

11     Yeah, yeah.  Carey's going to come take my

12     spot here.

13          THE VIDEOGRAPHER:  Would you like to

14     go off the record?

15          MR. CROSS:  Do we need to go off the

16     record, Vincent, or is Carey there?

17          MR. MILLER:  I'm here.

18          MR. CROSS:  Oh, okay.

19          MR. MILLER:  Yeah, I'm --

20          MR. CROSS:  Just let me know when

21     you're ready, Carey.

22          MR. MILLER:  Yeah.  Are we off right

23     now or are we still on?

24          MR. CROSS:  We're still on.

25          MR. MILLER:  Okay.  Can we just -- I

Page 89

```
 1          don't understand there's any objection,

 2          but maybe can we stipulate to no objection

 3          to me subbing in to defend, keep this

 4          train rolling?

 5               MR. CROSS:  Sure.

 6               MR. MILLER:  Okay.

 7               MR. CROSS:  I mean, I don't know if

 8          you're really a substantive for Vincent.

 9          I'll defer to him for that.

10               MR. MILLER:  Okay.  I'm --

11     BY MR. CROSS:

12          Q.  Mr. Harvey, I don't know if you got an

13     upgrade or a downgrade there.

14               MR. MILLER:  I'm ready when you all

15          are.

16               MR. CROSS:  Okay.

17     BY MR. CROSS:

18          Q.  All right.  I had a couple more questions

19     on this document.  Then if you want to take a

20     break, Mr. Harvey, I know we've been going for a

21     little while.

22          A.  I'm fine to keep going.

23          Q.  Okay.  Good.  Well, if you need a break at

24     any point, just let me know.

25               Okay.  All right.  So looking back at -- I
```

Page 90

1    think we're on Exhibit 8.  Yes.  So looking back at

2    Exhibit 8, you pointed out this language where you

3    wrote "█████████████████████████████████████████

4    ████████████████████████████."

5              Can you describe what you have in mind

6    there?

7        A.   Let me -- yeah, I think the -- you know,

8    we have a -- ██████████████████████████████

9    ██████████████████████████████████████

10   █████████████████████████████████████████████

11   ██████.  So the -- you know, that's constantly

12   monitored.

13             And I say "████████████████████████████

14   ████████████████," those are the F.B.I. bulletins

15   that would come out or the different threat

16   assessments that would come out from the F.B.I.

17             I think there was -- I think there were

18   one or two that had to do with some -- that

19   actually had to do with some cyber issues or some

20   sites that should be blocked or -- that we shared

21   with all the counties.

22             So that's what I was trying to convey to

23   her was that this was something that we were doing

24   almost every day.  I mean, we were -- we were

25   having telephone calls and on-line meetings and

Page 91

1    getting updates from numerous sources.  So that's

2    really what I meant by "██████."

3            I wanted to make sure she understood that

4    we hadn't just, you know, said -- you know, laid

5    back and said, well, whatever's going to happen

6    happens.  We tried to keep our pulse on what was

7    going on as much as we could.

8    Q.    The only examination of voting equipment

9    in the state that you're aware of for security

10   purposes is what you identified earlier where five

11   to six counties were examined by Pro V&V; is that

12   right?

13   A.    Post-election, yes.  Although, I would --

14   I would say that the logic and accuracy testing is

15   also a test for the security of the voting

16   equipment.  So that's done before every election.

17   Q.    Have you reviewed any of the reports of

18   any of the election security experts from any of

19   the parties in this litigation?

20   A.    I don't believe so.  I have -- I've read a

21   lot about this case, and I've read a lot of things

22   that people have said in the course of, you know,

23   the last year or two.

24           But I don't believe I have read a report

25   from -- first of all, I'm not -- I don't know who

Page 92

1    all the witnesses you're -- the experts you're

2    talking about.  So.  But I don't believe I've read

3    their reports.

4         Q.   So as you sit here, you're not aware of

5    the opinions or analyses of election security

6    experts pointing out the limits or inability of

7    logic and accuracy testing to identify malware or

8    other compromises with the voting equipment?

9              MR. MILLER:  Objection to form.  Lack

10         of foundation.

11             THE WITNESS:  I've heard over the --

12         over the last several years I've heard,

13         you know, arguments along those lines, but

14         I don't -- I don't think I've read

15         specific reports like you're talking

16         about.

17   BY MR. CROSS:

18        Q.   All right.  Let me pull up the next

19   exhibit here.  It will be Exhibit 9.

20                        (Whereupon, Plaintiff's

21                         Exhibit 9 was marked for

22                         identification.)

23   BY MR. CROSS:

24        Q.   All right.  Let me know when you've got

25   Exhibit 9 in front of you.  And take a moment to

Page 93

1    review it.

2        A.   Okay.  I'm pulling it up now.  I'll let

3    you know when I've read it.

4            (Whereupon, the document was

5         reviewed by the witness.)

6            THE WITNESS:  Okay.  I've read it.

7    BY MR. CROSS:

8        Q.   And just before we look at this, you

9    mentioned a moment ago on the checks that there are

10   alarms that are in place?  What did you mean by

11   that?

12       A.   Well, I know there are -- on the -- on the

13   Secretary of State's security system or cyber

14   system, it's my understanding from talking with

15   Merritt Beaver that, if something were to happen,

16   he would be notified of it.  If there was some

17   intrusion or something like that, he would be

18   notified.

19       Q.   And those alarms are limited to intrusion

20   by the Internet; right?

21       A.   I'm really not sure.  I don't know much

22   more than that.  But that if there -- if there was

23   a compromise in the system, he would be notified is

24   my understanding.

25       Q.   Okay.  And if you wanted to understand the

Page 94

1    limits of that system and how it works, who would

2    you ask?

3         A.   Merritt Beaver.

4         Q.   All right.  Take a look at Exhibit 9, if

5    you would, please.

6         A.   Okay.

7         Q.   You'll see the most recent E-mail is one

8    that you received from Deb Cox at Lowndes County --

9    is it Lowndes County or Lowndes County?  How do you

10   say that in Georgia?

11        A.   Lowndes.  No --

12        Q.   Okay.

13        A.   The E is silent.

14        Q.   Okay.  I thought so.

15             So Exhibit 9 is an E-mail you received

16   from Deb Cox at Lowndes County on October 30, 2019.

17   Do you see that?

18        A.   I see that.

19        Q.   Okay.  If you come down to the earliest

20   E-mail in the thread at the bottom of the second

21   page, this is an E-mail from, is it Rokey Suleman

22   at KNOWiNK?

23        A.   There is -- yeah, that's the, it looks

24   like that's at the very bottom of the E-mail

25   string.

Page 95

1      Q.   Right.

2      A.   Yeah.  That's for -- yeah, Rokey Suleman

3   was the, for a time he was the, kind of the lead

4   KNOWiNK poll pad liaison for Georgia.

5      Q.   Okay.  So in Mr. Suleman's E-mail, which

6   goes to, it looks like, several Georgia county

7   election officials on October 30, 2019, do you see

8   that?

9      A.   Yes.

10      Q.   And it says, subject line, ████████████

11   ███████████████████.  And he indicates in the first

12   line:

13              "████████████████████████████████████

14   ████████████████."

15              Do you see that?

16      A.   I do.

17      Q.   What's a ██████████████████?

18      A.   ███████████████████████████████████████████

19   ████████████████████████████████████████

20   █████████████████████████████████████████

21   █████████████████████████████████████.

22              So they usually, the second Thursday

23   before the election, they basically label all the

24   identified eligible voters and they pull them into

25   a database so that they can put them into the poll

1    pads.

2          Well, if a county has a -- has a backlog

3    of voter registration applications, they keep

4    processing them.  So if on that -- the Friday after

5    they do the pull of voters they enter my voter

6    registration application, I'm not going to be on

7    the poll pad, but I am an eligible voter.

8          So when I show up, they get a supplemental

9    voter list that's pulled on the Saturday before the

10   election, and they say, okay, here are all the

11   people in your county that have been entered into

12   the voter registration system since we did the big

13   pull, you know, a week and two days ago.

14          And so they're to have that at every

15   polling place.  And then when I show up to vote and

16   I show my ID and they look me up first on the poll

17   pad and they say, Mr. Harvey, we don't see you in

18   here, the next thing they should do is check the

19   supplemental list, and they say, oh, wait, here you

20   are, yeah, you're on the supplemental list, and

21   then they can encode a card for me on the poll pad

22   and add me to the list of voters.

23          ███████████████████████████████

24   ███████████████████████████████████

25   █████████████████████████████████.

Page 97

1        Q.   And Mr. Suleman in his E-mail describes

2   ████████████████████████████████████████████████████

3   the second paragraph of his E-mail.  Do you see

4   that?

5        A.   I do.

6        Q.   And he talks about ████████████████████████

7   ████████████████████████████████████████████████████

8   ██████████████████.  Do you see that?

9        A.   I do.

10       Q.   And he indicates █████████████████████

11   ██████████.  Do you see that in the fourth line?

12       A.   I do.

13       Q.   And he says, "█████████████████████████."

14   Do you see that?

15       A.   I do.

16       Q.   And if you come up, there's a response

17   from Janine Eveler, who's the elections director

18   for Cobb County, on October 30, the same day.  Do

19   you see that?

20       A.   I do.

21       Q.   And she writes to Mr. Suleman:

22            "█████████████████████████████████

23        ████████████████████████████████████

24        ████████████████████████████████████

25        ████████████████████████████."

1          Do you see that?

2     A.   I do.

3     Q.   Do you know whether ███████████████████

4     ██████

5     A.   ███████████████████████████.   I

6  would -- I would point out that this was, due to

7  the timing of this and the counties it was sent to,

8  this was for the pilot election that was done in

9  November of 2019, I guess.  And there were six

10 counties that were doing it, so this would have

11 only affected six counties.

12          ███████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████

15 ███████████████████████.  But I don't know

16 what was done for this election.

17     Q.   And in 2020 the KNOWiNK poll pads were

18 rolled out for all counties across the state for

19 use with the B.M.D. system; right?

20     A.   That's correct.

21     Q.   And you don't know whether █████████

22 ██████████████████████████; right?

23     A.   ███████████████████████████

24 ███████████████████████████████████████

25 █████████████████████████████████



Page 99

1 ████████████████████████████████████

2 ████████████████████

3      ████████████████████████████████

4 ██████████████████████████████████████

5 ██████████████████████████████████████

6 █████████████████

7     Q.   Okay.  Who would you ask if you wanted to

8 know the answer to that?

9     A.   I would probably ask either Michael Barnes

10 or the -- Gabriel Sterling, who works closely with

11 the current -- the current KNOWiNK liaison is not

12 Rokey Suleman.  I can't -- I can't -- his name

13 doesn't come to mind.  But I talked with him an

14 awful lot in 2020.  But Gabriel Sterling or Michael

15 Barnes would be the best person to contact about

16 that.

17     Q.   The KNOWiNK poll pads that were used in

18 the pilot elections in 2019, those were continued

19 to use in the elections in 2020 and 2021; right?

20     A.   I believe so.

21     Q.   And the KNOWiNK poll pads are connected to

22 the Internet via WiFi; right?

23     A.   Not when they're in a -- not normally when

24 they're in a polling place during elections,

25 they're not.  They can be, but they're not supposed

1    to be connected to any network while voting's

2    taking place, or really at any time in the polling

3    place.

4        Q.   But they are connected to the Internet

5    before the election begins, because that's how they

6    get updated with the voter registration list;

7    right?

8        A.   Yeah, that's done in a -- with a secure --

9    you know, it's a network secured system at the

10   county -- usually at the county warehouse or where

11   the county keeps their elections equipment.

12       Q.   What's the process for updating the poll

13   pads?

14       A.   Generally speaking, somebody from Michael

15   Barnes' team will pull the data out of ENet.  So

16   after the registration deadline has passed and,

17   like, it comes time -- like I say, usually the

18   second Thursday before the election, they pull all

19   the voters -- or they don't pull them out of ENet,

20   but they identify and get that data from ENet and

21   say, okay, these are all the Cobb County voters

22   that are eligible to vote in this election.

23            And they, I can't explain technically what

24   they do, but they con -- they get them into a form

25   that can go into the poll pad.  And then it

1   populates the poll pad so that -- the poll pads are

2   set up by precinct to have the voters in there

3   first by precinct, and then you could -- it has all

4   the voters in there, but they're really designed to

5   go to a specific precinct.

6       Q.   And the --

7       A.   (Inaudible due to cross-talk).

8       Q.   Sorry.  Go ahead.

9       A.   I was going to say, the file that Michael

10  Barnes and/or the Dominion and KNOWiNK people put

11  together is then uploaded into the individual poll

12  pads that are then disconnected from WiFi and they

13  are packaged to go to the polling place on election

14  day.

15      Q.   And you said earlier that that occurs at a

16  secure facility where the county has, what, its

17  election management's -- its E.M.S. server?

18      A.   Well, it depends.  In large counties they

19  may have, like, a separate building where they may

20  not -- it may or may not have the E.M.S. with it.

21           But like, Fulton County's, their main

22  office is separate from their election warehouse

23  where they have all the equipment.  I believe they

24  do all this updating in the elections warehouse,

25  which is across town from that.

1              But in smaller counties, well, or even

2      like Paulding County, their equipment is stored in

3      the same building that their office is held.  So it

4      varies.

5          Q.   Are the county E.M.S. servers connected to

6      the Internet?

7          A.   No.

8          Q.   Does the state have any E.M.S. servers

9      connected to the Internet?

10         A.   None that I'm aware of.

11         Q.   Are the KNOWiNK poll pads ever connected

12     to E.M.S. servers?

13         A.   No.

14         Q.   Are there -- is there removal media, like

15     U.S.B. drives, that are connected to an E.M.S.

16     server and then also connected to a poll pad?

17         A.   I don't believe so.  I mean, poll pads

18     without an adapter couldn't accept a U.S.B.  But I

19     don't think there would be any reason for -- that a

20     poll pad would ever be -- would ever be connected

21     to an E.M.S. server.  I can't think of a scenario

22     where that would be -- need to be done.

23         Q.   Are E.N.R. servers at the county level,

24     are those separate from the E.M.S. servers?

25         A.   I don't -- what do you mean by "E.N.R.

1   server"?

2        Q.   Election night reporting where the

3   counties report election results, tabulation

4   results to the State.

5        A.   Yeah, those aren't -- those aren't done on

6   servers.  So that process is the E.M.S., the county

7   E.M.S. is, the data is copied from the E.M.S. on a

8   jump drive or something and then is uploaded to the

9   State for election night reporting purposes.  But

10  there's not a specific server that's involved in

11  any of that stuff.

12       Q.   How does the election data in any given

13  county get from the B.M.D. -- I'm sorry, from the

14  scanners to the E.M.S.?

15       A.   It's physically collected at the -- you

16  know, if you have a polling place, you physically

17  shut down the scanner or scanners.  You'd remove

18  the -- one of the memory cards.  And you would

19  physically transport it to the -- whether -- the

20  designated location is at the county where the

21  E.M.S. server is.  And then it would be manually

22  inserted into the -- into the E.M.S. server.

23       Q.   So the memory card on a scanner, that card

24  itself is manually inserted into the E.M.S. to

25  upload the data from that scanner?

1      A.   Yes.

2      Q.   And then how did -- how did the election

3   results get from the E.M.S. to the E.N.R. system?

4   Did you say that's a U.S.B. drive, typically?

5      A.   Yeah.  Typically, it would be U.S.B.

6   drive.  So you would -- you would get a copy of the

7   results from the E.M.S.  So the E.M.S. shows, you

8   know, a hundred votes for Joe and 101 votes for

9   Sam.

10       You would download that to a -- some type

11   of removal media and then take that and go to a

12   completely separate computer system that is

13   connected to the Internet, and then that data file

14   would be sent to the server that processes these

15   E.N.R. results.

16       And it would be -- it would eventually

17   come to our office, and we would publish it through

18   our election night reporting page.

19      Q.   And so when a county transmits election

20   results through the E.N.R. system, are those

21   transmitted over the Internet?

22      A.   Yeah.  The copies of the -- of the data

23   from the -- from the jump -- from the E.M.S. server

24   is transported over the Internet to the county --

25   to the State for the unofficial election night

1    reporting page.  But it -- but it never leaves the

2    E.M.S.  It stays on the E.M.S.  And what's on the

3    E.M.S. is the official -- the official vote.

4         Q.   Where do the counties get the U.S.B.

5    drives that they use to copy the election results

6    from the E.M.S. into the E.N.R. system?

7         A.   I think initially we sent them some U.S.B.

8    drives to do that.  I think we had -- we had talked

9    about having a procedure where we would send them a

10   new U.S.B. drive before every election and,

11   basically, have it be disposable.

12             I don't know if they -- if they adopted

13   that.  We hadn't had any other elections before I

14   left.

15        Q.   Okay.  So before you left, the counties

16   were typically reusing the U.S.B. drives instead of

17   getting new ones from the State for each election?

18        A.   They all got new ones for -- with the new

19   system, but I couldn't -- I couldn't tell you if

20   some counties may have reused them or used old

21   systems or got -- old drives or got new drives.

22        Q.   Who would you ask if you wanted to know

23   the answer to that question?  Is that a county

24   level question?

25        A.   I think you'd have to ask each county.

1      Q.   Was there a policy at the state level

2  about reusing U.S.B. drives with the election

3  system?

4      A.   We had talked about it.

5      Q.   Oh, this is the policy that you just

6  mentioned that you --

7      A.   Right.

8      Q.   -- might -- go ahead.  Sorry.

9      A.   Right.  And I had -- I had -- I was a

10 proponent of just sending them a new jump drive

11 when they get -- when they got all the rest -- the

12 rest of their election materials and just tell them

13 to, you know, either store it or destroy it or, you

14 know, after the election once everything was done

15 and it was -- it was -- you know, the time was fine

16 to reuse or -- the data, but just to send them a

17 new U.S.B. drive whenever they got an election

18 database from us.

19           But I don't know if they've done that or

20 if they've decided to do that or not.

21     Q.   If you wanted to know the answer to that

22 question, who would you ask?

23     A.   Either Blake Evans or Gabriel Sterling.

24     Q.   Okay.  Are you aware of whether Dominion

25 has the ability to access county E.M.S. servers

1    remotely?

2        A.   I don't believe they can do that, no.

3        Q.   So that's not something you heard of where

4    Dominion techs access E.M.S. servers remotely to

5    provide tech support for counties?

6        A.   No.  They -- my understanding is they

7    cannot do that.  Now, what I did see techs do is

8    they would sometimes, especially if a county was

9    far away and they couldn't get somebody there

10   quickly, they would have the person at the county

11   maybe use, like, a video on their phone or FaceTime

12   or something like that and show, you know, show the

13   screen, and the tech would be able to tell them,

14   okay, you need to check this box and uncheck this

15   box and it -- you know, update or whatever, and

16   they would walk them through that process.

17            But they could not -- they could not

18   access them remotely.

19       Q.   Okay.

20       A.   Because if they could have accessed them

21   remotely, they wouldn't have had to FaceTime them.

22       Q.   Got it.  Okay.  Thank you.

23            Take a look at Exhibit 10, if you would,

24   please.

25                         (Whereupon, Plaintiff's

Page 108

```
 1                        Exhibit 10 was marked for

 2                        identification.)

 3     BY MR. CROSS:

 4          Q.   And let me know --

 5          A.   If we could take -- if we could take,

 6     like, a five-minute break --

 7          Q.   Yeah.

 8          A.   -- that would be appreciated.  I'll get it

 9     loaded up.  And then, if you guys are good with

10     that, give me about --

11          Q.   Sure.

12          A.   -- five minutes.

13          Q.   You want to come back at 11:00?  Seven

14     minutes?

15          A.   Yeah.  That's plenty of time for me.

16          Q.   Okay.  Great.  Thank you.

17               THE VIDEOGRAPHER:  Okay.  The time is

18          10:53 a.m.  We're off the record.

19               (Whereupon, a discussion ensued

20           off the record.)

21               (Whereupon, there was a brief

22           recess.)

23               THE VIDEOGRAPHER:  The time is 11:07

24          a.m.  We're on the record.

25     BY MR. CROSS:
```

 1      Q.   All right, Mr. Harvey, do you have -- I

 2   think we're at Exhibit 10.  Do you have that in

 3   front of you?

 4      A.   I do.

 5      Q.   Okay.  Have you had a chance to look

 6   through it?

 7      A.   Yes.

 8      Q.   Okay.  Do you see that the most recent

 9   E-mail in Exhibit 10, this is one that you sent to

10   Jordan, is it Fuchs?

11      A.   It's pronounced Fuchs.

12      Q.   Fuchs?  Okay.  Thank you.

13           Do you see that Exhibit 10 is an E-mail

14   that you sent to Jordan Fuchs on February 25th of

15   2021?

16      A.   Yes.

17      Q.   And the subject line is ███████████

18   ███████████  with a forward, Call Follow-Up; right?

19      A.   Correct.

20      Q.   And why did you send this E-mail -- well,

21   before I get to that, let's get the whole context.

22           If you come down to the earliest E-mail in

23   the thread, do you see that that came from

24   Lathan -- Nathan Langmack at the F.B.I. on February

25   25th of 2021?

Page 110

1          A.   Yes.

2          Q.   And in Mr. Langmack's E-mail, if you look

3     at the bottom, there's a reference to "███████" in

4     his signature block?

5          A.   Yes.

6          Q.   Was Special Agent Langmack, was that one

7     of the people at the F.B.I. that you dealt with

8     from time to time regarding cybersecurity issues?

9          A.   No, it wasn't.  I don't -- at least not to

10    my knowledge.  I generally just dealt with one or

11    two people at the F.B.I.  And this may have been

12    the only communication I had with Agent Langmack as

13    far as I know.

14         Q.   So he indicates:

15              "████████████████████████████████

16    ██████████████████████████."

17              And then there are a few bullet points.

18    The second one concerns a ████████████.  Do you

19    remember anything about this phone call?

20         A.   Looking at this E-mail, I kind of remember

21    it.  I honestly don't remember much about it.  I

22    remember it happening, and I remember following up

23    with the counties and talking with Clint Walker at

24    C.I.S.A.  But I think this was -- I think we were

25    asked to be on a call with the F.B.I., and this is

Page 111

1    a follow-up to that.

2         Q.   What do you recall about this situation?

3         A.   ███████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ███████████████████████████████████████████████

8    ███████████████████████████████████████████████

9    ██████████████████████████████████████████

10   ██████████████████████████████████

11        ████████████████████████████████████████████

12   █████████████████████████████████████████

13   █████████████████████████████████████████

14   ██████████████████████████████████████████████

15   ████████████████████████████████████████████████

16        Q.   And in fact, if you look at the E-mail

17   where you forward this on, your -- you forward on

18   Special Agent Langmack's E-mail internally, then

19   actually you provide some context on the call where

20   you indicated ████████████████████████████████████

21   ██████████████████?

22        A.   Yes.

23        Q.   And you indicate ███████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████████

Page 112

```
 1   ████████████████████████████████
 2   ██████████████████████████.
 3          Do you see that?
 4     A.   Yes.
 5     Q.   And in the parenthetical you indicate that
 6   it's "██████████████████████████
 7   ████████████████████████."  Right?
 8     A.   Correct.
 9     Q.   Was there ever any determination by anyone
10   that investigated this at the state or federal
11   level or county level on whether this ██████
12   ████████████████████████████████
13   ██████████████████?
14     A.   My memory is that there was no
15   determination or -- that elections were compromised
16   at any time.
17          I believe, in talking with some of the
18   counties, they determined that it had been somebody
19   in their roads department or some other county
20   office that they were able to track it down to.
21   But it as -- the result of all this was that we
22   never got any information or indication that it had
23   compromised or affected elections in any way.
24     Q.   Now, I just want to make sure the language
25   is clear, because you said there was no
```

1    determination.  So let me ask a clear question.

2         Was there an affirmative determination

3    made based on an investigation that ███████████

4    ████████████████████████████████████████████████

5    █████████

6    A.    No, I don't think there -- I don't think I

7    ever saw a report to that effect.  What I was

8    stating, I guess, was the conclusion that...

9    Q.    Okay.  What can you tell me about the

10   investigation that was done to determine whether

11   ████████████████████████████████████████████████

12   ██████████████████████████████████?

13   A.    Well, we contacted all the counties and

14   had them follow up with us, and I believe they all

15   followed up back and reported that they had been

16   able to █████████████████████████████████████████

17   ████████████   ███████████████████████████████████

18   ██████████████████████████████████.

19        I know Merritt took it on the -- on the

20   Secretary of State's, you know, cybersecurity side

21   to see if there was anything -- I mean, the

22   Secretary of State wasn't identified as an agency

23   that had done this.

24        But he was certainly, he was on the call

25   and he was aware of the situation.  So he went and

Page 114

1    did whatever he would do to check our system.

2    And --

3        Q.   So if you look at -- oh, sorry.  Go ahead.

4        A.   That's kind of the end of it, after the

5    counties all followed up and basically said that

6    ████████████████████████████████████████████████

7    ████████████████████

8        Q.   So if you wanted to have a comprehensive

9    understanding of the investigation and its

10   findings, who would you ask?

11       A.   Probably Merritt Beaver and the county --

12   and the nine counties.

13       Q.   Okay.  Why did you include Jordan Fuchs on

14   your E-mail here regarding this incident?

15       A.   Well, she was the Deputy Secretary of

16   State and was my supervisor.

17       Q.   So you report directly to Ms. Fuchs, or

18   you did?

19       A.   Yes.  I did.

20       Q.   What is Ms. Fuchs's role and

21   responsibilities generally as the Deputy Secretary?

22       A.   I mean, I haven't seen her job

23   description, but it's -- basically, she dealt with

24   the different division directors, and she was sort

25   of the link between us and the Secretary.

1          As I've said before, I didn't have much

2     direct contact with the Secretary, and I would, you

3     know, keep -- generally keep Jordan apprised of any

4     situation that I thought he needed to know about,

5     or that he would want to know about or should know

6     about.

7          Q.   I see.  So Ms. Fuchs is sort of for the

8     directors, like when you were the elections

9     director, was she sort of the conduit for

10    information to the Secretary; is that fair?

11         A.   She was.  Yeah, she was more internally

12    focused, and the Secretary, I suppose he was sort

13    of universally focused or maybe a little bit more

14    exteriorly focused.

15         Q.   Okay.  How did you decide what to bring to

16    the attention of Ms. Fuchs or the Secretary himself

17    for things that arose when you were elections

18    director?

19         A.   I just used my judgment and experience and

20    knowing what -- you know, if it was something that

21    I thought was going to rise to a -- potentially be

22    an issue or be something that -- you know, she

23    dealt primarily with the media.

24              If she was going to get a call from a news

25    reporter or from somebody about something going on

1     in the office, I wanted her to hear it from me

2     before she heard from somebody else that something

3     was going on.

4          So I thought, if I thought she really

5     needed to know something, I would share it with

6     her.  But at the same time, I didn't want to, you

7     know, overload her with picayune issues that I

8     could generally handle -- we could handle

9     ourselves.

10          But it was -- but it was really a judgment

11     call based on, you know, working with her for a

12     while.

13     Q.   Did you generally rely on Ms. Fuchs to

14     determine what got elevated to the level of the

15     Secretary?

16     A.   I would say generally that would -- either

17     Ms. Fuchs or Ryan Germany, or both like in this

18     case.

19     Q.   All right.  Grab -- let's see.  What

20     exhibit are we up to?  All right.  Grab Exhibit 11,

21     if you would.

22                         (Whereupon, Plaintiff's

23                         Exhibit 11 was marked for

24                         identification.)

25     BY MR. CROSS:

Page 117

1      Q.   And just let me know when you've had a
2   chance to look at it.
3      A.   I've got it.  I'm reading it.
4           (Whereupon, the document was
5       reviewed by the witness.)
6           THE WITNESS:  Okay.  I've read it.
7   BY MR. CROSS:
8      Q.   All right.  So Exhibit 11, the most recent
9   is an E-mail from Kevin Rayburn to Jordan Fuchs,
10  copying Gabriel Sterling and Secretary
11  Raffensperger, on April 5th of 2019; correct?
12     A.   Yes.
13     Q.   If you come to the first E-mail in the
14  thread at the bottom of Page 3, do you see there's
15  an E-mail from an account Bret Solid at Gmail.com?
16     A.   Yes.
17     Q.   And that was sent to a generic "in" box at
18  the Secretary of State's office called S.O.S.
19  Contact, on April 4, 2019; right?
20     A.   Correct.
21     Q.   And the subject line is, ██████████████
22  ████████████████████████████; right?
23     A.   Yes.
24     Q.   And this person writes:
25           "████████████████████████████

Page 118

1 ████████████████████████

2 ████████████████████████

3 ████

4 ███████████████████████

5 █████████████████████

6 █████████  ████████████████

7 ████████████  ██████████."

8          Right?

9     A.    Correct.

10    Q.    And it's signed ████████; correct?

11    A.    Yes.

12    Q.    And then this is forwarded on to Russell

13 Lewis at the Secretary of State's office, with a

14 copy to you and Kevin Rayburn; right?

15    A.    Yes.

16    Q.    Who is Russell Lewis?

17    A.    He was the chief investigator at that

18 time.

19    Q.    Oh, did Frances Watson replace him?

20    A.    Yes.

21    Q.    Do you know where Ms. Watson is today?

22    A.    I believe she's working for the Department

23 of Revenue.

24    Q.    Oh, okay.  She's still a State employee,

25 just not the Secretary's office?

Page 119

1      A.   I be -- that was -- that was the plan.  I

2   don't -- but I know she's not at the Secretary of

3   State's office.  So.

4      Q.   Okay.  All right.  Mr. Rayburn writes

5   back:

6        ████████████████████████████████

7      ██████████████████████████  ███████████████

8      ████████████████████████████████████

9      ███████████████████████████"

10       Do you see that?

11     A.   Yes.

12     Q.   Then Mr. Germany indicates:

13       "████████████████████████████████████████████

14       ████"

15       Right?

16     A.   Correct.

17     Q.   And then if you come up to the first page,

18   there's an E-mail from MS-ISAC regarding the

19   situation on April 5th, 2019.  Do you see that?

20     A.   I do.

21     Q.   And here they indicate:

22       "████████████████████████████████

23       ████████████  ██████████████████████

24       ██████████████████████████████████

25       ██████████████████████████████████

Page 120

1    ████████████████

2       ████████████████████████████

3    ███████████████████████

4    ████████████████████████

5    ███████████████████████

6    █████████████████████████████

7    ████████████████████"

8         Do you see that?

9    A.   I do.

10   Q.   Tell me everything you recall about this

11   situation and any investigation that was done and

12   any findings.

13        A.   I vaguely remember this coming in.  And

14   this is an incident, like I mentioned before, we

15   would report to C.I.S.A. or MS-ISAC or EI-ISAC.  I

16   don't know what follow-up was done.  I don't re --

17   I don't recall what we did in follow-up.

18        Q.   Are you -- do you recall any findings, for

19   example, on whether ███████████████████████████████

20   ███████████████████████████████████████████

21   ██████?

22        A.   I don't believe we ever heard anything

23   else or ever had any other communications with this

24   person.

25        Q.   If you wanted to get a comprehensive

Page 121

1     understanding of this situation, the investigation

2     and any findings, who would you ask?

3         A.   I'd probably ask the chief -- the current

4     acting chief investigator, Jim Callaway, to see if

5     there's a -- an investigative file.

6              And maybe Merritt Beaver, he -- I don't

7     see him copied on much of this stuff.  Although I

8     do see him on some of it.  But those would be the

9     two people I would ask.

10        Q.   All right.  Let's look at Exhibit 12.

11    Give me one second.

12                       (Whereupon, Plaintiff's

13                       Exhibit 12 was marked for

14                       identification.)

15    BY MR. CROSS:

16        Q.   All right.  Exhibit 12 should come up.

17    Let me know when you have this and have a chance to

18    take a look at it.

19        A.   It's trying to refresh, but it's just

20    spinning.  Ah, here we go.  Let's see.

21             Okay.  I've got it up.  Let me read it.

22             (Whereupon, the document was

23          reviewed by the witness.)

24             THE WITNESS:  Okay.  I've read it.

25    BY MR. CROSS:

Page 122

1        Q.   All right.  Do you see the most recent

2    E-mail in Exhibit 12 is internal to Fortalice

3    Solutions on November 2nd, 2020; right?

4        A.   I do.

5        Q.   And I believe you mentioned this earlier.

6    Fortalice Solutions is an outside cybersecurity

7    consulting firm that the Secretary's office works

8    with; is that right?

9        A.   Correct.

10       Q.   Did you have many dealings with Fortalice

11   or was that other folks, like Mr. Beaver or

12   Mr. Hamilton?

13       A.   I had very few dealings with Fortalice,

14   and I would say no dealings with Fortalice outside

15   of the connection with Merritt Beaver or somebody

16   on his team.

17       Q.   All right.  If you take a look at the

18   earliest E-mail in the thread, the bottom of the

19   last page, do you see that this is an E-mail that

20   Frances Watson sent to Ryan Germany and Jordan

21   Fuchs in the Secretary's office and Ralph Jones at

22   Fulton County on October 29, 2020?

23       A.   Yes.

24       Q.   And there is a description of information

25   that was received by a poll worker.  Do you see

Page 123

1     that in the first line?

2         A.   Yes.

3         Q.   And then what's reported here from

4     Ms. Watson indicates:



23             Do you see that?

24    A.   I do.

25    Q.   Is this a situation that you're familiar

Page 124

 1    with?

 2        A.    I remember it.  So I mean, I have a --

 3    some familiarity with it.  I don't know a

 4    tremendous amount about it.

 5        Q.    Okay.  If you look at the bottom of the

 6    first page, the third E-mail there is one that Ryan

 7    Germany sent to you and others at the Secretary's

 8    office on October 29, 2020, forwarding this █████

 9    ████████████

10          Do you see that?

11        A.    Let me get to that.  What page is that on,

12    the -- an E-mail from Ryan Germany?

13        Q.    The bottom of the first page.

14        A.    Okay.  I see it.  Starts "████████████

15    ████████████████"?

16        Q.    Yes.

17        A.    Okay.

18        Q.    And you see that Mr. Germany included you

19    on that E-mail; right?

20        A.    Yes.

21        Q.    Okay.  So tell me everything you recall

22    about this situation.

23        A.    ██████████████████████████████████████

24    ████████████████████████████████████

25    ██████████████████████████████████████

Page 125

1  ███████████████████████████  ████████████

2  ██████████████████████████████████████

3       Q.   Who would you talk to to get a

4  comprehensive understanding of this situation, any

5  investigation or findings?

6       A.   I would say either Merritt Beaver, who

7  would presumably have the report from Fortalice,

8  and/or the Secretary of State investigations Jim

9  Callaway to see if they have an investigative

10  report.

11       Q.   Okay.  If you look at the third page,

12  there's an E-mail from it looks like Adrick or

13  Adrick Hall at the Secretary's office on October

14  29, 2020.  Do you see that?

15       A.   I do.  At 4:16?

16       Q.   Yes.  Wait.  Yeah, at 4:16 p.m., yes.

17  Thank you.  And Mr. Hall writes:

18            "████████████  ██████████████

19  ████████████████████████████

20  ████████████████████████████████

21  ████████████████████████████"

22            Do you see that?

23       A.   I do.

24       Q.   Would those ██████████████ typically

25  go into the investigative file?



Page 126

```
 1         A.   Yes, they would.

 2         Q.   Okay.  And he has, it looks like, in

 3    italics -- oh, no.  I'm sorry.  ████████████████

 4    ███████████████████████

 5              Mr. Hall writes in his second sentence:

 6              "███████████████████████████████

 7         ███████████████████████████████████"

 8              Do you see that?

 9         A.   Yes.

10         Q.   And then he goes on:

11              [As read]  "████████████████████████

12    ███████████████████████████████████████

13    ███████████████████████████████████

14    ███████████"

15              Do you see that?

16         A.   I do.

17         Q.   Is it customary for counties to have

18    Internet-facing laptops at poll sites during

19    elections?

20         A.   On a -- during advanced voting, it's

21    essential that they do so that they can mark voters

22    as having cast their ballots.  So that's, yeah,

23    that's essential during advanced voting.  This is

24    during advanced voting and not on Election Day.

25              On Election Day, they would not have -- I
```

Page 127

1    mean, conceivably they could have a laptop for some

2    other kind of communication with the County, but

3    the laptop wouldn't be connected to any of the

4    voting equipment that's going on.

5         Q.   Are poll pads not used for early voting?

6         A.   Poll pads are only used to encode voter

7    access cards during early voting.  They don't --

8    the poll pads during early voting don't have any

9    voter data on them.

10        Q.   I see.  Okay.  Got it.  Okay.  Thank you.

11             All right.  Let me pull up Exhibit 13.

12   Wait.  Shoot.  I forgot to put the exhibit label

13   on.  Let me just try to do that now.

14                       (Whereupon, Plaintiff's

15                        Exhibit 13 was marked for

16                        identification.)

17   BY MR. CROSS:

18        Q.   All right.  We'll have to do that later.

19   It shows up as Exhibit 13.  It just doesn't have

20   the label on it.  Let me know when you've got that.

21        A.   Okay.  I've got it.

22        Q.   Okay.  Do you see that there's an E-mail

23   here from, it says Do Not Reply at SOS.GA.gov, sent

24   to the same address, with the subject █████████

25   █████?

Page 128

1      A.    Yes.

2      Q.    Is The Buzz, is that one of the ways in

3   which the Secretary's office communicates with

4   counties on election-related issues?

5      A.    Yeah.  It's probably the primary way that

6   I would use to get a message out to all the

7   counties.  And then they would get it when I -- I

8   would post it on The Buzz, and then the counties

9   would get an E-mail saying there's a new Buzz post,

10  go check it out, and then they could read the

11  message.

12         It may -- it may actually -- I don't -- I

13  don't remember if it actually puts the message in

14  the E-mail or it just tells them there's a new Buzz

15  post from Chris Harvey, go check it out.

16         But that's how I would -- and in all the

17  discussions I've had before, all the answers, when

18  I say I would send stuff to the counties,

19  99 percent of the time it was like this.

20     Q.    And what, if any, steps were taken to

21  preserve relevant communications in The Buzz system

22  for this litigation?

23     A.    I don't think The Buzz has any type of

24  expiration or drop-off date, so it should all be

25  preserved.  I mean, that should be -- it should

Page 129

1    have been covered by the preservation order or the

2    preservation notice we sent out, but.  And it

3    should all still be there.

4         Q.   Do you know if any steps were taken to

5    search The Buzz system for documents to produce in

6    this case?

7         A.   I don't know.

8         Q.   All right.  If you take a look, the date

9    of this is September 25th, 2020, and the subject

10   line is ███████████████████████████████████████

11   ███████████

12          Do you see that?

13        A.   Yes.

14        Q.   And in the second paragraph -- you wrote

15   this; right?

16        A.   I did.

17        Q.   Okay.  The second paragraph, you wrote:

18          "████████████████████████████████

19       ██████████████████████████████

20       ████████████████████████████████

21       ███████████████████████████████

22       ███████████████████████████████

23       ██████████████████████████"

24          Do you see that?

25        A.   I do.

Page 130

```
 1        Q.   And this relates to the software change we
 2   discussed earlier that the State got -- or Dominion
 3   got E.A.C. approval for; right?
 4        A.   I believe so.
 5        Q.   Okay.  And so do I understand correctly,
 6   ████████████████████████████████████████████████████
 7   ██████████████████████████████, it was actually a
 8   software update to the operating software of the
 9   B.M.D.s?
10        A.   I believe that's correct.
11        Q.   Why did you believe at this time that it
12   was █████████████████████████████████████████████?
13        A.   I suspect that that's -- that's what I was
14   told.  I wouldn't have used the word "█████████"
15   you know, loosely.  ██████████████████████████████████
16   ████████████████████████████████████████████
17   ████████████
18             It may have been at the time when we got
19   the -- you know, it says -- at that point, you
20   know, I said I'd give you an update Monday.  It may
21   have been believed that we would have to have ████
22   ████████████ but I can't say specifically.
23        Q.   Did the counties have to conduct new L & A
24   testing after the software upgrade that occurred at
25   or around this time?
```

1         A.    I don't remember.

2         Q.    Based on your experience as elections

3    director, do you have an expectation one way or the

4    other as to whether they needed to do that?

5         A.    I don't, because I don't recall.  And I

6    didn't have -- and I wasn't part of the

7    understanding exactly what needed to be updated.

8              And so if it was -- if the -- if the

9    experts that knew about the operation of the

10   B.M.D.s and the displays and the databases would

11   have -- which would have been, you know, Michael

12   Barnes primarily and maybe somebody at Dominion,

13   you know, if they had indicated that there was no

14   need to do L & A testing, I would have gone with

15   that.  If they had recommended that they redo L & A

16   testing, I would have gone with that just based on

17   the nature of what the issue was, which I don't

18   remember right now.

19        Q.    Got it.  Okay.

20             All right.  Grab Exhibit 14, please.

21                       (Whereupon, Plaintiff's

22                        Exhibit 14 was marked for

23                        identification.)

24   BY MR. CROSS:

25        Q.    Let me know when you've had a chance to

1    take a look at it.

2            (Whereupon, the document was

3        reviewed by the witness.)

4            THE WITNESS:  Okay.  I've read it.

5    BY MR. CROSS:

6        Q.   All right.  Do you see that Exhibit 14 is

7    an E-mail that Scott Tucker sent to you and others

8    at the Secretary's office on October 19, 2020?

9        A.   I do.

10        Q.   And the subject line refers to Georgia

11    Advanced Voting 2020 October 19; right?

12        A.   I do, yes.

13        Q.   And for Mr. Sterling, he's got an E-mail

14    address here of Gabriel Sterling at Sterling

15    Innovative.  Do you see that?

16        A.   I do.

17        Q.   What was Mr. Sterling's role with respect

18    to Georgia elections when he was working at

19    Sterling Innovative?

20        A.   My understanding is that, when he started

21    at the Secretary of State's office, his position

22    was chief financial officer and then, when they

23    were looking for an implementation manager for the

24    new election system, is that he took a leave of

25    absence from the Secretary of State's office and

1    worked as a contractor for the Secretary of State's

2    office as the implementation manager for the new

3    voting system.

4         Q.   Do you know why --

5         A.   So that's why he had that --

6         Q.   Oh, I'm sorry.

7         A.   -- E-mail --

8         Q.   Go ahead.

9         A.   That's why he had that E-mail address.

10        Q.   Do you know why he didn't fill that role

11   as an employee of the Secretary's office instead of

12   as a contractor?

13        A.   I don't know.

14        Q.   Who would know the answer to that?

15        A.   Probably him.  Maybe Jordan Fuchs.

16        Q.   Based on your experience, who at the

17   Secretary's office would make that decision, would

18   approve that role?

19        A.   I would think Jordan Fuchs would have --

20   would have -- would have been part of that

21   conversation or whatever arrangement was made.

22        Q.   Okay.  All right.  So if we look at

23   Exhibit 14, Scott Tucker at Dominion Voting

24   Systems, what is Mr. Tucker's role with respect to

25   Georgia elections?

1      A.   He was really the primary liaison for

2   Dominion Voting System.  He was our kind of go-to

3   guy if we had a question about the system.  And he,

4   he sort of, he worked very closely with Michael

5   Barnes on the equipment, and so he was, you know,

6   troubleshooting Dominion issues and reporting back

7   to us, you know, things that they saw and heard.

8         Because they had, Dominion had techs in

9   every polling place.  And so sometimes the techs,

10  Dominion techs might call him and report something

11  or share something that either the county wouldn't

12  share or maybe they would both share it or maybe

13  just in communications the tech would tell him

14  something that maybe we didn't know otherwise.

15        So he would generally give us updates on

16  anything that he saw.

17      Q.   You mentioned Dominion has techs at every

18  polling place.  And that's every --

19      A.   I --

20      Q.   -- polling place involved --

21      A.   And I may have misspoke.  I know they had

22  one at every county.  I'm not positive they had one

23  at every polling place, so I may have misspoken

24  before.

25      Q.   And that was my -- I was going to try to

1    understand that.  About how many techs does

2    Dominion employ across the state of Georgia during

3    elections, approximately?

4         A.   Well, I know each county had at least one

5    when the system rolled out in early 2020.  Some of

6    the larger counties had more than one.  And so I

7    would -- and then as the, you know, elections went

8    on, there were some counties that would hire some

9    former Dominion techs as employees or contract with

10   them some other way.

11        So I would estimate there were probably,

12   you know, when they started with the techs, there

13   were probably maybe 200, 200 plus techs working in

14   Georgia for Dominion with -- directly with the

15   counties.

16        Q.   And did that number approximately continue

17   in your time as the elections director?

18        A.   I believe it did.  They may have even

19   added some as we got close to November.  But it --

20   and then I -- my understanding was that, after the

21   run-offs in 2021, after the Senate run-offs in

22   2021, Dominion would stop providing that service.

23        It was to be provided I think for the

24   first year, and then it was up to the counties to

25   hire techs or contract with other people to do it.

1    I believe that was the understanding.

2       Q.   Okay.  And that gets to what I want to try

3    and understand.  So the documents produced by the

4    State, it looks like typically, whenever there are

5    technical issues that arise with the B.M.D. system,

6    whether it's with the B.M.D.s, the scanners, the

7    printers, really any aspect of the system, they

8    typically turn to someone like Scott Tucker or

9    Dominion techs to help with that.

10          Is that generally how that worked, at

11   least through 2020?

12      A.   It depended.  They often did.  But Michael

13   Barnes would normally be the person that was -- he

14   was sort of our machine guy.  So he was working,

15   you know, side by side with Scott with several

16   people, too.  So it was kind of a joint effort, but

17   a lot of times it would be Dominion techs.

18          Now, a lot of times they would report

19   something to the counties, and the counties would

20   report it to us, and then we'd get both Michael

21   Barnes's and Dominion's team to work together to

22   figure out what the issue was.  So it was a -- it

23   was a very collaborative process.

24      Q.   What changed with respect to Dominion's

25   technical support responsibilities or the service

1     that it was providing at the end of that one-year

2     period that you mentioned?

3          A.   And I can't remember if it was -- if it

4     ended after the first year or if it ended -- if it

5     ends at the end of 20 -- well, I think it ended

6     maybe in 2021.

7               I know that most of the stuff that

8     Dominion -- that dealt with Dominion's stuff was

9     covered by the counties -- by the State for two

10    years with the counties.

11              So things like warranties and all that

12    stuff had a two-year life, so basically starting in

13    mid, I guess mid-2019.  I don't know if it went

14    back to when the contract was signed or after the

15    first election.

16              But support was going to drop off either

17    after one year or two years.  And at that point

18    counties would have to start either, you know,

19    doing it themselves or bearing the cost and working

20    with individual techs themselves.

21         Q.   So counties have, to your understanding,

22    the ability to contract, like, Dominion techs, for

23    example, at their own expense today; is that right?

24         A.   They, yeah, they have always had that

25    ability.  It's just Dominion provided a certain

1    number, usually one per county, maybe a few more.

2    Like, Fulton County may have gotten, you know,

3    three to five, DeKalb may have gotten, you know,

4    three or four.  But most counties would have gotten

5    one.

6          But they could have -- they could have

7    contracted with people themselves to have somebody

8    else if they wanted.

9    Q.   We talked about earlier an E-mail that you

10    had sent indicating that you need to protect

11    against bad actors who might be part of the -- who

12    might be an election worker or have access to the

13    election system that could to do things they're not

14    authorized to do.

15          Do you remember that discussion?

16    A.   I do.

17    Q.   In fact, one of -- one of the concerns the

18    Secretary's office has raised about hand-marked

19    paper ballots in our case is that an insider, as

20    they use that term, could alter ballots or even

21    throw out ballots.

22          Are you familiar with that?

23    A.   I'm not specifically familiar with what

24    they've said about that, but I know that that's, in

25    general discussions about election security, that's

Page 139

1    a -- that's a common thing to be aware of and

2    defend against.

3              (Whereupon, Ms. Conaway joined the

4         deposition.)

5    BY MR. CROSS:

6         Q.   What security checks or background checks

7    do Dominion techs go through before they are given

8    access to key components of the Georgia election

9    system?

10        A.   I don't know.

11        Q.   Who would you ask to find out?

12        A.   Dominion.  Scott -- I believe Scott Tucker

13   is still in that role, but I would ask him.

14        Q.   So that that, that security check is

15   something that the Secretary's office and the

16   counties rely on Dominion for; is that fair?

17        A.   I believe so, yes.  Yeah, I -- we -- now,

18   I don't know if counties may have done their own

19   checks.  I don't -- I don't believe I recall that

20   question coming up.  So I don't know if any county

21   may have done something else.  I sus -- you know, I

22   just don't know.

23        Q.   Well, the Secretary's office at least

24   relies on Dominion for the background checks on

25   Dominion techs; is that fair?

Page 140

1      A.   That's my understanding.  And I don't know

2    whether there's anything specified in the contract

3    about that or not.  That was kind of out of my

4    bailiwick.

5      Q.   Is there anyone at the Secretary's office

6    you would expect to be able to provide insight on

7    that?

8      A.   Gabriel Sterling.

9      Q.   All right.  Let's take a look at Exhibit

10   15.

11                     (Whereupon, Plaintiff's

12                     Exhibit 15 was marked for

13                     identification.)

14         (Whereupon, the document was

15       reviewed by the witness.)

16         THE WITNESS:  Okay.

17   BY MR. CROSS:

18     Q.   All right.  Do you see that exhibit --

19   what are we on, 15?  Yeah.  Do you see that, sorry,

20   do you see that Exhibit 15 is an E-mail from Kay

21   Stimson at Dominion that you received on November

22   8, 2020?

23     A.   Yes.

24     Q.   And the subject line is Voting Issue in

25   Georgia; correct?

Page 141

1      A.   Correct.

2      Q.   And the E-mail thread begins with an

3  E-mail from Jen Daulby, D-A-U-L-B-Y, on the same

4  date.  Do you see that?

5      A.   I do.

6      Q.   And are you familiar with Ms. Daulby?

7      A.   I believe I've heard the name, but no,

8  other than that.  The name sounds familiar, but I

9  couldn't tell you who she is.

10      Q.   And her E-mail is a -- looks to be an

11  official E-mail from the Georgia House; right?

12      A.   That's probably why her name is familiar.

13      Q.   In fact, she -- her signature line

14  indicates she's a Republican staff director for the

15  Committee on House Administration; right?

16      A.   Okay.

17      Q.   And then she writes here to Ms. Stimson at

18  Dominion Voting:

19           "We are having issues observing

20       the Georgia-7 race.  There have been

21       irregularities with machine counts,

22       and your techs are coming to reprogram

23       the machines."

24           Do you see that?

25      A.   I do.

1      Q.   Tell me everything you know about this

2   situation.

3      A.   I don't know anything about this specific

4   situation.  I can tell you that a lot of times,

5   when non-election people talk about machines and

6   doing things with machines, they often use

7   imprecise language that -- you know, reprogramming

8   and, you know, irregularities that are -- that are

9   very vague and may or may not be accurate.  But I

10  don't remember anything about this.

11     Q.   Who would you ask if you wanted to get a

12  comprehensive understanding of this situation and

13  any investigation or findings?

14     A.   I would check with the -- with Jim

15  Callaway at the Secretary of State to see if there

16  was an investigation.  I think that's where I

17  would -- that's where I would look.

18     Q.   Okay.  What is Ms. Stimson's role at

19  Dominion?

20     A.   I believe she's the head of their media

21  relations department.  I'm not exactly sure what

22  her title is, but I think she's one of their, if

23  not their prime, one of their primary public res --

24  public relations people.

25     Q.   Did you deal with Ms. Stimson from time to

1    time as elections director?

2         A.   I did.   I spoke with her, I would say

3    about half a dozen times maybe, and then a --

4    leading up to the election, and then probably a

5    couple times after the election.   But it wasn't

6    a -- it wasn't a real common thing for me to talk

7    with her.

8         Q.   What sort of issues did Ms. Stimson get

9    drawn into regarding Dominion and Georgia elections

10   in your experience?

11        A.   I think prior to the general election, our

12   conversations were about, you know, community

13   outreach and producing materials to go out to

14   voters or to put on our Web site that would help

15   familiarize people with the voting system.   Those

16   would have been most of the conversations.

17             Because we had a pretty vigorous education

18   campaign, really particularly before COVID hit,

19   where we were doing a lot of outreach, we were

20   doing a lot of public appearances and demonstration

21   on the machines and things like that.

22             And then, you know, after the election I

23   remember having a couple conversations with her,

24   but I don't know -- I don't really remember what

25   they were about.   I think it was mainly just a

Page 144

1    checking in to see how things were going, that kind

2    of stuff.

3        Q.   All right.  Mr. Harvey, again, if you

4    could just stay a little bit closer to the

5    computer.

6        A.   Sorry about that.

7        Q.   Yeah.  That's all right.

8             But in the E-mail here from Ms. Daulby at

9    the Georgia House where she indicates Dominion

10   techs are coming to reprogram the machines, do you

11   know what rights Dominion techs had with respect to

12   voting machines?  Like, do they have administrator

13   access, for example?

14       A.   They generally did not absent supervision

15   of the county election director or their designee.

16   The purpose of the techs was really to work

17   directly alongside county people so that they could

18   teach the county people how to do the stuff and

19   really to be more of a resource or a coach than an

20   employee to do stuff.

21            Now, in some cases, you know, they might

22   go out to a polling place to deal with something

23   like a jammed scanner that a poll worker couldn't

24   deal with.

25            But the idea behind the techs was not that

1     they were to -- they were to run the election or

2     anything like that, but they were to be there to

3     provide answers and instructions on stuff if the

4     County got stumped on how you do something.

5            A lot of the stuff was, you know, just

6     familiarization, re-teaching somebody, hey, this is

7     how you -- this is how you clear a jam in a

8     scanner, this is -- you know, that kind of stuff.

9            So I can't tell you what each individual

10    county, how they used their techs.  I -- you know,

11    some -- and you know, some counties had good

12    experiences with techs and ended up hiring them

13    after the trial period or the support period, but I

14    couldn't tell you exactly what type of

15    administrator rights they would have had.

16    Q.    Some Dominion techs did receive

17    administrator access to Dominion voting equipment;

18    right?

19    A.    I don't know that.

20    Q.    Oh, okay.  What about for the E.M.S., did

21    the Dominion techs have access at any level to

22    county E.M.S. servers?

23    A.    Again, that -- they -- you know, you'd

24    have to ask each county.  It certainly was the --

25    our expectation with the counties that they were to

Page 146

1    work with E.M.S.

2           Now, you know, they often would have the

3    techs at their side doing it, again, in some sense

4    maybe walking them through the process or

5    confirming that they were doing the right thing.

6    But it was -- it was our expectation of the

7    counties that the counties were doing that.

8           Now, you know, depending on how good

9    somebody was with the E.M.S. system, they may have

10   had more or less help with it from a tech.

11   Q.   Who at the state level has administrator

12   access to voting equipment in Georgia?

13   A.   Well, what -- I mean, that's a very big

14   question.  The -- as far as the local E.M.S. and

15   things like that, those would be county

16   restrictions.  So nobody at the state would have

17   access to, you know, Cobb County's E.M.S. password.

18          We would have -- I think state employees

19   might have access to the E.N.R. system to help a

20   county, like, if they got logged out or something

21   like that.

22          But generally speaking, the passwords and

23   the access to local election equipment are -- the

24   state election equipment that's operated by the

25   counties is a county issue that we wouldn't have.

Page 147

```
 1              I certainly didn't have a notebook that
 2    had, you know, county passwords or anything like
 3    that.  And nor do I believe anyone in the state
 4    did.
 5         Q.   Who has administrator access to components
 6    of the election system at the state level?
 7         A.   Well, I guess it depends on what
 8    components you're talking about.  For ENet it would
 9    generally be I would have access.  The assistant
10    administrator would have had access.
11              Merritt Beaver and/or people he designated
12    in his team would have had access.  I believe Kevin
13    Rayburn when he was the deputy would have had
14    access.  But a pretty small number of people for
15    the -- for the ENet system, and pretty much
16    everything else was local.
17              I mean, there were -- there are no other
18    really connected networks that talk to each other.
19    I mean, the Lowndes County E.M.S. didn't talk with
20    the -- anything at the state.  It had to be -- the
21    data had to be pulled from it and sent to E.N.R.
22    for us to get it.
23              So there wasn't -- there really weren't
24    statewide networks except for ENet.
25         Q.   Okay.  So you had passwords, you had
```

Page 148

1    administrator access to ENet; is that right?

2        A.   Correct.

3        Q.   What about the E.M.S., the state E.M.S.

4    server?

5        A.   There's -- what do you mean by "state

6    E.M.S. server"?

7        Q.   Well, my understanding is there are E.M.S.

8    servers at the county level that the counties rely

9    on, but there's also a state level, at least one,

10   maybe more than one, E.M.S. server as well.

11       A.   I'm not aware of that.  Michael Barnes

12   would be able to answer that.  But there's -- I

13   don't -- I don't think that's the case.

14       Q.   Okay.  All right.  Grab exhibit, I think

15   we're up to 16, please.

16                        (Whereupon, Plaintiff's

17                         Exhibit 16 was marked for

18                         identification.)

19            THE WITNESS:  I'm reading it now.

20            (Whereupon, the document was

21         reviewed by the witness.)

22            THE WITNESS:  Okay.

23   BY MR. CROSS:

24       Q.   Oh, and before we look at this document,

25   just a follow-up on what we were talking about, did

1      the State provide security policies to the counties

2      for how to manage access to passwords for

3      components of the election system?

4          A.   I don't think we -- I don't think we

5      issued specific guidelines other than sort of the

6      standard, you know, admonitions to, you know, keep

7      them secure, don't put them on a Post-it note on

8      the monitor, that kind of thing.  I don't think

9      there was a specific password protection policy or

10     something that we had.

11         Q.   And so there's not, like, a state level

12     policy that indicates who at the county level or at

13     any level is allowed to have access to

14     administrator passwords for the election system?

15         A.   No, there's not.

16         Q.   That's something the counties determine

17     themselves?

18         A.   Correct.

19         Q.   All right.  Take a look at Exhibit 16, if

20     you would.  The -- at the top of Exhibit 16, this

21     is an E-mail that you sent to Scott Tucker and

22     David Greenwalt on November 17, 2020; correct?

23         A.   Yes.

24         Q.   Okay.  And if we come down, this thread

25     originates with an E-mail from David Greenwalt at

Page 150

1    KNOWiNK on November 13, 2020.  Do you see that?

2         A.   I do.

3         Q.   And it concerns an update to the firewall

4    rules for the poll pads; right?

5         A.   Yeah.  For the -- for the Meraki, which is

6    the secure -- I talked before about when they --

7    when they're uploading material into the poll pads.

8    It's done under the protection of this Meraki

9    system.

10        Q.   So the Meraki system is some sort of

11   secure system that sits on the poll pad?

12        A.   No.  It's installed in the location where

13   the county updates their poll pads.

14        Q.   Got it.  Okay.

15             Is it installed on, like, a computer or a

16   server?

17        A.   No.  It's installed, I think it's

18   installed in a -- in a building almost like a --

19   like you'd plug in, like, a network extender or

20   something like that.  I think it's a -- it's a

21   free-standing device.

22        Q.   I see.

23             And what's the security the Meraki

24   provides?

25        A.   I'm not sure.  I don't know all the

Page 151

1     technical or any of the technical specifications of

2     what the Meraki does.  But I know it provides

3     security for when the poll pads are receiving the

4     uploads of the voter lists.

5                 Merritt Beaver would --

6          Q.   This is -- sorry.  Go ahead.

7          A.   I was going to say, Merritt Beaver would

8     be able to explain how it works.

9          Q.   Is it essentially a firewall protection?

10    And if you don't know, that's fine.

11         A.   I don't know.  I don't know if it's a -- I

12    don't know if it's -- no, I don't know.

13         Q.   Okay.  That's fine.

14                All right.  Take a look at, after

15    Mr. Greenwalt's E-mail comes out, there's an E-mail

16    from Wanda Burke at a Gmail address to you,

17    forwarding Mr. Greenwalt's E-mail on November 17,

18    2020.

19                Do you see that?

20         A.   I do.

21         Q.   And Ms. Burke in her signature block

22    indicates that she's a Jenkins County probate

23    judge.  Do you see that?

24         A.   I do.

25         Q.   Do you know why a Jenkins County probate

1    judge received Mr. Greenwalt's E-mail about

2    updating the firewall rules for the poll pads?

3        A.   Well, I don't think she received his

4    E-mail.  His E-mail was sent to tech support

5    Nicholett Jones and Samantha Sims.

6        Q.   Right.  But if you look at her -- at the

7    thread, it goes from his E-mail to her E-mail, and

8    the subject line you can indicate -- you can see is

9    a forward.  So she's forwarding Mr. Green --

10       A.   Okay.  That may have been forwarded by

11   somebody else, but okay.  I see what you're saying.

12       Q.   I see.

13            So as you sit here, you don't, you just

14   don't know how Ms. Burke received this?

15       A.   Correct.

16       Q.   All right.  Okay.

17       A.   And Ms. Burke is the election

18   superintendent.  In about 35 counties in Georgia,

19   the probate judge is the election superintendent.

20       Q.   Ah, okay.  All right.  So it wouldn't be a

21   surprise that she would have this E-mail, then,

22   because she's --

23       A.   No, I --

24       Q.   -- the election --

25       A.   Yeah, she's the -- she's the county

1      election superintendent in Jenkins County.

2          Q.   Okay.  All right.  Thank you.  That's

3      helpful.

4              All right.  So if you look at her E-mail,

5      she writes to you:

6              "I have not received anything from

7          the Secretary of State stating we

8          would receive anything about updating

9          our firewall."

10             She references the message below.  She

11     then goes on:

12             "Is this something that the State

13         has approved.  My I.T. department

14         wanted verification before they

15         proceeded."

16             She then goes on in the next paragraph:

17             "Also, a lady came to my office

18         while I was at a funeral today stating

19         she was here to wipe out everything in

20         my adjudication program from the last

21         election.

22             [As read]  "I have not been

23         notified by Secretary of State that

24         anyone had the authority to touch my

25         E.M.S. system.  My clerks would not

Page 154

1          allow her to have access."

2               Do you see that?

3          A.   I do.

4          Q.   And then you forward this on to Scott

5     Tucker and David Greenwalt on November 17.  Do you

6     see that?

7          A.   I do.

8          Q.   And then you ask in the last question:

9               "Are both of these things

10         generated by you?"

11              Do you see that?

12         A.   I do.

13         Q.   Tell me everything you recall about this

14    situation, including a woman coming in to the

15    Jenkins County election office wanting to wipe

16    their adjudication program and getting access to

17    the E.M.S. system?

18              MR. RUSSO:  Objection the form.

19         Lacks foundation.

20              THE WITNESS:  I don't remember much

21         about it except seeing the E-mail.  I

22         remember seeing the E-mail.  But as to

23         what may have -- how it was resolved or

24         what it was determined, I don't have any

25         memory of how -- what was done after this.

Page 155

1    BY MR. CROSS:

2         Q.   Who would you ask?

3         A.   I would ask Scott Tucker and James

4    Greenwalt.

5         Q.   Was this the kind of thing that would get

6    referred to Mr. Callaway's department or then

7    Frances Watson's department?

8         A.   It depends.  It depends on what they would

9    have told me.  And they may have E-mailed me back

10   or they may have picked up the phone and called me.

11             If it was -- if it was some kind of

12   misunderstanding in talking with Judge Burke and,

13   you know, we were able to figure out that, okay,

14   this is really what happened, it may not have been.

15             If it was, you know, if it was determined

16   that we didn't send anybody there to do anything,

17   then that would have been the kind of thing to have

18   gone to investigations.

19        Q.   Okay.  But you --

20        A.   But you had --

21        Q.   Sorry.  Go ahead.

22        A.   You had -- you had, you know, you had

23   Dominion, you had KNOWiNK, you had us, a lot of

24   communication going back and forth, and sometimes

25   one of the other groups would get out ahead of us.

1            And we had tried to, and were generally

2     pretty successful but not always, of getting

3     Dominion or KNOWiNK or anybody to let us know about

4     changes or things they needed to do, because we

5     wanted to be the trusted source of information that

6     the counties relied on.

7            And if we told them that, hey, somebody's

8     going to come to do this, we wanted to let them

9     know so that they would -- they would feel secure

10     in doing that.

11     Q.    Would it have been unusual for KNOWiNK or

12     Dominion to send someone to an election county --

13     I'm sorry, to a county election office to wipe

14     everything on -- in an adjudication program from a

15     prior election?

16     A.    Yeah.  That would not have been -- that

17     would not have been something I would have expected

18     to see.

19            If something would have needed to have

20     been done, you know, like that, and I can't imagine

21     why anything like that would need to happen, that

22     would be something that they would coordinate with

23     their tech and ideally with us so that we could

24     say, hey, this is the problem, this is what they're

25     going to do, and it's okay.

1          Which is -- which is why I sent the E-mail

2     saying, hey, you know, please let us know if you're

3     sending stuff out to the counties that we need to

4     know about.

5          Q.   Okay.  Want to do one more exhibit before

6     lunch or you want to break now?

7          A.   We can do one more.

8          Q.   Okay.  All right.  Take a look at Exhibit

9     17, if you would, please.

10                         (Whereupon, Plaintiff's

11                         Exhibit 17 was marked for

12                         identification.)

13          (Whereupon, the document was

14           reviewed by the witness.)

15          THE WITNESS:  Okay.

16     BY MR. CROSS:

17          Q.   All right.  Do you see -- do you see that

18     Exhibit 17 is an E-mail that Scott Tucker of

19     Dominion sent you and some other folks on November

20     17, 2020?

21          A.   Yes.

22          Q.   Who is -- so Blake Evans is the person who

23     replaced you in your role; right?

24          A.   Yes.  But at the time -- okay, yeah, he

25     was working with us, yeah.  Blake at that -- at

Page 158

1    this time he would have been the deputy director.

2        Q.   Were -- was there a time where Blake Evans

3    was working with you guys at the Secretary's office

4    but was not an employee?

5        A.   No.  Blake Evans had worked at Fulton

6    County before he came to work for us.  I think he

7    came to work for us in July of 2020.

8        Q.   Okay.

9        A.   And I was looking at the date, and for

10   some reason I was thinking it was 20 -- he hadn't

11   come here yet, but I'm getting my '20s and '21s

12   mixed up.

13       Q.   The pandemic will do that to you.

14       A.   Yeah.

15       Q.   So Mr. Evans is on this E-mail, and

16   Mr. Barnes we've talked about.  The other recipient

17   is Gabrielle Holland.  Who is that?

18       A.   At the time she was an attorney working in

19   the Secretary of State's -- she was the elections

20   attorney working in the Secretary of State's

21   office.

22       Q.   So that's Gabrielle Holland; is that

23   right?

24       A.   Correct.

25       Q.   Okay.  All right.  So briefly on this, if

1    you look at the first E-mail in the thread, the

2    bottom of the first page continuing to the top of

3    the second, this is an E-mail that Scott Tucker at

4    Dominion sent only to you, with the subject line

5    Memory Cards, on November 17, 2020; right?

6        A.   Yes.

7        Q.   He writes to you --

8        A.   You said November 17th; right?

9        Q.   Yes.  November 17th.

10       A.   Yeah.

11       Q.   And he writes to you:

12            "Chris, is there a rule or law

13        that states how long the counties need

14        to retain the memory cards from the

15        scanners before being reused?"

16            Do you see that?

17       A.   I do.

18       Q.   And he indicates:

19            "Clarke County is looking at

20        buying additional cards because of a

21        45-day retention period."

22            Do you see that?

23       A.   I do.

24       Q.   And then you respond to him the same day,

25    and that's when you add Ms. Holland and Mr. Barnes

Page 160

1    and Mr. Evans.  Do you see that?

2        A.   I do.

3        Q.   And you write:

4             "The period to request a recount

5         is two business days after

6         certification..."

7             And then you quote an S.E.B. rule on

8    memory cards; right?

9        A.   Yes.

10       Q.   Did you have any understanding as to

11   whether memory cards used in elections during the

12   pendency of this litigation, whether those were

13   required to be preserved for the purpose of this

14   case irrespective of the time lock under the S.E.B.

15   rules?

16       A.   Can you ask that again, please?

17       Q.   Sure.  Yeah.  Sorry.

18            So we talked before, you understand -- in

19   fact, it's one of the topics that you're designated

20   on as a corporate rep concerns the efforts that the

21   Secretary's office made to preserve information for

22   this litigation; right?

23       A.   Yes.

24       Q.   All right.  Do you have any understanding

25   as to whether the Secretary's office and anyone

1    acting at their direction had an obligation to

2    preserve memory cards for elections that occurred

3    during the time of this lawsuit?

4         A.   I don't believe that that was my

5    understanding, that we were required to preserve

6    all memory cards from elections that would be going

7    forward.

8         Q.   Do you have any understanding as to

9    whether you were required to preserve the data on

10   those memory cards, such as copying it to another

11   media?

12        A.   I don't think so.

13        Q.   And is it customary for counties to reuse

14   memory cards from one election to the next to cut

15   down on costs, for example?

16        A.   Yes.

17        Q.   Do I understand right, when a memory card

18   is reused, the data from the prior elections would

19   be lost, right, on the memory card?

20        A.   In the old system, not necessarily.  On

21   the old -- the old system, I believe it could be

22   recovered.  I don't know whether that's the case in

23   the new system.

24        Q.   So they -- so in the old system at least,

25   they -- the counties typically would not wipe a

Page 162

1      memory card before reusing it; is that your

2      understanding?

3           A.   Right.  My understanding is, when they --

4      when they would format them for a new election, the

5      old data would still be on there.  It would just

6      kind of refresh them with the new -- with the

7      ability to receive new information is my

8      understanding.

9           Q.   And you just don't know one way or the

10     other whether that holds for the B.M.D. system?

11          A.   That's correct.

12          Q.   Okay.  All right.  You want to take a

13     break now?

14          A.   Sure.

15               MR. CROSS:  Okay.  So well, let's go

16          off the record.

17               THE VIDEOGRAPHER:  The time is 12:20

18          p.m.  We're off the record.

19               (Whereupon, a discussion ensued

20           off the record.)

21               (Whereupon, there was a luncheon

22           recess.)

23               THE VIDEOGRAPHER:  The time is 12:50

24          p.m.  We're on the record.

25     BY MR. CROSS:

1      Q.   Mr. Harvey, did you have any

2  responsibility with respect to audits in the state

3  election audits?

4      A.   I would say I had responsibility in that

5  we had to do them, but generally those details were

6  carried out by people that worked with me.

7      Q.   Okay.  Do I understand right that the

8  Secretary's office entered into a contract with

9  VotingWorks to help with audits, election audits?

10      A.   I know -- I know we worked with them.  I

11  don't know any details of a contract, but I assume

12  there was something.

13      Q.   And VotingWorks uses a system called Arlo;

14  is that right?

15      A.   That's correct.

16      Q.   And for the audits that have been done to

17  date, election audits in the state, they've used

18  Arlo, at least in part, for the audit; right?

19      A.   Yeah, we did that in -- after the November

20  election, we used VotingWorks and Arlo.

21      Q.   Do you know negotiated the contract

22  between the Secretary's office, or whoever, between

23  the State of Georgia and VotingWorks?

24      A.   I don't.

25      Q.   Who would you ask if you wanted to know?

Page 164

1       A.   Gabriel Sterling.

2       Q.   Somebody needs to mute.  Let's see.

3            Okay.  Do you know what the compensation

4   arrangement is between Georgia and VotingWorks for

5   any audit services VotingWorks provides?

6       A.   I don't.

7       Q.   Is that something you expect Mr. Sterling

8   to know?

9       A.   I would.

10      Q.   Okay.  The audit of the presidential

11  election in 2020, what involvement did you have in

12  that?

13      A.   I pretty much, my main job was to

14  communicate with the counties and kind of get the

15  counties on board and informed as to how it was

16  going to go, that was my main role, and then while

17  it was going, to receive feedback from them or hear

18  concerns or issues or problems and stuff like that.

19      Q.   Who designed the protocol that was used

20  for that audit?

21      A.   I think it was mostly VotingWorks.

22      Q.   So your understanding is that the

23  Secretary's office and the counties largely relied

24  on VotingWorks to determine what methods or

25  procedures would be used for that audit?

1      A.   No.  I -- Secretary Raffensperger decided

2      to do the hand recount.  So that was -- that was

3      the -- that was the form of the audit.  Now, in

4      terms of how best to accomplish that, we worked

5      with VotingWorks and other people to come up with a

6      manageable way for the counties to do it.

7      Q.   Okay.  What went into the decision,

8      Secretary Raffensperger's decision to do the hand

9      recount or audit of the 2020 presidential election?

10     A.   I don't know.

11     Q.   Who would know that?

12     A.   Probably Ryan Germany, Gabriel Sterling

13     and Jordan Fuchs and the Secretary.

14     Q.   Okay.  So no one ever explained to you the

15     reason that that was done?

16     A.   We -- no, I would say no, nobody ever sat

17     down and explained why this was being done, but I

18     understood why it was being done.

19     Q.   What was your understanding?

20     A.   That due to the closeness of the race and

21     the concern that that was the -- I mean, we had to

22     do one risk-limiting audit under the statute, and

23     that was clearly the one with the most interest and

24     consequence.

25          And I sup -- I mean, not that I was asked,

1    but I supported the decision.

2        Q.    And the audit we're talking about looked

3    at the human readable portion of the ballots; is

4    that right?

5        A.    That's correct.

6        Q.    And do you have an understanding as to why

7    a decision was made by Secretary Raffensperger to

8    do that rather than just rescan the ballots and

9    rely on the Q.R. code tabulation?

10       A.    I don't know -- I don't know the reason he

11   decided to do that, no.

12       Q.    Well, what did the audit of the human

13   readable portion offer that scanning the Q.R. codes

14   did not in terms of validating the election

15   outcome?

16       A.    It allowed, you know, independent people

17   to evaluate the ballot and determine the, you know,

18   the voters' intent based on what was printed out.

19   And so it was a -- it is, an audit as a way of

20   comparing to the Q.R. code that was used in the

21   original election and then the recount.

22       Q.    I guess what I'm -- sorry.  I guess what

23   I'm not getting, Mr. Harvey, is what does

24   tabulating the ballots based on the human readable

25   text offer voters that they don't get from a

1    tabulation of the Q.R. code?

2        A.   It would confirm or confound the reading

3    of the Q.R. code.  And so if you -- if you scan

4    them and you come up with a number for the Q.R.

5    code and then you go back and you count them by

6    hand and see if that number is, you know, the same

7    or very close or very disparate, and then you

8    could, you know, depending on what the result is,

9    you could, you know, deal with whatever that issue

10   was.

11       Q.   But if the expectation is that the

12   election system is reliably tabulating the Q.R.

13   code, why does tabulating the human readable

14   portion offer anything more to voters?

15       A.   Well, it -- when you do an audit, my

16   understanding of an audit is it's designed to,

17   again, either confirm results or to show that

18   there's some problem with the results.

19            So you would want an alternative method to

20   independently, as independently as possible,

21   compare to the first run, you know, the Q.R. code

22   produced these results, let's use an alternative

23   method that -- and then see if we get the same

24   results.

25            And if you do, it tends to be a

Page 168

1    confirmation.  If you don't, it indicates that

2    there's some disconnect somewhere.

3        Q.   Are you aware that the Dominion equipment

4    that the State currently has, the scanners are

5    capable of tabulating the human readable portion of

6    the B.M.D. printed ballots?

7        A.   Ask that again, please.

8        Q.   Sure.  So and just to break it down if it

9    helps, the B.M.D. ballot that con -- that's printed

10   in the current system has a Q.R. code and it's got

11   a human readable portion; right?

12       A.   Correct.

13       Q.   And right now the system tabulates the

14   Q.R. code; right?

15       A.   Correct.

16       Q.   Are you aware that the Dominion scanners

17   that are used in the current system are capable of

18   tabulating the human readable portion of the

19   ballot?

20           MR. RUSSO:  Objection to form.

21           THE WITNESS:  No, I'm not.

22   BY MR. CROSS:

23       Q.   That's not something anyone ever told you

24   as the elections director for Georgia?

25       A.   I don't believe so.

1      Q.   So that may dictate the answer to the next

2   question, but I'll ask it anyways.  Do you have any

3   insight or understanding as to why Georgia

4   tabulates the Q.R. code rather than using the same

5   equipment to tabulate the human readable portion of

6   the ballots?

7           MR. RUSSO:  Objection to form.  He

8           said he didn't know if the machine could

9           tabulate based on the human readable form.

10          THE WITNESS:  No, I don't.

11   BY MR. CROSS:

12      Q.   Are you aware of any discussion or

13   consideration at the Secretary's office on whether

14   to tabulate the human readable portion with the

15   existing system?

16      A.   I'm not aware of any.

17      Q.   Okay.  The audit that was done on the

18   presidential election in 2020 in Georgia, do I

19   understand correctly that, during that audit, no

20   one compared the human readable portion of a

21   specific ballot to how the Q.R. code on that ballot

22   was tabulated?  Right?

23      A.   That's correct.

24      Q.   Do you know why that was, that that was

25   not done?

Page 170

1       A.   I don't think there would be any way to

2   have a record of identifying how this particular

3   ballot that I'm holding in my hand during the audit

4   was scanned.  So I don't -- I don't think there's a

5   way to do that even if you wanted to.

6       Q.   Well, there were two different things done

7   to try to verify the presidential election in

8   Georgia in 2020.  One was the manual read or audit

9   of the human readable portion and the other was

10  rescanning the Q.R. codes; right?

11            MR. RUSSO:  Objection to form.  Lacks

12       foundation.

13            THE WITNESS:  Yeah.  We did both.

14  BY MR. CROSS:

15       Q.   Right.  And so one of the things that

16  could have been done was election workers could

17  have read the human readable portion of a ballot

18  and then scanned that ballot and see how the

19  scanner tabulated the Q.R. code and whether it came

20  up with the same selections that are on the human

21  readable portion.

22            That could have been done with a random

23  sample of ballots; right?

24       A.   I suppose it could have been done.

25       Q.   Do you know why that was not done?

Page 171

1    A.   No.

2    Q.   Are you aware of any discussion or

3    consideration of whether to do that?

4    A.   I -- no, I don't believe so.

5    Q.   You said that --

6         THE VIDEOGRAPHER:  I'm picking up

7    somebody's --

8         MR. CROSS:  Yeah.  Hey, Hannah?

9         MR. RUSSO:  That's not on our side.

10        MR. CROSS:  No, no.  Hannah, you need

11   to mute.

12        THE VIDEOGRAPHER:  I went ahead and

13   muted.

14        MR. CROSS:  Okay.  Thanks.  All

15   right.  Sorry about that.  And Hannah's

16   with us, by the way.

17   BY MR. CROSS:

18   Q.   Mr. Harvey, you mentioned that one of the

19   things that you did with respect to the audit was

20   that you received concerns or feedback from the

21   counties; is that right?

22   A.   That's correct.

23   Q.   What were the concerns and feedback that

24   you received from counties about the 2020

25   presidential audit?

1      A.    I think most of them had to do with,

2   excuse me, with questions about observers and

3   monitors and spacing and more the logistics of, you

4   know, how many people can come in, what -- how

5   restrictive, how free, that kind of stuff.  Those

6   were -- those seemed to be most of the questions

7   and comments I got.

8      Q.    Didn't some of the counties raise a

9   concern on whether the State rules actually allow

10   an audit of every single ballot?

11            MR. RUSSO:  Objection.  Form.

12            THE WITNESS:  I don't recall that.  I

13       don't recall that happening.

14   BY MR. CROSS:

15      Q.    Well, the state election rules say that an

16   audit has to use a random sample of ballots; right?

17            MR. RUSSO:  Objection.  Form.

18            THE WITNESS:  I don't have the rules

19       memorized.  I don't know that.

20   BY MR. CROSS:

21      Q.    You just don't recall one way or the

22   other?

23      A.    I don't.

24      Q.    Okay.  But to be clear, the audit that was

25   done for the 2020 election did not use a random

1    sample, they -- the effort was to review the human

2    readable portion of every ballot; is that right?

3        A.   That's correct.  It was to review every

4    single ballot using the human readable form.

5        Q.   Who made the decision to do that rather

6    than doing a risk-limiting audit that would apply

7    statistical sampling to some set of ballots?

8        A.   The discussions about that were that the

9    likelihood, because the margin was so close, that

10   to do a statistical sample would require multiple

11   efforts to do that because -- and again, many

12   people know more about the statistics of a

13   risk-limiting audit than I do.

14          But the concerns that, due to the

15   tightness of the race, doing a risk-limiting audit

16   would likely result in the need to pull a second

17   batch and likely need to pull a third and multiple

18   samples until you, you know, would likely end up

19   doing every ballot anyway, and it would take a

20   significant longer amount of time to do that rather

21   than just doing all of them.

22       Q.   Oh, so at least one of the concerns was

23   that a risk-limiting audit using a random sampling

24   of ballots would take longer than just doing a

25   manual review of the human readable portion of all

Page 174

1    ballots?

2        A.   I think that was one of the

3    considerations.

4        Q.   Okay.  The validity or the accuracy of the

5    audit results depend on the accuracy of the human

6    readable portion of each ballot in terms of whether

7    it actually reflects the intended selections of the

8    voter; right?

9        A.   Ask that again.  I --

10       Q.   Yeah.  Sorry.  It was kind of a long

11   question.  So for the -- for an audit that relies

12   on the human readable portion of a ballot, okay,

13   for that audit to be reliable, the human readable

14   portion of each ballot has to accurately reflect

15   what the voters intended when they voted on that

16   ballot; right?

17            MR. RUSSO:  Objection.  Form.

18            THE WITNESS:  I'm just trying to kind

19       of wrap my head around that question.  So

20       when you're doing the audit, you're

21       relying on what's on the ballot, the human

22       readable portion of the ballot.

23            And I -- so I suppose what you're

24       asking is is that -- do we have a way to

25       know that that was the voter's intent?  Is

1          that what you're asking?

2     BY MR. CROSS:

3          Q.   Part of it, yes.

4          A.   Okay.  I think part of the audit is to

5     work with the -- with the evidence, with the facts

6     you have in front of you and say these are -- this

7     is the audit result of the ballots we examined.

8               I think there's a presumption that they're

9     legitimate, bona fide ballots that were lawfully

10    cast and done by voters who had the right to vote,

11    if that's what you're asking.

12         Q.   Well, and there's a presumption that the

13    human readable portion of the ballot accurately

14    reflects each of the selections that each voter

15    made on that ballot; is that right?

16         A.   I think that's a reasonable presumption.

17         Q.   Okay.  And you agree, in fact, I think

18    you've spoken about this, that voter verification

19    of their B.M.D. ballots is very important; right?

20         A.   It is.

21         Q.   And it's important because we want to make

22    sure to the presumption we just discussed as best

23    we can that any given ballot accurately reflects

24    what the voter intended when they voted on the

25    B.M.D.; is that fair?

Page 176

1        A.   Yes, I agree with that.

2        Q.   Are you aware of the study the Secretary's

3   office commissioned that actually looked or

4   examined voter verification during 2020 elections

5   in Georgia?

6        A.   I'm aware that there was going to be a

7   study.  I don't know that I ever saw results.

8        Q.   So you -- well, I'll ask if you know.  Are

9   you aware that that study found that the vast

10  majority of voters in actual Georgia elections in

11  2020 spent little to no time reviewing their

12  ballots before they were cast?

13            MR. RUSSO:  Objection.  Form.  I

14       think he just said he didn't see the

15       results.

16            THE WITNESS:  I don't know that.

17  BY MR. CROSS:

18       Q.   Would that surprise you?

19       A.   I guess it depends on -- I'd want to know

20  more about how the characterization was done about

21  what qualified as little to none.

22       Q.   Would it surprise you that half of Georgia

23  voters in 2020 elections spend only a second, one

24  second or so reviewing their ballots before casting

25  them?

1          MR. RUSSO:  Objection to form.  Lacks

2     foundation.

3          THE WITNESS:  I'm not sure it would

4     surprise me.

5  BY MR. CROSS:

6     Q.   And why not?

7     A.   I think, and this is just my opinion, but

8  I think many people are interested in the top of

9  the ticket, you know, races and they can glance,

10  they can confirm that's good, and then they're less

11  interested about down-ballot races would be my

12  hypothesis.

13     Q.   Okay.  Is it fair to say that the State

14  and the counties don't have any way to require

15  voters to carefully verify each selection of their

16  ballot before it's cast?

17     A.   Can you ask that again, please?

18     Q.   Sure.  Let me just ask you this way.  Are

19  you aware of any means available to the State or

20  counties that can require each voter who votes on a

21  B.M.D. to carefully confirm that every selection on

22  the human readable portion of the ballot is

23  accurate?

24          MR. RUSSO:  Objection to form of the

25     question.

1           THE WITNESS:  I don't think there's

2      any authority to do that.  I don't think

3      there's any legal authority to require

4      somebody to review their ballot.

5  BY MR. CROSS:

6      Q.   Okay.

7      A.   I know we did -- we did encourage.  We put

8  up notices.  But I think that's -- I think that's

9  it.

10     Q.   Okay.  Why was only the 2020 presidential

11 election audited in 2020?

12     A.   Well, the law required one risk-limiting

13 audit.  Again, I think that the -- to -- you

14 couldn't audit more than one election at a time.

15 And so you're talking about a lot more work and a

16 lot more time, especially at a time when the

17 counties were trying to get ready for the Senate

18 run-off and the P.S.E. run-off.  I don't know if

19 that was ever considered.

20     Q.   And I was going to ask you, are you aware

21 of any discussion or consideration at the

22 Secretary's office to audit any election beyond

23 just the presidential election in 2020?

24     A.   No, I don't believe so.  No.

25     Q.   Was there a view in the Secretary's office

1    that the audit that was done of the presidential

2    election would help give voters more confidence in

3    the results of that election?

4        A.   I think so.  I think that's a -- I think

5    that's a fair -- yeah, I think that's fair.

6        Q.   Okay.  What's your basis for your belief

7    you couldn't, the State and the counties could not

8    conduct more than one audit of an election within

9    the same window before the results have to be

10   certified?

11       A.   Well, we couldn't do it the way we did

12   this one.  I'm not saying there's not another way,

13   a more complex way that would have been done.  But

14   to, you know, to do it for the first time at that

15   scale with those numbers with everything that had

16   gone on and everything that was yet to come, it

17   would have had to be a much more complex

18   calculation or evaluation.

19       Q.   I see.  You're --

20       A.   But I'm not saying it couldn't --

21       Q.   Sorry.

22       A.   I was saying I'm not saying it couldn't

23   have been done.  It would have just been -- and I

24   suspect it would have taken a lot more preparation,

25   training and time to do it, to do one if it could

1   be done.  I'm not sure it couldn't be done.  I'm

2   not sure it could be done; I'm not sure it couldn't

3   be done.

4        Q.   Okay.  If the current B.M.D. system had a

5   vulnerability where a voter could hack a B.M.D. in

6   just a few minutes in the voting booth, right,

7   plugging a device in, like a U.S.B. drive, and that

8   vulnerability, nothing had been done once it came

9   to light to mitigate that vulnerability, would that

10  give you concern as a voter about voting on that

11  B.M.D. --

12       A.   So --

13       Q.   -- or on any B.M.D. in that system?

14       A.   If a B.M.D., if I knew that a B.M.D. had

15  been hacked before I used it, it would give me

16  great concern.

17       Q.   What if you didn't know that it had been

18  hacked but you understood that, on any B.M.D.

19  anywhere across the state, a voter could walk in,

20  plug in a U.S.B. device, upload malware to it and

21  walk out while they were purporting to vote

22  themselves, would that give you a concern as a

23  voter?

24       A.   If that were true, yes, I think it would

25  give me concern.

Page 181

1      Q.   And would you expect measures to be taken

2   to mitigate or eliminate that vulnerability?

3      A.   Yes.

4      Q.   Did you help collect documents for

5   production in this case?

6      A.   No.

7      Q.   So do you know whether any of your own

8   documents, E-mails, things on your -- you said you

9   have a personal drive on the Secretary's server.

10  Do you know whether documents were collected for

11  this case from those sources?

12     A.   You know, I -- there may have been

13  document -- to go back to the previous question,

14  there may have been documents that I did give to --

15  would have given them, I think, to Ryan Germany.

16          I can't think that there would have been

17  much that wasn't on my computer if there was -- if

18  there was anything.  I honestly don't know if I

19  did.  But if I did, it wouldn't have been much,

20  but.

21          So I don't know that -- I don't know what

22  was done with my computer or my personal drive or

23  any of that.

24     Q.   So just so I understand, so you never, for

25  example, had a conversation with the Secretary's

Page 182

1      counsel to sort of talk them through where they

2      might find documents, like your personal drive,

3      your personal laptop, to --

4              MR. RUSSO:  I'm --

5      BY MR. CROSS:

6          Q.    -- locate those documents?

7              MR. RUSSO:  And I'm just going to

8          object to the extent he's not a 30(b)(6)

9          witness on that topic.  I mean, it's topic

10         17.  But otherwise, if it's, you know, in

11         his personal capacity you're asking him

12         this, that's different.

13             THE WITNESS:  And just to be clear,

14         when I say "my personal drive," I don't

15         mean, like, my personally owned drive.  I

16         mean my -- every employee had their own

17         designated drive on the thing.

18             So I'm not talking about a personal

19         computer or personal drive or anything

20         like that.  And that may have been the

21         wrong use -- the word to use.

22             But to answer the question, I

23         don't -- I don't recall any conversations

24         about -- you know, because again, everyone

25         had a personal drive, and everybody had a

Page 183

1          desktop or a laptop.  I don't believe I

2          had conversations with people about, hey,

3          you can find this here, you can find that

4          there.

5               Merritt Beaver had access to all of

6          our -- the whole network.  He could look

7          in E-mail boxes and personal drives and

8          desktops and all that kind of stuff.

9     BY MR. CROSS:

10         Q.   Okay.  Are you aware of any, written or

11    unwritten, formal or informal, rule at the

12    Secretary of State's office not to put concerns or

13    complaints about the election system in writing?

14              MR. RUSSO:  Objection to form.

15              THE WITNESS:  There's certainly no --

16         there's certainly no written rule that I'm

17         familiar with.

18              I know that it's not uncommon

19         practice to often have phone calls about

20         the election system, frankly because

21         it's -- you know, we'd all have carpal

22         tunnel syndrome if we typed out the

23         E-mails, because they tend to be pretty

24         complex, and it just saves time.

25              But no, I'm not aware of a -- of --

Page 184

1      there's certainly nothing formal.  And I

2      mean, just I can only imagine how many

3      E-mails, you know, you all got from me.

4      You saw that I sent, you know, and

5      received hundreds of E-mails in the course

6      of a week.

7           But frankly, in many cases I'd pick

8      up the phone and call someone just because

9      it was much easier to have a conversation

10     about it rather than somebody sends me an

11     E-mail, and then I send it back asking for

12     clarification, and then they clarify my

13     questions, and then we go back and forth

14     and we spend, you know, 15, 20 minutes

15     writing an E-mail about something that,

16     oh, I didn't -- I didn't mean this, I

17     meant that.

18          So no.  And so personally, no.  But

19     again, I don't know that there's any

20     informal system or any informal plan that

21     you don't talk about the system in written

22     form.  But I know that, in my case, I

23     tried to do as much face-to-face or

24     person-to-person communication as I could.

25  BY MR. CROSS:

1      Q.   There was never to your knowledge any sort

2   of informal or casual guidance to state workers or

3   county workers not to put concerns or complaints

4   about the election system in writing?

5      A.   Oh, you mean internally?  Externally?

6   Anywhere?

7      Q.   Yeah.

8      A.   No.  I'm not -- I'm not aware of that.

9      Q.   Sorry.  I'm trying to pull up another

10   document, but the Exhibit Share just crashed, so

11   I'm pulling it back up.

12          All right.  Grab Exhibit 18, if you would,

13   please.

14                      (Whereupon, Plaintiff's

15                      Exhibit 18 was marked for

16                      identification.)

17   BY MR. CROSS:

18      Q.   So just let me know when you've had a

19   chance to look at it, Mr. Harvey.

20          (Whereupon, the document was

21       reviewed by the witness.)

22          THE WITNESS:  Okay.

23   BY MR. CROSS:

24      Q.   All right.  Do you -- do you see that

25   Exhibit 18 is an E-mail that -- is it Tom Feehan?

Page 186

1    Is that how you say the name?

2        A.    Yes.

3        Q.    Tom Feehan sent you this E-mail, along

4    with Blake Evans and Scott Tucker, on January 7,

5    2021.  Do you see that?

6        A.    Is that the first one?  Yes.

7        Q.    And then in the subject line, it's a

8    forward, but the subject line reads We Have a

9    Problem; right?

10       A.    Yes.

11       Q.    Okay.  If you come to the first E-mail in

12   the thread, which starts at the bottom of Page 2,

13   do you see that's from Randy Howard at Sumter

14   County?

15       A.    Yes.

16       Q.    And he writes to Robin Carr at the

17   Secretary's office; right?

18       A.    Yes.

19       Q.    Mr. Howard is indicated on the E-mail as

20   the supervisor of elections for Sumter County;

21   right?

22       A.    That's correct.

23       Q.    And who is Robin Carr?

24       A.    She was an election liaison that would

25   have covered that part of the state.

Page 187

1        Q.   Okay.

2        A.   So she was the primary contact for an

3    election director in her region if they had an

4    issue so I didn't have 159 people calling me.  They

5    would call her first, or E-mail her or whatever.

6        Q.   Okay.  And so you see that the Sumter

7    County supervisor of elections wrote to Ms. Carr on

8    January 6th, 2021:

9            [As read]  "I was just informed

10            that my Dominion tech could not come

11            back to assist me.  I understand this

12            will effect a number of counties."

13            He goes on in the third paragraph:

14            "I have depended on her to run the

15            tabulator and help with the report to

16            Secretary of State.  I have not had

17            the time to train on this equipment."

18            Do you see that?

19        A.   I do.

20        Q.   Was it customary or common for counties to

21    depend on Dominion techs to run the election

22    tabulator?

23        A.   Well, like I said before, different

24    counties had different levels of proficiency and

25    experience.  And some, as I said before, some of

1    them relied on them more than others.

2         So I wouldn't say it was -- it was common

3    that they would -- that they would rely so heavily

4    on the techs, but I know there were some counties

5    that did.

6    Q.   Okay.  So there was no state policy, for

7    example, that prohibited that; is that right?

8    A.   That -- no, there was no -- as I said

9    before, the expectation was that the counties were

10   running the elections, the techs were not running

11   the elections, and that the techs were there to

12   assist and train the county people in how to use

13   the equipment.

14   Q.   So by January of 2021, the B.M.D. system

15   had been used in several pilot elections in 2019

16   and had been used for all elections throughout 2020

17   in Georgia; right?

18   A.   Yes.

19   Q.   Do you know why the supervisor of

20   elections in Sumter County as of that time still

21   had not had time to train on the tabulator for the

22   new B.M.D. system?

23   A.   I don't know specifically why he didn't

24   have time to train.  I know that the county

25   election directors were under tremendous

1    unprecedented strain and trying to do things like

2    recruit new poll workers, find alternate polling

3    locations, deal with a massive influx of absentee

4    ballots.

5         And so I know they were -- these were not

6    normal times to be learning a new system while

7    everything else was going on.  But I don't know

8    specifically why Randy Howard felt like he didn't

9    have time to train.

10   Q.   But you actually received pretty regular

11   concerns or communications from county officials

12   that, even into the November 2020 elections, that

13   they and their staff still had not been fully

14   trained on the new system; right?

15   A.   And what was the time frame you mentioned

16   again?

17   Q.   Through the end of 2020, even into the

18   November 2020 elections, you were still receiving

19   fairly regular communications and concerns from

20   county election officials that they and their staff

21   had not yet been fully trained on the new system.

22   A.   Well, I know that there was -- there was a

23   lot of anxiety with the thought of losing the

24   techs.  I don't know that -- I mean, every county

25   had received training.

1          So again, we sent the techs to the

2     counties, and we -- after the counties attended the

3     training with the understanding that, look, this

4     tech support is going to end at a -- at a certain

5     time and you have to be ready to pick it up and run

6     with it unless you're going to hire some people to

7     help you.  And that's exactly what some counties

8     did that felt they weren't up to the task.

9          But no, I don't disagree with the premise

10    that there were some counties that, by the end of

11    2020, still felt overly reliant on some of their

12    techs.

13    Q.   And if we look back at Exhibit 18, if you

14    look at the bottom of Page 1, you'll see there's an

15    E-mail from Scott Tucker to you and others at the

16    Secretary's office on January 7, 2021 forwarding

17    the exchange below.

18          Do you see that?

19    A.   I do.

20    Q.   And Mr. Tucker writes:

21          "Thanks for calling me about this,

22     Blake.  We have talked with the

23     regional manager and will get someone

24     on-site to assist as needed."

25          Do you see that?

Page 191

1       A.   I do.

2       Q.   And he goes on to indicate:

3            "...yesterday we had all

4        contractors leave sites, but we are

5        back to business as usual."

6            Do you see that?

7       A.   I do.

8       Q.   And the date of this is January 7, 2021;

9   right?

10      A.   Yes.

11      Q.   Do I understand correctly that Dominion

12  had all of their contractors leave election sites

13  on January 6 because of the insurrection at the

14  Capitol that occurred that day?

15           MR. RUSSO:  Objection to the form of

16      the question.

17           THE WITNESS:  You know, I don't

18      know -- I don't -- I don't remember why

19      they left.  I thought -- I thought it may

20      have had something to do with COVID,

21      but...

22  BY MR. CROSS:

23      Q.   Well, Mr. Tucker indicates that they had

24  all their contractors leave on January 6, and by

25  the morning of January 7 they were already back to

Page 192

1    business as usual.

2        A.   Okay.

3        Q.   Right?

4             And so as the elections director for

5    Georgia, you don't recall whether Dominion pulled

6    all of their Dominion techs on January 6 because

7    they were worried about their safety given the

8    violence that played out at the Capitol that day?

9             MR. RUSSO:  Objection.  He's -- asked

10           and answered.

11           THE WITNESS:  So I don't remember

12           them telling me that.

13   BY MR. CROSS:

14       Q.   Well, when you got this E-mail indicating

15   that Dominion had pulled all their contractors for

16   the day of January 6, you didn't ask them why?

17           MR. RUSSO:  Objection.  He's already

18           said he doesn't know why.

19           THE WITNESS:  I don't know if I

20           followed up -- I don't know if I followed

21           up with Dominion after that, if they were

22           all back to work.  I just don't know if I

23           had a conversation with Tom or Scott

24           Tucker.

25   BY MR. CROSS:

Page 193

1        Q.   Well, January 6 was right after an

2    important Senate run-off in Georgia, wasn't it?

3        A.   Yes.

4        Q.   And so as the elections director for the

5    state, it wasn't a really big deal to you to find

6    out that Dominion had pulled all of their

7    contractors the -- across the state the day after a

8    major Senate run-off?

9        A.   Again, I don't remember this.

10       Q.   You don't even remember it happening?

11       A.   I --

12            MR. RUSSO:  Asked and answered.

13            THE WITNESS:  I don't.  I mean, I, as

14       I read the E-mail, I just don't remember

15       what I did -- what I did, if anything.

16            You notice that Blake Evans was

17       communicating with them.  He, you know, he

18       may have handled it.  I just, I don't

19       recall what I did, but -- that's it.

20   BY MR. CROSS:

21       Q.   Are you aware of any -- maybe I know the

22   answer because you say you don't remember it, but

23   I'll ask to confirm.  Are you aware of any

24   discussion or consider -- strike that.

25            Are you aware of any discussion at the

Page 194

1      Secretary's office expressing any concern about

2      Dominion pulling all contractors on January 6?

3          A.   No.

4          Q.   Are you aware of whether this information

5      was conveyed to Jordan Fuchs?

6          A.   No, I'm not.

7          Q.   Do you know whether this was conveyed to

8      Secretary Raffensperger?

9          A.   I don't know.

10         Q.   If you wanted to understand what happened

11     here with Dominion pulling its techs on January 6,

12     who would you ask?

13         A.   I'd ask Scott Tucker.

14         Q.   Who would you ask at the Secretary's

15     office that you think might know?

16         A.   Blake Evans or Gabriel Sterling.

17         Q.   And are you offering the view that you

18     don't think this had anything to do with the

19     violence at the Capitol on the January 6, or are

20     you just saying you don't know one way or the

21     other?

22              MR. RUSSO:  David, it's getting

23         harassing at a certain point.  He said he

24         doesn't -- he doesn't know why they left.

25              THE WITNESS:  Yeah, I'm -- I don't

1          know.  I mean, this was the day -- the day

2          after the election, and I may have been --

3          I may have been tied up in other meetings.

4               It's 10:00 in the morning, so it may

5          not have -- I don't know when it came to

6          my attention.  I mean, like, I've gotten,

7          you know, hundreds of E-mails.  It could

8          have been later in the day before I

9          acknowledged it or noticed it.  I just

10         don't remember.

11    BY MR. CROSS:

12         Q.   Did the violence at the Capitol on January

13    6th have any implications for you personally when

14    you were still the elections director in Georgia?

15              MR. RUSSO:  Objection.  It's not

16         relevant.

17              THE WITNESS:  I received a threat

18         prior to that.  I think I certainly took

19         notice of it.

20              You know, as a matter of fact, as

21         I -- as I think about it now, I think I

22         was -- I think I was actually in

23         deposition prep while all this stuff was

24         going on because -- and I think I was

25         speaking with our attorneys.

```
 1              I think there was a deposition or
 2       something that was getting ready to go,
 3       because I remember leaving that meeting
 4       and I had gotten a bunch of texts from a
 5       family member asking if I was okay and not
 6       understanding what was going on.
 7              So I think it was later in the
 8       afternoon before I even knew that January
 9       6th had happened.  So that's kind of
10       coming back to me now.
11              So while all this stuff was going on,
12       with your previous questions, I think I
13       was basically incommunicado doing
14       deposition prep.
15              But getting back to the other
16       question, right, did it have any effect on
17       me or did I -- what was your question
18       again about the effect January 6th had on
19       me?
20  BY MR. CROSS:
21  Q.   I was trying to understand whether the
22  events that occurred on January 6th and the
23  motivation for those events, whether that had any
24  personal impact on you.
25              MR. RUSSO:  I'm going to, again,
```

Page 197

```
 1        object to the question, to the form of the

 2        question.  What do you mean "the

 3        motivation for the events"?

 4   BY MR. CROSS:

 5        Q.   Do you understand the question,

 6   Mr. Harvey?

 7        A.   I sort of do.  Is the -- are you asking me

 8   what effect it had on me personally witnessing or

 9   being aware of what happened on January 6th?

10        Q.   No.  So let me ask this.  Are you -- are

11   you familiar with what's now become known in sort

12   of common parlance "The Big Lie" coming out of the

13   Trump campaign that the 2020 election was stolen?

14        A.   I'm aware of that, yes.

15        Q.   And do you have a personal view on whether

16   that is true or false?

17             MR. RUSSO:  I'm going to object to

18        the form.  It's not relevant.  I mean,

19        unless you're asking, I guess, to the --

20        are those people the same ones who think

21        the Dominion machines were hacked.

22             MR. CROSS:  I don't know what you're

23        talking about, Vincent.  But if you don't

24        stop coaching the witness, we're going to

25        get on the phone with the judge.
```

```
 1            You can --

 2            MR. RUSSO:  That's fine.

 3            MR. CROSS:  -- say objection to

 4       form --

 5            MR. RUSSO:  David, you keep ha --

 6            MR. CROSS:  -- and that's it.

 7            MR. RUSSO:  David, you keep harassing

 8       him.

 9            MR. CROSS:  All right.

10            MR. RUSSO:  It's not relevant.

11            MR. CROSS:  Relevance is not even an

12       appropriate objection and --

13            MR. RUSSO:  David, you keep harassing

14       him.

15            MR. CROSS:  -- I'm not --

16            MR. RUSSO:  You keep harassing --

17    BY MR. CROSS:

18       Q.   Go ahead, Mr. Harvey.

19            MR. RUSSO:  -- him, David.  I don't

20       think -- I don't think the judge would

21       find it amusing either.

22    BY MR. CROSS:

23       Q.   Go ahead, Mr. Harvey.

24            MR. CROSS:  You don't think it's

25       relevant whether the former elections
```

Page 199

```
 1          director of the state of Georgia believes

 2          that the presidential election over which

 3          he had responsibility was stolen?

 4               Go ahead and put that statement on

 5          the record for me, please, Mr. Russo,

 6          because you've already said it.  So why

 7          don't we go on with the deposition.

 8    BY MR. CROSS:

 9         Q.   Mr. Harvey, my question to you is this.

10    You served as the former head of elections for the

11    State of Georgia.  Do you, sir, believe based on

12    your experience in that role that the presidential

13    election in November of 2020 was stolen, that the

14    outcome as reported is not accurate?

15               MR. RUSSO:  And I'm going to go ahead

16          and object again, David.  It's --

17               MR. CROSS:  Stop.

18               MR. RUSSO:  It is not --

19               MR. CROSS:  State your objection.

20          One more word and we're calling the judge.

21          This is inappropriate.

22               MR. RUSSO:  Let's call.  Let's call.

23          We need a -- let's go ahead and call her.

24          Please.

25    BY MR. CROSS:
```

Page 200

1     Q.   Go ahead, Mr. Harvey.

2     A.   I know that the election was not stolen in

3   Georgia.  I can't speak for any other state, but I

4   am ultimately very confident in the Georgia

5   results.

6     Q.   Thank you.

7          And what's the basis for that belief?

8     A.   Largely, it's the -- it's the hand count.

9   It's the hand count audit with the recount, knowing

10   the general integrity and the work of the county

11   election officials and knowing that our system is

12   secure.

13     Q.   Are you familiar with a phone call that

14   former President Trump made to Secretary

15   Raffensperger asking about finding votes in that

16   election?

17          MR. RUSSO:  Object to the form of the

18          question again.  There's no foundation.

19          THE WITNESS:  Through news reports,

20          yes.

21   BY MR. CROSS:

22     Q.   And you anticipated where I was going.  Do

23   you have any knowledge about those events that you

24   learned through your role at the Secretary of

25   State, meaning not through public news reports?

1        A.   I would say no.  I mean, I -- I may have

2    had a conversation or two with people about it, but

3    nothing other than I think -- I don't remember if I

4    heard it first in the news or somebody mentioned

5    that President Trump had called Secretary

6    Raffensperger, but I didn't have any discussions

7    with anybody about what was said or -- other than

8    general, you know, hey, what was it about.

9             But no, it was -- it was almost all from

10   news reports.

11        Q.   Based on your experience as the elections

12   director in Georgia in 2020, do you have any basis

13   to believe that the presidential election outcome

14   was wrong based on the results reported from any

15   state?

16        A.   So are you asking me if I believe the --

17   ask that question again, please.  I lost you --

18        Q.   Yeah.  You --

19        A.   -- about halfway through.

20        Q.   Sorry.  Yeah.  You said that you believe

21   that the election outcome for the presidential

22   election in 2020 in Georgia was accurate, and I

23   just, I'm following up.

24             Based on information that you -- available

25   to you while you were the elections director in

Page 202

1    Georgia, do you more broadly have any basis to

2    believe that the presidential election was wrong?

3         MR. RUSSO:  Objection.

4         THE WITNESS:  I don't.  I don't have

5         any reason to believe it was wrong.  But I

6         certainly haven't examined evidence from

7         other states.  But no, the answer is no, I

8         don't believe the results were wrong.

9    BY MR. CROSS:

10        Q.   Okay.  All right.  Take a look at, you

11   should have Exhibit 18 in front of you.

12        MR. RUSSO:  And David, I need to take

13        a five-minute break at about 1:55 or just

14        to -- just to swap out with Carey again,

15        because I've got another work matter to

16        deal with at 2:00.

17        MR. CROSS:  Okay.

18        THE WITNESS:  David, are we on 18?

19   BY MR. CROSS:

20        Q.   Hold on.  Let me make sure I've got the

21   right thing here.  Sorry.  18 is what we just

22   looked at; right?

23        A.   Right.

24        Q.   Sorry.  Let me get the right one.

25        A.   Okay.  I'm only still seeing 18 on my

Page 203

1    list.

2         Q.   Yeah.  Sorry.  For some reason, ever since

3    Exhibit Share crashed, it is kind of hanging up.

4    Yeah, sorry, it's just not working right.  It's

5    really annoying.

6              THE VIDEOGRAPHER:  Would you like to

7         go off the record, Mr. Cross?

8              MR. CROSS:  No, I'll figure it out.

9         It used to be you just click on the

10        document and it'll give you the option to

11        introduce, but it's not doing it anymore.

12        I have to right click.

13              Yeah.  Sorry.  Let's go off the

14        record.  I don't know what this is doing

15        now.

16              THE VIDEOGRAPHER:  The time is 1:46

17        p.m.  We're off the record.

18              (Whereupon, a discussion ensued

19         off the record.)

20              THE VIDEOGRAPHER:  The time is 1:49

21        p.m.  We're on the record.

22    BY MR. CROSS:

23         Q.   Okay.  Mr. Harvey, grab Exhibit 19.

24                        (Whereupon, Plaintiff's

25                         Exhibit 19 was marked for

Page 204

```
 1                    identification.)
 2    BY MR. CROSS:
 3        Q.   And just let me know when you've had a
 4    chance to read through it.
 5        A.   I've got it.  I'm looking at it.
 6        Q.   Okay.
 7             (Whereupon, the document was
 8         reviewed by the witness.)
 9             THE WITNESS:  Okay.
10    BY MR. CROSS:
11        Q.   All right.  Do you recognize Exhibit 19 as
12    an E-mail from Ryan Germany on July 16, 2019?
13        A.   I do.
14        Q.   And this is to Secretary Raffensperger,
15    Jordan Fuchs, Mr. Beaver, yourself and others at
16    the Secretary's office; right?
17        A.   Yes.
18        Q.   Okay.  If you'd come down to the bottom --
19    or sorry, the top of the second page, do you see
20    the first E-mail is from Leslie Reynolds at
21    SSO.org?
22        A.   Yes.
23        Q.   Do you know who that is?
24        A.   I think she's the executive director of
25    the National Association of Secretaries of State.
```

Page 205

1        Q.   All right.

2        A.   I believe that's the case.

3        Q.   And you see the subject line of her E-mail

4   refers to N.A.S.S., and that's the National

5   Association of Secretaries of State; right?

6        A.   Correct.

7        Q.   And it refers to their elections

8   committee.  Do you see that?

9        A.   I do.

10        Q.   And her E-mail refers ██████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████   right?

13        A.   Actually, it was -- my understanding is

14   not the ████████████████████████████████████

15   ███████████████████████████████████████

16   ████████████████████████████████████████████

17   ██████████████ --

18        Q.   Okay.

19        A.   -- ████████████████████████████████████

20   ████████████████████████████████████

21        Q.   Okay.  Are you familiar with ████████████

22        A.   Only through this interaction.  I had -- I

23   don't believe I had heard of, I'll say them.  I

24   don't know if it's an individual or a group -- I

25   think it's a group, but it may be sort of run by an

Page 206

1    individual that -- so I'm just familiar from sort

2    of this association, this brief association.

3        Q.   Do you know how █████████████████████

4    ████████████████████    ████████████████████

5    ████████████████████████

6        A.   No.  I think this was -- my recollection

7    was that ██████████████████████████

8    ███████████████████████████████████

9    ███████████████████████████████████

10   ████████████████████████████████████████

11   █████████████████████████████████████████

12   ██████████████████████████

13            █████████████████████████████

14   ███████████████████████████████

15   ███████████

16       Q.   ██████████████████████████████████████

17   █████████████████████████████████?

18       A.   I don't think I did.  I think they -- █

19   █████████████████████████████████████

20   ██████████████████████████████████████████

21   ███████████████████

22           █████████████████████████████████████

23   ██████████████████████████████████████████

24   ██████████████

25       Q.   So the E-mail that Mr. Germany sends to

Page 207

```
 1    you and others, do you see in the first line he

 2    writes:

 3              "███████████████████████

 4         ███████████████████████████████

 5         ██████████"?

 6              Do you see that?

 7    A.   I do.  Give me one second.  I just --

 8    Q.   Sure.

 9    A.   -- I lost the thing.

10         Okay.  I got it back.  Okay.  So yeah.

11              "████████████████████████

12    ██████████████████████████████████

13    █████████"

14    Q.   Right.  And the timing there, if I -- if

15    my memory serves correctly, this was just before a

16    preliminary injunction hearing we had in our case

17    regarding election security.

18              Do you recall whether that's what he was

19    referring to?

20              MR. RUSSO:  Object to form.  Lacks

21         foundation.

22              THE WITNESS:  I don't -- I don't know

23         specifically.  I mean, I went to court so

24         often, I don't remember what specifically

25         the "court" was talking about.
```

Page 208

1    BY MR. CROSS:

2         Q.   Okay.  And then he goes on and he writes

3    "Chris" -- and that's directed at you; right?

4         A.   Yes.

5         Q.   And he writes:

6              "███████████████████████████

7         ███████████████████████████████████

8         ██████████████████████████████

9         █████████████████"

10             Do you see that?

11        A.   I do.

12        Q.   Did you reach out to them?

13        A.   I did not.  I think I had further

14   discussions with Mr. Germany about it, and we

15   decided not to.  Or they decided not to release

16   the -- whatever it was they were going to release.

17             But I don't recall ever seeing what their

18   report for Georgia was or any -- anything else.

19        Q.   And then Mr. Germany also wrote here to

20   Secretary Raffensperger and you and others

21   regarding this anticipated report:

22             "████████████████████████

23         ████████████████████████████████████

24         ███████"

25             Do you see that?

Page 209

 1     A.   I do.

 2     Q.   What was the reason for an assumption that

 3   ████████████████████████████████████████████

 4   ████████████████████████████████████████████?

 5          MR. RUSSO:  Object to the form.

 6          If you know what he meant, of course

 7       you can -- you can answer.

 8          THE WITNESS:  I don't know -- I don't

 9       know why Ryan Germany wrote that.

10   BY MR. CROSS:

11     Q.   Well, as the elections director, did you

12   have any expectation that ████████████████████

13   ████████████████████████?

14     A.   No.  But I knew that Georgia had gotten a

15   lot of attention.  ████████████████████████████

16   ████████████████

17     Q.   Why had Georgia gotten a lot of attention

18   in July of 2019?

19     A.   The gubernatorial race in 2018 had focused

20   a lot of attention on Georgia, and it just seemed

21   like Georgia was sort of in the -- in the spotlight

22   in elections.

23     Q.   All right.  Grab Exhibit 20, please.

24                      (Whereupon, Plaintiff's

25                       Exhibit 20 was marked for

Page 210

1              identification.)

2         THE WITNESS:  Okay.  I've got it.

3    Let me get -- give me a chance to read it.

4         (Whereupon, the document was

5     reviewed by the witness.)

6         THE WITNESS:  Okay.

7         MR. RUSSO:  Hold on one second.

8    Carey's going to jump in and --

9         MR. CROSS:  Oh, okay.

10         MR. RUSSO:  I've got to make a call.

11    Thank you.

12         MR. CROSS:  Yep.

13         MR. MILLER:  Sorry.  I'll try not to

14    blow up moving this thing along.

15         MR. CROSS:  Yeah.  Okay.  You ready

16    Carey?

17         MR. MILLER:  Yeah.

18         MR. CROSS:  Okay.

19    BY MR. CROSS:

20    Q.   All right.  So Mr. Harvey, you should have

21    Exhibit 20 in front of you.  And you see that at

22    the top there's an E-mail from Angelos Keromytis,

23    K-E-R-O-M-Y-T-I-S, at Georgia Tech to Jordan Fuchs

24    on December 31, 2020?

25    A.   Yes.

Page 211

1      Q.   All right.  If you come down to the

2    penultimate page at the bottom, you'll see there's

3    an E-mail from the same person at Georgia Tech to

4    you, Ms. Fuchs, Merritt Beaver and Tori Thompson at

5    the Secretary's office.

6           Do you see that?

7      A.   I do.

8      Q.   And the subject line is ████████████████

9    ████████████████████████████████████████

10   Supposedly.  Do you see that?

11     A.   I do.

12     Q.   And then below it reads:

13           "████████████████████████████████

14        ████████████████████████████████████

15        ████████████████████████████████

16        ████████████"

17           Do you see that?  Do you see that on the

18   last page?

19     A.   I do, yes.

20     Q.   Okay.  And this is dated December 30,

21   2020, at 4:14 p.m.; right?

22     A.   Yes.

23     Q.   Do you know this person at Georgia Tech?

24     A.   I've met him I think once or twice.

25     Q.   And what is his role or affiliation, if

1   any, with the Secretary's office?

2       A.   He's a -- he's a professor at Georgia

3   Tech.  And Jordan Fuchs brought him over sometime

4   before this to talk about cybersecurity concerns

5   and issues.  I met with him, I don't remember when.

6   It was sometime prior to this, obviously.

7           And there had been talk about him working

8   with us in some capacity that I wasn't aware of or

9   really part of that discussion.

10      Q.   If you wanted to understand his role with

11  the Secretary's office, would you ask Jordan Fuchs?

12      A.   Yes.

13      Q.   Okay.  And do I understand, is he a

14  computer science professor?

15      A.   I believe he is.

16      Q.   So Ms. Fuchs responds to him:

17          "███████████████████  ██████████

18          ███████"

19          Do you see that?

20      A.   I do.

21      Q.   And then you see Mr. Beaver sends an

22  E-mail also on December 30, middle of the second

23  page?

24      A.   I do.

25      Q.   He writes:

1        "████████████████████████████

2        ████████████"

3              Do you see that?

4        A.   I do.

5        Q.   And then Professor Keromytis writes on the

6   same day:

7              ███████████████

8              And then he -- in the second sentence he

9   writes:

10             [As read] ██████████████████████

11   █████████████████████████████████

12   ████████████████████████████████

13   █████████████████████████████████

14   ██████████████████████     ██████████

15   ██████████████████████████████

16   █████████████████████████████

17   ████████████████

18             And it indicates, ████████████████   He

19   goes on to explain:

20             ████████████████████████████████

21        ██████████████████████████

22             Do you see that?

23        A.   I do.

24        Q.   Tell me everything that you know about

25   this particular allegation of ████████████████████

1 ███████████████████████████████?

2      A.   I don't think I had any real connection or

3 follow-up with this.  I would have -- I mean, I

4 don't think I had any participation on the E-mail.

5 So I don't think I had anything -- I don't think I

6 had any involvement in this.

7      Q.   So there's nothing you can tell me beyond

8 what's written on the pages here?

9      A.   I don't think so.

10      Q.   As the elections director, was it

11 important to you to know what the result of this

12 was as to whether there had been ████████████

13 ██████████████████████████?

14      A.   Well, the -- yeah, it would have been

15 important to know if there had been something

16 █████████████████████████.

17      Q.   Is it fair to say that, for your purposes

18 as the election director, you relied on people like

19 Mr. Beaver, Ms. Fuchs, to make those determinations

20 and to bring it to your attention if there was some

21 sort of security risk like that?

22           MR. MILLER:  Objection to form.

23 Compound.

24           THE WITNESS:  I would -- I would say,

25      yeah, there were -- there were lots of

1        different points of contact.  Sometimes it

2        would -- something like this would come

3        into Ryan Germany.  Sometimes it'd come in

4        to Gabriel.  Sometimes it'd come in to

5        Jordan.  Sometimes it would come in to me.

6             And in some cases, they would handle

7        it and resolve it and determine nothing

8        happened.  And you know, I may follow up

9        the next day or -- but if it -- if it

10       didn't -- if it didn't develop into

11       something, then sometimes I, you know, I

12       wouldn't -- I wouldn't follow up.

13   BY MR. CROSS:

14       Q.   Okay.  Do you know why Ms. Fuchs in

15   particular was involved in this situation?

16       A.   I don't except that she had, as far as I

17   know, she was the first one that had made contact

18   with Mr. Keromytis.

19       Q.   So she was the person who engaged

20   Professor Keromytis with the State?

21       A.   Well, I got that impression.  When I --

22   when I first met with him and her at the same time,

23   I got the impression that that was kind of the

24   first meeting.  How they -- how they met or what

25   their involvement was, I don't know.

1      Q.   Are you aware of whether Professor

2   Keromytis has done any cybersecurity assessments or

3   analysis for the Secretary's office?

4           MR. MILLER:  Objection.  Lack of

5       foundation.

6           THE WITNESS:  I'm not aware of

7       anything he's done.

8   BY MR. CROSS:

9      Q.   Is Ms. Fuchs who you would ask to know

10   about that?

11      A.   Either Ms. Fuchs or Merritt Beaver.

12      Q.   So you mentioned earlier that there was a

13   committee that helped advise Secretary

14   Raffensperger on the selection of the current

15   B.M.D. system.

16           Do you know how people were selected for

17   that committee?

18      A.   I do not.

19      Q.   Who would you ask to find out?

20      A.   Probably Jordan Fuchs.

21      Q.   We talked briefly a moment ago about this

22   phone call that was reported of former President

23   Trump asking Secretary Raffensperger to find votes

24   in the 2020 election.

25           Let me just ask you, based on your

Page 217

1      experience as the elections director for Georgia,

2      are you aware of any effort by anyone to alter or

3      manipulate the outcome of the 2020 election in

4      Georgia?

5          A.   No.

6          Q.   Is that something that you would expect to

7      have been brought to your attention if someone at

8      the Secretary's office had learned that something

9      like that had happened?

10              MR. MILLER:  Objection.  Calls for

11          speculation.

12              THE WITNESS:  I would have -- I would

13          expect something like that to be brought

14          to my attention.

15     BY MR. CROSS:

16         Q.   As a voter in Georgia, is it important to

17     you that your vote is counted as you intended it to

18     be counted?

19         A.   Yes.

20         Q.   Why?

21         A.   Because that's one of my fundamental

22     rights.

23         Q.   What if the election outcome comes out the

24     way you want it but your vote had not been counted,

25     would that matter to you?

Page 218

1      A.   It would.

2      Q.   Why?

3      A.   Well, assuming that I cast my vote legally

4    and properly, each -- my vote should be a record.

5      Q.   Okay.  Are you aware of a situation where

6    election workers, when they were transmitting

7    ballots coming out of the B.M.D. system, they

8    stopped at one of the election workers' homes, one

9    of them took a shower, the ballots sat in their

10   cars in the driveway for some period of time, and

11   then they finally made it on to the county election

12   facility where those ballots were supposed to be

13   stored and the results were supposed to be

14   transmitted to the State?

15          MR. MILLER:  Object to form.

16          THE WITNESS:  I believe I recall

17      that.  I -- although I don't remember

18      where it was.  But that sounds -- that

19      sounds familiar.

20   BY MR. CROSS:

21      Q.   Fair to say that's not consistent with

22   State protocol or County protocol; right?

23      A.   I agree.

24      Q.   Okay.  Do you know of any efforts that

25   were taken to confirm that that incident did not

Page 219

1    affect the tabulation of the ballots in that county

2    for that election?

3              MR. MILLER:  Objection.  Lacks

4         foundation.

5              THE WITNESS:  I -- I'm not aware of

6         follow-up steps to that.

7    BY MR. CROSS:

8         Q.   Who would you ask if you wanted to know?

9         A.   Probably the county election director.

10        Q.   Okay.

11             MR. CROSS:  All right.  Let's go off

12        the record.  I'm pretty close to done.

13        Let me just look at my notes real quick,

14        if that's all right, Mr. Harvey.

15             THE WITNESS:  Sure.

16             THE VIDEOGRAPHER:  The time is 2:10

17        p.m.  We're off the record.

18             (Whereupon, a discussion ensued

19         off the record.)

20             (Whereupon, there was a brief

21         recess.)

22             THE VIDEOGRAPHER:  The time is 2:15

23        p.m.  We're on the record.

24    BY MR. CROSS:

25        Q.   Mr. Harvey, is voter confidence in an

Page 220

1    election system, is that important?

2              MR. MILLER:  Objection.  Lack of

3         foundation.

4              THE WITNESS:  I think so.

5              MR. MILLER:  We're getting an echo

6         here.  Hold on just a second.  I'm not

7         sure what happened.

8              MR. CROSS:  Sounds like you guys have

9         two mikes on, Carey.

10             MR. MILLER:  Yeah.  Let's see.

11             THE VIDEOGRAPHER:  You can -- you

12        can -- yeah, there you go.

13             MR. MILLER:  That going?  Yeah.  All

14        right.

15             MR. CROSS:  I think that's better.

16             MR. MILLER:  Apologies.

17             MR. CROSS:  Yeah.  There we go.

18    BY MR. CROSS:

19        Q.   And why is that important to you based on

20    your experience as the Georgia elections director?

21        A.   Why is voter confidence important?

22        Q.   Yes.

23        A.   Because they're the -- they're the

24    mechanism by which we, I guess, fuel the government

25    with people to do the people's will.

Page 221

1           So I think it's important that people are

2      confident that their will is accurately reflected

3      and legal changes take place as in accordance with

4      voters' wishes.  That's how our system operates.

5           MR. CROSS:  Okay.  I don't have any

6           further questions for you, Mr. Harvey.  I

7           appreciate your time.  I'm actually

8           sitting right down the road from your

9           alma mater, the Citadel.  So.

10          THE WITNESS:  Oh, okay.

11          THE VIDEOGRAPHER:  Anyone else,

12     Counsel?

13          MR. CROSS:  You're on mute, Cary.

14          THE VIDEOGRAPHER:  Mr. Ichter, you're

15     muted.

16          MR. ICHTER:  Thank you.

17          Can y'all access the folder in which

18          our exhibits are located?  Because it's

19          currently labeled as private.  I don't

20          know whether or not that's meaningful with

21          respect to whether or not you can access

22          it.

23          MR. MILLER:  We can.

24          MR. CROSS:  Cary, you have to -- you

25          have to move from the private folder to

Page 222

1        the Marked Exhibits folder.

2            MR. MILLER:  You have to -- you have

3        to do the "introduce exhibit" thing.

4            MR. ICHTER:  Well, I have to admit

5        that you guys are testing the levels of my

6        competence on this.

7            MR. MILLER:  Do you want to go off

8        the record for a minute?

9            MR. ICHTER:  Yeah.  It appears as

10       though they're loading up right now.

11           MS. CONNORS:  Cary?

12           THE VIDEOGRAPHER:  The time is --

13           MR. ICHTER:  Yeah.

14           THE VIDEOGRAPHER:  The time is 2:17

15       p.m.

16           MS. CONNORS:  They are loading.

17           THE VIDEOGRAPHER:  The time is 2:17

18       p.m.  We're off the record.

19           (Whereupon, a discussion ensued

20        off the record.)

21           THE VIDEOGRAPHER:  The time is 2:24

22       p.m.  We're on the record.

23   ///

24   ///

25                     EXAMINATION

Page 223

1    BY MR. ICHTER:

2        Q.   Good afternoon, Mr. Harvey.  My name's

3    Cary Ichter.  I represent the Coalition For Good

4    Governance and some individual members of the

5    Coalition.  And I'm going to be asking you some

6    questions on some topics that were covered by

7    Mr. Cross that would be follow-up questions and

8    also a couple of topic areas that he didn't cover.

9            If I ask you any questions at any point in

10   time that you don't understand or seem

11   discombobulated to you, if you'd let me know that,

12   I'll do my best to repeat them in a way that's

13   somewhat more coherent than my first try.

14           Okay?

15       A.   Okay.  Thank you.  And good afternoon to

16   you, too.

17       Q.   Okay.  By the way, you are a graduate of

18   the Citadel?

19       A.   I am.

20       Q.   Are you wearing your ring?

21           All right.  Very good.

22           So I wanted to ask you to go ahead and

23   take a look at the document that is marked as CGG

24   Exhibit 14.

25                           (Whereupon, CGG Exhibit 14

Page 224

1                          was marked for

2                          identification.)

3      BY MR. ICHTER:

4          Q.   It purports to be an Official Election

5      Bulletin, dated December 1, 2020.

6          A.   Where would I find that in the file?

7          Q.   It's --

8               MR. MILLER:  You have to hit refresh.

9               THE WITNESS:  Okay.  Give me one

10          second.  Let me refresh this.  This still

11          looks like the old list of exhibits.

12               MR. MILLER:  Try scrolling all the

13          way down.

14               THE WITNESS:  Yeah.

15      BY MR. ICHTER:

16          Q.   Yeah.  It should be towards --

17          A.   Oh.

18          Q.   -- the bottom.

19          A.   Okay.  Gotcha.  So CDG -- CGG --

20          Q.   14.

21          A.   -- one?

22          Q.   14.

23          A.   14.

24          Q.   Yes, sir.

25          A.   Okay.

1      Q.   Okay.  This is an Official Election

2   Bulletin, dated December 1, 2020.  Do you recognize

3   this document, sir?

4      A.   I do recognize it as an Official Election

5   Bulletin.  I haven't read it yet, but.

6      Q.   Okay.  Well, it appears to be from you --

7      A.   Yeah.

8      Q.   -- in your capacity as the elections

9   division director for the Secretary of State's

10  office; correct?

11     A.   That's correct.

12     Q.   And it's directed to the county election

13  officials and county registrars; correct?

14     A.   Correct.

15     Q.   And the subject is Preserving Ballot

16  Images and Delivering them to the Secretary of

17  State; correct?

18     A.   Yes, sir.

19     Q.   Okay.  So let me ask you first of all,

20  because I'm not an elections super genius like some

21  of these other folks, so I need basic rudimentary

22  terms explained to me, what is a ballot image?

23     A.   A ballot image is the -- is a P.D.F. of

24  each ballot as it's scanned in the scanner.  It

25  photographs it or scans it and creates a P.D.F. and

Page 226

1     preserves it in the -- in a memory card.

2         Q.   Okay.  So, so the process is --

3              MR. MILLER:  Cary, can you give me

4         one second.  Vincent's back.  We're just

5         going to swap back out.

6              MR. ICHTER:  Oh, sure.  I haven't

7         seen this much tag teaming since my last

8         wrestling match.

9              MR. RUSSO:  Well, unfortunately

10        there's other work to do.

11             MR. ICHTER:  I understand.  I only

12        mentioned wrestling, professional

13        wrestling so that you would know I was

14        cultured.

15             MR. RUSSO:  Whenever you're ready.

16    BY MR. ICHTER:

17        Q.   Okay.  So, so I understand how the -- what

18    a ballot image is, if I'm a voter, I go in to

19    the -- or I go to the B.M.D. and I make my various

20    selections, and the B.M.D. spits out a paper

21    document; correct?

22        A.   The printer below the B.M.D. does.

23        Q.   Okay.  And that paper document consists of

24    a Q.R. code along with some human readable text

25    that indicates, hopefully, who I voted for when I

1    was using the B.M.D.; correct?

2         A.   Yes, sir.

3         Q.   I then take that paper to one of the poll

4    workers and they scan that into the system;

5    correct?

6         A.   Actually, the direction is the voter

7    themselves scan it.  It --

8         Q.   Okay.

9         A.   So they wouldn't -- they wouldn't -- in

10   most cases, unless they needed some type of

11   assistance, they would scan it themselves.

12        Q.   Okay.  But the poll worker would be there

13   to tell me what I'm supposed to do, where I'm

14   supposed to do it, make sure it gets done properly;

15   correct?

16        A.   Correct.  Yes.

17        Q.   Okay.  And once that scanning event

18   occurs, that document becomes stored in the system

19   somewhere; correct?

20        A.   The actual ballot document or the image

21   document?

22        Q.   The image.

23        A.   Yeah, the image is generated when the

24   ballot is scanned and gets stored on the memory

25   card.

Page 228

1      Q.   Okay.  So there's a memory card in the

2    scanner that stores the image of the ballot, which

3    is the paper with the Q.R. code and the human

4    readable outcome of my selections; correct?

5      A.   Correct.

6          MR. RUSSO:  And I'm just going to

7       object to the extent he's not a 30(b)(6)

8       witness on these topics.

9          If you're just asking him if he

10       knows, that's fine, but it's a fairly

11       technical question, it sounds like.

12          MR. ICHTER:  That's -- I'm just

13       asking him general knowledge.  I'm not

14       asking this as a 30(b)(6).

15          THE WITNESS:  The scanner actually

16       has two memory cards.  And I believe a

17       copy is stored on each memory card.

18    BY MR. ICHTER:

19      Q.   Okay.  And then at the end of the day

20    those memory cards are removed from the scanner;

21    correct?

22      A.   One of them is removed from the scanner.

23      Q.   Okay.  What happens to the other one?

24      A.   It's -- it initially stays with the

25    scanner.

```
 1        Q.   Okay.  And then thereafter what happens
 2    with it?
 3        A.   It gets collected later.
 4        Q.   By who?
 5        A.   Election officials.
 6        Q.   For what purpose?
 7        A.   I think it's a back-up and -- I think
 8    that's the main purpose.
 9        Q.   Okay.  What happens to the one that's
10    initially removed, the memory card?
11        A.   It's transported to the tabulation center
12    in the county, usually the county election
13    headquarters and is uploaded into the jump serve --
14    into the E.M.S. server.
15        Q.   Okay.  And what happens to that
16    information in the E.M.S. server?
17        A.   It is -- it's basically uploaded into the
18    E.M.S. server that keeps a record, and then that's
19    the -- that's the record of the ballots that were
20    scanned on that memory card.
21        Q.   Okay.  And what happens to the memory
22    card?
23        A.   After it has been uploaded to E.M.S.,
24    it's -- should be preserved by the county election
25    office.
```

Page 230

1     Q.    And where is it supposed to be preserved?

2     A.    In a secured location until it's

3   transferred to the Clerk of Superior Court.

4     Q.    Okay.  And that particular memory card is

5   supposed to have all the ballot images on it for

6   the B.M.D. -- or for the scanner, rather, that it

7   was removed from; correct?

8         MR. RUSSO:  Object to the form.

9     Lacks foundation.

10         THE WITNESS:  It should, yes.

11  BY MR. ICHTER:

12    Q.    Okay.  And the -- in a given county, all

13  of the memory cards for all of the scanners should

14  contain all of the ballot images for votes cast in

15  that county?

16    A.    It should.

17    Q.    Okay.  All right.  And so is the purpose

18  of this particular bulletin to advise the counties

19  on the manner in which they are to provide copies

20  of those ballot images to the Secretary of State's

21  office?

22    A.    Give me a second to just review the

23  bulletin.

24         (Whereupon, the document was

25          reviewed by the witness.)

1          THE WITNESS:  Yes.

2     BY MR. ICHTER:

3          Q.   Okay.  So properly handled, am I correct

4     that as of today the Secretary of State's office

5     should have a copy of all of the ballot images from

6     count -- Fulton County for the November 2020

7     election?

8          A.   They should.

9          Q.   Okay.  And am I also correct that Fulton

10    County should have its own separate copy of a

11    memory card that contains all of the ballot images

12    for all the ballots cast in the November 2020

13    election, and those would be in the possession of

14    the Superior Court?

15          MR. RUSSO:  Objection.  Relevance.

16          THE WITNESS:  The Clerk of Superior

17    Court, yes, sir.

18    BY MR. ICHTER:

19          Q.   Okay.  All right.  And if -- well, let me

20    ask you this.  Are you aware of the fact that

21    Fulton County produced ballot images on December

22    8th to the Coalition that were to represent the

23    ballot images from the November 2020 election and

24    that some 18,000 ballot images were unaccounted

25    for --

Page 232

1              MR. RUSSO:  Objection.

2    BY MR. ICHTER:

3         Q.  -- roughly, 18,000 roughly?

4              MR. RUSSO:  Objection.  Lacks

5         foundation.

6              THE WITNESS:  I wasn't aware of that.

7    BY MR. ICHTER:

8         Q.  Okay.  If Fulton County did that and their

9    explanation was they no longer have possession of

10   those ballot images, is there anything about the

11   way that ballot images are supposed to be

12   maintained and retained by the county that would

13   explain why that would be the case?

14             MR. RUSSO:  Objection.  Lacks

15        relevance.

16             THE WITNESS:  I don't know.

17   BY MR. ICHTER:

18        Q.  Okay.  Is it correct that, if Fulton

19   County properly followed instructions in this

20   bulletin from the Secretary of State with respect

21   to ballot images for ballots that were cast in the

22   November 2020 election, then the Secretary of

23   State's office should currently have in its

24   possession a copy of all of those ballot images?

25        A.  Are you asking should the Secretary of

1    State have a copy of all the ballot images?

2         Q.   Yes, sir.

3         A.   If Fulton County followed the proper

4    procedure and did everything they were supposed to

5    do, then I would think the Secretary of State would

6    have images.  But I can't say that for certain.

7         Q.   Okay.  Now, the bulletin on preserving

8    ballot images and delivering them to the Secretary

9    of State, is that intended by the Secretary of

10   State just to be sort of a helpful educational

11   nudge on this is how you do it because you're

12   legally obliged to turn those ballot images over to

13   the Secretary of State?

14        A.   Ask your question again.

15        Q.   Let me ask it this way.  The requirement

16   that Fulton County turn over all ballot images to

17   the Secretary of State is to your understanding a

18   legal requirement; correct?

19             MR. RUSSO:  Objection.  Calls for a

20        legal conclusion.

21             THE WITNESS:  I'm not -- I'm not sure

22        what the law says about ballot images and

23        the requirement to -- what has to be done

24        with the ballot images.

25   BY MR. ICHTER:

Page 234

1        Q.   Okay.  All right.  The -- when the

2   Secretary of State receives ballot images from the

3   counties, what does it do in order to preserve

4   those?

5        A.   We would generally retain them in the

6   office for a year or so and then put them in

7   archives.

8        Q.   Put them in the archives?

9        A.   Yes.

10       Q.   And where are the archives?

11       A.   The state, the state archives.

12       Q.   Okay.  So they should be -- anything that

13  the Secretary of State's office would have received

14  from Fulton County containing ballot images from

15  the November 2020 election would either be in the

16  possession of the Secretary of State's office or in

17  the archive at this point in time; correct?

18       A.   That's what I would expect.

19       Q.   Okay.  When the ballot images come in from

20  the counties, what does the Secretary of State's

21  office do in order to assess what is -- well, let

22  me back up.

23            In what format does the -- do the ballot

24  images come in?

25            MR. RUSSO:  Objection to the form of

1          the question.

2                    If you know the answer.

3                    THE WITNESS:  I don't -- I don't know

4          what form they come in.

5     BY MR. ICHTER:

6          Q.   Okay.  You don't know if they come in on,

7     like, a thumb drive or a D.V.D. or some other way?

8          A.   I don't.

9                    MR. RUSSO:  I'm just going to object

10         again.  He's not a 30(b)(6) witness on

11         these topics.

12                   MR. ICHTER:  I know.  But the scope

13         of the deposition is not defined by the

14         30(b)(6) notice.  It's defined by the

15         rules.  And we can inquire into any matter

16         relevant to the case.

17                   MR. RUSSO:  Right.  And we identified

18         him, though, for certain 30(b)(6) topics.

19         If you're just going to ask him about, you

20         know, his personal knowledge, that's fine

21         again.

22                   But the phrasing of the question is

23         such that it's -- it appears that you're

24         asking in a 30(b)(6) context.  So.  And

25         again, if he knows the answer, he can go

```
1       ahead.
2               MR. ICHTER:  I can --
3               MR. RUSSO:  If he doesn't know the
4       answer, that's fine.
5               MR. ICHTER:  Yeah.  That's fine.  If
6       he doesn't know the answer, it's fine.
7   BY MR. ICHTER:
8       Q.   So is there anything that the Secretary of
9   State's office does when the ballot images come in
10  in order to determine exactly what volume of ballot
11  images are contained in whatever medium is being
12  provided to them?
13      A.   I don't believe so.
14      Q.   So it's not -- they're not inventoried in
15  any kind of way?
16      A.   The -- whatever the media is, whatever is
17  turned in to us is logged in, so it's logged in,
18  it's checked off to make sure we've gotten it, and
19  then it's stored.  But it's -- nobody reviews the
20  images or does anything like that if that's what
21  you're asking.
22      Q.   Yeah, that's what I was asking.
23              How is -- how are they logged in?  What
24  kind of record is maintained?
25      A.   I think there's a, essentially a check-off
```

1    sheet that -- for each county or a list of the

2    counties, and you check off to make sure that

3    they've included whatever they're supposed to have

4    included in their -- in their package.

5        Q.   Okay.  If Fulton County had not turned

6    over ballot images from the November 2020 election

7    to the Secretary of State's office, would the

8    Secretary of State's office have followed up with

9    Fulton County to see why not and where they were?

10           MR. RUSSO:  Again, I will --

11       objection.  Lacks relevance.

12           THE WITNESS:  I, yes, I believe it

13       would have.

14   BY MR. ICHTER:

15       Q.   Okay.  And are you aware of that

16   happening?

17       A.   No.

18       Q.   Okay.  Would you have been aware of it if

19   that had happened?

20       A.   I believe so, yes.

21       Q.   Okay.  And what kind of process would have

22   been followed by the Secretary of State's office

23   for the purposes of making some sort of

24   determination about what the status of receiving

25   those ballot images was?

1      A.   I likely would have called Fulton County

2    and said, hey, we haven't gotten your election

3    materials, can you -- you know, is there a problem,

4    is there a delay, did you send them over and

5    they're somewhere else.  We would have wanted them

6    accounted for.

7      Q.   Okay.  And is that something that you

8    would have personally done?

9      A.   I may have.  It kind of depends on --

10   Fulton County would usually bring theirs over

11   themselves.  The way -- the way it was done, you'd

12   send people out and collect them.

13            But the large metro counties would

14   generally bring them over to our offices

15   themselves.  And so if they hadn't brought them

16   over, it's likely I would have called them.  Or

17   maybe the deputy director would have called them.

18   Somebody would have certainly made contact with

19   them.

20     Q.   Okay.  Are the ballot images typically

21   delivered as part of the election project package?

22     A.   They're generally delivered when they send

23   all their paperwork from the election.  It's

24   generally delivered together.

25     Q.   Okay.  And is that accumulation of data

Page 239

1    usually referred to as the election project

2    package?

3        A.   I don't know that we call it that.  We've

4    colloquially used the term "ballot run,"

5    election -- "post-election materials."

6        Q.   Would it be surprising to you to learn

7    that there are more than 50 counties that say that

8    they did not retain images for the November

9    original count?

10            MR. RUSSO:  Objection.  Lacks

11        foundation.

12            THE WITNESS:  That would be

13        surprising.

14   BY MR. ICHTER:

15       Q.   Okay.  If that had happened, what would

16   the Secretary -- what would you expect the

17   Secretary of State's office to have done about

18   that?

19       A.   Well, the first thing probably would have

20   been to determine if there was any way they could

21   have been retrieved somehow.  If not, it would

22   certainly be a training issue to make sure that

23   everyone was aware of the proper procedure.

24       Q.   Is it fair to say that the Secretary of

25   State's office would have done not only those

1    things but done those things necessary to retrieve

2    those ballot images from those counties who had not

3    turned them in?

4         A.   Well, that's what I -- that was the first

5    thing I said is --

6         Q.   Okay.

7         A.   -- is -- would have been to attempt to

8    retrieve them.

9         Q.   Okay.  Do you have any recollection of any

10   attempts to retrieve ballot images from any

11   counties from the November 2020 election?

12        A.   I don't think so.

13        Q.   Okay.  When -- you called them in the

14   election bulletin a ballot run; correct?

15        A.   Correct.

16        Q.   And again, a ballot run as that term is

17   used in the bulletin means what?

18        A.   That's the process whereby the day would

19   be designated after the election, and together with

20   the investigation division we would designate State

21   Patrol locations, and we would get counties in an

22   area, say, okay, all you ten counties in southeast

23   Georgia, take all your election returns to, you

24   know, Georgia State Trooper Post 142 between, you

25   know, 10:00 and 12:00 and an investigator will pick

Page 241

1      up, take custody of them and bring them back here

2      so we don't have 159 counties having to make a trip

3      to Atlanta.

4              So that's the -- that's the general ballot

5      run process.  And what I pointed out in the

6      previous answer was that about five or six of the

7      large metro counties just bring them themselves.

8      They don't -- they don't participate in that.

9      Q.   Okay.  And when you get in whatever media

10     it is transmitted to you the ballot images, I trust

11     from what you said before nothing is really done to

12     check the authenticity of the files or materials in

13     whatever media that is?

14             MR. RUSSO:  Object to the extent it

15         calls for a legal conclusion.

16             THE WITNESS:  We -- the process at

17         the Secretary of State's office is to

18         check to make sure that it's been

19         supplied, but it's not individual -- you

20         know, if it's a C.D. or it's a jump drive

21         that says ballot images, it's checked off,

22         but they're not inspected.

23     BY MR. ICHTER:

24     Q.   Okay.  Nothing is done to make sure that

25     there's been no modification to the ballot images;

1    correct?

2         A.    That's correct.

3         Q.    Okay.  In your time with the Secretary of

4    State's office, are you aware of there ever having

5    been a situation in which counties failed to

6    deliver either the election project packages or the

7    ballot runs to the Secretary of State's office?

8         A.    There were times when, yeah, somebody

9    would miss the meeting point and they'd have to

10   bring it themselves.  Our practice was, if you're

11   not there by 12:00 o'clock, you know, you're going

12   to have to drive it to Atlanta yourselves.

13             But I don't believe there was ever a time

14   that nobody ever turned it in.  They may have been

15   late or had to drive it up themselves or maybe even

16   bring it down the next day if something happened.

17        Q.    Okay.  So, so if there was a -- any county

18   in 2020 that did not deliver all of the ballot

19   images for all of the ballots cast in the November

20   2020 election to the Secretary of State's office,

21   that would have been an unprecedented event?

22        A.    What I'm saying is if no -- if a county

23   didn't deliver any of their post-election materials

24   to us, that would have been an unprecedented event.

25   If a county had left something out or failed to

1    deliver something, we would generally follow up

2    with them after and say, hey, you left this out,

3    can you bring it or send it or whatever was

4    appropriate.

5        Q.   And they always comply with that to your

6    recollection; correct?

7        A.   To my recollection, yes.

8        Q.   Okay.  Was November 2020 -- or the

9    November 2020 election, was this the first time

10   that the Secretary of State's office informed the

11   counties about this preserving of ballot images in

12   the manner that this Official Election Bulletin

13   does?

14            MR. RUSSO:  Objection.  Relevance.

15            THE WITNESS:  I believe it was part

16        of the initial training the counties got

17        when they were training on the new system,

18        so that would have been the first time.

19            I don't know if there were previous

20        directives or updates sent either from the

21        training director of the Secretary of

22        State's office or from me about ballot

23        images to the counties.  I just don't

24        know.

25   BY MR. ICHTER:

1      Q.   Was this bulletin then prompted by the

2   fact that there was a new system in place and you

3   wanted to make sure that the superintendents and

4   the registrars were familiar with the process for

5   handling the ballot images and getting them to the

6   Secretary of State's office?

7      A.   I don't really remember the origin of what

8   prompted this, whether it was questions from

9   counties or issues.  I don't remember the genesis

10  of this bulletin.

11     Q.   Okay.  All right.  That's what I had to

12  ask about that.

13          I was curious about a couple of things

14  that Mr. Cross was asking you about.  And he asked

15  you early on -- and I apologize, by the way, if I

16  ask you about anything that he asked about.

17  Because early in the deposition, I don't know

18  whether y'all noticed it or not, but I took a

19  hiatus because my Internet went down for about ten

20  or 15 minutes, and so I missed a bit.  I will try

21  not to ask you anything that he asked you about.

22          But he asked about when the B.M.D.s were

23  purchased whether or not there were concerns about

24  them, and you mentioned them being bulky and having

25  so many component parts and that sort of thing;

Page 245

1    correct?

2        A.   That's correct.

3        Q.   Okay.  Did Texas, soon before Georgia

4    purchase the Dominion system, reject an identical

5    or similar system from Dominion?

6        A.   I don't know what Texas did.

7        Q.   You're not familiar and haven't heard

8    anything about Texas rejecting a Dominion system?

9            MR. RUSSO:  Objection.  Asked and

10           answered.

11           THE WITNESS:  I don't know what

12           system they had looked at or what the

13           issues were.

14   BY MR. ICHTER:

15       Q.   Okay.  Do you know if it was a Dominion

16   system?

17       A.   I'm not positive it was Dominion, but

18   it -- that sounds familiar.

19       Q.   Okay.  Would the state have done anything

20   to investigate or research the question of whether

21   or not other states had done due diligence with

22   respect to the purchase of the Dominion system to

23   sort of get a leg up on doing research into the

24   pros and cons of the system?

25       A.   Are you asking if we did or if we would

1    have?

2         Q.   Did you?

3         A.   I did not.  And as I mentioned before, I

4    wasn't part of the selection process, so I don't

5    know if anybody else did or not as part of that

6    process.

7         Q.   Okay.  So, so you didn't hear anything

8    about that?

9         A.   About --

10        Q.   About --

11        A.   -- particularly with states?

12        Q.   Well, let me -- let me change the

13   question.  Is it fair to say that, based upon that

14   answer, that you know nothing and have heard

15   nothing about the due diligence process that was

16   pursued in connection with the purchase of the

17   Dominion system?

18             MR. RUSSO:  Objection.  Asked and

19        answered.

20             THE WITNESS:  That, that's correct.

21        I did not have anything to do with that.

22   BY MR. ICHTER:

23        Q.   Okay.  Other than the bulletin we looked

24   at a moment ago, has the Secretary of State issued

25   any other directives to the counties instructing

Page 247

1     them to preserve election records from the November

2     2020 election?

3          A.   I don't remember specific directives.  I'm

4     not -- I don't know.

5          Q.   Okay.  Are you aware of the Secretary of

6     State's office making the counties aware of this

7     and other litigation that was going on that would

8     have triggered a preservation duty on the part of

9     the Secretary of State's office and those counties?

10              MR. RUSSO:  Objection.  Lacks

11         foundation.  And calls -- to the extent it

12         calls for a legal conclusion, I would

13         object on that basis also.

14              THE WITNESS:  Like I said before, I

15         know we sent out at least one, if not

16         more, directives about preserving records

17         for litigation.  And I couldn't tell you

18         when each one was done or if any have been

19         done since I've been gone.

20     BY MR. ICHTER:

21          Q.   Are you aware of anything that the

22     Secretary of State's office did to investigate or

23     research county compliance with those preservation

24     efforts?

25          A.   I'm not aware of anything.

1      Q.   Okay.  Did the State Election Board issue

2      a rule of some sort about preserving images of

3      election records in 2020?

4      A.   I don't remember.  I know the State

5      Election Board changed some rules and added some

6      rules, but I don't remember specifically what it --

7      what the rules said about ballot images.

8      Q.   Okay.  Do you know how those rules, once

9      promulgated, were made known to the counties?

10          In other words, did the Secretary of

11     State's office send out other bulletins, such as

12     the one we saw moments ago, advising about State

13     Election Board rule changes?

14          MR. RUSSO:  Objection to the ex -- it

15          lacks foundation.  He said he wasn't aware

16          of other rules, I thought.

17          THE WITNESS:  Well, the general

18          practice was, if there was a change in an

19          S.E.B. rule or an addition to a rule, we

20          would either send out something like an

21          Official Election Bulletin or would send

22          out sometimes on The Buzz with a link to

23          the new rule notifying them of -- and then

24          oftentimes a description of what this rule

25          does and what it means to them.

```
 1            So the general practice was to alert

 2       the counties when a State Election Board

 3       rule had been changed or created.

 4  BY MR. ICHTER:

 5       Q.   Okay.  And for those not in the know, what

 6  is The Buzz?

 7       A.   The Buzz is a, sort of an electronic

 8  bulletin board that all the counties subscribe to.

 9  And it's a primary way of communicating between the

10  Secretary of State's office and the counties.

11            I could, for example, log on to The Buzz

12  and send a message to all -- everybody that

13  subscribed to it.  And it's not just directors.

14  It's anybody in the county election office can be

15  subscribed.

16            And if we had something to try to get out

17  as quickly and widely as possible, I would post

18  up -- it's kind of like making a Facebook post, you

19  know, post a message.

20            I could put links on there or something

21  and say, hey, this State Election Board rule has

22  been changed or this has been added or we've gotten

23  a temporary injunction from a judge regarding this

24  matter, this is something you need to be aware of

25  immediately.
```

Page 250

1          So they weren't always in the form of

2    election bulletins.  Sometimes we communicated

3    through The Buzz, less frequently with E-mail to

4    the counties.

5          We tried to get away from E-mails with

6    attachments to limit cyber vulnerabilities.  But we

7    generally communicated with counties when something

8    like that happened.

9      Q.   Okay.  In November of 2020, who in the

10   Secretary of State's office was responsible for

11   cybersecurity, or in charge of cybersecurity?

12     A.   I would say the primary person was Merritt

13   Beaver.

14     Q.   Okay.  And did Dominion have involvement

15   to your knowledge in developing cybersecurity

16   policies for the State of Georgia after the

17   implementation of the B.M.D. system?

18     A.   Are you asking if Dominion had influence

19   on Georgia's Secretary of State's policies or vice

20   versa or both or either or neither?  I'm not trying

21   to make --

22     Q.   Was it involved?

23          No.  My question was was it involved?  Was

24   it involved in, was it consulted, was it

25   voluntarily contributing in any manner?

Page 251

 1          A.   I don't know.

 2          Q.   Okay.  I want to ask you some questions,

 3     sir, about ballot secrecy.  Are you aware of the

 4     Georgia requirements for ballot secrecy?

 5          A.   I am.

 6          Q.   And what is your understanding of them?

 7          A.   That the secrecy of the ballot is supposed

 8     to be protected from anybody seeing it, viewing it,

 9     being able to take a picture of it, anything like

10     that.

11          Q.   Okay.  Take a look at Exhibit CGG 1.

12                    (Whereupon, CGG Exhibit 1

13                     was marked for

14                     identification.)

15     BY MR. ICHTER:

16          Q.   As the head of --

17          A.   Yeah, give me one second.  I've got to get

18     there.

19          Q.   Okay.

20          A.   Are we talking about 21-2-379.22?

21          Q.   Yes, sir.

22          A.   Okay.

23          Q.   Are --

24          A.   I'm there.

25          Q.   As the director of elections with the

Page 252

1      Secretary of State's office with the State of

2      Georgia, did you ever have occasion to familiarize

3      yourself with O.C.G.A. 21-2-379.22?

4         A.   Yes.

5         Q.   Okay.  And so were you aware of the fact

6      that that statute said no electronic ballot marker

7      shall be adopted or used in primaries or elections

8      in the state unless it shall at the time satisfy

9      the following requirements:

10              [As read]  "Number five,

11          permitting voting in absolute secrecy

12          so that no person can see or know any

13          other elect or's vote, except for when

14          he or she has assisted the elector in

15          voting as prescribed by law"?

16          Were you aware of that?

17        A.   I was.

18        Q.   Okay.  As that term "absolute secrecy" is

19     used in that statute, what do you understand that

20     to mean?

21              MR. RUSSO:  Objection to the extent

22          it calls for an opinion, a legal opinion.

23              THE WITNESS:  I think it means that

24          the ballot should be something that is --

25          I mean, "absolute" is a strong word, I

1        can't expand on absolute, but in a way

2        that is going to protect the integrity of

3        the voter's choice, so the secrecy of the

4        voter's choices.

5  BY MR. ICHTER:

6        Q.   Okay.  And it indicates that there are two

7  aspects to this absolute secrecy, one is that so no

8  person can see the way that another elector is

9  voting.  Is that your understanding?

10       A.   That's what it says, yes.

11       Q.   Okay.  And the other is that so no person

12 can know how you're voting; correct?

13       A.   That's correct.

14       Q.   And being in the elections business as you

15 have been for as long as you have been, and it

16 sounds like you have a pretty good and strong sense

17 of the importance of voting, do you have a sense of

18 why it is that ballot secrecy is regarded as so

19 absolutely important?

20            MR. RUSSO:  Objection to the form of

21       the question.

22            THE WITNESS:  I think it's -- you

23       know, I -- my focus primarily was that

24       it's the law, and so you maintain it.

25            But certainly you don't want people

Page 254

1          unduly influenced or threatened or

2          intimidated by voting a certain way or by

3          revealing how somebody votes for fear or

4          favor or anything like that.

5     BY MR. ICHTER:

6          Q.   You don't want people subject to

7     intimidation or violence because of how they vote;

8     right?

9          A.   Certainly not.

10         Q.   And the vote to -- the right to vote would

11    pretty much be a sham if that were the case; right?

12         A.   It could be.

13         Q.   Yeah.  Are you aware of any level of

14    acceptable intrusion into the privacy of a voter

15    while they are voting in the state of law -- I

16    mean, state, let me try that again -- in the state

17    of Georgia?

18              MR. RUSSO:  Objection to the extent

19         it calls for a legal conclusion.

20              THE WITNESS:  Could you ask it again?

21    BY MR. ICHTER:

22         Q.   Are you aware of any level of acceptable

23    intrusion into the privacy of an elector when they

24    are voting in Georgia?

25              MR. RUSSO:  Same objection.

1          THE WITNESS:  Well, certainly when

2      they're receiving lawful assistance --

3  BY MR. ICHTER:

4      Q.  Okay.

5      A.  -- that's allowed.  And there are also

6  circumstances where parents can bring young

7  children into the voting booth that could possibly

8  compromise the secrecy of the ballot.

9          And so there are -- there are some

10  exceptional circumstances where that would be

11  allowed.  But other than that, I would say no.

12      Q.  Okay.  Are you also aware of the fact that

13  voting machines and voting components, the

14  components of those machines, are required to be in

15  the full view of poll workers while the polls are

16  open and those machines are being used?

17      A.  I believe that's correct.

18      Q.  Okay.  And that's important, is it not, so

19  that those machines cannot be tampered with?

20  Correct?

21      A.  That's one -- that's one significant

22  reason, yes.

23      Q.  So there is, would you not agree, some

24  tension between the privacy requirement of the

25  voter who is casting the vote and the requirement

Page 256

1     that components always be visible?

2          MR. RUSSO:  Objection to form of the

3     question.

4          THE WITNESS:  I would agree those

5     are -- those are sometimes competing

6     interests.

7  BY MR. ICHTER:

8     Q.   Okay.  But the interest of privacy and

9  secrecy is, as we have seen, absolute; correct?

10    A.   The law uses the term "absolute."

11    Q.   Okay.  Are you aware of concerns that some

12 people have articulated regarding the size of

13 B.M.D. screens and the visibility of votes being

14 cast on those machines?

15    A.   I'm aware of complaints and concerns that

16 have been voiced regarding those topics.

17    Q.   Okay.  Who have you heard those kinds of

18 complaints out of?

19    A.   I remember being at several state -- I

20 couldn't identify the individual, but at several

21 State Election Board meetings people have spoken in

22 public comments about concern for those issues that

23 you mentioned.

24         And again, I can't -- I can't tell you

25 everybody that's mentioned or even how many, but I

1  have heard comments and complaints about that

2  before.

3      Q.   When you say "people," are you talking

4  about voters who have voiced concerns about whether

5  or not their right to absolute secrecy in casting

6  their votes was being violated by the use of the

7  B.M.D.s?

8      A.   So you're -- are you saying that somebody

9  may have called and said my right was violated

10  because I had to do this?

11      Q.   No, sir.  I'm talking about the context

12  that you just described where you were at meetings

13  where people stood up and told about their

14  concerns.

15          And I'm wondering whether or not you

16  understood those folks to be electors, to be voters

17  who were concerned that, when they used a B.M.D.,

18  their right to absolute secrecy was being violated.

19      A.   I, again, I don't remember everything that

20  everyone said, whether that -- whether or not they

21  identified themselves as an elector or -- but I

22  know that people have stood and spoken and have

23  expressed that exact concern that you're talking

24  about.  But I can't begin to remember if somebody

25  identified themselves as a voter or not.

1    Q.   Did -- do you know if the Secretary of

2    State's office received complaints regarding

3    B.M.D.s and the size of the B.M.D. screens being a

4    problem with respect to the right of absolute

5    secrecy in casting one's ballots?

6    A.   I, although I can't point to any specific

7    complaint, I believe -- I believe that's correct.

8    I believe we have gotten some complaints along

9    those lines.

10    Q.   Okay.  And has the State of Georgia worked

11    at all with the Elections Assistance Commission

12    regarding the concerns about the size of the B.M.D.

13    screens and the privacy concerns that that creates?

14    A.   I don't believe I'm aware of any

15    communication with the E.A.C. on that.  And I

16    don't -- I don't recall any communication that I've

17    had with it regarding that topic.

18    Q.   I want to direct you to an exhibit, but my

19    exhibit list just went down and it's queuing back

20    up here.

21         All right.  So one of the things that the

22    Secretary of State's office did in order to try to

23    reconcile the tension between the right to absolute

24    secrecy and the need for poll watchers to keep an

25    eye on the voting equipment was to put together CGG

Page 259

1    Exhibit 12.

2              Can you take a look at that?

3                    (Whereupon, CGG Exhibit 12

4                    was marked for

5                    identification.)

6              THE WITNESS:  Okay.

7    BY MR. ICHTER:

8         Q.   Okay.  Exhibit 12 purports to be a

9    Precinct Layout to Aid With Privacy Training.  And

10   it is essentially a schematic that reflects a

11   couple of different approaches for the organization

12   of polling places to maximize the privacy of voters

13   as they use B.M.D.s; correct?

14        A.   That's correct.

15        Q.   Okay.  Now, who is it that prepared these

16   particular schematics?

17        A.   Well, actually, I did the rough version of

18   these.  But then somebody in our office who's a

19   much better graphic designer than I am populated it

20   with nice details.  Mine were boxes and arrows and

21   things like that.  So.  But I gave the rough plans

22   to somebody at our office to dress it up.

23        Q.   At the point in time that these were

24   created -- well, let me change that.

25              When were these schematics created?

1     A.   I don't remember.  I don't remember

2     exactly when I did that.

3     Q.   Did you actually have access to a live

4     B.M.D. at the point in time that you created the

5     schematic?

6     A.   I mean, I didn't have one in front of me,

7     but I had certainly been around them and had seen

8     them used when I created this, yes, if that's --

9     Q.   Okay.

10     A.   -- what you're asking.

11     Q.   Okay.  Did you have -- well, let's take a

12     look at the first schematic, which -- well, that

13     one says it's ineffective, so let's not look at

14     that one.  Let's look at the effective/preferred

15     precinct layout, which is the second schematic.

16     Okay?

17          And I take it that the difference between

18     schematic number one, which is ineffective, and

19     schematic number two, which is effective, is that

20     we see people lined up behind the folks who are

21     casting their votes on the B.M.D. screen, and it's

22     ineffective because, in the position of being

23     behind the voter, you can see the screen; right?

24     A.   You could potentially see the screen if

25     the person wasn't standing in front of it, yes.

1      Q.   Okay.  And the way that we cure that with

2      the effective and preferred precinct layout is that

3      we take the B.M.D.s and we point them towards a

4      wall, and the voters who are waiting to vote wait

5      on the other side such that they don't have a view

6      of both the back of the voter and the front of the

7      B.M.D. screen; right?

8      A.   That's correct.

9      Q.   Okay.  Now, when you put together the

10     effective and preferred precinct layout, did you

11     actually have two B.M.D. screens side by side

12     configured in the manner that is shown on this

13     preferred layout such that you could determine

14     whether or not, if you were standing -- if two

15     voters were standing next to each other, whether

16     they could see each other's screens as they voted?

17     A.   I did not.  And it's not necessarily drawn

18     to scale.

19     Q.   Okay.  All right.  Well, did you do any

20     sort of analysis, research or testing that was

21     designed to tell you whether or not two people who

22     were voting next to each other in this

23     configuration would be able to see how each other

24     was voting?

25     A.   I didn't do testing.  However, I had

1    travelled throughout the state and had observed a

2    lot of polling places and people voting, and so I

3    used that to inform this.

4        Q.   Okay.  Well, did you, yourself, ever stand

5    in front of a B.M. -- in connection with doing this

6    work, putting together this schematic, did you ever

7    stand in front of a B.M.D. screen that was active

8    that you were sort of doing a test vote on and have

9    somebody else stand next to you with a B.M.D.

10   screen to see whether or not you could see what

11   they were doing on their screen?

12       A.   I don't know that I ever conducted that

13   experiment specifically.  But I know that, in

14   our -- in our training environment we had B.M.D.s

15   set up kind of side by side for demonstration and

16   for training and stuff like that, so I was familiar

17   with seeing B.M.D.s side by side.

18       Q.   And are you saying that, when a B.M. --

19   when two people are voting side by side in the

20   manner depicted in this, quote, effective and

21   preferred precinct layout, that neither one of

22   those people standing next to each other can see

23   how the other one is voting because of the layout

24   of the precinct?

25       A.   I'm saying they can be set up so that

1    that's not the case.  It -- they could also be set

2    up ineffectively in that same -- they could be too

3    close.  They could be set too far back.  There --

4    you could -- you could certainly configure it so

5    that that's not optimal either.

6           But I believe that if you -- if you did it

7    effectively and you tested that with the set-up and

8    there was enough room, that they could be

9    potentially side by side.

10   Q.   Okay.  So --

11   A.   Again, this was -- this wasn't designed to

12   tell people, hey, slap them right next to each

13   other.  It was designed primarily to say, hey, turn

14   them around so that they're not facing outwards.

15   Q.   Okay.  Let me ask you this.  I trust that

16   a fundamental assumption of the way that this is

17   configured, the layout is configured, that one of

18   your fundamental assumptions is that neither one of

19   these voters -- and let's talk about the two folks

20   in blue at the bottom, bottom left-hand corner.

21          Do you see where I am?

22   A.   Yes, sir.

23   Q.   Okay.  Those, let's call them voter one,

24   the lower one, and voter number two is the higher

25   one in the --

1      A.   Okay.

2      Q.   -- blue and white.  Is it not a

3   fundamental assumption of the notion that this is

4   effective that voter number one is not going to try

5   to look at voter number two's screen?

6      A.   I think the -- because it's illegal to

7   look at somebody else's screen, I think there's --

8   that's part of the equation, that you're not

9   allowed to look at somebody else's screen.  So I

10   think that's factored in.

11          I don't know that you rely on that

12   exclusively.  Otherwise you could, you know, put

13   them together and just say, hey, the law says you

14   can't look at them.  You certainly want to help

15   people obey the law by making it difficult.

16          But the expectation, legal expectation is

17   you're not going to look at somebody else's ballot

18   anyway.

19      Q.   But as you say, if the fundamental

20   assumption is that people are going to -- just

21   going to follow the law because it's the law, it

22   doesn't matter how the room is configured, right,

23   they're just not going to look?

24      A.   Right.  And so that's -- you know, I'm not

25   sure I estimate human nature quite that high that I

 1      would just leave them out there unguarded.

 2           But again, you know, could you set up a

 3      system with enough space or with some other type of

 4      barriers that would allow this to happen is --

 5      again, this is not the only way to do it.  But in

 6      contrast to the previous one, this is a -- this is

 7      a better way to do it.

 8      Q.   So since you and I have been around the

 9      block a couple of times and we know human nature is

10      such that people do not always follow the law, we

11      should assume that some voters will try to see how

12      some other voters are voting; correct?

13      A.   Yes.  And take appropriate precautions to

14      prevent that.

15      Q.   Is there anything in this particular

16      configuration, this preferred precinct layout, that

17      you believe prevents voter number one from taking a

18      look at voter number two's screen if that's what

19      they want to do?

20      A.   I think there could be.  I know a number

21      of counties set up additional privacy screens or

22      they had curtains on the side.  So again, it

23      depends on the specifics of a -- of a particular

24      building and the particular polling place.  So the

25      answer is it could be.

1       Q.    Right.  One of the problems with

2   configuration number one is, if you're standing

3   directly behind the voter, the screens are of such

4   a size and the font is such a size that, if you're

5   straight behind them, you can pretty much get a

6   good look at the screen, can't you, if you're close

7   enough?

8       A.    Depending on the different factors, the

9   size of the voter, the distance, all those things,

10  it's certainly easier to get a look if you're

11  facing the actual screen or if the screen is facing

12  you than if the screen is blocked or obscured or

13  somehow not facing you directly.

14      Q.    Okay.  And if voter number one decided

15  that, since our lady in orange down here who is

16  going to take the place of voter number one is such

17  an anxious and enthusiastic voter that she's

18  already walking towards the machine as voter number

19  one finishes up, voter number one could go in

20  behind voter number two and take a glance at her

21  screen as she walked by and walk between the two

22  tables that have the B.M.D.s on them, couldn't she?

23      A.    That's a possibility.

24      Q.    Okay.  And if you're right behind at that

25  close a proximity, you're going to get a good look

Page 267

1    at that screen, aren't you?

2        A.    You might, depending on how the voter is

3    positioned and what other privacy measures they

4    have in place.

5        Q.    Then we have another preferred version

6    which has the voters at opposite ends of a table

7    that has the B.M.D.s at the ends of those tables;

8    correct?

9        A.    Correct.

10       Q.    Or in some cases I've seen metal cabinets

11   that contain the B.M.D.s; correct?

12       A.    Yes.   Fulton County uses those.

13       Q.    Okay.   Have you seen any polling places

14   that employ these specific schematics?

15       A.    Where they're set up on the end of the

16   table?

17       Q.    No.   I mean either one of them, either one

18   of the preferred schematics.

19       A.    Yes.

20       Q.    Okay.  All right.  Would you say that the

21   majority of polling places in the state of Georgia

22   employed layouts like these schematics?

23       A.    I wouldn't be able to answer that.   I've

24   certainly not been to a majority of the polling

25   places in Georgia.

Page 268

1          Q.    Take a look at CGG Exhibit 4.

2                          (Whereupon, CGG Exhibit 4

3                           was marked for

4                           identification.)

5          THE WITNESS:  Okay.  I've got it.

6     BY MR. ICHTER:

7          Q.    And before we get into that, is it correct

8     that the polling places have to have one B.M.D. for

9     every 250 voters in the precinct?  I may have

10    misstated.

11         A.    You -- I believe they have to have a

12    voting station for every 250 voters.

13         Q.    I may have --

14         A.    I think it technically doesn't require it

15    to be a B.M.D.

16         Q.    Okay.  Do you know if there's a ratio of

17    voters to B.M.D.s for polling places?

18         A.    I don't think specifically.  Most

19    counties -- most counties take a -- take the one to

20    250 for B.M.D.s.

21         Q.    Uh-huh.  Do you recognize this as being

22    the polling place for the presidential election at

23    the State Farm Arena in Atlanta, Georgia?

24         A.    I see that's how it's labeled.  I never

25    went there, but I don't dispute that that's what it

1    is.

2         Q.   Okay.  And do you see, are these B.M.D.s

3    that are contained inside of metal cabinets?

4         A.   Yes.

5         Q.   And is it four B.M.D.s, one on each end

6    and two in the middle, is that the way that it's

7    configured?

8         A.   I don't know if it's four or three.  But

9    it's at least three, and there may be four.  But I

10   don't --

11        Q.   It may be just one end unit?

12        A.   Yeah.  Or there could -- yeah, because

13   I -- something tells me there are only three per

14   unit, but I could be wrong.  I went and looked at

15   them when Fulton County first got them, but I don't

16   recall exactly how they're laid out.

17        Q.   Okay.  Do you see anything in this

18   particular photograph that employs some of the

19   strategies behind the preferred layouts that are

20   intended to protect the voter's right to absolute

21   secrecy?

22        A.   I do.

23        Q.   What's that?

24        A.   Well, you've got -- you've got a screen on

25   the end of a cart or a -- really it's the end of a

1    table.  And you also have the barrier doors between

2    the side-by-side creating a barrier to look from

3    one side to the next to see how your neighbor's

4    voting.

5            So I do see some of those --

6        Q.   Uh-huh.

7        A.   -- in this.

8        Q.   So if the -- the woman who's over to the

9    left-hand side in black carrying a piece of paper,

10   do you see her?

11       A.   Yeah.  Looking kind of straight at us?

12       Q.   Yep.

13       A.   Okay.

14       Q.   And you see the fellow in the orange

15   sweatshirt?

16       A.   I do.

17       Q.   Who must occupy the unfortunate station in

18   life of being a Tennessee Volunteer fan?

19       A.   Or a Halloween enthusiast.

20       Q.   Yeah.  One of those two.

21           Am I not correct that, if the lady in

22   black were to take about one or two more steps and

23   turn to her left, that she would be able to see

24   right over the shoulder of the gentleman in the

25   orange sweatshirt and see how he's voting?

Page 271

1        A.   I'm not sure that she'd be able to see

2   through the guy in the orange sweatshirt.  I mean,

3   if she -- am I saying if she made extraordinary

4   efforts might she be able to see it?  She might be

5   able to.  But he looks like he takes up a good

6   amount of real estate in front of that B.M.D.

7        Q.   Okay.  So people who have a little more

8   meat on their bones have a greater right to privacy

9   and voting in the state of Georgia.  What about

10  skinny folks?

11       A.   Well, I didn't say that.  You were --

12  we're talking about a specific case.

13       Q.   I understand.  I'm just making a joke.

14       A.   Okay.

15       Q.   But the point is, if there was someone who

16  was slighter than the gentleman in orange who was

17  casting votes at that point in time, somebody

18  standing directly behind them -- and there's no --

19  nothing that inhibits the ability of anybody in

20  this shot from standing one foot behind that

21  gentleman as he votes, is there?

22       A.   Well, they -- I suspect they probably had

23  COVID protocols and social distancing.  But whether

24  or not that would be enforced, I couldn't tell you.

25       Q.   Usually when I see social distancing and

Page 272

1    COVID protocols, there's tape on the floor.  Do you

2    see any tape on the floor?

3        A.   I do not.

4        Q.   Okay.

5        A.   I see everyone wearing masks.

6        Q.   So if that lady in black were to walk up

7    behind the gentleman in orange one foot behind him

8    and crane her neck a little bit, don't you think

9    she'd be able to see how he's voting?

10       A.   She might be able to.  Or if she walked up

11   and looked around his side or climbed up on his

12   shoulder, I believe she'd be able to do that.

13       Q.   And that would be a violation of his

14   absolute right to secrecy of his vote, wouldn't it?

15       A.   It would, and she would be breaking the

16   law.

17       Q.   Okay.  Now, if our friend in orange were

18   to vote by absentee ballot and mail in his ballot,

19   he wouldn't have that problem, would he?

20       A.   He would not.

21       Q.   Okay.  Or if he had a hand-marked paper

22   ballot and he was behind a curtain or some other

23   enclosure which would -- that would be possible, we

24   could use enclosures or curtains or things like

25   that where there was no mechanical device that we

Page 273

1    had to worry about being tampered with, because you

2    don't -- you can't tamper with a piece of paper;

3    right?

4        A.   Well, I think you -- I'm not sure I would

5    agree that you can't tamper with a piece of paper.

6    But I think that the -- I think there would not be

7    the same concerns with a curtain or a slide or

8    something like that if --

9        Q.   If you had a hand-marked paper ballot;

10   correct?

11       A.   I don't disagree with that.

12       Q.   So, so the ability to preserve the

13   absolute right to ballot secrecy would better be

14   served by hand-marked paper ballots; correct?

15            MR. RUSSO:  Objection to the form of

16       the question.  Calls for a legal

17       conclusion.

18            THE WITNESS:  It would certainly have

19       a -- it would provide different

20       opportunities.

21   BY MR. ICHTER:

22       Q.   And it doesn't have the same tension as

23   the securities between absolute secrecy and

24   security that we have with a ballot marking device;

25   correct?

1      A.   Say that again.  I --

2      Q.   Well, we had -- you testified before that

3  there's a tension between the need to have the

4  ballot marking device in a place where the poll

5  workers can see it and at the same time have

6  absolute secrecy of the manner in which the voter

7  votes --

8      A.   Right.

9      Q.   -- where they vote, how they vote.

10          And my question is, that tension is

11  eliminated with the hand-marked paper ballot;

12  correct?

13     A.   It's certainly diminished greatly.

14     Q.   Excuse me a second.  I'm sorry.  I'm

15  getting E-mails from my daughter's school.  Give me

16  just a second.

17          MR. RUSSO:  Want to take a break,

18     Cary?

19          MR. ICHTER:  Yeah.  Let's -- can we

20     take five?  Can we take five minutes?

21          MR. RUSSO:  Sure.

22          MR. ICHTER:  Thank you.

23          THE VIDEOGRAPHER:  The time is 3:32

24     p.m.  We're off the record.

25          (Whereupon, a discussion ensued

Page 275

1          off the record.)

2               (Whereupon, there was a brief

3           recess.)

4               THE VIDEOGRAPHER:  The time is 3:39

5           p.m.  We're on the record.

6     BY MR. ICHTER:

7          Q.   Okay.  Mr. Harvey, would you look at

8     Exhibit CGG 16.

9                         (Whereupon, CGG Exhibit 16

10                             was marked for

11                             identification.)

12               THE WITNESS:  Mine stops at 15.  Want

13          me to refresh and see if it comes up?

14     BY MR. ICHTER:

15          Q.   Yeah.  Try refreshing.  It was obviously

16     the last one.

17          A.   Okay.

18          Q.   Got it?

19          A.   Okay.  I've got it.

20          Q.   Okay.  This purports to be an E-mail from

21     Cynthia Willingham, dated June 11, 2020, to a

22     variety of people.  You're not one of them.  But

23     the subject is Additional Training Needed.

24               And this has to do with what appears to be

25     a batch management problem that is described by

Page 276

```
 1    Ms. Willingham in the first paragraph where she

 2    talks about an attempt to pull by mail ballots

 3    scanned from I.C.C. over into R.T.R. and it did not

 4    work.  And then she goes into some additional

 5    detail about that that I can let you read on your

 6    own.

 7            My first question is whether or not you

 8    are familiar with this batch management problem.

 9    A.    No, I'm not.

10    Q.    Okay.  You're not aware of this particular

11    problem that Rockdale County had?

12    A.    I don't believe so, no.

13    Q.    Okay.  Hold on a second.

14    A.    I mean, it --

15    Q.    Oh, I take it back.  You were one of the

16    recipients.

17    A.    I am on the E-mail.

18    Q.    Yeah.  That's correct.  Sorry.

19            Do you recall receiving this?

20    A.    I don't remember receiving it

21    specifically.  I'm not disputing that I received

22    it, but.

23    Q.    It's -- it says it's a request for

24    additional training.

25    A.    Uh-huh.
```

1      Q.   Are you aware of additional training that

2    was provided to Rockdale County because of a

3    problem that was being had there?

4      A.   I'm not aware of specific training for,

5    specifically for Rockdale County, but I know that

6    additional training was provided after the primary

7    election.

8          And a lot of it had to do with the back

9    end with the E.M.S. uploads, which is where we

10   identified a -- you know, some concerns with people

11   doing that.

12         So I know there was additional training

13   provided.  Whether or not Rockdale County

14   specifically took advantage of it, I suspect they

15   did, because she was a pretty proactive director.

16     Q.   And when you say "problems with people

17   doing that," what specifically are you referring

18   to?

19     A.   Well, again, I didn't -- I didn't really

20   get into a lot of the specifics of the E.M.S. and

21   the process used to upload and do that kind of

22   stuff, but I knew that those were processes that

23   had to be done exactly.  I mean, you -- if you

24   don't follow one of the steps, you're not going to

25   get everything where it needs to be.

1            So we, after the primary, we got with

2       Dominion and identified complaints that they got,

3       concerns that their techs reported, and said, okay,

4       where do we need to target some training for areas

5       of concern for all the counties.

6            And so we did our best to get whatever

7       specific training people needed or make it

8       available for them to take advantage of it.

9       Q.   Were there a number of counties that were

10      having issues with respect to the uploads to the

11      E.M.S. system?

12      A.   I don't know about a number.  I know that

13      there were counties that had problems with it, but

14      I couldn't tell you how many.

15      Q.   Okay.  And following the additional

16      training, is it your testimony that those problems

17      did not persist?

18      A.   They, I think they certainly got better.

19      But as you saw, and I think it was maybe during the

20      previous questioning, you had the director in

21      Sumter County that still wasn't comfortable with

22      doing it.

23           So I wouldn't say that, you know,

24      everything was perfect and that everybody had a

25      perfect comprehension of everything they were

Page 279

1    supposed to be doing, which is why we, you know,

2    tried to drive as much training as we could.

3        Q.   And when these problems would arise, what

4    would be the upshot of the problems in terms of

5    election results?

6        A.   Well, it depends on what the -- what the

7    issue was and how long it took to get it resolved.

8    If it was a simple, you know, phone call to a

9    support person to say, you know, I can't -- I can't

10   do this thing to move on to the next step, they

11   could maybe walk them through the process of, hey,

12   have you done this, have you done this, have you

13   done -- oh, no, I missed that step, well, you do

14   that and then you can go forward.

15             And in some cases it did delay results.

16   We did have some instances where results were

17   delayed and we, you know, we did our best to get

18   those resources to the people who had those kinds

19   of problems.

20       Q.   Okay.  Did the problems ever result in the

21   inaccurate counting of votes?

22       A.   Not that I'm aware of, no.

23       Q.   Okay.  Give me just a second.

24             MR. ICHTER:  Sir, that's all I have

25       for you.  I certainly do appreciate your

Page 280

1      time and patience.

2           THE WITNESS:  Thank you.

3           MS. ELSON:  Before we go off the

4      record, this is Hannah with Morrison &

5      Foerster, I'd just like to put on the

6      record that we're going to hold the

7      30(b)(6) part of the deposition open

8      because Mr. Harvey wasn't knowledgeable on

9      certain topics that he was designated on.

10     And we're going to send a follow-up note

11     explaining our position on that.

12          THE VIDEOGRAPHER:  All right.  This

13     concludes the deposition.  The time is

14     3:46 p.m., and we're now off the video

15     record.

16          (Whereupon, a discussion ensued

17      off the record.)

18          (Whereupon, the reading and

19      signing of the deposition by the

20      witness was reserved.)

21          (Witness excused.)

22                  - - -

23          (Whereupon, the deposition

24      concluded at 3:50 p.m.)

25                  --oOo--

Page 281

1                    VERITEXT LEGAL SOLUTIONS

2                 FIRM CERTIFICATE AND DISCLOSURE

3

4           Veritext represents that the foregoing
    transcript as produced by our Production
5   Coordinators, Georgia Certified Notaries, is a
    true, correct and complete transcript of the
6   colloquies, questions and answers as submitted by
    the certified court reporter in this case.

7

8           Veritext further represents that the
    attached exhibits, if any, are a true, correct and
    complete copy as submitted by the certified
9   reporter, attorneys or witness in this case;

10          And that the exhibits were handled and
    produced exclusively through our Production
11  Coordinators, Georgia Certified Notaries.  Copies
    of notarized production certificates related to
12  this proceeding are available upon request to
    litsup-ga@veritext.com.

13

14          Veritext is not taking this deposition
    under any relationship that is prohibited by OCGA
15  15-14-37(a) and (b).  Case-specific discounts are
    automatically applied to all parties at such time
16  as any party receives a discount.  Ancillary
    services such as calendar and financial reports are
    available to all parties upon request.

17

18

19

20

21

22

23

24

25

Page 282

1          R E P O R T E R   C E R T I F I C A T E

2     STATE OF GEORGIA )
      COBB COUNTY      )
3

4          I, Debra M. Druzisky, a Certified Court
      Reporter in and for the State of Georgia, do hereby
5     certify:
           That prior to being examined, the witness
6     named in the foregoing deposition was by me duly
      sworn to testify to the truth, the whole truth, and
7     nothing but the truth;
           That said deposition was taken before me
8     at the time and place set forth and was taken down
      by me in shorthand and thereafter reduced to
9     computerized transcription under my direction and
      supervision.  And I hereby certify the foregoing
10    deposition is a full, true and correct transcript
      of my shorthand notes so taken.
11         Review of the transcript was requested.
      If requested, any changes made by the deponent and
12    provided to the reporter during the period allowed
      are appended hereto.
13         I further certify that I am not of kin or
      counsel to the parties in the case, and I am not in
14    the regular employ of counsel for any of the said
      parties, nor am I in any way financially interested
15    in the result of said case.
           IN WITNESS WHEREOF, I have hereunto
16    subscribed my name this 11th day of February, 2022.

17

18

19
                         <%13053,Signature%>
20    _____
                         Debra M. Druzisky
21                       Georgia CCR-B-1848

22

23

24

25

Page 283

1                R E P O R T E R   D I S C L O S U R E

2     DISTRICT COURT   )    DEPOSITION OF
      NORTHERN DISTRICT)    WILLIAM "CHRIS" HARVEY
3     ATLANTA DIVISION )

4            Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:
6            I am a Georgia Certified Court Reporter.
      I am here as a representative of Veritext Legal
7     Solutions.
             Veritext Legal Solutions was contacted by
8     the offices of Morrison & Foerster to provide court
      reporting services for this deposition.  Veritext
9     Legal Solutions will not be taking this deposition
      under any contract that is prohibited by O.C.G.A.
10    9-11-28 (c).
             Veritext Legal Solutions has no contract
11    or agreement to provide court reporting services
      with any party to the case, or any reporter or
12    reporting agency from whom a referral might have
      been made to cover the deposition.
13           Veritext Legal Solutions will charge its
      usual and customary rates to all parties in the
14    case, and a financial discount will not be given to
      any party in this litigation.

15

16

17                          Debra M. Druzisky
                            Georgia CCR-B-1848
18

19

20

21

22

23

24

25

1    Vincent Russo, Esquire

2    vrusso@robbinsfirm.com

3                        February 7. 2022

4    RE: Curling, Donna  v. Raffensperger, Brad

5        1/28/2022, William  "Chris" Harvey (#5037466)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                       Yours,

23                 Veritext Legal Solutions

24

25

```
 1    Curling, Donna  v. Raffensperger, Brad

 2    William  "Chris" Harvey (#5037466)

 3                 E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____     _____

24    William  "Chris" Harvey Date

25
```

1   Curling, Donna  v. Raffensperger, Brad

2   William  "Chris" Harvey (#5037466)

3                   ACKNOWLEDGEMENT OF DEPONENT

4       I, William  "Chris" Harvey, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____ _____

12   William  "Chris" Harvey Date

13   *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20____.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25