IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

_____

DONNA CURLING, ET AL.,

      Plaintiffs,      CIVIL ACTION FILE
                           NO. 1:17-CV-2989-AT

vs.

BRAD RAFFENSPERGER, ET AL.,

      Defendants.

_____

VIDEO-RECORDED 30(b)(6) DEPOSITION

TAKEN VIA VIDEOCONFERENCE OF

GEORGIA SECRETARY OF STATES' OFFICE

BY: SANFORD MERRITT BEAVER

AND

SANFORD MERRITT BEAVER

IN HIS PERSONAL CAPACITY

(Taken by Plaintiffs)

Atlanta, Georgia

Wednesday, February 2, 2022

9:08 a.m.

Reported stenographically by
V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR

```
 1                     APPEARANCES

 2   ON BEHALF OF THE PLAINTIFFS:
     (Appeared Via Videoconference)
 3
             DAVID D. CROSS, Esquire
 4           REILEY JO PORTER, Esquire
             LOGAN WREN, Esquire
 5           ZACHARY FUCHS, Esquire
             REEMA S. SHOCAIR ALI
 6           Morrison & Foerster LLP
             2100 L Street, NW, Suite 900
 7           Washington, D.C. 20037
             (202) 887-8795
 8           dcross@mofo.com

 9   ON BEHALF OF THE SECRETARY OF STATE
     and THE STATE ELECTION BOARD:
10   (Appeared Via Videoconference)

11           ALEXANDER DENTON, Esquire
             JAVIER PICO-PRATS, Esquire
12           CAREY MILLER, Esquire
             Robbins Alloy Belinfante
13           Littlefield LLC
             500 14th Street, NW
14           Atlanta, Georgia 30318
             (404) 856-3276
15           adenton@robbinsfirm.com
             jpicoprats@robbinsfirm.com
16           cmiller@robbinsfirm.com

17   ON BEHALF OF THE DEFENDANTS
     FULTON COUNTY VOTER REGISTRATION AND ELECTIONS:
18   (Appeared Via Videoconference)

19           DAVID LOWMAN, Esquire
             Office of the Fulton County Attorney
20           141 Pryor Street, SW, Suite 4038
             Atlanta, Georgia 30303
21           (404) 612-0286
             david.lowman@fultoncountyga.gov
22

23

24

25
```

```
 1    APPEARANCES (Continued)
      (Appeared Via Videoconference)
 2
              MARILYN MARKS,
 3            Vice President and Executive Director
              Coalition For Good Governance
 4            1520 Cress Court
              Boulder, Colorado 80304
 5            (704) 292 9802
              Marilyn@USCGG.org
 6

 7    Also Present:

 8            JONATHAN MILLER, Videographer

 9

10

11

12

13

14

15

16

17            VIDEO-RECORDED 30(b)(6) DEPOSITION

18    TAKEN VIA VIDEOCONFERENCE OF GEORGIA SECRETARY OF

19    STATES' OFFICE BY: SANFORD MERRITT BEAVER AND

20    SANFORD MERRITT BEAVER IN HIS PERSONAL CAPACITY,

21    a witness called on behalf of the Plaintiffs,

22    before V. Dario Stanziola, CCR (GA)(NJ), RPR,

23    CRR, with the deponent located in Atlanta,

24    Georgia, on Wednesday, February 2, 2022,

25    commencing at 9:08 a.m.
```

Page 4

1                    INDEX OF EXAMINATIONS

2

3
    By Mr. Cross                          PAGE     7
4

5

                     INDEX OF EXHIBITS
6
    NUMBER           EXHIBIT                  MARKED
7
    Exhibit 1: Curling Plaintiffs' Second    10
8   Amended Notice of Deposition of
    Office of the Secretary of State
9
    Exhibit 2: Declaration of Merritt        23
10  Beaver

11  Exhibit 3: Declaration of S. Merritt     68
    Beaver
12
    Exhibit 4: LinkedIn Printout of          94
13  Merritt Beaver's profile page

14  Exhibit 5: Atlanta                       112
    Journal-Constitution article entitled
15  Case files discredit Kemp's
    accusation that democrats tried to
16  hack Georgia election

17  Exhibit 6: E-mail string with the top    115
    from Kevin Robertson dated 7/1/2020
18
    Exhibit 7: E-mail string with the top    129
19  from Kay Stimson dated 12/2/2020

20  Exhibit 8: ImageCast X ballot marking    135
    device document
21
    Exhibit 9: Document entitled             141
22  Information Technology Security
    Program Charter
23
    Exhibit 10: Document entitled            146
24  Fortalice Solutions Web Vulnerability
    Remediation Checks Secretary of State
25  Georgia Draft - July 14, 2020

1    Exhibit 11: E-mail string with the        152
     top from Dave Hamilton dated
2    7/10/2020

3    Exhibit 12: E-mail string with the        156
     top from Chris Furtick dated
4    11/2/2020

5    Exhibit 13: E-mail string with the        159
     top from Kevin Rayburn dated 4/5/2019
6
     Exhibit 14: E-mail string with the        162
7    top from Josh Hood dated 4/3/2019

8    Exhibit 15: E-mail string with the        167
     top from Dave Hamilton dated
9    8/13/2020

10   Exhibit 16: E-mail string with the        170
     top from Chris Harvey dated
11   12/30/2020

12   Exhibit 17: E-mail string with the        176
     top from Dave Hamilton dated
13   12/21/2020

14   Exhibit 18: 2020 Security of the          184
     voter registration system artifacts
15   and attestation pursuant to Rule
     590-8-3-.01 December 18, 2020
16
     Exhibit 19: E-mail from Dave Hamilton     188
17   dated 8/21/2020

18   Exhibit 20: E-mail string with the        189
     top from Angelos Keromytis dated
19   12/31/2020

20   Exhibit 21: E-mail string with the        201
     top from Terry Jones dated 9/17/2020
21
     Exhibit 22: Document entitled             203
22   Fortalice Rules Of Engagement For
     Georgia Secretary of State Memorandum
23
     Exhibit 23: E-mail string with the        209
24   top from Dave Hamilton dated
     7/29/2020
25

```
 1     Exhibit 24: E-mail string with the        214
       top from Merritt Beaver dated
 2     11/12/2020

 3     Exhibit 25: E-mail from Jason              220
       Matthews dated 11/3/2020
 4
       Exhibit 26: E-mail string with the        224
 5     top from Kevin Robertson dated
       8/14/2020
 6
       Exhibit 27: E-mail string with the        226
 7     top from Merritt Beaver dated
       3/3/2019
 8
       Exhibit 28: E-mail from Nick Salsman      240
 9     dated 8/14/2020

10     Exhibit 29: Document entitled             250
       Election Office Notes: 10 am
11     6/15/2020 Meeting

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

```
 1              THE VIDEOGRAPHER:  We are on the record

 2         February 2nd, 2022 at approximately

 3         9:08 a.m. Eastern time.  This will be

 4         volume II to the 30(b)(6) videotaped

 5         deposition of the Secretary of State's

 6         office.  The representative today will be

 7         Merritt Beaver.  Will counsel please

 8         identify themselves and who they represent

 9         for the record.

10         MR. CROSS:  This is David Cross of

11         Morrison & Foerster for the Curling

12         plaintiffs.

13              MR. DENTON:  This is Alexander Denton

14         of Robbins Alloy Belinfante Littlefield for

15         the state defendants.

16              THE VIDEOGRAPHER:  Will the court

17         reporter please swear in the witness.

18         (OATH ADMINISTERED.)

19              SANFORD MERRITT BEAVER,

20    having first been duly sworn, was examined and

21    testified as follows:

22                        EXAMINATION

23    BY MR. CROSS:

24         Q.   Good morning, Mr. Beaver.

25              Are we picking you up okay?
```

```
 1              THE STENOGRAPHER:  I can't hear him.
 2      A.   Can you hear me?
 3      Q.   You kind of cut in and out I think with
 4  the microphone.
 5      A.   I can sit closer.
 6           Is that -- is that better?
 7      Q.   Little bit.  It tends to lose the first
 8  word or two is what I hear.
 9      A.   I'm not sure what -- what to do for
10  you.
11              THE VIDEOGRAPHER: I can walk him
12       through making a quick adjustment, counsel,
13       that it should help.  Would you like to --
14       it could -- it's pretty quick.  We can do
15       it on the record or go ahead and go off
16       real fast.
17             MR. CROSS:  We can go off.
18             THE VIDEOGRAPHER:  The time is 9:10.
19          We're off the record.
20             (A DISCUSSION WAS HELD OFF THE RECORD.)
21             THE VIDEOGRAPHER:  The time is 9:11.
22          We're back on the record.
23  BY MR. CROSS:
24      Q.   Good morning, Mr. Beaver.
25      A.   Good morning.
```

Page 9

```
 1        Q.    Have you been deposed before?

 2              Sorry, did you say yes?

 3              Yeah, we're not getting that.

 4              Yeah, let's go off the record.  Your

 5   mic's not working.

 6              THE VIDEOGRAPHER:  The time is 9:11.

 7         We're off the record.

 8              (A DISCUSSION WAS HELD OFF THE RECORD.)

 9              THE VIDEOGRAPHER:  The time is 9:13.

10         We're back on the record.

11   BY MR. CROSS:

12        Q.   All right.  Good morning, Mr. Beaver.

13   We'll try this again.

14        A.    Good morning again.

15        Q.    And I think you said you have or have

16   not been deposed before?

17        A.    I have been deposed before.

18        Q.    Okay.  All right.  And did you meet

19   with counsel before your deposition today?

20        A.    Yes.

21        Q.    Okay.  So do you understand that you're

22   testifying today not just in your personal

23   capacity, but as a representative of the

24   Secretary of State's office on particular topics?

25        A.    Yes, I do.
```

1        Q.   And do you understand that means that

2    you're testifying as to the knowledge and

3    information that the Secretary's has on those

4    topics?

5        A.   Yes, I do.

6        Q.   Okay.  So do you have exhibit share up

7    in front of you?

8        A.   No.  I need to click on something?

9        Q.   Oh.

10            MR. CROSS:  Let's go off the record

11        again.

12            THE VIDEOGRAPHER:  The time is 9:14

13        We're off the record.

14            (A DISCUSSION WAS HELD OFF THE RECORD.)

15            THE VIDEOGRAPHER:  The time is 9:17.

16        We're back on the record.

17            (Exhibit 1: Curling Plaintiffs' Second

18        Amended Notice of Deposition of Office of

19        the Secretary of State marked for

20        identification, as of this date.)

21    BY MR. CROSS:

22        Q.   Mr. Beaver, do you have Exhibit 1 in

23    front of you?

24        A.   I do.

25        Q.   Have you seen this document before?

Page 11

1    You can flip through it.

2         A.    This looks -- yeah, this looks like the

3    document that counsel had shown me before.

4         Q.    Okay.  So scroll down to -- oh, there

5    are no page numbers.  The -- sorry about that.

6    The page that has amended topics on the top.  It

7    looks like it's page 7 of the PDF.

8         A.    I'm there.

9         Q.    And do you see topic 1 reads,

10   Implementation and operation of Georgia's current

11   election system limited to the following

12   subtopics and then there's subtopic A; do you see

13   that?

14        A.    Yes.

15        Q.    And then subtopic B and C are at the

16   top of the next page.

17              Do you see that?

18        A.    Yes.

19        Q.    And do you understand you've been

20   designated by the Secretary's office to testify

21   today on topics 1 A, B and C?

22        A.    Yes.

23        Q.    Okay. And then scroll down to topic 10,

24   if you would, please, which is on page 14 of the

25   PDF.

Page 12

1       A.   I see.  Yes.

2       Q.   And do you understand you've been

3  designated to testify on that topic today?

4       A.   Yes.

5       Q.   And then if you come to the last topic,

6  18, on page 15; do you see that?

7       A.   Yes.

8       Q.   And do you understand you've been

9  designated to testify on that topic today as

10  well?

11       A.   Yes.

12       Q.   Are there any other topics in here that

13  you understand you're designated to testify on

14  today that we've not addressed?

15       A.   Give me a moment.  No.

16       Q.   Okay.  All right.  Come back to topic

17  1A, if you would, please.

18       A.   1A.  I'm here.

19       Q.   And what did you do to prepare to

20  testify on topic 1A today?

21       A.   I went and validated -- first off,

22  let's define malware.  Malware is an application

23  program that runs on a computer that was

24  basically designed to do an action of some sort,

25  all right?

1          Malware must follow two tenets.  It has

2   to follow the rules of physics, means it can't

3   just pop and arrive someplace without having some

4   way of getting there.  It has to take digital

5   space.  And it has to follow programming logic.

6   Somebody had to program it to do something.

7          And malware can't switch on its own

8   from being a banking malware that looks for

9   credit cards and all of a sudden be software that

10  grabs voter data.  So it has a specific purpose.

11  So when they're speaking of malware is located on

12  the components of this -- the prior election

13  system, knowing that it's have to follow those

14  two tenets, it has to be physically there and it

15  has to follow programming logic, which means it

16  was designed to work on a Windows platform with

17  an access database.

18          Are we agreeing that's what we're

19  talking about here?

20       Q.   You're the witness, Mr. Beaver.  I will

21  defer to you as to how you want to define it.

22       A.   Okay.  That's what this question is

23  asking.  Is it -- did we determine whether

24  malware is located on any component, all right?

25  We did not find any malware on that.  But even if

1    there was malware on it, if it at any way managed

2    to get to a new platform, it would be inert,

3    meaning it would have no capabilities in the new

4    environment.  Because based on this question, the

5    malware was targeting the old election system,

6    which was Windows-based using access database

7    application.

8              One of the smartest things that the

9    Georgia Secretary of State did was we moved to a

10   system that was completely different, meaning it

11   didn't use the same operating system, did not use

12   the application prior used, which means that

13   anything that was targeting that system would be

14   inert in a new system.  But even knowing that, we

15   did make sure that it didn't exist.

16      Q.   Okay. Let me -- we'll come back to that

17   answer.  But let me come back to the question I

18   asked you.  What did you do to prepare to testify

19   on topic 1A?

20      A.   I validated with my team that we built

21   out a whole different system not connected at any

22   reason or physically or electronically to the old

23   system.  We had no components of the old system,

24   no software, no data, no anything.  And the

25   reason was the two systems were so different

1    there was absolutely nothing in the old system

2    that was useful in the new system.  So there was

3    no reason to move any of that stuff over there.

4    The old system was old equipment.  We didn't need

5    to use any old equipment.  We started fresh.  And

6    there was nothing on the old system that was

7    needed in the new system.  So there was no effort

8    to even try to connect the two.  Because it would

9    have made no value, added no value.

10        Q.   When you say you validated this with

11   your team what did you do to validate that?

12        A.   I met with my team, met with the people

13   that were actually hands on doing it, the work,

14   and validated this is the process we follow.

15        Q.   When did you do that?

16        A.   Probably at least two or three weeks

17   ago.  Well -- and I -- we did it a long time ago

18   when we actually did the move.  We met and talked

19   about how we were going to do it.  That was back

20   when we actually built out the new system.  We

21   did a whole plan as to how we would built --

22   would build it out.  There was conversation of is

23   there anything needed from the old system?  The

24   answer was no.  Do we need any of the data on the

25   system?  No.  So there was no effort to even try

1    to do anything with the old system.  When we

2    finished using the old system we just turned it

3    off.

4         Q.   When did that happen?

5         A.   We walked away from it.

6         Q.   When did that happen?

7              When did you turn off the old system?

8         A.   It was -- I'd have to go back and look.

9    I mean, I'd be guessing right now.

10        Q.   Do you have any time frame?

11             Was it 2019 when you rolled out the new

12   system or was it 2020?

13        A.   We had the old system still on -- I'll

14   say turned on.  But we essentially -- we call it

15   put it over in the corner because nobody was

16   using it for about six months just in case there

17   was any questions about something that was done

18   in that system.  So it would be somewhere towards

19   the end of '19, probably into early 2000 that we

20   literally unplugged it.

21        Q.   And did servers from the old system sit

22   in the same environment as the new system at any

23   point?

24        A.   Nope.  They were in totally different

25   racks.  In fact, the rack was on wheels.  When we

1   finished we literally rolled it into a caged area

2   that was locked, pulled all the cables off of it

3   and left it in a secure area.  So it -- nobody

4   could accidentally get into it.  It would have

5   taken somebody from my group to go reset it up.

6        Q.   Okay.  Who did you meet with you said

7   about two or three weeks ago to validate this for

8   the system?

9        A.   Who did I meet with?  My director of

10  technology.  My -- a couple of the people that

11  work with him.

12       Q.   What's his name?

13       A.   Jason Matthews.

14       Q.   You said Jason Matthews?

15       A.   Yeah, Jason Matthews.

16       Q.   And who else did you meet with?

17            What are their names?

18       A.   Ronnell Spearman and Kevin Fitts.

19       Q.   And they are report to the director of

20  technology?

21       A.   Yes.

22       Q.   And were they the ones that were

23  responsible for setting up the -- the new system

24  and turning off the old one?

25       A.   Ronnell was involved in that group,

1    Jason was involved in that group.  I think Kevin

2    was more on the sidelines, was being informed as

3    to what was going on.  He was part of the team

4    that -- that was more consulted as to what we

5    should do.  But I don't know that he had any

6    hands-on.

7         Q.   Do they have log-in credentials for the

8    Dominion EMS server at the state?

9         A.   Yes.

10        Q.   Do you?

11        A.   No.

12        Q.   Who else has log-in credentials for the

13   state Dominion EMS server?

14        A.   On the -- it's called the

15   infrastructure team.  Those are the IT people

16   that manage the servers.  They're probably maybe

17   two, two other people.

18        Q.   And they're on the infrastructure team?

19        A.   Yes.

20        Q.   Okay.  Do you know if anyone in Michael

21   Barnes's office has log-in credentials?

22        A.   I have one person that's on the

23   infrastructure team that works over in his group.

24   And I believe he does.  His group is actually in

25   a different building.  So we -- we have to have

1    somebody on site to support his group.

2        Q.   You said there's no equipment used with

3    the old system that's used with the new system.

4    Did I understand that right?

5        A.   Correct.  The old system was

6    Windows-based running access.  It's a very old

7    Windows 2000 environment.  The new system is

8    Android-based.

9        Q.   The -- the individuals who have log-in

10   credentials for the new system for the EMS

11   server, did you guys replace all of their laptop

12   computers, any electronic equipment that they use

13   for their work with respect to elections?

14       A.   Are you saying the -- the people that

15   work over in the -- in election center?  The

16   people that use this new environment?

17       Q.   I'm saying anyone who has access or

18   uses this new environment, did you replace all of

19   their electronic equipment that they use for

20   their work?  So computers, laptops, removable

21   media?

22       A.   Yes, all -- all desktops, everything

23   connected to that new environment, including the

24   wires in the wall, were all brand new.  The

25   desktop computers that they used to tie into it

Page 20

1    were brand new.  We started clean, fresh.  We did

2    not take any chances by introducing anything old.

3        Q.   And how do you -- I'm sorry.  Go ahead.

4        A.   We did not share any of the networking

5    infrastructure.  That was all new.

6        Q.   And are you saying -- you're also

7    saying that there is no data in the old system

8    that's used with the new system?

9        A.   Correct.  As I said, it's not

10   compatible.

11       Q.   So how does that work for the data in

12   E-Net?  Doesn't --

13       A.   So -- so for the new system, we had to

14   go back to E-Net and get new data and bring it

15   over to the new system.

16       Q.   All right.  So how did you do that?

17            I thought you said there's no data from

18   the old system used in the new system?

19       A.   The old system -- there are multiple

20   systems.  Their E-Net is not the voter -- the

21   votering balloting system.  The question that

22   this test talks about is all of the ballot and

23   voting system, not the voter registration system.

24   So when you're speaking of the system, I need you

25   to tell me which system you're talking about.  So

Page 21

1    voter registration system is different than the

2    ballot generation system that feeds the -- the

3    vote-taking system, the voting system.  It's two

4    complete environments.  Two totally different

5    systems.

6         Q.   So you don't --

7         A.   The only thing that comes from one to

8    the other is E-Net will export information about

9    candidates over to the balloting system.

10        Q.   Do you not consider Georgia's voter

11   registration system part of the state's election

12   system?

13        A.   That is an umbrella statement.  And

14   when you say the election system, there are

15   numerous systems.  They're not tied together.

16   They're all independent systems that are run and

17   managed independently.  So you can't apply

18   something about one system to the other system.

19   Operating systems are different, applications are

20   different.  The actual users are different.

21        Q.   So let me -- let me just make sure I

22   understand.  I just want to see -- so does

23   Georgia's election system include the voter

24   registration database or that's something

25   separate?

Page 22

1        A.    So when you say the Georgia election

2    system, are you stating the system that collects

3    votes and builds ballots?

4        Q.    I'm asking what you think of as the

5    election system as the chief information officer

6    for the Secretary, does that include the voter

7    registration database as you think of the

8    election system?

9        A.    So as I said, when you -- when I hear

10   you say the election system, I hear an umbrella

11   that encompasses multiple systems.  Each of those

12   systems are different and run on different

13   platforms, are run in different data centers,

14   have different security profiles.

15       Q.    Is that a yes or a no to my question?

16       A.    It's not a yes or no question.  Because

17   you asked a very broad question about multiple

18   systems.  So the election system contains many

19   systems.

20       Q.    So you can't say yes or no whether the

21   state election system includes the voter

22   registration database; is that right?

23             MR. DENTON:  Objection.

24       A.    I think I was pretty clear.  I said it

25   was an umbrella that covered many systems.

1      Q.   Okay.  So answer to my question is yes,

2   the election system includes the voter

3   registration database; are we agreed on that or

4   not?

5           MR. DENTON:  Objection.

6      A.   The election system is a umbrella which

7   I consider covers many systems where the voter

8   registration system is one of those systems under

9   what we call the elections system.

10          (Exhibit 2: Declaration of Merritt

11           Beaver marked for identification, as of

12           this date.)

13     Q.   All right.  Mr. Beaver, grab Exhibit 2.

14   We'll come back to Exhibit 1.  So you may want to

15   leave that up, if you can.

16     A.   Is that -- is there something new in

17   here that I've got to look at?

18     Q.   Yeah.  And you have to -- sometimes you

19   have to refresh.  So if you just refresh your

20   screen, it will pull up the next exhibit.  It

21   will be Exhibit 2.  Just let me know when you

22   have it.

23     A.   All right.  That's the one that says

24   0002?

25     Q.   Yes, sir.

Page 24

```
 1        A.    Declaration.
 2              All right.  It's a declaration of mine
 3   from -- what's the date on it?
 4        Q.    If you go to the last day, you'll see
 5   it's executed August 13, 2018.
 6              Do you see that?
 7        A.    Okay.  All right.  Got it.
 8        Q.    And were you careful and truthful in
 9   preparing this declaration?
10        A.    Yeah, I think I was.
11        Q.    Okay.  So take a look at paragraph 3 of
12   your declaration, please.
13        A.    Yes.
14        Q.    If you come four lines down -- or
15   sorry, five lines down you see the sentence you
16   wrote, our election system includes a voter
17   registration database; do you see that?
18        A.    Yes.
19        Q.    Okay.  So we're agreed on that, right?
20        A.    Yep.  Right there.
21        Q.    Okay.  And you go on to say --
22        A.    And if you go -- the next line talks
23   about another system and --
24        Q.    I'm going to get there. I'm going to
25   get there.  Mr. Beaver, I'm going to -- you're
```

1    going to have plenty of chances to say what you

2    want to say today.  The state's counsel can ask

3    you questions too.  But just work with me and try

4    to limit your answers to my questions.

5             MR. DENTON:  Well, that said, David,

6         he's also entitled to finish his answer,

7         so...

8             MR. CROSS:  He's entitled to answer the

9         questions.  He's not entitled to go beyond.

10        But we don't need to debate it.  You can

11        ask him whatever you want at the end -- at

12        the end of the deposition.

13        Q.   All right.  So Mr. -- I was going to go

14   on and read the rest, Mr. Beaver.  So in addition

15   to the voter registration database, you indicate

16   the election system includes an air gap system

17   for building ballots, numerous other components

18   including -- I think it's supposed to be an

19   online, but including online voter registration

20   tool, an online voter information page, an

21   election night reporting page.  And because this

22   was signed in 2018, at that time you indicated

23   direct reporting electronic voting machines used

24   for casting ballots, right?

25        A.   Yes.

1        Q.    The definition you have for your

2    election system, is the only thing that's

3    different today is that in lieu of the DRE voting

4    machines used for casting ballots, you now have

5    the BMDs?  Was there anything --

6        A.    So what's under those systems, like the

7    air gap system for building ballots, it's a

8    totally different air gap environment for

9    building ballots, running a different application

10   than this point.  But we still have an air gap

11   system for building ballots today.  It's just got

12   a different application inside of it.

13       Q.    Understood.

14       A.    The voter information page is the same,

15   the election night reporting page is the same.

16   Like you said, the DRE is replaced -- replaced

17   with a different system.  And all those fall

18   under the election system umbrella.

19       Q.    And when you say election system

20   includes numerous other components, what are

21   those other components?

22       A.    Those could be networked environments,

23   the securities applications that protect it,

24   things like that.

25       Q.    What networked environments are

1   included in the election system today?

2       A.   So they -- at the data center where the

3   election system is held there is a whole network

4   environments which components for security and

5   basically segmenting networks, the actual

6   environment itself.  Each of our environments

7   have those kind of components in it.  They're not

8   necessarily the same.  They're different based on

9   the system that it's protecting and the system

10  it's supporting.

11      Q.   Anything else, any other components?

12      A.   I'm sure there's other more detailed --

13  I mean, depending on how granular we want to get

14  into defining what an environment is holding.

15  But those are the high level things.

16      Q.   Okay.  What interactions are there, if

17  any, between the Dominion air gaps election

18  system that you talked about earlier that you

19  said is air gapped and the voter registration

20  database or E-Net?

21      A.   Well, there is not necessarily

22  interaction between the two.  There is a data

23  transfer that happens for each election where

24  somebody from the election center will download a

25  file from E-Net, it will go through numerous

1    security checks and then it gets uploaded into

2    the air gap environment following NIST protocols,

3    that's the National Institutes of Science and

4    Technology.  They're the ones that define that we

5    follow defining an air gapped environment.

6         Q.   And you said that -- so the data gets

7    transferred from E-Net into the Dominion EMS for

8    a particular election and it goes -- that process

9    goes through numerous security steps.

10             What are those security steps?

11        A.   So the device that gets used gets

12   formatted by an independent device that's not

13   tied to a computer.  It's strictly a formatter.

14   It's literally a hardware device that you plug

15   electricity into the wall.  That's it.  It has no

16   operating system other than a hard program that's

17   formats a USB.  So nothing could ever get stored

18   on it.  It formats the USB drive to clean it so

19   that we know nothing has ever moved to it or

20   anything that was on it is off.

21             Then it gets inserted into a PC that's

22   tied into the election system.  It is immediately

23   scanned -- once the file comes down to that thing

24   it's immediately scanned for any malware, any

25   strange things that could be also on it.  Then it

1    gets moved over to the -- a PC that's tied into

2    the air gapped environment and it gets uploaded.

3        Q.   And is that device, is that a hard

4    drive?

5        A.   It's a flash drive.

6        Q.   Oh, okay.  And is that a new flash

7    drive every time these transfers are done or are

8    those flash drives reused?

9        A.   Potentially could be reused.  But as I

10   said, they get completely formatted by a box that

11   is not tied to any Internet.  Cannot have

12   anything stored on it.  So if there was anything

13   on that flash drive, doesn't matter what it was,

14   it can't transfer off to the formatter.  The

15   formatter will format that completely blank.

16            So anything on it, malware, anything is

17   erased.  There's no transferring of old data to

18   the formatter because the formatter is not

19   intelligent to be actually able to hold anything.

20   It just has a function of format.  So it is

21   probably cleaner than a brand new purchased -- in

22   fact, I'll tell you it is cleaner than a brand

23   new purchased flash drive.  Even if we use a

24   brand new purchased flash drive, we clean it

25   first just in case the manufacturer had something

1    on that drive that they didn't know about, we

2    don't trust it.  We clean it.

3         Q.   Are ballot definition files stored on

4    the state EMS for each election?

5         A.   On the state EMS?  What do you mean?

6         Q.   The state EMS server, are ballot

7    definition files uploaded to that server each

8    year or for each election?

9              MR. DENTON:  Objection.

10        A.   I don't know the term EMS.

11        Q.   Election management system, the

12   Dominion -- the state server that we're talking

13   about.

14        A.   Oh, the ballot building system.

15        Q.   Yes.  Yes.  They're -- let's just back

16   up, make sure we're talking about the same thing.

17   What we've been talking about is a server that

18   the state uses that has the Dominion software on

19   it to run elections, right?

20        A.   Yes, that's the ballot building system.

21        Q.   Okay.

22        A.   So when you say EMS, now I understand

23   what you're saying.

24        Q.   Right.

25             And have you heard the term election

1   management system or election management

2   software?

3        A.   Yes.  I just never tied it to EMS.

4        Q.   Got it.  Okay.

5        A.   Now I know.

6        Q.   Okay.  How did -- what's the process

7   for getting the files, the ballot definition

8   files that come out of the ballot billing process

9   on this server, for getting those out to counts?

10       A.   Those get put on flash drives also.

11       Q.   And then how are they --

12       A.   Clean flash drives.

13       Q.   How are they -- how are those files

14   transmitted to the 159 counties in Georgia?

15       A.   You'd have to ask Michael Barnes that.

16   I -- I think I know.  But I -- I guess I can't

17   say positively that I know.  So you'd have to ask

18   Michael Barnes that question.

19       Q.   I mean, are you familiar with the -- do

20   you understand that they're transferred over an

21   FTP site?

22       A.   I -- as I said, you'd have to ask

23   Michael Barnes that question, please.

24       Q.   Okay, okay.  And then at the end of

25   each election the counties send back the

1    tabulation results through the election night

2    reporting system to the state, right?

3         A.   Yes.

4         Q.   And is that also done through -- well,

5    strike that.

6              Do you know whether that's done through

7    a FTP, that transfer?

8         A.   That's a Michael Barnes question.

9         Q.   Okay.  The tabulation results that come

10   out of each election, are those also stored on

11   the EMS, the election management system server at

12   the state level?

13        A.   I am not aware that any of that is

14   stored there.  My understanding is that's all

15   stored back on the voter registration system.

16        Q.   Okay.  Are you aware of any data or

17   files that are generated during the course of an

18   election in Georgia that are uploaded to the

19   state election management system server after an

20   election?

21        A.   I am not aware of any.

22        Q.   When you talked about earlier that

23   there are no devices or equipment used with the

24   old system, meaning the old DRE system that's

25   also used with the new BMD system, are you

1   talking only at the state level or are you

2   including the counties with that?

3       A.   Once again, none of the old DRE system

4   is compatible with the new environment.  So there

5   would be no reason a county would use any of the

6   old DRE equipment for the new environment.  It

7   was a direct recording device.  We now use a

8   paper ballot process.  They're incompatible.

9           So, you know, I'm not out in 159

10  counties.  I cannot even imagine why they would

11  use any of the old system because it wouldn't

12  have had -- do nothing for them.

13      Q.   But you're only speaking on behalf of

14  the state, YOU'RE not speaking on behalf of the

15  practices of 159 counties across Georgia in every

16  election, right?

17      A.   Well, I can't speak because I'm not out

18  there.  But as I said, because the old DRE

19  environment has absolutely no functional use,

20  there would be no reason for them to use any of

21  that old equipment.  In fact, as far as I know,

22  most of them packed it all up and we sent it off

23  for grinding.  So there is no reason for them to

24  go off and do something.  And even if they wanted

25  to bring something out, it would add nothing to

1    the process.  You can't use any of the old system

2    information in the new environment.

3        Q.   But you don't know, for example,

4    whether the counties use some of the same USB

5    drives, flash drives that they plugged in or used

6    with the old system, you don't know whether some

7    of them used those with the new system, right?

8        A.   As I said, it's incompatible.  The

9    flash drives were not the same as the current USB

10   drives.  They weren't USB.  They were a different

11   format.  The plug on them wouldn't fit.

12       Q.   You're saying that it's your belief

13   that the USB drives the counties use with the

14   with respect to elections on the GEMS system, the

15   DRE system, those wouldn't even plug into

16   equipment that they used with the BMD system; is

17   that -- is that really your belief?

18       A.   The DREs, this is the Windows-based

19   voting equipment, had a different format for

20   their flash drive.  They were a square drive

21   device that had, I don't know, 40-hole --

22   pinholes in it.  Wouldn't even come close to

23   fitting in a USB drive, which has got a very

24   rectangular slide-in port.  So the DREs took a

25   different format flash drive.

1      Q.   But the DREs are not the only part of

2   the election system at the county level that uses

3   flash drives, right?

4            They also use desktop computers, laptop

5   computers, they have their own election servers

6   such as for election night reporting, for

7   managing their own system.  And those would take

8   the same flash drives that would fit on equipment

9   today, right?

10     A.   You asked me about a DRE interface.  I

11  answered you about a DRE interface.  So now then,

12  now you're asking me whether or not they have

13  computers that use USB flash drives, which is

14  yes.  The new system has computers which can

15  accept USB drives, yes.

16     Q.   And you've not undertaken any

17  investigation to determine whether the counties

18  got rid of all their old flash drives and

19  replaced them with new flash drives when the new

20  Dominion system was rolled out; is that fair?

21     A.   So if you're asking me if a USB drive

22  that was used with the old DRE system that was

23  running a Windows application using an access

24  database program that potentially could have had

25  malware that was attacking that system, which

1    nobody's ever seen or proved existed, but if it

2    did exist, did we put steps in place to make sure

3    that malware couldn't jump on the new

4    Android-based system?  The question is why would

5    you ask that question?  Since we -- everyone

6    knows malware that's targeted at a Windows-based

7    access program is inert in an access database.

8    Once again, we have to follow the two tenets of

9    programming is the laws of physics and

10   programming logic.

11        Q.   Mr. Beaver, let me -- I'm going to have

12   to help you out here, okay?  You have to ask the

13   questions I -- you have to answer the questions I

14   ask and only what I'm asking.  I'm going to get

15   all of my questions in no matter what.  We can do

16   ten hours a day, we can do 12 hours, we can break

17   it up into multiple days, but it's going to

18   happen.  And if you continue to give these

19   speeches, then we'll just -- we'll either call

20   the court and let the judge explain to you how

21   this works or we'll just go for many, many days.

22             So I'm going to ask you again.  I'm

23   asking you simple yes or no questions, okay?  My

24   question is simply this:  Do I understand

25   correctly that you're not aware of any

1    investigation done by the state to determine

2    whether flash drives or desktops or laptop

3    computers or iPads, any equipment used at the

4    county level with the old election system that

5    would include the DREs, their GEMS servers, their

6    poll pads, whatever -- we don't have poll pads.

7    The GEMS servers and -- and the DREs and their

8    elections, there's no investigation you're aware

9    of by the state to ensure that every county

10   replaced all of that equipment when transitioning

11   to the Dominion system; is that true, yes or no?

12           MR. DENTON:  Objection.

13       Q.  You can answer.

14           Is it true, yes or no?

15       A.  My understanding is a notice was sent

16   out to the counties that they should not reuse

17   the equipment.  I do not know whether or not the

18   counties bought all new equipment or not.

19       Q.  Okay.  Thank you.

20           Oh, I'm sorry, I should have asked from

21   the start.  And I'm not suggesting you are.

22   Since we're on an online forum both sides ask

23   these questions.

24           Do you have anything open other than

25   the Zoom and the exhibit share on your computer,

1    any other apps or devices or anything?

2         A.    No.  I closed everything.

3         Q.    Okay.  Great.  Thank you.

4               Do you have any notes that you're

5    relying on today for your testimony?

6         A.    I just printed out your 30(b)(6)

7    document.

8         Q.    Okay.  But that's it?

9         A.    Yep.

10        Q.    Okay.  All right.  Thank you, Mr.

11   Beaver.

12              But on the -- the way you're describing

13   malware, I understand you're saying that malware

14   designed for a Windows operating system and the

15   DRE environment, that that could not work in the

16   Android operating system in the BMD environment.

17              Do I understand that right?

18        A.    Correct.

19        Q.    Okay.  And so is it your understanding

20   that malware designed for the old system, that if

21   that malware included a back door into the

22   election system, so it's not trying to alter or

23   steal votes necessarily, it's just trying to

24   create a back door, that even that type of

25   malware would not work in the new Dominion

1    system?

2         A.   Correct.

3         Q.   And what's the basis for that

4    understanding?

5         A.   Programming logic says that whoever

6    wrote the program would have to know that the

7    system, the target system that they're writing

8    the malware for.  The malware you're describing

9    was targeting a Windows application.  So the

10   operating systems was Windows based, it was

11   actually Windows 2000.  So it was an even older

12   application than -- Windows than what is

13   currently out there.  They would have to build it

14   for that.

15             When we switched to a new system, the

16   operating system is now Android, which has

17   totally different programming logic.  The only --

18   it wouldn't work.  It is absolutely inert.

19        Q.   And have you consulted any election

20   security experts on your understanding that you

21   just explained?

22        A.   I've talked to internally all of our

23   technical people.  I have a programming

24   background.  I've done that for years.  In fact,

25   my background is in healthcare, medical records.

1   Basically the industry cut their teeth on

2   security with HIPAA, specifically targeted at

3   medical records.  So I have a number of years,

4   over ten years, experience in programming in that

5   environment.

6       Q.   So my question was have you consulted

7   any election security experts on the

8   understanding of your software about malware?

9           MR. DENTON:  Objection.

10      A.   Now, I -- I don't know election

11  security, that specific title.  Anybody of that

12  -- with that title.

13      Q.   So, for example, Fortalice is a company

14  that you guys rely on for -- to help with

15  securing the election system; is that fair?

16      A.   Yes.

17      Q.   Did you discuss with Fortalice the view

18  that malware potentially could be embedded in the

19  old GEMS system, that it would be inert in the

20  Dominion system?

21      A.   No.

22      Q.   Did you discuss that with the state's

23  expert, Dr. Juan Gilbert?

24      A.   Ron Gilbert?  I don't know Ron Gilbert.

25      Q.   Juan Gilbert, J-U-A-N.

```
1        A.   I don't know Juan Gilbert.

2        Q.   Okay.  All right.  Come back to

3   Exhibit 1, if you would, please, and back to

4   topic 1A.

5        A.   Do you do that by going back and

6   reopening it or is there a --

7        Q.   Yeah.  Yeah, I think -- if you closed

8   it, you'll have to go back and reopen it.

9        A.   Okay.

10       Q.   And just let me know you've got that

11  up.

12       A.   1A.  I'm there.

13       Q.   Okay.  So just so we're clear, it's my

14  understanding that, to your knowledge,

15  representing the state on this topic, there is no

16  evidence of any malware infecting the components

17  of Georgia's current election system; is that

18  right?

19       A.   Correct.

20       Q.   And what investigation was undertaken

21  to get to that conclusion?

22       A.   Of the current system or the old system

23  are you asking?

24       Q.   The current system.

25       A.   So when we built out the system, we
```

Page 42

1    built it out, as I said, as a clean system.  We

2    did not use anything that was tied to the

3    Internet where malware can come into it, get in,

4    infect it.  We have only entered the information

5    that has been scanned for malware into that

6    environment.

7         Q.   So no one, to your knowledge, has

8    actually gone in and done any kind of forensic

9    analysis of any of the BMDs or the Dominion

10   servers at the state or county level to see if

11   they are infected with malware; is that right?

12        A.   I'm not aware of that.

13        Q.   Do you know why that has not been done

14   even on a sampling basis, for example?

15        A.   Not aware that there's any sign that

16   there is any malware on it.  That's usually the

17   first trigger to look for malware.  That would be

18   it.

19        Q.   Well, you understand malware can

20   successfully operate in the background without

21   giving an indication that it's there, right?

22             MR. DENTON:  Objection.

23        A.   Yes, I do.  But then I follow back to

24   the tenet we talked earlier is that malware has

25   to somehow physically get onto that environment

1    and have programming logic that is compatible

2    with the environment that it's in.

3         Q.   Right.

4              And I understand that, Mr. Beaver.

5         A.   Okay.

6         Q.   But -- okay.  I get it.  Thank you.

7              All right.  Take a look at topic 1 B,

8    please.  Just let me know when you're there.

9         A.   Yes.  Yes, I'm there.

10        Q.   This is any efforts made to air gap a

11   components of Georgia's current election system

12   and the success or failure of any such efforts.

13        A.   The answer -- the answer is yes.

14        Q.   Right.

15             And so what are those efforts?

16        A.   So Secretary of State's IT group,

17   department built an air gapped environment based

18   on NIST standards using NIST protocols to hold

19   the Dominion ballot building environment.  And

20   continues to maintain that air gapped environment

21   per the NIST protocols.

22        Q.   And that was built sometime in 20- --

23        A.   '19.

24        Q.   Oh, 2019?

25        A.   I think it was -- yes.

Page 44

1          Q.   All right.  And this was what you were

2     talking about earlier that it's all new

3     equipment, even new wires in the wall?

4          A.   Yes.

5          Q.   Okay.

6          A.   It does not share anything with any

7     other network environment.  It does not

8     cohabitate in any racks or environment.

9          Q.   Right.

10          But it does share data with the voter

11     registration system, though, right?

12          A.   Yes.  And that data is transferred

13     using the NIST protocol.

14          Q.   Okay.  Who at the Secretary's office is

15     actually responsible for transferring that data?

16          A.   That would be Michael Barnes's group.

17          Q.   Okay.  Who is responsible for uploading

18     any data or files to the state EMS server for any

19     given election?

20          Is there anyone on your team that does

21     that or is that also Mr. Barnes's group?

22          A.   That's Mr. Barnes.

23          Q.   Okay.  All right.  Take a look at topic

24     1 C, please.

25          A.   Okay.

1        Q.   And here it is any connections of any

2   components of Georgia's current election system

3   to the Internet, telephone lines, cable lines,

4   satellites or other third-party system or

5   network.

6             Do you see that?

7        A.   Yes.

8        Q.   And do you -- what connections in that

9   topic are you aware of today?

10       A.   So when -- when we say the election

11  system, remember that's numerous environments.

12  So are we talking about the Dominion air gapped

13  environment or are we talking about the voter

14  registration system or one of the other systems?

15       Q.   So I -- I would use the definition that

16  was in your -- well, strike that.  Because I want

17  to be fair.

18            We have a particular system -- we have

19  a particular definition here, right?  So if you

20  come to the first page of the topics.

21       A.   Is that going up or down?  Am I

22  scrolling --

23       Q.   Yeah, going up.  Go up back to the top.

24  There's topic 1.  Do you see that?  And here you

25  do you see at the bottom the definition of

```
1   component?

2        A.   Oh, hold on.

3        Q.   It's for the --

4        A.   Component list limited to the following

5   equipment for election...

6             So this all looks like it's speaking to

7   the current Dominion environment, meaning the

8   ballot building device --

9        Q.   Yes.

10       A.   -- environment.

11       Q.   Yes, that's right.

12       A.   It doesn't speak to any of the voter

13  registration system, the my voter page, the

14  online registration page.  It's just the Dominion

15  environment.

16       Q.   Correct.  Yeah.

17       A.   Okay.

18       Q.   And so let's --

19       A.   So now --

20       Q.   Yeah, let's start with that.  So take a

21  look at -- with that definition in mind, are you

22  aware of any connections to the Internet,

23  telephone lines, cable lines, satellites or other

24  third-party system or network for any of the

25  components identified in footnote two for the
```

1    current election system?

2         A.    None.

3         Q.    And what's the basis for that belief?

4         A.    We have built an air gapped

5    environment, follows, as I've said, the NIST

6    protocols on its own dedicated hardware network

7    environment.  Does not share anything with an

8    environment that has any of these types of

9    things, Internet, telephone, cable, satellites or

10   other third-party networks, is not tied to

11   anything that would have those things connected

12   to it.

13        Q.    Okay.  But you don't know, for example,

14   whether any of the 159 counties have ever

15   connected any of those components to any Internet

16   or third-party system, right?

17             MR. DENTON:  Objection.

18        A.    We're talking about what was described

19   above and that everything that's described above

20   is that Dominion environment, which is based in

21   our election center in Marietta.  So the counties

22   don't have access to that.

23        Q.    Well, no.  Look -- if you look at

24   footnote two it includes the Dominion BMDs, the

25   printers used with the Dominion BMDs, the

1    scanners used to scan ballots, servings --

2    servers containing election management system --

3         A.    So you're talking about the actual

4    equipment that's in the field?

5         Q.    Correct.  That's part of it.  Yeah.

6               And so you don't -- so you don't know

7    as you sit here whether any of the 159 counties

8    in Georgia has ever connected any of that

9    equipment to the Internet or to a third-party

10   system, right?

11        A.    No.  I mean, there's some of the stuff

12   that can't be connected, like the BMDs don't have

13   a network connection to go into that.  Now, a

14   laptop, I'm not sure what a laptop -- what they

15   would use a laptop for, a desktop computer, not

16   sure how that would be involved in this whole

17   environment.  So I can't speak to those things.

18   Smart phones, same thing, like I -- it's -- it's

19   listed in this list, but it isn't necessarily

20   used in the Dominion environment.

21              So this is a very large list of things,

22   but not all of them have anything to do with the

23   Dominion environment.  But I can't speak to, you

24   know, what the counties have done with these

25   kinds of things.

1       Q.   All right.  The Dominion BMDs used in

2  Georgia have a standard USB port on them, right?

3       A.   Yes.

4       Q.   In fact, the detached printer that

5  prints the ballot connects to the BMDs with

6  standard USB port, right?

7       A.   Yes.

8       Q.   And are you aware that the Dominion BMD

9  USB ports are not sealed, meaning that a voter,

10  for example, has access to plug in a USB drive to

11  a BMD used in an election?

12       A.   I don't believe that's true.  It was a

13  term it's sealed.  It's not sealed.  I have never

14  seen an environment where it's not sealed.  So

15  I'm not sure where that comes from.  So I guess I

16  can't answer that that would be true.  I am not

17  aware that that -- that system is not sealed.

18       Q.   So what is the basis for your

19  understanding that the USB port on each of the

20  30,000 BMDs in Georgia is sealed?

21       A.   I've seen them and they're sealed.  And

22  that is our protocol is to keep it sealed.

23       Q.   Well, I assume you haven't seen all

24  30,000 BMDs, right?

25       A.   No, I -- yeah, I haven't seen 30,000

1    BMDs.  But, as I said, the protocol is to keep

2    them sealed.  And when I say sealed, they're

3    locked -- locked away.  They have a sealing

4    device that will show tampering if somebody

5    unseals it.  So I have not heard of any counties

6    that have had an issue with BMDs being unsealed.

7    I have not heard that.

8        Q.   Okay.  And is that something you would

9    expect to know as the state CIO?

10       A.   I would have heard it.  It isn't the

11   counties report to me.  You could probably ask

12   Mr. Michael Barnes if he's heard it.  I think

13   he's more in touch with the counties than I am.

14       Q.   And why is sealing the BMDs important?

15       A.   Many type of layers of security.

16   Security is not just one thing.  It is a layer

17   approach.  Sealing the BMD is just one of the

18   many security aspects to that -- verifying that

19   we have a very secure system.  Sealing is a piece

20   of it.

21       Q.   But what is the sealing of a BMD

22   intended to protect against?

23       A.   Just what you described, somebody

24   having access to do something to it that's

25   unknown.

Page 51

1        Q.   Got it.

2             Okay.  And would it be fair to say that

3    if -- that if -- if a county found that its BMDs

4    were unsealed, the seals were broken, for

5    example, before an election, they should not use

6    those, right?

7        A.   Correct.  That is the protocol.

8        Q.   Okay.  What's the device that's used to

9    seal the USB ports on the BMDs?

10       A.   I don't know what that device is.

11       Q.   All right.  Jump to topic ten, please.

12       A.   Okay.

13       Q.   Topic ten is any instance in 2020 or

14   2021 within the knowledge of the Secretary of

15   State's office when a person or entity other than

16   an authorized election worker of Georgia state or

17   county official obtained voting data from a

18   Georgia election or images of voting equipment

19   used in a Georgia election.

20            Do you see that?

21       A.   Yes.

22       Q.   And are you aware of any such instance?

23       A.   I am not aware of any instance.

24       Q.   And would you expect to be aware of

25   this as the state CIO if -- if this was known to

1    anyone in the Secretary's office?

2         A.   I would have expected to because I

3    would have been asked to help investigate how it

4    happened.

5         Q.   Okay.

6         A.   We manage security.  That would be an

7    event.  And we would go through our whole

8    incident response process to investigate how

9    something like that would have happened.  So I

10   would have expected to hear.

11        Q.   Okay.  And what did you do to prepare

12   yourself to testify on topic ten today?

13        A.   To prepare for that?  I asked -- I

14   asked a couple people here within our

15   organization in the elections area whether or not

16   they'd heard anything about this.  I didn't hear

17   anything.

18        Q.   Who did you ask?

19        A.   They didn't say -- over in elections --

20   I mean, I think the head of elections, Blake

21   Evans, is over there.

22        Q.   Anyone else?

23        A.   I guess I -- I've asked around.  I

24   don't remember the people, just poking at people

25   that might have heard something.  And within our

Page 53

1   security group we have a couple -- three people

2   over there in that group which I talked about

3   Ronnell Spearman, Kevin Fitts.  They're -- they

4   had not heard anything.  So...

5        Q.   Is there anyone else you talked to

6   about topic ten that comes to mind?

7        A.   No.

8        Q.   Okay.  Did you review any documents in

9   preparation for your testimony on any of the

10  topics you're designated on?

11       A.   Just my prior depositions and

12  testimony.

13       Q.   When you say deposition, you mean your

14  prior declarations in this case?

15       A.   I guess I'm not sure whether they were

16  declarations or depositions.

17       Q.   Okay.

18       A.   I didn't -- they were just documents

19  that were -- the legal team gave me as areas

20  where -- or events where I was recorded, whether

21  it be court transcriptions or depositions or

22  declarations.  So it was three or four of them.

23       Q.   Okay.  But those documents all

24  contained testimony that you gave in -- in some

25  form; is that fair?

Page 54

1        A.    That's fair.

2        Q.    Okay.  And is there anything else you

3    reviewed in preparation for deposition beyond

4    your own testimony?

5              MR. DENTON:  Objection.

6        A.    Nothing I can say specific.  I mean, I

7    definitely talked to some of my peers to validate

8    my understanding of Windows, did my understanding

9    of the NIST protocol, my understanding of

10   Android, programming languages that could be

11   compatible in both environments.  Things like

12   that.

13       Q.    But no other documents you reviewed

14   beyond the testimony you've identified; is that

15   -- is that right?

16       A.    No, no other documents.  I had -- as I

17   said, I did go online, validate documents from

18   NIST that we were following their protocols.

19   That was about it.

20       Q.    Okay.  And then let's look at the last

21   topic here, topic 18.  Again, it's on page --

22       A.    Yes.

23       Q.    And the last topic is your process for

24   preserving information within your possession,

25   custody or control potentially relevant for this

1   matter, including any communications with

2   counties or other entities or individuals

3   regarding the same.

4           Do you see that?

5       A.   Yes.

6       Q.   What steps has the Secretary's office

7   taken to preserve information potentially

8   relevant to this case?

9       A.   So information relative -- the -- I

10  guess reading this, communications primarily are

11  e-mails.  Written documents, I don't have access

12  to, you know, as if somebody wrote a note.  But

13  everything would be in e-mails.  And I have

14  validated that we have maintained copies of all

15  e-mails sent within the organization during this

16  time frame.

17      Q.   And what time frame is that?

18      A.   From '19 forward.

19      Q.   From 2019 forward?

20      A.   Yes.  Which is what it looks like this

21  is, at least in my understanding, is where this

22  conversation is speaking to from the time that we

23  switched over from the old system to the new

24  system forward.

25      Q.   And are you aware that the case was

1    filed in 2017?

2        A.   Are you saying the Curling case or are

3    we talking about this 30(b)(6) topic.

4        Q.   No, no, the Curling case was filed

5    in --

6        A.   No, I got it.  But I -- was your

7    question about retaining data?  I thought this

8    was on the 30(b)(6) topic.

9        Q.   Right.

10            I'm just trying to understand what you

11   understand the topic covers.  So just --

12       A.   Okay.  As I say, so your question, I

13   thought you were speaking of 30(b)(6).

14       Q.   Right.

15            So my question is are you aware of

16   steps taken by the Secretary's office to preserve

17   information potentially relevant to this matter

18   going back to when the case was filed in 2017?

19       A.   And my -- for the Curling case, all

20   e-mails that were tied to that did go back to '17

21   that we need to be able to retain.  So that too

22   on that topic.  So e-mails from that point far

23   back, so yes.

24       Q.   Okay.  And what steps were taken to

25   preserve e-mails going back to -- well, strike

Page 57

1    that.  Let me -- let's be clear we're talking

2    about the same thing.

3              The case was filed in 2017.  But you

4    understand -- well, strike that.  Let me try to

5    get at this better.

6              What is the time frame, time period for

7    which the Secretary of State's office is

8    preserving information potentially relevant to

9    this case, meaning how far back do the e-mails,

10   for example, go in time that are being preserved?

11       A.   Okay.  So we have two systems that

12   store e-mails.  One is Microsoft 365.  It stores

13   e-mails that go back three years.  We have

14   another system called Commvault that goes back an

15   additional I think it's two years.  So we're

16   going back five years on this topic.

17       Q.   Okay.  So when the case got filed in

18   2017, what steps did the Secretary's office take

19   at that time to preserve potentially relevant

20   information?

21       A.   They validated that we were able to

22   store e-mails that covered from that point

23   forward from the -- basically where the Curling

24   case forward.

25       Q.   But what about e-mails going back in

Page 58

1    time?

2         A.   They haven't given me the okay to

3    delete any of that.

4         Q.   Okay.

5         A.   Even though it's longer than our

6    retention period, we've still held onto it.

7         Q.   And where are those documents -- are

8    those e-mails stored?

9         A.   In Commvault.

10        Q.   And that -- does that include the

11   e-mails that were generated in 365?

12        A.   No.

13        Q.   Okay.  So e-mails are stored in both

14   365 and Commvault?

15        A.   Yes.  That's what I said.  We have two

16   systems.  The most current stuff is in 365, the

17   older stuff is in Commvault.

18        Q.   I see.

19             Okay.  So the stuff going back to like

20   2017 or earlier, that's in Commvault, the stuff

21   generated in the last three years would be in

22   365; is that a fair?

23        A.   Yes, yes.  There's probably some

24   overlap.  But 365 only holds three years.

25        Q.   And did the Secretary's office replace

Page 59

1   Commvault with 365 three years ago as its e-mail

2   system?

3        A.   Commvault is an archive system which is

4   where we used to archive e-mails into.  We have

5   -- since we've gone to 365, not when we went to

6   365, but since we've done it, we've switched

7   over.  So there's a transition period where

8   Commvault was doing archiving, some archiving 365

9   -- or I say some, was archiving 365, so there's

10  an overlap.

11       Q.   And are the e-mails that are

12  potentially relevant to this case in 365, are

13  those stored in a distinct place on the 365

14  server or are they stored in the individual

15  custodian's e-mail inboxes or accounts?

16       A.   Well, they're isn't necessarily -- all

17  e-mails are stored in, I guess, a mass storage

18  and they're tagged for, you know, who they belong

19  to.  So that if somebody in their personal e-mail

20  box deletes something, it doesn't delete it from

21  the mass storage.

22       Q.   And is that something that was turned

23  on for preservation purposes or is that the

24  default setting for 365?

25       A.   It's default for us.  I don't know

1    whether it's default for everyone.

2         Q.   Okay.

3         A.   This is just how we set the system up.

4    We didn't do it specifically for legal or

5    anything.  Secretary of State gets a lot of open

6    records requests, so it's a standard of how we

7    just set ourselves up.

8         Q.   Okay.  And we talk about e-mail and

9    365, you're talking about Outlook, right?

10        A.   Yes.

11        Q.   Okay.  So do I understand right, so

12   after switching to 365, no one in the Secretary's

13   office has the ability to delete any e-mails,

14   even if they delete it from their own account,

15   it's still sitting on the Outlook server?

16        A.   Yes.

17        Q.   I guess, exchange server?

18        A.   Yeah, that's correct.  That's the right

19   term.

20        Q.   When e-mails were collected and

21   produced for this case, what time period was used

22   for that collection?

23        A.   I -- I wasn't involved with that

24   collection, so I can't tell you that.  And legal

25   has their own team that does the pulling of

Page 61

1    e-mails.  We -- we just provided them the tools

2    to let them do that.

3         Q.   And so the legal team pulled -- they

4    ran whatever searches they ran and pulled e-mails

5    from the exchange server and the Commvault

6    server; is that right?

7         A.   Yes.  If they needed Commvault help,

8    they would historically have had to come to IT to

9    do that.  But I think they pulled all the e-mails

10   from Commvault for this.

11        Q.   What was the --

12        A.   Most -- go ahead.

13        Q.   I'm sorry.  I'm sorry.  I was just

14   going to ask, what was the e-mail system that was

15   used with Commvault?

16        A.   It was on prem exchange.  That means we

17   ran the exchange server on premise.

18        Q.   Okay.

19        A.   365 is in the cloud.

20        Q.   So the on prem exchange was -- it was

21   still Outlook, but it was -- it was an on-premise

22   system as opposed to a cloud system?

23        A.   Correct.

24        Q.   And is 365, is that hosted with

25   Microsoft?

1       A.   Yes, in their gov cloud.

2       Q.   So what steps were taken, if any, to

3  preserve potentially relevant information for

4  this matter beyond the e-mails?

5       A.   You'd have to ask somebody in legal.

6       Q.   Okay.

7       A.   I handle the IT side, which would be

8  things like Outlook.  If it's non IT, then it

9  wouldn't come to me.

10      Q.   What about, for example, documents

11  stored locally on individual employee desktops or

12  laptops or removable media, what steps were taken

13  to preserve and collect that, if any?

14      A.   So if it's stuff that's out there for

15  somebody who has left the business, we actually

16  make a copy of their desktop, laptop or whatever

17  and I store it, actually store it in my office

18  for everybody who's left, whether we knew they

19  were tied to this or not, that they were a

20  pertinent player.

21      Q.   Okay.  So beyond people who've left,

22  folks who have not left, what steps were taken,

23  if any, to preserve potentially relevant

24  information on their own desktops, laptops, other

25  devices or removable media?

Page 63

1    A.   Okay.  And you'd have to ask legal what

2    their instructions were to those people.

3    Q.   Okay.  And then I can't remember who it

4    was, one of the people we deposed explained that

5    each employee of the Secretary's office has a

6    personal drive on a Secretary's office server

7    where they can store documents, meaning that

8    drive is assigned to them; is that right?

9    A.   It's called OneDrive.

10    Q.   Oh, you're using Microsoft OneDrive?

11    A.   Yes.

12    Q.   Okay.  And then employees have their

13    own sort of sub folder, you might call it, that's

14    assigned to them where they can store documents

15    under their name; is that right?

16    A.   That's what -- the word called the

17    OneDrive.

18    Q.   Got it.  Okay.

19    A.   Now --

20    Q.   And what steps -- sorry.

21    A.   So I -- I was going to say that -- that

22    is -- that OneDrive environment is included in

23    all of our backup processes.

24    Q.   Okay.  What steps, if any, were taken

25    to preserve and search potentially relevant files

Page 64

1    in the OneDrive environment?

2              MR. DENTON:  Objection.

3         A.   Again, you'd have to ask -- I mean, we

4    verified that the drives are there and

5    maintained.  You'd have to ask -- talk to legal

6    about what instructions were given to people --

7         Q.   Okay.

8         A.   -- for those -- for that information.

9         Q.   Does the Secretary's office have any

10   auto deletion policies for e-mails or any other

11   electronic files or data?

12        A.   I said we have a retention policy of

13   three years that e-mails are kept on the exchange

14   server for three years.

15        Q.   So meaning -- go ahead.

16        A.   Unless -- unless -- unless there is

17   something tagged that we retain, which you can.

18   That's the nice thing about 365, you can tag

19   e-mails for retention, then they get rolled off

20   after three years.

21        Q.   So meaning once an e-mail reaches the

22   three-year date from the time it was sent or

23   received, it becomes automatically deleted unless

24   it's tagged for preservation; is that right?

25              MR. DENTON:  Objection.

1       A.   That's what we set up in 365.

2       Q.   Okay. And what steps, if any, were

3  taken to remove e-mails potentially relevant to

4  this matter from that auto delete practice?

5       A.   As I said, the 365 has a feature that

6  you can go in and you can tag e-mails as on like

7  hold for -- let's say they're for like this, for

8  a legal issue and tag it.  So that's a feature

9  within the system.

10      Q.   What steps --

11      A.   And then -- and then it basically will

12  supersede any retention policy.

13      Q.   What steps, if any, were taken to tag

14  e-mails as potentially relevant for preservation

15  purposes for this case?

16      A.   Once again, you'd have to ask legal.

17  They're the ones that do the searches.

18      Q.   I see.

19           Okay.  Do you know whether any such

20  steps were taken?

21      A.   I don't.  A lot of times what they'll

22  do is they'll literally pull those e-mails out

23  and create an extract that they can store on a --

24  a file server that's separate.

25      Q.   Do you know if that was done in this

1    case or you just don't know one way or the other?

2        A.   As I said, that's -- legal manages

3    that.

4        Q.   Okay.  All right.  We've been going

5    close to an hour and a half.  You want to take a

6    short break, Mr. Beaver?

7        A.   Sure.

8        Q.   Okay.

9            THE VIDEOGRAPHER:  The time is 10:29.

10       We're off the record.

11           (A BRIEF RECESS WAS TAKEN.)

12           THE VIDEOGRAPHER:  The time is 10:37

13       We're back on the record.

14   BY MR. CROSS:

15       Q.   All right.  Mr. Beaver, can you grab

16   Exhibit 2, your 2018 declaration again, if you

17   would, please.  Just let me know when you've got

18   that in front of you.

19       A.   Sorry.  I was on mute.  I'm here.

20       Q.   All right. Take a look at paragraph

21   seven of your declaration.

22       A.   Moving to paper ballots, is that what

23   you're asking me?

24       Q.   Yes.  And so you wrote here moving to

25   paper ballots for the voting mechanism would not

1    add one iota of protection to the state's voter

2    registration database, air gapped ballot building

3    network or other online tools such as election

4    night reporting.

5              Do you see that?

6         A.   Yes.

7         Q.   Is it your view that moving to the

8    paper ballots generated by the current BMD system

9    did not add any protection to the state's

10   election system?

11             MR. DENTON:  Objection.

12        A.   It added a different protection.

13        Q.   What did it add?

14        A.   It -- one, it changed the -- I'll say

15   the attack profile of somebody trying to get in

16   and do malicious things to our system by creating

17   a more complex path.  Change always makes it

18   difficult for somebody who's planning to create

19   havoc because everything they did before has to

20   -- has to change.  Anything that they had done

21   prior is no longer valid.

22        Q.   Okay.  Let me -- let me ask a -- I

23   guess maybe a narrower question.  I understood

24   what you're saying.

25             I understand changing the -- changing

1    the overall operating system, I get that that's a

2    change between the old system and the new such as

3    from Windows to Android.  I'm asking a more

4    specific question, which is did the adoption of

5    paper ballots specifically, that part of the

6    change, did that add any protection to the

7    Georgia election system in your view?

8         A.   Did it add to?  It's different.  I

9    mean, I don't -- I don't have the security

10   analysis to say what are all the security levels

11   that are -- that our old system provided versus

12   this new system to do a side-by-side comparison.

13   It's just different.  And I -- I couldn't tell

14   you which one is stronger.

15        Q.   Okay.  All right.  Let me grab the next

16   exhibit.

17        A.   Should I leave this one?

18        Q.   Yes.

19             (Exhibit 3: Declaration of S. Merritt

20         Beaver marked for identification, as of

21         this date.)

22        Q.   All right.  Grab Exhibit 3, if you

23   would, please.  And, again, you may have to

24   refresh to get it to pop up.

25        A.   You have to refresh.

Page 69

1               Exhibit 3.  All right.  Exhibit D it

2     says.

3          Q.   Yes.  And if you scroll down, you'll

4     see that this is a declaration that you signed on

5     July 9, 2019.

6          A.   Okay.

7          Q.   Do you see that at the last page?

8          A.   Yep.

9          Q.   Okay.  And is it fair to say that you

10    were careful and truthful in this declaration?

11         A.   The best I could, yes.

12         Q.   All right.  Take a look at paragraph 6,

13    if you would, please.

14         A.   Yes.

15         Q.   Here you wrote, the Secretary of

16    State's office now requires an annual

17    cybersecurity assessment for the CES.

18              Do you see that?

19         A.   Yes.

20         Q.   And what's CES?

21         A.   That's the election center, center --

22    or center for elections, yes.

23         Q.   And that's Michael Barnes'

24    organization; is that right?

25         A.   Yes.

1      Q.    Why did the Secretary's office start

2   requiring an annual cybersecurity assessment for

3   the CES in 2019?

4      A.    We expanded our existing annual

5   assessments just to include.  We felt it was

6   appropriate at the time to -- to expand out and

7   start encapturing that.  I mean, over time the

8   whole annual reviews started off simple, which

9   looks -- just looking at one data center and we

10  slowly added more data centers and more systems.

11  So it was just -- it was time to start doing

12  that.

13     Q.    Well, why was it time to start doing

14  that for CES in 2019 as opposed to the -- to the

15  many prior years that CES existed?

16     A.    Well, the many prior years, it was at

17  Kennesaw.  So it was outside of our purview.

18     Q.    Well, Kennesaw managed CES under the

19  direction of the Secretary of State's office,

20  right?

21     A.    They were contracted, as far as I know,

22  from the Secretary of State's office.  But they

23  were considered a vendor, a third party.

24     Q.    Right.

25           And the Secretary of State's office

Page 71

1    does have the authority to require cybersecurity

2    assessments of its vendors, right?

3              MR. DENTON:  Objection.

4         A.   I don't know.  That's a good question.

5         Q.   You're not aware of a rule that

6    actually requires the Secretary of State's office

7    to ensure that vendors that are related to the

8    election system do cybersecurity assessments?

9         A.   Are you saying annually?

10        Q.   Annually or on any schedule.  Sorry, go

11   ahead.

12        A.   I am not aware of a rule or any

13   legislation or anything that says that.  I think

14   that is good practice that we have built over the

15   years since I've been here.  But I don't know of

16   any rule.  I've never been told of any rule that

17   states that.

18        Q.   Okay.  The cybersecurity assessment for

19   CES that's done annually, is that -- is there a

20   written report of that?

21        A.   We don't do written reports now.

22        Q.   When you say now, when did that -- when

23   did that start?

24        A.   The last two years.

25        Q.   Why are there no written reports of ooh

1    cybersecurity assessments for the Secretary's

2    office as of the last two years?

3              MR. DENTON:  Objection.

4         Q.   You can answer it.

5              Do you know why?

6         A.   Yes.  They're taken out of context by

7    the public.

8         Q.   What do you mean?

9         A.   They read them, they don't understand

10   them, they take them out of context.

11        Q.   So how is the cybersecurity assessment

12   the -- the steps that are taken and the findings

13   conveyed to folks at the Secretary's office if

14   not in writing?

15        A.   We have conference calls.  I have a

16   working team that works with Fortalice.  We

17   review things that they say you need to be

18   looking at this, you need to be looking at that.

19   We look at our project lists of tasks that we

20   need to do across the board to figure out how do

21   we mold some of those in.  Or not some of those,

22   but mold those things in.  Made our life

23   difficult.

24        Q.   You mentioned Fortalice.  Is Fortalice

25   the one that does the annual cybersecurity

Page 73

```
1   assessment for CES?

2        A.   In the recent years, yes.

3        Q.   How long has Fortalice done it?

4        A.   I'd have to look for sure, but I would

5   guess close to five years.

6        Q.   Who did it before that?

7        A.   We had a company called Deloitte, a

8   company called Black Ice.  I -- once again, I

9   have to go look at them.  We -- we tried a number

10  of different companies.  We're not happy with the

11  reports and decided to move onto the next

12  companies.  Fortalice was the first company that

13  actually we felt was doing a very good job.  If a

14  report doesn't come back and it's not painful,

15  it's not good.

16       Q.   Okay.  Why is that?

17       A.   Their job is to make us better.  Our

18  security has increased immensely with their help.

19       Q.   What involvement does your department

20  have with the annual cybersecurity assessment for

21  CES?

22       A.   I contract them.  They basically --

23  each year is slightly different.  In the last few

24  years they are -- have been sort of asked to be

25  independent and don't tell us when they're
```

Page 74

1   coming, when they're doing the assessment to

2   basically try to catch us off guard.  Then they

3   come back and essentially give us a results of

4   what they they've discovered, things that they

5   found that -- that we should look at.

6        Q.   Okay.  And do I understand right,

7   beginning in the last couple years they're now

8   directed to convey that orally in a conference

9   meeting as opposed to in writing?

10       A.   Yes.

11       Q.   Okay.  Fortalice in addition to the

12  cybersecurity assessment, the annual assessment,

13  Fortalice has been tasked with doing other sort

14  of narrower, more discrete assessments from time

15  to time for the Secretary's office; is that

16  right?

17       A.   Yes, it is.

18       Q.   And when it does that, one of the

19  requirements the Secretary's office typically has

20  is to require monthly reporting from Fortalice on

21  that work; is that right?

22       A.   It has in the past, yes.

23       Q.   But those monthly --

24       A.   We haven't done any of that type of

25  activity probably in the last year and a half.

Page 75

1          Q.    Why not?

2          A.    We didn't have any events or incidents

3      that required it.

4          Q.    The monthly reporting, is that

5      typically in writing or is that also now not in

6      writing?

7          A.    Not in writing.  And in the -- we're

8      not necessarily having any monthly reporting for

9      a while, probably for almost the last year.

10         Q.    So Fortalice did an annual

11     cybersecurity assessment of CES in 2020; is that

12     right?

13         A.    Yes.

14         Q.    And the findings that came out of that,

15     those were conveyed in -- in a conference meeting

16     with your team and others; is that right?

17         A.    Yes.

18         Q.    What -- what exactly was the scope of

19     work that Fortalice did for that assessment in

20     2020?

21         A.    Okay.  I was not in that meeting.  So I

22     can't tell you.  I don't know.

23         Q.    Who would you ask?

24         A.    I know Bill Warwick was involved.  But

25     he no longer works here.  I forget who else?

1    Dave Hamilton was involved.  He's no longer here.

2         Q.   Anyone else?

3         A.   No, I don't -- there probably was, but

4    I don't know who they were.  Those are the two

5    managers or leaders.

6         Q.   Who determined the scope of Fortalice's

7    work in 2020 for the annual cybersecurity

8    assessment of CES?

9         A.   I think that was more of a -- and it --

10   and it goes on today.  It's a conference call

11   that goes on with them where we discuss what

12   would make most sense on the call.

13        Q.   So for 2020 --

14        A.   As of today is have a conference call,

15   let's talk about what we think would be good to

16   do and we come to an agreement.

17        Q.   And when did that call happen in 2020

18   for that assessment?

19        A.   I don't have a date for that.

20        Q.   Well, does it typically happen --

21        A.   Earlier in the year.

22        Q.   Okay.  Like first quarter?

23        A.   Probably -- I mean, this year's

24   conversation is going on now.

25        Q.   So is it fair to say that that for --

Page 77

1    in 2020 and 2021 and 2022 the kickoff conference

2    with Fortalice for the annual assessment

3    typically happens sometime in the first quarter

4    of the year?

5              MR. DENTON:  Objection.

6         A.   I don't know for sure.  That would make

7    sense.  We contract them annually.

8         Q.   Okay.  And who all was in the kickoff

9    conference with Fortalice in 2020?

10             You mentioned Bill Warwick, David

11   Hamilton.  Who else was in that?

12        A.   As I said, I don't know who else.

13   Those would be the main people.

14        Q.   What about in the 2021 kickoff

15   conference?

16        A.   Same thing.  People.

17        Q.   You just -- oh, Mr. Warwick and Mr.

18   Hamilton would have been in that?

19        A.   Yep.  Yes.

20        Q.   And you don't know who else might have

21   been in it?

22        A.   No.  There -- I mean, they're my

23   managers.  I don't get involved at that level.

24        Q.   And what about 2022, who was in that

25   kickoff conference?

1      A.   Oh, it's not -- it's just planned right

2 now.  So I will be involved in that one.  They'll

3 be one or two other people from here involved.

4      Q.   Who else is expected to be in that?

5      A.   Probably Kevin Fitts and Jason

6 Matthews.

7      Q.   And they both work with you?

8      A.   Yes.

9      Q.   Why are you joining this year but not

10 the last couple years?

11      A.   I've lost some key people this year

12 being Dave Hamilton and Bill Warwick, who are

13 critical -- I wouldn't say critical.  Were key

14 leaders in my organization.

15      Q.   Sure.  Where did Bill Warwick go?

16      A.   Palo Alto.

17      Q.   When did he leave?

18      A.   Last Friday.

19      Q.   Do you know why he left?

20      A.   Money.

21      Q.   He's in private sector?

22      A.   Yes.

23      Q.   Do you know where he works?

24      A.   In Atlanta.

25      Q.   Wait.  I thought you said he went to

Page 79

1   Palo Alto?

2        A.   That's the company.

3        Q.   Oh, oh, it's called -- oh, the company

4   is called Palo Alto and it's based in Atlanta?

5        A.   Yes.  Well, I -- they have an office in

6   Atlanta.  I don't know where they're based.

7        Q.   I got it.  Okay.  All right.  Sorry.

8             Were there any performance concerns or

9   negative issues with Mr. Warwick when he left?

10       A.   No.  I hated to see him go.  He was

11  probably my strongest engineer.

12       Q.   All right.  So for the 2020 annual

13  cybersecurity assessment for CES, what were the

14  steps that took -- Fortalice took for that

15  assessment?

16       A.   You mean how did they do their

17  assessment?

18       Q.   Yes.

19       A.   I don't have that information.

20       Q.   Who would you ask to get that

21  information?

22       A.   I would have asked Bill and Dave.

23       Q.   Who would you ask today?

24       A.   I probably have to call Fortalice.  I

25  think the person that was involved then has left

Page 80

1    there also.

2         Q.   Who was that?

3         A.   I'd have to go see if I could dig up an

4    old contact list.  But our old contacts for there

5    left around the end of 2020, early 2021.

6         Q.   Okay.

7         A.   I don't remember his name.  I have a

8    lot of vendors.

9         Q.   What were the findings that Fortalice

10   reached in 2020 for the annual assessment?

11        A.   I don't have that list.

12        Q.   Would you ask --

13        A.   Depended on Dave, Dave and Bill to

14   implement them.  I basically asked did we have

15   the assessment?  Yes, we did.  Are we working it

16   into our -- our scheduled maintenance and

17   upgrades?  Yes, we are.

18        Q.   Okay.  What recommendations, if any,

19   did Fortalice make in 2020?

20        A.   As I said, I -- that's the same

21   question I think.  I don't have that.

22        Q.   Yeah, I didn't know if there was a

23   difference between their findings, meaning they

24   found certain things, and then separately they

25   made recommendations on what to address?

Page 81

1     A.   No.

2     Q.   Okay.  Do you recall any significant

3  concerns or any significant findings or

4  recommendations coming out of the 2020

5  assessment?

6     A.   Nothing was raised to me.

7          MR. DENTON:  Objection.

8     Q.   Okay.  If I were to ask you the same

9  questions about the 2021 assessment, would it be

10  the same answers that you would need to talk to

11  Mr. Hamilton or someone at Warwick or someone at

12  Fortalice?

13     A.   Yes.

14     Q.   And were there any significant concerns

15  raised with you coming out of the 2021 Fortalice

16  assessment?

17     A.   Nothing was raised to me.

18     Q.   What's the scope that's planned for the

19  2022 assessment?

20     A.   That's what the conference call will

21  work on.

22     Q.   And when is that planned for?

23     A.   I just made a request that we get a

24  meeting set up here in the next couple of weeks.

25  Won't be for another two or three weeks because

Page 82

1    I'm out of town.

2         Q.   Do you have a scope in mind for what

3    you think they need to look at this year for CES?

4         A.   Validate that our environment still is

5    following this protocol.  Basically, we have not

6    been able to do a scan of what's in it right now

7    because introducing a scanned product would

8    introduce an outside application, which would

9    potentially endanger the environment.  I mean,

10   once you bring third-party software into it, you

11   are now basically no longer having a sterile

12   environment.  So part of the talking was like

13   what could we do?  Is there anything we can do

14   not to disrupt that sterile environment?  They

15   may come back and say you can't.  I don't know.

16        Q.   Do you recall receiving any e-mails

17   from anyone on your team regarding the 2020

18   Fortalice annual assessment for CES?

19        A.   No e-mails that I can think of.  I -- I

20   do know conversations that were had.

21        Q.   Okay.  And is that also true for 2021?

22        A.   Correct.  Pretty much.  I mean, the

23   guys work right down the hall in the same area.

24   So they'll come in.  And typically the last two

25   have been -- they have been pretty happy.

Page 83

1   Fortalice has not been able to penetrate the
2   networks.  We've had to let them in in order for
3   them to continue their testing.
4        Q.   So you anticipate where I was going to
5   go.  The 2020 and 2021 assessments included
6   penetration testing, right?
7        A.   Yes.
8        Q.   And do I understand correctly, it's
9   your understanding that the penetration testing
10  by Fortalice failed in both 2020 and 2021?
11       A.   My understanding is that it failed.
12       Q.   Okay.  All right.  What --
13       A.   When you say penetration testing, that
14  means them trying to get access into our system.
15       Q.   And what systems were they -- strike
16  that.
17            You may not know because I think you
18  said you didn't know the scope.  But let me just
19  be sure.  What specific systems at the
20  Secretary's office were within the scope of the
21  penetration testing in 2020?
22       A.   The only one that they could actually
23  do potentially penetration testing is our data
24  centers where the voter registration system is,
25  the SOS, other applications such as corporations,

Page 84

1    POB, securities applications are in -- e-mail

2    environment, those.  Has not -- they can't do

3    penetrations testing on any of the CES

4    environment, the -- a Dominion environment.

5         Q.   Why not?

6         A.   It is not tied to any network, whether

7    it be Wi-Fi or hard wire that they could come

8    through.  It is completely isolated out.

9         Q.   Have you had them test that?

10        A.   We had them -- I think -- when we first

11   built it, I believe that was one of the tests.

12   But I'd have to go validate that to see whether

13   or not there was a connection out.

14        Q.   Okay.  So as you sit here today, you

15   don't recall any specific test Fortalice has done

16   to penetrate the CES network; is that right?

17             MR. DENTON:  Objection.

18        A.   I don't know.

19        Q.   Okay.  All right.  Come to paragraph 13

20   of your 2019 declaration, if you would.

21   Exhibit 2.

22             MR. DENTON:  Sorry, David, is this

23        Exhibit 2 or 3?

24             MR. CROSS:  Oh, good question.  Maybe

25        it's Exhibit 3.  Let's see.

Page 85

1       A.    I'm in Exhibit 3.  I'm looking at 13 --

2       Q.    Yes.

3       A.    -- established.

4       Q.    That's right.  Sorry, it's Exhibit 3.

5             All right.  Yes, and so paragraph 13

6  you wrote, the Secretary of State's office has

7  established a new hardened air gapped Secretary

8  of State IT managed network which houses both the

9  GEMS ballot building process and the express poll

10 data set production.

11            Do you see that?

12      A.    Yes.

13      Q.    What was the express poll data set

14 production?

15      A.    So this is the old system.  This is

16 what we built when we brought the -- all of the

17 stuff that was in the Kennesaw environment over.

18 So the GEMS ballot and express poll were both two

19 of the systems that were part of the old systems.

20 One was the poll -- not a poll pad.  There was a

21 polling device and the other one was the GEMS

22 ballot building application.

23      Q.    The express poll data set production,

24 was that the voter registration information?

25      A.    That is not the voter registration

1    system.  That would use the data that came over

2    from the voter registration system.  That's that

3    every -- prior to every election, I don't -- take

4    me to it -- but I think it's 40 days before the

5    election we bring a data file over.  But the

6    exact time frame I'm not positive on gets brought

7    over from the voting registration system over

8    into this environment using the protocol I just

9    -- I described earlier.

10        Q.   Okay.  Got it.

11             Okay.  And just sticking with the GEMS

12   system for a moment, the express poll data set

13   production sat within the air gapped network that

14   included the GEMS ballot building process.  What

15   was the set up?  Did the data set sit on the same

16   server as GEMS or was it a separate server?

17             MR. DENTON:  Objection.

18        A.   I don't recall.

19        Q.   Okay.  Do you know what the setup is

20   today?

21             Does the -- the voter registration data

22   that's used for the poll pad system, does that

23   sit on the Dominion EMS server or is it somewhere

24   else in that air gapped network?

25             MR. DENTON:  Objection.

1        A.    It does -- it does not share the same

2    server.  I don't know -- the poll pad, you'd have

3    to ask Michael Barnes about that.

4        Q.    Okay.

5        A.    Where that one is.

6        Q.    Okay.  And what's the basis for your

7    belief that the voter registration data set

8    that's used with the Dominion system doesn't set

9    on the EMS server?

10       A.    Are you saying the extract that comes

11   out of the voter registration system or the data

12   from the -- the whole voter registration system

13   data.

14       Q.    The extract that's used with -- with

15   the Dominion software.

16       A.    So the ballot building software does a

17   extract from the voter registration system for

18   candidates.  It brings over candidate

19   information, not voter information.  So that

20   comes off and gets put over there.  Poll pads are

21   interested in valid voters.  So you have two

22   environments.  One is interested in candidates,

23   one is interested in voters.

24       Q.    Got it.

25             Okay.  The candidate information, that

1    is what sits on the EMS server.  The voter

2    registration data, meaning about the voters

3    themselves, does not.  Do I have that right?

4         A.   That would go over to wherever the poll

5    pad software is.

6         Q.   Got it.

7              Okay.  The candidate information that's

8    loaded to the EMS ballot building server, where

9    does that candidate information come from?

10        A.   Candidate comes from the voter

11   registration system.  We actually store it within

12   the same environment.  So it's a sub application

13   of the voter registration is the candidate.  We

14   call it the candidate module.

15        Q.   And when you say it's stored in the

16   same environment as the EMS, what -- what do you

17   mean?

18        A.   Not as -- the candidate information is

19   collected and managed in the voter registration

20   system.  Not the EMS.

21        Q.   Got it.

22             So when you said stored in the same

23   system, you meant the voter registration system,

24   not the EMS server?

25        A.   Correct.

Page 89

1      Q.   Okay.  Got it.

2           Have you given any consideration to

3      asking Fortalice to do penetration testing for

4      CES this year?

5      A.   We haven't.  It's not outside the

6      purview of something that we could do.  I mean,

7      it's an interesting thought.

8      Q.   Sure.

9      A.   Not sure what they would do.  But, I

10     mean, that's -- that's their job.  And they --

11     it's -- as I said, it's an air gapped

12     environment.  Not sure -- you know, your -- it

13     would not be a typical penetration test, which is

14     Internet based.  That's what penetration test is,

15     an Internet based.  And since this is not tied to

16     the Internet, not sure what they would do.  But

17     it's a question.  It's a valid question we could

18     ask.

19     Q.   So take a look at paragraph 15, please,

20     in your declaration from 2019.  Do you have that

21     in front of you?  It begins with additionally.

22     A.   Yep, I see it.

23     Q.   And here you wrote, Additionally now

24     all watermarked ballot proofs and database

25     structure reports prepared for each county are in

Page 90

1    PDF format only and placed within a

2    county-specific folder on the Secretary of State

3    IT managed and secured file transfer protocol or

4    what's called an SFTP site.

5             Do you see that?

6        A.   Yep.

7        Q.   Is that the same process with the

8    Dominion system today or has that process

9    changed?

10            MR. DENTON:  Objection.

11       A.   I believe that's the same process.

12       Q.   Okay.

13       A.   I have not heard it's changed.  That is

14   not stored within the domain of that air gapped

15   environment.  That is outside of that

16   environment.

17       Q.   Okay.  If you look at paragraph 16,

18   here you wrote, Likewise, the only non PDF files

19   made available to counties through the Secretary

20   of State's SFTP site are ExpressPoll logic and

21   accuracy testing, ExpressPoll absentee and

22   ExpressPoll bulk update data sets.

23            Do you see that?

24       A.   Yes.

25       Q.   And do you have an understanding, is

1    that also the same process today with Dominion

2    and the poll pad software that's used?

3        A.    That would be a Michael Barnes

4    conversation.

5        Q.    Okay.  Is it your belief that logic and

6    accuracy testing done on BMDs provide

7    cybersecurity assessments for those machines?

8        A.    It is one of the layers we use.

9    Remember I said that security is not one thing,

10   it's one of many layers.  It's an important to

11   valid validate that the software that's on there

12   is what you expect to be on there and there's

13   nothing else on that system.  So yes, it is one

14   of the layers.

15       Q.    And is it your understanding that logic

16   and accuracy testing actually validates the

17   software that's on a given BMD?

18       A.    It validates that it matches a hash

19   test.  Means if you hash the file, you will get a

20   respondent hash.  If you hash a file that has

21   been modified at all or is of a different

22   structure, meaning something hiding there with

23   the same name, it will come back a different

24   hash.  And it will fail.

25       Q.    But do you understand that it's common

Page 92

1    with malware to design malware so that it defeats

2    the hash test, meaning it will spit back the same

3    hash that you're looking for when you're doing

4    something like logic and accuracy testing?

5              MR. DENTON:  Objection.

6         A.   I don't have any -- any document that

7    says that.

8         Q.   That's not something you've heard

9    before?

10        A.   Nope.

11        Q.   Okay.  All right.  Take a look at

12   paragraph 18, please.

13             Do you have that in front of you?

14        A.   Yes, I do.

15        Q.   And here you wrote, State defendants

16   also conducted parallel testing on election day

17   for a copy of an actual county GEMS database is

18   used with a voting machine set up in the

19   Secretary of State's office and set an election

20   mode for a specific real county precinct.

21             Do you see that?

22        A.   Yes.

23        Q.   Is that same sort of parallel testing

24   done today with the Dominion system?

25        A.   I'm not aware of that.

1      Q.   You just don't know one way or the

2  other?

3      A.   Correct.  I have not heard that that's

4  being done.  That doesn't mean it's not being

5  done.  I just not -- have not heard of it.  I did

6  know this because I was involved with helping

7  them set it up.

8      Q.   Would you expect Michael Barnes to know

9  the answer to this?

10     A.   Yes.

11     Q.   Okay.  And when you wrote this, was it

12 your understanding that this sort of parallel

13 testing is an effective way to test the security

14 of the voting equipment in the state?

15     A.   It's one of many ways to test.  As I

16 said, it's part of the layered approach is you

17 come at the problem from multiple different

18 directions looking for anomalies.

19     Q.   But this is one of them; is that fair?

20     A.   Yes, yes, this is one of them.

21     Q.   Okay.  Have you ever heard from any

22 election security experts that this sort of

23 parallel testing actually does not provide a

24 reliable indication of whether the voting

25 equipment is secure?

Page 94

1      A.    No, I've never heard of that.

2      Q.    Okay.

3      A.    Not sure what they would base that on,

4   but...

5            (Exhibit 4: LinkedIn Printout of

6             Merritt Beaver's profile page marked for

7             identification, as of this date.)

8      Q.    All right.  Let me pull up the next

9   exhibit.  Give me one second.

10           All right.  Exhibit 4 should pop up in

11   a moment here.  If you can open that, Mr. Beaver.

12     A.    Okay.  All right.  I have it open.

13     Q.    Does this look to be a fair and

14   accurate copy of your LinkedIn profile?

15     A.    I haven't looked at LinkedIn in so

16   long.  I'd have to compare.  But it looks like

17   maybe what I did.  It's probably been a couple of

18   years since I've looked at it.

19     Q.    Okay.  And that gets to the next

20   question I was going to ask you.  Is this -- I

21   see that it has your current position, chief

22   information officer at Georgia Insurance and

23   Safety Fire Commission and Georgia Secretary of

24   State.  Is that still your current position?

25     A.    Yes.

```
 1              MR. DENTON:  Objection.
 2      Q.   Just read through this, if you would
 3  take a moment, and tell me are -- are there any
 4  professional positions you've had that are not
 5  listed here that you think you would want to
 6  identify today?
 7              MR. DENTON:  Objection.
 8      A.   I'm not sure what you're asking.  It's
 9  a overview of, you know, 35 to 40 years of work.
10      Q.   Yeah, I'm just trying to make sure
11  whether this generally captures your -- your work
12  experience over the years or is there some
13  significant job or position you've had in the
14  past that -- that's not reflected here?
15              MR. DENTON:  Objection.
16      A.   It is my profile that I wrote.
17      Q.   And is it a generally accurate
18  reflection of your work experience over the
19  years?
20              MR. DENTON:  Objection.
21      A.   I -- I would say it's what I wrote
22  based on what I felt that I needed to put out on
23  LinkedIn.
24      Q.   Okay.
25      A.   I mean, I can't tell you about -- when
```

1    you say accurate, I don't know what the context

2    of that conversation is.  It is my view of my

3    past.

4         Q.   Well, is there anything in here that

5    you think may be incorrect?

6         A.   Not that I can see.

7         Q.   Okay.  And your education, you

8    graduated from Virginia Tech -- sorry, graduated

9    from Virginia Tech in 1981 with a degree in

10   electrical engineering; is that right?

11        A.   Correct.

12        Q.   So you do not have a degree in computer

13   science; is that right?

14        A.   No.  I have an electrical engineering

15   degree.  Not sure what that means, but...

16        Q.   Well, when you say no, are you saying

17   that I'm wrong or --

18        A.   No.  I mean, you asked me do I have a

19   computer science degree.  No, I have an

20   electrical engineering degree.

21        Q.   And those are -- those are distinct

22   degrees, right?

23             You could have gotten a degree in

24   computer science, you chose electrical

25   engineering; is that -- is that right?

1          MR. DENTON:  Objection.

2     A.   I'm not sure what you're asking.  I

3 mean, yes, there are -- colleges give lots of

4 degrees.  I picked the career -- or not the

5 career, the degree that I was going after was

6 electrical.

7     Q.   All right.  It's -- it's not meant to

8 be a trick question.  I'm -- some people have

9 degrees in computer science.  And I'm just trying

10 to understand when you were going to Virginia

11 Tech and got your electrical engineering degree,

12 that's not a computer science degree?

13     A.   Correct.

14     Q.   Okay.

15          MR. DENTON:  Objection.

16     Q.   Do you recall in 2018, just a few days

17 before the November election, that then Secretary

18 Kemp publically announced that the Democratic

19 party of Georgia had tried to hack some component

20 of the election system?

21     A.   Yes.

22     Q.   Were you involved in that situation at

23 all?

24     A.   Yes.

25          MR. DENTON:  Objection.

1        Q.    What was your involvement?

2        A.    As the CIO, I was brought in to help

3    analyze what was going on, to help lead the --

4    basically the team to figure out just what was

5    going on with the system.  I believe legal

6    contacted me.

7        Q.    What did you determine was going on at

8    that time with that incident?

9        A.    You mean at that specific time when I

10   was brought in?

11       Q.    Yes.

12       A.    Didn't know.  I had to bring a team

13   together to see if we can analyze what was going

14   on, both our vendor and Fortalice.

15       Q.    Was the vendor PCC?

16       A.    Yes.

17       Q.    Before the Secretary's office made the

18   accusation of a hack by the Democratic party of

19   Georgia, did you offer any view to anyone in the

20   Secretary's office on whether there had been some

21   attempted hack?

22       A.    Did I have -- I was asked information

23   that came from a third party person who was tied

24   to the Democratic party office.  Their e-mail

25   address was Democratic party, whatever their

1    e-mail it was.  That was identified in the e-mail

2    saying I have hacked the system.  That's what the

3    e-mail said.  So the person's e-mail with the

4    e-mail address of being from the Democratic party

5    stated in the e-mail I have hacked the system.

6    That's what raised the first question that gee,

7    looks like somebody in the Democratic party has

8    declared they have hacked the system.

9         Q.   And you --

10        A.   The question --

11        Q.   You saw an e-mail from someone with a

12   Democratic party of Georgia address that had the

13   words I hacked the system?

14        A.   Yes.  Yes.  Well, it said essentially I

15   have broken into the system or I have been able

16   to breach the system.  I have proof that I can

17   get into the system, something like that.  I

18   don't know if they used the word hacked, but they

19   said I, to be read as the person who wrote the

20   e-mail, have compromised, hacked, whatever you

21   want to call it.  I don't know what the words

22   are.  I have to go see if we can find that

23   e-mail.

24             So our assumption is if somebody who's

25   sending an e-mail from the Democratic party

1   e-mail address stating I have compromised your

2   system, sounds like somebody from the Democratic

3   party has tried to hack our system.  I'm not sure

4   what other assumptions you would make.  So that

5   was our first view.

6       Q.   You thought someone in the Democratic

7   party of Georgia hacked some component of the

8   election system and then sent you an e-mail and

9   told you they had done that; is that right?

10      A.   They didn't send it to me.  I said I

11  got a copy of an e-mail.  An e-mail was actually,

12  I think, and I'd have to go back through, sent to

13  counsel for the Democratic party who knew that

14  apparently we were in litigation, knew that he

15  needed to share information and sent a copy

16  across, which was shared with me.  So I did not

17  get the e-mail.  It was a shared e-mail from

18  legal counsel and I think it was the Democratic

19  party's legal counsel.  But it's been a long

20  time.  I don't have all of the details in front

21  of her -- in front of me.

22          MR. CROSS:  Alex, we request production

23      of all the e-mails associated with what

24      he's discussing.  Because I don't think

25      we've seen anything like that.

1      A.   Now, we later found out that the person

2  claimed that the message was not I have -- from

3  the e-mail sender, she said oh, well no, I just

4  cut and pasted from somebody else's e-mail into

5  my e-mail and sent it directly.  But on initial

6  seeing of it, we -- nobody had talked with that

7  person directly.

8      Q.   When did you --

9      A.   Learned days later.

10     Q.   Sorry, it was days later?

11     A.   Yes.  As far as I remember.  As I said,

12  it's been a number of years.  I don't have all

13  the time frames down.

14         MR. DENTON:  David, I'm told that you

15      may already have that e-mail.  I certainly

16      will take another look to follow up.  But I

17      understand that may have -- whatever Mr.

18      Beaver is referencing may have already been

19      produced.

20         MR. CROSS:  Okay.  Yeah, if you guys

21      could confirm with him, check his e-mails.

22      Because what he's describing sounds quite

23      different.

24     Q.   Okay.

25     A.   Do we want to go into what actually

Page 102

1    happened.

2         Q.   Yeah, we're going to walk through that.

3         A.   Okay.

4         Q.   The -- do you recall the time frame of

5    this was the election was on a Tuesday in

6    November, as usual, and the Secretary's office

7    learned of this incident on the Saturday before.

8    Does that sound about right?

9         A.   I think the actual communication was on

10   Friday night and a lot of activities happened

11   overnight and a lot of it came -- more details

12   came out on Saturday.

13        Q.   Okay.  And the Secretary released the

14   statement about the Democratic party on Sunday

15   morning before the election.

16             Do you recall that time frame?

17        A.   It sounds right.  I mean, I'm not -- I

18   wouldn't swear to it.  I just know it was

19   something was released.

20        Q.   Did you ever learn that I personally

21   had a conversation with John Salter, the

22   Secretary of State's trial counsel at that point

23   in this Curling litigation, on Saturday and

24   explained to him that this was coming from a

25   concerned voter that just stumbled upon this

Page 103

1    vulnerability and that it had nothing do with the

2    Democratic party and that we reported it to him

3    so he could alert the Secretary's office; is that

4    something you're aware of?

5         A.   Not aware -- no.

6         Q.   So you're not aware that the

7    Secretary's office learned that before it

8    released the statement about the Democratic party

9    on Sunday?

10         A.   I'm not aware of that.

11         Q.   Okay.  And so when you were looking

12   into this situation and what was going on, no one

13   conveyed that information to you?

14         A.   Correct.

15         Q.   All right.  I do want to talk through

16   the details of this.  But we have to take a short

17   break, Mr. Beaver, because the court has a

18   hearing in this case at 11:30 that shouldn't take

19   very long.  So let's go off the record.

20              THE VIDEOGRAPHER:  The time is 11:27.

21        We're off the record.

22              (A BRIEF RECESS WAS TAKEN.)

23              THE VIDEOGRAPHER:  The time is 12:35.

24        We're back on the record.

25              MR. DENTON:  David, before you

```
1       continue, sorry, I learned during the break
2       that Mr. Beaver had previously informed us
3       that regards his availability for today
4       that he has a flight tonight and that he
5       needs to be out of the office by 4:15 or
6       4:30 at the very latest.  I don't know
7       whether that was communicated to you.  But
8       I wanted to let you know.  And I'm hopeful
9       that you'll be able to wrap up by 4:15 so
10      he can catch his flight.
11           MR. CROSS:  Okay.  Yeah, I mean, we --
12      I surely don't want anybody to miss a
13      flight.  I don't -- I don't remember us
14      learning that.  We'll get you out
15      regardless.  And if we still have time we
16      need, we can figure that out at the end.
17      But certainly no one's going to make you
18      miss a flight, Mr. Beaver.
19           MR. DENTON:  Thanks, David.
20           MR. CROSS:  Yeah.
21      A.   Can you guys hear me now?
22      Q.   Yes.
23      A.   Okay.  We were playing with the
24 microphones before.
25      Q.   Okay.  All right.  Mr. Beaver, we left
```

1    off talking about the incident in -- just before

2    the November 2018 election involving an

3    allegation of attempted hacking by the Democratic

4    party of Georgia.  And you asked me at some point

5    if I wanted to know what actually happened.  I

6    do.  So tell me what you know about that

7    situation, if you would, please.

8         A.   Well, there's a whole stir around the

9    communication back and forth of how we got the

10   information.  That's probably better told by our

11   legal counsel because I think they lead that

12   communication.  The actual analysis of what was

13   going on that they were declaring a -- I think

14   the term of theirs was a major breach was

15   actually what happened was somebody discovered a

16   programming issue we had with our my voter page.

17   So that's not the voter registration system.  The

18   my voter page is a separate application that uses

19   a non-readable or non-edible data extract from

20   the voter election system.  That means it is a

21   one-way transfer of data from voter election

22   system to the database that my voter page works

23   on.

24              The bug that they found was that if

25   somebody goes in and looks up their precinct

1    information, they can print out essentially what

2    looks like a precinct card or an information

3    about where to go vote.  And they found that if

4    they take the URL and change the last digit,

5    which was the counter, to a prior counter, they

6    could pull up somebody else's voter registration

7    card and see where they could vote.

8              Now, that's bad practice for any system

9    to be able to allow people to do that.  It was

10   not a breach in the ability to go in and modify

11   any data.  But it did expose, I guess, voter

12   registration precinct cards for the past.  And I

13   think the window was like an hour when cache gets

14   cleared.  So you can go back and probably see 20

15   or 30 cards of people if you just walked back

16   through the numbers.

17             We discovered that with the help of

18   both civics and Fortalice to figure out just what

19   it was.

20             We also went back through the system to

21   see whether or not the perpetrator was able to do

22   anything more than just pull up prior records.

23   And they were not.  They were not able to

24   actually penetrate into the system.  They were

25   able to just pull up the last X number of

1    precinct cards that somebody had displayed on

2    their computer.  So that was actually fixed

3    overnight.  I can't remember whether it was fixed

4    Friday night or Saturday night.  But one of those

5    two nights it was fixed before Sunday.  And then

6    it became more -- after we fixed it, we went back

7    and did the forensics to see whether or not

8    anything had got further into the system and had

9    discovered no, that nothing was actually breached

10   into the system.  They were able to just print a

11   few precinct cards.

12        Q.   Okay.  The vulnerabilities that were

13   identified with the system at that time,

14   Fortalice found that those vulnerabilities did,

15   in fact, exist with the system, but that there

16   was no evidence that they were exploited in a way

17   that they would alter data or take data out of

18   the system; is that fair?

19        A.   Correct.

20        Q.   Okay.  And you mentioned the my voter

21   page, there was a second system that Fortalice

22   looked at at the time that's called is it OLVR or

23   something like that?

24        A.   Online voter registration system, yes.

25        Q.   And those are two separate systems,

Page 108

1   right?

2        A.   Correct.

3        Q.   And Fortalice found vulnerabilities

4   with each of those two systems.  But, again, no

5   evidence that data had been altered or extracted;

6   is that right?

7        A.   Correct.  And both were fixed.

8        Q.   Right.

9             And measures were taken by the

10  Secretary's office sometime in that weekend when

11  this issue came to light to -- to mitigate both

12  of those vulnerabilities; is that right?

13       A.   Yes.  My best -- well, I know we fixed

14  the stuff right away that weekend, so...

15       Q.   Okay.  Did you -- were you given an

16  opportunity to review any of the public

17  statements that the Secretary's office put out or

18  any communications with the press about those

19  incidence before those statements were made?

20       A.   Not that I recognize -- I mean,

21  remember.  I mean, I focus on the IT

22  infrastructure press releases and all that media

23  kind of stuff is handled by the Secretary's front

24  office.

25       Q.   Okay.  And was there ever a time in the

Page 109

1    few days that the Secretary was dealing with this

2    incident in making statements about it or his

3    office was where anyone consulted you on what to

4    say to the public or the press about this?

5        A.   No.  I think legal assumes engineers

6    aren't -- don't make the best press people.

7        Q.   Okay.  When did you first learn that

8    there actually was no attempted hack?

9            MR. DENTON:  Objection.

10       A.   I'm -- I guess I don't understand quite

11   what you mean by learned that there was no --

12   when you say when did we discover that it wasn't

13   actually a successful penetration?

14       Q.   No.  When did you first learn that no

15   one had actually tried -- that there was no bad

16   actor who had actually tried to hack any aspect

17   of the -- of the my voter page or the OLVR?

18           MR. DENTON:  Objection.

19       A.   It was part of -- I'm -- I will say I'm

20   assuming from your question you're asking when

21   did we discover that all this person was able to

22   do was print prior precinct cards and not able to

23   penetrate the system.  That was later in the week

24   when forensics -- the forensics were done by

25   Fortalice.  I think we actually figured it out

1    before the election.  But I can't swear to when

2    we actually determined okay, everything is clean

3    and safe.

4         Q.   Are you aware that GBI, the Georgia

5    Bureau of Investigation, conducted its own

6    investigation into this incident?

7         A.   I'm pretty confident the answer is yes.

8    I do recall working with -- I'll say working or

9    talking to GBI about it.  So I guess yes.

10        Q.   And were you aware that the GBI found

11   that there was no attempted hack?

12        A.   I think that's what I remember hearing.

13   So that that was their -- I think their claim was

14   that they could not prove that there was an

15   attempted hack.

16        Q.   Well, that there was no evidence of an

17   attempted hack, right?

18        A.   I don't know whether that's a semantic

19   question.  If they -- if they working with the

20   detectives they're saying that they could not

21   find substantial proof, I don't know what

22   insubstantial or other things they had.  But I

23   just know that they said they didn't have enough

24   to bring charges for the -- the action.  And

25   that's how -- where it was left with me.  I mean,

Page 111

1    I wasn't consulted.  I was just sort of brought

2    up to date by the detective.

3         Q.   Are you aware that the GBA -- the GBI

4    found and recommended closing the case as a

5    result of this finding that, quote, the

6    investigation by the GBI revealed no evidence of

7    damage to the Secretary of State's office network

8    or computers and no evidence of theft, damage or

9    loss of data, are you aware of that finding?

10              MR. DENTON:  Objection.

11        A.   I don't recall reading that.  I

12   probably had somebody tell me that.  I mean, that

13   does not sound different.  I just -- I know that

14   the issue basically was put to bed that other

15   than someone claiming -- making a claim versus

16   actually doing something was what really

17   happened.

18        Q.   And you've talked a bit about this

19   individual who raised the concern about the my

20   voter page.  But didn't it also come to light

21   that some of what lead the Secretary's office to

22   make the hacking accusation was actually standard

23   testing by the Department of Hum- -- Department

24   of Homeland Security on the Georgia state system?

25        A.   Well, you're -- now you've brought in a

1   whole new event, which I think was back in -- was

2   it 2016?

3       Q.   Didn't -- wasn't this what happened in

4   2018 at the same time?

5       A.   No.  As far as I know, the -- the

6   Department of Homeland Security event I'm pretty

7   confident was back in 2016.

8           (Exhibit 5: Atlanta

9           Journal-Constitution article entitled Case

10          files discredit Kemp's accusation that

11          democrats tried to hack Georgia election

12          marked for identification, as of this

13          date.)

14      Q.   All right.  Grab Exhibit 5, if you

15   would, please.  Just let me know when you've got

16   it in front of you.

17      A.   I have it now.

18      Q.   And do you see this is a Atlanta

19   Journal Constitution article about the hacking

20   allegations from 2018 we were just discussing?

21      A.   Yes.

22      Q.   Have you seen this article before?  Do

23   you recall seeing it?

24      A.   No.  I mean, there was so much stuff in

25   the press.  I -- I don't tend to read all this

1   stuff.

2        Q.   Okay.

3        A.   So...

4        Q.   Are you familiar with Mark Niesse, the

5   reporter here?

6        A.   I think I've heard the name.

7        Q.   Okay.  If you look at the first

8   paragraph at the bottom of page 1, do you see

9   here the report indicates, Two days before the

10  2018 election for Georgia governor, Republican

11  Brian Kemp used his power as Secretary of State

12  to open an investigation into what he called,

13  quote, a failed hacking attempt, closed quote, of

14  voter registration systems involving the

15  Democratic party.

16            Do you see that?

17       A.   Yep.

18       Q.   And then if you come down to the second

19  page, you look at the fourth paragraph.  Do you

20  see the sentence quoting a memo about the GBI

21  finding that I just read to you?

22       A.   Now, which paragraph now?

23       Q.   The fourth paragraph on page 2.

24       A.   Starts with the investigation by GBI?

25       Q.   Yes.

1      A.   Reveals no evidence of damage.  Yes, I

2  see that.

3      Q.   Great.

4           If you come to the next paragraph, do

5  you see that begins with the Internet activity?

6           Do you see that paragraph?

7      A.   Yep, yep.

8      Q.   And there it reads, The Internet

9  activity that Kemp's staff described as hacking

10  attempts were actually scans by the U.S.

11  Department of Homeland Security.  But the

12  Secretary of State's office had agreed to,

13  according to the GBI.  Kemp's chief information

14  officer signed off on the DHS scans three months

15  beforehand.

16           Do you see that?

17      A.   I see that.

18      Q.   Does that refresh your recollection

19  that part of what lead Secretary Kemp's office to

20  accuse the Democratic party of Georgia of hacking

21  just before the election in 2018 were actually

22  lawful authorized scans by the Department of

23  Homeland Security?

24           MR. DENTON:  Objection.

25      A.   I can't say what group Kemp -- all I

1    can say is the things -- I don't recall this.  I

2    do recall in 2016 DHS doing scans on --

3    unauthorized scans of our system.  That was

4    brought to the attention of DHS.  And it was

5    initially -- they said they didn't do it and then

6    later came back and tried to explain that it was

7    -- oh, it's actually somebody in a remote office

8    doing something that they had no control over.

9    So I don't know this specific event.  I would

10    have assumed that this was -- could have been a

11    misinterpretation of something that happened two

12    years prior.  But I don't have any recollection

13    of this statement.

14         Q.   So you don't recall a report from

15    Fortalice finding that in 2018, just a few days

16    before the election involving the OLVR, the DHS

17    was actually running scans that you personally

18    had authorized at that time and that those were

19    misconstrued as hack attempts by the Secretary's

20    office?

21              MR. DENTON:  Objection.

22         A.   I don't recall that.

23              (Exhibit 6: E-mail string with the top

24               from Kevin Robertson dated 7/1/2020 marked

25               for identification, as of this date.)

Page 116

1      Q.   Okay.  All right.  Let me pull up the

2  next exhibit.

3           All right.  Grab Exhibit 6, if you

4  would, please.

5      A.   ██████████████████████████████?

6      Q.   That's right.  Yes.  Let me make sure.

7  Yes.

8           So do you see that this is ████████

9  that you -- sorry, strike that.

10          This is an ████████████████████

██  ████████████████████████████████████████

██  ██████████████████

13     A.   Okay.

14     Q.   And then if you come down to the

15  ████████████████████████████████████

██  ████████████████████████  ████████████████

██  ██████████████████████

18          Do you see that?

19     A.   Yes, ████████████████████████████

20     Q.   Right.  ████████████  ████████████████

██  ████████████████████████████

22     A.   Yes.

23     Q.   And are you familiar with ████████████

██  ████████████████████████████████████████

25     A.   He -- not directly.  I know the name

Page 117

1    back then.  Really didn't deal a lot with the

2    Dominion people day in, day out.  So there was

3    some guy named ████████ , so yes.

4         Q.   And I was going to ask a question, does

5    your team or department have responsibility for

6    dealing with Dominion regarding election security

7    issues?

8              MR. DENTON:  Objection.

9         A.   Very limitedly.  Depends on -- the

10   concept with the scope of what you're asking for

11   is broad so you'd have to need to narrow it down

12   as to just what.  Our -- our involvement is

13   creating an environment that is secured for them

14   to put their application in.  And then we install

15   their application.  Now, the development of that

16   application at their site is their

17   responsibility.

18        Q.   And if an election security -- strike

19   that.

20             If a vulnerability concern is raised

21   with any of the Dominion equipment or software,

22   is that something your team handles or is that

23   something someone else handles for the Secretary

24   of State in terms of dealing with Dominion to

25   address that?

Page 118

1              MR. DENTON:  Objection.

2         A.   I can't tell you specifically because

3    sometimes we get pulled in, sometimes we don't.

4         Q.   And do you know how the determination

5    is made as to whether you're pulled in on

6    something like that?

7         A.   We do not have a protocol.

8         Q.   Who makes that decision, whether to

9    include your team?

10        A.   It could be somebody from Dominion, it

11   could be Michael Barnes, it could be Gabe

12   Sterling.

13        Q.   All right.  If you look at this e-mail

14   on ███████████████████ -- and sorry, I should

15   ask, did Kevin Robertson, did he report to you?

16   Was he in your group?

17        A.   Yes.  He reports to me.

18        Q.   Is he still there?

19        A.   Did.  No.

20        Q.   When did he leave?

21        A.   Earlier this last -- or late last year.

22        Q.   Do you know where he went?

23        A.   A company called transform.

24        Q.   Still in Atlanta?

25        A.   Yes.

Page 119

1      Q.    Why did he leave; do you know?

2      A.    Money, I think.

3      Q.    All right.    ████████████████████████

█    ██████████████████████████████████

█    ████████████████████████████████

6      A.    Yes.

7      Q.    ████████████████████████████████

█    ██████████████████████████████████

█    ████████████████████████████████████

█    ██████████████    ████████████████████

█    ████████████████████████████████   █████

█    ██████████████████████████████████

█    ████████████████████

14            Do you see that?

15     A.    Yep.

16          ███   █████████████████████████████████

█    ██████████████████████████████████

█    ██████████████████████████████████

█          ███   █████████████    ████████████████████

█    ██████

█          ███   ████████████████████████████

█          ███   ██████████████████████████████

█    ███████████████████████████████████████

█    ████████████████████████████████████

█    ███████████████████████████████████████

Page 120

1   ███████████████   ████████████████████████

   █   ████████████████████████████████

3        Q.   Yeah, and if you need to read through

4   it, go ahead.  I don't want -- I don't want you

5   to speculate on anything.  So why don't you take

6   a moment and let me know when you're -- when

7   you're finished reading it.

8        A.   Okay.

9        Q.   Okay.  So if you stay at the bottom,

10  the first e-mail in the thread we just looked at,

11  and then you scroll up.  Do you see that there's

12  a response from Mr. Feehan two days later on

13  February 16, 2020 to Mr. Robertson?

14       A.   Yep.

15       ██   █████████████████████████████████

█   ██████████████████████████████████

█   █████████████████████████████████

18            Do you see that?

19       A.   Yes.

20       ██   ██████████████████████████████

21       A.   No.

22       ██   ██████   ██████████████████████

█   ████████████████████████████████████████

█   ██████████████████████████

25       A.   Yep.  No.





17        A.   So what we actually did was we actually

18   used the standalone server as the initial

19   Dominion environment.  It wasn't even an air gap

20   system.  It was a standalone.  Wasn't plugged

21   into anything.  So there was no network to it.

22   Then we -- that got him through sort of the

23   initial build out to learn how to use the system

24   until we could build out the larger instance of

25   the air gap system.  And that's why they brought

Page 123

1    this back up as we've got to finish building this

2    air gap system so we can get off the standalone

3    server that's not connected to anything and

4    actually plug into an air gap environment so all

5    the people that worked for Michael Barnes to get

6    on the system at the same time. ███████████████

███████████████████████████████████████████████████

███████████████████████

9          Q.   Okay.  All right.  So I think I

10   understand what you're saying.  So let me just

11   make sure I have this right. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  ██████████████████

███████████████  █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

22         A.   Correct.

23              MR. DENTON:  Objection.

24         Q.   Okay.  And help me understand the --

25   the IT here a bit.  So before -- whatever happens

Page 124

1    after June of 2020 to set up the air gap election

2    center network, I think you said the Dominion EMS

3    was running on did you say a standalone server?

4         A.   Yes.

5         Q.   Okay.  And do you know when that server

6    got set up?  Was that sometime in late 2017 when

7    the pilot elections rolled out on the BMDs?

8         A.   I think so.  Dominion actually supplied

9    the hardware with the software on it.  So it was

10   very early on in the process.  Essentially when

11   Michael Barnes had to start learning how to use

12   the system to start building ballots.  And it was

13   before we could get a air gap environment built

14   and he needed to move forward.

15        Q.   Why couldn't you build the air gap

16   environment before the summer of 2020 for the

17   Dominion system?

18        A.   We didn't have the hardware needed to

19   do it yet because we were buying all new

20   hardware.  We didn't have the network environment

21   run in the building.  Remember I said we put all

22   new stuff in.  We wanted it to be dedicated.  So

23   that takes time.  And then there was also what --

24   at one point in time we couldn't just do it.  He

25   was in the middle of other election building

1  activities.  So he couldn't stop.  So we had to

2  look for a window.  And typically summer is

3  between the spring elections and the fall

4  elections.  So summer is when -- is one of our

5  gaps.  So June is -- makes -- to me makes perfect

6  sense when they jumped back in as we're back into

7  our gap or our open window for doing IT work for

8  the election center.

9       Q.   So the state was relying on the -- the

10  standalone EMS server that Dominion itself

11  provided until the air gap network was set up in

12  sometime after June 16 of 2020.

13            Do I have that right?

14       A.   Yes.

15       Q.   Okay.  And do you know how long after

16  June 16 of 2020 the air gap network was set up

17  for the Dominion election system?

18  ███  ███  ████████████████

███  ████████████████████████

███  ████████████████████████

███  ████████  I think by August it's got to be done.

22       Q.   Okay.  If you wanted to know when that

23  was up and running, who would you ask?

24       A.   I think I'd have to have someone

25  actually probably go look on a server and see

1  what the dates were that the files were created

2  on that server and that would give us an idea.

3  Unfortunately, like David Hamilton's not here

4  anymore, some of the people that were working on

5  that project are not here anymore.  So we'd have

6  to sort of reverse engineer it, kind of look at

7  it and see if we could figure out when it

8  actually came live.  But it's in that window.

9      Q.   Given that these e-mails were sent to

10 Michael Barnes and 6 Gabriel Stirling, would you

11 expect them to have better insight on when this

12 system was up and running?

13     A.   I'm guessing this was more for their --

14 just their knowledge that we're progressing on

15 this project.

16     Q.   Okay.  If you come down to the second

17 to -- well, come down to the second e-mail.  It's

18 the second to most recent e-mail on the first

19 page from Michael Barnes on July 1, 2020.

20          Do you see that?

21     A.   Yes.

22     ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



1 ████████████████████████████████

2 ████████████████  ███████████████

3 ██████████████████████████████

4 █████████████████████████████████

5 ███████████████████████████

6 ███████████████████████████

7 ██████████████████████████████████

8 █████████████████████████

9 █████████████████████████████

10 █████████████████████████████████

11 ████████████████████████████████

12        Do you see that?

13     A.   Yes.

14        ██  ███████████████████████████

15 ██ ████████████████████████████

16 ██ ████████████████████████████████

17 ██ ████████████████

18        ██  ████████████████████████  ██

19 ██ ████████████████  ██████████████

20 ██ ████████████████

21     Q.   Why is that?

22     A.   Because current versions of Adobe need

23 to be connected to the Internet to get licensed.

24 You couldn't just take a license key over and put

25 it into it.  It has to phone home.  So after --

1    we went through a number of trials and after

2    30 days or something the license -- the temporary

3    one would run out and they said hey, Adobe

4    stopped working because it can't phone out.

5              So that one I know got in there.  I

6    know they use Excel and Word.  So that must have

7    gotten on there.  Browsers come with Windows, so

8    that's not a big deal.

9         Q.   Do you know how the -- what the

10   solution was for the licensing issue you

11   identified?

12        A.   Yes.  We had to go to a very old

13   version.  So we had to go back in time

14   essentially, and look at our oldest license copy

15   of Adobe that was functional without an online

16   verification.  I think it was actually a 2015

17   version that we had to go back to.

18        Q.   And do you know if you needed to do the

19   same -- oh, sorry.  Go ahead.

20        A.   It didn't phone home.

21        Q.   Okay.  And do you know if you needed to

22   do the same for any of the other applications

23   like Word or Excel?

24        A.   No.  Because we have license keys that

25   we can put in.

Page 129

1      Q.   Okay.  Got it.

2           Have you personally inspected the air

3      gapping of this network to confirm that it is, in

4      fact, air gapped as you understand that term?

5      A.   I have not.  I have been over to see

6      it, but I haven't done, like, electrical

7      inspection of it.  So I -- I know which room it's

8      in.  I can point to the rack and say that's it.

9      Q.   Okay.  Let me pull up the next exhibit.

10     A.   Next exhibit.  All right.

11     Q.   Just give me a minute.

12     A.   Tell me when to refresh.

13          (Exhibit 7: E-mail string with the top

14           from Kay Stimson dated 12/2/2020 marked for

15           identification, as of this date.)

16     Q.   All right.  Go ahead.  You should have

17     Exhibit 7.

18     A.   Okay.  Got it open.  From Kay Stimson?

19     Q.   Yes.

20     A.   Okay.

21     Q.   Do you see Exhibit 7 is an e-mail that

22     Kay Stimson sent to you and others at the

23     Secretary of State's office on December 2nd,

24     2020.

25          Do you see that?

Page 130

1        A.    Yes.

2        Q.    And are you familiar with Ms. Simpson?

3   Have you dealt with her?

4        A.    No, I don't know who she is.

5        Q.    If you come down to the bottom of

6   Exhibit 7, do you see there's an e-mail from

7   Walter Jones in the Secretary's office?

8        A.    Yes.

9        Q.    And he e-mails you, Ms. Stimson, Ms.

10  Fuche, Ari Schaffer, Gabriel Sterling.  It

11  indicates that a reporter with Georgia Star News

12  asked what the protections against the

13  introduction of malware were in place when the

14  Dominion tech on the Gwinnett video used a flash

15  drive on a laptop connected to E-Net.

16             Do you see that?

17       A.    Yes.

18       Q.    Do you recall this situation?

19       A.    Vaguely.  Not really well.  There was

20  numerous events that happened with Dominion

21  techs.

22       Q.    And tell me about that.

23       A.    For some reason my phone hung up.  Is

24  there a timer?

25       Q.    We don't have a timer on it.  Do you

Page 131

1    want to just dial back in?  You should be able to

2    dial in the same way.

3         A.    Switch to phone audio.

4               Okay.  Can you hear me?

5         Q.    Yes.  Thank you, Mr. Beaver.

6         A.    Okay.  Sorry about that.  I'm not sure

7    what happened.

8         Q.    No problem.

9         A.    All right.  Let's go back to your

10   question.

11        Q.    Yes.  You said there were a number of

12   issues that came up with the Dominion techs.  And

13   tell me about that.  What do you mean?

14        A.    We had death threats against Dominion

15   techs by people in the public.  We had people

16   that were filming them doing just their daily job

17   trying to create stories around them, trying to

18   hack systems when they were just doing their

19   regular job.  So this sounds like it was a

20   specific incident.  So I don't know specifically

21   which one of the incidents it was.  But it's --

22   anyway, so somebody filmed a tech doing

23   something.  So now I'm not sure how they knew

24   this person had a laptop connected to E-Net.  No

25   details of that.

Page 132

1          Q.   Do you know whether there was any

2     investigation by the Secretary's office into the

3     situation report here?

4          A.   I don't know.

5          Q.   Who would you ask if you wanted to find

6     out?

7          A.   Who would I ask?  I'd probably have to

8     go back to Walter Jones.  May have to call Dave

9     Hamilton to see if he recalls anything on this.

10    There was a lot of press churn going on during

11    2020.

12         Q.   If you take a look at Ms. Stimson's

13    e-mail, do you see if you come down five lines --

14    no, I'm sorry, six lines, there's a sentence in

15    the middle that begins, Even if a malicious

16    insider.  Do you see that?

17         A.   Even if --

18         Q.   And she writes there, Even if a

19    malicious insider tried to add malware using a

20    dirty USB, the voting system is certified through

21    a federal standard which requires software

22    independence, meaning it must be auditable and

23    its tabulation record cannot be based solely on

24    its software.

25              Do you see that?

Page 133

1       A.    Yes.

2       Q.    Do you have an understanding as to

3   whether the Dominion BMD system is software

4   independent?

5       A.    I'm not sure I understand your

6   question.  It's software independence.

7       Q.    Sorry.  The question is just that do

8   you have -- do you have any understanding as to

9   whether the Dominion BMD system used in Georgia,

10  whether it's considered software independent?

11          MR. DENTON:  Objection.

12      A.    I've never heard that term.

13      Q.    Okay.  Where she goes on to say that

14  the system must be auditable and its tabulation

15  record cannot be based solely on its software, do

16  you have an understanding of whether the

17  tabulation record in Georgia with the DM -- the

18  BMD system is based on the software?

19          MR. DENTON:  Objection.

20      A.    I can tell you there's no voting on a

21  BMD system.  All you're doing is marking a

22  ballot.  So if somebody says you are maliciously

23  changing votes, there are no votes counted on a

24  BMD.  So I am -- you know, I can only speculate

25  here.  But the whole conversation is sideways.

1    Because we don't count ballots on BMDs.  It's

2    counted over on the scanner, which runs different

3    software completely than what's on the BMD.

4         Q.   All right.  The software on the scanner

5    tabulates a QR code on the ballot in the current

6    system, right?

7         A.   I believe that's correct.

8         Q.   And are you aware of any research or

9    testing of the Dominion BMD system by any

10   election security experts who found that the QR

11   code can be changed so that it doesn't actually

12   match what the voter intended when they voted on

13   the BMD?

14        A.   No, I'm not.

15        Q.   Is that -- assuming that were a

16   vulnerability with this system, that that could

17   -- that that were doable, is that -- or that was

18   a finding that was reached, is that something you

19   would expect to know?

20        A.   I don't know.  No, apparently not.  If

21   it was a finding and I don't know.

22        Q.   Okay.  Would you expect measures to be

23   taken to mitigate any vulnerability like that?

24             MR. DENTON:  Objection.

25        A.   I'd -- I'd have to know more about it.

Page 135

1    I mean, you're describing something that, you

2    know, could take all kinds of shapes.  I --

3    there's -- there would be more investigation to

4    understand it.  I mean, it's kind of like that

5    conversation we had earlier where initially it

6    looks really bad only to find out there's no

7    evidence.  So this could be the same thing.

8    Initially it looks bad, but could come out as

9    there's no evidence.

10              (Exhibit 8: ImageCast X ballot marking

11         device document marked for identification,

12          as of this date.)

13        Q.   All right.  Let me grab the next

14    exhibit here.  Give me one second.

15              All right.  Grab Exhibit 8, if you

16    would, please.

17        A.   Refreshing.

18              Okay.  Some document from ImageCast X

19    ballot marking device.

20        Q.   Yes.

21        A.   The name of the --

22        Q.   Yeah.

23              And let me ask you, have you seen --

24    what exhibit are we up to?  Have you seen

25    Exhibit 8 before?

 1        A.    What page is that on?  Figure 1.

 2        Q.    And take a moment to flip through

 3   Exhibit 8 if you need to.  I just want to --

 4   right now I just wanted to know if you've seen

 5   this, if you've read this before?

 6        A.    Oh, this document called Exhibit A.

 7   Oh, I was looking in the document.  No, I've not

 8   seen this document.

 9        Q.    Okay.  Yeah, it's Exhibit -- it's

10   Exhibit Number 8.  But I see it's also Exhibit A

11   on the -- sorry, I think we were missing each

12   other.

13        A.    Yep.

14        Q.    You've got Exhibit Number 8 in front of

15   you?

16        A.    Okay.  Yes, I do.

17        Q.    Okay.  And so you've --

18            MR. DENTON:  David, this is an

19        attorney's eyes only document, right?

20            MR. CROSS:  Yeah.  But I just checked,

21        everybody -- there's no one on the Zoom

22        that doesn't have access to this.

23            MR. DENTON:  I don't know a lot of

24        these people.

25            MR. CROSS:  So Susan Greenhalgh has

Page 137

```
 1        access.  Reema's with us, Zachary's with

 2        us, Carey obviously has access, Javier's

 3        with you, court reporter.  Who is Logan

 4        Wren?

 5            MR. DENTON:  No idea.  I guess Marilyn

 6        was on --

 7            MS. REEMA:  He's with us, David.

 8        David, he's with us.

 9            MR. CROSS:  Oh, he's one of our

10        associates. I'm sorry.

11            MS. REEMA:  Yes, he's one of the

12        associates.

13            MR. CROSS:  Sorry, we added some

14        associates to the team and Logan is one of

15        our new associates.  Everybody -- everybody

16        on here has access top the -- to the

17        report.

18        Q.   All right.  So Mr. Beaver, this is not

19    something that anyone has asked you to review and

20    comment on before?

21        A.   No.  At least, I've never seen it

22    before.

23        Q.   Okay.  Are you familiar with ███████

   ██ ████████████████████████████████████████

25        A.   I saw him in federal court once doing a
```

Page 138

1  little magic trick.

2      Q.  By magic trick, you mean the
3  demonstration he did when he hacked the Georgia
4  election equipment to alter the tabulation?

5      A.  I saw him with a piece of election
6  equipment that he had stripped all electronics,
7  all security, everything that made it a piece of
8  election equipment and reduced it to a computer
9  and then loaded a program that emulated a voting
10  program.  But the voting program that he built
11  would tabulate in the wrong columns and then said
12  ta-da, see, this is how malware works.  Only
13  later to have his software looked at and say this
14  would actually break a Georgia election piece of
15  equipment.  So introducing something like this
16  would actually defeat the whole purpose of what
17  it's trying to do.  So yes, I saw his -- his --
18  his act.

19      Q.  And you're talking about the
20  demonstration he did in 2018 with the DRE
21  equipment?

22      A.  When -- in Totenberg's court.

23      Q.  Right.

24          Where he did it live in the courtroom,
25  right?

Page 139

1      A.   Yes, yes.

2      Q.   Okay.  Are you aware that in the

3 September of 2020 he received current BMD voting

4 equipment from Fulton County supplied by Fulton

5 County to do an analysis of that equipment to

6 test the cybersecurity of that equipment; were

7 you aware of that?

8      A.   No.

9      ███   ████████████████████

██ ████████████████████████████████

██ ██████████████████████████████████

██ █████████████████████████████

██ ███████████████████████████████████████

██ ██████████████████████████████████

██ ████████████████████████████████████████

██ ████████████████

17           MR. DENTON:  Objection.

18     ███   ██████████████████████

██ █████████████  ███████████████  █████

██ █████████████████  ████████████████

██ ██████████████████████████████

██ ██████  ████████████  ████████████████

██ ████████████████████████████████████████

██ ████████████

25     Q.   Right.

Page 140

1    ██████████████ ████████████████

   █ ██████████████████████████████

   █ ███████████████████████████

   █ ████████████████████

5      A.   Correct.

6      Q.   Okay.  And I understand that the DRE

7  equipment he had in 2018 was something that he

8  did not get from Georgia, he got that through a

9  third-party source.  █████████████████████

   █ ██████████████████████████████

   █ ███████████████████████████████████

   █ ██████████████████████████████████████

   █ ███████████████████████████████

14         MR. DENTON:  Objection.

15      A.   I'm not aware of anything to do with

16  his activity.

17      Q.   Okay.

18      A.   The -- it happening or any of the

19  outcomes.

20      Q.   And so do I understand --

21      A.   I can't comment on anything -- I can't

22  comment on anything on here.

23      Q.   And here you mean in Exhibit 8, Dr.

24  Halderman's report?

25      A.   Correct.

```
 1       Q.   Okay.  All right.  Thank you.

 2            All right.  You can put that aside.

 3            Sorry.  I accidentally closed Exhibit

 4  Share.

 5            (Exhibit 9: Document entitled

 6            ████████████████████████████

 ██       ████████  marked for identification, as of

 8       this date.)

 9       Q.   All right.  Let me put up the next

10  exhibit.  This will be Exhibit 9, Mr. Beaver.

11            MR. DENTON:  David, while that's

12       loading, if you're through with Exhibit 8,

13       I don't know whether you are, but I know

14       there have been people on this deposition

15       who should not have access at this time.

16       And that I know, for example, Ms. Marks was

17       in here earlier and indicated that she had

18       access to Exhibit Share.  So it might make

19       sense to pull Exhibit 8 back out of the

20       share folder for now.

21            MR. CROSS:  I don't have a problem with

22       that.  But I don't think I have the ability

23       to do that.  Looks like maybe I could block

24       it.  See what this does.

25            THE VIDEOGRAPHER:  This is the
```

1          videographer.  I'm not sure about the

2          ability to lock or unlock.  But I know once

3          a exhibit is introduced into Exhibit Share,

4          the only people that could remove it is

5          Veritext.  So I can e-mail them and ask

6          them to remove it if I need to.

7     Q.   Mr. Beaver, see if -- and you can try

8  to, see if you can open Exhibit 8 now.  I just

9  locked it.  I don't know if that means you guys

10  can no longer open it.

11     A.   I just opened it again.

12     Q.   Oh, you did?

13     A.   Yes.

14          MR. CROSS:  Alex, can you open

15      Exhibit 8?

16          MR. DENTON:  I can as well.

17          MR. CROSS:  Oh.  All right.  It doesn't

18      let me pull it out.  But...

19     A.   Can we lock out people from joining?

20          MR. CROSS:  I don't think Ms. Marks is

21      coming back.  But if she comes on, we can

22      -- we can deal with that.

23          MR. DENTON:  Yeah, my -- I don't have a

24      full understanding how of how Exhibit Share

25      works.  I think you can probably

Page 143

1          independently access it at any point

2          whether you -- regardless of whether you're

3          in Zoom.  So to the extent --

4               THE VIDEOGRAPHER: That is correct.

5               MR. DENTON:  To the extent that that's

6          something that needs to be -- have limited

7          disclosure right now, it sounds like from

8          Mr. Miller that we may -- Jonathan Miller

9          that we may need to ask Veritext to pull

10          that back.

11               MR. CROSS:  Okay.  All right.

12               THE VIDEOGRAPHER:  Would you all like

13          me to ask them to do so, counsel?

14               MR. CROSS:  Yeah, why don't you, if you

15          don't mind, ask them to pull Exhibit 8 out.

16               THE VIDEOGRAPHER.  Exhibit 8.  Got it.

17          I'll take care of it.  Thank you, sir.

18               MR. CROSS:  All right.  Thank you.

19     BY MR. CROSS:

20          Q.   All right.  Mr. Beaver, do you have

21     Exhibit 9 in front of you?

22          A.   Yes, I do.

23          Q.   All right.  Have you seen Exhibit 9

24     before?

25          A.   Is there a date on it?  Oh, let's see.

Page 144

1  So this is --

2      Q.   ████████████████████████████████████

███  ████████████████████  ██████████████  If

4   you look at the bottom right corner, you'll see

5   there's this -- it says Fortalice and then

6   there's a little number there ending in 171.

7           Do you see that?

8      A.   Mine ends in 172.  So that's the second

9   page is 172.

10     Q.   Yeah.  So that -- that little legend

11  there brand at the bottom right corner indicates

12  that this was a document that was produced to us

13  by Fortalice.  █████████████████████████████

███  █████████████████████████████  █████████████

███  ███████████████████████████████████████████

███  █████████████████████████████████

17     A.   You don't have a date on this, do you?

18     Q.   I don't?

19     A.   When it was produced?  I don't recall

20  it.  But, I mean, we have conversations back and

21  forth regularly, you know, in every -- ████████

███  █████████████████████████████████████████████

███  █████████████████████████████████████████████

24  █████████████████████████████████████████████

███  █████████████████████████████████████████

████████  ████

████████████████

██  ████

 4       Q.   Okay.

 5       A.   But I don't recall it specifically.

 6       Q.   Okay.  All right.  I'll give you the

 7   next exhibit.

 8            MR. DENTON:  And David, I guess a

 9        similar comment as to Exhibit 9, this looks

10        like a forward produced document under the

11        confidential AEO designation.  So it

12        probably requires the same treatment as

13        Exhibit 8.

14            MR. CROSS:  So let's do this, what

15        we've done in the past is -- I don't want

16        to start pulling exhibits out.  It's going

17        to get really confusing.  Jonathan, can you

18        just -- are you still there?

19            THE VIDEOGRAPHER:  Yes, sir.

20            MR. CROSS:  Can you just ask Veritext

21        to remove Marilyn Marks' access to this

22        exhibit folder if she has it.  That's what

23        we've done in the past.  So she will not --

24            THE VIDEOGRAPHER: I will ask if they

25        can do that.  They may or may not be able

1       to do that.  I'm not hundred percent sure.

2       But I will ask.

3           MR. CROSS:  Okay.  I know they've done

4       it in the past when we've had a situation

5       --

6           THE VIDEOGRAPHER:  And she specifically

7       needs to not have access to Exhibit 8 only?

8           MR. CROSS:  No, just pull that access

9       to Merritt Beaver entirely.  Because there

10      are going to be a number of confidential or

11      AEO documents.

12          THE VIDEOGRAPHER:  Pull her access to

13      the folder for today entirely, correct?

14          MR. CROSS:  That's correct.

15          THE VIDEOGRAPHER:  Okay.  That's easy

16      to do.  I can -- I can take care of that.

17          MR. CROSS:  All right.  Thank you.

18          (Exhibit 10: Document entitled

19      ███████████████████████████████

        ███████████████████████████████

        ██████████████████████████ marked for

22      identification, as of this date.)

23   BY MR. CROSS:

24       Q.  Okay.  All right.  Grab Exhibit 10,

25   please, Mr. Beaver.

Page 147

1    A.   Okay.

2    Q.   Have you seen this before?

3    A.   No.

4    Q.   So this is entitled ███████████████

███████████████████████████████    ███████████

███████████████████████████████████████████

███████████████████    And just take a moment if

8    you want to flip through it real quick.  But this

9    is not something you recall seeing before from

10   Fortalice?

11   A.   As I said, we didn't share reports for

12   the last two years.

13   Q.   Okay.  So do you know ██████████████

██████████████████████████████████████

██████    ██    ████████████████████████

██████    ██    ████████████████████████████

██████████████████████████████████████████

18   A.   I don't know.  It could be -- I mean I

19   could speculate, but it would be speculation.

20   Q.   That's fine.  No, no, no, I'm not

21   asking you to guess.  That's okay.

22   A.   Yeah.

23   Q.   All right.  Well, if you come down to

24   the substance of the report.

25   A.   Okay.

Page 148



```
 1        ■        ████████████████████████

          ■  ████████████  ██████████████████

 3        A.   Yes.

          ■        ■        ██████████████████████

          ■  ██████████████████████████████████████████

          ■  ██████████████████████████████████████████

          ■  ██████████████████████████████████

 8             Do you see that?

 9        A.   Yes.  ██████████████████████

          ■        ■        ██████████████████

          ■  ██████████████████████████████████████████

          ■  ██████████████████████████████████████████

13             Do you see that?

14        A.   Yes.

          ■        ■        ████████████████████████████

          ■  ██████████████  ████████████████████

17             Do you see that?

18        A.   Correct.

          ■        ■        ██████████████████████████

          ■  ██████████████████████████████████

          ■  ████████

22        A.   Yes.

          ■        ■        ████████████████████

          ■  ██████████████████████████████

          ■  ██████████████████
```

1      A.    No.

2            MR. DENTON:  Objection.

3      A.    They have not been.

4      Q.    Have not been.

5            Okay.  Do you know why?

6      A.    It would break the software.

7      Q.    What does that mean?

8      A.    The software would have -- would cease

9   to work.

████      ████      ████████████████████

████   ██████████████████████████████

12     A.    Their job is to go find

13  vulnerabilities.  Not to determine whether or not

14  it impacts the business.  The business then has

15  to look at what is the risk?  What's the

16  exposure?  Are there alternative ways to

17  remediate?  So we have a couple of applications.

18  And over the years we've had a number of issues

19  like this that we have had to remediate that we

20  could not fix the code.

21            So there's other ways to solve this

22  problem.  The common solution for this and the

23  one that we have implemented is using something

24  called Cloudflare.  Cloudflare is a site that you

25  direct all web traffic through prior to it

1    hitting your application.  It is purposely for

2    solving these kinds of problems where it will

3    look at the traffic coming in and basically block

4    anything that has cross-side scripting in it, has

5    sequel injection in it, has black sites that are

6    coming from, things like that.

7           Because the market knows there's a lot

8    of applications out there that has

9    vulnerabilities like cross-side scripting that

10   the -- that the companies just can't fix because

11   they're either too old or they don't have the

12   resources to fix them or they don't -- there's a

13   number of reasons why you can't always fix

14   problems.

15          So in security, you know, the first

16   thing you want to do is go fix the exact problem.

17   If you can't fix the problem, then you come up

18   with an alternative.  One of the other -- I mean,

19   another alternative we had was a system that had

20   cross-side scripting was we put it in its own

21   domain so that knowing that the site -- that the

22   application could be hacked.  If it was hacked,

23   the hacker would go no further than that

24   application.  Couldn't get into anything else.

25   So you basically put it in a corral by itself.

Page 151

1          So there's numerous ways to solve

2    cross-side scripting.  The best way is to go fix

3    the application.  But it's a lot of times not an

4    actual something you can do.

5    ████  ████  ████████████████████

6    ████  ████████████████████████████

7    ████  ████████████████████████

8          A.   We remediated the risk.  We did not

9    remediate the problem.

10         Q.   I see.  Okay.  I understand.

11   ████        ████████  ████████████

12   ████  ████████████████████████

13   ████  ██████████████████████

14         A.   Yes.

15   ████  ████  ████████████████████

16   ████  ████████  ████████████

17         A.   Yes.

18   ████  ████  ████████████████████

19   ████  ████████████████████████

20   ████  ████████████

21         MR. DENTON:  Objection.

22         A.   I'm not familiar with this one.  So I

23   don't know.

24         Q.   Okay.  If you wanted to know, who would

25   you ask?

Page 152

1       A.   I'd call Bill Warwick.  Even though

2  he's gone, I'd probably have to still ask him.

3       Q.   So there's --

4       A.   He can probably point me to somebody

5  who knew.

6       Q.   Okay.

█ █        ████████████████████████████

█   █████████████████████████████████

█   ███████████████████████████████████

█   ██████████████████   ██████████████

█   ████████   █████████████████████   I know

12  that for a fact because there were meetings

13  talking about how do we fix some of the PCC

14  applications that had vulnerabilities?

15  Cloudflare was a huge fix for us for a number of

16  the issues.

17       Q.   And when did you guys add Cloudflare?

18       A.   It was either '19 or '20.

19       Q.   And are you still using them today?

20       A.   Absolutely.

21       Q.   All right.  Grab --

22       A.   We put it -- we put it in front of all

23  of our applications now, not just elections.

24       (Exhibit 11:  ██████████████████████

█       ████████████████████████████  marked

Page 153

1        for identification, as of this date.)

2        Q.   Grab Exhibit 11, if you would, please.

3        A.   █████████████████████████

4        Q.   Yes.

5        A.   Okay.

6        Q.   And Exhibit 11 is ████████████████

█  ██████████████████████████████████████,

8   right?

9        A.   Yes.

█        █      ████████████████████████████

█        ██████████████████████████

12            Do you see that?

13       A.   Yes.

█        █      ████████████████████████████

█        ████████████████████████████

█        █████████████████████████████████

█        ██████   █████████████████████████████

█        ████████████████████████

19            Do you see that?

20       A.   Yes.

█        █      ████████████████████████

█        ███████████████████████████████

█        ████████████████

█        █      ██████████████████████   ███████

█        ███████████████████████████

Page 154

```
  7        A.   I don't recall specifically what it
  8   was.
  9        Q.   All right.  You can put that aside.
```

```
      , who would you ask?
 13        A.   Well, I might go back to Dave and ask
 14   him.  I might go to Fortalice and see if we could
 15   dig up some of the communications that was going
 16   on at that time.  I think you showed a document,
 17   although I'd like to see what that date was on
 18   that one, to see whether or not -- it may have
 19   been exactly what that -- around that same time.
 20   So...
```

```
 23        A.   Yeah.
 24        Q.   Yeah, that was --
```

1        A.   Okay.  ███████████████████

██     ████████     So it could very well have been all

3    around that -- I mean, you're -- you're within a

4    week or so of that document being finalized.

5        Q.   Okay.  But you just don't recall for

6    sure?

██     ███     ███     ████████████████

██   ███████████████████████████

██   ███████████████████████

10       Q.   Okay.  Couple follow-up questions on --

11   that I forgot to ask.  On Dr. Halderman's report,

12   which was Exhibit 8, are you aware that that

13   report has been sealed, meaning it's been kept

14   confidential since it was issued on July 1?

15       A.   As I said, I have never heard of that

16   document, never seen that document.  So I

17   wouldn't know anything about how it's being

18   managed.

19       Q.   Okay.  All right.  So no one has talked

20   to you about whether that document should be made

21   public, for example; is that right?

22       A.   I have never seen that document.  I

23   don't know anything about that document.  I

24   wouldn't know anything about that document.

25       Q.   Okay.  All right.  Thank you.  I just

Page 156

1    wanted to be sure.  Thank you, Mr. Beaver.

2             All right.  Pull up Exhibit 11, if you

3    would, please.

4        A.   Oh, 11?

5        Q.   Yes, sir.

6        A.   This is the same one we just looked at.

7        Q.   Oh, yeah, you're right.  Sorry.  I

8    didn't show you this exhibit yet.  Let me do it

9    again.  This used to be so much easier when we

10   were in person.  Hang on.

11            MR. DENTON:  Sorry everyone, we had a

12         power outage here, I think, and knocked me

13         off the system.

14            MR. CROSS:  Who was that?  Was that

15         Alex?

16            MR. DENTON:  Yeah, sorry, I got kicked

17         out and I think I'm back in now.  We had a

18         power flicker here that kicked me out.

19            MR. CROSS:  Oh, sorry.  All right.  You

20         good now?

21            MR. DENTON:  I am in, yeah.

22            MR. CROSS:  Okay.

23            (Exhibit 12: E-mail string with the top

24         from ███████████████████ marked

25         for identification, as of this date.)

1          Q.   All right.  Grab Exhibit 12, if you

2     would, please.

3          A.   ███████████████

4          Q.   Yes.

5               So it's an e-mail from ███████████

      ███████████████████████████████████████

      ███████

8               Do you see that?

9          A.   Yes.

10         Q.   All right.  Come down to the bottom,

11    the earliest e-mail, sorry, in this thread --

12         A.   Oh, yes.

13         Q.   -- on the last page.

14              Do you see this e-mail████████████

      ████████████████████

16         A.   Yeah.  I think I remember this one.

17         Q.   And so you'll see here████████████

      ███████████████████████████████████

      ██████████████████████████████████

      ██████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████████████████████

      ███████████

24         A.   Yep.

25         Q.   Do you see that?

Page 158

1              What do you recall about this

2      situation?

3          A.   So it raised a concern.  It's what we

4      call an event.  So we start the process of

5      investigation, bringing in help.  Fortalice does

6      a lot of our forensics.  Seems to me we sent a

7      investigator out to that polling place to get

8      that laptop.  We packaged it up and sent it up to

9      Fortalice and had them basically go on the site

10     and see whether or not there was any evidence of

11     somebody doing any malicious activity on the

12     computer.

13              Fortalice, if I recall, looked through

14     the whole machine, did all of their, basically,

15     forensic activity and found there was nothing

16     going on that computer.

17         Q.   And do I understand right -- oh, sorry.

18     Go ahead.

19         A.   I said the only thing we can guess is

20     it was potentially a novice computer person using

21     it and it was -- had done something -- a lot of

22     times people will in the X -- the process of,

23     like, dragging a file to open it will

24     accidentally drag it into another folder and all

25     of a sudden say hey -- hey, somebody deleted my

1    file, somebody's taken over my computer when in

2    reality it was a pilot error.  So this was

3    classified as an event, not an incident.

4         Q.   Okay.  And what's the distinction you

5    draw between event and incident?

6         A.   So an event is when something has

7    flagged as a suspicious activity or something

8    that looks wrong that deserves somebody to do

9    investigation.  Once you identify, you know, that

10   there is malicious activity going on, it gets

11   transferred to status of an incident and you

12   start a process called an incident response

13   process, which is bringing in the -- you know,

14   the appropriate people, starting to document it,

15   things like that.

16        Q.   Okay.  And do I understand correctly

17   that there's no written report on Fortalice's

18   findings because of the policy for them not to

19   generate reports on this?

20             MR. DENTON:  Objection.

21        A.   I don't recall -- I don't recall.  Even

22   a -- like a document.  I just remember hearing

23   oh, it's -- there's nothing there.  They've

24   searched it.

25             (Exhibit 13: E-mail string with the top

Page 160

1       from ██████████████████████ marked

2        for identification, as of this date.)

3       Q.   Okay.  All right.  Grab Exhibit 13,

4    please.

5       A.   From ███████████.

6       Q.   Yes.

7            So this is an e-mail that ████████

██   █████████████████████████, right?

9       A.   Okay.

10      Q.   And then if you come down to the

11   earliest e-mail on the thread, the bottom of the

12   page, you see ██████████████

██    ████████████████████████

14      A.   Yes.

15      Q.   And that ███████████████████

██    ████████████████████████████████

██    ██████

18      A.   Yep.

19      Q.   And the subject line is ██████████

██    ████████████████████

21           Do you see that?

22      A.   Yes.

██         ██    ██████████████████████

██    ████████████████████████

██    ████████████████████████



```
5           Do you see that?

6      A.   Yes.

7      Q.   What do you recall about this

8  situation,
```

Page 162



10          MR. DENTON:  Objection.

17          (Exhibit 14:                              marked for

19       identification, as of this date.)

20     Q.   Okay.  All right.  Grab the next

21  exhibit, if you would, please.  Should be

22  Exhibit 14.

23     A.   Refreshing.

24

25     Q.   Yes.

Page 163

```
 1            So this is an e-mail that you received
 2    from ███████████████████████████
 3       A.   You mean ████████████████, not me.
 4       Q.   Well, ███████████████████████
 5    Do you see that?  End of the third or fourth
 6    line.
 7       A.   Oh, way over there.  Yeah, I see it.  I
 8    see it.
 9       Q.   Yeah.
10            The ██████████████████████████████
██    ████████
12       A.   Yes.
13       Q.   And █████████████████████████████
██    █████████████████
15            Fannin County is a county in Georgia;
16    is that right?
17       A.   My geography's not that great.  There's
18    159 of them.  I don't know all their names.
19       Q.   All right.  █████████████████████████
██    ███████████████████████████████████████
██    ███████████████████████████████
22            Do you see that in the middle of the
23    first page?
24            And do you see that ███████████████████
██    █████████████████
```

Page 164

1      A.   Yeah.

2      Q.   ██████████████████████████████

██  ██████████████████████████

4           Do you see that?

5      A.   Yes.

6      Q.   Are you familiar with them?

7      A.   ████████████████████

8      Q.   Yes.

██  ██  ███  ██████████████

██  ██  ███  ████████████████

██  ██  ███  ███████████████████

██  ████████████████

██  ██  ████████████████████████

██  ██  ███

██  ██  ██████████████████

██  ██████████████

██  ██  ██████████████████

██  ██  █████  ██████████████

██  ██  ████████████████████

██  ████████████████████████

21     Q.   Okay.  If you come down to the bottom

22  of the ████████████████████████

██  ██████████

24     A.   Yes.

██  ██  ██████████████████████page,



Page 165

5          Do you see that?

6     A.   Yes.

9          Do you see that?

10    A.   Yes.

12         Do you know who that is?

13    A.   No, I don't.

Page 166



4        Q.    Okay.

18

Page 167



9           (Exhibit 15:

         marked

11      for identification, as of this date.)

12      Q.   Okay.  So grab Exhibit 15, if you

13   would, please.

14      A.

16      Q.   Yes.

17           So this is an

19           Do you see that?

20      A.   Okay.

21      Q.   And if you come down to the earliest

22   e-mail on the thread at

Page 168

1          Do you see that?

2     A.   Are you on the last page?

3     Q.   I'm at the top of the last page, bottom

4  of the second to last page.

5     A.   Oh, yeah, yeah, yeah, yeah, █████████

█    ████████

█         █    ███████████████████████████████

█    ████████████████████████████

█    ██████████████████████████████████████

█    █████████████████████████████████████

█    ████████████████████████████████████

█    █████████████████████████████

13         Do you see that?

14    A.   Yep.

█         █    ██████████████████████████

█    ████████████████████████████████████████

█    ████████████████████████████████████████

█    █████████████████████

19         Do you see that?

20    A.   Yes.

█         █    ████████████████████████████████

█    █████████████████████████████

23         Do you see that?

█         █    ██████████████████    ████████████

25    Q.   And then if you keep scrolling up

Page 169

1    you'll see on -- 

4            Do you see that?

5       A.   Yes.

6       Q.   And that one is to you, right?

7       A.   Yep.

So



Page 170

11      Q.   And what's the basis for your

12  understanding that it was remediated?

13      A.   It seems to me I had a conversation

14  with Dave afterwards that he had worked with them

15  to -- to understand -- you know, explain to them

16  what it was to fix.  I think they actually pulled

17  the page down until they could fix it.

18          (Exhibit 16: ███████████████████████

         ████████████████████████████████ marked

20       for identification, as of this date.)

21      Q.   Okay.  All right.  Grab Exhibit 16,

22  please.

23      █████  ███████████████████████████████

    ████████████████

25      Q.   Yes.

Page 171

1           So this is an e-mail you can see that

2     ██████████████████████████████████████████

██    ████████████████████████████████████████

4     A.    Yes, yes.

5     Q.    And if you come down the beginning of

6     the thread it begins with an ████████████████

██    ██████████████████████████████████

8           Do you see that?

9     A.    Yes.

██    ██    ██████████████████████████████

██    ██████████████████████████████████████

12    A.    Okay.

██    ██    ██████████████████████████████

██    ██████████████████████████████████

15          Do you see that?

16    A.    Yes.

██    ██    ██████████████████████████████

██    ██████████████████████████████████████████████

██    ██████████████████████████████████████████████

██    ██████████████████████████████████████████████

██    ██████████████████████████

22    A.    Yes.

██    ██    ██████████████████████████████

██    ██████████████████████████████████

██          ██████████████████████████

Page 172



11      A.   Yes.

17           Do you see that?

18      A.   Yes.

23           MR. DENTON:  Objection.

24      A.   I can't speak to that.

25      Q.   Okay.

Page 173

1        A.    I know he -- Dave was a hard-core

2    security person and he didn't like -- he was

3    basically -- was very much this is how he felt

4    things should be done.  People doing something a

5    different way rubbed him.  So this doesn't

6    surprise me.

7        Q.    And Hamilton was the chief information

8    security officer while he was at the Secretary's

9    office, right?

10       A.    Yes.

11       Q.    Okay.

12       A.    He did a good job.

17              Do you see that?

18       A.    Yep.

21       A.    Yes.

25       A.    As I said --

Page 174

1           MR. DENTON:  Objection.

2      A.   -- Dave was a -- I'll say a

3  perfectionist.  He was very judgmental of other

4  people.  And if they didn't do things his way, he

5  wasn't satisfied.  There are lots of people in

6  the securities world.  Dave was a very hard-core

7  and that he had his vision of how things should

8  be done.  Not that his was the only way to do

9  something, but he had his way and he spoke his

10  mind.  ██████████████████████   ████████████

   ██  ████████████████████████████████████████

   ██  ████████████████

13          Now, did Dave have a harder view on

14  things and drive the organization better?  Yeah,

15  he did.  That's why he essentially replaced

16  James.  But James did what he was supposed to do.

17  He worked within the legal law of what

18  requirements were.  ██████████████████████████

   ██  ████████████████████████████████████████████

   ██  █████████████████████  Security is a broad

21  topic.  Dave was very opinionated and he

22  basically would voice his opinion all the time.

23  ████████████████████████████

   ██      ██   ████████████████████████████████

   ██  ███████████████████████████████████████████

Page 175

5          MR. DENTON:  Objection.

6     A. ████████████████████████████

████████████  I know he and I have talked about

8  this on multiple occasions.  As I said, he was a

9  perfectionist.  The attestation applies only,

10  only to the voting -- voter registration system,

11  the election system.  Dave felt it should apply

12  to all things that the Secretary of State

13  managed.  But the attestation specifically only

14  applied to election.  So Dave was always on a --

15  on a course to say we should have things like

16  artifacts that cover everything, whether it's the

17  corporate registration system, whether it is the

18  security system, professional licensing system.

19  He felt all of them should fall under the same

20  level of security that elections did.  But the

21  attestation clearly does not include anything but

22  elections.  And that was always a rub to Dave.

23          Does that answer your question?

24     Q.  I think so.  I was going to grab

25  another exhibit for you.

Page 176

1         A.   Oh, all right  I didn't -- one of those

2    pregnant pause moments --

3         Q.   Yes.  Sorry.

4              (Exhibit 17: ████████████████████████

█    ████████████████████████████████████  marked

6     for identification, as of this date.)

7         Q.   All right.  Grab Exhibit 17.

8         A.   This looks like it's the same topic.

9         Q.   Yes, yes, a little bit earlier.  So I

10   wanted to -- a little more context.

11             So if you go to the top, you'll see

12   this is ██████████████████████████████████

█    ████████████████████████████████████████

█    ████████████████████████████████

15        A.   Okay.

16        Q.   If you come down in the ████████████

█    ████████████████████████████████████

█    ████████████████████████████████████

█    ██████████████████████████

20             Do you see that?

21        A.   Yes.

22        Q.   What is the ██████████████████████████

█    ██████████████████████████████████

█    ██████████████████████

█    ██  ██████████████████████████████



Page 177

```
 9      Q.   Okay.  Do you know whether that e-mail
10  in box was searched for relevant e-mails for this
11  case?
12      A.   If we do a search on 365, it's
13  included, which would be the answer is yes, it
14  was included.
15      Q.   Meaning if they did a search on 39- --
16  365 that it encompassed that e-mail advice?
17      A.   It should, yes.
18           MR. DENTON:  Objection.
```





16          Do you see that?

17          A.   No.  I've lost you.  I'm down on the

18   first -- bottom of the first page.



16          Do you see that?

17          A.    Yep.



Page 181

19          MR. DENTON:  Objection.



Page 182

8        Q.   Okay.

16        Q.   All right.

18        Q.   The Secretary's office has announced

19   that they're actually moving away from E-Net,

20   right?

21        A.   Yes.

22        Q.   And why is that?

23        A.   It's an old system, to start with.

24   Civix has changed vendors -- or has been

25   purchased I think at least twice, maybe three

1   times in the last four years, four or five years.

2        Q.   When was the decision made to move away

3   from E-Net?

4        A.   Last year.

5        Q.   Who made that decision?

6        A.   Front office.

7        Q.   And by front office who do you mean?

8        A.   Secretary.

9        Q.   Oh, Secretary Raffensperger?

10       A.   Yes.  Those kind of decisions, it comes

11   down to him to make the call.  We present

12   proposals and it's up to him to say yay, nay.

13       Q.   What --

14       A.   It's a big decision.

15       Q.   Sorry.

16       A.   Yeah, that was a big, big decision.

17       Q.   What were those specific reasons that

18   he decided to move -- to replace E-Net?

19       A.   One was the age, one was the ability

20   for us to get, like this, certain fixes put in

21   place that we wanted to see.  Some of it was

22   security related, some was just functionality

23   related.  The application was built I think like

24   in 2012 when we first purchased it.  And the --

25   but the actual application was probably built a

Page 184

1   year or two before that.  So the core code was

2   ten years old.  Getting very old.  Technology has

3   changed.  So it was time to look at another

4   solution.  We were in the process of also looking

5   at some of our other systems and we decided to do

6   basically an overall refit of everything.

7        Q.   What's the new solution that you're

8   bringing in in place of E-Net?

9        A.   I think they've announced -- already

10  announced that it's Salesforce based.

11       Q.   And will that be a cloud solution

12  hosted by Salesforce?

13       A.   Yes.

14       Q.   Okay.  What's the process for migrating

15  data from E-Net to Salesforce; do you know?

16       A.   It hasn't been done yet.  We're in the

17  process of trying to come up with a migration

18  plan.

19            (Exhibit 18: ████████████████████

    ██       ████████████████████████

    ██       ██████████████████████████

    ██       ████████████████marked for

23       identification, as of this date.)

24       Q.   All right.  Grab Exhibit 18, please.

25       ██  ████████████████████████████

Page 185



6          Do you see that?

7     A.    Yes.

8     Q.    And this is dated ███████████████████ .

9  Do you see that on the front page?

10    A.    Yes, I've got it.

23    A.    Yeah.

24    Q.    So okay.  I'm sorry, you said yes?

25    A.    Yes, I did.



```
 7        Q.    Okay.

 8        A.    We probably talked through it.
```

```
25              Do you see that?
```

Page 187

1        A.    Yes.



17       Q.    Okay.  All right.  We've been going a

18   while.  Why don't we take another short break,

19   Mr. Beaver, and then we'll -- we'll get you out

20   of.  Sorry, you need to leave by 4:15; is that

21   right?

22       A.    Yes.

23       Q.    Okay.  All right.  Let's take a short

24   break.

25             THE VIDEOGRAPHER:  The time is 2:24.

Page 188

1          We're off the record.

2                (A BRIEF RECESS WAS TAKEN.)

3                THE VIDEOGRAPHER:  The time is 2:40.

4          We're back on the record.

5                (Exhibit 19:  ██████████████████

██          █████████████  marked for identification,

7           as of this date.)

8          Q.   All right.  Mr. Beaver, can you grab

9     the next exhibit, please.

10         A.   Exhibit 19?

11         Q.   Yes, sir, Exhibit 19.

12         ██   ██████████████████

13         Q.   Yes.

██              ████████████████████████

██    █████████████████████████████

██         ██   █████████████

██         ██   ██████████████████

██    █████████

19              Do you see that?

20         A.   Yes.

██         ██   ██████████████████████

██    █████████████████████████████

23         A.   Okay.  Yes.  I don't see the

24    attachment, but yes.

25         Q.   Yeah.



Page 189

1    ████████████████████████████████

█    ██████████████████████████████

█    ████████████████████████████

█    ██████████

█    ████  ████████████  ████████████

█    ████████  ████████████████

█    ████████  ████████████████████████

█    ████████████████████  Give me one second.

9         A.   So should I have move to that one?

10        Q.   Yes.  As soon as I can get it up.  Hold

11   on.  Trying to put the label where it's not

12   blocking anything.  That's unfortunate.

13             Ah, there we go.

14             Okay.  All right.  Grab Exhibit 20.  It

15   should pop up in a second.

16        A.   Got it.

█    ████  ████  ████████  ████████████████

█    ████████████████████████████

█    ██████████

█    ████████████████████████

█    ████████████████  ████████████████████

█    ████████████████████

█    ████  ████████████████████████

█    ████████████████

█    ████  ████  ████████████████

Page 190



```
 9          Do you see that?
10      A.   Yes.  I can hardly read it, but yes.
```

Page 191

1          Q.   Got it.  Okay.





Page 192

14      Do you see that?

15      A.   Yep.

Page 193



```
7        Q.   If you can pull up Exhibit 20 again.
8        A.   Yes.
```



17      Q.   Who has Dave Hamilton's

18   responsibilities now as the CISO?

19      A.   So it's tied between Kevin Fitts and

20   Fortalice.  Dave is hard to replace.

21      Q.   How long has Kevin Fitts been with your

22   office?

23      A.   About eight years.

24      Q.   And he reports to you?

25      A.   Yes.

Page 195

1       Q.   And what responsibilities does

2   Fortalice have for filling in part of the CISO

3   role?

4       A.   So the key strategic where do we go,

5   what are the core elements that we need to work

6   on, Kevin Fitts does not have that level of

7   experience of a CISO.  He is not a CISO.  He's a

8   manager, he's certified in security.  But he

9   doesn't have the years of experience Dave had.

10  So until we figure out how to replace Dave, Kevin

11  is helping me fill in the position of helping to

12  manage the day-to-day.

13          I mean, so for like risk registers,

14  once it's been identified where the issues are,

15  we need to start working -- working a plan on

16  each of these.  And each of these could take

17  months to fix.  And some of them that are what

18  are considered high risk maybe probability is

19  someone actually attacking it is really low.  But

20  if they were to find it, it would cause a

21  problem.

22          So his task is working with Fortalice

23  to identify all right, let's work on these five

24  things first.  Because you can only do so much at

25  a time.  It's a working environment.  This is not

1    some, you know, academic world that work doesn't

2    go around.  They just work on building the best

3    system in the world, but nobody really uses it.

4    This is a working environment.  Things happen

5    every day.  So this is a good list.  This is the

6    list that we work off of to help prioritize,

7    okay, we need to work on these three things

8    first.  And they aren't necessarily the top three

9    because the top one may take replacing an entire

10   system.  So we have to go through and figure out

11   okay, the really bad ones, if we can't fix right

12   away, what can we do to remediate or block or

13   protect ourselves in case somebody does penetrate

14   them.  We talked about that earlier.  Sometimes

15   you actually shield off a system, move it outside

16   the firewall into its own corral to know that if

17   it gets breached, it doesn't impact anybody else.

18   You do extra things like back it up, make sure

19   nothing that you can lose is out there.  Those

20   kinds of activities.  Because it's a high -- and

21   I have to use it, but I don't have a fix right

22   away.  So you remediate it in different ways.  So

23   but I can't -- I don't have a list here of which

24   ones are the worst or the best.  That would take

25   some analysis and time.

1      Q.   Okay.

2      A.   The important thing here is we track

3  what our weaknesses are and we work toward fixing

4  them.  Too many organizations that I've seen do

5  turn a blind eye to try to keep track of this.

6  This is what's made our organization strong

7  security-wise is we keep track of it, we hold

8  ourselves accountable.

9      Q.   And sorry, Mr. Beaver, if I asked you

10  this earlier, but I can't remember.  We talked

11  about, you know, possible forensic examination of

12  voting equipment like BMDs and printers and

13  scanners.  Do you know why that has not been done

14  in Georgia?

15          MR. DENTON:  Objection.

16      A.   No.  I have not been involved in a

17  question about doing that.  So I don't have -- I

18  couldn't answer you either way.

19      Q.   So that's not something you've proposed

20  as the CIO; is that fair?

21      A.   That is fair.

22      Q.   Okay.  And are you aware of any

23  discussion or consideration at the Secretary's

24  office about doing that or you've just not heard

25  anything like that?

1          A.    Correct.  I have not heard anything.

2          Q.    Okay.  Who would have the authority to

3    make the decision to do that type of analysis?

4          A.    It would be between the election

5    center, the elections department, Gabe Sterling

6    and the Secretary.  If an issue bubbled up that

7    pointed to a risk, meaning it's verified that

8    something has happened that shows that something,

9    you know, has happened, yeah, we probably would

10   act on it.  If we get an e-mail from somebody

11   saying I'm going to start hacking your system,

12   beware, that's probably not enough information to

13   jump on, oh, let's run a test on all the stuff.

14         Q.    Okay.

15         A.    And you've seen it.

16         Q.    Are you familiar with something called

17   the SolarWinds hack?

18         A.    Yes.

19         Q.    And do you recall that nine Georgia

20   counties, there was evidence that they may have

21   downloaded malware related to that hack in

22   February of 2021?

23         A.    I didn't know the count.  I knew that

24   there were some counties that were vulnerable.

25         Q.    Were you involved in any investigation

Page 199

1    into whether the solar wind hack created any

2    compromise of any Georgia counties?

3        A.   Not Georgia counties.  We focused on

4    our own environment.

5        Q.   What investigation was done with

6    respect to the Secretary's environment related to

7    the SolarWinds hack?

8        A.   We went through and did a full search

9    of all of our systems to see if there was any

10   solar winds applications that were vulnerable

11   within our systems.  We came back with negative.

12       Q.   How did you do that?

13       A.   We did an inventory of all of our

14   applications to see if any of them used solar

15   winds.  And then if they did use solar winds,

16   which we do use, we went back and verified

17   whether or not it was in the group that were

18   vulnerable and what we had was not.

19       Q.   And how did you determine -- determine

20   what group was vulnerable?

21       A.   SolarWinds published that information.

22       Q.   You looked to see that it -- whether

23   anyone in the Secretary's office was using

24   SolarWinds applications that SolarWinds had

25   identified as being potentially vulnerable?

1        A.   Correct.  Meaning when you say office,

2    the only people that would have used SolarWinds

3    would have been the SOS IT group.  So we only

4    have to check ourselves.  It's not an application

5    that your regular office people would use.

6        Q.   And --

7        A.   A small group of people that would use

8    it.

9        Q.   And your investigation found that no

10   one in the Secretary's office among those you

11   would expect to use it, it sounds like you're in

12   the IT department, were using any of the

13   SolarWinds applications that SolarWinds

14   identified as potentially vulnerable; is that

15   right?

16       A.   Correct.  Correct.

17       Q.   Do you recall a situation involving a

18   ransomware infection related to the Jekyll Island

19   authority?

20       A.   No.  I don't know which -- was it

21   recent or a long time ago?

22       Q.   September 2020.  Let me -- I can show a

23   document to help.  Hang on a second.

24       A.   Was it a county office?

25       Q.   I'm not sure.  I'm hoping you can help

Page 201

1    me.  Hang on one second.  Let me pull this up for

2    you.

3          A.   I know for a while there was a number

4    of counties and cities that got -- were getting

5    hit.  In fact, I think the City of Atlanta got

6    hit.

7               (Exhibit 21: ██████████████████████

██            ██████████████████████████  marked for

9          identification, as of this date.)

10         Q.   All right.  Grab Exhibit 21, if you

11   would.  And just let me know --

██        ██      ██████████████

██        ██   ██   ████████████████████████████████

██   ████████████████████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████████████████████████████

██        ██   ████   ████

██        ██   ██████████████████████████████

██   ████████████████████████████████████

██   ████████████████████     ██████████████████

██   ██████████████████████████

██        ██   ██████   ████████████████████████████

██   ██████

24         Q.   Right.

██                ████████████████████████████████



Page 203



11                (Exhibit 22: Document entitled

12

                                              marked for

14        identification, as of this date.)

15        Q.    All right.   Grab Exhibit 22, please.

24        A.    Yes.

Page 204



6        A.    So whenever --

7              MR. DENTON:   Objection.

Page 205



18        Q.   Okay.  Does the Secretary's office do

19    random phishing testing for its employees?

20        A.   Yes.  We contract with a company called

21    KnowBe4.

22        Q.   How do you spell that?

23        A.   I have no idea.

24        Q.   Okay.

25        A.   I don't know if it's K-N-O-W or N-O.  I

Page 206

1    think it's K-N-O-W Be4, but I won't swear to it.

2         Q.   Okay.

3         A.   If someone Googles it, they'll figure

4    it out.

5         Q.   Is that company -- when they do the

6    random phishing testing, do they generate

7    reports, written reports?

8         A.   Yes, they do.  And KnowBe4 the

9    company's solution actually comes as part of our

10   annual cyber insurance policy.  So the state

11   signs -- created a cyber insurance policy and

12   part of paying your paid -- part of the cyber

13   insurance each agency gets basically an agreement

14   with KnowBe4.

15        Q.   Do you personally receive their random

16   phishing testing reports?

17        A.   No, I don't.

18        Q.   Who receives those?

19        A.   Somebody on my security team goes and

20   gets it.

21        Q.   And is that -- how often is that

22   testing done?

23        A.   Quarterly.

24        Q.   Are you aware of the -- the findings in

25   those reports or do you rely on other folks to

1   review those?

2       A.   I -- about a year ago I started asking

3   about them because I was hearing from GTA that

4   agencies were really falling off their compliance

5   in taking them.  And I went and checked and we

6   too had fallen off, meaning, you know, we're down

7   to -- in the 70 percentiles of people taking it.

8   So I asked my security team to go in and figure

9   out what the heck's going on.

10          Where the problem lie -- seem to lie

11  was GTA, who runs the whole thing, wasn't taking

12  people that had left the business off the report.

13  So people that had left were still being counted

14  as not taking the test.  So it took -- and

15  they're supposed to have fixed it.  I don't think

16  it's fixed as of today, that reporting.

17      Q.   So were you able to confirm whether the

18  Secretary's office was actually doing the random

19  phishing testing for everyone who was supposed

20  to?

21      A.   Yes, it was actually being sent to more

22  than our people.  It was sent to our people and

23  the people that had left, which, of course, those

24  e-mails were going nowhere.

25      Q.   And do you know whether employees had

1    fallen for the phishing testing over the years?

2         A.    Sure.   We used to send out messages in

3    the beginning about, you know, bad performance.

4    I mean, we didn't get a lot.   But we got a

5    handful.   And we basically tried different

6    approaches, the shame approach, the -- the -- you

7    know, maybe this department is doing so much

8    better than another department, trying different

9    ways to influence people to -- to try harder.

10   And then over time they've gotten very well.   And

11   I would say phishing has -- the phishing test has

12   really sharpened our peoples' ability to tell

13   when an e-mail comes in to a point that we get

14   lots of e-mails that you're totally legitimate,

15   but people are calling saying hey, what is this

16   thing?   So they're probably overly sensitive now.

17        Q.    Have you ever had a year where no one

18   fell for the phishing test?

19        A.    I don't think so.   That's not reality,

20   probably.

21        Q.    Are you familiar with an organization

22   called Secureworks?

23        A.    Yes.   Dell -- company from Dell.   We

24   used to use them.

25        Q.    Right.

1          I was going to say, that's an

2   organization that you -- the Secretary's office

3   used to use to help with cybersecurity; is that

4   right?

5          A.   Yes.

6          Q.   Why did the Secretary's office

7   terminate its relationship with Secureworks?

8          A.   Essentially it was redundant.  We had

9   moved to Palo Alto to do our security and

10  Cybraics.  And those two vendors covered the same

11  platform space that Secureworks did.  So it was

12  redundant.  We double ran them I think for about

13  a year, we ran both, and didn't find that

14  Secureworks was doing any better, you know,

15  finding anything that the other two weren't

16  finding.  So we turned them off.  And they were

17  very expensive.

18          (Exhibit 23: ███████████████████████

    █████      ██████████████████████████████ marked

20       for identification, as of this date.)

21          Q.   All right.  Let me give you another

22  exhibit here.  So grab Exhibit 23, if you would.

    ████    ████   █████████████████████████

24          Q.   Yes.

    ████        ████████████████████████████████

Page 210



10          Do you see that?

11     A.   Yes.



Page 212

████████████████████████████████████████

████████████████████████    ████████████████

████████████████████████████████

████████████████████████████████████

███████████████████████████████   ████████████████

████████████████████████   ████████████████████

███████████████████████████████████

██████████████████████████

```
 9        Q.   What is -- so is TeamViewer still used

10   by the state today?

11        A.   Yes.

12        Q.   And what is Team -- what is -- strike

13   that.

14             What is -- what is the state -- or the

15   Secretary's office use TeamViewer for?

16        A.   So the counties -- whenever they're

17   having problems, whether it's E-Net related or

18   anything to do with voter registration,

19   transferring files and things like that, we find

20   is that trying to walk somebody through that's

21   very low skill in computers, just walking them

22   through what to do say, okay, click on this

23   button, do this, they still get lost.  And so

24   it's easier for our liaisons, those are the

25   people that work in elections that work with each
```

Page 213

1   of the counties, I think we have four or five of

2   them, they -- it's found that it's much faster to

3   just log onto the county's desktop and say here,

4   let's practice this together.  So they use it to

5   help the counties guide them through how to use

6   election systems applications.

7        Q.   So it's -- it's a remote desktop access

8   to tool, right?

9        A.   Yes.

10       Q.   Got it.

11       A.   And it's used worldwide.  It's one of

12   the more popular ones.

13            Am I on another one?

14       Q.   Yeah, in a moment.  Trying to winnow

15   down a few things so I can get you out of here.

16       A.   Okay.  You're making me really work my

17   brain.

18       Q.   That's how it goes in a deposition.

19       A.   I hope they upgrade me to comfort plus,

20   then I'll at least get a drink this evening.

21       Q.   What are you on, Delta?

22       A.   Yep.

23       Q.   I'd give you one of my drink vouchers.

24   But I don't know, maybe that's not appropriate.

25            All right.  Yeah,  let me grab this.

Page 214

1          (Exhibit 24: ███████████████████

██                    ███████████████████████████  marked

3     for identification, as of this date.)

4     Q.   All right.  Grab -- I think we're on

5  23.  Give me one second.

6     A.   I'm at 24.

7     Q.   Oh, 24, yes.  Thank you.

8          Just let me know when you've got that.

9     A.   I'm in.

██          ██     █████████████████████████

██     █████████  ███████████████

12     A.   It's still spinning.

13     Q.   Okay.

14     A.   All right.  24, click on it.  Yes.  Oh,

15  there you go.

██          ██     ████████████████████

██     ██████████████████████████████████████

██     ██████████████████████████.

19          Do you see that?

20     A.   Yep.

██          ██     ████████████████████  ████████

██     ██████████████

██          ██     ████████████████████

24     Q.   Okay.

██          ██     █████████████████████████





9        A.   The -- what I get a lot of is people,

10  like, saying oh, I see you're the information

11  manager, could you tell me this information?

12       Q.   Okay.  That's kind of funny.

13       A.   I just -- yeah, I tell them, do you

14  need a laptop fixed?  I can help you with that.

15       Q.   Some people don't understand the CIO

16  role.

17       A.   Correct.







Page 220



13      Q.   Okay.

14      A.   But you can see Secretary called a lot

15   to help the counties.

16           (Exhibit 25: ████████████████████

            ████████████   marked for identification,

18      as of this date.)

19      Q.   All right.  Grab Exhibit 25, please.

     ██   ██   ████████   ██████████

21      Q.   Yeah, you see Exhibit 25 is a -- ██

     ██   ████████████████████████████████

     ██   ████████████████████████

24      A.   Yes.

     ██   ██   ██████████████████



12          Do you see that?

13          A.    Yes.

Page 222



```
 3        Q.   And to be clear, Mr. Beaver, I'm not

 4   asking you to guess.  If you don't remember,

 5   that's fine.
```

```
12        A.   We have -- it was prior to that big

13   election that had so much going on.  Things were

14   happening every day.
```



21      Q.   And what --

Page 224



11       Q.   All right.  Let me pull up the next

12  exhibit.  Give me one second.

13            (Exhibit 26: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

                ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ marked

15       for identification, as of this date.)

16       Q.   All right.  Grab Exhibit 26, please.

17       A.   Still spinning.

18       Q.   Oh.

19       A.   Kevin Robertson again.

20       Q.   Yes.  And you'll see this is an▉▉▉▉

23       A.   Okay.  Yep.



Page 226



```
10              (Exhibit 27: ████████████████████████
    ████████████████████████████████████████ marked
12      for identification, as of this date.)
13      Q.   Okay.  All right.  Grab Exhibit 27,
14  please.
    ███    ███  ███████████████████████
16      Q.   Yes.
    ███      ████████████████████████████████████
    ███  ████████████████████████████████
19           Do you see that?
20      A.   Yes.
    ███    ███  ██████████████████████████
    ███  ██████████████      ████████████████████████
    ███  █████████████████████████████████████████
    ███  ████████████████████████████████████████████
    ███  ███████████████████████████████
```

Page 227

1          A.    Um-hum.



25                MR. DENTON:   Mr. Beaver, make sure --

Page 228

```
 1          if you're answering questions about the

 2          document, make sure you have the time to

 3          look at it so you can answer David's

 4          question.

 5     A.   Okay.  So I'm not positive about what

 6  this one is specifically talking to.  I can only

 7  speculate.

 8     Q.   Yeah, and --

 9     A.   What it sounds like -- you know, I --

10  more details, I can't tell you.

11     Q.   That's fine.  And, again, I'm not

12  asking you to guess.  So if you don't remember

13  ██████████████████████████████████████████████,

14  that's fine.  So you just -- you just don't

15  remember specifics about this?
```



13    Q.   All right.  Let's go off the record.

14   Trying to narrow down some stuff I want to look

15   at just so I can make sure I can get you out of

16   here, Mr. Beaver.

17    A.    Okay.

18         THE VIDEOGRAPHER:   The time is 3:39

19    We're off the record.

20        (A BRIEF RECESS WAS TAKEN.)

21         THE VIDEOGRAPHER:   The time is 3:50

22    We're back on the record.

23   BY MR. CROSS:

24    Q.   All right.  Mr. Beaver, if you can go

25   into the list of exhibits, you'll see there's now

Page 231

1    2 -- Exhibit Number 20.

2         A.   Oh, let me refresh.  Yes.

3         Q.   All right.  So open -- let me get the

4    right --

5         A.   Look at what size it is.  It's the 1.2

6    or the 420.

7         Q.   Hold on one second.

16        A.   Yes.

21             Do you see that?

22        A.   Yes.

23        Q.   Who is --

Page 232



16       A.   No, I don't.

17       Q.   Okay.

18       A.   Doesn't mean he isn't.  I just don't

19   know.

20       Q.   Understood.

Page 233

1       Do you see that?

2       A.   Yes.



19      Q.   Right.

23      A.   Yes.

24      Q.   -- at the bottom?

Page 234



 9          Do you see that?

10     A.   Yes.



7        Do you see that?

8     A.   Yep.





Page 238

1      Q.   Sorry, can you --

2      A.   He's the deputy secretary.

3      Q.   Can you just explain what you mean by

4  that?

5      A.   Oh.  So you've got Brad Raffensperger

6  is the Secretary of State.  His number two is

7  Jordan.  So if anybody wants to work with him or

8  get his attention or make any communication, they

9  go to Jordan.

10      Q.   Okay.

Page 239



9              MR. DENTON:  Objection.

Page 240

████ ██████████████████████████  ████████████

████ ████████████████████████████████

████ ██████████████████████████████

████ ██████  ██████████████████████████████

████ ████████████████████  ██████████████████████

████ ██████████████████████████████████

████ ███████████

 8         Q.   Okay.  All right.  Oh, why doesn't this

 9   have an exhibit label.  Shoot.

10              All right.  There are three more

11   documents I want to touch on if we have time.

12   For some reason they came -- look at the -- in

13   the marked folders, the last three.  Do you see

14   the one State Defendant 00158640?

15         A.   What's the Exhibit -- oh, yeah, yeah,

16   there's three of those.  Okay.  640.  Got it.

17   That's the first one.

18              (Exhibit 28: E-mail from Nick Salsman

19               dated 8/14/2020 marked for identification,

20               as of this date.)

21         Q.   That's going to be Exhibit 28.  So open

22   that as Exhibit 28, if you would.

23         A.   Okay.  From Nick Salsman.

24         Q.   Yes.  This is an e-mail from Nick

25   Salsman to Dave Hamilton on August 14, 2020,

Page 241

1   right?

2         A.   Yep.

3         Q.   And the subject line is election center

4   infrastructure server and then proposed changes.

5              Do you see that?

6         A.   Yes.

7         Q.   What is -- it indicates Nick Salsman is

8   with something called Basecamp.  What is that?

9         A.   Basecamp is our project management

10  system.  So if we have a project going on, we

11  track the activity in the project, the status of

12  the project in Basecamp.  And so he has an

13  account in Basecamp for building out this server.

14  The election center server was a project he was

15  working on.

16        Q.   So Nick Salsman is a Secretary

17  employee?

18        A.   Yes.  Was.

19        Q.   Okay.  And he was in the IT department?

20        A.   He was in the security group.

21        Q.   When did he leave?

22        A.   Over a year ago.

23        Q.   Got it.

24             So sometime in 2020 you think?

25        A.   '21.

Page 242

1       Q.   '21, okay.

2       A.   Last year.  Maybe not over a year ago.

3    Last year.

4       Q.   So Basecamp is a -- it's some sort of

5    tool that helps you track this type of, like,

6    projects, helps us to track projects?

7       A.   It's a project management tool.  Very

8    common tool.

9       Q.   For some reason I couldn't come up with

10   the language for project management tool.  So

11   thank you for making it simple.

12            All right.  So I had a few questions on

13   this.  If you come down to Mr. Salsman's e-mail

14   concerning changes to the election center

15   infrastructure server, if you come down where --

16   do you see where it says we'll stay in place?

17   It's kind of the middle of the page.  You see --

18      A.   The second page or the first page?

19      Q.   First page, first page.

20      A.   Oh, yeah, yeah, will stay in place,

21   yes.

22      Q.   And below that it reads -- there's a

23   bullet, new democracy suite, Dominion, Windows 10

24   based client, unsure about supporting back end

25   requirements other than SQL server 2005, two

Page 243

1    question marks and confirm version build.

2            Do you see that?

3        A.   Yes.

4        Q.   What's the reference to Windows 10 here

5    with respect to the democracy suite for Dominion?

6        A.   That -- the people that are working in

7    the application, what's on the desktop?  Remember

8    we talked about you asked about putting new

9    laptops or desktops on people, that's what those

10   are.  And they're all Windows 10 based.

11       Q.   So does the Dominion democracy suite

12   software sit on desktops as well?

13       A.   You access it from your desktop.  But

14   those desktops have to be in the air gapped

15   network.  So we put brand new equipment in there

16   and they're all Windows 10.

17       Q.   I see.

18            Okay.  So just so I understand, the

19   operating system for the BMDs is Android?

20       A.   Correct.

21       Q.   But the operating system for the

22   desktops that are within the -- within the --

23       A.   -- building environment, yeah.

24       Q.   Right.

25            Those -- those operate on a Windows

Page 244

1    operating system?

2         A.   Yes.   We talked about putting Word on

3    them and Adobe.   Those were all for those

4    machines, not for the Dom- -- not for the

5    Dominion BMDs.

6         Q.   Got it.

7              Okay.   Is Windows -- strike that.

8              So Windows is also installed on the

9    state EMS, right?   Because that -- right?

10             MR. DENTON:   Objection.

11        Q.   And on the server is what I'm talking

12   about.

13        A.   I believe it's Linux.   Could be

14   Windows.   I am not positive.

15        Q.   Okay.   You just don't know one way or

16   the other?

17        A.   I don't know what the server itself was

18   set up with.   I -- I -- I remember we talked

19   about it.   Linux was going to be used because we

20   could use something called VMware on it.

21        Q.   And what do you use VMware for on the

22   EMS server?

23        A.   It creates -- takes a server and it

24   creates sort of virtual servers.   That's what

25   VMware, virtual ware.   So it creates virtual

Page 245

1    servers so I could have multiple servers.  And

2    what we did was create virtual desktops for the

3    people to use so, actually, code doesn't transfer

4    over the network to that PC that's on their

5    desktop.  They use a browser window into a

6    virtual desktop that sits on the server.  It's

7    just the configuration we did.

8        Q.   How are the PCs that access the EMS

9    server -- what is the -- what are the mechanics

10   of connecting to that server?

11       A.   It's an Ethernet hard-wired cable.

12       Q.   And so when people are working on those

13   PCs, are they sitting in a room physically with

14   the server or where are they sitting?

15       A.   No.  In their desks.  That's why we had

16   to run new wires in the wall.

17       Q.   Oh, I see.  So the people who have

18   access to the EMS server, they work from their

19   offices on a PC that's hard-wired to the server

20   and that server sits in some room somewhere; is

21   that correct?

22       A.   A caged room.

23       Q.   Okay.

24       A.   Elsewhere in the building.

25       Q.   Okay.

1          A.    So the typical configuration of the

2    office is you have a desk on one side, you turn

3    one way and you're working on your PC for daily

4    e-mail and stuff and it's tied to the Internet.

5    And you turn around and you face the opposite

6    direction and you're working on PC that's on the

7    air gap network.

8          Q.    Got it.

9                Okay.  And so I may have said this

10   before.  How many people have those PCs in their

11   offices?  Just approximately.

12         A.    Oh, five, maybe eight.  It's depending

13   on -- I think at the beginning when we had a big

14   push we had as many as eight.  But I think

15   they're down to about five now.

16         Q.    Okay.  And then if you come to where --

17   see where it says supports SQL Express and Win

18   10, do you see that, just where we were?

19         A.    Yes.

20         Q.    And then below that it reads, Windows

21   10 running XP guest to access old system.

22               Do you see that?

23         A.    Yes.

24         Q.    Do you know what that refers to?

25         A.    So we were still -- remember we were

1   running in parallel in a different environment,

2   the old GEMS system.  Because we hadn't

3   completely switched over.  So they were -- as

4   part of the project they had to make sure that

5   they had the machines that could run the old

6   system, they had machines that could run the new

7   system.  The old system had to run XP because the

8   GEMS application run -- ran with XP.

9        Q.   All right.

10       A.   Two totally different environments.

11       Q.   And just so I understand, when you say

12  two totally different environments, the Dominion

13  EMS server you said was locked in the cage

14  somewhere.  Was the old GEMS system, whatever

15  servers it was still running on, was that locked

16  in a different cage somewhere?

17       A.   It was in a different rack.  A

18  different rack.  You know what a rack is?

19       Q.   Yes, yes, yes.  So it's all in the same

20  locked cage?

21       A.   Locked area.

22       Q.   But it's on a different server rack?

23       A.   Yes.

24       Q.   Got it.

25            And you're saying there were no -- no

Page 248

1    cables or wires connecting the two servers?

2         A.   Correct.

3         Q.   And no Wi-Fi connections, no wireless

4    connections?

5         A.   Correct.  Absolutely, no.

6         Q.   Okay.

7         A.   And, in fact, down here it verifies

8    that server host VMware 5.5 there.

9         Q.   Okay.  If you come down still on this

10   -- the next bullet, you see where it says no

11   history of patching anything?

12             Just below where you were, the VMware

13   5.5.  Do you know what that refers to, no history

14   of patching --

15        A.   Oh, history of patching.  Yes, I see

16   that.

17        Q.   Do you know what that refers to?

18        A.   No, I don't know what an ESXI 6.0.  I

19   mean, this is kind of a cryptic document that

20   Nick put out there that -- for his team that were

21   deep into building this thing.  So each one of

22   these line items could refer to a different

23   environment.  But they would know what it --

24   themselves what it means.

25        Q.   Okay.  All right.  One more question on

1    this document.  Come to the second page and go

2    down to the second bullet.

3         A.   Yes.

4         Q.   See where it says --

5         A.   The one that says needs to be able to

6    scan every USB attached storage device?

7         Q.   Yes.  And it goes on to say, Cannot

8    ensure USB is free from malware, keylogging, et

9    cetera.

10             Do you see that?

11        A.   Yes.

12        Q.   And do you agree with Mr. Salsman that

13   you cannot actually ensure that USB devices are

14   free from malware, keylogging or similar

15   software?

16             MR. DENTON:  Objection.

17        A.   So remember we talked about layers of

18   security.  The system can't do that.  So when you

19   have a known vulnerability, you add another

20   layer.  And we talked about this early on is that

21   we have that box that wipes this out because the

22   system couldn't tell that.  So that was why we

23   introduced that box.

24        Q.   So you agree that you cannot ensure a

25   USB is free from malware or keylogging or similar

1   software, but you're saying that you take

2   additional measures to address for that risk; is

3   that fair?

4        MR. DENTON:  Objection.

5        A.   Correct.  We -- because -- because you

6   can't know for sure, the only way that you can

7   absolutely make sure that it doesn't have it is

8   using something like with the box I described

9   earlier that completes it -- completely wipes it.

10  Then there's nothing on it.  And then you start

11  from there.

12            (Exhibit 29: Document entitled Election

13            Office Notes: 10 am 6/15/2020 Meeting

14            marked for identification, as of this

15            date.)

16       Q.   Okay.  All right.  Almost done.  Try to

17  do one more document, if we can.  Take a look at

18  the next document that's ends in 823.  It's the

19  second to last in the folder.  And it's State

20  Defendant's 00158823.

21       A.   Yes.

22       Q.   And so that's going to be Exhibit

23  Number -- yeah, Exhibit 29.  And so if you look

24  at this, election office notes from a 10:00 a.m.

25  meeting on June 15, 2020.

1            Do you see that?

2       A.   Yes.

3       Q.   And it goes -- it reads basic overview,

4  most data provided by Michael Barnes, Nick and

5  Terrence in attendance.

6            Do you know who Nick and Terrence are

7  referenced here?

8       A.   Nick was Salzman, that was the guy in

9  the other meeting.  And Terrence, I don't

10 remember Terrence's last name, but he was a

11 desktop support person over in the election

12 center at the time.  He doesn't work here

13 anymore.

14      Q.   If you come down to the third bullet it

15 reads, Each permitted user has to access it via a

16 dedicated desktop computer on that physical

17 network.  They then access a XP-based virtual

18 guest.

19           Is that what you were describing

20 earlier where the people who have access to the

21 EMS server, they work through a virtual desktop

22 rather than -- than using their actual desktop?

23      A.   Yes.  But here he's talking about GEMS,

24 not Dominion.

25      Q.   Oh, I'm sorry.  What --

1        A.   GEMS -- well, because I know GEMS

2    required the XP-based where Dominion requires

3    Windows 10.

4        Q.   Got it.

5        A.   So he's saying XP-based and then we set

6    that system up when we brought it back from

7    Kennesaw in the same type of environment where we

8    had the GEMS in a virtual and people created --

9    ran virtual desktops that were virtual XP.

10       Q.   Got it.  Okay.  Okay.

11       A.   And it speaks to this over and over

12   here.  And your count of eight users is just

13   above that.

14       Q.   Yep.  Thank you.  I saw that.

15            And then come down just a few bullets.

16   Do you see the one where it says these desktops

17   have no wireless cards/access?

18       A.   Yes.

19       Q.   And then it goes on, need to confirm

20   Wi-Fi capabilities of these desktops.   Also

21   Bluetooth data transfer being disabled.

22            Do you see that?

23       A.   Yes.

24       Q.   Do you know what, if anything, was done

25   to confirm Wi-Fi capabilities of those desktops

Page 253

1    and Bluetooth data transfer being disabled?

2        A.   Yeah, that was when we bought them, he

3    was basically describing what he needed for us to

4    purchase.  And he was saying these machines can't

5    have Wi-Fi.  A lot of machines nowadays come with

6    Bluetooth in them.  So we've got to be able to

7    disable the Bluetooth.  So he's -- he's

8    describing how he wants this to verify there is

9    no wireless going on in this machine -- these

10   machines.

11       Q.   Okay.  All right.  Well, let me let you

12   go, Mr. Beaver.

13            MR. CROSS:  Alex, we're going to hold

14         the deposition open.  And we'll send you an

15         e-mail about that.  But I don't want to

16         keep Mr. Beaver since he's got to catch a

17         flight.

18            MR. DENTON:  And I wanted to return

19         very briefly to one topic.  You had asked

20         about e-mails pertaining to the Democratic

21         party hack.  Those Bruce Brown has those

22         e-mails.  They also were produced as state

23         defendants 200993 beginning page and it

24         looks like 200995.  Again, Bruce has those.

25         So I appreciate you're working with us on

Page 254

```
 1      time today.
 2           MR. CROSS:  Sure.
 3           Thank you, Mr. Beaver.  Go get your
 4      flight.
 5           THE DEPONENT:  Thank you.  See you.
 6           MR. CROSS:  See you.
 7           THE VIDEOGRAPHER: This concludes the
 8      videotaped deposition.  The time is 4:17.
 9      We're off the record.
10           MR. CROSS:  Dario, did you need
11      anything else?
12           THE STENOGRAPHER:  If you can please
13      place your orders on the record for the
14      transcript, starting with Mr. Cross.
15           MR. CROSS:  I think we have a standing
16      order.  We don't need a rush.  But we would
17      like the rough as soon as you can
18      reasonably get to it.  And then I think the
19      video we always do synched.
20           THE VIDEOGRAPHER:  Yes, sir.
21           MR. DENTON:  Yeah, Dario, do you know
22      what we requested and asked for these?  I'm
23      not sure.
24           THE STENOGRAPHER:  I'm sorry, I don't
25      know.  But are you saying you have a
```

Page 255

1       standing order?

2            MR. DENTON:  I suspect we do.  I guess

3       we would ask for a draft when ready and the

4       final when -- whenever it's ready normal

5       also.

6            THE STENOGRAPHER:  And video?

7            MR. DENTON:  I don't think at this

8       time.

9                           (TIME NOTED: 4:44 p.m.)

10                          (SIGNATURE RESERVED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 256

1                    REPORTER'S CERTIFICATE

2

3              I, V. Dario Stanziola, a Certified

4    Court Reporter in the State of Georgia, duly

5    commissioned and authorized to administer oaths

6    and to take and certify depositions, do hereby

7    certify that on Wednesday, February 2, 2022,

8    Sanford Merritt Beaver, being by me personally

9    duly sworn to tell the truth, thereupon testified

10   as above set forth as found in the preceding

11   pages, this examination being recorded

12   stenographically by me verbatim and then reduced

13   to typewritten form by me, that the foregoing is

14   a true and correct transcript of said proceedings

15   to the best of my ability and understanding; that

16   I am not related to any of the parties to this

17   action; that I am not interested in the outcome

18   of this case; that I am not of counsel nor in the

19   employ of any of the parties to this action.

20              IN WITNESS WHEREOF, I have hereto set

21   my hand, this the 8th day of February 2022.

22

              <%13745,Signature%>
23        _____
              V. DARIO STANZIOLA, CCR (GA)(NJ), RPR, CRR
24            Certification Number: 4531-3928-0743-6288

25

1    Alexander Denton, Esquire

2    adenton@robbinsfirm.com

3                   February 9, 2022

4    RE: Curling, Donna  v. Raffensperger, Brad

5       2/2/2022, Sanford Merritt Beaver (#5061369)

6       The above-referenced transcript is available for

7    review.

8       Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                 Yours,

23                 Veritext Legal Solutions

24

25

```
1    Curling, Donna  v. Raffensperger, Brad

2    Sanford Merritt Beaver (#5061369)

3                 E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Sanford Merritt Beaver Date

25
```

1    Curling, Donna  v. Raffensperger, Brad

2    Sanford Merritt Beaver (#5061369)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, Sanford Merritt Beaver, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____ _____

12   Sanford Merritt Beaver Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20___.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25