IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, ET AL.,            )
                                  )
Plaintiffs,                       )
                                  )  Civil Action No.
vs.                               )
                                  )  1:17-CV-2989-AT
BRAD RAFFENSPERGER, ET AL.,       )
                                  )
Defendants.                       )



VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

SANFORD MERRITT BEAVER

Thursday, March 10, 2022

9:09 a.m.

VOLUME II (Pages 260 - 439)


Robin K. Ferrill, CCR-B-1936, RPR

Page 261

1                  APPEARANCES OF COUNSEL

2   On behalf of the Plaintiffs Donna Curling, Donna
    Price & Jeffrey Schoenberg
3
    DAVID D. CROSS, Esquire
4        Morrison & Foerster LLP
         2100 L Street, N.W., Suite 900
5        Washington, D.C.  20037-1679
         202.887.1500
6        dcross@mofo.com

7

8   On behalf of the Plaintiff Coalition for Good
    Governance
9
    ERIC R. HAVIAN, Esquire
10       Constantine Cannon LLP
         150 California Street, Suite 1600
11       San Francisco, California  94111-4553
         415.639.4001
12       ehavian@constantinecannon.com

13

14  On behalf of the Defendant Brad Raffensperger

15  BRYAN P. TYSON, Esquire
         Taylor English Duma LLP
16       1600 Parkwood Circle, Suite 200
         Atlanta, Georgia  30339-2119
17       678.336.7249
         btyson@taylorenglish.com
18

19  On behalf of the State Defendants

20  ALEXANDER DENTON, Esquire
    CAREY MILLER, Esquire
21  JAVIER PICO-PRATS, Esquire
         Robbins Alloy Belinfante Littlefield LLC
22       500 14th Street, N.W.
         Atlanta, Georgia  30318
23       678.701.9381
         adenton@robbinsfirm.com
24       cmiller@robbinsfirm.com
         jpicoprats@robbinsfirm.com
25

1              APPEARANCES OF COUNSEL (continued)

2    DAVID R. LOWMAN, Esquire
          Fulton County Attorney's Office
3         141 Pryor Street, S.W., Suite 4038
          Atlanta, Georgia  30303-3468
4         404.612.0246
          david.lowman@fultoncountyga.gov
5

6

7    ALSO PRESENT:

8         DUNCAN BUELL

9         JENNA CONAWAY, Senior Paralegal, Morrison &
          Foerster LLP
10
          JILL CONNORS, Legal Assistant, Ichter Davis, LLC
11
          MARILYN MARKS, Executive Director
12        SUSAN GREENHALGH, Consultant
          Coalition for Good Governance
13
          KEVIN SKOGLUND, Citizens for Better Elections
14
          Jonathan Miller, Videographer
15

16

17

18

19

20

21

22

23

24

25

Page 263

```
 1                         INDEX

 2        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

 3                  SANFORD MERRITT BEAVER

 4                  Thursday, March 10, 2022

 5   EXAMINATION BY                              PAGE

 6   By Mr. Cross                                268

 7   By Mr. Havian                               394

 8   By Mr. Denton                               433

 9
                  DESCRIPTION OF EXHIBITS
10
     EXHIBIT              IDENTIFICATION          PAGE
11

12   Exhibit 1   Fortalice Solutions Technical   268

13               Assessment Prepared for Secretary

14               of State Georgia, DRAFT - May 19,

15               2020, Bates labeled

16               FORTALICE003593 - FORTALICE003624

17   Exhibit 2   Fortalice Solutions Firmware     311

18               Comparison and Configuration

19               Analysis, Secretary of State

20               Georgia, DRAFT - July 9, 2020,

21               Bates labeled FORTALICE003807 -

22               FORTALICE003811

23

24

25
```

Page 264

```
 1                    INDEX CONTINUED

 2                 DESCRIPTION OF EXHIBITS

 3   EXHIBIT            IDENTIFICATION              PAGE

 4   Exhibit 3  Fortalice Solutions Technical       332

 5              Assessment Prepared for Secretary

 6              of State Georgia, DRAFT - August

 7              25, 2020, Bates labeled

 8              FORTALICE003692 - FORTALICE003704

 9   Exhibit 4  Fortalice Solutions Technical       345

10              Assessment Prepared for Secretary

11              of State Georgia, DRAFT - August

12              25, 2020, Bates labeled

13              FORTALICE003625 - FORTALICE 003639

14   Exhibit 5  Fortalice Solutions Technical       352

15              Assessment Prepared for Secretary

16              of State Georgia, DRAFT - August

17              25, 2020, Bates labeled

18              FORTALICE003678 - FORTALICE003691

19   Exhibit 7  Secretary of State Georgia, Fulton  359

20              County Laptop Forensic Review,

21              November 25, 2020

22   Exhibit 8  E-mail string Bates labeled         361

23              FORTALICE001209 - FORTALICE001212

24

25
```

Page 265

1                    INDEX CONTINUED

2                DESCRIPTION OF EXHIBITS

3   EXHIBIT              IDENTIFICATION              PAGE

4   Exhibit 9   E-mail string Bates labeled          369

5               STATE-DEFENDANTS-00104972

6   Exhibit 10  Security Analysis of Georgia's       373

7               ImageCast X Ballot Marking

8               Devices, Expert Report Submitted

9               on Behalf of Plaintiffs Donna

10              Curling, et al., authored by Prof.

11              J. Alex Halderman, Ph.D. with the

12              assistance of Prof. Drew

13              Springall, Ph.D., dated July 1,

14              2021

15  Exhibit 11  Curling Plaintiffs' Fifth Amended    396

16              Notice of Deposition of Office of

17              the Secretary of State

18  Exhibit 12  CGG Recording                        405

19

20

21

22

23

24

25

1                    INDEX CONTINUED

2                 DESCRIPTION OF EXHIBITS

3    EXHIBIT  IDENTIFICATION                        PAGE

4

5    Exhibit 13  Official Election Bulletin, dated    413

6                November 17, 2020, from Chris

7                Harvey, Elections Division

8                Director, to County Election

9                Officials and County Registrars,

10               RE:  Open Records Requests -

11               Security Information Exempt

12

13

14          (Original exhibits attached to the Original

15       transcript.)

16

17

18

19

20

21

22

23

24

25

```
 1          VIRTUAL VIDEOTAPED 30(B)(6) DEPOSITION OF

 2                  SANFORD MERRITT BEAVER

 3                  Thursday, March 10, 2022

 4          THE VIDEOGRAPHER:  We are on the record

 5     March 10th, 2022 at approximately 9:09 a.m.

 6     Eastern time.  This will be Volume II to the

 7     30(b)(6) videotaped deposition of the Office of

 8     Secretary of State.  Representative today will

 9     be Sanford Merritt Beaver.

10          Would counsel please identify themselves

11     and who they represent for the record.

12          MR. DENTON:  Morning.  This is Alexander

13     Denton, here on behalf of the State Defendants.

14          I'll also announce at this time, because I

15     believe his microphone is not connected, that

16     Mr. Pico-Prats, also with our firm, is here on

17     behalf of the State Defendants.

18          MR. CROSS:  David Cross of Morrison &

19     Foerster on behalf of Curling Plaintiffs.

20          MR. HAVIAN:  Eric Havian, Constantine

21     Cannon on behalf of Coalition for Good

22     Governance.

23          MS. MARKS:  This is Marilyn Marks.  I'm a

24     Plaintiff's representative for Coalition for

25     Good Governance.
```

Page 268

1          MR. TYSON:  Good morning.  Bryan Tyson for

2     the State Defendants.

3          MR. MILLER:  This is Carey Miller, also

4     here for the State Defendants.

5          MR. LOWMAN:  This is David Lowman for the

6     Fulton County Defendants.

7          MS. GREENHALGH:  Susan Greenhalgh,

8     consultant to Coalition for Good Governance.

9          MS. CONNORS:  This is Jill Connors,

10    paralegal for Ichter Davis for Coalition

11    Plaintiffs.

12          THE VIDEOGRAPHER:  Thank you.

13          Would the court reporter please swear in

14    the witness.

15  SANFORD MERRITT BEAVER,

16          called as a witness, having been duly sworn

17  by a Notary Public, was examined and testified as

18  follows:

19  EXAMINATION

20  BY MR. CROSS:

21    Q.   Good morning, Mr. Beaver.

22    A.   Morning.

23          (Plaintiffs' Exhibit 1, ███████████████████

██    ██████████████████████████████████████████████

██      ██████████████████████████████████████████

2       marked for identification.)

3       Q.   (By Mr. Cross) Would you grab Exhibit 1,

4   please.

5       A.   Is it in Exhibit Share?

6       Q.   It should be, yes.

7       A.   So I'm looking under Curling depositions.

8   I've got deposition of Merritt Beaver, I've got

9   deposition of Merritt Beaver and deposition of

10  Sanford Beaver.

11          Which one of these do you want me to look

12  at?

13      Q.   Yes.  If you look at the first one,

14  Deposition of Merritt Beaver, Office of Secretary of

15  State.  And then you see it's March 10, 2022 is the

16  date.  It should be the first one with your name.

17  You will see today's date.

18      A.   Okay.  Under Marked Exhibits.  So

19  Exhibit 1.

20          Got it.

21      Q.   Yes.

22      A.   Okay.

23      Q.   Do you have that in front of you?

24      A.   I do.



Page 270

5      A.   Yes, I see it.

10          Do you see that?

11     A.   Yes.

12     Q.   And if you flip through it -- if you need a

13  moment to review it, let me know -- but tell me if

14  this is a document you recognize, that you have seen

15  before.

18     Q.   So this is a document you saw in the past

19  week?

20     A.   Yes.

21     Q.   Was that part of your preparation for the

22  deposition today?

23     A.   Yes.

24     Q.   Just to put this document aside for a

25  moment, what did you do to prepare for today's

Page 271

1    deposition?

2         A.    I went through the different documents that

3    were sent to me.  ████████████████        ████████████

    █    ████████████████████████████████████████████████████

    █    ████████████████        ████████████████████████    ████

    █    ████████████████████████████████████████████████████████████

    █    ██████████████████████████████

    █                    ██████████████████████    ████████████████████

    █    ████████████████████████████████████████████████████

    █    ██████████████████████████████████████████

11              And then there was one other document,

12   which was the red hat report.

13        Q.    What's the red hat report?

14        A.    A red hat report is basically a report from

15   Fortalice where they take the stance of a malicious

16   attacker to use whatever resources they have to try

17   to breach our system.

18        Q.    And do you remember the date, timing of

19   that report?

20        A.    I would have to go look at it.  I do not.

21        Q.    What do you remember about that report?

22        A.    Essentially, they talked a lot through

23   their -- the different steps they went through to

24   breach the system from the outside.  After going

25   through -- and they documented a number of different

Page 272

1    approaches they took.

2            At, I think, on the end of -- I think it

3    was Page 6, they defined that they were not able to

4    breach the system with any resources or expertise

5    that they had, and so they moved on to a admitted

6    breach.  Admitted breach, meaning we gave them access

7    to a machine as if they were able to breach so they

8    could go into a Phase II to look into moving around

9    our system.

10       Q.   When you say "gave them access to a

11   machine," how did you do that?

12       A.   We gave them username and password to a

13   computer that was on our network.

14       Q.   And why did you give them that access?

15       A.   Because they could not get into our system.

16   And the next level of testing was to simulate a

17   breach that had -- potentially had happened, what the

18   potential person could do if they were able to get

19   in.  But since they weren't able to breach the

20   system, we make the assumption that "Okay.  Let's

21   assume that you are able to get in.  Let's give you

22   access as if you were able to breach and then see

23   what you can do."  It's a typical exercise when you

24   do red hat.

25       Q.   Sorry.  You said it's a typical exercise

1    when you do that, and I think I interrupted you.

2    What do you mean by that?

3         A.   So red hat is testing basically all your

4    layers of defense in security.  If we stop them on

5    the outside so they can't get in, then all we know

6    about our system is that we have got a really good

7    external security layer.

8              But over time things change.  People

9    find -- and systems find other vulnerabilities.  And

10   if somebody was able to exploit a vulnerability that

11   nobody knew about, then they might be able to get

12   into the system.  We still want to know if somebody

13   got into the system what could happen.

14             So we allow somebody a red hat test to get

15   in as if they did breach the system so that they

16   could go to the next level of testing to see, once

17   they got in, what it would look like.

18        Q.   And you said this is a typical type of

19   testing.  What do you mean it's typical?

20        A.   We do an assessment every year.  And this

21   is the typical -- there is something called a blue

22   hat, a red hat and a purple hat.  Those are security

23   terms for the types of external testing.  Red hat is

24   the most aggressive attack.

25        Q.   What's a blue hat test?

1      A.   That is a -- basically where we give them

2  access to different points ahead of time so they can

3  test, but they know ahead of time how to get in.

4      Q.   What's a purple hat test?

5      A.   It's a blend of the two.

6      Q.   Is the idea with these different types, the

7  red hat and the others, to try to simulate realistic

8  circumstances?  You have some sense of

9  vulnerabilities in the real world with your actual

10  system.  Is that kind of the idea?

11      A.   Yes.

12      Q.   The red hat report you said you looked at,

13  is there anything else you remember about it?

14      A.   Not off the top of my head, no.

15      Q.   Okay.  And you said, if I understood you

16  right, so you looked at 20 documents.  One was the

17  red hat report.

Page 275

1    Q.   Okay.

2    A.   I would have to verify that.

3    Q.   So were there any other documents you

4    looked at beyond those 20 to prepare for today?

5    A.   No.

6    Q.   Was there anyone you spoke with or met with

7    to prepare for today?

8    A.   With counsel.

9    Q.   Anyone other than counsel?

10   A.   Not in specific to prepare for this.

25             Do you see that?



1          A.    Yes.



Page 278



 9          Do you see that?

10      A.   I do.









Page 282



Page 284



7       Do you see that?

8    A.   Yes.

18       Do you see that?

19    A.   Yes.



Page 286



2          A.    Okay.  I'm there.

3          Q.    (By Mr. Cross) Using the pagination on the

4    page.

5          A.    Okay.











Page 292



24      Q.   Okay.  And it is commonly understood in

25   cybersecurity that the more a particular password is

1    reused across accounts, the greater risk that it is

2    disclosed or it's leaked in some way, right?

3            MR. DENTON:  Object to form.

4            You can answer, Merritt.

5        A.    Okay.  So the answer to that is yes.  But

6    that's not what that -- this is talking about here.

7    This is not talking about using the same

8    administrative password for setting up laptops as for

9    accessing servers.  This is strictly the password for

10   setting up laptops.

Page 294







2      Q.   What connections still existed between that

3   Exchange server and other parts of the Secretary's

4   network ███████████████████████████

5           MR. DENTON:  Objection.  Form.

6      A.   You need to be clear about what you mean by

7   what connections.

8      Q.   (By Mr. Cross) Well, so for example, did

9   individual users still have access to e-mails on the

10  Exchange server at that time?

11     A.   No.

12     Q.   Did anyone in the Secretary's Office still

13  have access to information on that server?

14     A.   IT did.

15     Q.   Which I guess what I'm trying to understand

16  is █████████████████████████, after the

17  migration from Outlook to 365 but the Exchange server

18  was still set up, it was still accessible by the

19  Internet.  And I'm trying to understand, were there

20  any other -- was that server connected in any way to

21  any other parts of the Secretary of State's IT

22  network?

23     A.   So at that point in time we had migrated

24  all of our other application servers to a new data

25  center.  And so that Exchange server was one of the

Page 298

1    servers that -- the old equipment that was left in a

2    data center that was no longer being used.

3              But the access to it, from the outside, you

4    could still go in from the outside to it.  But there

5    was no connection to the old data center.  You would

6    have to go out on the Internet and come back into the

7    new data center through the firewalls.

8         Q.   All right.









[redacted]

█  ████████████████████████

█    ███   ████   ████████████████

3        Q.   Who had responsibility for determining

4   whether mitigation measures were put in place for

5   each of the vulnerabilities here?  Was that you or is

6   that someone else?

7             MR. DENTON:  Object to the form.

8        A.   Dave Hamilton was in charge at the time for

9   the security group.  Jason Matthews was in charge of

10   the infrastructure group.  Between the two of them,

11   they sat through the reviews.  And we had a regular

12   work schedule of activities that they work on.

13             And they -- basically, if there was

14   something on here that they didn't already know

15   about, then they would add it to their work schedule

16   activities to work on.  If it was something they

17   already knew about, then it was just basically "Okay.

18   You identified something we knew about."

19        Q.   (By Mr. Cross) As the CIO, did you expect

20   to be informed of any mitigation measures that were

21   taken in response to these vulnerabilities?

22        A.   As part of my conversation with those two

23   managers and the regular managers' meetings, I was

24   kept abreast of these -- these conversations were

25   being had that things were being identified and that

Page 305

1   we were on track to work on them.  I did not get into

2   any details of which specific items were identified

3   and what the plan was for working on them.

4       Q.   So you relied on Mr. Hamilton and

5   Mr. Matthews to address that; is that fair?

6       A.   Correct.  This is an annual thing.  It's

7   part of our regular working activity along with lots

8   of other things we do to maintain the Secretary of

9   State's network systems.  These were focused on our

10  stuff that's exposed to the outside only, things

11  that -- like, voting machines and anything to do with

12  the voting process are not included in these because

13  those weren't attached to any of those systems.

14      Q.   So if the voting machines and those types

15  of election systems or election equipment you

16  mentioned aren't part of this annual assessment, is

17  there any separate annual assessment or other

18  assessment Fortalice does on those systems?

19           MR. DENTON:  Object to form.

20      A.   Those systems are not connected in any way

21  to the outside network Internet.  Fortalice helps us

22  understand our exposure to attacks from the Internet.

23  So there wouldn't be -- Fortalice wouldn't be focused

24  on anything like that because those items aren't

25  exposed.

████  ████  ████████████████████████

████  ████████████████████████████████

████  ██████████████████████████

████  ████  ████████████████████████

 5      Q.   Why not also rely on their experience and

 6   expertise to assess vulnerabilities of equipment

 7   that, in the ordinary course, may not be connected to

 8   the Internet?  Why not have them do that as well?

 9      A.   We had -- when we first started the

10   election process, they did look at different aspects

11   of that voting system.  That was a different

12   contract.  That was a different activity.  I think

13   you have reviewed that before.

14      Q.   And that included the voter registration

15   system, right?

16      A.   The voter registration system is part of

17   this.

████  ████  ████████████  ████████████████

████  ████████████████████████████, what do you mean

20   by voting systems?

21      A.   The balloting system, the actual voting

22   machines and vote counting process.

23      Q.   What did Fortalice previously do in cyber

24   assessment of voting machines?

25      A.   I would have to go back and review that.

1   As I said, in a prior deposition you covered that,

2   but I would have to go back and rereview that.

3       Q.   Are you talking about the DREs or the

4   current BMDs?

5       A.   The current BMDs.

6       Q.   Was that a specific assessment that was

7   done in late 2019?  Is that what you are talking

8   about?

9       A.   I would have to go back again.  I know we

10  discussed this in a prior deposition and I don't have

11  that current in mind.

12      Q.   And -- sorry.  I just want to make sure we

13  are talking about the same thing if it's something we

14  talked about before.

15           When you say that Fortalice previously did

16  an assessment of the voting machines, are you talking

17  one specific assessment or are you talking something

18  they did on a regular periodic basis?

19      A.   A specific.

20      Q.   And you mentioned an assessment of the

21  balloting system.  What do you mean by that?

22      A.   That would be the Dominion BMD scanners and

23  those systems involved in the voting -- vote

24  collection process.

25  ████  ██████████████████████████████████████

10     Q.   The election results are communicated to

11  the State from the counties through the election

12  night reporting system, right?

13     A.   Yes.

14     Q.   And those are communicated via the

15  Internet, right?

16     A.   Yes.

17     Q.   Why not have Fortalice do a security

18  assessment of that system given it's Internet

19  connected?

20     A.   That is a cloud service that we buy from a

21  third party vendor.  So it's not in our network

22  domain.

23     Q.   Who is the cloud service provider for that?

24     A.   I think it's Scytl, S-c-y-t-l.  May be an

25  "E" on the end.

1    Q.   So you rely on the Scytl for the security

2  of that system; is that right?

3    A.   Yes.

4    Q.   And do you require Scytl to conduct annual

5  cybersecurity assessments of the ENR system?

6    A.   We, as part of our contract, give them a

7  security requirements document that they sign off

8  that they have completed and maintain.

9    Q.   But that's a document they send back to

10  you, what, each year?

11    A.   I don't see a document from them each year.

12  I do get a report from -- I will say from time to

13  time I have seen a report that they have submitted.

14  But I wouldn't say that I get an annual report.

15    Q.   How often does that report come in?

16    A.   As I said, I don't recall.

17    Q.   Do you recall at any point any of those

18  reports identifying any election -- or, I'm sorry,

19  strike that.

20         Do you recall any of those reports at any

21  point identifying any security vulnerabilities or

22  concerns of any kind?

23    A.   No.

24    Q.   But that's not something you reviewed for

25  today; is that right?

Page 310

1        A.    Correct.

2        Q.    Where are those reports maintained at the

3    Secretary's Office?

4        A.    I don't maintain any of them.

5        Q.    Why is that?

6        A.    I don't -- I don't have a reason why.

7        Q.    How do you receive them?  By e-mail?

8        A.    I can't say because I don't know.  I can't

9    remember the last one.  It's probably been at least a

10   year or two since I remember seeing one.

11       Q.    But you don't remember how they get

12   circulated to you?

13       A.    The only thing I can say for sure, I can

14   say it's probably e-mail.

15       Q.    And so when that comes in -- sorry.  Go

16   ahead.

17       A.    I said that's how typically communications

18   come in.

19       Q.    And so it's your sort of ordinary practice

20   when that comes in, you review it and then you delete

21   the e-mail; is that right?

22             MR. DENTON:  Object to form.

23       A.    When it comes in, I would more than likely

24   send it to my security, CISA.

25       Q.    (By Mr. Cross) So where in the Secretary's

Page 311

1    Office would you expect those reports to be

2    maintained, if at all?

3         A.   I don't have a specific place that I would

4    know to go look.

5         Q.   What are the specific security requirements

6    the State has for Scytl?

7         A.   There's a document that we give all

8    vendors.  It's part of our contracting process.

9         Q.   Do you know what the security requirements

10   are in that document?

11        A.   I would have to go review it.  And over

12   time that document changes as more security things

13   are identified.  So back when it was given to them, I

14   don't know -- I couldn't tell you what the document

15   looked like compared to the one that we use now.

16             MR. CROSS:  All right.  Take a look at

17        Exhibit 2, if you would, please.

18             (Plaintiffs' Exhibit 2, ████████████████

     ████████████████████████████████████████████████

     █████████████████████████████████████████████

     █████████████████████████████████marked for identification.)

23        Q.   (By Mr. Cross) Just let me know when you

24   have it, sir.

25        A.   I have got it.

Page 312



```
5          Do you see that?

6     A.   Yes.

7     Q.   Is this a document you recall seeing

8  before?

9     A.   No.
```

Havana



Page 314

15      A.   No.

Page 315



3        Do you see that?

4        A.    Yes.





```
17          Does that answer your question?
18     Q.   It does, yes.  Thank you.  It's very
19   helpful.
```

Page 318

███████████████████████████████████

███████████████████████████████████████

████████████████████████

     4        A.    My understanding is an audit is typically a

     5   required activity with a required report.  An

     6   assessment is an outside opinion.

     7        Q.    And why has the Secretary's Office done

     8   assessments instead of -- and not done audits for

     9   cybersecurity purposes?

    10             MR. DENTON:   Object to form.

    11        A.    There is no law that requires an audit.

    12   There is nothing that requires an audit.

████     ███   ████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████

              ██████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████























11     Q.   As a general matter, is it accepted

12   practice, accepted cybersecurity practice to

13   implement updates that are offered to patch

14   vulnerabilities in a system?  As opposed to what I

15   think you referred to as, like, a feature

16   enhancement?

17            MR. DENTON:  Object to form.

18     A.   There are different types of updates.

19   There are different types of updates.  Some are more

20   automated, such as blacklisted IP addresses.  Those,

21   typically, you automate those.  But patches for

22   vulnerabilities, that -- that has to be assessed in

23   your specific environment, whether or not you really

24   want to do that or not.

25     Q.   (By Mr. Cross) Under what circumstances

1  would you envision not accepting a patch for a

2  vulnerability in the software?

3       A.   Well, patches don't necessarily come in

4  saying "This is for a vulnerability."  It just says

5  "patch."

6       Q.   So you may not know that a patch coming in

7  includes a vulnerability patch.  Is that the idea?

8       A.   Not until you research it.

Page 332

█

█

█

█      ██    ██

5          Q.   All right.  Let me grab the next exhibit.

6     And if you want to take a break at any point,

7     Mr. Beaver, just say the word.

8               MR. CROSS:  Okay.  This is going to be

9          Exhibit 3.

10              All right.  You should be able to grab

11         Exhibit 3 now.

12              (Plaintiffs' Exhibit 3, ████████████████

█

█

█

16    marked for identification.)

17    A.    Okay.  ████████████████

18    Q.    (By Mr. Cross) Yes.  And so this one is

19    labeled ████████████████

█

█

22              Do you see that?

23    A.    Yes.

24         ██  ████████████████████

█

Page 333



21          MR. DENTON:  Object to form.

Page 334

3          MR. DENTON:   Object to form.

7          MR. DENTON:   Object to form.



Page 336



[redacted]

Page 338





Page 339

9        Q.    And why is it important to adhere to secure

10   coding principles when doing coding?  Like, creating

11   software?

12            MR. DENTON:  Object to form.

13        A.    Secure coding principles -- without

14   following good, secure coding principles, you leave

15   code open to attacks, such as SQL injection and

16   cross-site scripting.  Those are two common examples.

                                    We have a system

22   that we route all requests through, which basically

23   scour the web requests and look for any types of

24   non-basically direct use of the system, where

25   somebody is trying to inject code because we know

Page 340

1    that these -- the code has these issues.

2            So this is -- what we talked about earlier

3    of you putting layers of security to protect any

4    known vulnerabilities.

5        Q.    (By Mr. Cross) And the layer you are

6    talking about now, that would protect against SQL

7    injection, right?

8        A.    Yes.

9        Q.    And just so we are clear, SQL injection --

10   I guess maybe it's easier to put it this way.   SQL

11   injection can occur when a user goes to, like, a

12   website, for example, where they can do a search.

13   And instead of conducting a legitimate search, they

14   put in various terms that causes the system to return

15   information that it shouldn't if it has a

16   vulnerability that allows that.   Is that generally

17   right?

18       A.    That's -- that's pretty close.

19       Q.    Right.

20       A.    So our system looks at if you are trying to

21   put in a date field for birth date and you put

22   something else in there, it blocks it.   If you have

23   your name, put your name here, and you put in

24   something, a SQL call, it blocks it.   And there

25   aren't too many SQL calls that start with Merritt

Page 341

1    Beaver.







Page 344

1        Q.   And the situation you are talking about is

2   one I think we talked about in the prior deposition

3   that went back -- that came to light shortly before

4   the 2018 election, right?

5        A.   Yes.   Yes.

Page 345



3      Q.   All right.  Let me grab the next exhibit.

4           MR. CROSS:  This should be Exhibit 4, I

5      believe.  Yes.

6           (Plaintiffs' Exhibit 4,

10     marked for identification.)

11          Q.   (By Mr. Cross) You should be able to pull

12     that up now, Mr. Beaver.

13          A.   Okay.  Is this the same one?  This is

14

16          Q.   Yes, but they are -- hold on.  Let me look

17     real quick.

18

Page 346



4       Do you see that?

5       A.   Yes.



Page 348



25              Do you see that?



Page 350



13          MR. DENTON:  Object to form.





```
 8        Q.   All right.
 9             MR. CROSS:  Let me -- you should be able to
10        pull up Exhibit 5 now, which is -- you'll see
11        it's the third assessment I mentioned before.
12        It's the same date.
13             (Plaintiffs' Exhibit 5,

17        marked for identification.)
18        Q.   (By Mr. Cross) Just let me know when you
19   have that.
20        A.   I've got it.
21        Q.   And if you come to

24        A.   Yes.
```







Page 356

1        need to open a door.

2               MR. CROSS:  Sure.

3               THE VIDEOGRAPHER:  I apologize for the

4        interruption, Counsel.  But actually, we are

5        approaching two hours on the record.  I need to

6        take a break to change media units here in the

7        next couple of minutes if you don't mind.

8               MR. CROSS:  Yes -- no, the timing is

9        perfect.  Let me just -- I think I'm done with

10       this document.  Let me just look real quick to

11       confirm.

12              Oh, one last question real quickly.

Page 357

```
5          MR. CROSS:  All right.  Let's take a break.
6          THE VIDEOGRAPHER:  Time is 11:09.  We are
7     off the record.
8          (WHEREUPON, a recess was taken.)
9          THE VIDEOGRAPHER:  The time is 11:16.  We
10    are back on the record.
11         MR. CROSS:  Grab the next exhibit, if you
12    would.
13         THE WITNESS:  Is that 5?
14         MR. CROSS:  Exhibit 6.
15         (Plaintiffs' Exhibit 6, ████████
```

, marked

```
20    for identification.)
21         MR. DENTON:  David, while he's pulling that
22    up, I just wanted to note -- we have had some
23    new people join since we last took roll.  It
24    looks like Duncan Buell is now on the call as
25    well.  I just wanted to note that for the
```

1       record.  And Phillip Stark, I see.

2            MR. CROSS:  Yes.  They are both experts.

3            MR. DENTON:  I know that.  I just -- they

4       weren't here when we started, so I wanted to

5       make sure the record reflected their

6       participation.

7            MR. CROSS:  Okay.  Thank you.

8       Q.   (By Mr. Cross) Do you have Exhibit 6,

9  Mr. Beaver?

10      A.   Yes.

18      Q.   Oh, I'm sorry.  Hold on.  I hit the wrong

19  thing.

20           Oh, weird.  This happened to Vincent

21  yesterday.  There seems to be a glitch with Exhibit

22  Share.  Let me try again.  For some reason, it looks

23  like it's grabbing the prior exhibit, even though

24  that's not checked.

25           That is weird.  I guess Veritext needs to

Page 359

```
1    fix this.  Hold on.  Let me try it again.  Let's see
2    if it works this time.
3         A.   So it's 7?
4         Q.   Yes.  So let's go --
5              (Plaintiffs' Exhibit 7, ████████████████
█    ████████████████████████████████████████████████
█    ██████████████████████████marked for identification.)
8         A.   █████   ██████████████████████████████
█         ██   ████   ████████████████
█              █████████████████████████████████████
█    █████████████
█         ██   ████████████████████████     ██████████
█    ██████   █████████████████████████████████████
█         ██   ██████   ████████████████████████████████
█    ████████████████████████████████████████████
█    ████████████████████████████████████████████
17             Do you see that?
18        A.   Yes.
█         ██   ███████████████████████████████████
█    ███████████████████████████████████████████████
█    ███████████████████████████████████████████████
█    ███████████████████████████████████████████
█    ████████████████████████████████████
24             Do you see that?
25        A.   Yes.
```



Page 361



16      Q.   I'm going to come back to this, but just to

17  help with the context, grab Exhibit 8 if you would,

18  please.  And just let me know when you have got it.

19          (Plaintiffs' Exhibit 8,

21  marked for identification.)

22      A.   All right.  I have it.

23      Q.   (By Mr. Cross) And if you come down to the

24  bottom of Exhibit 8,



Page 362

14          Do you see that?



21          MR. DENTON:  Object to the form.



Page 364

15      Q.   All right.

16           Come back to Exhibit 7, if you would.   I

17   just had a couple questions on that.



Page 365

1          Do you see that?



10          MR. DENTON:  Object to the form.

Page 367



11            MR. DENTON:  Object to form.

20            MR. DENTON:  Object to form.

Page 368



Page 369



12          MR. CROSS:  All right.  Grab Exhibit 9,

13      please.

14          (Plaintiffs' Exhibit 9, ███████████████

███████████████████████████, marked for

16      identification.)

17      Q.   (By Mr. Cross) Just let me know when you

18  have that.

19      A.   I've got it.

20      Q.   And do you see Exhibit 9 is ██████████

██████████████████████████████████

22      A.   Yes.





Page 372



8          Do you recall that?

9     A.    I believe so.

10    Q.    As of today, have you reviewed that report

11   yourself?

22    Q.    All right.

23          MR. CROSS:  Grab Exhibit 10, if you would.

24   And I'm giving you the redacted version.  It has

25   modest redactions, but if you want to see the

Page 373

1          unredacted, we can do it.  But I'm just going to

2          start with the redacted.

3                  (Plaintiffs' Exhibit 10, Security Analysis

4          of Georgia's ImageCast X Ballot Marking Devices,

5          Expert Report Submitted on Behalf of Plaintiffs

6          Donna Curling, et al., authored by Prof. J. Alex

7          Halderman, Ph.D. with the assistance of Prof.

8          Drew Springall, Ph.D., dated July 1, 2021,

9          marked for identification.)

10         Q.   (By Mr. Cross) So just let me know when you

11    have got it in front of you.

12         A.   I got it.

13         Q.   As you see, Exhibit 10 says "Security

14    Analysis of Georgia's ImageCast X Ballot Marking

15    Devices," and it's by Professor Halderman, dated

16    July 1, 2021.

17         A.   Yes, I see it.

18         Q.   And if you need a moment to flip through

19    it, go ahead.  But tell me if this is a document you

20    have seen before.

21         A.    It looks familiar.  I can't recall when I

22    saw it, but it looks familiar.

23         Q.    Well, what -- I thought you told me last

24    time that you testified that you had never seen this

25    report and were not even aware of it until recently.

Page 374

1          A.   Well, I think that's -- when I say

2     "familiar," the conversation that's in here looks --

3     sounds familiar.  It may have been from our

4     conversation.  But prior to that, I have not gone

5     through this in detail.

6          Q.   I see.  So it could just be --

7          A.   Did you not bring this up last time?

8          Q.   I did.  And that's a fair point.  So let me

9     be more specific.

10         A.   That's probably when I saw it last.

11         Q.   Okay.  Okay.  That's fair points.  Let me

12    be -- let me ask a better question.

13              Have you at any point, as part of your job

14    as a CIO, reviewed this report?

15         A.   No.

16         Q.   Okay.  All right.  Thank you.  And that's a

17    good clarification.

Page 375



8        MR. DENTON:  Object to form.

10       Q.   (By Mr. Cross) Sorry.  You said you are not

11   aware?

19       MR. DENTON:  Object to form.

25       MR. DENTON:  Object to form.



2      Q.   Do you know whether Secretary Raffensperger

3  has reviewed this July 1 report?

4      A.   No, I am not aware.

5      Q.   If you wanted to know, who would you ask?

6      A.   I might ask him.

7      Q.   Okay.

8           Okay.  Do you know whether Jordan Fuchs has

9  reviewed the July 1 report from Dr. Halderman?

10     A.   I'm not aware of anything about this report

11 with anybody at SOS.

12     Q.   So as you sit here, you are not aware of

13 anyone at the Secretary's Office -- you can't

14 identify anyone who has read this report; is that

15 fair?

16     A.   That's fair.

17     Q.   Have you -- well, I guess to give it some

18 context, do you understand that this report has gone

19 to CISA at DHS?

20     A.   (Unintelligible.)

21     Q.   I'm sorry.  There's some static.

22     A.   I said other than you just telling me that.

23     Q.   Can you hear me?

24     A.   Can you hear me?

25          THE VIDEOGRAPHER:  I'm getting some really

Page 378

1        bad static as well, Counsel.

2              MR. CROSS:  Okay.  Sorry.

3              THE WITNESS:  Am I okay now, or am I still

4        staticky?

5              THE VIDEOGRAPHER:  It sounds like it's

6        coming from the witness' end.

7              THE WITNESS:  Did it just start?

8              MR. CROSS:  Yes.

9              THE WITNESS:  Can I get a phone or

10       something?

11             THE VIDEOGRAPHER:  Would you like to go off

12       the record, Counsel, while we address the issue?

13             MR. CROSS:  Yes, let's do that.

14             THE VIDEOGRAPHER:  The time is 11:42.  We

15       are off the record.

16             (WHEREUPON, there was a discussion off the

17       record.)

18             THE VIDEOGRAPHER:  The time is 11:44.  We

19       are back on the record.

20        Q.  (By Mr. Cross) All right.  Mr. Beaver, I'm

21   almost done.  I was just asking you have you -- had

22   you heard that CISA now has a copy of this July 1

23   report from Dr. Halderman?

24        A.   No.

25        Q.   Do you have any view on whether the report

1   should be public?  Publicly released?

2        A.   I don't think that's my decision.

3        Q.   Okay.  But you are the Chief Information

4   Officer for the Secretary's Office.  ███████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

9        A.   Anything that can adversely effect

10  security, in my opinion, shouldn't be released.  You

11  are only reducing Georgia's ability to secure their

12  equipment and systems whenever security information

13  about an existing system is released.  In my mind,

14  it's bad practice and just, you know, being ignorant

15  of cybersecurity.

16       Q.   Last couple questions or couple points.

17            What are the industry-recognized benchmarks

18  that the Secretary's Office attempts to adhere to for

19  cybersecurity for the voting system, if any?

20            MR. DENTON:  Object to form.

21       A.   That is way too broad of a question.

22            MR. CROSS:  Fair enough.  Let me narrow it

23       down.  Let's just focus on the Dominion

24       equipment, the BMDs, the printers, the scanners.

25       Q.   (By Mr. Cross) What, if any,

1   industry-recognized benchmarks does the Secretary's

2   Office try to adhere to for securing that equipment?

3        A.   Once again, you are -- it's a very broad

4   question.  You would have to be very specific.

5   Everything from physical to software to wireless and

6   hard networks, there's a whole range of attack

7   vectors to take into consideration.  We use that

8   word.  It's a common term in cybersecurity.

9             So when you say what avenues, I mean,

10  someone could talk for days on the attack vectors

11  that one should look at.  So I can't be specific with

12  it, that broad of a question.

13       Q.   And why should one look at the attack

14  vectors of that equipment?

15       A.   Basically attack vectors are where systems

16  can be compromised.  And so reducing attack vectors

17  is always your first defense.  And then once you have

18  vectors that you can't get rid of, then what do you

19  do on those vectors?

20       Q.   If I wanted to understand -- or strike

21  that.

22            If I wanted to understand what the

23  industry-recognized benchmarks are that the

24  Secretary's Office attempts to adhere to with the

25  voting equipment that we -- just the Dominion

Page 381

1    machines, is there someplace I can look?  Like, are

2    there industry treatises?  Is there some source that

3    I could turn to to get a sense of what those

4    standards are?

5               MR. DENTON:  Object to form.

6         A.   I don't have one I can point you to.

7         Q.   (By Mr. Cross) Are you familiar with the

8    concept of software independence?

9         A.   That's a concept.  I have not heard it as a

10   term.

11        Q.   Sorry.  Make sure I understand your answer.

12             You are or are not familiar with software

13   independence?

14        A.   I have an idea what it might be, but could

15   be multiple things.  So if you are saying that is an

16   industry term that means something specific, I don't

17   know what you are talking about.

18        Q.   And when you say you have an idea of what

19   it might be, what's the idea that you have in mind?

20        A.   Software independence could be a software

21   that a company has that is proprietary that nobody

22   else can use.  Software independence could be

23   something that could stand on its own in an

24   environment to do some activity.

25             There's lots of ways you might use those

Page 382

1    terms when speaking to software.  But if it's an

2    industry term that that means, I don't know what it

3    is.

4         Q.   Okay.  And when you say it could mean

5    software could stand on its own in an environment,

6    what do you mean by that?

7         A.   Such as a cash register, by itself, doesn't

8    have to plug into anything else.  It can stand on its

9    own and do what it needs to do.

10        Q.   Without interacting with some other

11   software or system?

12        A.   Exactly.

13        Q.   Okay.

14        A.   That would be a term that, if you said

15   that's what it means, I would understand what you are

16   saying.

17        Q.   In that situation -- just so I understand

18   what you are saying -- the cash register would depend

19   on the software for its operation, but it wouldn't

20   depend on other software for its operation.  Is

21   that --

22        A.   Other software or outside connections,

23   let's say.

24        Q.   Okay.

25        A.   But I don't know if that's truly what that

Page 383

1   means.  That was just an example of what that one

2   interpretation might be.

3        Q.   Understood.

4             Last topic and then I'm done.

5             Are you an employee of the Secretary's

6   Office?

7        A.   I'm a contractor.

8        Q.   Contractor.  And do you -- is your --

9   strike that.

10            Do you have a contract with the Secretary's

11  Office that governs your role as CIO?

12       A.   Every year I sign a contract.

13       Q.   So you renew a contract each year?

14       A.   Correct.

15       Q.   And I'm sorry, just remind me, how many

16  years have you been the CIO?

17       A.   Since 2014.

18       Q.   And have you always been a contractor?

19       A.   It has varied -- it has varied over the

20  years.

21       Q.   What years were you an employee of the

22  Secretary's Office?

23       A.   I think '15 I was an employee.

24       Q.   Any other years you think you --

25       A.   Well, actually, I was not an employee.  I

Page 384

1   was a temp.  I started off as a contractor and I went

2   to be a temp and then I went back to a contractor.

3           Q.   So there has not been a period where you

4   were an employee of the Secretary's Office, you were

5   either a contractor or a temp?

6           A.   Yes.

7           Q.   And what's the difference between a

8   contractor and a temp?

9           A.   I think it's an administrative or

10  accounting term and how they can pay people.

11          Q.   What's the difference in your experience?

12          A.   One, I get a check from the Secretary of

13  State.  And one, I get a check from a third party

14  vendor.

15          Q.   I see.  So when you were a temp, you were

16  working through a third party vendor and your

17  compensation came through that vendor?

18          A.   Opposite.

19          Q.   Oh.  Oh, I'm sorry.  So when you were a

20  temp, you were paid directly by the Secretary's

21  Office, but not as an employee.  When you were a

22  contractor, your comp comes through a third party

23  vendor?

24          A.   When I was a temp, I got paid by the

25  Secretary of State as a temp.  When I initially

Page 385

1   started, I was paid by a third party.  Then I became

2   my own contractor.

3       Q.   And you became your own contractor after

4   you were a temp?

5       A.   Correct.

6       Q.   And when you were a contractor before you

7   were a temp, who was the third party that you were

8   working through?

9       A.   That was a long time ago.  I don't recall.

10  It seems to me it started with a "K."  They were out

11  of Minnesota.

12      Q.   How did you get the job as CIO?

13      A.   I was recruited by a contracting firm.

14      Q.   Was that the same contracting firm that you

15  were compensated through?

16      A.   Yes.

17      Q.   That firm recruited you -- was it

18  specifically for the CIO role at the Secretary's

19  Office?

20      A.   Yes.  Yes.

21      Q.   And do you have any insight into why the

22  Secretary has never brought you in as an employee of

23  the office?

24      A.   I can only speculate.

25      Q.   Okay.  That's fine.  I don't want you to

1   guess.

2           Have you ever had any discussions or

3   communications with anyone in the Secretary's Office

4   about why you are not an employee?

5       A.   No.  I mean, I have talked to them about

6   being a contractor.  Basically it's "How do you want

7   to, this relationship, work?"

8       Q.   And so is it your --

9       A.   So I have not approached them and said

10  "Hey, I want to be an employee."

11      Q.   Is it your preference to be a contractor?

12      A.   Yes.

13      Q.   And why is that?

14      A.   I have more control of what I do.

15      Q.   In what sense?

16      A.   Right now I'm a CIO for multiple agencies.

17      Q.   Got it.  So if you were an employee of the

18  Secretary's --

19      A.   I couldn't do that as an employee.

20      Q.   And I don't think I asked you this before.

21  I'm sorry if I did.

22           What is your annual compensation as a

23  contractor for the CIO role?

24      A.   120,000.

25      Q.   And that's current?

Page 387

1       A.   That's current.

2       Q.   And has that gone up in the time that you

3   have been in that role?

4       A.   It changes from time to time, up and down.

5       Q.   What's the highest it's been in a given

6   year to the best of your memory?

7       A.   It was around 200 at one time.

8       Q.   Do you recall when that was?

9       A.   I think in '18.

10      Q.   And what was the lowest?

11      A.   Probably when I got started, it was around

12  a hundred.

13      Q.   And what factors go into determining

14  compensation for any given year?

15           MR. DENTON:  Object to form.

16      A.   I don't -- you would have to ask Secretary

17  of State what they value in a CIO.

18      Q.   (By Mr. Cross) Do you negotiate your comp

19  for your contract or they just tell you "This is what

20  we are going to pay you"?

21      A.   It's a negotiation, like anything.

22      Q.   Okay.

23      A.   It's a contractor.  I'm a contractor.  I

24  negotiate all services.

25      Q.   And I guess what I'm trying to understand

1    is when you negotiated your compensation with the

2    Secretary's Office, what was your understanding of

3    the factors that went into deciding what that

4    ultimate number would be?

5         A.   Performance.  I was the fifth CIO in two

6    years when I started.  Secretary of State's Office

7    was struggling to find the right person that could

8    handle what -- their environment.

9         Q.   And why was that a struggle?

10        A.   Managing the different agencies is a

11   challenge.  Understanding the difference between

12   vendor management, internal systems management and

13   security and politics is not something typically they

14   found in the people they hired.

15        Q.   To your understanding, why is your

16   compensation as CIO, why did it go from a high of

17   200,000 in or about 2018 to 120 now?

18        A.   Because I picked up another agency.

19        Q.   And are you doing less work for the

20   Secretary now than you were before?

21        A.   You say "less work."  I'm still managing

22   the same responsibility.  I have just built a team --

23   I have just built a team that can carry the load

24   better.

25        Q.   Yes.  That was a bad question.  Let me ask

1    it different.

2            When I say "less work," are you working

3    fewer hours in your role as CIO now than you were in,

4    say, 2018 when you had a higher pay level?

5        A.   Today I work in two different

6    organizations.  So I spend -- there's only 24 hours

7    in a day.  So I -- of course I have to spend time in

8    my other agency.  So, I mean, that's -- I'm

9    considered a fractional CIO now.

10       Q.   And how long have you been a fractional

11   CIO?

12       A.   Well, I have been -- I think about two

13   years.

14       Q.   And how --

15       A.   It was after Kemp left.

16       Q.   About how much of your working hours would

17   you say you spend -- whatever metrics is easier for

18   you, weekly, monthly -- working for the Secretary as

19   a CIO?

20       A.   It completely varies.  Right now, I'm

21   spending an awful lot of time.  Other times, I spend

22   more time in my other agency.  So I don't have a set

23   calendar of time.

24       Q.   Were you to do it over the course of a

25   year, how would say it breaks out roughly?

Page 390

```
 1        A.    I have never tried to assess that.

 2        Q.    What would your best assessments?   Is

 3   it 50/50?  If it swings, is it closer to more -- one

 4   agency over the other?

 5              MR. DENTON:  Object to form.

 6        A.    I don't know.  I would be speculating and I

 7   don't want to speculate.

 8        Q.    (By Mr. Cross) Do you keep track of your

 9   hours?

10        A.    No.

11        Q.    So you're compensated on a salary basis?

12        A.    Correct.  Doing the job, not hours.

13        Q.    And you said your other agency, what's the

14   other agency?

15        A.    Office of the Commissioner of Insurance.

16        Q.    And have you had that role since 2019 or

17   2020?

18        A.    2020.

19        Q.    Are there any other jobs that you have

20   beyond the insurance agency and Secretary's Office?

21        A.    Not at this time.

22        Q.    Are there any other jobs that you have had

23   while you were the CIO of the Secretary's Office?

24        A.    No.

25        Q.    Let me just look at my notes real quick.
```

Page 391

 1          Do you have any other contractors or temps,
 2   anyone who works for you, who is not an employee of
 3   the Secretary's Office?
 4        A.   I have nobody working for me under my
 5   contract.  I have people who work for me at the
 6   Secretary of State.
 7        Q.   Are those individuals all employees at the
 8   Secretary's Office?
 9        A.   Some are contractors.  But not working for
10   me.
11        Q.   Who are the contractors?
12        A.   I think IDR is one.  Inside Global is
13   another.  We may have a couple of independents.
14        Q.   Do you have any insight into how the
15   decision gets made at the Secretary's Office to bring
16   somebody in, particularly at a senior level, on a
17   contract basis rather than an employee basis?
18        A.   In IT, since I have started there, we have
19   typically done contract to hire almost, I would say,
20   90 -- 90 percent of the time.  It is a good practice
21   in the IT arena that I have used for years is do
22   contract to hire.
23        Q.   Why is that?
24        A.   The IT -- the IT world is -- sorry.
25   Somebody is at the doorbell.

1          IT world is -- is a hot market.  And so

2     being able to assess people in just an interview with

3     what they say versus what they can actually do is

4     difficult.  So I find it's better to contract with

5     them for three to six months, see if they really can

6     do what they say.  And then after that, if I want to

7     bring them on board, I will bring them on board.

8          Q.   Who are the names of the individuals at

9     Secretary's Office that you are familiar with who

10    work with the IT Department who are on a contract

11    basis?  You mentioned some roles or some positions.

12    Who are the individual names?

13         A.   You mean, like, in my -- people in my

14    department?

15         Q.   Yes.  Any -- you mentioned particular roles

16    that you understand are on a contract basis.  Who

17    fills those roles?  What are the names of the people?

18         A.   I mean, who fills them?

19         Q.   Yes.

20         A.   Well, all contracting has to come through a

21    company called CAI.

22         Q.   No, I'm sorry.  I'm saying who are the

23    names of those individual people in those roles

24    currently?

25         A.   So you are asking for the name of the

1    people that are on my staff?

2         Q.   Yes, who are on a contract basis, rather

3    than an employee?

4         A.   I would have to get my org chart out.  So,

5    I mean, I have got 22 people and probably 50 percent

6    of them are contractors.  So I have -- I would have

7    to get an org chart.

8              Let me shut the door.

9         Q.   All right.  I'm almost done, Mr. Beaver.

10             So about half of your team is on a contract

11   basis.  Do the roles and responsibilities change for

12   people on your team on whether they are an employee

13   of the Secretary's Office versus a contractor?

14        A.   No.

15        Q.   Does the compensation vary in any way?

16        A.   Well, not everybody makes the same thing.

17   So depending on -- compensation goes by role, not by

18   contract versus a full-time equivalent.  FTEs, we

19   call them.  So -- but an FTE could be filled by a

20   contractor -- or a position could be filled by a

21   contractor or an FTE.  Typically, the pay is similar.

22        Q.   Are there any documents you brought with

23   you today other than the Fortalice reports that you

24   looked at?

25        A.   No.  I think I have learned from the past.

Page 394

1     Q.   All right.

2          MR. CROSS:  I don't have any further

3     questions for you, Mr. Beaver.  I understand

4     another lawyer for some other Plaintiffs will

5     ask you some questions.

6          But thank you.  I appreciate you taking the

7     time.

8          THE WITNESS:  Okay.  Can we take two

9     minutes so I can see who's at the front door?

10         MR. HAVIAN:  Yes.  Actually, let's take ten

11    minutes because I want to pull stuff together

12    and then we will go back on the record and I

13    will be finishing up with you.  Okay?

14         THE WITNESS:  Thank you.

15         THE VIDEOGRAPHER:  The time is 12:04.  We

16    are off the record.

17         (WHEREUPON, a recess was taken.).

18         THE VIDEOGRAPHER:  The time is 12:14.  We

19    are back on the record.

20    EXAMINATION

21    BY MR. HAVIAN:

22    Q.   Good afternoon, or I guess it's just

23    afternoon your time, Mr. Beaver.  This is -- my name

24    is Eric Havian and I am appearing for the Coalition

25    for Good Governance.  We have a total of an hour and

1   14 minutes that we are allotted to question you, but

2   I know it's lunchtime back there.  So I'm going to

3   ask do you guys -- are you okay just going through

4   and finishing or would you prefer to take a break and

5   get something to eat?

6        A.   I prefer just finishing.

7        Q.   Okay.  That's what most witnesses prefer to

8   do, but I figured I would give you the choice.

9             MR. DENTON:  Eric, before you continue, I

10            just have -- have you made an appearance in this

11            case?

12            MR. HAVIAN:  Yes, I have a pro hac vice

13            application that's currently pending.

14            MR. DENTON:  Okay.  So you haven't made an

15            appearance?

16            MR. HAVIAN:  We checked the rules.  It's

17            our understanding of the rules in Georgia that I

18            don't need to make a formal appearance.  If I

19            have made a pro hac vice application, that

20            serves as my Notice of Appearance.

21            MR. DENTON:  That's fine.  I just wanted to

22            understand.

23            MR. HAVIAN:  Yes.  I presume you should be

24            served at some point electronically with the pro

25            hac application I filed.

1          MR. DENTON:  Yes, I saw the application.  I

2     just haven't seen anything further.

3          Thank you.

4          MR. HAVIAN:  You are welcome.

5          (Plaintiffs' Exhibit 11, Curling

6     Plaintiffs' Fifth Amended Notice of Deposition

7     of Office of the Secretary of State, marked for

8     identification.)

9     Q.    (By Mr. Havian) Okay.  Mr. Beaver, let's

10    jump right in.  I would like to have you take a look

11    at Exhibit 11.

12    A.    Okay.

13    Q.    Which is a Notice of Deposition.  And the

14    pages, at least on my copy, do not appear to be

15    numbered.  But if you could -- if you could scroll

16    down to Topic Number 10, which is about

17    three-quarters of the end of the document.

18    A.    Does it start with any instance in 2020 and

19    2021?

20    Q.    Correct.  That says "Any instance in 2020

21    or 2021, within the knowledge of the Secretary of

22    State's Office, when a person or entity other than an

23    authorized election worker or Georgia state or county

24    official obtained voting data from a Georgia election

25    or images of voting equipment used in a Georgia

1    election."

2              Do you see that?

3         A.    Yes.

4         Q.    That's going to be the primary area of my

5    focus today.  Are you prepared to address that issue

6    today?

7         A.    I can answer to my knowledge.

8         Q.    Have you taken any steps to gather

9    knowledge of any other persons in the Georgia

10   Secretary of State's Office about this issue?

11        A.    No.

12        Q.    Okay.  I believe it was yesterday or

13   perhaps the evening before yesterday, Mr. Bruce

14   Brown, counsel for the Coalition, sent an e-mail to

15   Mr. Russo and Mr. Miller asking that you, in

16   particular, focus on a particular aspect of Issue

17   Number 10.  And I'll read that to you.  It says "That

18   examination will focus primarily on the events

19   discussed in the audio recording marked as Exhibit 12

20   and played at the deposition of Gabriel Sterling

21   involving the imaging of election hardware and

22   software in Coffee County.  Please ensure that the

23   witness is prepared to address that aspect as well as

24   the other aspects of Issue 10."

25              I guess my question is, are you aware --

Page 398

1   and I don't want to get into discussions with

2   counsel -- but are you aware that it was our

3   intention to focus especially on the incident in

4   Coffee County?

5        A.   I was told that that question came up.

6        Q.   Okay.  Are you prepared to address that

7   issue?

8        A.   I can tell you my knowledge of it.

9        Q.   Have you taken any steps to go beyond your

10  personal knowledge with regard to that topic?

11       A.   No.  I just heard about it.

12       Q.   I understand.

13       A.   We don't -- we have less than -- less than

14  a day notice on this.

15       Q.   On that particular aspect, yes, I

16  understand.  Although you've had considerably longer

17  notice about Issue Number 10, correct?

18       A.   Issue Number 10, you mean knowledge of any

19  person other than authorized election workers,

20  counties obtained voting data from Georgia?

21       Q.   Correct.

22       A.   And I have no knowledge of anybody that

23  aren't authorized getting any voter data.

24       Q.   Okay.  So -- and as I understand your

25  testimony, you have not taken any steps to

Page 399

1    investigate whether anyone else at the Georgia

2    Secretary of State's Office has any knowledge of

3    unauthorized election workers allowing voting data to

4    be copied?

5        A.   Yes, no one has --

6             MR. DENTON:  Objection to form.

7        A.   No one has reported to me anything that

8    would state that there was any non-authorized people

9    getting data.

10       Q.   (By Mr. Havian) What steps did you take to

11   investigate whether anyone had such information?

12       A.   As I said, I just learned about this

13   question.  So none.

14       Q.   Okay.  So let me -- I apologize because

15   there are two separate issues I'm talking about.

16   There's a narrower question of Coffee County.  I want

17   to focus on the broader question.

18            What steps did you take to investigate

19   whether any person or entity other than authorized

20   election workers obtained voting data from a Georgia

21   election or images of voting equipment used in a

22   Georgia election?

23       A.   And as I said, I have --

24            MR. DENTON:  Object to form.

25       A.   -- only heard about Question 10 for less

Page 400

1    than a day.

2         Q.   (By Mr. Havian) So until yesterday, you

3    were not aware of Topic Number 10 at all; is that

4    correct?

5              MR. DENTON:  Object to form.

6         Q.   (By Mr. Havian) Just so I clarify, by

7    Topic 10, I'm referring to Topic Number 10 that's

8    stated in Exhibit 11 that you are looking at now.

9         A.   Correct.

10        Q.   Okay.  So after you learned about Topic

11   Number 10 yesterday, you didn't have -- is it fair to

12   say you just didn't have sufficient time to speak

13   with others in the Georgia Secretary of State's

14   Office to see if anyone else might have information

15   on that topic?  Is that fair?

16        A.   That would be fair.

17        Q.   If you did have more time to inquire, who

18   would you speak to about Topic Number 10 to find out

19   what the Georgia Secretary of State's Office knew

20   about it?

21        A.   I would speak to probably the head of the

22   elections group, Blake Evans.  Probably would speak

23   to my security person, although if he had heard of

24   anything -- I say person, my security manager -- if

25   he had heard something, he would have probably told

1    me.

2            So the fact that I didn't hear anything

3    from him, I know his answer.  I might talk to Gabe

4    Sterling.  I might talk to Michael Barnes.  Those

5    would be my starting points.

6        Q.    And who is the security person that you are

7    referring to?

8        A.    Kevin Fisk.

9        Q.    All right.  So let me ask you a few other

10   questions, more general questions about Coffee

11   County.

12           First of all, are you aware that

13   Mr. Gabriel Sterling gave a deposition in this matter

14   as well?

15       A.    I just heard about it.  I have no details

16   on it.

17       Q.    I'm going to read to you something that

18   Mr. Sterling said in his deposition and ask you

19   whether you agree with his statement or not.

20           Mr. Sterling testified, quote, "Physical

21   security is the -- obviously, the frontline of all

22   cybersecurity.  And that's one of our main things we

23   have to worry about at all times.  That's why we --

24   we work with the counties to make sure they have

25   these things in under lock and key," close quote.

1          Do you understand the sentence I just read

2    to you about physical security?

3        A.   Yes, I do.

4        Q.   Do you agree with Mr. Sterling's testimony?

5        A.   I do.

6        Q.   Can you explain why physical security is so

7    important in election security?

8        A.   Physical security is one vector of attack

9    for someone who is trying to do some malicious damage

10   to the environment.  So protecting physical access is

11   one avenue that you have to go after to make sure

12   that the system is secure.

13       Q.   To your knowledge, has the Secretary of

14   State taken any steps since the 2020 Presidential

15   election to investigate the physical security of the

16   election hardware and software in Coffee County?

17       A.   In Coffee County?  I -- specifically, that

18   county, I can't speak to.  I know that we do a number

19   of things to monitor all counties, so Coffee would be

20   included in that.

21          So -- but I don't know of anything

22   specifically targeting Coffee County.  Coffee would

23   be included in the -- in the monitoring for physical

24   security that is done across all counties.

25       Q.   Okay.  Do you know -- can you describe for

1    us the activities taken across all counties to

2    investigate the physical security of the hardware and

3    software in the election system?

4         MR. DENTON:  Object to form.

5         A.   Yes.  I don't have the specific

6    requirements for each county.  Each of them are

7    required to store all the equipment in a secure

8    location that is locked and monitored.  Monitor is

9    either -- you know, includes video and surveillance,

10   like, Security checking on it on a regular basis.

11        But I don't have any specific document that

12   I can point to that says here's what all the counties

13   do.  That -- you would have to talk to somebody in

14   the Elections Department and -- to see what are some

15   of the common things that are identified for counties

16   to do.  That's not my role.

17        Q.   (By Mr. Havian) Would the copying or

18   imaging of data, election data or election software

19   or hardware, would that be a violation of the

20   physical security requirements if done by anyone

21   other than an authorized election worker?

22        MR. DENTON:  Object to form.

23        You can answer if you understood the

24        question, Merritt.

25        A.   I think the question is obvious that yes,

1   that would be a breach of security, although I have

2   yet to hear of any breach, although we do get many

3   people who claim to do breaches that have never been

4   proved.  I would suspect that if there is such a

5   claim right now, until someone can actually prove

6   that that was done, that it would be in question as

7   to the actual reality of that actually happening.

8        Q.   (By Mr. Havian) So --

9        A.   Has anybody tested that?

10       Q.   Well, I'm not allowed to answer questions

11  you ask me, although sometimes I would really enjoy

12  doing that, but that violates the rule.  So I'm

13  afraid I'll have to leave you in suspense on that

14  question.

15            I take it from your answer, is it fair to

16  say that imaging election software or other election

17  data is a serious, serious breach of security --

18            MR. DENTON:  Object to form.

19       Q.   (By Mr. Havian) -- if it happened?

20       A.   It is a breach of security.

21       Q.   Do you consider it a very serious breach of

22  security if it, in fact, occurred?

23       A.   Breach of security is serious.  It's not

24  something I would ever want to happen.

25       Q.   Okay.  And I take it from your testimony

1    that you have never seen an example in Georgia of

2    anyone breaching security in this manner; is that

3    fair?

4              MR. DENTON:  Object to form.

5         A.   That's more than fair.  That is accurate.

6         Q.   (By Mr. Havian) Okay.  Have you ever heard

7    about such breaches occurring in other jurisdictions?

8         A.   You mean other jurisdictions, you mean

9    other states?

10        Q.   Yes.

11        A.   No, I have not heard other states that had

12   that problem either.  It doesn't mean it happened.  I

13   just haven't heard it.

14             (Plaintiffs' Exhibit 12, CGG Recording,

15             marked for identification.)

16        Q.   (By Mr. Havian) I would like to play a

17   recording for you.  It's been uploaded as an exhibit.

18   And that will be --

19        A.   Do you want me to download it?

20        Q.   Well, it should show up.  Hopefully, it's

21   going to show up on your screen in the same way as

22   any other exhibit.  And if you click on it it should

23   play.

24        A.   Exhibit 12?

25        Q.   Exhibit 12, correct.

Page 406

1    A.   Do you want me to play it or are you going

2  to play it?

3    Q.   I think you have to play it, I believe.

4    A.   All right.

5         It's two minutes and 35 seconds.  Do you

6  want me to listen to the whole thing?

7    Q.   Please.

8         (WHEREUPON, the recording was played.)

9    Q.   (By Mr. Havian) Were you able to hear that

10  okay, Mr. Beaver?

11   A.   Yes.  Yes.

12   Q.   Have you ever heard that recording before?

13   A.   No.

14   Q.   I will represent to you that the female

15  voice on that recording is Marilyn Marks, who is

16  associated with the Coalition for Good Governance.

17        Do you recognize the male voice?

18   A.   No.

19   Q.   You have never heard it before?

20   A.   No.

21        MR. DENTON:  Object to the form.

22   Q.   (By Mr. Havian) Does the name Scott Hall,

23  does that mean anything to you?

24   A.   No.

25   Q.   You have never heard that name before?

Page 407

1      A.    Never heard that name before.

2            MR. DENTON:  Object to form.

3      Q.    (By Mr. Havian) The events described on

4   this audio recording, if those events really

5   occurred, would they constitute a violation of

6   Georgia election rules as you understand them?

7            MR. DENTON:  Object to form.

8      A.    Yes.  But his comments kind of lead me to

9   believe that he's not very technical and really

10  doesn't know what he's talking about.  So I would be

11  highly suspect of anything he's saying.

12     Q.    (By Mr. Havian) Did you understand him to

13  be saying that he did something technical himself as

14  opposed to observing others doing technical things?

15     A.    He was observing others doing technical

16  things and was not able to very accurately reflect

17  what potentially could have happened.

18     Q.    Can you explain further what you mean by

19  that?

20     A.    Poll pads don't have a hard drive.  Yet he

21  said they imaged the hard drive on a poll pad.  I

22  would guess he doesn't know what he's talking about.

23     Q.    Can --

24     A.    So that kind of puts the whole conversation

25  in question as to really did he know what he was

1    seeing going on.

2         So I would definitely would want somebody

3    who actually understood technology and understood

4    what was potentially going on there to do before I

5    jumped to any conclusions.  Sounded like somebody was

6    trying to brag and get somebody's attention.

7         Q.   So I -- you're at somewhat of a

8    disadvantage because I have an informal writeup of

9    what he said on the audiotape.  And I apologize we

10   didn't have a transcript for you.  But I don't recall

11   him saying that the poll pad was imaged.

12        A.   He said he imaged everything.

13             MR. DENTON:  Merritt, let Mr. Havian finish

14        his question before you start to answer.

15        Q.   (By Mr. Havian) My question is, did you

16   hear him specifically say that he imaged the poll

17   pad?

18             MR. DENTON:  Object to form.

19        A.   I heard him say he imaged everything.

20        Q.   (By Mr. Havian) Okay.

21        A.   And then he referenced poll pads.

22        Q.   If it turns out that you misheard and he

23   didn't say he -- that they imaged the poll pad or

24   didn't mean that, would that affect your view about

25   whether he was a suspect person providing this

1   information?

2        A.   Just the whole conversation sounded suspect

3   to me.  I would want -- I would want somebody

4   technically competent to go assess before I jump to

5   any conclusions.

6        Q.   Okay.

7        A.   I have seen too many people brag that they

8   could do something in this job only to find out they

9   weren't even close to doing what they said they were

10  doing.

11       Q.   Okay.

12            Getting back to the specifics of the

13  conversation, aside from the comment about imaging

14  the poll pad, was there anything else that he said in

15  the conversation that struck you as not plausible?

16       A.   I would have to listen to it a few times.

17  But the fact that he even said that he was -- that

18  somebody in the department gave them access to image

19  the equipment, first would be who would have done

20  that?  I would ask to go back to Coffee County and

21  talk to the elections people there and say "Did you

22  actually do this" or "Is this guy" -- so until you

23  can tell me that you have got corroborating evidence

24  from somebody else there, I would hold this whole

25  conversation in suspect.

Page 410

1    Q.   Yes.  And I take it from your demeanor it's

2  fair to say this is such an absurdly grotesque

3  invasion of security that it's hard for you to

4  imagine it actually happened; is that fair?

5    A.   Yes.

6         MR. DENTON:  Object to the form.

7    Q.   (By Mr. Havian) During Mr. Sterling's

8  deposition, he testified that events in Coffee County

9  were investigated in connection with the Presidential

10  election of 2020.

11         Are you aware of any such investigation?

12    A.   No.

13    Q.   You are not aware of any investigation of

14  events during the Presidential election of 2020 that

15  occurred in Coffee County at all; is that right?

16         MR. DENTON:  Object to form.

17    A.   Correct.  I am not aware.

18    Q.   (By Mr. Havian) So I don't want to beat a

19  dead horse.  To the extent that Mr. Sterling

20  testified that there was an investigation, you are

21  just not familiar with what he's alluding, referring

22  to; is that right?

23    A.   Correct.  If there was an investigation

24  with a issue, it most likely would have come to me.

25  But if it was an investigation where it was found

1   that there was no issue, then he probably wouldn't

2   have told me anything about it.

3       Q.   Okay.  So is it correct, then, that you

4   would not be brought into the loop simply because

5   there was an investigation of an election security

6   issue?  You would only be brought into the loop if it

7   was determined to be above a certain level of

8   seriousness?

9            MR. DENTON:  Object to form.

10      A.   I can only say from what my experience, I

11  was not brought in.  There was nothing that they

12  identified that they needed the CIO of the Secretary

13  of State to get involved with.  I have been involved

14  with other things, such as the Fulton County laptop.

15      Q.   (By Mr. Havian) Understood.  So can you

16  describe for us the threshold of the seriousness of

17  an issue before it is brought to your attention?

18           MR. DENTON:  Object to form.

19      A.   If something is identified as a security

20  issue that has been verified, that they need somebody

21  from the IT Department of the Secretary of State to

22  investigate, yes, I would get pulled in.  If there

23  was a county issue that the counties are managing,

24  often it's left at the county level.  So this one was

25  not brought to me.

Page 412

1      Q.   (By Mr. Havian) Okay.

2           Again, focusing on Coffee County, do you

3   recall ever hearing anything about a password being

4   shared improperly in Coffee County, a password to the

5   EMS system?

6      A.   I have heard no security questions that

7   came out of Coffee County about any topic.

8      Q.   Were you aware that in Coffee County, as in

9   other counties, they did a machine recount following

10  the 2020 Presidential election?

11     A.   Not particularly.  I think there was

12  recounts in numerous counties, and I didn't -- I

13  don't get involved with the actual voter tabulation

14  process.  I focus on the systems at the state level.

15     Q.   So were you aware that in Coffee County,

16  the machinery count produced a discrepancy?

17     A.   Okay.  I'll restate.  I know nothing

18  specific about Coffee County election-wise.

19     Q.   Do you recall hearing about machine recount

20  discrepancies in any counties in Georgia in

21  connection with the 2020 Presidential election?

22     A.   I recall hearing accusations.  I never

23  heard of any actual proven issues.

24     Q.   Okay.  Do you recall anything more specific

25  about the accusations you heard?

1       A.    No.  It was quite a while back.

2       Q.    I'm going to ask you to take a look at the

3    next exhibit, which will be Exhibit 13.

4             MR. HAVIAN:  Joe, can you upload the

5             November 2020 memo, please?

6             (Plaintiffs' Exhibit 13, Official Election

7             Bulletin, dated November 17, 2020, from Chris

8             Harvey, Elections Division Director, to County

9             Election Officials and County Registrars, RE:

10            Open Records Requests - Security Information

11            Exempt, marked for identification.)

12      Q.    (By Mr. Havian) And while we are doing

13   that, do you recall any information about Coffee

14   County declining to certify their results after a

15   machine recount?

16      A.    As I stated before, I have no knowledge of

17   anything that was tied to Coffee County.  Prior to

18   this conversation, I can't tell you I have ever even

19   heard anything about Coffee County as the county.

20      Q.    Okay.  Can you please pull up Exhibit 13?

21      A.    Election Bulletin, November 17?

22      Q.    Correct.  And you may need to enlarge it on

23   your screen in order to read it.

24      A.    Yes.

25      Q.    Let me know when you've got it to the point

Page 414

1    where it's legible.  Sorry about that.

2         A.    I can see it.

3         Q.    Okay.  So first of all, take a look at this

4    memo, which is from Chris Harvey, Elections Division

5    Director, to County Election Officials and County

6    Registrars, dated November 17th, 2020.  And I would

7    like to ask you if you recognize this memo.

8         A.    No.

9         Q.    You don't believe you have seen it before?

10        A.    I know I haven't seen it before.

11        Q.    I would like to ask you a few questions to

12   see if some of these things are familiar to you, even

13   though I appreciate you haven't read the memo before.

14             First of all, do you know Mr. Harvey?

15        A.    Yes.

16        Q.    And who is he?

17        A.    He was the Director for Elections.

18        Q.    And do you know generally what his

19   responsibilities were as Director of Elections?

20        A.    So he was responsible for running the

21   state-level responsibilities for running elections.

22   So that means managing the voter registration system,

23   collecting anything that was tied to the voter

24   registration system.  They managed the election

25   ballot count collection process.

Page 415

1          Counties actually are responsible, by law,

2    to actually run the elections and actually run the

3    machines.  So he did not manage that.  But he did act

4    as an adviser to the counties on the election law.

5          Q.   Okay.  So I would like to have you look at

6    this memo and I would like to read a couple of short

7    parts of it to you.

8          First, I want to start in the second

9    paragraph --

10         A.   Yes.

11         Q.   -- where Mr. Harvey says "Several counties

12   have also received Open Records Requests for the

13   information contained in the log files of the KNOWiNK

14   poll books."

15         Do you see that?

16         A.   Yes.

17         Q.   And then he's -- going down a couple of

18   paragraphs, in the second to last paragraph, he says

19   "Under the Open Records Act, providing copies of

20   software, software updates, or thumb drives

21   containing software or software updates is not

22   subject to open records requests."

23         Do you see that?

24         A.   Yes.

25         Q.   And then later at the bottom of the first

Page 416

1    page, there's the last couple lines -- well, actually

2    it's a fairly long sentence there.  But basically, he

3    says he cannot give out software or databases except

4    upon the order of a court of competent jurisdiction.

5            Do you see that?

6    A.   Yep.

7    Q.   Do you know why -- do you know of any

8    reason why Mr. Harvey sent out a memo warning people

9    about turning over copies of software, election

10   software at this particular moment in November 2020?

11   A.   Based on the first paragraph, it sounds

12   like a lot of counties were getting requests for

13   copies.  So I think he -- my guess is he was

14   reiterating to make sure that everybody knew the

15   rules.

16   Q.   Do you recall, in your role as Chief

17   Information Officer, that there was quite a bit of

18   discussion around this time period about people

19   trying to get ahold of copies of election software?

20   A.   Yes.

21   Q.   What do you recall about those discussions?

22   A.   Just that we had moved to a new system.

23   There were people out that had gotten a copy of

24   similar systems of our old and tried to prove that

25   you could breach them, although nobody was ever

1   actually able to prove that.  We have never found

2   anything in the old system, and I think people now

3   that they have a new system, they were just going to

4   try to redo the same exercises of trying to prove

5   that you could breach the new system.

6        Q.   Can you explain what are the reasons that

7   election software is not released to the public?  I

8   think you've already touched on this quite a bit in

9   your earlier testimony.

10       A.   It's pretty obvious.  You don't expose

11  your -- basically your system to the public because

12  they -- basically you're giving them a road map to

13  how to basically get in and access the system.  So

14  the best defense of any system is keeping everything

15  secret about that system.

16       Q.   Has your department ever issued

17  recommendations to physically secure software against

18  unauthorized use or copying?

19       A.   My department, you mean the IT Department?

20       Q.   Yes.

21       A.   We have had conversations with both our

22  counsel and the Elections Department in general of

23  how to communicate different types of security

24  measures to the county.  Often Chris Harvey would

25  come to us and say "Hey, I have got to talk to the

Page 418

1    counties about this issue, it could be a security

2    issue' or something like that and ask how to phrase

3    it to make sure that it complies with, you know, best

4    practices.  Things like that.

5              Is that what you are asking?

6         Q.   That's among them, yes.  And do you recall

7    any such conversations shortly after the 2020

8    election?

9         A.   I don't recall anything.  It doesn't mean

10   it didn't happen because Chris sent messages out to

11   the counties all the time, and he would come consult

12   with me on occasion to help word his messages.

13             So he may have.  I don't keep track or

14   records of them.  It was just -- they were

15   conversations.

16        Q.   Did they have any particular urgency, those

17   conversations, in the aftermath of the 2020 election?

18        A.   I don't have any record of that.

19        Q.   Are there protocols in place at the

20   Secretary of State if there is a suspicion that

21   there's been an unauthorized access of election

22   software?

23        A.   We have an Incident Response Plan that we

24   walk through, basically if something comes up that we

25   will walk through to collect information to determine

Page 419

1    whether we had an event.

2         Q.   Can you describe briefly for us the steps

3    of that Incident Response Plan?

4         A.   Essentially, first, is to go collect -- you

5    know, collect information initially of what the event

6    was.  So, for example, the Fulton County laptop

7    issue, it was -- it was an event.  It then turned out

8    it was not an incident.  They are different.

9              So the first thing to do is you collect

10   information from that source.  Often we will go

11   directly to, like, Investigations to help us do the

12   research.  We will notify the department head, like,

13   that would have been Chris Harvey.  We'd have

14   notified Gabe Sterling of it and Ryan Germany, so the

15   key leadership structure, that this is going on.

16             And then we would start our investigation.

17   In some situations when it seems that we need more

18   high-end forensics, we will bring in an outside

19   source.  So we have a company called Fortalice that

20   helps us do forensics work if it's specifically that

21   type of work.  And we will go through and collect

22   that.

23             Oftentimes we will reach out to -- we have

24   contacts at both Homeland Security and FBI and GBI,

25   for Georgia Bureau of Investigation, and we will work

Page 420

1   with -- so we have direct contacts to them.  They are

2   used to us contacting them on events like this and

3   they go through their process for helping us research

4   it to determine whether this is -- this is really

5   something, an issue or just more of a scare.

6       Q.   You mentioned that there is a distinction

7   between an incident and an event.  What's that

8   distinction?

9       A.   Well, when somebody first declares "Oh,

10  this is a problem," we don't call it an incident.

11  It's an event.  So we have to basically find out is

12  it real?  Is it something -- because once it gets to

13  an incident, then you've got to figure out and start

14  establishing a recovery plan and damage control.  But

15  we don't jump into all of those things until we

16  actually can prove that this was real.

17          So it's -- we have lots of events.

18  Incidents rarely, if ever, happen.

19      Q.   So is it fair to say, then, that something

20  being elevated from an event to an incident is a

21  matter of how much proof there is that you find when

22  you look at it initially?

23      A.   That's essentially how you transition.

24  Someone could say that, that they hacked the system.

25  Okay.  So we have this -- we all go do an

Page 421

1    investigation of that.  We may find, well, they

2    really didn't hack the system.  What they did was

3    this, this and this.

4            So our, you know, remediation may be

5    anything from it's a hoax, to oh, it's something that

6    looks, like, bad, but it really isn't, to oh, we have

7    got damage control we have got to do.  That's an

8    incident.  I have got to -- probably end up having to

9    report it.

10           The Secretary of State's going to get

11   involved.  We may have to report to the press.

12   There's a number of things that we will probably have

13   to do.  But events, those are just day-to-day things

14   that you work.

15      Q.   So when something goes from an event to an

16   incident, do you become involved at that point if

17   it's a security issue?

18      A.   It differs.  I get pulled in a lot on

19   events.  The Fulton County one I got pulled into.

20   The Coffee County one I didn't.  Coffee County hasn't

21   turned into an incident yet.

22      Q.   Okay.  And who would be the person in the

23   Secretary of State's organization most likely to hear

24   about some sort of improper access, even if it didn't

25   rise to the level of an incident but was only an

Page 422

1   event?

2       A.   It depends on where it happens.  If it

3   happens in the counties, Chris Harvey might have

4   heard of it.  But he worked with the county to find

5   out what happened.

6            I mean, we will get messages from counties

7   saying that e-mails have been compromised and they

8   don't know whether or not they have hacked into the

9   system.  And so the county level will go through and

10  send Chris Harvey a message saying this is what they

11  are doing to evaluate it.  And then when they have

12  resolved what happened, they will let him know.  And

13  if it doesn't deem that it was impacting our system,

14  he wouldn't let me know.

15      Q.   All right.  So -- and again, just so I

16  understand this correctly, if something happens at

17  the county level but it's an incident that is

18  deemed -- or rises to the level of an incident and

19  involves election security --

20      A.   I will hear about it.

21      Q.   What's that?

22      A.   I will hear about it.

23      Q.   You will hear about it.  So in other words,

24  it can't just -- something that I've just described

25  can't be resolved properly at the county level and

Page 423

1    the state has to get involved; is that fair?

2            MR. DENTON:  Object to the form.

3        A.   Traditionally, in the past, I have heard

4    about it if it -- if it truly has happened.

5        Q.   (By Mr. Havian) Okay.  And when you say --

6    I think you mentioned that you were describing the

7    process that Investigations gets involved.  Can

8    you -- is there a specific department that you were

9    referring to there?

10       A.   So we have an Investigation Department.

11   Frances -- Ms. Frances was heading that department.

12   So she -- she might get pulled in.  If it is

13   something that needs more technical investigation,

14   that's why we use Fortalice to do our forensics work

15   there.

16            It all depends on the type of

17   investigation.  It may be just something that

18   department heads can work through.  If it's a county

19   level, the county is going to have to go through.

20   They're the ones that basically manage and own their

21   process.

22       Q.   Okay.

23            Let's go back to Exhibit 13, the Harvey

24   memo for a moment.

25       A.   Yes.

1      Q.    Again, that second paragraph that I read

2  out loud referred to log files in the poll books.

3           Do you see that?

4      A.    Yes.

5      Q.    Can those log files be copied?

6      A.    I have never heard of anybody being able to

7  do that.  But, I mean, we would have to talk to

8  KNOWiNK to know whether or not they have a process

9  for getting log files off of those -- those iPads.

10     Q.    Well, Mr. Harvey's memo suggested they can

11 be copied, doesn't it?  Because the next sentence

12 says "The information stored in the log files may not

13 be produced, as it contains information that is

14 protected under the Georgia Trade Secrets Act of 1990

15 and the Open Records Act."

16          Do you see that?

17          MR. DENTON:  Object to the form.

18     A.    That doesn't mean that he knows that you

19 can do it.  He's just stating if somebody has asked

20 for them, then you are not to try getting them off,

21 if they even exist on there.  I mean, from this

22 conversation, I don't even know if KNOWiNK has log

23 files.  But somebody has to ask for them.

24     Q.    (By Mr. Havian) You don't think it reflects

25 negatively on Mr. Harvey's credibility, do you, that

Page 425

1  he believes that it's possible to copy that

2  information from the poll books, do you?

3              MR. DENTON:  Object to form.

4       A.   Chris Harvey was not a technical person.

5       Q.   (By Mr. Havian) Right.  But you believe --

6       A.   So he wouldn't know whether you could or

7  could not.  From the conversation in Paragraph 1, it

8  looks like somebody is making an Open Records Request

9  for things like log files.  So its message is

10 basically saying whether it's there or not, you are

11 not allowed to get it out.  I doubt he would know

12 whether or not a log file existed on a poll pad.  In

13 fact, I would be surprised if he even understood what

14 a log file was.

15      Q.   I'm sorry if I interrupted your answer a

16 little bit there, Mr. Beaver.  There is a little bit

17 of a lag here.  So I just want you to -- but I

18 appreciate your answer.

19           My question, though, is you don't believe

20 that Mr. Harvey suggesting that this was a

21 possibility reflects negatively on his credibility,

22 do you?

23      A.   No.

24      Q.   Okay.  And you know Mr. Harvey, you have

25 worked with him, correct?

Page 426

1      A.   Correct.

2      Q.   Do you respect his ability?

3      A.   Yes.

4      Q.   Do you think he's competent in his job?

5      A.   Very.

6      Q.   When you earlier referred to Frances,

7   someone named Ms. Frances, excuse me, I may have

8   misheard you.  Were you referring to Frances Watson?

9      A.   Yes.

10      Q.   Does she still work for the Secretary of

11   State's Office?

12      A.   No.

13      Q.   Do you know when she left?

14      A.   I think it was the last six months.

15      Q.   I have to ask you another name.

16           Have you ever heard the name Misty Martin

17   or Misty Hampton?  Is that name familiar?

18      A.   No.  No.

19      Q.   You were not aware that she was terminated

20   from her position in Coffee County, right?

21      A.   That would be correct since I don't know

22   anything about Coffee County.

23      Q.   And just to be clear on your testimony,

24   Mr. Beaver, you are not taking -- it's not your

25   understanding that poll pads cannot have anything

Page 427

1    imaged or exported, it's just simply that you don't

2    know whether that's true or not; is that fair?

3         A.   That's fair.

4              MR. DENTON:  Object to form.

5              MR. HAVIAN:  Can we go off the record for a

6         bit?  I just want to gather my final thoughts

7         and then I will wrap up.  So can we just take a

8         five-minute break?

9              THE VIDEOGRAPHER:  The time is 12:59.  We

10        are off the record.

11             (WHEREUPON, a recess was taken.).

12             THE VIDEOGRAPHER:  The time is 1:04.  We

13        are back on the record.

14        Q.   (By Mr. Havian) Mr. Beaver, just one last

15   area.

16             If someone were to obtain an image of the

17   election software, can you give some examples of some

18   of the bad things that someone who had malintent

19   could do with that?

20             MR. DENTON:  Object to form.

21        A.   It will be speculation only.  But if

22   somebody has a copy of software, you could

23   essentially go through and get a better understanding

24   of how it works, and basically practice defeating its

25   security.  Because no software is someone can walk up

Page 428

1    to it without any prior knowledge to it and just

2    defeat it.

3              So you would have to have -- if you want to

4    defeat a piece of software, you are going to have to

5    have a copy of it.  It's kind of like an operating

6    system.  To defeat the security in an operating

7    system, you will have to practice defeating it and

8    coming at -- and using the words I used before,

9    "different vectors" to see which ones could actually

10   do it.

11             So that if somebody had a copy, then they

12   would give them the ability to go find the different

13   vectors to come at it to defeat it.

14   Q.   (By Mr. Havian) And if someone were able to

15   defeat the software security, can you explain what

16   the -- kind of a worst case scenario would be of

17   someone gaining access?

18   A.   So -- and could you tell me which piece of

19   equipment you are talking about?

20   Q.   Election machinery.

21   A.   Okay.  And that's a broad spectrum.

22        MR. DENTON:  Object to form.

23   A.   So election machinery includes lots of

24   pieces and parts.  Are you talking about the ballot

25   marking device, the scanner --

Page 429

1      Q.   (By Mr. Havian) How about the EMS server?

2      A.   The EMS server.  So that is -- you are

3  talking about the ballot building system?

4      Q.   Yes.

5      A.   So that's the Dominion software?

6      Q.   Yes.

7      A.   Okay.  So the Dominion software, which sits

8  in an air-gapped environment, even if you had the

9  software, the vectors to attack it are very small.

10  So that would have limited them to some very, very

11  tight criteria of how you could attack it,

12  considering it's not connected to any Intranet

13  network.

14          Basically you have got a USB port on a

15  machine, and so you would have to deal with just a

16  very small amount of vectors to get to it.  And we

17  have put layers and layers of security on how data is

18  transferred through those USB ports, even.

19          So having a copy of that, you would get an

20  idea what to go after, but the vectors of attack are

21  so small, it would be -- even with the software, it

22  would be really hard to come up with a scenario that

23  could get there.  It would be near impossible.

24          That was the whole purpose of putting that

25  software in an air-gapped environment is that we

Page 430

1    limited the access to basically a USB port and what

2    we call sneaker net.  And the devices that are

3    allowed to go into that machine are not only

4    formatted, double scanned and assessed as to what's

5    in there with keys, that would be really difficult to

6    penetrate.  So you would have to know all the other

7    parts of the security system, even once you had the

8    Dominion software, to get on to it.

9         Q.   So is there any way to get data connection

10   into the EMS software through internal networks?

11        A.   No.  That's the whole idea.  That's the

12   whole idea of the environment.  It is completely

13   blocked off.  It doesn't even share anything but

14   electricity in the building.  It is an island.

15        Q.   And how about the tabulation and reporting

16   machinery?

17        A.   So the tabulation, you are talking election

18   night reporting?

19        Q.   Yes.

20        A.   So the Scytl system.  So that is run by

21   Scytl.  It runs in the cloud.  The counties send data

22   to that that gives basically the counts to the press

23   and what people report, you know, winners.

24             But the actual certification process does

25   not come through that.  It comes directly from the

Page 431

1   counties in a separate path, and that's what is

2   certified.  So if somebody was to hack, let's say,

3   Scytl and change the tabulation numbers, when it came

4   down to certifying, it would have -- it would be

5   revealed that it was hacked.

6       Q.   So I'm really trying to focus in on the

7   county level.  The counties do tabulation, the

8   counties have an EMS system as well, right?

9       A.   The counties have ballot marking devices

10  that they collect their data from.  Is that what

11  you're ask -- well, they don't collect the data from

12  the ballot marking devices.  They collect the data

13  from the scanners and the scanners -- and get --

14      Q.   And they have EMS servers?

15      A.   -- compiled.  Yes, but they get compiled.

16  And so they have got a paper receipt that says "This

17  is what just came off this ballot."  And those get

18  posted on a window or some public place for people in

19  the public to see, and then we electronically pull

20  them together.

21           So the comparison of those numbers is easy

22  to do.  So if somebody got in and decided,

23  electronically, to hack the process, that would also

24  be easily determined that it was compromised by just

25  doing a simple comparison between the posted numbers,

Page 432

1   that were a hard copy, and the electronic numbers.

2   So at the county level they have got double

3   protection.

4        Q.   I understand there are protections.  I'm

5   just trying to find out what would happen if you

6   compromised the security of a county EMS server.

7        A.   So --

8             MR. DENTON:  Object to form.

9        A.   You know, I would have to have somebody do

10  the forensics of what that might happen.  But it

11  would -- the tabulation, the summations would

12  potentially be wrong.  And they would mismatch with

13  the hard copies of what's being posted.

14            So if they were to compromise that, your

15  initial reporting might be off.  But then when they

16  go and certify, it would be verified that there's a

17  problem.

18       Q.   (By Mr. Havian) So if I understand you

19  correctly, you are saying that yes, the electronic

20  results would be incorrect if someone compromised the

21  EMS server.  However, you could find it if you knew

22  to compare with the physical ballots.  Is that your

23  testimony?

24       A.   Not the physical ballot, but the ballot

25  scanning device actually generates a paper report.

Page 433

1    So by looking at that tabulation you could start

2    doing comparisons.  So there is checks and balances

3    to look for exactly what you are describing.

4              MR. HAVIAN:  Just give me one moment.

5              All right.  I don't think I have any

6         further questions.  Thank you very much,

7         Mr. Beaver.

8              MR. DENTON:  Mr. Beaver, I have a couple of

9         questions for you, assuming those are all of our

10        Plaintiff representatives.

11             THE WITNESS:  Okay.

12   EXAMINATION

13   BY MR. DENTON:

14        Q.   Okay.  Will you please pull back up what

15   Mr. Havian marked as Exhibit 11.  And this is the

16   Notice of Deposition and please scroll back to

17   Topic 10.

18        A.   Okay.  I'm there.

19        Q.   Mr. Beaver, did you prepare to provide

20   testimony today in response to the topic described in

21   Topic 10?

22        A.   My preparation was to read through this and

23   understand what the question was.

24        Q.   Right.  And from your understanding of the

25   question, it involves an actual unauthorized person

Page 434

1    accessing voting data from a Georgia election of

2    images of voting equipment used in a Georgia

3    election.  Is that your understanding of what that

4    topic is about?

5         A.   Yes.

6         Q.   And if something like that had occurred, is

7    that something that you would have known about?

8         A.   Absolutely.

9         Q.   And so because of that, would there have

10   been any reason for you to ask anyone else in the

11   Secretary's Office whether something like this had

12   happened for purposes of preparing for this

13   deposition?

14        A.   No.  I would have known already.

15             MR. DENTON:  I believe those are all my

16        questions for you, Mr. Beaver.  Thank you.

17             THE WITNESS:  All right.  Does this mean we

18        are done?

19             MR. HAVIAN:  That's all, unless David has

20        any questions.

21             MR. CROSS:  I do not.

22             THE VIDEOGRAPHER:  This concludes the

23        videotaped deposition.  The time is

24        approximately 1:14 p.m.  We are off the record.

25             (WHEREUPON, the proceedings were concluded

Page 435

1          at 1:14 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 436

1                    C E R T I F I C A T E

2    STATE OF GEORGIA   )

3                       )  ss.:

4    FULTON COUNTY      )

5

6        I,  Robin Ferrill, Certified Court Reporter within

7    the State of Georgia, do hereby certify:

8              That MERRITT BEAVER, VOLUME II, the witness

9    whose deposition is hereinbefore set forth, was duly sworn

10   by me and that such deposition is a true record of the

11   testimony given by such witness.

12             I further certify that I am not related to any

13   of the parties to this action by blood or marriage; and

14   that I am in no way interested in the outcome of this

15   matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand this 25th day of March, 2022.

18                    <%13637,Signature%>

19             _____

20                  ROBIN K. FERRILL, RPR

21

22

23

24

25

1    Alexander Denton, Esquire

2    adenton@robbinsfirm.com

3

4    RE: Curling, Donna  v. Raffensperger, Brad

5        3/10/2022, Sanford "Merritt" Beaver

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
 1   Curling, Donna  v. Raffensperger, Brad

 2   Sanford "Merritt" Beaver, (5127735)

 3                E R R A T A  S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Sanford "Merritt" Beaver Date

25
```

```
 1    Curling, Donna  v. Raffensperger, Brad

 2    Sanford "Merritt" Beaver (#5127735)

 3                 ACKNOWLEDGEMENT OF DEPONENT

 4      I, Sanford "Merritt" Beaver, do hereby declare that I

 5    have read the foregoing transcript, I have made any

 6    corrections, additions, or changes I deemed necessary as

 7    noted above to be appended hereto, and that the same is

 8    a true, correct and complete transcript of the testimony

 9    given by me.

10

11    _____  _____

12    Sanford "Merritt" Beaver Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25
```