```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
                 ATLANTA DIVISION


DONNA CURLING, ET AL.,

        Plaintiffs,
                           CIVIL ACTION FILE
vs.                          NO. 1:17-CV-2989-AT

BRAD RAFFENSPERGER, ET AL.,

        Defendants.
```

```
          VIDEOTAPED ZOOM DEPOSITION OF
                MICHAEL BARNES

            February 11, 2022
                9:04 A.M.
```

```
Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
```

```
 1                   APPEARANCES OF COUNSEL

 2                 (All appearances via Zoom)

 3

 4    On behalf of the Plaintiffs:

 5        DAVID D. CROSS, ESQ.
          ZACHARY FUCHS, ESQ.
 6        SONJA N. SWANBECK, ESQ.
          LOGAN WREN, ESQ.
 7        NICHOLAS KENNEDY, ESQ.
          JENNA CONAWAY, ESQ.
 8        MORRISON & FOERSTER LLP
          2100 L Street, NW
 9        Suite 900
          Washington, DC 20037
10        202.887.8795
          dcross@mofo.com
11        zfuchs@mofo.com
          sswanbeck@mofo.com
12        lwren@mofo.com
          jconaway@mofo.com
13

14    On behalf of Secretary of State and the State
      Election Board:
15
          DIANE F. LaROSS, ESQ.
16        TAYLOR ENGLISH DUMA LLP
          1600 Parkwood Circle, SE
17        Suite 200
          Atlanta, Georgia 30339
18        678.336.7249
          dlaross@taylorenglish.com
19

20

21

22

23

24

25
```

1                    APPEARANCES OF COUNSEL

2                  (All appearances via Zoom)

3

4    On behalf of Defendants Fulton County Voter
     Registration and Elections:
5
          DAVID LOWMAN, ESQ.
6         OFFICE OF THE FULTON COUNTY ATTORNEY
          141 Pryor Street, SW
7         Suite 4038
          Atlanta, Georgia 30303
8         david.lowman@fultoncountyga.gov

9

10
     Also Present:
11
          Krishan Patel, Videographer
12        Danielle Hernandez
          Marilyn Marks, Representative Coalition for
13        Good Governance
          Susan Greenhalgh, CGT Consultant
14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXAMINATION

2    WITNESS:  MICHAEL BARNES

3    EXAMINATION                          PAGE
     By Mr. Cross                           9
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX TO EXHIBITS

2   Plaintiffs'
      Exhibit          Description              Page
3
    Exhibit 1   Curling Plaintiffs' Third      10
4               Amended Notice of Deposition
                of Office of the Secretary
5               of State, no Bates numbers

6   Exhibit 2   Michael Barnes LinkedIn        71
                Profile, no Bates number
7
    Exhibit 3   Michael Barnes LinkedIn        110
8               Profile, no Bates number

9   Exhibit 4   Email Chain dated January      114
                2020, Bates Number
10              Dominion001889

11  Exhibit 5   Email Chain dated January      116
                2020, Bates Numbers
12              Dominion017810 through
                -17812
13
    Exhibit 6   Email Chain dated February     119
14              2020, Bates Number
                STATE-DEFENDANTS-00157766
15
    Exhibit 7   Email Chain dated February     126
16              2020, Bates Number
                STATE-DEFENDANTS-00158505
17
    Exhibit 8   Email Chain dated February     138
18              2020, Bates Number
                STATE-DEFENDANTS-00158494
19
    Exhibit 9   Email Chain dated May 2020,    148
20              Bates Numbers
                STATE-DEFENDANTS-00157783
21              through -157784

22  Exhibit 10  Email dated 6/1/20 from        158
                Scott Tucker to Gabriel
23              Sterling and Others, Bates
                Number Dominion042072
24

25

1                    INDEX TO EXHIBITS

2    Plaintiffs'
       Exhibit              Description              Page
3
     Exhibit 11  Email dated 6/1/20 from            162
4                Scott Tucker to Gabriel
                 Sterling and Others, Bates
5                Number Dominion042114

6    Exhibit 12  Email Chain dated June 2020,       165
                 Bates Numbers
7                STATE-DEFENDANTS-00124842
                 through -124845
8
     Exhibit 13  Email Chain dated 6/3/20,          176
9                Bates Numbers Dominion042575
                 through -42576
10
     Exhibit 14  Email Chain dated June 2020,       180
11               Bates Number Dominion042641

12   Exhibit 15  Email Chain dated June 2020,       209
                 Bates Numbers Dominion042793
13               through -42796

14   Exhibit 16  Email Chain dated June 2020,       215
                 Bates Numbers Dominion043437
15               through -43438

16   Exhibit 17  Email Chain dated June 2020,       228
                 Bates Numbers Dominion043491
17               through -43492

18   Exhibit 18  Email Chain dated June 2020,       231
                 Bates Numbers
19               STATE-DEFENDANTS-00104453
                 through -104455
20
     Exhibit 19  Email dated 6/11/20 from           233
21               Cynthia Willingham to Scott
                 Tucker and Others, Bates
22               Numbers Dominion043648
                 through -43649
23
     Exhibit 20  Email Chain dated June 2020,       237
24               Bates Numbers Dominion043765
                 through -43766
25

1                    INDEX TO EXHIBITS

2   Plaintiffs'
      Exhibit           Description           Page
3
    Exhibit 21  Email Chain dated June 2020,   241
4               Bates Numbers Dominion044536
                through -44538
5
    Exhibit 22  Email Chain dated July 2020,   244
6               Bates Number
                STATE-DEFENDANTS-00157919
7
    Exhibit 23  Email Chain dated August       252
8               2020, no Bates numbers

9   Exhibit 24  Email Chain dated August       256
                2020, Bates Number
10              STATE-DEFENDANTS-00161074

11  Exhibit 25  Email Chain dated September    275
                2020, Bates Numbers
12              STATE-DEFENDANTS-00127945
                through -127948
13
    Exhibit 26  Email Chain dated September    279
14              2020, Bates Number
                Dominion069731
15

16        (Original exhibits are attached to the

17      original transcript.)

18

19

20

21

22

23

24

25

```
 1              Deposition of MICHAEL BARNES
                    February 11, 2022
 2

 3              (Reporter disclosure made pursuant to
 4         Article 8.B of the Rules and Regulations of the
 5         Board of Court Reporting of the Judicial
 6         Council of Georgia.)
 7              VIDEOGRAPHER:  Today's date is
 8         February 11, 2022, and the time is 9:04 a.m.
 9         This will be the remote videotaped deposition
10         of Michael Barnes.
11              Will counsel please introduce themselves
12         and any objection to the witness being sworn in
13         remotely.
14              MR. CROSS:  This is David Cross of
15         Morrison & Foerster on behalf of the Curling
16         plaintiffs.
17              MS. LaROSS:  Diane LaRoss on behalf of the
18         State defendants and Mr. Barnes.  We also have
19         Danielle Hernandez on the line with us from our
20         team.
21              MR. LOWMAN:  And this is David Lowman on
22         behalf of the Fulton County defendants.
23              MS. MARKS:  This is Marilyn Marks,
24         plaintiffs' representative, Coalition for Good
25         Governance.
```

Page 9

```
 1        MICHAEL BARNES, having been first duly sworn,
 2   was examined and testified as follows:
 3        EXAMINATION
 4        BY-MR. CROSS:
 5        Q.   Good morning, Mr. Barnes.
 6        A.   Good morning, Mr. Cross.  How are you?
 7        Q.   Good.  How are you?
 8        A.   I'm doing well.  Happy Friday.
 9        Q.   I'm sure this is the way you always want
10   to spend a Friday; right?
11        A.   Well, I could probably think of some
12   better things to do, but, alas, we have to take care
13   of this.
14        Q.   We do.
15             All right.  You've been deposed before.
16   In fact, I think you may have been deposed in this
17   case years ago, so you've been through this before.
18             Do you understand that today you're
19   testifying on behalf of the Secretary of State's
20   office as what we call a corporate representative?
21        A.   Yes, sir, that's my understanding.
22        Q.   You understand that you are here to
23   testify on behalf of the Secretary of State's office
24   on specific topics; is that right?
25        A.   Yes, sir.  Yes, sir.
```

1      Q.   Okay.  Do you have Exhibit Share open in

2   front of you?

3      A.   I have access to it.  One second.

4           So yes, sir.

5      Q.   All right.  So pull up Exhibit 1, please.

6           (Plaintiffs' Exhibit 1 was marked for

7           identification.)

8           THE WITNESS:  Under which folder?

9   BY MR. CROSS:

10     Q.   Oh, go down to -- you'll see "Deposition

11   of Michael Barnes 2/11."

12     A.   Actually, I don't see that.  I see 2/16,

13   2/3, 2/4, 2/9.

14     Q.   Weird.

15          So if you come down, you see where it says

16   "Deposition of Merritt Beaver," and then immediately

17   below that "Michael Barnes"?  Or I don't know, maybe

18   you can only see certain things.

19          You don't have a Michael Barnes 2/11/2022?

20     A.   I do not.  I have Gabriel Sterling 2/16,

21   Michael Barnes 2/3, Michael Barnes 2/4, Michael

22   Barnes 2/9.

23          MR. CROSS:  All right.  Let's go off the

24      record.

25          VIDEOGRAPHER:  The time is 9:07 a.m.  We

1     are off the record.

2          (Off the record.)

3          VIDEOGRAPHER:  The time is 9:12 a.m.

4     We're on the record.

5  BY MR. CROSS:

6     Q.  All right.  Mr. Barnes, you have

7  Exhibit 1?

8     A.  Yes, sir, I do.

9     Q.  All right.  So take a look at Exhibit 1 in

10 front of you.

11          And do you understand that you are

12 designated to testify today on Topic 1?

13    A.  Yeah, I remember seeing a list of topics

14 in which I was designated as being the one that

15 would speak.

16    Q.  Okay.  So just read through Topic 1, the

17 subparts a through h, and tell me if you're prepared

18 to testify on that topic today.

19          MS. LaROSS:  And, David, we're going to be

20          reserving all objections except those to the

21          form of the question or responsiveness of the

22          answer until trial; is that correct?

23          MR. CROSS:  Yeah, that's the default under

24          the federal rules, yeah.

25          MS. LaROSS:  Sure.  And I just -- you

1    know, we go into each deposition and often say

2    it or don't, but I just wanted to clarify --

3         MR. CROSS:  Okay.

4         MS. LaROSS:  -- we just have that standing

5    agreement with you guys.  That's -- I just

6    wanted the record to be clear.

7         MR. CROSS:  Okay.

8         THE WITNESS:  I've looked at the items in

9    point 1a through h, and those are the items I

10    am familiar with, yes, sir.

11   BY MR. CROSS:

12    Q.   Okay.  Then go on to Topic 2, please, and

13   let me know if you're prepared to testify on that

14   today.

15         MS. LaROSS:  David, I believe David

16    Sterling is designated for 2c.

17         MR. CROSS:  Okay.  Great.  That's right.

18    Sorry.

19   BY MR. CROSS:

20    Q.   So, Mr. Barnes, just look at 2a, b, and d.

21    A.   2a, b, and d, I -- I believe I'm prepared

22   to testify on those items.

23    Q.   Okay.  And then look at Topics -- just to

24   make sure -- yeah, look at Topics 7 through 11, so

25   7, 8, 9, 10, and 11, and let me know if you're

1   prepared to testify on those topics today.

2       A.   Yes, sir, I believe I'm prepared.

3       Q.   And then the last one is Topic 18, the

4   last one in the list, and let me know if you're

5   prepared to testify on that, too, please.

6           MS. LaROSS:  It's my understanding, David,

7       that that one -- that topic was -- we

8       designated David Sterling, Merritt Beaver, and

9       Chris Harvey.

10          MR. CROSS:  Sorry.

11          MS. LaROSS:  And some of the topics in the

12      7 --

13          MR. CROSS:  Yeah, that's right.  Sorry.

14      Yeah.

15          MS. LaROSS:  Okay.  No -- no worries.

16          And some of the topics in 7 through 11 we

17      also designated either Mr. Sterling or

18      Mr. Beaver, but there is certainly overlap with

19      Mr. Barnes.

20          MR. CROSS:  Yeah.  Okay.

21          MS. LaROSS:  Great.  Thank you.

22  BY MR. CROSS:

23      Q.   Mr. Barnes, what did you do to prepare to

24  testify on these topics today?

25      A.   I have met with our attorneys.

1      Q.   And when did you do that?

2      A.   Let's see.  In multiple occasions.  Met

3   with attorneys last week in preparation for

4   deposition and also, I believe, a couple of weeks

5   prior to that.

6      Q.   Okay.  About how many hours would you say

7   you spent preparing?

8      A.   Let's see.  Last week, I was here in the

9   law office for, I believe, three and a half hours.

10   In the previous visit to the attorneys' office, that

11   was another two- to three-hour meeting.

12           And this list of items had been provided

13   to me to look over and, you know, keep my memory

14   fresh on these items to the best of my ability.

15      Q.   Okay.  And did you review any documents to

16   prepare for these topics?

17      A.   The only documents that I've looked over

18   in preparation are previous records in the case,

19   previous -- I think some of my previous deposition,

20   reviewed that and other filings, I think, a couple

21   of times where I testified in court.  Those

22   documents I reviewed.

23      Q.   Did you look, for example, at -- at emails

24   or documents from the Secretary's office?

25      A.   I did not go through a list of the emails

1    that I maintain in my Secretary of State inbox

2    looking for specific topic emails, no, sir.

3         Q.    Okay.  Did you speak with anyone other

4    than counsel to prepare on those topics?

5         A.    No.  I've only spoken with counsel.

6         Q.    All right.  Look at Topic 1 if you've got

7    that in front of you, please.

8         A.    Sure.

9         Q.    And if you look at 1a.

10         Walk me through the efforts that have been

11   made to determine whether malware has ever been

12   located on any component of Georgia's prior election

13   system, the DRE system.

14        A.    With the prior voting system, the system

15   that was used in the state from 2002 through, what,

16   2018, that system was constantly being inspected and

17   tested to make sure that what was installed at the

18   local levels matched what had been federally

19   certified and state certified throughout the years.

20         My office, the Secretary of State's

21   office, whenever we were out in the field, in the

22   counties, any opportunity that we had to sit down at

23   the Election Management computer, we would do a -- a

24   verification test based upon hash signatures on the

25   applications to validate that what was installed on

1   the systems was what was certified for the State.

2   And those inspections always came back in line with

3   what was expected, not finding anything nefarious.

4          Local testing done by local election

5   officials prior to every election to validate the

6   system was working properly.

7          We also conducted parallel testing from

8   election to election on same dates of the elections,

9   putting in ballots, testing the results that came

10  back from the known entries to validate that the

11  calculations matched what went in.  And in all those

12  instances, the system tested accurate, showed

13  results that were expected.

14         And we continued those operations

15  throughout the life history of the previous voting

16  system.

17      Q.   And the testing that you're talking

18  about -- you said that the DRE system was constantly

19  inspected and tested -- what specific testing are

20  you talking about?

21      A.   Well, prior to every election, of course,

22  county election officials had to go through a

23  process of logic and accuracy testing where they

24  would load the needed election that had been built

25  for that particular election onto their election

1  equipment.  That would be loaded to their DRE

2  equipment.  It would be loaded to their absentee

3  scanners.

4          And then a test deck, test ballots, would

5  be entered into the system with a known result prior

6  to entry.

7          Then once those ballots were entered and

8  tabulated and calculated by the DREs, by the optical

9  scan scanners, the results were compared against the

10  test deck.  If counties ever found a discrepancy, of

11  course, that piece of equipment would be set aside,

12  would not be used, would be returned to the vendor

13  for repair.

14          T hen if it were sent for repair, the

15  vendor would repair the equipment.  Then the

16  equipment would come back through the Center for

17  Election Systems for acceptance testing to verify

18  that repair had been made, that the system was

19  working properly, and that the proper installation

20  of the certified system was installed.

21          And then it would be returned to the

22  county's possession, where the county would then go

23  through a logic and accuracy testing prior to any

24  given election to validate that the system was

25  operational.

Page 18

1     Q.   So you're talking about logic and accuracy

2   testing; right?

3     A.   I am.

4     Q.   Are you aware that malware can be designed

5   to defeat logic and accuracy testing on voting

6   equipment like DREs?

7          MS. LaROSS:  Object to the form of the

8          question.

9          You may go ahead and answer if you know.

10         THE WITNESS:  I know that people can --

11         can develop malware.  What does it do, how does

12         it operate, how does it bypass systems, I

13         cannot speak to that.

14   BY MR. CROSS:

15     Q.   So who do you rely on for that

16   information?

17     A.   I rely on my IT department for assistance

18   in finding and protecting us from malware attacks.

19          On -- Secretary of State's office, we go

20   through exercises to make sure that we do not

21   have -- that we are trained on how to avoid such

22   attacks.

23          So I am -- I am always depending upon the

24   IT services that the Secretary of State's office

25   provides.

1      Q.   And is that -- are you talking about

2   Merritt Beaver's department?

3      A.   Yes, sir.

4      Q.   You have your own IT staff in CES?

5      A.   We have a member of the IT department who

6   is located at CES.  He is not a member of the CES

7   team.  I am not his supervisor.  He is a member of

8   the IT staff and is supervised by the IT operation.

9      Q.   I see.

10          So when it comes to the -- the sort of

11   technical side of election security, do I understand

12   right you and your department in CES relies on the

13   IT department headed up by Merritt Beaver for that?

14      A.   Yes, sir.

15      Q.   Is there any other testing that you're

16   aware of that the State did with the DRE system that

17   you believe could determine whether there's malware

18   on that equipment, apart from logic and accuracy

19   testing?

20      A.   Well, again, we would do -- we would

21   perform a test on the Election Management computer,

22   which was holding the -- the software that was used

23   to program the equipment, maintains the software

24   that would take the results that came from

25   individual pieces of equipment and tabulate those

1    results and produce the results that were used to

2    certify the results of the election.

3              We would do a hash inspection of that

4    computer, and we called -- we used a system that was

5    called GEMS Verify.  And that operation would look

6    at specific files maintained on the GEMS server that

7    should be static, that shouldn't be unchanging.  And

8    those -- some of those files equate back to the

9    certified applications.

10             And we would do this hash compare, and the

11   hash compare was built off of the original

12   installation of the software that was obtained from

13   the federal testing lab and then used to be

14   installed on all of the devices that were rolled out

15   to the individual counties.

16             And that compare process was done to

17   validate that the installation at the county level

18   matched what had been through federal testing and

19   what had been distributed to the State of Georgia by

20   the federal testing lab.

21        Q.   Okay.  When you say "Election Management

22   computer," what do you mean?

23        A.   This is the isolated computer that's

24   maintained in the county office that is used to

25   program your election voting equipment and also to

1   tabulate the results collected from those pieces of

2   equipment.

3        Q.   Are you talking about the server at the

4   county level that hosts the Election Management

5   software so that --

6        A.   Yes, yes.

7             MS. LaROSS:  And, Michael, you should wait

8        until he finishes his question --

9             THE WITNESS:  Oh.

10            MS. LaROSS:  -- before you begin answering

11       so that the court reporter can get a clear

12       transcript.

13            Excuse me, David.

14            MR. CROSS:  Yeah.  No, that's helpful.

15       Thank you.

16   BY MR. CROSS:

17       Q.   Are you aware that malware can be designed

18   for voting machines that defeats the hash test?

19            MS. LaROSS:  Objection to the form of the

20       question.

21            You may go ahead and answer if you know.

22            THE WITNESS:  I -- I personally have not

23       seen it demonstrated directly in front of me.

24       So I have heard of such, but I have never

25       interacted with it myself.

Page 22

1    BY MR. CROSS:

2         Q.   And do I understand correctly you would

3    rely on Merritt Beaver's department to handle the

4    ways in which the State would protect against that

5    sort of compromise?

6         A.   Yes, sir.

7         Q.   On the logic and accuracy testing you

8    described, is that done with the equipment in a test

9    mode?

10        A.   With the previous system?  Is that the

11   question?

12        Q.   Yes.

13        A.   With the previous system that was used

14   between 2002 and 2018, yes, sir, the logic and

15   accuracy testing was done -- the way the system was

16   designed was done in a test mode environment and

17   then, at the conclusion of the testing mode, would

18   be transitioned into election mode.

19             We would also, of course, as part of

20   continuing testing on election day, conduct parallel

21   testing, which was separate and apart from logic and

22   accuracy testing, but parallel testing was done in

23   the standard election mode using -- using the

24   election file that had been built for that election

25   with the equipment set for election mode, using the

1   date itself of the election, and during the full

2   12-hour voting period.

3          And we would actually conduct the same

4   test that we would conduct under L & A, where we

5   would put in a test deck with a known result into

6   the system and have the system calculate those

7   votes, and also we would then check that against the

8   known result.

9          And the parallel testing showed an equal

10  result, just as the logic and -- excuse me -- just

11  as the logic and accuracy testing had shown in

12  preelection mode.

13     Q.   Is logic and accuracy testing done today

14  on the Dominion system?

15     A.   Yes, sir, it is.

16     Q.   Is that also done in a test mode?

17     A.   No, sir.  In the Dominion system, the

18  system is either in election mode or it's not in

19  election mode.  There is not a test mode

20  environment.

21     Q.   When logic and accuracy testing is done on

22  the Dominion system, is it done on election day or

23  before election day?

24     A.   It's done before election day, but, again,

25  we executed a parallel testing done on the equipment

1    the day of the election.

2           During the November 2020 election, where

3    we did the same exercise, where we had a BMD and

4    printer set up, an optical scanner set up, and

5    produced a set of ballots, put them through the

6    machine on election day, just in the same manner as

7    we did during logic and accuracy testing.

8       Q.   And the parallel testing you're talking

9    about with the DRE system and the BMD system, just

10   so I understand -- I think you said this, but you

11   take a single voting machine -- so with the old

12   system, it's a DRE; new system it's a BMD -- plus a

13   printer, and while the election is ongoing, you're

14   running sort of a mock election on that equipment to

15   see if it operates as it's expected.

16          Is that generally right?

17      A.   Yes, sir.

18      Q.   And do you recall Michael Shamos was an

19   expert that testified for the State --

20   Secretary of State's office in this case?

21      A.   I -- I remember his name.  I remember him

22   being a -- a witness.  I don't recall any of his

23   testimony.

24      Q.   Did anyone ever tell you that Michael

25   Shamos testified that the parallel testing the State

Page 25

1   does with the single voting equipment is useless for

2   evaluating the security of the voting system?

3          MS. LaROSS:  Object to the form of the

4       question.

5          You can answer to your understanding.

6          THE WITNESS:  I -- I do not recall being

7       told that, no, sir.

8   BY MR. CROSS:

9       Q.   Do you know why the Secretary's office

10  still does that with a single BMD and printer, given

11  that their own election security expert said it's

12  useless?

13         MS. LaROSS:  Objection to the form of the

14      question.

15         THE WITNESS:  All we do in regards to

16      continued testing of the system is working to

17      build confidence in the system.  We have done

18      these tests for almost 20 years now as a -- as

19      a way of seeing and trying to look for any

20      problems in the system, and we have continued

21      to use this testing process.

22  BY MR. CROSS:

23      Q.   Who made the decision at the Secretary's

24  office to test a single BMD and printer for parallel

25  testing on election day?

1      A.   Well, the process has evolved through the

2   years.  When we first started the testing back in

3   2004, I believe we started doing parallel testing,

4   it wasn't just one single unit, it was multiple

5   DREs.

6            We would get -- obtain copies of the

7   election database that had been installed on the

8   county-level computer and have them create a backup

9   copy of that elections project, deliver it back to

10  the Secretary of State's office, and then it would

11  be installed on a GEMS computer and then DREs would

12  be programmed.  And the DREs, it would be one, two,

13  three, or four that would be programmed with

14  multiple elections from different jurisdictions.

15           And as we continued to do that testing

16  and, again, always finding everything was -- was as

17  expected, then that began -- began to be pared down

18  to fewer pieces of equipment because of longer

19  amount of time that the equipment has been in place.

20           And we have just come and settled back

21  into randomly selecting a county, and then once that

22  county is randomly selected, then an elections

23  project is obtained for that -- from that county,

24  brought back into Atlanta, installed on the -- on

25  today's system, onto the Dominion Election

1    Management System, and then media created and then

2    the testing executed.

3         Q.   And who decided on that process today?

4         A.   It was -- I was involved in that decision,

5    along with attorneys in the Secretary of State's

6    office.

7         Q.   What attorneys?

8         A.   When we set it up last was Ryan Germany

9    and Kevin Rayburn, when he was deputy general

10   counsel.

11        Q.   When the new system was implemented with

12   BMDs, was there any discussion of Mr. --

13   Dr. Shamos's testimony and about the need to test a

14   whole lot more than a single BMD and printer?

15             THE WITNESS:  I --

16             MS. LaROSS:  Objection to the form of the

17        question.

18             THE WITNESS:  I do not recall.

19   BY MR. CROSS:

20        Q.   As the head of CES, is it your view that

21   testing a single BMD and printer on election day is

22   a reliable way of assessing the security and

23   reliability of some 30,000 BMDs and printers across

24   the state?

25        A.   When we enter into the testing, the way

1  that the project files are built in regards to

2  programming a BMD, when you're within a single

3  jurisdiction, there's only one data file created

4  from that jurisdiction's data election project

5  that's used to program a BMD.  So the same data file

6  is used to program all BMDs within a single county.

7            So if we randomly select a county, have

8  them create a backup, bring that backup into

9  Atlanta, install that into a Dominion Election

10 Management computer, then create the election file

11 that's used to program a BMD, we would be putting

12 the same file on one BMD or 500 BMDs.  So it's an

13 expectation that if one BMD shows proper operation,

14 that others would as well.

15      Q.   So is the answer to my question yes, you

16 think that is a reliable method?

17      A.   We have found to be -- we have found it to

18 be reliable in the past.

19      Q.   You've found it to be reliable because

20 it's never shown malware or a glitch with whatever

21 equipment you tested?

22      A.   We --

23           MS. LaROSS:  Objection to the form of the

24      question.

25           You may answer.

1              THE WITNESS:  We have never encountered

2         any situation where the system did not operate

3         as expected.

4    BY MR. CROSS:

5         Q.   Do you have a background in statistics?

6         A.   I took some statistical classes in

7    graduate school, yes, sir.

8         Q.   So why doesn't the State test a

9    statistically representative sample of voting

10   equipment, instead of 1 out of some 30,000 pieces?

11             MS. LaROSS:  Objection to the form of the

12        question.

13             THE WITNESS:  As you speak, there are

14        30,000 pieces of equipment.  Depending upon

15        what sampling you were to set up, you would

16        then have to have access to that amount of

17        equipment and a location to set all of that

18        equipment up for testing purposes and manpower

19        to go through that testing exercise.

20   BY MR. CROSS:

21        Q.   And that's not something the State can do?

22        A.   The State, of course, has resources.  My

23   office has a total of seven individuals, and that

24   would be a hard task for us to execute on a single

25   day.

Page 30

```
 1        Q.   Are you aware that there are USB ports in
 2   the current voting equipment, the BMDs and the
 3   printers, that are accessible to voters in the
 4   voting booth?
 5        A.   I am aware that there are USB ports on the
 6   devices.  However, accessible by the voter on
 7   election day, I would -- I would raise question of
 8   that.
 9             Because the B -- the D -- the BMDs on
10   election day, the -- the panels where you would find
11   those USB ports are behind sealed mechanisms.  There
12   are seals that are attached on the sides of the BMD,
13   there are seals that are attached on the sides of
14   the printers, to prohibit access to those locations.
15        Q.   So it's your understanding that all the
16   USB ports on the printers and BMDs are covered by
17   seals on election day?
18        A.   It is my understanding, yes, sir.
19        Q.   But you haven't inspected those; right?
20        A.   I have not been out into a county on
21   election day, no, sir.
22        Q.   And who is responsible for inspecting all
23   of the seals on all of the voting equipment?  Is
24   that at the county level?
25        A.   The counties are responsible for
```

Page 31

1  maintaining the security of their voting equipment.

2       Q.   But you're aware that it's happened on

3  numerous occasions the counties have used BMDs in

4  elections where the seals were broken on election

5  day; right?

6            MS. LaROSS:  Objection to the form of the

7       question.

8            THE WITNESS:  Any notification that we

9       have obtained with a county saying that they

10      had a unit that the seal was broken, our

11      direction has always been, well, that needs to

12      be resealed or the unit taken out of operation,

13      preferably take the unit out of operation if it

14      is election day.

15  BY MR. CROSS:

16      Q.   And under what circumstances would you

17  tell a county to just go ahead and reseal a broken

18  seal on a BMD on election day, rather than remove it

19  for testing?

20      A.   To be honest, I don't believe I would ever

21  tell a county just to reseal it.  And if it's in the

22  midst of election day, you're going to turn that

23  machine off and you're going to set it aside.

24      Q.   And why is that?

25      A.   Because we want to try to -- also try to

Page 32

1    do our best to ensure that the system has not been

2    infiltrated in some way.

3         Q.   And so if there were a handful of BMDs

4    that had been infiltrated through, say, the USB

5    ports, is it your belief that parallel testing of a

6    single BMD out of some 30,000 across the state would

7    be a reliable way to identify the infected BMDs?

8              MS. LaROSS:  Object to the form of the

9         question.

10             THE WITNESS:  I am just going to again

11        state that the State has performed this

12        parallel testing on election day in the past

13        and has plans to continue doing it moving

14        forward, and to this date, we have not

15        encountered any issue.

16   BY MR. CROSS:

17        Q.   And the State has continued to do that

18   despite the testimony of its own election security

19   expert; right?

20             MS. LaROSS:  Objection to the form of the

21        question.

22             THE WITNESS:  We have continued to do that

23        testing.

24   BY MR. CROSS:

25        Q.   So you talked about hash testing and logic

Page 33

1    and accuracy testing on the old DRE system.

2              Is there other testing that was done to

3    look for malware or some other compromise of the DRE

4    system, to your knowledge?

5        A.   I -- I do not recall at this moment.

6        Q.   Do you know why the Secretary's office

7    never performed any forensic examination of any of

8    the DRE voting equipment or the -- or the servers,

9    the GEMS servers?

10             MS. LaROSS:  Objection to the form of the

11        question.

12             THE WITNESS:  No, sir, I do not.

13   BY MR. CROSS:

14       Q.   Who would make that decision on whether to

15   conduct that type of examination?

16       A.   I believe that would be a decision that

17   would be made by the Secretary.

18       Q.   Do you know if there was ever discussion

19   or consideration of that type of examination of the

20   old system?

21       A.   I do not know.

22       Q.   Who would you ask if you wanted to know?

23       A.   I -- I would ask, most likely, our general

24   counsel.

25       Q.   Is that Ryan Germany?

1        A.    Yes, it is.

2        Q.    Are both logic and accuracy testing and

3    the hash testing that you described with the old

4    system, are those both still done with the new

5    system?

6        A.    Yes, they are.

7        Q.    And are they still done generally in the

8    same way, except that the logic and accuracy testing

9    is done in election mode?

10        A.    That is correct.

11        Q.    And there's also not been any forensic

12    examination of the voting equipment or the -- the

13    servers that are used with the Dominion system,

14    right, by the State?

15        A.    At the end -- after the conclusion of the

16    November 2020 election, the State did work with

17    Pro V&V, who is a federal testing lab, to come in

18    and go to a number of counties and did a random pull

19    of BMDs and ICP scanners to do a hash validation

20    examination on the -- on those devices to see if

21    anything had changed in the applications that had

22    been installed.

23        Q.    Right, but that was a -- that was another

24    one of the hash tests that you talked about before;

25    right?

1      A.   Yeah, that was a -- that was a hash

2  inspect where they would bring -- they -- they

3  removed the application from the devices and did a

4  hash compare based upon the certified -- the gold

5  copy, the copy maintained by Pro V&V of the

6  applications.

7      Q.   And so you're not aware of any forensic

8  examination of any of the voting equipment in

9  Georgia with the Dominion system; right?

10          MS. LaROSS:  Objection.  Form of the

11      question.

12          THE WITNESS:  I can only speak to what I

13      just mentioned.

14  BY MR. CROSS:

15      Q.   Is it your belief that the hash test that

16  Pro V&V did after the November 2020 election, that

17  that's a forensic examination --

18          COURT REPORTER:  Excuse me, excuse me --

19          MR. CROSS:  Yeah, sorry.  Let me say it

20      again.

21          COURT REPORTER:  Thank you.

22  BY MR. CROSS:

23      Q.   Is it your belief that the hash test that

24  Pro V&V did after the November 2020 election, that

25  that is a forensic examination of the voting

1  equipment?

2      A.   I'm just thinking that that's a -- that's

3  an examination that was done.  Whether that meets

4  the definition of "forensic" in the information

5  sector of the world, I do not know.

6      Q.   Is there any other examination of the

7  Dominion voting system that you're aware of that you

8  would think of as potentially a forensic examination

9  by the State or the counties?

10     A.   I cannot think of one, no, sir.

11     Q.   And would that also be -- would you expect

12 that to be the Secretary's decision, as with the DRE

13 system?

14     A.   Yes, sir.

15     Q.   And do you have any knowledge on whether

16 that's ever been discussed or considered?

17     A.   I do not know.

18     Q.   I gather you don't know why it's not been

19 done, then?

20          MS. LaROSS:  Objection to the form of the

21     question.

22          Go ahead.

23          THE WITNESS:  I do not know.

24 BY MR. CROSS:

25     Q.   And if you wanted to know if it had been

1    considered, who would you ask?

2         A.   Again, I would -- I would -- I would point

3    my question to general counsel.

4         Q.   Okay.  You mentioned earlier that L & A

5    testing -- strike that.

6              You mentioned earlier that if a

7    discrepancy arises with voting equipment during

8    logic and accuracy testing, the equipment is -- is

9    not used and -- and may be sent back to the

10   manufacturer for repair; is that right?

11        A.   That is correct.

12        Q.   How often are there those sorts of

13   discrepancies with the Dominion equipment,

14   approximately?

15        A.   We are just now entering our second full

16   use of the -- of the system in the Dominion

17   environment.  There have not been very many -- I

18   can't think of an instance where the system

19   wasn't -- didn't calculate properly.

20             There have been issue -- instances where

21   the scanner would not take the ballot, the rollers

22   on the ICPs were not pulling properly and the ballot

23   couldn't be processed, and I know that equipment has

24   been returned to the vendor for repair.

25             I know of LCD screens on the ICPs that are

1    not responsive to touch that have been sent back for

2    repair.

3              But at this point, we have not had a high

4    volume of equipment repair come back through our

5    office for acceptance testing and redistribution to

6    the county.

7         Q.   Has there ever been a time with the

8    Dominion system where any of the equipment did not

9    pass the hash test?

10        A.   We have not encountered that at this

11   moment in time.

12        Q.   What about with the prior DRE system?

13        A.   I can only think of one instance of where

14   the Election Management System, when we did the hash

15   compare, came back with a single mismatch.  And that

16   was in a report-generating file that had a mismatch,

17   and then, of course, that server was immediately

18   replaced with a new server.

19              But that is the only -- only instance that

20   we've ever had a hash value not come back and be

21   equal.

22        Q.   And when was that?

23        A.   Honestly, I can't remember the exact year

24   that was.  It was -- I would -- I would be guessing

25   right now to tell you the year, but it was -- it

1   would be a guess right now to tell you the year.

2        Q.   Would you say it was within the last five

3   years?  Last ten years?  What's your best

4   approximation?

5        A.   Within the last ten years, not within the

6   last five years.

7        Q.   Okay.  And we're talking about a GEMS

8   server; is that right?

9        A.   Right, this was a -- was a GEMS server.

10       Q.   Was that county or state?

11       A.   It was found at the county level.

12       Q.   Do you recall what county?

13       A.   I believe it was Newton County, but I

14   could be mistaken.

15       Q.   When was that testing done in relation to

16   an election?  Was it -- are we talking, like,

17   shortly before an election?  Shortly after?  What do

18   you -- what do you recall?

19       A.   I -- I don't recall the specific time that

20   it was done.  It was -- I -- I -- I do not recall.

21       Q.   Okay.  Was it being done before some kind

22   of election that was upcoming?  Is that usually when

23   the hash testing is done?

24       A.   No.  The hash testing was normally done

25   whenever we were in a county for reason.  It could

Page 40

1   have been that they were -- that they had just moved

2   into a new elections office and their election

3   equipment had to be moved.  Whenever that takes

4   place, before the equipment can be used again, we

5   would appear and do an -- an equipment test and

6   validation test to make sure that nothing had

7   happened to the equipment during that move.

8           So I assume that it was probably in

9   conjunction with something of that nature, but I --

10  I just -- I don't remember.

11      Q.   And what happened with the server?  What

12  did you guys do with it?

13      A.   The server was brought back to the Center

14  for Election Systems, and then my recollection of

15  the event was trying to determine, okay, well,

16  what -- what created this -- this mismatch.

17          And my recollection was -- determined that

18  it was never an issue with any application, but it

19  was one of the report files -- one of the files

20  that's used to generate one level of a -- a

21  printable report had -- was given a mismatch and had

22  not been installed properly, was what was -- was

23  found.  That's my recollection.

24      Q.   How long had that server been used in the

25  county?

Page 41

1        A.    I do not know.  I -- I can't recall that.

2        Q.    But this -- this wasn't a new server that

3   had just been installed; this was a server the

4   county had used for elections and you guys were

5   doing your hash testing?

6        A.    Yeah, again, I don't recall how old or how

7   many -- if -- if and even that server had been used

8   in an election.  I don't know.

9        Q.    You said that there was an issue with one

10  of the report files.

11             A report for what?

12       A.    Again, I don't remember which exact one.

13  It's -- there are a litany of printable reports that

14  can be generated from the GEMS computer.  It could

15  have been a report showing you the list of

16  districts.  I don't know.  I -- I don't recall what

17  report it was.

18       Q.    Does CES still have the -- that GEMS

19  server, or is it gone?

20       A.    I believe that one is gone, being part of

21  the old system.  If -- if -- if CES still has it,

22  it's still in our secured closet where we're

23  maintaining anything that we had whenever the system

24  transitioned over to the new system.

25             But, again, I -- I don't -- I cannot speak

Page 42

1    to that, whether we have that specific box anymore

2    or not.

3        Q.   Okay.  In any of the testing that has ever

4    been done in Georgia on either the prior or old

5    election system that you're aware of, has there ever

6    been any suspicion of malware on any of that

7    equipment?

8        A.   No, sir, not that I'm aware of.

9        Q.   Let's talk about Topic 1b, "Any efforts

10   made to 'air-gap' any Components of Georgia's

11   Current Election System...."

12       A.   Hold on a second.  My Veritext just cut

13   out.

14       Q.   Oh.

15            MS. LaROSS:  Okay.  Hang on for a moment

16       here.

17            MR. CROSS:  Sure.

18            VIDEOGRAPHER:  Counsel, did you want to

19       stay on the record?

20            MR. CROSS:  Yeah, let's go off the record.

21            VIDEOGRAPHER:  The time is 9:55 a.m.

22       We're off the record.

23            (Off the record.)

24            VIDEOGRAPHER:  The time is 9:56 a.m.

25       We're on the record.

Page 43

1    BY MR. CROSS:

2         Q.    Do you have Exhibit 1 in front of you?

3         A.    Yes, sir, I do.

4         Q.    Okay.  So the latter part of Topic 1a --

5    we talked about the first part -- the latter part

6    references "any exchanges of software or data

7    between any Component of the two election systems

8    and the use of the same computers, servers, or

9    removable media with both systems."

10            What, if any, data or software has been

11   exchanged between any component of the DRE system

12   and the BMD system?

13        A.    I am not aware of any computers or servers

14   that were used at the -- that -- to hold on to the

15   GEMS application being used to execute the Dominion

16   application in any way.  Everything was replaced at

17   the county level; everything has been replaced at

18   the State level.  Computers that were used to

19   program a DRE, those were an own set of computers.

20   Computers used to program BMDs and run the Dominion

21   system was a whole 'nother set of computers.

22        Q.    So your understanding is at the State

23   level, there were no computers that ever were used

24   with the DRE system that are now used with the BMD

25   system?

Page 44

1      A.   There are no computers that I am aware of

2  that have been used to execute the GEMS application

3  and also used to execute any of the Dominion

4  applications.

5      Q.   So you're talking specifically about the

6  computers within what the State calls the air-gapped

7  environment for the Election Management server; is

8  that right?

9      A.   Yes.

10     Q.   What's the basis for your belief that the

11 counties made the same equipment replacement?

12     A.   Well, one, the State went and collected

13 all of the GEMS Election Management computers from

14 all 159 counties, and then Dominion installed new

15 Election Management computers in all 159 counties.

16          And those computers were not transferred

17 and installed in the county until a member of the

18 Secretary of State's office had done an acceptance

19 test on those new Election Management computers.

20     Q.   And when you say that the State installed

21 new Election Management computers in the county,

22 you're talking the Election Management server?

23     A.   That is correct.

24     Q.   The -- the individual desktops or laptops

25 that the county officials use to work with that

1    server, the State didn't replace all of those,

2    though; right?

3         A.    No, the State replaced all of those.

4         Q.    The State replaced all of the computers

5    and desktops that are also used with the county

6    Election Management server?

7         A.    The -- the State replaced all of the

8    computers that a county uses to interact with the

9    Election Management System, yes, sir.

10        Q.    The State did not do the same for

11   removable media like USB drives, flash drives;

12   right?

13        A.    As part of the distribution of the voting

14   system, the vendor included a large quantity of USB

15   drives for use with the new voting system.

16        Q.    And when were those provided?

17        A.    Those were provided in -- the exact time

18   frame, which date did the county get the supply from

19   the vendor, I can't speak to, but they were

20   distributed during the distribution of the voting

21   system in 2019.

22             When the system started, I think there was

23   a smaller set of jump drives, USB drives, that were

24   distributed to counties, and I think the total

25   amount that the vendor was obligated to provide to

1  the counties was completed in 2020, I'm go- -- I'm

2  thinking by sometime in early March of 2020.

3      Q.   Right.

4          At least in early 2020, say in the

5  January/February time frame, the counties were still

6  reusing their older flash drives from the DRE system

7  with the BMD system; right?

8      A.   In one circumstance -- and I believe this

9  was in January of 2020 -- the -- we had an

10  unexpected State election to fill a vacancy, I

11  believe, in the State house, and I believe it was in

12  Southwest Georgia, Decatur County, I think.

13          And as -- being a State election, the

14  county is required to create an export file and

15  transport that export file to the State for election

16  reporting purposes, because it's a State race.  And

17  at the time, this jurisdiction -- I think Decatur

18  County -- had been a pilot county for the new

19  system.  They had used the system in a preceding

20  November election in which they -- they didn't have

21  to do any election night reporting or upload to the

22  State, but in January they were going to need to do

23  an election -- an upload.

24          And at the time, they did not have another

25  USB drive that they could use to transfer data over

1  from the Election Management computer over to the

2  computer they use for upload to the Secretary of

3  State's Election Night Reporting, and they did ask

4  if it would be okay if they would use a drive that

5  had been provided by the State previously for those

6  same purposes with the old system.  And we did give

7  them clearance to use that particular drive.

8      Q.   You're not suggesting that's the only

9  instance when a county has used a USB drive from the

10  DRE system with the BMD system; right?

11      A.   I'm just speaking to one instance that I

12  am aware of.

13      Q.   You're saying you're not aware of any

14  other instance?

15      A.   I am just speaking to the one instance I'm

16  aware of.

17      Q.   So, again, does that mean you're not aware

18  of any other instance?

19          MS. LaROSS:  Objection to the form of the

20      question.

21          THE WITNESS:  I -- I am -- I'm stating the

22      one that I am aware of.

23  BY MR. CROSS:

24      Q.   Well, are you aware of any other instance

25  where anyone at the county or state level used a USB

Page 48

1   drive with the Dominion system that had also been

2   used with the GEMS system?

3       A.   I do not know.

4       Q.   You just don't know one way or the other?

5       A.   I -- I do not know the exact individual

6   drives that the county uses to interact with

7   their -- their system on a -- on an

8   election-by-election operation.

9       Q.   In the current system, counties typically

10  reuse flash drives from one election to the next;

11  right?

12      A.   With the current system, yes, they have --

13  again, they were provided a set of USB drives that

14  were being used to -- to interact with the voting

15  system, yes, sir.

16      Q.   In addition to the -- the Election

17  Management server the counties have, they also have

18  an Election Night Reporting server or computer that

19  they use to send election results to the State;

20  right?

21      A.   Yes, sir.  They have to -- they have to

22  use a computer in the -- in the office that has a

23  connection that allows them to connect to the

24  Secretary of State's Election Night Reporting page.

25      Q.   And when the Dominion system rolled out,

1    the State and counties didn't replace the ENR

2    computers; right?

3         A.   No, the State never provided counties with

4    computers for direct connection to the Election

5    Night Reporting System.  Those -- the counties have

6    always used county-maintained equipment to access

7    that -- that particular page.

8         Q.   In the -- just so I understand the process

9    right, do I understand correctly that the way the

10   election night reporting works is the tabulation

11   results are taken from the scanners on memory cards

12   that are then plugged into the county Election

13   Management server, the -- the vote tallies are sort

14   of tabulated or aggregated there, and that then

15   comes off the county Election Management server on a

16   USB drive that's plugged into the Election Night

17   Reporting computer, and the results are then sent

18   over the Internet to the State; is that right?

19        A.   On election night, the -- the scanners

20   that are used to scan the ballots and tabulate the

21   results, there are two types of scanners.  There's

22   the ICP scanner, which is the ImageCast Precinct

23   scanner used in the polling location.  When that

24   tabulator is closed, a tab- -- a tabulation tape is

25   produced by that device.

1          Information that that device collects is

2    then stored to two compact flash cards.  One of

3    those two compact flash cards is removed from the

4    ICP and transported back to the election -- to the

5    elections office, where it is then uploaded into the

6    Election Management computer using an application

7    called -- RTR is the acronym, RTR.  It's -- Results

8    Tally & Reporting is the application.

9          And then information from the compact

10   flash card is -- is uploaded into the Election

11   Management computer through RTR.  RTR then

12   aggregates those result files and produces a

13   cumulative result file for the county.

14         The county can then generate an export

15   file from RTR.  The export file is in a common --

16   not a commonly delineated -- but a CSV file.

17         That CSV file is then transferred from the

18   Election Management computer onto some sort of

19   removable media that is then removed from the

20   Election Management computer and taken over to a

21   county-maintained computer that would be connected

22   to the Internet.

23         That remov- -- removable media is then

24   inserted and then the county signs in to the

25   Secretary of State's Election Night Reporting

1  application using username and passwords, and then

2  they upload that CSV file into the Secretary of

3  State's ENR page, and then that -- that service

4  aggregates that file and loads it into a State

5  display of results.

6      Q.   That -- the computer where counties

7  typically upload the election results into the --

8  the Election Night Reporting application, that's not

9  a standalone computer just for ENR purposes; right?

10     A.   It could be in that particular county or

11  it may not be.  I -- I do not know.  Some

12  counties -- each county sort of manages that in

13  their own particular way.

14          So I have heard of counties that they

15  isolate a specific computer for that and I know of

16  other counties that do not isolate a specific

17  computer for that action.

18     Q.   What data or software -- we talked about

19  equipment, but what data or software, if any, was

20  exchanged between the old election system with the

21  GEMS DREs and the Dominion system?

22          MS. LaROSS:  Objection to the form of the

23      question.

24          THE WITNESS:  I'm not aware of any

25      specific other applications on the servers --

1          you know, I don't -- I'm not aware of any of

2          the same version applications or anything that

3          was on an old system that was housing GEMS

4          versus on a new computer that would be housing

5          the Dominion applications.

6     BY MR. CROSS:

7          Q.   Well, the Dominion system also needed

8     access to the voter registration data in the same

9     way that the GEMS system did; right?

10         A.   Well, no.  The -- the GEMS system, the

11    only avenue for entering in voter registration

12    information into GEMS was to manually key it in, and

13    that is the same that is in place with the Dominion

14    system.  Whenever a county is putting in their total

15    number of registered voters within the Dominion

16    application, they have to open up the Dominion --

17    they have to go to the Election Management computer,

18    open up the election project using the application

19    that's called Election Event & Design, EED, and

20    inside that application, they can go in and -- and

21    key in the number of active registered voters per

22    precinct.

23              And that's -- there was a similar

24    operation that was done on the GEMS computers, where

25    you would open up -- go to the Election Management

1  computer that was housing GEMS, open up the specific

2  GEMS database, and then enter in your voter

3  registration totals by -- by the base precinct

4  level, I believe it was in GEMS.

5       Q.   The ballot -- the ballot-building process

6  requires voter registration data; right?

7       A.   The ballot-building process is dependent

8  upon reports that come out of the voter registration

9  system.  And these reports outline the individual

10 precincts that are in a county, the divisions in

11 that precinct, what are the district combinations in

12 those precincts, and what political districts are

13 aligned to those particular district combinations.

14          We have to have those reports -- and it's

15 a physical report that comes out of the -- out of

16 eNet, which is the State's voter registration

17 system -- that ballot builders then use to key in

18 that information into the Election Management System

19 computers.

20      Q.   So -- so in the ballot-building process,

21 when the ballot builders are looking at voter

22 registration data to build the ballots for a

23 particular election, do I understand correctly

24 they're relying on hard-copy reports, as opposed to

25 pulling data out of the voter registration system

Page 54

 1    and onto whatever computer they're building the

 2    ballots on?

 3         A.    That is correct.

 4         Q.    And what's the basis for that

 5    understanding of yours?

 6         A.    Well, the basis of understanding is that's

 7    how the system is built, is -- in the -- in the

 8    previous system, in order to get information that

 9    was in the registration system, you had to key it

10    in.  There is no -- there was no -- there's no

11    im- -- there was no import system.  There was no

12    report that could be generated out -- out of eNet in

13    any format that could then just be imported into the

14    GEMS system.

15              In the Dominion system, it's the same --

16    same setup.  We have a data set, a printable report

17    that can be generated from eNet, and then we use

18    that same keystroke process of ballot builders

19    looking at the report with their eyes and going into

20    the application, the Dominion application, and

21    building a precinct, and then associating that

22    precinct to the necessary districts that had been

23    built into that election project.

24         Q.    In the old GEMS DRE system, the ballot

25    building occurred at individual contractors' homes.

Page 55

1           Do you recall that?

2      A.   That -- that took place in 2018, when the

3   Secretary of State's office was bringing the Center

4   for Election Systems back into the Secretary of

5   State's office at the time.

6           And the Secretary of State's office did

7   not have employees at the time who were versed on

8   the Election Management System, on the GEMS Election

9   Management System, and the Secretary of State's

10  office did contract with Election Systems & Software

11  for assistance in building the election databases in

12  2018.  And they were built by contractors who were

13  working for Election Systems & Software.

14     Q.   When the -- since the Dominion system has

15  been implemented, where does the ballot building

16  occur?

17     A.   It's -- it's occurred in two different

18  phases.

19          When the Secretary of State's office

20  completed their contract with Dominion for the new

21  voting system, as part of that contract, Dominion

22  would provide ballot-building services for the State

23  of Georgia from the time that the contract was

24  signed until the end of the State's fiscal year in

25  2021.  So up until June 30th of 2021, if an election

1   project was needing to be built, it was built by

2   Dominion.

3           Since July 1 of 2021, the Secretary of

4   State's office has been building the election

5   projects that are needed for any election that is

6   scheduled within the -- within the state.

7       Q.   When Dominion was building the ballots,

8   where did they physically do it?

9       A.   They set up location -- they had a office

10  location, warehouse location, in Metro Atlanta.  It

11  was in -- off of Highland Parkway in Smyrna,

12  Georgia, and they had their -- their staff set up at

13  that location and that is where they were conducting

14  their ballot-building operations.

15      Q.   How did the State and counties get the

16  ballot-building files from Dominion in that system?

17      A.   In that process, when an election project

18  was needed, the Secretary of State's office would

19  communicate with individual counties and obtain

20  whatever information was needed to be placed onto an

21  upcoming election ballot, what were the contests,

22  who were the candidates.

23           The Secretary of State's office would

24  generate the voter registration reports, those

25  reports we spoke of earlier that outlined the

1  precincts, the combos, the districts that are

2  aligned thereto.  And all of that information would

3  be compiled and then provided to Dominion, who would

4  then take that product, that information, and

5  produce -- begin building the election project file.

6        When -- there's a -- there's a point when

7  the project file has been built to a point to where

8  it needs to then be proofed to verify that what has

9  been built in relation to content is what is needed

10  for the given election.

11        We set up a process where the -- the

12  Dominion side would produce what we would call a

13  proofing packet, and the proofing packet contained

14  PDF copies of the ballots as they would be

15  constructed on an optical scan ballot and then a

16  litany of individual Excel reports that outlined the

17  precincts in the project, how the precincts were

18  divided, what were the district combos in the

19  precincts, what ballot styles related back to those

20  precincts and -- and district combos, tabulator

21  reports, what equipment had been set up, to what

22  polling places was it assigned, what type of

23  configurations were assigned to those equipment in

24  relation to how it -- how will it interact with

25  ballots.  So there was a size -- a number of

1    reports.

2            There were audio files for us to review to

3    make sure that candidate names were being read

4    properly.

5            When a proofing packet was ready, it would

6    be brought to the Secretary of State's office, where

7    member of CES would then go through the proof

8    package and compare its content based upon what was

9    in the original information obtained from the county

10   in relation to, again, precincts, the -- the

11   information within the precincts, the contests, the

12   candidates.

13           If CES found all of that stuff to be

14   correct, CES would then distribute to the counties a

15   copy of that -- of that proof packet with

16   instruction on how they would need to go about and

17   review that packet to make sure that it is correct.

18           Sometimes counties would get the packet

19   and then they would find mistakes that we had not

20   found in our proofing process.  Whenever a mistake

21   was found, a -- a written indication of what the

22   mistake was would be given, and then that correction

23   would be given over again to Dominion for them to

24   then correct the data package, a new proof package

25   would be generated, and it would go through that

 1   proofing process a second time, end up in the

 2   county's hands.

 3            Once the county then said, "Yes,

 4   everything is complete and accurate in the proofing

 5   packet," the county would then send over a sign-off

 6   sheet with signature indicating that they had

 7   reviewed the proofing packet, found it to be

 8   correct.

 9            When CES was in possession of that

10   sign-off, CES would then notify Dominion that the

11   county had signed off on the proofing package.

12   Dominion would then finalize the election project,

13   and that's where the user names and passcodes for

14   that assigned county would be set into the elections

15   project and the election project would be made ready

16   for election.

17            That election project would then -- was

18   then hand-delivered to the Elect- -- to CES, where

19   CES would then transfer that election project onto a

20   brand-new, freshly formatted USB drive, and then

21   that USB drive would be placed into a locked bag

22   specifically for the county.

23            And then that locked bag is then delivered

24   to the county for the county to unlock, remove

25   the -- the USB drive, and begin their process of

Page 60

1  installing that election project into their Election

2  Management computer.

3      Q.   How were the proofing packets generated by

4  Dominion provided to CES when Dominion was doing the

5  ballot building?

6      A.   It was done in two ways.  The election

7  project may have been placed onto a jump drive and

8  delivered -- hand-delivered to our office.

9           When we were in the midst of the pandemic

10  and we were not always in the office every day,

11  Dominion had set up a secured SFT site on their

12  system, and then those proof packets were

13  transferred electronically to that SFT site, where

14  we would have access to log in and pull that packet

15  down that contained the PDF files and Excel reports

16  for us to inspect.

17      Q.   Do you mean SFTP?

18      A.   Yes, S- -- SFT.

19      Q.   SFTP?

20      A.   You -- you may -- I -- I remember it as

21  SFT, but you are probably correct as SFTP.

22      Q.   Okay.  Okay.  I understand what you're

23  talking about.

24           In -- in the time frame when Dominion and

25  CES were exchanging the -- the proof packets over

1    the -- I think it's an FTP site, but SFT, as you

2    called it, was that same system also used to get the

3    packages to the counties?

4         A.   No.  A different system would be used to

5    transfer the -- the -- the packet to the county.

6    The Secretary of State's office maintains an FTP

7    that each individual county has access into, and CES

8    also has access to that FTP.

9              And when we would complete our proofing of

10   the election packet that had been provided to us by

11   Dominion, we would then post to that SOS-maintained

12   FTP a copy of the election packet and notify the

13   county that the packet had been placed out there for

14   their review.

15        Q.   Okay.  And once you got to the final stage

16   of the election project coming, so you're beyond the

17   proofing packet and Dominion is providing the

18   election project, was that also sometimes provided

19   to the State over this SFT?

20        A.   No, sir, it was not.  We -- we wanted them

21   to bring the election project, the finalized

22   project -- hand-deliver that to our office.  We did

23   not want that election project transferred through

24   the FTP means.

25        Q.   When the project package came in through

Page 62

1    the SFT, did that go directly into the State

2    Election Management server?

3         A.   The -- the proofing -- the proofing

4    packet?  Which -- which one are you referencing?

5         Q.   Oh, I'm sorry.  I may have misspoken, yes.

6    Back up.

7              The proofing packet that you said

8    sometimes comes in over -- I think you said SFT, did

9    that go directly to the Election Management server?

10        A.   No, because the proofing packet was

11   nothing more than a set of PDF files and Excel

12   files.  So that -- it -- it was not a project file,

13   it was information generated from an election

14   project file that was used to proof the content of

15   an election project file.  It was not the election

16   project file.  It was PDF files; it was Excel

17   spreadsheets.

18        Q.   So that went to a computer in CES?

19        A.   Yes, that would be on a computer in CES.

20             And then you would -- we would review that

21   packet for content to make sure it had the right

22   precincts, the precincts were labeled the right way,

23   that the precincts had been built properly, that the

24   ballots that were resulting from that process

25   contained the right races, were organized in the

1    right way.

2             And then once we approved of that packet,

3    found it to be correct, that packet was then shared

4    with the county for their approval.

5        Q.   At the election project stage, you said

6    that that goes from CES to the counties on a new --

7    I think you said a brand-new and newly formatted USB

8    drive; is that right?

9        A.   That is correct.

10       Q.   And that's put in some sort of locked bag;

11   is that right?

12       A.   That's correct.

13       Q.   And then that bag goes to the county.

14            How is that delivered to the county?

15       A.   It's delivered in one of two ways.  It was

16   either shipped via UPS with a tracking ID or it

17   could be hand-delivered by an SOS investigator,

18   depending upon the time frame.

19       Q.   What is this -- what does this bag look

20   like?  Is it like one of those bank bags that people

21   used to take --

22       A.   Yes.  Sorry.  Yes, it's a -- it looks like

23   a bank bag, an old bank bag.  It is red in color.

24   It has the county's name on -- on the bag, also the

25   county's numeric number -- like Columbia County is

1    36.  On the back of the bag is the state seal, and

2    it has a -- a zip pouch that has a key lock that

3    when you zip it up, you lock it with a key.

4           And CES has a key to that bag, the

5    Secretary of State's office downtown has a key to

6    that bag, and then the individual county that it's

7    assigned to has a key to that bag.

8        Q.   Okay.  And when it gets shipped, is it --

9    do you put these things in like a box or do you just

10   ship the bag?

11       A.   We put the bag inside a box and then the

12   box goes inside a UPS envelope.

13       Q.   Okay.  Does each county have its own

14   assigned bag with its own unique lock?

15       A.   It does.

16       Q.   And so the county has its own key when

17   this thing shows up?

18       A.   That is correct.

19       Q.   And who at the county level is responsible

20   for maintaining the key?

21       A.   The election supervisor.

22       Q.   And do you know -- does the State have

23   requirements on how the key is to be maintained, or

24   is that for the counties to determine?

25       A.   That's for the counties to determine.

1      Q.   Is there any confirmation protocol for

2   when this thing arrives at a county to confirm that

3   they have received it, they've opened it, the right

4   people have access to it?

5      A.   What we have set up is -- is the

6   following.

7           When -- when an election project has been

8   finalized and ready to be shipped or delivered to

9   the county, we post to the county FTP location an

10   informational document that the county pulls down.

11   And that information document gives the county the

12   usernames and passwords they need for the project,

13   but they also are given a CES access code.

14           When the election project is placed onto a

15   USB drive for distribution to the county, the -- the

16   file -- we do a password protect on the file onto

17   the USB drive, and you can't remove the file from

18   the USB drive without obtaining the password from

19   CES.

20           And the way you obtain the password from

21   CES is you have to have access to the Secretary

22   of State's FTP site.  You have to then download that

23   informational file.  You then have to call CES and

24   provide that access code, and at the time of

25   providing that access code, we can then give you the

1    passcode to be able to extract the information from

2    the USB drive.

3         Q.   Is that access code the same for all

4    counties?

5         A.   It is not.

6         Q.   So each county has its own access code?

7         A.   That is correct.

8         Q.   Does each county also have its own

9    individual passcode for the election project files

10   on the USB drive it receives?

11        A.   The -- yeah, the election project file --

12   every new election project that's generated is given

13   a new set of passcodes for that given election.

14        Q.   And that would be the same across all

15   counties?

16        A.   No.  Each individual county has its own

17   passcode.

18             MS. LaROSS:  David, I don't mean to

19        interrupt your train of thought, but if there's

20        a point where we can take a break, I would

21        appreciate doing so.

22             MR. CROSS:  Sure.  Just give me a few

23        minutes, okay, Mr. Barnes?

24             MS. LaROSS:  Yeah.  Okay.

25             THE WITNESS:  Yeah, a few more minutes.

Page 67

```
 1              MS. LaROSS:  Yeah, no problem.

 2   BY MR. CROSS:

 3       Q.   Just to wrap up this topic.

 4              And so that was the process until -- I

 5   think you said July of 2021; is that right?

 6       A.   Well, it's still the process of today.

 7       Q.   Sorry.  Yeah, let me ask a better

 8   question.

 9              Dominion was building the ballots for

10   Georgia with its Dominion system until July of 2021;

11   is that right?

12       A.   Yes, sir.

13       Q.   Why was Dominion building ballots at any

14   point, rather than just having the State do it

15   itself?

16       A.   Because of the knowledge base that was --

17   that's needed to gain about an Election Management

18   System and how to build a ballot properly.

19              We -- we signed on with Dominion as our

20   vendor in 2019, and at that time, the State did not

21   have anybody employed that knew enough about the

22   Election Management applications to build a ballot

23   on their own.

24              And to build an election project is --

25   is -- is an important task.  We want to make sure we
```

1    have it built right.  So the State built into its

2    contract negotiations with an understanding that it

3    was going to take time for the Secretary of State's

4    office to build up its internal knowledge on the use

5    of the application in order to take over the

6    ballot-building operations.

7              And the same process was done in 2001,

8    2002, when the State contracted with Diebold at the

9    time for the new voting system.  Diebold built the

10   ballots for the State of Georgia for the first year,

11   and then the State of Georgia had built its

12   knowledge of the application to where it could take

13   over that operation.

14       Q.   And so since July of 2021, CES builds the

15   ballots; right?

16       A.   Yes, sir.

17       Q.   Who in CES is responsible for that?

18       A.   We have -- we have four full-time

19   employees that are tasked with building election

20   project files.

21       Q.   Are they former Dominion employees or are

22   they people Dominion trained?

23       A.    They are people that Dominion trained.

24   None of these four people -- well, one is a former

25   Dominion tech.  He had worked for us before he was a

1    Dominion tech.  He was part of our equipment-testing

2    group in 2019 and early '20 and then he went to work

3    for Dominion as a county tech, and then we were

4    lucky enough to hire him on as a full-time employee

5    in our office.

6         Q.   And the other three that have been

7    building ballots for CES since July of 2021, are

8    those -- were those already State employees at the

9    time that they began this work?

10        A.   Right, one is -- one is a full-time,

11   permanent employee; the other two are contract, but

12   they're contract full time.

13        Q.   And where do they physically build the

14   ballots?

15        A.   In -- within CES.  Within our -- within

16   our offices.

17        Q.   So even throughout the pandemic, they have

18   not worked remotely at any point?

19        A.   Well, again, during 2020, we were not

20   building the election projects; those were being

21   built by Dominion.

22             We, during 2020, were working remotely.

23   This was during the time when we were proofing the

24   packets.  But when it came time to distribute the

25   election projects when we have gained possession of

Page 70

1    those, we would be in the office when we would gain

2    possession of those, and then they were packaged

3    within our office and then shipped out from our

4    office.

5         Q.   But since July of 2021, when CES took over

6    the ballot building, the individuals who were

7    responsible for that, they never worked remotely on

8    that project?

9         A.   They -- they do not have the ability to

10   work with an elections project remotely.  They have

11   to be inside the office to work on an elections

12   project.

13        Q.   And the computers they do that on, are

14   those part of what you consider the air-gapped

15   Election Management System or -- or are those

16   different computers?

17        A.   In our -- in our office, our employees

18   have two computers at their desk.  They have their

19   SOS-provided -- SOS computer, which is used to

20   communicate with the outside world and to do the

21   work that you do as an employee of the Secretary of

22   State's office, and then they have a second computer

23   that is connected to our private system that is

24   air-gapped, that is isolated from outside

25   interconnection.  And that is the system that they

Page 71

1    use to produce their election project files.

2        Q.   So these folks don't do any work on the

3    election project files, including any proofing

4    packets, on the -- the computers that are not part

5    of this air-gapped system; is that right?

6        A.   That is -- that is correct.  We -- we do

7    our work on the private side when it comes to

8    election projects.

9            MR. CROSS:  All right.  Sure, let's take a

10       break.

11           VIDEOGRAPHER:  The time is 10:36 a.m.

12       We're off the record.

13           (Off the record.)

14           VIDEOGRAPHER:  The time is 10:54 a.m.

15       We're on the record.

16           (Plaintiffs' Exhibit 2 was marked for

17       identification.)

18   BY MR. CROSS:

19       Q.   So, Mr. Barnes, wrapping up Topic 1a

20   briefly, just so we're clear, you're not aware of

21   any malware or other compromise that affected the

22   election outcome of the November 2020 elections in

23   Georgia; do I understand that right?

24       A.   I am not aware of anything that

25   compromised the system in November of 2020.

Page 72

1      Q.   And as the head of CES for the State, do

2   you have a view on whether the election outcome of

3   the presidential election and the other

4   November 2020 elections were accurately decided?

5      A.   In relation to my interactions with

6   elections within the State of Georgia, I feel like

7   everything was executed as it should have been

8   executed.

9      Q.   You don't -- you don't personally, based

10  on your experience and role as the head of CES, have

11  any doubts about the election outcome; is that

12  right?

13     A.   I do not have any doubts.

14     Q.   And you're not aware of any widespread

15  fraud in the State of Georgia in the November 2020

16  elections?

17     A.   No, sir, I am not.

18     Q.   Is that true for any election?  Let me --

19  well, let me ask a better question.

20          Are you aware of any widespread fraud

21  affecting any elections in Georgia since the time

22  you've been the head of CES?

23          MS. LaROSS:  Objection to the form of the

24          question.

25          THE WITNESS:  I am not.

Page 73

1    BY MR. CROSS:

2        Q.   Are you aware of any election fraud at all

3    that potentially altered an election outcome in

4    Georgia since you became the head of CES?

5        A.   Not --

6             MS. LaROSS:  Objection to the form of the

7        question.

8             Go ahead, you can answer to your

9        understanding.

10             THE WITNESS:  I am not.

11    BY MR. CROSS:

12        Q.   You're aware of a phone call that was

13    publicly reported between the former president,

14    Donald Trump, and Secretary Raffensperger regarding

15    the November 2020 election; right?

16             MS. LaROSS:  I -- I object to the form of

17        the question.

18             THE WITNESS:  Yes, sir, I'm aware of the

19        report.

20    BY MR. CROSS:

21        Q.   And you're aware that it was reported that

22    in that call, former President Trump asked Secretary

23    Raffensperger to find a specific number of votes for

24    him in that election.

25             Do you recall that?

```
 1          MS. LaROSS:  I object to the form of the

 2     question.

 3          And, David, can you clarify what topic

 4     you're asking this question under?

 5          MR. CROSS:  He's also testifying in his

 6     personal capacity today.

 7   BY MR. CROSS:

 8     Q.   Go ahead, Mr. Barnes.

 9          MS. LaROSS:  Well, I still -- I have an

10     objection to the form of the question.

11          MR. CROSS:  It also goes to 1a, but go

12     ahead.

13          THE WITNESS:  Can you repeat the question?

14   BY MR. CROSS:

15     Q.   Sure.

16          Are -- are you aware that, at least

17   according to the public reports, during that call

18   between former President Trump and Secretary

19   Raffensperger, Mr. Trump asked the Secretary to

20   find, I think was his word, a specific number of

21   votes for Trump in that election?

22     A.   Yes, I -- I believe I remember reading

23   that in the paper and hearing that on the news, yes,

24   sir.

25     Q.   And picking up on what you just said, do
```

1  you have any personal knowledge from your work at

2  the Secretary's office about that conversation, or

3  is everything you know only what you read in public

4  news?

5       A.   I, of course, was not on that phone call,

6  and I am aware of that phone call through the news,

7  through reporting, for -- reading articles online,

8  watching the news.  I have not had any conversations

9  with anybody within the office who -- who were

10 reported to have been on that phone call or engaged

11 in that phone call and asked them any questions

12 about what was it like to be on that phone call.  So

13 I -- I do not -- all I can speak to is what I've

14 heard in the news.

15      Q.   Okay.  Were you aware of any efforts by

16 anyone in the Secretary's office or at the

17 Secretary's office's direction or any county in

18 Georgia to try to find or generate votes for Trump

19 in that election?

20      A.   No, sir, I am not.

21      Q.   And is that also true for votes for Biden?

22      A.   Yes, sir, that -- that is -- I am not

23 aware of any -- any -- any message, any directive,

24 anything from the Secretary of State's office out to

25 counties for them to do anything in relation to what

1   was reported in that phone call.

2        Q.   Okay.  Thank you.

3             All right.  Let's look at 1b, please.

4             We talked about this briefly before, but I

5   want to make sure I understand.  This is "Any

6   efforts made to 'air-gap' any Components of

7   Georgia's Current Election System, and the success

8   or failure of any such efforts."

9             The first question I have is the -- what

10  you refer to as the air-gapped Election Management

11  server and the network that are part of the -- that

12  include certain computers, is that physically housed

13  at CES?

14       A.   It is.

15       Q.   So your group is responsible for securing

16  that network; is that right?

17       A.   No.  Secretary of State -- SOS IT is --

18  oversees all of the infrastructure that's used by

19  our office.  So we use the system that has been

20  provided to us by SOS IT.

21       Q.   Got it.  Okay.

22             But you rely on the Secretary of State's

23  IT department to secure that system; is that right?

24       A.   That is correct.

25       Q.   And does that include physical security as

1   well?

2        A.   The -- the server that -- that our

3   private-access computers are connected to is

4   physically located within the Center for Election

5   Systems inside a secured room that is under 24-hour

6   video surveillance.  So it's -- it's in a secured

7   server room in a rack isolated from other devices.

8        Q.   And what are all the devices that are

9   included in that room with the Dominion EMS server?

10       A.   SOS IT could -- could tell you more about

11   what's all in that room.  I don't even have direct

12   access into that room.

13            But it -- you know, it's -- it's -- it

14   houses all of the connecting points for CES into the

15   SOS public system, as well as it -- it's a room that

16   houses the -- the -- the private network as well.

17   We have cabling in the center that's specifically

18   designed for the public systems and cabling that's

19   specifically designed for the private systems.

20       Q.   And when you say that it houses all the

21   connecting points for CES into the Secretary of

22   State public system and the private system, are you

23   talking -- this is inside I think what you said is a

24   locked room; is that right?

25       A.   Yes.  It's inside our server room, yes.

1       Q.   Okay.  And have you personally been inside

2   that room?

3       A.   Oh, I have, yes.

4       Q.   But you said you don't have access to it,

5   someone has to give you access?

6       A.   That is correct.

7       Q.   Who has access to that room?

8       A.   Our IT support person on-site has access

9   to that room.  So if something is wrong inside the

10  server room, we have to get the IT support service

11  personnel to go and swipe his card key in order to

12  gain access to the room.

13      Q.   Who is that?

14      A.   John Francis is the current member of the

15  IT staff that's housed at CES.

16      Q.   And so do I understand correctly you rely

17  on Merritt Beaver's department, the Secretary's IT

18  department, to ensure that there are no connections

19  between the public server system in that room and

20  what you call the private system?

21      A.   Yes, sir.

22      Q.   And there was at least a period of time

23  when there was also a GEMS server that was set up in

24  that room after the Dominion system rolled out;

25  right?

Page 79

1        A.    Yes, sir.

2        Q.    Do you know whether there were any

3   connections between those two servers or systems?

4        A.    I am not aware of any connections between

5   the Dominion system server and the GEMS server.

6        Q.    Fair to say you rely on Mr. Beaver's

7   department to ensure that that was the case?

8        A.    Yes, sir.

9        Q.    Is there any remote access to the

10  private -- what you call the private server or

11  private network in that room?

12       A.    No, sir.

13       Q.    Let's just be clear we're talking about

14  the same thing.

15             There are -- I think you said before --

16  let me back up.

17             You said before that employees in CES, at

18  least some of them have two computers, one that's

19  their public-facing computer provided by the

20  Secretary's office and then there's a computer that

21  is on the private network; right?

22       A.    Yes, sir.

23       Q.    And the computers that are on the private

24  network, are those hard-wired into that server?

25       A.    Yes, sir, they are.

1       Q.   And, again, you rely on Mr. Beaver's

2   department for that; is that right?

3       A.   Yes, sir.

4       Q.   Do those computers have any Internet

5   capability?

6       A.   They are directly connected in to the

7   private network.  They are not plugged into any type

8   of outward-facing network line.

9       Q.   Do they have Wi-Fi or Bluetooth

10  capability?

11      A.   I do not know.

12      Q.   All right.  Is that a question you would

13  ask Mr. Beaver or his department?

14      A.   I -- I would have to ask Mr. Beaver, his

15  department, if those boxes are enabled -- have the

16  ability to be enabled Wi-Fi or Bluetooth connection.

17  I am unaware.

18      Q.   Does the server itself that sits on the

19  private network, does it have any Internet

20  connections?

21      A.   To my knowledge, it does not.  But, again,

22  that is a question that would need to be asked of

23  the IT support team.

24      Q.   Does it have any Wi-Fi or Bluetooth or

25  other remote capability, to your knowledge?

Page 81

1       A.   To my knowledge, I do not believe so.

2   But, again, you would need to follow up with that

3   question to the IT support team.

4       Q.   Since the private network was set up, has

5   anyone from Dominion had access to it, such as for

6   support, tech support?

7       A.   No, sir.

8       Q.   Did Dominion set the private network up or

9   did the Secretary's office do that?

10       A.   I believe the Secretary of State's office

11   worked with personnel from Dominion in setting up

12   the system; that Dominion was on -- on-site working

13   with SOS IT staff to make sure that SOS IT staff set

14   up the -- configured the system properly, that the

15   applications were installed in the right locations.

16       Q.   We talked before the counties have their

17   own Dominion EMS server; right?

18       A.   Yes, sir.

19       Q.   Are they individually responsible for

20   maintaining the security of those servers?

21       A.   Yes, sir.

22       Q.   Do you know whether county-level EMS

23   servers in the Dominion system have Internet

24   connections or capability?

25       A.   Is there a network port on the back of the

Page 82

1    computer?  There is, but those computers are not

2    plugged into any type of outside network.

3        Q.   And that, you rely on the counties to

4    maintain that; right?

5        A.   Yes, sir.

6        Q.   Has the State ever done a security

7    assessment where it has gone in and inspected a

8    random sampling of counties' Election Management

9    servers for security purposes?

10       A.   What we have done, again, is any time that

11   we are present in a county elections office, we

12   always put our eyes on the Election Management

13   computer to verify when we are there in person that

14   the system is not public-facing in any way, shape,

15   or form.

16       Q.   When you say "we are there," who do you

17   mean?

18       A.   A member of CES.  If we have reason to

19   visit a county elections office, whether we've been

20   asked by the elections office to come and test their

21   equipment, do an acceptance test on their server, or

22   if they've recently moved, changed location, we go

23   on-site, look at the equipment, and, again, always

24   verify that it is not connected.  Any time that we

25   visit an elections office, we always look for that.

1        Q.   But that's only if you happen to be there

2    for another purpose.

3             You -- you haven't done the sort of

4    security assessment that I've described; right?

5        A.   That's correct.

6        Q.   Does -- does CES have direct access to

7    county-level EMS servers or do you have to get that

8    access from someone at the county?

9        A.   Oh, we have to get that access from the

10   county.  We don't just walk into a county elections

11   office and go to their Election Management computer.

12   We always go to the election supervisor and then

13   have them walk us to that location.

14            Counties are supposed to have logs for us

15   to sign to validate that we are there, that we're

16   there for a reason.  We show our IDs.  We don't have

17   unfettered access into the system.  We -- we -- we

18   access the system how anyone else should, and that's

19   through the election supervisor.

20       Q.   Does the State have written guidance or

21   requirements for how the counties maintain their

22   Election Management servers from a security --

23       A.   There are -- excuse me.

24            There are SEB rules in place that govern

25   access to the Election Management System, and those

1   are the rules that county election officials are

2   supposed to be following.

3         Q.   Are counties required to log the time and

4   individual or purpose for anyone who has access to

5   their EMS server?

6         A.   I believe there is an SEB rule in place

7   that outlines that counties should be maintaining an

8   activity log.

9         Q.   Does the State receive those logs or the

10  counties maintain those?

11        A.   I believe those are just maintained and

12  held at the county.  I do not believe that there's

13  any current practice in place for those logs to be

14  shared with the State periodically or with us.

15        Q.   Does the Secretary maintain a similar log

16  for its own EMS server, its own private network?

17        A.   In our facility, there is a -- there is a

18  checklist going in and out of the server room.

19  Thankfully, I don't have to go in there very often,

20  so I do not know how accurate that log is at this

21  moment in time.  But I do know that it exists.

22        Q.   Who is responsible for maintaining that

23  log now?

24        A.   That is an IT operation.

25        Q.   And it's in hard copy?

Page 85

1      A.   Yes, sir.  I remember seeing it on the

2   door day before yesterday.

3      Q.   So it hangs on the door, and anyone who

4   goes in is supposed to sign that they went in and

5   the time?

6      A.   Yes, sir.  And, again, it's under video

7   record, so it's -- it's -- it's documenting who's

8   been in and out of that room.

9           And we retain -- I believe the copy is

10  retained videoally [sic] -- on video, we can run it

11  back three days.

12     Q.   All right.  Take a look at Topic 1e.

13     A.   Okay.

14     Q.   Are you aware of any failure of any

15  component of Georgia's Dominion election system to

16  correctly tabulate, tally, record, store, or

17  maintain any ballot cast in any 2020 election in

18  Georgia?

19     A.   I am not.

20     Q.   Is that the same answer for any 2021

21  election in Georgia?

22     A.   That is correct.  I am not aware of any

23  circumstance of that nature.

24     Q.   Are you aware of any efforts taken by the

25  State, by the Secretary's office, to determine

Page 86

1    whether anything like this occurred in the 2020 or

2    2021 elections?

3         A.   Again, the one thing I would point back to

4    is the exercise that took place postelection in

5    November '20, where Pro V&V was brought in and did

6    an inspection of equipment, random selection of BMDs

7    and ICPs, to validate that the applications running

8    on those devices were what was certified for use in

9    the state.

10        Q.   Is there anything else you had identified?

11        A.   There is not.

12        Q.   All right.  We covered 1f.

13             Take a look at 2c, if you would, please.

14             MS. LaROSS:  I think 2c --

15             MR. CROSS:  Oh, yeah.

16             MS. LaROSS:  -- we've designated

17        Mr. Sterling.

18             MR. CROSS:  Right.  Right.

19             MS. LaROSS:  Sorry about that.  Let me

20        turn that off.

21    BY MR. CROSS:

22        Q.   All right.  Take a look at 2d.

23             So this is "Documentation - including

24    research, reports, assessments, findings, studies,

25    publications, memoranda, and communications -

Page 87

1    regarding the security, integrity, reliability, or

2    accuracy of any component of Georgia's Current

3    Election System."

4              Are you aware of any such documentation

5    apart from the Pro V&V report and anything coming

6    out of logic and accuracy testing that you

7    identified?

8         A.   No, sir, I am not aware of any other

9    things.

10        Q.   Okay.  All right.  Take a look at Topic 7,

11   please.

12             So at a high level, it's "Policies and

13   practices for scanning and tabulating paper ballots

14   under Georgia's Current Election System," and then

15   there are three subtopics.

16             Do you see that?

17        A.   Yes, sir, I do.

18        Q.   Do I understand correctly that with the

19   current Dominion system, what the system actually

20   tabulates for voting purposes when a -- when a BMD

21   printed ballot goes through the scanner is the QR

22   code?

23        A.   That is correct.

24        Q.   Do you know why the decision was made

25   to -- to adopt that tabulation process, rather than

Page 88

1    to simply tabulate the human-readable portion of the

2    ballot?

3             MS. LaROSS:  Object to the form of the

4         question.

5             THE WITNESS:  I do not know why Dominion

6         chose to write their application in that

7         manner.  No, sir, I do not know.

8    BY MR. CROSS:

9         Q.   Well, I'm asking you a different question.

10            Are you aware that the current BMD system

11   that you have in the State of Georgia can actually

12   tabulate the human-readable portion of the ballot

13   rather than the QR code?

14        A.   I am not aware of that.  My understanding

15   of the Dominion system is that it scans the QR code,

16   and inside the QR code is a -- a set of coordinate

17   positions that relate to the candidate selected and

18   the contest to which that candidate is selected

19   within the ballot that is displayed in the

20   human-readable text below.

21        Q.   You're aware that the same Dominion system

22   also scans and tabulates hand-marked paper ballots

23   on an absentee basis at least; right?

24        A.   The hand-marked -- the hand-marked optical

25   scan paper ballots, which are on a different format

Page 89

1    than the BMD ballot, is based upon a grid system.

2            The tack marks -- the timing marks that

3    you see around the optical scan ballot establish a

4    grid, and then the ovals that are present on the --

5    on the optical scan ballot fall within particular

6    grid points within that grid.

7            And when you fill in the oval, that grid

8    area becomes darkened, and that becomes the point

9    that the scanner is interpreting for marking and

10   recording the result indicated from the voter.

11       Q.   Right.

12           And is it -- are you not aware that the

13   current Dominion system, the equipment you have, can

14   do a similar thing with the hand -- with the

15   human-readable portion of BMD-generated ballots?

16           MS. LaROSS:  Objection as to form.

17           THE WITNESS:  I believe that Dominion may

18       be building new applications that allow their

19       BMD ballots to generate a ballot from the

20       printer that looks similar, if not identical

21       to, a preprinted optical scan ballot.

22   BY MR. CROSS:

23       Q.   Did you have any involvement in the

24   decision-making by the Secretary's office to choose

25   the Dominion system in 2019?

Page 90

1        A.    I was not part of the evaluation

2    committee.

3        Q.    Do you have any understanding or insight

4    into why the Secretary's office chose a QR code

5    system, rather than a non-QR code system, given that

6    there were non-QR code systems in the RFP process?

7        A.    I was not a member of the evaluation

8    committee, so I did not have a say in what was --

9    what systems were valued higher or lower.  So I

10   cannot speak to why that decision was made.

11       Q.    But as the head of CES, you never -- never

12   had a conversation with anyone as to why they chose

13   a QR system?

14       A.    In the evaluation process in 2019, I was a

15   subject matter expert; I was not a member of the

16   evaluation committee.  I know that the evaluation

17   committee reviewed various systems.  Some created a

18   bar code; some created a 2D bar code that was read

19   for scanning; others read and tabulated the optical

20   scan ballot.

21            But the evaluation committee used the

22   protocols of the Georgia Department of

23   Administrative Services for procurement, and to my

24   knowledge, they followed that protocol and a

25   decision was made in the evaluation process.

1      Q.   So you never talked to anyone in the

2   Secretary's office about why the decision was made

3   to choose a QR code system; is that right?

4      A.   Again, I point to the evaluation committee

5   made a determination upon the products that were

6   presented for evaluation.  They rated those

7   products.  There was also a cost proposal that was

8   involved, and all of those things were weighted and

9   a decision was made on what vendor was selected.

10     Q.   Mr. Barnes, yes or no:  Have you ever had

11  a conversation with anyone in the Secretary's office

12  about why a QR code system was selected in 2019?

13          MS. LaROSS:  Object to the form of the

14      question.

15          THE WITNESS:  The only conversation I can

16      say is I was a member of the Secretary of

17      State's office when a decision was made to go

18      with Dominion voting.  Why they chose a QR

19      system over a non-QR system, I don't know the

20      answer to that question.

21          I just know that an evaluation committee

22      followed protocol, reviewed RFPs, reviewed bids

23      under the protocols of the State of Georgia for

24      procurement purposes, and this vendor was

25      selected.

Page 92

1    BY MR. CROSS:

2         Q.    If you wanted to know who -- strike that.

3               If you wanted to know why the Secretary

4    chose a QR code system, who would you ask?

5         A.    I would imagine you would have to ask the

6    Department of Administrative Services, because

7    they're the ones that put out the bid and they're

8    the ones that worked with the vendor in finalizing

9    the bid, along with members of the Secretary of

10   State.  Perhaps Gabe Sterling would also be asked

11   that question.

12        Q.    Well, wasn't it Secretary Raffensperger's

13   decision as to what system was selected?

14        A.    Again, I was not part of the evaluation

15   committee.  I was not privy to any of those

16   discussions when they were taking place and the

17   negotiations between the vendors.  I don't know

18   what -- what was said or when it was said or how it

19   was said or by whom it was said.

20        Q.    You still haven't answered my question.

21              Have you personally had a conversation

22   with anyone in the Secretary's office about why a QR

23   code system was selected in 2019?  Yes or no?

24              MS. LaROSS:  I object to the form of the

25        question.

Page 93

1          THE WITNESS:  Again, in my role with the

2      Secretary of State's office, it is our job to

3      interact with the voting system.  An evaluation

4      committee was used to --

5  BY MR. CROSS:

6      Q.   Mr. --

7      A.   -- evaluate proposals.

8      Q.   -- Barnes, you've got to answer my --

9      A.   A voting system --

10     Q.   -- question.

11     A.   -- was selected.

12          That group determined that the system with

13  a QR code was what was needed and what the State of

14  Georgia should procure, and that's what the State of

15  Georgia did.

16          I have not asked a general question,

17  "Well, why did we pick a QR system?"  I have not

18  asked that question.

19     Q.   Okay.  So just so we're clear, you have

20  never asked anyone in the Secretary's office why a

21  QR system was selected in 2019; is that right?  Is

22  that your testimony?

23          MS. LaROSS:  Object to the form of the

24      question.

25          THE WITNESS:  Yes.

Page 94

1   BY MR. CROSS:

2       Q.   Okay.   Thank you.

3            And you understand that voters cannot read

4   a QR code when they -- if they inspect their ballot

5   before it's scanned in an election; right?

6       A.   Yes, sir.

7       Q.   And are you aware that the current

8   Dominion system can be hacked or compromised in a

9   way that would change the QR code from what's

10  actually reflected in the human-readable portion of

11  the ballot?

12           MS. LaROSS:   Object to the form of the

13       question.

14           THE WITNESS:   I am not.

15  BY MR. CROSS:

16      Q.   You've never heard that before?

17      A.   I have heard people say that I'm sure that

18  it could be, but I have not -- I have not seen it.

19  I have not seen it executed, so I -- I -- I

20  haven't -- I'm -- I'm not aware if it can be done.

21      Q.   So nobody told you that in September of

22  2020, Dr. Alex Halderman did a demonstration for the

23  Court with Dominion's voting equipment provided by

24  Fulton County where he printed ballots that had a

25  different QR code than what was indicated in the

Page 95

```
 1    human-readable portion and what -- and from what had

 2    actually been selected on the BMD?  No one ever told

 3    you that?

 4              MS. LaROSS:  Objection as to form of the

 5         question.

 6              THE WITNESS:  No, sir, they have not.

 7    BY MR. CROSS:

 8         Q.   As the head of CES, wouldn't you expect

 9    somebody to tell you that?

10              MS. LaROSS:  Objection to the form of the

11         question.

12              THE WITNESS:  Yes.  I am a member of the

13         Secretary of State's office and I am the

14         director for CES, but that doesn't mean I hear

15         everything that's said within the Secretary of

16         State's office.

17    BY MR. CROSS:

18         Q.   Well, wouldn't you expect that if -- if an

19    expert had done an in-court demonstration where they

20    had hacked your voting system, that someone in the

21    Secretary's office would have alerted you to that,

22    as the head of CES?

23              MS. LaROSS:  Objection as to form of the

24         question.

25              THE WITNESS:  I can just say that no one
```

1        has brought that to me.

2   BY MR. CROSS:

3        Q.   Are you aware that Dr. Halderman prepared

4   a report that was submitted to the Secretary's

5   office -- or to their counsel, I should say, on

6   July 1 of 2021, where he did a further inspection of

7   the Fulton County voting equipment?

8             MS. LaROSS:  Objection to the form of the

9        question.

10            THE WITNESS:  The only thing I'm aware of

11       is a report that was referenced in a news

12       article of a couple of weeks ago.  But that is

13       all the knowledge I have of that.

14   BY MR. CROSS:

15       Q.   So before that news article, you had not

16   heard anything about this report from Dr. Halderman

17   regarding the Fulton County voting equipment?

18       A.   No, sir, I had not.

19       Q.   So no one in the Secretary's office ever

20   told you that a -- an expert had prepared a nearly

21   100-page report detailing numerous security

22   vulnerabilities in the voting equipment that you're

23   responsible for as the head of CES?

24            MS. LaROSS:  Objection to form of the

25       question.

```
 1              THE WITNESS:  No, sir, they had not.
 2   BY MR. CROSS:
 3       Q.   Do you have any insight into why the
 4   decision was made at the Secretary's office not to
 5   share anything about the fact that Dr. Halderman had
 6   found these vulnerabilities with you, with David
 7   Hamilton, with James Oliver, with Merritt Beaver?
 8   Do you know why that is?
 9              MS. LaROSS:  Objection to the form of the
10         question.
11              THE WITNESS:  No, sir, I do not.
12   BY MR. CROSS:
13       Q.   Does that strike you as odd?
14              MS. LaROSS:  I object to the form of the
15         question.
16              THE WITNESS:  I'm sure that members of the
17         Secretary of State's office are doing the
18         things that they feel are necessary need to be
19         done.
20   BY MR. CROSS:
21       Q.   Who would you ask if you wanted to know
22   why the decision was made not to share any
23   information, including that Dr. Halderman had found
24   vulnerabilities, with you and others in the office?
25   Who would you ask?
```

1         A.   My question would probably be asked of

2    general counsel.

3         Q.   Mr. Germany?

4         A.   Yes, sir.

5         Q.   Would you expect the Secretary's office to

6    take measures to mitigate vulnerabilities that were

7    identified in the current voting system?

8              MS. LaROSS:  Object to the form of the

9         question.

10             THE WITNESS:  It's my expectation that the

11        Secretary of State's office would do what it

12        needs to do to make sure that the voting system

13        is functioning properly.

14   BY MR. CROSS:

15        Q.   Properly and securely; right?

16        A.   Yes, sir.

17        Q.   And including taking measures to mitigate

18   any vulnerabilities that were identified with that

19   system; right?

20             MS. LaROSS:  Objection to the form of the

21        question.

22             THE WITNESS:  Again, I can't speak to what

23        may or may not be in the item that you're

24        discussing, so I -- I -- I don't know what the

25        State would need to do to address them.

Page 99

1   BY MR. CROSS:

2        Q.   Fair enough.

3             You don't know the specifics, but you

4   would expect the State to take some measures to

5   mitigate vulnerabilities, whatever those measures

6   might be; right?

7             MS. LaROSS:  Objection to form of the

8        question.

9             THE WITNESS:  I have confidence that the

10       State would continue doing its job as the --

11       you know, we are the elections division for the

12       State.  We're part of the elections division,

13       and I would -- I would have a belief that the

14       Secretary of State's office would continue

15       doing its due diligence.

16  BY MR. CROSS:

17       Q.   Well, given none of the senior leadership

18  in the Secretary's IT department and you, as the

19  leader of CES, were informed about anything that

20  Dr. Halderman had found, including even that he had

21  found vulnerabilities at all, who is it you believe

22  in the Secretary's office is actually dealing with

23  those vulnerabilities, if anyone?

24            MS. LaROSS:  Objection to form of the

25       question.

Page 100

 1            THE WITNESS:  I do not know.

 2    BY MR. CROSS:

 3        Q.   Who would you ask if you wanted to know?

 4        A.   Again, the people -- the person that I ask

 5    the most questions of in our office is our general

 6    counsel.

 7        Q.   Mr. Germany?

 8        A.   Yes, sir.

 9        Q.   As you sit here, though, you're not aware

10    of any specific measures -- there are no measures

11    you can point me to that have been adopted since

12    July 1 of 2021 to address the vulnerabilities of

13    Dr. Halderman's report; right?

14            MS. LaROSS:  Object to the form of the

15        question.

16            THE WITNESS:  That is correct.

17    BY MR. CROSS:

18        Q.   And you can't point me to any measures

19    that have been adopted since September 2020 taken by

20    the Secretary's office to address the hack that he

21    demonstrated in that hearing; right?

22            MS. LaROSS:  Object to the form of the

23        question.

24            THE WITNESS:  I cannot.

25

Page 101

1    BY MR. CROSS:

2         Q.   Have you participated in any discussions

3    with anyone in the Secretary's office regarding

4    Dr. Halderman generally or his work?

5         A.   No, sir, I -- I can't recall any direct

6    conversations with anybody in the Secretary of

7    State's office in relation to Dr. Halderman.

8         Q.   Are you familiar with the name Dr. Juan

9    Gilbert.

10        A.   I believe he is associated with the

11   University of Florida, or -- or was at some point in

12   time.

13        Q.   And have you worked with him at all or had

14   any communications with him about his work in this

15   case?  Just yes or no.

16        A.   No.

17        Q.   Are you aware that he has -- he was

18   retained and offered testimony on behalf of the

19   Secretary's office as an election security expert in

20   this case?

21        A.   I am not aware.

22        Q.   Were you aware that Dr. Gilbert testified

23   in his deposition that if he wanted to have a

24   cybersecurity assessment done of voting equipment

25   like that used in Georgia, he would turn to two

Page 102

1    experts, Dr. Alex Halderman and Dr. Andrew Appel?

2          MS. LaROSS:  Object to the form of the

3       question.

4          THE WITNESS:  I am not aware of what

5       Dr. Gilbert may have said in his deposition.

6    BY MR. CROSS:

7       Q.   Are you aware that Dr. Gilbert had access

8    to Dr. Halderman's full July 2021 report on the

9    Fulton County voting equipment?

10      A.   No, sir, I am --

11         MS. LaROSS:  Object to the form of the

12      question.

13         THE WITNESS:  No, sir, I am not aware.

14   BY MR. CROSS:

15      Q.   Were you aware that Dr. Gilbert testified

16   under oath that he did not disagree with any of the

17   technical vulnerabilities identified in that report?

18         MS. LaROSS:  Object to the form of the

19      question.

20         THE WITNESS:  No, sir, I'm not aware.

21   BY MR. CROSS:

22      Q.   All right.  Take a look at Topic 9,

23   please, if you would.

24      A.   Sure.

25      Q.   Looking at Topic a, are you aware of any

1   suspected or actual unauthorized access to software

2   or data on any component of the -- of Georgia's

3   Dominion system?

4       A.   No, sir, I'm not.

5       Q.   Are you aware of any suspected or actual

6   unauthorized copying or alteration of software or

7   data on any component of Georgia's Dominion system?

8       A.   No, sir, I'm not.

9       Q.   Did you undertake any investigation or any

10  research in preparation for today to determine

11  whether that happened?

12      A.   No, sir, I have not.

13      Q.   Looking at Topic 9c -- I'm sorry, just

14  actually before we leave 9a, if you were to do some

15  research or some sort of investigation on 9a, who

16  would you ask?  Who would you expect to know the

17  answer to that?

18      A.   I really don't know where I would start

19  with that.

20      Q.   Would the current elections director be a

21  good start?

22      A.   I have discussions with him on a weekly

23  basis, if not more than weekly, about our voting

24  system.  But any time that we feel like we would

25  need to start looking into something, he would be

Page 104

1    something that I -- he would be whom I would talk

2    to, he and general counsel.

3         Q.   All right.  Looking at 9c, we -- we've

4    talked about some of this equipment already, but

5    just to close the loop, do any of the printers used

6    in the Dominion system have Internet capabilities,

7    whether by Wi-Fi, Bluetooth, or other means?

8         A.   All of the printers in the voting system,

9    when they were bought off the shelf, I believe they

10   did have a -- a Wi-Fi or network capability, but

11   have since been placed into a secured setting

12   parameter that prohibits that connection from being

13   made.

14           In addition, we place security seals over

15   the network port area on the back of the printers so

16   that a network connection can't be made without

17   detection.

18        Q.   And the -- and the printers are HP

19   printers; is that right?

20        A.   That is correct.

21        Q.   When you say "bought off the shelf," what

22   do you mean?

23        A.   Well, a lot of the equipment in the voting

24   system is COTS, commercial off-the-shelf, equipment,

25   and the printers are one of those items.

1      Q.   And just so everybody is clear, when you

2   say commercial -- or COTS, commercial off-the-shelf,

3   what does that mean?

4      A.   That's terminology for equipment that can

5   be obtained.  It's a -- it's -- it's an -- I don't

6   know, you know, who came up with the terminology; it

7   is just common terminology in relation to when

8   you're procuring electronic equipment, is it

9   equipment that is built specifically for an action

10  or is it equipment that's commercially available.

11     Q.   Got it.  Okay.

12          So let's see if I have it.  So, for

13  example, the Dominion BMDs you would not say are

14  off-the-shelf because those are built specifically

15  by Dominion; is that right?

16     A.   It's not a tablet that is, I believe,

17  obtainable through other means.  I think Dominion

18  does work with a vendor to have that tablet built

19  for that purpose.

20     Q.   Right.

21          But the printer is commercial

22  off-the-shelf because it's generally commercially

23  available; is that the idea?

24     A.   Yes, sir.

25     Q.   Okay.  All right.  Thanks.

1          Take a look at Topic 10, please.

2          Are you aware of any instance in 2020 when

3     a person or entity other than an authorized election

4     worker or Georgia State or county election official

5     obtained voting data from a Georgia election or

6     images of voting equipment used in a Georgia

7     election?

8          A.   I am not.

9          Q.   Okay.  Is that the same answer for 2021?

10         A.   Yes, it is.

11         Q.   And did you undertake any investigation or

12    research or study to determine whether this happened

13    before your deposition today?

14         A.   I did not.

15         Q.   Who would you ask if you wanted to know

16    whether this had occurred?

17         A.   In regards to investigations, we would --

18    I would be asking general counsel or the head of the

19    Secretary of State's investigative unit.

20         Q.   Who is that today?

21         A.   I -- honestly, I do not know who the head

22    of the investigative unit is today.

23         Q.   And it used to be Frances Watson?

24         A.   It did.

25         Q.   All right.  Take a look at Topic 11, too,

1    please.

2         A.    Uh-huh.

3         Q.    Are you aware of any changes to any of the

4    software or firmware used on any component of the --

5    Georgia's Dominion system since September 1, 2020?

6         A.    The only change that I am aware of since

7    September 1, 2021 [sic], is we did have to update

8    the -- the application version on the BMDs.  It is

9    the ICX application.

10             When the BMDs were initially rolled out in

11   Georgia in late 2019, early 2020, the version was

12   ICX 5.5.10.30, and that application had to be

13   upgraded to 5.5.10.32 because of how the ballot

14   needed to be displayed to show all candidates for

15   the special election for United States Senate in

16   November of 2020.  The previous version of the

17   application was unable to show all 21 candidates

18   that were qualified for that election on one screen,

19   but the upgrade to 5.5.10.32 allowed that race to

20   be -- and all of its candidates to be displayed on

21   one single screen so that the voter did not have to

22   scroll up or down in order to see all candidates.

23        Q.    And that software change was made in the

24   September/October time frame of 2020; right?

25        A.    It was.

1      Q.   Did you have any involvement in that

2  personally?

3      A.   My involvement in that process was the

4  vendor brought forth a solution once the Secretary

5  of State's office said that, you know, "We -- we've

6  got to work to improve how this ballot is -- how the

7  ballot image is being displayed."  The vendor then

8  brought forth this new application.

9           That application was then submitted to

10 Pro V&V for two purposes.  It was submitted to

11 Pro V&V in Huntsville, Alabama, for federal

12 certification and also for state certification.

13          When Pro V&V finished their analysis of

14 the application, they submitted a letter to EAC, and

15 I believe the letter iterated that they felt like

16 this -- that the application, the new application,

17 should be approved as a de nimus [sic] change -- I

18 think I'm saying that right -- to the software's EAC

19 certification.

20     Q.   Did you have any involvement in the

21 decision that that software change was de minimus or

22 did you defer or rely on Pro V&V or others for that?

23     A.   We relied on Pro V&V for that.

24     Q.   Were you aware that the Secretary of

25 State's office made a recommendation to Pro V&V that

1    they viewed it as a de minimis change?

2         A.   I don't recall such, but I'm not

3    100 percent sure at this moment.

4         Q.   If you wanted to know whether that

5    decision was made and who made it, who would you

6    ask?

7         A.   I would probably have to go back through

8    my emails, because I would have been the individual

9    communicating with Pro V&V, but also with Dominion's

10   certification group as well.

11              And I -- I don't -- again, I don't recall

12   the Secretary of State making statement that it was

13   a de nimis [sic] -- that it was -- that that was

14   being a claim made from Dominion, because they were

15   attempting to become federally certified with that

16   application, and also it was being made from Pro V&V

17   as the testing agency.

18        Q.   Okay.  But that's not a decision you would

19   have made; right?

20        A.   Correct.

21        Q.   All right.  Take a look at Topic 18,

22   please.

23              MS. LaROSS:  Okay.  This is a topic that

24        we've not designated him.

25              MR. CROSS:  Oh, is that right?  Sorry.

Page 110

```
 1              MS. LaROSS:  Yeah, that's okay.  I think
 2        we did --
 3              MR. CROSS:  Yeah.  Yeah, I have the list.
 4        Yeah, sorry.  I forgot about that.
 5              MS. LaROSS:  Yes.  Okay.
 6   BY MR. CROSS:
 7        Q.   All right.  Let me pull up another exhibit
 8   here, Mr. Barnes.
 9              (Plaintiffs' Exhibit 3 was marked for
10        identification.)
11              MS. LaROSS:  And then once he tells us
12        it's up, then you just hit the "Refresh"
13        button.
14              MR. CROSS:  Oh, you know what, I had
15        actually already put it in.  Sorry.  Pull up
16        Exhibit 2.
17   BY MR. CROSS:
18        Q.   So Exhibit 2 is a copy of your LinkedIn
19   profile we found online.
20              You see that?
21        A.   It does look like that.
22        Q.   In the -- is the "Education" information
23   here accurate?
24        A.   Yes, sir, that is accurate.
25        Q.   Okay.  And the "Experience," it's got
```

1    "Center for Elections - Kennesaw State University,

2    Director, June 2005 - present."

3           Do you see that?

4    A.   Yes, sir.

5    Q.   The Kenne- -- the Kennesaw State

6    University part doesn't apply since about 2018;

7    right?

8    A.   It does not apply as of January 1, 2018,

9    yes, sir.

10   Q.   Okay.  So you got your master's in 2002

11   and your current role you've had since June 2005.

12          What did you do in that three-year gap?

13   A.   Let's see.  In 2002, I was the assistant

14   director for elections for the Secretary of State's

15   office, and served in that capacity until June of

16   2005.

17   Q.   So -- okay.  So right out of your master's

18   program, you joined the Center for Elections in

19   Georgia; is that right?

20   A.   No.  I -- I completed my master's in 2002,

21   and then I remained with -- and I was actually

22   working with the Secretary of State's office.  I

23   started with the Secretary of State's office in 1998

24   and then began my master's program while I was

25   employed with the Secretary of State's office.

1          In 2001, I transitioned to be the

2    assistant director of elections for the State of

3    Georgia and the Secretary of State's office while I

4    was in graduate school.  I completed graduate school

5    in 2002, and then I remained with the Secretary of

6    State's office in the -- in the role as assistant

7    director of elections until June of 2005.

8        Q.   What did you do at the Secretary of

9    State's office between 1998 and 2001?

10       A.   From 1998 through 2001, I was a special

11   assistant to two Secretaries of State.  I started

12   under Secretary of State Lewis Massey in August of

13   1998, served as a special assistant, and then I

14   served as a special assistant under Secretary of

15   State Cathy Cox from January 1999 until sometime in

16   2001.

17       Q.   And were you employed between 1996, when

18   you got your bachelor's degree, and 1998, when you

19   started at the Secretary's office?

20       A.   In 1997, I was employed by the Lewis

21   Massey campaign for governor that he -- when he ran

22   for governor in 1997 and early 1998.

23       Q.   Do you have any other professional work

24   experience that we've not covered?

25       A.   No, sir, I have not.

1    Q.   When CES was still at KSU, were you an

2  employee of KSU or you were an employee of the

3  Secretary's office?

4    A.   I was an employee of Kennesaw State

5  University.

6    Q.   So when did you first become an employee

7  of KSU?

8    A.   In June of 2005.

9    Q.   So when you were an assistant director,

10  you were employed by the Secretary's office in CES?

11    A.   When I was the -- when I went to work

12  in -- at Kennesaw State University, I was no longer

13  a member of the Secretary of State's office.  I was

14  hired by Kennesaw State University and became a

15  full-time employee of Kennesaw State University as

16  the assistant director for the Center for Election

17  Systems in June of 2005.

18    Q.   Okay.  But maybe I missed something.  I

19  thought you started working for CES before 2005.

20         Is that -- am I wrong?

21    A.   No, I did not start working for CES as a

22  member of Kennesaw State University until June of

23  2005.  In my role as the assistant director of

24  elections in 2002, 2003, 2004, and in early 2005, I

25  worked with the Center for Election Systems, but

Page 114

1    through my capacity with the Secretary of State's

2    office.  I was not at the Center for Election

3    Systems.  I was still downtown at the Secretary of

4    State's office, but I would spend some days at the

5    Center for Elections.  I was sort of the liaison

6    between the Secretary of State's office and the

7    Center for Election Systems.

8         Q.   Okay.  Got it.

9              MR. CROSS:  Sorry.  I was going to pull up

10        another exhibit, but Exhibit Share just

11        crashed.  Give me a second.

12             All right.  Here we go.

13             (Plaintiffs' Exhibit 4 was marked for

14        identification.)

15   BY MR. CROSS:

16        Q.   All right.  Grab Exhibit 4, if you would,

17   please.

18        A.   I'm refreshing right now and it hasn't

19   refreshed.

20        Q.   Okay.  Yeah, give it -- it should pop up.

21        A.   You said Exhibit 4?

22        Q.   Yes.

23        A.   Okay.

24        Q.   All right.  So do you see Exhibit 4 is an

25   email that you sent to Scott Tucker on January 15,

1    2020; right?

2         A.   Yes, sir.

3         Q.   If you come down, the earliest email in

4    the thread is one that Dedrick Smith at Dominion

5    sent to Scott Tucker on the same date.

6              Do you see that?

7         A.   Yes, sir.

8         Q.   And he asks "I was wondering if" -- he

9    asks "I was wondering if you could ask the state if

10   there is a special usb they are supposed to be

11   sending out to the counties to submit their L&A

12   exports and the exports for election day.  They have

13   a usb that they normally send the export files on,

14   but they are old."

15             Do you see that?

16        A.   Yes, sir.

17        Q.   And then you -- sorry -- Mr. Tucker

18   forwards this on to you and asks "...is the state

19   providing new USB drives for the counties to send

20   their L&A exports and E-Day exports to you...or

21   should they use the USB drive they had from the

22   previous system?"

23             Do you see that?

24        A.   Yes, sir.

25        Q.   And then you write back "They can use the

Page 116

1    USB that the state has previously provided."

2              Do you see that?

3        A.    Yes, sir.

4        Q.    And so in January of 2020, when the

5    Dominion system was still being rolled out, do I

6    understand correctly that on at least this occasion,

7    your direction was for the counties to continue to

8    use the USB drives they had from the old system?

9        A.    This was where I was referencing earlier

10   this morning in relation to a election that popped

11   up on us in early January of 2020 to fill a vacancy

12   in a State house seat.

13             And I believe this, again, was for Decatur

14   County and their house -- the house district at the

15   time, where they were going to have to have an

16   election for a State race.  And part of that process

17   requires the County to transfer -- export files into

18   the Secretary of State's ElectioNet reporting

19   system.  So to facilitate that election, that was

20   the circumstances for this discussion.

21             (Plaintiffs' Exhibit 5 was marked for

22        identification.)

23   BY MR. CROSS:

24        Q.    All right.  Grab Exhibit 5, please.

25        A.    Refreshing.

1          Okay.  Exhibit 5?

2     Q.   Yes.  Let me know -- do you have that in

3    front of you?

4     A.   I do.

5     Q.   Okay.  Do you see -- Exhibit 5 at the top

6    is an email from Chris Harvey to Scott Tucker on

7    January 27, 2020; right?  Do you see that?

8     A.   Yes, sir.

9     Q.   And if you come down, you'll see the email

10   in the middle of the page is one that you were

11   copied on, also between Mr. Tucker and Mr. Harvey

12   and also on January 27, 2020; right?

13    A.   I am looking.  So I'm at the bottom of the

14   first page?

15    Q.   Well, you're -- if you look at -- you can

16   look at either.  The middle or the bottom, you'll

17   see you're on the email thread between Mr. Harvey

18   and Mr. Tucker.

19          Do you see yourself cc'd?

20    A.   I do.

21    Q.   And if you come down to the earliest

22   email, there's an email from Nancy Gay, the

23   executive director for the Columbia County Board of

24   Elections.

25          Do you see that?

 1      A.   I do.

 2      Q.   And if you look at the last paragraph of

 3  her email to Mr. Harvey, she asks "Can I have the

 4  ICC (computer/scanner) setup in our main office and

 5  then transport election tallies out to the warehouse

 6  on election night once complete?"

 7           Do you see that?

 8      A.   I do.

 9      Q.   And then Mr. Harvey forwards this on to

10  Mr. Tucker and copies you, and he indicates that he

11  talked to Nancy about this.

12           Do you see that in the first sentence?

13      A.   I do.

14      Q.   And then he writes "Does the central

15  scanner have to be hooked up to EMS when scanning?"

16           Do you see that?

17      A.   Yes, sir.

18      Q.   Mr. Tucker responds "Yes, that is possible

19  to set the ICC up that way.  You would need to copy

20  the data to an external drive and then upload into

21  RTR," which is the "Results Tally and Reporting."

22           Do you see that?

23      A.   I do.

24      Q.   Are the central scanners hooked directly

25  to the EMS servers at the counties?

1       A.   It is dependent upon the county's setup.

2   Most counties, the majority of counties -- small

3   counties that we have in Georgia, everything is

4   contained within the elections office, where the

5   Election Management computer is in one -- one corner

6   of the office, perhaps, or one side of the desk, and

7   on the other side of the desk is the -- what we

8   classify as the ICC workstation, which is a computer

9   that is then connected to the central scanner.  And

10  that ICC workstation, that computer, is directly

11  connected through a network connection with the

12  Election Management computer.

13          And when ballots are scanned, ballots are

14  scanned on the ICC -- through the ICC scanner, image

15  is saved to the ICC workstation as -- along with

16  tabulated results that the scanner has tabulated,

17  and then those files are transmitted through the

18  network connection directly into the Election

19  Management computer.

20          (Plaintiffs' Exhibit 6 was marked for

21      identification.)

22  BY MR. CROSS:

23      Q.   All right.  Grab Exhibit 6, please.

24      A.   Okay.

25      Q.   All right.  So if you look at Exhibit 6,

Page 120

1    do you see there's an email from Marjorie Howard to

2    you on February 26, 2020?

3         A.   Yes, sir.

4         Q.   Do you know who Marjorie Howard is?

5         A.   She was the election supervisor for Talbot

6    County.

7         Q.   And she -- the subject line of her email

8    indicates an ███████████████████████████████

9    ██████ right?

10        A.   That's what the subject line says, yes,

11   sir.

12        Q.   And "████ is shorthand for logic and

13   accuracy testing; right?

14        A.   Yes, sir.

15        Q.   And if you read her email, she writes "███

16   ████████████████████████████████████████████

17   ███████    ██████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████████████

20   █████████████████████████████████████████████

21   █████████████████████████████████████████████

22   █████████

23             Do you see that?

24        A.   I do.

25        Q.   Then she goes on ███████████████████████

1 ███████████████████████████████████

2 ███████████████████████████████████

3 ████████████████████

4          Do you see that?

5     A.   I do.

6     Q.   Do you remember this situation?

7     A.   I do not.

8     Q.   When she says that there was -- ████████

9 ████████████████████████, do you know what

10 she's referring to?

11     A.   I would be speculating with an answer to

12 that question right now.  I just -- I don't recall

13 this situation.  Clearly, I was involved with it, I

14 see my name in the email exchange, but I don't --

15 I'm trying to piece it back from memory of what we

16 were discussing at the time.

17     Q.   When she's talking about "████████████"

18 there, do you know what -- what she means?  What's

19 the -- what coding is there in this context with

20 the -- the ballots?

21     A.   What my -- what I am thinking that she is

22 referencing here is relating back to the data set

23 that has to be loaded onto a polling pad in order

24 for it to function properly.

25          So a data file has to be built prior to

1   logic and accuracy testing that allows the Poll Pad

2   to create voter access cards for given polling

3   locations so that it can create the voter access

4   card, then be placed inside a BMD device to validate

5   that the proper ballot is displayed, and then the

6   county goes through the process of testing the BMD

7   to make sure that it's responsive to the actions of

8   the voter.

9           So in reference to this email, I'm trying

10  to figure out are we talking about a logic and

11  accuracy data set that had not been properly

12  configured where it had everything that it needed in

13  it or not, or if this was a scenario where she had a

14  logic and accuracy data set on a polling pad when it

15  was supposed to have an election day data set on the

16  polling pad.

17          So I'm -- I'm -- I'm uncertain of -- of

18  the circumstances surrounding on this right now.

19      Q.   What's the difference between a logic and

20  accuracy data set and a election day data set for

21  the polling pad?

22      A.   The main difference is the presence of

23  voter information, is that the -- the polling plaid

24  [sic] -- the polling pad data set for logic and

25  accuracy does not contain voters.  It contains a

1  list of precinct and district combos per precinct

2  that are related to activation codes that are placed

3  onto a voter access card that a BMD device didn't

4  recognize as -- so it displays the proper ballot.

5      Q.   And getting back to the email, do I

6  understand right that in the database files that go

7  to the counties for elections, there's executable

8  code that's used, at least in part, to generate the

9  cards that they need on election day?

10     A.   Ask that question again.

11     Q.   Yeah.

12          Do I understand correctly that in the

13 database files that go to counties for elections,

14 that those files include some executable code that's

15 used to create the cards that are used on election

16 days, like the voter cards, the poll worker cards?

17     A.   Are we talking about the ExpressPoll data

18 set or are we talking about the election project

19 data set?  Which -- which -- which database are you

20 referring?

21     Q.   The database that -- the election project

22 that goes to the -- the BMDs.

23     A.   The election project file has a list

24 contained within the election project file -- has a

25 list of activation codes.  And what these are are

Page 124

1    a -- a numeric code that is used to activate a

2    ballot display on the BMD.

3            And in every election database, there is a

4    precinct, and then inside the precinct there is a --

5    what's called a precinct portion, and that is, like,

6    their district combo number.  And that precinct

7    portion is related to a specific set of political

8    districts, and by relation to those political

9    districts, it is connected to any contests that are

10   in those political districts.  And that's what

11   relates it to the physical ballot that's needed.

12           So every precinct portion in the database

13   has a specific ballot activation code that when you

14   enter that ballot activation code on the BMD, it

15   displays that ballot.  When the ballot is voted,

16   then the BMD ballot that's printed out contains that

17   precinct portion designation so that when the ballot

18   is scanned, the results from that ballot are applied

19   back to that particular precinct portion within the

20   project file.

21       Q.   Okay.  And -- and I was asking something

22   different.

23           Are you familiar with the term "executable

24   code"?

25       A.   Yes, I'm -- I'm familiar with executable

Page 125

1   code, but I was just answering the question that you

2   asked in the best way that I could.

3        Q.   Right.  And I just wanted to make sure we

4   weren't missing each other.

5             So you were talking about activation

6   codes, but do you understand executable code is

7   different?  I'm asking about something different

8   than activation codes.

9        A.   Yes, yes.

10       Q.   So the question I'm trying to understand

11  is in the database files, the election project files

12  that go to the counties, that get uploaded to the

13  county EMS and the BMDs, do you know whether they

14  include executable code?

15       A.   I do not believe they include any

16  executable code.  The executable code is already

17  installed on the Election Management computers that

18  are at the county office; that -- the only thing

19  that is distributed to the county from the Secretary

20  of State's office is an election project file.

21            And then that file is loaded into the

22  Election Management computer by using an executable

23  application, and that application resides on the

24  computer at the elections -- at the election office.

25       Q.   If you wanted to know for sure whether the

Page 126

1    election project files include any executable code,

2    would that be a question for someone in IT?

3        A.   That would be a question for someone in

4    Dominion, I believe.

5        Q.   Got it.

6             All right.  Grab Exhibit 7, if you would,

7    please.

8             (Plaintiffs' Exhibit 7 was marked for

9        identification.)

10            THE WITNESS:  All right.  Exhibit 7.

11   BY MR. CROSS:

12       Q.   So Exhibit 7, do you see -- this is an

13   email that you sent to Samantha Sheldon on

14   February 26, 2020; right?

15       A.   It is.

16       Q.   And you were responding -- well, actually,

17   strike that.

18            You were forwarding to her an email from

19   Susan Gray at Jefferson County.

20            Do you see that?

21       A.   Yes.

22       Q.   And Ms. Gray indicates to you on

23   February 26, 2020, "████████████████████████████████

24   ████████████████████████████████████████████

25   ██████████   ████████████████████████████████

1 ███████████████████████████████████████

2 ████████ ."

3          Do you see that?

4     A.   I do.

5     Q.   Do you remember this situation?

6     A.   Not directly.  I mean, clearly I was

7 involved with it because it has my email address to

8 it, but I don't remember this specific conversation,

9 no, sir.

10    Q.   Is it unusual for an election worker to

11 take off BMWs' -- BMD serial number seals?

12    A.   It is not unusual for an elections

13 officer, election official, to remove seals from the

14 BMDs.  It is unusual for them to remove a seal that

15 would be on the left-hand side of the BMD.

16          The left-hand -- the seals that are placed

17 on the BMD -- and there are two -- were placed by

18 CES, by the Secretary of State's office, during the

19 initial acceptance testing of the devices, and there

20 are two seals.  There's a -- there's a taped seal

21 that is over an access panel that is -- that is

22 resistant evident, and then there's also a wire seal

23 that you would have to physically break in order to

24 remove.

25          Now, the -- the doors on the right-hand

1   side of the BMD are seals that poll workers are

2   removing from election to election.  They're used to

3   close the compartment preelection; they're used to

4   open and -- open -- be removed in order to power the

5   machine on, and then seal's replaced, attached, and

6   then they stay in place on election day and then

7   they're removed at the end of election day to power

8   the machine off and then new seals placed on for --

9   for delivery back to the Elections office.

10          But the seals on the left-hand side of the

11  unit, those have been placed there by the Secretary

12  of State's office.

13      Q.   Okay.  What -- what's the difference

14  physically between the seals on the left-hand side

15  and the ones on the right-hand side?

16      A.   The difference between -- when you say

17  "difference physically," what do you mean?

18      Q.   Are they -- is it a different design?  Do

19  they look differently?  Do they function

20  differently?  How are they physically different?

21      A.   They are a different design.  They are a

22  wire seal.  The ones -- a wire seal that sort of has

23  a twist of the wire to secure the wire.

24          And then the second seal that's placed on

25  is a -- is a -- again, is a tamper-evident tape seal

Page 129

1    that has a State of Georgia seal on it.  It has --

2    it has -- it says that it's a -- and it's -- it is

3    an acceptance testing sticker and then it has a

4    numeric code value on it.

5           And it's sort of twofold, is that if by

6    some chance the wire seal that the State has

7    attached to that door became damaged or

8    inadvertently removed, then we also have that

9    secondary seal there that if someone then attempted

10   to open that compartment, we would see that through

11   the tamper-resistant tape being removed and it

12   would -- it would actually leave tape on the side of

13   the device.

14          So we have two -- two areas to see to what

15   level of extent someone may have been interfering

16   with that side compartment if they had been working

17   with that sealed area.

18   Q.   Are the wire seals on the left side?

19   A.   The wire seal is on the top left side,

20   along with the tamper-evident tape.

21          And then on the right side, counties may

22   choose to use a wire seal or they may use a plastic

23   seal.

24   Q.   The seals on the left side, you said

25   they're -- are they on -- is it a wire, you said,

Page 130

1    that's twisted together?  Is it twisted together by

2    hand?  What do you mean?

3         A.   The seal itself, you feed the wire through

4    and then there is sort of a twist mechanism in the

5    seal itself that you twist to lock the wire into the

6    seal.

7         Q.   And how is that seal removed?  What's the

8    process?

9         A.   It has -- it has to be cut to be removed.

10        Q.   So looking back at Exhibit 7, the BMD --

11   the BMD -- I just can't say that today.  Let me try

12   this again.

13            Looking back at Exhibit 7, ███████████████

14   ██████████████████████████████████████████████

15   ███████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████

18        A.   ███████████████████████████████████████

19   ██████████████

20        Q.   ███████████████████████████████████

21   ███████████████████████████████████████████████

22   ██████████████

23        A.   ███████████████████  ███████████████

24   ████████████████████████████████████████████

25   ██████████████████████████████

1

2

3

4

5      Q.   The seals on the left side, these wire

6  seals, does each one have a unique serial number?

7      A.   They do.

8      Q.   And does your office maintain an inventory

9  of every seal that it puts on a machine?

10      A.   When we were in the phase of doing the

11  acceptance testing of the equipment in 2019 and

12  early '20, when we would assign seals to the

13  devices, we would make record of the seals that were

14  attached.  So those were put into the inventory

15  system at the time of acceptance testing.

16      Q.   And you're talking acceptance testing when

17  the equipment first came in for Dominion to be

18  rolled out as the new election system?

19      A.   Yes, sir.

20      Q.   Would the standard county have any reason

21  to remove those seals since that acceptance testing

22  in the ordinary course?

23      A.   The only reason that there would be need

24  to remove that seal on the left-hand side was if

25  they needed to plug in a -- a headset that's used in

Page 132

1    order to access the audio ballot for visually

2    impaired voters.  Where you would plug in that

3    device is in -- is behind that door in the top

4    left-hand side.

5         Q.   Is that sometimes referred to as an ATI?

6         A.   It is.

7         Q.   And so if they're using a BMD for a voter

8    that needs an ATI, they would have to cut that seal

9    to get access to the panel; is that right?

10        A.   Well, what we did in the distribution of

11   equipment at the time is we actually went ahead and

12   preconnected ATI devices to some BMD units so that

13   they were already connected, and then the door was

14   then -- even then sealed with those two seals that

15   I've spoken of.

16             But if that ATI device has now become

17   unoperative [sic] and it had to be replaced, then

18   the county would need to gain access to that slot in

19   order to unplug and plug in a new one.

20        Q.   So the BMD can be sealed with both of

21   those two seals on the left side and still have an

22   ATI connected to it; right?

23        A.   That is correct.

24        Q.   So here, when Ms. Gray indicated that ███

25   ████████████████████████████████████████████████████

Page 133

1   and she said, ███████████████████████, you

2   wrote back to her "████████████████" -- I'm

3   sorry, you forwarded this on to Samantha Sheldon and

4   wrote "████████████████████████

5   ████████████████████████████████?"

6           Do you see that?

7       A.   I do.

8       Q.   And do you recall, did you have any

9   response to Ms. Barn- -- or, sorry, to Ms. Gray

10  about this?

11      A.   I don't have direct recollection of

12  conversation with her.  What I hope I've told her

13  was that, A, "Okay, what has happened?  Tell me

14  what's happened."  And I probably asked her the

15  question of, "Okay, what is the status of the tape

16  that is also in place?  Has -- is there any evidence

17  of that tape being removed or cut or anything of

18  that nature?"

19           And the fact that ████████████████████

20  ████████████████████████ -- where a wire seal

21  would be placed leads me to indicate that there was

22  no evidence that the tamper-resistant tape had been

23  removed or been cut or anything of that nature.

24  Because if that had been the case, then we would

25  have sent someone directly to the county and would

Page 134

1    have done a new acceptance test on these devices and

2    then attached new -- new tamper-resistant tape seals

3    and additional wire seals.

4        Q.   She doesn't indicate ████████████████████

5    ██████████████████████████; right?

6        A.   Based on this one, that is correct.

7        Q.   And you don't have a memory of actually

8    speaking with her, do you?

9        A.   I -- I don't have direct memory of having

10   a conversation with her on this fact.

11       Q.   So do I understand correctly that when she

12   indicates ██████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████?

15       A.   Yes, sir.

16       Q.   Where -- so do counties have access

17   themselves to the -- to the wire seals that the

18   Secretary's office puts on the left side of the

19   machines?

20       A.   They have access to wire seals.  They

21   don't have direct access to these wire seals that we

22   placed on the devices ourselves.

23            So we can tell the difference between the

24   wire seal that SOS office placed on a device versus

25   a wire seal that a local county may have placed

Page 135

1    there.

2        Q.   And then why did you ask Ms. Sheldon ████

3    ████████████████████████████████████████████████

4    ███████████████████?

5        A.   Well, we wanted to make sure and have a

6    record in the system that the seal number had been

7    changed, that it had been changed from a previous

8    seal number that was attached.

9        Q.   And what is EasyVote?

10       A.   EasyVote is an application that the

11   Secretary of State uses for maintaining the list of

12   equipment inventory.

13       Q.   Is that hosted by a third party, like a

14   vendor?

15       A.   I believe it is, yes, but I'm not

16   100 percent certain.

17       Q.   Do you know what the company is called?

18       A.   The company is called EasyVote.

19       Q.   Ah, okay.

20            What -- what is -- can you just give me an

21   overview of what the information is that sits in

22   EasyVote?

23       A.   It is an outline of what equipment has

24   been -- it's what equipment is in the state of

25   Georgia and where it is, where it is currently.

1          So it gives you a list of BMD serial

2     numbers, seals that were attached at the time of

3     acceptance testing.  It also indicates when it was

4     last acceptance tested.

5          Counties also have access into this

6     inventory system, and some counties use it to

7     document local logic and accuracy testing that's

8     been performed on the equipment prior to various

9     elections.

10     Q.   Any time seals are broken or changed, is

11     that indicated in the EasyVote database, too?

12     A.   It has the ability of maintaining, I

13     believe, a history of seal numbers, but I would have

14     to double check.

15     Q.   So, for example, here, ███████████

16     ███████████████████████████████████

17     ████████████████████████████████████████████████

18     ███████████████████████████████████████████████

19     ██████████████████████████████████████████

20     ████████████████████████████?

21     A.   I believe it maintains a record of change

22     of when it was changed and what was changed, but,

23     again, I'd have to double check.

24     Q.   Does the EasyVote system interact at all

25     with any other election systems, like eNet, EMS

1    servers, voter registration, ENR, anything like

2    that?

3         A.    No, sir, it does not.

4         Q.    Does it interact with Poll Pads?

5         A.    It does not, not this -- not this

6    application that we use from EasyVote.

7              EasyVote has other applications that they

8    use with counties.  EasyVote is used in some

9    counties for preparing absentee ballot applications.

10             When people go in to vote via in-person

11   advance voting, EasyVote -- the county contracts

12   with EasyVote for this application and the county

13   provides EasyVote a list of voters that are

14   registered to vote in that county.

15             And then the county uses EasyVote to

16   basically check voters in -- check voters in during

17   advance voting and to prepopulate their absentee

18   ballot application for the voter to then sign and

19   then provide back to the county before being gained

20   access to the voting equipment.

21        Q.    And what's the equipment that they use?

22   The counties that use EasyVote, what is -- what's

23   the equipment they use for that process?  Is it a

24   computer or a tablet or...

25        A.    That's -- that's county-owned computer

Page 138

1    that they access EasyVote on.  I don't know what

2    devices they use, whether they use a -- a desktop

3    computer or a laptop to access.  I do not know.

4         Q.   The counties that don't do that process by

5    EasyVote, how do they do that process?

6         A.   When they are interacting with -- when

7    they are managing voters during advance voting, then

8    if they're not using EasyVote, then they're using

9    the Secretary of State's eNet system to manage

10   voters, to check voters in, to -- to mark them as

11   participating in advance voting.

12             And then second and apart from that, even

13   if they were using EasyVote, they would use a Poll

14   Pad to create the voter access card that would be

15   given to the voter.

16        Q.   Okay.  Before we leave Exhibit 7, are you

17   aware of any investigation or assessment that was

18   done to make sure that ████████████████████████████

19   ████████████████?

20        A.   I -- I -- I do not remember or recall.

21        Q.   Okay.  All right.  Grab Exhibit 8, if you

22   would, please.

23             (Plaintiffs' Exhibit 8 WAS marked for

24        identification.)

25             THE WITNESS:  Okay.

Page 139

1   BY MR. CROSS:

2       Q.   All right.  So do you see here similar

3   email to the one we just saw, but different county.

4            Here, the first email in the thread is an

5   email that you received from Denise Maddox in Grady

6   County on February 27, 2020; right?

7       A.   Yes, sir.

8       Q.   And the subject is "▓▓▓▓▓▓▓▓"; right?

9       A.   Yes, sir.

10      Q.   And Ms. Maddox writes "▓▓▓▓▓

11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓▓▓▓▓▓▓▓▓."

15           Do you see that?

16      A.   Yes, sir.

17      Q.   So this is a situation we talked about a

18  moment ago where ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓?

22      A.   Yes, sir, that's what this appears to be.

23      Q.   Okay.  And then you write -- you forward

24  this again to Ms. Sheldon -- "▓▓▓▓▓▓▓▓▓▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓."

Page 140

1          Do you see that?

2     A.   I do.

3     Q.   And do you make it a practice or does

4  CEA -- CES make it a practice to hold on to

5  notifications from counties whenever seals are

6  broken or removed or tampered with?

7     A.   We make it a practice to basically hold on

8  to anything we receive from a county.  We try to

9  hold on to emails.  We try to hold on to, you know,

10  any type of notification from a county in pertation

11  [sic] to their equipment and to -- in relation to

12  seals themselves.

13     Q.   Where are those communications typically

14  maintained at CES?

15     A.   They're maintained electronically on the

16  computers of the workers at our office.

17     Q.   Is there like a -- a network or a server

18  folder or someplace?  Where do you -- where do you

19  tend to keep those, store those so that you have

20  them?

21     A.   We tend to keep them within our email

22  environment, basically leave the email intact, leave

23  the attachment to the email, and leave the emails in

24  place.

25     Q.   Okay.  So when you wrote to Michelle,

1  then, "███████████████████████████,"

2  do you mean the two of you just keep it in your

3  inbox, it doesn't go into a particular folder

4  somewhere or a file?

5       A.   Right.  We're just keep -- we're just

6  keeping this record, keeping it in the inbox.

7       Q.   Okay.  And do you know whether there was

8  any examination done ██████████████████████

9  ████████████████████████████?

10      A.   Again, I do not recall.

11      Q.   If you had called for a BMD to be examined

12  because you were concerned that there may have been

13  some sort of tampering or you just wanted to confirm

14  that there wasn't, that's the kind of thing you

15  would probably recall asking for; right?

16      A.   I -- yes, sir, I would hope.  Because I

17  have sent members of my staff to counties in some of

18  these circumstances where the seal was broken and

19  there looked to be something not right with the tape

20  that was also in place.  So out of abundance of

21  caution, I would send them to the site, tell the

22  county to set that unit aside, and we would test it

23  when we would be there on-site.  So I -- I have

24  sent -- I have sent people in the field in the past

25  and will continue to do so.

1        Q.    Tell me about those instances.

2        A.    Instances, again, similar to these, where

3    the -- the seal had been broken, but no one could

4    explain why it had been broken, why -- why did it

5    come back in that nature, why was it in that nature,

6    and there looked to be some damage to that second

7    seal that we would have to damage in order to open

8    that side compartment.  When we have those

9    instances, we go and we do an acceptance test of

10   that device to make sure that nothing has happened.

11       Q.    About how often has that happened in the

12   last, say, couple of years?

13       A.    I would say less than ten times.

14       Q.    And do you remember the counties that were

15   involved?

16       A.    I do not.

17       Q.    Who do you send out to do the -- to

18   inspect the equipment in those instances?

19       A.    In those instances, the person that I send

20   is Chris Bellew.  He is my equipment specialist

21   at -- at CES.

22       Q.    How do you spell his last name?

23       A.    B-e-l-l-e-w.

24       Q.    And does he have IT training?

25       A.    He -- he has been with our center since

1  2018.  He has his master's degree from Georgia Tech.

2  I can't -- I don't remember exactly what his

3  specialty is.

4         He is a graduate -- undergraduate of

5  Kennesaw State University, and he actually worked at

6  the Center for Election Systems as a student

7  assistant in 2010 and 2011, I believe.

8      Q.   Okay.  But he's not -- he doesn't -- he's

9  not an IT guy, right, like in Merritt Beaver's

10  department; right?

11     A.   Right, he is not.  He is not.  He is -- he

12  is what we deem as our election equipment

13  specialist.  He knows a lot about the applications

14  that we use on the -- within the voting system.

15     Q.   And when you send him out in the instances

16  you talked about, what does he do?  What do you

17  expect him to do to validate the equipment?

18     A.   Oh, I expect him to run -- to basically

19  inspect the -- the area to see if he sees anything

20  that's out of -- out of sorts.

21         And then he's going to do an acceptance

22  test of the -- of the equipment, whether it's a BMD,

23  whether it's an ICP, whether it's the ICC, the

24  election server, whatever it may be, and validate

25  that the system is operating as it should and that

Page 144

1    it only contains the applications that it should.

2        Q.   Does he do logic and accuracy testing?

3        A.   He does not do logic and accuracy testing.

4    That is a count- -- that is a county test.

5        Q.   And I assume --

6        A.   The acceptance -- the acceptance test has

7    portions of the logic and accuracy test within it.

8        Q.   The acceptance testing that -- that you

9    do -- that you did when the machines came in, you

10   mean?

11       A.   Right.  The acceptance testing isn't --

12   isn't just logic and accuracy testing; it's checking

13   application install and such of that nature.  But it

14   also incorporates portions of a logic and accuracy

15   test similar to what a county would perform when

16   preparing for an election.

17       Q.   But are you saying when Mr. Bellew goes

18   out in these instances where there's a concern about

19   access to the BMD or whatever the voting equipment

20   might be, you -- he's doing acceptance testing all

21   over again on that equipment?

22       A.   Yeah, he performs an acceptance -- any

23   time we have a question about a piece of voting

24   equipment, we perform a new acceptance test on that

25   piece of equipment.

1      Q.    Okay.  And you're saying logic and

2   accuracy is part of that?

3      A.    Part of the acceptance test, part of the

4   acceptance protocol, is a -- is a logic and accuracy

5   process where we will load an election file onto the

6   BMD, we will generate a number of ballots from the

7   BMD, and then we will scan those ballots into an ICP

8   to validate that the BMD not only produces a ballot

9   as it should, but that that ballot, when paired with

10  a scanner, is processed properly.

11     Q.    When Mr. Bellew goes out on these

12  occasions, does he do the hash value test that you

13  talked about before?

14     A.    He does.

15     Q.    So he's able to do the hash value test

16  without the help of Pro V&V or IT?

17     A.    He is.

18     Q.    Is there any other testing that he does on

19  the equipment on those occasions?

20     A.    There is not.

21     Q.    In any of the instances where he's been

22  out, have you taken any of the equipment out of use?

23     A.    I do not recall any equipment being taken

24  out of use on the trips that he has executed out

25  into the field.

Page 146

1          I know that we have had repaired equipment

2    come back from Dominion to our facility, and then we

3    go through testing and they may not have completely

4    finished repairing the unit, they were supposed to

5    finish -- fix a cracked screen and they didn't fix a

6    cracked screen and we would have to send it back for

7    repair.

8          But has he ran into a situation that

9    required him to take possession or return or have

10   the county -- return the equipment to the county?  I

11   cannot think of one.

12   Q.   Are there seals on the USB ports on the

13   equipment, the printers, the scanners, and the --

14   the BMDs?

15   A.   There are seals attached on the left-hand

16   side, again, that were attached by the State.  There

17   are seals placed on the two -- two openable doors on

18   the right-hand side of the BMD.  Those seals are

19   attached locally by the county at the end of logic

20   and accuracy testing.

21          And also, after opening the polls on

22   election day, they have to reseal the unit, and then

23   at the end of election day, they have to break a

24   seal to power the machine off, and then they put a

25   seal back on it for transport to the elections

1    office.

2              So seals on the right-hand side that cover

3    any available ports, they're placed there and

4    maintained by the county.

5         Q.   Okay.  I was asking a more precise

6    question.

7              Do you know whether any of the seals that

8    are placed by the State or the counties on any of

9    the voting equipment covers all of the BMD ports?

10        A.   All of the doors that give you access to

11   the ports are closed and sealed.

12        Q.   And are those State seals or county seals

13   that cover those doors, or is it --

14        A.   On -- on the left-hand side, it is a State

15   seal.  On the right-hand side, it is county seals.

16        Q.   So where there are USB ports on the

17   right-hand side, those would be county seals?

18        A.   That is correct.

19        Q.   We talked -- we talked a lot about the

20   State seals, the wire seal.

21              What does the county seal look like?

22        A.   It, too, could be a wire seal, but it's a

23   wire seal that goes through like a little red brick

24   that is then pressed and locked by pressing in.

25              The other seals that counties use is more

1   like a wraparound plastic seal that, basically, it

2   feeds through and the teeth grab it.  And then you

3   can't pull the seal back out, it has to be cut and

4   removed.

5            Some counties use like a -- like a -- it's

6   almost like a loop seal.  It's a little plastic loop

7   seal.  They use those primarily, I think, on their

8   optical scan units.  But it could -- there's a

9   litany of various seals that counties opt to choose

10  to use.

11       Q.   Where do they get their seals?

12       A.   They're -- they get seals from the

13  Secretary of State's office.  The Secretary of

14  State's office maintains a set of different type

15  seals, and then they can request those seals as part

16  of their election supplies.

17       Q.   Does the State have any security

18  requirements on how seals are to be maintained when

19  they're not on the equipment, meaning seals they

20  have to replace for purposes at the county level?

21       A.   I -- I -- I do not know.

22       Q.   All right.  Grab one more exhibit and then

23  we can take a break.  This should be short.

24            Grab Exhibit 9, if you would, please.

25            (Plaintiffs' Exhibit 9 was marked for

Page 149

 1       identification.)

 2            THE WITNESS:  Okay.

 3  BY MR. CROSS:

 4       Q.   So if you look at Exhibit 9, it's a

 5  two-page document.  If you come to the bottom of the

 6  first page, do you see there's an email from

 7  Jennifer Phipps?

 8       A.   I do.

 9       Q.   And that is sent to

10  ElectionCenter@sos.ga.gov on May 11, 2020.

11            Do you see that?

12       A.   I do.

13       Q.   And then if you come up, there's an email

14  forwarded on from that Election Center address to

15  Cathi Smothers at Dominion copying you.

16       A.   Uh-huh.

17       Q.   Yes?  Do you see that?

18       A.   I do.

19       Q.   And that looks to be sent -- if you look

20  at the signature block, the email from Election

21  Center looks like it was actually sent by Chris

22  Bellew, who you were just talking about; right?

23       A.   Correct.

24       Q.   And then if you come up to the top,

25  there's another email from Election Center.  This is

Page 150

1    sent to Election Center on May 12, 2020.

2            Do you see that?

3        A.   I do.

4        Q.   And the signature there is "Michael," so

5    it looks like this indicates you sent that email;

6    right?

7        A.   Yes.

8        Q.   What is the ElectionCenter@sos.ga.gov

9    email account?

10       A.   It's an email account that we use for

11   communication purposes that a county, instead of

12   having to email me directly or email Chris Bellew or

13   any other member of our team, they can email -- send

14   an email to CES@sos.ga.gov, and that goes into a

15   separate inbox that we monitor to make sure that we

16   are hearing what we need to hear from the county.

17       Q.   Do you know what measures, if any, were

18   taken to preserve potentially relevant

19   communications in that Election Center email box for

20   the litigation?

21       A.   My understanding is IT is holding on to

22   any and all -- any and all election -- any and all

23   emails regarding elections in -- under the

24   litigation hold purposes.

25            So anything that's in CES or anybody at

1   CES, all of their emails are being held until

2   litigation is over.

3        Q.   And -- and is that something that CES

4   relies on the IT department to manage?

5        A.   Yes.

6        Q.   Do you know whether the Election Center

7   email account we were just talking about, whether

8   that was searched for production in this case?

9        A.   I do not know.

10       Q.   Did you have any involvement in collecting

11  or identifying potentially relevant documents for

12  discovery in the case?

13       A.   In regards to email searches, I know all

14  of the email searches that are being done for

15  discovery are being handled through IT because of

16  how they archive all of the emails in our system.

17            So I -- from that perspective, I -- I was

18  not involved in searching through for emails.  I

19  have been involved in searching through for

20  documents that I may have possession of on my

21  computer, but in relation to all emails, that has

22  been handled -- or I have been told that is being

23  handled through IT.

24       Q.   What have you done personally to locate

25  and collect potentially relevant documents?

1      A.    Anytime I'm asked by counsel to look

2   through my computer, go through my records to find

3   anything that I may think is -- applies to a

4   request, I do that.

5           I go through my -- I haven't deleted

6   emails off my computer in a very, very long time, so

7   I have those, and then I also have all of my

8   documents that I create and maintain within my

9   computer.

10          So I would go through searching through

11  those documents to find anything that counsel tells

12  me that I need to be looking for.

13     Q.    Is that -- do you recall when you did

14  that?

15     A.    I don't recall the last time I did that.

16  We've -- we've been -- we've been going through

17  these -- process of trying to find, you know, things

18  for discovery for a while now, but I can't remember

19  the last time I went through that.

20     Q.    Do you know if it was last year or was it

21  years ago?

22     A.    I feel like there was a time last year

23  that I had to go through and look through documents,

24  but a lot of the years are starting to run together.

25     Q.    Okay.  All right.  Just to wrap up on this

Page 153

1    document, looking at Exhibit 9, do you see the --

2    the email that Chris Bellew -- Chris Bellew sends --

3    well, actually, he's just copying and pasting

4    Jennifer Phipps.

5             If you look at her email, she indicates

6    "████████████████████████████████████████

7    ████████████████████    ██████████████████

8    ████████████████████████."

9             Do you see that?

10   A.    I do.

11   Q.    And then you write to your colleagues in

12   CES "███████████████████████████████████████

13   ████████████████████████████    ████████

14   ████████████████████████████████████████."

15            Do you see that?

16   A.    I do.

17   Q.    Do you remember this situation and -- and

18   ████████████████████████████████████████████

19   ████████████████████?

20   A.    I don't remember the exact situation, but

21   I believe the resolution to it -- we determined that

22   the -- the ballot proof that they had been sent did

23   have the party question on No. 7 present and they --

24   and they were given the production file that that

25   printed ballot had been -- had been built from.  So

1    it was the actual correct project.

2              But what we found later on was that the

3    BMD ballot had that -- the contest in question had

4    had a setting placed on it to where it was only

5    appearing on the printed ballot and not on the BMD

6    ballot as it should have.  And then once that

7    setting was corrected, then the -- the question was

8    showing up on the BMD -- BMD ballot as it should.

9         Q.   Okay.  How was that corrected?

10        A.   It is a setting that was changed at the

11   project level.  I -- I don't remember if we had --

12   we took the project, made the correction, and then

13   sent a new, revised project to the jurisdiction, or

14   if we worked with the jurisdiction and -- and gave

15   them direction over the phone on how to update the

16   project so that it would be corrected.  It was one

17   of those two methods.

18        Q.   And what was Cathi Smothers' role with

19   Dominion at this time?

20        A.   She was the one that was building the

21   election projects.

22              MR. CROSS:  Okay.  Let's take a break.

23              VIDEOGRAPHER:  The time is 12:47 p.m.

24        We're off the record.

25              (Off the record.)

1          VIDEOGRAPHER:  The time is 1:33 p.m.

2     We're on the record.

3 BY MR. CROSS:

4     Q.   Mr. Barnes, before we look at the next

5 exhibit, we talked earlier about EasyVote.

6     A.   Yes.

7     Q.   Have you -- are you aware of any reports

8 that -- that EasyVote experienced a data breach

9 recently?

10     A.   I believe there was a report earlier this

11 week about some voter information that they had on

12 their system being accessed.

13     Q.   And what all do you know about the data

14 breach to EasyVote?

15     A.   What I know about it was it was a few

16 county -- they had information from a few

17 counties -- how many, I don't know -- and that

18 the -- it did not contain any Social Security

19 values.  It did contain name and, I believe, full

20 date of birth.  But that's all I'm aware of.

21     Q.   Do you know what -- what the circumstances

22 of the data breach were in terms of how -- what the

23 intrusion was or who it was?

24     A.   I do not.

25     Q.   Do you know if anyone at the Secretary's

Page 156

1   office has been tasked with investigating this?

2        A.   I do not.  I know the elections director

3   was notified by EasyVote and the elections director

4   notified the Secretary of State's general counsel

5   and others, but I do not know what other actions the

6   Secretary of State's office has taken at this time.

7        Q.   Sorry.  The current elections director, is

8   that Blake -- what's his last name?

9        A.   Blake Evans.

10       Q.   Thank you.  Okay.

11            In the data that was compromised, do you

12   know whether it included driver's license numbers?

13       A.   I do not know.  All I -- all I was told

14   was that it was a -- a subset of counties and that

15   it had -- that the -- the PII information was date

16   of birth.

17       Q.   Okay.  Do you know what connections there

18   are, if any, between the EasyVote database where

19   this compromise occurred and the EasyVote

20   application that you guys use to track things like

21   BMD seal inventories?

22       A.   There -- there is no commun- -- no

23   connection at all, in my understanding.  Those are

24   two separate applications, two separate and apart,

25   and they do not reside in the same environment.

Page 157

1     Q.   What's the basis for your belief that the

2   data in those applications doesn't reside in the

3   same environment at EasyVote?

4     A.   The -- the application that we use, I --

5   I've never seen it have anything connected to the

6   application that counties use for generating

7   absentee ballot applications.

8          To my knowledge and understanding,

9   EasyVote is the vendor for both of those

10   applications, but those two applications are not ran

11   in the same suite.  So that's my understanding.

12     Q.   The -- the inventory data that you guys

13   have on the EasyVote, is that hosted locally on

14   servers at the Secretary's office or is that hosted

15   in the cloud at EasyVote?

16     A.   I believe it's hosted via EasyVote, but

17   that's -- that may be a better question for IT.  We

18   use -- we use the application and nothing more.

19     Q.   Got it.  Okay.

20          Okay.  So you don't -- you -- just to be

21   fair, you don't -- you don't know where the

22   underlying data physically resides, where the

23   servers are that hold that data?

24     A.   Correct.

25     Q.   Do you know whether the EasyVote

Page 158

1    applications we've been talking about, whether they

2    operate on the same computers that use the eNet

3    system?

4         A.   I don't know.  Again, I don't know how the

5    counties use -- or what computers the counties use

6    to interact with their EasyVote application if they

7    choose to use that application.  I don't know if

8    that's the same computer that they may also be

9    accessing the State's registration system.  I -- I

10   just do not know.

11        Q.   What about at the State level?

12        A.   The -- we access in to the EasyVote

13   application using -- using our public computer.  So

14   when we access the registration system, we are using

15   that public computer.

16        Q.   Is there any access to EasyVote from the

17   computers that are used with the State's Election

18   Management server?

19        A.   There is not.

20        Q.   Is there any access to eNet from those?

21        A.   There is not.

22        Q.   Okay.  Grab the next exhibit, if you

23   would, please, Exhibit 10.

24             (Plaintiffs' Exhibit 10 was marked for

25        identification.)

1           THE WITNESS:  Okay.

2    BY MR. CROSS:

3        Q.   Do you have that in front of you?

4        A.   I do.

5        Q.   Okay.  So Exhibit 10 is an email that you

6    received on June 1 of 2020, along with some other

7    folks at the Secretary's office.

8             Do you see that?

9        A.   Yes, I do.

10       Q.   And this is an email, you can see, that

11   you received from Scott Tucker; right?

12       A.   Yes.

13       Q.   And what was Scott Tucker's role with

14   Dominion at this time with respect to Georgia

15   elections?

16       A.   Scott was -- I don't recall what his

17   direct title was, but Scott worked with the -- the

18   rollout of the system.  He worked -- communicated

19   with counties.

20            He also helped oversee the county

21   technicians that had been dispersed to the 159

22   counties and sort of was their point of contact, if

23   a county tech ran into issues with the equipment, it

24   got reported back in to -- up to Scott and then

25   Scott would relay that information to the Secretary

Page 160

1    of State's office.

2         Q.   Is it fair to say -- was Scott Tucker sort

3    of the primary contact at Dominion with respect to

4    issues that came up with the Dominion system in

5    Georgia?

6         A.   He was -- he was one of the contacts.  The

7    project manager was Tom Feehan, who's also cc'd on

8    this email.  So Tom Feehan was the -- was the

9    top-level contact within the state of Georgia, and

10   then Scott worked under him.

11        Q.   And this is in June -- this is on June 1

12   of 2020.

13             Do you recall there was a -- a primary

14   election in Georgia on June 9, 2020?

15        A.   I seem to recall that there was one on

16   June 9, yes, sir.

17        Q.   So is this about the time where you would

18   expect counties were doing logic and accuracy

19   testing?

20        A.   This is a combination of counties doing

21   logic and accuracy testing at this time and then

22   also counties would have been executing advance

23   voting at this time.

24        Q.   And that gets to a question I was going to

25   ask.

1          So if you look at the first line here,

2   there's indication that "Gwinnett replaced an ICP

3   that is showing continual ballot misreads."

4          Do you see that?

5   A.   I do.

6   Q.   Do you know whether that was in logic and

7   accuracy testing, or was that during the advance

8   voting?

9   A.   I do not recall.

10   Q.   And then if you come down, do you see

11   where, on the fourth line regarding Clarke County,

12   it writes "Clarke EMS getting message that it cannot

13   open a USB, working on this issue."

14          Do you see that?

15   A.   I do.

16   Q.   Do you know whether that involved advance

17   voting?

18   A.   I do not know.  I would imagine that that

19   had to do not with advance voting, but it may have

20   done with either programming a USB in order to then

21   transfer information to a BMD prior to logic and

22   accuracy testing, or it could be where the county is

23   trying to create an L & A export file for uploading

24   to the Secretary of State's Election Night Reporting

25   System for testing purposes.

Page 162

1      Q.   Are there any other purposes that election

2  workers would have to access a USB port on the EMS

3  server?

4      A.   Those are the two that I am most familiar

5  with, are those two actions.

6           The third -- a third would be if you were

7  uploading the Election Management project you

8  received from the State, that that would be through

9  a USB drive.

10     Q.   Given the election was on June 9 and they

11 were already in advance voting, would you expect

12 that to have happened already?

13     A.   No, I would think it would be one of the

14 two things that I mentioned.

15     Q.   Okay.  Thank you.

16          MR. CROSS:  All right.  Let me pull up the

17     next exhibit.

18          (Plaintiffs' Exhibit 11 was marked for

19     identification.)

20          MR. CROSS:  Yeah, it's already there.

21 BY MR. CROSS:

22     Q.   All right.  Grab Exhibit 11, if you would,

23 please.

24     A.   Okay.

25     Q.   And you see that Exhibit 11 -- make sure I

Page 163

1    got the right one.  Yeah.

2            All right.  Exhibit 11 is an email from

3    Scott Tucker to you and others at the Secretary's

4    office on June 1, 2020; right?

5        A.   Yes, sir.

6        Q.   And here, you see the subject line

7    "Advanced Voting June 1st"?

8        A.   Yes.

9        Q.   And do you recall that advance voting had

10   begun at least as of June 1, 2020, for the primary?

11       A.   With the primary being on the 9th, we

12   would be in the back end of it, probably leading

13   into the last week of advance voting, so yes.

14       Q.   The first bullet here from Mr. Tucker

15   reads "Clarke county is going to use the ICC

16   attached to the server and not transfer results over

17   USB."

18            Do you see that?

19       A.   I do.

20       Q.   So is this one of the situations we talked

21   about before where counties will sometimes connect

22   their scanner to the Election Management server

23   rather than moving tabulation results between the

24   two devices on like a USB drive?

25       A.   It is.

1      Q.   And do you have any insight into -- into

2   how the counties decide whether to do that, meaning

3   put a direct connection to the scanner as opposed to

4   using removable media?

5      A.   I think it depends upon how they are

6   planning to go about maintaining the transparency of

7   their tabulation process.  Each county elections

8   office is, of course, configured differently and

9   each county elections office determines how they're

10  going to set up the ability for the public to watch

11  the tabulation process.  The public's not allowed to

12  interfere with the tabulation process, but they are

13  allowed to watch the tabulation process.

14          So it -- it all gets back to how the

15  county is setting up to maintain the transparency in

16  that process.

17     Q.   Who actually puts the ballots through the

18  ICC at the [audio interference] in the ordinary

19  course?

20     A.   I'm sorry.  Ask -- ask me again.

21     Q.   Yeah.  Sorry.

22          In the ordinary course of an election,

23  when a county's using an ICC, who feeds the ballots

24  into the ICC?

25     A.   Poll workers, absentee ballot clerks that

Page 165

1    the county has deputized, you know, to process and

2    handle absentee ballots for counting purposes.

3            So it's done under the purview of the

4    election supervisor, but they then assign people to

5    handle the process of using the scanner and feeding

6    ballots through.

7        Q.   And are ICCs only used with absentee

8    ballots?

9        A.   ICCs are primarily used for mail-in

10   absentee ballots and provisional ballots.

11           ICCs are also used whenever a jurisdiction

12   has to do a recount postelection day.  So an ICC is

13   a central scanner.  It's a device that has the

14   ability to scan any -- any type of ballot that the

15   voting system produces.

16       Q.   Are there ever occasions when voters would

17   put their ballot into an ICC?

18       A.   I am not aware of an occasion.

19       Q.   All right.  Grab Exhibit 12, please.

20           (Plaintiffs' Exhibit 12 was marked for

21       identification.)

22           THE WITNESS:  Okay.

23   BY MR. CROSS:

24       Q.   All right.  Do you see at the top of

25   Exhibit 12, this is an email that Kevin Rayburn sent

Page 166

1    to you, Veronica Johnson?

2         A.   Yes.

3         Q.   And you see Mr. Rayburn sent this email on

4    June 2, 2020; right?

5         A.   That is correct.

6         Q.   And is Veronica Johnson with one of the

7    counties?

8         A.   She is the election supervisor in -- in

9    Lee County down in Southwest Georgia.

10        Q.   If you look at the middle of the first

11   page, Ms. Johnson sends an email to you,

12   Mr. Rayburn, and Dennis Carbone, all at the

13   Secretary's office, on June 2, 2020; right?

14        A.   Yes.

15        Q.   And the subject line is "██████████████

16   ██████."

17             Do you see that?

18        A.   I do.

19        Q.   And she indicates she has a quick

20   question, and then she writes "███████████████████

21   █████████████████████████████████████████████████

22   ███████████████████████████████████████████."

23             Do you see that?

24        A.   I do.

25        Q.   Do you recall what the ████████████████

Page 167

1    ██████████████████████████████ at this time?

2        A.   I believe what this is in reference to is

3    there is a specific export file format that the

4    State of Georgia uses that creates an export file

5    that is then loaded into ENR.

6             And in this circumstance, that particular

7    format had not been included in Lee County's

8    election project file, so they need- -- they needed

9    to have that particular export format installed on

10   their election project file so that the election

11   project could then create the needed export file in

12   the proper format.

13       Q.   Okay.  And then Ms. Johnson goes on in her

14   email and indicates ████████████████████████████

15   ████████████████████████████████████████████████████

16   █████████████████████████████."

17            Do you see that?

18       A.   I do.

19       Q.   Then she writes "████████████████████████

20   █████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ███████████████████████████████████████

23   █████████████████  ████████████████."

24            Do you see that?

25       A.   I do.

Page 168

1      Q.   And then Mr. Rayburn responds "██████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████."

4           Do you see that?

5      A.   I do.

6      Q.   Was the solution proposed by the Dominion

7  tech, was that the solution implemented?

8      A.   I believe it was.

9      Q.   And is it common to connect Dominion tech

10 laptops, either directly or through removable media,

11 to county EMS servers?

12     A.   It is not.

13     Q.   Do you know who the Dominion tech was

14 here?

15     A.   I do not know.

16     Q.   Dominion techs are often temporary

17 short-term employees that are hired just to support

18 an election; right?

19          MS. LaROSS:  I object to the form of the

20     question.

21          THE WITNESS:  Dominion had techs that they

22     recruited from within the state and from

23     outside the state and brought those people in,

24     trained them, and then distributed them to the

25     counties as part of their contract requirement.

1    BY MR. CROSS:

2        Q.    And -- and there are literally hundreds of

3    techs that are deployed across the 159 counties

4    during an election, particularly a major election

5    like November 2020; right?

6        A.    Yes, sir.

7        Q.    And do I understand correctly that the

8    State and the counties rely on Dominion for

9    background checks and other security measures that

10   are taken with respect to the techs?

11       A.    I believe as part of the contractual

12   relationship between the State and Dominion, that

13   Dominion was required to have back- -- background

14   checks performed on all the people that they brought

15   in.

16       Q.    So in determining whether any of the

17   hundreds of Dominion techs that are deployed across

18   the state in an election cycle, whether they are

19   reliable and trustworthy, is that something you

20   depend on Dominion to assess?

21       A.    That was something that Dominion was

22   tasked on bringing on the techs, training the techs,

23   doing background checks on the techs, and then

24   assigning techs to counties.

25             And then counties, when they interacted

1   with the techs, if they felt any level of uncomfort

2   [sic] with the techs, then the county could contact

3   the vendor and have the tech replaced, removed,

4   switched for -- with a different technician.

5           I know we had instances where counties did

6   not like the techs that had been assigned to them,

7   and those techs were removed and changed with --

8   with additional technicians.

9       Q.   In those situations, why were the techs

10  removed?

11      A.   I can't speak to why they were removed

12  other than the county expressing to Dominion that

13  they just did not -- they did not seem to get along,

14  they did not seem to work well with that assigned

15  tech.

16      Q.   As the head of CES, have you ever had a

17  concern about Dominion techs, who, again, are often

18  short-term, temporary hires --

19      A.   The --

20      Q.   Sorry.  Let me finish the question.

21           -- having access to components of the

22  election system in Georgia?

23      A.   The Dominion techs that I have encountered

24  as being director of CES have always struck me as

25  people that are people of good standing, that have

1    an ability to navigate a computing system, a

2    computing program, and able to then share and help

3    the county to which they are assigned.

4         Now, I have not met all of the techs that

5    Dominion pulled in, trained, and distributed out to

6    counties.  I've only been -- I've only met a handful

7    of those.  But those that I have met I have never

8    walked away feeling uncomfortable about.

9         Q.   Have you ever had a concern about any

10   election worker or poll worker, any other individual

11   who has authorized access to components of the

12   election system?  Have you ever had any discomfort

13   about whether they could be trusted?

14        A.   To my recollection, the people that I have

15   interacted with at the county level with this vendor

16   and with the preceding vendor, I cannot think of an

17   instance where I -- I didn't feel like the person

18   that I was working with, communicating with, were

19   lacking trust.

20        Q.   Is that true for the -- the county

21   employees as well?

22        A.   Again, with the -- the county employees

23   that I have interacted with -- of course, I have not

24   interacted with all poll workers and I have not

25   interacted with every county election employee.  I

1    have -- I've encountered a good number of them in my

2    20 years with the Secretary of State's office, with

3    Kennesaw State, in interacting with the counties,

4    and I have not come across people that I feel like

5    were untrustworthy or un- -- unbecoming of someone

6    that should be involved in elections.

7         Q.   In your 20 or so years working with

8    elections in Georgia at the Secretary's office, have

9    you ever come across anyone who has had access to

10   any aspect of Georgia's election system that you

11   felt uncomfortable with them having that access?

12        MS. LaROSS:  Object to the form of the

13        question.

14        THE WITNESS:  No one comes to mind at this

15        point in time.

16   BY MR. CROSS:

17        Q.   So one of the key arguments the Secretary

18   has made against the use of hand-marked paper

19   ballots is that they're -- can be manipulated by

20   what he and his experts have called insiders, which

21   they refer to as people who have authorized access

22   to components of the voting system.

23             Have you heard that argument?

24        MS. LaROSS:  Object to the form of the

25        question.

Page 173

1         Go ahead.

2         THE WITNESS:  Yes, sir, I have heard that.

3    BY MR. CROSS:

4    Q.   What's the basis for that concern, given

5    that you, as -- as the head of CES, in all your

6    years have never come across anyone that you didn't

7    trust who has access to the election system in

8    Georgia?

9         MS. LaROSS:  Object to the form of the

10        question.

11        THE WITNESS:  Certainly, my -- my

12        interaction with county election officials has

13        always been a positive one.  I have a level of

14        trust with all 159 county election

15        superintendents and I have a -- a trust that

16        they are doing their job to the best of their

17        abilities.

18        What -- the opinions that others may have

19        on their trustworthiness, of course, every

20        individual has the ability to make up their own

21        mind about how they feel about people.  But how

22        I feel about election supervisors and elections

23        employees at the county level, I feel like they

24        are solid people.

25

Page 174

1  BY MR. CROSS:

2      Q.   Have you ever conveyed that view to the

3  Secretary?

4      A.   I have always expressed my confidence in

5  election officials to the Secretary of State when

6  asked.

7           There are always degrees of knowledge

8  within the counties, that some county election

9  supervisors are on their -- on the -- they're still

10  learning the process, so they don't know everything.

11  There are election officials that have been involved

12  with it for many, many years and that are very

13  well-educated in the process.  So there are leveling

14  degrees of knowledge from county to county.

15           But I've always found that the county

16  election officials, for lack of a better way of

17  saying it, have their heart in the right place, and

18  they are trying to do the best job that they can

19  with the resources they have.

20      Q.   So based on your years of experience

21  working with elections in Georgia, do you have any

22  insight as to why the Secretary believes that

23  hand-marked paper ballots are unreliable because an

24  election insider may manipulate them in some way --

25           MS. LaROSS:  Objection --

Page 175

1  BY MR. CROSS:

2      Q.   -- or why he has that concern about

3  election officials and other insiders?

4          MS. LaROSS:  Objection to the form of the

5      question.

6          THE WITNESS:  I can't speak to why the

7      Secretary may have that thought of concern.

8  BY MR. CROSS:

9      Q.   That's not something you've ever discussed

10  with him?

11     A.   That is not --

12         MS. LaROSS:  Objection to the form of the

13     question.

14         Go ahead.

15         THE WITNESS:  That is not a conversation

16     he and I have had.

17  BY MR. CROSS:

18     Q.   Have you ever talked with anyone in the

19  Secretary's office about any concerns about the

20  reliability of -- of what they call election

21  insiders?

22     A.   I --

23         MS. LaROSS:  Objection to the form of the

24     question.

25         Go ahead.

Page 176

1           THE WITNESS:  I have not.

2           (Plaintiffs' Exhibit 13 was marked for

3       identification.)

4   BY MR. CROSS:

5       Q.   All right.  Grab Exhibit 13, please.

6       A.   Okay.

7       Q.   All right.  Do you see at the top there's

8   an email from Chris Harvey to you and others at the

9   Secretary's office that you received on June 3,

10  2020?

11      A.   Yes, sir.

12      Q.   At this time, Chris Harvey was still the

13  elections director; right?

14      A.   That is correct.

15      Q.   If you come down to the bottom of the

16  first page, you'll see the header on the earliest

17  email on the thread from Scott Tucker to you and Tom

18  Feehan on June 30 -- or, sorry, June 3?

19      A.   At the bottom of the first page or top of

20  the second page?

21      Q.   In mine, it's on the bottom of the first

22  page.  You'll see Scott Tucker's email?

23      A.   I see an email from Scott Tucker to me,

24  and Tom Feehan is copied.

25      Q.   Right.

1          And then that email continues on to the

2    top of the second page with the subject "Fayette

3    county server."

4          Do you see that?

5    A.   Yes.  Yes.

6    Q.   And Mr. Tucker writes to you "Michael, we

7    just got off the phone with the tech in Fayette

8    county and he came in today to find the server was

9    moved and the password is no longer working.  No one

10   in the office knows why and don't know that anything

11   was moved.  The tech notified the supervisor that we

12   will need to get the server back.  We have an

13   accepted Express server here and will swap it out

14   and restore the backup from the county."

15         Do you see that?

16   A.   I do.

17   Q.   Do you recall this situation?

18   A.   I don't recall this particular situation,

19   but I have no doubt in that it -- it transpired just

20   because of this email.

21   Q.   Okay.  If you -- you respond to this in

22   the middle of the first page on the same day, within

23   three minutes, actually, quite promptly.  You wrote

24   back "Thank[s]...for letting us know.  When you

25   recover the original server from Fayette County,

1    please tag it and don't do anything else to it."

2           Do you see that?

3       A.   I do.

4       Q.   And then Mr. Harvey responds later in the

5    afternoon "I spoke with the Election Director.  By

6    'moved,'" which he puts in quotes, "they meant that

7    the table may have been bumped or slightly

8    rearranged (in the immediate vicinity of where it

9    was).  The county didn't relocate the server, nor

10   did anyone else.  Dominion is trying to determine

11   why the server isn't working."

12          Do you see that?

13      A.   Yes.

14      Q.   And he goes on to say "Obviously, they

15   will need either that one reset or a new one ASAP."

16          Do you see that?

17      A.   I do.

18      Q.   Do you recall whether a new server was

19   provided to Fayette County at this time?

20      A.   I do not recall whether we ended up

21   changing that server out or not.  I just -- I do not

22   recall.

23      Q.   And do you recall any instance where a

24   county Election Management server has been replaced

25   because of a -- a situation like this where there

1    was some concern about its reliability?

2              MS. LaROSS:  Objection as to form.

3              Go ahead.

4              THE WITNESS:  Again, as you'll notice with

5         the email that I had sent immediately to Scott

6         was basically outlining that in this

7         circumstance, any time a server became

8         involved, we wanted to, you know, be certain of

9         what was going on to the best of our abilities

10        before moving forward.  And that was -- there

11        was reasons why I responded to Scott and also

12        responded to Chris and included others in that

13        email.  So we always do what we can to protect

14        the server.

15             We have had to replace servers that became

16        inoperable, that -- we've had power surges in

17        the field where you have a power surge and

18        suddenly the box is unresponsive and we have to

19        replace that server.

20             You know, other things can transpire where

21        hardware on the server itself fails, where the

22        C drive becomes un- -- unaccessible [sic] and

23        we have to replace the server.

24             So we -- we have replaced servers in the

25        past and I'm sure we will replace servers in

Page 180

```
 1       the future.

 2  BY MR. CROSS:

 3       Q.   But you're not aware of any forensic

 4  examination that's ever been done of a county EMS

 5  server; right?

 6       A.   That is correct.

 7       Q.   And that includes the one here in Fayette

 8  County in June of 2020; right?

 9       A.   Again, I don't recall what the next steps

10  were in this situation.

11       Q.   Okay.  Let's grab the next exhibit.

12            (Plaintiffs' Exhibit 14 was marked for

13            identification.)

14  BY MR. CROSS:

15       Q.   Grab Exhibit 14, please.

16       A.   Okay.  I'm refreshing.

17            Okay.

18       Q.   All right.  So Exhibit 14 is an email that

19  you sent to Scott Tucker and Cathi Smothers at

20  Dominion on June 4, 2020; right?

21       A.   That is correct.

22       Q.   And this is actually a forward of an email

23  you received from Dennis Carbone on the same day;

24  right?

25       A.   It is.
```

Page 181

1      Q.   And Dennis Carbone, you can see here, was

2   an elections liaison for the Secretary of State's

3   office; right?

4      A.   He was.

5      Q.   Is he still there?

6      A.   He is not.

7      Q.   When did he leave?  Just --

8      A.   I think Dennis left sometime in 2020, but

9   I'm not 100 percent certain.

10     Q.   Did he -- was it his choice to leave or

11  was he terminated?

12     A.   I honestly don't know.  I think he left on

13  his own.  I don't think he was terminated, but I do

14  not know.

15     Q.   Okay.  Do you know where he is now?

16     A.   I do not.

17     Q.   All right.  So Mr. Carbone -- oh, sorry.

18  One other question.

19          What's the role of the elections liaisons

20  in the Secretary's office?

21     A.   The election liaisons are sort of county

22  contacts for the Secretary of State's office, is

23  that -- the Secretary of State's office has the

24  state divided into regions, and then there are a

25  number of counties in each of these regions and then

Page 182

1   the Secretary of State's office has an election

2   liaison assigned to that region.  So that person

3   becomes the primary point of contact between the

4   county and the Secretary of State's elections

5   division.

6          One of the main tasks that the election

7   liaisons serve is helping those counties in using

8   the voter registration system and making -- making

9   sure people are registered properly, that

10  applications are processed timely, and stuff of that

11  nature.

12      Q.   Okay.  So if you look at Mr. Carbone's

13  email, he indicates in the first sentence "...I

14  think there is an issue down in Camden County with a

15  candidate not appearing on the BMD's."

16          Do you see that?

17      A.   I do.

18      Q.   And so this is June 4, 2020, and do you

19  understand this was -- this was arising in advance

20  voting?

21      A.   This -- this would be most likely

22  happening during advance voting for the June

23  primary.

24      Q.   And then you and -- you forward on to,

25  again, Mr. Tucker and Ms. Smothers at Dominion

Page 183

1   asking them to get in touch with the tech in Camden

2   County and see if this can be resolved.

3           Do you see that?

4       A.   I do.

5       Q.   What do you recall about this specific

6   situation?

7       A.   I -- I do not recall the specific

8   situation.

9       Q.   Okay.  So do you know, for example,

10  whether there were voters who had voted on this BMD,

11  you know, at some point during the day before this

12  issue had been flagged, before election workers

13  realized there was a candidate that was not

14  appearing on the BMD?

15          MS. LaROSS:  Objection as to form of the

16      question.

17          You can answer.

18          THE WITNESS:  I do not know if anyone had

19      already used this BMD prior to this instance,

20      but I also do not know whether they had

21      programmed the voter access card to actually

22      display the proper ballot with what -- that

23      voter's candidate that they were looking for.

24      So I -- I do not know.

25

Page 184

1    BY MR. CROSS:

2        Q.   You just don't recall anything about this

3    incident one way or the other?

4        A.   I do not recall, no, sir.

5        Q.   So is it fair to say you don't recall

6    whatever the solution was either?

7        A.   I do not.

8        Q.   And then when you sent this on to

9    Mr. Tucker and Ms. Smothers, why was it Dominion's

10   responsibility to figure this out, rather than

11   County or State election officials?

12       A.   At this point, this is, again, where

13   Dominion had built the elections projects, and they

14   would actually have more knowledge, at this point in

15   time, on how a candidate could be missing on a

16   ballot, if it was missing, and if it was missing on

17   a ballot, how do we go about getting that candidate

18   placed into the system so that their name does

19   appear on the ballot.

20            And if -- whatever that solution is, what

21   does it involve being done to the elections project.

22   Is that something that has to be done away from the

23   County, meaning back in the Atlanta area at the

24   Dominion location, or is it a task that the County,

25   with help from their local Dominion tech, could they

Page 185

1    be walked through via a phone call from Dominion on

2    the tasks at hand to make sure that correction was

3    made.

4         Q.   So having -- we've spent a lot of time

5    reading through a lot of documents that the State

6    produced and Dominion produced.  It seems like since

7    this system rolled out, when issues like this come

8    up, any issue involving the Dominion voting

9    equipment, you or Mr. Harvey or others typically

10   refer to Scott Tucker to deal with that.

11            Was that sort of the general practice in

12   2020 and 2021?

13            MS. LaROSS:  Object to the form of the

14       question.

15            THE WITNESS:  In 2020, when we had some

16       sort of equipment issue, whether it be the

17       generation of the ballot, the display of the

18       ballot, the execution of the equipment, the

19       operation of the equipment, if there was a

20       concern about a technician at the county level,

21       yes, that was -- that was reported back to

22       Scott and to Tom Feehan.

23   BY MR. CROSS:

24       Q.   And usually there would be a Dominion tech

25   that would be dispatched either physically or

1   remotely, by phone, for example, to help with that;

2   is that right?

3        A.   Yes.  They had technician -- Dominion had

4   techs on-site at the county, but then they also had,

5   like, regional managers.  And I think these regional

6   managers were, you know, a higher-trained elections

7   tech who would then oversee 10 to 12 counties, and

8   then the county tech would report to the regional

9   tech, the regional tech would report back to Scott

10  and his team.

11           And then when an issue -- if the State

12  took an issue to Dominion, took it to Scott, took it

13  to Tom, then they would follow back up through that

14  chain of command down to the county.

15       Q.   Was that the same process with ES&S under

16  the old GEMS DRE system, meaning the State and

17  county relied significantly on ES&S techs during an

18  election?

19       A.   Well, it was a different dynamic with ES&S

20  at the end of their -- at the end of their contract.

21           When Diebold was the initial vendor for

22  the State back in 2002-2003, the same dynamic that

23  we were executing with Dominion in 2019 and 2020 was

24  similar to what was being executed in 2002-2003 in

25  regards to Diebold when that voting system was

Page 187

1    originally rolled out.

2            By the time that ES&S had taken ownership

3    of the -- of the system in 2010, by that point in

4    time, a lot of counties had become self-sufficient

5    in the use of the voting system and getting them

6    prepared.

7            And then for technical support, that was

8    phone calls in to the Secretary of State's Center

9    for Election Systems or Kennesaw State's Center for

10   Election Systems in regards to -- if there was a

11   problem with a server, if there were problems with

12   DREs or optical scan units.

13       Q.   And now in 2022, the support obligations

14   Dominion originally had under its contract, those

15   have expired; is that right?

16       A.   That is correct.

17       Q.   What, if any, continuing obligations does

18   Dominion have with respect to supporting the

19   election system in Georgia?

20            MS. LaROSS:  Object to the form of the

21       question.

22            THE WITNESS:  Yeah, that's a question in

23       regards to what are they contractually bound

24       to, and I can't speak to that.  I don't have

25       intricate knowledge of the State's contract

1    with Dominion.

2         However, Dominion still contracts with

3    individual counties for technical support if

4    that county is so choosing.  So if there's a

5    contract in place between the county and

6    Dominion for technical support, they're still

7    beholden to that contract.

8         The Secretary of State's office still has

9    a relationship with Dominion as -- as our

10   vendor.  If we, in the process of building

11   election project files, come across a

12   circumstance where we're not quite certain how

13   to set something up in the application, then we

14   will pick up the phone and we will call

15   Dominion and ask them to sort of, you know,

16   refresh our memory how -- how do we need to

17   make -- how -- what is the setting we need to

18   have in place to make sure that the ballot is

19   displayed in this such manner if necessary or

20   how best to, you know, organize the list of

21   candidates so that we are getting the -- you

22   know, the right display on the BMD, that it --

23   it -- the display will make sense to the

24   voters.

25        So we still have a very good working

Page 189

1    relationship.  I -- I personally do not speak

2    to Scott Tucker very often now.  He is still

3    working with the State of Georgia as a customer

4    service representative.  I think he sort of

5    focuses on a certain set of counties now.

6         But they have, I think, a group of three

7    regional service managers that communicate with

8    certain counties and provide services to

9    counties if -- if required.

10   BY MR. CROSS:

11        Q.   The services that are provided to counties

12   now that you said the counties can opt for from

13   Dominion, do the counties pay for that?

14        A.   They do.

15        Q.   Putting aside -- and I understand the

16   point about contractual obligations.  Let me ask the

17   question a different way.

18        What expectation do you have going forward

19   with respect to Dominion providing support for

20   counties of the State for the -- the Dominion

21   election voting equipment that's used, technical

22   support?

23        MS. LaROSS:  I object to the form of the

24   question.

25        THE WITNESS:  My expectation of Dominion

1          is as long as the State of Georgia is using a

2          Dominion product, that we should be able -- the

3          Secretary of State's office should be able to

4          pick up the phone, call someone at Dominion,

5          who can then help us resolve the problem we may

6          be having.

7     BY MR. CROSS:

8          Q.   And as the head of CES, do you believe

9     that the counties now -- that the election workers

10    at the county level are sufficiently trained and

11    proficient with the Dominion equipment that they can

12    support this through elections without separately

13    paying for Dominion techs?

14         A.   It's my belief that counties are getting

15    to that point.  Are they already at that point?

16    Some may be, based upon their resources, the amount

17    of staff that they've had on board throughout '20

18    and now in -- and now through all of '21.

19              A lot of counties have had multiple

20    elections in '20 and '21, and with every election,

21    you gain additional knowledge and -- and comfort

22    with the voting system.

23              The Secretary of State's office, we do

24    training classes.  We're in the midst of conducting

25    training classes right now for counties.  We've been

Page 191

1   conducting training classes in January and we'll be

2   conducting them the rest of this month, where

3   counties come in and we give them, you know, again,

4   a full overview of the voting system, its

5   components.  We go through the logic and accuracy

6   procedures.  We go through the process of setting up

7   their BMDs, of setting up their scanners, of setting

8   up their central scanner.

9          We go through exercises of scanning

10  ballots, tabulating results, all of those things

11  that a county will have to do to execute an

12  election, whether it's a general election, a general

13  primary, or a special election.

14          And it's the intention of CES to continue

15  providing those training opportunities for counties

16  if they wish to take them.  Some counties will do

17  that.  Some counties will spend a lot of time

18  educating themselves, gaining more information.

19  Other counties, they're going to contract with the

20  vendor for support, and they will probably do that

21  for some years to come.

22      Q.   And I believe you said that Diebold

23  provided similar tech support for the DRE system in

24  the first year or two to what Dominion provided in

25  the first year or two of this system; is that right?

Page 192

1      A.    That is correct.

2      Q.    Why does Georgia introduce new systems in

3  that way?  Meaning why does it put the election

4  system into actual elections and then rely on the

5  vendor to provide tech support, rather than getting

6  its election officials trained to be self-sufficient

7  before it's actually used in elections?

8           MS. LaROSS:  Objection to the form of the

9      question.

10          THE WITNESS:  Elections happen on a set

11     schedule, and whenever you transition from one

12     set to another, the elections calendar is not

13     going to stop and elections have to be executed

14     on those dates and times.  So the State of

15     Georgia, through its rollout of voting systems

16     statewide, in both instances did engage the

17     vendor for assistance.

18          And in other locations outside the state

19     of Georgia, it's a high level of expectation

20     that vendors are providing support and services

21     to local county elections offices in the

22     execution of elections.

23          There are probably very few counties in

24     the entire nation that are completely

25     self-sufficient and have no reliance in any

1        way, shape, or form on vendor support.

2    BY MR. CROSS:

3        Q.   Right.  But you -- with a system like

4    Dominion, right, understanding elections have to

5    continue, you could use the DRE system while you're

6    training people on the new system in parallel so

7    that your election workers would be more proficient

8    with the new system before it's used in actual

9    elections; right?  That would be an option.

10            MS. LaROSS:  Objection to the form of the

11        question.

12            THE WITNESS:  Well, again, in 2019, the

13        State of Georgia continued using the DRE system

14        while we were in the process of procuring and

15        acceptance testing the new voting system, and

16        counties were being trained on the new voting

17        system while they were still using the DRE

18        system.

19            So at some point in time, there has to be

20        a transition from System A to System B, and

21        when you're dealing with a statewide

22        transition, it -- it's not the easiest

23        execution of operation.

24    BY MR. CROSS:

25        Q.   Right.

Page 194

1            And since it's not the easiest execution

2      of operation, why not have a longer ramp-up period

3      to train folks on the new system?

4            MS. LaROSS:  Objection as to form of the

5         question.

6            THE WITNESS:  Whenever rolling out a

7         system, you have to follow -- follow upon some

8         timeline that has been decided upon.

9            And that was our task at hand in 2019 and

10        2020, was following through on a legislative

11        decision to change the voting system and to

12        transition to the system that we have today.

13     BY MR. CROSS:

14        Q.   And there was a Court-ordered injunction

15     prohibiting the DRE system beyond 2019; right?

16        A.   That is correct.

17        Q.   And -- and -- strike that.

18            One of the things that you guys had to do

19     during the transition was to set up the new private

20     network for the State EMS for Dominion; right?

21        A.   Yes.

22            MS. LaROSS:  Objection as to form of the

23        question.

24            Go ahead.

25            THE WITNESS:  Yes, that is correct.

Page 195

1    BY MR. CROSS:

2         Q.   And that actually did not get set up until

3    the summer of 2020; right?

4         A.   That is correct.

5         Q.   Why did it take -- well, strike that.

6              The -- the Dominion system was announced

7    publicly in August of 2019; right?

8         A.   That is my recollection, yes, sir.

9         Q.   And how long before the public

10   announcement was the decision made to go with the

11   Dominion system?

12        A.   That, I -- I -- that, I don't know.  I

13   can't answer that question.

14        Q.   When did you first learn that the Dominion

15   system was going to be the one that was going to be

16   used?

17        A.   It was in the summer of 2019, at the

18   conclusion of the evaluation committee's review of

19   RFPs and the negotiation between the procurement

20   office for the State of Georgia and the selected

21   vendors.

22        Q.   Let me ask you this way:  How long before

23   the public announcement did you learn that Dominion

24   was going to be the new system so that you could

25   start getting ready for that transition?

```
 1           MS. LaROSS:  Objection as to form of the
 2      question.
 3           THE WITNESS:  I think I found out about it
 4      the same time the public was finding out about
 5      it.  It was generally in the same time frame.
 6  BY MR. CROSS:
 7      Q.   When you say "same time frame," do you
 8  mean within weeks?
 9      A.   Within weeks, within days.
10      Q.   Okay.  So given that the -- the decision
11  had been made by the summer of 2019, why did it take
12  a year to get the -- the private network set up for
13  the State on the Dominion EMS?
14           MS. LaROSS:  Objection to the form of the
15      question.
16           THE WITNESS:  Again, a question for the IT
17      department, for they are the ones that were
18      putting that system together.
19           In 2019, we were still in an environment
20      of supporting elections for the remainder of
21      2019 under the old system, and CES was fully
22      engaged in that, as well as in the process of
23      testing the 30-something-thousand pieces of
24      equipment that were coming in to the state for
25      distribution as part of the new system.
```

Page 197

```
 1            So as all of that testing was going on, we
 2       were also in the process of acquiring a new
 3       facility that was going to be the -- the
 4       housing location for CES.  Prior to the summer
 5       of '19, CES was housed in the Twin Towers
 6       downtown across from the State Capitol, but it
 7       was relocated out to Marietta in the summer of
 8       '19.  And during that process was when all the
 9       infrastructure was being built and put in place
10       to facilitate their -- the actions that CES
11       were having to undertake.
12            The building of election projects was
13       going to be something that was later on in our
14       operation, because the vendor was going to be
15       engaged in building those projects.
16            We did have computers in our facility that
17       had the election applications installed.  These
18       computers were standalone computers, not
19       connected to any network in any way, shape, or
20       form, that we would then use to interact with
21       elections projects when election projects were
22       prepared and made ready to -- distribution then
23       to the county.
24            So even though we didn't have the full
25       infrastructure built and in place, we had
```

1      things in place that allowed us to execute the

2      tasks that we needed to execute during that

3      time frame.

4  BY MR. CROSS:

5      Q.   So what was -- what changed between

6  whatever infrastructure you set up for the Dominion

7  system beginning in 2019 until the private network

8  was set up that you have in place today that was set

9  up sometime in summer of 2020?

10      MS. LaROSS:  I object to the form of the

11      question.

12      THE WITNESS:  The dedicated computers that

13      we used to interact with the Dominion

14      application were being housed in what we

15      design- -- what we call our training room

16      within CES.

17      So whenever we had to interact with an

18      elections project that had been built by

19      Dominion and before it was distributed to a

20      county, it was placed on these standalone

21      Election Management computers, similar to what

22      were housed -- similar to what were in place at

23      the county level, and then we would interact

24      with those projects for proofing purposes and

25      for packaging for distribution to the

1      individual counties.

2           What was being configured at the time was

3      our internal infrastructure that would allow us

4      to be able to sit in our individual offices and

5      have not only a public-facing computer, which

6      we had, but also a private network computer

7      that would be tied in to the Election

8      Management System and application that was

9      being placed on the private server.

10   BY MR. CROSS:

11        Q.   So before the current private network,

12   when the new Dominion system rolled out in 2019, you

13   set up a -- an EMS network in the -- the training --

14   the IT training room in your office?

15        A.   It was not an EMS network; it was an

16   isolated computer.  It wasn't -- these computers

17   were not plugged into one another.  They were

18   isolated computers.  All they were plugged into was

19   a power source.

20        Q.   When you say "computers," do you mean

21   desktop computers?  Servers?  Or what do you mean?

22        A.   I mean a -- a -- a Election Management

23   computer similar to what you would see in the county

24   today.

25        Q.   How many of those were there?

1          A.    There were two dedicated computers.

2          Q.    And what were they connected to?

3          A.    A power outlet.

4          Q.    That was it?

5          A.    That was it.

6          Q.    They weren't connected to each other

7     either?

8          A.    They were not.

9          Q.    Why did you have two?

10          A.    Because that's what we had, was two.

11          Q.    No, I'm sorry.  Why did you have -- why

12     did you need two, instead of just one, to run the

13     system at that time?

14          A.    Well, we had two because we're trying to

15     support the production of 159 county project files

16     in the same time frame.  So we wanted to have more

17     than one person working on these tasks at that time

18     if possible.

19          Q.    But if the computers weren't connected to

20     each other and you have multiple people working on

21     those two computers at the same time, how do you --

22     how did you synchronize the data across those two

23     computers?

24          A.    We weren't needing to synchronize the data

25     between those two computers.  Those -- one computer

1    would have a project file for Fayette County;

2    another computer would have a project file for

3    Spalding County.

4         We were checking project files independent

5    of one another, one at a time, to make sure that

6    they are correct and then also producing the project

7    file for delivery to the county.  So you don't --

8    you work on one project file at a time.  You -- you

9    don't synchronize project file data from project

10   file to project file.

11        Q.   So each of the two computers, in this 2019

12   to early 2020 time frame, that you were using for

13   the Dominion election system, each one was fully set

14   up with the Dominion Democracy Suite that you needed

15   to run the -- the Election Management software?

16        A.   It was set up with EED, which is the

17   Election Event Design application; it was set up

18   with RTR, which is the Results Tabulating &

19   Reporting application.  And those are the two

20   primary applications that we interact with when we

21   are building and constructing an elections project.

22        The computers, to my recollection, also

23   had the Adjudication Client application installed on

24   them, but that is not an application that's used

25   during the -- the production of an elections

Page 202

1    project.

2              And I think those were the three

3    applications installed from a Dominion Suites

4    perspective -- from a Dominion Suite perspective.

5         Q.   So what's on the current State Dominion

6    EMS server that's used to administer the -- the

7    Dominion election system?

8         A.   On the server currently is EED -- or the

9    applications that we have on our workstations are

10   EED, are RTR, the Adjudication Client.  Those are

11   the three applications that we have on our

12   workstations that are -- and these are the

13   workstations that are connected to the private

14   network.  Those are the three applications.

15        Q.   What do you use RTR for?

16        A.   RTR, our Results Tabulating & Reporting,

17   we have to -- when we are building an elections

18   project, one of the checks that we do on the back

19   end before we send it to the county is we have to

20   open up RTR to make sure that the project file will

21   create the proper formatted export file.

22             So we have to make sure that the proper

23   export file format has been in -- that is in place

24   and is active so that when the project file is

25   loaded at the county level, that they are able to

1   produce the export file that they need for

2   submission to the Secretary of State's ENR page.

3            And we also validate that RTR can produce

4   the election summary report that it needs to produce

5   and also the statement of votes cast report.

6        Q.   Do election results data get stored on the

7   State EMS server?

8        A.   It does not.

9        Q.   So what goes onto the EMS server after an

10  election is done, if anything?

11       A.   After an election is over with -- are you

12  talking about after a county has completed the

13  election and then they send in their backup copies

14  of the project postelection?

15       Q.   Yeah, you've gotten their backup copies of

16  the project, you've gotten their ENR data,

17  everything that you get from the counties.

18       A.   Well, ENR data, that is transmitted from

19  the county elections office to the Secretary of

20  State's Election Night Reporting System.

21            But postelection, county election

22  officials are supposed to create an election backup

23  copy of their election project and submit that to

24  the Secretary of State's office.

25            When that jump drive is received, that

1    jump drive is extracted from the transport bag that

2    the county uses to send that information back to the

3    State, and then that USB drive is placed inside a

4    bin and that bin is then placed in a secured room.

5    We have no reason to take that jump drive returning

6    from the county and plug it back into our -- our

7    private environment.

8           If we need to look at that project file

9    for some reason, then that jump drive is going to be

10   plugged into one of our Election Management System

11   training computers that we have in our training

12   room.  And, again, those are computers that are only

13   plugged into a power source, and they do have the

14   applications necessary to open the project and view

15   the information within the project.

16          But the -- the postelection project files

17   are never reintroduced into our Election Management

18   System on the private system.

19   Q.   Is there a log maintained of -- of the

20   election project data coming back from the counties?

21   A.   Is -- is there a log?  Do we notate what

22   we got -- do we note for whom we got something back?

23   Q.   Yes.

24   A.   I don't believe I create a physical record

25   that indicates what that is.  If I'm questioned by a

Page 205

1    county -- now, the county -- when the county

2    certification materials are returned to the State,

3    the State goes through an inspection of what is

4    returned and they make note of what is returned at

5    that point in time.

6            And then the Secretary of State's office

7    downtown brings -- by way of an investigator, brings

8    out the returned jump drives that we then place into

9    a bin and put into a secured room.  So there's

10   record of what a county returns, but that's done by

11   a different portion of the Secretary of State's

12   office, not CES.

13      Q.   So what efforts, if any, are made at the

14   Secretary's office to ensure that counties comply

15   with the rule requiring them to provide this data

16   back to the State?

17           MS. LaROSS:  Objection to the form of the

18      question.

19           THE WITNESS:  I can only speak to what

20      I -- what I just mentioned, is that the --

21      the -- the certified returns are returned to

22      the Secretary of State's office downtown, and

23      then those -- those packages are opened and

24      people with the Secretary of State's office

25      downtown inspects what has been delivered and

Page 206

1          then, to my knowledge, make note of what the

2          county has returned.

3     BY MR. CROSS:

4          Q.   So your office doesn't have responsibility

5     for tracking the -- this data, these files from the

6     counties?

7          A.   No.

8          Q.   And are you talking the postelection data

9     or the preelection database files?

10         A.   I'm talking about the postelections, what

11    we're discussing right now.

12         Q.   Okay.  That's what I thought.

13              So the counties also have to provide to

14    the Secretary a copy of the Election Management

15    System database for that county before the election;

16    right?

17         A.   No.

18         Q.   Okay.  That's not -- that's not a

19    requirement?

20         A.   No, that is not a requirement.

21         Q.   So going back to the setup of the Dominion

22    system in 2019 and 2020, given your -- you say that

23    you are able to run the -- the Dominion system on

24    two standalone computers.

25              Why did you bother to transition to what

Page 207

1   you say now is the private network that has a -- a

2   central server and then multiple computers connected

3   to it?

4           MS. LaROSS:  Objection as to form of the

5       question.

6           THE WITNESS:  We have employees.  They

7       have offices, and we like for our employees to

8       be able to sit at their desk and do their job

9       in their desk next to their public computer, as

10      well as their private computer, as opposed to

11      having to go into one office to get their email

12      and then go around to another office to

13      interact with a Election Management computer.

14          We felt like it would be easier for us to

15      do our task if we could be able to sit in our

16      offices and access both systems at the same

17      time, with one being in the protected, isolated

18      environment and the other one being in the

19      standard SOS environment.

20  BY MR. CROSS:

21      Q.   And just so I understand, when you say

22  they're -- the two computers are on the two

23  different environments, the two computers sit in the

24  same employee's office, it's just that one has an

25  Internet connection and the other has a hard-line

Page 208

1    connection to the private network; is that right?

2         A.    That is correct.

3         Q.    And sorry if I asked you this before.

4               How many employees have that setup, those

5    two computers?

6         A.    One, two, three, four, five, six, seven --

7    seven employees.

8         Q.    And what are their -- I don't need all

9    their names.

10              What -- what are their titles or roles,

11   generally?

12        A.    There's myself, and then I have four

13   election coordinators and those are the people that

14   are responsible for building election projects.

15              And then I have my two election system

16   specialists, and their involvement is in the

17   proofing of the project files that are constructed

18   by election coordinators and in the packaging of

19   those projects once they've been approved by county

20   review.

21              (Jenna Conaway entered the deposition.)

22   BY MR. CROSS:

23        Q.    Does anyone else have access to the

24   private network room?

25        A.    My IT support has access to the private

Page 209

1    server room.

2              In case of emergency, we do have a card

3    key swipe that will allow us to get into the server

4    room, but it's -- but it's contained in a locked key

5    box.  The -- the lock -- I maintain the key to that

6    lockbox, and me and my election -- my election

7    system specialist can get to that key in order to

8    open that lockbox in order to gain that swipe card

9    access.

10        Q.   So only two people have that key?

11        A.   There's only two people that have that --

12   well, have that physical key, yes.

13        Q.   So only two people have access to that

14   lockbox?

15        A.   That is correct.

16        Q.   All right.  Grab Exhibit 15, please.

17             (Plaintiffs' Exhibit 15 was marked for

18             identification.)

19             THE WITNESS:  Okay.  I'm looking at it.

20             MS. LaROSS:  Sorry.  What exhibit are we

21        on?  I apologize.

22             MR. CROSS:  15, 1-5.

23             MS. LaROSS:  Thank you.  Excuse me.

24   BY MR. CROSS:

25        Q.   Do you have it?

Page 210

1      A.   Yes, I'm looking at it.

2      Q.   Okay.  Sorry.  Hold on one second.

3           All right.  So Exhibit 15 is an email that

4  Kevin Rayburn sent to you, several folks at the

5  Secretary's office, and some folks at the -- at

6  Dominion on June 8, 2020; right?

7      A.   Correct.

8      Q.   And the subject line is "continuing ENR

9  issues."

10          Do you see that?

11     A.   I do.

12     Q.   If you come down to the bottom of the

13 document, the last page, the middle of that page,

14 you'll see that the first email in here is from Ryan

15 Germany on June 8, 2020.

16     A.   Yes.

17     Q.   And he writes in the second sentence -- or

18 midway through the first sentence, "...we still have

19 79 counties that have errors in their ENR upload

20 file.  It seems that the Dominion techs in those

21 counties did not properly implement the corrections

22 that we identified last week.  This is completely

23 unacceptable.  If ENR is not successful tomorrow,

24 then we do not have a successful election."

25          Do you see that?

Page 211

1        A.    I do.

2        Q.    And we are literally on the eve of the

3    June 9 primary at this point; right?

4        A.    We are.

5        Q.    What do you recall about the ENR upload

6    issues that were occurring at this time?

7        A.    My recollection of what this is relating

8    to is when the election projects were built for the

9    June primary, they're called export codes.  We have

10   to assign a code to state-level races.  The contests

11   themselves have to have an ID number so that when

12   the export file is generated, the ENR system knows

13   that this -- this candidate and its result is tied

14   to the governor's race or it's tied to the U.S.

15   Senate race.

16           When the project files were built, those

17   codes were put in place for State races, and in

18   addition, they also put in export codes for the

19   individual candidates below there.

20           The ENR system was not expecting there to

21   be a numeric value for the individual candidates.

22   In fact, it did not need that.  But with the -- but

23   with that value being in place and in the export

24   file, it would not load properly into the ENR

25   system.

1            So the resolution required going back into

2    the election project and removing those -- those

3    numbers -- and they're in an area that's called an

4    external ID field -- is removing those numbers from

5    all -- all state races that had candidates.  If the

6    candidate had an external ID number, it had to be

7    cleared out, and if any local candidate in any local

8    race had an external ID number entered, it had to be

9    cleared out, so that the only items in the system

10   that would have an external ID number would be

11   state-level contests and nothing more.

12            And once that -- once that correction was

13   made, a new export file was generated and then

14   submitted to ENR for processing, and it would then

15   be -- it's successfully processed.

16        Q.   So if you come up to the email from Kevin

17   Rayburn here, in the last sentence, he writes "...we

18   are seeing techs trying to upload March zero files

19   into the June ENR.  They need to be very careful not

20   to do that."

21            Do you see that?

22        A.   I do.

23        Q.   What are March zero files?

24        A.   Well, again, this gets back to the -- the

25   fun we had in 2020.  We were scheduled to have a

Page 213

1  March PPP in 2020, and election project files were

2  generated and distributed to a number of counties

3  for execution of the March PPP.  But there was never

4  a March PPP.  The March PPP was rescheduled to then

5  be held in conjunction with the May 2020 general

6  primary.

7          So a new election project had to be built

8  for all 159 counties that incorporated the -- the

9  March PPP race and placed it on the May 2020 ballot,

10  and then that combined ballot of the PPP and the --

11  and the planned May primary was then further

12  rescheduled until June 9.

13          So when it came time to do an election

14  upload, there were some ballots that were issued in

15  connection with the March PPP, and those ballots

16  still had to be counted.  So counties that had

17  gotten that original PPP project and had issued

18  ballots in the original PPP had to count votes and

19  tabulate them in that PPP March project.

20          What this is referring to is that when you

21  would upload an Election Night Reporting file, if

22  you're generating it from the May 2020 primary,

23  which was being used for the June election, that

24  export file had to feed into the -- the June 9 ENR

25  page.  But there also was a second ENR page for

1   upload of the March results that needed to be

2   collected and tabulated.

3           So counties were actually doing two

4   Election Night Reporting uploads at the end of the

5   general primary.  Some of the votes were going into

6   the original March framework, and that database only

7   had two races in it, which was the presidential

8   race, Democratic and Republican, but the primary

9   database had those two races plus all the other

10  statewide and local races that were part of the

11  general primary.

12      Q.   When you say "PPP," you mean presidential

13  preference primary; right?

14      A.   Yes, sir.  I'm sorry.  I should -- I

15  should -- I should have explained that.

16      Q.   No, no, that's fine.  Just so we're all

17  clear.

18          And why -- why was it a serious problem

19  to -- for Dominion techs to upload the March zero

20  data?

21      A.   This gets back to how ENR operates, is

22  that if it sees a file, it's trying to load that

23  file into -- into the application, but the

24  application is expecting the file to contain a lot

25  more information because it's trying to feed

Page 215

1   information to a lot more races, a lot more

2   contests.

3           But the file that was coming over from the

4   county from a March election did not have that same

5   litany of information, so it would -- it didn't

6   match the -- it didn't match the slot that it was

7   trying to be placed into.

8       Q.   All right.  Grab Exhibit 16, please.

9           (Plaintiffs' Exhibit 16 was marked for

10          identification.)

11          THE WITNESS:  Okay.

12   BY MR. CROSS:

13      Q.   And you see Exhibit 16 at the top is an

14   email from Chris Harvey --

15      A.   Yes.

16      Q.   -- on June 9, 2020.

17          That's what you've got; right?

18      A.   That is what I see, yes, sir.

19      Q.   Okay.  So if you come down to the middle

20   of the first page, you'll see there's an email.  It

21   says "managementescalationissues."

22          Do you see that?

23      A.   I do.

24      Q.   Are you familiar with that email account?

25      A.   I am not.

1      Q.   That's not something you've seen at the

2   Secretary's office?

3      A.   I am not familiar with that, no, sir.  I

4   do not know what that is.

5      Q.   Okay.  And then this -- this is an email

6   June 9, 2020, 9:46 a.m., so we're a little while

7   into the presidential primary that day; right?

8      A.   Yes, sir.

9      Q.   And then in all caps, it reads "MACHINES

10   NOT WORKING, NO PAPER BALLOTS AVAIL."

11           Do you see that?

12      A.   I do.

13      Q.   And if you come down, you'll see that

14   there's a signature block here that indicates the

15   email is from Tasheena Lockett, the customer service

16   team lead at the Georgia Secretary of State.

17           Do you see that?

18      A.   Yes.

19      Q.   Do you know her?

20      A.   I do not.

21      Q.   And so there's a report from a caller.  It

22   says "Nature of call:  Caller states she has

23   been" -- sorry.  I'll try it again.

24           "Nature of call:  Caller states she been

25   at this location since 6AM.  She states not one

1    machine is working and they do not have any paper

2    ballots."

3         Do you see that?

4    A.   I do.

5    Q.   And fair to say the June primary rollout

6    of the Dominion system was a bit chaotic; right?

7         MS. LaROSS:  Objection as to the form of

8         the question.

9         THE WITNESS:  That was a very -- that was

10        a very busy day, yes.

11   BY MR. CROSS:

12   Q.   There were a lot of challenges that arose

13   with the new BMD system at counties around the

14   state; right?

15   A.   Yes.

16   Q.   And, in fact, there were counties like

17   Cobb County, among others, that had to rely pretty

18   heavily on paper ballots as a backup because of the

19   challenges with the BMD system; right?

20        MS. LaROSS:  Objection as to form of the

21        question.

22        THE WITNESS:  I believe there were a

23        number of locations that when they started out

24        the day, that they did have to transition over

25        to the emergency paper ballot because the poll

Page 218

1          workers were not successful in powering on the

2          equipment as they should have been.

3    BY MR. CROSS:

4          Q.   And that's just one of the problems.

5    There were also problems where the BMD equipment,

6    even when powered on, didn't function as it was

7    supposed to.  That happened in some cases; right?

8          A.   I'm -- I suspect that was the case, but I

9    can't think of a direct example.  But I will say

10   yes.

11         Q.   Okay.  What emergency paper back- --

12   strike that.

13              What plan did the Secretary adopt as an

14   emergency paper backup for the 2020 election, if

15   any?

16              MS. LaROSS:  Objection as to form of the

17         question.

18              THE WITNESS:  It's my understanding that

19         they had -- Secretary of State's office had

20         instructed counties that as a cause of

21         emergency, that if something were to transpire

22         where the BMD was not operational, that they

23         should have preprinted copies of hand-marked --

24         hand-fillable ballots available to poll workers

25         for distribution to the voters.

Page 219

1          Those hand-marked paper ballots can be

2          scanned by the ICP scanners that are in place

3          at the polling locations on election day.

4    BY MR. CROSS:

5          Q.   Did you at some point see a written plan

6    for using emergency paper ballot backups for the

7    2020 election, the June 2020 election?

8          A.   I don't recall seeing very much of the

9    instructional documentation for process of managing

10   polls that was being sent out from the elections

11   division to counties to try to get them ready for

12   the first rollout.  There was a -- a high number of

13   training materials and official election

14   notifications and such that went from Mr. Harvey's

15   office to the counties to get them ready for that

16   election.

17          So I'm sure that there were those things,

18   but I can't remember -- I can't say to a fact that I

19   saw every single one of those.

20         Q.   If someone were to ask you for a copy of a

21   emergency paper ballot backup plan for the June 2020

22   election, is there a document that you could put

23   your hands on and say, "Here it is"?

24          MS. LaROSS:  Objection to the form of the

25          question.

1           THE WITNESS:  I do not know of a document

2      of that nature, but if I was looking, I would

3      probably go on to the Firefire -- excuse me,

4      the Firefly system that the State has for

5      distributing materials of that nature to the

6      counties.  And it would be my assumption that

7      those documents would be there if they existed.

8  BY MR. CROSS:

9      Q.   One of the challenges that counties ran

10  into in June 2020 was that they had too few paper

11  ballots on hand, given the problems with the BMD

12  system; right?

13           MS. LaROSS:  Objection as to form of the

14      question.

15           THE WITNESS:  There was a -- there was a

16      high level of turnout on the morning of June 9,

17      and when -- when the equipment is not working

18      and you have to go -- fall back to that

19      emergency, there were probably locations that

20      were running out of those emergency ballots,

21      yes.

22  BY MR. CROSS:

23      Q.   And you said your understanding was that

24  the counties were supposed to have some number of

25  preprinted ballots on hand as a contingency for that

1    situation; right?

2         A.    That is correct.

3         Q.    How were the counties supposed to do that?

4    What was -- what was the plan, if there was one, for

5    counties to figure out how many paper ballots they

6    needed, where they would get them, who would pay for

7    it, how they'd be transported, all the logistics

8    that would go into that.

9              MS. LaROSS:  Objection to form of the

10             question.

11             THE WITNESS:  Well, again, counties

12             execute elections, and counties have always

13             been putting together backup plans to keep

14             balloting going, no matter what election system

15             may have been in operation.

16             And the use of a paper ballot in a polling

17             location in case of equipment failure has been

18             in practice for -- for many years.  We've

19             referenced them for a long time as, "Well, you

20             just issue them a provisional ballot in case of

21             emergency."

22             But the State had changed the vernacular

23             on those things to say, "No, let's -- we

24             will -- you know, it's an emergency ballot.  We

25             don't have to worry about whether it needs to

Page 222

1    be counted or not.  These voters have proven,

2    you know, they're on the registration list.

3    They're in the polling place.  We will issue

4    them a ballot on paper and it will be scanned

5    and their vote counted.  It doesn't have to go

6    through a provisional double-check."  So

7    counties have -- will always work to have those

8    emergency things in place.

9         Counties are responsible for executing the

10   election.  The cost of printing ballots is a

11   county expense.  Counties have ballots printed

12   for mail-out purposes, they have ballots

13   printed for provisional purposes, and they have

14   ballots printed for emergency purposes.

15        MS. LaROSS:  David, whenever we could, I'd

16   appreciate a break.

17        MR. CROSS:  Sure.  Yeah.  Just a few more

18   minutes, if that's okay.

19        MS. LaROSS:  Yes, totally fine.  Thank

20   you.

21   BY MR. CROSS:

22   Q.   I guess what I'm trying to understand is

23   for -- given you had a new system that was in place

24   in June of 2020 and this was going to be the first

25   statewide use of the system in Georgia for

Page 223

1  elections, did -- did the Secretary's office provide

2  any particular plan to the counties for how to --

3  how to prepare to use paper ballots as an emergency

4  backup in that election if they needed to?

5         MS. LaROSS:  I object to the form of the

6      question.

7  BY MR. CROSS:

8      Q.   Or did they leave that to the discretion

9  of the counties?

10     A.   The State, you know, from my -- in my

11 opinion, they did provide information to the

12 counties through educational means.

13         I remember at the State conferences

14 leading up to this and the regional meetings

15 discussing about, you know, making sure you have an

16 emergency plan, that you have ballots available, we

17 can't stop -- voting has got to continue, if you

18 have an equipment issue, that you still issue

19 ballots.

20         You know, was there a plan -- a,

21 quote/unquote, plan that was drafted and shared to

22 individual counties about "Here's what the State

23 recommends you do"?  I cannot speak to that.  I do

24 not recall seeing that.

25     Q.   Are you aware of any counties using their

Page 224

1    BMDs to print a ballot for voters at the precinct on

2    election day?

3         A.   No.

4         Q.   You're not aware of Chris Harvey, for

5    example, ever giving authorization to any county to

6    do that?

7              MS. LaROSS:  Object to the form of the

8         question.

9              THE WITNESS:  You can't use a BMD to print

10        a hand-marked paper ballot to give to a voter.

11   BY MR. CROSS:

12        Q.   And what's the basis for that belief?

13        A.   I have never seen a hand-marked paper

14   ballot be produced from our BMDs to be handed to a

15   voter to fill in to then have scanned.  I have never

16   seen our BMDs print out a ballot in that format at

17   all.

18             Now, counties have what's called a mobile

19   ballot printer, and a mobile ballot printer is

20   actually a printer that's housed in their elections

21   office.  And the mobile ballot printer, in essence,

22   is a big printer, and a computer is connected to

23   that printer and PDF files can be extracted from the

24   Election -- Election Management project and taken

25   over to that computer that's connected to the

Page 225

1  printer and you can print out PDF files, which would

2  be the hand-marked paper ballots.  And then those

3  ballots could be taken to a polling location and

4  could then be scanned and recognized by the scanner.

5           That could be done, and I believe that

6  there were counties on election day in need of

7  printed ballots that did do that.

8       Q.   You've never heard that the Dominion BMDs

9  that Georgia currently has can be used as on-demand

10  ballot printers at the precincts?

11      A.   I have never heard that, and I have never

12  seen a ballot-on-demand be printed out from the BMD

13  that is a hand-marked paper ballot format.

14      Q.   All right.  Two quick questions and then

15  we'll take a break, if that's okay.

16      A.   Sure.

17      Q.   Just going back to what we talked about

18  before on the -- the -- the transi- -- the -- sorry.

19           We've talked a lot about this private

20  network that was set up for the Dominion system in

21  the summer of 2020; right?

22      A.   Yes.

23      Q.   Okay.  You said the reason of the

24  transition, if I understood you right, from the

25  system that you had in the training room when you

1   were first rolling this out to what you have now was

2   that it made a lot more sense, it was easier for the

3   workers who have access to those computers to be

4   able to have them in their office together, rather

5   than have to go from one office to another.

6           Did I get that right?

7       A.   Correct.

8       Q.   And why would the workers, during the

9   course of the day, need access to both computers?

10      A.   Well, if you're an elections -- if you're

11  an elections coordinator and you're building an

12  elections project, you're obtaining information from

13  the county related to the contests, the candidates.

14          You're also pulling information from eNet

15  that indicates, "Here are the precincts.  Here are

16  the combos."

17          Having the ability to actually have that

18  displayed on a computer screen in front of you on a

19  monitor to your right while you are turning and

20  working on a completely different computer in a

21  completely different network environment and you're

22  keystroking in that information, instead of having

23  to have a lot of different pieces of paper flying

24  around, you can have all of that information on

25  display on your public monitor and then sit at your

1    private computer and key the information in.

2         Q.   Okay.  And one last question.

3              Are you aware of any forensic examination

4    that's ever been done of the computers or the server

5    that sits on the Dominion private network to

6    determine whether it's ever been compromised in any

7    way or -- or accessed in any unauthorized fashion?

8              MS. LaROSS:  Objection to form of the

9         question.

10             THE WITNESS:  The Dominion -- the

11        Dominion-maintained system?

12   BY MR. CROSS:

13        Q.   Yeah.  Let me be clear.

14             So the -- the private network that now

15   exists as of the summer of 2020 that's used to

16   main- -- run the Dominion system at the Secretary's

17   office.  That's what we're talking about.

18        A.   Okay.  All right.  So -- so state the

19   question again, please.

20        Q.   Are you aware of any forensic examination

21   of any of that equipment, meaning the computers, the

22   server, any part of the equipment that makes up that

23   private network, to determine whether there's ever

24   been any compromise or unauthorized access?

25        A.   I am not aware of one.

Page 228

1      Q.   No.

2           MR. CROSS:  All right.  Yeah, let's take

3      a -- let's take a break.

4           VIDEOGRAPHER:  The time is 3:04 p.m.

5      We're off the record.

6           (Off the record.)

7           VIDEOGRAPHER:  The time is 3:30 p.m.

8      We're on the record.

9  BY MR. CROSS:

10     Q.   Okay.  Mr. Barnes, let's grab the next

11  exhibit, which I think is 17.

12          (Plaintiffs' Exhibit 17 was marked for

13      identification.)

14          THE WITNESS:  Okay.

15  BY MR. CROSS:

16     Q.   And if at any point, Mr. Barnes, you need

17  to take a break, just say the word; okay?

18     A.   Yes, sir.  Thank you.

19     Q.   Including if you need to stop.

20     A.   No, I appreciate it.  Yeah, the sugar

21  today has been extremely high, but I have been

22  powering through.

23     Q.   Okay.  Well, I'm sorry to hear that.

24  Hopefully that's not my fault.

25     A.   It's not -- it's not all your fault.

Page 229

1      Q.   I have been told I'm very sweet, so I

2    don't know.

3            MS. LaROSS:  It may not be personal at

4        all, David.  I'm not sure.

5    BY MR. CROSS:

6        Q.   All right.  Let me know when you've got

7    17.

8        A.   I'm looking at it.

9        Q.   Okay.  Let's see.

10           All right.  So Exhibit 17 is an email that

11   you received from Kevin Rayburn on June 9, 2020;

12   right?

13       A.   Yeah, it was sent to Scott Tucker and

14   myself.

15       Q.   Yeah.  And if you look at the -- in

16   Mr. Rayburn's email, he writes to you and Mr. Tucker

17   and copying Ms. Smothers at his -- or at Dominion

18   and Mr. Feehan at Dominion.  He writes "Is there

19   someone at Dominion making calls?  I am concerned

20   they are giving incorrect information.  One tech

21   reported a person named Jennifer (or Jessica) told

22   him to take certain corrections that set them back.

23   And now Jefferson has worsened their file."

24           Do you see that?

25       A.   I do.

1      Q.   Do you recall this situation?

2      A.   I don't recall that specific situation,

3   but this is -- in just scanning the rest of the

4   document, seems to be, you know, in -- in line with

5   what we were discussing earlier.

6      Q.   In what respect?

7      A.   It's discussing a "CHOICE External_ID for

8   county races" in that row there for Appling.  That's

9   what we were -- that's what I was mentioning earlier

10   as what was causing the problem with the Election

11   Night Reporting files that the counties were

12   generating and sending up to the State for ENR

13   checking purposes.

14      Q.   Okay.  So you don't recall a specific

15   situation where Dominion was -- techs were giving

16   direction to counties that were creating problems?

17      A.   I -- no, I don't recall a situation where

18   the instructions they were giving were creating

19   problems, but it could have been a scenario where

20   the instructions they were giving -- that the tech

21   was not understanding fully themselves and, thus,

22   creating a problem.

23      Q.   Okay.  All right.  Grab Exhibit 18,

24   please.

25      A.   Sure.

Page 231

```
 1              (Plaintiffs' Exhibit 18 was marked for
 2         identification.)
 3              THE WITNESS:  Okay.  I have it up.
 4    BY MR. CROSS:
 5         Q.   And you see Exhibit 18 is an email from
 6    Leigh Combs to Chris Harvey at the Secretary's
 7    office on June 9, 2020?
 8         A.   Yes.
 9         Q.   And do you know Leigh Combs?
10         A.   She is an election liaison for the
11    Secretary of State's office.
12         Q.   Okay.  Do -- the election liaisons, do
13    they work with CES or do they work with Chris
14    Harvey's department, or what was their role?
15         A.   Election -- election liaisons report to
16    the elections director -- at the time that was Chris
17    Harvey -- and they work in the downtown office of
18    the Secretary of State's elections division.
19         Q.   Okay.  So Ms. Combs writes here "███████
20    ████████████████████████████████████████████████
21    ████████████████████████████████████████████████.
22    ████████████████████████████████████████████████
23    ██████████████████████████."
24              Do you see that?
25         A.   I do.
```

Page 232

1       Q.   Do you know what it means when she writes

2   ██████████████████████████████████████████████████

3   ██████████████████████████████████?

4       A.   What that means is there are two ways to

5   activate a voting session on the BMD.  One is by

6   creating a voter access card from the Poll Pad, with

7   that voter access card containing the needed

8   activation code.

9            The other way is by what's called poll

10  worker ballot activation, where a poll worker

11  inserts a poll worker voter -- a poll worker card,

12  smart card, into the smart card reader on the front

13  of the BMD.

14           The poll worker then keys in an

15  eight-digit code that's associated to that poll

16  worker card and to that election, and then it gives

17  the poll worker the ability to do a ballot

18  activation where they are then asked for a ballot

19  activation code that then enables and brings up the

20  ballot on the touchscreen.  And then the voter can

21  interact with the ballot on the BMD touchscreen and

22  then have the BMD produce the printed ballot.

23      Q.   The default way is to use the card, right,

24  rather than the activation code?

25      A.   The expected way is for us to create the

Page 233

1   voter access code from the Poll Pad, yes.

2            The secondary way is poll -- is poll

3   worker activation if the Poll Pads are not

4   functioning as expected.

5        Q.   All right.  Grab Exhibit 19, please.

6            (Plaintiffs' Exhibit 19 was marked for

7        identification.)

8            THE WITNESS:  Okay.  I see it.

9   BY MR. CROSS:

10       Q.   All right.  So Exhibit 19, do you see

11  there's an email at the top from Cynthia Willingham

12  to Scott Tucker at Dominion and Chris Harvey and

13  Kevin Rayburn at the Secretary's office and then

14  cc'd to some others?

15       A.   Yes, I see that.

16       Q.   You see this is dated June 11, 2020?

17       A.   Yes, sir.

18       Q.   If you come down to the bottom, you'll see

19  Cynthia Willingham is the supervisor [audio

20  interruption] --

21       A.   That's correct.  I see that.

22            COURT REPORTER:  Excuse me.  It froze up

23       on my end.  Can you repeat that?  I have, "If

24       you come down to the bottom, you'll see Cynthia

25       Willingham is the supervisor" --

Page 234

1          MR. CROSS:  Yeah.

2     BY MR. CROSS:

3          Q.   If you come down to the bottom, Cynthia

4     Willingham is indicated as the supervisor of

5     elections for Rockdale County Board of Elections;

6     right?

7          A.   Yes, that's what I see.

8          Q.   Is she still there in that role?

9          A.   She is.

10         Q.   Okay.  And have you seen this email

11    before?

12         A.   No, sir, I have not.

13         Q.   Okay.  If you come down, there's one

14    particular point I wanted to ask you about.

15              If you look at the top of the second page,

16    do you see where it begins "Election Night," with a

17    closed parentheses, and then it says "As Scott

18    knows..."?

19         A.   Yes, I see that.

20         Q.   And he or she writes, "As Scott knows,

21    during the scanning of the by mail ballots last

22    week, our Tech, purged the scanned ballots, not

23    once, but twice on two different days."

24              Do you see that?

25         A.   I do.

Page 235

1        Q.    And this is sent on June 11, 2020, so two

2    days after the presidential primary; right?

3        A.    Yes.

4        Q.    Do you know why a Dominion tech would have

5    the ability to purge scanned ballots in the Dominion

6    election system?

7        A.    The Dominion system, when you are loading

8    election results, when you are loading images

9    collected by the scanner, they are uploaded through

10   RTR and housed inside of the -- the file structure

11   of the elections project.  And that's where they're

12   retained during the counting process, and then once

13   the election is completed and -- and certified,

14   those records stay in that possession.

15           Whenever you're in the elections project

16   and you're going through the process of counting

17   votes, there are times where you have loaded a file,

18   you've loaded a result file, but you may not have

19   loaded the images that are also paired with that

20   result file.  And then you may be attempting to do

21   the adjudication process, and you've got to have

22   both of those things in place in order for the

23   adjudication application to operate, it has to have

24   the result file and it has to have the ballot

25   images.

1              If it doesn't have those things, then you

2      have to remove the uploaded result file or the

3      uploaded images and reload them in.  And the

4      process -- one of the [audio interruption] use in

5      that process is called purging of results, and it is

6      a way of clearing out results from the system and

7      then making it ready for then uploading those --

8      that informational pieces back into the system for

9      tabulation.

10         Q.   So are you suggesting that what the

11     election supervisor is complaining about here was

12     actually appropriate by the Dominion tech, it's what

13     they're supposed to do?

14         A.   Again, I -- this is the first time I've

15     seen this email, so I don't really even know what

16     they are discussing at the time.

17              I am just speaking to the fact that if a

18     mistake was made in the process of uploading

19     information into RTR, that you do want to clear out

20     the mistake and then begin anew, making sure that

21     you are uploading things properly.

22         Q.   I see.

23              But you don't understand why the Dominion

24     tech here purged the scanned ballots twice?  You

25     don't know the reason in this particular instance;

Page 237

1    is that right?

2        A.   I do not know the reason in this

3    particular instance.

4        Q.   All right.  Grab -- what are we up to?  I

5    think we're up to 20.  Yeah.  Grab Exhibit 20,

6    please.

7            (Plaintiffs' Exhibit 20 was marked for

8            identification.)

9            THE WITNESS:  Okay.  I'm looking at

10           No. 20.

11   BY MR. CROSS:

12       Q.   And Exhibit 20, that's an email that you

13   sent to Scott Tucker on June 12, 2020; right?

14       A.   It is.

15       Q.   And if you come down to the bottom, the

16   first email on the bottom of the -- of the second

17   page, there's an email from Charlton Elections --

18   well, more precisely, it's an email from Brenda

19   Hodges, who's the supervisor of elections in

20   Charlton County, on June 12, 2020; right?

21       A.   That is correct.

22       Q.   And Brenda emails you and Chris Bellew;

23   right?

24       A.   Yes.  Yes, she does.

25       Q.   And if you look at the third sentence of

Page 238

1  her email, she puts "We have made corrections to the

2  Ballot ID's and all of those numbers are good, but

3  the NP votes are doing crazy things in that it is

4  adding the REP and DEM votes together for a Total

5  Votes Cast number and that is really throwing off

6  our numbers still.  I am 915 votes over what it

7  should be."

8          Do you see that?

9     A.   I do.

10    Q.   And in this time frame, in June of 2020,

11  there were a number of complaints or concerns that

12  came in from counties where the vote cast number was

13  not consistent with the Election Night Reporting

14  tabulation; right?

15          MS. LaROSS:  Objection as to form of the

16     question.

17          THE WITNESS:  State the question again.

18     I'm sorry.  It sort of broke up on me.

19  BY MR. CROSS:

20    Q.   Yeah.  Sorry.

21          Do you recall in this June 2020 time frame

22  that a number of counties alerted the Secretary's

23  office, including you, that their total votes cast

24  number was not the same as their ENR vote tallies?

25    A.   I do recall that.

Page 239

1      Q.   And what was the reason for that?  Was

2   there a particular reason that you recall?  Was it a

3   variety of reasons?

4      A.    In relation to Charlton County, I believe

5   the issue at hand here was they were actually

6   dealing with a dual database for the general

7   primary.  They had an initial database generated,

8   and before election day an error was found in that

9   original database.  I think it related to a county

10  commission race, that it didn't have a candidate it

11  needed to have or it had a -- something of that

12  nature.  I think it was a local race.

13             And in order to resolve that, we actually

14  had to have a second election project generated and

15  provided to the jurisdiction for loading into their

16  election equipment.

17             But because they had already begun voting

18  on the initial project file, in that there were

19  races on ballots that were not impacted by the

20  error, they continued to collect ballots and votes

21  during the advance voting period in that initial

22  election project, and then on election day, they

23  were using the new election project that had been

24  corrected and the mistake corrected.

25             What they were doing at -- on postelection

Page 240

1    time were trying to get the results from the initial

2    general primary ballot tabulated using the -- the

3    initial project file and then manually keying in the

4    results from that original election project file

5    into the corrected election project file so they

6    could -- they could generate a single consolidated

7    report, election summary report and statement of

8    votes cast report, that showed all votes collected

9    for the election, combining both of those two

10   project files to get a final result and also to

11   create an export file that would be then uploaded

12   into the Secretary of State's Election Night

13   Reporting System that would report all the votes

14   tabulated in the process.

15            And I -- I recall that when they were

16   going through this process of doing this manual

17   entry, it is a very arduous task to do.  And they

18   were given -- given instructions by Dominion on how

19   to do this manual entry, and the instructions that

20   were given did not seem to be correct and that they

21   have -- they had to keep going back and correcting

22   mistakes that kept happening.

23            And then eventually they were able to get

24   a tech that was well versed on the manual entry

25   process actually to Charlton County to get the whole

Page 241

1   process resolved and cleared.

2        Q.   Was that the same problem other counties

3   ran into when their votes cast count did not match

4   their ENR tallies, or were there other issues that

5   arose?

6        A.   There were a couple of instances of the

7   manual entry that took place.  I can think of -- I

8   believe Charlton had to go through a manual entry

9   exercise.  I believe Chatham County had to also go

10  through a manual entry exercise.

11            Those are the two that I remember.  There

12  may have been a couple more.  And so those are the

13  two that I can think of.

14       Q.   Okay.  All right.  Grab Exhibit 21,

15  please.

16            (Plaintiffs' Exhibit 21 was marked for

17       identification.)

18            THE WITNESS:  Okay.  I'm looking at it.

19  BY MR. CROSS:

20       Q.   Right.  So Exhibit 21 is an email from

21  Chris Harvey to Ryan Germany on June 19, 2020;

22  right?

23       A.   Yes.

24       Q.   If you come down to the bottom, this is

25  another email from Brenda Hodges at Charlton County.

Page 242

1   That's the first email in the thread.

2           Do you see that?

3       A.   I'm getting there.

4       Q.   Middle of the --

5       A.   Yes, I see it.

6       Q.   And that's June 19, 2020.

7            You see that; right?

8       A.   I do.

9       Q.   So this is again talking about how she

10  found a difference in the numbers when she was

11  trying to certify the results.

12          You see that in the second paragraph?

13      A.   I'm reading it.

14      Q.   And then she goes on "The Dominion

15  Regional Manager came earlier this week and finagled

16  with the Ballot ID's to get the number of votes cast

17  to be correct and in doing this some of my votes are

18  different."

19          Do you see that?

20      A.   I do.

21      Q.   Is this the process you were just talking

22  about with the manual entry or is this something

23  different, or do you know?

24      A.   I think it's related to, but I'm not

25  100 percent certain.

1      Q.   She then goes on in the next paragraph

2   "When I called the Regional Manager and told him

3   about the problem, he told me 'I don't have time to

4   worry about it right now and it doesn't matter

5   because he won.'  This was in reference to the

6   Sheriff's race, but there are other races with

7   different vote totals.  Needless to say that was

8   like throwing ice water in my face because" -- and

9   then she puts in all caps -- "because IT DOES

10  MATTER!!!!!  He was in Tattnall County trying to

11  help them get their numbers to work as well due to

12  [their] craziness with the Ballot ID's causing the

13  vote totals to be way over what they should be."

14           Do you see that?

15      A.   I do.

16      Q.   Did you get involved in this particular

17  situation?  Have you seen this before?

18      A.   I don't recall seeing this particular

19  email.  Again, I was -- I was involved in relation

20  to their manual entry and at least made aware of the

21  manual entry operations that they were having to go

22  through in Charlton County.  I don't have a

23  recollection of what she's discussing in regards to

24  the ballot IDs.

25      Q.   The conversation she attributes to the

Page 244

1   Dominion regional manager, who reportedly told her

2   that he didn't have time to worry about the

3   difference in the numbers she was seeing and it

4   didn't matter because the candidate had won the

5   sheriff's race, is that direction consistent with

6   what you would expect from Dominion?

7       A.   I would hope that anybody involved in

8   elections would never say something of that nature.

9   It would be my hope and expectations that if a

10  county is having issues with their election and has

11  concerns about whatever their election results may

12  be, what they are indicating, that they would work

13  to get it resolved so that those questions are

14  answered.

15      Q.   And you don't -- you don't know what was

16  done here because you hadn't seen this before; is

17  that right?

18      A.   This one I do not recall and I do not

19  remember seeing.

20      Q.   All right.  Grab Exhibit 22, please.

21           (Plaintiffs' Exhibit 22 was marked for

22           identification.)

23  BY MR. CROSS:

24      Q.   Just let me know when you have it.

25      A.   Yeah, I've got -- I'm sorry.  I've got it.

Page 245

1        Q.   Do you see Exhibit 22 at the top is an

2   email that you sent to -- the address is

3   clinchelections@clinchcounty on July 9, 2020?

4        A.   Yes, sir.

5        Q.   And you're responding to an email that

6   came in from -- it looks like Laina Ballance, the

7   Clinch County elections supervisor, on the same day.

8             Do you see that?

9        A.   I do.

10       Q.   And she wrote to you then "██████████

11   ████████████████████████████████████████████████

12   ███████████████████████████████████████████

13   ████████████    ██████████████████████████████

14   █████████████    ████████████████████████████

15   ██████████████████████████████████████████████

16   █████████████████    ████████████████████████

17   ██████████████████████."

18            Do you see that?

19       A.   I do.

20       Q.   And you responded "████████████████████

21   ██████████████████████████████████████████████████

22   ████████████████████."

23            Do you see that?

24       A.   I do.

25       Q.   And -- and we had talked earlier -- I

Page 246

1    thought you had testified that there was never a

2    time when you would tell a county that found broken

3    seals on BMDs to just replace the seals and continue

4    to use them.

5    ████████████████████████████████

6        A.  ██████████████████████████████████████

7    █████████████    ██████████████████████████

8    ████████████████████████

9             The election data seal is located on the

10   right-hand side of the device, on the top right-hand

11   side, and those are the seal areas that I had

12   mentioned earlier that are controlled by the county.

13            The seal on the left-hand side is not

14   noted as any type of poll worker location.  That's

15   all on the right-hand side.

16       Q.   Right.  But aren't -- I guess help me

17   understand, then.

18            I mean, I -- I understand the ones on the

19   left are put on by the State; the ones on the right

20   are put on by the county.  But isn't it still a

21   concern that they have got two BMDs that were

22   supposed to be securely stored and they have broken

23   seals at all?

24       A.   Well, again, they're in the process of

25   doing L & A testing and discovered that two of them

1    had -- had broke seals when they were starting to do

2    L & A testing.

3            Well, it would be up to them to put the

4    seals on the devices at the end of L & A testing

5    when it says completed.

6       Q.   Right.  But why wouldn't you -- why

7    wouldn't you want to undertake some investigation to

8    figure out whether the seals are missing on these

9    two BMDs because somebody tampered with them?

10      A.   Because this equipment is going through

11   logic and accuracy testing and she's referencing the

12   seals on the right side of the unit that would be

13   opened and resealed during logic and accuracy

14   testing.

15      Q.   Right.  But you understand that she's

16   saying that ███████████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████████████; right?

19           MS. LaROSS:  Objection as to form of the

20           question.

21           THE WITNESS:  A normal practice is to

22           remove seals from devices to begin logic and

23           accuracy testing and then to place new seals

24           upon those devices at the completion of logic

25           and accuracy testing.

Page 248

1    BY MR. CROSS:

2         Q.    So are you saying that you read this email

3    to mean that an elections county -- an elections

4    supervisor for Clinch County emailed you to say that

5    ██████████████████████████████████████████████

6    ███████████████████████████████████████████████

7    █████████████████████████████████████████████

8    ███████████████████████████████████████████████

9    ███████████

10        A.    That is how I interpret that email.

11        Q.    Okay.  Did you pick up the phone to call

12   her and find out if that's what she meant?

13        A.    I do not recall doing that, no, sir.

14        Q.    Well, sitting here reading it now, do you

15   think maybe what she actually meant was ████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   Did that reading ever occur to you?

19             MS. LaROSS:  Objection to form of the

20        question.

21             THE WITNESS:  That -- excuse me.  That may

22        be the way I was reading it today as I read it.

23             And, again, I would still point to they

24        are going to go through a logic and accuracy

25        testing on this device to get some level of

Page 249

1          assurance that the system is operational.

2              And also there's no mention to any seal

3          breakage on the left-hand side of the device,

4          which would be those seals that are placed

5          there by the State.

6              So at -- in reading this email, I don't

7          feel like any advice was given contrary to what

8          we would normally do.

9     BY MR. CROSS:

10        Q.   Even if she meant that ██████████████

11    ███████████████████████████████████████████████

12    ████████; is that right?

13        A.   Even so.  Because when you start taking

14    equipment out of storage and bringing it forward to

15    do testing, there are times when seals break in that

16    process.

17        Q.   And you don't think it would be a better

18    practice to actually investigate why the seals are

19    broken or missing before just putting new seals on

20    and putting the -- the equipment into an election?

21            MS. LaROSS:  Objection to form of the

22        question.

23            THE WITNESS:  Again, the equipment was in

24        the process of going through logic and accuracy

25        testing, so a level of testing was going to be

Page 250

1      done on the equipment and was done on the

2      equipment before use.

3  BY MR. CROSS:

4      Q.   And when you got back to Ms. Ballance, was

5  it your belief at this time that logic and accuracy

6  testing would detect malware or any other compromise

7  with the equipment?

8      A.   It was my -- my understanding of the logic

9  and accuracy process is that they do a process of

10 validating the version that is installed on the

11 device, and that involves looking at a hash value of

12 that version.

13          And then they perform an operational test

14 to confirm that the system is producing the ballots

15 as intended and that the ballots are then scanned

16 and counted as reflective to what is on the ballot.

17 So they were executing their logic and accuracy

18 test.

19     Q.   I'm sorry.  Are you saying that the

20 hash-matching test we talked about earlier, you

21 consider that part of the logic and accuracy

22 testing?

23     A.   That is, I believe, documented in the

24 logic and accuracy outline of how counties can

25 verify the hash that is installed on the BMD device.

 1          Q.    So when counties do their regular logic

 2    and accuracy testing before an election, is it your

 3    understanding that they're also matching the hash

 4    values for the applications on there?

 5          A.    They are matching -- they have the ability

 6    to view the hash signature of the ICX application.

 7          Q.    But is that required of them as standard

 8    logic and accuracy testing?

 9          A.    It is -- my recollection of the logic and

10    accuracy procedures is it is -- it is outlined in

11    the procedures to review the hash.

12          Q.    And when you sent this email on July 9,

13    2020, were you under the belief that logic and

14    accuracy testing, including the hash value match

15    that you've described, would detect malware or a

16    compromise with the equipment?

17          A.    I can only speak to the fact that those

18    were the procedures that counties were taking to

19    complete their logic and accuracy testing.

20          Q.    Right.  But as of 2020, were you under the

21    belief that that testing would detect malware or

22    another compromise on the voting equipment?

23               MS. LaROSS:  Object to the form of the

24          question.

25               THE WITNESS:  Those were the tests that

Page 252

1      are in place for counties to execute on their

2      equipment.

3   BY MR. CROSS:

4      Q.    That's not my question, Mr. Barnes.

5            My question is:  In 2020, were you under

6   the belief that the logic and accuracy testing that

7   you've described would detect malware or any other

8   compromise of the voting equipment in Georgia?

9            MS. LaROSS:  Object to the form of the

10      question.

11            THE WITNESS:  It was my belief that the

12      tests that the counties were undertaking would

13      give them some level of confidence that the

14      voting system was matching to what had been

15      certified for use by the State previously.

16   BY MR. CROSS:

17      Q.    So is that a "yes" or a "no" to my

18   question?

19      A.    That's a yes.

20      Q.    All right.  Grab Exhibit 23, please.

21            (Plaintiffs' Exhibit 23 was marked for

22      identification.)

23   BY MR. CROSS:

24      Q.    Just let me know when you've got that.

25      A.    I am looking at it.

Page 253

1      Q.   All right.  And if you need time to read

2   through it, let me know.

3           But just to make sure we're looking at the

4   same thing, do you see at the top it's an email from

5   Richard Barron at Fulton County on August 4, 2020,

6   to Dwight Brower, Derrick Gilstrap, and Timothy

7   Cummings?

8      A.   That is what I'm looking at.

9      Q.   Okay.  And then if you come down to the

10   bottom of the second page, you'll see that it starts

11   with an email from Rick Barron to Chris Harvey and

12   Blake Evans on August 3, 2020.

13      A.   Yes, sir.

14      Q.   And then if you look at the second --

15   well, show you the full context.  Sorry.  Back up.

16           You see "Subject" line "questions on new

17   proposed procedures" in Mr. Barron's email?

18      A.   Where in -- where in relation on the

19   document?

20      Q.   So if you come to the first email on the

21   thread, bottom of the second page, the subject line

22   Mr. Barron put was "questions on new proposed

23   procedures."

24      A.   Yes.

25      Q.   And "Importance" says "High."

Page 254

1            Do you see that?

2       A.   Yes.

3       Q.   And then in his second paragraph, he

4   writes "The County wants us to have our techs meet

5   the poll manager at the polling place to ensure all

6   equipment powers up.  They want us to break all

7   seals, power up the BMDs to ensure that all of the

8   circuits have enough juice to power those units

9   where they are plugged.  They then, want us to

10  reseal everything for Tuesday morning."  And then he

11  goes on to ask "Is all of this kosher and legal?"

12            Are you with me?

13      A.   Yes.

14      Q.   And then Mr. Harvey responds at the top of

15  the -- top half of the first page "I think that plan

16  is possible, depending on some details," and then he

17  quotes an SEB rule -- or actually multiple SEB

18  rules.

19            Do you see that?

20      A.   I do.

21      Q.   Were you involved with this situation at

22  all?

23      A.   I was not.

24      Q.   As the head of EC- -- sorry.  Strike that.

25            As the head of CES, do you have any

1    understanding as to whether the procedure that

2    Mr. Barron identified here about breaking all the

3    seals, powering up the BMDs, and then resealing

4    everything, whether that complies with the -- the

5    standards in Georgia for election security?

6              MS. LaROSS:  Objection as to form.

7              THE WITNESS:  It is my assumption in

8         reading this that what Mr. Barron is

9         referencing in regards to breaking all the

10        seals is not physically breaking every single

11        seal that's present on the BMD, but breaking

12        the seal that allows you access to the power

13        button that allows you to power on the BMD and

14        then resealing that one location with a new

15        seal after the machine had been powered on.

16        That is my assumption, being that I just read

17        this email for the first time.

18   BY MR. CROSS:

19        Q.   So you just -- you don't -- because you

20   haven't seen this before or dealt with it, you don't

21   know one way or the other what Mr. Barron was

22   referring to?

23        A.   That is correct, I do not know.

24        Q.   But if he was -- if he literally meant

25   breaking all the seals, that would not be the

Page 256

1    appropriate procedure; right?

2            MS. LaROSS:  Object as to form.

3            THE WITNESS:  Correct.  Breaking all the

4        seals -- poll workers are only supposed to be

5        opening one sealed compartment on the BMD, and

6        that is the lower right-hand side.

7    BY MR. CROSS:

8        Q.   A poll worker should only be breaking a

9    single seal on a BMD on the lower right-hand side?

10       A.   Correct.  They have to open that seal the

11   morning of the election in order to power the device

12   on.

13           Once the device is powered on, they are

14   instructed to close that door and place a new seal

15   on that door and notate that seal that's placed on

16   their opening and closing poll worker -- excuse me,

17   opening and closing polling place recap form.

18       Q.   Okay.  All right.  Let me grab the next

19   exhibit.

20           (Plaintiffs' Exhibit 24 was marked for

21       identification.)

22   BY MR. CROSS:

23       Q.   All right.  Grab Exhibit 24, please.

24       A.   Sure.

25           Okay.  I am looking at it.

Page 257

1        Q.   All right.  So Exhibit 24, do you see the

2    top is an email from Merritt Beaver to Dave Hamilton

3    on August 24, 2020?

4        A.   Yes.

5        Q.   And at this time, Dave Hamilton was the

6    chief information and security officer for the

7    Secretary's office; right?

8        A.   I believe that was his role, yes, sir.

9        Q.   Do you know who fills that role today?

10        A.   I am not 100 percent sure.  There has been

11    some turnover in the SOS IT, so I do not know the

12    name of the individual that's currently holding that

13    position.

14        Q.   Do you ever, in your work in CES, work

15    with a -- a vendor called Fortalice?

16        A.   I have not worked with Fortalice.  I know

17    that Fortalice is a company that the IT department

18    has used, I believe, for security assessment and

19    such of infrastructure that the SOS IT is involved

20    with.

21        Q.   So you, yourself, have not had any

22    communications or meetings with Fortalice?

23        A.   I have had one meeting with Fortalice, but

24    that was under guidance from our counsel.  But that

25    is the only interaction I've ever had with

1    Fortalice.

2         Q.   When you say a meeting with Fortalice

3    under guidance from your counsel, what do you mean?

4         A.   I was asked to meet with Fortalice in

5    their offices in Washington, D.C., in -- at a

6    request of our attorneys in this case.

7         Q.   When was --

8              MS. LaROSS:  And, David, this is the --

9         connected to the document that the Court has

10        already ordered is subject to the attorney work

11        product privilege.  So, you know, anything

12        about -- or substantively about that meeting or

13        connected in any way with that document is --

14        is privileged under the court order.

15   BY MR. CROSS:

16        Q.   When was that meeting, Mr. Barnes?

17        A.   I believe it was in 2019, I believe.  I

18   think it was in maybe April of 2019, April or May, I

19   think.

20        Q.   And without getting into the substance of

21   what was discussed, what was the -- what was your

22   understanding as to the purpose of that meeting?

23             MS. LaROSS:  I -- I object and I'm going

24        to instruct him not to answer.  I think that

25        does fall within the Court's order and the

Page 259

1      privilege.

2              MR. CROSS:  The purpose of the meeting --

3              MS. LaROSS:  Yes.

4              MR. CROSS:  -- is privileged?

5              MS. LaROSS:  Yes.

6              MR. CROSS:  We'll disagree on that.

7      BY MR. CROSS:

8          Q.   Who was at that meeting?

9          A.   My recollection was members of Fortalice

10     and myself.

11         Q.   Anyone else?

12         A.   My recollection, it was me and -- and

13     members of Fortalice.

14         Q.   Were there any lawyers in that meeting?

15         A.   I do not recall if we had a lawyer present

16     in the meeting room.

17         Q.   And you -- you traveled up to D.C. for

18     that meeting; is that right?

19         A.   I did.

20         Q.   How long was that meeting?

21         A.   It was one day.

22         Q.   And did this concern the Dominion

23     equipment or the DRE equipment?

24         A.   The DRE equipment.

25         Q.   Did you ever participate in any meetings

Page 260

1    with Dominion regarding the -- sorry.  Strike that.

2          Did you ever participate in any meetings

3    with Fortalice regarding the Dominion equipment?

4          A.   I have not.

5          Q.   So this meeting that you had with

6    Fortalice regarding the DRE equipment, what was

7    discussed there?

8          MS. LaROSS:  I object to the form of

9          the -- not the form of the question.  I object;

10         I think it's privileged and within the scope of

11         the Court's order.  So I'm going to instruct

12         him not to answer.

13         MR. CROSS:  What's the basis of that?

14         The -- the Court's order regarded something

15         totally different.

16         MS. LaROSS:  It's my understanding that

17         the Court's order pertains directly to this.  I

18         may -- you and I may disagree on that.

19         MR. CROSS:  But help me understand the

20         basis, though.  The Court's order regarded

21         Dominion BMD equipment that Fortalice looked at

22         in November of 2019.  It has nothing to do with

23         this.  So what's the basis for the instruction?

24         MS. LaROSS:  As I stated, it is -- I -- I

25         believe that it is within the Court order.

Page 261

```
 1            MR. CROSS:  Okay.  But can you help me
 2       understand what the linkage is you're drawing?
 3       You just don't know?
 4            MS. LaROSS:  I can -- let -- you can bring
 5       up the order and we can discuss it, but that's
 6       my understanding of the order.
 7            MR. CROSS:  Okay.
 8  BY MR. CROSS:
 9       Q.   Mr. Barnes, are you going to decline to
10  answer questions about that meeting at the direction
11  of your counsel?
12       A.   I am.
13            MR. CROSS:  All right.  We'll reserve on
14       that.
15  BY MR. CROSS:
16       Q.   All right.  Do you have an exhibit in
17  front of you?
18       A.   24?
19       Q.   Yes.
20       A.   Yes, sir.
21       Q.   All right.  So, again, we're looking at an
22  email from Merritt Beaver to Dave Hamilton
23  August 24, 2020; right?
24       A.   Yes, sir.
25       Q.   And if you come down, there's an email --
```

Page 262

1   the first email in the thread is from Dave Hamilton

2   on August 21, 2020.

3            Do you see that?

4   A.    Yes, sir.

5   Q.    And he writes "███████████████████████

6   ████████████████████████████████████████████

7   █████████████████████████████████████████████

8   ████████████████████████████████████████

9   █████████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████."

12           Do you see that?

13  A.    I do.

14  Q.    Do you agree with Mr. Hamilton's

15  assessment, in your role as the head of CES, that

16  ████████████████████████████████████████████

17  ████████████████████████████████████?

18  A.    It has been the custom of the Secretary of

19  State's office that if -- that we do not disclose

20  information that we feel like could be damaging to

21  the voting system.

22           And in this email, I don't know what

23  Mr. Hamilton is referencing or talking about in --

24  is this talking in reference to the voting system or

25  such?  I don't know.

Page 263

1      Q.   And what kind of information could be

2  damaging to the election system if disclosed

3  publically?

4      A.   Well, if you have complete, unfettered

5  access to the applications and have the ability to

6  go in and manipulate them at the code level, then

7  you may be able to make the system do something that

8  it's not supposed to do.

9      Q.   What other kinds of information would be

10  damaging to the election system if publicly

11  disclosed?

12          MS. LaROSS:  Objection to form of the

13      question.

14          THE WITNESS:  Well, again, unfettered

15      access into the voter registration system gives

16      you access to -- which is a part of the voting

17      system -- is personal data information, date of

18      birth, driver's license numbers, information

19      that is contained in those voter files.

20          The voting system, the voter registration

21      system, are all components that our office work

22      to keep secure.

23  BY MR. CROSS:

24      Q.   The -- the voting equipment in Georgia is

25  supposed to be kept in secure facilities across the

Page 264

1  state; right?

2      A.   It's supposed to be kept in

3  county-maintained locations with efforts to keep it

4  secure, yes, sir.

5      Q.   So given that, why would you ever have to

6  worry about ███████████████████?  Why would you

7  ever have to worry about information being damaging

8  to the election system, since it's locked up?

9          MS. LaROSS:  I object to the form of the

10         question.

11         THE WITNESS:  Indi- -- individual voters

12         touch voting machines with every election.

13         People witness the tabulation of votes in

14         elections offices where equipment is out and in

15         full view of people.  Those offices become

16         hectic on election night.  There are a lot of

17         people around.

18         So keeping the system secure in relation

19         to physical access, but also keeping

20         information secured in relation to how systems

21         operate, is also important.

22  BY MR. CROSS:

23      Q.   What's the -- you mentioned individual

24  voters touch voting machines at every election.

25          Why -- why does that matter, from a

1    security standpoint?

2            MS. LaROSS:  Objection to form of the

3        question.

4            THE WITNESS:  Voters interact with

5        devices.  That means they touch devices.  They

6        touch these devices under the purview of poll

7        workers.  They touch these devices under the

8        purview of other voters at the same time.

9            We're doing everything we can do to make

10       sure that when a voter is interacting with that

11       system, that they have no way of interacting

12       with the system to introduce anything

13       nefarious.

14           That is the reason that we put seals in

15       places.  That is the reason that we have poll

16       watchers that are watching things.  That is the

17       reason that we have poll workers who are

18       watching things constantly, is to make sure

19       that when there is added activity of voters, of

20       individuals in the polling place, when people

21       are in the process of doing logic and accuracy

22       testing, that all of these protocols, these

23       procedures, are maintained and in place to try

24       to protect and keep the voting system safe.

25

1    BY MR. CROSS:

2        Q.   And the security of that system depends,

3    in large part, on being able to trust all the

4    individuals who have access to it; right?

5        A.   That is correct, we have a level of trust

6    with those people that work in the elections

7    environment.

8        Q.   Except the Secretary of State has

9    repeatedly argued in our case that they cannot be

10   trusted with hand-marked paper ballots.

11           How do you reconcile those two positions?

12           MS. LaROSS:  I object to the form of the

13       question.

14           THE WITNESS:  Policymakers are going to

15       make decisions on how tasks are executed.  And

16       the legislative body of the State of Georgia

17       has instituted that we have this system in

18       place, and that's the system that we use.

19   BY MR. CROSS:

20       Q.   Well, that's not quite right.

21           The legislature in Georgia did not require

22   a BMD-based system that uses QR codes; right?

23           MS. LaROSS:  Object to the form of the

24       question.

25           THE WITNESS:  The -- the legislature

Page 267

1          passed a resolution indicating that the State

2          would have a uniform system of voting, and

3          protocols have been put in place for that

4          system to be a BMD design.

5                And then the Secretary of State put out a

6          bid for a BMD-based voting system, and that bid

7          was answered by vendors.  Those responses were

8          reviewed.  The procurement process isolated the

9          system that we have, and that is the system

10         that we are using.

11    BY MR. CROSS:

12         Q.   The answer to my question is "yes"; right?

13    The legislature in Georgia did not require a BMD

14    system that uses QR codes.

15                We're agreed on that; right, sir?

16                MS. LaROSS:  I object to the form of the

17         question.

18                THE WITNESS:  The legislature did not put

19         into the code a BMD device with QR code, that

20         is correct.

21    BY MR. CROSS:

22         Q.   That's a decision that the Secretary,

23    Secretary Raffensperger, made; right?

24                MS. LaROSS:  Objection to form of the

25         question.

1            THE WITNESS:  The RFP process, through

2       evaluation of proposals, selected a BMD system

3       that uses a QR code.

4  BY MR. CROSS:

5       Q.   So coming back to the question I asked you

6  a moment ago that I don't -- I don't think you

7  actually answered, how do you reconcile the position

8  that you have an election system the security of

9  which depends, in large part, on trusting everyone

10 who has access to it with the position repeatedly

11 taken by Secretary Raffensperger that those people

12 cannot be trusted with access to hand-marked paper

13 ballots?

14           MS. LaROSS:  Object to the form of the

15      question.

16           THE WITNESS:  I -- excuse me.  I'm a

17      member of the Secretary of State's office, and

18      my job is to work hand in hand with county

19      election officials that are -- that have the

20      task of executing elections.

21           So from my point of view and from my -- I

22      reconcile in my mind that our job is to work to

23      empower and enable those county election

24      officials to do the best job that they can.

25           Again, policymakers, who are -- who are

1           above me, may have differing opinions on what

2           counties can do and what counties can't do.

3           And those decisions they will be held

4           accountable for by the voters.

5                So my job, I will continue to work with

6           county election officials and do the best I can

7           to help support them.

8   BY MR. CROSS:

9      Q.   And you said policymakers can be held

10  accountable by the voters.  In fact, the Georgia

11  Republican party has made explicit in its platform

12  calling for hand-marked paper ballots in the State

13  of Georgia.

14               Are you aware of that?

15               MS. LaROSS:  I object to the form of the

16          question.

17               THE WITNESS:  I believe I'm aware of that,

18          but I'm -- I haven't read that recently.  But I

19          believe that is the case.

20  BY MR. CROSS:

21     Q.   And do you have a personal view on the

22  reliability of hand-marked paper ballots as a voting

23  system for Georgians?

24               MS. LaROSS:  I object to the form of the

25          question.

```
 1            THE WITNESS:  Election vendors have
 2       designed a various litany of voting systems.
 3       Some are -- some use nothing but hand-marked
 4       paper ballots that go through scanners.  Some
 5       use a combination of BMD-generated ballots with
 6       and without bar code.  Some are old optical
 7       scan systems.  And there are still
 8       jurisdictions that are using old lever machines
 9       that haven't been produced in a long time.
10       Some jurisdictions are using paper ballots that
11       are hand-counted.  Each jurisdiction, each
12       state, and in some cases each county, makes the
13       determination of what equipment they use.
14            I once did research trying to figure out
15       how reliable optical scan ballots were in
16       relation to undervotes.  I undertook that in
17       2001, early 2002, and found that optical scan
18       systems at that time had a high level of
19       undervote capture.
20            Now, systems have improved since then, and
21       if policymakers make a decision that the State
22       of Georgia needs to transition away from its
23       current system into a different system, we'll
24       be ready to help implement that system and keep
25       moving forward.
```

Page 271

1    BY MR. CROSS:

2         Q.   Mr. Barnes, let me come back to the

3    question I asked you.

4              Do you have a personal view --

5    irrespective of what any jurisdiction is doing

6    around the country, as someone who's been working

7    with elections for two decades, do you have a

8    personal view on whether hand-marked paper ballots

9    are a reliable method of voting?

10             MS. LaROSS:  I object to the form of the

11             question.

12             THE WITNESS:  I think any system that

13             jurisdictions use, whether it's a BMD system

14             that's been through federal testing and state

15             testing, whether it's an optical scan system

16             that's been through federal testing and state

17             certification testing, a hand-marked paper

18             ballot system that's been through levels of

19             testing, I believe all of those voting systems

20             are reliable for use by whatever jurisdiction

21             chooses to use them.

22    BY MR. CROSS:

23        Q.   In fact, Georgia does currently process

24    millions of hand-marked paper ballots through its

25    absentee voting system; right?

Page 272

1        A.    It does.

2        Q.    And you certainly would not suggest

3   there's anything unreliable about that system;

4   right?

5        A.    I would not suggest that.  I believe it is

6   very reliable.

7        Q.    Are you aware that the current Dominion

8   system can process, scan, tabulate hand-marked paper

9   ballots at the precincts on election day?

10             MS. LaROSS:  Objection as to form of the

11        question.

12             THE WITNESS:  The -- the ICP scanner that

13        is sent out to a polling location on election

14        day has the ability to process either a

15        hand-marked paper ballot or a BMD-generated

16        ballot.

17   BY MR. CROSS:

18        Q.    Are you aware that BM- -- sorry.  Strike

19   that.

20             Are you aware that Georgia is the only

21   state in the country that uses BMDs as the primary

22   means of voting statewide?

23             MS. LaROSS:  I object to the form of the

24        question.

25             THE WITNESS:  I am not certain on that.

Page 273

1   BY MR. CROSS:

2       Q.   Would it surprise you to learn that that's

3   true?

4           MS. LaROSS:  Object to the form of the

5           question.

6           THE WITNESS:  I -- I don't -- I don't know

7           if it would surprise me or not.  I know that

8           Georgia has been using an electronic form of

9           voting for almost 20 years now, that there were

10          states that instituted electronic forms and

11          have now transitioned back to hand-marked paper

12          ballots or optical scan ballots, and

13          continue -- and there are jurisdictions that

14          continue to assess and adopt new systems.

15  BY MR. CROSS:

16      Q.   Are you aware that scanners now have

17  developed to the point that they can flag under- and

18  overvotes on hand-marked paper ballots at the point

19  at which the voter scans the ballot so that the

20  voter can then go back and indicate whether they

21  intended that or not?

22      A.   I am.

23          MS. LaROSS:  Objection as to form.

24          THE WITNESS:  Excuse me.

25          I am.

Page 274

1    BY MR. CROSS:

2        Q.   And are you aware of whether the current

3    Dominion scanners have that capability in Georgia?

4        A.   I am aware, and they do.

5        Q.   Do you know if that's turned on?

6        A.   The system currently is configured to

7    reject overvotes, so any overvote that's introduced

8    into the scanner is flagged and sent back to the

9    voter.

10           An undervoted ballot is not rejected,

11   because the voter has the right to undervote a

12   ballot.

13       Q.   So one question on terminology.

14           In the emails that I've seen, sometimes

15   there's discussion of "tabulator," as distinct from

16   "BMD."

17           What's the tabulator?

18       A.   Okay.  A tabulator -- the way I reference

19   it, a tabulator is a device that counts ballots.

20       Q.   So that would be --

21       A.   There are three -- there are three types

22   of tabulator in our election project.

23           There is -- a BMD is a classification of

24   tabulator.  It does not tabulate votes, but it does

25   count the number of ballots it produces.

1            An ICP, which is a polling place scanner,

2      is a tabulator.  It counts votes, it counts every

3      ballot that's scanned, but it also tabulates a

4      result from that scanned ballot.

5            And then the ICC, the central scanner, is

6      a tabulator.  It counts ballots as ballots are

7      passed through in the scanning process, but it also

8      tabulates the result from those scanned ballots.

9          Q.   Got it.  Okay.  Thank you.

10           All right.  Let me pull up the next

11     exhibit.

12           (Plaintiffs' Exhibit 25 was marked for

13           identification.)

14     BY MR. CROSS:

15         Q.   All right.  Grab Exhibit 25, if you would.

16           MR. CROSS:  Are you doing all right,

17         Mr. Barnes?

18           THE WITNESS:  Yeah, I'm hanging in there

19         with you right now.

20           MR. CROSS:  Okay.

21           THE WITNESS:  And you said 25?

22     BY MR. CROSS:

23         Q.   Yes, sir.

24         A.   Okay.  I am on -- I've got it open.

25         Q.   Okay.  Do you see Exhibit 25 is an email

Page 276

1    from Blake Evans to Gabriel Sterling and Chris

2    Harvey on September 10, 2020?

3         A.   Yes.

4         Q.   Okay.  And if you come down -- let's see.

5    If you come down, the email immediately below is an

6    email from Gabe Sterling forwarding on an email from

7    Rick Barron on September 10, 2020.

8              Do you see that?

9         A.   I do.

10        Q.   And Mr. Barron's email has the subject

11   line "███████████████████████████████."

12             Do you see that?

13        A.   I do.

14        Q.   And then if you come down to the

15   second-to-last paragraphs -- it's the top half of

16   the second page just above where Rick signs off

17   "█████████████" -- do you see the paragraph that

18   begins "█████████████..."?

19        A.   I do.

20        Q.   And here, Mr. Barron writes to

21   Mr. Sterling "████████████████████████████████████

22   ███████████████████████████████████████

23   ███████████████████████████████████████

24   ███████████████████████████████

25   ████████████████████████████████████████████

1   ██████ ."

2          Do you see that?

3   A.   I do.

4          MS. LaROSS:  David, I did have a question.

5   I'm sorry to interrupt, but this is a document

6   that's been marked AEO, so this ought to be a

7   confidential portion of the deposition, all

8   questions about this document.

9          MR. CROSS:  Okay.  Understood.

10          MS. LaROSS:  Thank you.

11          MR. CROSS:  And we don't understand why

12   it's AEO, but we -- we'll just reserve on that.

13   I understand your -- your position.

14          MS. LaROSS:  Thank you.

15   BY MR. CROSS:

16   ██ ████████████████████████████████

17   ███████████████████████

18      ██████████████████████████████████

19   ███████████████████████████████

20   ████████████████████████████████

21   ██████████████████████████

22   █████████████████████████████████

23   ██████████████████████████████████

24   ████████████████████

25      ██ ████████████████████████████████



Page 279

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5  ▓▓

6       Q.   All right.  Let me grab the next one.

7            (Plaintiffs' Exhibit 26 was marked for

8       identification.)

9  BY MR. CROSS:

10      Q.   Just let me know when you've got that.

11      A.   Okay.  Sorry.  I'm refreshing.

12      Q.   Okay.  I think it's 26.

13      A.   Okay.  I've got it open.

14      Q.   All right.  So at the top, this is an

15  email from Scott Tucker to you that you received on

16  September 29, 2020; right?

17      A.   Yes.

18      Q.   And it begins with an email that

19  Mr. Tucker sent you on the same date.

20           Do you see that at the bottom?

21      A.   I am looking at it now.

22      Q.   And Mr. Tucker wrote "You have received

23  access to a DVS File Share from Scott Tucker."

24           Do you see that?

25      A.   I do.

Page 280

1      Q.   And below, he writes "Michael, here are

2   the instructions for updating the software on the

3   ICX."

4           Do you see that?

5      A.   I do.

6      Q.   And do I understand correctly that this

7   was instructions involving the software change on

8   the BMDs we talked about earlier that Pro V&V

9   characterized as de minimis?

10     A.   Yes.

11     Q.   And then you write back "My password is

12   not accessing the link."

13          Do you see that?

14     A.   I do.

15     Q.   And he writes "Try the standard sos

16   password."

17          Is there -- is there a -- what does he

18   mean by "standard Secretary of State password"?

19     A.   I'd have to recall what we were putting in

20   place there now.  There -- when we first build an

21   Election Management -- or when Dominion were putting

22   together the initial Election Management computers,

23   there was a -- a -- a starting point username and

24   password that we use on that system.  But then once

25   it was assigned to an individual county, then that

Page 281

1  county had an updated password assigned to that

2  administrative sign-in point.

3          So my assumption here is that he's talking

4  about that password that we use just on the initial

5  structure of the file, before it is then replaced by

6  individual and county passwords.

7      Q.   So that standard password was still in use

8  at this time; right?

9      A.   Well, again, when we build individual

10 projects or build -- build out the server for a

11 county, it was -- had a password that we assigned to

12 it during its setup and testing phase.

13         And then after it has been completed and

14 tested and we knew where it was going to be assigned

15 at the county, once it was assigned at the county,

16 that password was updated with a new county-specific

17 password.

18     Q.   Did the standard password work for you

19 here?  There's no follow-up email from you that's --

20     A.   I -- you know, I don't recall.

21     Q.   Do you have any reason to believe it

22 didn't?

23     A.   I -- I don't know.  I can't remember.  I

24 mean, I know we got the file from that

25 Dominion-controlled site, but I can't recall if that

Page 282

1    password or a different password was used to access

2    it.  I do not know.

3         Q.   And one other question about -- I forgot

4    to ask earlier on this change in the BMD software in

5    September, October of 2020.

6              It went from Democracy version ending in

7    .30 to .32.  Was there a .31, or did they skip that?

8         A.   I don't know if there was a .31.  We were

9    only provided .32.

10        Q.   And you were originally using .30; is that

11   right?

12        A.   That is correct.

13        Q.   Does the Secretary's office provide any

14   requirements for the counties on instructions for

15   voters on the importance of reviewing their BMD

16   ballots?

17             MS. LaROSS:  Objection to form of the

18             question.

19             THE WITNESS:  The Secretary of State's

20             office, you know, educated counties that when

21             they're training their poll workers, their poll

22             workers that are stationed near the ICPs should

23             be instructing voters to please review their

24             ballot, make sure it is correct before entering

25             it into the scanner.

1          Did the Secretary of State's -- has the

2          Secretary of State's office written a document

3          outlining those procedures?  I would have to

4          check.  I am not sure.

5    BY MR. CROSS:

6          Q.   Based on your experience with this system

7    and with elections over the years, is it important

8    for voters to review their BMD ballots?

9          A.   I think it's important for a voter to

10   always review their ballot, whether it was on a DRE

11   before they hit "Cast," whether it's been printed

12   from a BMD and before it's inserted into a scanner.

13   If they were filling out a paper ballot, before they

14   return it to the elections office, they should

15   always double-check it.

16          Do I have reason to believe that if it's

17   not correct, the system is going to do something

18   nefarious?  No.  If it's not -- if it's something

19   that the system is not expecting to receive, it's

20   not going to take it.

21         Q.   Well, if the ballot has a QR code that is

22   of the type that the scanner is designed to

23   tabulate, but it -- it captures different selections

24   than the voter intended and actually casts on the

25   BMD, the scanner's not going to kick that out;

Page 284

1   right?

2           MR. CROSS:  Shoot.  He's freezed.

3           COURT REPORTER:  Yeah, I don't hear

4       anything.

5           VIDEOGRAPHER:  Yeah.

6           MR. CROSS:  I think we lost --

7           VIDEOGRAPHER:  Would you like to go off

8       the record?

9           MR. CROSS:  It's funny, we can see Diane,

10      but Michael's gone.

11          MS. LaROSS:  I think Michael's screen

12      froze.

13          MR. CROSS:  Oh.

14          VIDEOGRAPHER:  Would you like to go off

15      the record, Counsel?

16          MR. CROSS:  Yeah.

17          VIDEOGRAPHER:  The time is 4:39 p.m.

18      We're off the record.

19          (Off the record.)

20          VIDEOGRAPHER:  The time is 4:42 p.m.

21      We're on the record.

22          MR. CROSS:  So, sorry, let me get back to

23      where I was.

24          Did I really say "he's freezed"?  That's

25      terrible.  That's terrible.  That's what I

1      said.  Okay.  I wish I got an errata.  That's

2      embarrassing.

3  BY MR. CROSS:

4      Q.   Okay.  All right.  So the question I was

5  asking you, Mr. Barnes, was:  If the ballot has a QR

6  code that is of the type that the scanner is

7  designed to tabulate, but it captures different

8  selections than the voter actually cast on the BMD,

9  the scanner would still -- would still tabulate

10 that; right?

11      MS. LaROSS:  Object to the form of the

12      question.

13      THE WITNESS:  The scanner is designed to

14      tabulate what is contained within the QR code.

15 BY MR. CROSS:

16      Q.   Based on your experience with elections

17 over the years and what you know about the current

18 environment of -- of threats -- sophisticated

19 threats to U.S. elections, would you personally be

20 more comfortable with an election system that does

21 not use QR codes, where voters can actually read

22 what's going to get tabulated?

23      MS. LaROSS:  I object to the form of the

24      question.

25      THE WITNESS:  What I can speak to is I do

1        have confidence, and continue to have

2        confidence, in the voting system that we have,

3        which just uses a QR code to interpret the

4        intent of the voter.

5             But in our use of the voting system,

6        through testing, continued testing, through

7        federal testing, state testing, logic and

8        accuracy testing, postelection audits that are

9        done, that what is -- the hand count that was

10        redone of all the voting ballots generated by

11        BMDs in the November '20 election that

12        correlated what the QR code had calculated

13        versus what the eyes read on the ballot from

14        the text format, I have a high level of

15        confidence that the voting system that we use,

16        which does have a QR code, is showing accurate

17        intent of the voter.

18   BY MR. CROSS:

19        Q.   All right.  Well, I want to break that

20   down into some pieces, but first let me come back to

21   the question I asked you, which is:  Would you

22   personally prefer a system that does not tabulate a

23   QR code, but instead tabulates human-readable text

24   where voters know that what's going to get tabulated

25   is what they, themselves, can read?

1          MS. LaROSS:  Object to the form of the

2     question.

3          THE WITNESS:  Vendors are going to

4     generate voting systems based upon the demand

5     of the marketplace.

6          And at the time, at the time that the

7     State of Georgia was in the marketplace looking

8     for a voting system, the procurement process

9     gave us the system that we have, which I do

10    have confidence in.

11         The State of Georgia will make a decision

12    moving forward in the future on whether to

13    maintain the system as we have or to transition

14    to other systems.  There is some discussion of

15    transitioning to hand-marked paper ballots

16    or -- that may be hand counted, that may be

17    processed through scanners, and the

18    policymakers in place will make the decision

19    that they feel is best for the State of

20    Georgia.  I'm not in a position to where I can

21    make that decision on what the system will be.

22         I have confidence in hand-marked paper

23    ballot systems that are procured -- that

24    vendors are putting forth; I have confidence in

25    electronic systems that vendors are putting

1       forth.  I feel like the vendor community is

2       doing a good job of putting products out there

3       and giving options to counties and states on

4       what to select.

5   BY MR. CROSS:

6       Q.   Mr. Barnes, let me try it again.

7            Yes or no, do you have a personal

8   preference -- do -- would you personally feel more

9   comfortable casting a ballot in Georgia elections

10  where the -- where the portion that's getting

11  tabulated is what you, yourself, can read?  Just yes

12  or no?

13       MS. LaROSS:  Objection to form of the

14       question.

15       THE WITNESS:  I support the voting system

16       that we have today.  I like the QR code from a

17       reliability standpoint, that when a computer is

18       reading something, it reads that code, it

19       interprets it, and it translates what is in

20       that code.  And I feel confident that what's in

21       that code is what the voter has intended to be

22       placed in that code.

23  BY MR. CROSS:

24       Q.   But you've already said that you have no

25  doubts about the reliability of the system scanning

Page 289

1    human -- I'm sorry -- scanning hand-marked paper

2    ballots; right?

3         MS. LaROSS:  I object to the form of the

4         question.

5         THE WITNESS:  Yes, I have confidence that

6         our system is scanning hand-marked paper

7         ballots properly and reflecting the intent of

8         the voter.

9         We have a system that actually gives us

10        both options and we are currently using both

11        options, and I have confidence in both options.

12   BY MR. CROSS:

13        Q.   Well, under the -- under the new Georgia

14   statute, it's not as easy to vote absentee as it

15   used to be; right?

16        MS. LaROSS:  Objection to the form of the

17        question.

18        THE WITNESS:  There have been changes to

19        the election statute in Georgia in reference to

20        when absentee ballots -- the length of time

21        absentee ballots can be issued prior to an

22        election, the amount -- how those absentee

23        ballots are returned to the county elections

24        office for tabulation purposes.  There have

25        been changes to the election statute, yes.

Page 290

1   BY MR. CROSS:

2       Q.   You said at the time that this system was

3   selected -- let me just get what you said, because I

4   want to make sure I get it right.

5            You said "...at the time that the State of

6   Georgia was in the marketplace looking for a voting

7   system, the procurement process gave us the system

8   that we have..."; right?

9       A.   Yes, sir.

10      Q.   Were you aware that before the Secretary's

11  office announced that it was adopting this BMD

12  system, the Secretary's own election security

13  expert, Michael Shamos, testified that you should

14  not use QR codes in election systems?

15           MS. LaROSS:  I object to the form of the

16      question.

17           THE WITNESS:  I am not aware of that.

18  BY MR. CROSS:

19      Q.   And you also testified that demand is a

20  significant driver of the types of election systems

21  that are produced by vendors; right?

22      A.   I believe so, yes.

23      Q.   And as the head of CES for Georgia, you

24  actually play a pretty meaningful role in -- in

25  shaping that demand; right?

Page 291

1          MS. LaROSS:  Objection to the form of the

2      question.

3          THE WITNESS:  My role at CES is to become

4      a high-level user of the voting system that the

5      State of Georgia has selected for use, whatever

6      that system may be.

7  BY MR. CROSS:

8      Q.   Are you familiar with the SAFE Commission?

9      A.   I believe that was a commission that the

10  Secretary of State instituted, yes.

11     Q.   And, in fact, Governor Kemp, when he was

12  the Secretary of State, created the SAFE Commission

13  to advise on what the next election system should

14  be; right?

15     A.   I believe that is true, yes.

16     Q.   And are you familiar with Professor

17  Wenke Lee.

18     A.   I remember meeting Professor Lee, yes.

19     Q.   In what context did you meet Dr. Lee?

20     A.   I believe I met him at one of the

21  commission meetings.

22     Q.   And did you talk with him about his views?

23     A.   Not directly one-on-one, no, sir.

24     Q.   Did you share any personal views of your

25  own with him or anyone on the SAFE Commission about

Page 292

1    the election system?

2              MS. LaROSS:  Objection as to form.

3              THE WITNESS:  My recollection of

4         interaction with the SAFE Commission is I

5         attended one meeting of the SAFE Commission.  I

6         think I attended a meeting that they had in

7         Savannah.  But that was my interaction with the

8         SAFE Commission.

9    BY MR. CROSS:

10        Q.   Do you recall that Dr. Wenke Lee was the

11   only cybersecurity expert who served on the

12   SAFE Commission, and he was hand-selected by

13   Governor Kemp?

14        A.   I believe that to be the case.

15        Q.   And are you aware that --

16             COURT REPORTER:  Excuse me.  I -- excuse

17        me.  I'm sorry.  I have an emergency.  Just

18        give me one second.  Sorry.

19             VIDEOGRAPHER:  The time is 4:51 p.m.

20        We're off the record.

21             (Off the record.)

22             VIDEOGRAPHER:  The time is 4:52 p.m.

23        We're on the record.

24   BY MR. CROSS:

25        Q.   Sorry.  I think you answered this yes, but

Page 293

1    I'm not sure she got it, so let me just ask the

2    question again, Mr. Barnes.

3              Do you recall that Dr. Wenke Lee was the

4    only cybersecurity expert on the SAFE Commission,

5    and he was selected by then-Secretary Kemp?

6              MS. LaROSS:  I object to the form of the

7         question.

8              THE WITNESS:  Yes, that's my recollection.

9    BY MR. CROSS:

10        Q.   Were you aware that Dr. Wenke Lee objected

11   to using BMDs in the State of Georgia and

12   specifically urged the adoption of hand-marked paper

13   ballots?

14             MS. LaROSS:  Object to the form of the

15        question.

16             THE WITNESS:  I seem to recall that

17        Dr. Lee wrote a -- I'll phrase it as a

18        dissenting opinion of what the -- what the

19        SAFE Commission found -- issued.

20   BY MR. CROSS:

21        Q.   And in particular, his opinion was that in

22   the current environment of threats to U.S.

23   elections, BMDs are not sufficiently secure and,

24   instead, hand-marked paper ballots should be used;

25   right?

1          MS. LaROSS:  Objection as to form.

2          THE WITNESS:  I believe that's what he

3      stated.

4  BY MR. CROSS:

5      Q.   I just want to make sure we all understand

6  where we are.

7          Georgia has an election system that the

8  sole cybersecurity expert on the SAFE Commission

9  objected to; Dr. Michael Shamos, who was the

10  election security expert in this case for the

11  Secretary, objected to; and that the current

12  election security expert for the State, Dr. Juan

13  Gilbert, has said he doesn't disagree with any of

14  the technical vulnerabilities Dr. Halderman has

15  found.

16          And just so I understand, you feel, as the

17  head of CES, in light of all that, this is a system

18  that voters should have confidence in; is that

19  right?

20          MS. LaROSS:  Object to the form of the

21      question.

22          THE WITNESS:  I feel like through the use

23      of this voting system, that the voting system

24      proved itself in the November 2020 election,

25      where the ballots were not only counted once by

1    the scanners that were used in the polling

2    locations with the ballots that were produced

3    from the BMDs, but counted by hand using the

4    text format on the ballot, came to the same

5    result as the scanners were count -- counted,

6    and then, thirdly, were counted a third time

7    using the central scanners and tabulated a

8    result that again was in line with what was

9    found in the previous two counts.

10         So I feel like the voting system in

11    Georgia is a reliable, trustworthy voting

12    system.  There will be others that do not agree

13    with that opinion, but I feel like we do have a

14    safe and secure voting system in Georgia.

15 BY MR. CROSS:

16    Q.   It doesn't concern you, as the head of

17 CES, that there's not a single election security

18 expert that has endorsed this system on the behalf

19 of the Secretary, literally not one?

20         MS. LaROSS:  I object to the form of the

21    question.

22         THE WITNESS:  We always want to have

23    people that like the things that we do, and we

24    feel like we have done an extremely good job of

25    instituting a new voting system, making sure

Page 296

1           that it's accessible to our voters, and that it

2           is reflective of what the voters wish to purvey

3           to the State when an election takes place.

4    BY MR. CROSS:

5         Q.   Can you identify one cybersecurity

6    election expert that has endorsed the current

7    Georgia system as a reliable voting system?

8         A.   I cannot.

9         Q.   Is voter confidence in that system

10   important?

11        A.   Voter confidence in all that we do as the

12   elections divisions important.  It's important that

13   they have confidence in the people that run

14   elections.  It's important that they have confidence

15   in the systems that we use.  It's important that

16   they have confidence in the voter registration

17   system.

18            And we work day in and day out doing what

19   we can to secure the system that we have.

20        Q.   But if you're confident that the system is

21   secure, particularly in an environment now where

22   there have been extraordinary claims made about the

23   reliability of that system, why not just have an

24   election security expert analyze it, examine it, and

25   offer an opinion on whether it's reliable?

1          MS. LaROSS:  I object to the form of the

2      question.

3          THE WITNESS:  I'm sure if the

4      Secretary of State decided that he wanted to do

5      that, that that would get done.

6  BY MR. CROSS:

7      Q.   And as you sit here, you don't know why

8  he's not decided that; right?

9          MS. LaROSS:  I object to the form of the

10      question.

11          THE WITNESS:  I do not.

12  BY MR. CROSS:

13      Q.   Do you think voters would have more

14  confidence in a system that did not use QR codes,

15  where what was getting tabulated, they could

16  actually read for themselves?

17          MS. LaROSS:  I object to the form of the

18      question.

19          THE WITNESS:  I don't know.  Voters have

20      confidence in systems, and it seems like in

21      today's environment, voters only have

22      confidence in systems that -- where the people

23      that they supported in the election won and

24      they don't have -- they don't have good

25      confidence in systems when their candidate of

 1        choice doesn't win.

 2             So the -- the world of elections is -- is

 3        continually under -- under a lot of stress and

 4        strain as we try to do the work that we can to

 5        allow voters their voice on the direction of

 6        the country, of the state, and of their

 7        counties.

 8   BY MR. CROSS:

 9        Q.   Mr. Barnes, we'd certainly agree that we

10   find ourselves in a pretty sad condition on how some

11   voters view the election system, but doesn't that --

12             MS. LaROSS:   Object --

13   BY MR. CROSS:

14        Q.   -- why doesn't that raise all the more for

15   the Secretary to bring someone in and do a robust

16   examination of this system and say, "I've looked at

17   it and I have reasonable confidence that it's not

18   compromised, it's reliable, and you can trust it"?

19             MS. LaROSS:   I object to the form of the

20        question.

21             THE WITNESS:   Well, before the system was

22        ever procured by the State, it went through a

23        federal testing lab for inspection against and

24        validation with the federal voting standards

25        for voting equipment.   So we had some level of

Page 299

1           confidence even before procurement that the

2           voting system in place is operational and

3           secure and functioning properly.

4                Whatever the Secretary of State chooses to

5           do from this point forward on how to analyze

6           the voting system, whether it be this voting

7           system, whether it be a different voting

8           system, I'm sure that task will get executed

9           and -- and done thoroughly and to the desire of

10          the Secretary of State whenever he, she, or

11          whomever makes that decision.

12     BY MR. CROSS:

13          Q.   All right.  And then just finally,

14     Mr. Barnes, you mentioned the audit a few times as

15     validating the reliability of the election system,

16     but I want -- I want to make sure we understand the

17     audit.

18               The audit that was done on the

19     November 2020 presidential election at most

20     validated the results of that election, not any

21     individual vote that was cast.

22               You understand that; right?

23               MS. LaROSS:  Object to the form of the

24          question.

25               THE WITNESS:  The -- the ballot -- the

Page 300

```
1        ballots, both hand-marked paper ballots and
2        BMD-generated ballots, were put through
3        scanners the first time they were counted and a
4        result was obtained.
5             They -- the State then undertook the task
6        of doing a hand count of those ballots, both
7        hand-marked paper ballots and BMD-generated
8        ballots.  In the BMD-generated ballots, they
9        read the text that was on the ballot to confirm
10       whether that was a vote for President Biden or
11       for then-President Trump.
12            And the calculations of both of those
13       exercises resulted in the same result.  They
14       didn't come back with the exact same totals,
15       which is normally the case when you're
16       recounting paper, whether it's hand-marked
17       paper ballots or BMD-generated ballots, because
18       it's a hand process versus an electronic or
19       computer-driven scanning process.
20            So we have reason to believe that what was
21       placed into the machine by the voter, then
22       generated by the BMD, was then accurately
23       reflected by the BMD printout not only in text,
24       but also in QR code.
25
```

Page 301

1    BY MR. CROSS:

2         Q.   You understand that during the audit that

3    you've just talked about, there was never any effort

4    made when reading the human-readable portion of a

5    particular ballot to see whether the QR code on that

6    ballot captured the same selections?  Are you aware

7    of that?

8              MS. LaROSS:  Objection to form of the

9         question.

10             THE WITNESS:  I am aware that during the

11        audit, that they focused on the text on the

12        ballot solely, that they were not correlating

13        back the text to the QR code at the time.

14   BY MR. CROSS:

15        Q.   So the ballot would -- sorry.  Strike

16   that.

17             The audit that we're talking about would

18   not catch a situation where the human-readable text

19   had different selections than the QR code on a

20   particular ballot.  That would not be captured;

21   right?

22        A.   It's my understanding that the audit that

23   they undertook was solely looking at the text and

24   were not engaging the QR code at that time.

25        Q.   Do you know why a decision was made not to

Page 302

1    conduct at least some reliable statistical sampling

2    of ballots to compare the QR codes to the

3    human-readable text to make sure that they actually

4    correspond?

5            MS. LaROSS:  Objection to the form of the

6        question.

7            THE WITNESS:  I was not privy to the

8        discussions outlining how the audit was going

9        to be performed, so I don't know if those -- if

10       those discussions were discussed or not.

11   BY MR. CROSS:

12       Q.   If you wanted to know, who would you ask?

13       A.   I believe the people that were involved in

14   that discussion at the time, I believe Kevin

15   Rayburn, who was the deputy general counsel for the

16   Secretary of State's office at the time was the --

17   was the preeminent audit person in the Secretary of

18   State's office at the time.  So I believe he was

19   involved with the discussions on the steps that

20   would be taken in that process.

21       Q.   And --

22       A.   I don't think he had left the Secretary of

23   State's office yet at that time.  I know he is now

24   working for EAC, but I'm -- I might be tying up my

25   calendar a little bit.

Page 303

1      Q.   And that's Kevin Rayburn you're talking

2   about?

3      A.   Yes, sir.

4      Q.   Mr. Barnes, do we agree that the fact that

5   there has not been any known compromise or

6   widespread fraud in Georgia elections to date, that

7   that does not mean that that can never happen in the

8   future?  Are we agreed on that?

9           MS. LaROSS:  Object -- objection as to

10          form of the question.

11          THE WITNESS:  We never know what can

12          happen in the future.  If something bad can

13          happen -- I think Murphy's Law is if something

14          bad can happen, it can happen.

15          So that's why we have the procedures and

16          protocols in place to try to prevent bad things

17          from happening, but none of us can see into the

18          future.

19   BY MR. CROSS:

20      Q.   Were you aware that Theresa Payton, the

21   head of Fortalice, testified in this case that it's

22   not a question of when a U.S. election will get

23   hacked, but if?

24          MS. LaROSS:  Object to the form of the

25          question.

Page 304

1          THE WITNESS:  I am not aware of that

2     testimony.

3          MR. CROSS:  All right.  Sorry I took you a

4     little longer than you asked.  I apologize

5     about that.  Let me let you get out of here.

6          And we will -- we'll keep it open.  I'm

7     not going to litter the transcript.  I'm going

8     to let him out.  We'll send you a letter,

9     Diane, on -- on how to proceed.

10          VIDEOGRAPHER:  Okay.  This suspends the

11     deposition.  The time is 5:04 p.m. and we are

12     now off the video record.

13          (Deposition suspended at 5:04 p.m.)

14          (Pursuant to Rule 30(e) of the Federal

15     Rules of Civil Procedure and/or O.C.G.A.

16     9-11-30(e), signature of the witness has been

17     reserved.)

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

    STATE OF GEORGIA:
4
    COUNTY OF FULTON:
5

6

    I hereby certify that the foregoing transcript was
7   taken down, as stated in the caption, and the
    questions and answers thereto were reduced to
8   typewriting under my direction; that the foregoing
    pages represent a true, complete, and correct
9   transcript of the evidence given upon said hearing,
    and I further certify that I am not of kin or
10  counsel to the parties in the case; am not in the
    regular employ of counsel for any of said parties;
11  nor am I in anywise interested in the result of said
    case.

12

13

14

15

16  <%12034,Signature%>
    LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER DISCLOSURE

 2

 3        Pursuant to Article 10.B. of the Rules and
          Regulations of the Board of Court Reporting of the
 4        Judicial Council of Georgia which states: "Each
          court reporter shall tender a disclosure form at the
 5        time of the taking of the deposition stating the
          arrangements made for the reporting services of the
 6        certified court reporter, by the certified court
          reporter, the court reporter's employer, or the
 7        referral source for the deposition, with any party
          to the litigation, counsel to the parties or other
 8        entity. Such form shall be attached to the
          deposition transcript," I make the following
 9        disclosure:

10

11        I am a Georgia Certified Court Reporter. I am here
          as a representative of Veritext Legal Solutions.
12        Veritext Legal Solutions was contacted to provide
          court reporting services for the deposition.
13        Veritext Legal Solutions will not be taking this
          deposition under any contract that is prohibited by
14        O.C.G.A. 9-11-28 (c).

15

16        Veritext Legal Solutions has no contract/agreement
          to provide reporting services with any party to the
17        case, any counsel in the case, or any reporter or
          reporting agency from whom a referral might have
18        been made to cover this deposition. Veritext Legal
          Solutions will charge its usual and customary rates
19        to all parties in the case, and a financial discount
          will not be given to any party to this litigation.

20

21

22
          <%12034,Signature%>
23        LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC

24

25
```

```
 1    Diane LaRoss, Esquire

 2    dlaross@taylorenglish.com

 3                    February 16, 2022

 4    RE: Curling, Donna  v. Raffensperger, Brad

 5       2/11/2022, Michael  Barnes (#5081041)

 6       The above-referenced transcript is available for

 7    review.

 8       Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-midatlantic@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25
```

```
 1   Curling, Donna  v. Raffensperger, Brad

 2   Michael  Barnes (#5081041)

 3                 E R R A T A  S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Michael  Barnes Date

25
```

1    Curling, Donna  v. Raffensperger, Brad

2    Michael  Barnes (#5081041)

3              ACKNOWLEDGEMENT OF DEPONENT

4      I, Michael  Barnes, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____ _____

12   Michael  Barnes Date

13   *If notary is required

14              SUBSCRIBED AND SWORN TO BEFORE ME THIS

15              _____ DAY OF _____, 20___.

16

17

18              _____

19              NOTARY PUBLIC

20

21

22

23

24

25